Ann McFarland Draper (Bar No. 065669)
courts@draperlaw.net
Draper Law Offices
75 Broadway, Suite 202
San Francisco, California 94111
Telephone:     (415) 989-5620

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Andrea Pallios Roberts (Bar No. 228128)
andreaproberts@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

Ed DeFranco (Bar No. 165596)
eddefranco@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

John E. Nathan (*Pro Hac Vice*)
jnathan155@yahoo.com
John E. Nathan LLC
1175 Park Avenue
New York, NY 10128
Telephone:     (917) 960-1667

Attorneys for Defendants and Counterclaimants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| TECHSHOP, INC., a California corporation, DORIS A. KAELIN, in her capacity as Chapter 7 trustee for TECHSHOP, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>DAN RASURE, et al.,<br><br>Defendants.<br><br>_____<br><br>AND RELATED COUNTERCLAIMS | CASE NO. 4:18-CV-01044-HSG (JCS)<br><br>**DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Hearing Date: November 7, 2019<br>Time: 2:00 pm<br>Judge: Haywood S. Gilliam, Jr. |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 7, 2019 at 2:00 pm, the undersigned shall appear before the Honorable Haywood S. Gilliam, Jr. in Courtroom 2 on the 4th Floor of the United States District for the Northern District of California, Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, and shall present Defendants' Motion for Attorneys' Fees and Costs. This motion is based on Section 1117 of the Lanham Act and Federal Rule of Civil Procedure 54. Defendants' Motion is based on the jury's verdict awarding Plaintiff no damages, making Defendants the prevailing party, and that the record reflects that this is an exceptional case. This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the other records and papers provided to the Court herewith, any oral argument, and all other evidence the Court may consider in hearing this Motion. A proposed Order accompanies this motion.

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ............................................................................. i

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND .......................................................................................................... 3

LEGAL STANDARD .................................................................................................. 4

ARGUMENT .............................................................................................................. 7

I. DEFENDANTS ARE THE PREVAILING PARTY ............................................ 7

II. PLAINTIFF'S TRADEMARK INFRINGEMENT CASE IS EXCEPTIONAL. ................. 8

 A. Plaintiff's Case Lacked Substantive Strength. .......................................... 9

  1. Plaintiff Consented to Defendants' Use of "TechShop 2.0" Until Two Days Before Filing Suit. ............................................ 9

  2. Plaintiff Presented No Evidence of That Defedants' Logo Used for Three Days and the New Name TheShop.Build Infringed. ......... 11

  3. The TechShop Brand Has Negative Value. .................................. 12

 B. The Lawsuit Was Filed for Anti-Competitive Reasons. ......................... 13

 C. Plaintiff Persisted in an Unreasonable Manner of Litigation. ............... 14

III. DEFENDANTS SEEK REASONABLE ATTORNEYS' FEES AND COSTS. ............... 21

 A. Attorneys' Fees ....................................................................................... 21

 B. Costs/Expenses ....................................................................................... 23

IV. CONCLUSION ............................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Am. Auto. Ass'n, Inc. v. AAA Autobody Shop,*
  2016 WL 3354347 (E.D. Cal. June 17, 2016)............................................................... 5

*In re Am. Home Mortgage Holdings, Inc.,*
  Case No. 07-11047, Dkt. 3695 (Bankr. D. Del. Apr. 14, 2008) ................................. 23

*Bistro Executive, Inc. v. Rewards Network, Inc.,*
  Case No. 04-cv-4640-CBM (C.D. Cal. Nov. 19, 2007)............................................... 23

*Boren ex rel. N.L.R.B. v. Continental Linen Servs., Inc.,*
  No. 1:10-CV-562, 2011 WL 2261537 (W.D. Mich. June 8, 2011) ............................. 6

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.,*
  532 U.S. 598 (2001) ..................................................................................................... 5

*Cadkin v. Loose,*
  569 F.3d 1142 (9th Cir. 2009)................................................................................. 5, 7

*Career Agents Network, Inc. v. Careeragentsnetwork.biz,*
  722 F. Supp. 2d 814 (E.D. Mich. 2010) ...................................................................... 4

*Cargill Inc. v. Progressive Dairy Sols., Inc.,*
  2008 WL 4532436 (E.D. Cal. Oct. 8, 2008), *aff'd*, 362 F. App'x 731 (9th Cir. 2010) .............. 3

*Cognex Corp. v. Microscan Sys., Inc.,*
  No. 13-cv-2027(JSR), 2014 WL 2989975 (S.D.N.Y. June 30, 2014) ...................... 16

*Curtis v. Shinsachi Pharm. Inc.,*
  45 F. Supp. 3d 1190 (C.D. Cal. 2014).......................................................................... 5

*Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria v. Ceiba Legal, LLP,*
  230 F. Supp. 3d 1146 (N.D. Cal. 2017) ................................................................. 13, 14

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,*
  778 F.3d 1059 (9th Cir. 2015)............................................................................... 1, 5, 6

*Academy of Television Arts & Sciences v. National Academy of Television Arts & Sciences, Am. Arbitration Assoc.,*
  Case No. 72 140 00247 07 JENF at¶ 2.2 (May 19, 2008) ........................................ 23

*DIRECTV, Inc. v. NWS Corp., Am. Arbitration Assoc.,*
  Case No. 72 494 Y 00219 09 NOLG (June 15, 2010) ............................................... 22

*Packaging Advantage Prop. Assocs., LLC v. Packaging Advantage Corp.,*
  Case No. VC045957 (Cal. Super. Ct. Nov. 6, 2007) ................................................. 23

*Riverside Cnty. Dept. of Mental Health v. A.S.,*
  Case No. 08-cv-00503-ABC (C.D. Cal. Feb. 22, 2010) ............................................ 23

*Monrovia Nursery Co. v. Rosedale,*
  Case No. BC351140 (Cal. Super. Ct.  Jan. 12, 2009) ............................................... 23

*Hewitt v. Helms*,
   482 U.S. 755 (1987) ................................................................................................. 5

*Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*,
   589 F.3d 1027 (9th Cir. 2009).............................................................................. 1, 5, 7

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003)..................................................................................... 4

*Milo & Gabby, LLC v. Amazon.com, Inc.*,
   No. C13-1932RSM, 2015 WL 5156330 (W.D. Wash. Sept. 2, 2015)....................................... 16

*Milton H. Greene Archives, Inc. v. Julien's Auction House, LLC*,
   No. CV057686AHMFMOX, 2007 WL 4898365 (E.D. Cal. Dec. 20, 2007) ........................ 6, 8

*Lockton v. O'Rourke*,
   Case No. BC361629 (Cal. Super. Ct. Feb. 23, 2011)............................................... 23

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) ............................................................................................. 6, 7

*Overstreet v. Farm Fresh Co. Target One, LLC*,
   No. CV-13-02358-PHX-NVW, 2014 WL 4371427 (D. Ariz. Sept. 4, 2014)..................... 5, 6, 7

*Park, ex rel. Park v. Anaheim Union High School*,
   464 F.3d 1025 (9th Cir. 2006)............................................................................. 6, 7, 8

*Pierce Cty. Hotel Employees & Rest. Emps. Health Trust v. Elks Lodge, B.P.O.E.*, No.
   1450, 827 F.2d 1324 (9th Cir. 1987)....................................................................... 3

*Poland v. Chertoff*,
   494 F.3d 1174 (9th Cir. 2007)................................................................................... 6

*Recouvreur v. Carreon*,
   940 F. Supp. 2d 1063 (N.D. Cal. 2013) ................................................................... 4

*Renna v. Cty. of Union, N.J.*,
   No. CIV.A. 11-3328 KM, 2015 WL 93800 (D.N.J. Jan. 7, 2015)............................... 4

*San Diego Comic Convention v. Dan Farr Productions*,
   No. 14-cv-1865-AJB-JMA, 2019 WL 1599188 (S.D. Cal. Apr. 15, 2019) ....................... 16

*Stephen W. Boney, Inc. v. Boney Servs., Inc.*,
   127 F.3d 821 (9th Cir. 1997)..................................................................................... 4

*Sugarfina, Inc. v. Sweitzer LLC*,
   2018 WL 6265074 (C.D. Cal. Mar. 8, 2018) ........................................................... 5

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
   839 F.3d 1179 (9th Cir. 2016)......................................................................... 4, 6, 15

*In re TechShop, Inc.*,
   Case No. 18-50398 (N.D. Cal. Bankr. Feb. 26, 2018) ....................................... 7, 21

*TigerCandy Arts, Inc. v. Blairson Corp.*,
   No. 09 CIV. 6215 GBD FM, 2012 WL 760168 (S.D.N.Y. Feb. 23, 2012) ..................... 4

*Transweb, LLC v. 3M Innovative Props. Co.*,
   No. 10-cv-04413-FSH (D.N.J. Sept. 24, 2013)....................................................... 22

*Viceroy Hotels LLC v. Shubaralyan*,
  2012 WL 13008437 (C.D. Cal. Jan. 24, 2012) ........................................................... 5

*Zynga Inc. v. Waas*,
  2011 WL 588147 (N.D. Cal. Jan. 31, 2011) ............................................................. 5

**Statutory Authorities**

15 U.S.C. §1117 ............................................................................... 1, 4, 9, 16

15 U.S.C. §1117(a) ............................................................................. 2, 4, 5, 21

**Rules and Regulations**

Fed. R. Civ. P. 26 ........................................................................................ 15

1

2

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## <u>PRELIMINARY STATEMENT</u>

3

4

    This Court should award attorneys' fees and non-taxable costs to Defendants Dan Rasure,

5

TheShop.build, LLC, and TheShop.build San Francisco, LLC (collectively "Defendants") under

Section 1117 of the Lanham Act.

6

7

    First, Defendants are the "prevailing party" because the jury did not award Plaintiff any

8

"actual relief" for infringement of the TECHSHOP marks.  Plaintiff did not "achieve[] a material

9

alteration in the legal relationship of the parties that is judicially sanctioned."  *Fifty-Six Hope Rd.*

10

*Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1078 (9th Cir. 2015) (quoting *Klamath Siskiyou*

*Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 589 F.3d 1027, 1030 (9th Cir. 2009)).  Rather,

11

Defendants defeated Plaintiff's attempt to obtain nearly $5 million and materially alter the legal

12

relationship, with Plaintiff obtaining no damages; thus, Defendants are the "prevailing party."

13

    Second, there can be no doubt that this case is "exceptional."  Indeed, on more than one

14

occasion, the Court commented on how unusual this case was.  And, it was unusual for a number

15

of reasons.  Plaintiff's trademark infringement case lacked substantive merit.  Defendants initially

16

used the name "TechShop 2.0" with Plaintiff's consent and acquiescence for two-and-a-half

17

months.  Plaintiff did not object until two days before filing suit, at the earliest.  Defendants used

18

the name "TechShop 2.0" without Plaintiff's consent for ***at most two days.***  Defendants used a

19

logo for "TheShop.build" that Plaintiff claimed to be infringing for ***only three days***.  Although

20

Plaintiff focused on that 3-day logo throughout the trial, Plaintiff did not even contend

21

"TheShop.build" infringed until nine months after Defendants stopped using the logo (and after

22

the close of fact discovery).  And Plaintiff featured this logo as the hallmark of infringement, even

23

though Plaintiff only sued for infringement of its federally registered ***word marks,*** when its

24

registrations specifically do not cover color, font, or style, and when it has no registrations for any

25

logos.  Plaintiff never asserted a trade dress claim or claim based on an unregistered mark at any

26

time in the case.  Plaintiff presented no evidence that Defendants' new name, "TheShop.build,"

27

infringed its registered marks.  Moreover, due to Plaintiff's own abrupt closure of its U.S.

28

1  locations, the TechShop brand suffered negative brand equity such that Plaintiff suffered no

2  damage from the alleged infringement.  Thus, Defendants litigated a case that boiled down to

3  conduct that occurred over less than a week that related to marks that had negative value.  The jury

4  agreed there was no substantive merit to the case, awarding Plaintiff no damages or other

5  monetary relief.

6      In reality, this lawsuit was not motivated by substantive merit but by competition.  Until

7  the day before filing suit on behalf of Plaintiff, Plaintiff's counsel served as Treasurer and member

8  of the Board of Directors of a competitor of Defendants, Maker Nexus.  Plaintiff's counsel stepped

9  down from that position and then the very next day filed suit against Defendants.  And, the lawsuit

10 had the desired effect:  having only operated under the black cloud of litigation, "TheShop.build"

11 has never turned a profit.  When required to move because its San Francisco building was being

12 torn down, Defendants found landlords were unwilling to negotiate with them, and the San

13 Francisco location never reopened.  Meanwhile, Maker Nexus continues in business to this day.

14      Lastly, Plaintiff consistently litigated this case in an unreasonable manner.  This ranged

15 from repeatedly re-litigating matters and changing positions, to producing only 803 pages of

16 documents from a company that had been in business for over a decade with 10 locations

17 throughout the U.S., to not cooperating with Defendants' counsel on even the most basic trial

18 preparation tasks, and to failing to follow the Court's Standing Order.  This case was also unusual

19 because Plaintiff did not serve interrogatories or take a single deposition.  As this Court observed,

20 "[t]hat's a first."  (4/30/19 Pretrial Conference Tr., 5:8-16.)  Had Plaintiff bothered to depose Mr.

21 Rasure, it would have learned about Defendants' *de minimus* use of "TechShop 2.0 (two days) and

22 3-day logo.  Instead, Plaintiff plowed ahead with the case.  The Court's docket grew to over 200

23 entries and counting.  A seven-day jury trial was held.  Extensive post-trial motions are being

24 filed.  All of this might have been avoided had Plaintiff conducted that single deposition.

25      As Mr. Rasure testified at trial, this baseless case cost him everything:  his job, his

26 business, his reputation, his health and time with his family.  He missed the entire first year of his

27 newborn son's life to deal with the litigation.  (Trial Tr. ___[Rasure].)  The attorneys' fees and

28 costs provisions in Section 1117(a) are intended to address this very type of case.  On the record

1   here, there is ample basis for finding that the case is exceptional and for awarding attorneys' fees

2   and non-taxable costs to Defendants as the prevailing party. [1]

3   **<u>BACKGROUND</u>**

4   This is a trademark infringement action.[2]  Plaintiff alleges federal trademark infringement.[3]

5   Plaintiff's claim is based on Defendants' alleged unauthorized use of Plaintiff's service marks for

6   the word TECHSHOP, which were registered with the U.S. Patent and Trademark Office.

7   (TX0351, TX0352).  Defendants answered and denied infringement.  (Dkt. 50).  Defendants

8   sought dismissal of the action, cancellation of Plaintiff's trademark registrations, and an award of

9   attorneys' fees and costs.  (*Id.*; Dkt. 42).  Defendant Dan Rasure counterclaimed alleging a fraud

10  cause of action. (Dkt. 42).

11  Trial before a jury commenced on June 3, 2019.  At trial, Plaintiff argued that Defendants'

12  use of the names "TechShop 2.0" and "TheShop.build," and use of a logo for "TheShop.build"

13  infringed the TECHSHOP marks.  The evidence presented at trial is discussed in detail in

14  Defendants' Motion for Judgment as a Matter of Law, filed concurrently herewith.  Noteworthy

15

16  ───────────────

17  [1] As the Court is aware, Defendants could not afford the cost of a daily transcript of the jury trial.  The trial transcript has been ordered.  Defendants received some portions of the trial transcript on July 23, but not with sufficient time to update all of the cites in this brief and other documents filed concurrently herewith.  Defendants understand from the court reporter that the remainder of the trial transcript should be available later in the week.  When the complete trial transcript is available, Defendants will seek leave to amend their post-trial filings to include citations to the trial transcript.

21  [2] While the marks at issue in this case are technically service marks, the parties have repeatedly referred to them as "trademarks."

22  [3] Although Plaintiff's First Amended Complaint alleged three causes of action—(1) federal trademark infringement, (2) contributory trademark infringement, and (3) vicarious trademark infringement (Dkt. 45)—the last two causes of action have been waived and should be dismissed. Plaintiff did not include allegations related to contributory trademark infringement or vicarious trademark infringement in either the Joint Pretrial Statement (Dkt. 155), the Proposed Jury Instructions (Dkt. 152), or its Proposed Verdict Form. (Dkt. 154).  And, without objection from Plaintiff, the latter two causes of action were not included in the final verdict form provided to the jury by the Court.  Consequently, these two causes of action are waived.  *See Pierce Cty. Hotel Employees & Rest. Emps. Health Trust v. Elks Lodge, B.P.O.E. No. 1450,* 827 F.2d 1324, 1329 (9th Cir. 1987) ("Issues not preserved in the pretrial order are eliminated from the action."); *Cargill Inc. v. Progressive Dairy Sols., Inc.,* 2008 WL 4532436, at *4 (E.D. Cal. Oct. 8, 2008), *aff'd,* 362 F. App'x 731 (9th Cir. 2010) (finding waiver where plaintiff "failed to raise th[e] issue in the Pretrial Statement, in motions in limine, at any time during the trial, or at any time during the process of preparing jury instructions and the verdict form").

1   was Plaintiff's focus at trial on Defendants' use of a red and blue logo for "TheShop.build" with a

2   gear for the letter "o," which was used for just three days.  However, Plaintiff's federal

3   registrations for the word TECHSHOP do not cover logos, fonts, styles, or colors.  And Plaintiff

4   never asserted, either in its original or amended complaints, a claim for infringement of an

5   unregistered mark or trade dress infringement.

6          After a seven-day trial, on June 12, the jury returned a verdict finding that "TechShop 2.0"

7   and "The Shop.build" infringed on Plaintiff's marks, and that such infringement was willful, but

8   the jury verdict awarded no damages or other monetary relief to Plaintiff.  (Dkt. 217.)  The jury

9   determined that Plaintiff suffered $0 in lost licensing revenue as a result of the infringement, and

10  that the Plaintiff should be awarded $0 in Defendants' profits.  (*Id.*)  Accordingly, Plaintiff took

11  nothing by its complaint.

12                              **LEGAL STANDARD**

13         Section 1117 of the Lanham Act permits the Court to award attorneys' fees in trademark

14  infringement cases.  15 U.S.C. § 1117; *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792,

15  816 (9th Cir. 2003).  A fees award under the Lanham Act only requires that (a) the party seeking

16  fees is considered the "prevailing party" and (b) the case is considered "exceptional."  *SunEarth,*

17  *Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (en banc) (citing 15

18  U.S.C. § 1117(a)).  Fees are appropriate "[w]hen a plaintiff's case is groundless, unreasonable,

19  vexatious, or pursued in bad faith."  *Stephen W. Boney, Inc. v. Boney Servs., Inc.,* 127 F.3d 821,

20  827 (9th Cir. 1997).  Fees may be recovered even if the prevailing party's counsel performed its

21  work *pro bono*.  *Recouvreur v. Carreon*, 940 F. Supp. 2d 1063, 1070-71 (N.D. Cal. 2013); *Career*

22  *Agents Network, Inc. v. Careeragentsnetwork.biz*, 722 F. Supp. 2d 814, 825 n. 6 (E.D. Mich.

23  2010) ("In making a lodestar calculation for work performed by Defendants' counsel, it is not

24  significant that counsel performed its work *pro bono*.").[4]  A litigant who prevails in a lawsuit

25  _____

26         [4]   *See also Renna v. Cty. of Union, N.J.*, No. CIV.A. 11-3328 KM, 2015 WL 93800, at *13
       (D.N.J. Jan. 7, 2015), *report and recommendation adopted*, 2015 WL 1815498 (D.N.J. Apr. 21,
27     2015) (awarding fees to pro bono counsel under Lanham Act); *TigerCandy Arts, Inc. v. Blairson*
       *Corp.*, No. 09 CIV. 6215 GBD FM, 2012 WL 760168, at *12 (S.D.N.Y. Feb. 23, 2012), *report*
28     *and recommendation adopted*, No. 09 CIV. 6215 GBD FM, 2012 WL 1948816 (S.D.N.Y. May
       30, 2012) (same).

1   under the Lanham Act "is also entitled to costs." *Zynga Inc. v. Waas*, 2011 WL 588147, at *1

2   (N.D. Cal. Jan. 31, 2011), *report and recommendation adopted*, WL 588050 (N.D. Cal. Feb. 10,

3   2011) (a litigant who prevails in a lawsuit under the Lanham Act "is also entitled to costs.") (citing

4   15 U.S.C. § 1117(a)); *Viceroy Hotels LLC v. Shubaralyan*, 2012 WL 13008437, at *5 (C.D. Cal.

5   Jan. 24, 2012) (same); *Sugarfina, Inc. v. Sweitzer LLC*, 2018 WL 6265074, at *11 (C.D. Cal. Mar.

6   8, 2018) (same); *Curtis v. Shinsachi Pharm. Inc.*, 45 F. Supp. 3d 1190, 1206 (C.D. Cal. 2014)

7   (same); *Am. Auto. Ass'n, Inc. v. AAA Autobody Shop*, 2016 WL 3354347, at *1 (E.D. Cal. June 17,

8   2016) (same).

9         **Prevailing Party.**  To be the "prevailing party" under the Lanham Act, a party must

10   "achieve[] a material alteration in the legal relationship of the parties that is judicially sanctioned."

11   *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1078 (9th Cir. 2015) (quoting

12   *Klamath*, 589 F.3d at 1030); *Cadkin v. Loose*, 569 F.3d 1142, 1148 (9th Cir. 2009).[5]  In this

13   context, a plaintiff is considered the prevailing party only if the plaintiff obtains "actual relief"

14   from the defendant.  *Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 589 F.3d

15   1027, 1030 (9th Cir. 2009).  Conversely, a defendant is considered the prevailing party simply by

16   virtue of "*defeating* such an alteration."  *Overstreet v. Farm Fresh Co. Target One, LLC*, No. CV-

17   13-02358-PHX-NVW, 2014 WL 4371427, at *3 (D. Ariz. Sept. 4, 2014) ("If a party prevails by

18   winning a judicially sanctioned material alteration in the legal relationship, then *defeating* such an

19   alteration must also be sufficient.") (emphasis in original).  In other words, where a plaintiff fails

20   to obtain any actual relief from the defendant, the defendant is considered the prevailing party.

21   *See id*; *Klamath*, 589 F.3d at 1030.  A party is not considered the "prevailing party" when the

22   "'lawsuit brought about a voluntary change in the defendant's conduct' without a 'judgment on

23   the merits or a court-ordered consent decree.'"  *Cadkin*, 569 F.3d at 1148 (quoting *Buckhannon*

24   *Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001)).[6]

25

26         [5]  "The term 'prevailing party' . . . is a term of art that courts must interpret consistently
27   throughout the United States Code."  *Klamath*, 589 F.3d at 1030 (citing *Buckhannon Bd. & Care
     Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 603 (2001)).

28         [6]  *See also Hewitt v. Helms*, 482 U.S. 755, 759–60 (1987) (concluding that opinion holding
     plaintiff's constitutional rights were violated is insufficient to confer prevailing-party status where

1   "A party need not succeed in all of its claims to be the prevailing party." *A.V.E.L.A.*, 778

2   F.3d at 1078.  Thus, a defendant who wins on some but not all claims may be considered the

3   prevailing party. *See Overstreet*, 2014 WL 4371427, at *3 (concluding defendant was prevailing

4   party where it defeated the "central" portion of injunctive relief sought by plaintiff despite plaintiff

5   obtaining some injunctive relief); *Boren ex rel. N.L.R.B. v. Continental Linen Servs., Inc.*, No.

6   1:10-CV-562, 2011 WL 2261537, at *2 (W.D. Mich. June 8, 2011) (same).  Notably, a defendant

7   may be the prevailing party where the jury returns a verdict of infringement but no damages.

8   *Milton H. Greene Archives, Inc. v. Julien's Auction House, LLC*, No. CV 05-7686 AHM (FMOx),

9   2007 WL 4898365, at *3 (E.D. Cal. Dec. 20, 2007), *aff'd*, 345 Fed. App'x 244, 249 (9th Cir.

10  2009); *see also Poland v. Chertoff*, 494 F.3d 1174, 1186–87 (9th Cir. 2007) (denying prevailing-

11  party status to plaintiff whose damages award was vacated on appeal because plaintiff had not

12  obtained "any relief on the merits of his claims," despite holding that plaintiff had established

13  liability on one of his claims).

14  **Exceptional Case.**  "[A]n 'exceptional' case is simply one that stands out from others with

15  respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in

16  which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545

17  (2014).  Courts assess the totality of the circumstances to determine whether a case is exceptional.

18  *SunEarth,* 839 F.3d at 1181 (adopting the *Octane Fitness* standard for Lanham Act cases).

19  Although there is no "precise rule or formula for making these determinations," relevant factors

20  include "frivolousness, motivation, objective unreasonableness (both in the factual and legal

21  components of the case) and the need in particular circumstances to advance considerations of

22  compensation and deterrence."  *Id.* at 1180–81 (quoting *Octane Fitness*, 572 U.S. at 554 n.6)

23  (internal quotation marks omitted).

24

25

26  _____

27  defendant's entitlement to official immunity precluded damages award); *Park, ex rel. Park v. Anaheim Union High School*, 464 F.3d 1025, 1036 (9th Cir. 2006) ("Attorney's fees may be properly denied '[w]here the plaintiff's success on a legal claim can be characterized as purely

28  technical or de minimis.' . . . De minimis judgments are those that . . . do not affect the obligations of the defendants toward the plaintiff.").

1    A case may also be "exceptional" based on the unreasonable manner in which it was

2  litigated.  *Octane Fitness*, 572 U.S. at 554.  Unreasonable conduct need not be "independently

3  sanctionable" to make a case "exceptional."  *Id.* at 555.  Exceptionality must be established by a

4  preponderance of the evidence.  *Id.* at 557–58.

5                                    <u>**ARGUMENT**</u>

6  **I.      <u>DEFENDANTS ARE THE PREVAILING PARTY</u>**

7    Defendants are the prevailing party in this case because the jury awarded Plaintiff no

8  damages or any other form of material relief.  (Dkt. 217.)  To be considered the prevailing party in

9  the attorneys' fees context, it is not enough for a plaintiff to achieve a "purely technical or de

10  minimis" judgment that does not "affect the obligations of the defendants toward the plaintiff."

11  *Park, ex rel. Park v. Anaheim Union High School*, 464 F.3d 1025, 1036 (9th Cir. 2006).  Instead,

12  the plaintiff must obtain "actual relief" such as damages or some similar relief that materially

13  alters the parties' positions.  *See Klamath,* 589 F.3d at 1031 (9th Cir. 2009).  A mere "moral

14  victory . . . is not enough."  *Id*.  In the instant case, although the jury entered a finding of

15  infringement against the Defendants, this finding was purely technical in nature as it did not result

16  in a monetary award, and thus did not materially impact the Defendants' obligations toward the

17  Plaintiff.  *See Park*, 464 F.3d at 1036.  Moreover, the verdict did not provide Plaintiff with the

18  actual relief that it sought—monetary relief.  In its bankruptcy filing, Plaintiff reported that the

19  value of the lawsuit was at least "$5,000,000, as listed in the Debtor's valuation of the

20  Trademarks, and all demands contained in the case."  *In re TechShop, Inc.*, Case No. 18-50398,

21  Dkt. 1, p. 13 (N.D. Cal. Bankr. Feb. 26, 2018).  Yet, Plaintiff took nothing from the case.  And,

22  while Defendants ceased use of the name "TechShop 2.0" and a logo for "TheShop.build" that

23  Plaintiff claimed was infringing, such changes were made voluntarily and without a "judgment on

24  the merits or a court-ordered consent decree."  *Cadkin*, 569 F.3d at 1148.  As such, the judgment

25  of infringement is a "de minimis" judgment that does not confer prevailing party status on

26  Plaintiff.  *Park*, 464 F.3d at 1036.  Instead, Defendants should be considered the prevailing party

27  by virtue of having defeated Plaintiff's attempt to obtain a material alteration.  *See Overstreet*,

28  2014 WL 4371427, at *3.

1    *Milton H. Greene* is instructive here.  *Milton H. Greene Archives, Inc. v. Julien's Auction*

2    *House, LLC*, No. CV057686AHMFMOX, 2007 WL 4898365, at *3 (E.D. Cal. Dec. 20, 2007),

3    *aff'd,* 345 F. App'x 244 (9th Cir. 2009).  In that case, the plaintiff brought copyright infringement

4    claims against various defendants alleging improper use of eight photographs.  *Id*. at *1.  At

5    summary judgement, the Court found that some of the defendants (the "Barclay Defendants" or

6    "Barclay") infringed the copyright covering one of the photos.  *Id*.  At trial, however, the jury

7    awarded no damages for this single instance of infringement, and found that Barclay did not

8    infringe any of the other photographs.  *Id*.  Barclay subsequently moved for attorneys' fees.  *Id.*  In

9    opposing Barclay's motion, the plaintiff argued that Barclay could not be considered the

10   prevailing party given that Barclay was found to infringe one of the plaintiff's copyrights.  *Id* at

11   *3.  The Court rejected the plaintiff's argument, and found that Barclay was the prevailing party

12   despite the finding of infringement.  Specifically, the Court found that Barclay "achieved

13   substantially all the benefits [it] hoped to achieve in defending the suit"—namely, the freedom to

14   operate without having to pay any damages, and without any further interference from the

15   plaintiffs.  *See id*. (noting how the Court's final judgment "prevents Plaintiff from pursuing"

16   subsequent claims against Barclay).  Given this result, it was immaterial that the plaintiff had

17   obtained a judgment of infringement—a finding of infringement without any award of damages

18   was a ***"de minimis judgment . . . that confer[red] no rights"*** on the plaintiff and, correspondingly,

19   ***"d[id] not affect the obligations of the defendants toward the plaintiff.***"  *Id*. (citing *Park,* 464

20   F.3d at 1036) (emphasis added).  As such, the Court found Barclay to be the prevailing party, and

21   awarded Barclay its fees associated with defending the lawsuit.

22       The Court should reach the same result here.  Given that this lawsuit "confer[red] no

23   rights" on Plaintiff and did not "affect the obligations" of Defendants, Defendants are the

24   prevailing party.

25   **II.    PLAINTIFF'S TRADEMARK INFRINGEMENT CASE IS EXCEPTIONAL.**

26       This Court should also find that this case is exceptional.  There is ample evidence of the

27   utter lack of substantive strength in Plaintiff's litigating position, as well as the unreasonable

28   manner in which the case was litigated.  First, Plaintiff's case lacked substantive strength, given

1   Plaintiff's consent for two-and-a-half months to allow Defendants' use of the name "TechShop

2   2.0", Plaintiff's assertion of un-pleaded rights against a logo not covered by its registrations,

3   Plaintiff's failure to present any proof that Defendants' new name caused a likelihood of

4   confusion, and the negative brand value associated with the TechShop brand.  This is evident from

5   the jury's finding that Plaintiff was not entitled to any relief.  Second, there is evidence of an anti-

6   competitive motive behind the litigation.  Third, Plaintiff litigated this case in an unreasonable

7   manner.  From repeatedly attempting to re-litigate issues already decided by the Court to generally

8   not cooperating with Defendants' counsel on even the most basis of aspects of litigation,

9   Plaintiff's unreasonable conduct increased the costs of litigation and serves as ample basis for an

10   award of fees and costs under Section 1117.

11         **A.**      **Plaintiff's Case Lacked Substantive Strength.**

12         From the dawn of this case, it was readily apparent that a monetary award against

13   Defendants (if any) would be nominal.  This is because (1) before the case was filed, Plaintiff

14   consented to Defendants' use of the name "TechShop 2.0", and as soon as Plaintiff objected,

15   Defendants changed their name; (2) Defendants used an allegedly infringing logo for

16   "TheShop.build" for only three days, and Plaintiff presented no evidence of a likelihood of

17   confusion between its marks and the name "TheShop.build;" and (3) Plaintiff's brand had negative

18   equity.  That the jury awarded Plaintiff $0 reveals the lack of substantive merit to Plaintiff's

19   claims.

20               1.      Plaintiff Consented to Defendants' Use of "TechShop 2.0" Until Two Days
                    Before Filing Suit.

21

22         First, there can be no dispute, that from late-November 2017 through at least February 14,

23   2018, Plaintiff consented to Defendants' use of the name "TechShop 2.0."  Mountains of

24   documentary evidence were introduced at trial showing that, during the parties' two-and-a-half

25   months of negotiations regarding a potential deal for Defendants to acquire Plaintiff's assets, both

26   parties referred to Defendants' business as "TechShop 2.0."  Witness after witness testified at trial

27   that Plaintiff never objected to "Techshop 2.0" during this entire time.  (Trial, Tr. ____ [Newton,

28   Woods, Busch, Rasure].)  Specifically, Defendants used that name in correspondence with

Plaintiff, and Plaintiff and its representatives did not object.  Rather, Plaintiff itself referred to Defendants as "TechShop 2.0" in correspondence with Defendants, the parties' Memorandum of Understanding, the draft acquisition agreement, correspondence with third parties, and public announcements.  (TX610, TX596, TX597, TX921, TX603, TX611, TX613, TX615, TX616, TX612, TX753, TX619, TX617, TX906, TX612, TX622, TX919, TX634, TX635, TX636, TX644, TX645, TX646, TX642, TX896, TX566.)  Indeed, Plaintiff announced to the world that it was pursuing a deal with "TechShop 2.0."  (TX501, TX505, TX527, TX528, TX530.)  As late as January 31, 2018—just two and a half weeks before filing suit, Plaintiff's then-CEO, Dan Woods, introduced Mr. Rasure's company as "TechShop 2.0" to a third party.  (TX642.)  And, the next day, on February 1, 2018, Mr. Woods referred to Mr. Rasure's company as "TechShop 2.0" in correspondence with Mr. Rasure.  (TX645.)  Plaintiff's witnesses testified that Plaintiff only consented to Defendants' use of the name "TechShop 2.0" for purposes of negotiating with Plaintiff.  But, that self-serving testimony was contradicted by the contemporaneous documentary evidence.  Thus, when Plaintiff chose to file a trademark infringement case against Defendants on February 16, 2018, Plaintiff was well aware that, at least until February 14, 2018—only two days earlier, Plaintiff consented to Defendants' use of the name "TechShop 2.0" and thus there could be no infringement prior to that date.

Further, within a matter of hours of receiving Plaintiff's February 16, 2018 cease-and-desist letter and a copy of the Complaint filed earlier that day, Defendants changed their name to "TheShop.build."  Mr. Rasure testified that on the evening he received notice of the Complaint, he personally took down the sign outside of the building and took steps to change the name on the company's website.  (Trial Tr., _____[Rasure]; TX0001; TX1159.)  He further testified that, even though it was a holiday weekend, Defendants worked to change everything over to "TheShop.build" as quickly as they could.  (Trial Tr., _____[Rasure].)  And the documentary evidence shows that Plaintiff's then-CEO, Dan Woods, was aware of the name change at least as of February 17, 2018—just one day later.  (TX321.)  Plaintiff nevertheless pursued the litigation, despite the name change.  Even if Plaintiff is given the benefit of the doubt, and its February 14, 2018 letter to Defendants is considered a cease and desist letter, Plaintiff pursued this litigation

1   knowing full well that Defendants only used the name "TechShop 2.0" without consent at most on

2   February 15 and 16, 2018.  Thus, viewing the evidence in the light most favorable to Plaintiff, that

3   would amount to just two days of infringement by using the name "TechShop 2.0."

4            2.   <u>Plaintiff Presented No Evidence of That Defedants' Logo Used for Three

5                 Days and the New Name TheShop.Build Infringed.</u>

6            Similarly, there can be no dispute that any claim of infringement of Plaintiff's marks by

7   use of "TheShop.build" lacked substantive merit.  Plaintiff presented no evidence that Defendants

8   used an allegedly infringing logo for "TheShop.build" for more than three days.  Mr. Rasure

9   testified that Defendants have not used that logo since February 21, 2018, and that testimony was

10  unrebutted.  (Trial Tr., _____[Rasure].)  Making matter worse, Plaintiff charged that the logo

11  infringed registrations for the word TECHSHOP, fully aware that the registrations did not cover

12  logos and colors.  (*See* Defendants' Motion for Judgment as a Matter of Law, filed concurrently

13  herewith.)  Plaintiff went even further.  During the entire trial, Plaintiff displayed a board showing

14  the 3-day logo to create the impression that the logo was used from Day 1 right up to the trial.

15  This was simply untrue, as Plaintiff's expert Dr. Matolo had to acknowledge on cross-

16  examination.  (Trial Tr. _____ [Matolo].)

17            Nor did Plaintiff present evidence that the name "TheShop.build" was likely to cause

18  confusion with Plaintiff's marks.  Indeed, Mr. Rasure testified that Plaintiff did not even claim that

19  "TheShop.build" infringed Plaintiff's marks until late November 2018.  (Trial Tr., _____[Rasure];

20  Dkt. 128-7 [Supplemental Response to Interrogatory No. 2, p. 5, line 6].)  Throughout the

21  discovery period, and even when Defendants opened a second location in San Jose in August 2018

22  under the new name, Plaintiff did not tell Defendants that they needed to stop using the name

23  "TheShop.build."  (Trial Tr., _____[Rasure].)  Moreover, Plaintiff (a former makerspace) and its

24  counsel (a member of the "maker" community) knew that members of the "maker" community

25  were highly sophisticated, well-connected, and well aware of the negotiations between Plaintiff

26  and Defendants such that there was no likelihood of confusion.  (*See e.g.*, TX611, TX612, TX501,

27  TX505, TX527, TX528, TX530; Trial Tr., _____ [Rasure; Woods; Bünger].)  Thus, Plaintiff

28  pursued this litigation alleging that "TheShop.build" infringed, knowing full well that it did not

1    have any evidence of an allegedly infringing logo for more than three days, that it did not object to

2    Defendants' use of the name "TheShop.build" for nine months, and that it did not have evidence

3    of likelihood of confusion.  Viewing the evidence in the light most favorable to Plaintiff, at most,

4    it would be able to show three days of infringement by using the allegedly infringing logo.

5           Thus, Plaintiff's entire case boiled down to conduct occurring over *five days* ("TechShop

6    2.0" for two; the logo for three).  Indeed, nearing the close of Plaintiff's case, this Court correctly

7    recognized and commented on the very limited time frame at issue in the case.  (Trial. Tr., _____.)

8                         3.      The TechShop Brand Has Negative Value.

9           Not only was any claim of infringement limited to a period of less than a week, but

10   Plaintiff's "TechShop" brand lacked value.  Defendants' branding expert Mark Bünger testified

11   that Plaintiff's abrupt closure in November 2017 and announcement that it intended to file for

12   bankruptcy severely damaged the TechShop brand.  (Trial Tr., _____[Bünger].)  Many members

13   were very angry about the closure because they lost the value of their membership investments

14   and many were locked out of Plaintiff's locations and unable to get to tools and projects that they

15   owned.  (Trial Tr., _____ [Bünger].)  Plaintiff's brand was so badly damaged that Mr. Bünger

16   testified that based on his analysis and expertise, the TechShop brand had negative brand equity.

17   (Trial Tr., _____ [Bünger].)

18          Incredibly, Plaintiff's damages expert Dr. Matolo testified that the TechShop name had

19   greater value in the U.S. after the bankruptcy than it had abroad several years earlier when

20   Plaintiff was riding high.  (Trial Tr. ___ [Matolo].)  By awarding Plaintiff $0 in lost licensing

21   revenue, the jury clearly credited Mr. Bünger's opinion and rejected that of Dr. Matolo.  (Dkt. 217,

22   Verdict, Answers to Questions 6, 10.)

23          The damage to Plaintiff's brand was well-known to Plaintiff.  A February 15, 2018 article

24   in the San Francisco Chronicle reported:  "The abrupt closure in November of TechShop

25   workshops across the country *disrupted the lives of small business owners and do-it-yourself*

26   *hobbyists* who relied on the chain's machinery, from 3-D printers to welding tools."  (TX337.)

27   (emphasis added)  The Chronicle quoted an entrepreneur and former TechShop member, Nick

28   Pinkston, saying: "the closing was 'a big loss to the community.'"  (*Id.*)  And, the article reported

1   on an "artist-in-residence" at TechShop, saying "he was stunned when the shop closed the day

2   before the opening reception for an exhibit of his sculptures.  He had to quickly move his

3   sculptures out."  (*Id.*)  Plaintiff cannot deny that it was aware of this Chronicle article; its trial

4   witnesses testified that they read the article and claimed to be outraged to learn that Mr. Rasure

5   was opening "TechShop 2.0."  (Trial Tr., _____[Newton; Woods; Busch].)

6          Further, Plaintiff's own witnesses recognized the damage its closure had to its brand.  Mr.

7   Busch, a member of the Board of Directors, wrote in an "open letter to stakeholders":

8              As a TechShop, Inc. member and as a director, ***I fully understand the frustration***
               ***members have experienced as a result of being locked out of stores, being unable***
9              ***to complete projects, and not having access to your materials***.  Legal restrictions,
               relationships with landlords and other entities, and the complexities of negotiating
10             this deal very quickly have produced ***a bad experience for our members***, and we
               deeply regret that.

11

12   (TX612 at DR007022) (emphasis added).  Mr. Busch further testified that he was aware that there

13   were comments on social media about the motivations and actions of Plaintiff's senior

14   management and its Board, that TechShop's closure had an impact on people's personal finances,

15   their business, and their livelihoods, and that investors had lost everything that they put into

16   TechShop.  (Trial Tr., ____[Busch].)

17          Given the recognized damage to Plaintiff's brand, the prospect of Plaintiff's damages

18   claim was non-existent.  The jury agreed and awarded Plaintiff  $0.

19          **B.        The Lawsuit Was Filed for Anti-Competitive Reasons.**

20          The particular timing of a suit can serve as a factor in determining whether a suit was

21   initiated in bad faith.  *Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria v.*

22   *Ceiba Legal, LLP*, 230 F. Supp. 3d 1146, 1150–51 (N.D. Cal. 2017) (suspicious timing of filing of

23   plaintiff's complaint suggested improper motivations warranting award of fees).  Here, there is

24   evidence that Plaintiff filed its claims, not due to their substantive strength—they had none—but

25   for anti-competitive purposes.  Plaintiff's trial counsel is a Founder and donor to a non-profit

26   called Maker Nexus (TX567), and served as its Treasurer and on its Board until the day before this

27   lawsuit was filed.  (TX568 at DR002807; TX540.)  Maker Nexus is a direct competitor of

28   Defendants.  (Dkt. 138, at 1; TX564 at DR002761; TX568; TX569; TX570; TX571; TX572.)

1   When Plaintiff abruptly shut down in November 2017, it left a host of "makers" whose projects

2   were locked up inside the closed stores and who had no place to do their making.  Numerous

3   social media groups formed to share information and find solutions for a place for "makers" to do

4   their building and crafting.  One of those groups developed into Maker Nexus.  Like Defendants,

5   in late-2017 and early 2018, Maker Nexus was making plans to open a Bay Area makerspace to

6   fill the void left by TechShop.  (*See* TX564 at DR002761; TX568; TX569; TX570; TX571;

7   TX572.)

8        In announcing that Plaintiff's counsel stepped down from his position with Maker Nexus,

9   Maker Nexus' President Eric Hess stated:

10        We regret to inform you that our Treasurer, James Pistorino, has resigned from our
          board effective ***the evening of 2/15/2018***. . . . In an abundance of caution, ***James***
11        ***made the decision to resign to avoid any appearance of conflict of interests as a***
          ***practicing attorney.  James remains a committed member of Maker Nexus and a***
12        ***founding donor.***

13   (TX540) (emphasis added).  Thus, Plaintiff's counsel stepped down from his position at Maker

14   Nexus "the evening of" February 15 and then filed a lawsuit against a competitor the very next

15   day**.**  (Dkt. 1.)  And, Mr. Busch's trial testimony suggested that Plaintiff's counsel approached

16   Plaintiff about the lawsuit.  (Trial Tr., _____[Busch].)  That a former officer and Board member of

17   a direct competitor brought this case is highly suggestive that the case was brought for anti-

18   competitive purpose.  *Ceiba Legal*, 230 F. Supp. 3d at 1150–51.  Such representation is

19   intertwined with a high likelihood of bias, bad faith, and ulterior motive.  Indeed, this lawsuit had

20   the result that a competitor would want: it damaged the competition.  Defendants have only

21   operated their business under the "black cloud" of this litigation and have never turned a profit.

22   (Trial Tr., _____[Rasure; Johnson].)  When required to move because the San Francisco building

23   they operated in was being torn down, Defendants found landlords were unwilling to negotiate

24   with them, and the San Francisco location never reopened.  (Trial Tr. ___ [Rasure].)  Meanwhile,

25   Maker Nexus continues in business to this day.  (*See* https://www.makernexus.com.)

26        **C.    Plaintiff Persisted in an Unreasonable Manner of Litigation.**

27        Plaintiff consistently litigated this case in an unreasonable manner.  This ranged from

28   repeatedly re-litigating matters and changing positions, to failing to take any depositions, to

1    producing only 803 pages of documents from a company that had been in business for over a

2    decade and had ten locations across the country (Roberts Decl. ¶ 10), to not cooperating with

3    Defendants' counsel on even the most basic trial preparation tasks, and failing to follow the

4    Court's Standing Order.  Plaintiff's conduct increased the costs of defending the litigation and

5    alone renders this case exceptional.  *SunEarth*, 839 F.3d at 1180–81.

6         First, Plaintiff repeatedly attempted to re-litigate issues that were already decided by this

7    Court.  For example, this Court denied Plaintiff's Motion to Dismiss Mr. Rasure's fraud

8    counterclaim.  (Dkt. 110.)  Yet, Plaintiff continued to pursue the same meritless positions after that

9    ruling.  Plaintiff made the very same arguments in its Motion in Limine No. 2.  (Dkt. 137.)  This

10   Court agreed with Defendants that Plaintiff's Motion in Limine No. 2 "appears to just be a re-

11   litigation of the motion to dismiss," noting "I've already ruled on this" and that "really this is an

12   attempt to take another run" at the issue of fraud.  (4/30/19 Pretrial Conference Tr., 25-26.)  In

13   response to this commentary from the Court at the Pretrial Conference, Plaintiff attempted to

14   argue that the fraud evidence should be excluded under Fed. R. Civ. P. 26, which Plaintiff had not

15   argued in its brief.  (4/30/19 Pretrial Conference Tr., 25.)  The Court reprimanded Plaintiff for its

16   shifting sands approach: "It's on you [counsel] to front the argument you were making clearly.

17   Stop shapeshifting.  You're just making an argument that has never been presented until the

18   second it just came out of your mouth."  *Id.* at 29; *see also id.* at 31–32 (asking Defendants for

19   additional briefing because "the motion presented [by plaintiff] is not the motion that's now being

20   argued"); *id.* at 34 ("Again, none of what [plaintiff] just said was in your motion.  This trial won't

21   go well if you keep pulling this.").  After giving Defendants the opportunity to respond in writing,

22   the Court denied Plaintiff's Motion in Limine No. 2.  (Dkt. 182.)  Undeterred, Plaintiff tried a

23   third time to preclude Defendants from introducing evidence of fraud during trial.  (Dkt. 195, 2-3.)

24   The Court again denied Plaintiff's attempt to preclude fraud evidence and permitted Defendants to

25   present evidence of fraud.  (Trial Tr., ___.)

26         Such behavior was not an isolated incident.  As a further example, Plaintiff filed a *Daubert*

27   motion seeking to exclude Mr. Bünger's opinions on the basis of relevance and lack of expertise.

28   (Dkt. 126.)  The Court denied that motion.  (Dkt. 158.)  Nevertheless, Plaintiff reiterated the same

1  arguments in its objections to Mr. Bünger's direct examination demonstratives, the majority of

2  which were rejected by the Court.  (Dkt. 195; Trial Tr. _____.)

3      Plaintiff's rehashing of the same issues already decided by this Court is precisely the kind

4  of behavior that is sanctionable under Section 1117.  *San Diego Comic Convention v. Dan Farr*

5  *Productions*, No. 14-cv-1865-AJB-JMA, 2019 WL 1599188, slip op. at *4–6 (S.D. Cal. Apr. 15,

6  2019) (noting party's re-argument of issues already decided by the court supported the conclusion

7  that case was exceptional); *Milo & Gabby, LLC v. Amazon.com, Inc.*, No. C13-1932RSM, 2015

8  WL 5156330, at *4–5 (W.D. Wash. Sept. 2, 2015) (plaintiff's repeated attempts to pursue claims

9  previously dismissed by court supported finding that case was exceptional); *Cognex Corp. v.*

10  *Microscan Sys., Inc.*, No. 13-cv-2027 (JSR), 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014)

11  (citing party's re-litigation of previously decided issues supported finding that case was

12  exceptional).  Plaintiff's behavior is further exacerbated by the fact that Plaintiff acknowledged

13  that the Court had already ruled on this issue, but claimed that the Court "did not like the way

14  [Plaintiff's counsel] wrote [the] motion in limine, and for that, reason denied it."  (Ex. 4 [6/5/19

15  Pistorino Email].)  Plaintiff's repeated waste of judicial resources and attempts to take second and

16  third bites at the apple contribute to a record of an exceptional case.

17      Second, Plaintiff failed to serve any interrogatories or take any depositions in the case.

18  Defendants deposed Plaintiff's damages expert, but no percipient witnesses were deposed in the

19  case.  At the Pretrial Conference, the Court commented "[t]hat's a first."  (4/30/19 Pretrial

20  Conference Tr., 5:8-16.)  The Court further commented: "Now, in a normal case, you all would

21  have done some depositions and this would have gotten teed up, so I'm not quite clear what

22  strategic decisions everybody made to end up in this oddball circumstances where we're going to

23  trial and you won't have any idea what the witnesses are going to say . . ."  (*Id.*, 29:7-11.)

24  Additionally, during discovery, when Plaintiff argued that it suffered prejudice by not taking the

25  relevant depositions, the Court shut down that argument, saying: "[Y]ou can't wait until the end

26  [of discovery] and say, well, my prejudice is I haven't taken any depositions because I didn't have

27  documents, so I can't do any depositions, Your Honor.  That's not the fault of the document

28  production.  That's a tactical choice."  (10/12/18 Hearing Tr., at 16.)

1    Admittedly, Defendants did not take percipient depositions either.  But Defendants lacked
2    the resources to litigate and were not the party to bring this case.  While it is unusual for there to
3    be no percipient depositions in a case, it is curious that the plaintiff—the party that initiated the
4    action—would choose not to pursue deposition discovery.  Further, Defendants established at trial
5    that they have not turned a profit.  (Trial Tr., _____[Johnson].)  Defendants had no choice but to be
6    as cost-efficient as possible in the litigation.  And, in any event, there was mountains of
7    documentary evidence showing Plaintiff's consent to Defendants' use of the name "TechShop
8    2.0" without the need for depositions of Plaintiff's percipient witnesses.  Had Plaintiff taken even
9    a single deposition of Mr. Rasure, it would have learned of the *de minimis* use of the allegedly
10   infringing marks.

11       Finally, Plaintiff did not cooperate with Defendants' counsel on even the most basic tasks
12   and failed to follow the Court's Standing Order.  Set forth below are examples of Plaintiff having
13   ignored Defendants' counsel or refused to work with Defendants' counsel in the lead-up to trial,
14   making the litigation more difficult than necessary and increasing costs:

15       • The parties agreed to provide their objections to the opposing party's trial exhibits
16         on April 9.  On April 9, Defendants provided the bases for their objections to
17         Plaintiff's trial exhibits.  (Ex. 5 [4/9/19 Roberts Email and Attachment].)  Plaintiff,
18         however, provided a list of Defendants' exhibits to which it objected (which was
19         nearly all of them), and did not disclose the bases for its objections.  (Ex. 6 [4/9/19
20         Pistorino Email and Attachment].)  On April 10, Defendants' counsel promptly
21         advised that Plaintiff must provide the bases for its objections so that the parties
22         could have a meaningful meet and confer regarding objections as required by the
23         Court's Standing Order.  (Ex. 7 [4/10/19 Roberts Email].)  Plaintiff's counsel
24         ignored the April 10 email.  Plaintiff did not provide the bases for its objections
25         until April 16.  (Ex. 8 [4/16/19 Pistorino Email and Attachment].)  This was too
26         late for the parties to have a meaningful meet and confer by the deadline in the
27         Court's Standing Order (which was that day) because the parties were still working
28         to finalize proposed jury instructions, proposed verdict forms, proposed voir dire,

1    proposed statement of the case, and oppositions to motions in limine, all of which

2    were due that same day.

3    •   On April 11, 2019, Plaintiff's counsel sent Defendants draft proposed jury

4       instructions.  (Ex. 9 [4/11/19 Pistorino Email and Attachment].)  Plaintiff's

5       proposed jury instructions did not comply with the Local Rules or the Court's

6       Standing Order.  (*Id.*)  Changes to the Ninth Circuit Model Jury Instructions were

7       not reflected in underlining and strike-throughs as required by this Court's Standing

8       Order.  Defendants' counsel undertook the time-consuming task of re-doing and re-

9       formatting the proposed jury instructions so that they would comply with the rules.

10      Initially, Plaintiff's counsel took issue with Defendants' changes to the format.

11      But, Defendants explained that they had taken the laboring oar of making the

12      document closer to file-ready.  (Ex. 10 [4/15/19 Roberts Email].)

13   •   The Court's Standing Order requires that two binders of the pretrial filings be

14      provided as Chambers Copies.  The parties agreed that Defendants' counsel would

15      prepare the copies for the Court and have them messengered to the Court and that

16      Plaintiff would pay 50% of the cost.  Plaintiff's counsel later reneged on that deal

17      because of a dispute with regard to the timing of Defendants recalling Mr. Newton

18      to testify at trial.  (Ex. 11 [5/3/19 Roberts Email and Invoice Attachment]; Ex. 12

19      [6/6/19 Slobodyanyuk Email.)[7]

20   •   Following the Pretrial Conference, Plaintiff's counsel expressed a willingness to

21      meet and confer with Defendants' counsel regarding a trial disclosure schedule that

22      would allow for disclosure of witnesses after noon (the deadline in the Standing

23      Order) so that the deadline did not fall during the court day.  When Defendants'

24      counsel reached out to Plaintiff's counsel, however, to discuss the logistics of the

25      schedule, Plaintiff's counsel repeatedly ignored the emails for weeks.  (Ex. 13

26      [5/17/19 Roberts Email]; Ex. 14 [5/22/19 Roberts Email]; Ex. 15 [5/24/19 Roberts

27

28   [7] It is worth noting that Plaintiff included its 50% share of these costs in its Bill of Costs (Dkt. 226), even though Plaintiff has not paid the outstanding invoice to Defendants' counsel.

Email]; Ex. 16 [5/29/19 Roberts Email]; Ex. 17 [6/1/19 Roberts Email].)  It was not until June 2, the day before trial began that Plaintiff confirmed the schedule to which it would agree.  (Ex. 18 [6/2/19 Pistorino Email].)

- Defendants' counsel coordinated meeting and conferring to schedule a time on Friday, May 31, for the parties to conduct their courtroom set-up before trial. Although the courtroom deputy told the parties that they could get into the courtroom on May 31, Plaintiff ignored that instruction and proposed different days, and then ignored Defendants' counsel when she tried to find a mutually convenient time on May 31.  (Ex. 19 [5/30/19 Roberts Email].)

- During trial, Defendants' counsel prepared binders of the exhibits to be used in their witness examinations for the witness and Plaintiff's counsel.  Initially, Plaintiff's counsel did not provide Defendants' counsel with the same courtesy. When Defendants raised this with the Court, the Court indicated that binders should be provided to the opposing counsel and the parties should work it out.  Plaintiff's counsel then began providing binders to Defendants' counsel.  Plaintiff, however, refused to continue doing so after Defendants re-called Mr. Newton to testify. Indeed, Plaintiff demanded that Defendants pay Plaintiff's counsel "$465.65, ideally in cash . . . for the costs incurred in printing Mr. Rasure's cross-examination binders."  (Ex. 12 [6/5/19 Slobodyanyuk Email].)

- During trial, Plaintiff disclosed 270 exhibits to be used in the cross-examination of Mr. Rasure.  (Ex. 20 [6/5/19 Pistorino Email and Attachment].)  Considering that Plaintiff's portion of the trial exhibit list was comprised of 377 exhibits, this disclosure was 71% of Plaintiff's entire exhibit list.  Given the amount of time that Plaintiff had used in its case-in-chief, this disclosure was not realistic.  And indeed, Plaintiff did not question Mr. Rasure on 270 exhibits.  Yet, Defendants had to review them all to prepare to meet and confer on any objections in compliance with the Court's Standing Order.

1      • On Sunday, June 9, 2019, before the deadline for disclosures for exhibits and

2          demonstratives to be used the following day in trial, Defendants' counsel emailed

3          Plaintiff's counsel to ask if he believed that closing arguments would be the

4          following day so that the parties could agree on when to disclose closing slides.

5          (Ex. 21 [6/9/19 Roberts Email].)  Plaintiff's counsel ignored Defendants' counsel's

6          inquiry.  Instead, after noon that day (the deadline for disclosing exhibits and

7          demonstratives to be used the following day), Plaintiff's counsel responded and

8          took the position that Defendants were late in disclosing their closing slides.  (Ex.

9          22 [6/9/19 Pistorino Email].)

10     • The parties were instructed by the courtroom deputy that, after the close of

11          evidence, they needed to provide a list of the admitted exhibits with descriptions

12          for the jury's use in deliberations.  This list was needed on the morning of June 11.

13          On June 10, Defendants' counsel provided to Plaintiff the list of the admitted

14          exhibits from Defendants' portion of the exhibit list, asked Plaintiff to provide the

15          admitted exhibits from Plaintiff's portion of the exhibit list, so that Defendants

16          could print the list and take it to Court the following morning.  (Roberts Dec., ¶ 30,

17          Ex. 23 [6/10/19 Roberts Email and Attachment].)  Plaintiff did not provide its

18          portion of the list until the following morning at 6:52 am.  (Ex. 24 [6/11/19

19          Pistorino Email and Attachment].)  Defendants combined the two lists and

20          provided a hard copy to the courtroom deputy on the morning of June 11 before

21          arguments on jury instructions and the verdict form.  The courtroom deputy

22          informed the parties that Plaintiff's portion of the list was not in the proper format

23          and needed to be corrected before it could be provided to the jury.  ***Defendants'***

24          ***counsel***—not Plaintiff's counsel—took the time to fix the formatting of Plaintiff's

25          portion of the admitted exhibit list so that it would be ready for the jury.  (Roberts

26          Dec., ¶ 32.)

27        These are things that experienced trial counsel know that they need to work on together.

28    For example, it is routine for trial counsel to negotiate trial disclosure schedules, or to provide the

1   bases for their objections to trial exhibits and not simply a list of the exhibits to which there are

2   objections.  In isolation, any one of these instances of non-cooperation may seem insignificant.

3   But, when compounded, they reveal Plaintiff's consistent approach of making things more

4   difficult than they should have been, which drove up litigation costs.  This pattern of unreasonable

5   conduct, along with the lack of substantive merit to the case and the competitive motivations

6   behind the case, supports a finding that the case is exceptional.

7   **III.**   **DEFENDANTS SEEK REASONABLE ATTORNEYS' FEES AND COSTS.**

8         Defendants seek to recover $ 2,027,790.25 in attorneys' fees and $ 61,165.75 in non-

9   taxable expenses.[8]

10         **A.**   **Attorneys' Fees**

11         Defendants seek to recover attorneys' fees incurred by three law firms.  The number of

12   hours worked by Defendants' counsel was reasonable, given the nature of the case and the amount

13   at stake.  In its bankruptcy filing, Plaintiff reported that the value of the lawsuit was at least

14   "$5,000,000, as listed in the Debtor's valuation of the Trademarks, and all demands contained in

15   the case."  *In re TechShop, Inc.*, Case No. 18-50398, Dkt. 1, p. 13 (N.D. Cal. Bankr. Feb. 26,

16   2018).  Defendants had no choice but defend against Plaintiff's claims, which included the

17   complication of collecting documents responsive to broad document requests, gathering and

18   reviewing an overwhelming amount of emails, social media, and other electronically stored

19   documents, generated in large part from the widespread negative social media activity that flowed

20   from Plaintiff's abrupt shut-down in November 2017.  (Draper Dec., ¶¶ 5-12 .)

21         The Law Offices of Ann M. Draper was sole counsel for Defendants from the outset of the

22   case in February 2018 through January 2019.  As discussed in the accompanying Draper

23   Declaration, Ms. Draper has been practicing law in California for over 43 years.  (Draper Dec. ¶

24   3.)  She is a seasoned trial lawyer, with experience in bankruptcy practice, as well as experience

25   litigating complex disputes and document intensive cases, including copyright infringement as

26   well as trademark infringement and civil RICO cases tried to verdict.  (*Id.*)  During the period that

27

28       [8]   To the extent that any expenses claimed on the Bill of Costs are not allowed as costs, Defendants request that they be awarded as costs or attorney's fees under § 1117(a).

1   Ms. Draper was the sole attorney for Defendants in this matter, Ms. Draper handled every aspect

2   of the case, including investigation of facts and development of legal and factual basis for

3   defenses, initial disclosures and discovery, responsive pleadings and motion practice, expert

4   witness disclosure and discovery, and developing the case for trial or settlement.  (*Id.*, ¶¶ 4-15.)

5   Ms. Draper billed at her normal hourly rate, which is lower than customary rates in the community

6   and rates that courts have found to be reasonable.  (*Id.*, ¶ 16.)  Ms. Draper was assisted by a

7   research assistant, who billed at her normal hourly rate as well, which is also lower than customary

8   rates in the community and rates that courts have found to be reasonable.  (*Id.*, ¶ 17.)  The number

9   of hours that Ms. Draper and her assistant billed on this matter was reasonable, particularly in light

10  of the number of factors that complicated the defense of the case, the volume of documents to be

11  collected and produced on Defendants' behalf, and the amount of motion practice.  (*Id.*, ¶¶ 4-17.)

12          In January 2018, the law firms of Quinn Emanuel and John E. Nathan LLC appeared in the

13  matter to try the case.  As set forth in the accompanying Roberts Declaration, the Quinn Emanuel

14  team was led by Andrea Pallios Roberts.  (Roberts Dec., ¶ 4.)  Ms. Roberts has sixteen years of

15  experience practicing law, focusing on intellectual property matters, and is an experienced trial

16  lawyer.  (*Id.*.)  Ms. Roberts served as lead trial counsel.  She billed at her normal hourly rate.  (*Id.*.)

17  Ms. Roberts was assisted by a team of Quinn Emanuel associates.  (*Id.*.)  Each of those associates

18  were billed at their normal rates.  (*Id.*)  The number of Quinn Emanuel associates who worked on

19  this matter was reasonable, given that Quinn Emanuel took over the case after discovery closed,

20  the large volume of documents produced by Defendants in this case that needed to be reviewed,

21  and the number of witnesses at trial and length of the trial.  (*Id.*, ¶ 3.)  Quinn Emanuel's rates are

22  in line with rates charged by similar law firms (Exs. 25-26), and courts have found Quinn

23  Emanuel's rates to be reasonable.  *See* Report and Recommendation of Special Master, *Transweb,*

24  *LLC v. 3M Innovative Props. Co.*, No. 10-cv-04413-FSH (D.N.J. Sept. 24, 2013) (ECF No. 567)

25  (Special Master's ruling finding that Quinn Emanuel was a "premier litigation firm" and that total

26  fees of $26,146,493.45 were reasonable); Final Award, *DIRECTV, Inc. v. NWS Corp.*, Am.

27  Arbitration Assoc., Case No. 72 494 Y 00219 09 NOLG (June 15, 2010) (finding Quinn

28  Emanuel's rates and hours reasonable); Notice of Ruling on Quinn Defendants' Motion for Award

1  of Attorneys' Fees, *Lockton v. O'Rourke*, Case No. BC361629 (Cal. Super. Ct. Feb. 23, 2011)

2  (attaching Feb. 14 court order finding Quinn Emanuel's rates and total hours reasonable); Order

3  Granting Plaintiff's and Plaintiffs in Intervention's Motions for Attorneys' Fees, *Monrovia*

4  *Nursery Co. v. Rosedale*, Case No. BC351140 (Cal. Super. Ct.  Jan. 12, 2009) (finding Quinn

5  Emanuel's rates and total fees reasonable); Civil Minutes re: Order Granting Motion for

6  Attorneys' Fees, *Riverside Cnty. Dept. of Mental Health v. A.S.*, Case No. 08-cv-00503-ABC

7  (C.D. Cal. Feb. 22, 2010) (ECF No. 123) (awarding full amount of attorneys' fees sought for work

8  performed by Quinn Emanuel); Final Award, *Academy of Television Arts & Sciences v. National*

9  *Academy of Television Arts & Sciences*, Am. Arbitration Assoc., Case No. 72 140 00247 07 JENF

10  at ¶ 2.2 (May 19, 2008) (finding Quinn Emanuel's billable rates and hourly totals reasonable);

11  Order Approving Interim Fee Requests Regarding Professionals, *In re Am. Home Mortgage*

12  *Holdings, Inc.*, Case No. 07-11047, Dkt. 3695 (Bankr. D. Del. Apr. 14, 2008) (finding attorneys'

13  fees requested by Quinn Emanuel were reasonable); Order Granting In Part Defendant Packaging

14  Advantage Corp.'s Motion For An Award Of Attorneys' Fees And Costs, *Packaging Advantage*

15  *Prop. Assocs., LLC v. Packaging Advantage Corp.*, Case No. VC045957 (Cal. Super. Ct. Nov. 6,

16  2007) (granting full amount of Quinn Emanuel's fee request); *Bistro Executive, Inc. v. Rewards*

17  *Network, Inc.*, Case No. 04-cv-4640-CBM (C.D. Cal. Nov. 19, 2007) (ECF No. 357) (finding

18  Quinn Emanuel's attorney rates and hours were reasonable).

19        Mr. Nathan is a retired partner from Paul Weiss and served as the Co-Chair of the firm's

20  Intellectual Property practice.  (Nathan Dec., ¶ 5.)  He also served as a partner at the intellectual

21  property law firm of Fish & Neave.  (*Id.*, ¶ 6.)  Mr. Nathan has over fifty years of experience

22  litigating intellectual property disputes.  (*Id.*, ¶4.)  He served as second chair at trial.  (*Id.*, ¶ 3.)

23  Mr. Nathan billed at his normal hourly rate, which is lower than the rate he billed at when at Paul

24  Weiss, and is in line with rates that courts have found to be reasonable.  (*Id.*, ¶ 5.)

25     **B.**     **Costs/Expenses**

26        Defendants seek to recover non-taxable costs in the amount of $ 61,165.75.  These costs

27  include expert fees of Mr. Mark Bünger, hotel costs associated with attending trial, parking and

28  meals for counsel during trial, legal research, copying, postage, and PACER.  (Nathan Dec., ¶ 7;

1   Draper Dec., ¶ 21; Roberts Dec. ¶¶ 6, 34, Ex. 27.)  As set forth in the accompanying Declarations,

2   these costs were reasonably incurred.  For example, Mr. Bünger is a recognized expert in branding

3   and the makerspace movement.  (Roberts Dec., Exs. 2-3; Trial Tr., _____[Bünger].)  Mr.

4   Bünger prepared an expert report on Plaintiff's negative brand value, prepared a rebuttal report in

5   response to Dr. Matolo's damages report, and testified at trial regarding Plaintiff's negative brand

6   value.  The jury ultimately agreed with Mr. Bünger's assessment, awarding Plaintiff $ 0.  (Dkt.

7   217.)

8           Defendants incurred expenses staying at the Oakland Marriott during trial, just as

9   Plaintiff's counsel did.  (Ex. 1; Nathan Dec., ¶ 7.)  Quinn Emanuel's Silicon Valley office (where

10  Ms. Roberts and the other Quinn Emanuel associates are based) is over thirty miles from the

11  courthouse.  Given the distance, morning traffic, and the amount of work to be done during trial,

12  some members of the Quinn Emanuel team stayed at the hotel.  Mr. Nathan, who is based in New

13  York, also stayed at the hotel, as did Mr. Rasure, who resides in Kansas but typically stays in San

14  Jose near TheShop.build when in the Bay Area.  (Roberts Dec., ¶ 7.)

15  **IV.    CONCLUSION**

16          For the foregoing reasons, the Court should grant Defendants' motion and award

17  $2,027,790.25 in attorneys' fees and $ 61,165.75 in non-taxable costs to Defendants.

18

19

20

21

22

23

24

25

26

27

28

1

DATED:  July 23, 2019                                By        _/s/ Andrea Pallios Roberts_

2                                                                   Ann McFarland Draper (Bar No. 065669)
                                                                    courts@draperlaw.net
3                                                                   Draper Law Offices
                                                                    75 Broadway, Suite 202
4                                                                   San Francisco, California 94111
                                                                    Telephone:     (415) 989-5620

5
                                                                    QUINN EMANUEL URQUHART &
6                                                                   SULLIVAN, LLP
                                                                    Kevin P.B. Johnson (Bar No. 177129)
7                                                                   kevinjohnson@quinnemanuel.com
                                                                    Andrea Pallios Roberts (Bar No. 228128)
8                                                                   andreaproberts@quinnemanuel.com
                                                                    555 Twin Dolphin Drive, 5th Floor
9                                                                   Redwood Shores, California 94065-2139
                                                                    Telephone:     (650) 801-5000
10                                                                  Facsimile:     (650) 801-5100

11                                                                  Ed DeFranco (Bar No. 165596)
                                                                    eddefranco@quinnemanuel.com
12                                                                  51 Madison Avenue, 22nd Floor
                                                                    New York, NY 10010
13                                                                  Telephone:     (212) 849-7000
                                                                    Facsimile:     (212) 849-7100
14
                                                                    John E. Nathan (P_ro Hac Vice_)
15                                                                  jnathan155@yahoo.com
                                                                    John E. Nathan LLC
16                                                                  1175 Park Avenue
                                                                    New York, NY 10128
17                                                                  Telephone:     (917) 960-1667

18                                                                  Attorneys for Defendants and Counterclaimants

19

20

21

22

23

24

25

26

27

28