VOL. 3

PAGES 291 - 493

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM, JR., JUDGE**

| | |
|---|---|
| TECHSHOP, INC., PLAINTIFF, | NO. C-18-1044 HSG |
| VS. | WEDNESDAY, JUNE 5, 2019 |
| DAN RASURE, ET AL., | OAKLAND, CALIFORNIA |
| DEFENDANTS. | JURY TRIAL |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:** PARRISH LAW OFFICE
24 LEXINGTON DRIVE
MENLO PARK, CALIFORNIA 94205
BY: JAMES C. PISTORINO, ESQUIRE

**ALSO PRESENT:** DORIS KAELIN, BANKRUPTCY TRUSTEE

**FOR DEFENDANTS:** QUINN EMANUEL URQUHART & SULLIVAN
555 TWIN DOLPHIN DRIVE, 5TH FLOOR
REDWOOD SHORES, CALIFORNIA 94065
BY: ANDREA P. ROBERTS, ESQUIRE
OLGA SLOBODYANYUK, ESQUIRE

JOHN E. NATHAN, ESQUIRE
1175 PARK AVENUE
NEW YORK, NEW YORK 10128

**REPORTED BY:** DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
OFFICIAL COURT REPORTER

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

**I N D E X**

| **PLAINTIFF'S WITNESSES:** | **PAGE** | **VOL.** |
|---|---|---|
| **WOODS, DANIEL** | | |
| DIRECT EXAMINATION BY MR. PISTORINO (RESUMED) | 295 | 3 |
| CROSS-EXAMINATION BY MS. ROBERTS | 326 | 3 |
| REDIRECT EXAMINATION BY MR. PISTORINO | 387 | 3 |
| RECROSS-EXAMINATION BY MS. ROBERTS | 402 | 3 |
| FURTHER REDIRECT EXAMINATION BY MR. PISTORINO | 404 | 3 |
| **BUSCH, DOUGLAS** | | |
| DIRECT EXAMINATION BY MR. PISTORINO | 405 | 3 |
| CROSS-EXAMINATION BY MS. ROBERTS | 460 | 3 |
| REDIRECT EXAMINATION BY MR. PISTORINO | 473 | 3 |
| **MATOLO, ERIC** | | |
| DIRECT EXAMINATION BY MR. PISTORINO | 475 | 3 |

| **TRIAL EXHIBITS:** | **WITHDRAWN** | **ID.** | **EVD.** | **VOL.** |
|---|---|---|---|---|
| 43 | | | 299 | 3 |
| 44 | | | 309 | 3 |
| 67 | | | 372 | 3 |
| 291 | | | 476 | 3 |
| 307 | | | 490 | 3 |
| 308 | | | 491 | 3 |
| 311 | | | 492 | 3 |
| 321 | | | 373 | 3 |
| 334 | | | 448 | 3 |
| 501 | | | 342 | 3 |

| TRIAL EXHIBITS: | WITHDRAWN | ID. | EVD. | VOL. |
|---|---|---|---|---|
| 505 | | | 343 | 3 |
| 527 | | | 344 | 3 |
| 528 | | | 344 | 3 |
| 530 | | | 345 | 3 |
| 566 | | | 360 | 3 |
| 581 | | | 380 | 3 |
| 584 | | | 382 | 3 |
| 586 | | | 382 | 3 |
| 587 | | | 375 | 3 |
| 592 | | | 378 | 3 |
| 594 | | | 377 | 3 |
| 595 | | | 384 | 3 |
| 603 | | | 335 | 3 |
| 604 | | | 385 | 3 |
| 606 | | | 386 | 3 |
| 610 | | | 330 | 3 |
| 611 | | | 337 | 3 |
| 613 | | | 347 | 3 |
| 614 | | | 345 | 3 |
| 615 | | | 347 | 3 |
| 616 | | | 464 | 3 |
| 619 | | | 341 | 3 |
| 621 | | | 387 | 3 |
| 622 | | | 350 | 3 |

| TRIAL EXHIBITS: | WITHDRAWN | ID. | EVD. | VOL. |
|---|---|---|---|---|
| 634 | | | 353 | 3 |
| 635 | | | 354 | 3 |
| 642 | | | 355 | 3 |
| 647 | | | 359 | 3 |
| 650 | | | 363 | 3 |
| 656 | | | 367 | 3 |
| 753 | | | 340 | 3 |
| 767 | | | 338 | 3 |
| 896 | | | 366 | 3 |
| 906 | | | 349 | 3 |
| 919 | | | 351 | 3 |

WEDNESDAY, JUNE 5, 2019 8:30 A.M.

P R O C E E D I N G S

OOO

**THE CLERK:** REMAIN SEATED. COME TO ORDER. THIS COURT IS IN SESSION. THE HONORABLE HAYWOOD S. GILLIAM, JR. PRESIDING.

**THE COURT:** READY FOR THE JURY?

**THE CLERK:** READY, JUDGE?

**THE COURT:** YES.

(PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

**THE COURT:** GOOD MORNING, EVERYONE. AND WELCOME BACK.

YOU WILL RECALL THAT YESTERDAY WE WERE IN THE MIDDLE OF THE DIRECT EXAMINATION OF MR. WOODS, AND WE'LL CONTINUE WITH THAT NOW.

MR. PISTORINO, YOU MAY PROCEED.

**DIRECT EXAMINATION RESUMED**

**BY MR. PISTORINO:**

**Q.** GOOD MORNING, MR. WOODS.

**A.** GOOD MORNING.

**Q.** YESTERDAY WE GOT A LITTLE BIT OF A SENSE OF YOUR BACKGROUND AND YOUR INVOLVEMENT WITH TECHSHOP OVER THE COURSE OF THE YEARS. I WANT TO NOW MOVE FORWARD TO THE TIME THAT IS MOST RELEVANT, THE REASON WHY WE ARE HERE TODAY.

IN MID-NOVEMBER 2017, TECHSHOP PUBLICLY ANNOUNCED IT WAS

GOING TO CLOSE ITS DOORS AND PURSUE BANKRUPTCY PROTECTION, CORRECT?

**A.** CORRECT.

**Q.** IF YOU -- SHORTLY THEREAFTER, I KNOW WE HAVE SEEN TECHSHOP WAS APPROACHED BY MR. RASURE, CORRECT?

**A.** THAT'S CORRECT.

**Q.** OKAY.

IF YOU CAN IN YOUR BOOK, IN THE BINDER IN FRONT OF YOU, TURN TO THE EXHIBIT THAT WE HAVE MARKED TX34.

**MR. PISTORINO:** WHICH I BELIEVE HAS PREVIOUSLY BEEN ADMITTED.

**THE CLERK:** I'M SORRY, I DON'T HAVE MY NOTES UP.

YES.

**THE WITNESS:** YES, I HAVE IT.

**MR. PISTORINO:** LET'S GIVE IT ONE MOMENT, IF WE CAN.

**BY MR. PISTORINO:**

**Q.** WHILE WE ARE WAITING FOR THAT TO COME UP, LET ME GO AHEAD AND ASK.

SHORTLY THEREAFTER, TECHSHOP ANNOUNCED THAT WITHIN A DAY OR TWO TECHSHOP WAS CONTACTED BY MR. RASURE, CORRECT?

**A.** THAT'S CORRECT.

**Q.** AND AT THAT TIME, DID YOU HAVE ANY CONVERSATIONS WITH MR. RASURE AFTER HIS APPROACH?

**A.** AT WHAT TIME? I'M SORRY.

**Q.** RIGHT WHEN HE INITIALLY APPROACHED YOU BY EMAIL, DID YOU

HAVE COMMUNICATION WITH HIM?

**A.** SURE.

**Q.** WHAT DID MR. RASURE SAY? WHO DID HE SAY HE WAS?

**A.** WELL, HE REPRESENTED HIMSELF AS AN EXECUTIVE WITH, I BELIEVE YOU CALL IT PIRANHA MEGAFAB, AND HE HAD A STRONG INTEREST IN ACQUIRING TECHSHOP AND ITS ASSETS, AND WANTED TO MOVE RELATIVELY QUICKLY AND WAS PREPARED TO MOVE QUICKLY.

**Q.** DID MR. RASURE MENTION ANYTHING ABOUT HIS FINANCIAL CAPABILITY TO DO A TRANSACTION LIKE THIS?

**A.** YEAH, HE DID.

(DISPLAYED ON SCREEN.)

YOU KNOW, AS YOU MIGHT IMAGINE, SINCE WE ALREADY ANNOUNCED WE WERE CLOSING THE DOORS AND ABOUT TO FILE CHAPTER 7, AN IMPORTANT TOPIC OF THAT CONVERSATION WAS I'M NOT SURE THAT WE CAN STOP AT THIS POINT IN TIME, BUT WE'RE OBVIOUSLY VERY COMMITTED IF WE CAN GET A DEAL DONE, GOOD DEAL AND GET IT DONE QUICKLY.

AND HE ASSURED ME IN THAT INITIAL CONVERSATION THAT HE WAS CERTAINLY PREPARED AND CAPABLE AND HAD THE MEANS OF MOVING QUICKLY IF WE COULD WORK OUT A GOOD DEAL.

**Q.** NOW WE CAN SEE TX34, THAT IS AN EMAIL FROM YOU TO MR. KOZLOWSKI DATED NOVEMBER 18, 2018, CORRECT?

**A.** THAT'S CORRECT.

**Q.** AS YOU SAY, IT'S AN EMAIL FROM YOU WHERE YOU ARE INTRODUCING MR. RASURE, YOU SAY PLEASE MEET MR. DAN RASURE OF

PIRANHA MEGAFAB, ENTREPRENEUR, MANUFACTURER, MARKETER, AND MAKER.

YOU MENTION, WE ARE IN SERIOUS 11TH HOUR DISCUSSIONS WITH DAN REGARDING A POSSIBLE ACQUISITION OF TECHSHOP. DAN IS EXTREMELY KNOWLEDGEABLE, EXPERIENCED IN ACQUISITIONS AND TURNAROUNDS, AND EXCEPTIONALLY WELL CAPITALIZED.

ARE YOU WITH ME?

**A.** THAT'S CORRECT. I MEAN THAT WAS CERTAINLY MY UNDERSTANDING FROM TALKING TO HIM. I TALKED TO HIM INITIALLY DIRECTLY AND THEN THE BOARD AND I TALKED WITH HIM ON THE PHONE.

**Q.** WHAT DID MR. RASURE REPRESENT TO YOU ABOUT HIS STATUS AS BEING EXCEPTIONALLY WELL CAPITALIZED?

**A.** WELL, WE TALKED ABOUT BROAD RANGES OF WHAT IT WAS PROBABLY GOING TO COST TO RESTART TECHSHOP, GET ITS LOCATIONS REOPENED. AND HE SEEMED NOT ONLY COMMITTED, BUT EXPRESSED TO US THAT HE HAD THE MEANS AND THE CAPITAL TO PULL THAT OFF; THAT HE HAD THE BACKING OF HIS COMPANY AND OTHER BACKERS AND COULD PULL THAT OFF, AND HAD DONE SIMILAR DEALS IN THE PAST.

**Q.** DID MR. RASURE SAY ANYTHING ABOUT HIS CAPABILITY TO COMMIT ANY OF THE ASSETS OF PIRANHA MEGAFAB TO A POTENTIAL TRANSACTION WITH TECHSHOP?

**A.** ASSETS AS IN PHYSICAL ASSETS FOR THE SHOPS, THE ANSWER IS UNEQUIVOCAL YES. IN TERMS OF CAPITAL, IT APPEARED TO US THAT HE WAS EXPRESSING THAT IT WAS PIRANHA MEGAFAB THAT WOULD BE

PUTTING CAPITAL BEHIND THE DEAL IF WE CAN PUT A DEAL TOGETHER.

**Q.** IN HIS POSITION, DID HE REPRESENT THAT IN HIS POSITION WITH AT PIRANHA MEGAFAB HE WOULD BE ABLE TO COMMIT PIRANHA MEGAFAB TO A TRANSACTION --

**A.** ABSOLUTELY.

**Q.** OKAY.

NOW, IF YOU CAN TURN, JUST TO KEEP US GOING ALONG CHRONOLOGICALLY, IF YOU CAN TURN IN YOUR BOOK TO AN EXHIBIT WE MARKED TX43.

**MR. PISTORINO:** I'LL MOVE TO --

**THE CLERK:** YOU HAVE NOT.

**MR. PISTORINO:** WHICH I WILL MOVE TO HAVE ADMITTED AT THIS TIME.

**MS. ROBERTS:** NO OBJECTION.

**THE COURT:** 43 IS ADMITTED.

**MR. PISTORINO:** THANK YOU.

(TRIAL EXHIBIT 43 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** TX43, THIS IS JUST ANOTHER EARLY VERSION OF THE MEMORANDUM OF UNDERSTANDING.

DO YOU RECOGNIZE IT?

**A.** YES, I DO.

**Q.** OKAY. DURING THE COURSE OF THE NEGOTIATIONS TO ENTER INTO THAT MEMORANDUM OF UNDERSTANDING, DID MR. RASURE INDICATE TO

THE BOARD ANY PARTICULAR ASSETS OF TECHSHOP THAT HE WAS INTERESTED IN?

**A.** ALL OF THEM? YOU KNOW, TO BE PERFECTLY CANDID, PROBABLY ONE OF THE MOST VALUABLE THINGS WAS CERTAINLY CUSTOMER, YOU KNOW, MEMBER DATA AND MEMBERSHIP LIST AND THE CRM ITSELF, NOT SO MUCH FOR THE SYSTEM PART, BUT THE CONTENT OF THE CRM.

**Q.** DID MR. RASURE INDICATE ANYTHING ABOUT WANTING TO -- THE TECHSHOP -- WANTING TO ACQUIRE THE TECHSHOP TRADEMARKS?

**A.** YEAH, ABSOLUTELY. THE BRAND WAS IMPORTANT. YOU KNOW, THE -- THE -- THE BRAND, BRAND PRESENCE, THE CRM, THE EXISTING MEMBERSHIP DATA, PARTNERSHIPS, THAT WAS ALL IMPORTANT. PART OF THE POTENTIAL DEAL.

**Q.** IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT WE MARKED AS TX51, WHICH I BELIEVE HAS ALREADY BEEN ADMITTED.

(DISPLAYED ON SCREEN.)

ARE YOU WITH ME THERE?

**A.** I'M THERE.

**Q.** OKAY.

**A.** I'M READING.

**Q.** AND TX51 IS AN EMAIL FROM MR. RASURE TO YOU DATED ABOUT THREE DAYS AFTER ENTERING INTO THE MOU.

AND IN THE SECOND PARAGRAPH, SECOND SENTENCE, HE INDICATES, "I VALUE WHAT TECHSHOP BECAME AND WHAT IT CAN DO IN THE FUTURE. IF I DIDN'T, I WOULD HAVE PUSHED FOR AN IMMEDIATE NAME CHANGE. MY GOAL IS NOT TO CHANGE THE NAME GOING FORWARD.

I HAVE ADMIRED TECHSHOP FROM A DISTANCE FOR ALMOST TEN YEARS."

WAS THERE ANY DISCUSSION WITH MR. RASURE ABOUT HIS DESIRE TO USE THE TECHSHOP NAME WHEN -- AFTER ACQUIRING THE TECHSHOP ASSETS?

**A.** YEAH, CLEARLY HE WANTED TO USE THE TECHSHOP NAME. THIS IS ABSOLUTELY AN ESSENTIAL PART OF THE DEAL.

**Q.** OKAY.

WE'VE SEEN IN THE MEMORANDUM OF UNDERSTANDING THAT THE AGREEMENT THERE IS BETWEEN TECHSHOP AND TECHSHOP 2 LLC.

DO YOU RECALL THAT?

**A.** YES, I RECALL THAT.

**Q.** OKAY. WHAT WAS THE BOARD'S FEELING ABOUT MR. RASURE USING THE NAME TECHSHOP 2, LLC AT THAT TIME?

**A.** WELL, OUR FEELING WAS THAT IF WE PUT TOGETHER A DEAL AND HE ACQUIRES THE ASSETS OF THE COMPANY, HE'S CERTAINLY FREE TO MARKET IT AS TECHSHOP OR TECHSHOP 2.0. THAT WAS OUR UNDERSTANDING.

**Q.** OKAY.

AFTER THE MOU WAS ENTERED INTO, WERE THERE VARIOUS THINGS THAT MR. RASURE WAS SUPPOSED TO DO TO ADVANCE THE TRANSACTION TOWARDS A FINAL AGREEMENT WITH TECHSHOP?

**A.** THAT'S CORRECT. THERE WERE... THERE WERE CERTAIN EXPENSES THAT TECHSHOP WAS GOING TO INCUR IF WE DID NOT FILE IMMEDIATELY. AND THAT WE QUITE LITERALLY HAD NO MONEY, LIKE $30, YOU KNOW, EFFECTIVELY HAD NO MONEY, AND WE COMMUNICATED

THAT, YOU KNOW, AT THE VERY BEGINNING THAT WE WERE SORT OF AT THE ROPE'S END.

AND IF WE WERE TO ENTER INTO, YOU KNOW, A NEGOTIATION, IT WAS -- EVEN IF WE MOVE VERY, VERY RAPIDLY, IT WAS LIKELY GOING TO TAKE WEEKS TO WORK THROUGH, AND THAT WE HAD NO MEANS, FOR EXAMPLE, OF KEEPING THE GOOGLE SUITE WHICH WAS BOTH THE EMAIL AS WELL AS ALL OF OUR CONTENT, ALL OF OUR FILES THAT WERE GOING TO BE NECESSARY TO NOT ONLY NEGOTIATE BUT EFFECT A CLEAN TRANSITION TO A NEW COMPANY, THAT WE WOULD NEED THAT.

WE HAD NO ATTORNEY AT THE TIME, HAD NO MONEY FOR A RETAINER; AND TO DO ANY EVEN RUDIMENTARY EVALUATION OF OFFERS, WE WOULD NEED TO RETAIN AN ATTORNEY, AND THAT WOULD NEED TO BE PAID FOR.

AND THERE WAS ONE OTHER ITEM. WE HAD PAID ABOUT TWO-THIRDS OF INSURANCE PREMIUMS THROUGH, I BELIEVE IT WAS THE END OF NOVEMBER, AND WE SAID THAT IF WE WERE NOT GOING TO FILE IMMEDIATE BANKRUPTCY AND ATTEMPT TO KEEP THE COMPANY OPEN, WE WERE GOING TO -- NEEDED TO FIND A WAY OF PAYING THAT AS WELL.

SO WE -- THAT TOTAL AMOUNT OF MONEY AMOUNTED TO, I THINK, BETWEEN 30 AND $35,000, SOMETHING IN THAT NEIGHBORHOOD. AND THAT WAS ONE OF THE THINGS THAT HE AGREED TO PAY.

ALSO --

**Q.** SO AT THAT TIME, MR. RASURE KNEW THAT TECHSHOP DID NOT HAVE MONEY TO RETAIN AN ATTORNEY; IS THAT CORRECT?

**A.** ABSOLUTELY.

**Q.** OKAY.

**A.** YEAH. WE WERE VERY HAT IN HAND, VERY TRANSPARENT THAT WE WERE BROKE. WE HAD NO FUNDS TO HIRE AN ATTORNEY.

**Q.** IF I CAN, I WOULD ASK YOU TO MOVE IN YOUR BOOK TO A DOCUMENT WE MARKED TX53, WHICH I BELIEVE --

**A.** 53?

**Q.** 53.

(DISPLAYED ON SCREEN.)

LET ME KNOW WHEN YOU ARE READY, SIR.

**A.** OKAY. I'M READY.

**Q.** AND TX53 IS A SERIES OF EMAILS EXCHANGED AROUND DECEMBER 7TH.

WHAT I'M REALLY INTERESTED IN IS THE BOTTOM EMAIL ON THE FIRST PAGE WHERE IT LOOKS LIKE MR. BUSCH IS INDICATING TO MR. RASURE THAT HE HAS NOT SEEN ANY OF THE ITEMS THAT WE AGREED YOU WOULD PROVIDE BY CLOSE OF BUSINESS TODAY.

DO YOU SEE THAT?

**A.** I DO.

**Q.** SO ABOUT A WEEK AFTER THE MOU HAD BEEN ENTERED, AND ENTERED INTO, WHAT ITEMS HAD TECHSHOP STILL BEEN SEEKING FROM MR. RASURE?

**A.** MOST IMPORTANTLY WE NEEDED ASSURANCE THAT HE HAD THE MEANS, THE BACKING, AND A PLAN TO PULL THIS OFF.

AND SO WE WERE HOPING TO BE INTRODUCED TO HIS PARTNERS OR BACKERS TO RECEIVE LIKE A PRO FORMA OF HERE'S WHAT I THINK IT

IS GOING TO TAKE, SORT OF THE SOURCES AND USES OF FUNDS TO PULL THIS DEAL OFF. AND TO US, THAT WAS ABSOLUTELY ESSENTIAL.

I MEAN, IF YOU CONSIDER THAT WE HAD JUST NOTIFIED OUR MEMBERS AND THE PUBLIC AND OUR INVESTORS THAT WE HAD TO CLOSE THE DOORS AND FILE FOR BANKRUPTCY, AND YOU CAN ONLY IMAGINE HOW DISRUPTIVE THAT WAS, THE LAST THING WE WANTED TO DO WAS AFTER WE HAD ALREADY ANNOUNCED THAT WE WERE NOW TRYING TO DO A DEAL WITH DAN RASURE WAS TO MOVE FORWARD AND FALL FLAT ON OUR FACE AGAIN.

SO IT WAS REALLY IMPORTANT TO US THAT WE GET THAT BODY OF INFORMATION, A PLAN AND ASSURANCE THAT HE HAD THE FINANCIAL WHEREWITHAL TO PULL THIS OFF.

**Q.** OTHER THAN JUST THE FINANCIAL WHEREWITHAL, WERE THERE OTHER ITEMS THAT THE BOARD HAD BEEN LOOKING FOR FROM MR. RASURE?

**A.** WELL, YEAH. I MEAN, MOST IMPORTANTLY IT WAS... IT WAS TO SEE AN ACTUAL PLAN AND TO SEE THE ACTUAL SOURCE OF FUNDS, AND TO SHOW -- TO PROVE THAT HE HAD THE FUNDS TO PULL IT OFF.

AND I THINK THE THREE ITEMS THAT HE ACTUALLY -- THAT WE NEEDED FROM HIM AND HE DELIVERED ON WAS THE GOOGLE, YOU KNOW, PAYING FOR THE GOOGLE SUITE, PAYING THE RETAINER FOR THE ATTORNEY, AND... THE INSURANCE PREMIUM. HE PAID THAT.

BUT AS PART OF THE MOU, WE NEEDED HIM TO AT LEAST PAY FOR THE STAFF OF, YOU KNOW, ACCOUNTANTS WE HAD RETAINED AND ALWAYS USED AS A COMPANY AND OUTSOURCED FINANCIAL AND ACCOUNTING

COMPANY IF WE WERE GOING TO CONTINUE FORWARD WITH THE NEGOTIATION. AND IF HE WERE GOING TO CONTINUE, OBVIOUSLY AND NECESSARILY, TO ASK FOR ACCOUNTING INFORMATION, WE -- I NEEDED PEOPLE WHO COULD GO GET THAT INFORMATION. I DIDN'T HAVE THAT INFORMATION. I NEEDED PEOPLE WHO COULD GET THAT.

SO WE NEEDED HIM TO MOVE FORWARD WITH PAYING THE PEOPLE TO DO THAT, MOVE FORWARD PAYING PEOPLE TO DO BASIC COMMUNICATIONS VIA SOCIAL MEDIA AS WELL AS TO OUR OWN CUSTOMER BASE.

**Q.** WAS THE TECHSHOP BOARD REQUESTING INFORMATION ABOUT WHO ELSE WOULD BE PART OF MR. RASURE'S TEAM TO COMPLETE THE TRANSACTION?

**A.** YEAH. WE WANTED TO KNOW WHO HIS BACKERS WERE.

**Q.** IF YOU CAN TURN IN YOUR BOOK TO THE DOCUMENT WE MARKED TX60, WHICH I BELIEVE --

**THE CLERK:** 60?

**MR. PISTORINO:** 60.

**THE CLERK:** THAT'S IN.

(DISPLAYED ON SCREEN.)

**THE WITNESS:** 60, CORRECT?

**BY MR. PISTORINO:**

**Q.** 60.

LET ME KNOW WHEN YOU ARE READY, SIR.

**A.** I AM READY.

**Q.** TX60 IS AN EMAIL FROM MR. BUSCH TO MR. RASURE AS WELL AS YOURSELF, SIR, DATED DECEMBER 11TH.

IF YOU CAN SEE THERE, MR. BUSCH SAYS, "DAN, I'VE GOTTEN NO RESPONSE FROM MR. GREEN OR MR. CLAXTON. I ALSO HAVEN'T GOTTEN ANYTHING FROM YOU REGARDING THE MATTERS BELOW. WHY HAVE WE NOT SEEN EVIDENCE OF CAPITALIZATION OR INFORMATION ON YOUR TEAM?"

DO YOU SEE THAT?

**A.** I DO SEE THAT.

**Q.** WAS THAT INFORMATION THAT TECHSHOP HAD BEEN SEEKING REALLY SINCE THE DAY THE MOU WAS ENTERED INTO?

**MS. ROBERTS:** OBJECTION, LEADING.

**THE COURT:** OVERRULED.

**THE WITNESS:** ABSOLUTELY ESSENTIAL THAT WE GET THAT INFORMATION. I MEAN, WE COULDN'T GO FORWARD WITH THE NEGOTIATION WITHOUT THAT.

**BY MR. PISTORINO:**

**Q.** WHAT WAS THE BOARD'S FEELING ABOUT THE FACT THAT IT DIDN'T HAVE THAT INFORMATION THROUGH DECEMBER 11TH?

**A.** WELL, FRANKLY, WE WERE FRUSTRATED BECAUSE WE WERE VERY COMMITTED AND VERY EAGER TO MOVE FORWARD WITH A DEAL, THOUGHT THAT WAS GOING TO BE VERY BENEFICIAL TO OUR FORMER EMPLOYEES, CONTRACTORS, AND THE COMMUNITY AT LARGE.

SO WE WERE INTERESTED IN DOING A DEAL, BUT WE WERE ALSO INCREASINGLY WORRIED THAT, IN FACT, THE REASON WE HADN'T BEEN GETTING THAT DATA WAS PERHAPS HE DIDN'T HAVE PROOF OF FUNDING, AND WE WERE EVEN A LITTLE CONCERNED BECAUSE HIS BACKERS THAT

HE GAVE US HADN'T RETURNED ANY OF OUR CALLS OR TEXTS; THAT, IN FACT, THEY WERE LESS THAN ENTHRALLED OR MIGHT BE LESS THAN ENTHRALLED WITH THE POTENTIAL DEAL.

**Q.** DURING THE ENTIRE PERIOD OF THESE NEGOTIATIONS WITH MR. RASURE, DID THE TECHSHOP BOARD EVER COMMUNICATE WITH ANYBODY ELSE THAT WAS WORKING WITH MR. RASURE ABOUT A POTENTIAL DEAL?

**A.** WELL, WE ATTEMPTED TO, YOU KNOW, AS THIS -- AS THIS IMPLIES, ATTEMPT TO CONTACT A MR. GREEN AND A MR. CLAXTON, NAMES OF PEOPLE THAT MR. RASURE FINALLY GAVE TO US AS PEOPLE THAT HE WAS WORKING WITH. HOWEVER, WE WERE UNABLE TO GET A RESPONSE FROM THEM -- OR DOUG BUSCH WAS THE ONE THAT WAS ATTEMPTING TO GET A RESPONSE FROM THEM AND DID NOT.

**Q.** DID TECHSHOP EVER ACTUALLY SUCCEED IN COMMUNICATING WITH ANYBODY ELSE OTHER THAN MR. RASURE ABOUT THE POTENTIAL TRANSACTION WITH MR. RASURE?

**A.** NOT THAT I AM AWARE OF.

**Q.** FOR THE ENTIRE TIME OF THE DISCUSSIONS WITH MR. RASURE, TECHSHOP WAS ONLY -- ONLY CONTACT WAS WITH MR. RASURE HIMSELF?

**A.** THAT'S CORRECT.

**Q.** OKAY.

IF YOU COULD TURN IN YOUR BOOK TO THE DOCUMENT THAT WE'VE MARKED TX62, WHICH I BELIEVE HAS ALREADY BEEN ADMITTED.

**A.** 62?

**Q.** 62. LET ME KNOW WHEN YOU ARE READY.

(DISPLAYED ON SCREEN.)

**A.** YES, I SEE -- I HAVE THE DOCUMENT IN FRONT OF ME. I'M FAMILIAR WITH IT.

**Q.** OKAY.

TX62 IS A DOCUMENT WE'VE SEEN BEFORE. IT IS AN EMAIL FROM MR. RUTTUM TO DAN RASURE AND YOU'RE COPYING YOURSELF, SIR, DATED DECEMBER 12TH. AND IN THIS EMAIL IT INDICATES THAT TECHSHOP IS TERMINATING THE MOU.

ARE YOU WITH ME THERE?

**A.** YES.

**Q.** OKAY.

CAN YOU TELL THE JURY WHY DID THE TECHSHOP BOARD DECIDE TO TERMINATE THE MOU WITH MR. RASURE?

**A.** TIMING WAS OF THE ESSENCE. NUMBER ONE, ANOTHER PARTY HAD APPROACHED ONE OF OUR SECURED CREDITORS, AUTODESK, AND INQUIRED ABOUT THE POTENTIAL OF DOING A DEAL. AND AS WELL, WE NOT ONLY WANTED TO BE OPEN TO TALK TO HIM, IF WE WEREN'T GOING TO BE ABLE TO GET A DEAL DONE WITH MR. RASURE, WE ALSO HAD TO DETERMINE IF WE SHOULD MOVE RAPIDLY AND CLOSE THE DOOR AND ACTUALLY FILE CHAPTER 7 AT THAT POINT IN TIME.

SO IT WAS A FISH-OR-CUT-BAIT SORT OF SCENARIO FOR US. AND, THUS, WE NEEDED TO TERMINATE THE MOU.

**Q.** DID THE LACK OF INFORMATION FROM MR. RASURE REGARDING A TEAM AND PROOF OF CAPITALIZATION, DID THAT CONTRIBUTE TO TECHSHOP'S DECISION TO TERMINATE THE MOU?

**A.** ABSOLUTELY. THAT WAS REALLY THE CRUX OF THE RATIONALE FOR WHY WE NEEDED TO TERMINATE THE MOU.

**Q.** EARLIER YOU MENTIONED THAT ONE THING MR. RASURE WAS PARTICULARLY INTERESTED IN WAS THE TECHSHOP CUSTOMER LIST.

DO YOU RECALL THAT?

**A.** I DO.

**Q.** OKAY. IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT THAT WE'VE MARKED TX44.

LET ME KNOW -- WHICH I BELIEVE IS ALREADY ADMITTED.

**THE CLERK:** 44?

**MR. PISTORINO:** 44.

**THE CLERK:** NO, I DON'T HAVE 44 ON MY LIST.

**MR. PISTORINO:** I'LL MOVE TO ADMIT TX44.

**MS. ROBERTS:** NO OBJECTION.

**THE COURT:** 44 IS ADMITTED.

(TRIAL EXHIBIT 44 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** LET ME KNOW WHEN YOU ARE READY, SIR.

**A.** I'M AT 44.

**Q.** I THINK WE'VE ACTUALLY SEEN A DIFFERENT VERSION OF THIS, BUT WE WILL USE THIS ONE.

TX44 IS A SERIES OF EMAILS BACK AT THE TIME OF THE EXECUTION OF THE MOU DISCUSSING WHETHER OR NOT TECHSHOP COULD SHARE ITS CUSTOMER EMAIL LIST WITH MR. RASURE.

DO YOU SEE THAT, SIR?

**A.** YES, I DO.

**Q.** AND CAN YOU DESCRIBE FOR US THE BOARD'S FEELING ABOUT SHARING THE CUSTOMER EMAIL LIST WITH MR. RASURE?

**A.** WELL, ABSOLUTELY. I MEAN, IN THE -- FROM OUR... FROM OUR STANDPOINT WE TALKED ABOUT THIS A LOT AMONGST OURSELVES, AND FELT THAT FOR PRIVACY LAWS, WE WERE NOT AT LIBERTY TO DIVULGE OUR MEMBERS' INFORMATION UNTIL A TRANSFER WAS DONE. AND FURTHER, IT MIGHT NOT EVEN HAVE BEEN POSSIBLE AFTER A TRANSFER WAS DONE. THERE WAS SOME DEBATE ABOUT THAT.

WE DISCUSSED THAT AT LOT WITH MR. RASURE ABOUT THE LEGALITY OF IT, THEREFORE, WE WEREN'T COMFORTABLE RELEASING THE INFORMATION. WE WOULD -- FELT COMFORTABLE EMAILING IT ACROSS OURSELVES, BUT NOT RELEASING THAT INFORMATION.

FURTHERMORE, IT WAS ONE OF THE ASSETS THAT WE WERE ATTEMPTING TO SELL AS PART OF THE DEAL; THAT RELEASING THAT INFORMATION WOULD CERTAINLY HAVE BEEN PREMATURE PRIOR TO A DEAL BEING CONSUMMATED.

**Q.** IN TX44 WE SEE IT'S BEING DESCRIBED AS -- YOU SEE THE FIRST LINE, "FOR CLARITY, IT IS NOT JUST PRIVACY LAW, IT IS GIVING AWAY THE FAMILY SILVER BEFORE IT IS PAID FOR."

DO YOU SEE THAT?

**A.** YES.

**Q.** WHAT WAS YOUR UNDERSTANDING THEN OF THE RELATIVE IMPORTANCE OF THE TECHSHOP CUSTOMER LIST TO THE POTENTIAL

TRANSACTION WITH MR. RASURE?

**A.** WELL, JUST THAT, THAT IT WAS AN ABSOLUTELY ESSENTIAL AND INVALUABLE PART OF WHAT HE WOULD BE BUYING. AND IF WE GAVE IT AHEAD OF TIME, HE DOESN'T REALLY NEED TO DO A DEAL WITH US.

**Q.** AFTER TECHSHOP CANCELED THE MEMORANDUM OF UNDERSTANDING, DID YOU CONTINUE TO HAVE NEGOTIATIONS WITH MR. RASURE ABOUT A POTENTIAL TRANSACTION WITH TECHSHOP?

**A.** YES, WE DID.

**Q.** CAN YOU -- WE KNOW THAT THEY WENT ON FOR SOME TIME. CAN YOU GENERALLY DESCRIBE THE SERIES OF NEGOTIATIONS WITH MR. RASURE?

**A.** YEAH. YOU KNOW, DAN APPROACHED ME NUMEROUS OCCASIONS AND SAID THAT HE CONTINUED TO HAVE AN INTEREST IN FINDING A WAY OF ACQUIRING THE ASSETS.

HE SORT OF TRANSITIONED TO A MODE WHERE HE WAS DEALING MORE DIRECTLY IN TERMS OF THE NEGOTIATIONS WITH AUTODESK, OUR LARGEST SECURED CREDITOR AND WORKING WITH THEM AND THEIR ATTORNEYS TO EXPLORE HOW AN ACQUISITION MIGHT BE DONE.

BUT HE WOULD CONTACT ME FAIRLY REGULARLY, IF NOT DAILY, YOU KNOW, FOUR -- THREE, FOUR, FIVE TIMES A WEEK DISCUSSING VARIOUS ASPECTS OF WHAT MIGHT MAKE FOR AN ATTRACTIVE DEAL. THERE WERE A LOT OF DIFFERENT SCENARIOS DISCUSSED.

**Q.** IF MR. RASURE HAD COME UP WITH A PROPOSED TRANSACTION FOR -- TO ACQUIRE THE ASSETS OF TECHSHOP THAT WOULD HAVE WORKED, WAS THAT SOMETHING THAT TECHSHOP WOULD STILL HAVE BEEN

INTERESTED IN DOING?

**A.** ABSOLUTELY. ABSOLUTELY.

**Q.** IF YOU CAN TURN IN YOUR BOOK WITH ME TO THE EXHIBIT THAT WE'VE MARKED TX78, WHICH I BELIEVE HAS BEEN ADMITTED.

**THE CLERK:** UH-HUH.

**MR. PISTORINO:** THANK YOU.

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** LET ME KNOW WHEN YOU ARE READY, SIR.

**A.** THAT WAS 78? I'M ON THAT NOW.

**Q.** IN THE EARLIER EXHIBITS THAT WE SAW, WE SAW THAT THE MOU WAS CANCELED, I BELIEVE, ON DECEMBER 12TH. AND TX78 IS AN EMAIL FROM YOU TO MR. RASURE DATED FEBRUARY 7TH.

ARE YOU WITH ME THERE?

**A.** I AM WITH YOU.

**Q.** SO HAVING THE NEGOTIATIONS WITH MR. RASURE ABOUT POTENTIAL ALTERNATIVE DEALS BEING GOING ON FOR THIS NEARLY TWO-MONTH TIME FRAME.

**A.** I'M SORRY, THE QUESTION?

**Q.** SURE.

HAD THE NEGOTIATIONS WITH MR. RASURE ABOUT A POTENTIAL TRANSACTION THEN CONTINUING ON THROUGH THIS FEBRUARY 7 TIME FRAME?

**A.** THAT'S CORRECT.

**Q.** SO FOR ABOUT TWO MONTHS AFTER THE CANCELLATION OF THE MOU,

YOU WERE STILL NEGOTIATING WITH MR. RASURE ABOUT A POTENTIAL TRANSACTION, CORRECT?

**A.** THAT'S CORRECT.

**Q.** NOW, SHORT -- IN TX78, YOU INDICATE THAT YOU'RE NOT PREPARED TO ACCEPT MR. RASURE'S LATEST PROPOSAL AND THAT TECHSHOP IS BEGINNING TO -- HAS NOW DECIDED AND FINALLY TO BEGIN PLANNING FOR A CHAPTER 7 FILING.

DO YOU SEE THAT THERE?

**A.** YES, I DO.

**Q.** OKAY. NOW SHORTLY AFTER YOU SENT THIS EMAIL, DID YOU BECOME AWARE OF MR. RASURE'S INTENTION TO OPEN TECHSHOP'S FORMER FACILITY IN SAN FRANCISCO UNDER THE NAME TECHSHOP 2.0?

**A.** YES, I DID.

**Q.** HOW DID YOU BECOME AWARE OF THAT, SIR?

**A.** SOMEONE SENT ME A NEWSPAPER ARTICLE. I BELIEVE IT WAS THE *CHRONICLE*.

**Q.** OKAY.

**A.** AND I READ THE ARTICLE AND WAS SURPRISED TO SEE THAT MR. RASURE HAD APPARENTLY DONE A DEAL WITH THE LANDLORD OF THE PROPERTY THAT USED TO BE TECHSHOP SAN FRANCISCO THAT WE OCCUPIED, AND THAT HE PLANNED TO OPEN THE OPERATION -- REOPEN THE SHOP UNDER THE NAME TECHSHOP 2.0.

**Q.** IF YOU... IF YOU CAN, IN YOUR BOOK, TURN WITH ME TO THE EXHIBIT MARKED TX324 WHICH IS --

**A.** I'M SORRY, THE NUMBER?

**Q.** 324.

**A.** 324.

(DISPLAYED ON SCREEN.)

**Q.** IN TX324, THIS IS A FACEBOOK POST BY MR. RASURE DATED FEBRUARY 12TH ANNOUNCING THAT HE'S GOING TO BE OPENING THE TECHSHOP LOCATION IN SAN FRANCISCO UNDER THE NAME TECHSHOP 2.0.

ARE YOU WITH ME?

**A.** I'M WITH YOU.

**Q.** OKAY. WHAT WAS YOUR REACTION ON LEARNING THAT MR. RASURE WAS GOING TO REOPEN TECHSHOP'S FORMER FACILITY IN SAN FRANCISCO UNDER THE NAME TECHSHOP 2.0?

**A.** FRANKLY I WAS SHOCKED. YOU KNOW, HERE WE HAD BEEN IN NEGOTIATION OR CONVERSATION WITH HIM FOR TWO MONTHS ABOUT, YOU KNOW, A WHOLE LITANY OF DIFFERENT WAYS THAT THE DEAL COULD BE DONE AND BACK AND FORTH, AND THEN I FIND THAT HE'S ALREADY DONE A DEAL WITH THE LANDLORD AND IS RE-OPENING WHAT WAS TECHSHOP SAN FRANCISCO, AND THAT HE WAS GOING AHEAD AND USING THE TECHSHOP 2.0 BRAND, WHICH I FRANKLY WAS BLOWN AWAY.

IT JUST -- IT STRUCK ME AS INCREDIBLY UNPROFESSIONAL. YOU KNOW, I MAY BE A LOT OF THINGS, BUT I TRY TO BE BRUTALLY TRANSPARENT AND OPEN AND HONEST WITH PEOPLE, EVEN IF IT'S NOT POPULAR. BUT I HAD NO IDEA THAT THAT'S WHAT HE WAS WORKING ON, AND APPARENTLY FOR SOME TIME. AND, YEAH, I WAS DISAPPOINTED, SHOCKED, SURPRISED AND, YOU KNOW, FELT DAMAGED

BY IT, FRANKLY.

**Q.** SO PRIOR TO LEARNING OF THE ANNOUNCEMENT FROM MR. RASURE, DID YOU KNOW THAT MR. RASURE HAD BEEN DISCUSSING OPENING TECHSHOP'S FORMER FACILITY WITH THE LANDLORD?

**A.** I KNEW HE WAS IN DISCUSSION WITH THE LANDLORD BECAUSE THAT WAS AN ESSENTIAL PART, EVEN IF YOU GO BACK TO THE MOU, OBVIOUSLY TO EFFECT THIS AS QUICKLY AS POSSIBLE. DAN WOULD HAVE HAD TO NEGOTIATE DEALS WITH ANY OF THE LANDLORDS THAT -- WHERE HE WAS GOING TO REOPEN THE SHOP. THAT WAS ABSOLUTELY ESSENTIAL.

IN FACT, WITHIN 24 HOURS OF FIRST SPEAKING TO DAN EVER, I DID, I THOUGHT, VERY COURTEOUS INTRODUCTIONS BETWEEN DAN AND EACH OF THE LANDLORDS SO THAT WE COULD EXPEDITE THOSE KINDS OF CONVERSATIONS. SO I KNEW HE HAD BEEN SPEAKING WITH THE LANDLORD. I HAD NO IDEA THIS WAS HAPPENING.

**Q.** IF YOU CAN TURN IN YOUR BOOK TO AN EXHIBIT WE MARKED TX81, WHICH HAS ALREADY BEEN ADMITTED.

(DISPLAYED ON SCREEN.)

AND IN TX81, THAT'S AN EMAIL FROM YOU DATED ONE DAY LATER, FEBRUARY 13TH, TO MR. COUGHLIN AND MR. RASURE. I AM INTERESTED IN THE PORTION DOWN BELOW WHERE YOU SAID, "MR. RASURE'S REPRESENTATIONS ONLINE AND SOCIAL MEDIA ARE HIS OWN. WE ARE AWARE THAT YESTERDAY HE PROMISED TO OPEN A MAKERSPACE IN TECHSHOP SAN FRANCISCO'S FORMER LOCATION BY NEXT MONDAY. HOWEVER, WE, NOR ANY OF OUR PARTNERS OR SECURED

CREDITORS WERE PARTY TO THAT AGREEMENT."

DO YOU SEE THAT?

**A.** YES, I DO.

**Q.** WHY DID YOU NOTIFY MR. COUGHLIN ABOUT THE FACT THAT YOU WERE NOT A PARTY TO AN AGREEMENT WITH MR. RASURE ABOUT RE-OPENING THE SAN FRANCISCO LOCATION?

**A.** SURE.

MR. COUGHLIN WAS, IN ADDITION TO LANDLORDS, HE WAS ONE OF THE INDIVIDUALS -- HE WAS AN EXECUTIVE AT FORD MOTOR COMPANY WHO WAS AN ADVOCATE OF TECHSHOP AND HAD FRANKLY BEEN AN INTERNAL CHAMPION OF THE PARTNERSHIP THAT TECHSHOP DETROIT HAD WITH FORD. AND I INTRODUCED HIM TO MR. RASURE EARLIER IN THE NEGOTIATIONS.

AND MR. COUGHLIN REACHED OUT TO ME EXPRESSING SOME CONFUSION. YOU CAN CERTAINLY UNDERSTAND FROM HIS PERSPECTIVE THAT IF ALL OF A SUDDEN, GEE, A DEAL HAD BEEN DONE AND A TECHSHOP WAS RE-OPENING, HE SHOULD HAVE KNOWN ABOUT IT. HE WAS A VERY IMPORTANT STRATEGIC PARTNER.

ANYWAY, MR. COUGHLIN REACHED OUT TO ME AND EXPRESSED -- I FORGET EXACTLY WHAT THE QUESTION WAS, BUT I HAD ASKED SOME QUESTIONS ABOUT THE STATUS OF THE DEAL AND THE RELATIONSHIP.

**Q.** DID YOU HAVE ANY CONCERN ABOUT POTENTIAL CONFUSION OF MR. RASURE USING THE NAME TECHSHOP 2.0 AND HIS ASSOCIATION OR SPONSORSHIP BY TECHSHOP ITSELF?

**A.** WELL, YEAH. IT WASN'T JUST SPECULATION, IT WAS -- THIS

WAS WRITTEN AS A RESULT OF MR. COUGHLIN INQUIRING ABOUT WHAT WAS GOING ON. SO THERE WAS ABSOLUTELY CONFUSION, AT LEAST ON MR. COUGHLIN'S PART, AND I AM QUITE CONFIDENT CONFUSION AMONGST MEMBERS, A LOT OF OTHER PEOPLE IN THE COMMUNITY.

**Q.** IF YOU CAN TURN IN YOUR BOOK -- LET ME ASK QUICKLY.

IN LIGHT OF THIS KNOWLEDGE, DID THE TECHSHOP BOARD MAKE ANY DECISIONS REGARDING PROTECTING ITS TRADEMARKS?

**A.** COULD YOU RESTATE THAT?

**Q.** SURE.

UPON LEARNING THAT MR. RASURE WAS INTENDING TO OPEN TECHSHOP'S FORMER FACILITY USING THE NAME TECHSHOP 2.0, DID THE BOARD ARRIVE AT ANY DECISIONS ABOUT PROTECTING ITS TRADEMARKS?

**A.** ABSOLUTELY WE DID.

**Q.** IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT THAT WE MARKED TX29, WHICH I BELIEVE HAS ALREADY BEEN....

(DISPLAYED ON SCREEN.)

TX29 IS A LETTER DATED ONE DAY LATER, FEBRUARY 14TH, 2018, AND THE LETTER IS ACTUALLY FROM YOU, SIR.

DO YOU RECOGNIZE IT?

**A.** I DO.

**Q.** OKAY. AND I NOTE SORT OF IN THE MIDDLE BEFORE THE BULLET POINTS -- WELL, ACTUALLY LET ME GO BACK.

THE LETTER IS ADDRESSED TO MR. DAVE BYERS OF THE HEARST CORPORATION. AND JUST SO WE CAN ALL RECALL, WHO'S MR. BYERS?

**A.** HE WAS THE, YOU MIGHT SAY, THE LEASING REPRESENTATIVE WITH THE HEARST CORPORATION, YOU KNOW, LIKE THE *CHRONICLE* NEWSPAPER IN SAN FRANCISCO, AND WE WERE ON A PIECE OF THEIR PROPERTY. SO HE WAS THE INDIVIDUAL -- IF YOU WILL, HE WAS THE LANDLORD'S REPRESENTATIVE.

**Q.** SO YOU WERE WRITING THIS LETTER TO THE LANDLORD OF TECHSHOP'S FORMER LOCATION, CORRECT?

**A.** CORRECT.

**Q.** AND ALSO AS WELL TO MR. RASURE, CORRECT?

**A.** CORRECT.

**Q.** AND IN THE TEXT OF THE LETTER BEFORE THE BULLET POINTS, YOU SAY, "ALSO BE ADVISED THAT MR. RASURE HAS NO RIGHTS TO THE POSSESSION OR USE OF THE ASSETS OF TECHSHOP, INC. OR TECHSHOP SOMA LLC, INCLUDING, BUT NOT LIMITED TO", AND FOUR, FIVE BULLET POINTS DOWN: "TRADEMARKS AND INTELLECTUAL PROPERTY".

DO YOU SEE THAT?

**A.** I DO.

**Q.** WHAT WERE YOU INTENDING TO INDICATE BY SAYING THAT, SIR?

**A.** THAT HE SHOULDN'T BE USING TECHSHOP 2.0, TECHSHOP, OR ANY OTHER SIGNAGE, WORDS, OR MARKS THAT WERE GOING TO CONFUSE THE MARKET, OUR MEMBERS.

**Q.** OKAY.

AFTER -- IF YOU CAN TURN IN YOUR BOOK TO AN EXHIBIT WE MARKED TX337, SIR.

**A.** 337?

**Q.** 337.

(DISPLAYED ON SCREEN.)

TX337 IS AN ARTICLE THAT APPEARED IN *SAN FRANCISCO CHRONICLE* ONE DAY AFTER YOUR LETTER TO MR. RASURE, SO NOW DATED FEBRUARY 15TH, TITLED "TECHSHOP 2.0 OPENS MONDAY IN SAN FRANCISCO".

ARE YOU WITH ME?

**A.** I AM.

**Q.** IS THAT THE NEWSPAPER ARTICLE YOU REFERRED TO EARLIER?

**A.** I WAS.

**Q.** SO AFTER WRITING THIS LETTER THE DAY BEFORE, YOU BECAME AWARE OF THIS ARTICLE IN THE *CHRONICLE*?

**A.** I DID.

**Q.** AGAIN, CAN YOU DESCRIBE FOR US WHAT YOUR REACTION WAS TO READING THE NEWSPAPER ARTICLE ABOUT MR. RASURE OPENING TECHSHOP 2.0 AT TECHSHOP'S FACILITY IN SAN FRANCISCO?

**A.** I WASN'T HAPPY. I -- I -- I WAS IRATE MOSTLY BECAUSE I -- I, YOU KNOW, WOULD DEAL WITH PEOPLE ON A DAY-TO-DAY BASIS WHO WERE INQUIRING AND CALLING AND ASKING WHAT'S THE STATUS OF THE -- OF THE DEAL AND WHEN DO YOU THINK YOU MIGHT BE REOPEN. SOME WERE FORMER EMPLOYEES AND PREVIOUS CONTRACTORS AND MEMBERS AND PARTNERS.

AND HERE, ALL OF A SUDDEN, YOU HAVE THIS ARTICLE THAT IS... THAT'S BASICALLY REPRESENTING TECHSHOP IS RE-OPENING AND WE WERE NOT PART OF THE DEAL. WE HAD NOT CULMINATED A DEAL.

HE WAS GOING AHEAD AND USING TECHSHOP 2.0, WHICH, TO US, WAS ALWAYS PART OF THE DEAL. AND HAD BASICALLY GONE OUT AND DONE THIS ON HIS OWN WITH, YOU KNOW -- I GUESS TO SUM IT UP, I FELT AS THOUGH, YOU KNOW, I HAD A FIDUCIARY RESPONSIBILITY TO CERTAINLY PRESERVE THE VALUE OF THE ASSETS THAT WERE THERE AND THEY WERE SIGNIFICANT; THAT IF WE WEREN'T ABLE TO DO A DEAL, WE WERE GOING TO FILE CHAPTER 7. AND OUR FIDUCIARY RESPONSIBILITY WAS TO TRY TO MAINTAIN THE VALUE OF THE ASSETS.

AND I FELT THAT NOT JUST BETRAYED, BUT I FELT THAT THIS WAS A COMPLETE VIOLATION OF ALL OF THE SPIRIT OF OUR NEGOTIATIONS AND, FRANKLY, WAS GOING TO HAVE A SIGNIFICANT IMPACT ON THE REMAINING VALUE OF ASSETS FOR THE COMPANY.

**Q.** IF YOU CAN TURN IN YOUR BINDER THERE TO AN EXHIBIT WE'VE MARKED... JUST GIVE ME ONE MOMENT, PLEASE.

(PAUSE IN THE PROCEEDINGS.)

THERE WE GO. IF YOU CAN TURN IN YOUR BINDER TO AN EXHIBIT WE MARKED AS TX336 WHICH HAS ALREADY BEEN ADMITTED.

(DISPLAYED ON SCREEN.)

TX336 IS A COPY OF THE TECHSHOP 2.0 WEBSITE INDICATING THAT TECHSHOP 2.0 WAS GOING TO OPEN IN SAN FRANCISCO ON FEBRUARY 19TH.

DO YOU SEE THAT?

**A.** YES, I DO.

**Q.** BUT MY QUESTION REALLY IS ABOUT THE TECHSHOP AND TECHSHOP 2.0 LOGO AT THE TOP.

ARE YOU WITH ME THERE?

**A.** I AM.

**Q.** DID THE BOARD HAVE A FEELING ABOUT MR. RASURE'S USE OF THE TECHSHOP LOGO AND THE TECHSHOP MARK IN THIS REGARD?

**A.** ABSOLUTELY. AND IT WAS BASICALLY THE CONCLUSION THAT I STATED A MOMENT AGO. WE FELT AS THOUGH HE WAS APPROPRIATING OUR LOGO FOR A SEPARATE BUSINESS WITHOUT HAVING NEGOTIATED FOR THE USE OF THAT BY US OR FOR ANY OTHER ASSETS THAT WERE ASSOCIATED WITH THIS ANNOUNCEMENT.

**Q.** IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT WE MARKED TX83.

**A.** 83?

**Q.** 83, SIR.

(DISPLAYED ON SCREEN.)

**A.** I'M THERE.

**Q.** TX83 IS, IN FACT, A LETTER FROM JAMES PISTORINO TO DAN RASURE DATED FEBRUARY 16TH.

ARE YOU WITH ME?

**A.** THE DEMAND TO CEASE AND DESIST INFRINGEMENT?

**Q.** YES.

SO HAD THE BOARD ARRIVED AT A DECISION ABOUT WHETHER OR NOT TO ENFORCE ITS TRADEMARK RIGHTS BY FEBRUARY 16TH?

**A.** YES.

**Q.** WHAT WAS IT?

**A.** THAT, IN FACT, WE WOULD DO EVERYTHING POSSIBLE TO PROTECT

THE TRADEMARK AS AN ASSET OF TECHSHOP, INC.

**Q.** AFTER THE COMPLAINT IN THIS CASE WAS FILED ON FEBRUARY 16TH, DID MR. RASURE MAKE -- BECOME AWARE OF ANY CHANGES IN THE NAME THAT MR. RASURE WAS USING?

**A.** DID I BECAME AWARE?

**Q.** YES.

**A.** YES, I DID. YES.

**Q.** IF YOU CAN TURN IN YOUR BOOK TO AN EXHIBIT WE'VE MARKED TX327.

**A.** THE NUMBER?

**Q.** 327, SIR, WHICH HAS ALREADY BEEN ADMITTED.

(DISPLAYED ON SCREEN.)

DID YOU BECOME AWARE SHORTLY AFTER THIS LAWSUIT WAS FILED THAT MR. RASURE WAS NOW USING THE NAME THESHOP.BUILD?

**A.** YES, I DID.

**Q.** AND DID YOU SEE THE WAY IT IS PRESENTED HERE AS WE ARE SEEING IT IN 327?

**A.** YES, I DO. IT'S THE ONE AT THE BOTTOM.

**Q.** AND --

**A.** SOMEONE SENT ME A PHOTOGRAPH. THEY HAD DRIVEN PASSED THE SHOP AND SENT ME A PHOTOGRAPH AND SAID, CHECK THIS OUT.

MY REACTION WAS, I ACTUALLY THOUGHT IT WAS A JOKE. HAH-HAH TYPE THING. THEY TEXTED THIS TO ME. I THOUGHT IT WAS A JOKE.

WHEN I WAS ASSURED IT REALLY WAS OUTSIDE THE SHOP, I

THOUGHT MAYBE, YOU KNOW, SOME CLEVER LADS OR SOMEONE WORKING FOR HIM HAD THOUGHT IT WOULD BE FUNNY TO, YOU KNOW, CHANGE ONE LETTER OR SOMETHING.

BUT, YOU KNOW, AT FIRST GLANCE IT LOOKS LIKE TECHSHOP, BUT, IN FACT, IT IS THE THESHOP.BUILD. AND MY LAUGHING SOON FADED AND, YOU KNOW, WE'RE OBVIOUSLY PRETTY UPSET. IT SEEMED ALMOST MOCKING THE, YOU KNOW, OUR POSITION WITH REGARDS TO THE VALUE OF OUR TRADEMARK.

**Q.** NOW, IF YOU GO BACK IN YOUR BOOK TO THE LETTER WE SAW BEFORE TX83?

**A.** I'M THERE.

(DISPLAYED ON SCREEN.)

(PAUSE IN THE PROCEEDINGS.)

**Q.** LET ME ASK IT THIS WAY.

TECHSHOP BOARD DECIDED IT IS GOING TO PURSUE BANKRUPTCY PROTECTION, CORRECT?

**A.** CORRECT.

**Q.** AND AFTER THE LAWSUIT WAS FILED, DID THE BOARD OF HAVE AN EXPECTATION OF WHAT WOULD HAPPEN WITH REGARD TO THE LAWSUITS AND ITS -- THE LAWSUIT AND THE TRADEMARKS THEMSELVES?

**A.** WELL, OUR MOST IMPORTANT EXPECTATION WAS THAT HE WOULD CEASE USING THE TECHSHOP NAME, TECHSHOP TRADEMARK. AND AT THE SAME TIME, WE WERE HOPEFUL TO PROTECT THE ASSETS, MOST IMPORTANTLY THE CRM, CUSTOMER INFORMATION THAT REMAINED AT TECHSHOP SAN FRANCISCO.

**Q.** BUT THE BOARD HAD ALREADY DECIDED IT WAS GOING TO SEEK BANKRUPTCY PROTECTION, CORRECT?

**A.** RIGHT.

**Q.** DID THE BOARD HAVE A FEELING ABOUT WHETHER OR NOT THE LAWSUIT AND THE TRADEMARKS THEMSELVES WOULD BE INVOLVED IN THAT BANKRUPTCY PROCEEDING?

**A.** I ASSUMED THAT IT WOULD. I -- I, YOU KNOW, I'M CERTAINLY NOT AN ATTORNEY. YOU KNOW, MY -- OUR EXPECTATION AND OUR BELIEF WAS THAT ONCE WE FILED FOR BANKRUPTCY, THAT THE RESPONSIBILITY FOR PROSECUTING THE CASE, I GUESS, OR PURSUING THAT WOULD BE THAT OF THE TRUSTEES.

**Q.** OKAY.

AFTER TECHSHOP CLOSED ITS DOORS IN MID-NOVEMBER 2017, WHAT DID TECHSHOP EXPECT WOULD HAPPEN WITH ITS TRADEMARK ASSETS?

**A.** WELL, WE WERE HOPEFUL THAT THEY WOULD BE ACQUIRED FOR, YOU KNOW, SOME VALUE AND THAT, YOU KNOW, HOPEFULLY -- THE HOPE THAT WAS HELD OUT BY THE 11TH HOUR NEGOTIATIONS WITH MR. RASURE WAS MOST PROMISING THAT WE COULD ACTUALLY EFFECT A DEAL WHERE WE WOULD REOPEN LOCATIONS AND CONTINUE -- THE BRAND WOULD CONTINUE TO FLOURISH UNDER HIS LEADERSHIP.

AND THAT IF THAT KIND OF A DEAL WEREN'T POSSIBLE, THAT THE TRUSTEE AT LEAST HAD THE OPPORTUNITY, PARTICULARLY OVERSEAS WHERE THE BRAND WAS VERY, VERY STRONG, TO EFFECT LICENSING DEALS OVERSEAS. PERHAPS DOMESTICALLY, BUT CERTAINLY OVERSEAS.

**Q.** AFTER TECHSHOP CLOSED ITS DOORS, DID THE BOARD EVER COME

TO A DECISION TO JUST ABANDON THE TRADEMARKS?

**A.** NO, ABSOLUTELY NOT.

**Q.** DID THE BOARD HAVE AN EXPECTATION THAT THE TRADEMARKS WOULD CONTINUE TO BE USED AFTER TECHSHOP CLOSED ITS DOORS?

**A.** WELL, THEY WOULD CONTINUE TO BE USED IF SOMEONE BOUGHT THEM, YEAH. SURE.

**Q.** OKAY.

**A.** BUT NOT -- WE DIDN'T ABANDON THEM. WE DIDN'T EXPECT PEOPLE TO START PUTTING UP TECHSHOP LOGOS AROUND TOWN.

**Q.** OKAY.

AND JUST ONE OTHER... I THINK YOU MENTIONED BEFORE YOU HAD SOME DISCUSSION ABOUT THE TECHSHOP CUSTOMER LIST, THE EMAIL LIST, CORRECT? REMEMBER THAT?

**A.** CORRECT.

**Q.** WERE THOSE -- WAS THAT INFORMATION STORED ON TECHSHOP'S CRM SYSTEM?

**A.** YES.

**Q.** AND DO YOU KNOW WHETHER OR NOT THE DATABASE OF THE CRM SYSTEM WAS STORED ON THE COMPUTERS AT TECHSHOP SAN FRANCISCO LOCATION?

**A.** AT TECHSHOP SAN FRANCISCO?

**Q.** YES.

**A.** YES.

**Q.** OKAY. WAS THERE A PASSWORD TO PROTECT THE TECHSHOP NETWORK TO PREVENT ACCESS TO THE CRM SYSTEM?

**A.** ABSOLUTELY. I.D. AND PASSWORD PROTECT.

**Q.** DID YOU KNOW THAT AFTER MR. RASURE HAD ACCESS TO THE FACILITY THAT HE WOULD HAVE ACCESS TO THE COMPUTERS THERE STORING TECHSHOP'S CRM?

**MS. ROBERTS:** OBJECTION, CALLS FOR SPECULATION.

**THE COURT:** SUSTAINED THE WAY IT WAS ASKED.

**MR. PISTORINO:** OKAY.

THAT'S IT. NO FURTHER QUESTIONS AT THIS TIME. THANK YOU.

**THE COURT:** ANY CROSS-EXAMINATION?

**MS. ROBERTS:** YES, YOUR HONOR.

(EXHIBIT BINDERS HANDED TO COUNSEL AND WITNESS.)

**CROSS-EXAMINATION**

**BY MS. ROBERTS:**

**Q.** GOOD MORNING, MR. WOODS.

**A.** GOOD MORNING.

**Q.** ALL RIGHT. SO TO START, YOU SAID YOU WERE THE CEO OF TECHSHOP, CORRECT?

**A.** THAT'S CORRECT.

**Q.** YOU ARE NO LONGER THE CEO OF TECHSHOP?

**A.** THAT'S CORRECT.

**Q.** YOU HAVEN'T HELD THAT POSITION SINCE THE BANKRUPTCY FILING?

**A.** THAT'S CORRECT.

**Q.** AND IS IT CORRECT THAT YOU ARE CURRENTLY EMPLOYED WITH MAKER PEOPLE?

**A.** I'M ACTUALLY A CONTRACTOR. I'M AFFILIATED WITH THEM, AND THE NAME IS MAKERSPACE PEOPLE.

**Q.** SORRY.

**A.** THERE'S REALLY NO FORMAL CONTRACT, CERTAINLY NO EMPLOYMENT CONTRACT.

**Q.** IT WOULDN'T SURPRISE YOU TO HEAR THAT YOU ARE ON THEIR WEBSITE?

**A.** NOT AT ALL.

**Q.** OKAY. I AM SORRY, YOU SAID THAT IS MAKERSPACE PEOPLE?

**A.** MAKERSPACE PEOPLE.

**Q.** IS IT CORRECT THAT MAKERSPACE PEOPLE USED TO BE KNOWN AS TECHSHOP GLOBAL?

**A.** NO.

**Q.** NO?

TECHSHOP GLOBAL YOU MENTIONED YESTERDAY WAS A, I THINK YOU CALLED IT, A SMALL ENTITY THAT HANDLED SOME FOREIGN AFFAIRS OF TECHSHOP OR THEY ARE RELATED BUT IT IS A DIFFERENT ENTITY, CORRECT?

**A.** THAT'S CORRECT. THEY WERE A DIFFERENT ENTITY. THE -- I BELIEVE THEY HAD TWO OR THREE EMPLOYEES MAYBE. AND THEY WERE NOT WHOLLY OWNED BY TECHSHOP, INC. AND THEY PROVIDED BUSINESS DEVELOPMENT.

**Q.** AND I THINK YOU IDENTIFIED THE NAME PAUL DUGGAN?

**A.** THAT'S CORRECT.

**Q.** IN CONNECTION WITH TECHSHOP GLOBAL?

AND TECHSHOP GLOBAL IS NOT THE ENTITY THAT DECLARED BANKRUPTCY, CORRECT?

**A.** THAT'S CORRECT.

**Q.** I'M GOING TO ASK YOU TO TAKE A LOOK -- I'M GOING TO HAND YOU WHAT WE HAVE MARKED AS TX243 (SIC).

(EXHIBIT HANDED TO WITNESS AND COUNSEL.)

**A.** THIS IS IN THE NEW BINDER YOU GAVE ME?

**Q.** IT IS RIGHT HERE.

**MS. ROBERTS:** IT'S FOR IMPEACHMENT.

(EXHIBIT HANDED TO COURT.)

**BY MS. ROBERTS:**

**Q.** IF YOU TAKE A MOMENT TO LOOK AT IT.

TELL ME IF THIS IS A DOCUMENT YOU'VE SEEN BEFORE OR A PRINTOUT OF A WEB PAGE YOU'VE SEEN BEFORE?

**A.** THAT'S CORRECT. IT APPEARS TO BE A PRINTOUT OF WEB PAGES THAT I'VE SEEN BEFORE.

**Q.** IS IT CORRECT THERE'S A BIO OF YOU IN THIS WEB PAGE PRINTOUT?

**A.** YES, THERE IS.

**Q.** AND IS IT CORRECT THAT THIS IS A WEB PAGE PRINTOUT FOR MAKERSPACE PEOPLE?

**A.** I BELIEVE IT IS.

**Q.** AND THAT'S THE COMPANY FOR WHOM YOU'RE CURRENTLY DOING CONSULTING WORK?

**A.** ACTUALLY NOT CURRENTLY DOING CONSULTING WORK. I'M SORT OF

AVAILABLE AS A CONSULTANT UNDER AN UMBRELLA OF CONSULTANTS, IF YOU WILL.

**Q.** UNDERSTOOD.

IF YOU LOOK AT THE PAGE JUST PRIOR TO THE ONE THAT HAS YOUR BIO ON IT, THERE IS A BIO OF PAUL DUGGAN?

**A.** THAT'S CORRECT.

**Q.** THAT'S THE SAME PAUL DUGGAN WE WERE TALKING ABOUT BEFORE?

**A.** THAT'S CORRECT.

**Q.** IT HAS A BIO FOR HIM, RIGHT?

**A.** THAT'S CORRECT.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT TX243 -- 1243?

**THE CLERK:** EXCUSE ME, IS IT --

**MS. ROBERTS:** 1243. SORRY.

**THE CLERK:** THAT'S OKAY.

**MR. PISTORINO:** WE OBJECT, YOUR HONOR. IT IS NOT ON THE EXHIBIT LIST.

**MS. ROBERTS:** IT'S BEING OFFERED FOR IMPEACHMENT, YOUR HONOR.

IF I CAN ASK A FOLLOW-UP QUESTION?

**THE COURT:** WHY DON'T YOU TRY TO LAY SOME FOUNDATION.

**BY MS. ROBERTS:**

**Q.** CAN YOU TAKE A LOOK AT THE FIRST SENTENCE WITH RESPECT TO PAUL DUGGAN'S BIO?

**A.** I SEE IT.

**Q.** ISN'T IT CORRECT THAT, AT LEAST FOR MR. DUGGAN'S BIO, THE MAKERSPACE PEOPLE WAS FORMERLY KNOWN AS TECHSHOP GLOBAL?

**A.** I SEE THAT. IT DOES SAY THAT.

**MS. ROBERTS:** YOUR HONOR, CAN WE MOVE TO ADMIT TX1243?

**THE COURT:** THE OBJECTION IS SUSTAINED.

**MR. PISTORINO:** THANK YOU.

**MS. ROBERTS:** ALL RIGHT.

**BY MS. ROBERTS:**

**Q.** IF YOU TAKE A LOOK PLEASE AT THE WHITE BINDER YOU HAVE IN FRONT OF YOU AND TURN TO TX610.

I BELIEVE THIS IS ALREADY ADMITTED.

**THE CLERK:** 610?

I DON'T HAVE 610 ON MY LIST.

**MS. ROBERTS:** WE MOVE TO ADMIT TX610.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** 610 IS ADMITTED.

(TRIAL EXHIBIT 610 RECEIVED IN EVIDENCE.)

**BY MS. ROBERTS:**

**Q.** THIS IS EMAIL FROM DAN RASURE TO YOU DATED DECEMBER 1ST, 2017, CORRECT?

**A.** CORRECT.

**Q.** THE EMAIL ATTACHES THE MEMORANDUM OF UNDERSTANDING, RIGHT?

**A.** THAT IS CORRECT.

**Q.** IF YOU TURN TO THE SECOND PAGE OF THE EXHIBIT, YOU'LL SEE

THE MEMORANDUM OF UNDERSTANDING; IS THAT RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND YOU SIGNED THIS DOCUMENT ON BEHALF OF TECHSHOP, CORRECT?

**A.** YES, THAT'S CORRECT.

**Q.** THAT'S YOUR SIGNATURE THAT APPEARS ON THE THIRD PAGE?

**A.** IT IS.

**Q.** IN THE MEMORANDUM OF UNDERSTANDING, MR. RASURE'S COMPANY IS CALLED TECHSHOP 2.0, CORRECT?

**A.** THAT IS CORRECT.

**Q.** PLEASE TURN TO TX596.

(DISPLAYED ON SCREEN.)

**MS. ROBERTS:** I BELIEVE TX596 IS ALREADY ADMITTED.

**THE CLERK:** SORRY. WHAT NUMBER DID I MISS?

**MS. ROBERTS:** 596.

**THE CLERK:** OKAY.

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** SO THIS IS AN EMAIL THAT YOU SENT TO LOUISE LARSON ON NOVEMBER 29TH, 2017 AND ALSO MR. RASURE, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND IN THIS EMAIL YOU INTRODUCE MR. RASURE TO LOUISE AS QUOTE "THE LEAD INSTIGATOR OF TECHSHOP 2.0", CORRECT?

**A.** THAT'S CORRECT.

**Q.** AND LOUISE LARSON WAS THE DIRECTOR OF MARKETING FOR

TECHSHOP, RIGHT?

**A.** THAT'S CORRECT.

**Q.** SO IN THIS EMAIL INTRODUCING MR. RASURE TO MS. LARSON, YOU ARE REFERRING TO MR. RASURE'S COMPANY AS TECHSHOP 2.0, RIGHT?

**A.** THAT'S CORRECT.

**Q.** TURN NOW PLEASE TO TX597.

(DISPLAYED ON SCREEN.)

**MS. ROBERTS:** I BELIEVE THIS IS ADMITTED.

**THE CLERK:** IT IS.

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL THAT YOU SENT ON NOVEMBER 29TH, 2017, CORRECT?

**A.** YES.

**Q.** YOU SENT THIS EMAIL TO MR. RASURE AND SEVERAL PEOPLE AFFILIATED WITH TECHSHOP, CORRECT?

**A.** CORRECT.

**Q.** AND THIS EMAIL ATTACHES A DRAFT MESSAGE FROM DAN WOODS, AND YOU TELL THE RECIPIENTS THAT COMMENTS AND EDITS ARE WELCOME TO YOUR DRAFT, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND THIS WAS A MESSAGE YOU WERE PREPARING TO SEND OUT DISCUSSING THE POTENTIAL DEAL WITH MR. RASURE'S COMPANY, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND IN THIS DRAFT MESSAGE THAT YOU SHARED AND WELCOME

COMMENTS ON, YOU STATED THAT MR. RASURE HAS PLANS TO REOPEN AS MANY STORES AS POSSIBLE UNDER THE NAME TECHSHOP 2.0, RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU ARE REFERRING TO MR. RASURE'S COMPANY AS TECHSHOP 2.0, CORRECT?

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX921.

**A.** 971?

**Q.** 921. SORRY.

(DISPLAYED ON SCREEN.)

**MS. ROBERTS:** I BELIEVE THIS IS ALREADY ADMITTED.

**THE CLERK:** IT IS.

**THE WITNESS:** I'M THERE.

**BY MS. ROBERTS:**

**Q.** AND THIS -- THE LATEST EMAIL IN THE CHAIN IS FROM MR. RASURE ON NOVEMBER 30TH, 2017, AND YOU WERE ONE OF THE RECIPIENTS, CORRECT?

**A.** CORRECT.

**Q.** IF YOU LOOK TO THE... PAGE 2 OF THIS EMAIL CHAIN, THE EARLIEST EMAIL IN THE CHAIN, DO YOU RECOGNIZE THAT AS BEING YOUR EMAIL THAT WE HAD JUST TAKEN A LOOK AT WHERE YOU WERE INVITING COMMENTS ON YOUR DRAFT MESSAGE FROM DAN WOODS?

**A.** THAT IS CORRECT.

**Q.** AND SO JUST ABOVE YOUR INITIAL EMAIL, MR. BUSCH, DOUG BUSCH, ONE OF THE BOARD MEMBERS OF TECHSHOP, RESPONDS,

CORRECT?

**A.** I AM SORRY, THE QUESTION AGAIN?

**Q.** JUST... JUST ABOVE YOUR INITIAL EMAIL, YOU SEE THE RESPONSE FROM MR. BUSCH, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND IN THAT RESPONSE, IF YOU TAKE A LOOK AT THE SECOND PARAGRAPH, IT SAYS, "DAN R., HAVE YOU SETTLED FIRMLY ON TECHSHOP 2.0 AS THE NAME YOU WILL REOPEN UNDER"?

IS THAT RIGHT?

**A.** CORRECT.

**Q.** AND AT THE VERY END OF THAT SECOND PARAGRAPH OF MR. BUSCH'S EMAIL, MR. BUSCH SAYS, "TOTALLY YOUR CALL. I'M JUST ASKING". RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND THEN JUST ABOVE THAT, YOU SEE YOUR RESPONSE TO MR. BUSCH'S COMMENT, RIGHT?

**A.** YES.

**Q.** AND IN YOUR RESPONSE IN THE FIRST PARAGRAPH, YOU SAY, "IT SURE WAS EASIER TO WRITE WITH A BRAND NAME, BUT, YES, THIS IS DAN'S CALL", RIGHT?

**A.** YES.

**Q.** AND IN THAT CASE YOU ARE REFERRING TO DAN RASURE, RIGHT?

**A.** RIGHT.

**Q.** WHEN YOU ANNOUNCED -- WHEN THE DEAL, THE MEMORANDUM OF UNDERSTANDING WAS SIGNED, YOU ANNOUNCED THE DEAL TO THE

PUBLIC, CORRECT?

**A.** CORRECT.

**Q.** IN THOSE ANNOUNCEMENTS, YOU TOLD THE WORLD THAT TECHSHOP HAD ENTERED INTO A POTENTIAL DEAL WITH A COMPANY CALLED TECHSHOP 2.0, RIGHT?

**A.** YEAH. I DIDN'T SAY WE'D ENTERED INTO A DEAL.

**Q.** RIGHT, A MEMORANDUM OF UNDERSTANDING?

**A.** RIGHT.

**Q.** BUT THE ENTITY, THE WAY YOU REFER TO THE ENTITY WITH WHOM TECHSHOP WAS TALKING WITH TECHSHOP 2.0?

**A.** YES. YES, I DID.

**Q.** PLEASE TURN TO TX603.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** 603 IS ADMITTED.

(TRIAL EXHIBIT 603 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** YOU LOOK AT THE VERY TOP, THERE'S AN EMAIL FROM ELIZABETH BOBEK TO DAN RASURE, BUT JUST BENEATH THAT THERE'S AN EMAIL FROM YOU.

DO YOU SEE THAT?

**A.** I SEE IT.

**Q.** AND THE EMAIL FROM YOU IS DATED NOVEMBER 30TH, 2017?

**A.** CORRECT.

**Q.** CAN YOU PLEASE TURN TO PAGE 5 OF THIS EXHIBIT?

(DISPLAYED ON SCREEN.)

ARE YOU THERE?

**A.** OKAY.

**Q.** THIS IS A NOTICE THAT TECHSHOP WAS GOING TO SEND OUT TO ITS SHAREHOLDERS, CORRECT, OR ITS INVESTORS?

**A.** YOU'RE REFERRING TO THE PAGE THAT SAYS "NOTICE OF LIQUIDATION EVENT"?

**Q.** YES.

**A.** YES. CORRECT.

**Q.** AND THAT'S YOUR SIGNATURE ON THE BOTTOM OF THAT PAGE, CORRECT?

**A.** THAT IS CORRECT.

**Q.** IF YOU LOOK AT THE SECOND PARAGRAPH OF THE NOTICE OF LIQUIDATION EVENT, THERE IS A REFERENCE TO AN EXHIBIT A, CORRECT?

**A.** THAT IS CORRECT.

**Q.** IF TURN TO THE NEXT PAGE, YOU'LL SEE EXHIBIT A.

IS THAT THE EXHIBIT A TO THE NOTICE OF LIQUIDATION EVENT?

**A.** YES, IT IS.

**Q.** AND THAT EXHIBIT A IS THE MEMORANDUM OF UNDERSTANDING THAT WE HAVE ALREADY LOOKED AT, RIGHT?

**A.** I BELIEVE SO. LOOKS LIKE IT.

**Q.** SO THE MEMORANDUM OF UNDERSTANDING THAT WE SEE HERE AS

EXHIBIT A AND WHICH REFERRED TO MR. RASURE'S COMPANY AS TECHSHOP 2.0 WAS GOING TO BE SENT OUT AS PART OF THIS NOTICE OF LIQUIDATION EVENT?

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX611.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 611 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** DO YOU SEE THERE IN THE MIDDLE OF THE PAGE THERE IS AN EMAIL FROM YOU ON DECEMBER 1ST, 2017?

**A.** I DO.

**Q.** AND IT WENT OUT TO THE EMAIL ADDRESS, EVERYONE@TECHSHOP.WS?

**A.** THAT'S CORRECT.

**Q.** AND IT BEGINS "DEAR COMRADES", CORRECT?

**A.** CORRECT.

**Q.** AND IN THE FIRST FULL PARAGRAPH OF THIS EMAIL THAT YOU SENT OUT TO EVERYONE@TECHSHOP.WS, YOU SAY, "TECHSHOP, INC. HAS REACHED AN AGREEMENT WITH A THIRD PARTY TO ACQUIRE ALL COMPANY ASSETS. THE NEW ENTITY, TECHSHOP 2.0 LLC PLANS TO REOPEN AS MANY STORES AS POSSIBLE AS SOON AS POSSIBLE."

DID I READ THAT CORRECTLY?

**A.** YOU DID.

**Q.** AND THE TECHSHOP 2.0 LLC YOU ARE REFERRING TO THERE IS MR. RASURE'S COMPANY?

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX767.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 767 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU ON DECEMBER 1ST, 2017 TO THE EMAIL ADDRESSED JOHNHUNTDESIGN@GMAIL.COM?

**A.** THAT IS CORRECT.

**Q.** THIS IS AN EMAIL THAT YOU SENT OUT ANNOUNCING THE AGREEMENT THAT HAD BEEN REACHED WITH TECHSHOP 2.0, CORRECT?

**A.** THAT IS CORRECT.

**Q.** IN FACT, PART OF THE SUBJECT LINE SAYS, "THE NEXT ITERATION OF TECHSHOP IS IN THE WORKS"?

**A.** THAT IS CORRECT.

**Q.** AND IN THIS EMAIL, THE SECOND PARAGRAPH SAYS, "THE NEW ENTITY, TECHSHOP 2.0 LLC PLANS TO REOPEN AS MANY STORES AS POSSIBLE AS SOON AS POSSIBLE", CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND, AGAIN, YOU ARE REFERRING TO MR. RASURE'S COMPANY AS TECHSHOP 2.0, RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU FORWARDED A COPY OF THIS ANNOUNCEMENT TO *MAKE:* MAGAZINE, CORRECT?

**A.** I DON'T KNOW.

**Q.** YOU DON'T KNOW?

WOULD YOU BE SURPRISED TO FIND OUT THAT THIS ARTICLE ENDED UP IN *MAKE:* MAGAZINE?

**A.** I WOULD NOT.

**Q.** AND YOU TOLD US YESTERDAY THAT YOU WERE PREVIOUSLY AFFILIATED WITH *MAKE:* MAGAZINE, CORRECT?

**A.** ABSOLUTELY. I MAY HAVE. I DON'T KNOW.

**Q.** *MAKE:* MAGAZINE, I THINK YOU SAID YOU LEFT IN 2011?

**A.** CORRECT.

**Q.** BUT AS OF 2011, YOU SAID IT HAD 80,000 PAID SUBSCRIBERS, AND I THINK YOU SAID A HUNDRED THOUSAND, I'M NOT SURE WHAT THEY FALL INTO IF THEY ARE NOT PAID, DOES THAT SOUND, RIGHT?

**A.** RIGHT.

**Q.** AND THEN YOU SAID THE MAKEZINE.COM HAS MILLIONS OF VISITORS?

**A.** CORRECT.

**Q.** SO ACCORDING TO YOUR TESTIMONY YESTERDAY, *MAKE:* MAGAZINE IS WELL READ IN THIS INDUSTRY?

**A.** ABSOLUTELY.

**Q.** AND IT WOULDN'T SURPRISE YOU TO FIND OUT WHETHER YOU SENT IT DIRECTLY OR SOMEBODY ELSE SENT IT THAT YOUR ANNOUNCEMENT OF THE DEAL WITH TECHSHOP 2.0 WAS IN *MAKE:* MAGAZINE?

**A.** IT WOULDN'T SURPRISE ME AT ALL.

**Q.** TURN NOW PLEASE TO TX753.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 753 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** IF YOU LOOK BENEATH THE FIRST "TO" AND "FROM", YOU SEE THERE'S AN EMAIL FROM YOU TO BILL SPANGLER ON DECEMBER 3RD, 2017?

DO YOU SEE THAT EMAIL?

**A.** I DO SEE IT.

**Q.** AND IN THIS EMAIL YOU TELL MR. SPANGLER, "TECHSHOP, INC. HAS REACHED AN AGREEMENT WITH A THIRD PARTY TO ACQUIRE ALL COMPANY ASSETS. THE NEW ENTITY, TECHSHOP 2.0, PLANS TO REOPEN AS MANY STORES AS POSSIBLE AS SOON AS POSSIBLE."

IS THAT CORRECT?

**A.** THAT'S CORRECT.

**Q.** AGAIN, YOU ARE REFERRING TO MR. RASURE'S COMPANY AS

TECHSHOP 2.0?

**A.** THAT IS CORRECT.

**Q.** TURN PLEASE TO TX619.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 619 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** HAVE YOU FOUND IT?

**A.** YES, I HAVE.

**Q.** IF YOU SEE THERE IN THE MIDDLE OF THE PAGE THERE'S AN EMAIL FROM YOU ON DECEMBER 2ND, 2017 TO LARA CROUSHORE?

**A.** CROUSHORE, CORRECT.

**Q.** SHE IS AFFILIATED WITH THE OFFICE OF ECONOMIC DEVELOPMENT IN NEW YORK?

**A.** CORRECT.

**Q.** AND TECHSHOP HAD WORKED WITH THEM TO OPEN UP A SPACE --

**A.** CORRECT.

**Q.** -- IN BROOKLYN?

**A.** CORRECT.

**Q.** SO THIS IS A THIRD PARTY OUTSIDE OF TECHSHOP THAT YOU ARE COMMUNICATING WITH HERE?

**A.** THAT IS CORRECT.

**Q.** IN THIS EMAIL TO MS. CROUSHORE, THE FIRST PARAGRAPH SAYS AGAIN, "TECHSHOP, INC. HAS REACHED AN AGREEMENT WITH A THIRD PARTY TO ACQUIRE ALL COMPANY ASSETS. THE NEW ENTITY TECHSHOP 2.0 LLC PLANS TO REOPEN AS MANY STORES AS POSSIBLE AS SOON AS POSSIBLE."

RIGHT?

**A.** THAT IS CORRECT.

**Q.** SO NOW YOU'RE TELLING ANOTHER THIRD PARTY ABOUT THE POTENTIAL DEAL WITH MR. RASURE'S COMPANY AND REFERRING TO HIS COMPANY AS TECHSHOP 2.0?

**A.** CORRECT.

**Q.** TURN NOW TO TX501.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 501 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** ARE YOU THERE, MR. WOODS?

**A.** I AM.

**Q.** THIS IS A POST FROM TECHSHOP'S OFFICIAL FACEBOOK PAGE, CORRECT?

**A.** IT APPEARS TO BE.

**Q.** AND THE DATE OF THE POST SAYS DECEMBER 1ST, 2017?

**A.** CORRECT.

**Q.** AND IN THIS POST IT SAYS, "THE NEXT ITERATION OF TECHSHOP IS IN THE WORKS. TECHSHOP, INC. HAS REACHED AN AGREEMENT AND PRINCIPAL TO SELL THE ENTIRE COMPANY TO A GROUP CALLED TECHSHOP 2.0 LLC."

RIGHT?

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX505.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 505 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS APPEARS TO BE A POST FROM THE TECHSHOP BROOKLYN FACEBOOK PAGE, CORRECT?

**A.** IT DOES, YES.

**Q.** AND ALSO DATED DECEMBER 1ST, 2017?

**A.** CORRECT.

**Q.** AND IT INCLUDES THE SAME LANGUAGE, OR VERY SIMILAR LANGUAGE TO WHAT I JUST READ, ANNOUNCING TECHSHOP HAD REACHED AN AGREEMENT TO SELL THE ENTIRE COMPANY TO A GROUP CALLED TECHSHOP 2.0?

**A.** YES, IT DOES.

**Q.** TURN NOW PLEASE TO TX527.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** IT'S ADMITTED.

(TRIAL EXHIBIT 527 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** AND THIS IS A POST -- I AM SORRY. THIS IS A TWEET BY -- ON THE TWITTER ACCOUNT FOR TECHSHOP AUSTIN RR, RIGHT?

**A.** CORRECT.

**Q.** AND THIS TWEET THE SAME ANNOUNCEMENT IS MADE THAT TECHSHOP HAS REACHED AN AGREEMENT TO SELL THE COMPANY TO TECHSHOP 2.0, CORRECT?

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX528.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 528 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN INSTAGRAM POST BY TECHSHOP, INC., CORRECT?

**A.** IT APPEARS TO BE, YES.

**Q.** AND, AGAIN, THE SIMILAR ANNOUNCEMENT IS MADE THAT TECHSHOP HAS REACHED AN AGREEMENT TO SELL THE ENTIRE COMPANY TO A GROUP CALLED TECHSHOP 2.0?

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX530.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** IT'S ADMITTED.

(TRIAL EXHIBIT 530 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS ANOTHER SOCIAL MEDIA POST ANNOUNCING THAT TECHSHOP HAD REACHED AN AGREEMENT TO SELL THE ENTIRE COMPANY TO A GROUP CALLED TECHSHOP 2.0?

**A.** CORRECT.

**Q.** TURN NOW PLEASE TO TX614.

**MS. ROBERTS:** I BELIEVE THIS IS ALREADY ADMITTED.

**THE CLERK:** NO.

**MS. ROBERTS:** WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 614 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** DO YOU RECOGNIZE THIS DOCUMENT AS THE PRESS RELEASE THAT MR. RASURE CIRCULATED ANNOUNCING THE DEAL?

**A.** I DO.

**Q.** IF YOU LOOK AT THE BOTTOM OF -- AT THE VERY END OF HIS -- THE TEXT OF HIS PRESS RELEASE, THERE IS A QUOTE FROM YOU.

DO YOU SEE THAT?

**A.** I DO.

**Q.** YOU REFER TO HIS BUSINESS AS TECHSHOP 2.0 IN THAT QUOTE?

**A.** CORRECT.

**Q.** IF YOU SEE AT THE BOTTOM, THERE'S A TEMPORARY WEBSITE LISTED, CORRECT?

**A.** CORRECT.

**Q.** WHAT'S THE -- THAT DOMAIN THAT'S LISTED THERE?

**A.** TECHSHOP 2, THE NUMBER 2 DOT COM. WWW.TECHSHOP2.COM.

**Q.** AND THIS WAS INCLUDED IN THIS RELEASE THAT HAS THE DATE DECEMBER 3RD, 2017, RIGHT?

**A.** CORRECT.

**Q.** NOW MOVING ON TO AFTER THE ANNOUNCEMENT OF THE DEAL, LET'S TURN PLEASE TO TX613.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**THE COURT:** ANY OBJECTION?

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** IT'S ADMITTED.

(TRIAL EXHIBIT 613 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO DAN RASURE AND ROBERT THOMAS ON DECEMBER 3RD, 2017, CORRECT?

**A.** THAT IS CORRECT.

**Q.** ROBERT THOMAS WAS ONE OF THE CO-FOUNDERS OF TECHSHOP; ISN'T THAT RIGHT?

**A.** CORRECT.

**Q.** IN THIS EMAIL, AT LEAST THE SUBJECT LINE, SAYS IT'S A BRIEF INTRODUCTION, RIGHT?

**A.** CORRECT.

**Q.** YOU ARE INTRODUCING ROBERT THOMAS AND MR. RASURE?

**A.** CORRECT.

**Q.** IN THIS INTRODUCTION EMAIL, YOU REFER TO MR. RASURE'S COMPANY AS TECHSHOP 2.0. CORRECT?

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX615.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 615 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO DAN RASURE ON DECEMBER 3RD, 2017, CORRECT?

**A.** YES.

**Q.** AND IN THIS EMAIL, YOU SAY YOU'VE ESSENTIALLY LAID OUT A PLAN FOR PRE-CLOSE TRANSITION AND WIND DOWN; ISN'T THAT RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND IF YOU SEE AT THE TOP OF THE EMAIL IT SAYS "ATTACHMENTS", AND THERE ARE SEVERAL THAT ARE LISTED THERE; ISN'T THAT RIGHT?

**A.** YES. CORRECT.

**Q.** SO I WOULD LIKE TO TAKE A -- TURN TO LOOK AT THESE ATTACHMENTS. IF YOU TURN FIRST TO PAGE 3.

**A.** I'M SORRY, YOU ARE LOSING ME. PAGE 3 OF --

**Q.** TX615, PAGE 3. THE PAGE NUMBER'S ON THE BOTTOM IN THE MIDDLE.

**A.** OKAY.

**Q.** THIS IS A DRAFT MESSAGE FOR MR. RASURE TO SEND OUT TO TECHSHOP MEMBERS, CORRECT?

**A.** ONE MOMENT. LET ME JUST REVIEW.

(PAUSE IN THE PROCEEDINGS.)

YES.

**Q.** IN THIS DRAFT MESSAGE TO THE TECHSHOP MEMBERS, MR. RASURE'S COMPANY IS CALLED TECHSHOP 2.0?

**A.** CORRECT.

**Q.** AND IT'S REFERRED TO AS A NEW ENTITY, RIGHT?
**A.** THAT'S CORRECT.
**Q.** TURN NOW TO THE PAGE, PAGE 6 OF THAT SAME EXHIBIT. THIS IS ANOTHER ATTACHMENT TO YOUR EMAIL.
**A.** OKAY.
**Q.** AND THE TITLE SAYS "FAQ'S BASED ON EARLY RESPONSE FROM MEMBERS AND FORMER EMPLOYEES"?
**A.** CORRECT.
**Q.** IN THESE DRAFT FAQ'S THAT YOU ATTACHED TO YOUR EMAIL, MR. RASURE'S COMPANY IS REFERRED TO AS TECHSHOP 2.0; ISN'T THAT RIGHT?
**A.** WE REFER TO TECHSHOP 2.0, YES.
**Q.** TURN NOW PLEASE TO PAGE 8.
THIS IS ANOTHER ATTACHMENT TO YOUR EMAIL. THIS IS YOUR TRANSITION PLAN, RIGHT?
**A.** THAT'S CORRECT.
**Q.** AND IN THE -- FOR POST TRANSITION, YOU LIST TECHSHOP 2.0, RIGHT?
**A.** CORRECT.
**Q.** TURN NOW PLEASE TO TX906.
**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.
**MR. PISTORINO:** NO OBJECTION.
**THE COURT:** ADMITTED.
(TRIAL EXHIBIT 906 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THE TOP EMAIL IS FROM DAN RASURE TO YOU ON DECEMBER 4TH, 2017?

**A.** THAT IS CORRECT.

**Q.** AND THE INITIAL EMAIL IN THE CHAIN IS FROM YOU TO MR. RASURE ON DECEMBER 3RD?

**A.** THAT IS CORRECT.

**Q.** IN THAT EMAIL, YOU REFER TO MR. RASURE'S COMPANY AS TECHSHOP 2.0?

**A.** I'M LOOKING.

YES, I DO.

**Q.** TURN NOW PLEASE TO TX622.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 622 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON DECEMBER 6TH, 2017, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND IN YOUR EMAIL, YOU TELL MR. RASURE THAT ATTACHED IS THE DRAFT OF THE PROPOSED ASSET PURCHASE AGREEMENT, RIGHT?

**A.** CORRECT.

**Q.** AND THERE ARE ATTORNEYS FOR TECHSHOP THAT ARE INCLUDED AS RECIPIENTS ON THE CC LINE OF THIS EMAIL, CORRECT?

**A.** THERE IS ONE ATTORNEY, YES.

**Q.** MR. RUTTUM?

**A.** YES.

**Q.** TURN NOW PLEASE TO PAGE 3 OF THIS EXHIBIT WHICH IS THE ATTACHMENT, AND THAT'S THE ASSET -- THE DRAFT ASSET PURCHASE AGREEMENT; ISN'T THAT RIGHT?

**A.** YES.

**Q.** AND THE FIRST PARAGRAPH OF THE DRAFT ASSET PURCHASE AGREEMENT IDENTIFIES THE PARTIES TO THE AGREEMENT AS TECHSHOP 2.0 LLC AND TECHSHOP, INC.; ISN'T THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** TURN NOW PLEASE TO TX919.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 919 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM DAN RASURE ON DECEMBER 12TH, 2017, AND YOU WERE LISTED ON THE CC LINE, CORRECT?

**A.** CORRECT.

**Q.** IT RESPONDS TO AN EMAIL FROM KURT RUTTUM ON DECEMBER 12TH, 2017.

DO YOU SEE THAT?

**A.** YES.

**Q.** AND THAT'S THE EMAIL WE LOOKED AT EARLIER IN WHICH TECHSHOP TERMINATED THE MEMORANDUM OF UNDERSTANDING?

**A.** CORRECT.

**Q.** YOU AUTHORIZED TERMINATION OF THE MEMORANDUM OF UNDERSTANDING?

**A.** THAT IS CORRECT.

**Q.** AND THIS TERMINATION EMAIL WAS SENT BY A LAWYER FOR TECHSHOP, CORRECT?

**A.** CORRECT.

**Q.** THIS EMAIL DOES NOT TELL MR. RASURE THAT HE NEEDS TO STOP USING THE NAME TECHSHOP 2.0, DOES IT?

**A.** NO. IT DOES NOT.

**Q.** IN FACT, IN THIS TERMINATION EMAIL, HIS COMPANY IS STILL CALLED TECHSHOP 2.0?

**A.** CORRECT.

**Q.** NOW WE HEARD YOU TESTIFY THAT EVEN AFTER THE MEMORANDUM OF UNDERSTANDING WAS CANCELED, YOU CONTINUED TO NEGOTIATE WITH MR. RASURE, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND IN THE NEGOTIATIONS, YOU CONTINUED TO REFER TO HIS COMPANY AS TECHSHOP 2.0, RIGHT?

**A.** I WOULD IMAGINE, YEAH.

**Q.** WELL --

**A.** I WOULD HAVE TO LOOK AT THE SPECIFIC -- LIKE WE HAVE BEEN DOING, BUT, YEAH, I WOULD IMAGINE.

**Q.** WE CAN DO THAT.

TURN TO TX634.

**A.** I'M SORRY, THE NUMBER?

**Q.** 634.

**A.** OKAY.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 634 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM DAN RASURE ON JANUARY 7TH, 2018 TO YOU AND MR. BUSCH, CORRECT?

**A.** CORRECT.

**Q.** AND MR. RASURE SAYS THAT THIS IS THE BASIC LAYOUT OF HOW WE WOULD DO THE TRANSACTION. RIGHT?

**A.** CORRECT.

**Q.** AND HE IS DESCRIBING A TRANSACTION BETWEEN TECHSHOP AND TECHSHOP 2.0; ISN'T THAT RIGHT?

**A.** CORRECT.

**Q.** IF YOU TURN TO THE SECOND PAGE OF THE EXHIBIT, YOU WILL SEE HIS LAYOUT THERE, RIGHT?

**A.** YES.

**Q.** AND HE REFERS TO HIS COMPANY AS TECHSHOP 2.0 IN THIS PROPOSAL TO TECHSHOP?

**A.** YES. CORRECT.

**Q.** TURN NOW PLEASE TO TX635.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 635 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON JANUARY 8TH, 2018, CORRECT?

**A.** CORRECT.

**Q.** THIS IS -- IF YOU FLIP BACK TO 634, THIS IS THE DAY AFTER THE EMAIL WE HAD JUST TOOK A LOOK AT FROM MR. RASURE.

**A.** YES.

**Q.** AND SO THE SUBJECT LINE OF YOUR EMAIL IS "RESPONSE TO YOUR PROPOSED FRAMEWORK", CORRECT?

**A.** CORRECT.

**Q.** AND IF YOU -- YOU'VE LAID OUT YOUR RESPONSE. IF I CAN TURN YOUR ATTENTION TO PARAGRAPH 2 OF YOUR EMAIL, IN THAT

PARAGRAPH YOU REFER TO MR. RASURE'S COMPANY AS TECHSHOP 2.0, RIGHT?

THE NUMBERED PARAGRAPH 2.

**A.** THE NUMBERED PARAGRAPH, I'M SORRY.

YES, CORRECT.

**Q.** TURN NOW PLEASE TO TX636, WHICH IS ALREADY ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS AN EMAIL THAT YOU SENT TO MR. RASURE ON JANUARY 13TH, 2018, CORRECT?

**A.** SORRY. I'M A LITTLE SLOW TURNING THE PAGE HERE.

THAT IS CORRECT.

**Q.** AND YOU START YOUR EMAIL TO MR. RASURE SAYING, "THE TEAM MET AND REVIEWED STATUS THIS AFTERNOON"; ISN'T THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND IF YOU TAKE A LOOK AT NUMBERED PARAGRAPH 1 IN THIS EMAIL, RESPONDING TO MR. RASURE, YOU REFER TO HIS COMPANY AS TECHSHOP 2.0, CORRECT?

**A.** CORRECT.

**Q.** TURN NOW TO TX642.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 642 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**THE WITNESS:** 642. YES.

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL YOU SENT ON JANUARY 31ST, 2018 TO RYAN.LLOYD@WILCO.ORG.

DID I READ THAT RIGHT?

**A.** YOU DID. THAT'S CORRECT.

**Q.** AND MR. LLOYD WAS WITH THE WILCOX COUNTY SHERIFF'S OFFICE IN TEXAS?

**A.** THAT IS CORRECT.

**Q.** SO HE IS OUT -- HE'S SOMEBODY THAT IS NOT AFFILIATED WITH TECHSHOP?

**A.** CORRECT.

**Q.** IN THIS EMAIL TO MR. LLOYD, YOU START BY SAYING, "TECHSHOP, INC.'S WHOLLY-OWNED SUBSIDIARY TECHSHOP ROUND ROCK LLC, OWES $11,423.19 OF PAST DUE TAXES PAYABLE TO THE TEXAS COUNTY CLERK. MR. DAN RASURE, REPRESENTING TECHSHOP 2.0 LLC, NO AFFILIATION WITH TECHSHOP, INC., WOULD LIKE TO PAY THESE PAST DUE TAXES."

IS THAT RIGHT?

**A.** THAT IS CORRECT.

**Q.** SO IN THIS EMAIL TO A PARTY OUTSIDE OF TECHSHOP, YOU REFER TO MR. RASURE'S COMPANY AS TECHSHOP 2.0?

**A.** THAT IS CORRECT.

**Q.** AND THAT WAS FOR THE PURPOSE OF GIVING AUTHORIZATION FOR MR. RASURE TO PAY THESE PAST DUE TAXES?

**A.** THAT IS CORRECT.

**Q.** TURN TO TX644, WHICH IS ALREADY ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS AN EMAIL FROM MR. RASURE ON FEBRUARY 1ST, 2018 TO YOU AND OTHERS AT TECHSHOP, CORRECT?

**A.** YES.

**Q.** AND MR. RASURE TELLS YOU THAT HE'S ENCLOSING AN EQUIPMENT RENTAL AGREEMENT FOR ROUND ROCK, RIGHT?

**A.** YES.

**Q.** AND ROUND ROCK IS THE NAME THAT WAS USED TO REFER TO TECHSHOP'S FORMER AUSTIN LOCATION?

**A.** CORRECT. IT'S -- IT'S TECHNICALLY LOCATED IN A SUBURB CALLED ROUND ROCK, TEXAS.

**Q.** AND IF YOU TURN TO THE SECOND PAGE, YOU WILL SEE MR. RASURE'S ATTACHMENT WHICH IS A DRAFT EQUIPMENT RENTAL AGREEMENT?

**A.** YES.

**Q.** AND THE PARTIES TO THIS DRAFT AGREEMENT ARE TECHSHOP AUSTIN LLC AND TECHSHOP 2.0 AUSTIN?

**A.** CORRECT.

**Q.** TURN TO TX645, WHICH IS ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS AN EMAIL FROM YOU TO DAN RASURE ON FEBRUARY 1ST, 2018, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND THIS IS A RESPONSE TO MR. RASURE'S PROPOSAL WITH THE EQUIPMENT RENTAL AGREEMENT FOR AUSTIN THAT WE JUST LOOKED AT, CORRECT?

**A.** CORRECT.

**Q.** AND IN THIS RESPONSE ON FEBRUARY 1ST, YOU DIDN'T OBJECT TO MR. RASURE'S USE OF THE NAME TECHSHOP 2.0, DID YOU?

**A.** NO, I DID NOT.

**Q.** YOU USED THE NAME TECHSHOP 2.0 TO REFER TO MR. RASURE'S COMPANY?

**A.** CORRECT.

**Q.** TURN TO TX646, WHICH IS ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS AN EMAIL FROM MR. RASURE TO YOU AND OTHERS AT TECHSHOP ON FEBRUARY 2ND, 2018, CORRECT?

**A.** CORRECT.

**Q.** AND HE'S INDICATED THAT HE'S REVISED THE PROPOSED EQUIPMENT RENTAL AGREEMENT; ISN'T THAT RIGHT?

**A.** YES. CORRECT.

**Q.** AND IN THIS EMAIL, HE REFERS TO HIS COMPANY AS TECHSHOP 2.0, RIGHT?

**A.** CORRECT.

**Q.** AND, AGAIN, THE DRAFT AGREEMENT, IF YOU TURN TO PAGE 2, REFERS TO MR. RASURE'S COMPANY AS TECHSHOP 2.0, RIGHT?

**A.** IT DOES.

**Q.** TURN TO TX647.

**MS. ROBERTS:** WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 647 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** I THINK YOU MIGHT HAVE SEEN THIS DOCUMENT EARLIER BUT WITH A DIFFERENT NUMBER ON IT.

THIS IS AN EMAIL FROM YOU TO MR. RASURE ON FEBRUARY 7TH, 2018, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND YOU TELL MR. RASURE, UNDER ADVISEMENT OF OUR ATTORNEY, THE BOARD HAS DECIDED NOT TO PURSUE YOUR PROPOSED RENTAL AGREEMENTS. THERE ARE SIMPLY TOO MANY PARTIES WHO CAN AND LIKELY WILL MAKE A CLAIM ON THE FUNDS.

SO YOU ARE TURNING DOWN THE PROPOSED RENTAL AGREEMENT THAT WE HAD JUST TAKEN A LOOK AT?

**A.** CORRECT.

**Q.** YOU ALSO INFORM MR. RASURE, WE HAVE DECIDED TO BEGIN THE PROCESS OF PREPARING FOR AN IMMINENT CHAPTER 7 FILING, RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU GO ON TO TELL HIM, THAT IS NOT TO SAY THAT WE WOULD NOT BE SUPPORTIVE OF A DEAL BETWEEN YOU AND THE SECURED CREDITORS OR SOME OTHER ALTERNATIVE ARRANGEMENT, OTHER THAN AN ASSET RENTAL.

RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND IN THIS EMAIL TELLING MR. RASURE THAT THE COMPANY HAS DECIDED TO PROCEED TOWARD A CHAPTER 7 FILING, YOU DON'T TELL HIM TO STOP USING THE NAME TECHSHOP 2.0, RIGHT?

**A.** THAT IS CORRECT.

**Q.** TURN TO TX566.

**A.** 566?

**THE CLERK:** 56?

**MS. ROBERTS:** 566.

YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 566 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THE HEADING ON THIS DOCUMENT SAYS "FACEBOOK POSTING OF LETTER FROM DAN WOODS".

DO YOU SEE THAT?

**A.** YES, I DO.

**Q.** DOES THIS APPEAR TO BE A FACEBOOK POSTING THAT YOU MADE?

**A.** IT APPEARS TO BE.

**Q.** THAT'S BEEN REPRODUCED ON THIS OTHER SOCIAL MEDIA SITE?

**A.** IT APPEARS TO BE, YES.

**Q.** IN THE SECOND PARAGRAPH THERE, YOU SAY, FURTHER, THERE IS

ABSOLUTELY NO RELATIONSHIP BETWEEN MR. RASURE'S TECHSHOP 2.0 ENTITY AND TECHSHOP, INC. OR ITS LLC'S.

CORRECT?

**A.** THAT'S CORRECT.

**Q.** AND YOU POSTED THAT ON FACEBOOK?

**A.** YES, AS I RECALL I DID.

**Q.** SO ON -- ON THE TECHSHOP FACEBOOK PAGE?

**A.** I WOULD -- I WOULD IMAGINE IT WAS THE TECHSHOP FACEBOOK PAGE, YES.

**Q.** SO YOU MADE CLEAR THAT THERE'S NO RELATIONSHIP BETWEEN THE TWO ENTITIES?

**A.** CORRECT.

**Q.** TURN NOW TO TX650.

**THE COURT:** WHY DON'T WE TAKE OUR BREAK. IT'S 10:00.

SO, LADIES AND GENTLEMEN, LET'S TAKE OUR FIRST MORNING RECESS. IT'S 10:00 O'CLOCK. WE WILL BE BACK TO RECONVENE AT 10:15.

AS ALWAYS, PLEASE CONTINUE TO ABIDE BY ALL OF YOUR RULES FOR LIVING AS JURORS. SEE YOU IN 15 MINUTES.

(PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

**THE CLERK:** YOU MAY BE SEATED.

**THE COURT:** SEE YOU IN 15.

(RECESS TAKEN AT 10:00 A.M.; RESUMED AT 10:20 A.M.)

(PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

**THE CLERK:** REMAIN SEATED. COME TO ORDER. THIS

COURT IS BACK IN SESSION. THE HONORABLE HAYWOOD S. -- REMAIN SEATED. REMAIN SEATED.

**THE COURT:** I UNDERSTAND THERE IS SOMETHING YOU WANT TO TAKE UP?

**MR. NATHAN:** YES, YOUR HONOR.

JOHN NATHAN. THIS IS A MECHANICAL ISSUE. IT HAS NOTHING TO DO WITH MR. WOODS, BUT I JUST WANTED TO SEE IF WE CAN RESOLVE THIS.

WE HAD RECEIVED A SUPPLEMENTAL EXPERT REPORT FROM ONE OF THE EXPERTS IN THE CASE, AND THAT'S FINE. WE HAVE NO OBJECTION. WE RECEIVED IT FROM MR. PISTORINO.

THERE IS A CHART WITH UPDATED FIGURES WHICH WE HAVE NO OBJECTION TO. HE IS PROPOSING TO USE THE CHART ONLY WITH THE DEMONSTRATIVE AND NOT PLACE IT INTO EVIDENCE. AND I HAVE --

**THE COURT:** LET'S DO THIS. I DON'T WANT TO SPEND TIME --

**MR. NATHAN:** OKAY.

**THE COURT:** -- WHILE THE JURY IS OUT ON THIS. WE CAN TAKE THIS UP AT 8:00 TOMORROW.

**MR. NATHAN:** THANK YOU, YOUR HONOR.

**THE COURT:** YOU'RE WELCOME.

(PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

**THE CLERK:** YOU MAY BE SEATED.

**THE COURT:** YOU CAN PROCEED WHENEVER YOU ARE READY, MS. ROBERTS.

**MS. ROBERTS:** THANK YOU.

**BY MS. ROBERTS:**

**Q.** I BELIEVE WE WERE LOOKING AT TX650.

ARE YOU THERE, MR. WOODS?

**A.** CORRECT, I'M THERE.

**MS. ROBERTS:** WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 650 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS EXHIBIT IS AN EMAIL FROM YOU TO MR. RASURE ON FEBRUARY 14TH, 2018, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND IF YOU TURN TO THE THIRD PAGE, YOU'LL SEE THE ATTACHMENT TO THAT EMAIL WHICH IS A LETTER THAT WE'VE ALREADY LOOKED AT TODAY.

DO YOU SEE THAT?

**A.** YES, I DO.

**Q.** THIS IS THE EMAIL THAT YOU SENT TO MR. RASURE AND MR. DAVE BYERS AT HEARST ON FEBRUARY 14TH?

**A.** YES.

**Q.** IN THIS EMAIL TO MR. RASURE AND MR. HEARST YOU REFER TO -- I'M SORRY, MR. BYERS, YOU REFER TO MR. RASURE'S COMPANY AS TECHSHOP 2.0, CORRECT?

**A.** CORRECT.
**Q.** NOWHERE IN THIS LETTER DO YOU SAY STOP USING TECHSHOP 2.0, DO YOU?
**A.** NO, I DO NOT.
**Q.** NOWHERE IN THIS LETTER DO YOU SAY CEASE AND DESIST USING THE NAME TECHSHOP 2.0, RIGHT?
**A.** THAT IS CORRECT.
**Q.** AND NOWHERE IN THIS LETTER DO YOU SAY TECHSHOP 2.0 INFRINGES TECHSHOP'S TRADEMARKS, RIGHT?
**A.** I DON'T SAY THOSE WORDS, NO.
**Q.** AND YOU'RE ACTUALLY -- YOU INTRODUCED MR. RASURE TO MR. BYERS, CORRECT?
**A.** THAT IS CORRECT.
**Q.** I THINK EARLIER YOU SAID THAT YOU CONNECTED HIM WITH VARIOUS DIFFERENT LANDLORDS BECAUSE IT WAS ESSENTIAL FOR HIM TO COMMUNICATE WITH THEM?
**A.** THAT IS CORRECT.
**Q.** LET'S TURN NOW PLEASE TO TX652, WHICH IS ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS AN EMAIL FROM MR. RASURE TO YOU AND OTHERS AT TECHSHOP ON FEBRUARY 15TH, 2018, CORRECT?
**A.** THAT IS CORRECT.
**Q.** MR. RASURE TELLS YOU, TODAY WAS A GREAT DAY BUT WE AREN'T QUITE DONE.

RIGHT?

**A.** YES, HE SAYS THAT.

**Q.** WE ARE WORKING ON FINALIZING ONE DOCUMENT RIGHT NOW INTERNALLY AND AUTODESK WILL HAVE A DOCUMENT BACK TOMORROW.

RIGHT?

**A.** CORRECT.

**Q.** AND YOU WILL RECALL WE SAW AN EARLIER EMAIL FROM YOU ON FEBRUARY 7TH SAYING TECHSHOP DIDN'T HAVE ANY ISSUES WITH MR. RASURE CONTINUING TO NEGOTIATE DIRECTLY WITH TECHSHOP'S CREDITORS WITH RESPECT TO A POTENTIAL DEAL, CORRECT?

**A.** CORRECT.

**Q.** AND SO AUTODESK WAS ONE OF THOSE POTENTIAL CREDITORS, RIGHT?

**A.** YES.

**Q.** AND MR. RASURE IS TELLING YOU AND OTHERS AT TECHSHOP ON FEBRUARY 15TH THAT HE'S WORKING ON FINALIZING ONE DOCUMENT AND AUTODESK WILL HAVE IT THE NEXT DAY.

RIGHT?

**A.** YES.

**Q.** HE TELLS YOU HE IS STILL TRYING TO FIND OUT A SOLUTION FOR THE INSTRUCTORS, RIGHT? SO HE'S STILL WORKING ON THAT PIECE?

**A.** THAT'S WHAT HE SAYS, YES.

**Q.** AND HE ACTUALLY THANKS YOU TWICE FOR STILL TRYING TO GET A DEAL DONE, RIGHT?

**A.** EXACTLY.

**Q.** CAN YOU TURN TO TX896?

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 896 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO WILLIAM COUGHLIN ON FEBRUARY 13TH, 2018.

RIGHT?

**A.** CORRECT.

**Q.** I BELIEVE YOU TESTIFIED EARLIER MR. COUGHLIN IS AFFILIATED WITH FORD; ISN'T THAT RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND THE VERY BEGINNING OF THE EMAIL YOU SAY, REMOVING DAN RASURE FROM DISTRIBUTION, BUT YOU DIDN'T ACTUALLY DO THAT, DID YOU?

**A.** NO, I DIDN'T.

**Q.** HE WAS LEFT ON THE CC LINE?

**A.** YES.

**Q.** SO IN THIS EMAIL TO MR. COUGHLIN, ARE YOU RESPONDING TO THE EARLIER EMAIL CHAIN FROM HIM?

IS THAT RIGHT?

**A.** AS I RECALL THAT'S CORRECT.

**Q.** AND IN HIS EMAIL TO YOU, HE ASKS FOR AN UPDATE ABOUT THE

PROSPECTS FOR RE-OPENING THE LOCAL TECHSHOP, RIGHT?

**A.** CORRECT.

**Q.** AND THEN IN YOUR RESPONSE, YOU LET HIM KNOW THERE IS ABSOLUTELY NO RELATIONSHIP BETWEEN MR. RASURE'S TECHSHOP 2.0 ENTITY AND TECHSHOP, INC. OR ITS LLC'S.

RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND THIS IS THE DAY BEFORE TECHSHOP FILED SUIT, RIGHT?

**A.** AS I RECALL, YES.

**Q.** I'M SORRY, THIS IS THREE DAYS BEFORE.

**A.** YEAH. CLOSE.

**Q.** TURN TO TX656.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 656 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** IF YOU TURN TO THE SECOND PAGE, YOU WILL SEE THAT THIS IS THE CEASE AND DESIST LETTER YOU'VE ALREADY TESTIFIED ABOUT.

DO YOU RECOGNIZE THAT?

**A.** I DO.

**Q.** AND THE COVER EMAIL THAT'S PAGE 1 OF THIS EXHIBIT IS THE EMAIL THAT WAS SENT TO MR. RASURE ATTACHING THIS LETTER,

RIGHT?

**A.** I BELIEVE SO, YES.

**Q.** AND IT WAS SENT ON FEBRUARY 16TH, 2018?

**A.** YES.

**Q.** AT THE TIME THAT THIS LETTER WAS SENT, A COMPLAINT HAD ALREADY BEEN FILED, CORRECT?

**A.** I DON'T RECALL THE EXACT SEQUENCE OR TIMING. I JUST DON'T RECALL.

**Q.** IF I CAN TURN YOUR ATTENTION IN THAT EXHIBIT TO THE LAST PARAGRAPH IN MR. PISTORINO'S EMAIL.

IF YOU CAN READ THE SENTENCE AT THE END OF THAT PARAGRAPH THAT BEGINS "ALONG THESE LINES".

DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER A COMPLAINT HAD ALREADY BEEN FILED AGAINST TECHSHOP 2.0?

**A.** ARE WE ON PAGE 3?

**Q.** PAGE 3, YES.

**A.** OKAY. YOU SAID "ALONG THESE LINES" --

**Q.** THE LAST PARAGRAPH.

**A.** "ALONG THESE LINES", CORRECT?

YES, I SEE THAT.

**Q.** THE LETTER SAYS THAT THE COMPLAINT WAS ALREADY FILED, RIGHT?

SO TECHSHOP FILED THE COMPLAINT AND THEN SENT THIS LETTER?

**A.** IT APPEARS -- YES. THAT'S THE SEQUENCE.

**Q.** AND AS CEO OF TECHSHOP, YOU APPROVED OF THE FILING OF THE

COMPLAINT?

**A.** YES, I DID.

**Q.** AND YOU AUTHORIZED THE CEASE AND DESIST LETTER?

**A.** YES, I DID.

**Q.** AND DID YOU REVIEW... REVIEW THE INFORMATION THAT WAS INCLUDED IN THE CEASE AND DESIST LETTER BEFORE IT WENT OUT?

**A.** I'M SURE I DID.

**Q.** THE SAME THING WITH THE COMPLAINT, DID YOU REVIEW IT?

**A.** YES, I DID.

**Q.** DID YOU BELIEVE IT ACCURATELY REFLECTED THE CONCERNS THAT TECHSHOP HAD?

**A.** I DID.

**Q.** DOES THE COMPLAINT MENTION ANYTHING ABOUT THE THESHOP.BUILD?

**A.** I WOULD HAVE TO READ IT, REVIEW IT.

**Q.** DO YOU RECALL THE COMPLAINT REFERENCING ANYTHING ABOUT CUSTOMER LISTS?

**A.** I DON'T RECALL. I WOULD HAVE TO REVIEW THE COMPLAINT NOW. IF YOU WOULD LIKE ME TO, I WILL.

**Q.** THAT'S ALL RIGHT.

IN THE EMAIL OR THE LETTER THAT WAS SENT TO MR. RASURE BY TECHSHOP'S COUNSEL, THE LETTER NOTES THAT MR. RASURE WAS OPENING A FACILITY AT TECHSHOP'S FORMER SAN FRANCISCO LOCATION. RIGHT?

**A.** CORRECT.

**Q.** AND, AGAIN, AS WE TOUCHED ON EARLIER, YOU INTRODUCED MR. RASURE TO MR. BYERS, THE REPRESENTATIVE OF HEARST, CORRECT?

**A.** CORRECT.

**Q.** AND YOU DID THAT EARLY IN THE NEGOTIATIONS BECAUSE IT WAS ESSENTIAL FOR MR. RASURE TO NEGOTIATE WITH THE LANDLORDS, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND YOU ACTUALLY TOLD HIM THAT YOU SUGGESTED BOTH OF MR. BYERS AND MR. RASURE DIRECT COMMUNICATION BETWEEN THE TWO OF THEM?

**A.** THAT'S CORRECT.

**Q.** SO BASED ON THAT EMAIL, IT'S NOT SURPRISING THAT MR. RASURE WOULD BE DIRECTLY COMMUNICATING -- BASED ON YOUR INTRODUCTION, IT'S NOT SURPRISING THAT MR. RASURE WOULD BE DIRECTLY COMMUNICATING WITH --

**A.** IT IS CERTAINLY NOT SURPRISING HE WOULD BE IN DIRECT COMMUNICATIONS WITH MR. BYER.

**Q.** ARE YOU FAMILIAR WITH WHAT HAS HAPPENED WITH THE LOCATIONS OF OTHER TECHSHOP LOCATIONS -- IN THE FORMER LOCATIONS?

**A.** IT'S BEEN QUITE A WHILE SINCE I HAVE HAD ANY FORMAL CAPACITY, SO I WOULDN'T SAY I HAVE A CURRENT FAMILIARITY WITH THE STATUS OF ALL THE OTHER LOCATIONS, THE NINE OTHER LOCATIONS.

**Q.** SO YOU DON'T KNOW WHETHER MAKERSPACES HAVE OPENED IN ANY

OF THE OTHER PRIOR LOCATIONS?

**A.** I REALLY DON'T KNOW. I DON'T BELIEVE SO, BUT I DON'T ABSOLUTELY KNOW.

**Q.** IN PLAINTIFF'S COUNSEL'S LETTER TO MR. RASURE, IT REFERS TO INTERVIEWS THAT MR. RASURE GAVE TO THE *SAN FRANCISCO CHRONICLE* AND ADAFRUIT USING THE TECHSHOP 2.0 NAME.

DO YOU RECALL THAT?

**A.** I'M SORRY, COULD YOU REPEAT THAT AGAIN?

**Q.** YES.

THE LETTER, WHICH IS PART OF TX656, REFERS TO MR. RASURE HAVING GIVEN INTERVIEWS TO THE *SAN FRANCISCO CHRONICLE* AND ADAFRUIT OR ADAFRUIT USING THE TECHSHOP 2.0 NAME?

**A.** YES, ADAFRUIT.

**Q.** AND WE'VE ALREADY TALKED ABOUT THE *SAN FRANCISCO CHRONICLE* ARTICLE. IS IT YOUR UNDERSTANDING THAT THE LETTER'S REFERRING TO THE *CHRONICLE* ARTICLE YOU'VE ALREADY TESTIFIED ABOUT?

**A.** YES, I BELIEVE IT WAS.

**Q.** DID YOU REVIEW THE ADAFRUIT INTERVIEW THAT'S REFERENCED?

**A.** I'M SURE I DID.

**Q.** CAN YOU TURN PLEASE TO TX67?

**A.** I'M SORRY, THE NUMBER?

**Q.** 67.

**A.** 67.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 67RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS THE ADAFRUIT INTERVIEW THAT IS REFERENCED IN THE CEASE AND DESIST LETTER THAT WAS SENT TO MR. RASURE, CORRECT?

**A.** IT APPEARS TO BE, YES.

**Q.** IF YOU LOOK UNDERNEATH THE -- THERE'S THE BOLD QUESTION, "MANAGING PARTNER, OKAY"?

DO YOU SEE THAT?

**A.** YES.

**Q.** THEN BENEATH THAT IT IS MR. RASURE'S ANSWER?

DO YOU SEE THAT?

**A.** YES, I DO.

**Q.** AND IN THE VERY FIRST LINE OF HIS ANSWER, HE REFERS TO A NEW ENTITY THAT WAS FORMED, RIGHT?

**A.** THAT'S CORRECT.

**Q.** NOW YOU'RE AWARE THAT TECHSHOP 2.0 CHANGED ITS NAME TO THESHOP.BUILD, RIGHT?

**A.** YES, I AM.

**Q.** CAN YOU TURN, PLEASE, TO TX321?

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** 321 IS ADMITTED.

(TRIAL EXHIBIT 321 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**THE WITNESS:** I DON'T HAVE A 321 -- MAYBE I DO. I'M THERE.

**BY MS. ROBERTS:**

**Q.** AND THE EMAIL AT THE VERY TOP OF THE CHAIN IS FROM SOMEBODY NAMED PHILLIP TORRONE@ADAFRUIT.COM?

**A.** CORRECT.

**Q.** TO YOU ON FEBRUARY 17TH, 2018; IS THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND IF YOU LOOK AT THE BOTTOM OF THE DOCUMENT, THERE'S AN EMAIL, AN EARLIER EMAIL FROM MR. TORRONE, RIGHT?

**A.** YES.

**Q.** HE INFORMS YOU ABOUT A POST -- ABOUT THE OPENING ON MONDAY AND THE NAME CHANGE, CORRECT?

**A.** YES.

**Q.** AND HE'S REFERRING TO THE NAME CHANGE OF TECHSHOP 2.0, RIGHT?

**A.** I HAVE TO REVIEW IT FOR A SECOND.

**Q.** SURE.

(PAUSE IN THE PROCEEDINGS.)

**A.** IT'S UNCLEAR TO ME EXACTLY WHAT NAME CHANGES THAT HE'S REFERRING TO BETWEEN TECHSHOP AND PEOPLE WERE USING TECHSHOP 1.0, WHICH NEVER ACTUALLY EXISTED. TECHSHOP 2.0.

SO I'M NOT -- I CAN SEE WHAT HE SAYS. AT THIS POINT IN TIME I'M NOT REAL CLEAR OUT OF CONTEXT EXACTLY WHAT NAME CHANGE HE'S REFERRING TO, BUT I CAN SEE HE IS REFERRING TO A NAME CHANGE.

**Q.** THIS IS DATED ON FEBRUARY 17TH, 2018?

**A.** CORRECT.

**Q.** NOW EARLIER TODAY AND YESTERDAY YOU WERE TALKING ABOUT ALL THE WORK THAT YOU'VE DONE TO PROMOTE TECHSHOP, RIGHT?

THAT WAS PART OF YOUR JOB?

**A.** SURE.

**Q.** ALL OF THAT WORK HAPPENED PRIOR TO TECHSHOP'S CLOSURE ON NOVEMBER 15, 2017 --

**A.** CORRECT.

**Q.** THERE'S NOT BEEN CONTINUING MARKETING OF THE BRAND?

**A.** NO.

**Q.** NOW YOU ALSO TESTIFIED THAT IN THE COURSE OF TECHSHOP'S NEGOTIATIONS WITH MR. RASURE, MR. RASURE MADE PAYMENTS ON TECHSHOP'S BEHALF, RIGHT?

**A.** THAT IS CORRECT.

**Q.** THAT'S BECAUSE, I THINK YOU SAID, TECHSHOP WAS BROKE?

**A.** WE WERE BROKE. WE HAD NO MONEY.

**Q.** IF YOU TURN BACK TO TX610, WHICH SHOULD ALREADY BE ADMITTED.

**THE CLERK:** UH-HUH.

(DISPLAYED ON SCREEN.)

**THE WITNESS:** OKAY.

**BY MS. ROBERTS:**

**Q.** THIS IS THE MEMORANDUM OF UNDERSTANDING AGAIN, RIGHT?

**A.** OKAY. YES.

**Q.** IF YOU LOOK AT ITEM NO. 1 IN THE SUMMARY OF PRINCIPAL TRANSACTION TERMS, IT SAYS, "TECHSHOP 2.0 ACQUIRES ALL ASSETS OF TECHSHOP, INC. FOR THE FOLLOWING CONSIDERATION."

RIGHT?

**A.** YES.

**Q.** AND IT LISTS THAT LIST THERE WHAT TECHSHOP 2.0 WOULD BE PROVIDING SO THAT IT COULD ACQUIRE ALL OF THE ASSETS OF TECHSHOP, INC., RIGHT?

**A.** CORRECT.

**Q.** AND AMONG THE THINGS LISTED IS IMMEDIATELY PROVIDING FUNDS FOR NOVEMBER HEALTH INSURANCE, GOOGLE SUITE, AND TECHSHOP'S LEGAL COUNSEL, RIGHT?

**A.** CORRECT.

**Q.** TURN TO TX587.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 587 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON NOVEMBER 27TH, 2017, CORRECT?

**A.** CORRECT.

**Q.** AND IN YOUR EMAIL TO MR. RASURE, YOU TELL HIM, "WE ABSOLUTELY MUST PAY THE FOLLOWING INSURANCE PREMIUMS TO ENSURE COVERAGE THROUGH NOVEMBER, THIS MONTH."

RIGHT?

**A.** CORRECT.

**Q.** SO YOU'RE LATE ON THE MEDICAL INSURANCE PAYMENTS FOR THAT MONTH, RIGHT?

**A.** CORRECT.

**Q.** AND THEN IN YOUR EMAIL, YOU LAY OUT THE AMOUNTS DUE TO KAISER AND ANTHEM, CORRECT?

**A.** YES, THAT'S CORRECT.

**Q.** AND THE TOTAL FOR THOSE TO IS $11,546.58, RIGHT?

**A.** CORRECT.

**Q.** AND YOU ASK MR. RASURE TO PAY THOSE PREMIUMS DIRECTLY?

**A.** CORRECT.

**Q.** AND THAT IMMEDIATE PAYMENT OF THOSE FUNDS WAS PART OF WHAT HE WAS PAYING UNDER THE MEMORANDUM OF UNDERSTANDING, CORRECT?

**A.** THAT IS CORRECT.

**Q.** TURN TO TX594.

**THE CLERK:** I'M SORRY.

**MS. ROBERTS:** 594. I MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 594 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THE EARLIEST EMAIL IS FROM MIKE HILBERMAN TO DAN RASURE CC'G YOU ON NOVEMBER 29TH, 2017 RIGHT?

**A.** THAT IS CORRECT.

**Q.** MIKE HILBERMAN WAS AFFILIATED WITH TECHSHOP IN SOME WAY?

**A.** HE WAS THE ACTING CFO. HE WAS AN OUTSIDE CONTRACTOR, BUT HE FILLED THE ROLE OF A CFO.

**Q.** THAT'S WHY HE DOESN'T HAVE A TECHSHOP @TECHSHOP EMAIL ADDRESS UP THERE?

**A.** THAT'S CORRECT.

**Q.** IN THIS EMAIL CHAIN, MR. HILBERMAN PROVIDES INSTRUCTIONS TO MR. RASURE ON HOW TO MAKE PAYMENTS TO KAISER AND ANTHEM, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND IF YOU LOOK AT MR. RASURE'S EMAIL AT 11:29 A.M., IT'S THE SECOND FROM THE TOP?

**A.** YES.

**Q.** MR. RASURE REPORTS, BOTH HAVE BEEN MADE, CORRECT?

**A.** CORRECT.

**Q.** NOW ANOTHER EXPENSE THAT WAS LISTED IN THE MEMORANDUM OF UNDERSTANDING AS PART OF THE CONSIDERATION FOR THE DEAL WAS

PAYMENTS TO GOOGLE, RIGHT?

**A.** CORRECT.

**Q.** AND THAT WAS FOR GOOGLE SUITE FOR, YOU MENTIONED EMAIL, FOR EXAMPLE, RIGHT?

**A.** GOOGLE DOCS, GOOGLE DRIVE, ALL OF OUR DATA.

**Q.** TURN TO TX592.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 592 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON NOVEMBER 29TH, 2017, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND YOU'RE RESPONDING TO MR. RASURE'S EARLIER EMAIL OF THE SAME DATE SAYING, FIRST GOOGLE PAYMENT IS DONE.

RIGHT?

**A.** YES, CORRECT.

**Q.** ABOUT A WEEK LATER, ON DECEMBER 5TH, YOU TOLD MR. RASURE THAT HE HAD ONLY PAID HALF THE BILL AND YOU NEEDED HIM TO MAKE ADDITIONAL PAYMENT, RIGHT?

**A.** CORRECT.

**Q.** TURN PLEASE TO TX620, WHICH IS ADMITTED.

**THE CLERK:** UH-HUH.

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON DECEMBER 5TH, 2017, RIGHT?

**A.** YES.

**Q.** AND YOU EMAILED HIM TO LET HIM KNOW YOU WOKE UP THAT MORNING TO THE FOLLOWING MESSAGE. YOUR DOMAIN'S G SUITE ACCOUNT HAS BEEN SUSPENDED. PLEASE CONTACT YOUR G SUITE DOMAIN ADMINISTRATOR TO REACTIVATE YOUR DOMAIN.

RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU TELL MR. RASURE THAT YOU NO LONGER HAVE ACCESS TO GMAIL AND SO IT IS ESSENTIAL THAT HE PAY THE REMAINDER OF THE BILL. RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU SAY, "WE MUST HAVE IT PAID ASAP".

**A.** CORRECT.

**Q.** TURN TO TX643, WHICH IS ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS AN EMAIL FROM YOU TO MR. RASURE ON FEBRUARY 1ST, 2018, CORRECT?

**A.** THAT IS CORRECT.

**Q.** THIS IS ROUGHLY OVER A MONTH AFTER THE LAST EMAIL REGARDING THE GOOGLE ACCOUNT THAT WE JUST LOOKED AT, RIGHT?

**A.** PROBABLY CLOSE TO TWO MONTHS.

**Q.** IF YOU TURN TO THE EARLIEST EMAIL IN THE CHAIN, WHICH IS AT THE VERY END ON PAGE 3, THIS COMMUNICATION BEGINS WITH MR. RASURE TELLING YOU, "I DID NOT AUTHORIZE THE $5,919 CHARGE TO GOOGLE. PLEASE HAVE IT REMOVED."

RIGHT?

**A.** THAT IS CORRECT.

**Q.** SO HE WAS REPORTING TO YOU THAT GOOGLE HAD CHARGED HIM THIS AMOUNT AND HE HAD NOT AUTHORIZED TO PAY THAT AMOUNT TOWARDS TECHSHOP'S G SUITE ACCOUNT, RIGHT?

**A.** CORRECT.

**Q.** AND ULTIMATELY YOU REPLY TO MR. RASURE THAT MR. NEWTON TRIED TO RESOLVE THIS BUT HADN'T BEEN ABLE TO DO SO. CORRECT?

**A.** YES, I INFORMED HIM THAT.

**Q.** AND YOU TELL HIM HE MAY HAVE TO ASK HIS BANK TO REVERSE IT.

**A.** THAT IS CORRECT.

**Q.** TURN TO TX581.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 581 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON NOVEMBER 20TH, 2017, RIGHT?

**A.** YES.

**Q.** AND THIS EMAIL DISCUSSES THE NEED FOR TECHSHOP TO HIRE LEGAL COUNSEL, RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU TELL MR. RASURE THAT TECHSHOP HAS FOUND OUTSIDE COUNSEL AND ASK HIM, "AWKWARD QUESTION, BUT SINCE WE ARE FLAT OUT RUNNING ON EMPTY, ANY CHANCE YOU WOULD CONSIDER WIRING THE 5,000 TO THEIR FIRM SO WE CAN AT LEAST GET THEIR COUNSEL THIS AFTERNOON".

RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU TELL HIM, "I KNOW THIS IS SOMEWHAT UNORTHODOX, BUT WE ARE TRYING TO REACH YES TONIGHT".

RIGHT?

**A.** YES. CORRECT.

**Q.** AND YOU ALSO TOLD HIM THAT THE DEAL COULD NOT MOVE FORWARD WITHOUT OUTSIDE COUNSEL WITH EXPERTISE IN M & A AND GENERAL CORPORATE COUNSEL EXPERTISE.

**A.** ABSOLUTELY.

**Q.** TURN TO TX584.

**MS. ROBERTS:** WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 584 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON NOVEMBER 24TH, 2017, CORRECT?

**A.** CORRECT.

**Q.** AT THE VERY BEGINNING YOU SAY, "WE ARE GETTING QUITE CLOSE".

YOU ARE REFERRING TO YOU'RE GETTING QUITE CLOSE TO A DEAL?

**A.** THAT'S CORRECT. CLOSE -- YES.

**Q.** BUT THEN YOU TELL HIM, IF YOU LOOK IN THE SECOND PARAGRAPH OF SECTION ONE, "WE NEED $50,000 BY MONDAY JUST TO COVER IMMEDIATE AND VERY PRESSING OBLIGATIONS".

RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND YOU ASK MR. RASURE TO MAKE A $50,000 WIRE TRANSFER TO STAVE OFF A CHAPTER 7 FILING.

**A.** THAT IS CORRECT.

**Q.** TURN NOW PLEASE TO TX586.

**MS. ROBERTS:** WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 586 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON NOVEMBER 24TH, 2017?

**A.** THAT IS CORRECT.

**Q.** THE SUBJECT IS WIND-DOWN EXPENSES, RIGHT?

**A.** YES.

**Q.** AND YOU'VE LISTED HERE WIND-DOWN REQUIRED EXPENSES AND IMMEDIATE REQUIRED EXPENSES, CORRECT?

**A.** CORRECT.

**Q.** AND IN THE IMMEDIATE REQUIRED COLUMN, IT INCLUDES $11,000 IN MEDICAL INSURANCE PREMIUMS, RIGHT?

**A.** THAT IS CORRECT.

**Q.** IT INCLUDES $20,000 IN ATTORNEY RETAINER, CORRECT?

**A.** THAT IS CORRECT.

**Q.** AND IT INCLUDES $17,500 FOR GOOGLE AND CLOUD FEES, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND IT INCLUDES STAFF FOR TWO MONTHS FOR $10,000, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND YOU ASK MR. RASURE TO HIRE SEVERAL FORMER TECHSHOP EMPLOYEES TO HELP WITH THE TRANSITION, RIGHT?

**A.** THAT IS CORRECT.

**Q.** TURN TO TX595.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 595 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON NOVEMBER 29TH, 2017, RIGHT?

**A.** YES.

**Q.** AND IN THIS EMAIL YOU RECOMMEND FORMER TECHSHOP EMPLOYEES OR CONTRACTORS THAT YOU THINK MR. RASURE SHOULD HIRE, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND ON THE BOTTOM OF THAT FIRST PAGE, YOU LIST LOUISE LARSON, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND DESCRIBING MS. LARSON, YOU SAY, "I'D USE LOUISE TO HELP WITH MEMBER COMMS AND SOCIAL MEDIA PRIMARILY OVER THE NEXT THREE TO FOUR WEEKS. PERHAPS HALF TIME. SHE'S BASED IN PITTSBURGH, KNOWS OUR COMMS SYSTEMS, KNOWS OUR MEMBERS AND THE MAKER COMMUNITY AND MAKES STUFF HAPPEN QUICKLY."

**A.** THAT'S CORRECT.

**Q.** AND YOU ALSO RECOMMENDED A FEW ADDITIONAL PEOPLE IN ADDITION TO MS. LARSON, RIGHT?

**A.** THAT IS CORRECT.

**Q.** TURN TO TX604.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 604 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM MR. NEWTON TO ELIZABETH BOBEK ON NOVEMBER 30TH, 2017, AND YOU ARE CC'D, CORRECT?

**A.** YES.

**Q.** MR. NEWTON ASKS, "WHEN ARE WE SENDING OUT THE MEMBER MESSAGE AND WHAT IS THE CONTENT FOR THAT?"

RIGHT?

**A.** YES.

**Q.** AND HE SAYS IN THE LAST PARAGRAPH OF HIS EMAIL, "I ALSO NEED TO REMIND EVERYONE, ONCE AGAIN, THAT WE HAVE NO EMPLOYEES TO DO THIS EMAIL BLAST TO MEMBERS. SO WE NEED TO GET LOUISE AND TERESA PAID ASAP SO THEY CAN DO IT."

RIGHT?

**A.** CORRECT.

**Q.** SO ARE YOU SAYING THAT TECHSHOP NEEDS PEOPLE TO BE ABLE TO SEND OUT COMMUNICATIONS TO MEMBERS?

**A.** BASIC HOUSEKEEPING REQUIREMENTS IN ORDER TO KEEP EVERYTHING MOVING FORWARD.

**Q.** MR. NEWTON IS TELLING YOU ALL THAT THAT CAN'T HAPPEN WITHOUT THESE PEOPLE, RIGHT?

**A.** THAT'S CORRECT.

**Q.** TURN TO TX606.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**MS. ROBERTS:** THIS IS AN EMAIL --

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 606 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** SORRY.

THIS IS AN EMAIL FROM YOU TO MR. RASURE ON DECEMBER 1ST, 2017, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND YOU TELL MR. RASURE THERE IS AN IMMEDIATE NEED TO BRING ON TWO FORMER EMPLOYEES, MS. LARSON AND MS. BELVINS, RIGHT?

**A.** THAT IS CORRECT.

**Q.** YOU TELL HIM THAT THEIR COMBINED FEES WOULD NOT LIKELY EXCEED $2,500, RIGHT?

**A.** THAT'S WHAT I SAY.

**Q.** TURN NOW, PLEASE, TO TX621.

**MS. ROBERTS:** YOUR HONOR, WE MOVE TO ADMIT THIS EXHIBIT.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 621 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL THAT LOUISE LARSON SENT TO MR. RASURE ON DECEMBER 6TH, 2017 CC'G YOU; ISN'T THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND MS. LARSON ATTACHES HER INVOICE FOR HER WORK FROM NOVEMBER 30TH THROUGH DECEMBER 5TH, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND THE INVOICE THAT'S PAGE 2 OF THIS EXHIBIT IS FOR THE AMOUNT OF $1,100, RIGHT?

**A.** THAT IS CORRECT.

**Q.** THESE PAYMENTS THAT TECHSHOP REQUESTED THAT MR. RASURE MAKE THAT WE'VE DISCUSSED, WE'VE TALKED ABOUT THE ATTORNEYS, MS. LARSON, THE MEDICAL INSURANCE, THE G SUITE ACCOUNTS, TECHSHOP DIDN'T REIMBURSE MR. RASURE FOR ANY OF THOSE PAYMENTS, CORRECT?

**A.** NO, WE DID NOT.

**MS. ROBERTS:** NO FURTHER QUESTIONS.

**THE WITNESS:** OKAY.

**THE COURT:** ANY REDIRECT?

**MR. PISTORINO:** YES.

**REDIRECT EXAMINATION**

**BY MR. PISTORINO:**

**Q.** MAYBE WE WILL JUST GO BACKWARDS.

THE PAYMENTS THAT MR. RASURE WAS MAKING HERE, THE G SUITE CHARGES, THE PAYMENTS FOR AN ATTORNEY, THE HEALTH INSURANCE, THOSE WERE ALL PAYMENTS TO ALLOW TECHSHOP TO ENGAGE IN A NEGOTIATION WITH MR. RASURE, CORRECT?

**A.** THAT IS CORRECT.

WHEN WE FIRST MET WITH MR. RASURE OVER THE PHONE, WE EXPLAINED THAT IT WAS GOING TO TAKE MONEY AND TIME TO EFFECT A DEAL AND NEGOTIATE EVERYTHING AND EFFECT THE TRANSFER. AND WE WERE GOING TO NEED BODIES TO MAKE THAT HAPPEN, AND IT WAS GOING TO COST SOME MONEY.

**Q.** WHEN YOU SAY "IT WAS GOING TO COST SOME MONEY", YOU MEAN SOME MONEY JUST TO ENGAGE IN A NEGOTIATION, NOT TO DO A DEAL, BUT TO NEGOTIATE A DEAL; IS THAT RIGHT?

**A.** WELL, CORRECT. THERE'S A LOT OF INFORMATION, A LOT OF CONTENT, A LOT OF DATA, A LOT OF LEASES AND OTHER INFORMATION THAT NEEDS TO BE DUG UP AND EXCHANGED BETWEEN THE PARTIES.

**Q.** OKAY. IF YOU CAN TURN, I THINK IT MUST BE IN YOUR WHITE BINDER, TO THE DOCUMENT MARKED TX584, WHICH I BELIEVE WAS ALREADY ADMITTED.

**THE CLERK:** YES.

(DISPLAYED ON SCREEN.)

**THE WITNESS:** IS THIS IN THE NEW BINDER?

**BY MR. PISTORINO:**

**Q.** YES, IT WOULD BE THE NEW BINDER. I THINK IT IS PROBABLY WHITE.

(PAUSE IN THE PROCEEDINGS.)

**A.** OKAY.

**Q.** OKAY.

AND YOU RECALL BEING ASKED SOME QUESTIONS BY MS. ROBERTS ABOUT THIS DOCUMENT?

**A.** YES. THIS IS THE DOCUMENT THAT... SUBJECT IS TECHSHOP SUMMARY AS OF 11/24?

**Q.** THAT'S CORRECT. IT'S AN EMAIL FROM YOU TO MR. RASURE DATED NOVEMBER 24TH, SO ABOUT A WEEK BEFORE THE MEMORANDUM OF UNDERSTANDING WAS ENTERED INTO, CORRECT?

**A.** YES, CORRECT.

**Q.** I JUST WANT TO FOLLOW UP ON ONE OF -- A FEW OF HER QUESTIONS.

FIRST, YOU SAY IN THE SECOND PARAGRAPH -- SORRY, SECOND SENTENCE UNDER BULLET POINT ONE, YOU SAY, "ADDITIONALLY WE NEED $50,000 BY MONDAY JUST TO COVER IMMEDIATE AND VERY PRESSING OBLIGATIONS".

ARE YOU WITH ME THERE?

**A.** YES.

**Q.** DID MR. RASURE SEND TECHSHOP $50,000 BY MONDAY?

**A.** NO.

**Q.** AND THEN YOU GO ON TO SAY, "THE BOARD'S OPINION IS THAT WE ARE TAKING ON SIGNIFICANT RISK VERSUS SIMPLY FILING CHAPTER 7. WE HAVE DONE EVERYTHING YOU'VE REQUESTED AND DONE SO QUICKLY AND ON GOOD FAITH".

DO YOU SEE THAT THERE?

**A.** YES.

**Q.** WHAT DID YOU MEAN BY THE BOARD WAS TAKING ON SIGNIFICANT RISK VERSUS FILING CHAPTER 7?

**A.** WELL, WE FELT THAT WE WERE OPERATING ON BORROWED TIME. WE FELT THAT WE NEEDED TO DO EVERYTHING POSSIBLE TO PRESERVE THE VALUE OF THE ASSETS FOR THE COMPANY SO THAT IF AND WHEN WE FILED CHAPTER 7, IT WOULD MAXIMIZE WHAT WAS SHAREHOLDER VALUE, BUT MAXIMIZE VALUE FOR THE TRUSTEE TO DISBURSE.

AND WE FELT THAT BY DELAYING THAT THERE WAS SIGNIFICANT RISK THAT... THAT BRAND AND OTHER ASSETS MIGHT DETERIORATE IN VALUE.

**Q.** OKAY.

SO THERE WAS A RISK OF JUST ENGAGING IN NEGOTIATION WITH MR. RASURE; IS THAT RIGHT?

**A.** WE WERE DELAYING -- WE WERE DELAYING FILING CHAPTER 7 ON THE PRESUMPTION THAT IT WAS WORTH THE RISK IF WE COULD EFFECT A DEAL TO SELL THE COMPANY.

**Q.** OKAY.

IF YOU CAN TURN TO WHAT IS IN YOUR WHITE BINDER THERE, TX581, WHICH WAS ALREADY ADMITTED.

**THE CLERK:** UH-HUH.

**THE WITNESS:** OKAY.

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** OKAY.

**A.** I'M THERE.

**Q.** YOU WERE ASKED SOME QUESTIONS ABOUT THIS EMAIL FROM YOURSELF TO MR. RASURE DATED NOVEMBER 20TH, SO ABOUT TEN DAYS BEFORE THE MEMORANDUM OF UNDERSTANDING WAS ENTERED INTO. AND YOU SAID IN THE SECOND PARAGRAPH, "THE BOARD DOES NOT FEEL COMFORTABLE MOVING FORWARD WITHOUT COUNSEL FROM OUTSIDE WITH EXPERIENCE", AND YOU CONTINUE ON.

DO YOU SEE THAT?

**A.** I DO.

**Q.** AND THEN -- SO -- DID -- HAD THE BOARD COMMUNICATED TO MR. RASURE THAT IT DIDN'T HAVE MONEY TO PAY FOR AN ATTORNEY TO REVIEW A POTENTIAL TRANSACTION WITH HIM?

**A.** YES.

**Q.** SO MR. RASURE KNEW THAT OTHER THAN FOR FILING BANKRUPTCY, THE BOARD DIDN'T HAVE ANY MONEY TO HIRE ATTORNEYS TO PROTECT IT, CORRECT?

**MS. ROBERTS:** OBJECTION, CALLS FOR SPECULATION.

**THE COURT:** SUSTAINED.

**BY MR. PISTORINO:**

**Q.** IF YOU CAN TURN IN THE BLACK BINDER TO THE DOCUMENT MARKED TX337, WHICH I BELIEVE HAS ALREADY BEEN ADMITTED.

**THE CLERK:** 337? YES.

**THE WITNESS:** WHAT IS THE NUMBER AGAIN?

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** 337.

**A.** 337?

**Q.** YES.

**A.** OKAY. I'M THERE.

**Q.** AND THIS IS A COPY OF THE ARTICLE THAT APPEARED IN THE *SAN FRANCISCO CHRONICLE* ON FEBRUARY 15TH, CORRECT?

**A.** THAT'S CORRECT.

**Q.** AND THEN LATER THAT SAME DAY, AGAIN, IF YOU CAN TURN NOW IN YOUR WHITE BOOK TO THE DOCUMENT MARKED TX652, WHICH I BELIEVE WAS ALREADY ADMITTED.

**A.** WHAT WAS THE NUMBER AGAIN?

**Q.** 652.

(DISPLAYED ON SCREEN.)

**A.** OKAY.

**Q.** 652, THAT WAS LATER THE SAME DAY MR. RASURE WROTE AN EMAIL TO YOU, RIGHT, THE SAME DAY, AND HE SAID, "TODAY WAS A GREAT DAY BUT WE AREN'T QUITE DONE".

DO YOU SEE THAT?

**A.** I DO.

**Q.** THE DAY AFTER TECHSHOP HAD SENT THE NOTICE ON FEBRUARY 14TH AND THE SAME DAY THAT THE ARTICLE APPEARED IN THE *SAN FRANCISCO CHRONICLE*, WAS FEBRUARY 15TH A GREAT DAY FOR TECHSHOP?

**A.** WELL, IT WASN'T A GREAT DAY FROM MY PERSPECTIVE BECAUSE OF THOSE THINGS. I -- YEAH, NO, IT WASN'T A GREAT DAY FOR TECHSHOP.

**Q.** WHAT DID YOU THINK WHEN YOU GOT THIS EMAIL FROM MR. RASURE?

**A.** WELL, SO I WAS AWARE THAT MR. RASURE WAS TALKING WITH AUTODESK AND, YOU KNOW, I -- MY ASSUMPTION HE WAS TALKING ABOUT A BREAK THROUGH THAT HE HAD IN HIS AUTODESK NEGOTIATIONS.

HE WAS WORKING -- THE PRIMARY BUSINESS POINT OF CONTACT AT AUTODESK WAS A GENTLEMAN NAMED JOSH EWING. AND I WAS IN FAIRLY REGULAR COMMUNICATION WITH JOSH EWING AS WELL AS DAN, AND DAN SEEMED TO THINK THAT -- I THINK WHAT HE IS REFERRING TO HERE IS HE HAD SIGNIFICANT PROGRESS IN TERMS OF NEGOTIATING SOME TERM WITH AUTODESK.

AUTODESK DIDN'T FEEL THE SAME WAY BECAUSE AT THE SAME TIME I WAS CHECKING IN WITH JOSH AND HE DIDN'T FEEL THAT --

**MS. ROBERTS:** OBJECTION. THE WITNESS IS SPECULATING.

**THE COURT:** IT'S HEARSAY, ISN'T IT? SUSTAINED.

**MR. PISTORINO:** THAT'S FINE.

**BY MR. PISTORINO:**

**Q.** WELL, WHAT I'M REALLY TRYING TO UNDERSTAND IS, IF YOU LOOK AT THE DOCUMENT THAT WAS MARKED TX650 IN THE WHITE BINDER, 650?

**A.** IN THE WHITE BINDER. 650?

**Q.** YEAH.

**A.** OKAY.

**Q.** IF YOU GO, IN THIS VERSION, THREE PAGES IN, IS A COPY OF THE FEBRUARY 14TH LETTER WE'VE SEEN BEFORE, RIGHT?

(DISPLAYED ON SCREEN.)

**A.** YES.

**Q.** OKAY. AND SO THAT WAS FEBRUARY 14TH, CORRECT?

**A.** CORRECT.

**Q.** OKAY.

AND THE *SAN FRANCISCO CHRONICLE* ARTICLE WAS FEBRUARY 15TH ABOUT MR. RASURE'S INTENTION TO OPEN THE TECHSHOP SAN FRANCISCO FACILITY USING THE NAME TECHSHOP 2.0, CORRECT?

**A.** CORRECT.

**Q.** SO NOW I'M GOING BACK; WAS FEBRUARY 15TH, 2018 A GREAT DAY FOR TECHSHOP?

**A.** NO.

**Q.** OKAY.

IN THE FEBRUARY 14TH LETTER MS. -- FROM OPPOSING COUNSEL YOU WERE QUESTIONED ABOUT WHETHER OR NOT IN THE LETTER YOU SAID THE WORDS "CEASE AND DESIST".

DO YOU RECALL THAT?

**A.** YES, I DO.

**Q.** AND YOU RECALL THERE WAS A QUESTION ABOUT WHETHER OR NOT YOU SAID "INFRINGE" IN THE LETTER, RIGHT?

**A.** CORRECT.

**Q.** OKAY. AND YOU SAID YOU DIDN'T USE THOSE WORDS.

**A.** CORRECT.

**Q.** BUT YOU DID SAY AT THE BOTTOM THERE, YOU SAID ON THE FIRST PAGE, "ALSO BE ADVISED THAT MR. RASURE HAS NO RIGHTS TO THE POSSESSION OR USE OF THE TECHSHOP ASSETS INCLUDING", AND THEN YOU WENT DOWN AND YOU LISTED SPECIFICALLY TRADEMARKS, RIGHT?

**A.** CORRECT.

**Q.** IF YOU CAN LOOK IN THE BLACK BINDER MARKED TX48.

**THE CLERK:** 48?

**MR. PISTORINO:** IT HAS ALREADY BEEN ADMITTED.

**THE CLERK:** IT IS.

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** ARE YOU WITH ME?

**A.** 48.

**Q.** RIGHT.

**A.** BLACK BINDER.

**Q.** 48, THAT'S A COPY OF THE MOU, CORRECT?

**A.** THAT'S CORRECT.

**Q.** SO, ALL THE COMMUNICATIONS WE'VE SEEN BEFORE DECEMBER 1ST, 2017 ABOUT PAYMENTS, MR. RASURE'S ENTITY, WERE ALL THOSE COMMUNICATIONS ABOUT TRYING TO DO THIS DEAL?

**A.** ABSOLUTELY.

**Q.** AND THEN IN THE MOU, WHAT I'M WANTING TO FIND OUT, WAS THE MOU THE FINAL DEAL, PROPOSED DEAL BETWEEN TECHSHOP AND

MR. RASURE?

**A.** NO. IT WAS A MEMORANDUM OF UNDERSTANDING. BOTH PARTIES HAD SHARED AS MUCH AS THEY COULD ABOUT WHAT THEIR OBJECTIVES WOULD BE IN NEGOTIATING A DEAL AND EXPRESSING THE HIGH LEVEL TRANSACTION TERMS, AND THAT WAS IT. MAKE SURE WE WERE ON THE SAME PAGE.

**Q.** SO IF MR. RASURE DID ALL THE THINGS THAT ARE LISTED AND THE PARTIES ACTUALLY CAME TO A FINAL AGREEMENT, MR. RASURE WOULD, AS THE FIRST BULLET POINT, ACQUIRE ALL OF THE ASSETS OF TECHSHOP, CORRECT?

**A.** CORRECT.

**Q.** AND WERE THE TRADEMARKS SOME OF THE ASSETS OF TECHSHOP?

**A.** YES.

**Q.** SO, FOR EXAMPLE, IN ORDER TO ULTIMATELY HAVE -- DO A DEAL IF ONE HAPPENED, MR. RASURE WOULD HAVE HAD TO ASSUME SECURED DEBT OF APPROXIMATELY $21 MILLION, RIGHT?

**A.** THAT'S CORRECT.

**Q.** DID THAT EVER HAPPEN? DID MR. RASURE EVER ASSUME THE SECURED DEBT OF $21 MILLION?

**A.** NO.

**Q.** HE WOULD HAVE ALSO HAD TO, FOR EXAMPLE, PUT UP TO A MAXIMUM OF $200,000, RIGHT?

**A.** CORRECT.

**Q.** DID HE EVER -- TECHSHOP EVER GET $200,000 FROM MR. RASURE?

**A.** NO.

**Q.** OKAY.

I THINK IN THE WHITE BINDER, I THINK THEY USED THE NUMBER 622, SO WE WILL STICK WITH THEIRS FOR A MOMENT.

(DISPLAYED ON SCREEN.)

**A.** I'M AT 622.

**Q.** OKAY. 622, THIS IS AN EMAIL FROM YOU DATED DECEMBER 6TH WHERE THE SUBJECT IS THE TECHSHOP ASSET PURCHASE AGREEMENT, CORRECT?

**A.** CORRECT.

**Q.** IN THE BODY, YOU SAY, "ATTACHED IS A DRAFT OF THE PROPOSED ASSET PURCHASE AGREEMENT". CORRECT?

**A.** CORRECT.

**Q.** THIS IS A DRAFT OF THE ACTUAL DEAL, POTENTIAL DEAL, AT LEAST, BETWEEN TECHSHOP AND MR. RASURE, CORRECT?

**A.** CORRECT.

**Q.** AT LEAST AS OF THIS TIME IT HADN'T BEEN SIGNED, RIGHT?

**A.** NO.

**Q.** IF THIS AGREEMENT WAS FINALLY EXECUTED AND SIGNED BY THE PARTIES AND THEY FULLY PERFORMED, WOULD MR. RASURE HAVE PURPOSED THE ASSETS OF TECHSHOP?

**A.** YEAH, IF WE HAD --

**MS. ROBERTS:** OBJECTION, CALLS FOR SPECULATION.

**THE COURT:** OVERRULED.

**THE WITNESS:** YES. IT WAS A DRAFT OF AN AGREEMENT, AND HAD BOTH PARTIES AGREED AND EXECUTED THE AGREEMENT, WE

WOULD HAVE HAD A DEAL.

**BY MR. PISTORINO:**

**Q.** SO IF MR. RASURE PUT UP THE MONEY AND ASSUMED THE LIABILITIES, HE WOULD HAVE GOTTEN THE ASSETS, CORRECT?

**A.** RIGHT.

**Q.** OKAY. ONE OF THE ASSETS WAS THE TRADEMARKS, CORRECT?

**A.** CORRECT.

**Q.** SO I THINK IN THE DOCUMENT, IT'S -- I DON'T KNOW HOW MANY PAGES IN, BUT THE BATES NUMBER IS 7796 EXHIBIT A TO THE DOCUMENT AT THE BOTTOM --

**THE CLERK:** I'M SORRY. ARE WE STILL TALKING ABOUT THE SAME EXHIBIT NO. 622?

**MR. PISTORINO:** EXACTLY.

**BY MR. PISTORINO:**

**Q.** 622, BATES NO. 7796 AT THE BOTTOM.

IT HAS A SECTION ENTITLED "INTELLECTUAL PROPERTY RIGHTS"?

**A.** YES, I SEE THAT.

**Q.** ALL RIGHT.

AND UNDER, I GUESS IT'S (B) THERE, SOME OF THE INTELLECTUAL PROPERTY RIGHTS THAT ARE LISTED ARE TRADEMARKS, RIGHT?

**A.** CORRECT.

**Q.** SO IF THE DEAL WAS ULTIMATELY SIGNED, BOTH SIDES DID WHAT THEY WERE SUPPOSED TO DO, INCLUDING MR. RASURE, ASSUMING THESE LIABILITIES, PAYING THESE AMOUNTS OF MONEY, HE WOULD ACQUIRE

THE ASSETS -- I'M SORRY, THE TRADEMARKS OF TECHSHOP, CORRECT?

**A.** CORRECT.

**Q.** OKAY. BUT THAT DIDN'T HAPPEN, DID IT?

**A.** NO.

**Q.** SO IF -- IN YOUR BOOK, GOING BACK TO YOUR BLACK BOOK, IF YOU COULD TURN TO THE NO. 351.

**A.** 351?

**Q.** 351.

**A.** OKAY.

**Q.** AND PREVIOUSLY ADMITTED 351.

GO TO THE SECOND PAGE, PLEASE.

(DISPLAYED ON SCREEN.)

AND THIS IS A COPY OF ONE OF THE TECHSHOP TRADEMARK REGISTRATIONS, CORRECT?

**A.** CORRECT.

**Q.** SO THIS WOULD BE THE THING THAT IF A DEAL HAD ACTUALLY BEEN EXECUTED WITH MR. RASURE, HE WOULD HAVE OBTAINED THE RIGHT TO, CORRECT?

**A.** THAT IS CORRECT.

**Q.** SO IF MR. RASURE HAD PUT UP THE MONEY, ACCEPTED LIABILITIES, HE WOULD OBTAIN THE RIGHT TO USE THE TERM "TECHSHOP" FOR PROVIDING PROFESSIONAL NETWORKING OPPORTUNITIES AND HOSTING PROFESSIONAL NETWORKING EVENTS FOR INDIVIDUALS WITH A SHARED INTEREST IN MANUFACTURING, CORRECT?

**A.** THAT IS CORRECT.

**Q.** BUT HE NEVER PUT UP THE MONEY, DID HE?

**A.** NO.

**Q.** LIKEWISE, IF HE HAD PUT UP THE MONEY AND THE DEAL HAD BEEN EXECUTED, HE WOULD HAVE ACQUIRED THE RIGHT TO USE THE PHRASE "TECHSHOP", TERM "TECHSHOP" FOR PROVIDING FACILITIES FOR EDUCATION AND TRAINING, CONDUCTING CLASSES AND WORKSHOPS IN THE FIELDS AND TECHNIQUES AND TOOLS USED IN THE FABRICATION OF PRODUCTS, DEVICES, AND PRODUCT PARTS, CORRECT?

**A.** THAT IS CORRECT.

**Q.** BUT HE NEVER GOT THE RIGHT FROM TECHSHOP, DID HE?

**A.** NO.

**Q.** OKAY. YOU CAN TURN WITH ME TO THE DOCUMENT MARKED TX352, PREVIOUSLY ADMITTED.

**THE CLERK:** UH-HUH.

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** THIS IS A COPY OF THE OTHER TECHSHOP TRADEMARK REGISTRATION IN THIS CASE.

DO YOU RECOGNIZE IT?

**A.** YES, I DO.

**Q.** SO, ONCE AGAIN, IF THE DEAL HAD BEEN COMPLETED, MR. RASURE PUT UP ALL THAT MONEY, ACCEPTED THAT $21 MILLION IN LIABILITIES, HE WOULD HAVE ACQUIRED THE ASSETS OF TECHSHOP, INCLUDING THE TECHSHOP TRADEMARK, CORRECT?

**A.** CORRECT.

**Q.** AND, THEREFORE, HE WOULD HAVE ACQUIRED THE RIGHT TO USE THE TERM "TECHSHOP" FOR PROVIDING WORKSHOP FACILITIES ALLOWING MEMBERS TO UNDERTAKE DO-IT-YOURSELF PROJECTS, FOR EXAMPLE, CORRECT?

**A.** THAT'S CORRECT.

**Q.** THAT NEVER HAPPENED, DID IT?

**A.** NO, IT DID NOT.

**Q.** FROM TECHSHOP, HE NEVER ACQUIRED THE RIGHT TO USE THAT TERM "TECHSHOP" IN THOSE FIELDS, DID HE?

**A.** NO, HE DID NOT.

**Q.** WHEN MR. RASURE OPENED THE TEXAS -- THE TECHSHOP -- THE FORMER TECHSHOP LOCATION IN SAN FRANCISCO UNDER THE NAME TECHSHOP 2.0, ISN'T THAT WHAT HE WAS DOING, OFFERING TO THE PUBLIC UNDER THE TERM "TECHSHOP", WORKSHOP FACILITIES ALLOWING MEMBERS TO UNDERTAKE DO-IT-YOURSELF PROJECTS?

**A.** YEAH. THAT'S CERTAINLY WHAT I FELT AND IT'S THE DECISION THE BOARD MADE.

**Q.** WAS HE ALSO OFFERING, UNDER THE TERM "TECHSHOP" A PLACE FOR PROVIDING PROFESSIONAL NETWORKING OPPORTUNITIES?

**A.** ABSOLUTELY.

**Q.** BUT HE STILL HADN'T ACQUIRED THE RIGHT TO USE THAT TERM "TECHSHOP" FOR THOSE FIELDS FROM TECHSHOP, HAD HE?

**A.** NO, HE HAD NOT.

**MR. PISTORINO:** NOTHING FURTHER, YOUR HONOR.

**THE COURT:** ANY RECROSS?

**MS. ROBERTS:** YES, YOUR HONOR.

**THE COURT:** WITHIN THE SCOPE OF REDIRECT?

**RECROSS-EXAMINATION**

**BY MS. ROBERTS:**

**Q.** CAN YOU TURN BACK, PLEASE, TO TX650 IN THE WHITE BINDER?

**THE CLERK:** I AM SORRY, 650?

**MS. ROBERTS:** 650.

**THE CLERK:** THANK YOU.

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** DID YOU FIND IT?

**A.** I'M THERE.

**Q.** THIS IS THE LETTER THAT YOU SENT ON FEBRUARY 14TH, 2018?

**A.** THAT IS CORRECT.

**Q.** AND JUST TO CLARIFY, IN THIS LETTER, YOU DID NOT TELL MR. RASURE TO STOP USING THE NAME TECHSHOP 2.0, RIGHT?

**A.** THAT IS CORRECT.

**Q.** AND AS WE'VE SEEN FROM A LOT OF DOCUMENTS THAT YOU AND I HAVE LOOKED AT TODAY, HE WAS USING THE NAME TECHSHOP 2.0 FOR ROUGHLY TWO AND A HALF MONTHS SINCE YOU STARTED NEGOTIATING WITH HIM, CORRECT?

**A.** THAT'S CORRECT. HE USED IT THROUGHOUT THE NEGOTIATION.

**Q.** AND YOU USED THE NAME TECHSHOP 2.0 WHEN REFERRING TO HIS COMPANY IN THE NEGOTIATIONS, RIGHT?

**A.** THROUGHOUT THE NEGOTIATION I DID.

**Q.** AND THE PUBLIC ANNOUNCEMENTS THAT WERE MADE REGARDING THE MEMORANDUM OF UNDERSTANDING, THEY IDENTIFIED MR. RASURE'S COMPANY AS TECHSHOP 2.0, RIGHT?

**A.** THAT IS CORRECT.

**Q.** BUT IN THE FEBRUARY 14TH LETTER YOU SENT, YOU DID NOT TELL MR. RASURE STOP USING THE NAME TECHSHOP 2.0, RIGHT?

**A.** NO, I DID NOT.

**Q.** AND ULTIMATELY, MR. RASURE NEVER OPENED A LOCATION IN SAN FRANCISCO UNDER THE NAME TECHSHOP 2.0, DID HE?

**A.** IT'S MY UNDERSTANDING HE DID.

**Q.** DIDN'T IT OPEN THE NAME OF THESHOP.BUILD?

**A.** I DON'T KNOW WHAT YOU WOULD CONSIDER THE OPENING SO I'M A LITTLE CONFUSED HOW TO ANSWER THAT.

MY UNDERSTANDING WAS IT WAS TECHSHOP 2.0 OVER THE DOOR. PEOPLE WERE GOING IN AND OUT.

**Q.** THE DAY THAT THE LOCATION OPENED ON FEBRUARY 19TH, 2018, IT DID NOT HAVE A SIGN THAT SAID TECHSHOP 2.0 ON IT, DID IT?

**A.** I DON'T RECALL.

**MS. ROBERTS:** NO FURTHER QUESTIONS.

**THE COURT:** MAY MR. WOODS BE EXCUSED?

**MR. PISTORINO:** I WOULD LIKE TO FOLLOW UP.

**THE COURT:** ALL RIGHT.

**MR. PISTORINO:** JUST VERY BRIEFLY.

**FURTHER REDIRECT EXAMINATION**

**BY MR. PISTORINO:**

**Q.** I JUST WANT TO MAKE SURE I'M CLEAR.

DURING ALL THIS TIME OF NEGOTIATION WITH MR. RASURE, HAD HE OPENED A MAKERSPACE FOR PROVIDING PROFESSIONAL NETWORKING OPPORTUNITIES USING THE TERM "TECHSHOP"?

**A.** NO.

**Q.** WHEN MR. RASURE ANNOUNCED HIS INTENTION TO OPEN TECHSHOP'S FORMER FACILITY UNDER THE NAME TECHSHOP 2.0, THAT'S THE POINT WHEN THE BOARD FELT THAT MR. RASURE WAS --

**MS. ROBERTS:** OBJECTION, LEADING.

**THE COURT:** IT IS. SUSTAINED. IT REALLY IS.

**MR. PISTORINO:** OKAY.

**BY MR. PISTORINO:**

**Q.** WHEN MR. RASURE, IN FACT, ANNOUNCED HIS INTENTION TO OPEN A MAKERSPACE FOR PROVIDING PROFESSIONAL NETWORKING OPPORTUNITIES, FOR EXAMPLE, USING THE NAME TECHSHOP 2.0, IS THAT THE POINT AT WHICH THE BOARD MOVED TO ENFORCE ITS TRADEMARK RIGHTS?

**A.** YES.

**Q.** BEFORE THEN, BEFORE THAT TIME, MR. RASURE HAD NOT OPENED ANY MAKERSPACE, TO THE BOARD'S KNOWLEDGE, USING THE TERM "TECHSHOP 2.0", CORRECT?

**A.** THAT'S CORRECT.

**MR. PISTORINO:** THANK YOU.

**THE COURT:** MAY MR. WOODS BE EXCUSED?

**MS. ROBERTS:** YES, YOUR HONOR, BUT WE RESERVE THE RIGHT TO RECALL HIM.

**THE COURT:** UNDERSTOOD.

ALL RIGHT. THANK YOU, MR. WOODS. YOU ARE EXCUSED.

**THE WITNESS:** THANK YOU.

**THE COURT:** PLAINTIFF MAY CALL ITS NEXT WITNESS.

**MR. PISTORINO:** TECHSHOP CALLS DOUG BUSCH.

**THE CLERK:** IF YOU COULD COME UP TO THE WITNESS STAND AND RAISE YOUR RIGHT HAND.

(**DOUGLAS BUSCH**, CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

**THE WITNESS:** I DO.

**THE CLERK:** YOU MAY BE SEATED. ONCE SEATED, I'M GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE RECORD, PLEASE.

**THE WITNESS:** DOUGLAS BUSCH. D-O-U-G-L-A-S B-U-S-C-H.

**THE CLERK:** THANK YOU.

**DIRECT EXAMINATION**

**BY MR. PISTORINO:**

**Q.** GOOD AFTERNOON, MR. BUSCH.

**A.** GOOD AFTERNOON.

**Q.** THERE'S SOME WATER IN FRONT OF YOU IF YOU LIKE.

**A.** THANK YOU.

**Q.** I AM NOT SURE WHICH ONE IS IN FRONT OF YOU, BUT THERE'S ALSO A BLACK BINDER THAT MIGHT BE HELPFUL TO HAVE THERE.

PLEASE TELL THE JURY A LITTLE ABOUT YOURSELF, SIR.

**A.** I LIVE IN A RURAL AREA OUTSIDE OF SACRAMENTO, CALIFORNIA WITH MY WIFE. WE'VE BEEN MARRIED 45 YEARS. I HAVE TWO SONS THAT LIVE IN THE BAY AREA. I RETIRED A NUMBER OF YEARS AGO FROM FULL-TIME EMPLOYMENT AND AM INVOLVED IN A NUMBER OF BUSINESS ACTIVITIES.

**Q.** ARE YOU A BAY AREA NATIVE, SIR?

**A.** I AM NOT. I ORIGINALLY GREW UP IN CENTRAL OHIO, ATTENDED OHIO STATE UNIVERSITY, MOVED TO PHOENIX IN -- ABOUT 20 YEARS AGO MOVED TO THE BAY AREA.

**Q.** I WAS GOING TO NEXT ASK IF YOU COULD BRIEFLY SUMMARIZE YOUR EDUCATIONAL BACKGROUND.

**A.** CERTAINLY.

I ATTENDED THE OHIO STATE UNIVERSITY, GOT A BACHELOR'S DEGREE IN MECHANICAL ENGINEERING IN 1978. I TOOK ADDITIONAL COURSE WORK TOWARDS A MASTER'S DEGREE IN MECHANICAL ENGINEERING, BUT DID NOT COMPLETE IT. I HAD ADDITIONAL PROFESSIONAL EDUCATION OVER THE YEARS.

**Q.** I'LL TRY TO BE KIND, IF WE CAN, TO THE COURT REPORTER. THE SLOWER WE CAN GO --

**A.** SORRY.

**Q.** I KNOW THAT THEY CONSIDER IT VERY IMPORTANT IF IT IS CALLED THE OHIO STATE UNIVERSITY.

**A.** THAT'S CORRECT.

**Q.** CAN YOU BRIEFLY SUMMARIZE YOUR WORK HISTORY, SIR?

**A.** CERTAINLY.

WHEN I GRADUATED FROM COLLEGE, I TOOK A JOB IN A RESEARCH AND DEVELOPMENT ORGANIZATION NAMED PATEL MEMORIAL INSTITUTE. I WORKED THERE FOR ABOUT A DECADE IN A VARIETY OF TECHNICAL POSITIONS AND MANAGERIAL POSITIONS.

IN 1987, I TOOK A JOB WITH INTEL CORPORATION AND MOVED TO PHOENIX TO TAKE THAT POSITION. I WORKED AS AN ENGINEERING MANAGER DEVELOPING MANUFACTURING EQUIPMENT FOR INTEL'S PRODUCTION FACILITIES.

EVENTUALLY I STARTED WORKING IN THE INFORMATION TECHNOLOGY ARENA. I MOVED UP THROUGH THAT PART OF THE BUSINESS, AND EVENTUALLY BECAME THE CHIEF INFORMATION OFFICER, THE CIO FOR INTEL, THE COMPANY, WORLDWIDE.

I WAS IN THAT POSITION FOR ABOUT SIX YEARS AND THEN I TRANSITIONED TO HELP START UP THE DIGITAL HEALTH GROUP AT INTEL WHICH WAS A HEALTHCARE VERTICAL ORGANIZATION WITHIN THE COMPANY. I SERVED AS AT THE CHIEF TECHNICAL OFFICER FOR THAT ORGANIZATION FOR ABOUT FIVE YEARS.

AT THE END OF THAT PERIOD, INTEL AND GENERAL ELECTRIC HEALTHCARE FORMED A JOINT VENTURE WHICH I NEGOTIATED AND SPUN OUT THE DIGITAL HEALTH GROUP AT INTEL ALONG WITH A GROUP THAT CAME OUT OF GE HEALTHCARE TO FORM CARE INNOVATIONS, INC., WHICH WAS A SMALL-TO-MEDIUM SIZE BUSINESS LOCATED IN

ROSEVILLE, CALIFORNIA.

I SERVED AS CHIEF OPERATING OFFICER AND CHIEF TECHNICAL OFFICER FOR CARE INNOVATIONS FOR ABOUT TWO AND A HALF YEARS BEFORE I RETIRED.

**Q.** IF I -- I JUST WANT TO ASK A FEW QUESTIONS ABOUT WHAT YOU JUST TOLD US.

YOU MENTIONED YOU WERE THE CHIEF INFORMATION OFFICER, CIO, OF INTEL; IS THAT CORRECT?

**A.** THAT'S CORRECT.

**Q.** AND RESPONSIBLE FOR INTEL'S INFORMATION SERVICES WORLDWIDE; IS THAT RIGHT?

**A.** THAT'S CORRECT. I HAD RESPONSIBILITY AT VARIOUS TIMES FOR ALL OF THE TECHNICAL INFRASTRUCTURE, THE NETWORKS AND SERVERS AND PC'S AT PEOPLE'S DESKTOPS, BUSINESS APPLICATIONS, AND SO FORTH. WE HAD AS MUCH AS 8,000 PEOPLE IN THE ORGANIZATION AND ALMOST A BILLION DOLLARS IN ANNUAL SPENDING.

**Q.** AS PART OF YOUR ROLE AS THE CIO OF INTEL, DID YOU EVER NEGOTIATE, I'LL SAY, USE THE TERM "SIGNIFICANTLY" SIZED FINANCIAL DEALS?

**A.** I DID. I NEGOTIATED WITH SUPPLIERS FOR MAJOR CONTRACTS, I NEGOTIATED ACQUISITION ACTIVITIES. WHEN WE FORMED THE CARE INNOVATIONS ORGANIZATION, I WAS THE LEAD NEGOTIATOR ON INTEL'S SIDE BETWEEN INTEL AND GENERAL ELECTRIC HEALTHCARE, AND WE NEGOTIATED THE CONSOLIDATION OF ABOUT A 400-PERSON ORGANIZATION AND SEVERAL HUNDRED MILLIONS OF DOLLARS IN

FINANCIAL RESOURCES.

**Q.** SO IF I FOLLOW ALL THE DATES HERE, IT SOUNDS LIKE YOU'VE BEEN A BUSINESSMAN INVOLVED IN THESE SORT OF LARGE TRANSACTIONS FOR ABOUT 40 YEARS; IS THAT RIGHT?

**A.** THAT'S ABOUT RIGHT, YES.

**Q.** AND CAN YOU TELL US A LITTLE BIT -- WE ARE GOING TO GO QUICKLY HERE NOW -- CAN YOU TELL US A LITTLE BIT ABOUT HOW YOU CAME TO BE ASSOCIATED WITH TECHSHOP?

**A.** CERTAINLY.

I HAVE BEEN VERY INTERESTED AND ENGAGED IN SCIENCE, TECHNOLOGY, ENGINEERING, AND MATHEMATICS, STEM EDUCATION FOR MANY YEARS. GOING CLEAR BACK TO WHEN I WAS IN COLLEGE AT OHIO STATE.

I HELPED START AN ONGOING STEM EDUCATION PROGRAM AT ROSEVILLE UNION HIGH SCHOOL IN ABOUT 2001 OR 2002, WHICH IS STILL OPERATING AND HAS GRADUATED SEVERAL HUNDRED STUDENTS. I HAVE BEEN INVOLVED IN A NUMBER OF OTHER STEM ACTIVITIES THROUGH INTEL.

IN THE MID 2000'S, I STARTED TO RECOGNIZE THE NEED FOR ACCESS TO MANUFACTURING AND WORKSHOP FACILITIES IN ORDER FOR PEOPLE TO PURSUE THOSE KIND OF STEM EDUCATION PROGRAMS.

I HAD BEEN VERY INVOLVED IN HANDS-ON MANUFACTURING ACTIVITY. I HAD A WORKSHOP AT HOME. I HAD WORKED AS A MACHINIST EARLY IN MY CAREER. SO I VALUED THAT HIGHLY.

AND WHEN I FOUND OUT ABOUT THE FIRST INSTANCE OF TECHSHOP

IN MENLO PARK, I WAS VERY INTERESTED AND WENT AND TALKED TO MR. NEWTON. I TOLD HIM AT THE TIME THAT IF THERE WAS EVER AN OPPORTUNITY TO DO A FRANCHISE, I MIGHT BE INTERESTED. THAT NEVER EVOLVED, BUT WHAT DID EVOLVE WAS THE OPPORTUNITY TO BE AN INVESTOR AND FINANCIAL BACKER.

SO IN, I BELIEVE, 2010, I MADE A $100,000 INVESTMENT, INITIALLY AS A LOAN, LATER CONVERTED TO AN EQUITY POSITION STOCK, AND THEN ABOUT NINE OR TEN MONTHS LATER, I ADDED ANOTHER $50,000 TO THAT.

**Q.** CAN I ASK WHY YOU CHOSE TO INVEST THAT MONEY IN TECHSHOP, SIR?

**A.** I BELIEVE VERY STRONGLY THAT THE ACCESS TO THESE KIND OF CAPABILITIES AND THIS KIND OF TRAINING IS AN ASSET TO THE COMMUNITY AND AN ASSET TO THE INDIVIDUALS THAT WANT TO TAKE ADVANTAGE OF IT. AND IT WAS AN OPPORTUNITY FOR ME AND MY WIFE TO PUT SOME OF OUR RESOURCES BEHIND SOMETHING THAT WE THOUGHT WAS GOING TO BE BENEFICIAL.

WE THOUGHT TECHSHOP PARTICULARLY WAS A GOOD WAY TO DO THAT BECAUSE THE FOR-PROFIT MODEL THAT IT HAD WE BELIEVED WOULD BE MORE SUSTAINABLE THAN SOMETHING THAT WAS STRICTLY A NONPROFIT.

**Q.** OTHER THAN YOUR INVESTMENT, DID YOU THEN COME TO HAVE AN ADDITIONAL ROLE AT TECHSHOP?

**A.** I DID. A YEAR OR TWO AFTER THE INITIAL INVESTMENT WAS MADE, TECHSHOP MANAGEMENT DECIDED TO FORM A BOARD. AND THEY WERE LOOKING FOR AN OUTSIDE DIRECTOR, AND THEY ASKED ME IF I

WOULD BE WILLING TO TAKE ON THE ROLE.

I HAD PREVIOUSLY OFFERED TO BE OF ASSISTANCE IN ANY WAY I COULD, AND WHEN THEY OFFERED ME THE OPPORTUNITY TO HELP BE AN OUTSIDE DIRECTOR OF THE COMPANY, I AGREED TO DO SO.

**Q.** WHEN DID YOU BECOME AN OUTSIDE DIRECTOR OF TECHSHOP?

**A.** I DON'T RECALL THE EXACT DATE. IT WAS SOMETIME AFTER MY INITIAL INVESTMENT. LIKELY 2011.

**Q.** AND DID YOU CONTINUE IN THAT ROLE AS AN OUTSIDE DIRECTOR UNTIL -- REALLY UNTIL THE BANKRUPTCY FILING IN FEBRUARY?

**A.** I DID.

**Q.** OKAY. OKAY. NOW I'M GOING TO TRY TO MOVE US ALONG QUICKLY HERE.

SO IN FEBRUARY -- I AM SORRY, IN NOVEMBER, BY NOVEMBER 2017, TECHSHOP HAD BEEN EXPERIENCING SOME FINANCIAL DIFFICULTIES, CORRECT?

**A.** CORRECT.

**Q.** AT THAT TIME, DID THE BOARD MAKE A DECISION?

**A.** WE DID. AFTER CONSIDERING A VARIETY OF ALTERNATIVES, WE CAME TO THE CONCLUSION THAT FILING CHAPTER 7 BANKRUPTCY WAS THE ONLY VIABLE OPTION.

**Q.** OKAY.

AND WE'VE ALL HEARD TESTIMONY FROM SEVERAL OTHERS THAT THE TECHSHOP STORES WERE CLOSED ON NOVEMBER 15TH, AND THERE WAS AN ANNOUNCEMENT THAT TECHSHOP WAS -- INTENDED TO SEEK BANKRUPTCY PROTECTIONS. IS THAT KIND OF WHAT HAPPENED?

**A.** THAT IS CORRECT.

**Q.** OKAY.

SHORTLY AFTER THAT, WAS THE BOARD CONTACTED BY MR. RASURE?

**A.** WE WERE. WITHIN TWO OR THREE DAYS AFTER THE ANNOUNCEMENT THAT THE STORES WERE CLOSED, WE WERE CONTACTED BY MR. RASURE TO INVESTIGATE THE POSSIBILITY OF SOME KIND OF BUSINESS DEAL.

**Q.** DID MR. RASURE COMMUNICATE ANYTHING TO THE BOARD ABOUT WHO HE WAS, WHAT HIS POSITION WAS?

**A.** MR. RASURE DESCRIBED HIMSELF AS A SENIOR MANAGER, AN IMPORTANT PLAYER AT A COMPANY CALLED PIRANHA, WHICH IS A METAL WORKING EQUIPMENT MANUFACTURER.

HE SAID THAT HE HAD BEEN FOLLOWING TECHSHOP FOR A NUMBER OF YEARS, AND WHEN HE SAW THE ANNOUNCEMENT OF CLOSURE, HE WAS INTERESTED IN TRYING TO DO SOME SORT OF DEAL. HE DESCRIBED A POSSIBLE OPPORTUNITY FOR PIRANHA AND -- FOR PIRANHA TO DERIVE BENEFIT FROM ASSOCIATION WITH TECHSHOP AND VICE VERSA, AND INDICATED THAT HE COULD BRING RESOURCES OF THAT COMPANY OR OTHER COMPANIES HE MIGHT BE AFFILIATED WITH TO HELP MAKE TECHSHOP A MORE VIABLE ENTITY BY SHARING ADMINISTRATIVE SERVICES.

**Q.** DID MR. RASURE INDICATE ANYTHING ABOUT HIS ABILITY TO COMMIT RESOURCES OF PIRANHA/MEGAFAB?

**A.** HE DESCRIBED THE ABILITY TO PLACE PIRANHA EQUIPMENT INTO TECHSHOP LOCATIONS IN ORDER TO UPGRADE THE INDUSTRIAL QUALITY OF THE EQUIPMENT BEING USED.

**Q.** DID HE DESCRIBE HIS ABILITY TO COMMIT PIRANHA TO PROVIDE THAT EQUIPMENT TO TECHSHOP?

**A.** AS HE DESCRIBED IT, HE COULD COMMIT TO BRINGING THAT EQUIPMENT INTO THE TECHSHOP LOCATIONS.

**Q.** OKAY. I'M GOING TO BRING US QUICKLY, IF I CAN.

AFTER THAT INITIAL CONTACT WITH MR. RASURE, ULTIMATELY TECHSHOP AND MR. RASURE ENTERED INTO A MEMORANDUM OF UNDERSTANDING, CORRECT?

**A.** CORRECT.

**Q.** IF YOU CAN TURN IN THE BOOK THAT'S IN FRONT OF YOU TO A DOCUMENT NUMBERED TX48, WHICH IS ONE THAT WE HAVE ALL SEEN. THIS IS A COPY OF THE MEMORANDUM OF UNDERSTANDING.

(DISPLAYED ON SCREEN.)

**A.** I APOLOGIZE, I AM NOT SEEING THAT TAB NUMBER.

**Q.** IN THE BLACK BOOK IN FRONT OF YOU.

**THE COURT:** IT'S ON THE FLOOR. IT IS A MULTI-PIECE PROJECT.

**MR. PISTORINO:** YES. LAWYERS HAVE A LOT OF PAPER.

**THE WITNESS:** I HAVE IT IN FRONT OF ME NOW.

**BY MR. PISTORINO:**

**Q.** THIS IS A COPY OF THE MEMORANDUM OF UNDERSTANDING ENTERED INTO BETWEEN TECHSHOP AND MR. RASURE, CORRECT?

**A.** THAT'S CORRECT.

**Q.** AND WERE YOU INVOLVED IN THE NEGOTIATIONS THAT LED UP TO THE EXECUTION OF THE MEMORANDUM OF UNDERSTANDING?

**A.** I WAS.

**Q.** AND, AGAIN, WE KNOW WE'VE HEARD FROM OTHERS ABOUT THE TECHSHOP'S LACK OF FUNDS.

DID TECHSHOP HAVE FUNDS TO HIRE A LAWYER TO HELP THEM REVIEW POTENTIAL AGREEMENTS WITH MR. RASURE?

**A.** WE DID NOT. AT THIS POINT IN TIME, THE COMPANY HAD ESSENTIALLY NO AVAILABLE CASH AND WE WERE CLEAR WITH MR. RASURE THAT ANY KIND OF LEGAL -- ANY KIND OF MERGERS AND ACQUISITIONS NEGOTIATION WOULD REQUIRE ASSISTANCE FROM LEGAL COUNSEL THAT WE COULDN'T PAY FOR.

**Q.** THAT WAS SOMETHING THAT TECHSHOP TOLD MR. RASURE?

**A.** THAT'S CORRECT.

**Q.** OKAY.

WE'VE GONE OVER IT SEVERAL TIMES NOW, THERE ARE A NUMBER OF POINTS IN THIS MEMORANDUM OF UNDERSTANDING. BUT ONE ASPECT OF IT IS, THIS -- WAS THIS THE FINAL DEAL, THE FINAL DEAL THAT WOULD TRANSFER ALL THE ASSETS OF TECHSHOP TO MR. RASURE?

**A.** NO, IT WAS NOT.

**Q.** OKAY. AND WERE THERE STEPS THAT NEEDED TO BE TAKEN TO ULTIMATELY CONCLUDE A FINAL DEAL AFTER THE EXECUTION OF THE MOU?

**A.** YES, THERE WERE.

A MEMORANDUM OF UNDERSTANDING IS INTENDED TO BE AN INITIAL DECLARATION OF WHAT THE INTENTIONS OF THE PARTIES ARE. IT'S A NONBINDING DOCUMENT THAT'S NOT A COMMITMENT.

IT ALWAYS REQUIRES ADDITIONAL NEGOTIATION, CONTRACTUAL TERMS TO BE DEVELOPED, AND FINAL NEGOTIATION OF WHAT THE DEAL IS, AND THIS WAS NOT THAT FINAL NEGOTIATION.

**Q.** IS THAT WHAT'S REFERRED TO IN THE -- RIGHT UNDER THE TITLE SUMMARY, WHERE IT SAYS "WITH DETAILS IN THE" -- "WITH DETAILS TO BE FINALIZED IN DEFINITIVE DOCUMENTATION TO BE PREPARED" --

**A.** YES.

**Q.** OKAY.

**A.** EXACTLY.

**Q.** AT THAT TIME, DID YOU HAVE A FEELING -- IF ULTIMATELY A DEAL WAS CONCLUDED WITH MR. RASURE, WAS THE -- AT LEAST TECHSHOP'S INTENTION ALL THE ASSETS OF TECHSHOP WOULD BE TRANSFERRED TO MR. RASURE?

**A.** THAT WAS OUR UNDERSTANDING, YES.

**Q.** DID YOU HAVE A FEELING OF WHAT THE MOST SIGNIFICANT ASSETS WERE OF TECHSHOP AT THAT TIME?

**A.** TECHSHOP AS A COMPLETE ENTITY HAD VERY STRONG MARKET PRESENCE. THE MARKET PRESENCE WAS CONSTITUTED BY THE BRAND NAME, THE VISIBILITY THAT THE COMPANY HAD, THE MEMBERSHIP, THE RELATIONSHIPS THAT WE HAD WITH CORPORATE SPONSORS AND A VARIETY OF OTHER THINGS WERE ALL WRAPPED UP IN THE IDENTITY OF THE COMPANY.

**Q.** YOU JUST USED THE PHRASE "BRAND NAME". ARE YOU REFERRING TO THE TECHSHOP TRADEMARKS?

**A.** I AM.

**Q.** OKAY. OTHER THAN THE BRAND NAME OF TECHSHOP, IN YOUR VIEW WERE THERE ANY OTHER SIGNIFICANT ASSETS OF TECHSHOP AT THAT TIME?

**A.** THE LOCATIONS THAT TECHSHOP HAD WORKSHOPS HAD HAD SIGNIFICANT, WHAT'S REFERRED TO AS TENANT IMPROVEMENTS, UPGRADES IN THE BASIC BUILDING THAT THEY OCCUPIED. THOSE HAD VALUE.

THE PHYSICAL ASSETS IN THE STORES HAD VALUE, ALTHOUGH A NUMBER OF THEM WERE LEASED. SO THE ASSETS RANGED FROM SMALL EQUIPMENT TO, IN SOME CASES, LARGE EQUIPMENT.

THE MEMBERSHIP LIST AND CONTACT WITH OUR MEMBERS WAS ALSO A VERY IMPORTANT ASSET.

**Q.** WHY DID YOU CONSIDER THAT TO BE A VERY IMPORTANT ASSET OF TECHSHOP?

**A.** THE BASIC REVENUE STREAM OF THE COMPANY DERIVED FROM MONTHLY MEMBERSHIP PAYMENTS. A GREAT DEAL OF ENERGY AND EFFORT AND MONEY WAS SPENT ON AN ONGOING BASIS RECRUITING NEW MEMBERS TO JOIN THE ORGANIZATION, JUST LIKE ANY MEMBERSHIP OR SUBSCRIPTION-BASED BUSINESS.

THE EXISTING LIST OF MEMBERS WHO WERE PAYING ON A MONTHLY BASIS OR WHO HAD LONG-TERM MEMBERSHIPS WAS A VERY IMPORTANT COMPONENT OF THE REVENUE STREAM OF THE COMPANY.

**Q.** AND WERE YOU A MEMBER OF TECHSHOP?

**A.** YES, SIR.

**Q.** AND WAS YOUR CONTACT INFORMATION ON THAT MEMBERSHIP LIST

OF TECHSHOP?

**A.** IT WAS.

**Q.** HOW ABOUT ANY OF YOUR FAMILY MEMBERS?

**A.** AS PART OF THE INVESTMENT THAT I MADE, THE NEGOTIATION OF THAT INVESTMENT INCLUDED LIFETIME MEMBERSHIPS FOR MY WIFE AND MY TWO SONS AND THEIR SPOUSES.

**Q.** OKAY.

HOW DID YOU FEEL ABOUT THE EXECUTION OF THE MOU? WAS THAT SOMETHING THAT YOU THOUGHT MIGHT WORK OUT WELL FOR TECHSHOP?

**A.** WE WERE VERY HOPEFUL THAT IT WOULD. ALL OF THE DECISIONS THAT MYSELF AND THE OTHER DIRECTORS AND OFFICERS MADE DURING THIS TIME PERIOD, IN FACT DURING THE WHOLE COURSE OF THE COMPANY, WAS INTENDED TO BE TO THE BEST ADVANTAGE OF TECHSHOP AND ITS STAKEHOLDERS.

BY STAKEHOLDERS I MEAN THE MEMBERS THAT DEPENDED ON TECHSHOP FOR SERVICES, THE EMPLOYEES AND CONTRACTORS THAT WE USED, THE INVESTORS AND LENDERS, AND THE LANDLORDS AND OTHER PEOPLE THAT PROVIDED SERVICES THAT WE OWED MONEY TO.

OUR BELIEF WAS THAT THE TERMS THAT WE HAD IDENTIFIED IN THIS MEMORANDUM OF UNDERSTANDING, WHILE THEY WOULD NOT SOLVE ALL THE PROBLEMS THAT WERE PRESENT AT THAT TIME, WAS OUR BEST OPPORTUNITY TO DO THE BEST THING FOR THAT ENTIRE GROUP OF STAKEHOLDERS.

**Q.** YOU MENTIONED THAT IN YOUR VIEW, OR THE VIEW OF THE BOARD, THAT ONE OF THE SIGNIFICANT ASSETS OF TECHSHOP WAS THE

TRADEMARKS; IS THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** DID MR. RASURE INDICATE ANYTHING TO YOU OR THE BOARD ABOUT HOW HE VIEWED THE TECHSHOP TRADEMARKS?

**A.** MR. RASURE MENTIONED REPEATEDLY THAT KEEPING THE COMPANY INTACT, KEEPING THE MEMBERSHIP ON BOARD, KEEPING THE PRESENCE OF THE COMPANY IN THE MARKETPLACE WAS AN IMPORTANT PART OF THE VALUE THAT HE SAW IN THE COMPANY.

**Q.** PARTICULARLY THE NAME?

**A.** PARTICULARLY THE NAME.

**Q.** HOW ABOUT -- YOU ALSO MENTIONED THE CUSTOMER LIST. DID MR. RASURE INDICATE ANYTHING TO YOU OR THE BOARD ABOUT HOW HE VIEWED THE VALUE OF THE CUSTOMER LIST?

**A.** HE VIEWED -- HE DESCRIBED THE CUSTOMER LIST AS ESSENTIAL TO THE DEAL. AND, IN FACT, REPEATEDLY ASKED TO GET A COPY OF THE CUSTOMER LIST INCLUDING EMAIL CONTACT INFORMATION DURING THE COURSE OF THE NEGOTIATION.

**Q.** WE ARE GOING TO COME TO THAT IN A MOMENT.

AFTER THE EXECUTION OF THE MOU, WERE THE PARTIES SUPPOSED TO EXCHANGE INFORMATION TO HEAD TOWARDS THIS FINAL PROPOSED DEAL?

**A.** WE WERE.

**Q.** OKAY. WHAT INFORMATION WAS THE BOARD LOOKING FOR FROM MR. RASURE?

**A.** WE HAD ASKED MR. RASURE TO PROVIDE BASIC INFORMATION TO

INDICATE THAT HE WAS -- HE AND WHOEVER HE WAS WORKING WITH WERE A VIABLE ENTITY TO TAKE OVER THE OBLIGATIONS AND THE ASSETS OF THE COMPANY AND RESTART IT AS THEY DESCRIBED.

WE SPECIFICALLY WERE LOOKING FOR IDENTIFICATION OF THE MAJOR PLAYERS ON HIS SIDE THAT WOULD HELP RUN THE COMPANY, THE TOP TWO OR THREE PEOPLE THAT WOULD BE INVOLVED IN RUNNING THE COMPANY, AN IDENTIFICATION OF ANYBODY WHO WAS GOING TO BE ON A BOARD THAT HE INTENDED TO FORM, INDICATION OF HIS FINANCIAL RESOURCES FOR STARTING THIS.

IT WAS VERY IMPORTANT TO US THAT ANY DEAL THAT WE CUT WAS WITH SOMEONE THAT HAD ADEQUATE FINANCIAL RESOURCES TO ACTUALLY RESTART THE BUSINESS BECAUSE IT INVOLVED ON THE ORDER OF $15 MILLION OF CASH FLOW PER YEAR. SO IT TOOK SUBSTANTIAL RESOURCES TO CORRECT THE ISSUES THAT WE HAD AND TO GET RESTARTED.

**Q.** I WANT TO MAKE SURE WE FOLLOW.

WHEN YOU SAY "ON THE ORDER OF $15 MILLION OF CASH FLOW PER YEAR", WHAT DOES THAT MEAN?

**A.** IT MEANS THAT THE REVENUE COMING INTO THE COMPANY AND THE EXPENSES GOING OUT WERE IN THAT ORDER OF MAGNITUDE.

THE FACT IS THAT THE COMPANY WAS NOT BREAKING EVEN. AND SO THERE WERE LOSSES THAT WERE ONGOING THAT WERE -- IT VARIED FROM STORE TO STORE, BUT THERE WAS A SIGNIFICANT AMOUNT OF ONGOING CASH THAT WAS NEEDED IN ORDER TO KEEP THE COMPANY FINANCIALLY SOUND WHILE IT TRIED TO GROW ITS REVENUE STREAM.

THERE WERE ALSO A LARGE AMOUNT OF DEBT THAT THE COMPANY HAD INCURRED WHICH NEEDED TO BE DEALT WITH.

**Q.** SO WHEN YOU SAY "CASH FLOW" $15 MILLION A YEAR GOING BACK AND FORTH, IS THAT FAIR?

**A.** GOING IN AND OUT, YES.

**Q.** OKAY. OKAY. OKAY.

DID YOU MAKE ANY EFFORTS TO TRY TO OBTAIN THIS INFORMATION ABOUT YOU SAID THE OFFICERS AND DIRECTORS, AND I THINK YOU SAID FINANCIAL CAPABILITY.

**A.** CORRECT.

**Q.** DID YOU MAKE ANY EFFORTS TO OBTAIN THAT INFORMATION FROM MR. RASURE AFTER THE EXECUTION OF THE MOU?

**A.** WE DID. THE FIRST STEP WAS TO ASK HIM TO PROVIDE THE INFORMATION.

**Q.** CAN I INTERRUPT YOU, SIR, TO FIND OUT.

DO YOU RECALL, I KNOW IT HAS BEEN A WHILE, EXACTLY WHEN YOU FIRST REQUESTED THAT KIND OF INFORMATION FROM MR. RASURE?

**A.** I BELIEVE IT WAS EITHER THE DAY THAT WE AGREED UPON THE CONTENT OF THE MOU OR WITHIN A DAY OR TWO AT ANY RATE.

**Q.** I AM SORRY I INTERRUPTED YOU. CAN YOU, AGAIN, GO BACK AND DESCRIBE FOR US THE EFFORTS THAT YOU MADE TO OBTAIN THAT, I THINK YOU USED THE TERM "BASIC INFORMATION" FROM MR. RASURE?

**A.** CERTAINLY.

THE FIRST STEP WAS TO REQUEST IT FROM MR. RASURE. A DAY OR TWO OR THREE WENT BY AND WE HAD NOT GOTTEN RESPONSES ON IT.

SO I STARTED REACHING OUT.

HE, AT ONE POINT, HE DID INDICATE THAT TWO INDIVIDUALS, WHOSE NAMES I WOULD HAVE TO REFER TO DOCUMENTATION FOR, FROM THE OWNER, THE HOLDING COMPANY THAT OWNED PIRANHA, CALLED MEGAFAB MANUFACTURING, WOULD BE HIS BOARD MEMBERS. THOSE ARE THE ONLY INDIVIDUALS HE HAD IDENTIFIED ASSOCIATED WITH IT. WE GOT NO INDICATION OF A SENIOR MANAGEMENT TEAM THAT HE INTENDED TO BRING TO BEAR ON THE COMPANY.

SO I REACHED OUT TO THOSE TWO INDIVIDUALS AT MEGAFAB MANUFACTURING. FIRST AN EMAIL, AND THEN BY TELEPHONE, THEN BY CALLING THE OFFICES AND TRYING TO GO THROUGH THEIR ADMINISTRATIVE TEAM TO REACH THEM.

I WAS UNABLE TO GET ANY RESPONSE FROM THOSE TWO INDIVIDUALS WHO WERE IDENTIFIED AS BOARD MEMBERS.

**Q.** WE ARE GOING TO LOOK AT SOME OF THOSE DOCUMENTS IN A MOMENT.

**A.** OKAY.

**Q.** YOU MENTIONED THAT MR. -- REMIND US, HOW DID MR. RASURE REPRESENT HIS POSITION AT PIRANHA MEGAFAB TO YOU?

**A.** MR. RASURE WASN'T VERY DEFINITIVE IN TERMS OF DESCRIBING IT. THE IMPLICATION HE LEFT IN THE MINDS OF MYSELF AND OTHER BOARD MEMBERS WAS THAT HE WAS A SENIOR MANAGER WITH THE ABILITY TO COMMIT PIRANHA RESOURCES.

**Q.** DID YOU MAKE ANY EFFORTS TO TRACK THAT DOWN, FIND OUT IF THAT WAS TRUE?

**A.** I DID. AFTER SEVERAL DAYS OF NONRESPONSIVENESS ON THESE ISSUES, I EVENTUALLY CALLED THE MEGAFAB MANUFACTURING OFFICES AND ASKED TO SPEAK TO THEIR HR DIRECTOR. I REACHED THAT INDIVIDUAL AND SAID THAT I WANTED TO DO AN EMPLOYMENT VERIFICATION REGARDING MR. RASURE.

THE INDIVIDUAL, WHO I BELIEVE WAS THEIR HR MANAGER, SAID MR. RASURE WAS NOT AN EMPLOYEE OF MEGAFAB MANUFACTURING OR PIRANHA, BUT WAS A CONSULTANT THAT HAD WORK FOR THEM AT TIMES.

**Q.** DID YOU FIND OUT ANYTHING ABOUT MR. RASURE'S CAPABILITY TO COMMIT PIRANHA RESOURCES?

**A.** I DID. I ASKED SPECIFICALLY WHETHER HE HAD THE ABILITY TO COMMIT PLACEMENT OF THEIR EQUIPMENT OR OTHER RESOURCES IN A BUSINESS VENTURE HE WAS DISCUSSING WITH US, AND THE ANSWER WAS HE DID NOT.

**Q.** OKAY.

I THINK YOU MENTIONED THAT THE MOU WAS SORT OF NONBINDING AND NONFINAL; IS THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** OKAY. AND THEN ULTIMATELY A TRUE TRANSACTION WOULD HAVE TO BE ENTERED INTO; IS THAT FAIR?

**A.** THAT IS CORRECT.

**Q.** IN YOUR BOOK IF YOU'LL TURN TO THE DOCUMENT MARKED TX52, WHICH I BELIEVE HAS ALREADY BEEN ADMITTED --

**THE WITNESS:** CAN I GET A CUP FOR WATER?

**THE CLERK:** THE CUPS ARE GONE?

(PAUSE IN THE PROCEEDINGS.)

**THE WITNESS:** SORRY. THANK YOU VERY MUCH.

SORRY. GO AHEAD.

**BY MR. PISTORINO:**

**Q.** IN YOUR BINDER, IF YOU TURN TO TAB 52, THIS IS A DOCUMENT THAT WE'VE SEEN BEFORE.

IT'S AN EMAIL FROM MR. WOODS TO MR. RASURE INCLUDING A NUMBER OF FOLKS AND YOURSELF, CORRECT?

**A.** THAT'S CORRECT.

**Q.** AND IT SAYS, "ATTACHED IS A DRAFT OF THE PROPOSED ASSET PURCHASE AGREEMENT", RIGHT?

**A.** CORRECT.

**Q.** AND WAS THIS SORT OF TECHSHOP'S FIRST EFFORT OF -- TO PROVIDE SORT OF A DRAFT OF WHAT A FINAL AGREEMENT MIGHT LOOK LIKE?

**A.** THAT'S CORRECT.

**Q.** SO IF EVERYTHING HAD BEEN DONE, AN AGREEMENT HAD FINALLY BEEN REACHED, WOULD MR. RASURE HAVE ACQUIRED ALL THE ASSETS OF TECHSHOP?

**A.** IF WE HAD COMPLETED THE DEAL, YES, HE WOULD HAVE.

**Q.** AND WERE SOME OF THE ASSETS OF TECHSHOP THE TECHSHOP TRADEMARKS?

**A.** YES.

**Q.** OKAY.

IF YOU TURN IN YOUR BINDER TO 53, THE NEXT ONE, WHICH IS

ADMITTED, I BELIEVE. LET ME KNOW WHEN YOU ARE THERE.

(DISPLAYED ON SCREEN.)

NO. 53 IS A DOCUMENT THAT WE HAVE SEEN BEFORE.

**A.** YES.

**Q.** IT'S AN EMAIL, ACTUALLY IT'S KIND OF A STRING OF EMAILS FROM YOURSELF TO MR. RASURE DATED ABOUT DECEMBER 7TH HERE, SO ABOUT A WEEK AFTER THE MOU WAS ENTERED.

AND I SEE YOU SAY IN SORT OF THE BOTTOM OF THE PAGE FROM YOU, "I HAVE NOT SEEN ANY OF THE ITEMS THAT YOU AGREED YOU WOULD PROVIDE BY THE CLOSE OF BUSINESS TODAY".

DO YOU SEE THAT?

**A.** YES.

**Q.** WHAT WERE YOU REFERRING TO THERE?

**A.** INDICATION OF FINANCIAL RESOURCES, INDICATION OF MANAGEMENT TEAM MEMBERS, BIO SKETCHES OF THE MANAGEMENT TEAM.

**Q.** WHEN YOU SAY "INDICATIONS OF FINANCIAL RESOURCES", TELL US LIKE WHAT KIND OF THING WERE YOU LOOKING FOR?

**A.** WE SPECIFICALLY ASKED FOR A DOCUMENT, EITHER FROM A CPA FIRM OR FROM A BANK, INDICATING THE AMOUNT OF CASH RESOURCES THAT MR. RASURE HAD AVAILABLE FOR THIS DEAL.

**Q.** AND DID YOU HAVE A -- WHAT KIND OF RANGE OF FINANCIAL RESOURCES WOULD YOU HAVE CONSIDERED TO BE, I'LL SAY EVEN IN THE BALLPARK, TO DO A TRANSACTION OF THIS SIZE?

**A.** GIVEN THE SIZE OF THE TRANSACTION, I BELIEVE AND THE OTHER DIRECTORS AGREED THAT THREE TO $5 MILLION WAS AN ABSOLUTE

MINIMUM, AND MORE THAN THAT WAS LIKELY REQUIRED.

**Q.** OKAY.

DID YOU GET -- ACTUALLY, I WILL ASK IT THIS WAY. IF YOU CAN BE TURN TO THE DOCUMENT, THE NEXT ONE, 54, WHICH I BELIEVE --

**THE CLERK:** 54?

**MR. PISTORINO:** 54.

**THE WITNESS:** YES.

**BY MR. PISTORINO:**

**Q.** 54 IS AGAIN ANOTHER SERIES OF EMAILS BETWEEN YOURSELF AND MR. RASURE.

AT THE BOTTOM ON THE FIRST PAGE IS AN EMAIL FROM MR. RASURE IDENTIFYING ROB GREEN AND JP CLAXTON.

DO YOU SEE THAT?

**A.** I DO.

**Q.** AND THEN YOU INDICATE AT THE TOP YOU WOULD BE REACHING OUT TO THEM, RIGHT?

**A.** CORRECT.

**Q.** WHAT EFFORTS DID YOU MAKE NOW TO COMMUNICATE WITH MR. GREEN AND MR. CLAXTON?

**A.** MR. GREEN AND MR. CLAXTON ARE THE TWO INDIVIDUALS I REFERRED TO EARLIER.

I SENT THEM AN EMAIL. I CALLED THEIR OFFICES. I LEFT VOICE MAIL FOR THEM. I ASKED MR. RASURE TO ASK THEM TO RESPOND TO ME.

AS A RESULT OF ALL THOSE EFFORTS OVER THE COURSE OF SEVERAL DAYS, I NEVER GOT ANY RESPONSE AT ALL.

**Q.** SO IF YOU CAN TURN IN YOUR BOOK TO JUST THE NEXT ONE, 55, WHICH I BELIEVE HAS BEEN ADMITTED.

(DISPLAYED ON SCREEN.)

**A.** YES.

**Q.** ONCE AGAIN, THIS IS AN EMAIL FROM YOU, ACTUALLY THE NEXT DAY, DECEMBER 8TH, WHERE YOU INDICATE YOU ARE GOING TO BE REACHING OUT TO THESE FOLKS, CORRECT?

**A.** CORRECT.

**Q.** AND THEN BELOW THE BULLET POINTS, YOU SAY, "WE ARE VERY CONCERNED THAT WE HAVE NOT SEEN ANY EVIDENCE OF CAPITALIZATION, THAT WE DON'T SEE ANY INDICATIONS OF AN OPERATIONAL TEAM BEING ASSEMBLED BEYOND YOU PERSONALLY, AND THAT NEGOTIATIONS WITH LANDLORDS AND AUTODESK AND LOWE'S SEEM TO BE AT AN EXTREMELY PRELIMINARY LEVEL".

DO YOU SEE THAT?

**A.** I DO.

**Q.** DID YOU HAVE DISCUSSIONS WITH MR. RASURE ABOUT AN OPERATIONAL TEAM, FOR EXAMPLE, OTHER THAN MR. GREEN AND MR. CLAXTON?

**A.** I DID.

DURING TELEPHONE CALLS WITH MR. RASURE, I EXPLAINED THAT A BUSINESS OF THIS COMPLEXITY WHICH HAD TEN LOCATIONS AROUND THE U.S. PLUS LICENSING AGREEMENTS OUTSIDE THE U.S. WAS A COMPLEX

ORGANIZATION TO MANAGE, AND IT WOULD REQUIRE A TEAM INCLUDING A CFO, A CHIEF FINANCIAL OFFICER, AND OPERATIONS MANAGEMENT TO RUN IT EFFECTIVELY. I ASKED HIM TO PROVIDE THE NAMES OR AT LEAST THE JOB DESCRIPTIONS OF INDIVIDUALS THAT HE WOULD BE PUTTING IN PLACE.

THE RESPONSE THAT I GOT WAS THAT HE DIDN'T INTEND TO HAVE A CFO, HE DIDN'T BELIEVE ONE WAS NEEDED, AND THAT HE WOULD BE ABLE TO RUN THE BUSINESS PRETTY MUCH BY HIMSELF.

**Q.** WHAT DID YOU THINK ABOUT THAT?

**A.** I DID NOT THINK THAT WAS A VIABLE APPROACH TO TAKING OVER THIS BUSINESS BY ANY MEANS.

**Q.** YOU INDICATED THAT... YOU INDICATED THAT YOUR ONLY CONTACT HAD BEEN WITH MR. RASURE PERSONALLY --

**A.** THAT'S CORRECT.

**Q.** -- AT THAT POINT.

OKAY. YOU HADN'T COMMUNICATED WITH ANYBODY ELSE WORKING WITH MR. RASURE TO DO THIS DEAL?

**A.** I HAD NOT.

AND DURING THE ENTIRE COURSE OF OUR NEGOTIATION, I PERSONALLY HAD NO CONTACT WITH ANYONE EXCEPT MR. RASURE.

**Q.** IF YOU TURN IN YOUR BINDER TO THE DOCUMENT WE ENTITLED TX58, WHICH WAS PREVIOUSLY ADMITTED.

(DISPLAYED ON SCREEN.)

**A.** YES.

**Q.** THIS IS A, SORT OF A STRING OF EMAILS FROM YOU. AT THE

BOTTOM IS AN EMAIL FROM YOU DATED DECEMBER 8 TO A NUMBER OF FOLKS, BUT DIRECTED TO MR. GREEN AND MR. CLAXTON.

DO YOU SEE THAT?

**A.** YES.

**Q.** WAS THIS YOUR EFFORT TO SORT OF TRACK IT DOWN, VERIFY WHAT MR. RASURE WAS SAYING?

**A.** IT WAS.

AS YOU'LL SEE IN THE FINAL PARAGRAPH, I OFFERED MY TELEPHONE NUMBER AND SO THAT I WOULD BE AVAILABLE BASICALLY BETWEEN 8:00 A.M. AND MIDNIGHT PACIFIC STANDARD TIME SEVEN DAYS A WEEK.

**Q.** DID YOU EVER RECEIVE A RESPONSE ON THE 8TH?

**A.** I DID NOT.

**Q.** AND ON THE 9TH, THE TOP PART, YOU SENT ANOTHER EMAIL, RIGHT?

**A.** YES.

**Q.** YOU SAID YOU DIDN'T HEAR BACK FROM THEM BY TELEPHONE OR EMAIL?

**A.** I DID NOT.

**Q.** AND YOU INDICATED THERE IN THE SECOND PARAGRAPH, "TIME IS GETTING VERY SHORT TO CONCLUDE THE DEAL THAT MR. RASURE HAS BEEN DEVELOPING WITH US".

DO YOU SEE THAT?

**A.** I DO.

**Q.** WHY DID YOU FEEL THAT TIME WAS GETTING VERY SHORT TO

CONCLUDE A DEAL?

**A.** MR. RASURE HAD INDICATED THAT IT WAS VERY IMPORTANT TO HIM TO REOPEN THE STORES VERY QUICKLY IN ORDER TO MAINTAIN THE MOMENTUM OF THE BUSINESS.

MEMBERS HAD BEEN -- HAD LOST ACCESS TO THE FACILITIES THAT THEY HAD SIGNED UP FOR. LANDLORDS WERE VERY, VERY IMPATIENT UNDERSTANDABLY AND APPROPRIATELY ABOUT BACK RENT THAT WAS DUE. THERE WERE A VARIETY OF THINGS HAPPENING THAT WERE GOING TO MAKE IT MORE AND MORE DIFFICULT FOR THE BUSINESS TO RESTART.

AND AT MR. RASURE'S INSISTENCE AND OUR AGREEMENT, IT WAS VERY IMPORTANT WE CONCLUDE THIS QUICKLY AND GET IT RESTARTED. WE WERE VERY CONCERNED ABOUT THAT.

WE ALSO WERE IN A POSITION WHERE MR. RASURE HAD EXPLICITLY ASKED US NOT TO FILE CHAPTER 7 BANKRUPTCY. SO WE WERE VERY UNEASY ABOUT THE FACT THAT THE BANKRUPTCY PROCEEDINGS WERE ON HOLD WHILE WE WAITED FOR A DEAL TO EMERGE.

**Q.** DID THE BOARD FEEL THERE WAS ANY RISK TO DELAYING THE BANKRUPTCY FILING WHILE CONTINUING WITH THESE NEGOTIATIONS?

**A.** WE DID.

WE FELT THAT IT WAS -- WE WERE ACCRUING RISK BY DELAYING BANKRUPTCY BECAUSE OF THE ACTIONS THAT I TALKED ABOUT PREVIOUSLY, PARTICULARLY WITH RESPECT TO LANDLORDS.

WE MADE A CONSIDERED DECISION THAT THE POTENTIAL BENEFIT OF A DEAL WITH MR. RASURE WAS HIGH ENOUGH THAT IT WAS WORTH TAKING THAT ADDITIONAL RISK OF DEFERRING THE BANKRUPTCY

FILING.

**Q.** IF YOU COULD TURN IN YOUR BINDER THERE TO THE DOCUMENT TX59, WHICH IS PREVIOUSLY ADMITTED.

(DISPLAYED ON SCREEN.)

THE FIRST ONE -- THE ONE WE JUST SAW WAS DATED THE 9TH. THIS ONE, THE TOP ONE, IS AT LEAST THE 10TH, CORRECT?

**A.** CORRECT.

**Q.** THIS IS JUST ANOTHER EMAIL FROM YOU TO MR. GREEN, MR. CLAXTON, MR. RASURE SAYING YOU JUST DIDN'T HEAR BACK YET, RIGHT?

**A.** CORRECT.

**Q.** YOU DID NOT HEAR BACK YET.

**A.** I DID NOT HEAR BACK, NO.

**Q.** SO BY THIS POINT YOU HAD BEEN ASKING FOR THAT -- WHAT YOU DESCRIBED AS THE BASIC INFORMATION FOR ABOUT TEN DAYS, RIGHT?

**A.** CORRECT.

**Q.** AND YOU ALREADY HEARD, YOU TOLD US, FROM THE PIRANHA MEGAFAB PEOPLE THAT MR. RASURE'S POSITION WAS AT LEAST DIFFERENT THAN YOU HAD UNDERSTOOD, CORRECT?

**A.** THAT'S CORRECT.

**Q.** WHAT WERE YOU THINKING ABOUT THIS POTENTIAL DEAL WITH MR. RASURE AT THAT POINT?

**A.** I WAS GETTING INCREASINGLY SKEPTICAL THAT THIS WAS GOING TO BE A VIABLE OPPORTUNITY. WE REALLY WANTED THIS TO WORK OUT BECAUSE WE BELIEVED THAT BASED ON OUR INITIAL DISCUSSIONS AND

ON THE MEMORANDUM OF UNDERSTANDING THAT IT WOULD BE IN THE BEST INTEREST OF ALL THE STAKEHOLDERS OF TECHSHOP, BUT I WAS -- I HAD BEEN CONCERNED INCREASINGLY OVER THIS PERIOD OF TIME, AND BY THIS POINT I WAS VERY, VERY CONCERNED THAT MR. RASURE DID NOT HAVE THE ASSETS OR THE TEAM REQUIRED TO DO THIS SUCCESSFULLY.

**Q.** OKAY.

WE'RE GOING TO GO TO ONE LITTLE POINT HERE ALONG THE WAY.

BACK -- IF YOU CAN TURN IN YOUR BINDER TO AN EXHIBIT WE MARKED AS TX47.

(DISPLAYED ON SCREEN.)

THIS IS --

**A.** YES.

**Q.** THIS IS A SERIES OF EMAILS AROUND THE TIME OF THE EXECUTION OF MEMORANDUM OF UNDERSTANDING, CORRECT?

**A.** YES.

**Q.** AND AT THE, I GUESS IT'S THE THIRD PAGE OF THE -- THIRD PAGE OR SO OF THE EXHIBIT, IS AN EMAIL FROM MR. NEWTON ABOUT SENDING OUT AN ANNOUNCEMENT ABOUT THE MEMORANDUM OF UNDERSTANDING, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND YOU SEE HE MENTIONS THERE, "PLUS, PRIVACY LAWS PREVENT US FROM PROVIDING CONTACT DATA TO TS2", RIGHT?

**A.** THAT'S CORRECT.

**Q.** WHAT DID THE -- DID THE BOARD HAVE A FEELING ABOUT

PROTECTING THE MEMBER DATA, THE PERSONAL INFORMATION?

**A.** YES, WE HAD EXTENSIVE DISCUSSIONS ABOUT THIS. AND THE BOARD -- WE HAD AN OBLIGATION TO PROTECT THE PERSONALLY-IDENTIFIABLE INFORMATION, THE PRIVATE INFORMATION OF OUR MEMBERS.

WE COLLECTED THAT INFORMATION AS PART OF THEIR MEMBERSHIP APPLICATION. WE COULD NOT DISCLOSE IT TO ANY PARTY OUTSIDE THE COMPANY. IF ANOTHER ENTITY BOUGHT THE ASSETS OF TECHSHOP, THAT INFORMATION WOULD GO WITH THE COMPANY'S OWNERSHIP, BUT WE COULDN'T HAND IT OFF TO SOMEBODY ELSE.

**Q.** WHEN YOU SAY LIKE THE PERSONAL INFORMATION, WHAT KIND OF INFORMATION?

**A.** IT WOULD BE NAME, PHYSICAL ADDRESS, YOUR HOME ADDRESS, TELEPHONE NUMBERS, EMAIL ADDRESS. WE DID NOT KEEP CREDIT CARD INFORMATION, BUT THOSE OTHER ELEMENTS WERE ALL CONSIDERED PERSONALLY-IDENTIFIABLE INFORMATION.

**Q.** ON THE SECOND PAGE OF THE EXHIBIT, MR. DOHERTY RESPONDS TO MR. NEWTON'S NOTICE ABOUT THE PRIVACY LAWS. AND HE SAYS, "FOR CLARITY, IT'S NOT JUST PRIVACY LAW, IT IS US GIVING AWAY THE FAMILY SILVER BEFORE IT IS PAID FOR." CORRECT?

**A.** THAT'S CORRECT.

**Q.** WHAT DID YOU THINK ABOUT THAT IN TERMS OF THE CUSTOMER LIST AS AN ASSET OF TECHSHOP?

**A.** WE, THE DIRECTORS, FIRMLY BELIEVED THAT THE MEMBERSHIP LIST AND THE CONTACT WITH THOSE INDIVIDUALS WAS AN IMPORTANT

BUSINESS ASSET OF THE COMPANY.

MR. RASURE APPARENTLY ALSO BELIEVED THE SAME THING BECAUSE HE WAS ADAMANT THAT HE NEEDED ACCESS TO IT.

**Q.** SO IF YOU GO TO THE FIRST PAGE OF THE EXHIBIT, THERE IS A RESPONSE FROM MR. RASURE DATED NOVEMBER 30TH WHERE HE SAYS, "WE NEED TO RECEIVE THE CONTACT INFORMATION AS PART OF THE TRANSACTION".

DO YOU SEE THAT?

**A.** I DO.

**Q.** AND THEN MR. DOHERTY, ON BEHALF OF THE BOARD, RESPONDED ABOUT TECHSHOP OPERATING IN SOME OF THE STATES WITH THE TOUGHEST PRIVACY LAWS IN THIS AREA, RIGHT?

**A.** YES.

**Q.** AND WAS THE PROTECTING THE CUSTOMER PRIVACY AND THAT DATA, WAS THAT SOMETHING THAT WAS OF PARTICULAR FOCUS OR CONCERN OF YOU PERSONALLY?

**A.** IT CERTAINLY WAS. GIVEN MY BACKGROUND AS THE CHIEF INFORMATION OFFICER OF A LARGE INTERNATIONAL COMPANY, THIS IS A VERY SENSITIVE POINT FOR ME. I WAS VERY AWARE OF WHAT THE LAWS ARE IN THIS REGARD. AND I WAS ADAMANT THAT WE COULD NOT DISCLOSE PERSONALLY-IDENTIFIABLE INFORMATION TO A THIRD PARTY.

**Q.** I DON'T THINK WE HAVE GONE TO -- LET'S GO TO 59, WHICH I BELIEVE IS ALREADY ADMITTED.

(DISPLAYED ON SCREEN.)

ARE YOU WITH ME?

**A.** I AM.

**Q.** I THINK THIS IS THE ONE WE LOOKED AT EARLIER, BUT I WANT TO FOCUS ON A DIFFERENT ASPECT OF IT NOW.

YOU HADN'T GOTTEN ANY RESPONSE FROM MR. GREEN OR MR. CLAXTON, BUT THEN YOU ALSO SAY IN THE TOP PART OF THE EMAIL, "THE BOARD OF DIRECTS OF TECHSHOP STILL DOES NOT HAVE ANY EVIDENCE THAT TECHSHOP 2.0 HAS THE CAPITALIZATION NEEDED TO CONCLUDE A DEAL".

DO YOU SEE THAT?

**A.** I DO.

**Q.** SO, AGAIN, YOU'VE BEEN TALKING ABOUT IT FOR MORE THAN TEN DAYS OR SO. WHAT WERE YOU THINKING ABOUT THE FACT THAT YOU DIDN'T HAVE ANY EVIDENCE THAT THEY HAD THE CAPITAL TO DO A DEAL LIKE THIS?

**A.** IT WAS -- THE FACT THAT IT WAS -- THAT MR. RASURE WAS UNRESPONSIVE ON THIS TOPIC AS OF THIS POINT LED US TO BELIEVE THAT PERHAPS HIS FINANCING EITHER DID NOT EXIST OR HAD FALLEN THROUGH OR WAS INADEQUATE.

REGARDLESS OF WHAT THE REASON WAS, WE FELT STRONGLY THAT WE COULD NOT MOVE FORWARD ON A DEAL WITH SOMEONE WHO DIDN'T HAVE ADEQUATE FINANCIAL RESOURCES TO CONDUCT THE DEAL. IT WOULD BE IMPRUDENT OF US TO HAND OVER THE ASSETS OF THE COMPANY TO SOMEONE WHO COULDN'T EFFECTIVELY MOVE THE BUSINESS FORWARD.

**Q.** AT THIS POINT, HOW DID TECHSHOP KNOW THAT MR. RASURE

WASN'T JUST A GUY SAYING HE COULD DO IT?

**A.** WE DIDN'T KNOW THAT.

**Q.** OKAY. IN YOUR BOOK, IF YOU CAN TURN TO WHAT WE MARKED AS EXHIBIT 60, WHICH I BELIEVE HAS PREVIOUSLY BEEN ADMITTED.

**A.** YES.

**Q.** OKAY. AND, AGAIN, THIS IS THE NEXT DAY, NOW WE'RE INTO THE 11TH, YOU SAY -- IT'S AN EMAIL FROM YOU DATED DECEMBER 11TH TO MR. RASURE.

YOU SAY, "DAN, I HAVE GOTTEN NO RESPONSE FROM MR. GREEN OR MR. CLAXTON. I ALSO HAVEN'T GOTTEN ANYTHING FROM YOU REGARDING THE MATTERS BELOW. WHY HAVE WE NOT SEEN EVIDENCE OF CAPITALIZATION, OR INFORMATION ON YOUR TEAM?"

**A.** YES.

**Q.** GIVEN THE AMOUNT OF TIME THAT TECHSHOP HAD BEEN TRYING TO GET THIS -- WELL, ACTUALLY, I AM SORRY, LET ME GO THE OTHER WAY.

WAS MR. RASURE ASKING FOR INFORMATION FROM TECHSHOP?

**A.** HE DID ASK FOR SOME INFORMATION, YES.

**Q.** AND DID -- WHAT WAS TECHSHOP DOING? WAS TECHSHOP TRYING TO GIVE IT TO HIM?

**A.** TECHSHOP PROVIDED THE INFORMATION AS QUICKLY AS WE COULD ASSEMBLE IT. AND WE KEPT HIM UP TO DATE ON OUR PROGRESS IN ASSEMBLING THE INFORMATION.

**Q.** FROM TECHSHOP'S PERSPECTIVE, WAS TECHSHOP DOING EVERYTHING IT COULD TO MAKE THIS DEAL HAPPEN?

**A.** YES.

**Q.** OKAY.

WHILE GIVEN THE -- GIVEN YOUR EMAIL HERE ON DECEMBER 11TH, DID THE BOARD COME TO A DECISION ABOUT CONTINUING WITH THE MOU WITH MR. RASURE?

**A.** WE DID.

**Q.** WHAT WAS THAT DECISION?

**A.** OUR DECISION WAS THAT WE DID NOT WANT TO CUT OFF NEGOTIATION WITH MR. RASURE BUT WE COULDN'T STAY IN THE MEMORANDUM OF UNDERSTANDING.

THE REASON FOR THAT WAS THAT WE HAD BEEN APPROACHED BY OTHER PARTIES THAT INDICATED AN INTEREST IN POSSIBLY DISCUSSING A DEAL. AND WE FELT LIKE IT WAS INAPPROPRIATE TO DISCUSS OPPORTUNITIES WITH OTHER PARTIES WHILE WE WERE UNDER A MOU. WE THOUGHT THAT WOULD NOT BE TRANSPARENT WITH MR. RASURE.

SO WE INFORMED HIM THAT WE WERE GOING TO CANCEL THE MOU BUT WE WOULD BE WILLING TO CONTINUE NEGOTIATION ON THE DEAL WITH HIM.

**Q.** IF YOU TURN IN YOUR BINDER TO TX62, WHICH I BELIEVE IS ADMITTED.

**THE CLERK:** 62, YES.

**THE WITNESS:** YES.

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** THAT'S AN EMAIL FROM MR. RUTTUM, THAT WE'VE ALL SEEN, TO MR. RASURE ON DECEMBER 12TH TERMINATING THE MOU, CORRECT?

**A.** THAT'S CORRECT.

**Q.** THAT'S THE RESULT OF THE DECISION THE BOARD MADE YOU JUST TALKED ABOUT?

**A.** THAT'S CORRECT.

**Q.** I WANT TO GO BACK JUST A LITTLE BIT. IF YOU WOULD TURN IN YOUR BOOK TO TX61 --

**A.** YES.

**Q.** -- THAT WAS PREVIOUSLY ADMITTED.

(DISPLAYED ON SCREEN.)

THAT WAS ONE OF MR. RASURE'S RESPONSES TO THESE REQUESTS FROM YOU, CORRECT?

**A.** YES.

**Q.** AND IN THE SECOND PARAGRAPH, MR. RASURE SAYS TO YOU, IN FACT, "BEING TOLD THAT WE WON'T RECEIVE CUSTOMER INFORMATION WHEN WE ARE HONORING PREPAID MEMBERSHIPS IN SOME CAPACITY IT HAS TAKEN UP TIME AND ADDED RISK".

DO YOU SEE THAT THERE?

**A.** I DO.

**Q.** WAS THAT THE KIND OF THING MR. RASURE WAS SAYING ABOUT HIS DESIRE TO GET THE TECHSHOP CUSTOMER LIST?

**A.** YES.

**Q.** OKAY. SO I THINK YOU SAID THAT TECHSHOP WANTED TO CANCEL

THE MOU TO POTENTIALLY TALK TO OTHERS, RIGHT?

**A.** THAT'S CORRECT.

**Q.** WHAT ABOUT CONTINUED DISCUSSIONS WITH MR. RASURE?

**A.** WE CONTINUED DISCUSSIONS WITH MR. RASURE WITHOUT INTERRUPTION. WE NEVER BACKED AWAY FROM HAVING CONVERSATIONS OR NEGOTIATIONS WITH HIM. WE CONTINUED TO PROVIDE INFORMATION AS HE REQUESTED.

**Q.** TURN TO THE DOCUMENT IN YOUR BINDER TX65.

**THE COURT:** SORRY. IF WE ARE GOING TO A NEW DOCUMENT IT IS PROBABLY A GOOD TIME FOR OUR BREAK. IT'S 11:55.

SO, LADIES AND GENTLEMEN, LET'S TAKE OUR SECOND MORNING RECESS. WE WILL RETURN AND RESUME AT 12:10.

(PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

**THE CLERK:** YOU MAY BE SEATED.

**THE COURT:** SO JUST ON THE ISSUE THAT WAS RAISED WITH THE EXPERT, I WANT TO BE SURE, IS THAT SOMETHING THAT COULD COME UP BEFORE TOMORROW'S SESSION OR IS IT LIKELY HE WOULDN'T GET ON UNTIL TOMORROW?

**MR. PISTORINO:** I THINK HE'S COMING ON LATER TODAY.

**MR. NATHAN:** IT IS GOING TO COME UP.

**THE COURT:** FIRST, BEFORE I EVEN HEAR ANYTHING ABOUT IT, HAVE YOU TRIED TO WORK IT OUT?

**MR. NATHAN:** I HAVE APPROACHED COUNSEL AND TRIED TO WORK IT OUT. HE WANTS TO USE A DEMONSTRATIVE ON AN EASEL. WE HAVE NO OBJECTION TO THAT.

THE PROBLEM IS, PARTICULARLY FROM WHERE I AM SITTING, I CAN'T SEE THE EASEL. IT'S NUMBERS. I CAN SHOW YOU WHAT IT IS. IT'S A TABLE WITH SOME DOLLAR AMOUNTS AND SO ON. I'M SURE THE JURORS WON'T BE ABLE TO SEE IT. AND MORE IMPORTANT, IT WILL NOT BE IN THE RECORD.

SO I HAVE OFFERED TO PUT INTO THE RECORD A COPY OF THE -- WHAT'S ON THE EASEL, MARK IT WITH AN EXHIBIT, AND HAVE IT ADMITTED, WHICH IS WHAT IS ROUTINELY DONE, AT LEAST IN MY EXPERIENCE, SO THAT WE HAVE SOMETHING THAT WE CAN DEAL WITH IN THE RECORD AND THE JURORS CAN SEE ON THE SCREEN.

THAT'S THE ONLY QUESTION. IT'S A MECHANICAL QUESTION. I AM, FRANKLY, SURPRISED THERE IS ANY DISPUTE HERE.

**THE COURT:** SO HERE IS HOW WE WILL DEAL WITH THE VARIOUS PIECES OF THAT.

ROUTINELY, WHEN A DEMONSTRATIVE IS USED, YOU CAN OBVIOUSLY MOVE TO WHERE YOU CAN SEE IT. YOU SHOULD DO THAT IN A WAY THAT IT DOESN'T BLOCK THE JURORS' VIEW, BUT IT IS FINE FOR YOU TO DO THAT.

OTHERWISE, DEMONSTRATIVES ARE DEMONSTRATIVES. AND THERE'S NOT A REQUIREMENT THAT IT BE ADMITTED. SO TO THE EXTENT THERE'S A REQUEST TO ADMIT A DEMONSTRATIVE EXHIBIT THAT'S NOT BEING OFFERED IN EVIDENCE, THAT'S DENIED.

**MR. NATHAN:** YOUR HONOR, CAN I HAVE PERMISSION TO, WHEN I CROSS-EXAMINE THE WITNESS, TO ACTUALLY PUT A COPY INTO EVIDENCE AND PUT IT ON THE ELMO SO I CAN DIRECT HIM TO A

SPECIFIC FIGURE?

**THE COURT:** I WOULD SAY THAT YOU CAN MOVE IT INTO EVIDENCE. IF THERE IS AN OBJECTION, I WILL DEAL WITH THE OBJECTION.

**MR. PISTORINO:** I DON'T HAVE ANY OBJECTION.

**THE COURT:** GREAT. NO DISPUTE.

**MR. NATHAN:** THANK YOU, YOUR HONOR.

(RECESS TAKEN AT 11:58 A.M.; RESUMED AT 12:10 P.M.)

**THE CLERK:** REMAIN SEATED. COURT IS BACK IN SESSION.

**THE COURT:** LET ME ASK ONE PRELIMINARY THING. IS THERE A REPORT FOR THE WITNESS WHO WILL BE COMING UP LATER THAT WE WERE JUST TALKING ABOUT, DR. MATOLO?

**MR. PISTORINO:** THERE IS AN EXPERT REPORT, YES.

**THE COURT:** COULD I HAVE A COPY OF IT, PLEASE?

**MR. PISTORINO:** YES. IN FACT, HE HAS TWO REPORTS.

**MR. NATHAN:** YOUR HONOR, WE OBJECT TO THE INTRODUCTION OF THE REPORT ITSELF.

**THE COURT:** IT'S NOT BEING OFFERED. I NEED IT IN CASE THERE'S AN OBJECTION ABOUT BEYOND THE SCOPE, OR THAT KIND OF THING.

**MR. NATHAN:** I SEE.

(DOCUMENT HANDED TO COURT.)

**THE COURT:** ARE WE READY TO PROCEED?

**THE CLERK:** GIVE ME ONE SECOND.

(PAUSE IN THE PROCEEDINGS.)

(PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

**THE CLERK:** YOU MAY BE SEATED.

**THE COURT:** YOU MAY CONTINUE, MR. PISTORINO.

**MR. PISTORINO:** THANK YOU, YOUR HONOR.

**BY MR. PISTORINO:**

**Q.** WE WILL DO OUR BEST TO GO A LITTLE BIT SLOWER, AT LEAST I WILL DO MY BEST TO GO A LITTLE BIT SLOWER.

AFTER TECHSHOP CANCELED THE MOU ON DECEMBER 12TH, I BELIEVE, DID YOU CONTINUE TO MAKE ANY EFFORTS TO TRY TO FACILITATE A TRANSACTION WITH MR. RASURE?

**A.** WE DID.

**Q.** HOW ABOUT YOU PERSONALLY; DID YOU CONTINUE TO TAKE STEPS TO TRY TO SEE IF YOU COULDN'T MAKE A DEAL WORK?

**A.** I DID.

**Q.** IN YOUR BINDER, IF YOU CAN TURN TO THE DOCUMENT THAT'S MARKED TX65, WHICH HAS ALREADY BEEN ADMITTED.

(DISPLAYED ON SCREEN.)

THAT IS AN EMAIL FROM YOU TO MR. RASURE DATED DECEMBER 19TH, SO ABOUT A WEEK AFTER TECHSHOP CANCELED THE MOU. AND YOU DESCRIBE IT AS -- WELL, YOU DESCRIBE THE SUBJECT AS MECHANISM FOR TRANSFERRING MEMBER DATA.

DO YOU SEE THAT?

**A.** I DO.

**Q.** AND YOU'VE GOT KIND OF A PROPOSAL HERE. TELL US WHAT YOUR IDEA WAS.

**A.** MR. RASURE WANTED TO BE ABLE TO CONTACT THE MEMBERS OF THE EXISTING TECHSHOP BUSINESS. WE COULDN'T TRANSFER ALL THAT PERSONALLY-IDENTIFIABLE INFORMATION.

IN AN EFFORT TO TRY TO BE ACCOMMODATING TO WHAT MR. RASURE ASKED FOR, DRAWING ON MY BACKGROUND IN INFORMATION TECHNOLOGY, I CAME UP WITH A SUGGESTION FOR A WAY THAT WE COULD ALLOW HIM TO REACH OUT TO PEOPLE, HAVE THEM VOLUNTARILY GIVE HIM THEIR PERSONALLY-IDENTIFIABLE INFORMATION, AND THEN WE COULD GO INTO OUR DATABASE AND PROVIDE ACCESS TO SOME OF THE INFORMATION HE WANTED ABOUT THE STATUS OF THEIR MEMBERSHIP. AND THAT WAY WE COULD GIVE HIM SOME OF THE IMPORTANT BUSINESS INFORMATION HE WAS SEEKING WITHOUT VIOLATING PEOPLE'S PERSONALLY-IDENTIFIABLE INFORMATION.

**Q.** IT WAS KIND OF LIKE AN OPT-IN?

**A.** YES. IT WOULD BE AN OPT-IN SORT OF MECHANISM.

**Q.** SO THE MEMBERS WOULD HAVE TO VOLUNTARILY SAY, YES, YOU CAN TRANSFER, AND THEN TECHSHOP COULD; IS THAT FAIR?

**A.** THAT'S FAIR.

**Q.** IN SOME OF THE DOCUMENTS THAT WE HAVE SEEN HERE LIKE, FOR EXAMPLE, THE MOU, WE DO SEE THE NAME TECHSHOP 2.0? YOU SAW THAT, RIGHT?

**A.** WE DID SEE THAT.

**Q.** THAT WAS AN ENTITY THAT MR. RASURE HAD CREATED TO -- A VEHICLE TO ACQUIRE THE ASSETS OF TECHSHOP, CORRECT?

**MS. ROBERTS:** OBJECTION, CALLS FOR SPECULATION.

**THE COURT:** SUSTAINED.

**BY MR. PISTORINO:**

**Q.** OKAY. WHAT DID YOU THINK ABOUT MR. RASURE'S USE OF THE NAME TECHSHOP 2.0, FOR EXAMPLE, AS THE PARTY TO THE MOU?

**A.** WHEN MR. RASURE FIRST USED THE TERM "TECHSHOP 2.0" WITH US, IT WAS IN THE CONTEXT OF A LEGAL ENTITY NAME.

WE HAD ASKED HIM TO TELL US WHAT THE NAME OF THE ACQUIRING ENTITY WOULD BE AND WHERE IT WAS INCORPORATED, AND OTHER DETAILS ABOUT ITS LEGAL STATUS. HE CAME BACK AND TOLD US THAT HE HAD INCORPORATED -- I BELIEVE HE HAD INCORPORATED AS TECHSHOP 2.0.

MY REACTION AT THE TIME WAS, I TOLD HIM DURING A TELEPHONE CALL THAT I THOUGHT THAT WAS AN UNWISE NAME TO CHOOSE BECAUSE IT MIGHT CAUSE MARKET CONFUSION.

**Q.** DID HE GO AHEAD AND STILL USE THE NAME TECHSHOP 2.0?

**A.** HE DID.

**Q.** YOU SAY FOR AN ENTITY TO PARTICIPATE IN THIS ACQUISITION, CORRECT?

**A.** THAT'S CORRECT.

**Q.** OKAY. AT THAT TIME DID YOU HAVE ANY KNOWLEDGE THAT MR. RASURE HAD OPENED A MAKERSPACE USING THE NAME TECHSHOP 2.0?

**A.** WE HAD NO KNOWLEDGE OF THAT. AT THAT TIME, I DON'T BELIEVE HE HAD.

**Q.** ULTIMATELY, AND WE'VE SEEN THE DOCUMENT BEFORE,

ULTIMATELY -- WELL, LET ME TRY IT THIS WAY.

AFTER THIS -- INTO DECEMBER AND NOW INDEED INTO FEBRUARY, EARLY FEBRUARY, WAS TECHSHOP CONTINUING TO NEGOTIATE WITH MR. RASURE ABOUT A POTENTIAL TRANSACTION?

**A.** IT WAS.

**Q.** AND THE SCOPE OF THAT POTENTIAL TRANSACTION, WOULD THE TECHSHOP TRADEMARKS HAVE BEEN SOME OF THOSE ASSETS?

**A.** YES. THE SCOPE OF THE TRANSACTION WAS... INCLUDED ALL OF THE ASSETS OF TECHSHOP INCLUDING TRADEMARKS.

**Q.** AND IF YOU TURN IN YOUR BINDER TO TX78, WHICH I BELIEVE HAS ALREADY BEEN ADMITTED.

**THE CLERK:** HOLD ON.

OKAY.

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** ULTIMATELY, AFTER THE PASSAGE OF THIS TWO MONTHS, DID THE BOARD REACH A DECISION ABOUT WHETHER OR NOT IT MADE SENSE TO CONTINUE DISCUSSIONS WITH MR. RASURE?

**A.** WE DID MAKE A DECISION LIKE THAT.

DURING THE COURSE OF THE NEGOTIATIONS OVER THAT TWO-OR-SLIGHTLY-MORE-MONTH PERIOD, THE SHAPE OF THE DEAL THAT MR. RASURE WAS TRYING TO PUT TOGETHER CHANGED REPEATEDLY.

I WON'T GO THROUGH THE DETAILS OF IT, BUT THERE WERE SEVERAL DIFFERENT APPROACHES THAT HE WAS TAKING. BY THE TIME FEBRUARY 7TH ROLLED AROUND, THERE HAD BEEN -- THE MOST RECENT

PROPOSAL HAD BEEN A RENTAL AGREEMENT WHERE MR. RASURE WANTED TO RENT THE FACILITIES AND THE EQUIPMENT FROM US ON A SHORT-TERM BASIS.

OUR LEGAL COUNSEL ADVISED US THAT WAS NOT A VIABLE THING TO DO GIVEN THE FINANCIAL CIRCUMSTANCES AND WE DECIDED WE COULD NOT WAIT ANY LONGER TO START FILING FOR CHAPTER 7 BANKRUPTCY, AND WE NOTIFIED HIM THAT WE WOULD.

**Q.** LET ME MAKE SURE I GET -- THE ORIGINAL PROPOSAL WAS A FULL PURCHASE OF ASSETS OF TECHSHOP, CORRECT?

**A.** THAT'S CORRECT.

**Q.** BY THIS LATER DATE, MR. RASURE WAS INDICATING THAT HE WAS JUST INSTEAD GOING TO RENT SOME OF THE EQUIPMENT FROM TECHSHOP.

IS THAT THE DEAL AT LEAST AS YOU UNDERSTOOD IT?

**A.** THAT'S THE DEAL AS I UNDERSTOOD IT.

**Q.** WHAT DID THE BOARD THINK ABOUT WHETHER OR NOT THAT WAS EVEN REMOTELY PRACTICABLE OR DOABLE?

**A.** WE DID NOT BELIEVE IT WAS PRACTICAL.

**Q.** OKAY. SHORTLY -- ACTUALLY, IN YOUR BOOK, TURN TO DOCUMENT WE MARKED TX324, WHICH IS ALREADY IN EVIDENCE?

**THE CLERK:** UH-HUH.

(DISPLAYED ON SCREEN.)

**THE WITNESS:** YES.

**BY MR. PISTORINO:**

**Q.** I USED THE TERM "SHORTLY". MAYBE NOT LONG AFTER THAT

FINAL INDICATION FROM TECHSHOP WE CAN SEE HERE IN 324 MR. RASURE MADE A PUBLIC ANNOUNCEMENT ON FEBRUARY 12 OF HIS INTENTION TO OPEN A MAKERSPACE AT TECHSHOP'S FORMER FACILITY UNDER THE NAME TECHSHOP 2.0?

DO YOU SEE THAT?

**A.** I DO.

**Q.** WHAT WAS YOUR REACTION TO LEARNING OF THAT?

**A.** I WAS SHOCKED.

**Q.** WHY?

**A.** WE HAD BEEN DISCUSSING FOR SEVERAL MONTHS MR. RASURE ACQUIRING THE ASSETS OF THE COMPANY. NEGOTIATIONS HAD FALLEN THROUGH. THERE WAS NO DEAL.

AND THEN THIS ANNOUNCEMENT CAME OUT THAT SAID HE WAS OPENING A BUSINESS WITH A NAME NEARLY IDENTICAL TO OUR NAME, IN THE SAME LOCATION WE OPERATED, SERVING THE SAME CUSTOMERS, WITH THE SAME EQUIPMENT, AND THE SAME COLLATERAL MATERIAL.

**Q.** OKAY. BUT HE HAD BEEN USING THAT NAME TECHSHOP 2.0 FOR THESE NEGOTIATIONS BEFORE, RIGHT?

**A.** THE LEGAL ENTITY NAME TECHSHOP 2.0 HAD BEEN USED DURING THE COURSE OF THE NEGOTIATION.

**Q.** SO WHY WAS IT A PROBLEM THAT HE OPEN TECHSHOP'S FORMER MAKERSPACE USING THE NAME TECHSHOP 2.0?

**A.** FROM THE STANDPOINT OF THE BOARD AND FROM MY STANDPOINT PERSONALLY, WE VIEWED THE TECHSHOP 2.0 NAME THAT HE HAD BEEN USING AS A LEGAL NAME -- LEGAL ENTITY NAME. IN OTHER WORDS,

THE NAME OF A BUSINESS FOR CONTRACTUAL PURPOSES, NOT A REPRESENTATION TO THE MEMBERS AND TO THE COMMUNITY THAT IT WAS THE SAME BUSINESS WE HAD BEEN OPERATING PREVIOUSLY.

OPENING THE BUSINESS UNDER THAT NAME WITHOUT ACQUIRING ANY OF THE ASSETS OF THE COMPANY STRUCK US AS INAPPROPRIATE IN THE EXTREME.

**Q.** WAS THE BOARD CONCERNED THAT THERE MIGHT BE CONFUSION BETWEEN THE ASSOCIATION OR SPONSORSHIP BETWEEN TECHSHOP AND MR. RASURE'S TECHSHOP 2.0?

**A.** WE WERE CONCERNED ABOUT THAT. AND ONE OF THE REASONS WE WERE CONCERNED WAS THAT WE HAD SEEN EVIDENCE OF SUCH CONFUSION IN SOCIAL MEDIA WITH PEOPLE POSTING --

**MS. ROBERTS:** OBJECTION, HEARSAY.

**THE COURT:** SUSTAINED.

**BY MR. PISTORINO:**

**Q.** THE BOARD -- WAS THE BOARD CONCERNED --

**A.** THE BOARD WAS CONCERNED. I WAS CONCERNED.

**Q.** OKAY.

ONCE TECHSHOP BECAME AWARE OF MR. RASURE'S INTENTION TO OPEN THE SAN FRANCISCO FACILITY UNDER THE TECHSHOP 2.0 NAME, DID THE BOARD DECIDE TO TAKE SOME STEPS WITH REGARD TO THAT?

**A.** WE DID.

**Q.** AND IF YOU TURN IN YOUR BOOK TO TX324 -- I'M SORRY, 334, WHICH HAS ALREADY BEEN ADMITTED, I BELIEVE.

**THE CLERK:** I DON'T HAVE 334.

**MR. PISTORINO:** WE WILL MOVE TO HAVE 334 ADMITTED.

**THE COURT:** ANY OBJECTION? I THINK IT'S THE SAME VERSION OR A DIFFERENT VERSION --

**MS. ROBERTS:** NO OBJECTION.

**THE COURT:** ADMITTED.

(TRIAL EXHIBIT 334 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**MR. PISTORINO:** WE'RE GOING TO HAVE THE SAME DOCUMENT UNDER FIVE DIFFERENT NUMBERS.

**BY MR. PISTORINO:**

**Q.** 334 IS -- THIS IS A LETTER FROM TECHSHOP DATED FEBRUARY 14TH TO MR. BYERS AND MR. RASURE ABOUT MR. RASURE'S OPENING THE TECHSHOP -- FORMER FACILITY OF TECHSHOP UNDER THE NAME TECHSHOP 2.0, RIGHT?

**A.** YES.

**Q.** DID THE BOARD HAVE DISCUSSIONS ABOUT HOW TO REACT OR RESPOND TO MR. RASURE'S ANNOUNCEMENT?

**A.** WE DID.

**Q.** WHAT WAS THE BOARD DISCUSSING?

**A.** THE BOARD WAS -- THE OTHER MEMBERS OF THE BOARD TOLD ME THAT THEY WERE EQUALLY SHOCKED AS I WAS. WE DISCUSSED WHAT TO DO ABOUT IT.

**MS. ROBERTS:** OBJECTION, THIS IS HEARSAY AS WELL.

**MR. PISTORINO:** I THINK, IN FACT, IT IS ACTUALLY -- I THINK IT IS LEGAL STEPS --

**THE COURT:** SO IF IT'S BEING... OVERRULED. I THINK WE HAVE TO BE CAREFUL NOT TO SAY WHAT OTHERS WERE SAYING, BUT I THINK WE CAN TALK ABOUT THE DISCUSSIONS GENERALLY.

**THE WITNESS:** DISCUSSIONS OF THE BOARD INDICATED THAT WE WERE, AS A GROUP WE WERE SHOCKED, AND WE NEEDED TO DETERMINE WHAT THE APPROPRIATE COURSE OF ACTION WAS.

AT ABOUT THAT TIME, WE WERE APPROACHED BY YOU, MR. PISTORINO, WITH RESPECT TO THE POSSIBILITY OF LEGAL ACTION ASSOCIATED WITH THE USE OF THE TRADEMARK.

**BY MR. PISTORINO:**

**Q.** BEFORE WE GET TO THERE, I WANT TO GO TO YOUR LETTER HERE -- OR THE LETTER HERE WHERE IT SAYS AT THE BOTTOM ON FEBRUARY 14TH.

IT SAYS, "ALSO BE ADVISED THAT MR. RASURE HAS NO RIGHTS TO THE POSSESSION OR USE OF THE ASSETS OF TECHSHOP, INC. OR TECHSHOP SOMA", I GUESS THAT IS SOUTH OF MARKET, RIGHT, "INCLUDING BUT NOT LIMITED TO", AND THEN IT LISTS TRADEMARKS.

DO YOU SEE THAT?

**A.** THAT'S CORRECT.

**Q.** WHAT DID THE BOARD INTEND TO INDICATE TO MR. RASURE WHEN IT SAID HE HAD NO RIGHTS TO USE THE TECHSHOP TRADEMARKS?

**A.** WE INTENDED TO INDICATE THAT HE HAD NO RIGHT, NO -- THAT WE HAD NOT GRANTED HIM ANY PERMISSION TO USE ANY OF THESE ITEMS INCLUDING TRADEMARKS.

**Q.** OKAY. OKAY.

IF YOU CAN TURN IN YOUR BOOK TO 337.

(DISPLAYED ON SCREEN.)

THE DAY AFTER THE FEBRUARY 14TH LETTER, AN ARTICLE APPEARED IN THE *SAN FRANCISCO CHRONICLE* ABOUT MR. RASURE OPENING TECHSHOP 2.0, RIGHT?

**A.** CORRECT.

**Q.** DID YOU BECOME AWARE OF THAT?

**A.** I DID.

**Q.** WHAT WAS YOUR REACTION TO SEEING AN ARTICLE IN THE *SAN FRANCISCO CHRONICLE* ABOUT THE THING THE BOARD WAS COMPLAINING ABOUT THE DAY BEFORE?

**A.** I WAS SHOCKED.

**Q.** OKAY.

DID IT HAVE ANY INDICATION THAT MR. RASURE WAS TAKING TECHSHOP'S NOTICE OF ITS TRADEMARK RIGHTS SERIOUSLY?

**A.** I SAW NO INDICATION THAT HE WAS.

**Q.** OKAY. HE DIDN'T CALL UP TECHSHOP AND SAY, I'M GOING TO STOP DOING IT, ANYTHING LIKE THAT?

**A.** I RECEIVED NO SUCH PHONE CALL OR EMAIL.

**Q.** OKAY.

DID YOU HAVE ANY SPECIFIC REACTION TO THE FACT THAT MR. RASURE APPEARED IN THE PICTURE IN THE *CHRONICLE* RIGHT UNDER THE NAME TECHSHOP?

**A.** YES, I DID.

**Q.** WHAT WAS YOUR REACTION?

**A.** OUTRAGE.

**Q.** OKAY.

TURN IN YOUR BOOK TO TX83.

**THE CLERK:** WHAT WAS THE NUMBER?

**MR. PISTORINO:** TX83.

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** AGAIN, THIS IS A LETTER WE HAVE SEEN MULTIPLE TIMES.

DID THE BOARD ARRIVE AT A DECISION IN TERMS OF WHETHER OR NOT TO ENFORCE ITS TRADEMARK RIGHTS?

**A.** WE DID.

**Q.** WHAT WAS THE DECISION?

**A.** THE DECISION WAS TO ENFORCE OUR TRADEMARK RIGHTS.

**Q.** WHY WOULD THE BOARD ENFORCE ITS TRADEMARK RIGHTS?

**A.** THE TRADEMARK ALONG WITH THE OTHER ASSETS OF THE COMPANY NEEDED TO BE PROTECTED AS WE WENT INTO CHAPTER 7 BANKRUPTCY. WE VIEWED THAT AS AN IMPORTANT RESPONSIBILITY OF THE BOARD DURING THIS TRANSITION. SO WE FELT THAT IT WAS IMPORTANT THAT WE PROTECT THAT ASSET SO THAT THE TRUSTEE COULD THEN DEAL WITH IT.

**Q.** OKAY.

NOW, AFTER TECHSHOP FILED THE LAWSUIT AGAINST MR. RASURE FOR USING TECHSHOP 2.0, DID YOU BECOME AWARE THAT MR. RASURE HAD CHANGED, AT LEAST SOMEWHAT, THE NAME THAT HE WAS USING?

**A.** YES, I WAS.

**Q.** IF YOU COULD TURN IN YOUR BOOK TO 327.

(DISPLAYED ON SCREEN.)

**A.** YES.

**Q.** AND DID YOU BECOME AWARE THAT MR. RASURE WAS USING... USING THE NAME THESHOP.BUILD?

**A.** I DID.

**Q.** AND DID YOU BECOME AWARE THAT HE WAS SORT OF USING THOSE COLORS THAT TECHSHOP WAS USING?

**A.** I DID.

**Q.** AND THE GEAR PART FOR THE "O"?

**A.** YES.

**Q.** WHAT WAS YOUR REACTION TO SEEING THAT? TELL US WHAT YOU WERE THINKING.

**A.** THE RISK OF USING THE SAME TERM OVER AND OVER AGAIN, I WAS OUTRAGED.

IT WAS -- THE GEAR PARTICULARLY, WITH THE ELEVATED GEAR AS "O" AND THE WORD "SHOP" WAS EXTREMELY RECOGNIZABLE COMPONENT OF TECHSHOP'S IDENTITY.

THE FACT THAT THE COLORS WERE THE SAME WAS AN EXTREMELY RECOGNIZABLE FACTOR, AND THE FACT THERE WAS ONLY ONE LETTER DIFFERENCE IN THE NAME BEFORE THE DOT CERTAINLY DIDN'T DO ANYTHING TO DIFFERENTIATE THEM.

**Q.** I'M JUST CURIOUS, DID YOU EVER HEAR FROM MR. NEWTON, HIS STORY ABOUT HOW HE CAME UP WITH TEN SPOKES?

**A.** I ACTUALLY DID NOT.

**Q.** YOU NEVER HEARD HIS STORY?

**A.** I HAVE NOT.

**Q.** OKAY. WE ALL DID.

NOW, NOT LONG AFTER THE LAWSUIT WAS FILED HERE, TECHSHOP DID, IN FACT, DECLARE BANKRUPTCY, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND DURING THIS PERIOD HERE, BETWEEN THE CLOSING OF THE STORES IN NOVEMBER AND THE FILING FOR BANKRUPTCY PROTECTION IN, I THINK IT'S FEBRUARY 26, 2017, TECHSHOP WASN'T REALLY USING THE TRADEMARKS, AT LEAST ON ITS STORES, CORRECT?

**A.** THE TRADEMARKS WERE STILL PRESENT ON THE STORES, BUT THE STORES WERE CLOSED.

**Q.** OKAY.

DID TECHSHOP, DURING ANY OF THAT TIME, DECIDE THAT'S IT, WE ARE GOING TO ABANDON THOSE TRADEMARKS, WE AREN'T GOING TO USE THEM AGAIN?

**A.** WE DID NOT.

**Q.** DID TECHSHOP HAVE ANY THOUGHT OF LIKE WHAT MIGHT HAPPEN TO THEM IN THE BANKRUPTCY PROCEEDINGS?

**A.** WE BELIEVED THAT THEY WERE ASSETS OF THE COMPANY. AND THE OUTCOME OF THAT WE THOUGHT THEY POTENTIALLY MIGHT BE A SALABLE ASSET DURING THE BANKRUPTCY PROCEEDING WHERE THEY MIGHT BE USED IN SOME OTHER FASHION, PARTICULARLY IN REGARDS TO THE CONTINUING TO EXIST LICENSING AGREEMENTS WITH OFFSHORE ENTITIES.

**Q.** YOU MENTIONED BEFORE THAT YOU HAD BEEN CIO OF INTEL, RIGHT?

**A.** THAT'S CORRECT.

**Q.** IN THAT ROLE, HAD YOU DEVELOPED FAMILIARITY WITH CRM SYSTEMS?

**A.** YES. CRM IS CUSTOMER RELATIONSHIP MANAGEMENT SYSTEM. THESE ARE THE SOFTWARE SYSTEMS THAT ARE TYPICALLY USED TO PROVIDE A DATABASE OF CUSTOMERS, THEIR CONTACT INFORMATION, WHAT'S BEEN SOLD TO THEM, THEIR STATUS AS A CUSTOMER, AND TO COMMUNICATE WITH THEM.

**Q.** AND DID YOU KNOW WHETHER OR NOT TECHSHOP'S CRM SYSTEM WITH THE TECHSHOP CUSTOMER EMAIL LIST WAS STORED ON COMPUTERS AT TECHSHOP SAN FRANCISCO LOCATION?

**A.** YES. I KNEW THAT IT WAS.

**Q.** OKAY.

WAS THERE LIKE A PASSWORD TO PROTECT IT; YOU COULDN'T -- YOU HAD TO LOG ON TO THE NETWORK FIRST BEFORE YOU --

**A.** THE SYSTEM WAS PASSWORD PROTECTED, BOTH TO GET ON THE NETWORK AND ALSO TO GET INTO THE CRM SYSTEM.

**Q.** OKAY.

SO MR. RASURE ANNOUNCED HIS OPENING TO OPEN THE STORE THERE IN FEBRUARY, RIGHT?

SOMETIME IN -- AFTER MARCH, MR. RASURE HAD ACCESS TO THE TECHSHOP FACILITY, DID YOU -- YOUR FAMILY START GETTING EMAILS FROM MR. RASURE?

**A.** WE DID.

**Q.** HOW?

**MS. ROBERTS:** OBJECTION, CALLS FOR SPECULATION.

**THE COURT:** OVERRULED.

**THE WITNESS:** I HAD PREVIOUSLY BEEN COMMUNICATING WITH MR. RASURE DIRECTLY TO MY PERSONAL EMAIL ACCOUNT.

**BY MR. PISTORINO:**

**Q.** HE HAD YOUR EMAIL ADDRESS?

**A.** HE HAD MY EMAIL ADDRESS AS PART OF OUR NEGOTIATING PROCESS.

HOWEVER, IN THE TIME PERIOD THAT YOU DESCRIBE, I STARTED RECEIVING AND OTHER MEMBERS OF MY FAMILY STARTED RECEIVING GENERAL MARKETING TYPE COMMUNICATION MESSAGES THROUGH EMAIL FROM MR. RASURE AND FROM THE COMPANY THAT HE WAS NOW RUNNING.

**Q.** YOU MENTIONED EARLIER THAT YOUR WIFE -- WIFE'S EMAIL CONTACT HAD BEEN STORED IN THE TECHSHOP CRM SYSTEM.

**A.** THAT'S CORRECT. AS PART OF THE DEAL WHEN I MADE AN INVESTMENT IN THE COMPANY, I GOT A LIFETIME MEMBERSHIP FOR MY WIFE AND MY TWO SONS AND THEIR EVENTUAL SPOUSES.

MY WIFE SPECIFICALLY WAS RECEIVING THOSE EMAILS. MR. RASURE HAD NO WAY TO EVER HAVE MY WIFE'S EMAIL ADDRESS OTHER THAN AS A MEMBER OF TECHSHOP.

**Q.** TO YOUR KNOWLEDGE, YOUR WIFE WASN'T TALKING TO MR. RASURE, WAS SHE?

**A.** SHE WAS NOT.

**Q.** YOU DIDN'T SEND MR. RASURE YOUR WIFE'S EMAIL ADDRESS, DID YOU?

**A.** I DID NOT.

**Q.** OKAY. AFTER THE BANKRUPTCY PETITION WAS FILED, YOU CAME TO UNDERSTAND THAT, FOR EXAMPLE, MS. KAELIN TOOK OVER HER ROLE AS A TRUSTEE FOR TECHSHOP, CORRECT?

**A.** CORRECT.

**Q.** THEN THERE WERE SOME PROCEEDINGS, SOME LEGAL PROCEEDINGS REGARDING THAT, CORRECT?

**A.** THAT'S CORRECT.

**Q.** DID YOU ATTEND ANY OF THOSE?

**A.** I ATTENDED THE FIRST TRUSTEE HEARING, BANKRUPTCY HEARING IN SAN JOSE.

**Q.** DOWN IN SAN JOSE.

AND WHEN YOU WERE THERE, DID YOU SEE MR. RASURE THERE?

**A.** I DID. I SAT SILENT THROUGHOUT THE COURSE OF THE PROCEEDING AND THEN AT THE END OF THE PROCEEDINGS, I WAKED OUT OF THE ROOM. I WAS IN THE VESTIBULE OF THE HEARING ROOM, WHEN MR. RASURE EXITED AND I INTRODUCED MYSELF TO HIM.

**Q.** YOU HADN'T MET HIM PERSONALLY AT THAT POINT?

**A.** I HAD NEVER MET HIM FACE-TO-FACE. I HAD OBVIOUSLY TALKED TO HIM ON THE PHONE, BUT WE NEVER MET FACE-TO-FACE.

**Q.** DID YOU HAVE A DISCUSS WITH MR. RASURE?

**A.** WE DID.

**Q.** CAN YOU DESCRIBE IT FOR US? WHAT HAPPENED? WHAT WAS

SAID?

**A.** CERTAINLY.

MR. RASURE CAME OUT OF THE MEETING ROOM. I INTRODUCED MYSELF. HE INTRODUCED HIMSELF. I SAID, COULD WE TALK FOR A MINUTE.

AND STANDING THERE IN THE VESTIBULE, HE SAID, YES. THEN WE STARTED TO WALK TOWARDS THE HALLWAY, AND I STARTED THE CONVERSATION.

I SAID, I THINK IT'S NOT PRODUCTIVE FOR YOUR BUSINESS OR FOR ANYBODY INVOLVED IN THIS TO POST INFLAMMATORY SOCIAL MEDIA MESSAGES. MY -- I THINK WE WOULD ALL BE BETTER OFF IF WE DIDN'T DO THAT.

AT THAT POINT MR. RASURE STARTED EXPRESSING A VERY HIGH DEGREE OF HOSTILITY, WAS VERY AGITATED AND VERY DEMONSTRATIVE. I SUGGESTED THAT WE TAKE IT OUTSIDE BECAUSE THERE WERE A LOT OF PEOPLE IN THE HALLWAY. SO WE WALKED OUT INTO THE PLAZA OUTSIDE THE COURTHOUSE BUILDING.

**Q.** SO LET ME MAKE SURE I'M UNDERSTANDING IT.

THIS ENCOUNTER WITH MR. RASURE, THIS OCCURRED INSIDE THE FEDERAL COURTHOUSE IN SAN JOSE; IS THAT RIGHT?

**A.** IT STARTED THERE, YES.

**Q.** OKAY. AND I THINK YOU MENTIONED THAT HE RESPONDED WITH A, I THINK YOU SAID HIGH DEGREE OF HOSTILITY.

WHAT DOES THAT MEAN? WHAT WAS HAPPENING AS BEST YOU CAN REMEMBER IT, SIR?

**A.** HE, YOU KNOW, EXPRESSED HIS ANGER VERBALLY, MADE A NUMBER OF VERY DEROGATORY COMMENTS ABOUT MYSELF AND THE OTHER MEMBERS OF THE TECHSHOP MANAGEMENT TEAM. EXPRESSED HIS FRUSTRATION AND AGGRAVATION AND ANGER ABOUT THE COURSE OF THE NEGOTIATION AND THINGS THAT HAD HAPPENED SUBSEQUENT TO THAT, INCLUDING THIS COURT CASE.

**Q.** DID MR. RASURE RAISE HIS VOICE IN THIS ENCOUNTER WITH YOU?

**A.** IT WAS AN INTENSE CONVERSATION WHEN WE WERE IN THE HALLWAY. WHEN WE GOT OUT ONTO THE PLAZA, IT GOT MORE INTENSE. THEN MR. RASURE RAISED HIS VOICE SUBSTANTIALLY.

I BASICALLY LISTENED AND RESPONDED QUIETLY TRYING TO, YOU KNOW, HAVE A RATIONAL DISCUSSION ABOUT THE SITUATION. HE WAS EXTREMELY EMOTIONAL AND AGITATED, AND THE CONVERSATION GOT QUITE LOUD.

**Q.** DID YOU HAVE A BELIEF WHETHER OR NOT -- DID YOU HAVE A FEAR THAT MR. RASURE MIGHT LOSE CONTROL OF HIS EMOTIONS?

**A.** I DIDN'T HAVE ANY FEAR OF PHYSICAL INTERACTION, BUT IT WAS PRETTY CLEAR HE HAD ALREADY LOST CONTROL OF HIS EMOTIONS FROM A VERBAL STANDPOINT. AT LEAST THAT WAS MY PERCEPTION.

AT ONE POINT IN THE CONVERSATION AFTER PROBABLY FIVE MINUTES OF THIS, A SECURITY GUARD THAT WAS STANDING OUTSIDE THE DOOR OF THE COURTHOUSE CAME OVER, AND VERY ADAMANTLY SAID, YOU GUYS NEED TO KNOCK IT OFF, OR SOMETHING TO THAT EFFECT. AND MY RESPONSE WAS TO SAY, HEY, WE'RE COOL. WE'LL TONE IT DOWN. HER RESPONSE WAS, I'M NOT TALKING TO YOU.

SHE SAID THAT WE NEEDED TO GET OFF OF THE FEDERAL COURTHOUSE PROPERTY OR SHE WOULD HAVE TO CALL --

**MS. ROBERTS:** OBJECTION, HEARSAY.

**THE COURT:** IT IS. SUSTAINED.

LADIES AND GENTLEMEN, THE PART ABOUT WHAT THE SECURITY GUARD SAID IS STRICKEN.

**BY MR. PISTORINO:**

**Q.** AND DID THE INCIDENT THEN END THERE, SIR?

**A.** NO. WE WALKED -- THE SECURITY GUARD -- I HEARD THE SECURITY GUARD SAY WE NEEDED TO GET OFF THE PROPERTY. SO WE WALKED ACROSS THE STREET.

THE CONVERSATION CONTINUED AT THE SAME LEVEL OF ANIMATION. MR. RASURE WAS VERY DEMONSTRATIVE WITH HIS ARMS. I NEVER FELT LIKE I WAS PHYSICALLY THREATENED, BUT HE WAS VERY, VERY ANGRY AND HOSTILE TO ME. AND EVENTUALLY I SAID, THIS IS NOT PRODUCTIVE, AND I LEFT.

**Q.** YOU SAID THE CONVERSATION CONTINUED. I THINK YOU SAID IT WAS VERY LOUD, LEVEL OF DISCUSSION.

WERE YOU SCREAMING AT MR. RASURE?

**A.** NO, I WAS NOT. I DID NOT RAISE MY VOICE.

**Q.** WAS HE SCREAMING AT YOU?

**A.** I WOULDN'T CALL IT SCREAMING, BUT HE WAS SPEAKING VERY, VERY LOUDLY.

**Q.** OKAY. OKAY.

**MR. PISTORINO:** NOTHING FURTHER AT THIS TIME.

**THE COURT:** ANY CROSS-EXAMINATION?

**MS. ROBERTS:** YES, YOUR HONOR.

(BINDERS HANDED TO COUNSEL AND WITNESS.)

**CROSS-EXAMINATION**

**BY MS. ROBERTS:**

**Q.** GOOD AFTERNOON, MR. BUSCH.

**A.** GOOD AFTERNOON.

**Q.** SO YOU WERE ONE OF THE EARLIEST INVESTORS IN TECHSHOP, CORRECT?

**A.** THAT IS CORRECT.

**Q.** YOU WERE ONE OF THE LARGER INDIVIDUAL INVESTMENTS IN THE COMPANY?

**A.** YES.

**Q.** YOU WERE ON THE BOARD OF DIRECTORS OF TECHSHOP?

**A.** YES.

**Q.** YOU WERE INVOLVED IN THE NEGOTIATIONS BETWEEN TECHSHOP AND MR. RASURE FOLLOWING THE CLOSURE OF TECHSHOP --

**A.** YES.

**Q.** -- IS THAT RIGHT?

YOU WERE INCLUDED ON COMMUNICATIONS WITH MR. RASURE?

**A.** MANY OF THEM.

**Q.** MANY WRITTEN COMMUNICATIONS WITH MR. RASURE, RIGHT?

YOU SAW DRAFT AGREEMENTS, RIGHT?

**A.** YES.

**Q.** I THINK YOU LOOKED AT DRAFT ASSET PURCHASE AGREEMENT

DURING YOUR TESTIMONY FROM TECHSHOP'S COUNSEL, RIGHT?

**A.** YES.

**Q.** YOU TESTIFIED ABOUT THE MOU; YOU SAW THE MEMORANDUM OF UNDERSTANDING DATED DECEMBER 1ST, 2017, RIGHT?

**A.** YES.

**Q.** YOU SAW PUBLIC ANNOUNCEMENTS OF THE MEMORANDUM OF UNDERSTANDING, CORRECT?

**A.** YES.

**Q.** AND IN MANY OF THESE DOCUMENTS, WHICH WE HAVE BEEN THROUGH IN THIS TRIAL AND THE JURY HAS SEEN, MR. RASURE'S COMPANY IS REFERRED TO AS TECHSHOP 2.0, RIGHT?

**A.** MR. RASURE REFERRED TO THE COMPANY THAT WAY, YES.

**Q.** AND TECHSHOP INDIVIDUALS REFERRED TO MR. RASURE'S COMPANY AS TECHSHOP 2.0?

**A.** ON OCCASION, YES.

**Q.** IN THE DOCUMENTATION, RIGHT?

**A.** ON OCCASION, YES.

**Q.** YOU SAW THAT IN COMMUNICATIONS THAT YOU WERE INCLUDED ON?

**A.** YES.

**Q.** RIGHT?

AND YOU HAD THE OPPORTUNITY TO REVIEW AT LEAST SOME OF THE PUBLIC ANNOUNCEMENTS BEFORE THEY WENT OUT, RIGHT?

**A.** I DID NOT HAVE THE OPPORTUNITY TO REVIEW ANY PUBLIC ANNOUNCEMENTS THAT MR. RASURE MADE. THEY WERE MADE WITHOUT MY REVIEW PRIOR TO THEIR ANNOUNCEMENT.

**Q.** YOU HAD THE OPPORTUNITY TO REVIEW TECHSHOP'S OWN ANNOUNCEMENTS BEFORE THEY WENT OUT?

**A.** YES. THAT IS CORRECT.

**Q.** CAN YOU PLEASE TURN TO TX597, WHICH IS ALREADY ADMITTED.

(DISPLAYED ON SCREEN.)

THIS WILL BE IN THE BINDER THAT I GAVE YOU.

**A.** YES.

**Q.** THIS IS AN EMAIL FROM DANIEL WOODS ON NOVEMBER 29TH, 2017, AND YOU ARE LISTED ON THE "TO" LINE, CORRECT?

**A.** YES. THAT'S CORRECT.

**Q.** AND THERE'S AN ATTACHMENT INDICATED ON THE -- ON THIS DOCUMENT, CORRECT?

**A.** YES, THAT'S CORRECT.

**Q.** AND MR. WOODS' EMAIL SAYS TO THE RECIPIENTS OF THE EMAIL, "COMMENTS/EDITS WELCOME". ISN'T THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** THEN IF YOU TURN TO THE NEXT PAGE OF THE EXHIBIT YOU WILL SEE THE ATTACHMENT THAT IT HAS THE TITLE MESSAGE FROM DAN WOODS.

**A.** THAT'S CORRECT.

**Q.** IN THIS DRAFT MESSAGE FROM DAN WOODS THAT MR. WOODS SHARED WITH YOU, HE SAYS, "I AM EXTREMELY PLEASED TO ANNOUNCE THAT TECHSHOP HAS REACHED AN AGREEMENT WITH A THIRD PARTY TO ACQUIRE ALL OF THE COMPANY'S ASSETS AND SECURED DEBT WITH PLANS TO REOPEN AS MANY STORES AS POSSIBLE UNDER THE NAME

TECHSHOP 2.0 BEGINNING AS EARLY AS NEXT WEEK".

ISN'T THAT RIGHT?

**A.** YES, THAT'S WHAT IT SAYS.

**Q.** MR. WOODS, IN HIS EMAIL, INVITED COMMENTS AND EDITS TO THIS DRAFT MESSAGE?

**A.** YES.

**Q.** TURN TO TX921, WHICH IS ALREADY ADMITTED.

(DISPLAYED ON SCREEN.)

**A.** YES.

**Q.** THE TOP EMAIL ON THIS CHAIN IS FROM MR. RASURE ON NOVEMBER 30TH, 2017. AND YOU'RE LISTED ON THE "CC" LINE.

DO YOU SEE THAT?

**A.** YES.

**Q.** IF YOU TURN TO THE LAST -- THE SECOND PAGE, WHICH WILL SHOW THE EARLIEST EMAIL IN THE CHAIN. THAT'S MR. WOODS' EMAIL INVITING COMMENTS AND EDITS ON HIS DRAFT MESSAGE FROM DAN WOODS, RIGHT?

**A.** YES.

**Q.** AND JUST ABOVE HIS INITIAL EMAIL IS YOUR RESPONSE TO HIS EMAIL, CORRECT?

**A.** GIVE ME A MOMENT TO READ IT.

(PAUSE IN THE PROCEEDINGS.)

YES, THAT'S MY COMMENT.

**Q.** AND IN YOUR COMMENT, THE SECOND PARAGRAPH TO DAN R., AS IN DAN RASURE, YOU ASK HIM, "HAVE YOU SETTLED FIRMLY ON TECHSHOP

2.0 AS THE NAME YOU WILL REOPEN UNDER"?
RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND YOU CONCLUDE THAT PARAGRAPH WITH TELLING MR. RASURE, "TOTALLY YOUR CALL, I'M JUST ASKING".
RIGHT?

**A.** THAT IS WHAT IT SAYS.

**Q.** TURN NOW PLEASE TO TX616.

**MS. ROBERTS:** WE MOVE TO ADMIT THIS DOCUMENT INTO EVIDENCE.

**MR. PISTORINO:** NO OBJECTION.

**THE COURT:** 616?

**MS. ROBERTS:** YES.

**THE COURT:** IT'S ADMITTED.

(TRIAL EXHIBIT 616 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MS. ROBERTS:**

**Q.** THIS IS AN EMAIL FROM YOU TO MR. RASURE ON DECEMBER 3RD, 2017, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND THE SUBJECT LINE IS "YOUR WELCOME TO TECHSHOP 2.0 EMAIL", RIGHT?

**A.** THAT'S CORRECT.

**Q.** IN THIS EMAIL YOU PROVIDE COMMENTS TO MR. RASURE ON HIS WELCOME TO TECHSHOP 2.0 EMAIL; ISN'T THAT RIGHT?

**A.** I DO.

**Q.** ON THE COMMENTS, THE COMMENTS THAT YOU PROVIDE ON HIS WELCOME EMAIL, YOU DON'T COMMENT ON THE USE OF THE NAME TECHSHOP 2.0, RIGHT?

**A.** I DID NOT IN THIS MESSAGE, NO.

**Q.** YOU DIDN'T TELL HIM YOU COULD ONLY USE IT FOR ANY CERTAIN -- ANY LEGAL ENTITY PURPOSES IN THIS EMAIL, RIGHT?

**A.** THAT WAS NOT THE PURPOSE OF THIS EMAIL.

**Q.** TURN NOW, PLEASE, TO TX612, WHICH IS ALREADY ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS AN EMAIL FROM YOU TO MR. RASURE ON DECEMBER 3RD, 2017, RIGHT?

**A.** THAT'S CORRECT.

**Q.** THE SUBJECT LINE OF THE EMAIL IS FORWARD REV 2 OPEN LETTER TO STAKEHOLDERS.

DO YOU SEE THAT?

**A.** I DO.

**Q.** YOU TELL MR. RASURE YOU ARE SHARING THIS MESSAGE WHICH WILL BE POSTING ON VARIOUS RELEVANT SOCIAL MEDIA SITES LATER TODAY, RIGHT?

**A.** CORRECT.

**Q.** YOU ALSO COMMENT THAT YOUR MESSAGE THAT YOU DRAFTED AND SHARED DRAWS A CLEAR DISTINCTION BETWEEN THE TECHSHOP, INC. TEAM AND YOUR NEW TEAM AND SPEAKS ONLY FOR US.

ISN'T THAT RIGHT?

**A.** YES, THAT'S WHAT I SAID.

**Q.** AT THE BEGINNING OF -- THE BOTTOM OF THE FIRST PAGE OF THIS EXHIBIT YOU WILL SEE THE HEADING "OPEN LETTER TO TECHSHOP, INC. STAKEHOLDERS".

**A.** THAT'S CORRECT.

**Q.** THAT IS WHERE THE LETTER YOU DRAFTED BEGINS?

**A.** RIGHT.

**Q.** TURN NOW TO PAGE 4 OF THAT EXHIBIT.

**A.** OKAY.

**Q.** IN THE SECOND PARAGRAPH OF YOUR OPEN LETTER TO STAKEHOLDERS, YOU WRITE: "BEFORE THE DEAL CAN ACTUALLY BE CLOSED BY SELLING THE ASSETS OF TECHSHOP, INC. TO THE NEW COMPANY NAMED BY MR. RASURE AS TECHSHOP 2.0", AND THEN YOU PROCEED TO TALK ABOUT WHAT NEEDS TO HAPPEN UNDER THE BYLAWS, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND SO YOU ARE REFERRING TO MR. RASURE'S COMPANY AS TECHSHOP 2.0; ISN'T THAT RIGHT?

**A.** I EXPLICITLY REFERRED TO IT IN THAT MANNER TO AVOID CONFUSION TO THE RECIPIENTS OF THIS MESSAGE BECAUSE THERE WAS CONFUSION THAT WE WERE CONCERNED ABOUT BETWEEN THE TWO COMPANIES.

**Q.** MY QUESTION IS, ARE YOU -- THE TECHSHOP 2.0 RIGHT HERE, YOU ARE REFERRING TO MR. RASURE'S COMPANY, RIGHT?

**A.** I AM.

**Q.** AND YOU ARE REFERRING TO HIS COMPANY AS TECHSHOP 2.0 IN A DRAFT MESSAGE THAT YOU WERE GOING TO POST ON VARIOUS RELEVANT SOCIAL MEDIA SITES, RIGHT?

**A.** MR. RASURE --

**Q.** YES OR NO.

**A.** YES.

**Q.** LET'S TURN TO TX -- LET'S TALK ABOUT THE TESTIMONY YOU PROVIDED REGARDING YOUR EFFORTS TO VERIFY THAT MR. RASURE COULD DO THE DEAL.

DO YOU RECALL STATING THAT AT SOME POINT IN TIME YOU WERE GETTING INCREASINGLY SKEPTICAL AS TO WHETHER THE DEAL COULD HAPPEN?

**A.** I AM SURE I DID, YES.

**Q.** WE LOOKED AT SEVERAL EMAILS AND I CAN POINT YOU TO THEM IF YOU DON'T RECALL, BUT THEY WERE IN THE DECEMBER 10TH, DECEMBER 11TH TIME FRAME. DOES IT SOUND RIGHT?

**A.** SOUNDS CORRECT.

**Q.** AND EVEN THOUGH YOU WERE GETTING INCREASINGLY SKEPTICAL THAT THE DEAL WOULD HAPPEN, TECHSHOP KEPT NEGOTIATING WITH MR. RASURE FOR ANOTHER ROUGHLY TWO MONTHS, RIGHT?

**A.** WE DID.

**Q.** AND IN THOSE LATER CONVERSATIONS AFTER YOU'VE BECOME SKEPTICAL OF WHETHER HE COULD DO THE DEAL, THE COMMUNICATIONS BACK AND FORTH BETWEEN MR. RASURE AND TECHSHOP STILL REFER TO HIS COMPANY AS TECHSHOP 2.0, RIGHT?

**A.** WE REFERRED TO THE COMPANY BY THE NAME HE HAD INCORPORATED IT AS.

**Q.** TURN, PLEASE, TO TX919, WHICH IS ALREADY ADMITTED.

(DISPLAYED ON SCREEN.)

YOU WILL SEE HERE THERE IS THE EMAIL FROM MR. RUTTUM ON DECEMBER 12TH, 2017 CANCELING THE MEMORANDUM OF UNDERSTANDING?

**A.** YES.

**Q.** AND THIS IS THE EMAIL YOU'VE ALREADY TESTIFIED ABOUT, RIGHT?

**A.** CORRECT.

**Q.** YOU AUTHORIZED OR APPROVED MR. RUTTUM TO SEND THIS TERMINATION EMAIL?

**A.** AS A MEMBER OF THE BOARD, YES, I DID.

**Q.** YOU WERE INVOLVED IN THE DECISION TO SEND IT?

**A.** YES, I WAS.

**Q.** IN THIS EMAIL, MR. RUTTUM REFERS TO MR. RASURE'S GROUP AS TECHSHOP 2.0, RIGHT?

**A.** THAT IS THE NAME HE WAS INCORPORATED UNDER, YES.

**Q.** THAT'S THE NAME YOU REFERRED TO -- TECHSHOP REFERRED TO HIM AS IN THIS CORRESPONDENCE, RIGHT?

**A.** YOUR GROUP, TECHSHOP 2.0, LLC, THE NAME HE HAD INCORPORATED IT UNDER, YES.

**Q.** AND IN THE EMAIL CANCELING THE MEMORANDUM OF UNDERSTANDING, TECHSHOP'S ATTORNEY, MR. RUTTUM, DID NOT TELL MR. RASURE TO STOP USING THE NAME TECHSHOP 2.0, RIGHT?

**A.** HE DID NOT.

**Q.** AS YOU'VE ALREADY TESTIFIED AND THE JURY HAS HEARD, EVEN THOUGH THE MEMORANDUM OF UNDERSTANDING WAS TERMINATED, NEGOTIATIONS CONTINUED AFTER DECEMBER 12TH, 2017, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND, IN FACT, YOU PUBLICLY COMMENTED ON THE TERMINATION THE DAY AFTER, ON DECEMBER 13TH, IN A BLOG ON ADAFRUIT.COM, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND IN THAT BLOG POST YOU SAID THAT IN THE PAST FEW DAYS YOU HAD BEEN APPROACHED BY OTHER PARTIES, BUT WE ARE -- AND WE ARE ENTERTAINING DISCUSSIONS WITH THEM. WE WILL CONTINUE TO TALK TO MR. RASURE AS HE MOVES FORWARD.

IS THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** SO IN THIS BLOG POST YOU WERE TELLING THE WORLD YOU WERE CONTINUING TO --

**A.** YES.

**Q.** -- COMMUNICATE WITH MR. RASURE.

YOU ALSO STATED IN THIS BLOG POST, "WE DON'T WISH TO CAST ANY ASPERSIONS ON MR. RASURE'S INTENTIONS OR ABILITY TO RUN A TECHSHOP 2.0 BUSINESS", RIGHT?

**A.** I BELIEVE THAT IS WHAT I SAID, YES.

**Q.** TURN, PLEASE, TO TX612, WHICH IS ALREADY ADMITTED.

**A.** YES.

(DISPLAYED ON SCREEN.)

**Q.** THIS IS YOUR OPEN LETTER TO TECHSHOP, INC. STAKEHOLDERS, RIGHT?

**A.** YES.

**Q.** ISN'T IT TRUE, AND DIDN'T YOU ACKNOWLEDGE IN YOUR OPEN LETTER TO STAKEHOLDERS THAT YOU BELIEVED THAT TECHSHOP MEMBERS WERE FRUSTRATED WITH TECHSHOP?

**A.** I WOULD HAVE TO READ THIS TO SEE THAT, BUT, YES, I KNOW THEY WERE FRUSTRATED WITH TECHSHOP.

**Q.** IF YOU LOOK ON PAGE 4 OF THE EXHIBIT UNDERNEATH THE HEADING "NEXT STEPS".

**A.** YES.

**Q.** AND YOU SAY IN THIS SECTION, "AS A TECHSHOP, INC. MEMBER AND AS A DIRECTOR, I FULLY UNDERSTAND THE FRUSTRATION MEMBERS HAVE EXPERIENCED AS A RESULT OF BEING LOCKED OUT OF STORES, BEING UNABLE TO COMPLETE PROJECTS, AND NOT HAVING ACCESS TO YOUR MATERIALS AND TOOLS IN STORAGE."

DOES THAT REFRESH YOUR RECOLLECTION REGARDING MEMBERS' FRUSTRATIONS WITH TECHSHOP?

**A.** YES.

**Q.** AND MEMBERS WERE FRUSTRATED, ACCORDING TO YOU, BECAUSE THEY HAD BEEN LOCKED OUT OF THE STORES WHEN THE DOORS CLOSED, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND THEY WERE FRUSTRATED BECAUSE THEY WERE UNABLE TO

COMPLETE PROJECTS THAT WERE ONGOING, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND THEY WERE FRUSTRATED BECAUSE THEY HAD MATERIALS THAT WERE STILL IN THE TECHSHOP LOCATIONS THAT THEY COULDN'T GET TO, RIGHT?

**A.** THAT IS CORRECT.

**Q.** SO YOU WERE ACKNOWLEDGING THAT FRUSTRATION, RIGHT?

**A.** YES.

**Q.** AND YOU STATE IN YOUR OPEN LETTER TO SHAREHOLDERS THAT YOU BELIEVE TECHSHOP PRODUCED A BAD EXPERIENCE FOR OUR MEMBERS, RIGHT?

**A.** (READING)

> "THE COMPLEXITIES OF NEGOTIATING THIS DEAL VERY QUICKLY HAVE PRODUCED A BAD EXPERIENCE FOR OUR MEMBERS, AND WE REGRET THAT."

**Q.** YOU REFER TO -- WE'LL FOCUS ON THAT. YOU SAY, "LEGAL RESTRICTIONS, RELATIONSHIPS WITH LANDLORDS AND OTHER ENTITIES, AND THE COMPLEXITIES OF NEGOTIATING THIS DEAL VERY QUICKLY HAVE PRODUCED A BAD EXPERIENCE FOR OUR MEMBERS AND WE DEEPLY REGRET THAT"?

**A.** THAT'S CORRECT.

**Q.** AND THEN YOU ADMIT, BASED ON WHAT YOU SAY HERE, THIS WAS A COMPLEX DEAL, THERE WAS A LOT THAT HAD TO HAPPEN WHICH WAS IMPACTING CUSTOMERS, RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND YOU'RE AWARE, AS YOU STATE IN YOUR OPEN LETTER TO STAKEHOLDERS, THAT THERE WERE COMMENTS ON SOCIAL MEDIA -- LET ME REPHRASE THAT.

YOU'RE AWARE THAT THERE WERE COMMENTS ON SOCIAL MEDIA ABOUT THE MOTIVATIONS AND ACTIONS OF SENIOR MANAGEMENT AND BOARD OF TECHSHOP, INC., RIGHT?

**A.** I WOULD HAVE TO REVIEW THAT PART OF THE DOCUMENT, BUT I BELIEVE I DID SAY THAT, YES.

**Q.** ACTUALLY, IN THE POST, THE ADAFRUIT POST ON DECEMBER 13TH THAT YOU TESTIFIED ABOUT EARLIER, YOU ACKNOWLEDGE THAT TECHSHOP'S CLOSURE HAD AN IMPACT ON PEOPLES' PERSONAL FINANCES, THEIR BUSINESSES, AND THEIR LIVELIHOODS, RIGHT?

**A.** THOSE WERE ALL FACTUAL STATEMENTS --

**MR. PISTORINO:** OBJECTION, ASSUMES FACTS NOT IN EVIDENCE.

**THE COURT:** OVERRULED.

**BY MS. ROBERTS:**

**Q.** ISN'T IT CORRECT THAT INVESTORS LOST EVERYTHING THAT THEY PUT IN TECHSHOP?

**A.** THEY DID.

**Q.** THAT'S ALL -- THAT HAPPENED BECAUSE TECHSHOP CLOSED ITS DOORS, RIGHT?

**A.** IT HAPPENED BECAUSE THE BUSINESS WAS NOT SUCCESSFUL. CLOSING THE DOORS WAS AN OUTCOME OF THAT.

**Q.** AND MR. RASURE WAS NOT INVOLVED IN THE CLOSURE OF

TECHSHOP, RIGHT?

**A.** HE WAS NOT.

**Q.** IF YOU CAN TURN BACK TO TX610, WHICH I BELIEVE IS ADMITTED.

(DISPLAYED ON SCREEN.)

THIS IS THE EMAIL ATTACHING THE SIGNED SUMMARY OF PRINCIPAL TRANSACTION TERMS, RIGHT?

**A.** YES.

**Q.** AND YOU TESTIFIED THAT THIS ISN'T THE FINAL CONTRACT. THE PARTIES WERE GOING TO NEGOTIATE A DETAILED AGREEMENT, RIGHT?

**A.** THAT'S CORRECT.

**Q.** BUT THIS DOCUMENT IS SUPPOSED TO REFLECT, TO BE A SUMMARY OF THE PRINCIPAL TRANSACTION TERMS, RIGHT?

**A.** THAT'S CORRECT.

**Q.** SO THIS IS A DECLARATION, I BELIEVE YOU TESTIFIED ON DIRECT, THIS IS A DECLARATION OF WHAT THE PARTIES' INTENTIONS ARE AS TO WHAT THE PRINCIPAL TERMS OF THE AGREEMENT WOULD BE.

**A.** PRIOR TO FINAL NEGOTIATION, YES, THAT'S CORRECT.

**MS. ROBERTS:** NO FURTHER QUESTIONS.

**THE COURT:** ANY REDIRECT?

**MR. PISTORINO:** JUST ONE THING.

**REDIRECT EXAMINATION**

**BY MR. PISTORINO:**

**Q.** MR. BUSCH, DID TECHSHOP EVER TELL MR. RASURE THAT HE COULD USE THE TECHSHOP TRADEMARKS?

**A.** NO.

**Q.** I'M SORRY, I DIDN'T HEAR.

**A.** NO.

**MR. PISTORINO:** NOTHING FURTHER, YOUR HONOR.

**THE COURT:** MAY MR. BUSCH BE EXCUSED?

**MS. ROBERTS:** YES. WE RESERVE THE RIGHT TO RECALL HIM.

**THE COURT:** ALL RIGHT. THANK YOU, MR. BUSCH. YOU ARE EXCUSED.

THE PLAINTIFFS MAY CALL THEIR NEXT WITNESS.

**MR. PISTORINO:** TECHSHOP CALLS DR. ERIC MATOLO.

(PAUSE IN THE PROCEEDINGS.)

**THE CLERK:** PLEASE COME UP TO THE WITNESS STAND AND RAISE YOUR RIGHT HAND.

WITNESS STAND. RAISE YOUR RIGHT HAND.

(**ERIC MATOLO**, CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

**THE WITNESS:** I DO.

**THE CLERK:** YOU MAY BE SEATED. ONCE SEATED, I'M GOING TO NEED YOU TO PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE RECORD, PLEASE.

**THE WITNESS:** FIRST NAME ERIC. LAST NAME MATOLO, M-A-T-O-L-O.

**THE CLERK:** OKAY. SO SPELL YOUR FIRST NAME.

**THE WITNESS:** I'M SORRY?

**THE CLERK:** SPELL YOUR FIRST NAME.

**THE WITNESS:** E-R-I-C.

**THE CLERK:** PERFECT. THANK YOU.

**DIRECT EXAMINATION**

**BY MR. PISTORINO:**

**Q.** GOOD AFTERNOON, DR. MATOLO.

**A.** GOOD AFTERNOON.

**Q.** DO YOU NEED SOME WATER?

**A.** PERFECT.

(PAUSE IN THE PROCEEDINGS.)

**Q.** DR. MATOLO, CAN YOU GO AHEAD AND TELL THE JURY A LITTLE BIT ABOUT YOURSELF?

**A.** YES. I'M AN ECONOMIST. I WORK FOR AN ECONOMIC CONSULTING FIRM.

I'VE ALSO TAUGHT ECONOMICS AT THE UNIVERSITY LEVEL. AND MY BACKGROUND IS UNDERGRAD AND GRADUATE WORK --

**Q.** I'M SORRY, CAN I INTERRUPT YOU?

I JUST WANT TO FIND OUT WHERE DO YOU LIVE? DO YOU HAVE A FAMILY?

**A.** I DO. YES. I'M MARRIED, HAVE TWO KIDS.

**Q.** AND WHERE DO YOU LIVE?

**A.** I LIVE IN IRVINE, CALIFORNIA.

**Q.** AND HOW OLD ARE THE KIDS?

**A.** ONE IS THREE AND ONE IS A MONTH.

**Q.** CONGRATULATIONS.

AND I WAS GOING TO ASK A LITTLE BIT ABOUT YOUR EDUCATIONAL BACKGROUND, BUT YOU ALREADY STARTED.

IN FRONT OF YOU, IF YOU CAN TURN TO -- IN YOUR BINDER, TURN TO THE DOCUMENT WE HAVE MARKED TX291.

**A.** OKAY.

**Q.** ARE YOU WITH ME?

**MR. PISTORINO:** YOUR HONOR, WE MOVE TO HAVE TX291 ADMITTED.

**THE COURT:** ANY OBJECTION?

**MR. NATHAN:** NO OBJECTION, YOUR HONOR.

**THE COURT:** 291 IS ADMITTED.

(TRIAL EXHIBIT 291 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** THIS IS A COPY OF YOUR RÉSUMÉ; IS THAT RIGHT?

**A.** CORRECT.

**Q.** IF YOU COULD TURN TO THE... ACTUALLY IT'S THE SEVENTH PAGE OF YOUR EIGHT-PAGE RÉSUMÉ, TURN TO THE SEVENTH PAGE FOR ME, PLEASE.

(DISPLAYED ON SCREEN.)

**A.** OKAY.

**Q.** WHAT I WOULD LIKE TO DO IS FIND OUT A LITTLE BIT ABOUT YOUR EDUCATIONAL BACKGROUND. WHERE DID YOU GO TO SCHOOL? WHAT DID YOU STUDY?

**A.** SURE.

SO I EARNED AN UNDERGRADUATE DEGREE IN ECONOMICS AND MATHEMATICS AT THE UNIVERSITY OF CALIFORNIA SANTA BARBARA.

**Q.** WHAT YEAR, SIR?

**A.** THAT WAS IN 2003.

**Q.** OKAY.

**A.** AND THEN I SUBSEQUENTLY EARNED A MASTER'S IN ECONOMICS AND A PH.D. IN ECONOMICS, ALSO FROM THE UNIVERSITY OF CALIFORNIA SANTA BARBARA.

**Q.** I HEAR THAT IF YOU GET A MASTER'S YOU HAVE TO WRITE SOMETHING CALLED A THESIS; IS THAT RIGHT?

**A.** IN THIS CASE -- IT DEPENDS. IN THIS CASE IT WAS MORE RIGOROUS EXAMS.

**Q.** OKAY. AND THEN EVENTUALLY YOU GOT A -- YOU ENDED UP -- CONTINUING ON IN YOUR STUDIES AND GOT A PH.D.; IS THAT RIGHT?

**A.** CORRECT.

**Q.** SO HOW MANY YEARS WERE YOU STUDYING ECONOMICS THERE AT THE UNIVERSITY OF CALIFORNIA AT SANTA BARBARA FOR?

**A.** A LOT OF YEARS. CLOSE TO A DECADE.

**Q.** OKAY. MAYBE YOU GOT AWAY FROM THE THESIS FOR YOUR MASTER'S, HOW ABOUT FOR YOUR DOCTORATE? DID YOU HAVE TO WRITE A DISSERTATION?

**A.** I DID.

**Q.** WAS WHAT THE SUBJECT OF YOUR DISSERTATION?

**A.** IT RELATED TO INVESTMENTS AND INTELLECTUAL PROPERTY. SO LOOKED INTO SOME VALUATION MODELS FOR VALUING INTELLECTUAL

PROPERTY USING FINANCIAL MODELS.

**Q.** AND THEN WHAT HAVE YOU BEEN DOING SINCE YOU GOT YOUR PH.D.?

**A.** I'VE BEEN WORKING AT AN ECONOMIC CONSULTING FIRM CALLED NATHAN ASSOCIATES. THAT'S IN IRVINE, CALIFORNIA.

AND DURING PART OF THE TIME WHEN I WAS -- I'VE BEEN WORKING AT NATHAN ASSOCIATES I'VE ALSO TAUGHT -- I WAS PART OF THE ADJUNCT FACULTY AT UNIVERSITY OF SOUTHERN CALIFORNIA IN THE ECONOMICS DEPARTMENT.

**Q.** WHAT'S YOUR CURRENT POSITION AT NATHAN ASSOCIATES?

**A.** VICE PRESIDENT.

**Q.** DURING THE COURSE OF YOUR STUDIES, DID YOU RECEIVE ANY -- I SEE AT THE BOTTOM YOU HAVE SOME HONORS AND AWARDS.

(DISPLAYED ON SCREEN.)

PICK ONE OF THEM AND TELL US ABOUT IT, PLEASE.

**A.** SURE.

SO, AS AN EXAMPLE, THE... THERE'S SOME RESEARCH GRANTS AND FEE FELLOWSHIPS. THIS RELATES TO AWARDS RELATED TO RESEARCH.

SOME OF THEM ARE AFTER THE FACT. YOU SUBMIT YOUR RESEARCH TO A COMPETITION OR SOMETIMES IT'S ON THE FRONT END IF YOU HAVE A TOPIC THAT YOU WOULD LIKE TO RESEARCH, AND YOU SUBMIT A PROPOSAL FOR SOME FUNDING. AND IF YOU WIN, YOU GET THE FUNDING TO ASSIST WITH YOUR RESEARCH.

**Q.** IT HAS BEEN AWHILE NOW, BUT IT LOOKS LIKE IN 2004, YOU WON THE AWARD FOR OUTSTANDING TEACHING ASSISTANT; IS THAT RIGHT?

**A.** THAT'S CORRECT, YES.
**Q.** YOU ALSO WON A DISTINGUISHED RESEARCH FELLOWSHIP, RIGHT?
**A.** CORRECT.
**Q.** WHAT DO YOU GET WHEN YOU WIN THE AWARD FOR DISTINGUISHED RESEARCH FELLOWSHIP? DO YOU GET A TROPHY OR SOMETHING?
**A.** ON THAT ONE, I BELIEVE, IT COVERED PART OF TUITION. SO IT MAY HAVE BEEN A FULL ACADEMIC QUARTER.
**Q.** OKAY. ALSO ON THE SAME PAGE, IT'S GOT A LISTING OF SEVERAL DIFFERENT PUBLICATIONS THAT YOU'VE AUTHORED; IS THAT RIGHT?
**A.** CORRECT.
**Q.** LOOKS LIKE MOST RECENTLY YOU WROTE AN ARTICLE, "ECONOMIC CONSIDERATIONS IN AUTOMOTIVE PRODUCT LIABILITY MATTERS", RIGHT?
**A.** THAT ONE WAS A PRESENTATION.
**Q.** OKAY.
**A.** YES.
**Q.** AND THEN YOU'VE GOT -- YOU ARE A MEMBER OF SOME PROFESSIONAL ORGANIZATIONS, RIGHT?
**A.** THAT'S CORRECT.
**Q.** I KNOW I SEE THE AMERICAN BAR ASSOCIATION, AMERICAN ECONOMIC ASSOCIATION, LICENSING EXECUTIVE SOCIETY, LOS ANGELES INTELLECTUAL PROPERTY LAW ASSOCIATION, AND THEN ORANGE COUNTY INTELLECTUAL PROPERTY LAW ASSOCIATION.
FOR FOLKS THAT AREN'T FAMILIAR, TELL US WHAT DO YOU DO IF

YOU ARE A MEMBER OF THE LICENSING EXECUTIVE SOCIETY?

**A.** AS A MEMBER OF THE SOCIETY, YOU HAVE ACCESS TO VARIOUS RESEARCH MATERIALS. IT MAY BE PUBLICATIONS, IT MIGHT BE LICENSING DATABASES. YOU HAVE ACCESS TO ATTENDING CLASSES AND PRESENTATIONS AND SEMINARS.

**Q.** OKAY.

AND HOW ABOUT THE ORANGE COUNTY INTELLECTUAL PROPERTY LAW ASSOCIATION, WHAT KIND OF WORK DO THEY DO?

**A.** THEY FOCUS ON INTELLECTUAL PROPERTY. IT'S SIMILAR TO THE OTHER SOCIETY WHERE THERE'S SEMINARS AND PRESENTATIONS AND VARIOUS MATERIALS THAT ARE AVAILABLE AS A MEMBER OF THE SOCIETY.

**Q.** AND YOU'VE BEEN DOING THIS KIND OF WORK, PARTICIPATING IN THESE ORGANIZATIONS AND WRITING THESE PUBLICATIONS, SINCE YOU GOT YOUR PH.D.; IS THAT RIGHT?

**A.** YES.

**Q.** AND I THOUGHT I HEARD MAYBE EVEN SOME BEFORE YOU GOT YOUR PH.D., CORRECT?

**A.** YES. I BELIEVE I WAS A MEMBER OF THE AMERICAN ECONOMIC ASSOCIATION. I DON'T RECALL IF THE OTHER ORGANIZATIONS WERE BEFORE OR AFTER I COMPLETED MY PH.D.

**Q.** HAVE YOU PREVIOUSLY BEEN EMPLOYED TO CONDUCT ANALYSES OF DAMAGES AS THEY RELATE TO INTELLECTUAL PROPERTY MATTERS?

**A.** YES.

**Q.** IF YOU GO TO THE FIRST PAGE OF YOUR RÉSUMÉ. IT'S GOT A

LIST UNDER YOUR EXPERIENCE. IT STARTS OFF WITH ANTITRUST AND CONSUMER HARM MATTERS; IS THAT RIGHT?

(DISPLAYED ON SCREEN.)

**A.** CORRECT.

**Q.** AND THEN... I DON'T KNOW, MAYBE THERE'S EIGHT THERE. AND ON THE NEXT PAGE, YOU CONDUCTED ANALYSES AND COMMERCIAL DISPUTES IN GENERAL LITIGATION, CORRECT?

(DISPLAYED ON SCREEN.)

**A.** CORRECT.

**Q.** LOT OF MATTERS THERE.

MAYBE ON THE NEXT PAGE, YOU'VE CONDUCTED IMPACT ANALYSES, RIGHT?

(DISPLAYED ON SCREEN.)

**A.** CORRECT.

**Q.** AND YOU'VE ALSO DONE SOME STUFF THAT RELATE TO ECONOMIC ANALYSES OF PATENTS; IS THAT RIGHT?

**A.** CORRECT.

**Q.** AND THEN IF WE TURN TO THE NEXT PAGE, PAGE 4, LOOKS LIKE A LOT OF ANALYSES OF DAMAGES AS THEY RELATE TO PATENTS, CORRECT?

**A.** SURE.

**Q.** PAGE 5, MORE PATENT STUFF.

(DISPLAYED ON SCREEN.)

AND THEN NOW YOU'VE DONE SOME ANALYSES FOR TRADEMARKS, TRADE DRESS, TRADE SECRETS, COPYRIGHTS, CORRECT?

**A.** THAT'S CORRECT.

**Q.** ON TO PAGE 6, PAGE 6 OF THE DOCUMENT.

(DISPLAYED ON SCREEN.)

THERE YOU GO.

THIS IS A CONTINUATION OF THE TRADEMARK, TRADE DRESS, TRADE SECRETS, AND COPYRIGHTS ANALYSES YOU'VE DONE; IS THAT CORRECT?

**A.** THAT'S CORRECT.

**Q.** OKAY. AND THEN IF WE GO TO THE LAST PAGE OF YOUR RÉSUMÉ, IT HAS A LISTING OF VARIOUS TESTIMONY AND REPORTS THAT YOU HAVE OFFERED, CORRECT?

(DISPLAYED ON SCREEN.)

**A.** CORRECT.

**Q.** AND ARE THESE TESTIMONY REPORTS THAT YOU HAVE AUTHORED IN OTHER CASES PENDING IN DIFFERENT FEDERAL COURTS; IS THAT RIGHT?

**A.** CORRECT.

**Q.** AND HAVE YOU PREVIOUSLY TESTIFIED IN FEDERAL COURT?

**A.** YES.

**Q.** AND YOUR TESTIMONY HAS BEEN ACCEPTED AS AN EXPERT IN ECONOMICS IN THESE KINDS OF THINGS IN FEDERAL COURTS BEFORE?

**A.** CORRECT.

**Q.** OKAY. LOOKS LIKE -- I'M GOING TO READ DOWN A COUPLE OF THEM JUST TO GET A SENSE.

LOOKS LIKE YOU'VE WORKED AT -- DONE STUFF WITH COURTS IN -- THE FEDERAL COURTS IN THE CENTRAL DISTRICT OF

CALIFORNIA; IS THAT RIGHT?

**A.** CORRECT.

**Q.** I SEE THE SECOND ONE YOU'VE GOT ONE HERE, NORTHERN DISTRICT OF CALIFORNIA, RIGHT?

**A.** CORRECT.

**Q.** SOUTHERN DISTRICT OF FLORIDA, RIGHT?

**A.** CORRECT.

**Q.** WAS THAT IN MIAMI?

**A.** THAT ONE --

**Q.** OR FORT LAUDERDALE?

**A.** THAT ONE I DON'T RECALL.

**Q.** OKAY. MIGHT BE A FREE CHANCE TO GO TO MIAMI. THAT MIGHT BE NICE.

THEN I THINK THE NEXT ONE IS BACK HERE IN NORTHERN DISTRICT OF CALIFORNIA. SO JUST A NUMBER OF DIFFERENT PLACES WHERE YOU PROVIDED TESTIMONY AND EXPERT REPORTS TO FEDERAL DISTRICT COURTS; IS THAT CORRECT?

**A.** CORRECT.

**MR. PISTORINO:** YOUR HONOR, TECHSHOP WOULD OFFER DR. MATOLO AS AN EXPERT IN THIS CASE.

**MR. NATHAN:** NO OBJECTION, YOUR HONOR.

**THE COURT:** ALL RIGHT. SO HE WILL BE PERMITTED TO SO TESTIFY.

LADIES AND GENTLEMEN, YOU ARE ABOUT TO HEAR TESTIMONY OF DR. MATOLO REGARDING HIS OPINIONS AND THE REASONS FOR THOSE

OPINIONS. THAT OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR EXPERIENCE OF THIS WITNESS.

SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER TESTIMONY; YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT AS MUCH WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL THE OTHER EVIDENCE IN THE CASE.

**MR. PISTORINO:** THANK YOU.

**BY MR. PISTORINO:**

**Q.** DR. MATOLO, WHAT WERE YOU ASKED TO DO IN THIS CASE?

**A.** I WAS ASKED TO --

**Q.** I'M SORRY. CAN YOU SPEAK UP A LITTLE BIT OR GET THE MICROPHONE SO WE CAN HEAR YOU?

**A.** IS THAT BETTER?

**Q.** I THINK SO.

**A.** I WAS ASKED TO REVIEW VARIOUS MATERIALS AND DOCUMENTS THAT WERE PROVIDED AND AVAILABLE IN THIS CASE, AND PERFORM AN INVESTIGATION INTO THE POTENTIAL ECONOMIC DAMAGES SUFFERED BY TECHSHOP IN THIS MATTER BASED ON THE ALLEGATIONS.

**Q.** I HEARD YOU MENTION THE WORD "INVESTIGATION".

WHAT DID YOU DO?

**A.** SO AFTER REVIEWING THE DOCUMENTS -- WELL, AFTER COLLECTING THE DOCUMENTS, I REVIEWED THEM AND ANALYZED THEM. I ALSO INTERVIEWED VARIOUS INDIVIDUALS, FORMER OFFICERS OF TECHSHOP. AND IN DOING SO, PERFORMED ROYALTY OR LICENSE -- LOST LICENSE

REVENUE ANALYSIS, AND I ALSO REVIEWED VARIOUS FINANCIAL DOCUMENTS FOR AN ALTERNATIVE FORM OF DAMAGES.

**Q.** YOU MENTIONED THAT YOU HAD INTERVIEWED INDIVIDUALS ASSOCIATED WITH TECHSHOP.

WHO DID YOU TALK TO?

**A.** MR. NEWTON, MR. WOODS, AND MR. BUSCH.

**Q.** AND DID YOU CONDUCT A GROUP INTERVIEW WITH THESE GUYS, OR SEPARATELY, HOW DID YOU TALK TO THEM?

**A.** THESE WERE SEPARATE, SEPARATE PHONE CALLS.

**Q.** HOW LONG DID YOU HAVE A DISCUSSION WITH EACH ONE OF THOSE GENTLEMEN?

**A.** ABOUT 30 MINUTES TO AN HOUR FOR EACH ONE.

**Q.** OKAY.

AND THEN I THOUGHT YOU MENTIONED OTHER THAN INTERVIEWS WITH MR. NEWTON, WOODS, AND BUSCH, RIGHT, THAT YOU ALSO REVIEWED SOME PRINTED MATERIALS, DOCUMENTS PRODUCED IN THIS CASE; IS THAT RIGHT?

**A.** CORRECT.

**Q.** COULD YOU SORT OF DESCRIBE THE DOCUMENTS THAT YOU WERE GIVEN AN OPPORTUNITY TO REVIEW?

**A.** SURE.

SO, THE DOCUMENTS THAT I REVIEWED INCLUDED SOME FINANCIAL DOCUMENTS, SOME LICENSING AGREEMENTS, SOME LICENSING OFFERS AND DISCUSSIONS, CERTAIN INTERNAL DOCUMENTS, MAYBE EMAILS, VARIOUS CORRESPONDENCE, SOME PUBLICLY AVAILABLE DOCUMENTS, FOR

EXAMPLE, WEBSITES AND INDUSTRY RESEARCH.

**Q.** YOU MENTIONED SOME FINANCIAL DOCUMENTS. WERE THOSE FINANCIAL DOCUMENTS OF TECHSHOP THAT YOU REVIEWED?

**A.** OF THE DEFENDANT --

**Q.** OF THE DEFENDANT. WE HAVE TO MAKE SURE WE DON'T TALK OVER EACH OTHER FOR THE COURT REPORTER.

YOU REVIEWED SOME FINANCIAL DOCUMENTS FROM THE DEFENDANTS; IS THAT RIGHT?

**A.** THAT'S CORRECT.

**Q.** AND HOW ABOUT ON TECHSHOP'S SIDE? I THOUGHT I HEARD YOU MENTIONED LICENSING. WHAT MATERIALS OF TECHSHOP'S DID YOU REVIEW?

**A.** I REVIEWED EXECUTED LICENSE AGREEMENTS. ALSO LICENSING OFFERS AND DISCUSSIONS AND PRESENTATIONS, AND INTERNAL DOCUMENTS REFERRING TO VARIOUS LICENSES OR NEGOTIATIONS. SO THESE MAY BE EMAILS OR PRESENTATIONS.

**Q.** SO OTHER THAN THE INTERVIEWS WITH THE TECHSHOP PEOPLE, REVIEWING SOME OF THIS FINANCIAL MATERIAL FROM THE DEFENDANTS, AND THE LICENSES OF TECHSHOP, DID YOU DO ANY ANALYSIS AS PART OF YOUR INVESTIGATION, ANY OTHER RESEARCH?

**A.** I ALSO LOOKED AT PUBLICLY AVAILABLE DOCUMENTS. SO THIS WOULD BE LOOKING AT COMPANY WEB PAGES THEMSELVES. IN ADDITION TO THE MATERIALS THAT I RECEIVED THAT WERE PRODUCED AS PART OF THE CASE, I ALSO LOOKED AT SOME PUBLICLY AVAILABLE INFORMATION.

**Q.** OKAY.

I THINK YOU MENTIONED THAT -- DID YOU FORM AN OPINION AS TO WHETHER OR NOT TECHSHOP SUFFERED DAMAGES IN THE FORM OF LOST LICENSING REVENUE?

**A.** SURE. SO AFTER REVIEWING THESE MATERIALS, YOU KNOW, PERFORMED MY ANALYSIS AND REACHED THE DETERMINATION THAT PLAINTIFF DID, IN FACT, INCUR ECONOMIC DAMAGES IN THE FORM OF LOST LICENSING REVENUE AND ALSO AN ALTERNATIVE FORM OF DAMAGES OF DEFENDANTS' PROFITS.

**Q.** YOU ARE USING THE PHRASE "LOST LICENSING REVENUE." WHAT IS THAT?

**A.** SO, FOR INTELLECTUAL PROPERTY, OFTENTIMES PARTIES, OWNERS OF INTELLECTUAL PROPERTY, WHETHER IT'S A PATENT OR A TRADEMARK OR COPYRIGHT, WILL ALLOW OTHER ENTITIES TO USE THE INTELLECTUAL PROPERTY IN EXCHANGE FOR PAYMENTS.

AND IN THIS CASE, WHAT WE SEE IS THERE'S BEEN A HISTORY OF LICENSING AND ALSO NEGOTIATIONS FOR CERTAIN LICENSES. AND SO WHEN WE TALK ABOUT LOST LICENSING REVENUE, BASED ON THE ALLEGATIONS IN THIS CASE, THEY RELATE TO THE DEFENDANT USING THE INTELLECTUAL PROPERTY WITHOUT PAYING FOR THE INTELLECTUAL PROPERTY.

AND SO IF THERE'S PAYMENT TO USE THE INTELLECTUAL PROPERTY, THAT WOULD BE LICENSING REVENUE THAT WOULD BE RECEIVED BY THE PLAINTIFF.

**Q.** DID TECHSHOP HAVE A PROGRAM TO LICENSE ITS TRADEMARKS?

**A.** YES.

**Q.** OKAY. AND SO IF YOU CAN TURN IN THE BOOK THAT IS IN FRONT OF YOU A DOCUMENT WE MARKED TX28.

(DISPLAYED ON SCREEN.)

THIS IS A DOCUMENT WE HAVE SEEN BEFORE TITLED "LICENSING OPTIONS AND MANAGED SERVICES 2017 GUIDEBOOK".

ARE YOU WITH ME THERE?

**A.** I AM, YES.

**Q.** OKAY. AND DID YOU COME TO HAVE AN UNDERSTANDING WHETHER TECHSHOP HAD A PROGRAM TO LICENSE ITS TRADEMARKS?

**A.** CORRECT. SO --

**Q.** GO AHEAD AND DESCRIBE TO US WHAT YOUR INVESTIGATION DETERMINED FROM REVIEWING THESE MATERIALS.

**A.** SO, GOING BACK TO THE MATERIALS I REVIEWED, THIS IS ONE OF THE DOCUMENTS I REVIEWED. AND IT DOCUMENTS AND DISCUSSES THE LICENSING PROGRAM FOR TECHSHOP.

I ALSO INTERVIEWED THE FORMER OFFICERS TO MORE FULLY UNDERSTAND THE LICENSING PROGRAMS, AND ALSO LOOKED AT THE LICENSE AGREEMENTS THAT WERE PROVIDED IN THIS CASE.

AND WHAT I LEARNED IS THAT TECHSHOP HAS A LICENSING PROGRAM WHERE IT LICENSES BOTH THE INTELLECTUAL PROPERTY IT OWNED AND ALSO PROVIDED SERVICES TO THE PARTIES THAT WANT TO USE THE INTELLECTUAL PROPERTY.

SO, IN OTHER WORDS, TECHSHOP WOULD ALLOW OTHER ENTITIES IN EXCHANGE FOR PAYMENTS TO USE THE TECHSHOP NAME, BUT THEN ALSO

PROVIDE SUPPORT TO HELP THOSE ENTITIES GET UP AND RUNNING.

**Q.** SO YOU SAY USE THE TECHSHOP NAME, DO YOU MEAN THE TECHSHOP TRADEMARKS?

**A.** CORRECT.

**Q.** THIS LICENSING PROGRAM YOU DESCRIBED TO US, WAS THAT LICENSING PROGRAM IN -- WAS THERE A LICENSING PROGRAM TO LICENSE THE TECHSHOP TRADEMARKS INSIDE THE UNITED STATES?

**A.** SO THE EXECUTED LICENSES THAT I REVIEWED WERE OUTSIDE THE UNITED STATES.

AS FAR AS IN THE UNITED STATES, I UNDERSTAND BY REVIEWING THE DOCUMENTS, THERE WERE DISCUSSIONS, BUT IN 2017, I UNDERSTAND TECHSHOP DECIDED AND HAD INTEREST IN BRINGING THE LICENSING PROGRAM ALSO INTO THE UNITED STATES, AND SO DISCUSSIONS HAD BEGUN TO WORK ON ENTERING INTO LICENSES WITH VARIOUS ENTITIES.

**Q.** SO AS WE ARE SEEING HERE IN 28, IT SOUNDS LIKE TECHSHOP HAD A PROGRAM IN THIS 2017 TIME FRAME TO LICENSE ITS TRADEMARKS IN THE UNITED STATES; IS THAT FAIR?

**A.** YES. THEY HAD THE PROGRAM ESTABLISHED HERE.

**Q.** BUT IT SOUNDS LIKE WHAT YOU ARE SAYING THEN, AT LEAST FOR -- IN NORTH AMERICA SO FAR TECHSHOP HAD NOT ACTUALLY EXECUTED A LICENSE FOR ITS TRADEMARKS SO FAR; IS THAT RIGHT?

**A.** CORRECT. AS OF 2017 THE LICENSES WERE --

**Q.** BUT THEN --

**A.** IT WAS CORRECT AS OF 2017 THE EXECUTED LICENSES WERE

OUTSIDE THE U.S.

**Q.** YOU MENTIONED THAT -- DID YOU REVIEW THOSE, IN FACT, EXECUTED LICENSES OUTSIDE THE UNITED STATES?

**A.** YES, I DID.

**Q.** AND MAYBE IN YOUR BINDER THERE, IF YOU COULD TURN TO TX307.

**MR. PISTORINO:** WE MOVE TO HAVE TX307 ADMITTED.

**THE COURT:** ANY OBJECTION AS TO 307?

**MR. NATHAN:** NO OBJECTION, YOUR HONOR. SORRY.

**THE COURT:** EXHIBIT 307 IS ADMITTED.

(TRIAL EXHIBIT 307 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** DR. MATOLO, THIS IS KIND OF DESCRIBED AS A NON-DISTURBANCE AGREEMENT, DO YOU SEE THAT?

**A.** YES.

**Q.** BUT IT'S SORT OF REFERRING TO A LICENSE TECHSHOP HAD EXECUTED TO ALLOW, IT LOOKS LIKE A COMPANY CALLED, SOMEPLACE IN FRANCE, RIGHT, ADEO; IS THAT FAIR?

**A.** YES.

**Q.** DID YOU REVIEW THE TECHSHOP LICENSE WITH ADEO?

**A.** YES. THERE WERE OTHER DOCUMENTS. YES.

**Q.** OKAY.

DID YOU -- WHERE WAS ADEO LICENSED TO USE THE TECHSHOP TRADEMARKS?

**A.** SO THE LICENSE COVERED FRANCE. SO PROVIDED THE RIGHT TO USE THE TECHSHOP NAME AND MARK IN FRANCE.

**Q.** AND I SEE IN THAT ONE IT REFERS TO SOMETHING LIKE... UNDER THE RECITAL SECTION, I SEE A PART THAT SAYS, "WHEREAS LICENSEE IS PREPARED TO INTO (SIC) A LICENSE AND ASSISTANT AGREEMENT", DO YOU SEE THAT?

**A.** YES.

**Q.** AND THEN IT TALKS ABOUT LOOKS LIKE $4 MILLION, RIGHT?

**A.** CORRECT.

**Q.** YOU REVIEWED ALL OF THE TERMS OF THIS THING?

**A.** YES.

**Q.** OKAY. AND THEN IF YOU CAN PLACE IN FRONT OF YOU THE DOCUMENT WE MARKED TX308.

**A.** OKAY.

**MR. PISTORINO:** WE MOVE TO HAVE 308 ADMITTED.

**MR. NATHAN:** NO OBJECTION.

**THE COURT:** 308 IS ADMITTED.

(TRIAL EXHIBIT 308 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** THIS, IN FACT, IS ENTITLED "LICENSE AND ASSISTANCE AGREEMENT", RIGHT?

**A.** RIGHT.

**Q.** I THINK IT'S WITH THE SAME GAYS, RIGHT, ADEO?

**A.** YES.

**Q.** DID YOU ANALYZE THIS ONE?

**A.** I DID, YES.

**Q.** IF YOU CAN PLACE IN FRONT OF YOU, WE HAVE MARKED TX -- HOW ABOUT 311.

**MR. PISTORINO:** WE MOVE TO HAVE 311 ADMITTED.

**MR. NATHAN:** NO OBJECTION.

**THE COURT:** 311 IS ADMITTED.

(TRIAL EXHIBIT 311 RECEIVED IN EVIDENCE.)

(DISPLAYED ON SCREEN.)

**BY MR. PISTORINO:**

**Q.** THIS IS KIND OF AN ATTACHMENT TO SOMETHING ELSE TALKING ABOUT STATEMENT OF FEES TO FUJITSU, CORRECT?

**A.** CORRECT.

**Q.** OKAY.

AND YOU ANALYZED THE TECHSHOP LICENSE TO FUJITSU TO ALLOW FUJITSU TO USE THE TECHSHOP TRADEMARKS, CORRECT?

**A.** CORRECT.

**Q.** AND I THINK THIS ONE SAYS SOMETHING ABOUT $237,500 FOR FIVE YEARS, RIGHT, FOR EACH YEAR, FOUR OR FIVE YEARS, CORRECT?

**A.** YES, THAT IS PART OF THE TERMS, YES.

(PAUSE IN THE PROCEEDINGS.)

**THE COURT:** THIS MIGHT BE A GOOD TIME TO BREAK. WE'RE AT ABOUT 1:20. THIS IS A GOOD BREAKING SPOT FOR THE DAY.

LADIES AND GENTLEMEN, WE WILL BREAK FOR THE DAY. AND WE

WILL BE BACK HERE TO RESUME PROMPTLY AT 8:30 TOMORROW MORNING.

JUST CONTINUE TO HEED ALL OF MY INSTRUCTIONS REGARDING YOUR CONDUCT AS JURORS, AND REMEMBER TO KEEP AN OPEN MIND UNTIL ALL THE EVIDENCE HAS BEEN PRESENTED, YOU'VE HEARD THE ARGUMENTS OF COUNSEL, MY INSTRUCTIONS, AND THE VIEWS OF YOUR FELLOW JURORS.

ENJOY THE REST OF YOUR DAY AND WE WILL SEE YOU TOMORROW MORNING.

(PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

**THE CLERK:** YOU MAY BE SEATED.

**THE COURT:** JUST FOR PLANNING PURPOSES, AFTER DR. MATOLO, WHO WOULD BE UP NEXT?

**MR. PISTORINO:** UP NEXT WOULD BE MR. RYAN SPURLOCK.

**THE COURT:** ALL RIGHT. AND HE'S YOUR LAST WITNESS?

**MR. PISTORINO:** HE IS THE LAST WITNESS, YOUR HONOR.

**THE COURT:** OKAY. WE WILL SEE EVERYONE TOMORROW. YOU SHOULD PROBABLY GRAB YOUR BINDERS BACK.

**MR. PISTORINO:** YES.

(PROCEEDINGS ADJOURNED AT 1:21 P.M.)

**CERTIFICATE OF REPORTER**

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

FRIDAY, JULY 19, 2019