VOL. 5

PAGES 713 - 926

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM, JR., JUDGE**

TECHSHOP, INC.,           )
                             )
          PLAINTIFF,     )   NO. C-18-1044 HSG
                             )
  VS.                   )   FRIDAY, JUNE 7, 2019
                             )
DAN RASURE, ET AL.,     )   OAKLAND, CALIFORNIA
                             )
                             )   JURY TRIAL
                             )
          DEFENDANTS.    )
_____)

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**           PARRISH LAW OFFICE
                          24 LEXINGTON DRIVE
                          MENLO PARK, CALIFORNIA 94205
                  BY:  JAMES C. PISTORINO, ESQUIRE

**ALSO PRESENT:**           DORIS KAELIN, BANKRUPTCY TRUSTEE

**FOR DEFENDANTS:**         QUINN EMANUEL URQUHART & SULLIVAN
                          555 TWIN DOLPHIN DRIVE, 5TH FLOOR
                          REDWOOD SHORES, CALIFORNIA 94065
                  BY:  ANDREA P. ROBERTS, ESQUIRE
                          OLGA SLOBODYANYUK, ESQUIRE

                          JOHN E. NATHAN, ESQUIRE
                          1175 PARK AVENUE
                          NEW YORK, NEW YORK 10128

**REPORTED BY:**           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                          OFFICIAL COURT REPORTER

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1                          I N D E X

 2   DEFENDANTS' WITNESSES:                       PAGE   VOL.

 3   RASURE, DAN

 4   DIRECT EXAMINATION BY MS. ROBERTS (RESUMED)   725    5

 5   CROSS-EXAMINATION BY MR. PISTORINI            785    5

 6   REDIRECT EXAMINATION BY MS. ROBERTS           886    5

 7   JOHNSON, JEREMIAH

 8   DIRECT EXAMINATION BY MS. ROBERTS             893    5

 9   CROSS-EXAMINATION BY MR. PISTORINI            921    5

10

11

12   TRIAL EXHIBITS:        WITHDRAWN    I.D.    EVD.   VOL.

13          1                                    833    5

14          4                                    868    5

15          5                                    854    5

16         12                                    861    5

17         15                                    791    5

18         16                                    867    5

19         21                                    813    5

20         23                                    794    5

21         24                                    869    5

22         25                                    861    5

23         33                                    790    5

24         68                                    800    5

25         70                                    802    5
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

| TRIAL EXHIBITS: | WITHDRAWN | I.D. | EVD. | VOL. |
|---|---|---|---|---|
| 80 | | | 810 | 5 |
| 84 | | | 832 | 5 |
| 85 | | | 836 | 5 |
| 89 | | | 849 | 5 |
| 90 | | | 850 | 5 |
| 91 | | | 851 | 5 |
| 92 | | | 852 | 5 |
| 94 | | | 876 | 5 |
| 98 | | | 877 | 5 |
| 100 | | | 838 | 5 |
| 112 | | | 878 | 5 |
| 128 | | | 879 | 5 |
| 135 | | | 879 | 5 |
| 140 | | | 841 | 5 |
| 141 | | | 881 | 5 |
| 146 | | | 882 | 5 |
| 148 | | | 844 | 5 |
| 149 | | | 884 | 5 |
| 150 | | | 846 | 5 |
| 152 | | | 846 | 5 |
| 180 | | | 872 | 5 |
| 187 | | | 852 | 5 |
| 191 | | | 834 | 5 |
| 193 | | | 842 | 5 |

| | TRIAL EXHIBITS: | WITHDRAWN | I.D. | EVD. | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 194 | | | 817 | 5 |
| 3 | 196 | | | 819 | 5 |
| 4 | 197 | | | 870 | 5 |
| 5 | 200 | | | 870 | 5 |
| 6 | 268 | | | 847 | 5 |
| 7 | 290 | | | 747 | 5 |
| 8 | 333 | | | 815 | 5 |
| 9 | 531 | | | 744 | 5 |
| 10 | 590 | | | 770 | 5 |
| 11 | 591 | | | 772 | 5 |
| 12 | 593 | | | 772 | 5 |
| 13 | 653 | | | 733 | 5 |
| 14 | 654 | | | 734 | 5 |
| 15 | 727 | | | 761 | 5 |
| 16 | 729 | | | 763 | 5 |
| 17 | 731 | | | 765 | 5 |
| 18 | 738 | | | 766 | 5 |
| 19 | 740 | | | 768 | 5 |
| 20 | 913 | | | 728 | 5 |
| 21 | 930 | | | 727 | 5 |
| 22 | 1159 | | | 742 | 5 |
| 23 | 1180 | | | 899 | 5 |
| 24 | 1194 | | | 905 | 5 |
| 25 | 1195 | | | 909 | 5 |

| | TRIAL EXHIBITS: | WITHDRAWN | I.D. | EVD. | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 1200 | | | 908 | 5 |
| 3 | 1203 | | | 904 | 5 |
| 4 | 1204 | | | 906 | 5 |
| 5 | 1205 | | | 909 | 5 |
| 6 | 1206 | | | 910 | 5 |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

| | |
|---|---|
| 1 | <u>FRIDAY, JUNE 7, 2019</u>                                    <u>8:07 A.M.</u> |

2                          P R O C E E D I N G S

3                                  O0O

4          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

5              **THE CLERK:**  PLEASE BE SEATED.

6          WE ARE CALLING C-18-1044 TECHSHOP, INC. VERSUS RASURE, ET

7     AL.

8          PLEASE STEP FORWARD AND STATE YOUR APPEARANCES FOR THE

9     RECORD.

10             **MR. PISTORINO:**  GOOD MORNING, YOUR HONOR.  JAMES

11    PISTORINO ON BEHALF OF TECHSHOP.

12             **THE COURT:**  GOOD MORNING.

13             **MS. ROBERTS:**  ANDREA ROBERTS FOR DEFENDANTS.

14             **THE COURT:**  GOOD MORNING.

15             **MR. PISTORINO:**  YOUR HONOR, WHENEVER YOU'RE READY, I

16    WOULD LIKE TO ADDRESS ONE MATTER.

17             **THE COURT:**  WHAT IS IT?

18             **MR. PISTORINO:**  IF I CAN, I WANTED TO ADDRESS THE

19    ISSUE OF YESTERDAY MORNING MR. NEWTON AND THE ORDER OF HIS

20    TESTIMONY.  BECAUSE I DIDN'T WANT TO HAVE THE COURT HAVE A

21    MISIMPRESSION.

22         YOUR HONOR'S ORDER INDICATES THAT THE --

23             **THE COURT:**  WHY DO WE NEED TO DO THIS?  I HAVE SOME

24    ISSUES.  WHY DON'T WE TAKE MY ISSUES FIRST.

25             **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

1          **THE COURT:**  OKAY.  SO I GOT THE FILINGS LAST NIGHT.

2     AS I SEE IT, THERE ARE FOUR ISSUES.

3          THE FIRST IS THE DEFENSE WANTS ME TO ORDER THE PLAINTIFF

4     TO DE-DUPLICATE HIS EXHIBITS.  I AM NOT GOING TO DO IT.

5     OBVIOUSLY IT'S YOUR HAZARD IF THE JURY IS CONFUSED LOOKING FOR

6     DUPLICATES.  WE HAVE ALREADY HAD A TON OF DUPLICATES ADMITTED.

7     THIS IS NOT SOMETHING THAT'S WORTH MY TIME.

8          ON EXHIBIT 5 TO BE USED WITH THE CROSS OF MR. RASURE,

9     IT'S -- MR. RASURE'S HALF OF THE TEXT EXCHANGE IS CLEARLY

10    ADMISSIBLE AS A PARTY ADMISSION.  AND THE JURY WILL BE

11    INSTRUCTED THAT THE REST OF IT IS NOT TO BE CONSIDERED FOR ITS

12    TRUTH BUT ONLY TO PROVIDE CONTEXT FOR HIS STATEMENTS.

13          **MS. ROBERTS:**  THAT'S FINE, YOUR HONOR.

14          **THE COURT:**  ALL RIGHT.

15          THREE.  THIS DISPUTE ABOUT THE JOHNSON FINANCIAL

16    DOCUMENTS.  THE REPRESENTATION THAT'S BEING MADE IS THAT

17    DR. MATOLO INCORPORATED THESE INTO HIS TESTIMONY AND RELIED ON

18    THEM.

19          IS THAT TRUE?

20          **MR. PISTORINO:**  NO.  NO.  I JUST WANT TO BE CLEAR.

21          DR. MATOLO REVIEWED THE REVENUE FIGURES THAT WERE PROVIDED

22    IN THERE.  NOT THE EXPENSE FIGURES, AS YOU WELL KNOW.  HE

23    REVIEWED THE REVENUE, FIGURES AND AGGREGATED THEM, SUMMED THEM

24    UP.  THAT IS TRUE.

25          **THE COURT:**  BUT THE EXPENSE FIGURES AT ISSUE WERE IN

1    THE SAME DOCUMENTS THAT HE REVIEWED, CORRECT?

2              **MR. PISTORINO:**  THAT IS TRUE.

3              **THE COURT:**  ALL RIGHT.  SO IT SEEMS TO ME THAT THEY

4    ARE ADMISSIBLE.  AND AS I DISCUSSED YESTERDAY, DR. MATOLO

5    OUGHT TO BE ALLOWED TO RESPOND ON THAT POINT IN REBUTTAL IF

6    PLAINTIFF WANTS.

7              **MR. PISTORINO:**  MAY I JUST ASK ONE -- ADDRESS AT

8    LEAST ONE ISSUE IN THERE THAT I KNOW THAT I HAVE BEEN

9    ADDRESSING IS THAT, AS I INDICATED, THE DOCUMENTS ARE REDACTED

10   WITH INFORMATION REMOVED, PARTICULARLY THE INFORMATION

11   REGARDING EXPENSE INFORMATION.

12        SO, AGAIN, THE SAME THING I KNOW I HAVE BEEN SAYING ALL

13   THE WAY THROUGH.  THERE WOULD BE NO WAY FOR US TO TEST IT WITH

14   REGARD TO EXPENSES -- WITH REGARD TO EXPENSE INFORMATION

15   BECAUSE THE MATERIALS HAVE BEEN REDACTED.

16             **THE COURT:**  HOW WOULD THE REDACTIONS IN ANY WAY

17   AFFECT YOUR ABILITY TO DETERMINE THE RELIABILITY OF THE

18   INFORMATION?

19             **MR. PISTORINO:**  SURE.  BECAUSE SOME OF THE REDACTIONS

20   GO DIRECTLY TO THE PAYROLL AND WHO WAS PAID WITH THE PAYROLL.

21   CLEARLY IT WOULD BE IMPROPER FOR MR. RASURE TO CLAIM PAYMENTS

22   TO HIMSELVES -- TO HIMSELF AS EXPENSES TO REDUCE DEFENDANTS'

23   PROFITS.  AND WE HAVE NO ABILITY TO TEST THAT BECAUSE THE

24   INFORMATION HAS BEEN REMOVED FROM THE DOCUMENTS.

25             **MS. ROBERTS:**  YOUR HONOR, MR. JOHNSON WILL TESTIFY

1    THAT NEITHER MR. RASURE NOR HIS WIFE ARE NAMES THAT WERE

2    REDACTED FROM THAT DOCUMENT.

3          **MR. PISTORINO:**  AND, RESPECTFULLY, YOUR HONOR,

4    THAT -- THAT ASKS US TO RELY ON THEIR REPRESENTATION ABOUT IT.

5    AND THAT, IN OUR VIEW, THAT'S NOT HOW IT WORKS.  WE GET THE

6    INFORMATION WE CAN EVALUATE, NOT RELY ON HAVING THEM -- IF

7    THAT WERE THE CASE, THEY CAN ENTIRELY REDACT THE ENTIRE

8    DOCUMENT AND TELL US THEY MADE ZERO PROFITS.

9          **THE COURT:**  THE OBJECTION IS OVERRULED.

10   THEN WITH BÜNGER, THE EXPERT WITNESS.  I WILL CONFESS,

11   I'VE GOT SOME CONCERNS ABOUT WHAT THE DEFENSE IS TRYING TO DO.

12   UNDER RULE 703, OBVIOUSLY AN EXPERT CAN RELY ON MATERIAL

13   EVEN IF IT'S NOT ADMISSIBLE, BUT IF THE UNDERLYING FACTS OR

14   DATA IS OTHERWISE NOT ADMISSIBLE, IT CAN ONLY BE DISCLOSED TO

15   THE JURY IF ITS PROBATIVE VALUE IS -- IF ITS PROBATIVE VALUE

16   SUBSTANTIALLY OUTWEIGHS PREJUDICIAL EFFECT.

17   WE HAVE A TON OF EMAILS CARPING ABOUT TECHSHOP, SLAMMING

18   TECHSHOP.  THE WHOLE APPENDIX I AM INCLINED TO EXCLUDE UNDER

19   THAT PRINCIPLE.  THE SLIDES REFERRING TO THE UNDERLYING

20   EVIDENCE, I'M INCLINED TO EXCLUDE ON THAT PRINCIPLE.

21   AND MY INCLINATION, FRANKLY, IS TO VOIR DIRE MR. BÜNGER,

22   HAVE HIM VOIR DIRED OUTSIDE THE PRESENCE OF THE JURY TO SEE

23   WHETHER HE'S ACTUALLY GOT A BASIS FOR ALL OF THE OPINIONS HE'S

24   TRYING TO OFFER.  IT SEEMS LIKE HE'S BEEN TURNED INTO SOME

25   KIND OF CATCH-ALL WITNESS.

1          I THINK THE BRAND EQUITY POINT WAS THE MAIN FOCUS OF WHAT

2     WAS DISCLOSED, AND IT SEEMS TO ME HE'S PROBABLY GOT A BASIS

3     FOR DOING THAT.

4          BUT THEN AS TO QUOTE-UNQUOTE, "NO POSSIBILITY OF

5     CONFUSION" BASED ON JUST LOOKING AT THE DOCUMENTS IN EVIDENCE

6     AND OPINING AS MUCH, OR THE IDEA THAT FOREIGN LICENSES DO NOT

7     MEASURE VALUE, I DON'T KNOW WHAT BASIS HE HAS FOR THAT

8     OPINION, THAT AT LEAST IT'S APPARENT ON THE FACE OF HIS C.V.,

9     OR THE CLAIM THAT TECHSHOP'S MARK IS NOT DISTINCTIVE.  HOW HE

10    IS ABLE TO OFFER AN OPINION AS TO THAT LEGAL CONCLUSION?

11         SO I THINK YOU'RE PROBABLY TRYING TO DO TOO MUCH WITH HIM

12    AND I AM INCLINED TO MAKE YOU, OUTSIDE THE PRESENCE OF THE

13    JURY, TRY TO ESTABLISH HIS QUALIFICATIONS TO MAKE THESE

14    OPINIONS, AND I WILL MAKE A DECISION AS TO WHAT, IF ANYTHING,

15    HE CAN TESTIFY TO.

16              **MS. ROBERTS:**  OKAY.

17              **THE COURT:**  WE WILL DO THAT AT THE NEXT BREAK.  I

18    ASSUME THAT MR. RASURE IS GOING TO TAKE US THROUGH OUR FIRST

19    BREAK.

20              **MS. ROBERTS:**  I WOULD EXPECT SO, YOUR HONOR.

21              **THE COURT:**  WHAT, DO YOU HAVE ANY PRELIMINARY

22    RESPONSE?  WHERE, IN HIS QUALIFICATIONS, IS THE BASIS FOR

23    DOING ALL THIS?

24              **MS. ROBERTS:**  SO EVERYTHING IS LAID OUT IN HIS

25    REPORT, AND PLAINTIFF HAS NOT TAKEN THE POSITION, AS FAR AS I

1    UNDERSTAND, THAT ANYTHING IN THE SLIDES WAS NOT DISCLOSED IN

2    THE REPORT.

3        SO HE ACTUALLY... HE HAS EXPERTISE IN TWO AREAS.  BOTH ON

4    THE BRAND EQUITY AND ALSO IN THE MAKERSPACE COMMUNITY.  HE'S

5    GIVEN SPEECHES, WRITTEN PUBLICATIONS, BEEN INTERVIEWED, HE'S

6    WELL RECOGNIZED IN THE MAKER COMMUNITY.  IN FACT, JUST IN THE

7    LESS THAN 12 HOURS SINCE WE GOT THIS OBJECTION LAST NIGHT, HE

8    WAS ABLE TO GET EMAIL RECOMMENDATIONS REGARDING HIS EXPERTISE

9    IN THE MAKER COMMUNITY.

10       SO FOR THE PARTICULAR -- THE THREE AREAS I THINK YOU

11   RAISED -- TWO AREAS, THE ONE ABOUT THE LACK OF DISTINCTIVENESS

12   AND THE NO LIKELIHOOD OF CONFUSION, THAT IS ALL BASED ON HIS

13   KNOWLEDGE OF THE MAKER COMMUNITY, WHICH HE IS A RECOGNIZED

14   EXPERT IN, AND HE CAN ATTEST TO.

15       WITH RESPECT TO THE FOREIGN LICENSES, HE'S... HE'S AN

16   EXPERT IN BRAND EQUITY AND SPECIFICALLY HAS FOCUS ON

17   INTERNATIONAL -- HE DOES A LOT OF WORK IN EUROPEAN COUNTRIES.

18   AND SO HE HAS EXPERTISE, WHICH, AGAIN, YOUR HONOR, HE CAN LAY

19   OUT WITH RESPECT TO THE DIFFERENT VALUES OF BRANDS IN

20   DIFFERENT COUNTRIES.  AND SO WHY A LICENSE IN FRANCE, FOR

21   EXAMPLE, DOES NOT NECESSARILY EQUATE TO THE AMOUNT THAT A

22   LICENSE WOULD GET IN THE UNITED STATES.

23       THAT IS PART OF HIS WORK.  HE'S GOT MORE THAN 25 YEARS IN

24   MARKET RESEARCH AND CORPORATE TECHNOLOGY STRATEGY, INCLUDING

25   IN AN INTERNATIONAL FORUM.  AND SO SPECIFICALLY, WITH RESPECT

```
1    TO THE FOREIGN LICENSES, HE DOES HAVE THE INTERNATIONAL

2    BACKGROUND TO BE ABLE TO WEIGH IN ON THOSE.

3             THE COURT:  ALL RIGHT.  WELL, THIS -- WE'LL TAKE THIS

4    UP OUTSIDE THE JURY'S PRESENCE AT THE FIRST BREAK.  AND YOU

5    WILL NEED TO LAY WHATEVER FOUNDATION YOU THINK YOU CAN FOR ALL

6    OF THE OPINIONS THAT YOU'RE TRYING TO OFFER.

7             MS. ROBERTS:  THANK YOU.

8             THE COURT:  ALL RIGHT.  ANYTHING ELSE?

9        YOU HAD SOME ISSUE?

10            MR. PISTORINO:  I JUST, AGAIN, I DON'T WANT THE COURT

11   TO HAVE THE WRONG IMPRESSION ABOUT SOMETHING.

12       YESTERDAY MORNING THERE WAS SOME DISCUSSION ABOUT

13   MR. NEWTON AND HIS ORDER OF APPEARANCE.  THE REAL POINT THAT I

14   WANTED TO GET ACROSS IS THAT THERE HAD NOT BEEN A MEET AND

15   CONFER ON THAT ISSUE.  YOUR HONOR'S ORDER REQUIRES EITHER AN

16   IN-PERSON OR TELEPHONIC MEET AND CONFER BEFORE EITHER CAN BE

17   BRIEFED TO THE COURT.

18       THE EVENING BEFORE --

19            THE COURT:  YOU ARE NOT HELPING YOURSELF.  NEITHER OF

20   YOU ARE HELPING YOURSELF.  THE FACT THAT WE HAD THIS SPAT AND

21   THEN WE BROUGHT A WITNESS BACK AND HE HAD TO COME HERE FOR TWO

22   MINUTES OF TESTIMONY WAS ABSURD TO ME.

23       I DON'T KNOW WHOSE FAULT IT IS.  I DON'T HAVE ANY

24   VISIBILITY.  IT SEEMS TO ME IF YOU HAD TOLD HIM THIS IS ALL WE

25   WANT TO DO WITH HIM, WE COULD HAVE HAD HIM NOT HAVE TO DRIVE
```

1   BACK HERE.

2        SO I DON'T CARE, COUNSEL.  IT'S JUST... I DON'T HAVE THE

3   TIME AND THE ENERGY WITH ALL THE OTHER STUFF I'M DEALING WITH

4   IN THIS TRIAL TO TRY AND FIGURE OUT WHO IS RESPONSIBLE FOR

5   THAT SITUATION.

6        I CAN JUST TELL YOU, YOU WILL NOT BE SURPRISED TO HEAR, I

7   THOUGHT THE SITUATION ITSELF WAS ABSURD AND WASTED THE

8   WITNESS'S TIME IN A WAY THAT IS UNACCEPTABLE.

9        WE WILL BE BACK AT 8:30.

10        **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

11        (RECESS TAKEN AT 8:17 A.M.; RESUMED AT 8:30 A.M.)

12        **THE CLERK:**  ALL RISE.  THIS COURT IS BACK IN SESSION.

13   THE HONORABLE HAYWOOD S. GILLIAM, JR., PRESIDING.

14        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

15        **THE CLERK:**  YOU MAY BE SEATED.

16        **THE COURT:**  GOOD MORNING, EVERYONE.  WELCOME BACK.

17        YOU WILL RECALL THAT YESTERDAY WE WERE IN THE MIDDLE OF

18   THE DIRECT EXAMINATION OF MR. RASURE, AND WE WILL CONTINUE

19   WITH THAT NOW.

20        YOU MAY PROCEED WHENEVER YOU ARE READY, MS. ROBERTS.

21        **MS. ROBERTS:**  THANK YOU.

22              **DIRECT EXAMINATION (RESUMED)**

23   BY MS. ROBERTS:

24   Q.  CAN YOU TURN TO TX273?

25        **MS. ROBERTS:**  IS IT ADMITTED?

1      **THE CLERK:**  IT IS.  GIVE ME A MINUTE.  I'M SLOW THIS

2   MORNING.

3   **BY MS. ROBERTS:**

4   **Q.**  WHAT IS THIS DOCUMENT?

5   **A.**  THIS IS A DRAFT PRESS RELEASE.

6   **Q.**  THIS DOCUMENT THAT IS TX273, DID IT GET SENT OUT?

7   **A.**  NO, IT DID NOT.

8   **Q.**  WAS THERE A PRESS RELEASE ANNOUNCING THE OPENING OF

9   TECHSHOP 2.0 THAT WAS SENT OUT?

10  **A.**  YES, THERE WAS.

11  **Q.**  WHEN DID YOU SEND THAT OUT?

12  **A.**  FEBRUARY 12TH OF 2018.

13  **Q.**  JUST TO BE CLEAR, THE DOCUMENT THAT YOU ARE LOOKING AT,

14  TX273, IS DATED FEBRUARY 9TH, RIGHT?

15  **A.**  THAT IS CORRECT.

16  **Q.**  YOU DID NOT SEND OUT A PRESS RELEASE ON THAT DATE?

17  **A.**  THAT IS CORRECT.

18  **Q.**  TURN, PLEASE, TO TX930.

19                    (DISPLAYED ON SCREEN.)

20      **THE CLERK:**  MS. ROBERTS, CAN WE STOP FOR A MINUTE?

21  IT IS ON YOUR SIDE, BUT THERE'S SOME TECHNICAL DIFFICULTIES.

22  I'M TRY TO FIGURE OUT WHAT IS GOING ON.

23      **MR. NATHAN:**  IT'S UP.

24      **THE CLERK:**  THANK YOU.

25

1   **BY MS. ROBERTS:**

2   **Q.**  WE ARE GOING TO GO TO TX930.

3           **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

4           **MR. PISTORINO:**  NO OBJECTION.

5           **THE COURT:**  930 IS ADMITTED.

6               (TRIAL EXHIBIT 930 RECEIVED IN EVIDENCE.)

7                       (DISPLAYED ON SCREEN.)

8   **BY MS. ROBERTS:**

9   **Q.**  IS THIS AN EMAIL THAT YOU RECEIVED FROM MR. WOODS ON

10  FEBRUARY 13TH OF 2018?

11  **A.**  YES, IT IS.

12  **Q.**  AND ON THE "TO" LINE IT SAYS, WILLIAM COUGHLIN.  WHO'S

13  THAT?

14  **A.**  CEO OF FORD INNOVATION.

15  **Q.**  AND TO REMIND THE JURY, I THINK YOU TESTIFIED YESTERDAY

16  THAT YOU MET WITH HIM IN YOUR EARLY NEGOTIATIONS WHEN YOU WERE

17  DOING DUE DILIGENCE ON TECHSHOP?

18  **A.**  YES, I DID.

19  **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF MR. WOODS'

20  EMAIL TO MR. COUGHLIN?

21  **A.**  A RESPONSE EMAIL TO MR. COUGHLIN REGARDING THE TECHSHOP

22  DETROIT AND ALSO TECHSHOP 2.0.

23  **Q.**  AND JUST TO BE CLEAR, MR. COUGHLIN IS SOMEBODY OUTSIDE OF

24  TECHSHOP, RIGHT?

25  **A.**  THAT IS CORRECT.

1    **Q.**  AND IN MR. WOODS' RESPONSE TO MR. COUGHLIN, HOW DID HE

2    REFER TO YOUR COMPANY?

3    **A.**  TECHSHOP 2.0.

4    **Q.**  IF I CAN REFER YOU TO THE SECOND PARAGRAPH OF MR. WOODS'

5    EMAIL.

6        CAN YOU JUST READ THAT TO THE JURY?

7    **A.**  (READING)

8            "FURTHER, THERE IS ABSOLUTELY NO RELATIONSHIP BETWEEN

9            MR. RASURE'S TECHSHOP 2.0 ENTITY AND TECHSHOP, INC.

10           OR ITS LLC'S."

11   **Q.**  REMIND THE JURY HOW MANY DAYS BEFORE THIS LAWSUIT WAS

12   FILED WAS THIS EMAIL SENT?

13   **A.**  THREE DAYS.

14   **Q.**  SO THREE DAYS PRIOR TO FILING THE LAWSUIT, MR. WOODS

15   REFERRED TO YOUR COMPANY AS TECHSHOP 2.0?

16   **A.**  THAT IS CORRECT.

17   **Q.**  TURN TO TX913.

18           **THE CLERK:**  IT'S NOT IN.

19           **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

20           **MR. PISTORINO:**  NO OBJECTION.

21           **THE COURT:**  ADMITTED.

22       (TRIAL EXHIBIT 913 RECEIVED IN EVIDENCE.)

23               (DISPLAYED ON SCREEN.)

24   **BY MS. ROBERTS:**

25   **Q.**  IS THIS AN EMAIL YOU SENT TO MR. WOODS ON FEBRUARY 13TH OF

1    2018?

2    **A.**  YES, IT IS.

3    **Q.**  WHAT WAS THE PURPOSE OF THIS EMAIL?

4    **A.**  AN UPDATE REGARDING THE AUTODESK OFFER AND PROOF OF FUNDS

5    BEING SENT TO AUTODESK WITH THE SIGNED AGREEMENT.

6    **Q.**  SO AS OF FEBRUARY 13TH OF 2018, WERE YOU STILL NEGOTIATING

7    WITH AUTODESK?

8    **A.**  YES, I WAS.

9    **Q.**  AND THOSE WERE NEGOTIATIONS THAT WERE RELATED TO THE

10   ULTIMATE GOAL OF ACQUIRING TECHSHOP?

11   **A.**  THAT IS THE SECURED DEBT OF TECHSHOP, YES.

12   **Q.**  AND ON FEBRUARY 13TH, DID YOU PROVIDE MR. WOODS, THE CEO

13   OF TECHSHOP, A STATUS REPORT OF YOUR NEGOTIATIONS WITH

14   AUTODESK?

15   **A.**  YES, I DID.

16   **Q.**  SO AS OF FEBRUARY 13TH, MR. WOODS KNEW YOU WERE STILL

17   HAVING COMMUNICATIONS WITH AUTODESK?

18   **A.**  THAT IS CORRECT.

19   **Q.**  TURN TO TX650, WHICH IS ADMITTED.

20          **THE CLERK:**  UH-HUH.

21                  (DISPLAYED ON SCREEN.)

22   **BY MS. ROBERTS:**

23   **Q.**  THIS IS THE LETTER WE HAVE SEEN THAT YOU RECEIVED FROM

24   MR. WOODS ON FEBRUARY 14TH OF 2018, CORRECT?

25   **A.**  CORRECT.

RASURE - DIRECT / ROBERTS

1    Q.  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL --

2    THE LETTER ATTACHED TO THE EMAIL?

3    A.  IT WAS A LETTER AMENDING THE TECHSHOP 2.0 MAILING ADDRESS.

4    Q.  AND THE LETTER THAT'S ATTACHED TO THE EMAIL, WHAT DID YOU

5    UNDERSTAND THE PURPOSE OF THAT?

6    A.  A LETTER ADDRESSING MR. BYERS WITH THE HEARST CORPORATION

7    AND MYSELF OF TECHSHOP 2.0 REGARDING THE FORMER TECHSHOP

8    FACILITY.

9    Q.  CAN YOU REMIND THE JURY WHO MR. BYERS IS?

10   A.  THE LANDLORD CONTACT FOR HEARST.

11   Q.  AND HEARST WAS THE LANDLORD FOR THE FACILITY AT 926

12   HOWARD?

13   A.  VIA THEIR 5M PROJECT LLC, YES.

14   Q.  DID THE FEBRUARY 14TH, 2018 LETTER SAY THAT YOU COULD NOT

15   USE THE NAME TECHSHOP 2.0?

16   A.  NO, IT DID NOT.

17   Q.  DID YOU UNDERSTAND THE FEBRUARY 14TH, 2018 LETTER TO BE

18   ASKING YOU TO CEASE AND DESIST USING THE NAME TECHSHOP 2.0?

19   A.  NO, I DID NOT.

20   Q.  DO YOU HAVE AN UNDERSTANDING AS TO WHY MR. WOODS WOULD

21   SEND THIS LETTER TO YOU AND MR. BYERS ON FEBRUARY 14TH IN

22   TERMS OF TIMING?

23   A.  WE HAD ANNOUNCED THE OPENING OF THE TECHSHOP 2.0 LOCATION

24   ON FEBRUARY 12TH.

25   Q.  AND HOW WERE YOU ABLE TO OPEN A LOCATION IN SAN FRANCISCO

```
 1    WITHOUT COMPLETING YOUR TRANSACTION WITH TECHSHOP FIRST?
 2    A.   TECHSHOP DID NOT OWN ANY OF THE ASSETS IN THE BUILDING.
 3    THEY WERE OWNED BY THE 5M PROJECT LLC.
 4         THE LANDLORD REACHED OUT TO US IN EARLY JANUARY TO
 5    COMPLETE A TRANSACTION WITH THEM, STATING THAT TECHSHOP HAD
 6    NOT BEEN HONEST WITH US AND THAT --
 7              MR. PISTORINO:  OBJECTION, YOUR HONOR, HEARSAY.
 8              THE COURT:  SUSTAINED.
 9              THE WITNESS:  THAT THEIR --
10    BY MS. ROBERTS:
11    Q.   LEAVING OUT WHAT HEARST SAID TO YOU, HOW DID YOU END UP
12    BEING ABLE TO OPEN A LOCATION WITHOUT FIRST COMPLETING A
13    TRANSACTION WITH TECHSHOP?
14    A.   ALL THE ASSETS IN THE FACILITY WERE OWNED BY 5M PROJECT
15    LLC WHICH WAS CONTROLLED BY THE HEARST FAMILY.
16    Q.   DID YOU OPEN A MAKERSPACE IN SAN FRANCISCO USING
17    TECHSHOP'S MACHINERY?
18    A.   NO, WE DID NOT.
19    Q.   WHEN YOU STARTED YOUR LEASE AT 926 HOWARD, WE HAVE HEARD
20    SOME TESTIMONY ABOUT COMPUTERS THAT HAD TECHSHOP'S CUSTOMER
21    LIST ON THEM.
22         WERE THEY STILL THERE?
23    A.   NOT TO MY KNOWLEDGE.  HEARST, AFTER THIS LETTER WAS SENT,
24    HEARST DID REMOVE ALL FRONT DESK COMMUTERS OUT OF AN ABUNDANCE
25    OF CAUTION.
```

RASURE – DIRECT / ROBERTS

1   **Q.**  IN YOUR NEGOTIATIONS WITH HEARST OVER THE LEASE, DID YOU

2   EVER TELL HEARST THAT YOU HAD A DEAL WITH TECHSHOP?

3   **A.**  NO, I DID NOT.

4   **Q.**  DO YOU HAVE AN UNDERSTANDING OF WHAT HAPPENED TO THE

5   MACHINERY AT THE OTHER FORMER TECHSHOP LOCATIONS?

6   **A.**  I BELIEVE THE EQUIPMENT WAS ABANDONED.  REALLY THE STAY

7   WAS GRANTED, AND AUCTIONS HAVE EITHER BEEN COMPLETED OR

8   WAITING ON DISPOSITION OF THE EQUIPMENT.

9   **Q.**  CAN YOU TURN TO TX652, WHICH IS ADMITTED.

10                  (DISPLAYED ON SCREEN.)

11      IS THIS AN EMAIL YOU SENT ON FEBRUARY 15TH?

12  **A.**  YES, IT IS.

13  **Q.**  THAT'S THE DAY BEFORE YOU WERE SUED?

14  **A.**  THAT IS.

15  **Q.**  YOU SENT IT TO MR. WOODS, MR. BUSCH, MR. NEWTON, AND

16  MR. DOHERTY?

17  **A.**  I DID.

18  **Q.**  WHAT WAS THE PURPOSE OF THIS EMAIL THAT YOU SENT?

19  **A.**  AN UPDATE RELATED TO THE NEGOTIATIONS RELATED TO THE

20  SECURED DEBT.

21  **Q.**  SO THE DAY BEFORE YOU WERE SUED, YOU WERE PROVIDING

22  UPDATES TO TECHSHOP ON THE STATUS OF YOUR NEGOTIATIONS?

23  **A.**  THAT IS CORRECT.  BILL LLOYD WAS ONE OF THE LARGEST

24  CREDITORS VIA JUDGMENT THAT WAS PREVIOUSLY UNDISCLOSED TO ME.

25      AND HE HAD AGREED TO CARRY THE MAJORITY OF THAT DEBT SO A

RASURE - DIRECT / ROBERTS

1    DEAL WITH AUTODESK COULD BE COMPLETED.

2    **Q.**  SO WE ARE A DAY BEFORE THE LAWSUIT IS FILED AND YOU ARE

3    STILL NEGOTIATING?

4    **A.**  THAT IS CORRECT.

5    **Q.**  TURN TO TX653.

6         **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT THIS

7    EXHIBIT.

8         **MR. PISTORINO:**  NO OBJECTION.

9         **THE COURT:**  ADMITTED.

10        (TRIAL EXHIBIT 653 RECEIVED IN EVIDENCE.)

11             (DISPLAYED ON SCREEN.)

12   **BY MS. ROBERTS:**

13   **Q.**  IS THIS AN EMAIL THAT YOU SENT TO JOSH EWING ON

14   FEBRUARY 16 OF 2018?

15   **A.**  YES, IT IS.

16   **Q.**  AS A REMINDER TO THE JURY JOSH EWING IS WITH AUTODESK?

17   **A.**  YES.

18   **Q.**  AND AS THE JURY IS AWARE, THIS LAWSUIT WAS FILED ON

19   FEBRUARY 16TH, 2018, RIGHT?

20   **A.**  THAT IS CORRECT.

21   **Q.**  IN TERMS OF TIME OF DAY, HAD YOU RECEIVED THE LAWSUIT --

22   NOTICE OF THE LAWSUIT AS OF THE TIME YOU SENT THIS EMAIL?

23   **A.**  NO, I HAD NOT.

24   **Q.**  CAN YOU EXPLAIN TO THE JURY WHAT THE PURPOSE OF THIS EMAIL

25   WAS?

RASURE - DIRECT / ROBERTS

1    **A.**   THIS WAS AN AGREEMENT THAT WAS DRAFTED BY AUTODESK FOR THE

2    COMPLETION OF THE SECURED DEBT.  THIS DOCUMENT WAS SIGNED,

3    SENT BACK TO AUTODESK.

4    **Q.**   JUST TO BE CLEAR, THIS IS AN EMAIL THAT HAS AN ATTACHMENT

5    TO IT, RIGHT?

6    **A.**   YES, IT IS.

7    **Q.**   AND THE ATTACHMENT IS A DRAFT PURCHASE AND SALE AGREEMENT?

8    **A.**   YES, IT IS.

9    **Q.**   AND THAT WAS PREPARED BY AUTODESK?

10   **A.**   YES, IT WAS.

11   **Q.**   YOU SAID IT WAS SIGNED.  I SEE, IF YOU TURN ON THE LAST

12   PAGE, TO PAGE 29, YOU SIGNED THE DRAFT AGREEMENT THAT AUTODESK

13   HAD SENT YOU?

14   **A.**   THAT IS CORRECT.

15   **Q.**   AND IN THE DRAFT AGREEMENT WITH AUTODESK, HOW IS YOUR

16   COMPANY REFERENCED?

17   **A.**   TECHSHOP 2.0.

18   **Q.**   AND, AGAIN, YOU SENT THIS BACK THE MORNING OF THE DAY YOU

19   WERE SUED?

20   **A.**   THAT IS CORRECT.

21   **Q.**   TURN TO TX654.

22        **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

23        **MR. PISTORINO:**  NO OBJECTION.

24        **THE COURT:**  ADMITTED.

25          (TRIAL EXHIBIT 654 RECEIVED IN EVIDENCE.)

```
 1                    (DISPLAYED ON SCREEN.)

 2    BY MS. ROBERTS:

 3    Q.   THIS IS AN EMAIL FROM JPCLAXTON@CATALYSTOG.COM TO JOSH

 4    EWING, RIGHT?

 5    A.   THAT IS CORRECT.

 6    Q.   YOU ARE CC'D?

 7    A.   I AM.

 8    Q.   WHO IS JP CLAXTON?

 9    A.   A MAJOR DIRECTOR OF THE CATALYST OPERATING GROUP AS WELL

10    AS PRESIDENT OF PIRANHA FABRICATION.

11    Q.   WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF MR. CLAXTON'S

12    EMAIL TO MR. EWING?

13    A.   FINANCING LETTER FOR... FOR THE AUTODESK AGREEMENT.

14    Q.   SO WERE YOU PROVIDING EVIDENCE OF FINANCING TO AUTODESK?

15    A.   YES, I WAS.

16    Q.   VIA JP CLAXTON?

17    A.   YES, I WAS.

18    Q.   THAT WAS PROVIDED THE MORNING BEFORE YOU WERE SUED?

19    A.   CORRECT.

20    Q.   AND THE TWO DOCUMENTS WE JUST LOOKED AT, TX54 AND TX53,

21    WERE THOSE THE FIRST PROPOSALS THAT WERE EXCHANGED WITH

22    AUTODESK?

23    A.   NO, THEY WERE NOT.

24    Q.   PRIOR TO FEBRUARY 16TH, HOW MUCH BACK AND FORTH HAD THERE

25    BEEN WITH AUTODESK?
```

1    **A.**  SEVERAL BACK AND FORTHS ON DISCUSSIONS, BUT AT LEAST FIVE

2    TO TEN DIFFERENT OFFERS.

3    **Q.**  SO YOU -- WERE YOUR NEGOTIATIONS WITH AUTODESK ONGOING

4    OVER THE COURSE OF -- FROM, YOU KNOW, LATE NOVEMBER 2017 UNTIL

5    THE MORNING OF FEBRUARY 16, 2018?

6    **A.**  AND PASSED THE 16TH, YES.

7    **Q.**  YOU CONTINUED TO NEGOTIATE?

8    **A.**  YES, WE DID.

9    **Q.**  AGAIN, AS A REMINDER TO THE JURY, WHY DID YOU NEED TO

10   NEGOTIATE WITH AUTODESK IN CONNECTION WITH ACQUIRING TECHSHOP?

11   **A.**  BECAUSE EVEN THOUGH THE UCC OR EQUIVALENT MORTGAGE OF THE

12   DEBT HAD EXPIRED, THEY WERE STILL LISTED AS A SECURED CREDITOR

13   OF TECHSHOP.

14   **Q.**  SO THEY HAD TO BE PART OF THE DEAL?

15   **A.**  YES, THEY DID.

16   **Q.**  WE HEARD TESTIMONY ABOUT AN ARTICLE THAT RAN IN THE *SAN*

17   *FRANCISCO CHRONICLE* ABOUT THE PLANNED OPENING OF TECHSHOP 2.0.

18       DO YOU RECALL THAT?

19   **A.**  I DO.

20   **Q.**  DO YOU RECALL THE DATE OF THE ARTICLE?

21   **A.**  I BELIEVE IT WAS PUBLISHED ON THE 15TH.

22   **Q.**  ON WHAT DAY WERE YOU INTERVIEWED FOR THE ARTICLE?

23   **A.**  THE 13TH, I BELIEVE.

24   **Q.**  THERE WAS A PICTURE OF YOU SWEEPING IN THE ARTICLE.

25       WAS THE PICTURE TAKEN ON THE SAME DAY?

1  **A.**  IT WAS.

2  **Q.**  YOU RECALL IN YOUR PICTURE YOU CAN SEE THERE'S A TECHSHOP

3  SIGN BEHIND YOU.

4  **A.**  I DO SEE THAT NOW.

5  **Q.**  WHY WAS YOUR PICTURE TAKEN IN FRONT OF THE TECHSHOP SIGN?

6  **A.**  I HAD BEEN IN THE FACILITY LESS THAN 15 MINUTES WHEN THAT

7  PICTURE WAS TAKEN.  MYSELF AND ONE OTHER PERSON, WE ENTERED

8  THE BUILDING WITH HEARST SECURITY, AND THE *CHRONICLE*, THE

9  OTHER EMPLOYEES -- THE OTHER WORKERS STARTED CLEANING

10  MACHINES.  I GRABBED A BROOM AND STARTED SWEEPING.  I WAS NOT

11  AWARE OF MY SURROUNDINGS OR ANYTHING THAT WAS ON THE WALL.

12  **Q.**  WHEN YOU SAY YOU HAD JUST GOTTEN INTO THE BUILDING, YOU

13  HADN'T PRIOR BEEN ABLE TO GET ACCESS TO GET THE BUILDING READY

14  FOR OPENING?

15  **A.**  THAT IS CORRECT.  OUR LEASE WAS NOT -- WE HAD JUST GAINED

16  EARLY ACCESS TO THE BUILDING, BUT WE DID NOT HAVE LEGAL

17  CONTROL OF THE BUILDING AT THAT TIME.

18  **Q.**  TURN NOW TO TX656, WHICH IS ADMITTED.

19                    (DISPLAYED ON SCREEN.)

20     AND THIS IS THE EMAIL FROM MR. PISTORINO TO YOU ATTACHING

21  A CEASE AND DESIST LETTER AND THE COMPLAINT THAT HAD ALREADY

22  BEEN FILED, RIGHT?

23  **A.**  YES, IT IS.

24  **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF

25  MR. PISTORINO'S CORRESPONDENCE?

RASURE - DIRECT / ROBERTS

1  **A.**  NOTIFYING ME THAT I HAD BEEN SUED AND A CEASE AND DESIST

2  LETTER.

3  **Q.**  AND WHEN YOU RECEIVED THIS, WHAT TIME DOES THE EMAIL SAY

4  ON THIS DOCUMENT?

5  **A.**  7:21 P.M.

6  **Q.**  WHEN YOU RECEIVED IT, WHAT WAS YOUR REACTION?

7  **A.**  SHOCKED.  WE HAD JUST SAT DOWN AS A GROUP TO EAT A LITTLE

8  BIT OF DINNER.

9      I IMMEDIATELY CONTACTED OUR IT PERSON TO TAKE DOWN ALL OF

10  OUR FACEBOOK PAGES, GROUPS, WEBSITES.  I BELIEVE I ALSO SENT

11  IT TO A LAWYER.

12      AND THEN THE FIRST THING I DID ONCE WE -- ONCE I GOT OUT

13  OF THE CHAIR WAS TAKE DOWN A SIGN THAT WAS ON THE FRONT OF THE

14  BUILDING; THAT EVEN THOUGH WE DIDN'T HAVE LEGAL CONTROL OF THE

15  BUILDING, I WANTED ALL EVIDENCE OF TECHSHOP REMOVED

16  IMMEDIATELY.

17  **Q.**  REMIND THE JURY, WHEN DID YOU FIRST USE THE NAME TECHSHOP

18  2.0 IN YOUR DEALINGS WITH TECHSHOP?

19  **A.**  APPROXIMATELY DECEMBER 1ST, 2017.

20  **Q.**  PRIOR TO FEBRUARY 16TH, WHEN YOU RECEIVED THIS LETTER,

21  WHAT WAS YOUR UNDERSTANDING AS TO WHETHER YOU WERE PERMITTED

22  TO USE THE NAME TECHSHOP 2.0?

23  **A.**  THAT I WAS PERMITTED AND AUTHORIZED.

24  **Q.**  WHAT WAS THAT UNDERSTANDING BASED ON?

25  **A.**  THE TECHSHOP BOARD APPROVED THE TECHSHOP 2.0 NAME.  THE

1   ONLY REASON WHY THE TECHSHOP 2.0 NAME WAS FORMED WAS AT THE

2   INSISTENCE OF THE BOARD WHEN THE MOU WAS SIGNED.  AND THERE

3   HAD NOT BEEN ANY OBJECTIONS SINCE.

4   **Q.**  WHEN YOU SAY THERE HADN'T BEEN OBJECTION SINCE, THERE HAS

5   BEEN A TWO-AND-A-HALF MONTH PERIOD OF TIME SINCE THE

6   MEMORANDUM OF UNDERSTANDING WAS SIGNED, RIGHT?

7   **A.**  THAT IS CORRECT.

8   **Q.**  SO IS THERE ANYTHING ABOUT THAT PERIOD OF TIME THAT YOUR

9   UNDERSTANDING WAS BASED ON?

10  **A.**  THERE HAD BEEN NO OBJECTIONS DURING THAT PERIOD OF TIME.

11  **Q.**  IN THAT PERIOD OF TIME, YOU WERE USING THE NAME TECHSHOP

12  2.0, RIGHT?

13  **A.**  THAT IS CORRECT.

14  **Q.**  PRIOR TO RECEIVING THE FEBRUARY 16TH, 2018 LETTER, HAD

15  ANYONE AT TECHSHOP OBJECTED TO YOUR USE OF THE NAME TECHSHOP

16  2.0?

17  **A.**  NO, THEY HAD NOT.

18  **Q.**  PRIOR TO RECEIVING THE FEBRUARY 16, 2018 LETTER, HAD

19  ANYONE AT TECHSHOP INDICATED TO YOU THAT USE OF THE NAME

20  TECHSHOP 2.0 INFRINGED ANY TECHSHOP TRADEMARKS?

21  **A.**  NO, THEY HAD NOT.

22  **Q.**  PRIOR TO FEBRUARY 16TH, 2018, HAD ANYONE AT TECHSHOP

23  INDICATED THAT USE OF THE NAME TECHSHOP 2.0 WAS LIKELY TO

24  CAUSE CONSUMER CONFUSION?

25  **A.**  NO, THEY HAD NOT.

1   **Q.**  PRIOR TO FEBRUARY 16TH, 2018, HAD ANYONE AT TECHSHOP

2   INDICATED TO YOU THAT YOU WERE ONLY ALLOWED TO USE THE NAME

3   TECHSHOP 2.0 IF YOU ENTERED INTO AN AGREEMENT WITH TECHSHOP?

4   **A.**  NO, THEY HAD NOT.

5   **Q.**  PRIOR TO FEBRUARY 16TH OF 2018, HAD ANYONE AT TECHSHOP

6   INDICATED TO YOU THAT YOU WERE ONLY ALLOWED TO USE THE NAME

7   TECHSHOP 2.0 IN NEGOTIATIONS WITH TECHSHOP?

8   **A.**  NO, THEY HAD NOT.

9   **Q.**  NOW YOU STARTED TO TALK ABOUT THE STEPS YOU TOOK AFTER

10  RECEIVING NOTICE OF THE LAWSUIT.  BEFORE WE GET INTO THE

11  STEPS, CAN YOU TELL THE JURY, BEFORE FEBRUARY 16TH, 2018, HOW

12  WERE YOU ACTUALLY USING THE NAME TECHSHOP 2.0?

13  **A.**  AT THAT PERIOD WE HAD NOT OPENED A FACILITY.  WE WERE

14  USING IT TO COMMUNICATE WITH PEOPLE WHO SIGNED UP ON OUR

15  NEWSLETTER LIST AND VIA OUR FACEBOOK PAGE.  NEWS ARTICLES

16  REFERENCED US AS TECHSHOP 2.0.  BUT AT THAT POINT WE HADN'T

17  ACTUALLY DELIVERED ON ANY PRODUCTS.

18  **Q.**  DID YOU EVER OPEN ANY LOCATIONS WITH THE NAME TECHSHOP

19  2.0?

20  **A.**  NO, WE DID NOT.

21  **Q.**  BETWEEN FEBRUARY OF 2017 THROUGH FEBRUARY 16TH OF 2018,

22  WHAT SERVICES WERE YOU OFFERING TO CUSTOMERS UNDER THE NAME

23  TECHSHOP 2.0?

24  **A.**  NO SERVICES.

25  **Q.**  WHEN DID YOU FIRST START OFFERING MEMBERSHIPS TO YOUR

1  COMPANY?

2  **A.**  WE OFFERED PRE-BOOKING FOR MEMBERSHIPS ON -- STARTING

3  FEBRUARY 12TH.  NONE OF THOSE SERVICES BECAME ACTIVE UNTIL

4  FEBRUARY 19TH WITH THESHOP.BUILD.

5      THE FIRST DAY WE OFFERED ANY SERVICES WAS VIA

6  THESHOP.BUILD ON FEBRUARY 19TH.

7  **Q.**  AND SO I JUST WANT TO CIRCLE BACK ON THOSE DATES.

8      YOU SAID YOU FIRST STARTED OFFERING PRE-MEMBERSHIPS ON

9  FEBRUARY 12TH BUT THEY DIDN'T BECOME ACTIVE UNTIL

10  FEBRUARY 19TH?

11  **A.**  THAT'S CORRECT.

12  **Q.**  THAT'S BECAUSE YOU DIDN'T HAVE A STORE OPEN YET?

13  **A.**  THAT IS CORRECT.

14  **Q.**  AND FOR HOW LONG DID YOU OFFER PRE-MEMBERSHIPS UNDER THE

15  NAME TECHSHOP 2.0?

16  **A.**  FROM FEBRUARY 12TH UNTIL THE EVENING OF FEBRUARY 16TH.

17  **Q.**  IN THE TIME PERIOD FROM FEBRUARY 15TH, 2017 THROUGH

18  FEBRUARY 16TH, 2018, WAS TECHSHOP OFFERING ANY SERVICES TO

19  CUSTOMERS?

20  **A.**  NO, THEY WERE NOT.

21  **Q.**  OKAY.  SO NOW AFTER LEARNING THAT TECHSHOP CONTENDED THAT

22  TECHSHOP 2.0 INFRINGED ITS MARKS, WHAT DID YOU DO?

23  **A.**  WE TOOK THE SAFE ROUTE AND RENAMED OUR COMPANY

24  THESHOP.BUILD.

25  **Q.**  HOW DID YOU COME UP WITH THAT NAME?

RASURE - DIRECT / ROBERTS

1   **A.**  THE SHOP WAS THE MOST GENERIC WAY TO DESCRIBE WHERE YOU GO

2   TO BUILD SOMETHING.  IT WAS A NAME THAT I HAD PREVIOUSLY

3   FLOATED IN JANUARY.  WE ALREADY HAD BEEN THE WEB DOMAINS

4   PURCHASED.  AND SO WE COMPLETED THAT NAME CHANGE.

5   **Q.**  HOW DID THE PHRASE "DOT BUILD" GET INCLUDED IN THE NAME?

6   **A.**  DOT COM WAS ALREADY TAKEN.  DOT BUILD REFERENCED ALSO WHAT

7   WE DO, AND IT WAS ALSO A TOP-LEVEL DOMAIN.

8   **Q.**  WHAT WAS THE FIRST THING YOU DID TO CHANGE THE NAME TO

9   THESHOP.BUILD?

10  **A.**  NOTIFIED OUR IT PERSON TO TAKE DOWN ALL FACEBOOK PAGES,

11  WEBSITES, ANYTHING THAT REFERENCED TECHSHOP 2.0 AS FAST AS WE

12  COULD.

13  **Q.**  YOU ALSO MENTIONED REFERENCE TO A SIGN ON THE BUILDING?

14  **A.**  THAT IS CORRECT.

15  **Q.**  WHAT HAPPENED WITH THE SIGN?

16  **A.**  THE SIGN WAS REMOVED.

17  **Q.**  AND WHEN YOU ACTUALLY OPENED FOR BUSINESS ON

18  FEBRUARY 19TH, WHAT DID THE SIGN OUTSIDE THE BUSINESS SAY?

19  **A.**  THESHOP.BUILD.

20  **Q.**  TURN TO TX1159.

21          **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

22          **MR. PISTORINO:**  NO OBJECTION.

23          **THE COURT:**  ADMITTED.

24          (TRIAL EXHIBIT 1159 RECEIVED IN EVIDENCE.)

25                  (DISPLAYED ON SCREEN.)

RASURE - DIRECT / ROBERTS

1    **BY MS. ROBERTS:**

2    **Q.**  DO YOU RECOGNIZE THIS PICTURE?

3    **A.**  I DO.  IT WAS A PICTURE I TOOK OF THE BUILDING ON

4    FEBRUARY 16TH.

5    **Q.**  THIS IS THE BUILDING 926 HOWARD IN SAN FRANCISCO?

6    **A.**  YES, IT IS.

7    **Q.**  HOW DO YOU KNOW THAT YOU TOOK THIS PICTURE ON

8    FEBRUARY 16TH?

9    **A.**  BECAUSE AS SOON AS THE SIGN WAS REMOVED, I TOOK A PICTURE.

10   **Q.**  DID YOU PERSONALLY TAKE DOWN THE SIGN?

11   **A.**  MYSELF AND TWO OTHERS.

12   **Q.**  IN ADDITION TO THE SIGN, I THINK YOU SAID YOU TALKED TO

13   YOUR IT PERSON ABOUT CHANGING THE NAME WHERE IT APPEARED ON

14   THE WEB; IS THAT RIGHT?

15   **A.**  THAT IS CORRECT.  WE HAD A FEW ISSUES GETTING AHOLD OF

16   HIM, SO THERE WAS WHAT ABOUT A 30- TO 60-MINUTE LAG IN GETTING

17   AHOLD OF HIM.

18   **Q.**  DID TECHSHOP 2.0 HAVE A DOMAIN NAME?

19   **A.**  YES, IT DID.

20   **Q.**  WHAT DID YOU DO WITH THE DOMAIN NAME?

21   **A.**  OUR CERTIFICATES, OUR SECURITY CERTIFICATES WERE TIED TO

22   THE DOMAIN NAME.  GIVEN THIS WAS A HOLIDAY WEEKEND, WE DID

23   EVERYTHING WE COULD TO CHANGE EVERYTHING RELATED TO THAT.

24      HE DID HAVE SOME ISSUES, BUT THE TRANSITION TO

25   THESHOP.BUILD WAS COMPLETED AS FAST AS POSSIBLE.

1      OUR CRM WAS ALSO DIRECTLY TIED INTO OUR DOMAIN THROUGH A

2   THIRD-PARTY PROVIDER, AND GIVEN IT WAS A WEEKEND, AND HOLIDAY

3   WEEKEND, IT WAS VERY DIFFICULT TO GET AHOLD OF PEOPLE.

4   **Q.**  CAN YOU TURN TO TX531.

5           **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

6           **MR. PISTORINO:**  NO OBJECTION.

7           **THE COURT:**  ADMITTED.

8               (TRIAL EXHIBIT 531 RECEIVED IN EVIDENCE.)

9                   (DISPLAYED ON SCREEN.)

10  **BY MS. ROBERTS:**

11  **Q.**  MR. RASURE, DO YOU RECOGNIZE THIS DOCUMENT?

12  **A.**  I DO.

13  **Q.**  WHAT IS THIS?

14  **A.**  A TEXT MESSAGE I SENT TO JERRY GABLE.

15  **Q.**  CAN YOU TELL THE JURY WHO JERRY GABLE IS?

16  **A.**  HE WAS A FORMER TECHSHOP INVESTOR WHO WAS SERVING AS A

17  VOLUNTEER WITH US AT THAT POINT FROM CHANDLER, ARIZONA.

18  **Q.**  WHAT WAS HIS ROLE?  WHAT WAS HE DOING, HIS VOLUNTEER ROLE

19  FOR YOUR COMPANY?

20  **A.**  HE CREATED OUR CRM, OUR CUSTOMER RELATION MANAGEMENT

21  SYSTEM AS WELL AS SET UP OUR WEBSITE AND A LOT OF OUR INITIAL

22  COMMUNICATION METHODS.

23  **Q.**  CAN YOU READ FOR THE JURY THE DATE AND TIME OF THAT -- THE

24  FIRST MESSAGE ON THIS EXHIBIT?

25  **A.**  2/16 OF '18.

1    **Q.**  WHAT TIME?

2    **A.**  9:33 P.M.

3    **Q.**  AND CAN YOU READ FOR THE JURY WHAT YOU TEXTED TO MR. GABLE

4    THERE?

5    **A.**  (READING)

6          "THIS IS URGENT.  CALL ME BACK.  WE NEED TO SWITCH

7          OVER THE WEBSITE ASAP."

8    **Q.**  SO THAT'S THE EVENING YOU RECEIVED NOTICE OF THE LAWSUIT?

9    **A.**  IT IS.

10   **Q.**  WERE YOU ABLE TO CHANGE EVERYTHING THAT USED THE NAME

11   TECHSHOP 2.0 ON FEBRUARY 16TH, 2018?

12   **A.**  WE WERE NOT.

13   **Q.**  WHY NOT?

14   **A.**  AGAIN, FRIDAY EVENING, HOLIDAY WEEKEND, AND AT THE END OF

15   THE DAY, WE WERE A VERY SMALL COMPANY AT THE TIME.

16   **Q.**  DID YOU WORK TO CHANGE THE NAME AS QUICKLY AS YOU COULD?

17   **A.**  YES, WE DID.

18   **Q.**  AFTER YOU CHANGED YOUR NAME, WAS THERE ANYONE WHO STILL

19   REFERRED TO YOUR COMPANY AS TECHSHOP 2.0?

20   **A.**  WE HAD SOME VENDORS WHO WE HAD ALREADY SET UP ACCOUNTS

21   WITH THAT WERE VERY SLOW ABOUT CHANGING... CHANGING OUR NAME

22   IN THEIR BOOKS.  AS WELL AS WE HAD SOME CUSTOMERS WHO HAD

23   RECEIVED PRIOR EMAILS WHO REPLIED TO THOSE EMAILS AS WELL.

24   **Q.**  SO FOR THE VENDORS, IS IT CORRECT YOU SET UP ACCOUNTS AS

25   TECHSHOP 2.0?

RASURE - DIRECT / ROBERTS

1    **A.**  WE HAD.

2    **Q.**  AND SO, FOR EXAMPLE, LIKE IF YOU WERE SENT AN INVOICE,

3    THEY DIDN'T CHANGE YOUR NAME IN THE SYSTEM AND SO THE INVOICE

4    MIGHT STILL SAY TECHSHOP 2.0?

5    **A.**  THAT IS CORRECT.

6    **Q.**  AND THEN YOU MENTIONED CUSTOMERS, TOO.  CAN YOU EXPLAIN

7    YOUR UNDERSTANDING AS TO WHY SOME CUSTOMERS CONTINUED TO CALL

8    THE COMPANY TECHSHOP 2.0?

9    **A.**  WELL, SINCE DECEMBER --

10         **MR. PISTORINO:**  OBJECTION, CALLS FOR SPECULATION.

11         **THE COURT:**  SUSTAINED IN THE FORM IT WAS ASKED.

12   BY MS. ROBERTS:

13   **Q.**  I THINK YOU HAD SAID SOMETHING ABOUT CUSTOMERS HAVING

14   RECEIVED EMAILS FROM TECHSHOP 2.0; IS THAT WHAT YOU SAID?

15   **A.**  THAT IS CORRECT.

16   **Q.**  CAN YOU EXPAND ON THAT TO EXPLAIN TO THE JURY WHAT YOU

17   MEANT BY THAT IN CONNECTION WITH CUSTOMERS CONTINUING TO CALL

18   THE COMPANY TECHSHOP 2.0?

19   **A.**  SINCE DECEMBER 1ST WE HAD HAD AN EMAIL PROGRAM.  WE

20   PROVIDED UPDATES TO PEOPLE WHO HAD SIGNED UP, AND THOSE EMAILS

21   REFERENCED US AS TECHSHOP 2.0.

22   **Q.**  AND JUST TO BE CLEAR, THE EMAILS YOU ARE REFERRING TO ARE

23   EMAILS THAT WERE SENT OUT BEFORE FEBRUARY 16TH OF 2018?

24   **A.**  THAT IS CORRECT.

25   **Q.**  SO CUSTOMERS HAD BEEN HEARING YOUR COMPANY CALLED TECHSHOP

RASURE - DIRECT / ROBERTS

1   2.0 FROM THAT PERIOD WHEN THE MEMORANDUM OF UNDERSTANDING WAS

2   ANNOUNCED ON DECEMBER 1ST UNTIL FEBRUARY 16TH OF 2018?

3   **A.**   THAT IS CORRECT.

4   **Q.**   NOW WHAT WAS THE DOMAIN NAME THAT TECHSHOP 2.0 USED?

5   **A.**   TECHSHOP2.COM.

6   **Q.**   DID THAT GET CHANGED?

7   **A.**   YES, IT DID.

8   **Q.**   WHAT DID IT CHANGE TO?

9   **A.**   THESHOP.BUILD.

10  **Q.**   WHEN WERE YOU ABLE TO CHANGE THE DOMAIN NAME IN RELATION

11  TO WHEN THE LAWSUIT WAS FILED?

12  **A.**   THE PROCESS STARTED THAT EVENING.  BUT GIVEN THERE ARE

13  MULTIPLE SYSTEMS, SEPARATE VENDORS, IT WASN'T AN IMMEDIATE

14  SWITCHOVER.

15  **Q.**   WAS IT SWITCHED OVER WITHIN A WEEK OF THE LAWSUIT?

16  **A.**   THERE WAS A FEW STRAGGLER ITEMS, NOTIFICATIONS AT BOTTOMS

17  OF PAGES THAT MAY HAVE TAKEN LONGER THAN A WEEK, BUT THE BULK

18  WAS DONE WELL WITHIN A WEEK.

19  **Q.**   CAN YOU TURN PLEASE TO TX290.

20          **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

21          **MR. PISTORINO:**  NO OBJECTION.

22          **THE COURT:**  ADMITTED.

23         (TRIAL EXHIBIT 290 RECEIVED IN EVIDENCE.)

24              (DISPLAYED ON SCREEN.)

25

1    **BY MS. ROBERTS:**

2    **Q.**  MR. RASURE, CAN YOU TELL US WHAT TX290 IS?

3    **A.**  THIS IS A SCREENSHOT FROM THE WAYBACK MACHINE FOR

4    DECEMBER 5TH, 2017 OF TECHSHOP2.COM.

5    **Q.**  ACTUALLY, CAN YOU LOOK THROUGH THE ENTIRE DOCUMENT, NOT

6    JUST THE FIRST PAGE, AND LET ME KNOW IF YOU RECOGNIZE WHAT THE

7    ENTIRE DOCUMENT IS.

8    **A.**  LOGOS OF TECHSHOP 2.0 AND THESHOP.BUILD, SOME DRAFTS AND

9    SOME THAT WERE USED.

10   **Q.**  YOU SAID SOME DRAFTS.  DID THESHOP.BUILD USE ALL OF THE

11   LOGOS THAT APPEAR IN TX290?

12   **A.**  NO, IT DID NOT.

13   **Q.**  TAKE A LOOK AT THE FIRST PAGE OF TX290 AND THE LOGO THAT

14   APPEARS IN THE TOP MIDDLE PART OF THAT PAGE.

15       DO YOU SEE THAT?

16   **A.**  YES, I DO.

17   **Q.**  DID TECHSHOP 2.0 USE THAT LOGO AFTER FEBRUARY 16TH OF

18   2018?

19   **A.**  NO, IT DID NOT.

20   **Q.**  CAN YOU TURN TO THE PAGE ENDING IN 065?

21       ARE YOU THERE?

22   **A.**  I AM.

23                        (DISPLAYED ON SCREEN.)

24   **Q.**  DID TECHSHOP USE THE LOGO THAT APPEARS ON 065 AFTER

25   FEBRUARY 16TH OF 2018?

1     **A.**   NO, IT DID NOT.

2     **Q.**   TURN TO PAGE 061.

3                       (DISPLAYED ON SCREEN.)

4           IS THIS A LOGO THAT THESHOP.BUILD USED?

5     **A.**   YES.

6     **Q.**   WHEN DID THESHOP.BUILD USE THE LOGO APPEARING ON THIS

7     PAGE?

8     **A.**   APPROXIMATELY FEBRUARY 19TH TO THE AFTERNOON OF

9     FEBRUARY 21ST.

10    **Q.**   SO FOR ONLY THREE DAYS?

11    **A.**   THAT IS CORRECT.

12    **Q.**   SO THIS IS AFTER THE LAWSUIT WAS FILED, RIGHT?

13    **A.**   YES.

14    **Q.**   AFTER YOU CHANGED THE NAME TO THESHOP.BUILD?

15    **A.**   CORRECT.

16    **Q.**   YOU USED THIS LOGO THAT APPEARS ON PAGE 061 FOR THREE

17    DAYS?

18    **A.**   THAT IS CORRECT.

19    **Q.**   TURN TO PAGE 063.

20                      (DISPLAYED ON SCREEN.)

21          DO YOU RECOGNIZE THAT LOGO?

22    **A.**   YES, I DO.

23    **Q.**   WHEN DID -- DID THESHOP.BUILD EVER USE THAT LOGO?

24    **A.**   YES.  STILL USES THIS LOGO.

25    **Q.**   TURN TO THE PAGE ENDING IN 070.

RASURE - DIRECT / ROBERTS

1          HAS THESHOP.BUILD EVER USED THE LOGO THAT APPEARS ON THIS

2     PAGE?

3     **A.**  YES AND STILL DOES.

4     **Q.**  WHEN DID THESHOP.BUILD START USING THE LOGO APPEARING ON

5     PAGE 070?

6     **A.**  SOMETIME IN MARCH.

7     **Q.**  MARCH OF 2018?

8     **A.**  2018.

9     **Q.**  HAS THESHOP.BUILD USED A LOGO THAT FEATURES A GEAR SINCE

10    FEBRUARY 21ST OF 2018?

11    **A.**  NO, IT HAS NOT.

12    **Q.**  NOW, WE'VE TALKED ABOUT THE OPENING OF THE SAN FRANCISCO

13    LOCATION.  WHEN DID YOU OPEN THE SAN JOSE LOCATION OF

14    THESHOP.BUILD?

15    **A.**  APPROXIMATELY AUGUST 22ND OF 2018.

16    **Q.**  DID THE SAN JOSE LOCATION EVER OPERATE UNDER THE NAME

17    TECHSHOP 2.0?

18    **A.**  NO, IT DID NOT.

19    **Q.**  BY THE TIME THAT YOU OPENED THE SAN JOSE LOCATION OF

20    THESHOP.BUILD, FOR HOW LONG HAD YOU BEEN USING THAT NAME IN

21    SAN FRANCISCO?

22    **A.**  JUST OVER SIX MONTHS.

23    **Q.**  AND WHEN YOU OPENED THE SAN JOSE LOCATION, WHAT WAS YOUR

24    UNDERSTANDING AS TO WHETHER YOU HAD THE RIGHT TO USE THE NAME

25    THESHOP.BUILD?

RASURE - DIRECT / ROBERTS

```
 1    A.   I HAD NO REASON TO BELIEVE WE DID NOT.

 2    Q.   WHAT WAS THAT UNDERSTANDING BASED ON?

 3    A.   NOBODY HAD EVER RAISED ANY OBJECTIONS TO THESHOP.BUILD.

 4    Q.   TECHSHOP HAD ALREADY FILED THIS LAWSUIT BY THEN, RIGHT?

 5    A.   THAT IS CORRECT.

 6    Q.   SO WHY DID YOU THINK IT WAS OKAY TO USE THE NAME

 7    THESHOP.BUILD?

 8    A.   AGAIN, I SAID THE SHOP IS THE MOST GENERIC WAY TO

 9    REFERENCE WHERE YOU GO TO BUILD SOMETHING.

10    Q.   PRIOR TO OPENING THE SAN JOSE LOCATION, HAD ANYONE AT

11    TECHSHOP OBJECTED TO YOUR USE OF THE NAME THESHOP.BUILD?

12    A.   WOULD YOU PLEASE REPEAT THE QUESTION?

13    Q.   BEFORE YOU OPENED THE SAN JOSE LOCATION, HAD ANYONE AT

14    TECHSHOP OBJECTED TO YOUR USE OF THE NAME THESHOP.BUILD?

15    A.   NO, THEY HAD NOT.

16    Q.   BEFORE OPENING THE SAN JOSE LOCATION, HAD ANYONE AT

17    TECHSHOP INDICATED THAT USE OF THE NAME THESHOP.BUILD OR

18    THESHOP INFRINGED ANY TECHSHOP TRADEMARKS?

19    A.   NO, THEY HAD NOT.

20    Q.   BEFORE YOU OPENED THE SAN JOSE LOCATION, DID ANY LAWYER

21    REPRESENTING TECHSHOP INDICATE TO YOU THAT THESHOP.BUILD WAS

22    AN INFRINGEMENT OF ITS TRADEMARKS?

23    A.   NO, THEY HAD NOT.

24    Q.   BEFORE YOU OPENED THE SAN JOSE LOCATION, DID TECHSHOP'S

25    TRUSTEE IN BANKRUPTCY INDICATE TO YOU THAT THESHOP.BUILD WAS
```

1   AN INFRINGEMENT?

2   **A.**  NO, THEY HAD NOT.

3   **Q.**  HAD -- PRIOR TO OPENING THE SAN JOSE LOCATION, HAD ANYONE

4   AT TECHSHOP INDICATED TO YOU THAT USING THE NAME THESHOP.BUILD

5   OR THESHOP WAS LIKELY TO CAUSE CONSUMER CONFUSION?

6   **A.**  NO, THEY HAD NOT.

7   **Q.**  WHEN WAS THE FIRST TIME THAT TECHSHOP OBJECTED TO YOUR USE

8   OF THE NAME THESHOP.BUILD OR THESHOP?

9   **A.**  APPROXIMATELY NOVEMBER 23RD OF 2018.

10  **Q.**  AND HOW DID YOU FIND THAT OUT?

11  **A.**  VIA DISCOVERY RESPONSE CALLED AN INTERROGATORY, ITEM USED

12  IN THE LEGAL DISCOVERY PROCESS.

13  **Q.**  THAT'S SOMETHING THAT WAS IN CONNECTION WITH THIS

14  LITIGATION?

15  **A.**  YES, IT WAS.

16  **Q.**  AT THE TIME YOU RECEIVED THAT DOCUMENT, HOW LONG HAD IT

17  BEEN SINCE YOU OPENED THE FIRST LOCATION OF THESHOP.BUILD IN

18  SAN FRANCISCO?

19  **A.**  JUST OVER NINE MONTHS.

20  **Q.**  THAT WAS THE FIRST TIME YOU RECEIVED NOTICE THAT TECHSHOP

21  HAD A PROBLEM WITH THAT NAME?

22  **A.**  THAT IS CORRECT.

23  **Q.**  IN THAT TIME PERIOD, THAT NINE-MONTH TIME PERIOD, HAD YOU

24  MARKETED YOUR COMPANY AS THESHOP.BUILD?

25  **A.**  YES, WE HAD.

1    **Q.**   HOW DID YOU DO THAT?

2    **A.**   FACEBOOK ADVERTISING, YELP ADVERTISING.  WE EXHIBITED AT

3    MAKER FAIRE.  I SPOKE TO VARIOUS GROUPS AND WE OFFERED

4    MEMBERSHIPS.

5    **Q.**   YOU WERE HERE FOR MR. SPURLOCK'S TESTIMONY, RIGHT?

6    **A.**   YES, I WAS.

7    **Q.**   DID YOU RECALL TESTIMONY ALONG THE LINES THAT YOU HAD A

8    CONVERSATION WITH HIM IN WHICH YOU SAID THAT YOU KNEW ABOUT

9    TECHSHOP'S TRADEMARKS BUT YOU DIDN'T THINK TECHSHOP HAD THE

10   MONEY TO ENFORCE THEM IN A LAWSUIT?

11   **A.**   I REMEMBER HEARING THAT.

12   **Q.**   DO YOU RECALL EVER TELLING MR. SPURLOCK THAT?

13   **A.**   NO, I DID NOT.

14   **Q.**   WE'VE HEARD SOME TESTIMONY REGARDING YOU ASKING FOR

15   TECHSHOP'S CUSTOMER LIST DURING THE NEGOTIATIONS OF A

16   POTENTIAL DEAL.

17        DO YOU RECALL THAT?

18   **A.**   I DO.

19   **Q.**   AND IN THE NEGOTIATIONS, DID YOU ASK FOR A CUSTOMER LIST?

20   **A.**   YES, I DID.

21   **Q.**   WHY DID YOU ASK FOR A CUSTOMER LIST?

22   **A.**   ON THE NOVEMBER 30TH MEETING, JIM NEWTON EXPLAINED THE

23   COMPLEXITIES OF SENDING AN EMAIL OUT VIA THEIR CRM SYSTEM,

24   WHICH WAS... SOME OF THE FIRST SIGNS THAT I HAD SEEN OR HEARD

25   OF HOW BAD THEIR CRM SYSTEM WAS CONSTRUCTED.

1        AND AS HE TESTIFIED, HE HAD TO WRITE A SCRIPT AND IT WAS

2   NOT A SIMPLE PROCESS.  AS PART OF MY EARLIER RESPONSIBILITIES

3   WITH PIRANHA FABRICATION, I SCHEDULED AND WROTE EMAILS THAT

4   WENT OUT TO CUSTOMERS AND KNEW THAT SENDING OUT AN EMAIL, THE

5   ACTUAL MECHANISM OF DOING SO IS SOMETHING THAT TAKES LESS THAN

6   FIVE MINUTES.

7        AFTER THREE DAYS OF THIS PROCESS WITH TECHSHOP, THE EMAILS

8   HAD JUST STARTED GOING OUT, I BELIEVE THE EVENING OF DECEMBER

9   3RD.  AND SO CLEARLY IT WAS NOT A SIMPLE PROCESS THAT THEY

10  WERE ABLE TO EASILY EXECUTE.

11  **Q.**  AND JUST FOR CONTEXT FOR THE JURY, WHEN WE ARE TALKING

12  ABOUT EMAILS GOING OUT, WHAT WAS THE EMAIL THAT YOU WANTED TO

13  GO OUT?

14  **A.**  THE EMAIL THAT BOTH SIDES HAD AGREED THAT WOULD GO OUT WAS

15  THE EXECUTION OF THE MOU.

16  **Q.**  SO BOTH SIDES HAD AGREED THAT THE EXECUTED MEMORANDUM OF

17  UNDERSTANDING WAS GOING TO BE SENT OUT TO CUSTOMERS?

18  **A.**  THAT IS CORRECT.

19  **Q.**  AND I THINK YOU TESTIFIED THERE WAS SOME LAG TIME IN

20  GETTING THAT EMAIL OUT?

21  **A.**  THAT IS CORRECT.

22  **Q.**  AND THAT'S THE CONTEXT IN WHICH YOU ASKED FOR THE CUSTOMER

23  LIST IN EARLY DECEMBER OF 2017?

24  **A.**  YES, IT WAS.

25  **Q.**  CAN YOU DESCRIBE FOR THE JURY THE CUSTOMERS OF

1   THESHOP.BUILD?

2   **A.**  OUR CUSTOMERS ARE FROM THE FIVE-YEAR-OLD CHILD, TO THE

3   JUST LEARNING HOW TO MAKE, TO THE RETIREE, TO THE HOBBYIST, TO

4   THE ENTREPRENEUR, TO A CORPORATE CUSTOMER.

5   **Q.**  WHAT IS THE AVERAGE MEMBERSHIP PRICES THAT CUSTOMERS PAY

6   TO BE A MEMBER OF THESHOP.BUILD?

7   **A.**  AN INDIVIDUAL MEMBERSHIP IS $150 A MONTH.

8   **Q.**  AND IN YOUR DUE DILIGENCE -- IN CONNECTION WITH YOUR DUE

9   DILIGENCE IN THE POTENTIAL ACQUISITION OF TECHSHOP, DO YOU

10  HAVE AN UNDERSTANDING AS TO WHAT THE MEMBERSHIP PRICES WERE

11  FOR TECHSHOP?

12  **A.**  THEIR LISTED PRICE WAS $150 A MONTH, BUT IN COMPARING THAT

13  TO FINANCIALS, IT WASN'T ADDING UP.

14  **Q.**  I THINK THERE'S BEEN SOME REFERENCES TO LIFETIME

15  MEMBERSHIPS.  DO YOU HAVE AN UNDERSTANDING HOW MUCH -- HOW

16  MUCH IT COST TO GET A LIFETIME MEMBERSHIP AT TECHSHOP?

17  **A.**  I BELIEVE THAT THEY WERE -- WHEN BOUGHT SEPARATELY, AS

18  CHEAP AS $5,000 A YEAR UP TO $10,000 A YEAR, BUT YOU COULD

19  ALSO INVEST $25,000, AND IN THE WORST CASE SCENARIO, I SAW

20  THAT THE BUYER WAS GIFTED 14 LIFETIME MEMBERSHIPS.  SO SOME

21  PEOPLE INVESTED IN TECHSHOP JUST FOR THE MERE FACT OF GETTING

22  LIFETIME MEMBERSHIPS.

23  **Q.**  DO YOU HAVE AN UNDERSTANDING AS TO WHETHER CUSTOMERS KNEW

24  ABOUT YOUR NEGOTIATIONS WITH TECHSHOP?

25  **A.**  YES.

RASURE - DIRECT / ROBERTS

1    **Q.**  WHAT'S THAT UNDERSTANDING BASED ON?

2    **A.**  IT WAS COMMUNICATED VIA... BY TECHSHOP.  DAN WOODS WROTE

3    AN ARTICLE THAT WAS PUBLISHED IN *MAKE:* MAGAZINE.

4        THEY ALSO SENT OUT OTHER RELEASES THAT WERE PICKED UP BY

5    NEWS PROVIDERS.  AND THERE WERE MULTIPLE SOCIAL MEDIA PAGES

6    DISCUSSING THE TRANSACTION.  AS SOON AS THE MOU WAS SENT OUT,

7    IT VERY QUICKLY BECAME PUBLIC KNOWLEDGE AFTER ONE OF THE

8    SHAREHOLDERS PUBLISHED IT ON A FACEBOOK PAGE OR READ A PAGE,

9    WHICH THEN SPREAD TO BLOGS AS WELL.

10   **Q.**  YOU MENTIONED SOCIAL MEDIA.  IS THE MAKER COMMUNITY

11   CONNECTED ON SOCIAL MEDIA?

12   **A.**  YES, IT IS.

13   **Q.**  CAN YOU DESCRIBE FOR THE JURY HOW THE MAKER COMMUNITY IS

14   CONNECTED ON SOCIAL MEDIA?

15   **A.**  THERE ARE SEVERAL FACEBOOK GROUPS.  ONE CALLED TECHSHOP

16   THEREAFTER.  ONE THAT WAS ORIGINALLY CALLED TECHSHOP ORPHANS

17   THAT HAS BEEN RENAMED MAKER ORPHANS.

18       I BELIEVE THE DETROIT GROUP IS CALLED DETROIT TECHSHOP

19   ORPHANS.  THERE'S ANOTHER GROUP BASED OUT OF ROUND ROCK,

20   ANOTHER GROUP BASED OUT OF THE DC AREA.

21       SO THERE'S SEVERAL GROUPS FOR THE REGIONAL BASES.  MAKER

22   ORPHANS TENDS TO REACH MORE OF AN OVERREACHING.  THERE'S ALSO

23   NATION OF MAKERS WHICH ALSO HAS A YEARLY CONVENTION.  LAST

24   YEAR IT WAS IN JUNE IN SANTA FE, NEW MEXICO.  SO THERE'S A LOT

25   OF COMMUNICATION ABOUT THE MAKER COMMUNITY.

1   **Q.**  ARE YOU A MEMBER OF ANY OF THESE FACEBOOK GROUPS?

2   **A.**  MOST OF THEM.

3   **Q.**  AND BASED ON YOUR MEMBERSHIP IN THESE FACEBOOK GROUPS, CAN

4   YOU DESCRIBE FOR THE JURY THE TYPE OF THINGS THAT ARE SHARED

5   AMONG THE GROUP MEMBERS?

6          **MR. PISTORINO:**  OBJECTION, HEARSAY.

7          **THE COURT:**  SUSTAINED.

8   **BY MS. ROBERTS:**

9   **Q.**  YOU MENTIONED MAKER NEXUS -- MAYBE YOU SAID MAKER ORPHANS

10  FACEBOOK PAGE?

11  **A.**  THAT IS TRUE.

12  **Q.**  HOW MANY MEMBERS DOES THAT GROUP HAVE?

13  **A.**  I BELIEVE AT ITS PEAK IT HAD AROUND 1700 MEMBERS.

14  **Q.**  AND ARE YOU A MEMBER OF THAT GROUP?

15  **A.**  I AM.

16  **Q.**  DID YOU SEE IN THESE FACEBOOK GROUPS THAT YOU WERE A

17  MEMBER OF, DID YOU SEE MEMBERS DISCUSSING YOUR NEGOTIATIONS

18  WITH TECHSHOP?

19  **A.**  YES, I DID.

20          **MR. PISTORINO:**  OBJECTION, HEARSAY.

21          **THE COURT:**  SUSTAINED.

22  **BY MS. ROBERTS:**

23  **Q.**  BASED ON YOUR MEMBERSHIP IN THE FACEBOOK GROUPS THAT YOU

24  ARE A PART OF, DO YOU HAVE AN UNDERSTANDING OF THE EXTENT TO

25  WHICH CUSTOMERS UNDERSTOOD THAT YOU WERE A DIFFERENT COMPANY

```
 1    THAN TECHSHOP?
 2              MR. PISTORINO:  OBJECTION, CALLS FOR SPECULATION.
 3              THE COURT:  SUSTAINED.
 4    BY MS. ROBERTS:
 5    Q.  DOES THE MAKER COMMUNITY COMMUNICATE OUTSIDE OF SOCIAL
 6    MEDIA?
 7              MR. PISTORINO:  OBJECTION, CALLS FOR SPECULATION.
 8              MS. ROBERTS:  HE'S A MEMBER OF THE COMMUNITY.
 9              THE COURT:  OVERRULED FOR WHAT IT'S WORTH.
10              THE WITNESS:  YES, I DO.  AFTER THE CLOSURE OF
11    TECHSHOP, THERE WAS ALSO COMMUNITY FORUMS HELD THROUGHOUT THE
12    COUNTRY AS WELL AS IN THE SAN FRANCISCO BAY AREA.
13    BY MS. ROBERTS:
14    Q.  AND HAVE YOU ATTENDED ANY OF THESE COMMUNITY FORUMS?
15    A.  YES, I HAVE.
16    Q.  CAN YOU GIVE THE JURY AN IDEA OF THE NUMBER OF PEOPLE THAT
17    ATTENDED THE COMMUNITY FORUMS THAT YOU WERE AT?
18    A.  I ATTENDED TWO IN THE LOCAL BAY AREA.  ONE IN SANTA CLARA
19    HOSTED A HACKER DOJO BY MAKER NEXUS.  AND IT HAD APPROXIMATELY
20    70 TO 85 PEOPLE.
21        I ALSO ATTENDED ONE HELD BY MAKER NEXUS IN PALO ALTO AND
22    IT HAD APPROXIMATELY 30 PEOPLE THERE.
23    Q.  AND AT THE COMMUNITY MEETINGS THAT YOU ATTENDED, DID YOU
24    HEAR DISCUSSION OF YOUR NEGOTIATIONS WITH TECHSHOP?
25              MR. PISTORINO:  OBJECTION, HEARSAY.
```

1       **THE COURT:**  SUSTAINED.

2    **BY MS. ROBERTS:**

3    **Q.**  HAVING ATTENDED THE COMMUNITY MEETINGS THAT YOU JUST

4    TESTIFIED ABOUT, DID YOU HAVE AN UNDERSTANDING AS TO WHETHER

5    POTENTIAL CUSTOMERS UNDERSTOOD THAT YOU WERE A SEPARATE

6    COMPANY FROM TECHSHOP?

7           **MR. PISTORINO:**  OBJECTION, CALLS FOR SPECULATION.

8    HEARSAY.

9           **THE COURT:**  SUSTAINED.

10   **BY MS. ROBERTS:**

11   **Q.**  AFTER YOU AND TECHSHOP ANNOUNCED THE MEMORANDUM OF

12   UNDERSTANDING, DID YOU HAVE ANY CONTACT WITH FORMER TECHSHOP

13   CUSTOMERS?

14   **A.**  YES, I DID.

15   **Q.**  CAN YOU DESCRIBE, WITHOUT DESCRIBING SPECIFIC

16   CONVERSATIONS, JUST THE NATURE OF THE CONTACT THAT YOU HAD?

17   **A.**  I HAD VARIOUS CONVERSATIONS.  SOME WERE OF GREAT ANGER --

18          **MR. PISTORINO:**  OBJECTION, HEARSAY.

19          **THE COURT:**  LET'S TAKE A SIDEBAR.

20      SO, LADIES AND GENTLEMEN, WE WILL TAKE A BRIEF BREAK.  THE

21   SORT THAT YOU HAVE SEEN WE HAVE OCCASION TO TAKE FROM TIME TO

22   TIME.

23          (SIDEBAR DISCUSSION WAS HELD AS FOLLOWS:)

24          **THE COURT:**  SO WE ARE GOING TO KEEP DRAWING THIS

25   OBJECTION.  WHAT IS THE NON-HEARSAY PURPOSE FOR ANY OF THIS?

1    IT'S STRAIGHTFORWARD HEARSAY.

2         **MS. ROBERTS:**  WELL, THERE'S TESTIMONY OF THE LOST

3    LICENSING, WHAT MR. RASURE PAID WITH REGARD TO THE TRADEMARK,

4    SO HIS TESTIMONY ABOUT THE VALUE OF THE BRAND IS RELEVANT TO

5    THAT.  AND IT IS FOR HIS STATE OF MIND.

6         **THE COURT:**  I DON'T UNDERSTAND THAT.  HOW DOES THAT

7    HAVE TO DO WITH HEARSAY REMARKS MADE BY PEOPLE ON SOCIAL MEDIA

8    FORUMS OR ANYWHERE ELSE?

9         **MS. ROBERTS:**  WHAT I'M GETTING AT IS HIS

10   UNDERSTANDING OF WHETHER THERE WAS ANY VALUE LEFT ON THE

11   BRAND.  THEY HAVE PRESENTED TESTIMONY THAT HE THOUGHT IT WAS

12   VERY VALUABLE AND THAT'S WHAT HE WANTED, AND HIS UNDERSTANDING

13   OF PEOPLE --

14        **THE COURT:**  WHY DON'T YOU JUST GO TO THE EMAILS HE

15   WROTE WHERE HE SAID $2.5 MILLION LICENSE TO ADEO AND GET HIM

16   TO EXPLAIN WHAT HE MEANT.

17        THIS SEEMS VERY FAR AFIELD FROM THAT, AND I DON'T SEE THAT

18   AS AN APPROPRIATE NON-HEARSAY PURPOSE.

19        **MS. ROBERTS:**  ALL RIGHT.

20        **MR. PISTORINO:**  THANK YOU.

21        (SIDEBAR CONCLUDED; PROCEEDINGS HELD IN OPEN COURT.)

22   **BY MS. ROBERTS:**

23   **Q.**  YOU WERE HERE WHEN DR. MATOLO TESTIFIED, CORRECT?

24   **A.**  YES, I WAS.

25   **Q.**  DO YOU RECALL HIM TESTIFYING ABOUT AN OFFER THAT YOU MADE

1    TO ADEO?

2    **A.**  YES, I DO.

3    **Q.**  CAN YOU REMIND THE JURY OF THE TIMING OF THAT OFFER?

4    **A.**  I BELIEVE AROUND THE 1ST OF FEBRUARY, 2018.

5    **Q.**  CAN YOU EXPLAIN TO THE JURY WHY YOU MADE THAT OFFER?

6    **A.**  THE TECHSHOP BOARD HAD CONTINUALLY REPRESENTED TO ME THAT

7    ADEO WAS READY TO SPEND $5 MILLION ON AN ADDITIONAL LICENSE

8    JUST FOR THE COUNTRY OF RUSSIA.

9        I BELIEVED IT TO BE A BOGUS STATEMENT.  AND AUTODESK

10   INTRODUCED ME TO ADEO, WHICH I ALSO FELT WAS INTERESTING GIVEN

11   THE POTENTIAL -- GIVEN THE NEGOTIATIONS WITH AUTODESK.

12       SO TO TRY TO GAUGE THE STATE OF MIND OF ADEO, I THREW OUT

13   WHAT I THOUGHT WAS A RIDICULOUS OFFER OF TWO AND A HALF

14   MILLION DOLLARS FOR FAR MORE COUNTRIES TO SEE WHAT THEIR

15   FEEDBACK WOULD BE.

16   **Q.**  DID ADEO ULTIMATELY ACCEPT YOUR OFFER?

17   **A.**  NO, THEY DID NOT.

18   **Q.**  CAN YOU TURN TO TX727.

19           **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

20           **MR. PISTORINO:**  NO OBJECTION.

21           **THE COURT:**  727 IS ADMITTED.

22           (TRIAL EXHIBIT 727 RECEIVED IN EVIDENCE.)

23                   (DISPLAYED ON SCREEN.)

24   **BY MS. ROBERTS:**

25   **Q.**  ARE YOU THERE, MR. RASURE?

RASURE - DIRECT / ROBERTS

1    **A.**   ALMOST.

2    **Q.**   ON THE "TO" LINE THERE, WHAT DOES IT SAY?

3    **A.**   REQUEST FOR CONTACT INFORMATION FOR TECHSHOP 1.0.

4    **Q.**   I'M SORRY, THE "TO" LINE.

5    **A.**   I APOLOGIZE.  TECHSHOP 2.0.

6    **Q.**   DID YOU RECEIVE EMAILS THAT WERE SENT TO TECHSHOP 2.0 IN

7    THIS TIME PERIOD.

8    **A.**   AS PART OF THE INFO ACCOUNT, YES, I DID.

9    **Q.**   AND THIS EMAIL SAYS IT IS FROM LAWRENCE JOHNSTON.

10        DO YOU SEE THAT?

11   **A.**   YES, I DO.

12   **Q.**   DO YOU HAVE AN UNDERSTANDING AS TO WHO HE IS?

13   **A.**   FORMER MEMBER OF TECHSHOP.

14   **Q.**   AND WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS

15   EMAIL THAT YOU RECEIVED?

16   **A.**   HE WAS REQUESTING THE CONTACT INFORMATION FOR TECHSHOP

17   1.0.

18   **Q.**   CAN YOU READ FOR THE JURY THE SECOND PARAGRAPH OF

19   MR. JOHNSTON'S EMAIL?

20   **A.**   (READING)

21        "I HAVE TOOLS AND PROJECTS STORED AT THE SF LOCATION

22        AND IT'S BEEN TWO MONTHS AND THEY HAVEN'T RESPONDED

23        TO ANY OF THE MANY EMAILS (TO THE TRUSTEE EMAIL

24        ADDRESS I'VE SENT THEM ABOUT GETTING MY STUFF BACK.

25        IT'S BEEN COMPLETE RADIO SILENCE."

RASURE – DIRECT / ROBERTS

```
1   Q.  IS THIS THE ONLY TIME THAT YOU WERE CONTACTED WITH THE

2   REQUEST FOR INFORMATION ABOUT HOW TO CONTACT TECHSHOP?

3           MR. PISTORINO:  OBJECTION, HEARSAY.

4           THE COURT:  OVERRULED.

5           THE WITNESS:  NO, IT IS NOT.

6   BY MS. ROBERTS:

7   Q.  TURN TO TX729.

8           MS. ROBERTS:  YOUR HONOR, WE MOVE TO ADMIT THIS

9   EXHIBIT.

10          THE COURT:  ANY OBJECTION?

11          MR. PISTORINO:  YES, I BELIEVE WE DO, YOUR HONOR.

12          THE COURT:  WHAT'S THE BASIS FOR THE OBJECTION?

13          MR. PISTORINO:  HEARSAY, YOUR HONOR.

14          THE COURT:  HOW IS IT DIFFERENT THAN THE EXHIBIT WE

15  JUST ADMITTED?

16          MR. PISTORINO:  I THINK WE ARE SEEING DOCUMENTS THAT

17  WEREN'T ON THE LIST OF MATERIALS THAT HAVE BEEN APPROVED

18  BEFORE.  ONE I DIDN'T ACTUALLY RECALL SEEING AND THIS ONE I

19  ACTUALLY DO RECALL SEEING AND AM OBJECTING TO IT, YOUR HONOR.

20                  (COUNSEL CONFER).

21          MR. PISTORINO:  I WITHDRAW THE OBJECTION, YOUR HONOR.

22          THE COURT:  ADMITTED.

23          (TRIAL EXHIBIT 729 RECEIVED IN EVIDENCE.)

24                  (DISPLAYED ON SCREEN.)

25
```

1    **BY MS. ROBERTS:**

2    **Q.**  ARE YOU AT EXHIBIT 729?

3    **A.**  YES, I AM.

4    **Q.**  AND THE "TO" LINE THERE HAS THE EMAIL ADDRESS SAN

5    FRANCISCO@TECHSHOP2.COM.

6         DID YOU RECEIVE THOSE EMAILS?

7    **A.**  YES, I DID.

8    **Q.**  THIS EMAIL SAYS IT'S FROM ALLEN LAVEE ON FEBRUARY 15TH OF

9    2018, RIGHT?

10   **A.**  THAT IS CORRECT.

11   **Q.**  DO YOU HAVE AN UNDERSTANDING AS TO WHO THAT IS?

12   **A.**  A FORMER MEMBER OF TECHSHOP.

13   **Q.**  CAN YOU READ FOR THE JURY THE FIRST PARAGRAPH OF HIS

14   EMAIL?

15   **A.**  (READING)

16          "I UNDERSTAND THAT TECHSHOP 2.0 IS NOT AFFILIATED

17          WITH TECHSHOP 1.0 AND THAT THE PURCHASE OF THEIR

18          ASSETS WAS NOT SOMETHING THAT YOU WERE ABLE TO

19          NEGOTIATE.  (AT LEAST ACCORDING TO THE *SF CHRONICLE*.)

20          I WAS AN INVESTOR (20,000) -- (20K) IN TECHSHOP 1.0,

21          AND AS YOU KNOW, MY INVESTMENT IS WORTH NOTHING NOW."

22   **Q.**  HAVING RECEIVED THIS EMAIL, DID YOU HAVE AN UNDERSTANDING

23   AS TO WHETHER THIS CUSTOMER WAS ASKING YOU FOR SOMETHING?

24   **A.**  YES, HE WAS.

25   **Q.**  WHAT WAS HE ASKING YOU FOR?

RASURE - DIRECT / ROBERTS

```
 1    A.  (READING)

 2               "I'M WONDERING IF THERE IS ANY COMPENSATION OR

 3               BENEFIT THAT I MIGHT OBTAIN FROM TECHSHOP 2.0 AS A

 4               RESULT OF THAT INVESTMENT."

 5    Q.  CAN YOU TURN TO TX731.

 6          MS. ROBERTS:  WE MOVE TO ADMIT THIS EXHIBIT.

 7          MR. PISTORINO:  NO OBJECTION.

 8          THE COURT:  731 IS ADMITTED.

 9          (TRIAL EXHIBIT 731 RECEIVED IN EVIDENCE.)

10                    (DISPLAYED ON SCREEN.)

11    BY MS. ROBERTS:

12    Q.  THIS IS AN EMAIL TO THE INFO@THESHOP.BUILD EMAIL ADDRESS,

13    CORRECT?

14    A.  YES, IT IS.

15    Q.  DID YOU RECEIVE THOSE EMAILS?

16    A.  YES, I DID.

17    Q.  DO YOU HAVE AN UNDERSTANDING AS TO WHO THIS EMAIL IS FROM?

18    A.  KIM.

19    Q.  BASED ON THE CONTEXT, DO YOU HAVE AN UNDERSTANDING AS TO

20    WHETHER KIM WAS A POTENTIAL CUSTOMER?

21    A.  SHE HAD PREVIOUSLY PURCHASED FIVE TECHSHOP CLASS PASSES.

22    Q.  WHAT'S YOUR UNDERSTANDING AS TO WHAT THIS CUSTOMER WAS

23    ASKING YOU?

24    A.  (READING)

25               "I WOULD LIKE TO KNOW IF TECHSHOP 2.0 WILL HONOR
```

```
 1              THESE TECHSHOP CLASS PASSES."

 2    Q.  DID YOUR COMPANY OFFER DEALS TO FORMER TECHSHOP MEMBERS?

 3    A.  YES, WE DID.

 4    Q.  CAN YOU DESCRIBE FOR THE JURY WHAT TYPES OF DEALS YOU

 5    OFFERED TO THEM?

 6    A.  WE OFFERED A SPECIAL MEMBERSHIP FOR PREVIOUS LIFETIME

 7    MEMBERS AS WELL AS IF YOU HAD TAKEN A CLASS, A SAFETY CLASS

 8    WITH TECHSHOP, YOU COULD COME INTO THE SHOP AND RE-CERTIFY ON

 9    THAT MACHINE.  YOU NEEDED TO SHOW YOUR PROFICIENCY THAT YOU

10    KNEW HOW TO OPERATE THE MACHINE.  IF YOU DID THAT, YOU WERE

11    OKAY TO USE THE MACHINE.

12    Q.  AND WHY DID YOU OFFER DEALS TO FORMER TECHSHOP MEMBERS?

13    A.  IT WAS SOMETHING THAT WAS PART OF THE PREVIOUS MOU THAT WE

14    WOULD DO.

15        WHILE WE DID MAKE SOME CHANGES TO THAT OFFER, WE WERE

16    TRYING TO DO EVERYTHING POSSIBLE TO HELP HEAL THE COMMUNITY

17    FROM THE STING THAT THEY HAD PREVIOUSLY SUFFERED.

18    Q.  CAN YOU TURN TO TX738?

19              MS. ROBERTS:  WE MOVE TO ADMIT THIS EXHIBIT.

20              MR. PISTORINO:  NO OBJECTION.

21              THE COURT:  738 IS SUBMITTED.

22          (TRIAL EXHIBIT 738 RECEIVED IN EVIDENCE.)

23                  (DISPLAYED ON SCREEN.)

24    BY MS. ROBERTS:

25    Q.  THIS IS EMAIL SENT TO THESHOP.BUILD SAN FRANCISCO.  DO YOU
```

1    SEE THAT?

2    **A.**  YES.

3    **Q.**  DID YOU RECEIVE EMAILS THAT ARE SENT TO THAT ADDRESS?

4    **A.**  I DO.

5    **Q.**  THIS IS DATED MARCH 9TH, 2018?

6    **A.**  YES, IT IS.

7    **Q.**  SO THIS IS SHORTLY AFTER YOUR NAME CHANGE?

8    **A.**  YES, IT IS.

9    **Q.**  WITHIN A FEW WEEKS?

10   **A.**  CORRECT.

11   **Q.**  AND WHO IS DAVID VANNIER?  DO YOU HAVE AN UNDERSTANDING OF

12   THAT?

13   **A.**  I BELIEVE HE IS A FORMER TECHSHOP MEMBER.

14   **Q.**  DO YOU HAVE AN UNDERSTANDING AS TO THE PURPOSE OF THE

15   EMAIL THAT HE SENT YOU?

16   **A.**  HE WAS EXCITED ABOUT THE SAN JOSE FACILITY OPENING SOON,

17   AND ASKING ABOUT HIS LIFETIME MEMBERSHIP.

18   **Q.**  CAN YOU READ FOR THE JURY THE FIRST SENTENCE OF THE SECOND

19   PARAGRAPH OF HIS EMAIL?

20   **A.**  (READING)

21          "I FREELY ADMIT THAT I WAS BADLY BURNED BY THE

22          TECHSHOP.  GETTING ROUGHLY TEN MONTHS FOR THE PRICE

23          OF A LIFETIME SUBSCRIPTION."

24   **Q.**  CAN YOU TURN TO TX740?

25          **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

1          **MR. PISTORINO:**  NO OBJECTION.

2          **THE COURT:**  740 IS ADMITTED.

3            (TRIAL EXHIBIT 740 RECEIVED IN EVIDENCE.)

4                    (DISPLAYED ON SCREEN.)

5    **BY MS. ROBERTS:**

6    **Q.**  ON THE "TO" LINE OF THIS EMAIL IT SAYS

7    "INFO@THESHOP.BUILD.

8         YOU RECEIVED THOSE EMAILS?

9    **A.**  YES, I DID.

10   **Q.**  AND THIS EMAIL IS FROM A PATRICK.BARRON@GMAIL.COM, RIGHT?

11   **A.**  THAT IS CORRECT.

12   **Q.**  DO YOU HAVE AN UNDERSTANDING AS TO WHO HE IS?

13   **A.**  FORMER MEMBER OF TECHSHOP.

14   **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL

15   THAT WAS SENT TO YOU?

16   **A.**  HE WAS ASKING FOR A SIGN-UP CREDIT DUE TO AN ANNUAL

17   MEMBERSHIP HE ACTIVATED IN AUGUST 2017.

18   **Q.**  SO WAS HE -- HE WAS ASKING YOU TO GIVE HIM A CREDIT

19   BECAUSE HE ALREADY HAD A MEMBERSHIP WITH TECHSHOP?

20   **A.**  THAT IS CORRECT.

21   **Q.**  AND YOU WERE OFFERING DEALS TO FORMER TECHSHOP MEMBERS?

22   **A.**  YES, WE WERE.

23   **Q.**  IN THE COURSE OF YOUR NEGOTIATIONS -- WE ARE GOING TO

24   SWITCH BACK TO THE NEGOTIATION PERIOD WITH TECHSHOP.

25         IN THE COURSE OF THOSE NEGOTIATIONS, DID YOU MAKE ANY

RASURE - DIRECT / ROBERTS

1  MONETARY PAYMENTS TO TECHSHOP?

2  **A.**  YES, I DID.

3  **Q.**  DID YOU MAKE -- I THINK WE HAVE HEARD TESTIMONY THAT

4  YOU'VE MADE MONETARY PAYMENTS ON BEHALF OF TECHSHOP.

5  **A.**  THAT IS CORRECT.

6  **Q.**  WHAT PAYMENTS DID YOU MAKE ON TECHSHOP'S BEHALF?

7  IF YOU CAN JUST LIST THEM, AND THEN WE WILL GO THROUGH

8  EACH ONE.

9  **A.**  I EXECUTED TWO PAYMENTS TO GOOGLE.  A THIRD PAYMENT WAS

10  MADE BUT NOT AUTHORIZED.

11  I MADE A PAYMENT ON BEHALF OF TECHSHOP ROUND ROCK FOR

12  TAXES.  I MADE A PAYMENT TO TONKON TORP ON BEHALF OF -- OR FOR

13  LEGAL EXPENSES AND HEALTHCARE INSURANCE PAYMENTS THAT WERE

14  PAST DUE.

15  **Q.**  LET'S START WITH THE HEALTHCARE INSURANCE.

16  WHO WAS THAT PAYMENT TO, THE COMPANY NAME?

17  **A.**  I BELIEVE IT WAS BLUE CROSS ANTHEM.

18  **Q.**  CAN YOU TAKE A LOOK AT TX586, WHICH IS ADMITTED.

19  (DISPLAYED ON SCREEN.)

20  IS THIS AN EMAIL THAT YOU RECEIVED FROM MR. WOODS ON

21  NOVEMBER 24TH OF 2017?

22  **A.**  YES, IT IS.

23  **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

24  **A.**  HIS ESTIMATE OF WHAT THEY WANTED TO SPEND ON WIND-DOWN

25  EXPENSES.

RASURE - DIRECT / ROBERTS

1    **Q.**  DOES IT LIST AMOUNTS DUE FOR MEDICAL INSURANCE PREMIUMS?

2    **A.**  YES, IT DOES.

3    **Q.**  TURN TO TX587, WHICH IS ADMITTED.

4               (DISPLAYED ON SCREEN.)

5       IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

6    NOVEMBER 27, 2017?

7    **A.**  YES, IT IS.

8    **Q.**  DOES THIS EMAIL LAY OUT THE AMOUNTS DUE TO KAISER AND

9    ANTHEM?

10   **A.**  YES, IT DOES.

11   **Q.**  AND FOCUSING ON THE AMOUNT PAID TO ANTHEM -- AMOUNT DUE TO

12   ANTHEM, IS THAT THE AMOUNT THAT YOU ULTIMATELY PAID TO ANTHEM?

13   **A.**  YES, IT IS.

14   **Q.**  CAN YOU READ THE INTRODUCTORY PARAGRAPH FROM MR. WOODS FOR

15   THE JURY?

16   **A.**  (READING)

17          "FURTHER TO OUR CALL YESTERDAY, WE ABSOLUTELY MUST

18          PAY THE FOLLOWING INSURANCE PREMIUMS TO ENSURE

19          COVERAGE THROUGH NOVEMBER (THIS MONTH) IN CAPS."

20   **Q.**  TURN TO TX590.

21       **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

22       **MR. PISTORINO:**  NO OBJECTION.

23       **THE COURT:**  ADMITTED.

24      (TRIAL EXHIBIT 590 RECEIVED IN EVIDENCE.)

25         (DISPLAYED ON SCREEN.)

1    **BY MS. ROBERTS:**

2    **Q.**  IS THIS AN EMAIL FROM MIKE HILBERMAN TO YOU AND MR. WOODS

3    ON NOVEMBER 28TH OF 2017?

4    **A.**  YES, IT IS.

5    **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

6    **A.**  THE WIRING INSTRUCTIONS TO PROVIDE THE MONEY.

7    **Q.**  AND ARE THERE WIRING INSTRUCTIONS FOR BOTH ANTHEM AND

8    KAISER?

9    **A.**  YES, THERE IS.

10   **Q.**  DID YOU MAKE BOTH OF THOSE PAYMENTS?

11   **A.**  NO, I DID NOT.

12   **Q.**  WHICH ONE DID YOU MAKE?

13   **A.**  I MADE THE ANTHEM PAYMENT.

14   **Q.**  DID ANYONE MAKE THE PAYMENT TO KAISER?

15   **A.**  BILL LLOYD.

16   **Q.**  CAN YOU REMIND THE JURY WHO BILL LLOYD IS?

17   **A.**  AT THIS POINT BILL LLOYD AND I WERE WORKING ON THE

18   ACQUISITION OF TECHSHOP TOGETHER.

19   **Q.**  WAS HE A POTENTIAL PARTNER FOR THE ACQUISITION?

20   **A.**  YES.  DUE TO HIS POSITION AS A SECURED CREDITOR AND HIS

21   THREAT OF A FRAUD LAWSUIT, EVERYTHING HAD TO GO THROUGH HIM.

22   **Q.**  CAN YOU TURN TO TX591?

23          **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

24          **MR. PISTORINO:**  NO OBJECTION.

25          **THE COURT:**  ADMITTED.

```
 1              (TRIAL EXHIBIT 591 RECEIVED IN EVIDENCE.)
 2                   (DISPLAYED ON SCREEN.)
 3     BY MS. ROBERTS:
 4     Q.  IS THIS AN EMAIL THAT YOU SENT TO MR. HILBERMAN ON
 5     NOVEMBER 29TH, 2017?
 6     A.  YES, IT IS.
 7     Q.  AND IN THIS EMAIL DO YOU INFORM HIM THAT THE ANTHEM WIRE
 8     HAS BEEN SCHEDULED?
 9     A.  YES, I DO.
10     Q.  TURN TO TX593.
11              MS. ROBERTS:  WE MOVE TO ADMIT.
12              MR. PISTORINO:  NO OBJECTION.
13              THE COURT:  593 IS ADMITTED.
14              (TRIAL EXHIBIT 593 RECEIVED IN EVIDENCE.)
15                   (DISPLAYED ON SCREEN.)
16     BY MS. ROBERTS:
17     Q.  IS THIS AN EMAIL FROM MR. HILBERMAN TO YOU AND MR. WOODS
18     ON NOVEMBER 29TH, 2017?
19     A.  YES, IT IS.
20     Q.  AND WHAT WAS THE PURPOSE OF THIS EMAIL?
21     A.  PROVIDING A PAYMENT RECEIPT OF THE KAISER INSURANCE.
22     Q.  THAT WAS -- THAT WAS THE INSURANCE THAT MR. LLOYD PAID,
23     RIGHT?
24     A.  THAT IS CORRECT.
25     Q.  NOW WITH RESPECT TO THE ANTHEM PAYMENT THAT YOU MADE, WHY
```

1   DID YOU MAKE THAT PAYMENT?

2   **A.** IT WAS PART OF THE LIST THAT TECHSHOP PROVIDED AS WELL AS

3   THE TECHSHOP EMPLOYEES, INCLUDING THE OFFICERS OF THE COMPANY,

4   IF THE PAYMENTS WERE NOT MADE, THEIR INSURANCE WAS GOING TO BE

5   RETROACTIVELY CANCELED TO NOVEMBER 1ST.

6   **Q.** I THINK YOU SAID IT WAS ONE OF THE THINGS THAT WAS LISTED,

7   RIGHT?

8   **A.** THAT IS CORRECT.

9   **Q.** WHEN YOU SAY "LISTED", WHERE DO YOU MEAN?

10  **A.** IT WAS PROVIDED AS PART OF DAN WOODS' LIST ON WIND-DOWN

11  EXPENSES.

12  **Q.** AND DID YOU... WHY DID YOU PAY THOSE WIND-DOWN EXPENSES?

13  **A.** AT THAT POINT I BELIEVE WE HAD A PROMISE TO COMPLETE A

14  DEAL. I RELIED ON THE TECHSHOP BOARD AND MADE THOSE PAYMENTS.

15  **Q.** NOW YOU ALSO MENTIONED MAKING PAYMENTS TO TONKON TORP.

16  **A.** THAT IS CORRECT.

17  **Q.** TELL THE JURY WHO IS TONKON TORP?

18  **A.** THE OUTSIDE LAW FIRM THAT TECHSHOP WISHED TO ENGAGE.

19  **Q.** WAS IT YOUR UNDERSTANDING THAT TECHSHOP WAS ENGAGING THIS

20  LAW FIRM TO ASSIST WITH THE NEGOTIATIONS OF YOUR DEAL?

21  **A.** THAT IS CORRECT.

22  **Q.** AND SO YOU WERE PAYING A RETAINER FOR TECHSHOP'S LAWYERS?

23  **A.** YES. THIS WAS THE SECOND REQUEST THAT THEY MADE FOR A

24  RETAINER PAYMENT.

25  **Q.** DID YOU ULTIMATELY MAKE A PAYMENT FOR A RETAINER TO

RASURE - DIRECT / ROBERTS

```
1    TECHSHOP'S OUTSIDE LAW FIRM?

2    A.   THE SECOND REQUEST, YES, I DID.

3    Q.   HOW MUCH DID YOU PAY?

4    A.   $15,000.

5    Q.   WHY DID YOU MAKE THAT PAYMENT?

6    A.   I BELIEVE WE WERE GOING TO HAVE A DEAL, AND TECHSHOP HAD

7    MADE A PROMISE AT THAT POINT TO PURSUE THE DEAL.

8    Q.   CAN YOU TURN TO TX581, WHICH IS ADMITTED.

9                      (DISPLAYED ON SCREEN.)

10        THIS IS AN EMAIL FROM MR. WOODS TO YOU ON NOVEMBER 20TH,

11   2017, RIGHT?

12   A.   THAT IS CORRECT.

13   Q.   WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

14   A.   THIS WAS THE FIRST REQUEST THAT I HAD RECEIVED FOR FUNDS

15   FOR TECHSHOP FROM DAN WOODS.

16   Q.   I THINK WE'VE SEEN AN EARLIER DOCUMENTATION WITH OTHER

17   WITNESSES.  THE NAME LOUISE LARSON, DO YOU KNOW THAT NAME?

18   A.   I DO.

19   Q.   WHO IS LOUISE LARSON?

20   A.   THE DIRECTOR OF -- FORMER DIRECTOR OF MARKETING FOR

21   TECHSHOP.

22   Q.   DID YOU MAKE ANY PAYMENTS TO MS. LARSON?

23   A.   YES, I DID.

24   Q.   HOW MUCH DID YOU PAY TO MS. LARSON?

25   A.   $1100.
```

1    **Q.**  DO YOU RECALL THE DATE THAT YOU MADE THAT PAYMENT?

2    **A.**  THE EVENING OF DECEMBER 11TH.

3    **Q.**  SO THE DAY BEFORE THE MEMORANDUM OF UNDERSTANDING WAS

4    CANCELED?

5    **A.**  THAT IS CORRECT.

6    **Q.**  CAN YOU TURN TO TX595, WHICH IS ADMITTED.

7                        (DISPLAYED ON SCREEN.)

8        IS THIS AN EMAIL FROM MR. WOODS TO YOU ON NOVEMBER 29TH,

9    2017?

10   **A.**  YES, IT IS.

11   **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

12   **A.**  IT IS AN EMAIL FROM DAN WOODS LETTING ME KNOW WHO HE

13   WANTED TO SEE HIRED AS PART OF THE WIND-DOWN TRANSITION TEAM.

14   **Q.**  IS MS. LARSON INCLUDED ON THAT LIST?

15   **A.**  YES, SHE IS.

16   **Q.**  SO MR. WOODS WAS RECOMMENDING THAT YOU HIRE HER?

17   **A.**  THAT IS CORRECT.

18   **Q.**  AND DID YOU ULTIMATELY DO SO?

19   **A.**  FOR -- YES, I DID.

20   **Q.**  FOR A LIMITED PERIOD OF TIME?

21   **A.**  THAT IS CORRECT.

22   **Q.**  TURN TO TX621.

23            **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT THIS

24   EXHIBIT.

25            **THE CLERK:**  621 IS ALREADY IN.

```
 1                       (DISPLAYED ON SCREEN.)

 2    BY MS. ROBERTS:

 3    Q.   IS THIS AN EMAIL THAT YOU RECEIVED FROM MS. LARSON ON

 4    DECEMBER 6TH OF 2017?

 5    A.   YES, IT IS.

 6    Q.   AND WHAT WAS THE PURPOSE OF THIS EMAIL?

 7    A.   A TECHSHOP 2.0 INVOICE FROM LOUISE LARSON FOR HER SERVICES

 8    RELATED TO SENDING OUT THE EMAIL.

 9    Q.   SENDING OUT THE EMAIL; IS THAT THE EMAIL YOU REFERRED TO

10    EARLIER TODAY, THE NOTICE OF THE MEMORANDUM OF UNDERSTANDING?

11    A.   THAT IS CORRECT.

12    Q.   HOW MUCH DID MS. LARSON INVOICE YOU FOR?

13    A.   $1100.

14    Q.   I BELIEVE THAT'S THE AMOUNT YOU SAID YOU PAID?

15    A.   IT IS.

16    Q.   WHY DID YOU MAKE THIS PAYMENT TO MS. LARSON?

17    A.   I WAS PROVIDED THE INVOICE FOR THE SERVICES.

18    Q.   DID -- WAS THIS SOMETHING THAT WAS INCLUDED IN WHAT YOU

19    BELIEVED YOU NEEDED TO PAY TO MAKE THE NEGOTIATIONS MOVE

20    FORWARD?

21    A.   YES, IT WAS.

22    Q.   YOU ALSO MENTIONED PAYMENTS TO GOOGLE, AND YOU SAID THERE

23    WERE THREE; IS THAT RIGHT?

24    A.   THAT IS CORRECT.

25    Q.   WE'LL WALK THROUGH EACH ONE OF THEM.
```

1    FIRST OF ALL, CAN YOU REMIND THE JURY WHY... WHAT THE

2    GOOGLE PAYMENTS WERE FOR BASED ON YOUR UNDERSTANDING?

3    **A.**   TECHSHOP MAINTAINED 592 EMAIL ADDRESSES ALONG WITH

4    THEIR... ALL THEIR STORAGE, BUSINESS STORAGE WAS ON THE CLOUD

5    WITH GOOGLE.

6    **Q.**   CAN YOU TURN TO TX909 -- ACTUALLY TURN TO TX918.

7          **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

8          **THE CLERK:**  918 AND 909 ARE ALSO IN.

9                (DISPLAYED ON SCREEN.)

10   **BY MS. ROBERTS:**

11   **Q.**   IS THIS AN EMAIL FROM YOU TO MR. NEWTON ON NOVEMBER 29TH,

12   2017?

13   **A.**   YES, IT IS.

14   **Q.**   AND WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS

15   EMAIL?

16   **A.**   I TRIED TO MAKE THE FIRST PAYMENT BUT WAS UNABLE TO.

17   **Q.**   IF YOU TURN TO THE EARLIEST EMAIL IN THE CHAIN, THAT'S AN

18   EMAIL FROM MR. NEWTON, RIGHT?

19   **A.**   YES, IT IS.

20   **Q.**   AND DID MR. NEWTON TELL YOU HOW MUCH WAS OUTSTANDING TO

21   GOOGLE?

22   **A.**   YES, HE DID.

23   **Q.**   AND HOW MUCH WAS OUTSTANDING?

24   **A.**   THE BALANCE WAS $6,586.23.

25   **Q.**   HOW MUCH DID YOU -- SETTING ASIDE THE THIRD PAYMENT, WHICH

RASURE - DIRECT / ROBERTS

1    WE WILL GET TO, HOW MUCH DID YOU END UP PAYING TO GOOGLE?

2    **A.**   THE FIRST PAYMENT I MADE WAS FOR $2,737.24.

3    **Q.**   DID YOU MAKE A SECOND PAYMENT?

4    **A.**   YES, I DID.

5    **Q.**   DO YOU RECALL THE AMOUNT OF THAT ONE?

6    **A.**   APPROXIMATELY $5900.

7    **Q.**   WAS IT YOUR UNDERSTANDING THAT YOUR SECOND PAYMENT BROUGHT

8    THE GOOGLE SUITE ACCOUNT CURRENT?

9    **A.**   THAT IS CORRECT.

10   **Q.**   NOW YOU SAID THERE WAS A THIRD PAYMENT TO GOOGLE.

11       ACTUALLY, BEFORE WE GET TO THE THIRD PAYMENT, THE FIRST

12   TWO PAYMENTS, CAN YOU DESCRIBE FOR THE JURY WHY YOU MADE THOSE

13   PAYMENTS ON TECHSHOP'S BEHALF?

14   **A.**   I BELIEVE WE WOULD HAVE A TRANSACTION, AND I RELIED ON THE

15   TECHSHOP BOARD.

16   **Q.**   NOW, TURNING BACK TO THE THIRD PAYMENT, WHY DID YOU MAKE

17   THAT PAYMENT?

18   **A.**   THE THIRD PAYMENT I DID NOT AUTHORIZE.  I INSTRUCTED THE

19   FIRST TWO PAYMENTS AS ONE-TIME PAYMENTS, BUT AFTER MAKING THE

20   SECOND PAYMENT, JIM NEWTON WENT IN AND CHANGED THE --

21           **MR. PISTORINO:**  OBJECTION --

22           **THE WITNESS:**  -- CREDIT CARD TO PRIMARY.

23           **THE COURT:**  SUSTAINED.  THE ANSWER WILL BE STRICKEN,

24   LADIES AND GENTLEMEN.

25       YOU CAN TRY AND ASK IT A DIFFERENT WAY.

1    **BY MS. ROBERTS:**

2    **Q.**  WHEN YOU MADE THE FIRST TWO PAYMENTS TO GOOGLE, IN WHAT

3    FORM DID YOU MAKE THEM?  WAS IT BY CREDIT CARD?

4    **A.**  AS CREDIT CARD AS ONE-TIME PAYMENT.

5    **Q.**  YOU HAD TO ENTER INFORMATION INTO GOOGLE TO MAKE THAT

6    PAYMENT?

7    **A.**  THAT IS CORRECT.

8    **Q.**  YOU SAID IT WAS A ONE-TIME PAYMENT?

9    **A.**  THAT IS CORRECT.

10   **Q.**  SO YOU DID NOT INTEND TO HAVE ONGOING PAYMENTS ON

11   TECHSHOP'S BEHALF?

12   **A.**  NO, I DID NOT.

13   **Q.**  OKAY.

14       SO GOING BACK TO THE THIRD PAYMENT, HAD YOU ENTERED YOUR

15   CREDIT CARD NUMBER AGAIN FOR A ONE-TIME PAYMENT ON THAT ONE

16   AMOUNT?

17   **A.**  NO, I DID NOT.

18   **Q.**  AND WHAT WAS THE AMOUNT OF THIS THIRD AMOUNT -- THIS THIRD

19   PAYMENT TO GOOGLE?

20   **A.**  I BELIEVE $5,919.

21   **Q.**  CAN YOU TURN TO TX643, WHICH IS ADMITTED.

22                     (DISPLAYED ON SCREEN.)

23   **BY MS. ROBERTS:**

24   **Q.**  IS THIS AN EMAIL FROM MR. WOODS TO YOU ON FEBRUARY 1ST OF

25   2018?

RASURE - DIRECT / ROBERTS

1    **A.**  YES, IT IS.

2    **Q.**  CAN YOU EXPLAIN TO THE JURY WHAT THE PURPOSE OF THIS EMAIL

3    EXCHANGE WAS?

4    **A.**  THE LAST EMAIL WAS LETTING ME KNOW THAT THE CARD HAD BEEN

5    MARKED AS PRIMARY, AND THAT I NEEDED TO CONTACT MY BANK TO ASK

6    FOR A REVERSAL OF THE CHARGE.

7    **Q.**  CAN YOU LOOK AT THE EARLIEST EMAIL ON THE CHAIN WHICH

8    BEGINS ON PAGE 3?

9                        (DISPLAYED ON SCREEN.)

10   DO YOU SEE THAT?

11   **A.**  YES, I DO.

12   **Q.**  THAT IS AN EMAIL FROM YOU, RIGHT?

13   **A.**  YES, IT IS.

14   **Q.**  AND IT HAS THE AMOUNT OF $5,919 WITH RESPECT TO THE CHARGE

15   TO GOOGLE?

16   **A.**  YES.

17   **Q.**  DOES THAT REFRESH YOUR RECOLLECTION AS TO THE AMOUNT THE

18   THIRD GOOGLE PAYMENT WAS?

19   **A.**  YES, IT DOES.

20   **Q.**  DID YOU REACH OUT TO TECHSHOP TO TRY TO GET THEM TO

21   CORRECT THAT UNAUTHORIZED CHARGE?

22   **A.**  YES, I DID.

23   **Q.**  WAS TECHSHOP ABLE TO HELP YOU?

24   **A.**  NO, THEY WERE NOT.

25   **Q.**  NOW FOR EACH OF THESE PAYMENTS THAT YOU TESTIFIED THAT YOU

1    MADE ON TECHSHOP'S BEHALF, HAVE YOU EVER BEEN REPAID THOSE

2    AMOUNTS?

3    **A.**  NO, I HAVE NOT.

4    **Q.**  YOU WERE HERE FOR MR. BUSCH'S TESTIMONY, CORRECT?

5    **A.**  YES, I WAS.

6    **Q.**  DO YOU RECALL HIM TESTIFYING ABOUT YOU AND HE MEETING

7    OUTSIDE OF A BANKRUPTCY PROCEEDING AT THE END OF THE

8    PROCEEDING?

9    **A.**  YES, I DO.

10   **Q.**  WAS HIS TESTIMONY THAT HE APPROACHED YOU ACCURATE?

11   **A.**  YES, IT WAS.

12   **Q.**  YOU DIDN'T APPROACH HIM?

13   **A.**  THAT IS CORRECT.

14   **Q.**  HAVING HEARD HIS ACCOUNT OF WHAT HAPPENED, IS THERE

15   ANYTHING THAT YOU RECALL THAT HE LEFT OUT?

16   **A.**  YES, HE DID.

17   **Q.**  WHAT IS THAT?

18   **A.**  WHEN HE APPROACHED ME, HE SAID THAT HE LOOKED FORWARD TO

19   HIS DAY IN COURT WITH ME BECAUSE HE HAD MORE MONEY AND MORE

20   CREDIBILITY, THEN GOT HEATED DUE TO TALK ABOUT THEIR PONZI

21   SCHEME THAT THEY HAD ON INVESTORS.

22   **Q.**  WE DON'T NEED TO GET INTO ALL THAT.

23        SO SPEAKING OF YOUR DAY IN COURT, WHAT IS THE IMPACT OF

24   YOUR NEGOTIATIONS WITH TECHSHOP AND THE ULTIMATE LITIGATION

25   THAT FOLLOWED BEEN ON YOU?

RASURE - DIRECT / ROBERTS

1    **A.**  I'VE HAD MASSIVE FINANCIAL REPERCUSSIONS, PERSONAL

2    CREDIBILITY, FAMILY, HEALTH --

3            **MR. PISTORINO:**  OBJECTION, YOUR HONOR.

4            **THE WITNESS:**  MY PERSONAL HEALTH.

5            **THE COURT:**  OVERRULED.

6            **THE WITNESS:**  MY PERSONAL HEALTH.

7       AND IN THE LAST YEAR, I'VE BEEN HOME 12 TIMES TO SEE MY

8    FAMILY.  I'VE MISSED MY ENTIRE FIRST YEAR OF MY SON'S LIFE, AS

9    WELL AS MY OTHER TWO CHILDREN.

10      FROM A FINANCIAL STANDPOINT, WE'VE NEVER OPERATED THIS

11   BUSINESS WITHOUT HAVING THIS LAWSUIT OVER OUR HEAD.  SO THE

12   FINANCIAL IMPACT OF THAT FROM A LENDING STANDPOINT, A CUSTOMER

13   STANDPOINT HAS BEEN MASSIVE AND REPEATED.

14      TRADITIONAL FINANCING OR EVEN NORMAL FINANCING THROUGH

15   PREVIOUS PARTNERS WAS NOT AVAILABLE DUE TO THE RISK OF THIS

16   LAWSUIT.  THE ONLY FINANCING THAT WAS DIRECTLY AVAILABLE FOR

17   THE COMPANY WAS MERCHANT CREDIT CARD ADVANCES WHICH GO UP TO

18   AS MUCH AS 400 PERCENT INTEREST.

19      FROM THE PERSONAL CREDIBILITY, I AM CONTINUALLY ATTACKED

20   ON A NEAR DAILY BASIS.  MY WIFE HAS BEEN SENT SURVEILLANCE

21   PHOTOS --

22           **MR. PISTORINO:**  OBJECTION, HEARSAY.

23           **THE COURT:**  OVERRULED.

24      LET'S TRY TO BREAK IT UP AS QUESTION AND ANSWER.

25

RASURE - DIRECT / ROBERTS

1    **BY MS. ROBERTS:**

2    **Q.** LET'S CIRCLE BACK TO INCOME, FINANCING.

3        SO YOU MENTIONED THAT... YOU MENTIONED ISSUES GETTING

4    FINANCING AND LOANS; IS THAT RIGHT?

5    **A.** THAT IS CORRECT.

6    **Q.** ARE THERE ANY OTHER WAYS THAT YOUR INCOME HAS SUFFERED?

7    **A.** YES.

8        IN OCTOBER OF 2018, I ALSO LOST MY JOB WITH PIRANHA.  EVEN

9    THOUGH I HAD SCALED BACK SOME OF MY RESPONSIBILITIES, ONCE

10   THIS DUE DILIGENCE AND THEN THE EVENTUAL OPENING OF

11   THESHOP.BUILD STARTED, DUE TO THE WEIGHT OF THIS LAWSUIT AND

12   THE MASSIVE TIME REQUIREMENTS THAT IT REQUIRED ME TO TAKE, I

13   WAS UNABLE TO PERFORM THOSE RESPONSIBILITIES THE WAY I HAD,

14   AND LOST THAT OPPORTUNITY IN OCTOBER.

15   **Q.** AND YOU ULTIMATELY OPENED THE SAN FRANCISCO LOCATION OF

16   THESHOP.BUILD AND YOU TESTIFIED EARLIER IN YOUR TESTIMONY

17   YESTERDAY THAT IT CLOSED.

18       HAS THE LAWSUIT HAD ANY IMPACT ON THE RE-OPENING OF THAT

19   LOCATION?

20   **A.** YES.  FOR OUR LANDLORD THIS LAWSUIT POSES TREMENDOUS RISK

21   TO US OPENING A NEW FACILITY IN A NEW LOCATION.  SO WE'VE HAD

22   TO DELAY THAT UNTIL ANYTHING POST-LAWSUIT.

23   **Q.** AND REMIND THE JURY WHY YOU HAD TO CLOSE THE SAN FRANCISCO

24   LOCATION IN THE FIRST PLACE SINCE YOU TESTIFIED YESTERDAY

25   ABOUT IT?

1    **A.**  THE BUILDING IS BEING TORN DOWN DUE TO REDEVELOPMENT OF A

2    HIGHRISE.

3    **Q.**  YOU HAVEN'T BEEN ABLE TO FIND A NEW RENTAL SPACE FOR THE

4    SAN FRANCISCO LOCATION?

5    **A.**  WE HAVE FOUND LOCATIONS, BUT DUE TO THE RISK, THE

6    LANDLORDS HAVE IMPOSED MUCH GREATER RESTRICTIONS AND FINANCIAL

7    PAYMENTS.

8    **Q.**  AND THEN YOU ALSO TALKED ABOUT MISSING YOUR FAMILY.  I

9    THINK YOU SAID YOU HAD BEEN HOME 12 TIMES OVER THE LAST YEAR;

10   IS THAT RIGHT?

11   **A.**  THAT IS CORRECT.

12   **Q.**  CAN YOU GIVE THE JURY A SENSE OF HOW MANY DAYS THAT IS?

13       WHAT IS THE LENGTH OF THOSE 12 VISITS TO YOUR FAMILY?

14   **A.**  I THINK MY SHORTEST VISIT WAS ABOUT 24 HOURS.  AND I THINK

15   MY TOTAL TIME AWAY HAS BEEN ABOUT 60 DAYS.

16   **Q.**  TOTAL TIME AWAY FROM --

17   **A.**  WITH AT LEAST ONE FAMILY MEMBER.

18   **Q.**  JUST TO BE CLEAR, WHEN YOU SAY "AWAY", DOES THAT MEAN AWAY

19   FROM THE BAY AREA?

20   **A.**  WITH MY FAMILY -- OR WITH AT LEAST ONE FAMILY MEMBER.

21   **Q.**  OKAY.  SO IN THE LAST YEAR YOU HAVE ONLY HAD ABOUT 60 DAYS

22   WITH AT LEAST ONE FAMILY MEMBER?

23   **A.**  THAT IS TRUE.

24   **Q.**  THAT'S AT LEAST IN PART BECAUSE OF THE WORK YOU HAD TO DO

25   ON THIS LITIGATION?

1    **A.**   THAT IS CORRECT.

2              **MS. ROBERTS:**  NO FURTHER QUESTIONS, YOUR HONOR.

3          **THE COURT:**  ANY CROSS-EXAMINATION?

4          **MR. PISTORINO:**  YES, YOUR HONOR.

5       YOUR HONOR, MAY I APPROACH THE WITNESS?

6          **THE COURT:**  YOU MAY.

7              (BINDER HANDED TO WITNESS)

8                       **CROSS-EXAMINATION**

9    **BY MR. PISTORINO:**

10   **Q.**   GOOD MORNING, MR. RASURE.

11   **A.**   GOOD MORNING.

12   **Q.**   WE HAVE MET BEFORE, HAVE WE?

13   **A.**   ONLY AT THE MAKER NEXUS MEETING.

14   **Q.**   OKAY.  I'VE GOT A FEW FOLLOW-UP QUESTIONS TO YOUR

15   TESTIMONY ON DIRECT.

16       I THINK I HEARD YOU TALK A LITTLE BIT, YOU KNOW, GO IN

17   SORT OF A DIFFERENT ORDER HERE.

18       I THINK I HEARD YOU TALK ABOUT YOUR CONFRONTATION WITH

19   MR. BUSCH.  DO YOU RECALL THAT?

20   **A.**   THAT IS CORRECT.

21   **Q.**   AND AT THAT CONFRONTATION, ISN'T IT TRUE YOU KIND OF LOST

22   CONTROL OF YOUR EMOTIONS?

23   **A.**   I WAS VERY UPSET ABOUT WHAT HAD GONE ON THROUGHOUT THIS

24   PROCESS.  THIS HAS BEEN AN ONION OF A DUE DILIGENCE.  FROM THE

25   VERY FIRST DAY THAT --

RASURE - CROSS / PISTORINO

1    **Q.** MR. RASURE, IF I CAN ASK YOU JUST TO ANSWER MY QUESTION,

2    PLEASE.

3        ISN'T IT TRUE YOU LOST CONTROL OF YOUR EMOTIONS, SIR?

4    **A.** I WAS VERY UPSET, SIR.

5    **Q.** OKAY.  ISN'T IT TRUE THE COURT SECURITY OFFICER HAD TO

6    COME OVER AND TELL YOU TO LEAVE THE PROPERTY?

7    **A.** TOLD BOTH OF US TO LEAVE THE PROPERTY, YES.

8    **Q.** OKAY.  HOW ABOUT DID YOU ALSO HAVE A CONFRONTATION WITH

9    MR. SPURLOCK?  WE HEARD ABOUT THAT.

10   **A.** AFTER HE THREATENED TO HAVE ME ARRESTED.  YES.

11   **Q.** DID YOU HAVE A CONFRONTATION WITH MR. SPURLOCK, SIR?

12   **A.** YES, I DID.

13   **Q.** OKAY.  YOU PHYSICALLY CHARGED HIM, DIDN'T YOU?

14   **A.** NO, I DID NOT.

15   **Q.** YOU WERE HERE FOR MR. SPURLOCK'S TESTIMONY, CORRECT?

16   **A.** YES, I WAS.

17   **Q.** SO WE HEARD THAT FROM MR. SPURLOCK.  WAS HE LYING?

18   **A.** I STOOD UP AND ASKED HIM TO LEAVE.

19   **Q.** I'M ASKING YOU, SIR, HE SAID THAT YOU CHARGED HIM.

20       DID HE OR DID HE NOT CHARGE YOU?

21   **A.** I DID NOT CHARGE HIM.

22   **Q.** OKAY.

23       IS IT YOUR TESTIMONY HERE TODAY THAT MR. SPURLOCK WAS

24   LYING WHEN HE SAID YOU DID?

25   **A.** YES, IT IS.

1    **Q.**  OKAY.

2        WE HEARD THE TESTIMONY FROM MR. BUSCH.  MR. BUSCH SAID

3    THAT YOU TOLD HIM THAT YOU WERE AN EXECUTIVE WITH PIRANHA

4    MEGAFAB AND THAT YOU COULD COMMIT THEIR RESOURCES.

5        YOU HEARD THAT, RIGHT?

6    **A.**  YES, I DID.

7    **Q.**  AND THAT WASN'T TRUE, WAS IT, SIR?  YOU WERE NOT AN

8    EXECUTIVE AT PIRANHA MEGAFAB AND HAD THE POWER TO COMMIT THEIR

9    RESOURCES, DID YOU?

10   **A.**  I DID NOT SAY THAT TO HIM.  AND I WAS PART OF THE SENIOR

11   MANAGEMENT TEAM.

12   **Q.**  AT THE TIME, IN DECEMBER 2017, YOU WERE A CONSULTANT TO

13   PIRANHA MEGAFAB, CORRECT?

14   **A.**  MY AGREEMENT WITH MEGA MANUFACTURING WAS ALWAYS VIA

15   CONTRACTOR, BUT THAT DOES NOT MEAN THAT I WAS NOT PART OF THE

16   SENIOR MANAGEMENT TEAM AND SERVED AS THE INTERIM GM AT THE

17   TIME.

18   **Q.**  OKAY.  SIR, I WAS GOING TO TRY AGAIN AND SEE IF I CAN A

19   YES OR NO.

20       AT THE TIME OF THE TRANSACTION HERE, PROPOSED TRANSACTION,

21   DECEMBER 2017, YOU WERE A CONSULTANT TO PIRANHA MEGAFAB,

22   CORRECT?

23   **A.**  I SERVED AS A -- MY AGREEMENT WAS VIA CONTRACTOR

24   AGREEMENT, YES.

25   **Q.**  YOU WERE A CONSULTANT WITH THEM, CORRECT?

1    **A.**  I HAD A CONTRACT AGREEMENT.

2    **Q.**  YOU DIDN'T HAVE THE POWER TO COMMIT THE RESOURCES OF

3    PIRANHA MEGAFAB, CORRECT?

4    **A.**  I COMMITTED RESOURCES ON PIRANHA ON A DAILY BASIS.

5    **Q.**  SO IT'S YOUR TESTIMONY HERE TODAY THAT, IN FACT, YOU DID

6    HAVE THE POWER TO COMMIT THE RESOURCES OF PIRANHA MEGAFAB; IS

7    THAT RIGHT?

8    **A.**  FOR THE PURPOSE OF THIS TRANSACTION, I DID NOT SAY THAT

9    AND DID NOT COMMIT THEM.

10   **Q.**  I'M -- LET'S BREAK IT UP A LITTLE BIT.

11       DID YOU OR DID YOU NOT TELL MR. BUSCH THAT YOU HAD THE

12   POWER TO COMMIT THE RESOURCES OF PIRANHA MEGAFAB?

13   **A.**  THAT CONVERSATION WAS IN RELATION TO PLACING MACHINES IN

14   FACILITIES, YES.

15   **Q.**  SO YOU TOLD -- YOU, IN FACT, TOLD MR. BUSCH THAT YOU HAD

16   THE POWER TO COMMIT THE RESOURCES OF PIRANHA MEGAFAB, CORRECT?

17   **A.**  IN RELATION TO PLACING MACHINES.

18   **Q.**  OKAY.  OKAY.

19       YOU HEARD THE TESTIMONY FROM MR. BUSCH, RIGHT, WHERE HE

20   SAID THAT THAT'S NOT THE INFORMATION HE GOT FROM PIRANHA

21   MEGAFAB, RIGHT?

22       DID YOU HEAR THAT, SIR?

23   **A.**  YES, I DID.  WE --

24                      (SIMULTANEOUS COLLOQUY.)

25   **Q.**  WHY, SIR, WHY WOULD PIRANHA MEGAFAB TELL MR. BUSCH THAT

1    YOU, IN FACT, DID NOT HAVE THAT POWER IF IT WASN'T TRUE?

2              **MS. ROBERTS:**  OBJECTION, CALLS FOR SPECULATION.

3              **THE COURT:**  HEARSAY.  SUSTAINED.

4              **MR. PISTORINO:**  OKAY.

5    **BY MR. PISTORINO:**

6    **Q.**  NOW, I WANT TO TALK -- GO BACK A LITTLE BIT AGAIN AND

7    START -- WE'LL START CHRONOLOGICALLY TO SOME OF YOUR FIRST

8    CONTACTS WITH TECHSHOP.

9        YOU BECAME AWARE OF -- THAT TECHSHOP CLOSED ITS DOORS AND

10   HAD ANNOUNCED ITS INTENTION TO FILE FOR BANKRUPTCY, CORRECT?

11   **A.**  THAT IS CORRECT.

12   **Q.**  ISN'T IT TRUE THAT YOU CONSIDERED TECHSHOP ITSELF A HUGE

13   MARKETING OPPORTUNITY?

14   **A.**  NOT THE NAME, BUT, YES, THE MAKERSPACE.  I PERCEIVED IT AS

15   A HUGE MARKETING OPPORTUNITY.

16   **Q.**  OKAY.

17       SO, FOR EXAMPLE, IF WE TURN IN YOUR BOOK TO THE DOCUMENT

18   WE MARKED TX33.

19             **THE CLERK:**  IT IS NOT ADMITTED.

20             **MR. PISTORINO:**  I MOVE TO HAVE IT ADMITTED.

21             **THE COURT:**  I'M SORRY, IT IS 33, CORRECT?

22             **MR. PISTORINO:**  33.

23             **THE COURT:**  IS THAT NOT IN?

24             **THE CLERK:**  I HAVE 32 AND 34, BUT NOT 33.

25             **MS. ROBERTS:**  NO OBJECTION.

RASURE - CROSS / PISTORINO

1            **THE COURT:**  33 IS ADMITTED.

2                 (TRIAL EXHIBIT 33 RECEIVED IN EVIDENCE.)

3                      (DISPLAYED ON SCREEN.)

4    **BY MR. PISTORINO:**

5    **Q.**  WHAT WE JUST MARKED -- WHAT IS MARKED AS TX33, THIS IS AN

6    EMAIL FROM YOU DATED NOVEMBER 20TH TO SOMEONE NAMED STEPHANIE

7    SORRELLS.  YOU MENTIONED... SO I GOT BORED AND DECIDED TO

8    MAYBE BUY A COMPANY.

9         RIGHT, FIRST PARAGRAPH?

10   **A.**  THAT IS CORRECT.

11   **Q.**  AND THE SECOND PARAGRAPH YOU SAY, "HUGE MARKETING

12   OPPORTUNITY IF I CAN PULL SO MANY RABBITS OUT OF THE HAT."

13        RIGHT?

14   **A.**  THAT IS CORRECT.

15   **Q.**  YOU GO ON TO SAY, "THE NAME OF THE COMPANY IS TECHSHOP".

16        RIGHT?

17   **A.**  THAT IS CORRECT.

18   **Q.**  YOU THOUGHT TECHSHOP WAS GOING TO BE A HUGE MARKETING

19   OPPORTUNITY, RIGHT?

20   **A.**  I HAD ALREADY STARTED THE PROCESS OF CHANGING THE NAME TO

21   PIRANHA.

22   **Q.**  PLEASE JUST ANSWER MY QUESTION.

23        YOU THOUGHT TECHSHOP WAS GOING TO BE A HUGE MARKETING

24   OPPORTUNITY, CORRECT?

25   **A.**  I THOUGHT THE FACILITIES COULD BE A HUGE MARKETING

1   OPPORTUNITY, YES.

2   **Q.**  OKAY.

3                    (PAUSE IN THE PROCEEDINGS.)

4       AND WE'LL JUST GO LOOK HERE FOR A MOMENT.  I BELIEVE, IN

5   YOUR BOOK IF YOU CAN TURN TO TX15, WHICH I BELIEVE IS

6   ADMITTED.

7            **THE CLERK:**  15?  I DON'T HAVE 15.

8            **MR. PISTORINO:**  WE ARE GOING TO HAVE ANOTHER VERSION.

9       MOVE TO ADMIT TX15.

10           **THE COURT:**  ANY OBJECTION ON 15?

11           **MS. ROBERTS:**  NO OBJECTION.

12           **THE COURT:**  IT'S ADMITTED.

13           (TRIAL EXHIBIT 15 RECEIVED IN EVIDENCE.)

14                    (DISPLAYED ON SCREEN.)

15   **BY MR. PISTORINO:**

16   **Q.**  THIS IS A -- TX15 IS ANOTHER VERSION OF THE TEXT MESSAGES

17   WE HAVE SEEN PRESENTED IN A DIFFERENT FORMAT.

18       AT THE TOP, THERE'S A MESSAGE FROM YOU TO MR. SPURLOCK,

19   WHO WE HEARD FROM, RIGHT, WHERE YOU SAY, WHAT ABOUT RENAMING

20   AS TECHSHOP 2.0, RIGHT?

21   **A.**  THAT IS CORRECT.

22   **Q.**  OKAY.

23       AND THEN WE'VE SEEN BEFORE WHERE MR. SPURLOCK KIND OF

24   RESPONDED AND SAID IT WAS INTERESTING AND TRANSLATED WELL,

25   RIGHT?

1    **A.**  YES.

2    **Q.**  OKAY.

3        ISN'T IT TRUE THAT DURING THIS TIME FRAME YOU VALUED WHAT

4    TECHSHOP HAD BECOME AND WANTED TO KEEP THE NAME THE SAME,

5    RIGHT?

6        YOU WANTED TO USE THE TECHSHOP NAME, RIGHT?

7    **A.**  ON A TEMPORARY BASIS.

8    **Q.**  OKAY.  SO, FOR EXAMPLE, IF WE TURN IN YOUR BOOK TO TX51,

9    WHICH I THINK --

10              **THE CLERK:**  IT IS.

11                    (DISPLAYED ON SCREEN.)

12   **BY MR. PISTORINO:**

13   **Q.**  IN TX51, THIS IS AN EMAIL FROM YOU TO MR. WOODS AND THE

14   OTHER MEMBERS OF THE TECHSHOP BOARD DATED DECEMBER 4TH.

15       IN THE SECOND PARAGRAPH YOU SAID, I VALUE WHAT TECHSHOP

16   BECAME AND WHAT IT CAN DO IN THE FUTURE.  IF I DIDN'T, I WOULD

17   HAVE PUSHED FOR AN IMMEDIATE NAME CHANGE, RIGHT?  MY GOAL IS

18   NOT TO CHANGE THE NAME GOING FORWARD.

19       CORRECT?

20   **A.**  EXCUSE ME, WHAT EXHIBIT?

21   **Q.**  51, SIR.

22   **A.**  I DID TYPE THAT.

23   **Q.**  OKAY.

24       YOU GO ON, JUST LIKE THE NEXT SENTENCE, YOU SAY, I HAVE

25   ADMIRED TECHSHOP FROM A DISTANCE FOR ALMOST TEN YEARS.

RASURE - CROSS / PISTORINO

1      ARE YOU WITH ME THERE?

2   **A.**  YES.

3   **Q.**  OKAY.  WHERE IS YOUR -- I KNOW YOU MENTIONED THE OTHER DAY

4   AND I'M SORRY I FORGET, WHERE ARE YOU FROM IN KANSAS?

5   **A.**  GOODLAND, KANSAS.  GOODLAND, KANSAS.

6   **Q.**  GOODLAND.  OKAY.

7      I'M SORRY THAT I AM NOT FAMILIAR ENOUGH WITH GEOGRAPHY TO

8   KNOW, IS THERE A PARTICULAR TOWN IN KANSAS THAT THAT'S CLOSE

9   TO, LARGE ONE, THAT WE MIGHT KNOW?

10  **A.**  NO.  IT'S ON THE KANSAS KANORADO BORDER.  ABOUT TWO HOURS

11  FROM -- TWO AND HALF HOURS FROM DENVER AND ABOUT FIVE HOURS

12  FROM WICHITA.

13  **Q.**  IS IT A MID -- WOULD IT BE RURAL --

14  **A.**  LESS THAN 5,000 PEOPLE.

15  **Q.**  OKAY.  SO EVEN IN THIS TOWN OF LESS THAN 5,000 PEOPLE IN

16  KANSAS, YOU HAD HEARD OF TECHSHOP, ISN'T THAT TRUE?

17  **A.**  I TRAVELED THOUSANDS OF MILES A YEAR.

18  **Q.**  OKAY.

19                 (PAUSE IN THE PROCEEDINGS.)

20     NOW YOU WERE HERE FOR THE TESTIMONY OF MR. BUSCH ABOUT

21  TECHSHOP'S REQUEST FOR INFORMATION FROM YOU, IN PARTICULAR,

22  REGARDING YOUR PROPOSED MANAGEMENT TEAM, CORRECT?

23  **A.**  THAT IS CORRECT.

24  **Q.**  AND IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT THAT WE

25  MARKED TX23.

1           **MR. PISTORINO:**  WHICH I MOVE TO ADMIT.

2           **THE CLERK:**  IT NEEDS TO BE ADMITTED.

3           **MR. PISTORINO:**  23.

4           **THE COURT:**  ANY OBJECTION ON 23?

5           **MS. ROBERTS:**  NO OBJECTION.

6           **THE COURT:**  23 IS ADMITTED.

7               (TRIAL EXHIBIT 23 RECEIVED IN EVIDENCE.)

8                   (DISPLAYED ON SCREEN.)

9    **BY MR. PISTORINO:**

10   **Q.**  SO WE WERE -- EVERYBODY IS GOING TO RECALL NOW, OF COURSE,

11   THAT THE MOU WAS ENTERED INTO ON DECEMBER 1ST.  AND IN TX23,

12   THIS IS A TEXT MESSAGE FROM MR. BUSCH, RIGHT, TO YOU, RIGHT,

13   DATED DECEMBER 7TH, CORRECT?

14       AND YOU SEE HIM SAY -- I GUESS, DECEMBER 7TH AT 7:29 P.M.?

15   **A.**  THAT'S CORRECT.

16   **Q.**  (READING)

17           "PLEASE SEE MY EMAIL.  I NEED A STATUS UPDATE ON THE

18           ITEMS YOU COMMITTED TO ON OUR CALL YESTERDAY."

19       THESE ARE THE THINGS ABOUT LIKE THE POTENTIAL BOARD

20   MEMBERS, CORRECT?

21   **A.**  THAT IS CORRECT.

22   **Q.**  AND ALSO THE PROOF OF FINANCIAL CAPABILITY, CORRECT?

23   **A.**  THAT IS CORRECT.

24   **Q.**  OKAY.

25       AND HE SAYS, "THESE ARE SIMPLE CONFIRMATIONS THAT THIS

1    DEAL IS REAL AND DO NOT REQUIRE NEGOTIATION OR DISCUSSIONS,

2    JUST DISCLOSURE OF FACTUAL INFORMATION.  THESE ARE CRITICAL

3    ITEMS REQUIRED FOR US TO MEET THE QUOTE 'REASONABLE ASSURANCE'

4    STANDARD I DESCRIBED, AND LACK OF THEM IS INCREASINGLY PUTTING

5    THE DEAL AT RISK."

6        RIGHT?

7    **A.**  THAT IS CORRECT.

8    **Q.**  SO YOU KNEW THROUGH DECEMBER 7TH -- WELL, ACTUALLY LET ME

9    TRY IT THIS WAY.

10       THROUGH DECEMBER 7TH, YOU HADN'T PROVIDED TECHSHOP WITH

11   THAT INFORMATION ABOUT WHO ELSE WAS GOING TO BE INVOLVED IN

12   YOUR DEAL TO ACQUIRE A COMPANY SPANNING THE NATION, EVEN

13   LARGER POTENTIALLY, THE GLOBE, WITH TEN LOCATIONS IN THE

14   UNITED STATES AND 9,000 MEMBERS, RIGHT?

15   **A.**  THAT IS CORRECT.

16   **Q.**  AND THROUGH THAT TIME, ALSO, AGAIN, YOU HADN'T PROVIDED

17   THE INFORMATION ABOUT YOUR FINANCIAL CAPABILITY TO TAKE ON A

18   ENTERPRISE OF THIS SHEER MAGNITUDE; ISN'T THAT RIGHT?

19   **A.**  THAT IS CORRECT.

20   **Q.**  OKAY.

21       MR. BUSCH KEPT ASKING YOU FOR THAT INFORMATION AND YOU

22   DIDN'T PROVIDE IT, DID YOU?

23   **A.**  THAT IS CORRECT.

24   **Q.**  OKAY.

25           **THE COURT:**  WE'VE HIT 10:00.  SO WHY DON'T WE TAKE

1    OUR BREAK.  IF I CAN TALK TO COUNSEL AT SIDEBAR JUST BRIEFLY

2    BEFORE WE ACTUALLY BREAK.

3              (SIDEBAR HELD; NOT REPORTED.)

4         **THE COURT:**  ALL RIGHT.  LADIES AND GENTLEMEN, SO IT'S

5    JUST ABOUT 10:05.  LET'S GO AHEAD AND TAKE OUR FIRST MORNING

6    RECESS AND RESUME AT 10:20.

7       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

8         **THE CLERK:**  YOU MAY BE SEATED.

9       (RECESS TAKEN AT 10:05 A.M.; RESUMED AT 10:25 A.M.)

10        **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

11   COURT IS BACK IN SESSION.

12        **THE COURT:**  READY TO RESUME?

13        **MR. PISTORINO:**  YES, YOUR HONOR.

14      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

15        **THE CLERK:**  YOU MAY BE SEATED.

16        **THE COURT:**  YOU CAN GO AHEAD AND PROCEED WHENEVER YOU

17   ARE READY, MR. PISTORINO.

18        **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

19   **BY MR. PISTORINO:**

20   **Q.**  COMING FORWARD NOW CHRONOLOGICALLY, I THINK THE LAST ONE

21   WE JUST SAW WAS MR. BUSCH'S TEXT TO YOU SAYING HE NEEDED THE

22   INFORMATION, RIGHT?

23   **A.**  THAT IS CORRECT.

24   **Q.**  AND MR. BUSCH KEPT ON ASKING FOR THE INFORMATION, CORRECT?

25   **A.**  THAT IS CORRECT.

1    **Q.**   AND I'LL JUST PICK SOME MORE.

2         HOW ABOUT TX58.  CAN YOU MOVE TO THAT ONE, SIR?

3         ACTUALLY, HOLD ON A SECOND.  LET ME GO BACK ONE MORE.

4         IF YOU CAN PUT TX55 IN FRONT OF YOU, SIR?

5              **THE CLERK:**  I AM SORRY, NOT 58?  55?

6              **MR. PISTORINO:**  YES.

7              **THE CLERK:**  THEY ARE BOTH ADMITTED.  THAT'S FINE.

8              **MR. PISTORINO:**  THANK YOU.

9                     (DISPLAYED ON SCREEN.)

10   **BY MR. PISTORINO:**

11   **Q.**   THE DOCUMENT WE SAW BEFORE WAS THE 7TH.  THIS IS THE 8TH.

12   ON THE 8TH, THIS IS ONE OF THE EXAMPLES WE ALL SAW BEFORE

13   WHERE MR. BUSCH WAS REACHING OUT, AND TRYING TO REACH OUT TO

14   THESE POTENTIAL DIRECTORS, CORRECT?

15   **A.**   THAT IS CORRECT.

16   **Q.**   OKAY.  AND THOSE POTENTIAL DIRECTORS NEVER GOT BACK TO

17   MR. BUSCH, CORRECT?

18   **A.**   THAT IS CORRECT.

19              **MS. ROBERTS:**  OBJECTION, CALLS FOR SPECULATION.

20              **THE COURT:**  OVERRULED.

21   **BY MR. PISTORINO:**

22   **Q.**   I WON'T WASTE OUR TIME BY GOING THROUGH ALL OF THE

23   REQUESTS BY TECHSHOP FOR MR. BUSCH CALLED THIS CRITICAL BASIC

24   INFORMATION, BUT LET'S GO TO THE NEXT ONE FOR A MOMENT.

25         HOW ABOUT TX60?

1               (DISPLAYED ON SCREEN.)

2       NOW WE ARE AT DECEMBER 11TH, LIKE TEN DAYS AFTER THIS

3   THING WAS SIGNED.  STILL, YOU HADN'T PROVIDED TECHSHOP THAT

4   BASIC INFORMATION ABOUT YOUR FINANCIAL CAPABILITY, CORRECT?

5   **A.**   THAT IS CORRECT.

6   **Q.**   AND NEITHER MR. GREEN OR MR. CLAXTON GOT BACK TO TECHSHOP,

7   CORRECT?

8   **A.**   THAT IS CORRECT.

9   **Q.**   THE ONLY PERSON IN CONTACT WITH TECHSHOP ABOUT YOUR

10  POTENTIAL DEAL TO ACQUIRE ALL TEN LOCATIONS OF TECHSHOP IN THE

11  UNITED STATES AND ASSUME THE $21 MILLION OF DEBT WAS YOU,

12  CORRECT?

13  **A.**   THAT IS CORRECT.

14  **Q.**   OKAY.

15      NOW, THE MOU WAS CANCELED ON DECEMBER 12TH.  YOU KNOW

16  THAT, RIGHT?

17  **A.**   I DO.

18  **Q.**   OKAY.  AND LET ME GO BACK FOR A SECOND.

19      ALL THIS TIME YOU HAD BEEN USING THE NAME TECHSHOP 2.0 AS

20  THE ENTITY TO ACQUIRE THE TECHSHOP ASSETS, CORRECT?

21  **A.**   THAT IS CORRECT.

22  **Q.**   MAKE SURE I'M CLEAR HERE.

23      THROUGH, IN THIS INSTANCE, DECEMBER 12TH, 2017, YOU HADN'T

24  OPENED THE MAKERSPACE USING THE NAME TECHSHOP 2.0, HAD YOU?

25  **A.**   I HAD NOT.

RASURE - CROSS / PISTORINO

1    **Q.**  SO YOU HADN'T OPENED A SPACE UNDER THE NAME TECHSHOP

2    PROVIDING SERVICES FOR DO-IT-YOURSELFERS, HAD YOU?

3    **A.**  THAT IS CORRECT, SIR.

4    **Q.**  AFTER THE MOU WAS CANCELED BY TECHSHOP, YOU CONTINUED

5    TO -- WELL, ACTUALLY, HOLD ON A SECOND.

6        AFTER THE MOU WAS CANCELED BY TECHSHOP, ON DIRECT, YOU

7    TESTIFIED THAT YOU MADE A DEMAND TO MR. BUSCH FOR A RETURN OF

8    THESE MONIES THAT YOU HAD PAID IN ORDER TO BE ABLE TO

9    NEGOTIATE WITH TECHSHOP, CORRECT?

10   **A.**  I DID.

11   **Q.**  ON THE DIRECT, I DIDN'T SEE A SINGLE DOCUMENT WITH SUCH A

12   DEMAND FROM YOU.

13       DID YOU EVER WRITE TO MR. BUSCH OR ANYBODY AT TECHSHOP

14   WITH A DEMAND FOR PAYMENT OF THE FUNDS THAT YOU HAD ADVANCED

15   TO EVEN HAVE A DISCUSSION WITH TECHSHOP?

16       DID YOU EVER WRITE TO TECHSHOP REQUESTING THAT, SIR?

17   **A.**  I DID WRITE IT.  IT WAS NOT SENT --

18   **Q.**  OKAY.  THANK YOU, SIR.

19       NOW WE HEARD -- WELL, WE'VE HEARD FROM OTHERS THAT YOU

20   WERE IN CONTACT WITH LANDLORDS, FORMER LANDLORDS OF TECHSHOP,

21   CORRECT?

22   **A.**  THAT IS CORRECT.

23   **Q.**  OKAY.

24       AND ONE OF THE LANDLORDS YOU WERE IN CONTACT WITH WAS THE

25   LANDLORD FOR TECHSHOP'S FACILITY, 926 HOWARD STREET, CORRECT?

RASURE - CROSS / PISTORINO

1    **A.**  THAT IS CORRECT.

2    **Q.**  OKAY.

3        AND DURING THIS TIME, YOU WERE NEGOTIATING WITH THE

4    LANDLORD AT 926 HOWARD STREET FOR A LEASE ON THE FORMER

5    TECHSHOP SPACE, CORRECT?

6    **A.**  THAT IS CORRECT.

7    **Q.**  OKAY.

8        DID YOU EVER TELL THE TECHSHOP THAT YOU INTENDED TO OPEN

9    THE SPACE AT 926 HOWARD STREET USING THE NAME TECHSHOP 2.0

10   WITHOUT THEIR PERMISSION?

11   **A.**  NO, I DID NOT.

12   **Q.**  OKAY.  SO, FOR EXAMPLE, IF WE LOOKED HERE, FOR EXAMPLE, AT

13   TX68.

14          **THE CLERK:**  NO.

15          **MR. PISTORINO:**  WHICH WE MOVE TO HAVE ADMITTED, YOUR

16   HONOR.

17          **MS. ROBERTS:**  NO OBJECTION.

18          **THE COURT:**  68 IS ADMITTED.

19          (TRIAL EXHIBIT 68 RECEIVED IN EVIDENCE.)

20                (DISPLAYED ON SCREEN.)

21   **BY MR. PISTORINO:**

22   **Q.**  TX68, THESE ARE SOME OF THE COMMUNICATIONS BETWEEN YOU AND

23   THE LANDLORD AT 926 HOWARD STREET WHERE YOU WERE NEGOTIATING

24   FOR A LEASE FOR THE FORMER TECHSHOP SPACE, CORRECT?

25   **A.**  THAT IS CORRECT.

RASURE - CROSS / PISTORINO

1  **Q.**  YOU DIDN'T TELL TECHSHOP THAT YOU WERE INTENDING TO DO

2  THAT, DID YOU?

3  **A.**  NO, I DID NOT.

4  **Q.**  OKAY.

5     THIS IS DURING THE SAME TIME WHEN YOU WERE HAVING

6  NEGOTIATIONS WITH TECHSHOP ABOUT ACQUIRING ALL OF TECHSHOP'S

7  ASSETS, CORRECT?

8  **A.**  YES, BUT THESE WERE NOT TECHSHOP ASSETS.

9  **Q.**  I'LL TAKE YOUR POINT.  THAT'S TRUE.  AT LEAST IN THIS

10  REGARD.

11     THE ASSETS YOU WERE ATTEMPTING TO ACQUIRE WERE, FOR

12  EXAMPLE, THE TRADEMARKS OF TECHSHOP, CORRECT?

13  **A.**  YES.

14  **Q.**  OKAY.

15                    (PAUSE IN THE PROCEEDINGS.)

16     YOUR NEGOTIATIONS WITH THE LANDLORD TO ACQUIRE THE

17  TECHSHOP'S -- TO ACQUIRE A LEASE TO TECHSHOP'S FORMER SPACE

18  CONTINUED ON, CORRECT?

19  **A.**  THAT IS CORRECT.

20  **Q.**  SO LET'S TURN TO TX70.

21        **THE CLERK:**  70?

22        **MR. PISTORINO:**  70.  I DON'T THINK IT HAS BEEN

23  ADMITTED, WHICH I MOVE TO HAVE ADMITTED, YOUR HONOR.

24        **MS. ROBERTS:**  NO OBJECTION.

25        **THE COURT:**  70 IS SUBMITTED.

```
 1              (TRIAL EXHIBIT 70 RECEIVED IN EVIDENCE.)

 2                   (DISPLAYED ON SCREEN.)

 3    BY MR. PISTORINO:

 4    Q.  WE'RE COMING FORWARD HERE NOW.

 5       NOW WE'RE AT JANUARY 22ND.  THIS IS AN EMAIL FROM DAVE

 6    BYERS BACK TO YOU ABOUT... ABOUT A LEASE, CORRECT?

 7    A.  THAT IS CORRECT.

 8    Q.  OKAY.

 9       AGAIN, YOU DIDN'T TELL TECHSHOP THAT YOU WERE IN

10    NEGOTIATION -- NEGOTIATING WITH THE LANDLORD TO ACQUIRE A

11    LEASE FOR TECHSHOP'S FORMER FACILITY AND OPEN A MAKERSPACE

12    UNDER THE NAME TECHSHOP 2.0, DID YOU?

13    A.  ACTUALLY, I WAS NEGOTIATING WITH ALL THE LANDLORDS AT THIS

14    POINT.

15    Q.  DID YOU TELL TECHSHOP -- DID YOU TELL TECHSHOP THAT YOU

16    INTENDED TO -- YOU WERE NEGOTIATING WITH THE LANDLORD ON

17    JANUARY 22ND, 2018, TO LEASE THE SPACE AT 926 HOWARD STREET

18    AND OPEN IT UNDER THE NAME TECHSHOP 2.0?

19    A.  THEY WERE AWARE I WAS NEGOTIATING WITH ALL LANDLORDS.

20    Q.  DID YOU TELL TECHSHOP YOU INTENDED TO OPEN IT WITHOUT

21    TECHSHOP'S PERMISSION?

22    A.  NO, I DID NOT.

23    Q.  OKAY.

24                   (PAUSE IN THE PROCEEDINGS.)

25       NOW, I JUST WANT TO MAKE SURE I'M A HUNDRED PERCENT CLEAR
```

RASURE - CROSS / PISTORINO

1    HERE.

2        THROUGHOUT THIS ENTIRE TIME, YOU KNEW THAT TECHSHOP HAD

3    TRADEMARKS, CORRECT?

4    **A.**  FOR THE WORD, YES.

5    **Q.**  YOU HAD SEEN THE TECHSHOP LOGO WITH THE "R" IN THE CIRCLE

6    NEXT TO IT MANY, MANY TIMES, HADN'T YOU?

7    **A.**  AT THAT POINT I DON'T RECALL IF I HAD SEEN THE CIRCLE "R"

8    IN THE LOGO.

9    **Q.**  HAD YOU EVER VISITED TECHSHOP'S WEB PAGE?

10   **A.**  I AM SURE I DID.

11   **Q.**  DID YOU SEE THE TECHSHOP LOGO WITH THE "R" IN THE CIRCLE

12   NEXT TO IT AT THE TOP OF EVERY TECHSHOP WEB PAGE?

13   **A.**  HONESTLY, AT THIS POINT, I WAS ONLY WORRIED ABOUT GETTING

14   SHOPS OPENED.

15   **Q.**  OKAY.  SO YOU JUST DON'T REMEMBER THAT TECHSHOP'S LOGO,

16   WITH THE "R" IN THE CIRCLE, WAS AT THE TOP OF EVERY SINGLE

17   TECHSHOP WEB PAGE; THAT'S YOUR TESTIMONY HERE TODAY?

18   **A.**  THAT IS CORRECT.

19   **Q.**  DID YOU SEE THE BOTTOM OF THE TECHSHOP WEB PAGES WHERE IT

20   SPECIFICALLY SAID, TECHSHOP IS A REGISTERED TRADEMARK OF

21   TECHSHOP?

22   **A.**  I DON'T RECALL.

23   **Q.**  OKAY.

24       NOW BY LATISH JANUARY, YOU HADN'T DONE A DEAL WITH

25   TECHSHOP, HAD YOU?

1    **A.**   THAT IS CORRECT.

2    **Q.**   YOU HADN'T PAID ALL THE MONEY, TAKEN ON THE LIABILITIES TO

3    GET THE RIGHT TO THE TECHSHOP ASSETS, INCLUDING THE TECHSHOP

4    TRADEMARKS, CORRECT?

5    **A.**   THAT IS CORRECT.

6    **Q.**   SO TURN IN YOUR BOOK, IF YOU WOULD, TO EXHIBIT 71.

7                     (DISPLAYED ON SCREEN.)

8         NEVERTHELESS, EVEN THOUGH YOU DIDN'T HAVE IT YET, YOU WERE

9    HOPING TO ACQUIRE THE TECHSHOP ASSETS, CORRECT?

10   **A.**   I WAS STILL HOPING A DEAL COULD BE COMPLETED, YES.

11   **Q.**   AND THE DEAL WOULD BE COMPLETED (SIC), YOU WOULD HAVE

12   ACQUIRED THE ASSETS, INCLUDING THE TRADEMARKS, CORRECT?

13   **A.**   THAT IS CORRECT.

14   **Q.**   AS WE ARE SEEING IN NO. 71 HERE, EVEN THOUGH YOU ACTUALLY

15   DIDN'T HAVE THE TECHSHOP TRADEMARKS, YOU MADE AN OFFER TO

16   LICENSE TO STEPHANE CALMES AT ADEO TO LICENSE THE TECHSHOP

17   TRADEMARKS FOR, IN THIS INSTANCE, 2 MILLION, RIGHT?

18   **A.**   THAT IS CORRECT.

19   **Q.**   OKAY.

20                     (PAUSE IN THE PROCEEDINGS.)

21        AND YOU MENTIONED, I THOUGHT ON DIRECT, THAT YOU SAID YOU

22   DECIDED YOU WOULD MAKE WHAT YOU CONSIDERED TO BE AN ABSOLUTELY

23   RIDICULOUS OFFER TO LICENSE THE TECHSHOP MARKS, CORRECT?

24   **A.**   THAT IS CORRECT.

25   **Q.**   TURN IN YOUR BOOK TO NO. 72.

1              (DISPLAYED ON SCREEN.)

2      THIS IS MS. CALMES (SIC) RESPONSE TO THE OFFER THAT YOU

3   DESCRIBED AS AN ABSOLUTELY RIDICULOUS ONE, CORRECT?

4   **A.**   THAT IS CORRECT.

5   **Q.**   AND MS. CALMES DID NOT RESPOND THAT THAT WAS ABSOLUTELY

6   RIDICULOUS, DID SHE (SIC)?

7   **A.**   HE DID NOT BECAUSE IT WAS TO THEIR BENEFIT IF THEY

8   ACCEPTED IT.

9   **Q.**   OKAY.

10      THEY DID NOT -- MS. CALMES DID NOT RESPOND THAT YOUR OFFER

11  TO LICENSE THE TECHSHOP TRADEMARKS IN THESE VARIOUS PLACES FOR

12  2 MILLION WAS ABSOLUTELY RIDICULOUS, DID SHE?

13  **A.**   NO, HE DID NOT.

14  **Q.**   OKAY.  STEPHANIE, I'M ASSUMING THAT'S A --

15  **A.**   STEPHANE.

16  **Q.**   OKAY.

17              (PAUSE IN THE PROCEEDINGS.)

18      IN FACT, IN LIGHT OF STEPHANE'S RESPONSE TO YOUR FIRST

19  PROPOSAL, YOU HAD CONTINUED HOPE THAT YOU MIGHT BE ABLE TO

20  LICENSE THE TECHSHOP TRADEMARKS TO ADEO IF YOU WERE ABLE TO

21  ACQUIRE THE TECHSHOP ASSETS, DIDN'T YOU?

22  **A.**   I WOULDN'T CALL IT HOPE, BUT THERE WAS A POTENTIAL THERE.

23  **Q.**   OKAY.

24      SO NOW WE CAN TURN IN YOUR BOOK TO WHAT WE MARKED TX71

25  (SIC), WHICH IS NOW JANUARY 30TH.

1          (DISPLAYED ON SCREEN.)

2      THAT'S THE OFFER OF LICENSE TO ADEO FOR 2.5 MILLION DATED

3  JANUARY 30TH, ABOUT TWO WEEKS BEFORE THIS LAWSUIT WAS FILED,

4  RIGHT?

5      YOU REMEMBER DOING THAT?

6  **A.**  I DON'T BELIEVE THAT'S A CORRECT EXHIBIT.

7  **Q.**  73, SIR.

8          **THE CLERK:**  YOU SAID 71.

9          **MR. PISTORINO:**  I'M SORRY, 73.

10              (DISPLAYED ON SCREEN.)

11         **THE WITNESS:**  THE DISCUSSION WAS RELATED TO SERVICES,

12  YES.

13  **BY MR. PISTORINO:**

14  **Q.**  OKAY.

15  **A.**  INCLUDING THE CRM THAT WAS NOT WORKING FOR ADEO.

16  **Q.**  IT DOES SAY -- I'M SORRY, SIR.  YOU SAY IT WAS ONLY

17  RELATED TO SERVICES; IT WASN'T TO LICENSE THE TECHSHOP

18  TRADEMARK?

19      IS THAT YOUR TESTIMONY?

20  **A.**  IT WAS FOR EVERYTHING.

21  **Q.**  FOR EVERYTHING.  SO EVERYTHING INCLUDING THE TECHSHOP

22  TRADEMARKS, CORRECT?

23  **A.**  THAT IS CORRECT.

24  **Q.**  A WEEK BEFORE, SO ON JANUARY 24TH, YOU MADE WHAT YOU

25  CONSIDERED TO BE THE -- AT LEAST -- LET ME START AGAIN.

1        ON JANUARY 24TH, YOU MADE WHAT YOU TESTIFY HERE TODAY WAS

2   AN ABSOLUTELY RIDICULOUS OFFER TO LICENSE THE TECHSHOP

3   TRADEMARKS FOR TWO MILLION, AND SEVEN DAYS LATER YOU BUMPED IT

4   UP TO 2.5; IS THAT RIGHT?

5   **A.**  FOR APPROXIMATELY 16 COUNTRIES, YES.

6   **Q.**  NOW WE ARE THROUGH JANUARY 30TH IN OUR TIMELINE HERE.  I

7   JUST WANT TO MAKE SURE I AM ABSOLUTELY CLEAR.

8        THROUGH JANUARY 30TH, 2018, YOU HAD NOT OPENED A

9   MAKERSPACE USING THE NAME TECHSHOP 2.0, HAD YOU?

10  **A.**  THAT IS CORRECT.

11  **Q.**  AND YOU DIDN'T TELL TECHSHOP OF YOUR INTENTION TO DO THAT,

12  OPEN THAT MAKERSPACE, WITHOUT THEIR PERMISSION, DID YOU?

13  **A.**  THAT IS CORRECT.

14  **Q.**  OKAY.  MOVE IN YOUR BOOK TO EXHIBIT 78.

15                      (DISPLAYED ON SCREEN.)

16     NOW, WE ARE HERE TO ANOTHER ONE WE HAVE SEEN BEFORE.

17      THIS IS AN EMAIL DATED FEBRUARY 7TH, FROM MR. WOODS TO YOU

18  REJECTING YOUR PROPOSAL TO SIMPLY RENT EQUIPMENT FROM

19  TECHSHOP, CORRECT?

20  **A.**  THAT IS CORRECT.

21  **Q.**  OKAY.

22     AND MR. WOODS TOLD YOU THAT TECHSHOP IS KIND OF DONE WITH

23  NEGOTIATING THIS WHOLE THING AND FEELS THEY HAVE TO PROCEED

24  WITH THE CHAPTER 7 FILING, CORRECT?

25  **A.**  THERE WAS CLAIM AFTER CLAIM ON THE ASSETS AT THIS POINT,

RASURE - CROSS / PISTORINO

1    YES.

2    **Q.**  OKAY.

3        NOW, AT THAT POINT WHEN MR. WOODS TOLD YOU THAT, YOU KNEW

4    YOU WERE NOT GOING TO GET THE ASSETS OF TECHSHOP, INCLUDING

5    THE TRADEMARKS, RIGHT?

6    **A.**  NO, I DID NOT KNOW THAT AT THIS TIME.

7    **Q.**  OKAY. WELL, YOU HADN'T HAD THEM UP UNTIL THEN, HAD YOU?

8    **A.**  I HAD NOT.

9    **Q.**  OKAY.  THROUGH FEBRUARY 7TH, YOU HADN'T PAID ALL THE MONEY

10   AND ACCEPTED THE $21 MILLION OF LIABILITY TO ACQUIRE THE

11   ASSETS OF TECHSHOP, INCLUDING THE TRADEMARKS, HAD YOU?

12   **A.**  THAT IS CORRECT.

13   **Q.**  OKAY.

14       I THINK IN YOUR SMALLER BINDER IN FRONT OF YOU TURN TO

15   TX273.

16                    (PAUSE IN THE PROCEEDINGS.)

17       WHILE YOU ARE DEALING WITH THAT, MAYBE I'LL JUMP BACK A

18   LITTLE BIT AND MAKE SURE I CAN ASK AND GET US TO THE RIGHT

19   PLACE.

20       THROUGHOUT THIS TIME, ALL THESE NEGOTIATIONS UNTIL, FOR

21   EXAMPLE, WE SEE THE EMAIL WE JUST SAW ON FEBRUARY 7, BOTH YOU

22   AND THE TECHSHOP BOARD WERE WORKING TO NEGOTIATE A DEAL UNDER

23   WHICH YOU WOULD ACQUIRE ALL OF THE TECHSHOP ASSETS, CORRECT?

24   **A.**  YES, WE WERE.

25   **Q.**  AND YOU HAD TOLD THE BOARD THAT THE ENTITY YOU WERE GOING

1    TO BE USING, THE NAME WAS GOING TO BE TECHSHOP 2.0, CORRECT?

2    **A.**  THAT IS CORRECT.

3    **Q.**  OKAY.

4       NOW -- AND WHAT WE SEE HERE IN TX273, THIS IS THE

5    IMMEDIATE RELEASE ABOUT TECHSHOP 2.0 TO OPEN IN SAN FRANCISCO,

6    CORRECT?

7    **A.**  THAT IS CORRECT.

8    **Q.**  OKAY.

9       AND AT THE BOTTOM, JUST SO WE CAN ALL CLEAR UP OUR FACTS

10   HERE, IT LISTS THE EMAIL -- I AM SORRY, THE PR CONTACT AS

11   MEGAN DREW WIESLANDER, CORRECT?

12   **A.**  THAT'S CORRECT.

13   **Q.**  MS. WIESLANDER IS YOUR WIFE, CORRECT?

14   **A.**  CORRECT.

15   **Q.**  I THOUGHT YOU SAID ON DIRECT THAT THIS WAS LIKE A DRAFT

16   THAT WASN'T KIND OF ACTUALLY SENT OUT; IS THAT RIGHT?

17   **A.**  THAT IS CORRECT.

18   **Q.**  OKAY.  NEVERTHELESS, WITHIN A DAY OR TWO, IT BECAME

19   PUBLICLY KNOWN OF YOUR INTENTION TO OPEN TECHSHOP'S FORMER

20   FACILITY AT HOWARD STREET UNDER THE NAME TECHSHOP 2.0,

21   CORRECT?

22   **A.**  THAT IS CORRECT.

23   **Q.**  OKAY.

24       IF WE TURN IN YOUR BOOK TO... I'LL HAVE YOU GO BACK TO

25   EXHIBIT TX80, WHICH I DON'T BELIEVE HAS BEEN ADMITTED.

```
1          THE CLERK:  80?  HUH-UH.

2          MR. PISTORINO:  WHICH WE OFFER.

3          MS. ROBERTS:  NO OBJECTION.

4          THE COURT:  ADMITTED.

5          (TRIAL EXHIBIT 80 RECEIVED IN EVIDENCE.)

6                    (DISPLAYED DISPLAY.)

7  BY MR. PISTORINO:

8  Q.   TX80, THIS IS AN EMAIL BETWEEN YOURSELF AND DAVE BYERS

9  NEGOTIATING THE LEASE TO OCCUPY TECHSHOP'S FORMER FACILITY?

10      LET ME KNOW WHEN YOU ARE READY.

11      READY?

12  A.   80?

13  Q.   80.

14  A.   YES, SIR.

15  Q.   THIS IS AN EMAIL FROM MR. BYERS BACK TO YOU WITH THE LEASE

16  FOR THE FORMER FACILITY ON HOWARD STREET, CORRECT?

17  A.   THAT IS CORRECT.

18  Q.   AND THIS IS THE PLACE THAT IT WAS NOW BECOMING PUBLICLY

19  KNOWN YOU WERE GOING TO OPERATE USING THE NAME TECHSHOP 2.0,

20  CORRECT?

21  A.   EXCUSE ME.  I THINK I TESTIFIED THAT THIS WAS THE SIGNED

22  LEASE.

23      THIS WAS NOT THE SIGNED LEASE.

24  Q.   OKAY.  IT IS A LEASE THAT YOU WERE EXCHANGING WITH

25  MR. BYERS TO HAVE A LEASE FOR THE HOWARD STREET FACILITY THAT
```

1  YOU INTENDED TO OPEN UNDER THE NAME TECHSHOP 2.0 WITHOUT

2  TECHSHOP'S AUTHORIZATION, CORRECT?

3  **A.**  THAT IS CORRECT.

4  **Q.**  OKAY.

5      AGAIN, THROUGH THIS POINT YOU HADN'T TOLD TECHSHOP'S BOARD

6  THAT YOU WERE GOING TO EXECUTE A LEASE TO OPEN TECHSHOP'S

7  FORMER FACILITY USING THE NAME TECHSHOP 2.0 WITHOUT THEIR

8  PERMISSION, HAD YOU?

9  **A.**  THAT IS CORRECT.

10  **Q.**  OKAY.

11                  (PAUSE IN THE PROCEEDINGS.)

12      NOW, WHEN IT BECAME PUBLICLY KNOWN... PUBLICLY KNOWN THAT

13  YOU WERE GOING TO -- WELL, ACTUALLY, LET ME TRY IT THIS WAY.

14      ISN'T IT TRUE THAT BY THIS POINT, OF COURSE, YOU HAD --

15  YOU KNEW -- YOU KNEW, OF COURSE, THAT THERE WAS GOING TO BE NO

16  DEAL WITH TECHSHOP AND THEY WERE GOING TO PROCEED TO A

17  BANKRUPTCY FILING, RIGHT?  YOU KNEW THAT.

18  **A.**  NO, I DID NOT.

19  **Q.**  DIDN'T WE JUST SEE WHERE THEY TOLD YOU, MR. WOODS TOLD YOU

20  THAT YOUR LAST OFFER WAS REJECTED, AND TECHSHOP WAS GOING TO

21  PROCEED WITH THE CHAPTER 7 FILING.

22      DIDN'T HE TELL THAT TO YOU?

23  **A.**  WE CONTINUED TO WORK ON A DEAL, YES.

24  **Q.**  MR. WOODS TOLD YOU THAT TECHSHOP HAD REJECTED YOUR DEAL --

25  YOUR OFFER -- FINAL OFFER AND WAS GOING TO PROCEED TO

1    CHAPTER 7 FILING, DIDN'T IT -- DIDN'T HE?

2    **A.**  HE DID SAY THAT.

3    **Q.**  I'M SORRY?

4    **A.**  HE DID.

5    **Q.**  OKAY.

6        IN FACT, ISN'T IT TRUE THAT IT WAS WIDELY KNOWN THAT THERE

7    WAS NOT -- THERE WAS NO DEAL BETWEEN YOURSELF AND TECHSHOP?

8    **A.**  AT THIS POINT, YES.

9        **MS. ROBERTS:**  OBJECTION.  CALLS FOR SPECULATION.

10       **THE COURT:**  OVERRULED.

11   **BY MR. PISTORINO:**

12   **Q.**  AND -- BUT THEN THERE WAS THE -- IT BECAME -- EVERYBODY --

13   THERE WAS A PUBLIC ANNOUNCEMENT OF YOUR INTENTION TO OPEN THE

14   HOWARD STREET FACILITY USING THE NAME TECHSHOP 2.0, CORRECT?

15   **A.**  THAT IS CORRECT.

16   **Q.**  OKAY.  SO IF YOU -- ACTUALLY, LET ME ASK IT THIS WAY.

17       ISN'T IT TRUE THAT MANY PEOPLE WONDERED HOW COULD THAT BE?

18   HOW COULD YOU BE OPENING A FACILITY, TECHSHOP'S FORMER

19   FACILITY USING THE NAME TECHSHOP 2.0 IF YOU DIDN'T GET THE

20   RIGHTS TO THE TRADEMARKS; ISN'T THAT TRUE?

21       **MS. ROBERTS:**  OBJECTION, CALLS FOR SPECULATION.

22       **THE COURT:**  SUSTAINED.

23   **BY MR. PISTORINO:**

24   **Q.**  OKAY.  WERE PEOPLE ASKING YOU ABOUT THAT, SIR?

25       **MS. ROBERTS:**  OBJECTION, HEARSAY.

1        **THE COURT:**  OVERRULED.

2   **BY MR. PISTORINO:**

3   **Q.**  WERE PEOPLE ASKING YOU HOW YOU COULD OPEN -- IF YOU HADN'T

4   DONE A DEAL WITH TECHSHOP TO ACQUIRE THE TRADEMARK, HOW YOU

5   COULD BE OPENING A MAKERSPACE FACILITY USING THE NAME TECHSHOP

6   2.0?

7   **A.**  I ASKED HOW WE HAD EXECUTED A LEASE, YES.

8   **Q.**  OKAY.

9        TURN IN YOUR BOOK TO TX21.

10       I DON'T THINK IT'S BEEN ADMITTED, SO WE OFFER IT, YOUR

11  HONOR.

12            **MS. ROBERTS:**  NO OBJECTION.

13            **THE COURT:**  21 IS ADMITTED.

14            (TRIAL EXHIBIT 21 RECEIVED IN EVIDENCE.)

15                 (DISPLAYED ON SCREEN.)

16  **BY MR. PISTORINO:**

17  **Q.**  THIS IS FEBRUARY 12TH, WHICH IS KIND OF LIKE -- EXACTLY

18  AROUND THE TIME IT BECAME PUBLICLY KNOWN, AND I AM LOOKING AT

19  THE MESSAGE AT -- ON FEBRUARY 12TH AT 8:45 P.M.

20       ARE YOU WITH ME THERE?

21  **A.**  I AM.

22  **Q.**  JUST TO BE CLEAR, THE NUMBER ON THE LEFT-HAND SIDE, THE

23  785-821-2676, THAT'S YOUR PHONE NUMBER, CORRECT?

24  **A.**  THAT IS CORRECT.

25  **Q.**  OKAY.

RASURE - CROSS / PISTORINO

1    SOMEBODY, WE DON'T EVEN KNOW WHO, SAID, I'M CONFUSED

2    THEN -- OH, I'M SORRY.  ACTUALLY LET'S GO BACK UP ONE JUST TO

3    MAKE SURE WE ARE CLEAR HERE.

4        YOU STATED AT 7:57:  THE BOARD REJECTED THE BEST OFFER

5    THAT ALLOWED A TRUSTEE TO DECIDE ON EVERYTHING EXCEPT MAYBE

6    PAY WHICH WOULD BE PAID BY ME IMMEDIATELY.

7        CORRECT?

8    **A.**  THAT IS CORRECT.  THIS WAS THE -- THIS PHONE NUMBER WAS

9    THE TECHSHOP EMPLOYEE WHO WAS OWED THE MOST MONEY BY TECHSHOP.

10   **Q.**  OKAY.

11       I'M SORRY.  I WAS GOING TO HAVE US -- GO US UP TO MAKE

12   SURE THE CONVERSATION FLOWS CHRONOLOGICALLY.

13       AT 7:54, THIS PERSON SAYS:  HI, DAN.  SAW YOUR POSTING AT

14   THE SHOP IS OPENING.  HAS A DEAL BEEN REACHED AND WHAT IS THE

15   EMPLOYEE BACK PAY DEAL?

16       RIGHT?

17   **A.**  THAT IS CORRECT.

18   **Q.**  AND THEN YOU SAID AT 7:57:  THE BOARD REJECTED THE BEST

19   OFFER THAT ALLOWED THE TRUSTEE TO DECIDE ON EVERYTHING EXCEPT

20   EMPLOYEE PAY, WHICH WOULD BE PAID BY ME IMMEDIATELY.

21       CORRECT?

22   **A.**  THAT IS CORRECT.

23   **Q.**  AND THEN THIS PERSON SAID:  I'M CONFUSED THEN.  HOW ARE

24   YOU ABLE TO OPEN THE SHOP AND USE TECHSHOP NAME IF THERE IS NO

25   DEAL IN PLACE.

1          CORRECT?

2     **A.**   HE DID ASK THAT.

3     **Q.**   OKAY.

4                         (PAUSE IN THE PROCEEDINGS.)

5          AND AS SOON AS TECHSHOP LEARNED OF YOUR INTENTION TO OPEN

6     A MAKERSPACE USING THE NAME TECHSHOP 2.0 WITHOUT TECHSHOP'S

7     PERMISSION, TECHSHOP BEGAN REACTING TO THAT, DIDN'T THEY?

8     **A.**   I RECEIVED A PHONE CALL FROM DAN WOODS.

9     **Q.**   OKAY.

10         WELL, MR. WOODS WROTE A NUMBER OF PEOPLE SAYING THAT

11    THERE'S ABSOLUTELY NO RELATIONSHIP BETWEEN THE MAKERSPACE THAT

12    YOU ARE ATTEMPTING TO OPEN UP UNDER THE NAME OF TECHSHOP 2.0

13    AND TECHSHOP ITSELF, CORRECT?

14    **A.**   TECHSHOP 2.0 WAS ALWAYS SEPARATE, YES.

15    **Q.**   OKAY.

16         FOR EXAMPLE, IF WE LOOK AT EXHIBIT 333, WHICH I BELIEVE

17    HAS BEEN ADMITTED.

18              **THE CLERK:**  NO.  I HAVE 334 AND 337 AND 330.

19              **MR. PISTORINO:**  I AM SURE IT IS GOING TO BE UNDER

20    ANOTHER NUMBER, BUT WE WILL MOVE TO ADMIT 333.

21              **MS. ROBERTS:**  NO OBJECTION.

22              **THE COURT:**  ADMITTED.

23             (TRIAL EXHIBIT 333 RECEIVED IN EVIDENCE.)

24              **THE WITNESS:**  WHICH BOOK IS THIS IN?

25              **MR. PISTORINO:**  IT'S GOING TO BE IN THE SMALLER OF

RASURE - CROSS / PISTORINO

1    THE ONES IN FRONT OF YOU.

2                      (DISPLAYED ON SCREEN.)

3    **BY MR. PISTORINO:**

4    **Q.** READY?

5    **A.** YES, SIR.

6    **Q.** OKAY.  IN 333, THAT'S AN EMAIL WE'VE SEEN BEFORE WHERE

7    MR. WOODS WROTE THE GUY AT FORD CLARIFYING, HE SAYS, YOU KNOW,

8    THERE'S ABSOLUTELY NO RELATIONSHIP BETWEEN TECHSHOP AND

9    TECHSHOP 2.0, CORRECT?

10   **A.** THAT WAS ALWAYS MY UNDERSTANDING, YES.

11   **Q.** OKAY.

12       BUT MR. WOODS WAS CLARIFYING IT FOR THE GUY AT FORD,

13   RIGHT?

14   **A.** YES, HE WAS.

15   **Q.** OKAY.

16                      (PAUSE IN THE PROCEEDINGS.)

17       I'M GOING TO -- NOW I WANT TO JUMP BACK A TAD... A BIT

18   HERE TO OUR DISCUSSION HERE.

19       IN YOUR DISCUSSIONS WITH THE TECHSHOP BOARD, YOU TOLD

20   THEM, DIDN'T YOU, THAT THE TECHSHOP NAME WAS IMPORTANT,

21   CORRECT?

22   **A.** IN MY VERY FIRST PHONE CALL WITH THEM, I SAID I WOULD HAVE

23   TO COMPLETE DUE DILIGENCE.  I KNEW THE TECHSHOP NAME, BUT WAS

24   ALSO LOOKING AT OTHER NAME SUCH AS PIRANHA SHOPS AS A

25   POTENTIAL RENAMING, BUT AT THAT POINT NO DECISION WOULD BE

1  MADE.  AND GIVEN THE MESS THAT THEY HAD DESCRIBED, MOST LIKELY

2  NO NAME CHANGE WOULD HAPPEN INSTANTLY BECAUSE I HAD TWO GOALS,

3  TWO IMMEDIATE GOALS ON --

4  **Q.**  SIR, IF YOU CAN JUST ANSWER MY QUESTION.

5      YOU TOLD THEM THAT THE TECHSHOP NAME WAS IMPORTANT, DIDN'T

6  YOU?

7  **A.**  IN THE INITIAL PHONE CALL, I DON'T REMEMBER TELLING THEM

8  THE NAME WAS IMPORTANT.

9  **Q.**  OKAY.

10      SO, FOR EXAMPLE, ON -- IF YOU CAN TURN IN YOUR BOOK TO

11  TX194.

12          **THE CLERK:**  194?

13          **MR. PISTORINO:**  194, WHICH WE WILL MOVE TO HAVE

14  ADMITTED.

15          **MS. ROBERTS:**  NO OBJECTION.

16          **THE COURT:**  ADMITTED.

17          (TRIAL EXHIBIT 194 RECEIVED IN EVIDENCE.)

18              (DISPLAYED ON SCREEN.)

19  **BY MR. PISTORINO:**

20  **Q.**  TX194 IS A SERIES OF TEXT MESSAGES BETWEEN YOURSELF AND

21  SOMEBODY WHOSE NAME HAS BEEN OMITTED, CORRECT?

22  **A.**  THAT IS CORRECT.

23  **Q.**  AND THIS IS A DISCUSSION THAT YOU WERE HAVING HERE IN THE

24  EARLY JANUARY TIME FRAME ABOUT WHETHER OR NOT TO USE THE

25  TECHSHOP NAME AND/OR REBRAND, CORRECT?

1    **A.**  THAT IS CORRECT.

2    **Q.**  THAT'S YOU THERE SAYING, NO REBRANDING.  THE 2.0 IS JUST

3    LEGAL.  WE WON'T BE USING IT IN THE U.S.

4         CORRECT?

5    **A.**  IT'S TALKING SPECIFICALLY ABOUT THE LOGO --

6    **Q.**  DOES IT SAY WHAT I SAID, SIR?

7         NO RE-BRANDING -- THAT'S YOU WRITING.  THE 2.0 IS JUST

8    LEGAL.  WE WON'T BE USING IN THE U.S.

9         CORRECT?

10   **A.**  CORRECT.

11   **Q.**  AND THEN YOU ALSO WROTE:  FIRST OF ALL, OF COURSE, A

12   CONFIRMATION THAT THE BRAND NAME WILL CONTINUE.

13        CORRECT?

14   **A.**  YES.

15   **Q.**  AND AT THE BOTTOM THERE, CONTINUING ON, YOU SAID:  AND

16   OBVIOUSLY RESTORING THE BRAND VALUE IS A TOP PRIORITY.

17        CORRECT?

18   **A.**  THE BRAND HAD BEEN SIGNIFICANTLY --

19   **Q.**  SIR, DID YOU WRITE WHAT I ASKED YOU?

20        AT THE BOTTOM -- DID YOU WRITE ON JANUARY 3RD, 2018:

21        OBVIOUSLY RESTORING THE BRAND VALUE IS A TOP PRIORITY.

22        CORRECT?

23   **A.**  YES.

24   **Q.**  OKAY.

25        SO DURING ALL THIS TIME YOUR INTENTION WAS TO ACQUIRE THE

1    TECHSHOP NAME, THE TRADEMARKS TO IT, CORRECT?

2    **A.**   THAT IS CORRECT.

3    **Q.**   OKAY.

4        NOW, IT'S TRUE, ISN'T IT, THAT YOU ACTUALLY CONSIDERED

5    SOME NAMES OTHER THAN TECHSHOP, DIDN'T YOU?

6    **A.**   YES, WE DID.

7    **Q.**   BUT ISN'T IT TRUE YOU COULDN'T COME UP WITH A BETTER NAME

8    AT ALL THAN TECHSHOP FOR A PLACE TO OPERATE A MAKER FACILITY,

9    CORRECT?

10   **A.**   NO, THAT WASN'T TRUE.

11   **Q.**   DIDN'T YOU THINK ABOUT IT FOR A WHOLE WEEK?  DIDN'T YOU

12   RACK YOUR BRAIN FOR A WEEK TO COME UP WITH A BETTER NAME AND

13   YOU COULDN'T DO IT?

14   **A.**   I WANTED TO GO WITH THESHOP, BUT MY INTERNAL TEAM THOUGHT

15   IT WAS TOO GENERIC.

16   **Q.**   OKAY.  IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT WE

17   MARKED TX196.

18           **MR. PISTORINO:**  WHICH WE WOULD OFFER TO BE ADMITTED,

19   YOUR HONOR.

20           **MS. ROBERTS:**  NO OBJECTION.

21           **THE COURT:**  ADMITTED.

22           (TRIAL EXHIBIT 196 RECEIVED IN EVIDENCE.)

23                   (DISPLAYED ON SCREEN.)

24   **BY MR. PISTORINO:**

25   **Q.**   TX196 IS, ONCE AGAIN, TEXT MESSAGES BETWEEN YOU AND

1    SOMEONE WHOSE IDENTITY IS SHIELDED FROM US WHERE YOU WERE

2    COMMUNICATING ABOUT THE TECHSHOP NAME, CORRECT?

3    **A.**   THAT IS CORRECT.

4    **Q.**   AND IT LOOKS LIKE THIS OTHER PERSON WAS THINKING, WELL,

5    MAYBE WE'LL DO A CLEAN SLATE MODEL, CORRECT?

6       ISN'T THAT WHAT THEY SAY THERE AT, LOOKS LIKE 6:01 P.M.,

7    RIGHT?

8    **A.**   THAT IS CORRECT.

9    **Q.**   AND YOU SAID, I DON'T KNOW WHAT TO CALL IT IF WE DON'T

10   CALL IT TECHSHOP.  WE HAVE BEEN RACKING OUR BRAINS FOR A WEEK

11   PLUS.

12      CORRECT?

13   **A.**   MY INTERNAL TEAM HAD BEEN, YES.

14   **Q.**   SO I'M GOING TO GO BACK TO MY QUESTION FROM BEFORE.

15      ISN'T IT TRUE THAT YOU WERE RACKING YOUR BRAINS FOR A WEEK

16   TO COME UP WITH A BETTER NAME THAN TECHSHOP, AND YOU COULDN'T

17   DO IT, CORRECT?

18   **A.**   I WAS NOT, BUT OUR TEAM WAS, YES.

19   **Q.**   WELL, WHEN IT SAYS "WE", THAT INCLUDES YOU, CORRECT?

20   **A.**   I SAW THE COMMUNICATIONS.

21   **Q.**   OKAY.

22      NO BETTER NAME THAN TECHSHOP, AT LEAST AT THAT POINT,

23   CORRECT?

24   **A.**   THAT IS WHAT I WROTE.

25   **Q.**   AND THAT -- I WANT TO MAKE ABSOLUTELY CLEAR, SIR, THIS

1    JANUARY TIME FRAME, THAT IS WHAT, A MONTH AND A HALF AFTER

2    TECHSHOP CLOSED ITS DOORS, CORRECT?

3    **A.**   THAT IS CORRECT.

4    **Q.**   AND A MONTH AND A HALF AFTER TECHSHOP ANNOUNCED ITS

5    INTENTION TO SEEK BANKRUPTCY PROTECTION, CORRECT?

6    **A.**   THAT IS CORRECT.

7    **Q.**   NEVERTHELESS, A MONTH AND A HALF LATER -- ACTUALLY, LET ME

8    TRY IT THIS WAY.

9        WITH THAT ANNOUNCEMENT, I THINK I HEARD YOU SAY, YOU

10   KNOW -- OR MAYBE WE HEARD IT FROM THE OTHERS -- SOME MEMBERS,

11   FORMER MEMBERS WERE UPSET, CORRECT?

12   **A.**   THEY WERE.

13   **Q.**   OKAY.

14       NEVERTHELESS, DESPITE ALL THE PEOPLE BEING UPSET THEY

15   COULDN'T GET IN THEIR PLACE, THROUGH JANUARY 2018, THINKING ON

16   IT FOR A WEEK, YOU COULDN'T COME UP WITH A BETTER NAME THAN

17   TECHSHOP, CORRECT?

18   **A.**   IT'S NOT A FAST PROCESS.

19   **Q.**   OKAY.  OKAY.

20       IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT WE MARKED

21   TX29.

22          **MR. PISTORINO:**  WHICH I BELIEVE HAS BEEN ADMITTED.

23          **THE CLERK:**  IT IS.

24              (DISPLAYED ON SCREEN.)

25

1    **BY MR. PISTORINO:**

2    **Q.**  LET ME KNOW WHEN YOU ARE READY.

3    **A.**  I'M READY.

4    **Q.**  THIS IS A LETTER WE HAVE ALL SEEN MANY, MANY TIMES NOW,

5    DATED FEBRUARY 14TH.  SO A DAY OR SO AFTER IT BECAME PUBLICLY

6    KNOWN OF YOUR INTENTION TO OPEN MAKERS FACILITY, PROVIDING

7    SPACES FOR DO-IT-YOURSELFERS USING THE NAME TECHSHOP 2.0

8    WITHOUT TECHSHOP'S PERMISSION.

9        AND I REALLY HAVE JUST A LITTLE BIT OF A QUESTION HERE.

10       THIS WAS A LETTER TO YOU, CORRECT?

11   **A.**  YES, IT WAS.

12   **Q.**  AND I KNOW WE HAVE SEEN OTHER ONES WHERE THEY CORRECT

13   EXACTLY HOW IT GOT SENT TO YOU, BUT YOU GOT THIS, RIGHT?

14   **A.**  I DID.

15   **Q.**  YOU GOT IT ON FEBRUARY 14TH, CORRECT?

16   **A.**  YES, I DID.

17   **Q.**  OKAY.  AND BEFORE THE BULLET POINTS THERE, THE LETTER TO

18   YOU SAYS, "ALSO, BE ADVISED THAT MR. RASURE HAS NO RIGHTS TO

19   THE POSSESSION OR USE OF THE ASSETS OF TECHSHOP, INC."

20       FIRST PART, CORRECT?

21   **A.**  THAT IS CORRECT.

22   **Q.**  AND THEN IT SPECIFICALLY LISTS TRADEMARKS, CORRECT?

23   **A.**  YES, IT DOES.

24   **Q.**  AND YOU KNEW THEN THAT ONE OF THE ASSETS OF TECHSHOP'S,

25   THAT TRADEMARKS WAS, IN FACT, THE NAME TECHSHOP, CORRECT?

1    **A.**  YES.

2    **Q.**  SO YOU KNEW AS OF FEBRUARY 14TH, REGARDLESS OF WHATEVER

3    ELSE HAPPENED IN THE WORLD BEFORE THEN, THAT YOU HAD NO RIGHTS

4    TO USE THE TECHSHOP NAME, CORRECT?

5    **A.**  I WASN'T USING THE NAME.

6    **Q.**  YOU WEREN'T USING THE NAME.

7         WHAT NAME WERE YOU USING, SIR?

8    **A.**  TECHSHOP 2.0.

9    **Q.**  OKAY.  OKAY.

10        TO OPERATE A MAKER -- TO OFFER TO THE PUBLIC A MAKER

11   FACILITY FOR DO-IT-YOURSELFERS, CORRECT?

12   **A.**  THAT IS CORRECT.

13   **Q.**  OKAY.

14        NOW I HAVE HEARD SOME TESTIMONY, I THOUGHT ON DIRECT, THAT

15   YOU DIDN'T UNDERSTAND FROM THIS LETTER, YOU DIDN'T UNDERSTAND

16   THAT YOU SHOULD STOP USING THE NAME TECHSHOP 2.0.

17   **A.**  THAT IS CORRECT.

18   **Q.**  YOU GOT THIS LETTER SAYING YOU HAD NO RIGHTS TO USE THE

19   TECHSHOP NAME, RIGHT?  AND YOU DIDN'T THINK, GEES, I BETTER

20   STOP USING THAT NAME.

21        YOU DIDN'T THINK THAT?

22   **A.**  NO.  IT HAD ALWAYS BEEN REPRESENTED AS COMPLETELY

23   SEPARATE.

24   **Q.**  ALWAYS BEEN REPRESENTED -- I'M SORRY, SIR, HOW DO YOU

25   MEAN?

RASURE - CROSS / PISTORINO

1  ALWAYS REPRESENTED AS COMPLETELY SEPARATE?

2  **A.** WE WERE NOT THE SAME. TECHSHOP AND TECHSHOP 2.0 WERE NOT

3  THE SAME.

4  **Q.** OKAY. YOU WERE USING THE NAME TECHSHOP 2.0, CORRECT?

5  YOU WERE USING THIS ONE AND THIS ONE (INDICATING),

6  CORRECT?

7  **A.** I DON'T KNOW WHEN THE TOP ONE WAS USED. THE MIDDLE ONE --

8  THE THIRD ONE DOWN, I BELIEVE, IS WHAT WAS BEING USED.

9  **Q.** IN THE NAME ITSELF THAT YOU WERE USING, IT SAID TECHSHOP,

10 CORRECT?

11 **A.** IT DID.

12 **Q.** OKAY.

13 SO, AGAIN, YOU KNEW NO LATER THAN FEBRUARY 14TH, 2018,

14 THAT YOU HAD NO RIGHT TO USE THE NAME TECHSHOP, CORRECT?

15 **A.** CORRECT.

16 **Q.** NEVERTHELESS WHEN YOU READ THIS LETTER, YOU DIDN'T --

17 WELL, YOU DIDN'T UNDERSTAND THAT YOU SHOULD STOP USING THE

18 NAME THAT YOU DIDN'T HAVE ANY RIGHTS TO, CORRECT?

19 **A.** THAT IS CORRECT.

20 **Q.** IS ENGLISH YOUR NATIVE TONGUE?

21 **A.** YES, IT IS.

22 **Q.** OKAY. YOU DON'T HAVE ANY PARTICULAR PROBLEM READING, DO

23 YOU?

24 **A.** NO. I ASKED OTHERS TO READ IT AS WELL.

25 **Q.** OKAY.

1      NOW, THE NEXT DAY AFTER THE CEASE AND DESIST LETTER, THERE

2   WAS THAT ARTICLE THAT APPEARED IN THE *SAN FRANCISCO CHRONICLE*,

3   CORRECT?

4   **A.**  I DON'T BELIEVE I RECEIVED A CEASE AND DESIST LETTER

5   BEFORE THE *CHRONICLE*.

6   **Q.**  OKAY.  LET'S TRY IT THIS WAY.

7      THE DAY AFTER YOU GOT THE LETTER ON FEBRUARY 14TH TELLING

8   YOU YOU HAD NO RIGHT TO USE THE TECHSHOP NAME, AN ARTICLE

9   APPEARED IN THE *SAN FRANCISCO CHRONICLE*, CORRECT?

10  **A.**  THAT IS CORRECT.

11          **MS. ROBERTS:**  OBJECTION, MISSTATES THE EVIDENCE.

12          **THE COURT:**  IT DOES.  SUSTAINED.

13      JUST ASK -- JUST STOP CHARACTERIZING THE DOCUMENTS.

14          **MR. PISTORINO:**  OKAY.

15  **BY MR. PISTORINO:**

16  **Q.**  TURN IN YOUR BINDER TO THE EXHIBIT WE MARKED TX337.

17                    (DISPLAYED ON SCREEN.)

18  **A.**  I AM READY.

19  **Q.**  THAT'S THE ARTICLE THAT APPEARED THE DAY AFTER THE

20  FEBRUARY 14TH LETTER ABOUT YOU OPENING THE FACILITY AT HOWARD

21  STREET UNDER THE NAME TECHSHOP 2.0, CORRECT?

22  **A.**  YES, IT IS.

23  **Q.**  OKAY.  AND THE FIRST PART OF TECHSHOP 2.0 IS, IN FACT, THE

24  TERM "TECHSHOP", CORRECT?

25  **A.**  IT IS THE FIRST PART OF THE WORD, YES.

RASURE - CROSS / PISTORINO

1    **Q.**  OKAY.  AND, AGAIN, THE DAY BEFORE THE ARTICLE APPEARED IN

2    THE *CHRONICLE*, YOU HAD BEEN TOLD BY TECHSHOP YOU HAD NO RIGHT

3    TO USE THEIR TRADEMARKS, CORRECT?

4    **A.**  THAT IS TRUE.

5    **Q.**  OKAY.

6        NOW YOU MENTIONED BEFORE, I THINK, THAT YOU COULDN'T

7    RECALL, I MEAN -- I'LL ACTUALLY TRY IT THIS WAY.

8        YOU KNEW FOR SURE, DIDN'T YOU, THAT TECHSHOP TRADEMARK'S

9    IN THE TERM "TECHSHOP", CORRECT?

10   **A.**  I KNEW THE FIRST PART OF TECHSHOP 2.0 WAS TECHSHOP, YES.

11   **Q.**  OKAY.  AND -- BUT I'M GOING TO -- YOU KNEW, THOUGH, THAT

12   THE TERM "TECHSHOP" WAS A REGISTERED TRADEMARK, CORRECT?

13   **A.**  I KNEW THE WORD "TECHSHOP" WAS REGISTERED, YES.

14   **Q.**  OKAY.

15       AND SO IT HAD BEEN -- PUTTING ASIDE EVERYTHING ELSE, BY

16   THE 16TH, IT HAD BEEN LIKE TWO DAYS LATER AND YOU WERE STILL

17   USING THE PHRASE OR THE NAME TECHSHOP 2.0 TO OPERATE A

18   MAKERSPACE, CORRECT?

19   **A.**  THAT IS CORRECT.

20   **Q.**  AND YOU WERE OFFERING IT TO THE PUBLIC FOR SERVICES

21   ASSOCIATED WITH PROVIDING FACILITIES FOR DO-IT-YOURSELFERS,

22   CORRECT?

23   **A.**  NO, WE WERE NOT.

24   **Q.**  OKAY.  WELL, YOU WEREN'T OFFERING IT FOR SERVICES -- YOU

25   TOLD FOLKS YOU WERE GOING TO USE THE NAME TECHSHOP 2.0 TO

RASURE - CROSS / PISTORINO

1    OPEN, IN FACT, TECHSHOP'S FORMER FACILITY ON HOWARD STREET,

2    CORRECT?

3    **A.**   WE DID NOT OPEN UNTIL FEBRUARY 19TH.

4    **Q.**   I'LL GET TO WHEN YOU OPENED IN A MINUTE.  I'M TALKING

5    ABOUT WHAT YOU TOLD PEOPLE.

6        YOU TOLD PEOPLE YOU WERE GOING TO OPERATE A FACILITY ON

7    HOWARD STREET USING THE NAME TECHSHOP 2.0, CORRECT?

8    **A.**   YES, WE DID.

9    **Q.**   OKAY.

10        AND MY POINT IS NOW, WE ARE UP TO FEBRUARY 16, AND IT HAD

11    BEEN KNOWN FOR THREE OR FOUR DAYS, AT LEAST, THAT YOU WERE

12    GOING TO DO THAT USING THE NAME TECHSHOP 2.0 WITHOUT

13    TECHSHOP'S PERMISSION, CORRECT?

14    **A.**   THAT IS CORRECT.

15    **Q.**   AND I THINK WE ARE GOING TO GET TO IT LATER, BUT WE HAVE

16    SEEN THE SPREADSHEET HERE THAT DURING THIS TIME, ALREADY, YOU

17    WERE TAKING IN MONEY, CORRECT?

18    **A.**   I BELIEVE APPROXIMATELY 40 PEOPLE SIGNED UP.

19    **Q.**   OKAY.  40 PEOPLE SIGNED UP, SIGNED UP WITH TECHSHOP 2.0,

20    RIGHT, AND PAID YOU MONEY TO HAVE ACCESS TO A MAKERSPACE

21    OFFERING FACILITIES FOR DO-IT-YOURSELFERS, CORRECT?

22    **A.**   I BELIEVE LESS THAN $20,000, YES.

23    **Q.**   YOU WERE OFFERING TO THE PUBLIC THE SERVICE OF A MAKER

24    FACILITY, OFFERING FACILITIES FOR DO-IT-YOURSELFERS UNDER THE

25    NAME TECHSHOP 2.0, AND YOU TOOK IN, YOU ARE SAYING NOW,

```
1    20,000?

2    A.  I BELIEVE SO.  I DON'T HAVE THAT MEMORIZED.

3    PRE-MEMBERSHIPS THAT WERE NOT ACTIVATED.

4    Q.  OKAY.  SO EVEN THOUGH YOU ACTUALLY HADN'T OPENED THE DOOR,

5    PHYSICAL DOOR YET, YOU WERE TAKING IN MONEY USING THIS NAME,

6    CORRECT?

7    A.  THAT IS CORRECT.

8    Q.  OKAY.

9        NOW, SEVERAL DAYS HAVE GONE BY.  WE ARE ON THE 16TH, AND

10   YOU GOT A LETTER, RIGHT, ON THE 16TH?

11       TURN IN TO TX83, PLEASE.

12           MR. PISTORINO:  WHICH I BELIEVE HAS BEEN ADMITTED.

13           THE CLERK:  83?

14           MR. PISTORINO:  YES.

15           THE CLERK:  YES.

16                   (DISPLAYED ON SCREEN.)

17                   (PAUSE IN THE PROCEEDINGS.)

18   BY MR. PISTORINO:

19   Q.  ARE YOU WITH ME?

20   A.  YES, I AM.

21   Q.  THAT'S A LETTER YOU GOT FROM ME, IN FACT, TELLING YOU TO

22   CEASE AND DESIST USING THE TERM "TECHSHOP" WITHOUT TECHSHOP'S

23   PERMISSION, CORRECT?

24   A.  CEASE FROM FURTHER INFRINGEMENT, YES.

25   Q.  YES.  FROM FURTHER INFRINGEMENT, CORRECT?
```

1  **A.**  THAT IS CORRECT.

2  **Q.**  OKAY.

3      AND THIS IS ON FEBRUARY 16TH.  AND YOU -- YOU GOT THIS,

4  DIDN'T YOU?  BECAUSE I EMAILED IT TO YOU, RIGHT?

5  **A.**  YES, I DID.

6  **Q.**  DID YOU REVIEW IT?

7  **A.**  QUICKLY.  YES.

8  **Q.**  AND SO YOU WERE -- ATTACHED TO THE EXHIBIT HERE WAS A COPY

9  OF THE COMPLAINT THAT HAD ALREADY BEEN FILED IN THIS COURT,

10  CORRECT?

11  **A.**  THAT IS CORRECT.

12  **Q.**  OKAY.

13      AND SO, FOR EXAMPLE, YOU -- LET ME TRY IT THIS WAY.

14      YOU GOT SUED.  DID YOU READ THE WHOLE COMPLAINT?

15  **A.**  AT SOME POINT, YES, I HAVE.

16  **Q.**  OKAY.

17      AND SO I ASSUME THEN, SIR, YOU TURNED TO PARAGRAPH 31 ON

18  THE SIXTH PAGE, CORRECT?

19      IT'S THE PARAGRAPH UNDER THE HEADING, FIRST CAUSE OF

20  ACTION FEDERAL TRADEMARK INFRINGEMENT AGAINST ALL DEFENDANTS.

21      CORRECT?

22  **A.**  YES.

23  **Q.**  OKAY.

24      SO YOU KNEW LIKE ON THAT DAY WHEN YOU GOT IT, RIGHT, THAT

25  YOU AND OTHERS, WE'LL GET TO THAT IN A SECOND, YOU WERE BEING

1    SUED FOR YOUR UNAUTHORIZED USE OF THE TECHSHOP TRADEMARKS,

2    CORRECT?

3    **A.**  I UNDERSTOOD THE ALLEGATIONS, YES.

4    **Q.**  AND IN ADDITION TO THE TECHSHOP TRADEMARKS, DIRECTLY

5    CONFUSINGLY-SIMILAR VARIATIONS THEREOF, CORRECT?

6    **A.**  I DO.

7    **Q.**  AND IN COMMERCE TO ADVERTISE, PROMOTE, MARKET MAKERSPACE

8    SERVICES, CORRECT?

9    **A.**  I DO.

10   **Q.**  OKAY.  SO YOU KNEW RIGHT THEN THAT IF YOU WERE USING THE

11   TECHSHOP TRADEMARK OR ANY CONFUSINGLY-SIMILAR VARIATION OF IT,

12   THAT'S WHAT YOU WERE BEING SUED FOR, CORRECT?

13   **A.**  I UNDERSTOOD THE ALLEGATION.

14   **Q.**  OKAY.

15       NOW I WANT TO GO BACK TO -- JUST SEE IF WE CAN CLEAR UP

16   ONE LITTLE BIT OF CONFUSION.

17       LET'S GO TO THE FIRST PAGE OF THE COMPLAINT, PLEASE.

18            **THE CLERK:**  SO WE'RE STILL ON 83?

19            **MR. PISTORINO:**  YES, 83.  THANK YOU.  FIRST PAGE.

20                 (DISPLAYED ON SCREEN.)

21   **BY MR. PISTORINO:**

22   **Q.**  ARE YOU WITH ME?

23   **A.**  I AM.

24   **Q.**  AND WHAT I WANT TO DO IS FOCUS FOR A MOMENT ON WHO WAS

25   SUED.

1          GO TO THE CAPTION, PLEASE, THAT LITTLE BOX RIGHT THERE ON

2     THE LEFT-HAND SIDE RIGHT UNDER THE PART WHERE IT SAYS "UNITED

3     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

4     CALIFORNIA".

5          DO YOU SEE THAT?

6     **A.**  I DO.

7     **Q.**  YOU WERE PERSONALLY SUED, CORRECT?

8     **A.**  I WAS.

9     **Q.**  OKAY.  AT THIS TIME, YOU KNOW, THROUGH THE NEGOTIATION

10    PERIOD, YOU HAD FORMED AN ENTITY CALLED TECHSHOP 2.0 LLC,

11    CORRECT?

12    **A.**  I HAD IT FORMED, YES.

13    **Q.**  AND YOU ALSO FORMED ANOTHER ENTITY CALLED TECHSHOP 2.0 SAN

14    FRANCISCO, CORRECT?

15    **A.**  THAT IS CORRECT.

16    **Q.**  THOSE ARE THE THREE ENTITIES THAT WERE SUED IN THIS CASE,

17    CORRECT?

18    **A.**  YES.

19    **Q.**  SO THE ENTITIES THAT WERE SUED IN THIS CASE AND THAT ARE,

20    IN FACT, THE DEFENDANTS IN THIS CASE, ARE YOURSELF, CORRECT?

21    **A.**  THAT IS CORRECT.

22    **Q.**  TECHSHOP 2.0, CORRECT?

23    **A.**  CORRECT.

24    **Q.**  AND TECHSHOP 2.0 LLC -- TECHSHOP 2.0 SAN FRANCISCO LLC,

25    CORRECT?

1   **A.**  THAT IS CORRECT.

2   **Q.**  THOSE ARE THE DEFENDANTS IN THIS CASE HERE TODAY, CORRECT?

3   **A.**  THAT IS CORRECT.

4   **Q.**  TURN IN YOUR BOOK, IF YOU WOULD, PLEASE, TO TX84.

5        **MR. PISTORINO:**  WHICH WE OFFER.

6        **MS. ROBERTS:**  NO OBJECTION.

7        **THE COURT:**  ADMITTED.

8           (TRIAL EXHIBIT 84 RECEIVED IN EVIDENCE.)

9                (DISPLAYED ON SCREEN.)

10  **BY MR. PISTORINO:**

11  **Q.**  WHATEVER YOUR KNOWLEDGE WAS GETTING TO THE POINT AT WHICH

12  SOMEBODY HAD TO SUE YOU FOR INFRINGEMENT ABOUT WHETHER THERE

13  WAS, IN FACT, TECHSHOP TRADEMARK, YOU RESEARCHED IT, DID (SIC)

14  YOU?

15  **A.**  NO, I DID NOT.

16  **Q.**  OKAY.  WELL, LET'S LOOK AT TX84.  THAT IS A COMMUNICATION

17  TO YOU, RIGHT, FROM MICHAEL, RIGHT, LATER THAT SAME EVENING

18  WITH THE TECHSHOP -- HIS RESULTS FROM SEARCHING FOR -- UP THE

19  TECHSHOP TRADEMARKS, CORRECT?

20  **A.**  IT IS, BUT THAT IS NOT -- MICHAEL CHUNG IS NOT ME.

21  **Q.**  OKAY.

22      ON THE SECOND PAGE, ACTUALLY... ON THE SECOND PAGE OF THE

23  DOCUMENT HERE, SECOND PAGE, MR. CHUNG WROTE YOU AT APPARENTLY

24  7:52:41 P.M., HE WROTE YOU AND HE TOLD YOU, IT SEEMS LIVE.  I

25  DON'T THINK TECHSHOP CAN BE USED.

1          CORRECT?

2     **A.**  HE DID.

3     **Q.**  AND WE HAVE PROBABLY SEEN OTHER VERSIONS OF IT BEFORE,

4     TX1.

5               **THE CLERK:**  EXHIBIT 1 HAS NOT BEEN ENTERED.

6               **MR. PISTORINO:**  WHICH WE OFFER.

7               **MS. ROBERTS:**  NO OBJECTION.

8               **THE COURT:**  ADMITTED.

9               (TRIAL EXHIBIT 1 RECEIVED IN EVIDENCE.)

10                    (DISPLAYED ON SCREEN.)

11    **BY MR. PISTORINO:**

12    **Q.**  TX1, THAT'S ANOTHER DOCUMENT WE HAVE SEEN BEFORE WHERE

13    AFTER YOU GOT SUED NOW -- HOLD ON LET ME MAKE SURE I GOT IT

14    RIGHT.

15        IT WAS ONLY AFTER YOU WERE SUED FOR USING THE TERM

16    "TECHSHOP" AS PART OF TECHSHOP 2.0, THAT YOU THEN SWITCHED THE

17    WEBSITE, CORRECT?

18    **A.**  THAT IS CORRECT.

19    **Q.**  OKAY.

20        DIDN'T SWITCH THE WEBSITE WHEN YOU GOT THE LETTER ON

21    FEBRUARY 14TH, DID YOU?

22    **A.**  WE WERE NOT TOLD TO.

23    **Q.**  OKAY.

24        WELL, YOU WERE TOLD YOU HAVE NO RIGHTS TO USE THE TECHSHOP

25    TRADEMARKS, WEREN'T YOU?

1    **A.**  WE DID NOT BELIEVE WE WERE USING ANY TRADEMARKS.

2    **Q.**  OKAY.

3                    (PAUSE IN THE PROCEEDINGS.)

4        AND ISN'T IT TRUE THAT YOUR DESIRE TO USE THE TECHSHOP

5    MARK, THE TECHSHOP NAME WAS SO POWERFUL THAT YOU HAD BEEN

6    DOING IT EVEN THOUGH OTHER PEOPLE HAD BEEN TELLING YOU NOT TO,

7    CORRECT?

8                **MS. ROBERTS:**  OBJECTION, ASSUMES FACTS NOT IN

9    EVIDENCE.

10                **THE COURT:**  SUSTAINED.

11    **BY MR. PISTORINO:**

12    **Q.**  PUT BEFORE YOU, SIR, PLEASE, TX191.

13                **THE CLERK:**  I DON'T HAVE 191 IN.

14                **MR. PISTORINO:**  WHICH WE OFFER.

15                **MS. ROBERTS:**  NO OBJECTION.

16                **THE COURT:**  191 IS ADMITTED.

17             (TRIAL EXHIBIT 191 RECEIVED IN EVIDENCE.)

18                    (DISPLAYED ON SCREEN.)

19    **BY MR. PISTORINO:**

20    **Q.**  TX191 ARE EMAIL -- SORRY, TEXT MESSAGES EXCHANGED BETWEEN

21    YOURSELF AND THE GENTLEMAN NAMED DAVID KERN, CORRECT?

22    **A.**  THAT IS CORRECT.

23    **Q.**  MR. KERN SAYS THERE ON FEBRUARY 17TH AT 10:51, I TOLD YOU

24    TO RUN AWAY FROM THE NAME TECHSHOP.

25        CORRECT?

1    **A.**  HE DID.

2    **Q.**  NEVERTHELESS, EVEN THOUGH MR. -- APPARENTLY MR. KERN HAD

3    TOLD YOU TO USE A DIFFERENT NAME, YOU CONTINUED TO USE -- YOU

4    ELECTED TO USE THE NAME TECHSHOP 2.0.  CORRECT?

5    **A.**  I WAS NOT AWARE OF ALL THE FRAUDS AND PONZI SCHEMES AT

6    THAT TIME.

7    **Q.**  SIR, IF YOU PLEASE JUST ANSWER MY QUESTION.

8    **A.**  I WASN'T AWARE.

9    **Q.**  DESPITE THE FACT THAT MR. KERN TOLD YOU NOT TO USE THE

10   NAME TECHSHOP, YOU WERE USING THE NAME TECHSHOP 2.0 IN ANY

11   EVENT, CORRECT?

12   **A.**  I WAS.

13   **Q.**  OKAY.

14       THAT'S BECAUSE YOU HAD BEEN RACKING YOUR BRAINS FOR A WEEK

15   AND COULDN'T THINK OF A BETTER NAME THAN TECHSHOP, CORRECT?

16   **A.**  I WAS NOT.

17   **Q.**  OKAY.

18       NOW, YOU HAD COMMUNICATIONS WITH OTHER PEOPLE ABOUT THE

19   IMPORTANCE OF THE TECHSHOP NAME, DIDN'T YOU?

20   **A.**  I HAD LOTS OF CONVERSATIONS.

21   **Q.**  WELL, DID YOU HAVE COMMUNICATIONS WITH THEM ABOUT THE

22   IMPORTANCE OF THE TECHSHOP NAME?

23   **A.**  I WOULD NEED TO BE REFRESHED.

24   **Q.**  OKAY.

25       IF YOU TURN IN YOUR BINDER TO THE EXHIBIT WE MARKED TX85.

1          **THE CLERK:**  85 IS NOT IN.

2          **MR. PISTORINO:**  WHICH WE OFFER, YOUR HONOR.

3          **MS. ROBERTS:**  NO OBJECTION.

4          **THE COURT:**  85 IS ADMITTED.

5          (TRIAL EXHIBIT 85 RECEIVED IN EVIDENCE.)

6                    (DISPLAYED ON SCREEN.)

7    **BY MR. PISTORINO:**

8    **Q.**  ARE YOU WITH ME, SIR?

9    **A.**  I AM.

10   **Q.**  ISN'T IT TRUE -- WELL, LET'S COME BACK.

11        THE LAWSUIT WAS FILED ON FEBRUARY 16, CORRECT?

12   **A.**  THAT IS CORRECT.

13   **Q.**  AND ON FEBRUARY 20TH, YOU RECEIVED A -- LET ME TRY IT THIS

14   WAY.

15        YOU WERE TRYING TO DO SOME SORT OF TRANSACTION DEAL WITH

16   THIS GENTLEMAN NAMED MICHAEL C @CHUNGMVP, CORRECT?

17   **A.**  THAT IS CORRECT.

18   **Q.**  AND MR. CHUNG TOLD YOU, DAN, WE HAVE TO MAKE A NEW DEAL.

19   WE NEED THE TECHSHOP NAME.

20        CORRECT?

21   **A.**  THAT IS WHAT HE SAID.

22   **Q.**  OKAY.

23        LIKE I SAID, MR. -- FOLKS TOLD YOU THAT YOU NEEDED THE

24   TECHSHOP NAME, CORRECT?

25   **A.**  HE WAS FIRED ON BEHALF OF HIS EMPLOYER --

RASURE - CROSS / PISTORINO

1    **Q.**  SIR, IF YOU'LL JUST ANSWER MY QUESTION, PLEASE.

2    **A.**  THIS WAS HIS PERSONAL REPRESENTATION.  I DID NOT REPLY.

3    **Q.**  OKAY.

4         SO THE LAWSUIT WAS FILED ON FEBRUARY 16TH, RIGHT?  AND

5    WE'RE GOING TO GET INTO IT IN A MINUTE.

6         WE SAW THE TEXT EARLIER WHERE IT HAD BEEN SWITCHED TO USE

7    THESHOP.BUILD, CORRECT?

8    **A.**  THAT IS CORRECT.

9    **Q.**  ON FEBRUARY 16TH, RIGHT?

10        BUT ISN'T IT TRUE, SIR, THAT YOU KIND OF CONTINUED TO USE

11   THE TECHSHOP 2.0 NAME AFTER FEBRUARY 16TH?

12   **A.**  THERE WAS DEFINITELY STRAGGLERS ON THINGS THAT DIDN'T GET

13   SWITCHED IMMEDIATELY.

14   **Q.**  OKAY.  SO IF SOMEONE WENT TO THE WEBSITE YOU WERE

15   OPERATING, THEY WOULD SEE TECHSHOP 2.0 ON THAT THING WELL

16   AFTER FEBRUARY 16TH, WOULDN'T THEY?

17   **A.**  I'M NOT SURE ON THE "WELL AFTER", BUT IT DID TAKE A LITTLE

18   WHILE FOR OUR SECURITY CERTIFICATES ALL TO GET SWITCHED OVER.

19   **Q.**  OKAY.

20        WELL, YOU SAY TAKE A LITTLE WHILE FOR SECURITY

21   CERTIFICATES.  HOLD ON THEN.  MAKE SURE I GOT IT.

22        SO AFTER YOU WERE SUED AND EVEN AFTER YOU STARTED USING

23   THESHOP.BUILD, YOU CONTINUED TO USE THE TECHSHOP 2.0 NAME ON

24   YOUR WEBSITE, CORRECT?

25   **A.**  MY ORDERS WERE TO CEASE ANYTHING --

RASURE - CROSS / PISTORINO

1   **Q.**  DID YOU CONTINUE TO USE THE TECHSHOP 2.0 NAME ON YOUR

2   WEBSITE AFTER YOU WERE SUED, SIR?

3   **A.**  THE DOMAIN -- THE REFERRING DOMAIN FOR SOME PERIOD OF

4   TIME, I BELIEVE IT WAS SHORT, STILL WENT TO TECHSHOP2 DUE TO

5   GETTING IT SWITCHED OVER AND OUR CRM BEING TIED TO IT ON A

6   HOLIDAY WEEKEND.

7   **Q.**  WHEN YOU SAY "SHORT", YOU MEAN LIKE A DAY OR SO THAT YOU

8   CONTINUED TO USE THE TECHSHOP 2.0 NAME AFTER YOU INFRINGE; IS

9   THAT RIGHT?

10  **A.**  I DON'T AGREE WITH THE INFRINGEMENT.  I DON'T KNOW HOW

11  LONG IT WAS STILL --

12  **Q.**  IS SHORT TO YOU LIKE TWO MONTHS?

13  **A.**  AGAIN, I DON'T KNOW HOW LONG IT WAS CONTINUING USE.  I

14  WASN'T INVOLVED IN ALL THIS -- THE DETAILS OF IT.

15  **Q.**  LET'S LOOK AT SOME EXAMPLES AS WE GO THROUGH HERE.

16      TURN IN YOUR BOOK TO TX100.

17          **MR. PISTORINO:**  WHICH WE OFFER.

18          **THE COURT:**  ANY OBJECTION?

19          **MS. ROBERTS:**  NO OBJECTION.

20          **THE COURT:**  100 IS ADMITTED.

21      (TRIAL EXHIBIT 100 RECEIVED IN EVIDENCE.)

22              (DISPLAYED ON SCREEN.)

23  **BY MR. PISTORINO:**

24  **Q.**  LET ME KNOW WHEN YOU'RE READY, SIR.

25  **A.**  I'M READY.

1    **Q.**  OKAY.

2        THIS IS, AGAIN, AN EMAIL FROM SOME PERSON WHOSE NAME HAS

3    BEEN HIDDEN FROM US, TO SAN FRANCISCO AT THESHOP.BUILD.  AND

4    IN THE TEXT OF IT IT SAYS, I AM ABLE TO LOG IN TO

5    THESHOP.BUILD, HOWEVER -- NEXT HE SAYS, IF I CLICK THE LOG IN

6    WITH TECHSHOP2 LINK AND ENTER THE SAME CREDENTIALS, I JUST

7    JUMP BACK.

8        CORRECT?

9    **A.**  YES.  THIS WAS TWO INDEPENDENT SYSTEMS THAT WERE TIED

10   TOGETHER.

11   **Q.**  OKAY.

12       SO YOU GOT SUED TO STOP USING THE TECHSHOP NAME, AND WHAT

13   DO WE HEAR?  DEPENDING ON WHAT YOU CALL IT, YOU CAN EITHER

14   CALL IT FOUR OR FIVE DAYS LATER, STILL YOU GO TO YOUR WEBSITE,

15   WEBSITE -- YOU'RE RESPONSIBLE FOR THE WEBSITE, CORRECT?

16   **A.**  NO, I WAS NOT.

17   **Q.**  WHAT DO YOU MEAN YOU ARE NOT?  AREN'T YOU THE PERSON

18   RUNNING THESHOP.BUILD?

19   **A.**  I HAD AN IT PERSON DOING ALL THIS.

20   **Q.**  YOU ARE THE HEAD GUY AT TECHSHOP 2.0 LLC, CORRECT?

21   **A.**  I WAS, YES.

22   **Q.**  YOU ARE THE HEAD GUY AT TECHSHOP 2.0 SAN FRANCISCO LLC,

23   CORRECT?

24   **A.**  I WAS.

25   **Q.**  OKAY.

1    AND AS THE HEAD GUY, AREN'T YOU RESPONSIBLE FOR WHAT

2    HAPPENS AT TECHSHOP 2.0 LLC AND TECHSHOP 2.0 LLC SAN

3    FRANCISCO?

4    **A.**  AND THEY WERE WORKING TO MAKE THESE CHANGES AS FAST AS

5    THEY COULD.

6    **Q.**  OKAY.

7    SO FOUR OR FIVE DAYS LATER, STILL, GO TO THE WEBSITE,

8    YOU'RE GOING TO LOG IN WITH TECHSHOP 2.0, CORRECT?

9    **A.**  OVER A HOLIDAY WEEKEND, YES.

10   **Q.**  OKAY.

11                      (PAUSE IN THE PROCEEDINGS.)

12   SO YOU SAY THAT WAS -- YOU SAY IT WAS A HOLIDAY WEEKEND,

13   CORRECT?

14   **A.**  THAT IS CORRECT.

15   **Q.**  SO THAT -- I'LL HAVE TO LOOK IT UP WHETHER OR NOT

16   FEBRUARY 20TH OR 21ST WAS A HOLIDAY WEEKEND.

17   BUT TYPICALLY A WEEKEND IS ONLY TWO TO THREE DAYS,

18   CORRECT?

19   **A.**  THAT IS CORRECT.

20   **Q.**  OKAY.

21   TURN IN YOUR BOOK, IF YOU WOULD TO TX140.

22        **MR. PISTORINO:**  WHICH WE OFFER.

23   WHICH WE OFFER.

24        **MS. ROBERTS:**  NO OBJECTION.

25        **THE COURT:**  140 IS ADMITTED.

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

1          (TRIAL EXHIBIT 140 RECEIVED IN EVIDENCE.)

2               (DISPLAYED ON SCREEN.)

3     **BY MR. PISTORINO:**

4     **Q.** OKAY.

5          TX140 IS AN EMAIL FROM YOU TO MR. GABLE, WE HEARD ABOUT

6     BEFORE, YOUR IT PERSON.  THIS ONE IS DATED SUNDAY,

7     FEBRUARY 22ND (SIC), CORRECT?

8     **A.** THAT IS CORRECT.

9     **Q.** AND ACTUALLY I'M KIND OF FIRST INTERESTED, WHAT IS

10    MR. GABLE'S EMAIL ADDRESS ON FEBRUARY 25, 2018?

11    **A.** INTERNALLY, HE STILL HAD THE TECHSHOP 2.0 EMAIL AS WELL AS

12    THESHOP.BUILD.  IT'S JERRY.GABLE@TECHSHOP2.COM.

13    **Q.** OKAY.

14               (PAUSE IN THE PROCEEDINGS.)

15         AND HOW ABOUT... YOU HAD BEEN OPERATING SOME FACEBOOK

16    PAGES DURING ALL THIS TIME FRAME, CORRECT?

17    **A.** WE HAD.

18    **Q.** AND YOU HAD BEEN USING THE NAME TECHSHOP 2.0 ON THOSE WEB

19    PAGES, CORRECT?

20    **A.** DURING THE NEGOTIATION PERIOD, YES.

21    **Q.** OKAY.  AND IN ADDITION TO YOUR INTENTION TO OPEN A STORE

22    IN SAN FRANCISCO, JUST MORE GENERALLY, YOU HAD ALSO EXPRESSED

23    THAT YOU WERE -- WELL, IN FACT, YOU TOLD PEOPLE YOU WERE GOING

24    TO OPEN ALL THE STORES, DIDN'T YOU?

25    **A.** WE WERE WORKING ON MOST OF THE STORES, YES.

1    **Q.**  ONE OF THE STORES YOU HAD TOLD PEOPLE YOU WERE GOING TO

2    TRY TO REOPEN WAS THE TECHSHOP THAT WAS DOWN THERE IN SAN

3    JOSE, CORRECT?

4    **A.**  A SAN JOSE LOCATION.  NOT NECESSARILY THE LOCATION THAT

5    TECHSHOP OCCUPIED, BUT A SAN JOSE LOCATION.

6    **Q.**  RIGHT.  BUT YOU'RE STILL USING THE NAME -- SO, OKAY.  SO

7    YOU HAD THAT.

8        IF YOU CAN TURN IN YOUR BOOK TO ME -- TO TX193.

9            **MR. PISTORINO:**  WHICH WE OFFER.

10            **MS. ROBERTS:**  NO OBJECTION.

11            **THE COURT:**  ADMITTED.

12            (TRIAL EXHIBIT 193 RECEIVED IN EVIDENCE.)

13                    (DISPLAYED ON SCREEN.)

14    **BY MR. PISTORINO:**

15    **Q.**  TX193, I'M GOING TO GUESS THIS IS A TEXT, BUT, AGAIN, WHO

16    YOU ARE COMMUNICATING WITH HAS BEEN CONCEALED FROM US ON --

17            **THE COURT:**  MR. PISTORINO, PLEASE STOP REFERRING TO

18    CONCEALMENT.

19            **MR. PISTORINO:**  OKAY.

20    **BY MR. PISTORINO:**

21    **Q.**  IT'S A TEXT WITH SOMEBODY FROM YOU ON FEBRUARY 25, 2018,

22    NINE DAYS AFTER YOU GOT SUED, AND YOU SAID, HEY, MAY WE START

23    USING THE TECHSHOP 2.0 SAN JOSE PAGE TO UPDATE PEOPLE

24    REGARDING THE SAN JOSE SHOP.

25        CORRECT?

1    **A.**   THIS WAS A COMMUNITY PAGE --

2    **Q.**   SIR, ISN'T THAT --

3    **A.**   NOT OWNED BY US --

4    **Q.**   -- ISN'T THAT WHAT YOU SAID?  YES OR NO.

5    **A.**   YES, IT IS.

6    **Q.**   OKAY.

7                         (PAUSE IN THE PROCEEDINGS.)

8         AND YOU KIND OF CONTINUED USING THE TECHSHOP NAME IN

9    PUBLIC, DIDN'T YOU, AFTER YOU'D OPENED A MAKERSPACE, OFFERING

10   MAKERSPACE SERVICES FOR DO-IT-YOURSELFERS AFTER FEBRUARY 25TH,

11   DIDN'T YOU?

12   **A.**   IT WASN'T MY -- I WAS NOT AWARE IF WE WERE.

13   **Q.**   YOU WEREN'T AWARE IF YOU WERE AT ALL?

14   **A.**   ANYTHING THAT WAS CAUGHT -- IT WAS OUR INTENTION TO NOT

15   USE THE TECHSHOP 2.0 NAME AT ALL.

16   **Q.**   ISN'T IT TRUE THAT AFTER -- EVEN AFTER FEBRUARY 2018, YOU

17   WERE PUBLICLY ANNOUNCING EVENTS THAT YOU WERE GOING TO DO

18   USING THE NAME TECHSHOP 2.0, CORRECT?

19   **A.**   OCCASIONALLY ITEMS --

20            **MS. ROBERTS:**  OBJECTION, VAGUE AS TO DATE.

21            **THE COURT:**  OVERRULED.

22   **BY MR. PISTORINO:**

23   **Q.**   ISN'T THAT CORRECT, SIR?

24   **A.**   OCCASIONALLY ITEMS THAT WERE SET UP PRIOR TO THE FORMATION

25   WERE STILL SET UP AS TECHSHOP 2.0.

RASURE - CROSS / PISTORINO

```
 1    Q.   OKAY.  SO IF YOU CAN TURN IN YOUR BOOK TO TX148.

 2              MR. PISTORINO:  WHICH WE OFFER.

 3              MS. ROBERTS:  NO OBJECTION.

 4              THE COURT:  ADMITTED.

 5         (TRIAL EXHIBIT 148 RECEIVED IN EVIDENCE.)

 6                   (DISPLAYED ON SCREEN.)

 7    BY MR. PISTORINO:

 8    Q.   NOW WE ARE INTO MARCH, RIGHT?  SO I GUESS THAT'S WHAT, A

 9    MONTH AND A HALF AFTER YOU GOT SUED, RIGHT?  AND --

10              MS. ROBERTS:  OBJECTION, THAT'S A MISSTATEMENT.

11              MR. PISTORINO:  I CAN --

12              THE COURT:  OVERRULED.

13         LADIES AND GENTLEMEN, AS I'VE TOLD AND WILL TELL YOU, THE

14    STATEMENTS OF THE ATTORNEYS ARE NOT EVIDENCE.  IF THEIR

15    CHARACTERIZATION OF THE EVIDENCE IS INCONSISTENT WITH YOUR

16    RECOLLECTION OF THE EVIDENCE, YOUR RECOLLECTION CONTROLS.

17              MR. PISTORINO:  I AGREE.  I DID MISSTATE IT

18    INADVERTENTLY THERE.

19    BY MR. PISTORINO:

20    Q.   THIS IS MARCH.  SO, IN FACT, IT'S LIKE TWO WEEKS OR SO

21    AFTER YOU GOT SUED, RIGHT?

22         WHAT WE SEE IN TX148, THIS IS THE ANNOUNCEMENT OF THE

23    PIZZA EVENT WITH DAN RASURE TECHSHOP 2.0, CORRECT?

24    A.   YES.  A VOLUNTEER -- AN EMPLOYEE USED THE WRONG --

25    Q.   SIR, SIR, ISN'T IT TRUE THAT THIS IS THE ANNOUNCEMENT ON
```

1    FRIDAY, MARCH 2ND OF PIZZA WITH DAN RASURE TECHSHOP 2.0?

2    **A.**  YES, IT IS.

3    **Q.**  OKAY.  THIS WAS PUBLISHED ON EVENTBRITE, CORRECT?

4    **A.**  MOMENTARILY, YES.

5    **Q.**  OKAY.

6                        (PAUSE IN THE PROCEEDINGS.)

7        YOU WERE STILL -- SO THE LAST ONE WE SAW WAS MARCH 2ND.

8        ISN'T IT TRUE THAT YOU CONTINUED -- AFTER MARCH 2ND, YOU

9    CONTINUED TO USING THE NAME TECHSHOP 2.0, FOR EXAMPLE, FOR

10   EMAIL?

11   **A.**  THE ORIGINAL DOMAIN WAS STILL --

12   **Q.**  SIR, ISN'T IT TRUE THAT AFTER MARCH 2ND, YOU KEPT ON USING

13   THE NAME TECHSHOP 2.0 FOR EMAIL COMMUNICATIONS?

14       YES OR NO, SIR.

15   **A.**  I STILL HAD AN IN BOX AT TECHSHOP 2.0.

16   **Q.**  SIR, IF YOU CAN TURN IN YOUR BOOK TO THE EXHIBIT MARKED

17   TX150.

18               **MR. PISTORINO:**  WHICH WE OFFER.

19   **BY MR. PISTORINO:**

20   **Q.**  ARE YOU WITH ME THERE?

21   **A.**  I AM.

22   **Q.**  OKAY.

23               **THE CLERK:**  YOU REALIZE THE COURT HASN'T STATED --

24               **MR. PISTORINO:**  I'M SORRY.  WHICH WE OFFER 150.

25               **THE COURT:**  ANY OBJECTION?

1        **MS. ROBERTS:**  NO OBJECTION.

2        **THE COURT:**  ADMITTED.

3        (TRIAL EXHIBIT 150 RECEIVED IN EVIDENCE.)

4                    (DISPLAYED ON SCREEN.)

5    **BY MR. PISTORINO:**

6    **Q.**  AND THE EMAIL ADDRESS AT THE TOP, IT COMES FROM

7    THESHOP.BUILD, BUT IT GOES TO YOU AT TECHSHOP 2.0 ON MARCH 5,

8    CORRECT?

9    **A.**  I SENT MYSELF AN EMAIL.

10   **Q.**  SIR, IF YOU COULD JUST ANSWER MY QUESTION YES OR NO.

11       ISN'T IT TRUE THAT IS WHAT IT SAYS?

12   **A.**  THAT IS WHAT IT SAYS.

13   **Q.**  OKAY.

14       TURN IN YOUR BOOK TO TX160 (SIC).

15       **MR. PISTORINO:**  WHICH WE OFFER.

16       **MS. ROBERTS:**  NO OBJECTION.

17       **THE WITNESS:**  I DON'T BELIEVE I HAVE A 160.

18       **MR. PISTORINO:**  I'M SORRY, I MISSTATED IT.

19   152.

20       **THE COURT:**  152 IS BEING OFFERED?

21       **MR. PISTORINO:**  OFFERED.

22       **MS. ROBERTS:**  NO OBJECTION.

23       **THE COURT:**  ADMITTED.

24       (TRIAL EXHIBIT 152 RECEIVED IN EVIDENCE.)

25                    (DISPLAYED ON SCREEN.)

1    **BY MR. PISTORINO:**

2    **Q.**  ISN'T IT TRUE, SIR, THAT THE NAME TECHSHOP 2.0 WAS STILL

3    SHOWING UP ON THE MEMBERSHIP SIGN-UP PAGE OF THE WEBSITE THAT

4    YOU WERE OPERATING, CORRECT?

5    **A.**  YES.  A CUSTOMER FOUND THIS.

6    **Q.**  OKAY.

7        SUIT IS FILED FEBRUARY 16TH.  THIS EMAIL IS DATED MARCH 6.

8    ON THE WEB PAGE THEY CAN SIGN UP WITH TECHSHOP 2.0, CORRECT?

9    **A.**  ON THIS PARTICULAR PAGE.

10   **Q.**  OKAY.

11       NOW GENERAL... GENERAL MEMBERS OF THE PUBLIC WERE SENDING

12   YOU EMAILS USING THE NAME TECHSHOP 2.0, CORRECT?

13   **A.**  AT TIMES PEOPLE RESPONDED TO PREVIOUS EMAILS, YES.

14   **Q.**  OKAY.  SO IF YOU TURN IN YOUR BOOK TO THE EXHIBIT MARKED

15   TX268.

16           **MR. PISTORINO:**  WHICH WE OFFER.

17           **MS. ROBERTS:**  NO OBJECTION.

18           **THE COURT:**  ADMITTED.

19           (TRIAL EXHIBIT 268 RECEIVED IN EVIDENCE.)

20                (DISPLAYED ON SCREEN.)

21   **BY MR. PISTORINO:**

22   **Q.**  AND WE SAW BEFORE THAT -- FROM SOME OF THE EARLIER

23   DOCUMENTS -- THAT ON FEBRUARY 19TH, YOU, IN FACT, OPENED

24   TECHSHOP'S FORMER FACILITY ON HOWARD STREET, CORRECT?

25   **A.**  THAT IS CORRECT.

RASURE - CROSS / PISTORINO

1    **Q.** OKAY.  AND WHAT WE'RE SEEING HERE IN 268, APPARENTLY THIS

2    IS A MESSAGE FROM JOHN SHIELD TO TECHSHOP 2.0, CORRECT?

3    **A.** THAT IS CORRECT.

4    **Q.** THAT'S AN EMAIL THAT YOU WERE RECEIVING AT THE ENTITIES

5    YOU WERE OPERATING; YOU ARE GETTING THESE EMAILS TO TECHSHOP

6    2.0, CORRECT?

7    **A.** I BELIEVE THIS WAS SENT TO THESHOP.BUILD.

8    **Q.** OKAY.  SIR, WHAT DOES IT SAY UNDER THE "TO" PART?  DOES IT

9    SAY THESHOP.BUILD?

10   **A.** I APOLOGIZE.  TECHSHOP 2.0 --

11   **Q.** THANK YOU.

12   **A.** -- IN PARENTHESES, BUT I DON'T KNOW WHAT ACCOUNT THAT

13   ACTUALLY IS.

14                  (PAUSE IN THE PROCEEDINGS.)

15   **Q.** ISN'T IT TRUE THAT AFTER THIS... I GUESS THAT'S MAY 3RD --

16   ISN'T IT TRUE THAT YOU WERE STILL USING THE NAME TECHSHOP 2.0

17   TO DO BUSINESS?

18   **A.** VENDORS CONTINUED TO REFER TO US AT TIMES AS TECHSHOP 2.0,

19   YES.

20   **Q.** OKAY.  DID YOU CONTINUE TO REFER YOURSELF -- OR THE

21   ENTITIES AS TECHSHOP 2.0?

22   **A.** WHAT DATE DID YOU STATE?

23   **Q.** I'M NOW -- THE LAWSUIT WAS FILED IN -- ON FEBRUARY 16TH.

24   I'M OUT INTO MAY, INTO MAY 2018.

25   **A.** I'M NOT AWARE THAT I DID.

1   **Q.**   TURN TO YOUR BOOK -- IN YOUR BOOK TO THE EXHIBIT MARKED

2   TX89.

3            **MR. PISTORINO:**  WHICH WE OFFER.

4            **MS. ROBERTS:**  NO OBJECTION.

5            **THE COURT:**  89 IS ADMITTED.

6            (TRIAL EXHIBIT 89 RECEIVED IN EVIDENCE.)

7                    (DISPLAYED ON SCREEN.)

8   **BY MR. PISTORINO:**

9   **Q.**   TX89 IS SORT OF A SIGNATURE PAGE OF AN AGREEMENT -- I

10  THINK IT MIGHT BE SORT OF A LEASE DATED MAY 11TH, 2018.

11       AND THE BOTTOM THERE THERE'S A SIGNATURE, CORRECT?

12  **A.**   89 OR 80 -- 289.

13  **Q.**   89.

14  **A.**   SORRY.

15                  (PAUSE IN THE PROCEEDINGS.)

16  **Q.**   LET ME KNOW WHEN YOU ARE READY.

17  **A.**   I'M READY.

18  **Q.**   OKAY.  I'M FOCUSED ON THE BOTTOM -- SIGNATURE BLOCK AT THE

19  BOTTOM, RIGHT?

20       THAT'S -- WE ARE INTO MAY, AND YOU GUYS WERE DOING

21  BUSINESS USING THE NAME TECHSHOP 2.0 SAN FRANCISCO LLC,

22  CORRECT?

23  **A.**   THIS IS --

24  **Q.**   THAT'S YOUR WIFE'S SIGNATURE, MEGAN DREW WIESLANDER, ON

25  THE SIGNATURE LINE, CORRECT?

1    **A.**   IT IS.

2    **Q.**   RIGHT UNDER THE NAME TECHSHOP 2.0 SAN FRANCISCO, CORRECT?

3    **A.**   AT THIS TIME IT WASN'T ABOUT ENTITIES --

4    **Q.**   SIR, SIR, ISN'T IT TRUE THAT ON MAY 11TH, 2018, YOUR WIFE,

5    MEGAN DREW WIESLANDER, SIGNED THIS DOCUMENT UNDER THE NAME

6    TECHSHOP 2.0 SAN FRANCISCO?

7    **A.**   I DON'T KNOW WHAT THIS DOCUMENT IS.

8    **Q.**   OKAY.

9        TURN IN YOUR BOOK -- WELL, LET ME TRY IT THIS WAY.

10       YOU WERE STILL USING THE NAME TECHSHOP 2.0 TO JUST

11   GENERALLY CONDUCT SOME BUSINESS, WEREN'T YOU?

12   **A.**   NOT THAT I WAS AWARE OF.

13   **Q.**   TURN IN YOUR BOOK TO THE DOCUMENT MARKED TX90.

14           **MR. PISTORINO:**  WHICH WE OFFER.

15           **MS. ROBERTS:**  NO OBJECTION.

16           **THE COURT:**  ADMITTED.

17           (TRIAL EXHIBIT 90 RECEIVED IN EVIDENCE.)

18                   (DISPLAYED ON SCREEN.)

19   **BY MR. PISTORINO:**

20   **Q.**   TX90 -- YOU SAY THAT YOU WEREN'T AWARE OF USING THE NAME

21   TECHSHOP 2.0 LATER.

22       TX90, THAT'S AN EMAIL FROM, LOOKS LIKE LIZ SOUSA AT

23   MICHELETT INSURANCE TO YOU DATED JULY 5, 2018, CORRECT?

24   **A.**   YES.  IT IS A VENDOR.

25   **Q.**   AND THAT'S -- THE SUBJECT IS THE PROPERTY ENDORSEMENT FOR

1   TECHSHOP 2.0 LLC, CORRECT?

2   **A.**  THAT IS WHO THE ORIGINAL AGREEMENTS WERE WITH.

3   **Q.**  OKAY.

4        YOU MENTIONED EARLIER, I THOUGHT IT WAS 5M.  RIGHT?  5M IS

5   THE ENTITY I THINK THAT ACTUALLY OPERATES THE FACILITY AT

6   HOWARD STREET AS THE LANDLORD, CORRECT?

7   **A.**  THAT IS CORRECT.

8   **Q.**  OKAY.  AND THEY WERE STILL CALLING YOU GUYS TECHSHOP 2.0,

9   CORRECT?

10  **A.**  NOT IN -- NOT WHEN THEY ACTUALLY DROPPED ANYTHING OFF.  IT

11  WAS ALWAYS LABELED THESHOP.  IN THEIR DOCUMENTS INTERNALLY,

12  THEY STILL HAD TECHSHOP 2.0.

13  **Q.**  SO, FOR EXAMPLE, IF WE TURN IN YOUR BOOK TO TX91?

14          **MR. PISTORINO:**  WHICH WE OFFER.

15          **MS. ROBERTS:**  NO OBJECTION.

16          **THE COURT:**  ADMITTED.

17          (TRIAL EXHIBIT 91 RECEIVED IN EVIDENCE.)

18                  (DISPLAYED ON SCREEN.)

19  **BY MR. PISTORINO:**

20  **Q.**  THAT'S ADDRESSED TO THE ACCOUNTS PAYABLE AT TECHSHOP 2.0

21  SAN FRANCISCO, CORRECT?

22  **A.**  THAT IS CORRECT.

23  **Q.**  OKAY.  AND THIS ONE IS OUT IN JULY 2018, CORRECT?

24  **A.**  YES.  THIS VENDOR SENT IT IN JULY.

25  **Q.**  TURN IN YOUR BOOK TO THE EXHIBIT MARKED TX187.

1      **MR. PISTORINO:**  WHICH WE OFFER.

2      **MS. ROBERTS:**  NO OBJECTION.

3      **THE COURT:**  ADMITTED.

4          (TRIAL EXHIBIT 187 RECEIVED IN EVIDENCE.)

5              (DISPLAYED ON SCREEN.)

6  **BY MR. PISTORINO:**

7  **Q.**  NOW TX187, THIS IS AN EMAIL WITH AN AGREEMENT IN

8  AUGUST 8TH.

9      THROUGHOUT -- INTO AUGUST 2018, YOU GUYS STILL USE THE

10 NAME TECHSHOP 2.0, CORRECT?

11 **A.**  I WASN'T A PART OF THIS --

12 **Q.**  ISN'T IT TRUE, SIR, THAT THE NAME TECHSHOP 2.0 ON THE

13 SIGNED AGREEMENT IS SHOWN HERE IN THE DOCUMENT?

14     ISN'T THAT TRUE?

15 **A.**  THAT IS WHAT IT SHOWS.

16 **Q.**  OKAY.

17              (PAUSE IN THE PROCEEDINGS.)

18     IN FACT, SIR, ISN'T IT TRUE THAT YOU STILL REFERRED TO THE

19 BUSINESS YOU WERE OPERATING AS TECHSHOP?

20 **A.**  NOT THAT I AM AWARE OF.

21 **Q.**  IF YOU CAN TURN IN YOUR BOOK TO TX92.

22     **MR. PISTORINO:**  WHICH WE OFFER.

23     **MS. ROBERTS:**  NO OBJECTION.

24     **THE COURT:**  ADMITTED.

25         (TRIAL EXHIBIT 92 RECEIVED IN EVIDENCE.)

```
 1                    (DISPLAYED ON SCREEN.)

 2     BY MR. PISTORINO:

 3     Q.   TX92 IS A SERIES OF EMAILS BETWEEN YOURSELF AND IT LOOKS

 4     LIKE CHERYL GOERTZEN.  AND I'M GOING TO THE NEXT EMAIL UP FROM

 5     THE BOTTOM OF THE PAGE, THE ONE DATED THURSDAY, AUGUST 30,

 6     9:54.

 7        READY?

 8     A.   I AM.

 9     Q.   YOU WROTE, "HOW DO I SUBMIT THE TECHSHOP REPORT SO IT IS

10     PULLED FROM MY PAY".

11        RIGHT?

12     A.   THIS WAS A DUE DILIGENCE --

13     Q.   SIR, DIDN'T YOU WRITE, "HOW DO I SUBMIT THE TECHSHOP

14     REPORT SO IT IS PULLED FROM MY PAY"?

15     A.   YES.  THIS WAS A NOVEMBER '17 REPORT.

16     Q.   OKAY.

17                    (PAUSE IN THE PROCEEDINGS.)

18        IF YOU TURN IN YOUR BOOK WITH ME TO... MARKED TX327 WHICH

19     I THINK IS ADMITTED.

20           THE CLERK:  UH-HUH.

21                    (DISPLAYED ON SCREEN.)

22     BY MR. PISTORINO:

23     Q.   LET ME KNOW WHEN YOU ARE READY.

24                    (PAUSE IN THE PROCEEDINGS.)

25        ACTUALLY, SIR, I'M SORRY.  CAN I STOP YOU?  IT MIGHT BE
```

1    MORE BENEFICIAL FOR US TO DO THIS.

2        CAN YOU TURN IN YOUR BOOK TO TX5.

3            MR. PISTORINO:  WHICH WE OFFER, TX5.

4            MS. ROBERTS:  NO OBJECTION.

5            THE COURT:  5 IS ADMITTED.

6            MR. PISTORINO:  THANK YOU.

7                (TRIAL EXHIBIT 5 RECEIVED IN EVIDENCE.)

8                        (DISPLAYED ON SCREEN.)

9    BY MR. PISTORINO:

10   Q.  AFTER THE LAWSUIT WAS FILED, I THINK WE SAW SOME

11   EARLIER -- WE SAW THE QUESTION EARLIER, HOW CAN YOU BE DOING

12   IT.

13       ISN'T IT TRUE THAT ONCE PEOPLE... ONCE PEOPLE BECAME AWARE

14   THAT YOU WERE OPENING A FACILITY USING THE NAME TECHSHOP 2.0,

15   PEOPLE STARTED TELLING YOU, YOU ARE INFRINGING ON THE TECHSHOP

16   BRAND?

17           MS. ROBERTS:  OBJECTION, ASSUMES FACTS NOT IN

18   EVIDENCE.

19           MR. PISTORINO:  FX5, YOUR HONOR.

20           THE COURT:  SO 5 WAS JUST ADMITTED WITHOUT OBJECTION,

21   RIGHT?

22           MS. ROBERTS:  HE IS NOT TALKING -- IF HE DIRECTS THE

23   QUESTION TO THE DOCUMENT.

24           THE COURT:  SUSTAINED.  WHY DON'T WE TRY REWORD IT.

25           MR. PISTORINO:  OKAY.

1   **BY MR. PISTORINO:**

2   **Q.** ISN'T IT TRUE THAT, IN PARTICULAR, MR. EWING, TOLD YOU

3   THAT YOU ARE INFRINGING THE TECHSHOP BRAND.  HE TOLD YOU THAT,

4   RIGHT?

5   **A.** THAT WAS HIS OPINION.

6   **Q.** OKAY.

7                    (PAUSE IN THE PROCEEDINGS.)

8       BEFORE I GET TO THIS OTHER STUFF -- WELL, LET ME SEE.

9       OKAY.  SO LET'S GO BACK TO 327.

10                   (DISPLAYED ON SCREEN.)

11      READY?

12   **A.** I AM.

13   **Q.** SO AFTER THE LAWSUIT WAS FILED, WE SAW THE EARLIER THING

14   WHERE YOU SAY GO AHEAD, WE NEED TO CHANGE THE WEBSITE ASAP.

15   AND YOU CHANGE THE WEBSITE TO START USING THIS LOGO

16   (INDICATING), DIDN'T YOU?

17   **A.** I DID.

18   **Q.** I HAVE A FEW QUESTIONS ABOUT IT.

19      THE NEW NAME YOU USED -- DECIDED TO USE WAS THESHOP,

20   CORRECT?

21   **A.** CORRECT.

22   **Q.** OKAY.  AND THE NAME YOU HAD BEEN USING BEFORE WAS TECHSHOP

23   2.0, CORRECT?

24   **A.** THAT IS CORRECT.  WE DECIDED TO USE THESHOP.BUILD.

25   **Q.** LET'S MAYBE WORK OUR WAY THROUGH IT.

RASURE - CROSS / PISTORINO

1      THE NAME -- THE TECHSHOP'S TRADEMARKS ARE TECHSHOP,

2  CORRECT?

3  **A.**   THE WORD, YES.

4  **Q.**   OKAY.  AND YOU HAD BEEN USING THE NAME TECHSHOP 2.0 TO

5  OPEN A MAKERSPACE WITHOUT TECHSHOP'S PERMISSION, CORRECT?

6  **A.**   WE WERE OPENING A MAKERSPACE TECHSHOP 2.0, YES.

7  **Q.**   WITHOUT TECHSHOP'S PERMISSION, CORRECT?

8  **A.**   CORRECT.

9  **Q.**   OKAY.  AND NOW YOU GOT SUED, AND YOU WENT TO

10  THESHOP.BUILD, CORRECT?

11  **A.**   I'VE BEEN BUILDING IN THE SHOP FOREVER, YES.

12  **Q.**   THIS IS THE NAME YOU CHOSE TO USE AFTER YOU GOT SUED,

13  CORRECT?

14  **A.**   CORRECT.

15  **Q.**   AND I HAVE TO ADMIT, I HAVE A FEW QUESTIONS HERE ABOUT THE

16  COLORS.

17      WE CAN SEE THE WAY TECHSHOP PRESENTED ITS TRADEMARKS.  IT

18  WAS BLUE FOR THE TECH PART AND RED FOR THE SHOP PART, CORRECT?

19  **A.**   IT'S MY UNDERSTANDING TECHSHOP DID NOT --

20  **Q.**   SIR, ISN'T IT TRUE, THE WAY TECHSHOP PRESENTED ITS

21  TRADEMARK WAS BLUE FOR THE TECH PART AND SHOP -- RED FOR THE

22  SHOP PART, CORRECT?

23  **A.**   THEIR LOGO, YES.

24          **MS. ROBERTS:**  OBJECTION, THAT MISSTATES THE

25  EVIDENCE --

RASURE - CROSS / PISTORINO

```
1        THE COURT:  OVERRULED.

2   BY MR. PISTORINO:

3   Q.  THE WAY YOU ELECTED TO USE -- PRESENT THIS NAME THAT YOU

4   ARE GOING TO USE NOW IS BLUE FOR THE "THE" PART AND, AGAIN,

5   THE SAME EXACT RED THING FOR THE SHOP PART, CORRECT?

6   A.  THAT IS CORRECT.

7   Q.  OKAY.  OF ALL THE INFINITE SPECTRUM OF COLORS IN THE

8   WORLD, WHY DID YOU PICK THE EXACT SAME TWO TECHSHOP PICKED?

9   A.  YOU KNOW, ALL THIS HAPPENED IN ABOUT AN HOUR'S WORTH OF

10  TIME WHILE WE WERE TRYING TO OPEN A SHOP.

11  Q.  OKAY.

12      SO WHY DID YOU PICK THE EXACT SAME COLORS TECHSHOP PICKED

13  FOR THE NAME YOU INTENDED TO USE, SIR?

14  A.  AT THIS POINT I HAVE NO IDEA.

15  Q.  YOU CAN'T REMEMBER HERE TODAY?

16  A.  NO.

17  Q.  DO YOU THINK, SINCE YOU CAN'T REMEMBER, DO YOU THINK IT

18  WAS BECAUSE YOU WERE TRYING TO MIMIC THE LOOK OF TECHSHOP?

19  A.  NO.  IN FACT, THE GEAR WAS SPECIFICALLY DESIGNED TO BE

20  DIFFERENT.

21  Q.  I'M SORRY, SIR, WHAT DID YOU SAY?

22  A.  THE GEAR WAS SPECIFICALLY DESIGNED TO BE DIFFERENT AND

23  ACCURATE.

24  Q.  BE DIFFERENT.

25      HOW MANY TEETH DID THE GEAR THAT IS SHOWN FOR THE "O" IN
```

RASURE - CROSS / PISTORINO

1   THE TECHSHOP LOGO HAVE?

2   **A.**  I NOW KNOW IT HAS TEN.

3   **Q.**  HOW MANY TEETH DID THE GEAR THAT'S FOR THE "O" IN YOUR

4   SHOP HAVE?

5   **A.**  EARLIER THIS WEEK I COUNTED IT.  IT HAS TEN.

6   **Q.**  EXACT SAME NUMBER.  WAS THAT -- IS THAT YOUR EFFORT TO

7   MAKE IT DIFFERENT?

8   **A.**  NO.  I HAD NOTHING TO DO WITH THE GEAR.

9   **Q.**  EXACT SAME NUMBER.

10      OF ALL THE WAYS IN THE WORLD THAT SOMEONE COULD PRESENT

11  THE LETTER "O", WHY DID YOU DECIDE TO MAKE YOUR "O" A GEAR

12  JUST LIKE TECHSHOP'S?

13  **A.**  BECAUSE OUR FIRST MEMBER BEGGED ME TO BE ABLE TO DESIGN IT

14  CORRECTLY.

15  **Q.**  YOUR FIRST -- HOLD ON.

16      OF ALL THE DIFFERENT WAYS, WHY DID YOU PICK THE EXACT SAME

17  WAY FROM A GEAR, TEN TEETH, RED, SAME AS TECHSHOP?

18  **A.**  BECAUSE THE MEMBER THAT ASKED THAT WAS THE REASON WHY I

19  WAS AT THE POSITION OF OPENING A SHOP, ASKED IF HE COULD

20  DESIGN A GEAR CORRECTLY.

21  **Q.**  AND YOU USED HIS DESIGN, PUT IT ON THE WEB PAGE, CORRECT?

22  **A.**  YES, WE DID.

23  **Q.**  SO YOU'RE THE TOP GUY AT TECHSHOP 2.0 LLC, CORRECT?

24  **A.**  I AM.

25  **Q.**  IT WAS PUT ON THE WEB PAGE WITH YOUR AUTHORITY, CORRECT?

RASURE - CROSS / PISTORINO

1    **A.**   IT WAS.

2    **Q.**   OKAY.  YOU'RE THE ONE THAT'S RESPONSIBLE, RIGHT?

3    **A.**   CORRECT.

4    **Q.**   OKAY.  SAME THING WITH TECHSHOP 2.0 SAN FRANCISCO, YOU ARE

5    THE TOP GUY, RIGHT?

6    **A.**   CORRECT.

7    **Q.**   AND IT WAS PUT ON THE WEB PAGE WITH YOUR AUTHORITY,

8    CORRECT?

9        ISN'T IT TRUE, SIR, THAT YOU PICKED THESE COLORS?

10       ISN'T IT TRUE, SIR, THAT YOU PICKED THESE COLORS AND THE

11   GEAR TO MIMIC THE LOOK OF TECHSHOP?

12   **A.**   I DON'T KNOW WHAT WE WERE DOING TO BE HONEST.

13   **Q.**   ARE YOU HERE TODAY TO TELL THE JURY THAT THIS WAS YOUR

14   EFFORT TO BE COMPLETELY DIFFERENT THAN TECHSHOP?

15   **A.**   I WAS TRYING TO GET OPEN AT THIS POINT.

16   **Q.**   CAN'T YOU JUST ADMIT, SIR, THAT YOU DESIGNED IT THIS WAY

17   TO MIMIC THE LOOK --

18   **A.**   I DIDN'T DESIGN IT.

19   **Q.**   OKAY.  CAN YOU ADMIT THAT IT WAS USED THIS WAY JUST TO

20   MIMIC THE LOOK AT TECHSHOP?

21       CAN'T YOU JUST TELL THEM?

22   **A.**   NO, WE WEREN'T TRYING TO MIMIC IT.

23   **Q.**   OKAY.

24       IN YOUR MIND -- I JUST WANT TO MAKE SURE I GOT IT --

25   THESHOP.BUILD PRESENTED THIS WAY (INDICATING), IN YOUR MIND,

1    THAT'S NOT CONFUSINGLY SIMILAR TO TECHSHOP'S IN THE WAY IT

2    PRESENTED IT, IS IT?

3    **A.**  IT DIDN'T CONFUSE ME, NO.

4    **Q.**  OKAY.

5         IN YOUR MIND, NO ONE ELSE LOOKING AT IT MIGHT BE CONFUSED,

6    HEY, THE COLORS ARE THE SAME -- I MEAN NOT SAME, IDENTICAL.

7    THE GEAR "O" GEAR, IN YOUR MIND, PEOPLE WEREN'T GOING TO BE

8    CONFUSED ABOUT THAT?

9    **A.**  I DIDN'T THINK THEY WERE GOING TO BE CONFUSED.

10   **Q.**  OKAY.

11        OKAY.  IF YOU CAN TURN IN YOUR -- NOW, SUBSEQUENTLY, WE

12   ALL KNOW, OF COURSE, THAT TECHSHOP ENDS UP FILING FOR

13   BANKRUPTCY ON FEBRUARY 26?

14   **A.**  THAT'S CORRECT.

15   **Q.**  MS. KAELIN HERE WAS APPOINTED THE TRUSTEE FOR THE ESTATE?

16   **A.**  THAT'S CORRECT.

17   **Q.**  YOU KIND OF SAW THAT AS AN OPPORTUNITY, DIDN'T YOU?

18   **A.**  TO PURCHASE THE REST -- THE TECHSHOP ASSETS?  YES.

19   **Q.**  IF YOU TURN IN YOUR BOOK TO THE EXHIBIT WE MARKED TX12.

20             **MR. PISTORINO:**  WHICH WE OFFER.

21                       (PAUSE IN THE PROCEEDINGS.)

22             **THE CLERK:**  HE OFFERED 12.

23             **THE COURT:**  ANY OBJECTION?

24             **MS. ROBERTS:**  NO OBJECTION.

25             **THE COURT:**  12 IS ADMITTED.

1          **MR. PISTORINO:**  THANK YOU.

2               (TRIAL EXHIBIT 12 RECEIVED IN EVIDENCE.)

3                    (DISPLAYED ON SCREEN.)

4    BY MR. PISTORINO:

5    **Q.**  THIS IS A TEXT MESSAGE FROM YOU TO ANDREW WONG DATED THE

6    DAY AFTER TECHSHOP FILED ITS BANKRUPTCY PETITION WHERE YOU

7    SAID -- THE FILING OF THE BANKRUPTCY PETITION -- YOU SAID, "IT

8    GIVES ME A LEGAL REASON TO BE IN TOUGH WITH THE TRUSTEE AND

9    MAKE A FAST OFFER FOR THE REST OF THE COMPANY THOUGH".

10        DIDN'T YOU SAY THAT?

11   **A.**  I BELIEVE IT WAS TOUCH.  A TYPO, BUT TOUCH.  YES.

12   **Q.**  OKAY.

13        NOW WE HAVE HEARD THE NAME THESHOP.BUILD A LITTLE BIT HERE

14   FROM TIME TO TIME, AND I WANT TO JUST ADDRESS THAT FOR A QUICK

15   SECOND.

16        IF YOU TURN IN YOUR BOOK TO THE EXHIBIT WE MARKED AS TX25.

17             **MR. PISTORINO:**  WHICH WE OFFER.

18             **MS. ROBERTS:**  NO OBJECTION.

19             **THE COURT:**  ADMITTED.

20               (TRIAL EXHIBIT 25 RECEIVED IN EVIDENCE.)

21                    (DISPLAYED ON SCREEN.)

22   BY MR. PISTORINO:

23   **Q.**  TX25 IS A SERIES OF PAGES FROM THE SECRETARY OF STATE, I

24   BELIEVE, OF THE STATE OF KANSAS.  RIGHT?

25   **A.**  THAT IS CORRECT.

1    **Q.**  AND THE -- I WANT TO GO IN HERE.

2        WE GO INTO THE, I GUESS IT'S THE FOURTH PAGE.  FOURTH PAGE

3    IN THE EXHIBIT.

4    **A.**  FRONT AND BACK OR WHAT NUMBER, PLEASE?

5    **Q.**  THE BATES NUMBER FOR THIS IS 2743.

6        WITH ME?

7    **A.**  I AM.

8    **Q.**  THESE ARE RECORDS FROM THE KANSAS SECRETARY OF STATE'S

9    OFFICE REFLECTING THE INCORPORATION OF TECHSHOP 2.0 LLC ON

10   DECEMBER 1ST, CORRECT?

11   **A.**  THAT IS CORRECT.

12   **Q.**  AND IF WE LOOKED IN HERE, WE'D FIND ANOTHER ONE FOR

13   TECHSHOP 2.0 SAN FRANCISCO ON OR ABOUT THE SAME DATE, WOULDN'T

14   WE?

15   **A.**  NO, WE WOULD NOT.

16   **Q.**  NO?  OKAY.  I'LL GO WITH IT.

17       TURN ABOUT TWO OR THREE MORE PAGES IN TO BATES NO. 2747.

18           **THE CLERK:**  JUST THE PAGE, NOT AN EXHIBIT NUMBER?

19           **MR. PISTORINO:**  NO, A PAGE WITHIN THE EXHIBIT.

20   **BY MR. PISTORINO:**

21   **Q.**  ARE YOU WITH ME?

22   **A.**  I AM.

23   **Q.**  2747.  I SAID ON OR ABOUT THE TIME FOR TECHSHOP 2.0 SAN

24   FRANCISCO.

25       IT WAS JANUARY 20TH TO BE EXACT, WASN'T IT?

RASURE - CROSS / PISTORINO

1    **A.**  THAT IS CORRECT.

2    **Q.**  OKAY.

3         AND IF YOU TURN IN THE DOCUMENT HERE TO THE BATES

4    NO. 2745.  WITH ME THERE?

5         THAT'S A DOCUMENT THAT REFLECTS A CHANGE IN THE NAME OF

6    TECHSHOP 2.0, CORRECT?

7    **A.**  THAT IS CORRECT.

8    **Q.**  THAT'S THE KIND OF WHAT WE SAW ON THE NEXT PAGE, THAT'S

9    THE DATE YOU CHANGED THE NAME FROM TECHSHOP 2.0 TO

10   THESHOP.BUILD, CORRECT?

11   **A.**  OUR CFO HAD BEEN WORKING ON THIS FOR MONTHS.

12   **Q.**  SIR, ISN'T IT THE CASE THAT ON APRIL 6TH, 2018, THAT'S

13   DATE YOU SUBMITTED THE REQUEST TO CHANGE THE NAME FROM

14   TECHSHOP 2.0 TO THESHOP.BUILD?

15   **A.**  I DID NOT SUBMIT THE REQUEST, BUT IT IS THE DATE OF THE

16   CERTIFICATION.

17   **Q.**  OKAY.  SO, LET'S SEE.

18        FEBRUARY 16TH TO APRIL 6, THAT'S THE PERIOD OF TIME YOU

19   ARE STILL OPERATING USING THE NAME TECHSHOP 2.0, CORRECT?

20   **A.**  THE LEGAL ENTITY WAS STILL TECHSHOP 2.0.

21   **Q.**  NOW, WE'RE GOING TO TURN TO ANOTHER ISSUE AND COME BACK ON

22   SOMETHING ELSE.

23        WE'VE HEARD A LITTLE BIT IN THIS CASE ABOUT -- WELL, LET

24   ME TRY IT THIS WAY.

25        ISN'T IT TRUE THAT YOU WERE VERY INTERESTED IN GETTING THE

1    TECHSHOP CUSTOMER EMAIL LIST?

2    **A.**  YES.

3    **Q.**  YOU TOLD THAT TO THE MEMBERS OF THE BOARD THAT YOU WERE

4    REALLY INTERESTED IN GETTING THAT LIST, RIGHT?

5    **A.**  YES.

6    **Q.**  OKAY.

7        AND YOU KNEW THAT THE ONLY PERSON AUTHORIZED TO GIVE YOU

8    AN EMAIL LIST LIKE THAT WOULD HAVE BEEN A MEMBER OF THE BOARD

9    WITH AUTHORITY, CORRECT?

10   **A.**  I ASSUME SO.

11   **Q.**  OKAY.

12       YOU ASSUME NOBODY ELSE OTHER THAN THE BOARD WOULD HAVE THE

13   AUTHORITY TO PROVIDE YOU WITH A COPY OF THE TECHSHOP CUSTOMER

14   LIST, CORRECT?

15   **A.**  THAT'S CORRECT.

16   **Q.**  OKAY.

17       BUT ISN'T IT TRUE YOU STARTED ASKING PEOPLE, OTHER THAN

18   THE BOARD, IF THEY HAD COPIES OF THE LIST?

19   **A.**  I ASKED TO SEE WHO HAD IT, YES.

20   **Q.**  SO LET'S SEE.  MAYBE WE WILL JUST ORGANIZE OURSELVES HERE

21   AGAIN.

22       TURN IN YOUR BOOK TO TX44.

23           **THE COURT:**  BEFORE YOU DO THAT, WHY DON'T WE BREAK

24   SINCE IT'S NOON.  IT'S PROBABLY A GOOD PLACE TO TAKE THE

25   BREAK.

1          ALL RIGHT.  LADIES AND GENTLEMEN, WE WILL TAKE OUR SECOND

2     RECESS.  IT'S 12:00, AND WE WILL COME BACK AND RESUME AT

3     12:15.

4          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

5               **THE CLERK:**  YOU MAY BE SEATED.  YOU MAY STEP DOWN.

6               **THE COURT:**  JUST FOR PLANNING PURPOSES, DO YOU HAVE A

7     SENSE OF HOW LONG YOU ARE LIKELY TO GO?

8               **MR. PISTORINO:**  I THINK IT KIND OF DEPENDS UPON HOW

9     HE ANSWERS IN THE NEXT SORT OF WHAT I'LL CALL MAJOR TOPIC, BUT

10    IT COULD BE HALF AN HOUR, 45 MINUTES.

11              **THE COURT:**  OKAY.  YOU HAVE AN HOUR AND 42 MINUTES

12    LEFT.

13              **THE CLERK:**  AND 23 SECONDS.

14              **MR. PISTORINO:**  WE'LL TAKE IT.

15         THANK YOU.

16         (RECESS TAKEN AT 12:02 P.M.; RESUMED AT 12:20 P.M.)

17              **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

18    COURT IS BACK IN SESSION.  THE HONORABLE HAYWOOD S. GILLIAM,

19    JR., PRESIDING.

20         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

21              **THE CLERK:**  YOU MAY BE SEATED.

22              **THE COURT:**  YOU MAY CONTINUE.

23              **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

24    **BY MR. PISTORINO:**

25    **Q.**  MR. RASURE, BEFORE WE TOOK OUR BREAK, WE WERE GETTING

```
 1    READY TO TALK ABOUT YOUR INTEREST IN THE EMAILS.

 2         DO YOU RECALL THAT?

 3    A.   YES.

 4    Q.   LOOK IN YOUR BOOK TO TX44, WHICH I THINK HAS BEEN

 5    ADMITTED.

 6                        (DISPLAYED ON SCREEN.)

 7         ARE YOU WITH ME, SIR?

 8    A.   YES.

 9    Q.   YOU HAVE BEEN SITTING HERE -- WELL, YOU'VE BEEN SITTING IN

10    THE COURTROOM BUT, IN FACT, YOU WERE COPIED ON THIS EMAIL,

11    RIGHT?

12    A.   THAT'S CORRECT.

13    Q.   FROM MR. DOHERTY TO YOURSELF AND A BUNCH OF OTHERS AT

14    7:54 P.M. ON NOVEMBER 30TH, CORRECT?

15    A.   THAT IS CORRECT.

16    Q.   AND I CALL THIS -- THIS IS THE ONE WHERE HE SAYS, THEY ARE

17    NOT GOING TO GIVE YOU -- THE ONE REASON THEY ARE NOT GOING TO

18    GIVE YOU THE EMAIL LIST IS BECAUSE IT'S THE FAMILY SILVER,

19    CORRECT?

20    A.   CORRECT.

21    Q.   OKAY.

22         ISN'T IT TRUE RIGHT AFTER GETTING THAT NOTICE FROM

23    TECHSHOP THAT THEY WOULDN'T GIVE IT TO YOU BECAUSE IT IS THE

24    FAMILY SILVER, THE BOARD SAID THAT, THE NEXT THING YOU DID IS

25    YOU TURNED AROUND AND ASKED MR. SPURLOCK IF HE WOULD GIVE YOU
```

1    THE EMAIL LIST, RIGHT?

2    **A.**  I BELIEVE I ASKED HIM IF HE HAD THE LIST.

3    **Q.**  WHY WOULD YOU BE -- SINCE THE BOARD JUST TOLD YOU THEY

4    COULDN'T GIVE YOU THE LIST -- OR WOULDN'T GIVE YOU THE LIST,

5    WHY ARE YOU INQUIRING OF MR. SPURLOCK IF HE'S GOT IT?

6    **A.**  BECAUSE THEY HADN'T BEEN ABLE TO COMPLETE THE EMAIL SEND

7    BECAUSE OF THE COMPLEXITY OF THEIR CRM SYSTEM BECAUSE IT BROKE

8    DURING THE SHUTDOWN.

9    **Q.**  WELL, YOU TURNED AROUND AND ASKED HIM WITHIN, WHAT, LESS

10   THAN AN HOUR; ISN'T THAT RIGHT?

11   **A.**  IF HE HAD IT, YES.

12   **Q.**  SO TURN IN YOUR BOOK TO TX16.

13            **THE CLERK:**  HUH-UH.

14            **MR. PISTORINO:**  WHICH WE OFFER.

15            **MS. ROBERTS:**  NO OBJECTION.

16            **THE COURT:**  16 IS ADMITTED.

17            (TRIAL EXHIBIT 16 RECEIVED IN EVIDENCE.)

18                    (DISPLAYED ON SCREEN.)

19   **BY MR. PISTORINO:**

20   **Q.**  SO IF YOU TURN TO THE SECOND PAGE OF IT.  THIS IS A SERIES

21   OF TEXT MESSAGES BETWEEN MR. SPURLOCK AND YOURSELF ALSO DATED

22   NOVEMBER 20TH, JUST LIKE MR. DOHERTY'S THING.  AND ON THE

23   SECOND PAGE AT 8:29, YOU ASK MR. SPURLOCK IF HE HAD THE MEMBER

24   LIST, CORRECT?

25   **A.**  YES, I DID.

1    **Q.**  OKAY.

2         AND HAVING BEEN TOLD NO BY THE BOARD, YOU ASKED

3    MR. SPURLOCK AGAIN, DIDN'T YOU, ON DECEMBER 3RD, THREE, FOUR

4    DAYS LATER, CORRECT?

5    **A.**  THAT IS CORRECT.

6    **Q.**  THAT'S TRIAL EXHIBIT 4, TX4, RIGHT?

7    **A.**  TX WHAT?

8    **Q.**  TX4.

9              **THE CLERK:**  4 IS NOT IN EVIDENCE.

10             **MR. PISTORINO:**  WE OFFER TX4.

11             **MS. ROBERTS:**  NO OBJECTION.

12             **THE COURT:**  4 IS ADMITTED.

13                 (TRIAL EXHIBIT 4 RECEIVED IN EVIDENCE.)

14                      (DISPLAYED ON SCREEN.)

15   **BY MR. PISTORINO:**

16   **Q.**  YOU ASK, DO YOU HAVE A MEMBER LIST, MR. SPURLOCK, CORRECT?

17   **A.**  THAT IS CORRECT.

18   **Q.**  AND, SIR, ISN'T IT TRUE THAT YOU ASKED MULTIPLE PEOPLE --

19   AFTER TECHSHOP TOLD YOU THEY WOULDN'T GIVE YOU THE LIST, YOU

20   ASKED MULTIPLE PEOPLE WHO WEREN'T ON THE BOARD FOR THE LIST,

21   CORRECT?

22   **A.**  I ASKED IF THEY HAD IT, YES.

23   **Q.**  FOR EXAMPLE, IF YOU TURN IN YOUR BOOK TO TX24.

24             **MR. PISTORINO:**  WHICH WE OFFER.

25             **MS. ROBERTS:**  NO OBJECTION.

1        **THE COURT:**  ADMITTED.

2            (TRIAL EXHIBIT 24 RECEIVED IN EVIDENCE.)

3                (DISPLAYED ON SCREEN.)

4    **BY MR. PISTORINO:**

5    **Q.**  SO WE TALKED BEFORE, AND YOU AGREED THAT ONLY THE BOARD

6    WOULD HAVE AUTHORITY TO GIVE YOU THE MEMBER LIST, CORRECT?

7    **A.**  YES.

8    **Q.**  OKAY.

9        AND WE JUST SAW YOUR REQUEST TO MR. RYAN IF HE'S GOT THE

10   LIST, AND NOW IN TX24, YOU ASK TIFFANI MASCARELLA, DO YOU HAVE

11   THE LIST ON DECEMBER 5, TWO DAYS LATER, CORRECT?

12   **A.**  YES, I DID.

13   **Q.**  AND TIFFANI MASCARELLA, SHE HAD BEEN A FORMER EMPLOYEE OUT

14   OF THE ARIZONA LOCATION, CORRECT?

15   **A.**  THAT IS CORRECT.

16   **Q.**  YOU KNEW SHE WOULD HAVE BEEN AUTHORIZED TO GIVE YOU A

17   LIST, CORRECT?

18   **A.**  THAT IS CORRECT.

19   **Q.**  NEVERTHELESS YOU WERE ASKING FOR IT, CORRECT?

20   **A.**  NO, I WAS NOT.

21   **Q.**  OKAY.

22       YOU WERE JUST... YOU WERE JUST CURIOUS, IS THAT IT?

23   **A.**  I WANTED TO KNOW WHO HAD THE LIST BECAUSE THE CRM SYSTEM

24   WAS STILL BROKEN AT THIS POINT.

25   **Q.**  TURNING IN YOUR BOOK TO TX197.

1          **MR. PISTORINO:**  WHICH WE OFFER.

2          **THE COURT:**  ANY OBJECTION TO 197?

3          **MS. ROBERTS:**  NO OBJECTION.

4          **THE COURT:**  ADMITTED.

5          (TRIAL EXHIBIT 197 RECEIVED IN EVIDENCE.)

6                    (DISPLAYED ON SCREEN.)

7     **BY MR. PISTORINO:**

8     **Q.**  TX197 IS TEXT MESSAGES EXCHANGED BETWEEN YOURSELF AND

9     KATHRYN KELLY ON DECEMBER 5TH.

10         AND YOU ASKED MS. KELLY, DO YOU HAVE THE LIST, CORRECT?

11    **A.**  YES, I DID.

12    **Q.**  AND YOU KNEW THAT MS. KELLY WAS NOT A MEMBER OF THE

13    TECHSHOP BOARD OR AUTHORIZED TO GIVE OUT THE TECHSHOP EMAIL

14    LIST, CORRECT?

15    **A.**  THAT IS CORRECT.

16    **Q.**  OKAY.

17         AND TURN IN YOUR BOOK, IF YOU WOULD, TO TX200.

18         **MR. PISTORINO:**  WHICH WE OFFER.

19         **MS. ROBERTS:**  NO OBJECTION.

20         **THE COURT:**  ADMITTED.

21         (TRIAL EXHIBIT 200 RECEIVED IN EVIDENCE.)

22                    (DISPLAYED ON SCREEN.)

23    **BY MR. PISTORINO:**

24    **Q.**  LET ME KNOW WHEN YOU ARE READY.

25    **A.**  I'M READY.

1    **Q.**  OKAY.

2         THIS, AGAIN, IS SOME TEXT MESSAGES WITH SOMEBODY ON

3    FEBRUARY 14TH.  AND YOU ASK THEM... AFTER -- AGAIN, THIS IS

4    LIKE WHAT, TWO MONTHS AFTER TECHSHOP SAID THE BOARD WOULDN'T

5    GIVE IT TO YOU, YOU ARE ASKING THEM.

6         DO YOU HAVE ANY FORMER MEMBER LIST, CORRECT?

7    **A.**  I DID.

8    **Q.**  OKAY.

9         NOW WE'VE HEARD A LITTLE BIT OF A DISCUSSION HERE ABOUT

10   YOU'VE GOT ACCESS TO TECHSHOP'S FORMER FACILITY IN THAT SORT

11   OF FEBRUARY 12TH, 2018 TIME FRAME.

12        THAT'S ABOUT WHEN YOU GOT ACCESS TO THE FACILITY, CORRECT?

13   **A.**  WOULD YOU RESTATE THE QUESTION?

14   **Q.**  SURE.

15        YOU GOT PHYSICAL ACCESS TO THE BUILDING WHERE

16   TECHSHOP'S -- TECHSHOP HAD BEEN, 926 HOWARD STREET, AROUND

17   FEBRUARY 12TH, 2018, CORRECT?

18   **A.**  THE MORNING OF FEBRUARY 13TH.

19   **Q.**  YOU WERE ABLE TO GET IN THERE AND HAVE ACCESS TO ALL THE

20   EQUIPMENT THAT WAS THERE, CORRECT?

21   **A.**  YES, WE WERE.

22   **Q.**  OKAY.

23        AND WE'VE HEARD FROM SOME OF THESE WITNESSES HOW, AFTER

24   YOU GOT ACCESS TO THAT, MAYBE STARTING IN MID- TO LATE MARCH,

25   THEY STARTED GETTING EMAIL, SOLICITATION EMAILS FROM YOU.

RASURE - CROSS / PISTORINO

1    DO YOU REMEMBER HEARING THAT FROM MR. BUSCH, FOR EXAMPLE,

2  CORRECT?

3  **A.**  I DID.

4  **Q.**  OKAY.  AND MR. BUSCH -- YOU REMEMBER MR. BUSCH TELLING US

5  ABOUT HOW HIS WIFE, WHO HAD NEVER BEEN IN COMMUNICATION WITH

6  YOU, STARTED GETTING EMAILS FROM YOU, YOU KNOW, ADVERTISING

7  YOUR BUSINESS, CORRECT?

8  **A.**  I DID.

9  **Q.**  SO LET ME JUST TRY IT THIS WAY.

10    ISN'T IT TRUE THAT YOU GOT THE PASSWORDS TO THE TECHSHOP

11  CRM SYSTEM AND DOWNLOADED IT FROM THE COMPUTERS AT TECHSHOP'S

12  FORMER FACILITY IN SAN FRANCISCO?

13  **A.**  ABSOLUTELY FALSE.  THE PERSON HAD ALREADY RENDERED THE

14  COMPUTERS --

15  **Q.**  IT IS FALSE.  THANK YOU, SIR.

16    IF YOU TURN IN YOUR BINDER TO THE EXHIBIT MARKED TX180.

17        **THE CLERK:**  I'M SORRY, 180?

18        **MR. PISTORINO:**  180, WHICH WE OFFER.

19        **MS. ROBERTS:**  NO OBJECTION.

20        **THE COURT:**  ADMITTED.

21        (TRIAL EXHIBIT 180 RECEIVED IN EVIDENCE.)

22            (DISPLAYED ON SCREEN.)

23  **BY MR. PISTORINO:**

24  **Q.**  TX180 IS AN EMAIL FROM A GENTLEMAN NAMED GREG CASTELLANOS

25  DATED MARCH 14TH CORRECT?

RASURE - CROSS / PISTORINO

1   **A.**  THAT IS CORRECT.

2   **Q.**  GREG CASTELLANOS WAS WORKING FOR YOU IN YOUR BUSINESS,

3   WASN'T HE?

4   **A.**  HE WAS.

5   **Q.**  OKAY.  AND HE TRANSMITTED TO YOU, THE BOTTOM PART HERE, IT

6   LOOKS LIKE HE FORWARDED AN EMAIL FROM COLIN DRAKE JARAMILLO OR

7   JARAMILLO, IT SYSTEMS TECHNICIAN AT TECHSHOP CORPORATE,

8   CORRECT?

9   **A.**  HE DID.

10  **Q.**  OKAY.  AND THEY ARE BLACKED OUT HERE, BUT HE TRANSMITTED

11  GREG CASTELLANOS IN MARCH, TRANSMITTED TO YOU, LOOKS LIKE THE

12  LOCAL ADMIN PASSWORD FOR TECHSHOP, CORRECT?

13  **A.**  FOR AN OLD PASSWORD FOR DEEP FREEZE --

14  **Q.**  SIR -- SIR, IT SAYS, HI (SIC) GREG, LOCAL ADMIN.  AND IT'S

15  BLACKED OUT, CORRECT?

16  **A.**  IT SAYS LOCAL ADMIN.

17  **Q.**  AND IT'S BLACKED OUT SO WE CAN'T SEE.

18      IT WAS A PASSWORD, WASN'T IT?

19  **A.**  CORRECT.  FOR DEEP FREEZE.

20  **Q.**  IT WAS A PASSWORD, WASN'T IT, SIR?

21  **A.**  CORRECT.

22  **Q.**  THEN HE TRANSMITTED TO YOU -- GREG TRANSMITTED TO YOU THE

23  EMAIL HE RECEIVED FROM COLIN FOR THE DEEP FREEZE PASSWORD,

24  CORRECT?

25  **A.**  CORRECT.

1    **Q.**  AND ADOBEID AND A PASSWORD FOR THAT, CORRECT?

2    **A.**  CORRECT.

3    **Q.**  AND THESE WERE ALL THE TECHSHOP PASSWORDS, CORRECT?

4    **A.**  CORRECT.

5    **Q.**  YOU WERE HERE THE OTHER DAY, AND YOU REMEMBER MR. SPURLOCK

6    TESTIFYING ABOUT HOW COLIN HAD BEEN AN IT PERSON AT TECHSHOP,

7    CORRECT?

8    **A.**  YES.

9         **MR. PISTORINO:**  PERMISSION TO APPROACH, YOUR HONOR?

10        **THE COURT:**  YOU MAY.

11            (BINDER HANDED TO WITNESS.)

12   **BY MR. PISTORINO:**

13   **Q.**  ON DIRECT EXAMINATION, I RECALL YOU HAD SOME DISCUSSION ON

14   A PARTICULAR EXHIBIT THAT YOU HAD WHERE SOMEONE WAS SAYING

15   THEY UNDERSTOOD THAT THERE WAS A DIFFERENCE BETWEEN TECHSHOP,

16   I THINK THEY CALLED IT TECHSHOP 1.0 AND TECHSHOP 2.0.

17        DO YOU REMEMBER THAT?

18   **A.**  I DO.

19   **Q.**  AND YOU TESTIFIED HERE ON MY EXAMINATION A FEW TIMES HOW

20   YOU THOUGHT EVERYBODY KNEW THAT THERE WAS A DIFFERENCE BETWEEN

21   TECHSHOP AND YOUR TECHSHOP 2.0.

22        REMEMBER THAT?

23   **A.**  IT WAS WELL PUBLICIZED.

24   **Q.**  OKAY.

25        ISN'T IT TRUE, SIR, THAT MANY, MANY PEOPLE WERE ACTUALLY

1    CONFUSED ABOUT WHAT THE ASSOCIATION OR SPONSORSHIP WAS BETWEEN

2    TECHSHOP AND THE TECHSHOP 2.0 MAKERSPACE THAT YOU WERE

3    OPERATING?

4              **MS. ROBERTS:**  OBJECTION, CALLS FOR SPECULATION AND IT

5    ASSUMES FACTS NOT IN EVIDENCE.

6              **THE COURT:**  SUSTAINED.

7    **BY MR. PISTORINO:**

8    **Q.**  SIR, DIDN'T MANY PEOPLE CONTACT YOU, YOUR BUSINESS

9    BELIEVING THAT YOU TO BE TECHSHOP?

10              **MS. ROBERTS:**  OBJECTION, CALLS FOR SPECULATION.

11   ASSUMES FACTS NOT IN EVIDENCE.

12              **THE COURT:**  OVERRULED.

13   **BY MR. PISTORINO:**

14   **Q.**  SIR, YOU CAN ANSWER.

15   **A.**  WE RECEIVED MANY EMAILS ASKING FOR CONTACT INFORMATION.

16   OUR RELATIONSHIP --

17   **Q.**  SIR, MY QUESTION WAS, DIDN'T MANY PEOPLE CONTACT YOUR

18   BUSINESS BELIEVING THAT YOU WERE TECHSHOP?

19   **A.**  MANY PEOPLE WERE REFERRED -- OR PUT TECHSHOP IN THE EMAIL

20   THAT THEY EMAILED TO INFO@THESHOP.BUILD.

21                   (PAUSE IN THE PROCEEDINGS.)

22   **Q.**  SIR, IF YOU CAN TURN IN YOUR BOOK TO TX94.

23              **MR. PISTORINO:**  WHICH WE OFFER.

24              **MS. ROBERTS:**  NO OBJECTION.

25              **THE COURT:**  ADMITTED.

```
1              (TRIAL EXHIBIT 94 RECEIVED IN EVIDENCE.)

2                    (DISPLAYED ON SCREEN.)

3    BY MR. PISTORINO:

4    Q.  TX94, ISN'T IT TRUE THIS IS AN EMAIL FROM... SOMEBODY

5    SAYING ON FEBRUARY 18TH, SAYING THEY JUST RE-SIGNED UP FOR

6    MEMBERSHIP.

7         DO YOU SEE THAT?

8    A.  YES.

9    Q.  WELL, I'M JUST TRYING TO UNDERSTAND.

10        YOU'RE TELLING US EVERYBODY KNEW YOUR BUSINESS WAS TOTALLY

11   SEPARATE FROM TECHSHOP, CORRECT?

12        HOW COULD THIS PERSON RE-SIGN UP FOR MEMBERSHIP?  THEY

13   WOULD BE SIGNING UP FOR THE FIRST TIME, CORRECT?

14   A.  WE WERE IN THE SAME FACILITY.

15   Q.  OKAY.

16        SO THE RE-SIGNED UP, THEY WEREN'T EXACTLY SURE ABOUT THE

17   DIFFERENCE BETWEEN YOUR TECHSHOP 2.0 AND ACTUAL TECHSHOP,

18   CORRECT?

19   A.  THEY ADDRESSED IT TO TECHSHOP 2.0.

20   Q.  WELL, THAT WAS THE NAME YOU WERE OPERATING UNDER, CORRECT?

21   A.  TWO DAYS PRIOR, YES.

22        THE EMAIL THEY SENT TO WAS INFO@THESHOP.BUILD.

23   Q.  WELL, YOU SAID -- HOLD ON.

24        THE BOTTOM EMAIL IS ADDRESSED ON FEBRUARY 18TH, RIGHT?

25   THAT'S TWO DAYS AFTER YOU GOT SUED.  MEMBERS OF THE PUBLIC
```

RASURE - CROSS / PISTORINO

1    WERE REACHING OUT TO YOU AS TECHSHOP 2.0 ABOUT THEIR

2    RE-SIGNING UP WITH TECHSHOP, CORRECT?

3    **A.**  WE HAD SENT EMAILS PRIOR TO BEING SUED, YES.

4    **Q.**  OKAY.

5         TURN IN YOUR BOOK TO THE EXHIBIT WE MARKED TX98.

6              **MR. PISTORINO:**  WHICH WE OFFER.

7              **MS. ROBERTS:**  NO OBJECTION.

8              **THE COURT:**  ADMITTED.

9              (TRIAL EXHIBIT 98 RECEIVED IN EVIDENCE )

10                  (DISPLAYED ON SCREEN.)

11   **BY MR. PISTORINO:**

12   **Q.**  TX98 IS SOMEBODY ELSE REACHING OUT ON FEBRUARY 21ST, AND

13   THEY SAY IN THIS EMAIL, I UNDERSTAND THAT TECHSHOP IS UNDER

14   NEW MANAGEMENT AND ALL.

15        DO YOU SEE THAT, SIR?

16   **A.**  I DO.

17   **Q.**  IT IS TRUE, ISN'T IT, THAT THE ENTITY YOU WERE OPERATING,

18   THAT WASN'T NEW MANAGEMENT FOR TECHSHOP, WAS IT?

19   **A.**  NO, IT WAS NOT.

20   **Q.**  OKAY.  WHOEVER IT IS THOUGHT THAT THE OLD TECHSHOP, THEY

21   JUST HAD NEW MANAGERS OPERATING A MAKERSPACE FACILITY; ISN'T

22   THAT TRUE, SIR?

23   **A.**  I BELIEVE IT SAYS NEW MANAGEMENT AND ALL.

24   **Q.**  UH-HUH.  OKAY.

25        TURN IN YOUR BOOK TO TX112.

1          **MR. PISTORINO:**  WHICH WE OFFER.

2          **MS. ROBERTS:**  NO OBJECTION.

3          **THE COURT:**  112 IS ADMITTED.

4          (TRIAL EXHIBIT 112 RECEIVED IN EVIDENCE.)

5                    (DISPLAYED ON SCREEN.)

6    **BY MR. PISTORINO:**

7    **Q.**  ARE YOU WITH ME, SIR?

8    **A.**  I AM.

9    **Q.**  THIS IS AN EMAIL FROM SOMEBODY DATED MONDAY, APRIL 9TH

10   SAYING, WHAT ABOUT THE MONTHS I PAID FOR WITH THE PREVIOUS

11   OWNER?

12        DO YOU SEE THAT, SIR?

13   **A.**  YES, I DO.

14   **Q.**  THERE WAS NO PREVIOUS OWNER OF YOUR BUSINESS, WAS THERE?

15        YOU'RE TELLING US EVERYBODY KNEW IT WAS TOTALLY DIFFERENT,

16   CORRECT?

17   **A.**  THERE WAS A PREVIOUS OWNER OF THE FACILITY, YES.

18   **Q.**  OKAY.

19                    (PAUSE IN THE PROCEEDINGS.)

20        TURN IN YOUR BOOK TO THE EXHIBIT MARKED TX128.

21        THIS IS AN EMAIL WHERE SOMEONE IS RESPONDING ON THE 16TH

22   ABOUT LOOKING FOR ITS NEW BEGINNING WITH TECHSHOP 2.0,

23   CORRECT?

24   **A.**  CORRECT.

25          **THE COURT:**  HAS THIS BEEN OFFERED YET?

1        **MR. PISTORINO:**  OFFER 128.  I'M SORRY.

2        **THE COURT:**  ANY OBJECTION?

3        **MS. ROBERTS:**  NO OBJECTION.

4        **THE COURT:**  128 IS ADMITTED.

5           (TRIAL EXHIBIT 128 RECEIVED IN EVIDENCE.)

6                    (DISPLAYED ON SCREEN.)

7   **BY MR. PISTORINO:**

8   **Q.**  TURN IN YOUR BOOK TO TX135.

9        **MR. PISTORINO:**  WHICH WE OFFER.

10       **MS. ROBERTS:**  NO OBJECTION.

11       **THE COURT:**  ADMITTED.

12          (TRIAL EXHIBIT 135 RECEIVED IN EVIDENCE.)

13                   (DISPLAYED ON SCREEN.)

14  **BY MR. PISTORINO:**

15  **Q.**  TX135 IS AN EMAIL FROM SOMEBODY DATED FEBRUARY 20TH.  THEY

16  STATE, FIRST OF ALL, I AM VERY, VERY HAPPY THAT TECHSHOP IS

17  FINALLY OPENED FOR BUSINESS.

18      CORRECT?

19  **A.**  CORRECT, WITH THE QUESTIONS.

20  **Q.**  I'M SORRY?

21  **A.**  CORRECT.

22  **Q.**  OKAY.

23      THAT PERSON, WHOEVER WROTE YOU HERE, THOUGHT THAT YOU WERE

24  TECHSHOP, CORRECT?

25  **A.**  ACTUALLY HE ASKED WHAT PROOF OF MEMBERSHIP DOES HE NEED.

RASURE - CROSS / PISTORINO

1    **Q.**  YEAH?

2        IT SAYS, VERY, VERY HAPPY THAT THE TECHSHOP IS FINALLY

3    OPENED FOR BUSINESS AGAIN.

4        ISN'T THAT WHAT HE SAYS?

5    **A.**  THAT IS WHAT HE SAID IN AN EMAIL HE SENT TO US.

6    **Q.**  OKAY.

7        ISN'T IT TRUE THAT YOU HAD TO START RESPONDING TO MANY,

8    MANY PEOPLE TELLING THEM, IN RESPONSE TO THEIR INITIAL

9    INQUIRIES, THAT YOU ARE SEPARATE; THAT YOU HAD TO MAKE IT

10   CLEAR TO THEM, DIDN'T YOU?

11       **MS. ROBERTS:**  OBJECTION, ASSUMES FACTS NOT IN

12   EVIDENCE.

13       **THE COURT:**  OVERRULED.

14       **THE WITNESS:**  WE DID MAKE IT CLEAR.

15   **BY MR. PISTORINO:**

16   **Q.**  WELL, NOT BEYOND YOU DID.  YOU HAD TO, RIGHT?

17       YOU GOT RESPONSES -- REQUESTS FROM PEOPLE THINKING THAT

18   YOU WERE ASSOCIATED WITH TECHSHOP, CORRECT?

19   **A.**  WE MADE IT VERY CLEAR, YES.

20   **Q.**  YOU GOT THE REQUEST FROM THEM THINKING INITIALLY THAT YOU

21   WERE ASSOCIATED WITH TECHSHOP, DIDN'T YOU?

22   **A.**  PEOPLE CONTINUED TO CALL SHOPS TECHSHOP AT TIMES.

23   **Q.**  AND THERE WERE SO MANY OF THESE YOU WERE FORCED TO ALMOST

24   ADOPT A PRACTICE OF TELLING THEM IN RESPONSE, WE ARE A

25   SEPARATE COMPANY, WE ARE A SEPARATE COMPANY, CORRECT?

1    **A.**  WE DID SAY WE WERE A SEPARATE COMPANY AT ALL TIMES.

2    **Q.**  AND THAT WAS YOUR EFFORT TO TRY TO ADDRESS THEIR CONFUSION

3    ABOUT WHAT YOUR ASSOCIATION OR SPONSORSHIP WAS WITH TECHSHOP,

4    CORRECT?

5    **A.**  WE DID SAY WE WERE A SEPARATE COMPANY.

6    **Q.**  OKAY.  THAT WAS YOUR EFFORT TO TRY TO ADDRESS THE

7    CONFUSION THEY HAD BETWEEN THE ASSOCIATION AND SPONSORSHIP OF

8    YOUR BUSINESS AND TECHSHOP, CORRECT?

9    **A.**  THEY SENT THE EMAIL TO THESHOP.BUILD.

10   **Q.**  WELL, I'M GOING TO TRY AGAIN, SIR.

11       WHEN YOU HAD TO KEEP TELLING THEM YOU WERE A SEPARATE

12   COMPANY, THAT WAS YOUR EFFORT TO ADDRESS THE CONFUSION THEY

13   WERE EXPERIENCING BETWEEN THE ASSOCIATION AND SPONSORSHIP OF

14   YOUR BUSINESS AND TECHSHOP, CORRECT?

15   **A.**  THAT IS WHAT WE DID.

16   **Q.**  OKAY.

17       TURN IN YOUR BOOK TO TX141.

18           **MR. PISTORINO:**  WHICH WE OFFER.

19           **MS. ROBERTS:**  NO OBJECTION.

20           **THE COURT:**  ADMITTED.

21       (TRIAL EXHIBIT 141 RECEIVED IN EVIDENCE.)

22               (DISPLAYED ON SCREEN.)

23   **BY MR. PISTORINO:**

24   **Q.**  THAT IS -- THAT'S ONE OF THEM, RIGHT?

25       TX141.  YOU HAVE TO START OFF BY SAYING... THEY -- THIS

1    PERSON SAYS, HEY -- WHEN THEY WERE A MEMBER, BELOW, THEY WERE

2    A MEMBER OF TECHSHOP AND THEY PAID WITH CREDIT CARD.  A BUNCH

3    OF THE INFORMATION IS SORT OF BLACKED OUT.  BUT YOU HAVE TO

4    RESPOND BECAUSE -- WELL, START IT THIS WAY.

5        THEY'RE TELLING YOU THAT THEY PAID FOR THEIR TECHSHOP

6    MEMBERSHIP WITH A CREDIT CARD.  WHAT WOULD THAT HAVE ANYTHING

7    TO DO WITH YOUR TOTALLY SEPARATE ENTITY?

8        ISN'T IT TRUE THAT THEY WERE CONFUSED ABOUT WHETHER OR NOT

9    YOU WERE, IN FACT, TECHSHOP?

10   **A.**  I BELIEVE THAT WAS THE THIRD EMAIL IN THIS CHAIN, NOT THE

11   FIRST.

12   **Q.**  OKAY.  AND AT THE TOP YOU HAD TO REPLY, WE ARE A SEPARATE

13   COMPANY.

14       CORRECT?

15   **A.**  IN THE FOURTH MESSAGE, YES, WE DID.

16   **Q.**  PEOPLE TOLD YOU -- DIDN'T PEOPLE TELL YOU THAT THESHOP WAS

17   TOO CLOSE TO THE TRADEMARK TECHSHOP?

18       TURN IN YOUR BOOK TO TX146.

19           **MR. PISTORINO:**  WHICH WE OFFER.

20           **MS. ROBERTS:**  NO OBJECTION.

21           **THE COURT:**  ADMITTED.

22           (TRIAL EXHIBIT 146 RECEIVED IN EVIDENCE.)

23                   (DISPLAYED ON SCREEN.)

24   **BY MR. PISTORINO:**

25   **Q.**  DIDN'T SOMEBODY TELL YOU ON FEBRUARY 28TH, AFTER YOU WERE

1    ALREADY USING THESHOP, WITH THE RED GEAR "O" AND THE BLUE

2    COLOR LIKE TECHSHOP AND THE RED COLOR LIKE TECHSHOP, DIDN'T

3    SOMEBODY TELL YOU FLAT OUT, MAYBE THESHOP IS STILL A LITTLE

4    TOO CLOSE TO TECHSHOP?

5    **A.**  WE WERE NOT USING THE LOGO AT THAT TIME.

6    **Q.**  SIR, DIDN'T SOMEBODY TELL YOU MAYBE THESHOP IS STILL A

7    LITTLE TOO CLOSE TO TECHSHOP?

8    **A.**  YES, HE DID.

9    **Q.**  OKAY.  MAYBE I WILL TRY IT THIS WAY.

10       SIR, I PLACED BEFORE YOU IN THE BINDER, THERE IS MORE THAN

11   130 EMAILS REFLECTING THIS KIND OF STUFF.  I DON'T WANT TO

12   WASTE THE JURORS' TIME GOING THROUGH THEM ALL.

13       DO YOU ADMIT, SIR, DO YOU ADMIT, SIR, THAT THERE WAS

14   ACTUAL CONFUSION BETWEEN THE ASSOCIATION AND SPONSORSHIP OF

15   YOUR ENTITY AND TECHSHOP?

16          **MS. ROBERTS:**  OBJECTION, ASSUMES FACTS NOT IN

17   EVIDENCE.

18          **THE COURT:**  SUSTAINED.

19   **BY MR. PISTORINO:**

20   **Q.**  SIR, DO YOU ADMIT THAT THERE WAS ACTUAL CONFUSION, MEMBERS

21   OF THE PUBLIC BETWEEN THE ASSOCIATION AND SPONSORSHIP OF YOUR

22   ENTITY AND TECHSHOP?

23   **A.**  NO, I DO NOT.

24   **Q.**  OKAY.

25       LET'S GO THROUGH A FEW MORE.  TURN IN YOUR BOOK TO 149.

1          **MR. PISTORINO:**  WHICH WE OFFER.

2          **MS. ROBERTS:**  NO OBJECTION.

3          **THE COURT:**  ADMITTED.

4              (TRIAL EXHIBIT 149 RECEIVED IN EVIDENCE.)

5                  (DISPLAYED ON SCREEN.)

6    **BY MR. PISTORINO:**

7    **Q.**  IN TX149, SOMEONE WAS WRITING IN MARCH, SAYING THEY HAVE

8    GOT GIFT CARDS FOR YOUR LOCATIONS.

9        YOU WEREN'T SELLING GIFT CARDS FOR YOUR LOCATIONS BY

10   MARCH, WERE YOU?

11   **A.**  YES, WE WERE.

12   **Q.**  OH, OKAY.

13       YOU RESPONDED TO THEIR REQUEST, IS THIS FOR THE ORIGINAL

14   TECHSHOP?

15       ISN'T THAT WHAT YOU SAID?

16   **A.**  I MAY HAVE.

17   **Q.**  WELL, THERE'S NO MAY ABOUT IT.

18       YOU SAID, IS THIS FOR THE ORIGINAL TECHSHOP, DIDN'T YOU?

19   **A.**  I WAS NOT THE ONLY PERSON WHO RESPONDED TO THESE EMAILS.

20   **Q.**  OKAY.

21       THERE'S NO TWO WAYS ABOUT IT; WHOEVER, ON BEHALF OF YOUR

22   ENTITIES, HAD TO ASK WHETHER OR NOT IT WAS FOR THE ORIGINAL

23   TECHSHOP, DIDN'T THEY?

24   **A.**  YES, THEY DID.

25   **Q.**  AND THEY RESPONDED, IT'S FOR THE ARLINGTON, VIRGINIA

1    LOCATION.  DIDN'T THEY?

2    **A.**  THEY DID.

3    **Q.**  YOU DIDN'T HAVE AN ARLINGTON, VIRGINIA LOCATION, DID YOU?

4    **A.**  WE DID NOT.

5    **Q.**  OKAY.  SO ISN'T IT TRUE THEY WERE CONFUSED?

6    **A.**  EVERYBODY WANTED A DEAL.  THEY LOST ALL THEIR MONEY.

7    **Q.**  SIR, ISN'T IT TRUE -- JUST LOOKING AT THIS ONE GUY, THEY

8    WERE CONFUSED, WEREN'T THEY, SIR?

9    **A.**  THEY WOULD LIKE A DEAL, YES.

10   **Q.**  WELL, THEY WERE CONFUSED ABOUT WHETHER OR NOT YOU WERE THE

11   ORIGINAL TECHSHOP OR NOT, WEREN'T THEY, SIR?

12   **A.**  I DON'T KNOW THEIR STATE OF MIND.

13   **Q.**  OKAY.

14       WELL, THEY WERE ASKING YOU ABOUT YOUR ARLINGTON, VIRGINIA

15   LOCATION THAT YOU DIDN'T HAVE AND TECHSHOP DID, WEREN'T THEY?

16   **A.**  WE DID NOT HAVE AN ARLINGTON, VIRGINIA LOCATION.  YOU'RE

17   CORRECT.

18   **Q.**  AND TECHSHOP DID, DIDN'T THEY?

19   **A.**  THEY DID.

20   **Q.**  OKAY.

21       AND THEN YOU -- WHOEVER ON YOUR SIDE HAD TO RESPOND,

22   TRYING TO ADDRESS THIS ACTUAL CONFUSION, WE ARE NOT THE SAME

23   COMPANY, DIDN'T THEY?

24   **A.**  CORRECT.

25           **MR. PISTORINO:**  NO FURTHER QUESTIONS, YOUR HONOR.

1          **THE COURT:**  ANY REDIRECT?

2          **MS. ROBERTS:**  YES, YOUR HONOR.

3                    **REDIRECT EXAMINATION**

4     BY MS. ROBERTS:

5     **Q.**  MR. RASURE, I WOULD LIKE YOU TO -- WE'RE GOING TO TAKE A

6     LOOK AT SOME OF THE DOCUMENTS THAT PLAINTIFF'S COUNSEL JUST

7     HAD YOU LOOK AT.

8          SO YOU WILL BE LOOKING IN THE BINDER THAT HE GAVE YOU, NOT

9     THE ONE THAT I GAVE YOU.

10         CAN WE START WITH TX33?

11                    (DISPLAYED ON SCREEN.)

12         ARE YOU THERE?

13    **A.**  I AM.

14    **Q.**  I BELIEVE THAT'S THE EMAIL THAT REFERS -- USES THE TERM

15    "HUGE MARKETING OPPORTUNITY"; IS THAT RIGHT?

16    **A.**  THAT'S CORRECT.

17    **Q.**  CAN YOU DESCRIBE FOR THE JURY WHAT YOU WERE REFERRING TO

18    AS A HUGE MARKETING OPPORTUNITY IN THAT EMAIL?

19    **A.**  YES.  I WAS PROPOSING USING THE MAKERSPACES AS A PIRANHA

20    DEMO CENTER AND POTENTIALLY RENAMING THEM AS PIRANHA SHOPS.

21    **Q.**  SO IT WOULD BE A HUGE MARKETING OPPORTUNITY FOR WHO?

22    **A.**  FOR PIRANHA.

23    **Q.**  AND THE ACQUISITION OF THE SHOPS WOULD BE A MARKETING

24    OPPORTUNITY FOR PIRANHA?

25    **A.**  YES, UNDER A LICENSE AGREEMENT.

```
1    Q.   NOW, PLAINTIFF'S COUNSEL POINTED YOU TO THE NAMES ON THE

2    COMPLAINT IN THIS CASE.

3         DO YOU REMEMBER THAT?

4    A.   I DO.

5    Q.   AND IN ADDITION TO YOUR OWN, IT WAS THE NAMES OF TECHSHOP

6    2.0 LLC AND TECHSHOP 2.0 SAN FRANCISCO, RIGHT?

7    A.   CORRECT.

8    Q.   HAVE YOU SINCE CHANGED THE NAMES OF THOSE LEGAL ENTITIES?

9    A.   YES, WE HAVE.

10   Q.   CAN YOU TURN TO TX25.

11                   (DISPLAYED ON SCREEN.)

12        AND THIS, I BELIEVE, WAS A COLLECTION OF THE CORPORATE

13   DOCUMENTS FILED WITH THE STATE OF KANSAS, RIGHT?

14   A.   AT THE TIME, YES.

15   Q.   AND CAN YOU JUST CONFIRM, MR. RASURE, INCLUDED IN THAT ARE

16   THE NAME CHANGE AMENDMENTS WHEN YOU CHANGED THE NAME FROM

17   TECHSHOP 2.0 TO THESHOP.BUILD WITH THE STATE OF KANSAS?

18   A.   YES, IT IS.

19   Q.   SO THE LEGAL ENTITY IS NO LONGER NAMED TECHSHOP 2.0?

20   A.   THAT IS CORRECT.

21   Q.   CAN YOU TURN NOW TO TX100.

22                   (DISPLAYED ON SCREEN.)

23        ARE YOU THERE?

24   A.   I AM.

25   Q.   AND I THINK THAT WAS AN EMAIL THAT WAS REFERENCING SOME
```

1    TECHNICAL ISSUE WITH THE WEBSITE; IS THAT RIGHT?

2    **A.**   THAT'S CORRECT.

3    **Q.**   IF YOU LOOK AT THE BOTTOM, DOES IT SAY THAT THE ISSUE WAS

4    FIXED?

5    **A.**   YES, IT DOES.

6    **Q.**   WHAT'S THE DATE ON THAT?

7    **A.**   THE 21ST.

8    **Q.**   FEBRUARY 21ST?

9    **A.**   CORRECT.

10   **Q.**   SO WHATEVER IS BEING DISCUSSED IN HERE ACCORDING TO THE

11   EMAIL WAS FIXED ON FEBRUARY 21ST?

12   **A.**   CORRECT.  THIS IS A BACK-END PAGE THAT NORMALLY IS NOT

13   VISIBLE TO THE PUBLIC.

14   **Q.**   CAN YOU TURN, AND I APOLOGIZE FOR HAVING YOU JUMPING

15   AROUND IN THE BINDERS, BUT TURN TO TX193.

16       ARE YOU THERE?

17                    (DISPLAYED ON SCREEN.)

18   **A.**   YES.

19   **Q.**   WHEN PLAINTIFF'S COUNSEL WAS ASKING YOU QUESTIONS, IT

20   SEEMED LIKE THERE WAS SOMETHING YOU WANTED TO SAY ABOUT THE

21   FACEBOOK PAGE THAT'S REFERENCED THERE, IS IT TECHSHOP 2.0 SAN

22   JOSE?

23       WHAT IS IT YOU WANTED TO SAY?

24   **A.**   THIS IS A COMMUNITY PAGE THAT HAD NO AFFILIATION WITH

25   TECHSHOP 2.0.  IT WAS FORMED SHORTLY AFTER THE CLOSURE OF

1  TECHSHOP, AND ONE THAT WE NEVER HAD CONTROL AND I BELIEVE IT

2  IS STILL ACTIVE TODAY.

3  **Q.**  SO THAT'S SOMEBODY ELSE'S FACEBOOK PAGE THAT'S NOT

4  AFFILIATED WITH YOUR COMPANY?

5  **A.**  THAT'S CORRECT.

6  **Q.**  AND WERE YOU ASKING IF YOU COULD PROMOTE THESHOP.BUILD ON

7  THIS UNAFFILIATED FACEBOOK PAGE?

8  **A.**  YES, WE WERE.  I BELIEVE IT'S A GROUP, NOT A PAGE.

9  **Q.**  SORRY, A GROUP.

10       TURN TO TX92.

11                      (DISPLAYED ON SCREEN.)

12       DO YOU RECALL THIS DOCUMENT?

13  **A.**  I DO.

14  **Q.**  AND I THINK WHEN YOU WERE ANSWERING QUESTIONS, YOU SAID

15  SOMETHING ABOUT THIS BEING A NOVEMBER 2017 REPORT, THE

16  TECHSHOP REPORT THAT'S BEING REFERENCED THERE?

17  **A.**  YES.

18  **Q.**  CAN YOU CLARIFY WHAT YOU MEANT BY THAT?

19  **A.**  WHEN THE DUE DILIGENCE OF TECHSHOP STARTED, I IMMEDIATELY

20  STARTED AN EXPENSE REPORT ON THE PIRANHA EXPENSE SYSTEM.  THIS

21  EXPENSE REPORT HAD BEEN HANGING OUT THERE FOR MONTHS.

22  **Q.**  SO IS THE EXPENSE REPORT IN CONNECTION WITH YOUR WORK

23  NEGOTIATING WITH TECHSHOP?

24  **A.**  IT WAS JUST THE NAME OF -- THE NAME OF THE REPORT,

25  TECHSHOP, YES.

RASURE - REDIRECT / ROBERTS

```
1   Q.  FOR THE NEGOTIATIONS WITH TECHSHOP, RIGHT?

2   A.  THAT IS CORRECT.

3   Q.  SO YOU ARE REFERRING TO TECHSHOP IN THAT REPORT?

4   A.  CORRECT.

5   Q.  NOT YOUR OWN COMPANY?

6   A.  THAT IS CORRECT.

7   Q.  NOW THERE HAS BEEN A LOT OF FOCUS ON THE LOGO WITH THE

8   GEAR, THE PLAINTIFF'S DEMONSTRATIVE.

9       FOCUSING ON THE ONE AT THE VERY BOTTOM, THESHOP.BUILD,

10  WITH THE LOGO?

11  A.  OKAY.

12  Q.  WHEN DID YOU USE THAT LOGO?

13  A.  I BELIEVE IT WAS USED ON FACEBOOK AND POTENTIALLY THE

14  WEBSITE FROM APPROXIMATELY FEBRUARY 18TH UNTIL THE 21ST.

15  Q.  AND SINCE FEBRUARY 21ST OF 2018, HAS THESHOP.BUILD USED

16  ANY LOGO THAT HAS A GEAR ON IT?

17  A.  NO.

18  Q.  YOU STOPPED ON FEBRUARY 21ST OF 2018?

19  A.  THAT'S CORRECT.

20  Q.  LOOKING BACK AT THE LETTERS THAT YOU RECEIVED ON

21  FEBRUARY 14TH AND FEBRUARY 16TH, PRIOR TO FEBRUARY 16TH OF

22  2018, WHAT WAS YOUR UNDERSTANDING AS TO WHETHER YOU HAD

23  PERMISSION TO USE THE NAME TECHSHOP 2.0, WHETHER YOU WERE

24  ALLOWED TO USE THAT NAME?

25  A.  I BELIEVE I WAS PERMITTED TO USE THAT NAME.
```

1   **Q.**  WHAT WAS THAT UNDERSTANDING BASED ON?

2   **A.**  THE INITIAL AUTHORIZATION ON APPROXIMATELY DECEMBER 1ST,

3   AND THE FACT THAT NOBODY HAD EVER TOLD ME I COULDN'T USE THE

4   NAME OR LOGOS.

5   **Q.**  AND YOU TESTIFIED THAT YOU DID NOT UNDERSTAND THE

6   FEBRUARY 14TH LETTER TO BE TELLING YOU TO STOP USING THAT

7   NAME, RIGHT?

8   **A.**  THAT IS CORRECT.

9   **Q.**  BUT IN ANY EVENT, HOW MANY DAYS AFTER RECEIVING THAT

10  FEBRUARY 14TH LETTER WAS IT BEFORE YOU WERE SUED?

11  **A.**  TWO DAYS.

12  **Q.**  SO THERE WAS ONLY A TWO-DAY LAPSE IN BETWEEN THOSE TWO

13  PIECES OF CORRESPONDENCE?

14  **A.**  THAT IS CORRECT.

15  **Q.**  AND THEN WHEN YOU LEARNED -- YOU SAID YOU LEARNED THAT

16  TECHSHOP OBJECTED TO YOUR USE OF THE NAME TECHSHOP 2.0 ON

17  FEBRUARY 16TH WHEN YOU GOT NOTICE OF THE LAWSUIT, RIGHT?

18  **A.**  THAT IS CORRECT.

19  **Q.**  DID YOU THEN CHANGE THE NAME?

20  **A.**  IMMEDIATELY.

21  **Q.**  DID YOU OPEN A MAKERSPACE UNDER THE NAME TECHSHOP 2.0?

22  **A.**  NO, WE DID NOT.

23  **Q.**  CAN YOU DESCRIBE FOR US, WE -- WHEN I WAS FIRST

24  QUESTIONING YOU, YOU TALKED ABOUT SORT OF THE BIG PICTURE

25  THINGS THAT YOU DID, THE SIGN, THE WEBSITE, THE FACEBOOK

```
 1    GROUPS.

 2         AND YOU TESTIFIED THAT NOT EVERYTHING GOT DONE ON

 3    FEBRUARY 16TH, RIGHT?

 4    A.   THAT IS CORRECT.

 5    Q.   THERE WAS SOME STUFF THAT TRICKLED -- YOU CONTINUED DOING

 6    WORK, RIGHT?

 7    A.   CORRECT.

 8    Q.   COULDN'T GET IT ALL DONE ON THE FIRST DAY?

 9    A.   RIGHT.

10    Q.   HOW DID YOU DECIDE WHAT YOU WERE GOING TO TACKLE FIRST?

11    A.   FIRST THING WAS FACEBOOK PAGE AND WEBSITES.  AND THEN I

12    KNEW THAT THERE WAS A SIGN ON THE OUTSIDE OF THE BUILDING.  SO

13    IT WAS KIND OF JUST A TRIAGE OF BIGGEST THINGS FIRST.

14    Q.   SO YOU GOT NOTICE OF THE LAWSUIT, YOU WANTED TO REACT, YOU

15    WERE IN TRIAGE MODE, SO YOU FOCUSED ON THE BIGGEST THINGS

16    FIRST?

17    A.   CORRECT.

18    Q.   AND THEN THERE WERE SOME THINGS THAT YOU DID SECOND AND

19    THIRD, BUT YOU STARTED THE STEPS TO DO IT AS SOON AS YOU GOT

20    NOTICE OF THE LAWSUIT?

21    A.   IMMEDIATELY.

22    Q.   YOU HAVE NOT OFFERED SERVICES UNDER THE NAME TECHSHOP 2.0

23    SINCE FEBRUARY 16TH OF 2018?

24    A.   THAT IS CORRECT.

25         MS. ROBERTS:  I HAVE NO FURTHER QUESTIONS.
```

1      **THE COURT:**  ANY RECROSS?

2      **MR. PISTORINO:**  NO, YOUR HONOR.

3      **THE COURT:**  ALL RIGHT.  THANK YOU, MR. RASURE.  YOU

4  ARE EXCUSED.

5      AND THE PLAINTIFF -- I AM SORRY, DEFENSE MAY CALL ITS NEXT

6  WITNESS.

7      **MS. ROBERTS:**  THE DEFENDANTS CALL JEREMIAH JOHNSON.

8      **THE CLERK:**  COME UP TO THE WITNESS STAND.

9      (**JEREMIAH JOHNSON,** CALLED AS A WITNESS FOR THE DEFENDANTS,

10  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

11      **THE WITNESS:**  I DO.

12      **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED -- GO

13  AHEAD, HAVE A SEAT.

14      PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE

15  RECORD, PLEASE.

16      **THE WITNESS:**  JEREMIAH JOHNSON.  J-E-R-E-M-I-A-H,

17  J-O-H-N-S-O-N.

18      **THE CLERK:**  THANK YOU.

19      (BINDERS HANDED TO COUNSEL AND WITNESS.)

20                    **DIRECT EXAMINATION**

21  BY MS. ROBERTS:

22  **Q.**  GOOD AFTERNOON.

23  **A.**  HELLO.

24  **Q.**  COULD YOU PLEASE STATE YOUR NAME FOR THE JURY?

25  **A.**  JEREMIAH JOHNSON.

1    **Q.**  WHERE ARE YOU FROM, MR. JOHNSON?

2    **A.**  GARDNER KANSAS, SUBURB OF KANSAS CITY ON THE KANSAS SIDE.

3    **Q.**  WHERE DO YOU CURRENTLY RESIDE?

4    **A.**  DES MOINES, IOWA.

5    **Q.**  DO YOU HAVE A FAMILY?

6    **A.**  I HAVE TWO BOYS, A 12 YEAR OLD AND A 10 YEAR OLD.

7    **Q.**  ARE YOU EMPLOYED BY THESHOP.BUILD?

8    **A.**  YES, I AM.  I WAS EMPLOYED AS THE CONTRACT CFO.

9    **Q.**  WHAT DOES THAT MEAN TO BE THE CONTRACT CFO?

10   **A.**  UNLIKE A REGULAR EMPLOYEE WHERE YOU ARE INTERVIEWED AND

11   HIRED, I WENT THROUGH -- DAN CONTACTED ME AND WE NEGOTIATED A

12   CONTRACT TO BE PAID ONCE A MONTH.

13   **Q.**  AND CFO, THAT'S CHIEF FINANCIAL OFFICER?

14   **A.**  THAT'S CORRECT.

15   **Q.**  AND WHAT ARE YOUR DUTIES AS THE CHIEF FINANCIAL OFFICER OF

16   THESHOP.BUILD?

17   **A.**  REQUIRED TO PREPARE THE MONTHLY FINANCIAL STATEMENTS, THAT

18   INCLUDES THE PROFIT AND LOSS STATEMENTS, THE BALANCE SHEET,

19   PREPARE ALL PAYROLLS, PROCESS THE PAYROLLS, ANY OTHER

20   FINANCIAL DUTIES THAT IS REQUIRED BY THE COMPANY.

21   **Q.**  DO YOU CREATE ALL THE FINANCIAL DOCUMENTS FOR

22   THESHOP.BUILD?

23   **A.**  I DO.

24   **Q.**  BEFORE WE START TALKING MORE ABOUT THESHOP.BUILD, I WOULD

25   LIKE TO TALK A LITTLE BIT ABOUT YOUR BACKGROUND.

1        CAN YOU TELL THE JURY ABOUT YOUR EDUCATION?

2   **A.**  SURE.

3        I HAVE AN ASSOCIATE'S DEGREE IN FINANCE FROM THE COMMUNITY

4   COLLEGE OF THE AIR FORCE, A SECOND ASSOCIATE'S DEGREE IN

5   AVIATION OPERATIONS FROM THE COMMUNITY COLLEGE OF THE AIR

6   FORCE, AND A BACHELOR'S DEGREE FROM GRAND VIEW UNIVERSITY,

7   WHICH WAS A DOUBLE MAJOR IN BUSINESS AND ACCOUNTING.  I

8   GRADUATED WITH HONORS IN 2006.

9   **Q.**  AND I HEARD YOU MENTION THE AIR FORCE.  HAVE YOU SERVED IN

10  THE MILITARY?

11  **A.**  I HAVE.  I JUST COMPLETED 20 YEARS OF TOTAL COMBINED

12  SERVICE IN SEPTEMBER.

13  **Q.**  CAN YOU GIVE THE JURY A SENSE OF YOUR SERVICE?

14  **A.**  SURE.

15       OUT OF HIGH SCHOOL, I SERVED FOUR YEARS OF ACTIVE DUTY.

16  SERVED -- WAS A C-5 LOADMASTER AND SERVED IN DOVER AIR FORCE

17  BASE, DELAWARE ON C-5 GALAXIES.  THEY ARE THE LARGEST CARGO

18  PLANE.  AND WAS IN 42 COUNTRIES IN FOUR YEARS.  HAD OVER 20

19  COMBAT MISSIONS AND 156 COMBAT HOURS UNTIL I SEPARATED FROM

20  ACTIVE DUTY IN MARCH OF 2003.

21  **Q.**  CAN YOU TELL THE JURY, WE WOULD LIKE TO HEAR ABOUT YOUR

22  WORK HISTORY.

23       WHAT WAS YOUR FIRST ACCOUNTING JOB?

24  **A.**  SO IN MARCH 2003, I HAD MET MY WIFE IN DOVER, AT DOVER AIR

25  FORCE BASE.  THOUGHT I WAS DONE WITH THE MILITARY AT THAT TIME

```
 1    AND I MOVED BACK TO DES MOINES.

 2        I HAD STARTED MY ACCOUNTING DEGREE WHILE I WAS ON ACTIVE

 3    DUTY AND USED THE GI BILL TO GO TO SCHOOL AT NIGHT WHILE I

 4    WORKED FULL TIME -- LOWER LEVEL ACCOUNT POSITIONS THAT DIDN'T

 5    REQUIRE A DEGREE.  SO THAT'S WHERE I STARTED AT.

 6    Q.  DID YOU EVENTUALLY GET CERTIFIED?

 7    A.  YEAH.  I GRADUATED, AGAIN, IN 2006, WITH A FOUR-YEAR

 8    DEGREE LIKE I MENTIONED.  AND THE FIRST JOB AFTER GETTING THAT

 9    DEGREE WAS A STAFF ACCOUNTANT ROLE FOR DES MOINES UNIVERSITY,

10    WHICH IS THE MEDICAL SCHOOL.

11        AND THEN I CONTINUED TO PURSUE MY CPA LICENSE FOR THE NEXT

12    TWO YEARS AND EVENTUALLY PASSED THE FOURTH OUT OF FOUR TESTS

13    IN THE SPRING OF 2008, AND CONTINUE TO BE LICENSED AS A CPA

14    TODAY.

15    Q.  AND AFTER RECEIVING YOUR CPA CERTIFICATION, WHAT POSITION

16    DID YOU TAKE?

17    A.  SO AFTER RECEIVING THAT CERTIFICATION, I REALLY WANTED TO

18    HAVE A JOB THAT REQUIRED THAT.  I WAS THEN EMPLOYED BY PANNAR

19    SEED, WHICH IS THE LARGEST SEED COMPANY IN AFRICA.  I WORKED

20    AS THE NORTH AMERICAN ACCOUNTING MANAGER.  THEY HAD SALES IN

21    THE DAKOTAS, MINNESOTA, AND IOWA.

22    Q.  AFTER WORKING AT PANNAR SEED, DID YOU HAVE ANY OTHER

23    ACCOUNTING POSITIONS?

24    A.  I WORKED THERE FOR FIVE YEARS, AND DU PONT PIONEER BOUGHT

25    THE PANNAR SEED COMPANY, THE ENTIRE COMPANY.  AND THEY BROUGHT
```

1   ME IN AS THE INTERNATIONAL FINANCE ANALYST FOR ALL OF LATIN

2   AMERICA.  THAT'S EVERYTHING FROM MEXICO AND ALL THE COUNTRIES

3   IN SOUTH AMERICA.

4       AND MY ROLE THERE WAS TO CONSOLIDATE THE FINANCIAL

5   STATEMENTS ON A MONTHLY BASIS.

6   **Q.**  AFTER WORKING FOR PIONEER INTERNATIONAL FINANCE, WHAT --

7   I'M SORRY, DU PONT PIONEER SEED, WHAT POSITION DID YOU TAKE

8   AFTER THAT?

9   **A.**  I WAS LOOKING FOR A LITTLE MORE WORK/LIFE BALANCE, SO I

10  TOOK A ROLE AS THE CHIEF FINANCIAL OFFICER FOR SPECIAL

11  OLYMPICS OF IOWA.  I WORKED THERE FOR ABOUT TWO AND A HALF

12  YEARS.

13      AND THEN IN JANUARY OF 2018, A COMPANY CALLED LINK

14  ASSOCIATES, WHICH IS ALSO ANOTHER NONPROFIT THAT WORKS WITH

15  INTELLECTUAL DISABLED ADULTS HIRED ME AS THEIR DIRECTOR OF

16  FINANCE, AND THAT'S WHERE I CONTINUE TO WORK FULL TIME TODAY.

17  **Q.**  SO YOU WORK FULL-TIME FOR LINK ASSOCIATES AND ALSO SERVE

18  AS THE CONTRACT CFO FOR THESHOP.BUILD?

19  **A.**  THAT'S CORRECT.

20  **Q.**  HAVE YOU EVER STARTED ANY BUSINESSES OF YOUR OWN?

21  **A.**  I DID.

22      IN 2011, I STARTED J.C. JOHNSON CONSULTING, WHICH IS A...

23  FOCUSES ON TAX AND BOOKKEEPING.  I AM THE ONLY OWNER OF THAT.

24      AND I USUALLY DO BETWEEN FOUR TO 500 PERSONAL AND BUSINESS

25  TAX RETURNS EVERY YEAR.  ADDITIONALLY I HAVE EIGHT TO TEN

JOHNSON - DIRECT / ROBERTS

1    BUSINESSES THAT I SERVE ON AS -- ON CONTRACT WHERE I DO THE

2    BOOKKEEPING, PREPARE FINANCIAL STATEMENTS, AND ANY OTHER

3    FINANCIAL DUTY AS NEEDED.

4    **Q.**  AND WHEN DID YOU START WORKING WITH THESHOP.BUILD?

5    **A.**  DAN CONTACTED ME IN DECEMBER OF 2017.  I THINK IT WAS

6    AROUND THE 10TH OF DECEMBER OF 2017.

7        AND THEN SHORTLY AFTER THAT, I ACCEPTED -- WE COMPLETED

8    THE CONTRACT AND I IMMEDIATELY BEGAN WORKING ON SOME FORECASTS

9    FOR HIM.

10   **Q.**  OKAY.

11       SO I WOULD LIKE TO TAKE A LOOK AT SOME OF THE FINANCIAL

12   DOCUMENTATION FOR THESHOP.BUILD.  LET'S START WITH THE FIRST

13   LOCATION.

14       WHAT WAS THE FIRST LOCATION OPENED BY THESHOP.BUILD?

15   **A.**  THE FIRST LOCATION OPENED WAS THE SAN FRANCISCO LOCATION.

16   **Q.**  AND IT OPENED IN FEBRUARY OF 2018; IS THAT RIGHT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  CAN YOU TURN TO TX1180.

19       DO YOU RECOGNIZE THIS DOCUMENT?

20   **A.**  I DO.

21           **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT.

22           **THE COURT:**  ANY OBJECTION?

23           **MR. PISTORINO:**  I THINK YOUR HONOR HAS ALREADY

24   ADDRESSED IT.  NO.

25           **THE COURT:**  1180 IS ADMITTED.

```
 1                (TRIAL EXHIBIT 1180 RECEIVED IN EVIDENCE.)

 2                        (DISPLAYED ON SCREEN.)

 3     BY MS. ROBERTS:

 4     Q.  CAN YOU EXPLAIN TO THE JURY WHAT TX1180 IS?

 5     A.  THIS IS THE PROFIT AND LOSS STATEMENT FOR THE SAN

 6     FRANCISCO LOCATION FOR THE FULL YEAR OF 2018, TO INCLUDE THE

 7     CALENDAR YEAR JANUARY THROUGH DECEMBER OF 2018.

 8     Q.  DID YOU PREPARE THIS DOCUMENT?

 9     A.  I DID.

10     Q.  WERE MONTHLY PROFIT AND LOSS SHEETS LIKE THIS OFTEN

11     CREATED IN THE ORDINARY COURSE OF BUSINESS FOR THESHOP.BUILD?

12     A.  THEY WERE.

13     Q.  AND YOU SAID YOU PERSONALLY CREATED THIS DOCUMENT?

14     A.  I DID.

15     Q.  AT THE TIME OF ITS CREATION, WOULD YOU HAVE CONFIRMED THE

16     DATA IN THIS DOCUMENT AS ACCURATE?

17     A.  YES.

18     Q.  NOW YOU SAID THAT THIS DOCUMENT SHOWS THE PROFIT AND LOSS

19     FOR THE SAN FRANCISCO LOCATION FROM JANUARY THROUGH DECEMBER

20     OF 2018, RIGHT?

21     A.  THAT'S CORRECT.

22     Q.  CAN YOU EXPLAIN TO THE JURY THE TYPES OF INCOME THAT THIS

23     DOCUMENT INCLUDES?

24     A.  SURE.

25          SO THE INCOME THAT YOU SEE ON HERE STARTS WITH MEMBERSHIP
```

1    INCOME, WHICH REPRESENTS THE MAJORITY OF THE INCOME.  YOU'LL

2    SEE THAT IN THE INDIVIDUAL INCOME LINE, WHICH IS THE SECOND

3    LINE UNDER MEMBERSHIP INCOME.  THAT WILL INCLUDE ALL MONTHLY

4    MEMBERSHIPS, QUARTERLY MEMBERSHIPS, AND ANNUAL MEMBERSHIPS.

5        NOW, QUARTERLY AND ANNUAL MEMBERSHIPS WOULD BE DEFERRED.

6    SO IF YOU PURCHASED A QUARTERLY MEMBERSHIP, YOU WOULD HAVE

7    ONE-THIRD OF THE COST OF THAT MEMBERSHIP INCLUDED IN EACH

8    MONTH.  IF YOU BOUGHT AN ANNUAL MEMBERSHIP, YOU WOULD SEE

9    ONE-TWELFTH OF THAT BROUGHT IN EACH MONTH AFTER THE MONTH OF

10   PURCHASE.

11       BELOW THAT YOU SEE CORPORATE INCOME.  THE CORPORATE INCOME

12   IS GOING TO BE WHEN COMPANIES SUCH AS AMAZON, GOOGLE, ET

13   CETERA PURCHASE CORPORATE MEMBERSHIPS FOR THEIR EMPLOYEES AS

14   AN INCENTIVE FOR THEIR EMPLOYMENT.

15       BELOW THAT YOU SEE A THREE-YEAR SPECIAL MEMBERSHIP.  THIS

16   WAS A NEW -- A SPECIAL TYPE OF MEMBERSHIP THAT DAN CREATED FOR

17   MEMBERS OF TECHSHOP THAT HAD BOUGHT LIFETIME MEMBERSHIPS.  HE

18   WANTED TO DO SOMETHING SPECIAL FOR THEM SO HE, FOR $500, THEY

19   COULD HAVE A THREE-YEAR MEMBERSHIP.  THAT REVENUE WOULD BE

20   DEFERRED OVER THREE YEARS OR ONE-THIRTY-SIXTH OF THAT INCOME

21   WOULD BE INCLUDED IN EACH MONTH.

22       BELOW THAT YOU SEE EDUCATION INCOME FOR THE CLASSES THAT

23   WERE HELD AT THE LOCATION.

24       FURTHER DOWN YOU WILL SEE LOCKER OR STORAGE INCOME, AND

25   THEN SERVICE INCOME FOR WHEN MEMBERS PAID FOR TIME ON

1    DIFFERENT TYPES OF EQUIPMENT.

2        AND THEN SOME EVENT INCOME AND OFFICE RENTAL INCOME BELOW.

3    **Q.**  NOW, CAN YOU EXPLAIN TO THE JURY THE SOURCE OF THE

4    INFORMATION THAT YOU USED TO PREPARE THE INCOME CALCULATIONS

5    IN A DOCUMENT LIKE TX1180?

6    **A.**  SURE.

7        THE MAIN DOCUMENT, AND THAT WAS BECAUSE MOST MEMBERSHIPS

8    WERE PAID WITH A CREDIT CARD AND THAT'S BECAUSE WE NEEDED TO

9    HAVE RE-OCCURRING -- WHEN THEY SIGNED UP, THEY WOULD HAVE

10   RE-OCCURRING CHARGES, SO MOST -- MOST OF THE MEMBERSHIPS WAS

11   DONE WITH A CREDIT CARD.

12       SO I WOULD UTILIZE THE MERCHANT STATEMENT, AND THEN ALSO

13   THE BANK STATEMENT TO TIE OUT THOSE MERCHANT DEPOSITS TO THE

14   BANK STATEMENT.  THIS WAS TO MAKE SURE THAT MERCHANT -- ALL

15   REVENUE WAS INCLUDED.  AND ALL BANK STATEMENTS WERE RECONCILED

16   TO THE FINANCIALS INTO THE BALANCE SHEET.

17   **Q.**  SO YOU USED THE CREDIT CARD PAYMENT INFORMATION AND THEN

18   BANK STATEMENT INFORMATION FOR -- TO GET THE DATA FOR INCOME?

19   **A.**  THAT'S CORRECT.

20   **Q.**  WHAT ABOUT EXPENDITURES; HOW DOES THE PROFIT AND LOSS

21   STATEMENT CATEGORIZE THEM?

22   **A.**  SO BELOW THE REVENUE, YOU'LL SEE THE DIFFERENT TYPES OF

23   EXPENSES.  THESE ARE NORMAL TRADITIONAL EXPENSES THAT YOU

24   PROBABLY SEE WITH MOST ANY COMPANY.

25       SO, YOU HAVE, YOU KNOW, YOUR PAYROLL EXPENSES, YOUR

1    CONTRACTS, YOUR PROFESSIONAL AND CONSULTING SERVICES, YOUR

2    FACILITY EXPENSE TO INCLUDE RENT, UTILITIES, ET CETERA.

3    INSURANCE, MARKETING, ADVERTISING, EQUIPMENT, EQUIPMENT

4    REPAIR, AND THEN YOUR TRAVEL AND ENTERTAINMENT.

5        THAT MAKES UP MOST OF THE LINE ITEMS YOU SEE IN THE

6    EXPENSES THAT ARE BELOW.

7    **Q.**  AND DO THESE NUMBERS REPRESENT ACTUAL EXPENDITURES?

8    **A.**  THEY DO.

9    **Q.**  IF YOU LOOK IN THE TOP LEFT-HAND CORNER OF THE DOCUMENT,

10   UNDERNEATH THERE THERE IS A DATE.

11       IT SAYS "ACCRUAL BASIS".  WHAT DOES THAT MEAN?

12   **A.**  ACCRUAL BASIS IS A, IS A TYPE OF ACCOUNTING WHERE YOU --

13   IT'S REQUIRED UNDER GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

14   WHERE YOU WOULD RECOGNIZE ANY REVENUE THAT WAS EARNED IN THE

15   APPROPRIATE PERIOD AND ALSO REPRESENT ANY EXPENSES THAT WERE

16   INCURRED IN THE APPROPRIATE EXPENSE.

17           **MR. PISTORINO:**  OBJECTION, YOUR HONOR.

18           **THE COURT:**  WHAT IS THE OBJECTION?

19           **MR. PISTORINO:**  APPEARS TO BE OFFERING AS FACT

20   TESTIMONY.

21           **THE COURT:**  OVERRULED.

22   **BY MS. ROBERTS:**

23   **Q.**  SO IS THE ACCRUAL BASIS, IS THAT A TYPICAL WAY OF

24   CALCULATING EXPENSES?

25   **A.**  IT IS, AND IT'S HOW MOST LARGER -- MID TO LARGER

JOHNSON - DIRECT / ROBERTS

```
1    BUSINESSES ACTUALLY DO THEIR ACCOUNTING IS ON ACCRUAL BASIS.
2    Q.  WHAT ARE THE SOURCES THAT YOU USED TO DETERMINE THE
3    EXPENDITURES?
4    A.  ALL THE EXPENSES WOULD HAVE CAME THROUGH THE BANK
5    STATEMENT AND/OR CREDIT CARD STATEMENTS.
6    Q.  CAN YOU TURN TO THE LAST PAGE OF THIS EXHIBIT.
7        TAKE A LOOK AT THE LAST LINE THAT SAYS "NET INCOME".
8    A.  OKAY.
9    Q.  WHAT DOES THAT MEAN?
10   A.  THE NET INCOME IS THE REMAINING AMOUNT AFTER YOU TAKE THE
11   TOTAL EXPENSES, AND TAKE THAT AWAY FROM YOUR TOTAL REVENUES.
12   Q.  IF YOU LOOK AT THE FIRST COLUMN ON THE NET INCOME LINE FOR
13   JANUARY OF 2018, DOES THE DOCUMENT SHOW REVENUE FOR THAT MONTH
14   FOR THE SAN FRANCISCO LOCATION?
15   A.  NO.  FOR JANUARY --
16   Q.  I'M SORRY, NET INCOME?
17   A.  JANUARY OF 2018, THERE WAS A LOSS OF $3,394.
18   Q.  WHAT DOES IT SHOWS FOR FEBRUARY OF 2018?
19   A.  FOR FEBRUARY IT SHOWS A LOSS OF $3,108.
20   Q.  WHAT IS THE FIRST MONTH THAT SHOWS A PROFIT FOR THE SAN
21   FRANCISCO LOCATION IN 2018?
22   A.  THE FIRST MONTH THAT YOU WOULD SEE A PROFIT WOULD BE JULY
23   OF 2018.  IT WAS A SMALL PROFIT OF $7,717.
24   Q.  IF YOU LOOK ALL THE WAY INTO THE FAR RIGHT COLUMN
25   UNDERNEATH TOTAL AND THE NET INCOME LINE, WHAT DOES THAT ENTRY
```

1    TELL YOU?

2    **A.**  THIS SHOWS FOR THE FULL YEAR OF 2018, THE SAN FRANCISCO

3    LOCATION HAD A LOSS OF $2,265.

4    **Q.**  SO FOR 2018, DID THE SAN FRANCISCO LOCATION OF

5    THESHOP.BUILD SHOW AN OVERALL PROFIT?

6    **A.**  NO.  THEY SHOWED A LOSS.

7    **Q.**  NOW TAKE A LOOK AT TX1203.

8            **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT THIS

9    EXHIBIT.

10           **THE COURT:**  IS THIS ONE OF THE ONES DISCUSSED

11   EARLIER?

12           **MS. ROBERTS:**  YES.

13           **THE COURT:**  1203 IS ADMITTED.

14           (TRIAL EXHIBIT 1203 RECEIVED IN EVIDENCE.)

15           **THE WITNESS:**  OKAY.

16                  (DISPLAYED ON SCREEN.)

17   **BY MS. ROBERTS:**

18   **Q.**  CAN YOU TELL US WHAT THIS DOCUMENT IS?

19   **A.**  THIS SHOWS THE PROFIT AND LOSS IN THE SAME MANNER FOR THE

20   FOUR MONTHS OF 2019 ENDING APRIL 30TH, 2019.

21   **Q.**  AND WAS THIS DOCUMENT CREATED UNDER THE SAME CONDITIONS AS

22   THE PROFIT AND LOSS STATEMENT THAT WE JUST LOOKED AT?

23   **A.**  IT WAS.

24   **Q.**  IN TERMS OF THE DIFFERENCES BETWEEN THE TWO, IS THIS JUST

25   A LATER FOUR-MONTH PERIOD?

1    **A.**  THAT'S CORRECT.

2    **Q.**  IF YOU TURN TO THE LAST PAGE, LAST LINE, SAYS "NET

3    INCOME".

4       ARE YOU THERE?

5    **A.**  YES.

6    **Q.**  DOES THAT HAVE THE SAME MEANING AS THE NET INCOME ENTRIES

7    THAT WE WERE JUST LOOKING AT IN THE PRIOR EXHIBIT?

8    **A.**  IT DOES.

9    **Q.**  WHAT ARE THESHOP.BUILD'S PROFITS FOR THE SAN FRANCISCO

10   LOCATION FOR 2019 THROUGH APRIL 30TH OF 2019?

11   **A.**  FOR THE FOUR MONTHS END APRIL 30TH, 2019, THERE WAS A LOSS

12   OF $61,320.

13   **Q.**  THE JURY HAS HEARD THAT THE -- THERE IS ANOTHER LOCATION

14   OF THESHOP.BUILD IN SAN JOSE, CORRECT?

15   **A.**  THERE IS ONE OTHER LOCATION, YES.

16   **Q.**  CAN YOU TURN TO TX1194?

17       **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT THIS

18   EXHIBIT.

19       **THE COURT:**  ADMITTED.

20       (TRIAL EXHIBIT 1194 RECEIVED IN EVIDENCE.)

21           (DISPLAYED ON SCREEN.)

22   **BY MS. ROBERTS:**

23   **Q.**  DO YOU RECOGNIZE THIS DOCUMENT?

24   **A.**  I DO.

25   **Q.**  CAN YOU TELL THE JURY WHAT THIS DOCUMENT IS?

1    **A.**  THIS DOCUMENT IS THE PROFIT AND LOSS STATEMENT FOR THE

2    SECOND LOCATION OPENED IN 2018, THE SAN JOSE LOCATION.  THIS

3    IS A FULL YEAR PROFIT AND LOSS STATEMENT FOR 2018 ENDING

4    DECEMBER 31ST, 2018.

5    **Q.**  AND YOU SAID THAT THIS IS A FULL YEAR PROFIT AND LOSS

6    STATEMENT, BUT THE SAN JOSE LOCATION WAS NOT OPEN FOR THE

7    ENTIRE YEAR OF 2018, RIGHT?

8    **A.**  NO.  IT OPENED IN JUNE.

9    **Q.**  WAS THIS REPORT CREATED UNDER THE SAME CONDITIONS AS THE

10    OTHER PROFIT AND LOSS STATEMENTS WE'VE SEEN?

11    **A.**  YES.

12    **Q.**  AND IF YOU TURN TO THE SECOND PAGE OF TX1194, UNDER NET

13    INCOME?

14    **A.**  OKAY.

15    **Q.**  CAN YOU TELL US WHAT IS THE NET INCOME FOR THE SAN JOSE

16    LOCATION FOR THE YEAR 2018?

17    **A.**  FOR THE FULL YEAR ENDING DECEMBER 2018, THE SAN JOSE

18    LOCATION HAD A LOSS OF $178,062.

19    **Q.**  CAN YOU TURN TO TX1204?

20            **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

21            **THE COURT:**  1204 IS ADMITTED.

22         (TRIAL EXHIBIT 1204 RECEIVED IN EVIDENCE.)

23            (DISPLAYED ON SCREEN.)

24    **BY MS. ROBERTS:**

25    **Q.**  CAN YOU EXPLAIN TO THE JURY WHAT THIS DOCUMENT IS?

JOHNSON – DIRECT / ROBERTS

1    **A.**  THIS IS THE 2019 FINANCIAL PROFIT AND LOSS STATEMENT FOR

2    THE FOUR MONTHS ENDING APRIL 30TH, 2019 FOR THE SAN JOSE

3    LOCATION.

4    **Q.**  WAS THIS CREATED UNDER THE SAME CONDITIONS AS THE OTHER

5    PROFIT AND LOSS STATEMENTS WE'VE SEEN?

6    **A.**  IT WAS.

7    **Q.**  BASED ON THIS DOCUMENT, DO YOU SEE THE SAN JOSE LOCATION

8    OF THESHOP.BUILD SHOWING A PROFIT?

9    **A.**  NO.

10   **Q.**  AND TO FIND THAT, DO YOU LOOK ON THE SECOND PAGE ON THE

11   NET INCOME LINE UNDER TOTAL?

12   **A.**  THAT'S CORRECT.

13   **Q.**  I WOULD LIKE YOU TO TAKE A LOOK AT THE RENT PAYMENTS LINE

14   ON THE FIRST PAGE.

15   **A.**  OKAY.

16   **Q.**  ARE YOU THERE?

17   **A.**  YES.

18   **Q.**  IS THE RENT BEING SHOWN THERE RENT THAT HAS ACTUALLY BEEN

19   PAID?

20   **A.**  THE RENT ON THIS LINE ITEM WAS PAID THROUGH JANUARY, AND

21   THEN AFTER JANUARY IT WAS BILLED BUT YET TO BE PAID.

22   **Q.**  SO WHY DID YOU INCLUDE THESE RENT EXPENSES THAT HAVE NOT

23   YET BEEN PAID IN THE PROFIT AND LOSS STATEMENT?

24   **A.**  BECAUSE THIS IS, AS MENTIONED BEFORE, THIS IS ACCRUAL

25   BASIS ACCOUNTING, AND THAT REQUIRES YOU TO RECORD ANY EXPENSES

1    THAT HAVE BEEN INCURRED BUT NOT YET PAID IN THE APPROPRIATE

2    PERIOD.

3        THIS WOULD BE MUCH LIKE YOUR MORTGAGE STATEMENT THAT YOU

4    WOULD HAVE PERSONALLY.  YOU STILL HAVE THAT EXPENSE THAT MONTH

5    WHETHER YOU PAID THAT OR NOT.  YOU WOULD RECORD THAT IN THE

6    APPROPRIATE MONTH AS AN EXPENSE FOR THAT MONTH.

7    **Q.**  ALL RIGHT.  CAN YOU TURN TO TX1200.

8            **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

9            **THE COURT:**  1200 IS ADMITTED.

10           (TRIAL EXHIBIT 1200 RECEIVED IN EVIDENCE.)

11                   (DISPLAYED ON SCREEN.)

12           **THE WITNESS:**  OKAY.

13   **BY MS. ROBERTS:**

14   **Q.**  CAN YOU TELL US WHAT THIS DOCUMENT IS?

15   **A.**  THIS DOCUMENT IS THE DETAILED EXPENSE TRANSACTION DETAIL

16   FOR THE SAN FRANCISCO LOCATION FOR CALENDAR YEAR 2018.  THIS

17   SHOWS ALL THE DETAIL FOR EACH EXPENSE TO INCLUDE THE DATE, THE

18   DESCRIPTION, AND THE AMOUNT.

19   **Q.**  DID YOU CREATE THIS DOCUMENT?

20   **A.**  I DID.

21   **Q.**  DID YOU CONFIRM THE ACCURACY OF THE DOCUMENT?

22   **A.**  I DID.

23   **Q.**  WAS IT CREATED IN THE ORDINARY COURSE OF BUSINESS?

24   **A.**  YES.

25   **Q.**  DOES THIS DOCUMENT SHOW ONLY ACTUAL PAID EXPENDITURES?

1    **A.**   IT DOES FOR ALL OF SAN FRANCISCO FOR 2018, YES.

2    **Q.**   AND HOW DO YOU COLLECT AND ORGANIZE THE INFORMATION THAT'S

3    IN THIS TRANSACTION DETAIL BY ACCOUNT DOCUMENT?

4    **A.**   SO ALL THESE EXPENSES EITHER HIT THE BANK ACCOUNTS OR THE

5    CREDIT CARD STATEMENTS OF THE COMPANY.

6    **Q.**   TO THE BEST OF YOUR KNOWLEDGE IS THIS DOCUMENT COMPLETE

7    AND ACCURATE?

8    **A.**   YES.

9    **Q.**   CAN YOU TURN TO TX1205?

10              **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

11              **THE COURT:**  1205 IS ADMITTED.

12            (TRIAL EXHIBIT 1205 RECEIVED IN EVIDENCE.)

13                      (DISPLAYED ON SCREEN.)

14    **BY MS. ROBERTS:**

15    **Q.**   CAN YOU EXPLAIN WHAT THIS DOCUMENT IS?

16    **A.**   THIS IS A SIMILAR REPORT.  WELL, THE SAME REPORT FOR THE

17    MONTHS JANUARY THROUGH APRIL 2019.  IT SHOWS THE DETAIL OF ALL

18    EXPENSES THAT HAD EACH EXPENSE ACCOUNT FOR THE FOUR MONTHS OF

19    2019.

20    **Q.**   WAS THIS DOCUMENT ALSO CREATED AND CHECKED FOR ACCURACY?

21    **A.**   IT WAS.

22    **Q.**   CAN YOU TURN TO TX1195.

23              **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

24              **THE COURT:**  1195 IS ADMITTED.

25            (TRIAL EXHIBIT 1195 RECEIVED IN EVIDENCE.)

1          (DISPLAYED ON SCREEN.)

2    **BY MS. ROBERTS:**

3    **Q.**  CAN YOU EXPLAIN WHAT THIS DOCUMENT IS, MR. JOHNSON?

4    **A.**  THIS IS THE SAN JOSE LOCATION.  AGAIN, THE DETAIL EXPENSE

5    REPORT, TRANSACTION DETAIL FOR ACCOUNT FOR ALL EXPENSE

6    ACCOUNTS FOR THE YEAR ENDING DECEMBER 2018.

7    **Q.**  WAS THIS DOCUMENT CREATED IN THE SAME MANNER THAT YOU

8    DESCRIBED WITH RESPECT TO THE TRANSACTION DETAIL BY ACCOUNT

9    DOCUMENTS FOR THE SAN FRANCISCO LOCATION?

10   **A.**  IT WAS.

11   **Q.**  WAS IT CHECKED FOR ACCURACY?

12   **A.**  YES.

13   **Q.**  CAN YOU TURN TO TX1206?

14          **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

15          **THE COURT:**  1206 IS ADMITTED.

16          (TRIAL EXHIBIT 1206 RECEIVED IN EVIDENCE.)

17               (DISPLAYED ON SCREEN.)

18   **BY MS. ROBERTS:**

19   **Q.**  MR. JOHNSON, CAN YOU EXPLAIN WHAT THIS DOCUMENT IS?

20   **A.**  THIS IS THE -- AGAIN, THE TRANSACTION DETAIL BY ACCOUNT

21   FOR EACH EXPENSE ACCOUNT FOR THE SAN JOSE LOCATION FOR THE

22   FOUR MONTHS ENDING APRIL 30TH, 2019.

23   **Q.**  AND WAS THIS DOCUMENT CREATED AND CHECKED FOR ACCURACY

24   LIKE THE OTHER TRANSACTION DETAIL REPORTS?

25   **A.**  YES.

1    **Q.**  DOES THIS TRANSACTION DETAIL BY ACCOUNT REPORT THAT'S

2    TX1206 INCLUDE ENTRIES THAT HAVE NOT YET BEEN PAID?

3    **A.**  FOR THE SAN JOSE LOCATION, NO.

4    **Q.**  ARE THE RENT PAYMENTS THAT WE WERE JUST DISCUSSING IN

5    CONNECTION WITH THE PROFIT AND LOSS, WOULD THEY BE REFLECTED

6    IN THIS ONE?

7    **A.**  SORRY.  FOR THE SAN JOSE LOCATION, THOSE RENTS WERE ALSO

8    INCLUDED.  BECAUSE, AGAIN, IF YOU NOTICE, THE ACCRUAL BASIS UP

9    HERE, SO THOSE RENTS WERE THE ONLY THING THAT WERE NOT PAID

10   AND WERE STILL SITTING IN THE BALANCE SHEET AS ACCOUNTS

11   PAYABLE.

12   **Q.**  AND THOSE, JUST TO BE CLEAR, THE RENTS WE ARE REFERRING TO

13   WITH RESPECT TO TX1206, THOSE ARE THE SAME MONTHS OF RENT THAT

14   WE WERE TALKING ABOUT WHEN WE WERE TALKING ABOUT THE PROFIT

15   AND LOSS STATEMENT, RIGHT?

16   **A.**  THAT'S CORRECT.

17   **Q.**  CIRCLING BACK TO WHEN YOU FIRST JOINED MR. RASURE'S

18   ORGANIZATION, I THINK YOU SAID YOU STARTED IN EARLY TO

19   MID-DECEMBER; IS THAT RIGHT?

20   **A.**  THAT'S CORRECT.

21   **Q.**  I THINK YOU SAID YOU GOT STARTED WITH FORECASTS?

22   **A.**  THAT'S CORRECT.

23   **Q.**  SO THAT WE ARE ALL ON THE SAME PAGE, WHAT DOES IT MEAN TO

24   CREATE A FORECAST?

25   **A.**  FORECASTS ARE COMMONLY USED TOOLS PREPARED BY ACCOUNTANTS

1    OR FINANCE PERSONNEL IN THE COMPANY TO PROJECT WHAT COULD

2    HAPPEN IF CERTAIN OTHER EVENTS HAPPEN WHEN IT COMES TO

3    REVENUES OR EXPENSES.

4        IF YOU HAD THIS MUCH SALES AND YOU HAD THIS MUCH EXPENSES,

5    PRESUMABLY OVER A 12-MONTH PERIOD, THIS IS WHAT YOUR OUTCOME

6    COULD BE.

7    **Q.**  SO THEY ARE PREDICTIONS OR ESTIMATES?

8    **A.**  THAT'S CORRECT.

9    **Q.**  AND SO YOU SAID YOU CREATED FORECASTS ALMOST IMMEDIATELY

10   WHEN YOU JOINED MR. RASURE'S COMPANY, CORRECT?

11   **A.**  THAT'S CORRECT.

12   **Q.**  SO DECEMBER 2017?

13   **A.**  YEAH.  I THINK HE CONTACTED ME ON THE 9TH, AND BY THE

14   10TH, WE WERE WORKING ON FORECASTS.

15   **Q.**  WHAT INFORMATION WERE THOSE EARLY FORECASTS THAT YOU

16   CREATED IN DECEMBER OF 2017 BASED ON?

17   **A.**  SO THE FORECASTS WERE BASED ON THE FINANCIAL -- THE SAME

18   FINANCIAL ACCOUNTS THAT WE RECEIVED FROM TECHSHOP, BUT THEN WE

19   COMPLETELY WENT LINE BY LINE AND PUT THOUGHT INTO EACH ACCOUNT

20   TO DETERMINE WHAT KIND OF EXPENSES WE THOUGHT WE WOULD INCUR

21   IF WE OPENED A LOCATION IN THE SAME MANNER.

22       AND, AGAIN, WE LOOKED AT THE REVENUE THAT WAS DETERMINED

23   BY THE AMOUNT OF MEMBERSHIPS THAT WE THOUGHT WE COULD SELL AT

24   EACH LOCATION OVER A CERTAIN PERIOD OF TIME.

25   **Q.**  AND I THINK YOU SAID EARLIER THAT YOU MADE CHANGES TO

1    CERTAIN VARIABLES; IS THAT RIGHT?

2    **A.**  THAT'S CORRECT.

3    **Q.**  CAN YOU PROVIDE SORT OF AN EXAMPLE OF WHAT YOU MEAN BY

4    THAT?

5    **A.**  FOR INSTANCE, AT THE SAN FRANCISCO LOCATION, THE PRIOR --

6    THE TECHSHOP COMPANY WAS INCURRING ABOUT $7,000 A MONTH IN

7    TRASH EXPENSE.  WE FORECASTED THAT TO BE AROUND 1,000 A MONTH,

8    AND THEN IN THE ACTUAL EXPENSE CAME IN AROUND 1200 A MONTH.

9       SO THAT'S HOW -- IT WOULD DIFFERENT FROM THE NUMBERS THAT

10   WE HAD RECEIVED WHEN WE RECEIVED THEIR FINANCIAL STATEMENTS.

11   **Q.**  NOW CAN YOU LOOK AT TX93, WHICH IS ADMITTED.

12                   (DISPLAYED ON SCREEN.)

13   **A.**  OKAY.

14   **Q.**  DO YOU RECOGNIZE THIS EXHIBIT?

15   **A.**  I DO.

16   **Q.**  AND IT IS A VERY LARGE EXHIBIT.  CAN YOU TELL THE JURY

17   WHAT IT IS?

18   **A.**  SO FOR THIS, THIS EXHIBIT, THIS IS THE FORECAST, THE

19   ORIGINAL FORECAST.  WE DID SEVERAL DIFFERENT OPTIONS.  THIS IS

20   THE FIRST OF MANY OPTIONS.

21      THIS IS THE CONSOLIDATED FORECAST THAT WOULD TAKE ANY

22   OTHER LOCATIONS AND CONSOLIDATE THESE INTO ONE SET OF

23   FORECASTS OR PROFIT AND LOSS STATEMENT.

24   **Q.**  AND SO JUST -- YOU USED THE TERM "CONSOLIDATED".  WHEN YOU

25   REFER TO A CONSOLIDATED FORECAST, WHAT DO YOU MEAN?

1    **A.**  SO EACH LOCATION WOULD HAVE ITS OWN FORECAST AND THEN THE

2    CONSOLIDATED FORECAST WOULD ADD THOSE -- COMBINE THOSE INTO

3    ONE REPORT.

4         SO IF YOU HAD REVENUE AT EACH LOCATION, YOU WOULD ADD ALL

5    THOSE UP TO ONE LINE ITEM BY EACH TYPE AND THE SAME FOR

6    EXPENSES.

7    **Q.**  IN THE FORECASTS THAT YOU CREATED IN DECEMBER OF 2017, DID

8    YOU INCLUDE MULTIPLE LOCATIONS?

9    **A.**  YEAH.  WE INCLUDED FIVE LOCATIONS.  AND AT LEAST FIVE

10   LOCATIONS IN ALL THE FORECASTS THAT WERE PREPARED IN DECEMBER.

11   **Q.**  AND AT THE TIME YOU WERE PREPARING THEM, DID YOU KNOW AT

12   THE TIME -- HOW MANY SHOPS WOULD END UP BEING OPENED IN THOSE

13   LOCATIONS?

14   **A.**  WE DID NOT.

15   **Q.**  ULTIMATELY DID YOU PREPARE FORECASTS FOR LOCATIONS THAT

16   DID NOT GET OPENED?

17   **A.**  YES.

18        AGAIN, THIS INCLUDED FIVE LOCATIONS.  I BELIEVE IT WAS

19   DETROIT, CHANDLER, ARIZONA, AUSTIN ROUND ROCK, WASHINGTON,

20   D.C., AND SAN FRANCISCO.  SO FIVE LOCATIONS AND ONLY THE SAN

21   FRANCISCO LOCATION WAS OPENED.

22   **Q.**  AND SO -- BUT THE NUMBERS IN THE CONSOLIDATED FORECASTS

23   WOULD INCLUDE ALL OF THESE OTHER LOCATIONS?

24   **A.**  YES.  THIS FORECAST WOULD INCLUDE THE TOTAL OF ALL

25   THOSE -- YOU KNOW, IF ALL LOCATIONS WERE OPENED, THIS IS WHAT

 1    WE PERCEIVED TO HAVE -- TO OCCUR AT THAT TIME.

 2    **Q.**  AND ARE YOU ABLE TO CONFIRM THE ACCURACY OF THE NUMBERS IN

 3    THE FORECASTS?

 4    **A.**  WELL, A FORECAST IS NEVER ACCURATE, BUT AS LONG AS YOUR

 5    FORMULAS AND VARIABLES THAT YOU PUT INTO IT ARE ACCURATE, THEN

 6    THE FORECAST IS ACCURATE BASED ON THE PARAMETERS THAT YOU PUT

 7    ON IT.  BUT, I MEAN, A FORECAST IS JUST THAT, IT'S A FORECAST.

 8    **Q.**  CAN YOU TURN TO PAGE -- I KNOW IT IS A VOLUMINOUS EXHIBIT,

 9    THE PAGE THAT HAS THE NUMBER 19481.

10                    (DISPLAYED ON SCREEN.)

11            **THE CLERK:**  YOU ARE STILL ON 93?

12            **MS. ROBERTS:**  YEAH.

13    **BY MS. ROBERTS:**

14    **Q.**  ARE YOU THERE?

15        WHAT DOES THIS PAGE SHOW?

16    **A.**  THIS IS THE BOTTOM LINE.  SO THE NET INCOME LINE ITEM FOR

17    THE CONSOLIDATED FORECAST FOR ALL LOCATIONS JUST SHOWS THE NET

18    INCOME OR LOSS.

19    **Q.**  AND THIS PARTICULAR CONSOLIDATED INCOME FORECAST, WHAT WAS

20    THE CONCLUSION?

21    **A.**  BASED ON FIVE LOCATIONS OPENING AT THE BEGINNING OF

22    JANUARY OF 2018, THIS FORECAST SHOWS A PROFIT OF 2,700,000.

23    **Q.**  AND I THINK YOU TESTIFIED EARLIER THAT YOU CHANGED

24    VARIABLES AND CAME UP WITH DIFFERENT OPTIONS; IS THAT RIGHT?

25    **A.**  YES.  I AT LEAST DID THREE DIFFERENT OPTIONS -- THREE

1    DIFFERENT FORECASTS BASED ON DIFFERENT PARAMETERS THAT WERE --

2    THAT WERE -- OR A DIFFERENT SET OF FACTS THAT WERE PUT INTO

3    PLACE, SO DIFFERENT WHAT IFS.

4    **Q.**  ON THE PAGE WE WERE JUST LOOKING AT, THAT IS A

5    CONSOLIDATED NUMBER FOR THE FIVE LOCATIONS?

6    **A.**  IT IS.

7    **Q.**  CAN YOU TURN TO THE PAGE THAT IS 19482?

8                        (DISPLAYED ON SCREEN.)

9        WHAT IS THIS?

10   **A.**  THIS IS ONE OF THE INDIVIDUAL LOCATIONS.  AND TO BE

11   PRECISE, THIS IS A FORECAST FOR THE DETROIT LOCATION ONLY.

12   THAT WOULD HAVE BEEN INCLUDED IN THE CONSOLIDATED FORECAST.

13   **Q.**  CAN YOU TURN TO PAGE 19524?

14                       (DISPLAYED ON SCREEN.)

15   **A.**  OKAY.

16   **Q.**  WHAT IS THIS?

17   **A.**  THIS IS ANOTHER -- THIS IS ANOTHER CONSOLIDATED FINANCIAL

18   INCOME STATEMENT WITH A DIFFERENT OPTION.  I THINK THIS WAS

19   MAYBE OPTION TWO.  THE FIRST ONE WE LOOKED AT WAS OPTION ONE.

20       BUT, AGAIN, THIS IS A CONSOLIDATED INCOME STATEMENT FOR A

21   FORECAST.

22   **Q.**  AND, AGAIN, THIS WAS FOR ALL FIVE LOCATIONS?

23   **A.**  THIS DID INCLUDE FIVE LOCATIONS, THAT'S CORRECT.

24   **Q.**  IF YOU TURN TO PAGE 19527.

25                       (DISPLAYED ON SCREEN.)

JOHNSON – DIRECT / ROBERTS

1        IS THAT THE LAST PAGE OF THIS PARTICULAR INCOME STATEMENT?

2        OH, NO.

3    **A.**   NO.

4    **Q.**   SORRY.  19 -- LET'S TURN TO 19535.

5                         (DISPLAYED ON SCREEN.)

6        ALL RIGHT.  TELL US WHAT THAT PAGE REFLECTS.

7    **A.**   THIS SHOWS THE NET INCOME FOR OPTION TWO.

8        OPTION TWO HAD ABOUT 50 PERCENT OF THE SALES AS THE DRIVER

9    THAN OPTION ONE, AND THIS SHOWS A NET INCOME OF $1,099,477.

10   **Q.**   AND THIS FOR THE SAME GROUP OF LOCATIONS FOR WHICH WE SAW

11   A FORECAST OF 2.7 MILLION?

12   **A.**   IT IS.

13   **Q.**   WHAT IS THE REASON FOR THE DIFFERENCE?

14   **A.**   I BELIEVE OPTION TWO TOOK INTO ACCOUNT IF WE ONLY SOLD

15   50 PERCENT OF THE MEMBERSHIPS THAT WE DID IN OPTION ONE.  AND

16   SO THAT WAS PROBABLY THE MAIN DIFFERENCE THAT CAUSED A

17   DIFFERENT FINAL OUTPUT.

18   **Q.**   AND YOU SAID THE CONSOLIDATED FORECASTS INCLUDED FIVE

19   LOCATIONS, RIGHT?

20   **A.**   YES.

21   **Q.**   INCLUDING THE SAN FRANCISCO LOCATION?

22   **A.**   YES.

23   **Q.**   WAS THERE ANYTHING UNIQUE ABOUT ANY OF THE OTHER LOCATIONS

24   THAT IMPACTED THEIR FORECASTS?

25   **A.**   EACH LOCATION HAD, YOU KNOW, SPECIAL CONTRACTS THAT WOULD

1    HAVE BEEN PUT INTO PLACE WITH DIFFERENT COMPANIES.

2         FOR INSTANCE, I BELIEVE THE AUSTIN LOCATION WAS

3    FORECASTING A CONTRACT WITH THE SAMSUNG COMPANY, AND DETROIT,

4    ARIZONA, ALL THOSE OTHER LOCATIONS, ALMOST ALL OF THEM HAD AT

5    LEAST ONE MAJOR CONTRACT THAT WOULD SIGNIFICANTLY INCREASE

6    REVENUE.

7    **Q.**   AND OVERALL, IN THE FORECAST THAT YOU PREPARED IN DECEMBER

8    OF 2017, WHICH ARE TX93, WERE YOU ESTIMATING PROFITS?

9    **A.**   SORRY.  SAY THAT AGAIN?

10   **Q.**   WE CAN GO ONE BY ONE, BUT OVERALL, DO YOU RECALL WHETHER

11   THERE WAS AN ESTIMATE OF PROFITS?

12   **A.**   FOR THE CONSOLIDATED, ON THE CONSOLIDATED LEVEL?

13   **Q.**   YES.

14   **A.**   YEAH, WE ESTIMATED THAT THERE WOULD BE PROFITS, YES.

15   **Q.**   IF YOU CAN TURN TO DR19711.

16             **THE CLERK:**  THAT IS THE PAGE NUMBER, RIGHT?

17             **MS. ROBERTS:**  YES.

18                        (DISPLAYED ON SCREEN.)

19   **BY MS. ROBERTS:**

20   **Q.**   WHAT DOES THIS REFLECT?

21   **A.**   THIS IS THE FORECAST FOR A -- ONE OF THE FORECASTS FOR THE

22   SAN FRANCISCO LOCATION ONLY FOR 2018.

23   **Q.**   DID YOU SIMILARLY DO THREE DIFFERENT OPTIONS ON THE

24   LOCATION-LOCATION BASIS?

25   **A.**   WE DID.

JOHNSON - DIRECT / ROBERTS

1  **Q.**  YOU PREPARED THREE DIFFERENT OPTIONS FOR THE SAN FRANCISCO

2  LOCATION --

3  **A.**  THAT'S CORRECT.

4  **Q.**  -- FOR 2018?

5  **A.**  THAT'S CORRECT.

6  **Q.**  AND IF YOU TURN TO PAGE 19716 -- I'M SORRY, 19717.

7                        (DISPLAYED ON SCREEN.)

8      I'M AM SORRY, TURN TO 719.

9                        (DISPLAYED ON SCREEN.)

10     WHAT DOES THE LAST LINE ON THAT FORECAST SHOW?

11  **A.**  THIS SHOWS THAT BASED ON THE PARAMETERS THAT WERE PUT INTO

12  PLACE FOR THIS FORECAST AND AN OPENING OF JANUARY 1 FOR A FULL

13  YEAR OF 2018, THAT THE PROJECTED FORECASTED NET INCOME WAS A

14  POSITIVE $1,151,792.

15  **Q.**  AND I -- YOU SAID YOU DID MULTIPLE DIFFERENT OPTIONS FOR

16  SAN FRANCISCO AS WELL?

17  **A.**  YES.

18         **THE COURT:**  THIS MIGHT BE A GOOD PLACE TO BREAK ONLY

19  BECAUSE IT IS 1:30.

20         **MS. ROBERTS:**  I HAVE ONE MORE QUESTION.

21         **THE COURT:**  JUST ONE MORE?

22  **BY MS. ROBERTS:**

23  **Q.**  JUST TO REMIND THE JURY, DID THE SAN FRANCISCO LOCATION OF

24  THESHOP.BUILD SEE ANY PROFITS?

25  **A.**  NO.  THEY HAD A LOSS FOR 2018.

1        **MS. ROBERTS:**  THANK YOU.

2        **THE COURT:**  ANY CROSS-EXAMINATION?  IF THERE IS, I

3   WOULD PROBABLY CONSULT WITH COUNSEL AND SEE WHETHER IT MAKES

4   SENSE TO SIMPLY BREAK FOR THE DAY.

5        **MR. PISTORINO:**  UNFORTUNATELY, I THINK -- IT MAKES

6   SENSE TO PROBABLY BREAK FOR THE DAY.

7        **THE COURT:**  WHY DON'T WE DO THAT.

8     AND MR. JOHNSON WILL GET TO ENJOY A BAY AREA WEEKEND.

9        **THE WITNESS:**  ALL RIGHT.

10       **THE COURT:**  SO, LADIES AND GENTLEMEN, LET'S BREAK FOR

11  THE DAY.  IT'S 1:30.  AND WE WILL RECONVENE ON MONDAY MORNING

12  TO GET STARTED PROMPTLY AT 8:30.

13     AND JUST OVER THE WEEKEND, CONTINUE TO FOLLOW ALL OF THE

14  INSTRUCTIONS THAT I'VE GIVEN YOU.  NO COMMUNICATIONS ABOUT THE

15  CASE WITH ANYONE THROUGH ANY FORM.  NO MEDIA ACCOUNTS ABOUT

16  THE CASE OF ANY TYPE, DON'T LET ANYONE COMMUNICATE WITH YOU

17  ABOUT THE CASE IN ANY WAY, NO RESEARCH ABOUT THE CASE OR THE

18  ISSUES OR PEOPLE INVOLVED IN IT.  AND PLEASE DO CONTINUE, AS

19  ALWAYS, TO KEEP AN OPEN MIND ABOUT THE ISSUES IN THE CASE

20  UNTIL ALL OF THE EVIDENCE HAS BEEN PRESENTED AND YOU'VE HEARD

21  MY INSTRUCTIONS AND THE ARGUMENTS OF COUNSEL AND THE VIEWS OF

22  YOUR FELLOW JURORS.

23       **MR. PISTORINO:**  MAY WE SPEAK FOR A MOMENT, YOUR

24  HONOR?

25       **THE COURT:**  YES.

1        WHY DON'T YOU SIT TIGHT FOR ONE MINUTE, LADIES AND

2   GENTLEMEN.

3                (SIDEBAR HELD; NOT REPORTED.)

4        **THE COURT:**  LOOKS LIKE YOU MAY NOT BE GETTING YOUR

5   BAY AREA WEEKEND, MR. JOHNSON.

6        ANY CROSS-EXAMINATION, MR. PISTORINO?

7            **MR. PISTORINO:**  YES, I DO, YOUR HONOR.

8        **THE COURT:**  LADIES AND GENTLEMEN, AS I MENTIONED WHEN

9   WE STARTED, SOMETIMES WE WILL TRY TO ACCOMMODATE AN

10  OUT-OF-TOWN WITNESS, AND THE EXPECTATION IS THAT WE WILL NOT

11  RUN TOO MUCH LONGER SO WE ARE GOING TO GO AHEAD AND DO THAT.

12                      <u>**CROSS-EXAMINATION**</u>

13  **BY MR. PISTORINO:**

14  **Q.**  I'M GOING TO GO FAST, BUT VERY BRIEFLY.

15       GOOD AFTERNOON, MR. JOHNSON.

16  **A.**  HELLO.

17  **Q.**  CONGRATULATION ON YOUR 20-YEAR CAREER.  THAT'S A GREAT

18  THING.

19       I REALLY JUST HAD A FEW QUESTIONS FOR YOU.  SO YOU WERE

20  THE ONE THAT ACTUALLY DID PREPARE THE PROJECTIONS THAT WE HAVE

21  SEEN HERE PROJECTING MORE THAN $10 MILLION IN REVENUE IN 2018,

22  CORRECT?

23  **A.**  YES.  I PREPARED ALL THESE DOCUMENTS.

24  **Q.**  AND THEN JUST TWO LITTLE ISSUES HERE.

25       WHEN YOU GO THROUGH -- WHEN YOU LOOK AT THE SPREADSHEET,

1   WE HAVE SEEN A SPREADSHEET EARLIER SHOWING CHARGES -- REVENUE

2   BY MR. RASURE'S ENTITIES.

3       YOU KNOW ABOUT THAT, RIGHT?

4   **A.**  WHICH -- WHAT SPREADSHEET ARE YOU REFERRING TO?

5   **Q.**  IF YOU WILL PULL UP TX294.

6       YOU MAY NOT HAVE A BOOK.

7           **MR. PISTORINO:**  MAY I APPROACH, YOUR HONOR?

8           **THE CLERK:**  294?

9           **MR. PISTORINO:**  294.

10          **THE CLERK:**  THAT IS NOT ADMITTED.

11          **MR. PISTORINO:**  JUST TO MAKE SURE REAL QUICK.

12              (PAUSE IN THE PROCEEDINGS.)

13          **MR. PISTORINO:**  SORRY.  I WILL MOVE ON.

14  **BY MR. PISTORINO:**

15  **Q.**  VERY BRIEFLY.  IN YOUR BOOK, IF YOU COULD GO TO TX1204.

16              (DISPLAYED ON SCREEN.)

17  **A.**  OKAY.

18  **Q.**  WITH ME?

19      AND I JUST HAD A -- VERY BRIEF QUESTIONS HERE.

20      SO IF I UNDERSTAND IT HERE, THE INFORMATION THAT'S SHOWN

21  ON THESE CALCULATIONS THAT YOU'VE DONE, YOU'RE TELLING US THAT

22  THESE DO NOT REFLECT ACTUAL ITEMS THAT WERE PAID BY THE

23  DEFENDANTS, DO THEY?

24  **A.**  EVERYTHING WAS ACTUALLY PAID EXCEPT FOR THE RENT.

25  **Q.**  SO, AGAIN, JUST WHAT WE ARE SEEING HERE.

1      YOU ARE CALLING IT ACCRUAL.  SO IT IS NOT ACTUAL PAID,

2    IT'S ACCRUED.  YOU SAY THAT THERE'S A LIABILITY OUT THERE.

3    BUT NOT ACTUALLY PAID, THAT'S WHY THE RENT WASN'T PAID, RIGHT?

4    **A.**  THAT'S CORRECT.

5    **Q.**  AND I TRIED TO LOOK THROUGH ALL THESE DOCUMENTS AND I

6    COULDN'T FIND IT.

7       HOW MUCH DID MR. RASURE AND HIS WIFE PAY HIMSELF THROUGH

8    THESE ENTITIES?

9    **A.**  THEY WERE NOT ON PAYROLL.  ANYTHING WAS REIMBURSED, WAS

10   JUST REIMBURSED EXPENSES.

11   **Q.**  HOW WERE THEY GETTING PAID?

12   **A.**  THEY WOULD SUBMIT BILLS OR EXPENSES -- EXPENSE REPORTS

13   THAT THEN WERE -- THEN ASKED ME TO ISSUE EITHER A CHECK OR A

14   TRANSFER TO THEIR ACCOUNT.

15   **Q.**  THEY WERE SUBMITTING THOSE EXPENSE REPORTS TO PAY FOR LIKE

16   THEIR LIVING EXPENSES, AND THAT KIND OF THING?

17            **MS. ROBERTS:**  OBJECTION, ASSUMES FACTS NOT IN

18   EVIDENCE.

19            **THE COURT:**  OVERRULED.

20            **THE WITNESS:**  NO.  THESE WERE FOR USUALLY LIKE SHOP

21   CONSUMABLES, SHOP EXPENSES, TRAVEL EXPENSE TO AND FROM THEIR

22   HOME IN THE MIDWEST AND BACK TO CALIFORNIA.

23   **BY MR. PISTORINO:**

24   **Q.**  SO MAKE SURE THAT I GOT IT.

25       SO THEY WERE SUBMITTING THEIR TRAVEL -- THEIR PERSONAL

1    TRAVEL EXPENSES, GO BACK TO KANSAS AND COME BACK TO THE BAY

2    AREA, CORRECT?

3    **A.**  YEAH.

4         **MS. ROBERTS:**  OBJECTION, ASSUMES FACTS NOT IN

5    EVIDENCE.

6         **THE COURT:**  OVERRULED.

7    **BY MR. PISTORINO:**

8    **Q.**  CORRECT?

9    **A.**  YES.

10   **Q.**  AND ANY OTHER LIKE -- LIKE PERSONAL MEAL EXPENSES WERE

11   BEING SUBMITTED WITH REQUEST FOR REIMBURSEMENT?

12   **A.**  WHILE THEY WERE IN SAN FRANCISCO OR IN THE BAY AREA, THOSE

13   MEALS WERE REIMBURSED, YES.

14   **Q.**  OKAY.  SO, LIKE IF THEY WERE JUST DOING THEIR NORMAL THING

15   AND THEY FELT LIKE THEY WOULD GO TO A, I DON'T KNOW, AN

16   ORIGINAL JOE'S DOWN THERE IN SAN JOSE AND GET A GOOD NIGHT'S

17   MEAL, THEY WOULD TURNAROUND AND SUBMIT A REQUEST FOR

18   REIMBURSEMENT TO YOU AND THEN YOU WOULD PAY IT, CORRECT?

19   **A.**  ALL THESE CHARGES WOULD BE ON THE CREDIT CARD EXPENSES

20   THAT WERE USED FOR THE BUSINESS IN THE SAME FASHION AS OTHER

21   COMPANIES.

22   **Q.**  THE CREDIT CARDS, DID YOU CONDUCT ANY ANALYSIS OF THE

23   INDIVIDUAL ITEMS THAT WERE BILLED?

24   **A.**  YES.  I WENT THROUGH THEM, EACH CREDIT CARD.

25   **Q.**  DID YOU MAKE ANY EFFORT TO ISOLATE THE PERSONAL EXPENSES

1  FROM BUSINESS-RELATED EXPENSES?

2  **A.**  I DID.  THERE WERE SEVERAL.

3  **Q.**  YOU DID NOT DEDUCT EXPENSES LIKE FOR MEALS.  YOU SAID --

4  **A.**  IF THE MEALS WERE IN -- TOOK PLACE IT WOULD SHOW ON THE

5  CREDIT CARD EXPENSE.  IF IT WAS A CALIFORNIA LOCATION, THEN

6  THOSE WOULD BE INCLUDED AS BUSINESS EXPENSES.

7      IF IT WAS -- IF IT LOOKED LIKE A STATE NOT IN CALIFORNIA

8  OR WAS ELSEWHERE, THEN THOSE WOULD NOT BE INCLUDED IN THE

9  EXPENSES.

10  **Q.**  SO EVERY WAKING MOMENT THAT THEY WERE HERE IN CALIFORNIA

11  AND WERE EATING, THEY WOULD SUBMIT A BILL AND YOU WOULD COUNT

12  THAT AS A BUSINESS EXPENSE, CORRECT?

13  **A.**  IF IT WAS ON THE CREDIT CARD AND IT WAS A MEAL ITEM

14  THAT -- UNLESS THEY TOLD ME NOT TO, THAT WAS INCLUDED AS A

15  MEAL EXPENSE.

16  **Q.**  ANY LIVING EXPENSE, LIKE APARTMENT, HOUSE, SOMETHING?

17  **A.**  THERE WERE HOTEL ACCOMMODATIONS.

18  **Q.**  BUT THEY WERE OUT HERE FOR A GOOD LONG TIME.  ANY

19  APARTMENT, HOUSE, RENT EXPENSES?

20  **A.**  I DON'T RECALL ANY RENT EXPENSE, NO.

21          **MR. PISTORINO:**  NOTHING FURTHER, YOUR HONOR.  THANK

22  YOU.

23          **THE COURT:**  ALL RIGHT.  ANY REDIRECT?

24          **MS. ROBERTS:**  NO, YOUR HONOR.

25          **THE COURT:**  THANK YOU, MR. JOHNSON.  YOU ARE EXCUSED.

1        AND WE WILL NOW BREAK FOR THE DAY, LADIES AND GENTLEMEN.

2   ENJOY YOUR WEEKEND.  WE WILL SEE YOU ON MONDAY MORNING.

3        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            **THE CLERK:**  YOU MAY BE SEATED.

5            **THE COURT:**  HERE IS WHAT I WOULD LIKE TO DO ON THE

6   VOIR DIRE FOR THE EXPERT.  I HAVE ANOTHER MATTER AT 2:30.

7   WHAT I WOULD PROPOSE IS THAT WE TAKE THAT UP AT 3:30, ASSUMING

8   THAT THE EXPERT IS STILL BEING PROFFERED IN THE SAME WAY.

9            **MS. ROBERTS:**  CAN WE HAVE A MOMENT, YOUR HONOR?

10           **THE COURT:**  YES.

11                (PAUSE IN THE PROCEEDINGS.)

12           **MS. ROBERTS:**  YOUR HONOR, WE ARE STILL OFFERING THE

13  WITNESS, ALTHOUGH OVER THE WEEKEND, IF WE TAKE A LOOK AT THE

14  TIME, IT MAY BE THE SCOPE OF THE TESTIMONY WILL BE NARROWER.

15     HE DOES HAVE A CONFLICT THIS AFTERNOON.  IS IT POSSIBLE TO

16  DO THE VOIR DIRE ON MONDAY MORNING?

17           **THE COURT:**  WE CAN.  IT WOULD END UP BEING 7:45.

18     CAN THAT BE ACCOMMODATED?

19           **MS. ROBERTS:**  I THINK SO.

20           **THE COURT:**  ALL RIGHT.  LET'S PROCEED THAT WAY.

21           **MS. ROBERTS:**  THANK YOU VERY MUCH.

22           **THE COURT:**  WE'LL SEE YOU ON MONDAY.

23           **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

24

25                (PROCEEDINGS ADJOURNED AT 1:43 P.M.)

## CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE
UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY
CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

MONDAY, JULY 22, 2019