VOL. 6

PAGES 927 - 1036

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM, JR., JUDGE**

| | | |
|---|---|---|
| TECHSHOP, INC., | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. C-18-1044 HSG |
| | ) | |
| VS. | ) | MONDAY, JUNE 10, 2019 |
| | ) | |
| DAN RASURE, ET AL., | ) | OAKLAND, CALIFORNIA |
| | ) | |
| | ) | JURY TRIAL |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**FOR PLAINTIFF:**               PARRISH LAW OFFICE
                                24 LEXINGTON DRIVE
                                MENLO PARK, CALIFORNIA 94205
                        BY:   JAMES C. PISTORINO, ESQUIRE

**ALSO PRESENT:**               DORIS KAELIN, BANKRUPTCY TRUSTEE

**FOR DEFENDANTS:**             QUINN EMANUEL URQUHART & SULLIVAN
                                555 TWIN DOLPHIN DRIVE, 5TH FLOOR
                                REDWOOD SHORES, CALIFORNIA 94065
                        BY:   ANDREA P. ROBERTS, ESQUIRE
                                OLGA SLOBODYANYUK, ESQUIRE

                                JOHN E. NATHAN, ESQUIRE
                                1175 PARK AVENUE
                                NEW YORK, NEW YORK 10128

**REPORTED BY:**                DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                                OFFICIAL COURT REPORTER

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
1                          I N D E X

2  DEFENDANTS' WITNESS:                        PAGE    VOL.

3  BÜNGER, MARK

4  DIRECT EXAMINATION BY MS. ROBERTS            955      6

5  CROSS-EXAMINATION BY MR. PISTORINO          1004      6

6  REDIRECT EXAMINATION BY MS. ROBERTS         1024      6

7

8  TRIAL EXHIBIT 377 RECEIVED IN EVIDENCE      1014      6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>MONDAY, JUNE 10, 2019</u>                              <u>7:49 A.M.</u> |

2                        P R O C E E D I N G S

3                               O0O

4       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

5           **THE CLERK:**  REMAIN SEATED.  THE HONORABLE HAYWOOD S.

6   GILLIAM, JR., PRESIDING.

7       CALLING C-18-1044 TECHSHOP VERSUS RASURE.

8       PLEASE STATE YOUR APPEARANCES FOR THE RECORD.

9           **MR. PISTORINO:**  GOOD MORNING, YOUR HONOR.  JAMES

10   PISTORINO ON BEHALF OF TECHSHOP.

11          **THE COURT:**  GOOD MORNING.

12          **MS. ROBERTS:**  GOOD MORNING.  ANDREA ROBERTS ON BEHALF

13   OF DEFENDANTS.

14          **THE COURT:**  GOOD MORNING.

15       ALL RIGHT.  LET'S DEAL WITH THE ISSUES OF... WITH

16   MR. BÜNGER.

17       SO FIRST OFF, MADAME CLERK JUST HANDED ME THIS.  HOW IS

18   THIS DIFFERENT THAN THE ONE THAT I GOT THE OTHER DAY?

19          **MS. ROBERTS:**  WE REALIZED ON FRIDAY AFTERNOON THE ONE

20   YOU GOT THE OTHER DAY DID NOT INCLUDE ALL THE APPENDICES TO

21   HIS REPORT, WHICH INCLUDE HIS BIO AND LIST OF PUBLICATIONS,

22   WHICH I BELIEVE IS APPENDIX 2.

23          **THE COURT:**  THE ONE THAT I HAD ACTUALLY HAD SOMETHING

24   CALLED APPENDIX TO EXPERT REPORT MARK BÜNGER NOVEMBER 19TH AND

25   DID HAVE A C.V. IN IT.  SO....

1          **MS. ROBERTS:**  IF YOU GOT IT -- IF YOU GOT IT ALL,

2     THEN THAT'S -- I WANTED TO MAKE SURE YOU HAD THE FULL SET.

3     THE COPY I HAD DID NOT.

4          **THE COURT:**  ALL RIGHT.

5          **MS. ROBERTS:**  MY APOLOGIES IF IT'S A DUPLICATE.

6          **THE COURT:**  OKAY.

7        SO I THINK THERE ARE A FEW ISSUES TO ADDRESS THIS MORNING.

8     FIRST IS THE FOUR PROPOSED OPINIONS AND THE BASES WHICH, TO

9     ME, FROM THE NEW SLIDES AND THE BRIEFS FROM LAST NIGHT APPEAR

10    TO HAVE BEEN MODIFIED FROM WHAT WAS PROPOSED BEFORE IN WAYS

11    THAT PROBABLY HELP THE DEFENDANTS' CAUSE.

12       THEN THERE'S THIS QUESTION OF THE DEMONSTRATIVES AND

13    WHETHER HE CAN REFERENCE PARTICULAR UNDERLYING DOCUMENTS THAT

14    HE CONSIDERED, AND THEN THE QUESTION OF THE PROPOSED ADMISSION

15    OF THE APPENDICES.

16       SO LET'S START WITH THE LAST ONE FIRST.  ARE YOU TRYING TO

17    PUT THE APPENDICES IN EVIDENCE?

18         **MS. ROBERTS:**  SO I BELIEVE IT'S TX927, WHICH IS THE

19    APPENDIX THAT HAS ALL OF THE SOURCES THAT HE RELIED UPON.  WE

20    ARE NOT TRYING TO PUT THAT INTO EVIDENCE.

21         **THE COURT:**  OKAY.  THAT'S WHAT I FIGURED.

22       SO YOU ARE NOT TRYING TO INTRODUCE ANY OF THE UNDERLYING

23    DOCUMENTS.  AT MOST, WHAT YOU ARE TRYING TO DO, IS HAVE HIM

24    REFER TO SOME OF THEM IN THE COURSE OF HIS TESTIMONY.

25         **MS. ROBERTS:**  RIGHT.

1        **THE COURT:**  ALL RIGHT.

2        AND THEN JUST IN TERMS OF BEING SURE THAT I UNDERSTAND THE

3    OPINIONS AS CURRENTLY FRAMED, THESE ARE THE FOUR.  FIRST, THE

4    WITNESS IS BEING PROFFERED TO OFFER AN OPINION AS TO THE...

5    ESSENTIALLY NEGATIVE BRAND EQUITY THAT TECHSHOP HAD

6    POST-BANKRUPTCY.

7        IT DOES SEEM TO ME THAT THAT IS RELEVANT.  THE PLAINTIFF

8    HAS, A, SPENT A LOT OF TIME BUILDING UP POSITIVE

9    ACCOMPLISHMENTS OF THE COMPANY AT TIMES BEFORE THE BANKRUPTCY

10   AND MORE PERTINENTLY HAS SAID THAT A LICENSE AS OF THE

11   RELEVANT TIME WOULD BE WORTH A CERTAIN AMOUNT.  AND IT DOES

12   SEEM TO ME OBVIOUSLY RELEVANT WHETHER THE COMPANY, IN FACT,

13   HAD THE SORT OF VALUE AT THAT TIME TO SUPPORT THE LICENSE

14   AMOUNT THAT IS BEING PROFFERED AS THE DAMAGES FIGURE BY THE

15   PLAINTIFF.  AND AS TO THIS POINT, IT APPEARS TO ME THAT THE

16   WITNESS HAS APPARENT EXPERIENCE TO OFFER THAT OPINION.

17       MR. PISTORINO, YOU OBVIOUSLY OBJECTED AND YOU CAN MAKE

18   YOUR RECORD, BUT THAT SEEMS -- I DON'T EVEN KNOW THAT I NEED

19   TO HAVE A VOIR DIRE ON THAT.

20       **MR. PISTORINO:**  OKAY, JUDGE, IF I MAY.

21       AND THE POINT I THINK I HAVE BEEN TRYING TO MAKE ALL

22   THROUGHOUT HERE, OF COURSE, IS IN MY VIEW, AT LEAST, IT IS

23   JUST WHAT HE'S OFFERING HERE IS ACTUALLY NOT EVEN RELEVANT.

24       THE ISSUE THAT THE JURORS -- SO, FIRST, LET ME TRY TO GO

25   THIS WAY.

1    WHAT IS HE SAYING BRAND EQUITY IS?  I THINK IN MY GROUP,

2  IF YOU LOOK AT WHAT HE CALLS SLIDE 5 IN THE SLIDES, HE SAYS

3  BRAND EQUITY IS THE AMOUNT THAT A CONSUMER IS WILLING TO PAY

4  FOR A PRODUCT OR SERVICE FROM ONE SOURCE OVER SIMILAR PRODUCT

5  OR SERVICE FROM ANOTHER SOURCE.

6    AND SO THE POINT I HAVE BEEN MAKING IS SO WHAT?  THE

7  ISSUE --

8    **THE COURT:**  SO WHAT IS, IF THE BRAND IS BADLY

9  DAMAGED, THEN THAT GOES TO WHETHER SOMEONE WOULD BE WILLING TO

10  PAY THE LICENSE FEE THAT IS YOUR PURPORTED DAMAGE.

11    YOU CAN CROSS HIM.  YOU CAN MAKE THE ARGUMENT.  TO THE

12  EXTENT YOUR ARGUMENT IS RELEVANCE, I REJECT THAT ARGUMENT.  I

13  THINK YOU'VE PRESERVED IT.

14    **MR. PISTORINO:**  OKAY.

15    **THE COURT:**  ALL RIGHT.  SO AS TO THAT, AGAIN, I THINK

16  BASED ON WHAT HAS BEEN PROFFERED, THE WITNESS PLAINLY HAS THE

17  BACKGROUND AND EXPERIENCE TO OFFER THAT OPINION AND HE WILL BE

18  RIGOROUSLY CROSSED ON IT.

19    **MR. PISTORINO:**  MAY I JUST ADDRESS ANOTHER ASPECT OF

20  IT?

21    **THE COURT:**  YES.

22    **MR. PISTORINO:**  SO, AND I THINK THE OTHER POINT THAT

23  I HAVE BEEN MAKING, OF COURSE, IS EVEN ASSUMING THAT YOU -- AS

24  YOU SAY YOU BELIEVE IT TO BE RELEVANT, THE NEXT ISSUE IS DOES

25  HE RELY ON SUFFICIENT FACTS OR DATA TO FORM AN OPINION ON IT.

1          SO, FOR EXAMPLE, JUST AS YOU SAY, WHAT CONSUMERS MIGHT

2     HAPPEN TO THINK.  THERE'S NO SURVEY.

3          **THE COURT:**  THE LAW IS CRYSTAL CLEAR THAT A SURVEY IS

4     NOT REQUIRED.  YOU DIDN'T OFFER A SURVEY.  THAT'S -- THERE'S

5     NO LEGAL REQUIREMENT OF A SURVEY.

6          **MR. PISTORINO:**  I AGREE, THERE'S NO LEGAL REQUIREMENT

7     OF A SURVEY, BUT, AGAIN, YOU HAVE TO HAVE SUFFICIENT FACTS OR

8     DATA.

9          SO HE DIDN'T DO A SURVEY.  THAT WOULD BE POTENTIALLY.  BUT

10    WHAT I DON'T THINK YOU CAN DO AS SUFFICIENT FACTS OR DATA IS

11    LOOK AT A HUNDRED MEDIA POSTS AND SAY THAT IS A REFLECTION OF

12    WHAT THE SENTIMENT IS ON THE PLANET ABOUT THE BRAND.  I DON'T

13    THINK YOU CAN DO THAT.  THAT'S NOT SUFFICIENT FACTS OR DATA.

14         ON TOP OF IT, I THINK, WHEN YOU CONSIDER FACTS OR DATA

15    THAT ARE RELIABLY APPLIED, YOU CAN'T ONLY CONSIDER THE FACTS

16    OR DATA THAT SUPPORT YOUR CONCLUSION, YOU HAVE TO LOOK AT ALL

17    OF THEM, INCLUDING THE ONES THAT MIGHT BE NEGATIVE TO IT.  AND

18    WE DON'T HAVE ANY EVIDENCE THAT THAT'S WHAT HE DID.

19         SO LOOKING AT, YOU KNOW, A HUNDRED POSTS AND SAY THIS

20    GROUP OF PEOPLE IS UPSET OR WHATEVER, AGAIN, THE POINT I HAVE

21    IS THAT'S NOT SUFFICIENT FACTS OR DATA.  IT DOESN'T CONSIDER

22    THE NEGATIVE ONES SO YOU CAN'T RELIABLY REACH A CONCLUSION

23    ABOUT WHAT THAT MIGHT HAPPEN TO BE ON THAT -- THOSE FACTS OR

24    DATA.

25         **THE COURT:**  GOES TO WEIGHT, BUT YOUR ARGUMENT IS

 1    PRESERVED.  YOU ALL PROBABLY -- IF YOU HAVE THE MONEY AND THE

 2    WHEREWITHAL, YOU WILL BE LITIGATING THIS ON APPEAL.  SO EVERY

 3    DECISION I MAKE, I'LL JUST BE MAKING.  AND THIS IS THE

 4    DECISION I'M MAKING, AND I THINK IT IS LEGALLY WARRANTED.

 5            **MR. PISTORINO:**  OKAY.

 6            **THE COURT:**  ALL RIGHT, NEXT.  THIS OPINION I'M NOT

 7    QUITE SURE I UNDERSTAND, AND I THINK IT IS MORPHED FROM THE

 8    PRIOR VERSION.

 9        THE USE OF 2.0 IN A BRANDING CONTEXT, WHAT DOES THIS MEAN?

10    I DON'T UNDERSTAND WHAT THE OPINION IS.  I'M NOT SURE I

11    UNDERSTAND.  WHY DON'T YOU CLARIFY.

12            **MS. ROBERTS:**  SO THE OPINION IS THAT 2.0 HAS A

13    MEANING IN A BRANDING CONTEXT, THAT IT DISTINGUISHES THE

14    TECHSHOP 2.0 FROM TECHSHOP.  AND MR. BÜNGER TALKS ABOUT WHAT

15    THE MEANING OF 2.0 IS, THE SORT OF USE OF INTEGERS IN

16    DIFFERENT VERSIONS OF SOFTWARE AND THE MEANING THAT WOULD

17    CONVEY TO CONSUMERS AND MEMBERS OF THE MAKER COMMUNITY.

18        SO IN THE BRANDING CONTEXT FOR THESE CONSUMERS THAT ARE AT

19    ISSUE HERE, 2.0 DISTINGUISHES TECHSHOP 2.0 FROM TECHSHOP,

20    WHICH IS RELEVANT TO THE SIMILARITY OF MARKS FACTOR IN THE

21    *SLEEKCRAFT* TEST.

22            **THE COURT:**  I MEAN, NEXT GENERATION OF SOFTWARE, THIS

23    ISN'T A SOFTWARE ITERATION.

24            **MS. ROBERTS:**  RIGHT.  BUT... BUT CONSUMERS IN THIS

25    INDUSTRY WOULD UNDERSTAND THAT 2.0 MEANS SOMETHING NEW AND

1    DIFFERENT; THAT TECHSHOP 2.0 IS SOMETHING NEW AND DIFFERENT

2    FROM THE TECHSHOP THAT CLOSED AND DECLARED IT WAS GOING TO

3    SEEK BANKRUPTCY.

4         **THE COURT:**  I GUESS THE QUESTION I PROBE IS, AGAIN,

5    SO WHAT?  IN MOST CASES WHERE THERE IS INFRINGEMENT, THE

6    INFRINGER IS A DIFFERENT ENTITY.  THAT'S NEITHER HERE NOR

7    THERE.  THAT'S ASSUMED.

8      WHY DOES THAT HAVE ANYTHING TO DO WITH WHETHER THERE WAS

9    USE OF A MARK IN A MANNER THAT IS LIKELY TO CAUSE CONFUSION?

10         **MS. ROBERTS:**  WELL, THE JURY ULTIMATELY WILL MAKE THE

11   DECISION AS TO, YOU KNOW, IN ANALYZING THE *SLEEKCRAFT* FACTORS

12   WHETHER THERE'S A LIKELIHOOD OF CONFUSION.  AND ONE OF THOSE

13   FACTORS IS THE SIMILARITY OF THE MARK.  ANOTHER IS THE SIGHT,

14   SOUND, AND MEANING.

15     THE USE OF 2.0 CONVEYS TO MEMBERS OF THE MAKER COMMUNITY

16   THAT THIS IS A DIFFERENT COMPANY.  SO THE MARKS ARE -- YOU

17   KNOW, OBVIOUSLY THERE'S THE OVERLAP IN THE WORD "TECHSHOP",

18   BUT THE 2.0 IS AN IMPORTANT PART OF THE BRAND TO CONVEY TO

19   CONSUMERS THAT THEY ARE NEW AND DIFFERENT.

20     SO A FACTOR THE JURY CAN CONSIDER WHEN REACHING ITS

21   ULTIMATE CONCLUSION OF WHETHER THERE'S LIKELIHOOD OF

22   CONFUSION.

23         **THE COURT:**  THAT SEEMS TO -- WELL, HERE, I JUST

24   DON'T -- HERE'S MY RULING.

25     THAT HERE, THE TESTIMONY THAT IS PROPOSED IS NOT HELPFUL

1    TO THE JURY IN THAT ULTIMATELY THEY CAN LOOK AT TECHSHOP, THEY

2    CAN LOOK AT TECHSHOP 2.0, AND THEY CAN FACTOR THAT IN AS A

3    FACTUAL MATTER AS TO WHETHER THERE'S A LIKELIHOOD OF

4    CONFUSION.

5        AND THE PURPORTED BASIS FOR THE OPINION, TALKING ABOUT

6    SOFTWARE VERSION ITERATIONS AND THE OTHER BASES JUST

7    INTRODUCES A LIKELIHOOD OF CONFUSION OF ISSUES THAT OUTWEIGHS

8    WHATEVER MARGINAL PROBATIVE VALUE THERE IS TO THAT PART OF THE

9    TESTIMONY.  SO THAT OPINION IS EXCLUDED.

10       ALL RIGHT.  THE NEXT ONE IS... AND, AGAIN, I THINK THIS

11   WAS... THE FRAMING OF THE OPINION OFFERED HAS BEEN TWEAKED

12   SINCE LAST WEEK BASED ON THE CHANGES IN THE SLIDES, BUT THE

13   THIRD OPINION IS THAT TECH AND SHOP ARE COMMONLY USED IN

14   MAKERSPACE NAMES.

15       THE DEFENDANT IS NOW CLARIFYING THAT IT IS NOT -- THE

16   WITNESS IS NOT BEING OFFERED TO GIVE AN OPINION AS TO THE

17   ULTIMATE CONCLUSION AS TO THE STRENGTH OF THE MARKS, WHICH I

18   THINK IS A SHIFT FROM THE WAY IT WAS FRAMED BEFORE, BUT WITH

19   THAT, IT DOES SEEM, AGAIN, THAT HE'S GOT AMPLE BASIS FOR

20   TESTIFYING REGARDING THE USE OF THOSE TERMS IN THIS SPACE, AND

21   THE JURY CAN THEN WEIGH THAT TESTIMONY IN DETERMINING THE

22   STRENGTH OF THE MARK.

23       THIS CERTAINLY GOES TO ONE OF THE ISSUES THAT WILL HAVE TO

24   BE HASHED OUT IN THE INSTRUCTIONS, BUT IT APPEARS TO ME CLEAR,

25   LOOKING AT MODEL INSTRUCTION 15.11, THAT EVEN WHEN THERE'S A

1    REGISTERED MARK, THERE'S A PRESUMPTION OF DISTINCTIVENESS, BUT

2    THE DEFENDANT HAS THE OPPORTUNITY TO PROVE THAT SECONDARY

3    MEANING IS NOT ATTACHED IF IT WISHES TO ARGUE THAT THE

4    PLAINTIFF'S MARK WAS WEAK, FOR EXAMPLE, WAS DESCRIPTIVE AND

5    NOT ENTITLED TO TRADEMARK PROTECTION.

6         I'M QUOTING FROM THE COMMENTS TO MODEL 15.11 WHICH, IN

7    TURN, ARE QUOTING *AMERICANA TRADING VERSUS BERRIE & COMPANY*,

8    966 F.2D 1284 AT 1287, WHICH IS A NINTH CIRCUIT CASE FROM

9    1992.

10        SO IT DOES SEEM TO ME AS A MATTER OF LAW THAT THE

11   DEFENDANT IS PERMITTED TO PUT IN THIS KIND OF EVIDENCE, AND

12   THE JURY CAN CONSIDER IT IN MAKING THE DETERMINATION THAT IT

13   WILL BE ASKED TO MAKE UNDER THE INSTRUCTION.

14        SO, AGAIN, HERE, IT APPEARS TO ME, ONE, THAT THE OPINION

15   IS RELEVANT AND HELPFUL AND, TWO, THAT THE WITNESS, BASED ON

16   THE PROFFER, HAS SUFFICIENT EXPERIENCE IN THIS FIELD TO OFFER

17   THE OPINION.  AGAIN, WITH THE UNDERSTANDING THAT HE WILL BE

18   CROSS-EXAMINED ABOUT IT AND THE JURY WILL GIVE IT WHAT WEIGHT

19   IT BELIEVES IT SHOULD.

20             **MR. PISTORINO:**  MAY I JUST BRIEFLY BE HEARD ON IT?

21             **THE COURT:**  SURE.

22             **MR. PISTORINO:**  I THINK THE POINT I'VE BEEN MAKING ON

23   THIS ONE THAT JUST IMMEDIATELY JUMPS TO MY MIND IS CONFUSION

24   AND PREJUDICE BY THE JURY IN THE CONTEXT HERE.

25        AS I INDICATED ON IN OUR PAPERS, RIGHT, OF COURSE YOU

1    CANNOT PROPERLY ASSESS -- SO IT'S JUST UTTERLY IRRELEVANT

2    WHETHER TECH AND SHOP ARE COMMONLY USED OR NOT.

3        THE PROPER ASSESSMENT, AS YOUR HONOR -- I FULLY AGREE THE

4    DEFENDANT CAN PUT ON EVIDENCE OF GENERICNESS, BUT, AGAIN, AS I

5    INDICATED, IT IS ASSESSED BY THE MARK AS A WHOLE.

6        SO, NUMBER ONE, SAYING, YOU KNOW, THAT TECH OR SHOP ARE

7    USED A LOT, SO WHAT.  THE ONLY EVIDENCE THAT WOULD BE RELEVANT

8    IS WHETHER OR NOT THE TERM "TECHSHOP" ITSELF IS GENERIC.  YOU

9    HAVE TO ASSESS THE MARK ON A WHOLE, AND HE DOESN'T OFFER AN

10   OPINION ON THAT ONE WAY OR THE OTHER.

11       **THE COURT:**  YOUR RECORD IS MADE.  DO YOU NEED TO MAKE

12   MORE OF A RECORD?

13       **MR. PISTORINO:**  NO.  THANK YOU, YOUR HONOR.

14       **THE COURT:**  ALL RIGHT.

15   FOURTH PROFFERED OPINION IS THAT THE FOREIGN LICENSE

16   AGREEMENTS THAT DR. MATOLO USED AS THE PRIMARY BASIS FOR HIS

17   VALUATION OF THE HYPOTHETICAL LICENSE ARE NOT THE RIGHT

18   COMPARATOR, BASICALLY.

19       THIS ONE, THAT, TO ME, SEEMS CLEARLY RELEVANT.  THE

20   QUESTION I HAVE HERE, AND THIS MAY BE THE ONE PLACE WHERE VOIR

21   DIRE IS NECESSARY IS WHAT IS THIS WITNESS'S BASIS FOR OFFERING

22   AN EXPERT OPINION AS TO LICENSE VALUATION AND WHETHER FOREIGN

23   LICENSES ARE THE PROPER COMPARATOR?

24       **MS. ROBERTS:**  WE WOULD BE HAPPY TO HAVE MR. BÜNGER

25   COME TO THE STAND TO EXPLAIN HIS EXPERIENCE, BUT HE HAS

EXTENSIVE, NEARLY 30 YEARS OF BRANDING EXPERIENCE, INCLUDING

IN AN INTERNATIONAL PERSPECTIVE.  SO HE UNDERSTANDS THE VALUE

OF BRANDS.

INCLUDED IN THAT IS HE HAS EXTENSIVE LICENSING EXPERIENCE.

HE CONSULTS HIS CLIENTS ON... ON INTELLECTUAL PROPERTY

LICENSING.  AND SO I THINK, LIKE I SAID, WE ARE HAPPY TO HAVE

MR. BÜNGER GET ON THE STAND TO EXPLAIN HIS EXPERTISE, BUT IT

SQUARELY COVERS THE TESTIMONY THAT HE INTENDS TO PROVIDE

REGARDING WHY LOOKING AT THESE EARLIER FOREIGN LICENSE

AGREEMENTS IS NOT AN APPROPRIATE WAY TO DETERMINE WHAT THE

VALUE OF THE BRAND WAS AND WHAT A LICENSE WOULD LOOK LIKE

AFTER THE CLOSURE OF THE BANKRUPTCY -- THE BANKRUPTCY AND

CLOSURE IN THE UNITED STATES.

**THE COURT:**  ALL RIGHT.  WELL, WE CAN DO IT TWO WAYS.

BASED ON THAT PROFFER, IF THAT IS WHAT THE WITNESS IS GOING TO

SAY, THAT SEEMS SUFFICIENT TO OFFER THE OPINION.  AGAIN, IT

WILL BE SUBJECT TO CROSS-EXAMINATION AND PERHAPS HEAVY

CROSS-EXAMINATION.

WE CAN EITHER -- I CAN EITHER DO THE VOIR DIRE ON THAT NOW

AND MAKE A CALL OR YOU CAN JUST PRESENT IT WHEN HE'S ON THE

STAND.  AS TO THAT ONE, MR. PISTORINO COULD OBJECT.  YOUR

OBJECTIONS TO THE OTHER THREE ARE OBVIOUSLY PRESERVED, AND WE

CAN HASH IT OUT THEN.

**MR. PISTORINO:**  MAY I BRIEFLY BE HEARD?  AT LEAST I

UNDERSTAND WHAT YOU ARE TALKING ABOUT, BUT IF I CAN BE HEARD

```
 1    ON ONE PROCEDURAL COMPONENT HERE.

 2        SO AT LEAST AS I UNDERSTAND THE RULE, RIGHT, WHATEVER HE'S

 3    GOING TO SAY ABOUT HIS LICENSING EXPERIENCE, WHATEVER THAT

 4    MIGHT HAPPEN TO BE, I THINK MY FIRST POINT WOULD BE IT'S NOT

 5    IN THE REPORT.  SO I THINK HE WOULD HAVE TO PUT DOWN YOUR

 6    BACKGROUND AND EXPERIENCE, EXPERTISE THAT GIVES RISE FOR YOUR

 7    ABILITY TO SAY THAT.  SO IF IT'S NOT IN THE REPORT, I DON'T

 8    WANT TO HEAR ABOUT IT NOW.

 9            THE COURT:  WELL, THE OPINION IS IN THE REPORT.

10            MR. PISTORINO:  RIGHT.

11            THE COURT:  AT SOME LENGTH.

12            MR. PISTORINO:  AND WHAT I'M SAYING IS, YES, THE

13    OPINION, WHATEVER HIS OPINION IS, IS IN THE REPORT.

14        WHAT I'M SAYING IS, I THINK THE BACKGROUND AND EXPERTISE

15    THAT PUTS YOU IN THE POSITION TO OFFER THAT OPINION NEEDS TO

16    BE IN THE REPORT.  SO YOU'D HAVE TO DETAIL IN THE REPORT YOUR

17    LICENSING EXPERIENCE TO WHATEVER THE HECK IT IS THAT PUTS YOU

18    IN THE POSITION TO OFFER THIS AS AN EXPERT.  YOU SHOULDN'T BE

19    HEARING ABOUT IT NOW IS THE BASIC POINT I HAVE ON THAT.

20        AND JUST, MAYBE JUST CANDIDLY TO HELP YOU UNDERSTAND, IF

21    HIS REPORT, IF IT'S IN HIS REPORT, RIGHT, I GOT SOME DETAILED

22    LIST THAT THE GUY WAS SOME GREAT LICENSING EXPERT,

23    THEORETICALLY, OF COURSE, I COULD HAVE DEPOSED HIM.

24        BUT THE WHOLE IDEA OF THE REPORT IS THAT I DON'T HAVE TO

25    DEPOSE HIM TO FIND OUT THESE THINGS.  THAT'S THE WHOLE IDEA OF
```

```
1    THE REPORT.  SO WHEN I GET A REPORT, THE GUY SAYS HE IS A

2    BRANDING GUY, I SAY, OKAY, GREAT.  BUT ONE THING I KNOW HE'S

3    NOT, I KNOW HE'S NOT A DAMAGES EXPERT, I KNOW HE'S NOT A

4    LICENSING EXPERT.  HE WOULD HAVE TO PROVIDE IT IN THE REPORT.

5        I MEAN, FURTHER, ACTUALLY, TO THE EXTENT HE'S OFFERING

6    THIS AS BASED ON HIS EXPERIENCE, JUST SHEER ONLY EXPERIENCE,

7    AGAIN, I THINK THE REQUIREMENT IS THAT THE EXPERIENCE IN THE

8    REPORT ITSELF, IT HAS TO DETAIL HOW THE EXPERIENCE TIES IN TO

9    WHATEVER THE ALLEGED OPINION IS.

10       AGAIN, THERE'S NONE OF THAT.

11            THE COURT:  ALL RIGHT.  ALTHOUGH I DON'T TAKE THE

12   POINT THAT FOREGOING A DEPOSITION WAS THE RESULT OF THE WAY

13   THAT THE REPORT IS FRAMED.  I THINK, OBVIOUSLY, EVERYONE

14   FOREWENT A LOT OF DEPOSITIONS IN THIS CASE IN A WAY THAT --

15            MR. PISTORINO:  IF I --

16            THE COURT:  -- IT'S HARD TO UNDERSTAND OTHER THAN

17   JUST DOING THE CASE ON THE CHEAP.

18            MR. PISTORINO:  CAN I BRIEFLY ADDRESS THAT, YOUR

19   HONOR?

20       CANDIDLY, AT LEAST IN MY EXPERIENCE, RIGHT, ESSENTIALLY,

21   THE WORST THE EXPERT REPORT, THE LESS LIKELY YOU ARE TO TAKE

22   THE DEPO.  BECAUSE AFTER THEY'LL FIX ALL THE HOLES IN IT.

23       SO WHEN I GET A REPORT THAT TALKS ABOUT BRANDING BUT

24   DOESN'T SAY THE GUY IS A LICENSING EXPERT AND DOESN'T TALK

25   ABOUT DAMAGES, I'M CONSCIOUS -- THERE'S JUST NO TWO WAYS ABOUT
```

1      IT, I CONSCIOUSLY MADE A DECISION NOT TO DEPOSE THIS GUY.

2              **THE COURT:**  SO ON THAT POINT, MS. ROBERTS, WHERE IN

3      THE REBUTTAL REPORT IS THE DISCLOSURE ON THIS POINT?

4              **MS. ROBERTS:**  JUST A MOMENT, YOUR HONOR.

5                   (PAUSE IN THE PROCEEDINGS.)

6              **MS. ROBERTS:**  HE CERTAINLY SAYS ON PAGE 1 OF

7      APPENDIX 2 HIS TIME AT THE VARIOUS DIFFERENT COMPANIES THAT

8      HE'S WORKED WITH.  HE HAS ADVISED MORE THAN 40 FORTUNE 500

9      CORPORATIONS, LED HUNDREDS OF ENGAGEMENTS, AUTHORED OVER 60

10     REPORTS AND OTHER PUBLICATIONS AND TRAVELED TO MORE THAN 40

11     COUNTRIES.

12         I KNOW -- I RECALL THERE BEING AT LEAST ONE PUBLICATION

13     THAT HAD LICENSING IN THE TITLE, ALTHOUGH I'M NOT FINDING IT

14     RIGHT NOW.

15         LIKE I SAID, I'M CONFIDENT THAT IF -- IF WE CAN PROFFER...

16     IN THE REBUTTAL REPORT PAGE 5, HE TALKS ABOUT -- HE DISCLOSES

17     HIS OPINIONS --

18             **THE COURT:**  RIGHT.  I DON'T THINK THERE'S ACTUALLY

19     ANY QUESTION THAT THE OPINION WAS ADEQUATELY DISCLOSED.  THE

20     QUESTION IS WHETHER THE REPORT DISCLOSED THE BASIS AND REASONS

21     FOR THE OPINIONS AS REQUIRED UNDER RULE 26.

22             **MS. ROBERTS:**  I THINK IT DID DISCLOSE THE BASIS AND

23     REASONS.  PAGES 5, IN THE REBUTTAL REPORT, PAGES 5 THROUGH 7

24     TALK ABOUT THE BASIS FOR WHY HE THINKS THE LICENSING MODEL

25     THAT DR. MATOLO RELIED ON, THE RELIANCE ON FOREIGN -- EARLY

1    FOREIGN LICENSES IS NOT APPROPRIATE.  I MEAN, HE STATED THE

2    BASIS FOR THAT.

3        OBVIOUSLY, IF COUNSEL BELIEVES THERE IS NOT SUFFICIENT

4    BASIS, THAT IS SOMETHING THAT CAN BE DRAWN OUT ON

5    CROSS-EXAMINATION, BUT HE DID LAY OUT THE BASIS IN THE REPORT.

6        **MR. PISTORINO:**  MY POINT IS ONLY THAT ALL OF THAT

7    STUFF ABOUT BACKGROUND AND QUALIFICATIONS THAT GIVES YOU A

8    BASIS TO WRITE AN OPINION NEEDS TO BE IN THE REPORT.

9        IF FRED DOWN THE STREET PUTS IN A REPORT THAT SAYS THE

10   TRADEMARK'S INVALID AND HE'S GOT GREAT REASONS FOR IT, BUT HE

11   DOESN'T DISCLOSE THAT HE'S GOT ANY BACKGROUND OR EXPERTISE,

12   SPECIALIZED TRAINING IN THAT, OR, TO THE EXTENT HE'S RELYING

13   ON HIS EXPERIENCE, TIE THAT ALLEGED EXPERIENCE IN THE REPORT

14   TO THE OPINIONS.  IF HE DOESN'T DO THAT, IT DOESN'T COME IN.

15       YOU CAN'T CURE -- AGAIN, THE RULE -- THE REQUIREMENT OF

16   THE RULE IS THAT YOU PUT IT IN THE REPORT SO YOU DON'T DO A

17   DEPO.  IT'S NOT THE IDEA THAT YOU JUST THROW AN OPINION OUT

18   THERE AND THEN YOU GET TO CROSS THE GUY.  IT HAS TO BE IN THE

19   REPORT.

20       **MS. ROBERTS:**  YOUR HONOR, I WOULD RETURN TO

21   MR. BÜNGER'S -- FIRST OF ALL, HE'S NOT FRANK DOWN THE STREET

22   OR ANYWHERE CLOSE TO THAT.  HE'S VERY WELL RECOGNIZED IN HIS

23   FIELD.

24       HIS EXPERTISE, HE HAS EXPERIENCE IN LICENSING, BUT THE

25   OPINION THAT IS LAID OUT IN THE REPORT EXPLAINS THAT IT'S

1   BASED ON THE DIFFERENCES IN BRAND, DIFFERENT PERIODS OF TIME

2   AND DIFFERENT GEOGRAPHICAL AREAS, AND THAT WOULD BEAR ON THE

3   VALUE OF THE LICENSE.

4         **MR. PISTORINO:**  AND --

5         **MS. ROBERTS:**  BUT THE UNDERLYING OPINIONS REGARDING

6   CHANGES TO VALUE OF BRAND AND HOW THE VALUE OF THE BRAND IS

7   NOT THE SAME AROUND THE WORLD, THAT IS VERY RELEVANT TO

8   REBUTTING DR. MATOLO'S OPINIONS.

9         **MR. PISTORINO:**  BY MENTIONING FRANK, I DID NOT INTEND

10  TO BE DISMISSIVE OF DR. BÜNGER.  I BELIEVE, YES, HE'S A GREAT

11  BRANDING GUY.  BUT IN TERMS OF LICENSING, THERE'S NOTHING IN

12  THE REPORT.

13        **THE COURT:**  ALL RIGHT.  HERE IS THE RULING.

14      THIS REPORT WITH THE OPINION WAS DISCLOSED ON

15  DECEMBER 3RD, 2018, ESSENTIALLY SIX MONTHS BEFORE THE TRIAL.

16  THE OPINION ITSELF THAT IS BEING OFFERED RIGHT NOW IS LAID OUT

17  IN SUBSTANTIAL DETAIL IN THE REBUTTAL REPORT AT PAGES 5

18  THROUGH 7.

19      AND TO THE EXTENT THERE'S A MOTION BEING MADE, IN ESSENCE,

20  NOW TO EXCLUDE THE OPINION BASED ON A VIOLATION OF RULE 26 AND

21  THE WAY THAT THE REPORT WAS DRAFTED, THAT IS OVERRULED.  THE

22  WITNESS CAN BE CROSS-EXAMINED ON THE BASIS FOR THE OPINION.

23      ALL RIGHT.  THOSE ARE THE FOUR.  THEN THE QUESTION BECOMES

24  CAN THE SLIDES BE USED.  AND REALLY, THE RELEVANT ISSUE WITH

25  THE SLIDES IS THAT IN THE BRAND EQUITY SECTION, THERE ARE

1    REFERENCES TO A LARGE NUMBER OF EMAILS, POSTINGS, AND OTHER

2    INFORMATION THAT THE WITNESS IS REFERENCING AS THE BASIS OF

3    HIS OPINION REGARDING THE DIMINISHED VALUE OF THE BRAND

4    POST-BANKRUPTCY.

5        REALLY, I THINK THE QUESTION THAT IS POSED IS UNDER

6    RULE 703.  IT'S CLEAR THAT THE OPINION MAY BE BASED ON

7    INFORMATION THAT IS NOT NECESSARILY ADMITTED OR ADMISSIBLE,

8    BUT IF THE FACTS OR DATA WOULD OTHERWISE BE INADMISSIBLE, THE

9    PROPONENT OF THE OPINION MAY DISCLOSE THEM TO THE JURY ONLY IF

10   THEIR PROBATIVE VALUE IN HELPING THE JURY EVALUATE THE OPINION

11   SUBSTANTIALLY OUTWEIGHS THEIR PREJUDICIAL EFFECT.

12       THIS IS A CLOSE CALL.  WHEN YOU HAVE A POSTING REFERRING

13   TO A PONZI SCHEME, HOW COULD IT BE MORE PREJUDICIAL?  AND IT

14   SEEMS TO ME THERE IS ALREADY SOME EVIDENCE IN THE RECORD OF

15   PEOPLE COMPLAINING ONCE THE BUSINESS SHUT DOWN.  I DON'T KNOW

16   THAT THAT ITSELF IS THAT CONTROVERSIAL.

17       SO, REALLY, THE QUESTION HERE IS HOW IS SHOWING THESE

18   QUITE DEROGATORY POSTS THEMSELVES AS OPPOSED TO JUST

19   REFERENCING THEM AND SAYING I REVIEWED A BUNCH AND PEOPLE

20   RESPONDED NEGATIVELY, WHICH, IT SEEMS TO ME, PROBABLY GETS YOU

21   WHERE YOU ARE GOING TO GET, MEETS THAT REQUIREMENT OF

22   SUBSTANTIALLY OUTWEIGHING THE PREJUDICIAL EFFECT WHICH

23   POTENTIALLY IS SIGNIFICANT.

24       NOW, I'LL SAY THIS:  IF ON CROSS PLAINTIFF OPENS THE DOOR

25   AND SAYS, WELL, IT WASN'T REALLY THAT BAD OR THERE REALLY

```
1    WEREN'T THAT MANY, THEN I'M JUST TELLING YOU YOU ARE OPENING

2    THE DOOR.  AND THAT WOULD, THAT WOULD REMOVE ANY DOUBT.  BUT

3    SHORT OF THAT, IT'S REALLY A QUESTION FOR YOU, MS. ROBERTS,

4    WHY DO YOU NEED TO SHOW THESE POSTS AND HOW DOES DOING SO

5    COMPORT WITH RULE 703?

6         MS. ROBERTS:  WE CAN REMOVE THE SLIDE THAT HAS THE

7    COMMENT ABOUT THE PONZI SCHEME.

8         AS FOR THE OTHERS, WE THINK THAT BEING ABLE TO SEE THESE

9    QUOTES, WHICH WILL NOT BE ADMITTED, AND WE ARE COMFORTABLE

10   WITH THE COURT GIVING AN INSTRUCTION TO THE JURY EXPLAINING

11   THESE ARE ONLY BEING OFFERED TO EXPLAIN THE BASIS FOR THE

12   EXPERT'S OPINION, BUT THEY WILL -- THEY ARE HELPFUL TO THE

13   JURY IN EVALUATING THE OPINION.

14        THE JURY HAS SEEN, I DON'T KNOW, TEN MAGAZINE ARTICLES AND

15   HEARD ABOUT ALL OF MR. NEWTON'S PHOTO SHOOTS, TALK ABOUT THE

16   EXTENSIVE REPORTING ON TECHSHOP THAT WAS FAVORABLE, AND NOW WE

17   ARE SIMPLY ASKING THAT MR. BÜNGER BE ALLOWED TO COUNTER THAT,

18   AND NOT JUST GET UP THERE AND SAY, I SAW A BUNCH OF -- YOU

19   KNOW, AS PART OF MY ANALYSIS, I LOOKED AT THE MATERIALS THAT

20   EXPERTS IN THIS FIELD LOOK AT.

21        AMONG THOSE THINGS ARE MEDIA, TRADITIONAL MEDIA AND SOCIAL

22   MEDIA POSTS, AND I FOUND THAT THERE WAS ALL THIS, YOU KNOW,

23   NEGATIVE REACTION TO THE CLOSURE AND THE ANNOUNCED BANKRUPTCY

24   AND THE PERCEPTION AS TO WHAT CAUSED IT.

25        BUT PARTICULARLY GIVEN THE EVIDENCE THAT THE JURY HAS
```

1    ALREADY SEEN, BEING ALLOWED TO SHOW THESE JUST EXAMPLES OF

2    WHAT HE WAS SEEING WILL ALLOW THE JURY TO BETTER UNDERSTAND

3    THE BASIS FOR HIS OPINION.

4         **MR. PISTORINO:**  IF I MAY?

5         **THE COURT:**  YOU MAY.

6         **MR. PISTORINO:**  THANK YOU.

7      MAYBE I'LL JUST START AT THE BEGINNING.  IN TERMS OF THE

8    SHOWING TECHSHOP MADE REGARDING THESE ARTICLES AND THOSE KINDS

9    OF THING, THAT REALLY GOES TO THE ISSUE OF THE FAME OF THE

10   MARK, RIGHT?  HOW WIDESPREAD KNOWN THE MARK IS.  IT DOESN'T

11   REALLY GO TO ANY -- ANYTHING ELSE ABOUT IT.

12     SO, MY FIRST QUESTION ON ALL OF THIS IS, I JUST ROLL BACK

13   TO, REALLY WHAT IS IT RELEVANT TO?  YOU'VE GOT A GUY THAT'S

14   GOING TO SAY HE REVIEWED SOME POSTS AND HE'S GOING TO TESTIFY

15   AS A QUOTE-UNQUOTE "EXPERT" ABOUT HIS FEELINGS ABOUT THEM.

16     I JUST DON'T THINK THAT'S -- I DON'T KNOW WHAT IT IS

17   RELEVANT TO, BUT I DON'T THINK IT'S EXPERT TESTIMONY.

18         **THE COURT:**  AGAIN, I DON'T THINK WHAT YOU PUT IN ONLY

19   WENT TO FAME.  YOUR EXPERT SAYS THAT AT THE RELEVANT TIMES,

20   SOMEBODY WOULD HAVE BEEN WILLING TO PAY ONE TO $1.48 MILLION

21   FOR THIS MARK --

22         **MR. PISTORINO:**  CORRECT.

23         **THE COURT:**  -- AND THIS ALL IS RELEVANT TO THAT.

24   THAT ASSERTION ASSUMES A LOT ABOUT THE REAL WORLD.  AND,

25   AGAIN, IF WE GET CLARITY FROM THE NINTH CIRCUIT LATER,

1  TERRIFIC.  THEN WE'LL KNOW, AND WE CAN COME BACK AND WE'LL TRY

2  THE CASE AGAIN AND I WILL HAVE THAT INPUT.

3  BUT IT JUST SEEMS PLAIN TO ME THAT YOU'VE -- THIS IS AN

4  ISSUE.  YOU'RE SAYING THAT SOMEBODY WOULD PAY $1.48 MILLION

5  FOR A LICENSE -- FOR A MARK FROM A BANKRUPT COMPANY THAT GOT

6  RUN INTO THE GROUND AND WENT UNDER.  THIS IS FAIR GAME.

7  **MR. PISTORINO:**  AND, AGAIN, MAYBE I MISSED IT.

8  YEAH, WHO WOULD PAY IT?  IT'S -- AND THE PART THAT I

9  MISSED HERE, IT IS TOTALLY IRRELEVANT WHAT CONSUMERS WOULD PAY

10  OR NOT.  THEY ARE NOT THE MARKET FOR A LICENSE TO THE TECHSHOP

11  MARKS.

12  **THE COURT:**  ISN'T THE VALUE OF A LICENSE DEPEND ON

13  WHAT PEOPLE IN THE MARKET WOULD ACTUALLY DO IF THERE IS NO

14  DEMAND OR IF THERE'S BAD FEELING ABOUT THE SERVICE, OF COURSE

15  THAT IMPACTS WHAT A LICENSE WOULD BE WORTH.

16  **MR. PISTORINO:**  SO, AT LEAST, MY VIEW WOULD BE, YEAH,

17  SO YOU WOULD LOOK TO THE POTENTIAL PURCHASERS OR LICENSEES OF

18  THE MARK, RIGHT, WHICH IS EXACTLY WHAT DR. MATOLO DID, YOU

19  WOULD LOOK AT THEM AND YOU WOULD EVALUATE THEM.

20  SO, IF A GUY HAD GONE OUT AND TALKED TO LEROY MARTIN OR

21  ANYBODY ELSE THAT WAS A POTENTIAL LICENSEE OF THE MARK AND

22  MADE A DECISION ABOUT IT, I THINK THAT WOULD BE GREAT FACTS OR

23  DATA.  BUT HE DIDN'T DO THAT.

24  AGAIN, TALKING TO A GUY DOWN THE STREET, HOW, YOU KNOW,

25  WHETHER OR NOT HE'S GOT GOOD FEELINGS OR BAD FEELINGS, AGAIN,

1    SO WHAT?  THE ISSUE -- THE ISSUE THE JURY WOULD (SIC)

2    PRESENTED WITH IS, WAS TECHSHOP DAMAGED BY THE UNAUTHORIZED

3    USE OF THE MARKS, AND, IF SO, BY HOW MUCH.

4        IT DOESN'T MAKE A DIFFERENCE WHAT -- WHERE, I GUESS, JOHN

5    NAGEL (PHONETIC) BELIEVES THERE IS A PONZI SCHEME OR NOT.

6    JOHN NAGEL IS NOT TAKING A LICENSE TO THE MARKS, RIGHT?

7            **THE COURT:**  YOUR POINT IS MADE.

8        HERE'S WHAT I'M GOING TO DO.  YOU CAN PICK FIVE OF THESE.

9    THE PONZI SCHEME ONE CAN'T BE ONE OF THEM.  AND WE DON'T NEED

10   TO BELABOR THE POINT.  AND I WILL GIVE THE INSTRUCTION THAT TO

11   THE EXTENT THESE ARE BEING REFERENCED, THE JURY MAY ONLY

12   CONSIDER THEM IN ASSESSING MR. BÜNGER'S OPINION AND FOR NO

13   OTHER PURPOSE, AND NOT FOR THEIR TRUTH.

14           **MS. ROBERTS:**  OKAY.

15           **MR. PISTORINO:**  CAN I -- I UNDERSTAND YOUR HONOR'S

16   RULING.  I'M NOT FIGHTING IT.  I JUST -- HELP ME TO UNDERSTAND

17   ONE THING.  WHEN DOCTOR -- JUST SO I CAN UNDERSTAND AT LEAST

18   FOR MAYBE MY OWN EDIFICATION.

19       AS I RECALL, WHEN DR. MATOLO TESTIFIED, I ACTUALLY HAD

20   INTENDED TO HAVE HIM JUST HAVE HIS EXPERT REPORT IN FRONT OF

21   HIM AND NOT DISPLAY IT TO THE JURY JUST SO HE COULD RECALL

22   EXACTLY WHAT HIS OPINIONS WERE.

23       AS I RECALL YOUR HONOR'S INSTRUCTION WAS, HE WAS NOT TO DO

24   THAT, THAT WAS IMPROPER.  HERE, I HAVE AN EXPERT REPORT IN

25   POWERPOINT FORM THAT, IN FACT, IS GOING TO BE SHOWN TO THE

1    JURY.  SO I GUESS I MISSED THE PROCEDURAL ASPECT OF IT.

2    THAT'S ALL.

3         **THE COURT:**  THE PROCEDURAL ASPECT IS, HE CAN'T SIT

4    THERE AND READ FROM HIS REPORT.  AND THIS GUY IS NOT DOING

5    THAT EITHER.

6       BUT THERE'S NO PROHIBITION ON USING A DECK TO ILLUSTRATE

7    THE TESTIMONY, AS IS ROUTINE AND AS YOUR WITNESS DID.

8       ALL RIGHT.  WE WILL BE BACK AT 8:30.

9       DOES EVERYONE UNDERSTAND THE RULINGS?

10         **MR. PISTORINO:**  YES.

11         **MS. ROBERTS:**  YES, YOUR HONOR.

12         **THE COURT:**  SO YOU NEED TO TRIM IT DOWN TO FIVE.  YOU

13   NEED TO CUT OUT THE IMPLICATION OF TECHSHOP 2.0 AND TAKE THAT

14   OUT OF THE TESTIMONY, AND OTHERWISE WE'LL PROCEED.

15         **MS. ROBERTS:**  THANK YOU, YOUR HONOR.

16         **MR. PISTORINO:**  YOUR HONOR, MAY I ADDRESS ONE JUST

17   FURTHER PROCEDURAL POINT ON THIS EXACT THING?

18      WHEN YOUR HONOR PREVIOUSLY MADE A RULING ON THE OPENING

19   SLIDES, IN PARTICULAR, FOR EXAMPLE, RULING THAT THE ARGUMENT

20   PLACED IN THE OPENING SLIDES THAT TECH AND SHOP WERE ONLY THE

21   COMMON PARTS OF IT, THE DEFENDANTS WENT OUT AND MADE A NEW

22   SLIDE DECK, DIDN'T SHARE A COPY WITH ME, AND THEN SHOWED IT TO

23   THE JURY.  IN PARTICULAR SLIDES YOUR HONOR HAD ORDERED WERE

24   NOT PROPER.

25      SO ALL I'M REQUESTING IS THAT I SEE A COPY OF THE SLIDES

```
1    BEFORE THEY ARE FLASHED IN FRONT OF THE JURY.

2         MS. ROBERTS:  WE WILL SHOW HIM A COPY.  YOU HAD ASKED

3    US THAT MORNING WHAT WE WERE GOING TO DO, AND I SAID WE WERE

4    GOING TO TAKE OUT ALL THE SLIDES THAT HAD IMAGES OF EXHIBITS

5    ON THEM, AND THAT'S EXACTLY WHAT WE DID.

6       ONCE WE MAKE THE OTHER CHANGES TO OUR SLIDES, I AM HAPPY

7    TO SHOW THEM TO MR. PISTORINO.

8         THE COURT:  THAT SOUNDS FINE.  WE WILL BE BACK AT

9    8:30.

10        MR. PISTORINO:  THANK YOU, YOUR HONOR.

11      (RECESS TAKEN AT 8:24 A.M.; RESUMED AT 8:35 A.M.)

12      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

13        THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS

14   COURT IS IN SESSION.  THE HONORABLE HAYWOOD S. GILLIAM, JR.,

15   PRESIDING.

16        THE COURT:  JUST A COUPLE OF OTHER LOGISTIC THINGS

17   WHILE I'M THINKING ABOUT THEM.

18      MY INCLINATION, AND I WANT TO GET YOUR SENSE ON THIS,

19   WOULD BE TO, IF THE EVIDENCE CLOSES TODAY, AS I EXPECT IT

20   WILL, TO GIVE THE JURORS TOMORROW OFF SO WE CAN FINALIZE THE

21   INSTRUCTIONS AND THE VERDICT FORM, AND THEN DO CLOSINGS FIRST

22   THING ON WEDNESDAY.

23      ANY RESPONSE TO THAT IDEA?

24        MR. PISTORINO:  THAT SOUNDS FINE WITH ME.

25        MS. ROBERTS:  THAT'S FINE.  WE WILL CLOSE TODAY.  AND
```

```
 1    IT'S MY UNDERSTANDING THERE'S NOT ANY REBUTTAL WITNESSES.

 2              THE COURT:  OKAY.  I JUST THINK THAT WAY WE WILL BE

 3    ABLE TO FINALIZE INSTRUCTIONS, YOU WILL HAVE THEM TOMORROW IN

 4    ENOUGH TIME TO INCORPORATE THEM INTO YOUR CLOSINGS, AND THAT

 5    WAY WE DON'T HAVE TO SCRAMBLE TO DO IT.

 6         AND THAT WAS THE OTHER THING IN TERMS OF WITNESSES, IS

 7    MR. BÜNGER YOUR LAST WITNESS?

 8              MS. ROBERTS:  YES, YOUR HONOR.

 9              THE COURT:  SO THAT MEANS WE ACTUALLY COULD BE DONE

10    QUITE EARLY.  I GUESS THE ALTERNATIVE WOULD BE TO JUST LET

11    THEM GO TODAY, AND TRY TO GET THEM TO YOU BY LATER IN THE DAY

12    AND THEN CLOSE TOMORROW.

13              MS. ROBERTS:  SORRY, LET THE JURY GO EARLY AFTER THE

14    TESTIMONY TODAY?

15              THE COURT:  EXACTLY.  SO THE EVIDENCE WOULD CLOSE.

16    THERE'S NOTHING FOR THEM TO DO BECAUSE WE HAVE WORK TO DO ON

17    THE INSTRUCTIONS.  LET THEM GO.

18         BUT GIVEN THAT WE ARE POTENTIALLY GOING TO BE DONE QUITE

19    EARLY TODAY, THAT IS GOOD TO KNOW.  THAT ACTUALLY -- MAKE

20    COUNSEL CLOSE FIRST THING TOMORROW, AS WE CONSIDERED BEFORE.

21    I THINK THAT WE COULD GET THE INSTRUCTIONS DONE, IF I'M NOT IN

22    HERE WITH YOU, BY THIS AFTERNOON.  AND OBVIOUSLY BOTH SIDES

23    HAVE MADE SUBSTANTIAL PROPOSALS AS TO WHAT YOU WANT TO GIVE,

24    SO THOSE ARE ALL PRESERVED.

25         BUT HOW LONG DO YOU THINK MR. BÜNGER WILL TAKE?
```

1          **MS. ROBERTS:**  I EXPECT IT WOULDN'T BE MORE THAN AN

2     HOUR ON OUR SIDE.

3          **THE COURT:**  ALL RIGHT.

4          **MR. PISTORINO:**  I DOUBT MY CROSS-EXAMINATION WILL

5     EXCEED AN HOUR AND A HALF.

6          **THE COURT:**  YOU HAVE TO KEEP TIME FOR YOUR CLOSING.

7          **MR. PISTORINO:**  THAT'S TRUE.

8          **THE COURT:**  THAT'S HELPFUL.  IN THAT CASE, I THINK WE

9     COULD LET THEM GO AND FIGURE OUT A WAY TO GET THE INSTRUCTIONS

10    DONE TODAY SO THAT WE CLOSE TOMORROW.  EVEN IF WE HAD THEM

11    COME BACK A LITTLE LATER THAN NORMAL TOMORROW, COME IN AT

12    10:00 IF THERE'S ANYTHING THAT WE NEED TO WRAP UP.

13         **MR. PISTORINO:**  I THINK THAT IF WE WERE GOING TO DO

14    THAT PLAN, WHICH IS FINE WITH ME AS WELL, I THINK THE ONLY

15    THING I WOULD BE THINKING ABOUT IS JUST HAVING ENOUGH TIME TO

16    FINISH PREPARING THE SLIDES SO THEY CAN BE EXCHANGED, AND

17    WHATEVER DISPUTES WE HAVE THEY CAN RESOLVED.

18         **THE COURT:**  EXACTLY.  I WOULD BE GETTING THEM TO YOU

19    BY THIS AFTERNOON SO THAT YOU WOULD KNOW WHAT WAS GOING TO BE

20    GIVEN.  AND THEN TO THE EXTENT WE WOULD HAVE SOME TIME

21    TOMORROW FOR YOU TO PUT ANY OBJECTIONS BEYOND THE ONES YOU

22    HAVE ALREADY RAISED -- YOU OBVIOUSLY HAVE EACH PROPOSED WHAT

23    YOU ARE GOING TO GIVE, YOU STIPULATED TO SOME.  THERE'S NO

24    CONTROVERSY ABOUT THOSE.  THERE ARE OTHERS WHERE YOU DISAGREE

25    SOMETIMES SUBSTANTIALLY.  I JUST HAVE TO DECIDE.  WE HAVE BEEN

```
 1    SPENDING A LOT OF TIME AND I WILL FIGURE OUT WHAT THE
 2    INSTRUCTION WILL BE, AND IT SEEMS TO ME THAT EVERYONE'S
 3    POSITION IS PRESERVED GIVEN WHAT YOU PROPOSED.  SO I DON'T
 4    KNOW THAT WE NEED TO SPEND THAT MUCH TIME ON A CHARGING
 5    CONFERENCE TYPE HEARING.
 6         MR. PISTORINO:  IF I CAN, THE ONLY OTHER PROCEDURAL
 7    THINK I'M THINKING OF THAT MIGHT TAKE TIME, ALTHOUGH MAYBE
 8    JUST MINUTES, IS THE JMOL.  SO I'M NOT SURE WHEN YOU INTEND
 9    TO -- OR WHEN THE COURT IS THINKING WE MIGHT HAVE EITHER
10    DISCUSSION OR ARGUMENT ABOUT IT.  OBVIOUSLY I HAVE SOME POINTS
11    I HOPE TO MAKE, THAT KIND OF THING.
12         THE COURT:  AT THIS POINT I AM VIRTUALLY CERTAIN TO
13    TAKE IT UNDER SUBMISSION PENDING RETURN OF THE VERDICT UNDER
14    RULE 50.
15         MR. PISTORINO:  OKAY.
16         THE COURT:  ALL RIGHT.  THIS IS HELPFUL.  I THINK
17    THIS OUGHT TO BE THE PLAN.  WE WILL FINISH THE TESTIMONY
18    TODAY.  I'LL LET THEM GO.  I WILL TELL THEM THAT CLOSINGS WILL
19    BE TOMORROW, AND I WILL PROBABLY TELL THEM, SAY 10:00 SO WE
20    HAVE TIME TO DEAL WITH ANY LOOSE ENDS BEFORE THEY COME BACK.
21         MR. PISTORINO:  OKAY.
22         THE COURT:  ALL RIGHT.  LET'S DO IT THAT WAY.
23         MS. ROBERTS:  THANK YOU.
24    (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)
25         THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.
```

| | |
|---|---|
| 1 | WELCOME BACK.  I HOPE EVERYONE MANAGED TO STAY COOL THIS |
| 2 | WEEKEND OR AS COOL AS YOU COULD. |
| 3 | YOU WILL RECALL THAT WHEN WE LEFT OFF ON FRIDAY THE |
| 4 | DEFENSE WAS PRESENTING ITS CASE AND THEY WILL CONTINUE WITH |
| 5 | THAT TODAY. |
| 6 | SO, MS. ROBERTS, YOU MAY CALL YOUR NEXT WITNESS. |
| 7 | **MS. ROBERTS:**  DEFENDANTS CALL MARK BÜNGER. |
| 8 | **THE CLERK:**  COME TO THE WITNESS STAND FOR ME, PLEASE, |
| 9 | AND RAISE YOUR RIGHT HAND. |
| 10 | GO UP THE STAIRS.  THANK YOU. |
| 11 | (**MARK BÜNGER,** CALLED AS A WITNESS FOR THE DEFENDANTS, |
| 12 | HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:) |
| 13 | **THE WITNESS:**  SO HELP ME GOD. |
| 14 | **THE CLERK:**  YOU MAY BE SEATED.  ONCE SEATED, LET ME |
| 15 | HAVE YOU PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR |
| 16 | THE RECORD, PLEASE. |
| 17 | **THE WITNESS:**  MY NAME IS MARK BÜNGER.  B- LIKE IN |
| 18 | BOY- U- WITH AN UMLAUT ABOVE IT, N-G-E-R. |
| 19 | **THE CLERK:**  OKAY.  HOW ARE YOU SPELLING MARK? |
| 20 | **THE WITNESS:**  M-A-R-K. |
| 21 | **THE CLERK:**  THANK YOU. |
| 22 | <div align="center">**DIRECT EXAMINATION**</div> |
| 23 | **BY MS. ROBERTS:** |
| 24 | **Q.**  GOOD MORNING. |
| 25 | **A.**  GOOD MORNING. |

BÜNGER - DIRECT / ROBERTS

1    **Q.**  CAN YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

2    **A.**  GOOD MORNING.  MY NAME IS MARK BÜNGER.  IT'S NICE TO MEET

3    YOU ALL.

4    **Q.**  CAN YOU TELL US WHAT YOUR CURRENT PROFESSION IS?

5    **A.**  I'M AN ADVISER AT A COMPANY CALLED MARSBOUND.

6    **Q.**  AND TELL US IT WILL THE JURY WHAT MARSBOUND IS?

7    **A.**  SO WE ADVISE LARGE CORPORATIONS ON HOW TO INTERACT WITH

8    TECHNOLOGY START-UPS.  THAT MIGHT BE THROUGH INVESTMENT,

9    THROUGH PARTNERSHIP, LICENSING, OTHER MEANS.

10   **Q.**  HOW LONG HAVE YOU BEEN WITH MARSBOUND?

11   **A.**  I STARTED MARSBOUND MYSELF ONE YEAR AGO.

12   **Q.**  YOU FOUNDED THE COMPANY?

13   **A.**  I DID.

14   **Q.**  CAN YOU DESCRIBE YOUR DUTIES AT MARSBOUND?

15   **A.**  WELL, SO AS THE FOUNDER, I HAVE A LOT OF ADMINISTRATIVE

16   DUTIES, BUT MOSTLY IT'S SPENDING TIME WITH MY CLIENTS THAT

17   ARE, AGAIN, THESE CORPORATIONS.

18   **Q.**  CAN YOU GIVE SOME EXAMPLES OF THE INDUSTRIES THAT YOU'VE

19   WORKED WITH IN YOUR WORK AT MARSBOUND?

20   **A.**  SURE.

21       SO IT'S A FAIRLY BROAD SPAN.  IT'S BASICALLY INDUSTRIES

22   WHERE TECHNOLOGY PLAYS AN IMPORTANT ROLE.  SO, FOR EXAMPLE, IN

23   PRIVATE TECHNOLOGY, TELECOMMUNICATIONS, MANUFACTURING, THINGS

24   LIKE THAT.  NOT SO MUCH BANKING OR ADVERTISING, THOSE SUCH

25   THINGS.

1   **Q.**  BEFORE FOUNDING MARSBOUND, WHAT DID YOU DO?

2   **A.**  FOR 13 YEARS BEFORE FOUNDING MARSBOUND, I WAS VICE

3   PRESIDENT OF RESEARCH AT LUX RESEARCH.

4   **Q.**  CAN YOU TELL THE JURY WHAT LUX RESEARCH IS?

5   **A.**  SO LUX RESEARCH WAS SPUN OUT OF A VENTURE CAPITAL FIRM

6   CALLED LUX CAPITAL.  IT DOES TECHNICAL DUE DILIGENCE, AGAIN,

7   ON TECHNOLOGY START-UPS.

8   **Q.**  AND CAN YOU DESCRIBE FOR THE JURY WHAT YOUR DUTIES WERE AT

9   LUX?

10  **A.**  YES.  SO WHEN THE COMPANY STARTED, IT WAS ABOUT FIVE

11  PEOPLE, AND WE GREW IT TO ABOUT 150 PEOPLE OVER THE TIME I WAS

12  THERE.

13      SO MY ROLE CHANGED FROM BEING A DIRECT PRACTITIONER AND

14  ANALYST MYSELF DOING THESE EVALUATIONS OF THE START-UPS TO

15  DEVELOPING CURRICULUM, TEACHING NEW ANALYSTS HOW TO DO THAT

16  SAME TYPE OF EVALUATION.  OVER THE TIME THAT I WAS THERE WE

17  DID ABOUT 20,000 START-UP EVALUATIONS.

18  **Q.**  AND WHEN DID YOU LEAVE LUX?

19  **A.**  ONE YEAR AGO.

20  **Q.**  AND THAT'S WHEN YOU FOUNDED MARSBOUND?

21  **A.**  EXACTLY.

22  **Q.**  PRIOR TO YOUR WORK AT LUX RESEARCH, WHAT DID YOU DO?

23  **A.**  IMMEDIATELY PRIOR TO LUX RESEARCH, I WAS AN ANALYST AT

24  FORRESTER RESEARCH DOING VERY SIMILAR WORK.  IN THAT CASE VERY

25  FOCUSED ON MANUFACTURING.

1    **Q.**  PRIOR TO FORRESTER RESEARCH, WHAT WERE YOU DOING?

2    **A.**  PRIOR TO FORRESTER I WAS -- I WAS ON THE MANAGEMENT TEAM

3    AT ONE START-UP AND I FOUNDED ANOTHER START-UP THAT BOTH

4    WORKED WITH ADVERTISING AND BRANDING AND TECHNOLOGY.  I HAD A

5    PATENT FROM ONE OF THOSE, AND BOTH OF THOSE WERE SUCCESSFULLY

6    EXECUTED.

7    **Q.**  WHAT WAS THE PATENT IN?

8    **A.**  THE PATENT WAS ON A TECHNOLOGY FOR ESSENTIALLY LINKING TWO

9    COMPANIES' BRANDS.  SO, FOR EXAMPLE, A COMPANY LIKE FRITO-LAY

10   MIGHT BE LINKED UP WITH A START-UP THAT WAS NEW IN THE FIELD

11   AND BASICALLY HELPING THEM LEVERAGE EACH OTHER'S BRAND EQUITY.

12   **Q.**  YOU MENTIONED BRAND.  CAN YOU EXPLAIN WHAT YOUR EXPERIENCE

13   IS ANALYZING BRANDS AND THEIR VALUE?

14   **A.**  SURE.

15       SO MY UNDERGRADUATE DEGREE IS IN MARKET RESEARCH.  AND IN

16   MARKET RESEARCH YOU BASICALLY SURVEY CONSUMERS, YOU HOLD FOCUS

17   GROUPS, YOU DO OTHER THINGS TO BASICALLY MEASURE WHAT --

18   WHATEVER THE BUYERS OF THAT PRODUCT OR SERVICE WOULD THINK

19   ABOUT THE BRAND.

20       THE... THE WORK I DID IMMEDIATELY AFTER THAT WAS FOR A

21   COMPANY CALLED ANDERSON CONSULTING, WHICH IS NOW CALLED

22   ACCENTURE.  IT'S ONE OF THE LARGEST MANAGEMENT CONSULT --

23          **THE REPORTER:**  I'M SORRY.

24          **THE WITNESS:**  ACCENTURE.  A-C-C-E-N-T-U-R-E.  I WILL

25   SPEAK MORE SLOWLY.

1        SO, AGAIN, IT'S A MANAGEMENT CONSULTANCY.  SO WE WOULD,

2   FOR EXAMPLE, DO SURVEYS OF CONSUMERS OF OUR CLIENTS AND SEE

3   WHAT THEY THOUGHT ABOUT THE PRODUCT OR SERVICE, AND SEE

4   WHETHER WE SHOULD CHANGE THE NAME OR CHANGE THE BRAND.

5        AFTER THAT, I WENT TO MY FIRST START-UP WHERE I WAS ALSO

6   ON THE MANAGEMENT TEAM.  IT WAS CALLED ICON MEDIALAB.  AND

7   THAT WAS A SWEDISH COMPANY THAT ALSO WORKED IN ADVERTISING AND

8   BRANDING AND TECHNOLOGY.  IT SUCCESSFULLY IPO'D.  AGAIN, I WAS

9   ON THE MANAGEMENT TEAM AND I RAN THE SAN FRANCISCO OFFICE.

10  AND ALSO IT RECEIVED A $20 MILLION INVESTMENT FROM ONE OF THE

11  LARGEST ADVERTISING AGENCIES IN THE WORLD THAT EVENTUALLY

12  ACQUIRED IT.

13  **Q.**  ARE YOU A MEMBER OF ANY PROFESSIONAL ORGANIZATIONS?

14  **A.**  I'M CURRENTLY A MEMBER OF THE ASSOCIATION OF COMPUTING

15  MACHINERY, WHICH IS THE... ESSENTIALLY THE PROFESSIONAL

16  ORGANIZATION FOR PEOPLE WHO WORK WITH... WITH COMPUTERS,

17  HARDWARE AND SOFTWARE.

18       IN THE PAST I'VE ALSO BEEN VICE PRESIDENT OF THE SWEDISH

19  AMERICAN CHAMBER OF COMMERCE AS WELL AS A MEMBER OF THE

20  SOCIETY OF PETROLEUM ENGINEERS.

21  **Q.**  DO YOU HAVE ANY TEACHING EXPERIENCE?

22  **A.**  I'M CURRENTLY ON THE FACULTY AT PRESIDIO GRADUATE SCHOOL,

23  WHICH IS BASED HERE IN SAN FRANCISCO.  IT'S AN MBA CURRICULUM

24  AND I TEACH WHAT'S CALLED ENTREPRENEURSHIPS SO THAT BASICALLY

25  HOW LARGE COMPANIES CAN BE MORE ENTREPRENEURIAL.

1    **Q.**  ANY OTHER TEACHING EXPERIENCE?

2    **A.**  I'M ALSO -- I'VE BEEN A GUEST LECTURER AT BERKELEY ALSO IN

3    THE HAAS SCHOOL OF BUSINESS FOR -- SINCE 2009.  SO I TEACH A

4    CLASS -- I CO-TEACH A CLASS THERE IN INTERNATIONAL CONSULTING.

5         AND IN THE PAST I'VE ALSO TAUGHT AT THE UNIVERSITY OF SAN

6    FRANCISCO AND I'VE GUEST LECTURED AT MANY SCHOOLS AROUND THE

7    WORLD, INCLUDING MASDAR IN THE UNITED ARAB EMIRATES,

8    UNIVERSITY OF MANAGEMENT SCIENCES IN PAKISTAN, AND MANY OTHER

9    PLACES.

10   **Q.**  HAVE YOU EVER PUBLISHED ANYTHING SUCH AS JOURNAL ARTICLES

11   OR REPORTS IN THE AREA OF MANUFACTURING?

12   **A.**  YES.  THAT WAS, AGAIN, THAT WAS MY PRIMARY JOB FOR THE

13   LAST 13 YEARS AT LUX AND THE FIVE OR SIX YEARS BEFORE THAT

14   WHEN I WAS AT FORRESTER.  SO OVER THAT TIME I'VE PUBLISHED

15   HUNDREDS OF DOLLARS ABOUT BROAD TRENDS IN THE SPACE, SUCH AS

16   DISTRIBUTED MANUFACTURING, WHICH IS VERY GERMANE TO THIS

17   TRIAL, AS WELL AS PROFILES OF INDIVIDUAL START-UPS, EVENTS

18   THAT I ATTENDED OR SPOKE AT, AND SO ON.

19   **Q.**  HAVE YOU PRESENTED ON ANY OF THESE TOPICS?

20   **A.**  YES.  I HAVE SPOKEN AT THE MAKER FAIRE HERE IN SAN MATEO

21   WHICH IS THE LARGEST ONE ABOUT, AGAIN, THE ROLE OF THE MAKER

22   MOVEMENT IN MANUFACTURING.

23        I PRESENTED ALSO AT THE FIRST MAKER FAIRE IN MOSCOW, WHICH

24   IS IN 2016.

25        I'VE PRESENTED AT NUMEROUS CONFERENCES, BOTH PUBLIC AND

1    PRIVATE EVENTS ABOUT, AGAIN, THE INTERSECTION OF THE MAKER

2    MOVEMENT, MAKERSPACES, AND MANUFACTURING MORE BROADLY.

3    **Q.**  CAN YOU EXPLAIN FOR THE JURY WHAT EXPERIENCE YOU HAVE

4    SPECIFIC TO THE MAKER MOVEMENT?

5    **A.**  SO, THE MAKER MOVEMENT IS ONE OF THE, I WOULD SAY, MOST

6    INTERESTING HOT TRENDS WITHIN MANUFACTURING RIGHT NOW.  THERE

7    IS A LOT OF INTEREST IN REVERSING THE DECLINE OF MANUFACTURING

8    THAT WE HAVE SEEN IN A LOT OF DEVELOPED ECONOMICS LIKE THE

9    UNITED STATES AND EUROPE BY USING MAKERSPACES AND OTHER

10   INITIATIVES TO BASICALLY RETHINK HOW MANUFACTURING HAPPENS.

11       AND SO, YOU KNOW, ON THAT TOPIC, AGAIN, I HAVE WRITTEN A

12   NUMBER OF REPORTS, SOME OF WHICH ARE SPECIFIC TO CLIENTS, BUT

13   AMONG THE ONES THAT WERE PUBLISHED, ONE WAS... ACTUALLY, I

14   SHOWED IT TO MARK HATCH THEN CEO OF TECHSHOP, AND HE SAID IT

15   IS ONE OF THE BEST HE HAD EVER SEEN.

16           **MR. PISTORINO:**  OBJECTION, YOUR HONOR, HEARSAY.

17           **THE COURT:**  SUSTAINED.

18           **THE WITNESS:**  YES.  SO I'VE PUBLISHED NUMEROUS

19   ARTICLES ABOUT THE MAKER MOVEMENT AND MANUFACTURING, AND I

20   HAVE SHARED THOSE WITH TECHSHOP.

21   **BY MS. ROBERTS:**

22   **Q.**  DO YOU HAVE ANY AREAS OF SPECIALTY?

23   **A.**  THE... SO MY AREA OF SPECIALTY IS EMERGING TECHNOLOGIES.

24   SO WHEN NEW THINGS LIKE 3D PRINTING, FOR EXAMPLE, BECOME, YOU

25   KNOW, MORE COMMERCIALLY VIABLE, MY JOB IS TO HELP FIND THE NEW

1    SPACES WHERE THEY CAN BE USED.

2        SO, FOR EXAMPLE, ONE OF THINGS I DID WAS INTRODUCE OAK

3    RIDGE NATIONAL LABORATORIES, WHICH IS THE U.S. NATIONAL LAB

4    BASED IN TENNESSEE, TO A START-UP CALLED LOCAL MOTORS.  AND IN

5    2014, THEY PRODUCED THE FIRST 3D PRINTED CAR.  AND THAT WAS

6    BASED ON MY INTRODUCTION.

7    **Q.**  HAS YOUR WORK BEEN RECOGNIZED IN THE MEDIA ANYWHERE?

8    **A.**  YEAH.  SO MY -- SO THE -- IN COMMON MEDIA, THINGS LIKE CNN

9    AND NPR, I'VE OFTEN BEEN INTERVIEWED AND QUOTED AS WELL AS IN

10   TECHNICAL PUBLICATIONS LIKE *NATURE* AND *THE ASSOCIATION FOR*

11   *ADVANCEMENT OF SCIENCE*.

12   **Q.**  CAN YOU TELL US ABOUT YOUR EDUCATION?

13   **A.**  YES.

14       UNDERGRADUATE DEGREE WAS IN MARKET RESEARCH, AS I THINK I

15   MENTIONED EARLIER.  AFTER THAT I STUDIED ONE YEAR IN SWEDEN

16   ALSO STUDYING INTERNATIONAL MARKETING.

17       I THEN, AFTER WORKING A LITTLE BIT IN THE U.S. AND THEN IN

18   EUROPE AGAIN, I'D ALWAYS WANTED TO BE AN AEROSPACE ENGINEER.

19   SO I DID SOME NIGHTS AND WEEKENDS TYPES OF COURSES THROUGH

20   BERKELEY.  ENDED UP GETTING A JOB AT UCSF WHERE I WORKED IN

21   NEUROLOGY AND BIO-ENGINEERING.

22       FOR WHAT IT'S WORTH, I ALSO TOOK A LOT OF CLASSES AT

23   TECHSHOP.

24   **Q.**  YOU SAID YOU TOOK CLASSES AT TECHSHOP.  WERE YOU A MEMBER

25   OF TECHSHOP?

1    **A.**  I WAS A MEMBER OF TECHSHOP.

2    **Q.**  WERE YOU EVER -- WERE YOU A MEMBER -- ARE YOU A MEMBER OF

3    THESHOP.BUILD?

4    **A.**  I WAS A MEMBER OF THESHOP.BUILD UNTIL THE SAN FRANCISCO

5    LOCATION CLOSED.

6    **Q.**  SO TODAY YOU ARE NO LONGER A MEMBER?

7    **A.**  TODAY I'M NO LONGER A MEMBER.

8    **Q.**  AND TURNING BACK TO YOUR SPEAKING ENGAGEMENTS REGARDING TO

9    THE MAKER MOVEMENT, I THINK YOU SAID YOU SPOKE AT MAKER FAIRES

10   IN SAN MATEO.  YOU USED THAT AS AN EXAMPLE.

11       CAN YOU JUST LIST SOME MORE PLACES WHERE YOU HAVE SPOKEN

12   ABOUT THE MAKER MOVEMENT SPECIFICALLY?

13   **A.**  YES.  I MEAN, AGAIN, IT'S -- THERE'S BEEN QUITE A LOT OF

14   OCCASIONS.

15       SO MAYBE SOME OF THE MORE, YOU KNOW, NOTABLE ONES FOR THE

16   LOCATION WOULD BE, I WAS AT A -- I PRESENTED AT A CONFERENCE

17   CALLED INNOFRUGAL, WHICH IS ABOUT WHAT'S CALLED FRUGAL

18   INNOVATION.  IN OTHER WORDS, INNOVATION NOT WITH

19   BILLION-DOLLAR BUDGETS, BUT SORT OF LIKE YOU SEE IN

20   MAKERSPACES WHERE YOU MAKE DO WITH WHAT YOU'VE GOT.  THE DIY

21   MOVEMENT IS ANOTHER PART OF THAT.

22       I'VE SPOKEN AT THE FRAUNHOFER INSTITUTE, WHICH IS

23   ESSENTIALLY... IT'S ONE OF THE MOST ADVANCE RESEARCH

24   INSTITUTES IN GERMANY, AND SPEAKING ABOUT AGAIN, THE SPOT UP

25   INNOVATION (PHONETIC).

1        I'VE ALSO PUBLISHED SCIENTIFIC -- OR EXCUSE ME, ACADEMIC

2   PAPERS WITH... WITH FRAUNHOFER.  AND ALSO I'VE SPOKEN ON THE

3   SAME TOPIC AT ENGINEERING SCHOOLS IN MOSCOW IN CONJUNCTION

4   WITH MAKER FAIRE AND ALSO SEPARATE FROM THAT AND I'VE ALSO

5   PUBLISHED ACADEMIC PAPERS ON THE ECONOMICS OF THE MAKER

6   MOVEMENT WITH COLLABORATORS AT RUSSIAN UNIVERSITIES.

7   **Q.**  HAVE YOU HAD ANY EXPERIENCE CONNECTING THE MAKER MOVEMENT

8   WITH CHILDREN?

9   **A.**  I STARTED THE FIRST MINI MAKER FAIRE FOR THE SAN FRANCISCO

10  UNIFIED SCHOOL DISTRICT AND I'VE ALSO DONE, YOU KNOW,

11  ACTIVITIES AT TECHSHOP AND OTHER MAKERSPACES AND AT THE SHOP

12  WITH CHILDREN'S GROUPS.  SO BASICALLY BIRTHDAY PARTIES, ROBOT

13  COMPETITIONS, THINGS LIKE THAT.  THAT'S ALL PERSONAL WORK,

14  THOUGH.

15        **MS. ROBERTS:**  YOUR HONOR, WE OFFER MR. BÜNGER AS AN

16  EXPERT IN BRAND VALUE AND THE MAKER MOVEMENT OR MAKERSPACES.

17        **THE COURT:**  ANY OBJECTION BEYOND THE ONE LODGED

18  PREVIOUSLY?

19        **MR. PISTORINO:**  NO, YOUR HONOR.

20        **THE COURT:**  ALL RIGHT.  SO I WILL PERMIT MR. BÜNGER

21  TO OFFER OPINIONS.

22        LADIES AND GENTLEMEN, THE INSTRUCTION THAT I GAVE YOU

23  EARLIER ABOUT OPINION TESTIMONY APPLIES EQUALLY HERE.  I'LL

24  JUST REMIND YOU THAT MR. BÜNGER WILL BE PERMITTED TO TESTIFY

25  TO OPINIONS AND THE REASONS FOR THOSE OPINIONS.  THIS OPINION

1    TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR EXPERIENCE OF

2    THIS WITNESS.  SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE

3    ANY OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE

4    IT AS MUCH WEIGHT AS YOU THINK IT DESERVES CONCERNING THE

5    WITNESS'S EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE

6    OPINION, AND ALL THE OTHER EVIDENCE IN THE CASE.

7    **BY MS. ROBERTS:**

8    **Q.**  MR. BÜNGER, ARE YOU BEING COMPENSATED FOR YOUR TIME AS AN

9    EXPERT IN THIS CASE?

10   **A.**  I HAVE NOT INVOICED MY TIME.

11   **Q.**  DO YOU HAVE AN HOURLY RATE?

12   **A.**  I DO.

13   **Q.**  WHAT IS THAT?

14   **A.**  $400 AN HOUR FOR LESS THAN HALF A DAY AND $300 AN HOUR FOR

15   MORE THAN HALF A DAY.

16   **Q.**  AND IS YOUR PAYMENT CONDITIONED ON THE SUBSTANCE ON YOUR

17   TESTIMONY HERE TODAY?

18   **A.**  NO.

19   **Q.**  IS YOUR PAYMENT CONDITIONED ON THE OUTCOME OF THIS CASE?

20   **A.**  NO.

21   **Q.**  CAN YOU TELL US WHAT YOU WERE ASKED TO DO IN REGARDS TO

22   THIS CASE?

23   **A.**  I WAS ASKED TO STUDY THE SENTIMENT AROUND THE TECHSHOP

24   BRAND IN THE RELEVANT PERIOD BEFORE AND DURING AND AFTER ITS

25   COLLAPSE.

1    **Q.**  AND HAVE YOU FORMED ANY OPINIONS IN THIS CASE?

2    **A.**  YES, I HAVE.

3    **Q.**  DID YOU PREPARE ANY DEMONSTRATIVES THAT WILL HELP THE JURY

4    UNDERSTAND THE EXPLANATION OF YOUR CONCLUSIONS?

5    **A.**  YES, WE HAVE SEVERAL ITEMS.

6    **Q.**  CAN WE PULL UP THE DEMONSTRATIVES?

7        **THE COURT:**  LADIES AND GENTLEMEN, THIS IS WHAT'S

8    CALLED A DEMONSTRATIVE EXHIBIT.  YOU HAVE SEEN SOME OF THESE

9    IN THE TRIAL.  THIS IS BEING OFFERED SIMPLY TO HELP ILLUSTRATE

10   THE WITNESS'S TESTIMONY, BUT IT IS NOT ITSELF EVIDENCE AND IS

11   NOT BEING OFFERED INTO EVIDENCE.

12                    (DISPLAYED ON SCREEN.)

13   **BY MS. ROBERTS:**

14   **Q.**  MR. BÜNGER, CAN YOU EXPLAIN FOR THE JURY WHAT OPINIONS YOU

15   REACHED?

16       AND WE'LL ADDRESS EACH ONE IN TURN.  BUT IF YOU CAN GIVE A

17   SUMMARY FIRST.

18   **A.**  SURE.

19       SO THERE ARE THREE IMPORTANT THINGS THAT CAME OUT OF THE

20   STUDY THAT I DID.  ONE IS THAT THE -- AT THE TIME OF THE

21   ALLEGED INFRINGEMENT, SO NOVEMBER TO FEBRUARY 2017, 2018, THE

22   TECHSHOP BRAND HAD WHAT WE CALL NEGATIVE EQUITY.

23       THE SECOND THING IS THAT TECH AND SHOP, IF YOU LOOK AT

24   THE -- THOSE NAMES IN THE -- IN MAKERSPACES AROUND THE WORLD

25   ARE VERY COMMON.

1        AND THEN THE THIRD IS THAT THE LOST LICENSING REVENUE

2   MODEL THAT WE SAW DISCUSSED EARLIER ISN'T AN APPROPRIATE WAY

3   TO VALUE THE TECHSHOP BRAND OR ANY OF THE VALUE THAT IT WOULD

4   HAVE HAD IN THAT PERIOD OF NOVEMBER '17 TO FEBRUARY 2018.

5   **Q.**  NOW, BEFORE WE GO INTO DETAIL IN YOUR CONCLUSIONS, YOU'VE

6   EXPLAINED THAT YOU HAVE EXPERIENCE WITH MAKERSPACES AND THE

7   MAKER MOVEMENT.

8        WAS TECHSHOP THE FIRST MAKERSPACE?

9   **A.**  NO.  TECHSHOP WAS NOT THE FIRST MAKERSPACE.

10       THE EVOLUTION OF THIS SPACE REALLY STARTED, YOU KNOW, BACK

11  IN THE '70S AND '80S WHERE, IN THE 1970'S THERE WAS SOMETHING

12  CALLED THE HOMEBREW COMPUTER CLUB.  THIS IS THE... THE

13  HACKERSPACE THAT APPLE WAS SPUN OUT OF, FOR EXAMPLE.

14       IN THE 1980'S THERE WAS SOMETHING CALLED THE CHAOS

15  COMPUTER CLUB THAT'S BASED IN GERMANY THAT IS STILL VERY

16  ACTIVE AND VERY IMPORTANT DRIVER OF INNOVATION.  THERE ARE

17  WHAT WERE CALLED HACKERSPACES.

18       AND IN 2001, A PROFESSOR AT MIT NAMED NEIL GERSHENFELD

19  STARTED A CLASS THAT HE CALLED "HOW TO MAKE ALMOST ANYTHING".

20  AND THAT WAS VERY POPULAR.  HE BASICALLY ENDED UP COMBINING

21  THE IDEAS OF MAKING, IN HIS MIND, THERE WERE THINGS LIKE LASER

22  CUTTERS AND 3D PRINTERS, WITH THE SPACES THAT HAD BEEN MORE

23  DEDICATED TO COMPUTER HARDWARE THAT WERE CALLED HACKERSPACES.

24       SO STARTING IN 2001, WHAT HE CALLED FAB LABS, FABRICATION

25  LABS STARTED TO SPREED.  AND AROUND 2006, A GROUP OF PEOPLE

1    FROM THE UNITED STATES VISITED THE CHAOS COMPUTER CLUB, KIND

2    OF COMBINED THAT WITH THE IDEAS THAT GERSHENFELD WAS WORKING

3    ON WITH HIS FAB LABS, AND STARTED THE FIRST MAKERSPACES.

4        SO ONE IN SAN FRANCISCO WAS CALLED NOISE BRIDGE.  THERE

5    ARE OTHERS IN WASHINGTON, D.C. AND NEW YORK, AND THIS IS THE

6    ABOUT THE SAME TIME THAT TECHSHOP BEGAN.

7    **Q.**  YOU USED THE TERM "FAB LABS".  WAS THAT THE NAME OF A

8    MAKERSPACE?

9    **A.**  THAT'S A NAME OF -- SO NEIL GERSHENFELD, THE MIT

10   PROFESSOR, BASICALLY CAME UP WITH A TEMPLATE, YOU COULD SAY A

11   RECIPE FOR HOW TO MAKE A MAKERSPACE; WHAT TOOLS SHOULD BE IN

12   IT, HOW YOU SHOULD RUN IT, THE FACT THAT IT NEEDED TO BE

13   NONPROFIT AND OPENED TO THE PUBLIC, AND THINGS LIKE THAT.

14       SO THAT WAS HIS CREATION.

15   **Q.**  SO WHEN YOU USE THE TERM "FAB LABS", THAT'S WHAT YOU ARE

16   REFERRING TO?

17   **A.**  THAT'S WHAT I'M REFERRING TO, YEAH.

18   **Q.**  AND HOW QUICKLY DID THE MAKERSPACE MOVEMENT SPREED?

19   **A.**  WELL, SO FROM 2001 TO 2006, IT WAS VERY MUCH KIND OF

20   LIMITED TO ACADEMIC AND NONPROFIT TYPES OF CIRCLES.

21       IN 2006, WHEN TECHSHOP BEGAN, THAT WAS, IF NOT THE FIRST

22   FOR-PROFIT MAKERSPACE, IT WAS ONE OF THE FIRST AND ONE OF THE

23   FIRST TO REALLY HAVE THIS IDEA OF SPREADING LIKE A CHAIN.

24       SO FROM 2006 TO ROUGHLY 2013, THIS IS WHEN A LOT OF

25   MAKERSPACES WERE STARTING AND SPREADING.  AGAIN, MAKERSPACES

1    INCLUDING FAB LABS AND OTHER LOCALLY FOUNDED MAKERSPACES THAT

2    HAD THEIR OWN NAMES.

3        SO THAT WAS UP UNTIL LIKE 2013.  AND DO YOU WANT ME TO

4    CONTINUE?

5    **Q.**  SO YOU MENTIONED THAT TECHSHOP WAS THE FIRST OR ONE OF THE

6    FIRST FOR-PROFIT MAKERSPACES, RIGHT?

7        SO WHAT DID TECHSHOP CONTRIBUTE TO THE IDEA OF

8    MAKERSPACES?

9    **A.**  SO MOST OF THE MAKERSPACES UP TO THAT POINT HAD, AGAIN,

10   BEEN SOMETHING LIKE THE CHAOS COMPUTER CLUB WHERE IT WAS A

11   LITTLE BIT ANARCHISTIC.  HACKERSPACES, THE FAB LABS DEFINITELY

12   TRIED TO MAKE THIS MORE OF AN EDUCATIONAL COMPONENT, AND

13   TECHSHOP, BY MAKING IT COMMERCIAL, ALSO TRIED TO, YOU KNOW,

14   ESSENTIALLY DO FOR THE -- FOR HACKERSPACES BASICALLY MAKE THEM

15   A LITTLE BIT MORE FAMILY FRIENDLY, POSSIBLY MORE CORPORATE

16   ACCESSIBLE, AND JUST BE A NEW BUSINESS MODEL THAT THEY HOPED

17   TO BE ABLE TO EXPAND MORE RAPIDLY THAN A NONPROFIT COULD.

18   **Q.**  AND BEFORE IT CLOSED, WHAT WAS THE MAKER COMMUNITY'S

19   FEELINGS TOWARDS TECHSHOP?

20        **MR. PISTORINO:**  OBJECTION, YOUR HONOR, NO FOUNDATION.

21   SPECULATION, CALLS FOR SPECULATION.

22        **THE COURT:**  SUSTAINED.  WHY DON'T YOU LAY THE

23   FOUNDATION.

24   **BY MS. ROBERTS:**

25   **Q.**  WERE ARE YOU STUDYING THE MAKER COMMUNITY BEFORE TECHSHOP

1    CLOSED ITS DOORS?

2    **A.**  YES.

3    **Q.**  WHEN DID YOU START STUDYING THE MAKER MOVEMENT?

4    **A.**  MY FIRST -- THE FIRST TIME I PUBLISHED ANYTHING ABOUT IT,

5    I BELIEVE, WAS 2009.  THAT WAS IN REGARD TO SOME OF THE THINGS

6    THAT THE OBAMA ADMINISTRATION AT THE TIME WAS TRYING TO

7    PROMOTE WITH... AT MAKER FAIRE AND WITH AMERICA MAKES, SOME OF

8    THE INITIATIVES THAT, AT THAT POINT, WERE STILL VERY, VERY

9    EARLY.

10       AND SO I WAS, AGAIN, INFORMING MY CORPORATE CLIENTS OF HOW

11   THEY MIGHT ENGAGE WITH THIS MOVEMENT AND WHAT BENEFIT IT MIGHT

12   HAVE FOR THEM.

13       MY FIRST BIG REPORT ON IT WAS IN 2014, AND THAT WAS ABOUT

14   DISTRIBUTED MANUFACTURING.

15   **Q.**  AND IN CONNECTION WITH YOUR RESEARCH AND ANALYSIS OF THE

16   MAKER MOVEMENT AND MAKER COMMUNITY, DO YOU HAVE AN

17   UNDERSTANDING AS TO WHAT THE COMMUNITY'S FEELINGS WERE ABOUT

18   TECHSHOP BEFORE IT CLOSED?

19         **MR. PISTORINO:**  OBJECTION, YOUR HONOR, CALLS FOR

20   SPECULATION.  NO FOUNDATION.

21         **THE COURT:**  OVERRULED.

22         **THE WITNESS:**  SO THE COMMUNITY, AGAIN, WE HAVE THE

23   RELATIONSHIP WITH HACKERSPACES AND, AGAIN, THE SORT OF

24   ANARCHISTIC BENT.  SO THE IDEA THAT YOU WOULD HAVE A

25   FOR-PROFIT ORGANIZATION WORKING ON THIS WAS, FOR SOME PEOPLE,

1    NOT VIEWED AS A POSITIVE THING.  IT WOULD SORT OF BE LIKE

2    COMMERCIALIZING BURNING MAN OR TAKING OPEN SOFTWARE AND

3    SELLING IT.

4        FOR CORPORATIONS, THIS WAS POTENTIALLY A GOOD THING

5    BECAUSE YOU CAN'T, FOR EXAMPLE, PUT YOUR NAME ON A FAB LAB.

6    YOU CAN'T SORT OF USE THAT FOR COMMERCIAL ACTIVITIES IN THE

7    SAME WAY, BUT, AGAIN, THE COMMUNITY WAS, I WOULD SAY, DIVIDED

8    ABOUT THAT.  THERE WERE AT LEAST THOSE TWO CAMPS, THE

9    CORPORATE IS GOOD AND THEN THE CORPORATE IS NOT SO GOOD.

10   **Q.**  AND WHAT WERE THE EFFECTS OF TECHSHOP'S CLOSURE ON THE

11   MAKER COMMUNITY?

12   **A.**  WELL, SO, AGAIN, WITH TECHSHOP -- WITH ANY MAKERSPACE BUT

13   TECHSHOP IN PARTICULAR, YOU HAD... BECAUSE IT WAS A MEMBER --

14   YOU WERE PAYING A LOT OF MONEY FOR MEMBERSHIP COMPARED TO A

15   NONPROFIT MAKERSPACE.  WHEN IT CLOSED, THE PEOPLE THAT LOST

16   ACCESS TO THAT, LOST THOUSANDS OF DOLLARS SOMETIMES AS

17   MEMBERSHIP, SOME OF THEM HAD --

18           **MR. PISTORINO:**  OBJECTION, NO FOUNDATION.

19           **THE WITNESS:**  -- THEIR TOOLS AND MATERIALS LOCKED

20   UP --

21           **THE COURT:**  HOLD ON --

22       MR. BÜNGER, HOLD ON.  THERE'S AN OBJECTION.

23           **MR. PISTORINO:**  OBJECTION, NO FOUNDATION.  CALLS FOR

24   SPECULATION.

25           **THE COURT:**  OVERRULED.

1          **THE WITNESS:**  SO IF YOU WERE IN A NONPROFIT

2     MAKERSPACE AND IT CLOSED, YOU PROBABLY DIDN'T HAVE A LOT OF

3     MONEY SPENT OR INVESTED IN THAT.

4          AT TECHSHOP -- WHEN TECHSHOP CLOSED, AGAIN, MEMBERSHIPS

5     WERE LOST.  THEY HAD PAID -- YOU KNOW, YEARLY MEMBERSHIP WAS

6     ABOUT $1500.  LIFETIME MEMBERSHIPS WERE TENS OF THOUSANDS OF

7     DOLLARS.  PEOPLE HAD MATERIALS AND TOOLS WORTH HUNDREDS OR

8     THOUSANDS OF DOLLARS THAT WERE STORED THERE, AND OVERNIGHT

9     THEY LOST ACCESS TO THOSE THINGS.

10    **BY MS. ROBERTS:**

11    **Q.**  NOW LET'S TURN TO THE OPINIONS THAT YOU SUMMARIZED

12    EARLIER.

13         SO, FIRST, YOU USED THE TERM "BRAND EQUITY" OR "NEGATIVE

14    BRAND VALUE".  CAN YOU EXPLAIN WHAT YOU MEAN BY THAT?

15    **A.**  SURE.

16         SO BRAND EQUITY IS THE AMOUNT YOU'LL PAY FOR A PRODUCT OR

17    SERVICE BASED ON ITS, YOU KNOW, HOW WELL YOU HOLD IT IN ESTEEM

18    OR WHAT YOU THINK OF IT COMPARED TO A FUNCTIONALLY IDENTICAL

19    PRODUCT OF ANOTHER SORT.

20         SO, FOR EXAMPLE, YOU COULD HAVE A BAG, A PURSE, FOR

21    EXAMPLE, THAT IS EXACTLY THE SAME AS ANOTHER BAG THAT HAS A

22    PRADA LABEL ON IT AND PEOPLE WILL PAY MORE FOR THE PRADA

23    BASED -- THE BAG WITH PRADA ON IT EVEN THOUGH THE FUNCTION IS

24    IDENTICAL.

25         SO THAT'S A COMPONENT OF THE EQUITY THAT PRADA HAS.

1    **Q.**  HOW DO YOU DETERMINE THE VALUE OF A BRAND'S EQUITY?

2    **A.**  THERE ARE NUMEROUS WAYS TO DO THAT.  SOME OF THEM ARE VERY

3    SUBJECTIVE.  SO PRESIDENT TRUMP -- THEN CANDIDATE TRUMP, FOR

4    EXAMPLE, ALWAYS CITED THAT HIS BRAND WAS WORTH PART OF HIS

5    BILLIONS.  THAT WAS A COMPLETELY SUBJECTIVE ASSESSMENT.

6        IN REALITY, WE DON'T GO ON SUCH SUBJECTIVE ASSESSMENTS.

7    YOU LOOK AT THE ACTUAL PRICES THAT PEOPLE PAY FOR A PRODUCT,

8    THE NUMBER OF TIMES THAT THEY BUY THAT PRODUCT, AND OTHER

9    CONCRETE, YOU KNOW, FINANCIALLY MEASURABLE WAYS THAT THAT'S

10   INCREASED.

11   **Q.**  AND WHAT FACTORS CAN LEAD A BRAND EQUITY TO DROP INTO THE

12   NEGATIVE?

13   **A.**  SO THERE'S... USUALLY COMPANIES HAVE POSITIVE BRAND EQUITY

14   OR ELSE THEY WOULDN'T BE IN BUSINESS.  BUT SOMETIMES THEY HAVE

15   A DISASTROUS EVENT THAT LEADS TO WHAT WE CALL NEGATIVE BRAND

16   EQUITY.

17       SO, YOU KNOW, THIS IS BASICALLY WHERE NOW YOU HAVE TO

18   ACTUALLY PAY PEOPLE MORE -- YOU HAVE TO ACCEPT LESS MONEY THAN

19   A FUNCTIONALLY EQUIVALENT PRODUCT.

20       SO, SOME EXAMPLES OF THAT THAT YOU MIGHT BE FAMILIAR WITH

21   THAT THROUGH THE NEWS, WOULD BE VOLKSWAGEN OR ENRON.  SO

22   VOLKSWAGEN, WHEN IT HAD ITS DIESEL GATE SCANDAL, IT HAD TENS

23   OF THOUSANDS OR MILLIONS OF CONSUMERS AROUND THE WORLD THAT

24   OWNED A CAR THAT WAS LESS -- WORTH LESS FROM ONE DAY TO THE

25   NEXT BECAUSE THE PURPORTED ENVIRONMENTAL BENEFITS OF THAT CAR

BÜNGER - DIRECT / ROBERTS

1    WERE SHOWN TO BE A LIE.  VOLKSWAGEN HAD TO COMPENSATE THE

2    OWNERS OF THOSE CARS TENS OF THOUSANDS OF DOLLARS.  THEY HAD

3    TO, YOU KNOW, MAKE ADVERTISING EXPENDITURES AND CAMPAIGNS TO

4    BASICALLY NOT ONLY MAKE UP FOR THAT AND APOLOGIZE, BUT GO

5    BEYOND THAT TO GET THEIR BRAND EQUITY BACK.

6        BP, WITH THE DEEPWATER HORIZON SCANDAL WAS ANOTHER

7    EXAMPLE.  AIG THAT BROUGHT DOWN THE WORLD ECONOMY A FEW YEARS

8    AGO HAD TO BASICALLY CHANGE THEIR NAME.

9    **Q.**  NOW FOCUSING ON A TECHSHOP'S BRAND EQUITY, WHAT FACTORS

10   DID YOU CONSIDER TO DETERMINE TECHSHOP'S BRAND EQUITY?

11   **A.**  SO THERE WERE, AS I SAID, THIS ISN'T SUBJECTIVE.  WE

12   LOOKED AT WHAT'S CALLED SENTIMENT ANALYSIS.  THIS IS THE

13   MODERN VERSION OF SURVEYS AND FOCUS GROUPS.

14       WHAT WE DO WITH SENTIMENT ANALYSIS IS WE LOOK

15   STATISTICALLY AT THINGS LIKE HOW MANY GOOGLE SEARCHES ARE

16   PEOPLE DOING FOR A TERM.  WHEN THEY POST SOMETHING ON SOCIAL

17   MEDIA, IS THAT POSITIVE OR NEGATIVE?  OR WHEN THERE'S AN

18   ARTICLE ABOUT THAT COMPANY IN A CREDIBLE PUBLICATION, IS THAT

19   POSITIVE OR NEGATIVE?

20       SO WE BASICALLY PERFORMED THE SENTIMENT ANALYSIS USING

21   THREE TOOLS, GOOGLE TRENDS, PROTAGONIST, AND CRIMSON HEXAGON

22   TO COME UP WITH SOME STATISTICAL BASIS FOR THE EQUITY AT THE

23   TIME.  AND THEN TO EXPLAIN SPECIFICALLY WHAT WAS CAUSING

24   POSITIVE OR NEGATIVE COMMENTS, WE LOOKED AT SOCIAL MEDIA POSTS

25   THAT WERE, AGAIN, AT THE SAME TIME AS THIS -- THESE

1    STATISTICAL CHANGES IN POSTINGS TO GIVE SOME EXPLANATION FOR

2    EXACTLY WHAT IT WAS THAT WAS CAUSING POSITIVE OR NEGATIVE

3    SENTIMENT.

4    **Q.**  NOW IF A BRAND DECREASES IN VALUE OR REACHES NEGATIVE

5    VALUE, CAN IT BE REPAIRED?

6    **A.**  IT CAN.  IT -- AS YOU'VE SEEN WITH THE EXAMPLES I

7    MENTIONED, LIKE VOLKSWAGEN, THEY ARE SPENDING BILLIONS OF

8    DOLLARS.  THEY WANT TO BE THE NUMBER ONE ELECTRIC VEHICLE

9    CAR -- VEHICLE MAKER IN THE WORLD.  THEY ARE INVESTING

10   BILLIONS OF DOLLARS IN BATTERY TECHNOLOGY AND THEY'RE

11   INVESTING HUNDREDS OF MILLIONS OF DOLLARS IN ADVERTISING.

12       SO YOU CAN DO THAT.  AGAIN, ANOTHER EXAMPLE WOULD BE

13   TYLENOL AFTER, YOU KNOW, THERE'S A -- SOME TAMPERING THAT WAS

14   DONE IN THE '80S.  THEY SPENT A LOT OF MONEY AND MANY, MANY

15   YEARS GETTING THEIR BRAND BACK.  SO YOU CAN DO IT WITH

16   SUSTAINED EFFORT.

17   **Q.**  AND FUNDS?

18   **A.**  FUNDING AND EFFORT AND LEADERSHIP, AND A LOT OF OTHER

19   THINGS.

20   **Q.**  ALL RIGHT.  NOW YOU SAID EARLIER THAT ONE OF THE THINGS

21   YOU CONSIDERED WAS SENTIMENT ANALYSIS TOOLS, RIGHT?

22   **A.**  RIGHT.

23   **Q.**  CAN YOU EXPLAIN TO THE JURY HOW SENTIMENT ANALYSIS TOOLS

24   WORK?

25   **A.**  SO AS I MENTIONED EARLIER, IN THE PAST, WE WOULD MEASURE

1    SENTIMENT BY BRINGING PEOPLE INTO A FOCUS GROUP AND SPENDING A

2    FEW HOURS WITH THEM AND ASKING THEM QUESTIONS OR YOU WOULD

3    SEND OUT A SURVEY EITHER, YOU KNOW, BY TELEPHONE, YOU'D GO

4    WALK AROUND TOWN WITH A CLIPBOARD, AND YOU'D BASICALLY TRY AND

5    GATHER THAT INFORMATION.

6         TODAY, BECAUSE OF SOME OF THE SHORTCOMINGS OF THAT TYPE OF

7    DIRECT QUESTIONING, THOSE ARE ACTUALLY CALLED LIARS GROUPS

8    BECAUSE IF YOU GIVE PEOPLE DONUTS, THEY'LL SAY NICE THINGS

9    ABOUT YOU.  WE USE SOMETHING CALLED SENTIMENT ANALYSIS.

10        AND BASICALLY WHAT YOU'RE DOING IS YOU'RE LOOKING AT WHAT

11   PEOPLE ARE ACTUALLY SAYING TO EACH OTHER.  SO WE ARE LOOKING

12   AT, AGAIN, THE SEARCHES THAT THEY ARE DOING ON GOOGLE AND

13   TRACKING THAT.  WE ARE LOOKING AT THE THINGS THAT THEY ARE

14   SAYING ON SOCIAL MEDIA.  SO THERE MIGHT BE A WORD LIKE "LOVE"

15   OR "HATE" IN A POST, AND THE PROXIMITY OF THAT WORD TO THE

16   BRAND THAT YOU ARE TALKING ABOUT, THE FREQUENCY OF THAT WORD

17   ACROSS THE BOARD WOULD ALL CONTRIBUTE TO, IF IT WAS "HATE",

18   NEGATIVE SENTIMENT, IF IT WAS "LOVE", POSITIVE SENTIMENT.

19        YOU CAN THINK OF DOING THAT WITH HUNDREDS OF THOUSANDS OR

20   MILLIONS OF POSTS ACROSS A LOT OF TIME, YOU GET A GOOD SENSE

21   FOR WHAT IS A POSITIVE OR NEGATIVE POST.

22   Q.  NOW IF WE CAN TURN TO THE NEXT SLIDE THAT'S IN FRONT OF

23   YOU.

24                  (DISPLAYED ON SCREEN.)

25        CAN YOU EXPLAIN TO THE JURY WHAT THIS IS SHOWING?

1    **A.**  YES.  SO THIS IS A SERVICE PROVIDED BY GOOGLE CALLED

2    GOOGLE TRENDS.  AND WHAT YOU DO IS YOU PUT IN A WORD THAT

3    YOU'RE INTERESTED IN, AND IN THIS CASE WE PUT IN TECHSHOP, AND

4    IT TRACKS THE SEARCHES FOR THAT WORD OVER TIME.

5         AND SO THEY -- THEY CALL THIS MEASURE INTEREST.  SO

6    INTEREST OVER TIME IS NEUTRAL.  IT IS POSITIVE, NEGATIVE, AND

7    NEUTRAL SEARCHES.  AND THIS STARTS IN 2004 AND GOES UP UNTIL,

8    I THINK, NOVEMBER OF LAST YEAR WHEN WE DID THIS STUDY.

9         SO, AGAIN, THIS IS A SEARCH FOR TECHSHOP.  AND INTEREST

10   OVER TIME, AS YOU CAN SEE STARTING IN 2004, IS RELATIVELY LOW.

11   AROUND 2013, IT STARTS TO RISE -- SORRY, THAT'S 2011.  AROUND

12   2013, '14, IT IS WHERE YOU SEE IT HIT ITS PEAK, AND THEN IT

13   STARTS TO DECLINE.

14        SO IT'S A PRETTY STEADY DECLINE, AS YOU CAN SEE FROM THE

15   CHART, UNTIL THE ONE SPIKE THAT IS BASICALLY THE REASON THAT

16   WE ARE HERE TODAY.  THERE WAS A BANKRUPTCY ANNOUNCED IN

17   NOVEMBER 2017, AND THAT IS THE SPIKE THAT YOU SEE RIGHT THERE.

18        SO MORE PEOPLE WERE SEARCHING FOR TECHSHOP IN THAT

19   PARTICULAR PERIOD THAN ANY OTHER PERIOD THROUGH TECHSHOP'S

20   HISTORY.

21   **Q.**  AND THE SPIKE YOU ARE REFERRING TO, THAT'S THE ONE ON THE

22   FAR RIGHT?

23   **A.**  FAR RIGHT, YEAH.

24   **Q.**  IS THERE ANY OTHER STATISTICAL EVIDENCE THAT YOU RELIED

25   UPON IN ADDITION TO THE GOOGLE TRENDS ANALYSIS YOU JUST SHOWED

1    US TO REACH YOUR CONCLUSIONS REGARDING SENTIMENT?

2    **A.**  RIGHT.

3         SO, AGAIN, AS YOU CAN SEE, THE OVERALL PEAK WAS IN...

4    AROUND 2013, 2014.  AFTER THE DROP IT WAS NEAR ZERO.  AND WE

5    REALLY WANTED TO FOCUS IN ON THAT PERIOD RIGHT BEFORE AND

6    AFTER THIS -- THIS SPIKE THAT IS, AGAIN, RELEVANT TO THIS

7    TRIAL.

8         WHAT WE DID IN THAT CASE IS WE USED A SECOND SERVICE

9    THAT'S CALLED PROTAGONIST.  SO PROTAGONIST IS ONE OF THE

10   LEADING COMPANIES DOING WHAT'S CALLED NARRATIVE ANALYTICS.

11        YOU LOOK AT WHAT'S THE NARRATIVE, WHAT'S THE STORY IN

12   MEDIA AND THE PUBLIC ABOUT A CERTAIN TOPIC, A BRAND BEING ONE

13   OF THOSE TYPES OF TOPICS.

14   **Q.**  IF YOU CAN TURN TO THE NEXT SLIDE.  CAN YOU EXPLAIN TO THE

15   JURY WHAT THIS IS?

16                   (DISPLAYED ON SCREEN.)

17   **A.**  THIS IS PROTAGONIST'S CHART OF SENTIMENT OF TECHSHOP GOING

18   FROM JANUARY OF 2017 UP UNTIL THE END OF OCTOBER 2018.

19        SO AS YOU CAN SEE, YOU CAN, AGAIN -- THAT SPIKE IS THE

20   DECEMBER TO -- SORRY, NOVEMBER TO FEBRUARY TIME FRAME OF 2017

21   TO 2018.  BEFORE THAT, THE SENTIMENT WAS SLIGHTLY MORE

22   POSITIVE.  AFTER THAT IT'S SLIGHTLY MORE NEGATIVE.

23        BUT THE PERIOD IN QUESTION, AGAIN, IS THAT BIG RED SPIKE,

24   WHICH IS NEGATIVE SENTIMENT.  THE BLUE SPIKE BENEATH IT IS

25   POSITIVE SENTIMENT.

1        I SHOULD SAY, NOT JUST THE SPIKES, THE LINES ARE -- BLUE

2   IS POSITIVE AND RED IS NEGATIVE.

3        DO YOU WANT ME TO EXPLAIN MORE?

4   **Q.**  WAS THERE -- IS THERE MORE YOU HAVE TO SAY?

5   **A.**  FOR WHAT IT'S WORTH, THE NEGATIVE SPIKE IS ABOUT TEN TIMES

6   THAN WHAT THE LEVEL WAS BEFORE THE BANKRUPTCY, BEFORE THE

7   FAILURE.  THE POSITIVE SPIKE IS BETWEEN THREE AND FOUR TIMES.

8   **Q.**  CAN YOU EXPLAIN HOW THIS DATA THAT WE ARE SEEING ON THIS

9   SLIDE WAS PRODUCED?

10  **A.**  YES.  SO WHAT PROTAGONIST DOES IS IT LOOKS AT A SAMPLE OF

11  ONLINE POSTINGS.  IN THIS CASE IT'S 6,257.  64 PERCENT OF

12  THOSE ARE FROM TWITTER, 19 PERCENT ARE FROM NEWS ARTICLES,

13  16 PERCENT ARE FROM FORUMS, AND 1 PERCENT ARE FROM BLOGS OR

14  ARTICLE COMMENTS.  SO THAT'S THE SOURCE OF THESE SPECIFIC

15  POSTINGS.

16  **Q.**  SO JUST TO CONFIRM, THE SLIDE THAT WE ARE LOOKING AT NOW,

17  THAT SHOWS THE BREAKDOWN OF THE SOURCES USED FOR THE

18  PROTAGONIST SENTIMENT ANALYSIS?

19  **A.**  RIGHT.

20       AND I SHOULD HAVE ALSO EXPLAINED THAT WHEREAS THE GOOGLE

21  SEARCH WAS POSITIVE, NEGATIVE, NEUTRAL, WE JUST LOOKED AT THE

22  POSITIVE AND NEGATIVE SENTIMENT ON THE PREVIOUS SLIDE.  THAT

23  WAS A BREAKDOWN OF THAT SAME SPIKE.

24  **Q.**  AND HOW DO THE SYSTEMS DETERMINE WHETHER SENTIMENT IS

25  POSITIVE OR NEGATIVE?

1   **A.**  SO, AS I WAS SAYING EARLIER, THERE ARE TOOLS THAT WE CAN

2   USE TO READ THROUGH, NOT MANUALLY ANYMORE, BUT USING

3   ARTIFICIAL INTELLIGENCE.  SOMETHING CALLED NATURAL LANGUAGE

4   PROCESSING TO COMPARE THESE POSTS LOOKING AT THE WORDS THAT

5   THEY CONTAIN, AND SO ON, TO POSTS THAT HAVE BEEN TAGGED AND

6   THAT WE KNOW ARE POSITIVE OR NEGATIVE BASED ON HUMAN

7   ASSESSMENT.

8       SO THE CRIMSON HEXAGON, WHICH IS THE WORLD LEADING

9   PLATFORM FOR DOING EXACTLY THIS.  THEY HAVE OVER A TRILLION --

10  WITH A T -- EXAMPLES TO COMPARE THINGS TO.  AND THEY'RE -- IN

11  THE TIME SINCE THIS, HAVE ALSO JOINED WITH ANOTHER COMPANY

12  CALLED BRAND WATCH.  SO THEY BASICALLY DO THIS FOR BRANDS.

13  THIS IS WHAT COMPANIES PAY THEM TO DO.  THEY ARE THE LEADING

14  COMPANY IN THAT FIELD.

15  **Q.**  IN ADDITION TO THE GOOGLE TREND, THE PROTAGONIST, AND

16  CRIMSON HEXAGON DATA, DID YOU ANALYZE ANY OTHER STATISTICAL

17  DATA REGARDING SENTIMENT?

18  **A.**  SO AS WE'VE BEEN TALKING ABOUT, THIS IS A COMMUNITY.  AND

19  THE ROLE THAT EMPLOYEES PLAY HAS ALSO -- IS ALSO VERY

20  IMPORTANT.

21      SO EMPLOYEES, IN THE CASE OF TECHSHOP, HAVE A ROLE THAT'S

22  A LITTLE BIT DIFFERENT FROM IF YOU WENT INTO A MACY'S, OR

23  SOMETHING LIKE THAT.  SO TECHSHOP EMPLOYEES WERE ALSO THE

24  INSTRUCTORS.  AS WE HEARD FROM MR. SPURLOCK, THE LINE BETWEEN

25  EMPLOYEE AND CUSTOMER WAS OFTEN VERY BLURRED.  PEOPLE WENT

1    FROM BEING CUSTOMERS TO BEING EMPLOYEES, AND VICE VERSA.

2       THE MAIN INTERACTION THAT PEOPLE HAD WITH TECHSHOP WAS

3    WITH THESE, WHAT WE CALL DC'S, DREAM CONSULTANTS, THE PEOPLE

4    ON THE FLOOR.

5    **Q.**  AND SO DID YOU DO ANY ANALYSIS OF THE SENTIMENT OF

6    TECHSHOP EMPLOYEES?

7    **A.**  YES.  SO WE LOOKED AT WHAT TECHSHOP EMPLOYEES WERE SAYING

8    ABOUT THE COMPANY AND ABOUT THE -- YEAH, ABOUT THE COMPANY.

9       AND WE USED FOR THIS A COMPANY CALLED GLASSDOOR.

10   GLASSDOOR IS, AGAIN, THE MOST WIDELY USED SITE FOR EMPLOYEE

11   REVIEWS.  IT'S A LITTLE BIT LIKE YELP FOR COMPANIES.  AND

12   THESE ARE THE DATA THAT WE HAD FOR TECHSHOP FROM THAT STUDY.

13   **Q.**  AND CAN YOU EXPLAIN TO THE JURY WHAT THE SLIDE IN FRONT OF

14   YOU IS SHOWING?

15                    (DISPLAYED ON SCREEN.)

16   **A.**  SURE.

17      SO THE EMPLOYEES RATE THE COMPANIES THAT THEY HAVE WORKED

18   FOR ON VARIOUS MEASURES.

19      1 IS OVERALL.  AS YOU CAN SEE, THE TECHSHOP RATING HERE IS

20   2.5 ON A SCALE OF 1 TO 5.

21      THE -- WOULD THEY RECOMMEND IT TO A FRIEND IS 30 PERCENT,

22   CEO APPROVAL, 17 PERCENT, AND POSITIVE BUSINESS OUTLOOK,

23   5 PERCENT.  MOSTLY THE OTHER SCORES ARE, EXCEPT FOR THE

24   CULTURE AND VALUES, WHICH WAS AN AVERAGE AT 3.2, THE REST ARE

25   BELOW THAT MIDDLE SCORE OF 3, WORK/LIFE BALANCE, SENIOR

1    MANAGEMENT, COMP AND BENEFITS, AND CAREER OPPORTUNITIES.

2    **Q.**   NOW, ARE THESE TOOLS THAT WE JUST LOOKED AT, GOOGLE

3    TRENDS, PROTAGONIST, CRIMSON HEXAGON, AND GLASSDOOR, ARE THESE

4    THE STANDARD KINDS OF TOOLS USED BY PEOPLE IN THE FIELD OF

5    MARKETING AND BRAND STUDIES TO DETERMINE A BRAND'S VALUE?

6    **A.**   THESE ARE THE STANDARDS AND THE LEADERS.

7    **Q.**   I THINK YOU ALSO MENTIONED THAT YOU LOOKED AT SOME MEDIA

8    SOURCES; IS THAT RIGHT?

9    **A.**   YES.

10       SO WE HAD -- JUST KNOWING THAT SOMETHING IS NEGATIVE OR

11   POSITIVE ISN'T SUFFICIENT TO KNOW EXACTLY WHY IT'S NEGATIVE OR

12   POSITIVE.  SO IT COULD BE NEGATIVE, FOR EXAMPLE, BECAUSE IT'S

13   JUST NOT ANY GOOD OR BECAUSE IT'S TOO EXPENSIVE, OR LOTS OF

14   THINGS LIKE THAT.

15       SO WE WANTED TO BETTER UNDERSTAND WHY PEOPLE WERE RATING

16   IT SO NEGATIVELY.  SO WE LOOKED AT THE SOURCES OF THOSE POSTS.

17   SO, AGAIN, TWITTER, BLOG POSTS, TRADITIONAL MEDIA OUTLETS, AND

18   THINGS LIKE THAT TO SEE EXACTLY WHAT THEY WERE SAYING.

19   **Q.**   CAN YOU GIVE A SENSE TO THE JURY OF THE VOLUME OF THE

20   MATERIAL THAT YOU LOOKED AT?

21   **A.**   WELL, IT RAN TO HUNDREDS OF PAGES OF JUST THE EXCERPTS, SO

22   IT WAS PROBABLY ON THE ORDER OF SEVERAL HUNDRED TO THOUSANDS

23   OF INDIVIDUAL POSTS.

24   **Q.**   AND DID YOU REACH A CONCLUSION BASED ON YOUR ANALYSIS OF

25   THE TRADITIONAL AND SOCIAL MEDIA POSTS YOU REVIEWED?

1    **A.**   THE OVERWHELMING SENSE OF WHY THE COMPANY HAD FAILED WAS

2    DUE TO MANAGEMENT --

3         **MR. PISTORINO:**  OBJECTION, YOUR HONOR, IT'S

4    SPECULATION.

5         **THE COURT:**  OVERRULED.

6    **BY MS. ROBERTS:**

7    **Q.**  SO --

8    **A.**   SO QUANTITATIVELY SPEAKING, THE OVERWHELMING NUMBER OF

9    POSTS WERE REGARDING MANAGEMENT MISSTEPS.  AND THAT CAME FROM

10   BOTH, YOU KNOW, EMPLOYEES AND CUSTOMERS AS WELL AS MORE...

11   LET'S SAY EXPERT OUTSIDERS, SUCH AS *FORBES* MAGAZINE.

12   **Q.**  DID YOU REACH A CONCLUSION ABOUT THE EFFECT OF TECHSHOP'S

13   CLOSURE ON THE VALUE OF ITS BRAND?

14   **A.**   YES.

15       SO THE CLOSURE, IN PARTICULAR THE WAY... THE WAY THAT THE

16   CLOSER HAPPENED, VERY SUDDENLY AND IN A WAY THAT WAS EXTREMELY

17   DAMAGING TO MEMBERS WAS... BASICALLY -- I WILL SAY IT'S ALMOST

18   UNPRECEDENTED.  THERE'S REALLY VERY FEW CASES I'VE SEEN, WHICH

19   IS WHY I BROUGHT UP EXAMPLES LIKE VOLKSWAGEN WHERE THE ACTIVE

20   OR ACTIVENESS STEPS OR INCOMPETENCE OF MANAGEMENT WERE BLAMED

21   FOR WHAT WAS A VERY DAMAGING EVENT TO EMPLOYEES AND TO

22   CUSTOMERS.  AND REAL MATERIAL MONETARY LOSSES.

23   **Q.**  SORRY, YOU SAID REAL MATERIAL?

24   **A.**   MATERIAL AND MONETARY LOSSES.  IN OTHER WORDS, NOT JUST I

25   HAD BAD SERVICE TODAY.  THEY WERE RUDE TO ME.  BUT LIKE I LOST

1  THOUSANDS OF DOLLARS.

2  **MR. PISTORINO:**  OBJECTION, HEARSAY, SPECULATION.

3  **THE COURT:**  OVERRULED.

4  LET ME MAKE THIS CLEAR, LADIES AND GENTLEMEN.  AND THIS

5  WILL APPLY TO THE EXAMPLES THAT WILL BE DISCUSSED IN

6  MR. BÜNGER'S TESTIMONY.

7  THE UNDERLYING MATERIALS THAT HE'S REFERENCING ARE ONLY TO

8  BE CONSIDERED BY YOU IN ASSESSING THE WITNESS'S OPINION, BUT

9  ARE NOT BEING OFFERED AS SUBSTANTIVE EVIDENCE AND YOU MAY NOT

10  CONSIDER THEM FOR THAT PURPOSE.  THEY ARE SIMPLY TO HELP YOU

11  EVALUATE THE WEIGHT, IF ANY, THAT YOU GIVE TO THE WITNESS'S

12  ULTIMATE OPINIONS.

13  **BY MS. ROBERTS:**

14  **Q.**  BASED ON YOUR REVIEW OF TRADITIONAL AND SOCIAL MEDIA

15  SOURCES, DID YOU REACH A CONCLUSION ABOUT THE CUSTOMERS'

16  REACTIONS TO THE MANNER OF TECHSHOP'S CLOSING?

17  **A.**  AGAIN, IT WAS VERY EMOTIONAL --

18  **MR. PISTORINO:**  OBJECTION.

19  **THE WITNESS:**  -- AS WELL AS MATERIAL.

20  **THE COURT:**  WHAT'S THE OBJECTION?

21  **MR. PISTORINO:**  JUST OBJECTION, CALLS FOR

22  SPECULATION, NO FOUNDATION.

23  **THE COURT:**  OVERRULED.

24  **BY MS. ROBERTS:**

25  **Q.**  SORRY.  GO ON.

1   **A.**   MEMBERS AND OTHERS USED WORDS LIKE "SHOCK, SUDDEN,

2   ABRUPT", YOU KNOW, OTHER WORDS, AGAIN, THAT IMPLY THAT IT WAS

3   NEGATIVE AND SWIFT AS OPPOSED TO A LONG, SLOW DECLINE, OR A,

4   YOU KNOW, NOT SO BAD.

5   **Q.**   NOW JUST CIRCLING BACK, YOU SAID YOU REVIEWED TRADITIONAL

6   AND SOCIAL MEDIA AS PART OF YOUR ANALYSIS.  CAN YOU JUST

7   EXPLAIN WHY... WHY YOU LOOKED AT TRADITIONAL AND SOCIAL MEDIA

8   POSTS AS PART OF YOUR ANALYSIS?

9   **A.**   YES.

10       SO, AGAIN, IN THIS CASE, WE ARE DEALING WITH A COMMUNITY

11   THAT HAS A DIFFERENT RELATIONSHIP WITH THE COMPANY THAN A,

12   AGAIN, I USED THE EXAMPLE OF PRADA.  PRADA DOESN'T TALK ABOUT

13   THE PRODUCT COMMUNITY.  THERE'S A VERY CLEAR DISTINCTION

14   BETWEEN FORMAL COMMUNICATION FROM THE COMPANY TO BROAD

15   AUDIENCES THROUGH TELEVISION, FOR EXAMPLE, AND THEN THE TYPES

16   OF THINGS THAT YOU HAVE IN A COMMUNITY WHERE MOST OF THE

17   MEMBERS KNOW EACH OTHER AND THEY KNOW MEMBERS OF OTHER

18   MAKERSPACES THAT ARE OWNED OR RUN BY DIFFERENT PEOPLE.

19       SO SOCIAL MEDIA IS AN IMPORTANT FACTOR IN THE BRAND

20   PERCEPTION AS WELL AS THE MORE FORMAL MEDIA.

21   **Q.**   AND THIS IS -- SOCIAL MEDIA ALSO IS SOMETHING THAT PEOPLE

22   IN THE FIELD WILL CONSIDER?

23   **A.**   IT'S MORE STRONGLY CONSIDERED NOW THAN, I THINK,

24   TRADITIONAL MEDIA BECAUSE, AGAIN, THE SHORTCOMINGS OF THE

25   PREVIOUS METHODS OF ASSESSING SENTIMENT WERE PRETTY BIG.

1    **Q.**  NOW, BASED ON YOUR ANALYSIS OF THESE TRADITIONAL AND

2    SOCIAL MEDIA POSTS, WERE YOU ABLE TO BREAK THEM DOWN INTO

3    CATEGORIES IN TERMS OF THE SUBJECT MATTER THAT CUSTOMERS WERE

4    TALKING ABOUT?

5    **A.**  YEAH.  WE -- SO THIS IS A VERY BROAD GROUP OF USERS.  SO

6    YOU'VE GOT PEOPLE THAT, AGAIN, USED IT FOR SAY, EDUCATION,

7    OTHERS THAT HAD IT AS THEIR WORK PLACE.  THIS WAS BASICALLY

8    THEIR FACTORY THAT CLOSED ALL OF A SUDDEN.  OTHER PEOPLE THAT

9    WERE, YOU KNOW, HOBBYISTS.

10        AND THE PARTICULAR THING IN THIS CASE THAT AFFECTED ALL OF

11   THEM WAS THAT THIS WAS RIGHT BEFORE THE HOLIDAYS, FOR

12   CHRISTMAS AND OTHER WINTER HOLIDAYS WHERE THE PEOPLE WERE

13   MAKING GIFTS FOR THEIR FAMILIES AND FRIENDS, THEY WERE

14   MAKING -- IF THEY WERE BUSINESSES, THEY WERE SORT OF RAMPING

15   UP INVENTORY TO SELL FOR THE HOLIDAY SEASON.  SO THIS WAS A

16   PARTICULARLY DAMAGING TIME AS WELL.

17   **Q.**  DO YOU THINK THAT SHARING SOME OF THE SOURCES THAT YOU

18   RELIED UPON WITH THE JURY WOULD HELP THEM TO EVALUATE YOUR

19   OPINION CONCERNING THE BRAND?

20   **A.**  I THINK YES.

21   **Q.**  LET'S TAKE A LOOK AT A FEW OF THEM.  THIS IS THE FIRST

22   DEMONSTRATIVE.

23                    (DISPLAYED ON SCREEN.)

24        CAN YOU TELL THE JURY WHAT THIS IS?

25   **A.**  YES.  THIS IS AN ARTICLE THAT WAS IN THE *SAN FRANCISCO*

1   *CHRONICLE* THAT WE'VE SEEN PREVIOUSLY.

2       IT SAYS, "TECHSHOP 2.0 OPENS MONDAY IN SAN FRANCISCO".

3   **Q.** AND WHAT IS THE DATE ON THIS ARTICLE?

4   **A.** I CAN'T READ IT ACTUALLY.  I'M SORRY.

5   **Q.** YOU SAID THIS IS THE ARTICLE WE'VE SEEN PREVIOUSLY.  THIS

6   WAS THE --

7   **A.** FEBRUARY OF -- FEBRUARY 2018.  I DON'T REMEMBER THE EXACT

8   DATE.  I WANT TO SAY THE 13TH OR 15TH, OR SOMETHING.

9   **Q.** THIS IS THE *SAN FRANCISCO CHRONICLE* ARTICLE THAT HAS BEEN

10  DISCUSSED BY OTHER WITNESSES, RIGHT?

11  **A.** SEVERAL TIMES, YES.

12  **Q.** AND CAN YOU READ FOR THE JURY THE SECTIONS OF THAT ARTICLE

13  THAT YOU RELIED UPON FOR YOUR OPINION?

14  **A.** SURE.

15      SO, AGAIN, I AM JUST TRYING TO DEFINE WHAT WAS THE

16  NEGATIVE SENTIMENT ABOUT.  "THE ABRUPT CLOSURE IN NOVEMBER OF

17  TECHSHOP WORKSHOPS ACROSS THE COUNTRY DISRUPTED THE LIVES OF

18  SMALL BUSINESS OWNERS AND DO-IT-YOURSELF HOBBYISTS".

19      "IT CLOSED IT'S TEN LOCATIONS WITH LITTLE PRIOR NOTICE AND

20  SAID IT MIGHT FILE FOR CHAPTER 7".

21      AND THEN, A PARTICULAR ARTIST-IN-RESIDENCE OF TECHSHOP

22  SAID HE WAS STUNNED WHEN THE SHOP CLOSED A DAY BEFORE HIS

23  OPENING RECEPTION FOR AN EXHIBIT AND HE HAD TO QUICKLY MOVE

24  HIS SCULPTURES OUT.

25  **Q.** LET'S TAKE A LOOK AT THE NEXT ONE.

1           (DISPLAYED ON SCREEN.)

2      CAN YOU TELL THE JURY WHAT THIS POST WAS?

3 **A.**  SO THIS IS AN ARTICLE IN *FORBES* MAGAZINE, WHICH IS A

4 LEADING BUSINESS PUBLICATION.  IT'S DATED IN NOVEMBER OF 2017.

5 I BELIEVE NOVEMBER 15TH.  AND SO THIS IS MORE OF AN EXPERT

6 OPINION ABOUT THE COLLAPSE.

7      AND THIS PERSON'S ANALYSIS IS "A FAILURE THAT COULD HAVE

8 BEEN PREVENTED.  TECHSHOP'S FAILURE TO FIND A SUSTAINABLE

9 BUSINESS MODEL CAN BE EXPLAINED BY A COMBINATION OF LACK OF

10 VISION AND THE HIGH COST OF OPERATING ITS STUDIOS".

11      THE AUTHOR SAYS, "WE BELIEVE THE TECHSHOP MANAGEMENT

12 FAILED TO ACT SOONER SINCE THE COMPANY HAD BEEN IN BUSINESS

13 FOR OVER TEN YEARS, IT FAILED TO ACT SOONER TO CLOSE OR

14 TRANSFER UNPROFITABLE STUDIOS AND ACTIVELY SEEK PARTNERSHIPS

15 WITH LOCAL ECOSYSTEMS LIKE UNIVERSITIES, COMPANIES, AND

16 CITIES", WHICH IS WHAT OTHER MAKERSPACES DO.

17      "INSTEAD, IT CHOSE TO OPEN ADDITIONAL WHOLLY-OWNED

18 MONEY-LOSING MAKERSPACES LIKE IT'S BRAND NEW BROOKLYN, NEW

19 YORK LOCATION THAT OPENED JUST TWO WEEKS AGO AND NOW IS

20 OFFICIALLY CLOSED".

21 **Q.**  ALL RIGHT.  CAN WE TURN TO THE NEXT ONE?

22           (DISPLAYED ON SCREEN.)

23      CAN YOU TELL THE JURY WITH THIS ONE IS?

24 **A.**  YES.  SO THIS IS NOVEMBER 15TH.  AND THIS IS ACTUALLY FROM

25 DAN WOODS WHO WE HEARD FROM EARLIER.

1     HE WROTE, "I DO NOT MEAN TO TRIVIALIZE THE IMPACT OUR

2    CLOSURE WILL HAVE ON EMPLOYEES, MEMBERS, OR OUR FAITHFUL

3    INVESTORS AND LENDERS".

4    **Q.**  YOU TESTIFIED EARLIER THAT MEMBERS WERE -- MEMBERS AND

5    INVESTORS WERE IMPACTED BECAUSE THEY HAD PAID FOR MEMBERSHIPS

6    THAT THEY WERE NO LONGER GOING TO GET THE BENEFIT OF; IS THAT

7    RIGHT?

8    **A.**  RIGHT.  AGAIN, IF YOU'D PAID FOR A MEMBERSHIP, THAT

9    MEMBERSHIP WAS NO LONGER USABLE ANYWHERE.  IF YOU'D PAID FOR

10   CLASSES AND TRAINING AND CERTIFICATIONS, THOSE WERE ALSO NO

11   LONGER USABLE ANYWHERE.  AND IF YOU HAD INVENTORY AND

12   MATERIALS THAT WERE LOCKED UP THERE, YOU DIDN'T HAVE ACCESS TO

13   THOSE.

14      THE INVESTORS OBVIOUSLY ALSO WERE POTENTIALLY LOSING MONEY

15   AND BECAUSE ONE OF THE INVESTMENT VEHICLES HAD BEEN LIFETIME

16   MEMBERSHIPS, SOME OF THOSE PEOPLE WERE INVESTORS AND MEMBERS.

17   **Q.**  ALL RIGHT.  LET'S TURN TO THE NEXT SLIDE.  CAN YOU EXPLAIN

18   TO THE JURY WHAT THIS SLIDE SHOWS?

19                    (DISPLAYED ON SCREEN.)

20   **A.**  YEAH.  THIS IS A CONTINUATION OF THE *FORBES* ARTICLE WE SAW

21   EARLIER.

22      "THE SUDDEN CLOSURE OF THE MAKER SHOP IS LEAVING THOUSANDS

23   OF ENTREPRENEURS AND ARTISANS UNABLE TO RUN THEIR BUSINESSES

24   WITHOUT ACCESS TO TECHSHOP'S TOOLS AND EQUIPMENT.  A DECISION

25   THAT ALSO COMES AT THE WORST PERIOD POSSIBLE WHEN THESE

1   BUSINESS NEED TO PREPARE FOR THE PEAK HOLIDAY SEASON, WITH

2   LITTLE OR NO TIME TO PROVIDE ALTERNATIVE SOLUTIONS".

3   **Q.**  AND LET'S TURN TO THE NEXT SLIDE.

4                         (DISPLAYED ON SCREEN.)

5       CAN YOU EXPLAIN TO THE JURY WHAT THIS SLIDE SHOWS?

6   **A.**  SURE.  THIS IS ONE OF THE POSTINGS FROM GLASSDOOR.  THAT'S

7   THE EMPLOYER REVIEW SITE THAT WE MENTIONED EARLIER.

8       THE POSTER HERE SAYS, "WITH THE RECENT BANKRUPTCY, IT'S

9   OBVIOUS THAT THE CORPORATE MANAGEMENT IS DELUSIONAL AT BEST,

10  AND MEAN-HEARTED IN ANY CASE.  CORPORATE DID NOT HAVE ANY

11  BUSINESS SENSE, AND HUNDREDS OF PEOPLE LOST THEIR JOBS IN ONE

12  FELL SWOOP WHEN THEY REALIZED THAT ALL THEIR BAD DECISIONS

13  COULD NO LONGER BE HIDDEN.

14  **Q.**  NOW WE HAVE JUST LOOKED AT FIVE EXAMPLES.  CAN YOU

15  DESCRIBE FOR THE JURY SORT OF NUMERICALLY HOW THAT COMPARES TO

16  WHAT YOU ACTUALLY LOOKED AT?

17  **A.**  AGAIN, THESE ARE, I THINK, FAIRLY ILLUSTRATIVE.  THEY ARE

18  ALSO FAIRLY FREE OF A LOT OF THE LANGUAGE YOU FIND IN A LOT OF

19  THE OTHERS BECAUSE, AGAIN, IN ADDITION TO THE SURPRISE AND

20  OUTRAGE, PEOPLE HAD ACTUALLY LOST QUITE A LOT OF THEIR

21  PERSONAL INVESTMENTS IN THIS, AND SO THE SENTIMENT WAS VERY

22  NEGATIVE, AND THESE ARE JUST PRETTY TYPICALLY REPRESENTATIVE

23  OF THOSE SENTIMENTS.

24  **Q.**  AND CAN YOU EXPLAIN TO THE JURY FOCUSING FIRST ON

25  TRADITIONAL MEDIA SOURCES, I THINK WE SAW *FORBES* AND THE *SAN*

1    *FRANCISCO CHRONICLE*, DO YOU RECALL ANY OTHER TRADITIONAL MEDIA

2    SOURCES THAT YOU LOOKED AT?

3    **A.**   YES.  SO ONE THAT REALLY IS BOTH TRADITIONAL MEDIA BUT

4    ALSO DIRECTLY ADDRESSES THE MAKER COMMUNITY IS MAKEZINE.  SO

5    THAT'S, AGAIN, THE MAKER MOVEMENT, THE TERM "MAKE" AND *MAKE:*

6    MAGAZINE AND MAKER FAIRE ARE ALL RUN BY A COMPANY CALLED MAKE

7    MEDIA THAT'S PART OF O'REILLY, WHICH IS ONE OF THE LARGEST

8    TECHNICAL PUBLISHING COMPANIES IN THE WORLD.

9    **Q.**   WERE YOU HERE FOR MR. WOODS' TESTIMONY?

10   **A.**   YES, I WAS.

11   **Q.**   AND HE TESTIFIED ABOUT *MAKE:* MAGAZINE.  IS THAT AFFILIATED

12   WITH THE MAKEZINE THAT YOU --

13   **A.**   ONLINE VERSION OF THE PRINT MAGAZINE.

14   **Q.**   AND THAT'S TRADITIONAL MEDIA SOURCES.

15       CAN YOU GIVE THE JURY A SENSE OF THE SOCIAL MEDIA SOURCES

16   THAT YOU LOOKED AT?

17   **A.**   CERTAINLY.  SO SOCIAL MEDIA WE HAVE ALREADY LOOKED AT

18   TWITTER.  SO TWITTER, INSTAGRAM, FACEBOOK.  FACEBOOK NOT ONLY

19   PUBLIC POSTINGS BUT THERE ARE A NUMBER OF GROUPS THAT FORMED

20   IMMEDIATELY AFTER THE COLLAPSE OF TECHSHOP TO BASICALLY FIND

21   NEW PLACES, TO DISCUSS WHAT WAS ACTUALLY GOING ON, AND KEEP IN

22   TOUCH WITH THE MEMBER BASIS WHO DIDN'T HAVE A PHYSICAL PLACE

23   TO MEET ANYMORE.

24   **Q.**   SO BASED ON THE SENTIMENT ANALYSIS YOU CONDUCTED AND THE

25   TRADITIONAL SOCIAL AND SOCIAL MEDIA POSTS YOU REVIEWED, WHAT

1    DID YOU CONCLUDE ABOUT TECHSHOP'S BRAND VALUE IN THE PERIOD

2    FOLLOWING FROM -- FOLLOWING THEIR CLOSURE IN MID-NOVEMBER

3    THROUGH MID-FEBRUARY 2018?

4    **A.**  SO AS WE SAW IN THE CHART EARLIER, THE SENTIMENT WAS

5    SLIGHTLY POSITIVE GOING INTO THAT COLLAPSE.  PEOPLE, I THINK,

6    HAD HIGH HOPES FOR -- I SHOULDN'T SAY I THINK.

7        THE POSTS SHOW THAT PEOPLE HAD HIGH HOPES FOR THE COMPANY

8    GETTING THROUGH A DIFFERENT PERIOD.  SOME PEOPLE EXPECTED IT

9    TO COLLAPSE, BUT WHEN IT ACTUALLY DID, IT WAS STILL A SURPRISE

10   FOR THE VAST MAJORITY OF THE POSTS THAT WE SAW.

11       THE FACT THAT, AGAIN, PEOPLE BLAMED THE COMPANY FOR, AS

12   WE'VE SEEN, MAKING BAD DECISIONS, A LONG STREAM OF BAD

13   DECISIONS AND THAT THAT WAS NOW COSTING THEM MONEY, MOST

14   PEOPLE WOULD HAVE WANTED TO HAVE THAT MONEY GIVEN BACK, BE

15   MADE WHOLE BEFORE THEY WOULD ENGAGE WITH THE ORGANIZATION

16   AGAIN.

17       SO THAT'S THE REASON I SAY IT HAD NEGATIVE EQUITY IS

18   BECAUSE FOR ANYBODY TO SELL A TECHSHOP MEMBERSHIP TO SOMEBODY,

19   YOU'D HAVE TO FIRST COMPENSATE THEM FOR THE LOSS OF THE

20   MEMBERSHIP THAT THEY HAD UP TO THAT POINT.

21   **Q.**  ALL RIGHT.  LET'S TURN NOW TO THE SECOND OPINION THAT YOU

22   LISTED.  AND THAT WAS WITH RESPECT TO USE OF THE WORDS "TECH"

23   AND "SHOP".

24       DO YOU RECALL THAT?

25   **A.**  YES.

1    **Q.**  CAN YOU EXPLAIN TO THE JURY WHAT YOUR OPINION IS ON THAT?

2    **A.**  YES.

3         SO THERE ARE THOUSANDS OF MAKERSPACES AROUND THE WORLD AND

4    THEY ALL USE VARIOUS NAMES THAT THEY PUT TOGETHER THEY CHOOSE

5    THEMSELVES.  AND THE WORDS "TECH" AND "SHOP" ARE VERY

6    FREQUENTLY USED IN THOSE COMBINATIONS.

7    **Q.**  DID YOU CONDUCT ANY ANALYSIS REGARDING THE USE OF THE

8    WORDS "TECH" AND "SHOP" IN MAKERSPACE NAMES?

9    **A.**  YEAH.  I LOOKED AT ONE LIST OF -- ONE DIRECTORY OF

10   MAKERSPACES.  THIS IS NOT A COMPLETE LIST OF MAKERSPACES.  FAB

11   LAB ALONE HAS MORE THAN 1700 LOCATIONS.  SO 170 TIMES MORE

12   THAN TECHSHOP ARE CALLED FAB LAB.

13        THIS IS A SAMPLE THAT IS MORE BIASED TOWARDS THE OTHER

14   NAMES.  SO THIS BASICALLY LOOKS AT THE COMPONENTS OF VARIOUS

15   WORDS IN THOSE NAMES.  I DON'T KNOW IF YOU CAN READ THEM, BUT

16   THEY SAY "SPACE, HACK, LAB, MAKE, FAB, TECH, OPEN", AND SO ON.

17        AND AS YOU CAN SEE, WORDS LIKE "SPACE", "HACK", AND "LAB"

18   ARE VERY FREQUENTLY USED.  OTHER WORDS LIKE "TECH" AND "SHOP"

19   ARE ALSO... APPEAR QUITE FREQUENTLY.  THEY ARE AMONG THE TOP

20   TEN MOST COMMON COMPONENTS OF MAKERSPACE NAMES.

21   **Q.**  JUST IN CASE THE JURY CAN'T SEE THE NUMBERS, CAN YOU READ

22   THE NAMES FOR "TECH" AND "SHOP" THERE?

23   **A.**  "TECH" IS 27 AND "SHOP" IS 20.

24   **Q.**  NOW CAN WE TURN TO THE NEXT SLIDE.

25                    (DISPLAYED ON SCREEN.)

```
 1        AND CAN YOU TELL US WHAT THIS SLIDE SHOWS?

 2   A.  SO THIS LISTS SOME OF THE NAMES THAT USE "TECH" OR "SHOP",

 3   JUST TO GIVE YOU, AGAIN, A SENSE OF HOW PEOPLE COME UP WITH

 4   THE NAMES FOR MAKERSPACES.

 5        SO YOU WILL SEE THINGS LIKE... THERE'S ACTUALLY ONE CALLED

 6   THE BUILD SHOP.  THERE'S... I'M SORRY, IT'S ACTUALLY REALLY

 7   BLURRY ON MY SCREEN SO I AM HAVING A HARD TIME READING SOME OF

 8   THESE.

 9        BUT, AGAIN, YOU CAN SEE WORDS LIKE "TECH", "LAB", AND

10   "WORKSHOP" AND SO ON ARE QUITE FREQUENTLY COMPONENTS OF THE

11   NAMES.

12        USUALLY THOSE ARE COMBINED WITH A MORE DISTINCTIVE

13   COMPONENT LIKE SAY "QUANTUM" OR "URBAN", OR SOMETHING LIKE

14   THAT.

15   Q.  ON THE RIGHT-HAND SIDE, IF YOU CAN READ IT, THE COLUMN

16   THAT SAYS "MAKERSPACE NAMES INCLUDING THE WORD SHOP".

17        CAN YOU READ THAT?  WHAT IS NO. 3?

18   A.  THE SHOP.

19   Q.  AND THEN I THINK YOU MENTIONED THE ONE THAT'S NO. 12?

20   A.  YES.  THE BUILD SHOP.

21   Q.  AND ON THE LEFT-HAND SIDE, THAT'S THE LIST OF MAKERSPACES

22   USING THE WORD "TECH", RIGHT?

23   A.  RIGHT.

24   Q.  TURN NOW TO YOUR THIRD OPINION.

25        WERE YOU HERE WHEN DR. MATOLO TESTIFIED?
```

1    **A.**  YES.

2    **Q.**  DO YOU AGREE WITH HIS OPINION THAT THE FOREIGN LICENSES

3    CAN BE USED TO VALUE THE TECHSHOP BRAND IN THIS CASE?

4    **A.**  NO.

5    **Q.**  WHY NOT?

6    **A.**  THERE ARE -- THERE'S SEVERAL REASONS.  ONE --

7              **MR. PISTORINO:**  I'M SORRY, YOUR HONOR, I HAVE TO

8    OBJECT.  IT MISCHARACTERIZES DR. MATOLO'S TESTIMONY.

9              **THE COURT:**  OVERRULED.

10   AS I SAID, LADIES AND GENTLEMEN, THE QUESTIONS OF COUNSEL

11   ARE NOT EVIDENCE.  IF YOUR RECOLLECTION OF THE EVIDENCE

12   DIFFERS FROM THE WAY IT IS CHARACTERIZED BY COUNSEL, YOUR

13   MEMORY CONTROLS.

14             **THE WITNESS:**  SO THE FIRST REASON IS THAT THEY WERE

15   BASICALLY VERY, VERY DIFFERENT TIMES.  SO IT'S NOT THAT THE

16   LICENSES WERE FOREIGN, BUT THE FACT THAT THEY WERE BASICALLY

17   ALL SIGNED IN 2014 TO 2016 TIME FRAME WHEN, AS WE SAW, THE

18   INTEREST IN TECHSHOP WAS AT ITS PEAK, AND IT HAD, GENERALLY

19   SPEAKING, POSITIVE CONNOTATIONS.

20   THAT'S A VERY DIFFERENT SITUATION FROM THE PERIOD OF TIME

21   WE ARE TALKING ABOUT, NOVEMBER 2017 UNTIL FEBRUARY 2018, WHEN

22   THERE WERE SIGNIFICANT NEGATIVE CONNOTATIONS AND, IN FACT, THE

23   WHOLE REASON THAT DAN RASURE CAME INTO THE PICTURE WAS BECAUSE

24   THE BRAND HAD COLLAPSED.  HE WAS NOT KNOWN TO THE COMMUNITY

25   BEFORE THAT.

1  **Q.** SO IF YOU COULD WALK US THROUGH, I THINK THIS SLIDE SHOWS

2  DIFFERENT REASONS WHY THE LICENSES THAT DR. MATOLO RELIED ON

3  ARE NOT APPROPRIATE.

4     IF YOU COULD WALK US THROUGH THOSE, AND THEN WE'LL GO INTO

5  EACH ONE IN MORE DETAIL.

6  **A.** SO, YOU KNOW, IN ADDITION TO THE MANY COMPONENTS OF THE

7  LICENSING DEALS THAT INCLUDED THE TRADEMARK OF THE BRAND,

8  THERE WERE OTHER THINGS THAT WERE, IN SOME CASES, SPECIFIC TO

9  THE COUNTRIES THAT THEY WERE OPERATING IN OR, AGAIN, NONBRAND

10  COMPONENTS OF INTELLECTUAL PROPERTY.

11     AND IN THOSE FOREIGN MARKETS, TECHSHOP WAS COMPLETELY

12  UNKNOWN.  SO IF YOU GO TO LEROY MERLIN, FOR EXAMPLE, IN

13  FRANCE, IT'S LIKE --

14        **MR. PISTORINO:**  OBJECTION, YOUR HONOR.

15  SPECULATION --

16        **THE COURT:**  ALL RIGHT.  SUSTAINED.  WHY DON'T WE LAY

17  A FOUNDATION FOR THAT.

18        **THE WITNESS:**  OKAY.  SO, LEROY MERLIN IS SORT OF THE

19  EQUIVALENT OF HOME DEPOT, OR SOMETHING LIKE THAT, IN A LOT OF

20  COUNTRIES IN THE WORLD, INCLUDING FRANCE.  TECHSHOP WAS,

21  AGAIN, DIDN'T HAVE A PRESENCE IN FRANCE AND WAS PRETTY

22  UNKNOWN.  IN THE QUOTE FROM MARK HATCH, THE CEO --

23        **MR. PISTORINO:**  OBJECTION --

24        **THE WITNESS:**  -- OF TECHSHOP --

25        **THE COURT:**  OKAY.  STOP.

1       LET'S TAKE A BRIEF SIDEBAR.  LADIES AND GENTLEMEN, WE WILL

2   TAKE A SHORT SIDEBAR.  JUST SIT TIGHT.  THANK YOU.

3           (SIDEBAR DISCUSSION WAS HELD AS FOLLOWS:)

4           **THE COURT:**  HOW DOES HE KNOW WHAT IS THE BASIS FOR

5   SHOWING --

6           **THE REPORTER:**  I'M SORRY.

7           **THE COURT:**  THERE IS NO FOUNDATION THAT'S BEEN LAID

8   THAT WOULD ESTABLISH THAT HE KNOWS WHETHER TECHSHOP WAS OR

9   WASN'T KNOWN IN FRANCE BEFORE.  WHERE IS THE FOUNDATION FOR

10  THIS?

11          **MS. ROBERTS:**  WE CAN GO THROUGH -- HE WAS THE EXPERT

12  IN THE MAKERSPACE KNOWN NATIONALLY.

13          **THE COURT:**  WE NEED TO PROVIDE SOME BASIS FOR HIM TO

14  KNOW THAT.  I DON'T EVEN KNOW RIGHT NOW WHAT THE BASIS FOR

15  THIS IS.  IT JUST SEEMS TO ME THIS WOULD GO QUICKER AND JUST

16  GET TO THE POINT IF YOU DON'T TRY TO DO TOO MUCH.  IT'S

17  ESSENTIALLY A PRETTY STRAIGHTFORWARD POINT.  AND WHY DON'T WE

18  JUST THINK OF MIRING AN OBJECTION AND JUST CUT TO THE POINT,

19  AND AVOID THE SPECULATIVE DIMENSION OF THIS.

20      I DON'T THINK THE FACT THAT HE HAS BEEN FOLLOWING THE

21  MAKER MOVEMENT IN ITSELF ESTABLISHES THE KINDS OF THINGS THAT

22  YOU ARE TRYING TO HAVE HIM DO.

23      SO YOU CAN KEEP TRYING, BUT THERE WILL BE ONGOING

24  OBJECTIONS, I'M SURE, AND I WILL BE SUSTAINING THEM IF THERE'S

25  NOT AN EXPLANATION ON HOW HE KNOWS THIS STUFF.

1          **MR. PISTORINO:**  IF I MAY, YOUR HONOR.  WHAT HE SAYS

2     NOW ABOUT THAT IS NOT IN THE REPORT.

3          **THE COURT:**  WELL, AGAIN, THAT'S -- SOME OF THAT IS

4     THE PROBLEM, RIGHT?  HE'S GOING TO BE HELD TO WHAT WAS IN THE

5     REPORT.  AND SO I DON'T SEE THIS IN THE REBUTTAL REPORT.

6          **MS. ROBERTS:**  WELL, THE MENTION OF THE VALUE

7     TRANSFERRED BACK IS IN THE REPORT.

8          **THE COURT:**  AGAIN, THIS IS ALWAYS -- WHEN THERE'S AN

9     EXPERT, I'M GOING TO BE LOOKING VERY CLOSELY AT THOSE PAGES

10    THAT ARE THE SUBJECT OF IT.  IF I DON'T SEE IT THERE, I WILL

11    SUSTAIN A BEYOND-THE-SCOPE OBJECTION.  SO YOU ARE ON NOTICE,

12    AND I'LL BE LOOKING AT THE OPINION, AND IF IT'S BEYOND THE

13    SCOPE, I WILL SUSTAIN IT.

14         **MR. PISTORINO:**  IF I MAY, I SPECIFICALLY ADDRESSED

15    THIS EXACTLY IN MY *DAUBERT* MOTION.  THERE'S NO -- HOW WOULD HE

16    KNOW?  I MEAN....

17         **THE COURT:**  THAT'S FINE.

18         **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

19         (SIDEBAR CONCLUDED; PROCEEDINGS HELD IN OPEN COURT.)

20    **BY MS. ROBERTS:**

21    **Q.**  MR. BÜNGER, LET'S GO BACK TO THE FIRST BASIS YOU DESCRIBED

22    FOR YOUR OPINION THAT DR. MATOLO'S RELIANCE ON FOREIGN

23    LICENSES ISN'T APPROPRIATE.

24         I THINK YOU TALKED ABOUT THE TIMING.

25    **A.**  THE TIMING --

1  **Q.** SO CAN YOU EXPLAIN TO THE JURY YOUR OPINION AS TO HOW THE

2  TIMING IMPACTS WHETHER THE LICENSE AGREEMENTS DR. MATOLO

3  RELIED UPON ARE APPROPRIATE TO CONSIDER?

4  **A.** CERTAINLY. SO THE BRAND AND OTHER ASPECTS OF THE

5  LICENSING AGREEMENTS THAT DR. MATOLO DESCRIBED ALL REFLECTED A

6  GROWING AND THRIVING BUSINESS AT THE TIME THAT THOSE LICENSES

7  WERE SIGNED.

8      SO, IT'S SORT OF WHEN YOU BUY A NEW CAR, YES, YOU CAN

9  EXPECT TO PAY A CERTAIN AMOUNT FOR IT. AT THE TIME OF THIS

10  INSTANCE THAT WE ARE, AGAIN -- THAT THIS DISCUSSION IS ABOUT,

11  THE CAR WAS INOPERABLE AND PEOPLE WERE TRAPPED INSIDE. SO IT

12  WAS -- THE VALUE OF THAT BRAND AT THAT TIME WAS VERY LOW AS

13  WELL AS ALL THE OTHER ASPECTS OF THE LICENSE AGREEMENT THAT

14  WERE IN DR. MATOLO'S TESTIMONY.

15      HE ATTESTED TO THE BRAND WOULD BE THE PRIMARY REASON FOR

16  THAT VALUE AND NOT THE OTHER SEVEN OR EIGHT COMPONENTS THAT

17  WERE PART OF IT. BUT, AGAIN, IF YOU LOOK AT WHAT THOSE

18  COMPANIES WERE NEEDING WHEN THEY BOUGHT THE LICENSE AND WHAT

19  WAS OPERATING AT THE TIME OF THIS CONVERSATION --

20          **MR. PISTORINO:** OBJECTION.

21          **THE WITNESS:** -- THEY WERE VERY DIFFERENT.

22          **THE COURT:** EVERYONE, PLEASE. WHEN AN OBJECTION IS

23  MADE, EVERYONE HAS TO STOP TALKING SO I CAN HEAR AND RULE ON

24  THE OBJECTION.

25      WHAT IS THE OBJECTION?

1          **MR. PISTORINO:**  NO FOUNDATION, SPECULATION.

2          **THE COURT:**  OVERRULED.

3          **THE WITNESS:**  I APOLOGIZE FOR NOT HEARING --

4          **THE COURT:**  NOT AT ALL.  IT'S NOT WHAT MOST ANYONE

5    SPENDS ALL THEIR DAY DOING.  SO IT'S QUITE ALL RIGHT.

6    **BY MS. ROBERTS:**

7    **Q.**  NOW, THAT ADDRESSES THE TIMING.

8          I THINK EARLIER IN ONE OF YOUR RESPONSES YOU SAID IT'S NOT

9    JUST THAT THEY ARE FOREIGN LICENSES THAT MAKES THEM

10   INAPPROPRIATE.

11         IS THE FACT THAT THESE LICENSES WERE WITH COMPANIES IN

12   FOREIGN COUNTRIES, DOES THAT WEIGH IN AT ALL TO YOUR OPINION?

13   **A.**  THAT'S ALSO AN IMPORTANT FACTOR.

14         SO, EVEN IF IT HAD BEEN THE SAME COMPANY AND THE SAME

15   TIME, FOREIGN MARKETS -- THE VALUE OF A LICENSE IN A MARKET IS

16   BASED ON THE AMOUNT OF MONEY YOU ARE LIKELY TO GET FROM THAT

17   PRODUCT IN THAT MARKET.

18         SO AS I MENTIONED EARLIER, YOU CAN HAVE TWO PRODUCTS, ONE

19   SAYS PRADA AND ONE HAS NO BRAND AND THEY ARE GOING TO BE

20   VALUED DIFFERENTLY BY DIFFERENT PEOPLE.  IN THE CASE OF, FOR

21   EXAMPLE, A SUBWAY FRANCHISE THAT A U.S. FRANCHISE COSTS

22   SIGNIFICANTLY MORE THAN THE SAME FRANCHISE IN ANOTHER COUNTRY.

23   SOME OF THAT IS DUE TO THE BRAND AWARENESS AND THE BRAND

24   ESTEEM THAT THAT MARK HAS IN THOSE OTHER COUNTRIES.

25   **Q.**  ARE THERE METHODS TO VALUING THE TRADEMARK THAT COULD BE

1    USED OTHER THAN THE METHOD USED BY DR. MATOLO?

2    **A.**  SO ANY LICENSING AGREEMENT IS A NEGOTIATION POINT.  SO YOU

3    ARE PROPOSING THAT YOUR BRAND IS WORTH A CERTAIN AMOUNT, THE

4    CRM IS WORTH A CERTAIN AMOUNT, THE KNOW-HOW AND EVERYTHING

5    ELSE THAT GOES INTO THAT LICENSING AGREEMENT ARE WORTH A

6    CERTAIN AMOUNT.  AND SO THAT'S WHY, FOR EXAMPLE, YOU SAW THAT

7    THE JAPANESE AND THE FRENCH LICENSES WERE VERY DIFFERENT.

8        THE -- SO THOSE ARE, AGAIN, THOSE ARE STARTING POINTS FOR

9    THE NEGOTIATION, AND IT WOULD BE RATHER COINCIDENTAL IF TWO

10   MARKETS HAD EXACTLY THE SAME VALUATION ON A BRAND LIKE THAT,

11   OR ON A LICENSING DEAL LIKE THAT.

12   **Q.**  ARE YOU FAMILIAR WITH THE TERMS "MARKET APPROACH" AND

13   "INCOME APPROACH"?

14   **A.**  THERE ARE -- SO THE INCOME APPROACH IS YOU'RE BASICALLY

15   LOOKING AT WHAT'S THE INCOME YOU ARE LIKELY TO DERIVE FROM

16   HAVING, FOR EXAMPLE, SUBWAY ON YOUR SUBWAY SANDWICH STORE IN

17   CHINA VERSUS SOME OTHER NAME, AND ESSENTIALLY LOOKING AT THAT

18   BY THE NUMBER OF LOCATIONS YOU WOULD HAVE, AND SO ON.

19   **Q.**  AND TO CONTRAST, WHAT IS THE "MARKET APPROACH"?

20   **A.**  THE MARKET APPROACH IS WHAT I WAS SAYING EARLIER, WHERE

21   IT'S WHAT WOULD THE MARKET BE WILLING TO PAY?  WHAT'S LIKELY

22   TO -- WHAT'S THIS LIKELY TO BE WORTH BASED ON SIMILAR MARKETS

23   THAT MIGHT BE BASED ON THE SIZE, THE -- THAT IS, THE NUMBER OF

24   PEOPLE THAT LIVE IN THAT MARKET, THE PURCHASING POWER THAT

25   THEY HAVE, AND SO ON.  BUT, AGAIN, THAT'S MORE OF A

1    NEGOTIATION POINT.

2    **Q.**  AND WHICH APPROACH DO YOU UNDERSTAND DR. MATOLO TO HAVE

3    TAKEN?

4    **A.**  WELL, HE LOOKED AT THE LOST LICENSING REVENUE.  SO HE

5    LOOKED AT WHAT DID THOSE OTHER COUNTRIES -- SORRY, LICENSEES

6    IN THOSE OTHER COUNTRIES PAY, HOW MUCH OF THAT WAS DUE TO THE

7    MARK, THE BRAND VERSUS THE OTHER COMPONENTS OF THE LICENSE

8    LIKE KNOW-HOW, HOW TO YOU SET UP 3D PRINTERS, HOW TO TRAIN

9    EMPLOYEES, HOW TO TRAIN CUSTOMERS, AND SO ON.

10         AND HE ESTIMATED THAT, I THINK, ALMOST ALL OF THE VALUE

11   WAS IN THE MARK ITSELF AND NOT THE OTHER COMPONENTS OF THE

12   LICENSE.

13   **Q.**  IS THERE AN APPROACH THAT YOU BELIEVE WOULD BE MORE

14   APPROPRIATE HERE?

15             **MR. PISTORINO:**  OBJECTION, YOUR HONOR.

16             **THE COURT:**  WHAT'S THE OBJECTION?

17             **MR. PISTORINO:**  I DON'T BELIEVE IT'S IN THE REPORT.

18             **THE COURT:**  THE OBJECTION IS BEYOND THE SCOPE?

19             **MR. PISTORINO:**  YES, YOUR HONOR.

20             **THE COURT:**  SO, MS. ROBERTS, WITHOUT DETAIL, POINT ME

21   TO THE PAGE IN THE REPORT.

22             **MS. ROBERTS:**  I BELIEVE IT IS THE REBUTTAL REPORT

23   PAGE 6 AND 7 --

24             **THE COURT:**  ALL RIGHT.  OVERRULED.

25             **THE WITNESS:**  WOULD YOU REPEAT THE QUESTION?

1    **BY MS. ROBERTS:**

2    **Q.**  YES.

3        COULD YOU TELL US, IN YOUR OPINION, WHETHER THE MARKET

4    APPROACH OR THE INCOME APPROACH WOULD BE MORE APPROPRIATE

5    HERE?

6    **A.**  SO THE INCOME APPROACH, AGAIN, IS NOT, I THINK, NOT VALID

7    FOR A NUMBER OF REASONS THAT I'VE OUTLINED.

8        IN ADDITION TO THAT, WHICH I THINK IS WHAT'S IN THE REPORT

9    THAT YOU ARE REFERRING TO RIGHT NOW, THESE FOREIGN ENTITIES

10   WERE DOING A DEAL WITH TECHSHOP TO PROMOTE LEARNING EDUCATION

11   IN THEIR LOCAL MARKETS, TO BETTER UNDERSTAND CONSUMERS AND

12   THINGS LIKE THAT.  THEY WEREN'T IN IT TO START A MAKERSPACE

13   BUSINESS.  AND THAT'S ACCORDING TO THEIR OWN STATEMENTS AT THE

14   TIME.

15        **MR. PISTORINO:**  OBJECTION, YOUR HONOR, CALLS FOR

16   SPECULATION, NO FOUNDATION.

17        **THE COURT:**  SUSTAINED.

18   **BY MS. ROBERTS:**

19   **Q.**  SO TO CONCLUDE REGARDING YOUR OPINION AS TO THE RELIANCE

20   ON THE TECHSHOP'S FOREIGN LICENSE AGREEMENTS, CAN YOU RESTATE

21   FOR THE JURY WHETHER YOU BELIEVE THAT'S AN APPROPRIATE --

22   THOSE ARE APPROPRIATE AGREEMENTS TO CONSIDER IN DETERMINING

23   THE LOST LICENSING REVENUE?

24   **A.**  I THINK THE TIMING OF THE TWO DIFFERENT SCENARIOS -- THE

25   FOREIGN LICENSES VERSUS THE ATTEMPTED DOMESTIC LICENSE IS

1   COMPLETELY DIFFERENT.  SO THAT IS THE FIRST REASON THEY ARE

2   COMPLETELY SEPARATE.

3       THE FOREIGN LICENSES ARE NOT DIRECTLY COMPARABLE TO WHAT

4   YOU WOULD PAY FOR A DOMESTIC LICENSE, AND THAT'S THE SECOND

5   REASON.

6           **MS. ROBERTS:**  NO FURTHER QUESTIONS.

7           **THE COURT:**  ANY CROSS-EXAMINATION?

8           **MR. PISTORINO:**  YES, YOUR HONOR.

9                       **CROSS-EXAMINATION**

10  BY MR. PISTORINO:

11  **Q.**  GOOD AFTERNOON, DR. BÜNGER.  I'M SORRY, IS IT BÜNGER?

12  **A.**  BÜNGER.

13  **Q.**  OKAY.  THE UMLAUT LOSES ME THERE.

14      A FEW POINTS THAT I THINK I HEARD.  SO I THINK I HEARD

15  THAT YOU MENTIONED THAT YOU HAVEN'T INVOICED FOR ANY OF YOUR

16  TIME ON THIS JOB, CORRECT?

17  **A.**  CORRECT.

18  **Q.**  AND STARTED -- WELL, CLEARLY, BECAUSE WE GOT A FIRST

19  REPORT BACK IN NOVEMBER, YOU WERE DONE THEN?

20  **A.**  YES.

21  **Q.**  YOU WERE DONE IN DECEMBER, RIGHT?

22  **A.**  YES.

23  **Q.**  IS THERE ANY REASON WHY YOU DIDN'T SEND A BILL FOR ALL

24  YOUR TIME THERE?

25  **A.**  I AM FAMILIAR ENOUGH WITH THIS WHOLE SITUATION THAT I

1    DON'T THINK MR. RASURE IS IN A POSITION TO PAY INVOICES RIGHT

2    NOW.

3    **Q.**  I THINK I HEARD YOU MENTION THAT YOU WERE A MEMBER OF

4    TECHSHOP, CORRECT?

5    **A.**  I WAS A MEMBER OF TECHSHOP, YES.

6    **Q.**  WHAT WAS THE TECHSHOP LOCATION YOU PRIMARILY WENT TO?

7    **A.**  PRIMARILY SAN FRANCISCO.

8    **Q.**  SO THE ONE AT 926 HOWARD STREET?

9    **A.**  YES.

10   **Q.**  THAT'S THE ONE MR. RASURE WAS USING FOR TECHSHOP 2.0,

11   CORRECT?

12   **A.**  THAT'S CORRECT.

13   **Q.**  AND --

14   **A.**  WELL, HE WASN'T USING IT FOR TECHSHOP 2.0, BUT WOULD HAVE

15   BEEN TECHSHOP 2.0 HAD HE OPENED IN THAT LOCATION.

16   **Q.**  AND THEN I THINK I HEARD YOU MENTION THAT YOU WERE, IN

17   FACT, WERE A MEMBER OF MR. RASURE'S TECHSHOP 2.0, CORRECT?

18   **A.**  I WAS -- THERE WAS NEVER A TECHSHOP 2.0 TO BE A MEMBER OF.

19   **Q.**  OKAY.

20   **A.**  I WAS A MEMBER OF THESHOP.BUILD.

21   **Q.**  OKAY.  WHATEVER ENTITY NAME MR. RASURE WAS OPERATING

22   UNDER, YOU WERE A MEMBER, CORRECT?

23   **A.**  YES.

24   **Q.**  WHEN DID YOU JOIN AS A MEMBER?

25   **A.**  I DON'T REMEMBER THE EXACT DATE, BUT IT WAS AFTER THE SORT

1   OF, YOU KNOW, FEBRUARY 19TH MORNING MEETING THAT HE HAD

2   TALKING WITH EVERYBODY.

3   **Q.**  SO YOU DIDN'T SUBMIT ANY OF THE MONEY -- IF WE GO TO THE

4   SPREADSHEET, WE ARE NOT GOING TO SEE YOU LISTED AS ONE OF THE

5   PEOPLE THAT PAID... BEFORE FEBRUARY 19TH?

6   **A.**  I DON'T THINK SO.  LIKE I SAID, I DON'T REMEMBER EXACTLY

7   BECAUSE --

8   **Q.**  OKAY.

9   **A.**  -- AT THE TIME --

10  **Q.**  TELL YOU WHAT.  STOP FOR ONE MINUTE.

11      IF WE CAN PULL UP, I THINK IT IS TX6, PLEASE.  IF WE CAN

12  GO TO THE LAST PAGE.

13                    (DISPLAYED ON SCREEN.)

14      SO I KNOW WE HAVE ALL LOOKED AT THIS BEFORE.  THIS IS A

15  SPREADSHEET SHOWING SOME REVENUES TAKEN IN BY MR. RASURE

16  BEFORE FEBRUARY 19TH.

17  **A.**  UH-HUH.

18  **Q.**  WOULDN'T YOU AGREE, RIGHT, HE WAS USING THE NAME TECHSHOP

19  2.0, CORRECT?

20          **MS. ROBERTS:**  OBJECTION, MISSTATES FACTS IN EVIDENCE.

21          **THE COURT:**  IT DOES, BUT ACTUALLY IT WAS ASKED AND

22  ANSWERED BEFORE, SO SUSTAINED ON THAT BASIS.  HE ANSWERED

23  EXACTLY THIS QUESTION A MINUTE AGO.

24  **BY MR. PISTORINO:**

25  **Q.**  I'LL TRY IT DIFFERENTLY, OKAY.

1      WHAT I AM REALLY TRYING TO DO DOCTOR -- SORRY, MR. BÜNGER,

2  IS JUST GET A BETTER SENSE REALLY OF THE UNDERLYING BASIS FOR

3  YOUR OPINION AND HOW YOU GOT THERE.

4  **A.**  FOR MY OPINION?

5  **Q.**  CORRECT.  YOU USED -- YOU STATED HERE TODAY, SO YOU

6  UNDERSTOOD WHEN YOU WERE DRAFTING YOUR REPORT, DIDN'T YOU,

7  THAT MR. RASURE WAS HOLDING HIMSELF OUT AS TECHSHOP 2.0 ALL

8  THE WAY THROUGH FEBRUARY 16TH.

9      YOU KNEW THAT, RIGHT?

10  **A.**  EVERYBODY WAS HOLDING OUT MR. RASURE'S COMPANY AS TECHSHOP

11  2.0.

12  **Q.**  SIR, JUST PLEASE ANSWER MY QUESTION.

13     WHEN YOU WERE DRAFTING YOUR REPORT, YOU KNEW THAT MR. --

14  PRIOR TO FEBRUARY 16TH, MR. RASURE WAS HOLDING HIMSELF OUT AS

15  TECHSHOP 2.0, CORRECT?

16  **A.**  I HEARD ABOUT TECHSHOP 2.0 FROM DAN WOODS, AND THAT'S --

17                    (SIMULTANEOUS COLLOQUY.)

18  **Q.**  SIR --

19  **A.**  YES, HE WAS AS WELL.

20  **Q.**  THANK YOU.

21     SO MR. RASURE WAS HOLDING HIMSELF OUT AS TECHSHOP 2.0 AND

22  ON THE SPREADSHEET, WE SEE THAT HE WAS TAKING IN REVENUES FROM

23  FEBRUARY 16TH AND BEFORE WHEN HE WAS USING THE NAME TECHSHOP

24  2.0, CORRECT, SIR?

25  **A.**  THAT'S CORRECT.

1    **Q.**  OKAY.  ALL RIGHT.  WANT TO MAKE SURE I GOT IT HERE.

2        NOW, I'LL JUST GO BACK, IF I CAN, A LITTLE BIT TO YOUR

3    COMPETITION HERE.

4        ISN'T IT TRUE THAT YOU HAVE BEEN PARTIALLY PAID BY HAVING

5    AN OFFICE AT THE 926 HOWARD?

6    **A.**  I DIDN'T HAVE IT IN 926.

7        I HAD IT FOR TWO OR THREE MONTHS OF ROUGHLY NOVEMBER TO

8    FEBRUARY OF THIS YEAR, SOMETIME IN THAT PERIOD.  I PAID DAN

9    RASURE $2,000 A MONTH FOR A SPACE THAT WAS IN THE 910

10   BUILDING.

11   **Q.**  OKAY.  JUST MAKE SURE I GOT IT.

12       YOU -- YOUR PAY, THE PAY YOU GOT FOR THIS CASE HERE WAS

13   THE PROVISION OF THAT SPACE TO YOU, CORRECT?

14   **A.**  NO.  I PAID HIM FOR PROVISION OF THAT SPACE.

15   **Q.**  OKAY.

16   **A.**  HE PROVIDED THE SPACE TO ME.

17   **Q.**  OKAY.

18   **A.**  I PAID MYSELF FOR TENANT IMPROVEMENTS AND OTHER THINGS.

19   **Q.**  OKAY.  SO JUST MAKE SURE THE JURY'S GOT IT.  MAKE SURE.

20       YOU'RE A MEMBER OF MR. RASURE'S ENTITY AND YOU'RE ALSO

21   RENTING SPACE FROM HIM, CORRECT?

22   **A.**  FOR -- AGAIN, FOR THAT PERIOD LAST YEAR BEGINNING OF THIS

23   YEAR.

24   **Q.**  OKAY.

25       **MR. PISTORINO:**  PERMISSION TO APPROACH, YOUR HONOR?

1      **THE COURT:**  YOU MAY.

2      **MR. PISTORINO:**  THANK YOU.

3                (EASEL MOVED TO WITNESS.)

4  BY MR. PISTORINO:

5  **Q.**  I JUST WANT TO MAKE SURE WE'VE GOT IT IN TERMS OF YOUR

6  BRAND OPINION AND THAT KIND OF THING.

7      YOU WERE A MEMBER OF TECHSHOP, RIGHT?

8  **A.**  YES.

9  **Q.**  SO THE FIRST ITEM ON THE DEMONSTRATIVE WE SEE THERE, THE

10  TECHSHOP TRADEMARK, WORD "TECHSHOP" IN THE LOGO THE WAY THEY

11  PRESENTED, THAT'S THE ONE ON THE TOP THAT YOU ARE VERY

12  FAMILIAR WITH, CORRECT?

13  **A.**  CORRECT.

14  **Q.**  AND THAT, AGAIN, WAS SOMETHING YOU CONSIDERED WHEN

15  ARRIVING AT YOUR OPINIONS THAT YOU'VE TOLD THE JURY ABOUT HERE

16  TODAY, CORRECT?

17  **A.**  I'M SORRY, WHAT DO YOU MEAN?  THAT --

18  **Q.**  THE TECHSHOP MARKS -- TRADEMARK TECHSHOP AND THE WAY THEY

19  PRESENTED, THAT WAS SOMETHING YOU CONSIDERED WHEN OFFERING

20  YOUR OPINIONS TO THE JURORS HERE TODAY, CORRECT?

21  **A.**  MY TESTIMONY HAS NOTHING TO DO WITH THE VISUAL APPEARANCE

22  OF THE MARK.

23  **Q.**  OKAY.  YOU WERE FAMILIAR WITH THE MARK AS IT WAS

24  PRESENTED, CORRECT?

25  **A.**  I AM VERY FAMILIAR --

1  **Q.**  OKAY.  SIR?  SIR?

2  **A.**  I'M JUST SAYING THAT IS NOT PART OF MY TESTIMONY.

3  **Q.**  OKAY.

4  **A.**  I'M NOT SURE IF YOU'RE ASKING ME AS A PERSONAL --

5  **Q.**  WELL, YOU KNEW IT, DIDN'T YOU?

6  **A.**  I'M NOT --

7  **Q.**  YOU KNEW THAT TECHSHOP USED THE WORD "TECHSHOP" AND

8  PRESENTED IT IN THE FORM THAT WE ARE SEEING THERE AT THE TOP,

9  CORRECT?

10  **A.**  YES.

11  **Q.**  OKAY.  SIR, PLEASE JUST GO UP TO THE DEMONSTRATIVE THERE

12  AND JUST PUT YOUR INITIALS RIGHT NEXT TO THE TOP ONE FOR ME,

13  PLEASE.

14      GO AHEAD.  THANK YOU.

15      JUST PUT YOUR INITIALS ON IT RIGHT THERE NEXT TO THE TOP

16  ONE.

17  **A.**  (INDICATING).

18  **Q.**  YEP, RIGHT THERE.  JUST MARK IT ON.  IT'S OKAY.

19  **A.**  ON IT OR NEXT TO IT?

20  **Q.**  PUT IT NEXT TO IT.  PUT YOUR INITIALS THERE FOR US.

21      OKAY.  AND YOU KNEW OF MR. RASURE'S EFFORTS -- COME BACK

22  HERE.

23      YOU KNEW OF MR. RASURE'S EFFORTS TO OPEN A MAKERSPACE

24  USING THE NAME TECHSHOP 2.0, DIDN'T YOU?

25  **A.**  YES.

BÜNGER - CROSS / PISTORINO

1    **Q.** OKAY. AND YOU HAD SEEN COMMUNICATIONS FROM HIM USING THE

2    NAME TECHSHOP 2.0, HADN'T YOU?

3    **A.** I'VE SEEN COMMUNICATIONS FROM TECHSHOP AND TECHSHOP 2.0.

4    **Q.** OKAY.

5       AND, FOR EXAMPLE, YOU SAW MR. RASURE USE THE NAME TECHSHOP

6    2.0 IN THE FORM WE SEE IN THE SECOND ONE, DIDN'T YOU?

7    **A.** AFTER DAN WOODS DID THAT, YES.

8    **Q.** SIR, YOU SAW MR. RASURE USE THE NAME TECHSHOP 2.0 IN THE

9    FORM THAT'S IN THE SECOND ONE, DIDN'T YOU?

10   **A.** I HAVE SEEN THIS.

11   **Q.** OKAY. GO AHEAD AND MARK YOUR -- PUT YOUR INITIALS NEXT TO

12   THE SECOND ONE FOR ME PLEASE, SIR.

13   **A.** (MARKS ON EASEL.)

14   **Q.** WHAT ABOUT THE THIRD ONE; DID YOU SEE THE VERSION THAT

15   MR. RASURE USED WHERE HE SAID OPENING SOON? YOU SAW THAT ONE

16   AT THAT TIME?

17   **A.** I HAVE SEEN ALL OF THESE.

18   **Q.** OKAY. GO AHEAD AND MARK YOUR NAME -- MARK YOUR INITIALS

19   NEXT TO THAT ONE.

20   **A.** (MARKS ON EASEL.)

21   **Q.** AND YOU JUMPED AHEAD FOR ME, BUT THAT'S OKAY. THE BOTTOM

22   ONE, YOU -- ACTUALLY, LET ME ASK -- YOU WENT AHEAD AND PUT

23   YOUR INITIALS.

24      YOU, AT THE TIME, YOU SAW MR. RASURE USING THE NAME

25   THESHOP.BUILD IN ASSOCIATION WITH HIS MAKERSPACE AT 926 HOWARD

1  STREET, CORRECT?

2  **A.**  I, TO BE HONEST, DON'T REMEMBER WHEN, YOU KNOW, WHEN I SAW

3  THAT.  I HAVE SEEN IT BEFORE.  I DON'T REMEMBER WHAT THE

4  TIMING OF THAT WAS.

5  **Q.**  OKAY.

6  YOU MENTIONED, I THOUGHT, I THOUGHT YOU MENTIONED THAT YOU

7  JOINED MR. RASURE'S ENTITY UNDER WHATEVER NAME, KIND OF LIKE

8  RIGHT AROUND THIS FEBRUARY 19TH TIME FRAME, RIGHT?

9  **A.**  YES.

10  **Q.**  OKAY.  AND YOU SAID YOU HAVE BEEN IN THE BACK OF THE

11  COURTROOM THE ENTIRE TIME, RIGHT?

12  **A.**  I CAME IN WHEN DAN WAS JUST BEING --

13  **Q.**  OKAY.  BUT --

14  (COURT REPORTER ADMONISHES COUNSEL AND WITNESS.)

15  **MS. ROBERTS:**  MAY THE WITNESS SIT BACK DOWN SO HE IS

16  IN FRONT OF A MICROPHONE?

17  **THE COURT:**  IT WOULD BE BETTER FOR EVERYONE IF HE

18  SITS DOWN ON THE STAND WHERE HE IS BY THE MIC.

19  **MR. PISTORINO:**  THAT'S FINE.

20  **BY MR. PISTORINO:**

21  **Q.**  THANK YOU, DOCTOR.  I WANT TO CALL YOU DOCTOR FOR SOME

22  REASON.

23  **A.**  YOU ARE WELCOME TO CONTINUE DOING SO.

24  **Q.**  I'M SURE EVERYBODY WOULD PREFER TO UPGRADE THEMSELVES,

25  RIGHT?

1    SO YOU HEARD, WHAT IT SOUNDS LIKE, YOU WERE HERE FOR

2  MR. RASURE'S TESTIMONY, CORRECT?

3  **A.**  I WAS, YES.

4  **Q.**  YOU HEARD MR. RASURE SAY THAT HE WAS USING THAT, THESHOP,

5  YOU KNOW, THESHOP.BUILD THE WAY WE SEE IT THERE.

6    I THINK HE SAID HE WAS USING IT AT LEAST FOUR OR FIVE

7  DAYS.  YOU WERE HERE FOR THAT TESTIMONY, CORRECT?

8         **MS. ROBERTS:**  OBJECTION, MISSTATES THE TESTIMONY.

9         **THE COURT:**  SUSTAINED.

10         **MR. PISTORINO:**   OKAY.

11  **BY MR. PISTORINO:**

12  **Q.**  YOU HEARD MR. RASURE SAY HE USED THE THESHOP.BUILD FOR

13  SEVERAL DAYS, CORRECT?

14  **A.**  DO YOU WANT ME TO SAY WHAT I BELIEVE MR. RASURE'S --

15  **Q.**  DID YOU --

16               (SIMULTANEOUS COLLOQUY.)

17  **Q.**  DID YOU HEAR HIM SAY HE WAS USING THESHOP.BUILD, AS WE SEE

18  IT DOWN THERE AT THE BOTTOM, FOR SEVERAL DAYS AFTER BEING SUED

19  ON FEBRUARY 16TH?

20  **A.**  I DON'T RECALL THAT HE SAID SEVERAL DAYS.  I DON'T RECALL

21  WHAT HE SAID.  BUT I DO RECALL HE STOPPED AFTER YOU TOLD HIM

22  TO.

23  **Q.**  WELL, HOLD ON A SECOND.  I'M TALKING ABOUT THE WAY

24  THESHOP.BUILD THERE IS PRESENTED.

25  **A.**  LIKE I SAID, HE SAID A MEMBER MADE THAT.  I DON'T KNOW

1    WHAT -- I WOULD LOVE TO TELL YOU WHAT I THINK HAPPENED, BUT I

2    DON'T HAVE ANY FACTUAL BASIS FOR WHEN OR HOW THAT CAME

3    ABOUT --

4    **Q.**  OKAY.

5    **A.**  -- OTHER THAN THE TESTIMONY WE ALL HEARD.

6    **Q.**  OKAY.  SO I WILL ROLL BACK AGAIN.

7        YOUR BEST RECOLLECTION IS THAT YOU JOINED THESHOP.BUILD

8    SOMETIME IN THAT -- RIGHT AROUND FEBRUARY 19TH, CORRECT?

9    **A.**  AROUND THAT TIME FRAME.

10   **Q.**  ALL RIGHT.

11        **MR. PISTORINO:**  YOUR HONOR, WE MOVE TO OFFER THE

12   DEMONSTRATIVE HERE AS MARKED BY DR. MATOLO (SIC) AS AN

13   EXHIBIT.  I THINK IT WOULD BE 377 ON OUR LIST.

14        **THE COURT:**  ANY OBJECTION?

15        **MS. ROBERTS:**  NO OBJECTION.

16        **THE COURT:**  OKAY.  377 IS ADMITTED.

17     (TRIAL EXHIBIT 377 MARKED AND RECEIVED IN EVIDENCE.)

18        **MR. PISTORINO:**  WE HAVE A STICKER.

19   **BY MR. PISTORINO:**

20   **Q.**  OKAY.  I DO HAVE A FEW QUESTIONS, VERY BRIEF ONES, ABOUT

21   YOUR SLIDES.

22        IF YOU COULD TURN TO -- IN THE DEMONSTRATIVES THAT WERE

23   USED ON YOUR DIRECT TESTIMONY.

24        SLIDE 1, PLEASE, OR THE SUMMARY OPINIONS SLIDE.  IT IS

25   ACTUALLY SLIDE 3.  WE'LL PULL THAT UP JUST TO REFRESH

1   EVERYONE'S RECOLLECTION.

2                  (DISPLAYED ON SCREEN.)

3       OKAY.  AND WE'LL GET TO MAYBE NO. 1, MAYBE NO. 3 LATER.  I

4   DID HAVE A LITTLE BIT OF QUESTION HERE ABOUT YOUR -- I JUST

5   WANT TO MAKE IT SURE, IT IS YOUR EXPERT OPINION THAT "TECH"

6   AND "SHOP" ARE COMMON IN MAKERSPACE NAMES; IS THAT RIGHT?

7   **A.**  THAT'S WHAT THE DATA SHOWS.

8   **Q.**  THAT'S FROM THE USE OF ALL YOUR YEARS OF EXPERIENCE AND

9   TRAINING YOU'VE ARRIVED AT THE OPINION THAT "TECH" AND "SHOP"

10  ARE COMMON IN MAKERSPACE NAMES, CORRECT?

11  **A.**  THAT'S MY EXAMINATION OF THE DIRECTORY THAT I MENTIONED

12  EARLIER.

13             **MR. PISTORINO:**  PLEASE TURN TO SLIDE 19, PLEASE.

14                  (DISPLAYED ON SCREEN.)

15  **BY MR. PISTORINO:**

16  **Q.**  AND THIS IS THE CHART THAT YOU RECALL SEEING THIS CHART

17  SHOWN ON YOUR DIRECT TESTIMONY, SIR?

18      DO YOU RECALL SEEING THIS?

19  **A.**  YES.

20  **Q.**  OKAY, GREAT.

21      AND I THINK I WROTE DOWN DURING YOUR OPENING -- YOUR,

22  DIRECT TESTIMONY THAT "TECH" AND "SHOP" WERE VERY FREQUENTLY,

23  QUITE FREQUENTLY USED IN MAKERSPACES, CORRECT?

24  **A.**  I DON'T KNOW IF I USED "QUITE" OR "VERY", BUT I DID SAY

25  THAT THEY WERE IN THE TOP TEN MOST COMMON.

1  **Q.**  NO, NO.  NO, I THINK I HEARD YOU SAY -- ARE YOU GOING TO

2  CHANGE YOUR TESTIMONY NOW?

3      DIDN'T YOU SAY VERY FREQUENTLY?

4  **A.**  TO BE HONEST, I DON'T RECALL --

5  **Q.**  OKAY.

6  **A.**  -- VERBATIM WHAT I SPOKE.  BUT MY POINT WAS IT'S THE DATE.

7  **Q.**  DO YOU HAVE ANY REASON TO DOUBT THAT I WROTE DOWN

8  CORRECTLY THAT YOU SAID VERY FREQUENTLY?

9  **A.**  WOULD I DISAGREE THAT IT'S VERY FREQUENTLY?

10  **Q.**  NO, THAT THAT'S WHAT YOU SAID, IT WAS VERY FREQUENT.

11  **A.**  I WOULDN'T... I WOULDN'T QUIBBLE ABOUT IT.

12  **Q.**  OKAY.  AND THAT YOU SAID QUITE FREQUENTLY?

13  **A.**  I MIGHT HAVE ALSO --

14  **Q.**  OKAY.

15      I HAVE TO ADMIT, MAYBE THERE'S A DIFFERENT STANDARD FOR

16  FREQUENCY IN THE FIELD THAT YOU ARE IN, BUT AS I UNDERSTAND

17  YOUR SLIDE, YOU LOOKED AT THE NAMES OF 1400 MAKERSPACES,

18  CORRECT?

19  **A.**  THAT'S CORRECT.  1434.

20  **Q.**  AND 27 OUT OF THE 1400 EVEN USED THE LITTLE SUBPART WORD

21  "TECH" SOMEWHERE IN THERE, CORRECT?

22      AND IT'S YOUR TESTIMONY AS AN EXPERT, IN YOUR VIEW, THAT

23  27 OUT OF 14 -- MORE THAN 1400 IS VERY FREQUENTLY, CORRECT?

24  **A.**  IT'S, AGAIN --

25  **Q.**  OKAY --

BÜNGER - CROSS / PISTORINO

1  **A.** -- SIXTH OR SEVENTH MOST FREQUENT --

2  **Q.** WELL, SIR, IT'S YOUR TESTIMONY AS AN EXPERT HERE TODAY

3  THAT 27 OUT OF MORE THAN 1400 IS VERY FREQUENTLY, CORRECT?

4  **A.** RELATIVE TO OTHER WORDS, THAT'S VERY FREQUENT.

5  **Q.** OKAY.  LIKEWISE I -- YOU'VE GOT THE LITTLE SHOP ON THERE

6  AS WELL.

7  IT'S YOUR TESTIMONY HERE TODAY AS AN EXPERT, THAT THE --

8  JUST THE FRAGMENT "SHOP" APPEARING IN SOMETHING 20 TIMES OUT

9  OF MORE THAN 1400, THAT IS -- I GOT YOUR THING -- QUITE

10  FREQUENT, CORRECT?

11  **A.** SO, AGAIN --

12  **Q.** SIR, SIR --

13  **A.** THIS IS MY --

14  **Q.** SIR, JUST ANSWER MY QUESTION.

15  IT'S YOUR TESTIMONY AS AN EXPERT HERE TODAY IN THE

16  BRANDING OR WHATEVER IT IS, THAT THE "SHOP" -- THE FRAGMENT

17  APPEARING 20 TIMES OUT OF MORE THAN 1400, AS AN EXPERT YOU ARE

18  TELLING THIS JURY THAT'S QUITE FREQUENT, CORRECT?

19  **A.** THESE ARE THE MOST FREQUENT TERMS --

20  **Q.** SIR, PLEASE, JUST ANSWER MY QUESTION.

21  **A.** I'M NOT SURE --

22  **Q.** SIR, JUST PLEASE ANSWER THE QUESTION.

23  **A.** I AM NOT USED TO ANSWERING QUESTIONS EXCEPT THE WAY THAT I

24  AM ANSWERING THEM RIGHT NOW.

25  (SIMULTANEOUS COLLOQUY.)

1    **Q.**  SIR --

2              **THE COURT:**  LADIES AND GENTLEMEN, LET'S TAKE OUR

3    RECESS.  IT'S 10:00 O'CLOCK.  WE WILL BREAK AND RETURN AT

4    10:15.

5         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

6              **THE CLERK:**  REMAIN SEATED.

7              **THE COURT:**  I'M SORRY, MR. BÜNGER, PLEASE STEP

8    OUTSIDE THE COURTROOM.  ALL THE WAY OUT.

9                   (WITNESS LEAVES COURTROOM.)

10             **THE COURT:**  ALL RIGHT.  SO, LOOK, MADAME REPORTER HAS

11   BEEN EXTREMELY PATIENT.  WE CAN'T HAVE THIS CUTTING EVERYBODY

12   OFF, STEPPING ON IT.  AND, FRANKLY, YOU ARE QUIBBLING AND

13   ARGUING WITH THE WITNESS.

14        YOU CAN -- I'M GIVING YOU A LOT OF LEEWAY, BUT WHAT YOU

15   CAN'T DO IS CONSTANTLY CUTTING HIM OFF AND MUDDYING THE

16   RECORD.  AND I JUST THINK THERE'S A CRISPER, LESS THEATRICAL

17   WAY TO GET AT IT THAT WILL MOVE THIS LOT FASTER.

18             **MR. PISTORINO:**  I UNDERSTAND, YOUR HONOR.  THANK YOU.

19             **THE COURT:**  ALL RIGHT.

20        (RECESS TAKEN AT 10:00 A.M.; RESUMED AT 10:17 A.M.)

21             **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

22   COURT IS BACK IN SESSION.

23             **THE COURT:**  MADAME CLERK, CAN YOU GIVE THE TIME

24   REMAINING FOR EACH SIDE?

25             **THE CLERK:**  FOR PLAINTIFF, 57 MINUTES AND 9 SECONDS.

1    AND FOR DEFENSE, 3 HOURS 57 MINUTES AND 3 SECONDS.

2            **THE COURT:**  SO THAT INCLUDES CLOSING.

3            **MR. PISTORINO:**  YES, YOUR HONOR.

4        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

5            **THE CLERK:**  YOU MAY BE SEATED.

6            **THE COURT:**  YOU MAY CONTINUE, MR. PISTORINO.

7            **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

8    **BY MR. PISTORINO:**

9    **Q.**  SO, MR. BÜNGER, MAKE SURE I GOT IT RIGHT HERE.

10       NOW I WANT TO MAYBE TURN TO THE LAST AREA OF OUR INQUIRY.

11   YOUR OPINIONS ABOUT LICENSING IN THIS CASE.  OKAY.

12       AND I WANT TO MAKE SURE, AT LEAST I UNDERSTAND, AND

13   ESPECIALLY YOUR OPINION ABOUT NEGATIVE BRAND EQUITY.

14       IT IS NOT YOUR OPINION, IS IT, THAT THE TECHSHOP

15   TRADEMARKS HAD NO VALUE; THAT'S NOT YOUR OPINION, IS IT?

16   **A.**  NEGATIVE IS LESS.  NO VALUE MEANS AN ABSENCE.  SO NEGATIVE

17   IS LESS THAN ZERO.

18   **Q.**  OKAY.  SO JUST MAKE SURE I UNDERSTAND IT.

19       THE OPINION YOU ARE TELLING THE JURORS HERE TODAY IS THAT

20   THE TECHSHOP TRADEMARKS HAD LESS THAN ZERO VALUE?

21   **A.**  CORRECT.

22   **Q.**  SOMEBODY WOULD HAVE HAD TO -- TECHSHOP WOULD HAVE HAD TO

23   PAY SOMEBODY TO USE THE TECHSHOP NAME; IS THAT YOUR TESTIMONY?

24   **A.**  OR TO BUY A PRODUCT OR SERVICE FROM TECHSHOP.

25   **Q.**  OKAY.

BÜNGER - CROSS / PISTORINO

1  **A.**  COMPARED TO A SIMILAR MAKERSPACE SOMEPLACE ELSE.

2  **Q.**  OKAY.  I'M JUST TRYING TO MAKE SURE I GOT IT.

3      IT'S YOUR TESTIMONY THAT SOMEBODY WOULD HAVE HAD TO --

4  IT'S YOUR TESTIMONY THAT TECHSHOP WOULD HAVE HAD TO PAY

5  SOMEBODY TO USE ITS TRADEMARKS; IS THAT CORRECT?

6  **A.**  SO, THE -- AGAIN... THERE IS NOT A "YES" OR "NO" ANSWER

7  BECAUSE WHAT -- NO, THAT IS NOT CORRECT.

8  **Q.**  OKAY.

9  **A.**  DO YOU WANT AN ANSWER OR JUST --

10 **Q.**  IF YOU SAY IT'S NOT CORRECT, IT'S NOT CORRECT.

11 **A.**  SO NEGATIVE, EVERYBODY MEANS THAT TWO MAKERSPACES SIDE BY

12 SIDE THAT BOTH OFFERED THE SAME SERVICES, THE SAME EQUIPMENT,

13 THE SAME EVERYTHING ELSE, IF YOU OPENED THAT UNDER A TECHSHOP

14 NAME VERSUS A GENERIC NAME, YOU WOULD HAVE TO DISCOUNT THE

15 MEMBERSHIP IN TECHSHOP COMPARED TO THE IDENTICAL STORE NEXT TO

16 IT.

17 **Q.**  OKAY.  SO TRY TO CLOSE THIS CIRCLE.

18     IT IS YOUR TESTIMONY THEN THAT THE TECHSHOP MARKS

19 THEMSELVES, THEY HAVE POSITIVE VALUE, CORRECT?

20 **A.**  NO.

21 **Q.**  OKAY.  LET'S SEE IF WE CAN GET BACK THERE THEN.

22     SO YOU ALSO SAY, I THINK, THAT YOU DON'T LIKE THE FOREIGN

23 LICENSES AND THAT KIND OF STUFF DR. MATOLO LOOKED AT, RIGHT?

24 **A.**  I DON'T THINK I SAID I DIDN'T LIKE THEM.  I SAID I

25 DISAGREED WITH THEM.

1    **Q.**  OKAY.  YOU THINK THEY ARE TOO REMOTE IN TIME; IS THAT

2    FAIR?

3    **A.**  REMOTE IN TIME AND DIFFERENT MARKETS.

4    **Q.**  OKAY.  YOU THINK IT WOULD BE MORE APPROPRIATE TO LOOK AT

5    SOMETHING IN THE SAME MARKET CLOSER IN TIME, CORRECT?

6    **A.**  SO, YOU COULD DO --

7    **Q.**  SIR, JUST YES OR NO.

8    **A.**  SAME MARKET SAME TIME OR OTHER MARKET SAME TIME.

9    **Q.**  BUT I'VE GOT TO ADMIT, THOUGH, THE ONE PART THAT KEEPS

10   ALLUDING ME HERE, LET ME TRY IT THIS WAY.

11        MAYBE THE PERSON THAT IS THE MOST CLOSE IN TIME, THE MOST

12   CLOSE IN THE MARKET IS MR. RASURE.  YOU KNOW, SIR, DON'T YOU,

13   THAT MR. RASURE OFFERED TO BUY THE TECHSHOP MARKS, TECHSHOP

14   MARKS FOR SOMETHING LIKE 200 GRAND AND ASSUMING THE

15   LIABILITIES OF 18 MILLION; YOU KNOW THAT, DON'T YOU?

16   **A.**  I WOULDN'T HAVE ADVISED MR. RASURE TO DO THAT.

17   **Q.**  DO YOU KNOW THAT --

18   **A.**  I DON'T KNOW EXCEPT WHAT TESTIMONY HAS BEEN GIVEN HERE.  I

19   DON'T BELIEVE I SAW THAT.

20   **Q.**  YOU --

21   **A.**  I KNOW HE WAS OFFERING TO BUY IT.

22   **Q.**  YOU DON'T KNOW THAT MR. RASURE OFFERED TO BUY THE TECHSHOP

23   ASSETS INCLUDING THE TRADEMARKS FOR MORE THAN $200,000 IN CASH

24   AND ASSUMING MORE THAN $18 MILLION IN LIABILITY; YOU DIDN'T

25   KNOW THAT?

BÜNGER - CROSS / PISTORINO

1    **A.**  SO, WHAT YOU'RE IMPLYING IS THAT HE WAS BUYING THE BRAND.

2    AND HE MIGHT HAVE SAID WITHOUT THAT BRAND, I WOULD PAY MORE

3    FOR IT.  I DON'T THINK THAT WAS THE NEGOTIATION, BUT YOU ARE

4    ASKING KIND OF A CONFUSING QUESTION.

5    **Q.**  YOU SAW THE DECEMBER 10TH -- I AM SORRY, THE DECEMBER 1

6    MOU, RIGHT?

7    **A.**  CAN I DISAGREE WITH YOU --

8    **Q.**  SIR, SIR --

9    **A.**  -- USING THE MOST IMPORTANT --

10   **Q.**  SIR, SIR --

11   **A.**  -- CHARACTERIZING PERSON.

12   **Q.**  YOU SAW THE DECEMBER 1 MOU, CORRECT?

13   **A.**  I DID SEE THE DECEMBER 1 --

14   **Q.**  JUST LIKE THE JURORS DID.

15       OKAY.  NOW, YOU KNOW, FOR EXAMPLE, YOU KNOW THAT AT LEAST

16   MR. RASURE, HE COULDN'T THINK OF A BETTER NAME THAN TECHSHOP,

17   CORRECT?

18   **A.**  HE STATED AS MUCH.

19   **Q.**  YEAH.  OKAY.

20       AND IT'S YOUR OPINION THAT, YEAH, HIS IDEA OF USING THE

21   NAME TECHSHOP, THAT'S JUST A TERRIBLE IDEA, RIGHT?  THAT'S

22   YOUR OPINION?

23   **A.**  YES, THAT'S MY OPINION.

24   **Q.**  BUT YOU KNOW MR. RASURE CHOSE IT, CORRECT?

25   **A.**  HE... AGAIN, I DON'T KNOW WHAT THE -- IT WAS IN THE MOU.

BÜNGER - CROSS / PISTORINO

1   **Q.**  CAN YOU PULL UP TX192?

2       YOU KNOW MR. RASURE THAT RACKED HIS BRAIN FOR A WEEK

3   TRYING TO THINK OF A BETTER NAME THAN TECHSHOP, CORRECT?

4                   (DISPLAYED ON SCREEN.)

5   **A.**  MR. RASURE IS NOT A BRAND EXPERT.

6   **Q.**  OKAY.  WELL --

7   **A.**  HE COULD HAVE RACKED HIS BRAIN FOR A YEAR AND NOT COME UP

8   WITH A GOOD NAME.

9   **Q.**  OKAY.  SO JUST FOCUSED ON MR. RASURE, THOUGH, FROM HIS

10  PERSPECTIVE, THAT'S THE BEST NAME HE CAN THINK OF AFTER

11  RACKING HIS NAME FOR A WEEK, CORRECT?

12  **A.**  WELL, HE DOESN'T --

13  **Q.**  WE CAN ALL READ IT IN TX96.

14      RACKED OUR BRAINS FOR A WEEK, TECHSHOP, RIGHT?

15  **A.**  HE DOESN'T --

16  **Q.**  OKAY.  NEXT, SIR, I WANT TO FOCUS ON MR. RASURE.

17      IT'S YOUR OPINION THAT TECHSHOP WOULD HAVE TO PAY PEOPLE

18  TO USE ITS NAME.  BUT ISN'T IT TRUE, SIR, THAT THERE'S ONE

19  PERSON WE KNOW OF, RIGHT, THAT VALUE THE TECHSHOP BRAND RIGHT

20  AROUND THE TIME HERE, I DON'T KNOW, MAYBE LIKE TWO WEEKS

21  BEFORE THIS LAWSUIT WAS FILED, AND WE KNOW HOW MUCH HE VALUED

22  IT FOR, RIGHT?  2.5 MILLION.

23      PLEASE PULL UP TX73.

24  **A.**  THIS IS THE PROPOSAL TO THE -- LEROY MERLIN.

25  **Q.**  SIR, DID YOU SEE THIS WHEN YOU WERE PREPARING YOUR EXPERT

1    REPORT?

2                    (DISPLAYED ON SCREEN.)

3    **A.**  NOT WHEN I WAS PREPARING THE EXPERT REPORT.

4    **Q.**  OKAY.  WHEN YOU WERE PREPARING YOUR EXPERT REPORT WITH ALL

5    THESE CONCLUSIONS ABOUT HOW TECHSHOP WOULD HAVE TO PAY PEOPLE

6    FOR, YOU DIDN'T KNOW THAT MR. RASURE HAD OFFERED TO LICENSE

7    THE MARKS IN SUIT FOR $2.5 MILLION; YOU DIDN'T KNOW THAT, SIR?

8    **A.**  NO, I DIDN'T KNOW THAT.

9    **Q.**  THANK YOU, SIR.

10            **MR. PISTORINO:**  NOTHING FURTHER, YOUR HONOR.

11            **THE COURT:**  ANY REDIRECT?

12                    **REDIRECT EXAMINATION**

13   **BY MS. ROBERTS:**

14   **Q.**  IN THE LATEST SORT OF QUESTIONS THERE ON CROSS-EXAMINATION

15   YOU KEPT BEING ASKED ABOUT MR. RASURE CHOOSING TO USE THE NAME

16   TECHSHOP.

17        DID MR. RASURE USE -- CHOOSE TO USE THE NAME TECHSHOP?

18   **A.**  NO.

19   **Q.**  WHAT DID HE CHOOSE TO USE INITIALLY?

20   **A.**  AGAIN, BASED ON THE STATEMENTS OF DAN WOODS INITIALLY,

21   THIS WAS TECHSHOP 2.0, AND THAT WAS THE NAME HE USED.

22   **Q.**  SO MR. RASURE DID NOT USE THE NAME TECHSHOP, HE USED

23   TECHSHOP 2.0?

24   **A.**  IN MY PERSONAL AWARENESS AND IN THE EXAMINATION I DID, I

25   HAVEN'T FOUND ANY INSTANCE WHERE DAN RASURE CALLED THE COMPANY

1  TECHSHOP.

2  **Q.**  NOW, IN RESPONSE TO ONE OF THE QUESTIONS, I THINK COUNSEL

3  ASKED YOU WHETHER MR. RASURE WAS HOLDING HIMSELF OUT AS

4  TECHSHOP 2.0, AND YOU SAID THAT EVERYONE WAS HOLDING HIM OUT

5  THAT WAY, AND YOU GOT CUT OFF.

6      WAS THERE ANYTHING YOU WANTED TO EXPAND ON THERE?

7  **A.**  SO THE TECHSHOP 2.0 TERM WAS, AGAIN, INTRODUCED TO THE

8  COMMUNITY.  I AND EVERYBODY ELSE HEARD IT FOR THE FIRST TIME

9  FROM DAN WOODS.

10      **MR. PISTORINO:**  OBJECTION, YOUR HONOR.  CALLS FOR

11  SPECULATION --

12      **THE WITNESS:**  IT'S --

13      **THE COURT:**  STOP, PLEASE.

14  SUSTAINED.  LET'S JUST MOVE ON.

15  **BY MS. ROBERTS:**

16  **Q.**  YOU WERE ALSO ASKED IN CROSS-EXAMINATION ABOUT WHETHER

17  MR. RASURE WAS THE BEST PERSON TO LOOK AT IN TERMS OF A

18  LICENSEE IN THE PERIOD LEADING UP TO THE ALLEGED INFRINGEMENT.

19      DO YOU RECALL THAT?

20  **A.**  YES, I RECALL THAT.

21  **Q.**  AND YOU DISPUTED WHETHER HE WAS.

22      CAN YOU EXPLAIN WHAT YOU WANTED TO SAY THERE?

23  **A.**  AGAIN, I WOULD STRONGLY QUESTION MR. RASURE'S EXPERTISE IN

24  THE AREA OF BRANDING.  I THINK THAT WHATEVER ASSESSMENT HE

25  MADE OF THE VALUE OF THE COMPANY OVERALL CERTAINLY TOOK THE

1    REPUTATION OF THE COMPANY AT THE TIME INTO ACCOUNT.

2    **Q.**  AND YOU WERE SHOWN TX73, WHICH WAS, I THINK THAT WAS THE

3    EMAIL REGARDING THE ADEO LICENSE?

4    **A.**  YES.

5    **Q.**  DO YOU RECALL SEEING THAT?

6         CAN YOU REMIND THE JURY, WHAT MARKET WAS THAT FOR?  WAS

7    THAT FOR THE UNITED STATES?

8    **A.**  THE ONE THAT WE JUST SAW A SECOND AGO?

9    **Q.**  YES.

10   **A.**  THAT WAS FOR... I THINK THERE WERE SEVERAL COUNTRIES AND

11   THE CONTINENT OF AFRICA.  IT WAS SORT OF THE EQUIVALENT OF

12   30 -- I'M SORRY, LIKE ABOUT 3 BILLION PEOPLE.

13   **Q.**  AND THEN AT THE OUTSET OF YOUR CROSS-EXAMINATION YOU WERE

14   ASKED ABOUT YOUR MEMBERSHIP IN THESHOP.BUILD.

15        DO YOU RECALL THAT?

16   **A.**  YES.

17   **Q.**  JUST TO BE CLEAR FOR THE JURY, YOU'VE BEEN A MEMBER OF

18   BOTH ENTITIES THAT ARE OPPOSING PARTIES HERE TODAY, RIGHT?

19   **A.**  THAT'S CORRECT.

20        **MS. ROBERTS:**  NO FURTHER QUESTIONS.

21        **THE COURT:**  ANY RECROSS?

22        **MR. PISTORINO:**  NOTHING FURTHER, YOUR HONOR.

23        **THE COURT:**  ALL RIGHT.  THANK YOU, MR. BÜNGER.  YOU

24   ARE EXCUSED.

25        AND THE DEFENSE MAY CALL ITS NEXT WITNESS.

1          **MS. ROBERTS:**  THE DEFENSE RESTS ITS CASE.

2          **THE COURT:**  ALL RIGHT.  SO, LADIES AND GENTLEMEN, THE

3   DEFENSE HAS NOW RESTED ITS CASE, WHICH MEANS IT HAS COMPLETED

4   THE PRESENTATION OF ITS EVIDENCE.

5       THE PLAINTIFF THEN HAS THE OPPORTUNITY FOR WHAT IS CALLED

6   A REBUTTAL CASE.

7       MR. PISTORINO, ANY REBUTTAL?

8          **MR. PISTORINO:**  NO, YOUR HONOR.

9          **THE COURT:**  ALL RIGHT.

10      SO WE HAVE REACHED ANOTHER MILESTONE IN THE CASE, LADIES

11  AND GENTLEMEN.  THE PRESENTATION OF THE EVIDENCE IS COMPLETE.

12  AND LET ME TELL YOU HOW WE WILL PROCEED FROM HERE.

13      SO AS I MENTIONED EARLY IN THE TRIAL, THE NEXT STEPS IS

14  THAT THE ATTORNEYS WILL HAVE THE OPPORTUNITY TO PRESENT THEIR

15  CLOSING ARGUMENTS TO YOU, WHICH IS THEIR VIEW OF WHAT THEY

16  BELIEVE THE EVIDENCE HAS SHOWN.  ONCE THEY DO THAT, I WILL

17  THEN GIVE YOU YOUR INSTRUCTIONS ON THE LAW AND THE CASE WILL

18  BE SUBMITTED TO YOU FOR YOUR DELIBERATIONS.

19      FOR PURPOSES OF EFFICIENCY, BECAUSE THERE IS SOME WORK

20  THAT I WILL NEED TO DO WITH THE ATTORNEYS BEFORE WE GET TO

21  THAT STAGE, WE ARE GOING TO BREAK TODAY FOR THE DAY.  AND YOU

22  WILL HAVE THE REMAINDER OF THE DAY TO YOURSELVES.

23      WE WILL THEN RESUME HERE AT 10:00 O'CLOCK TOMORROW FOR

24  CLOSING ARGUMENTS AND INSTRUCTIONS.  AND ONCE THAT IS

25  COMPLETE, THE CASE WILL BE SUBMITTED TO YOU FOR YOUR

```
1    DELIBERATIONS.

2         NOW, ONE THING I MENTIONED TO YOU WHEN WE SPOKE EARLIER IS

3    YOU SHOULD PROBABLY START THINKING ABOUT NOW IS, AS I SAID,

4    ONCE THE CASE IS SUBMITTED TO YOU TO DELIBERATE, YOU ARE NO

5    LONGER SUBJECT TO MY SCHEDULE.  SO RATHER THAN BREAKING AT

6    1:30, IF YOU CHOOSE, AND JURIES OFTEN DO CHOOSE, YOU CAN BE

7    DELIBERATE ALL DAY IF YOU WISH UNTIL 4:30 OR 5:00.

8         THAT DECISION ON HOW TO STRUCTURE YOUR DELIBERATIONS IN

9    TERMS OF THE SCHEDULE IS TOTALLY UP TO YOU.  BUT THAT'S

10   SOMETHING TO KEEP IN MIND AS YOU PLAN FOR THIS NEXT STAGE OF

11   THE CASE.

12        SO, I WILL RELEASE YOU FOR TODAY AND JUST REMIND YOU, I'LL

13   GIVE YOU -- THIS WILL BE THE LAST TIME YOU HEAR IT.  I'M SURE

14   YOU'LL BE WEEPING NEVER TO HEAR IT AGAIN, BUT JUST TO KEEP IN

15   MIND, SO, REMEMBER, UNTIL THE TRIAL IS OVER, AND IT IS NOT

16   OVER, DO NOT DISCUSS THE CASE WITH ANYONE, INCLUDING YOUR

17   FELLOW JURORS, MEMBERS OF YOUR FAMILY, PEOPLE INVOLVED IN THE

18   TRIAL, OR ANYONE ELSE.  DO NOT ALLOW OTHERS TO DISCUSS THE

19   CASE WITH YOU BY ANY MEANS IN PERSON, IN WRITING, PHONE OR

20   ELECTRONIC MEANS, OR ANY CHAT ROOM OR SOCIAL MEDIA

21   APPLICATION, INCLUDING ALL OF THE LIST OF NORMAL FAVORITES.

22        IF ANYONE TRIES TO COMMUNICATE WITH YOU ABOUT THE CASE,

23   PLEASE LET THEM KNOW YOU CAN'T DO SO AND NOTIFY ME

24   IMMEDIATELY.  DO NOT READ, WATCH, OR LISTEN TO ANY MEDIA

25   REPORTS ABOUT THE CASE OR ANYONE ASSOCIATED WITH IT.  AND DO
```

1    NOT DO ANY KIND OF RESEARCH THROUGH ANY MEANS, BOOKS, OR THE

2    INTERNET, OR ANYTHING ELSE ABOUT THE CASE OR THE ISSUES

3    INVOLVED IN IT OR THE PEOPLE INVOLVED IN IT.  JUST DO NOT MAKE

4    ANY INVESTIGATION ABOUT THE CASE OR THE ISSUES INVOLVED IN IT

5    ON YOUR OWN.

6         AND, FINALLY, KEEP -- CONTINUE, PLEASE, TO KEEP AN OPEN

7    MIND UNTIL YOU'VE HEARD THE ARGUMENTS OF COUNSEL, MY

8    INSTRUCTIONS ON THE LAW, AND YOUR VIEW OF FELLOW JURORS.  EVEN

9    THOUGH WE HAVE REACHED A DIFFERENT STAGE OF THE CASE, THAT

10   DIRECTION STILL APPLIES.

11        ALL RIGHT?  SO ENJOY THE REST OF YOUR DAY.  I HOPE IT'S

12   NOT TOO SAD FOR YOU TO HAVE A LITTLE FREE TIME THAT YOU MAY

13   NOT HAVE ANTICIPATED AND WE WILL SEE YOU HERE TOMORROW AT

14   10:00 O'CLOCK FOR CLOSING ARGUMENTS.

15        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

16             **THE CLERK:**  YOU MAY BE SEATED.

17             **THE COURT:**  SO, FIRST, IS THERE ANOTHER RULE 50

18   MOTION?

19             **MR. PISTORINO:**  YES, THERE IS, YOUR HONOR.

20             **THE COURT:**  WHY DON'T YOU PUT THE --

21             **MR. PISTORINO:**  SURE.

22             **THE COURT:**  -- GROUNDS ON THE RECORD.

23             **MR. PISTORINO:**  TECHSHOP MOVES FOR JUDGMENT AS A

24   MATTER OF LAW UNDER RULE 50.

25        FIRST, THE DEFENDANTS BEAR THE BURDEN OF PROVING

1    ABANDONMENT.  I THINK, ACTUALLY, YOUR HONOR'S DISPUTE WHETHER

2    OR NOT IT'S CLEAR AND CONVINCING OR PREPONDERANCE OF THE

3    EVIDENCE, BUT IN ANY EVENT THE DEFENDANTS BEAR THE BURDEN OF

4    PROVING IT AND THERE IS NO EVIDENCE, FOR EXAMPLE, OF INTENT

5    NOT TO RESUME USE OF THE MARKS.  THERE'S NOTHING LIKE THAT

6    FROM ANYBODY.

7         NEXT, DEFENDANTS BEAR THE -- AS THE COURT IS AWARE IN THIS

8    CASE ALREADY, THE CERTIFIED COPIES OF THE TRADEMARK

9    REGISTRATIONS ARE IN EVIDENCE IN THIS CASE.  AND BECAUSE THEY

10   ARE, IT CREATES A REBUTTABLE PRESUMPTION.  AND THERE IS NO

11   EVIDENCE OFFERED BY THE DEFENDANTS EITHER CHALLENGING THE

12   OWNERSHIP OR THE VALIDITY OF THE MARKS.  THERE'S NOTHING

13   THERE, NOTHING FROM WHICH A REASONABLE JUROR COULD FIND THAT.

14        FINALLY, YOUR HONOR, TECHSHOP MOVES FOR JUDGMENT AS A

15   MATTER OF LAW ON DEFENDANTS' FRAUD CLAIM.  IN THE FIRST

16   INSTANCE, ACTUALLY, ONE OF THE ELEMENTS IS JUST THAT THERE WAS

17   A PROMISE.  THERE'S NO PROMISE IDENTIFIED.  NO PROMISE

18   IDENTIFIED.

19        EVEN ASSUMING THAT THERE WAS A PROMISE, WHICH I DON'T KNOW

20   WHICH ONE THAT IS, IN ANY EVENT THERE'S NO EVIDENCE OFFERED BY

21   DEFENDANTS THAT TECHSHOP DID NOT INTEND TO PERFORM WHATEVER

22   THE PROMISE IS.  THE MOU, I THINK AT BEST YOU'D SAY, IT'S

23   POTENTIALLY -- IT'S JUST A STATEMENT OF WHAT THE PARTIES WERE

24   THINKING AT THE TIME.  IT'S NOT AN AGREEMENT TO ACTUALLY DO

25   THEM, ON THE OTHER HAND.  TO THE EXTENT IT IS CONSIDERED AN

1   AGREEMENT TO AGREE, WE KNOW THOSE ARE UNENFORCEABLE.  TO THE

2   EXTENT IT IS CONSIDERED AN AGREEMENT TO NEGOTIATE, THERE'S NO

3   EVIDENCE IN THAT REGARD.

4       FINALLY, ONE OF THE ELEMENTS OF THE FRAUD CLAIM OFFERED BY

5   THE DEFENDANTS IS THAT -- IS THAT THE TECHSHOP HAD TO HAVE THE

6   INTENT NOT TO PERFORM WHATEVER PROMISE IS IDENTIFIED AT THE

7   TIME IT MADE THE PROMISE.  AND THERE IS NO EVIDENCE FROM WHICH

8   THE JURORS COULD EVER FIND THAT EITHER.  THANK YOU.

9       AND I'M NOT SURE HOW YOUR HONOR WOULD LIKE TO HANDLE THE

10  BRIEFING SCHEDULE.  ACTUALLY I DO HAVE A VERY SHORT WRITTEN

11  FORM, BUT I AM PREPARED TO DRAFT A MUCH LONGER ONE IF YOU'D

12  LIKE TO READ THAT.

13          **THE COURT:**  I THINK WHAT YOU OUGHT TO DO IS FILE IT,

14  EFILE IT.

15          **MR. PISTORINO:**  SURE.

16          **THE COURT:**  AND CAN SOMEONE ON YOUR TEAM RESPOND TO

17  THAT BY CLOSE OF BUSINESS TODAY?

18          **MS. ROBERTS:**  SURE.

19      WHAT ARE WE DOING IN TERMS -- WE FILED OUR BRIEF THIS

20  MORNING.  I'M NOT SURE IF HE PLANS ON FILING A WRITTEN

21  RESPONSE, BUT THAT'S NOT ON THE RECORD YET.

22          **THE COURT:**  I'M NOT SURE.  PROBABLY THE SAME THING.

23  DO YOU WANT TO RESPOND TO THAT BY CLOSE OF BUSINESS?

24          **MR. PISTORINO:**  ACTUALLY IF I CAN, I SAW THEIR BRIEF.

25  I KNOW IT'S 18 PAGES LONG.  I JUST DIDN'T GET A CHANCE TO

1  REVIEW IT.  SO GIVEN THE PRESS OF THE SLIDES AND EVERYTHING,

2  I'M KIND OF SKEPTICAL OF MY ABILITY TO DO THAT AND EVERYTHING

3  BY THE CLOSE OF BUSINESS, BUT -- SO....

4         **THE COURT:**  WELL, IT'S A FAIR POINT.

5      JUST... I THINK WE END UP WITH THE CIRCUMSTANCE IN JUST

6  ABOUT EVERY TRIAL WHERE THERE'S THIS CRUNCH AT THE END.  I

7  OBVIOUSLY HAVE THE ABILITY TO RULE ON IT UNDER RULE 50(C) ONCE

8  THE VERDICT IS RETURNED, WHICH WOULD END UP BEING A MOTION FOR

9  JUDGMENT NOTWITHSTANDING THE VERDICT.

10         **MR. PISTORINO:**  IF I MAY, I THINK WHAT I WOULD

11  PROPOSE TO OFFER HERE IS I ASSUME THAT WE ARE GOING TO COME UP

12  WITH SOME TIME FRAME BY WHICH THE CLOSING SLIDES ARE DUE.  IF

13  I CAN HAVE THE REST OF THE EVENING TO RESPOND IN WRITING,

14  WHATEVER THEY'VE PUT IN, I WILL GET IT IN BY MIDNIGHT,

15  WHATEVER.

16         **THE COURT:**  THAT'S FINE WITH ME.

17         **MS. ROBERTS:**  SO, HE'S RESPONDING TO OUR MOTION BY

18  MIDNIGHT TONIGHT, AND WE SHOULD DO THE SAME TIMING RESPONDING

19  TO HIS?

20         **THE COURT:**  I SUPPOSE.  FAIR IS AS FAIR DOES.

21      I CAN TELL YOU WHO WON'T BE READING IT AT 12:01 A.M.  SO

22  IT WILL BE IN THE RECORD.

23         **MR. PISTORINO:**  IF I MAY.  THE ONLY THING I'M

24  THINKING, CANDIDLY, IS, AGAIN, IN TERMS OF THE JURY

25  INSTRUCTIONS AND THE VERDICT FORM, I'M NOT SURE HOW YOUR HONOR

1    WANTED TO -- WANTS TO HANDLE THAT.  OBVIOUSLY SOME OF THE

2    ITEMS THAT I'VE IDENTIFIED HERE, AT LEAST IN MY VIEW, GIVEN

3    THE COMPLETE LACK OF EVIDENCE OF THEM, IT ACTUALLY SHOULDN'T

4    BE SUBMITTED TO THE JURY IN THAT FORM.

5       SO, AGAIN, I'M NOT SURE WHAT YOUR HONOR WANTS TO DO, BUT

6    SOME GUIDANCE IN THAT REGARD WOULD BE GREAT.

7          **THE COURT:**  YOU KNOW, AS I SAID, WHAT YOU SHOULD

8    LIKELY ANTICIPATE IS THAT I WILL EXERCISE MY DISCRETION TO

9    TAKE THE MOTION UNDER SUBMISSION PENDING THE JURY'S VERDICT.

10          **MR. PISTORINO:**  OKAY.

11          **THE COURT:**  AS RULE 50 PERMITS.  AND WE'LL SEE.  I

12   MEAN, I DO TAKE THE POINT ON THE FRAUD CLAIM, FOR EXAMPLE, I

13   DON'T KNOW HOW MUCH THERE'S REALLY BEEN ON THE FRAUD CLAIM AND

14   YOU WILL HAVE YOUR CHANCE TO BRIEF IT.  BUT IN TERMS OF SAYING

15   SOMETHING THAT WAS KNOWINGLY FALSE AT THE TIME, I'D BE

16   INTERESTED IN YOUR VIEW AS TO WHAT EVIDENCE WENT TO THAT

17   POINT.

18          **MS. ROBERTS:**  OKAY.

19          **THE COURT:**  IF I END UP TAKING OUT INSTRUCTIONS ON

20   PART OF IT IN THE MORNING, THEN YOU WILL JUST HAVE TO ADAPT

21   YOUR SLIDES.

22          **MR. PISTORINO:**  SURE.

23          **THE COURT:**  ALL RIGHT.

24       ON THAT POINT, WE ARE GOING TO TRY TO GET THE PROPOSED SET

25   OF THE INSTRUCTIONS TOGETHER OVER THE NEXT FEW HOURS, AND WE

1    WILL GET IT TO YOU AS SOON AS WE CAN.  YOU'LL HAVE THE CHANCE

2    TO REVIEW IT.  YOU WILL AT LEAST KNOW WHAT I'M PLANNING TO

3    GIVE.

4        AND AS I SAID, I DON'T KNOW THAT ANYBODY NEEDS TO MAKE

5    MUCH MORE OF A RECORD IN TERMS OF OBJECTING SINCE YOU MADE

6    YOUR ARGUMENTS WHEN YOU SENT IN YOUR PROPOSALS, BUT THAT'S

7    WHAT WE CAN DO.

8        WHY DON'T WE PLAN TO RECONVENE AT 8:30 TOMORROW TO DEAL

9    WITH ANY INSTRUCTION-RELATED ISSUES.

10             **MS. ROBERTS:**  OKAY.

11             **THE COURT:**  ALL RIGHT.

12             **MR. NATHAN:**  YOUR HONOR, A MOMENT?

13                  (PAUSE IN THE PROCEEDINGS.)

14             **MS. ROBERTS:**  WHEN YOU PROVIDE THE JURY

15   INSTRUCTIONS -- I THINK WE HAVE DISPUTED VERDICT FORMS AS

16   WELL.  WILL WE HANDLE THAT ALL AT THE SAME TIME?

17             **THE COURT:**  YES.

18             **MS. ROBERTS:**  AND THEN I THINK IN TERMS OF THE

19   EXCHANGE OF CLOSING DEMONSTRATIVES, AS I UNDERSTAND IT,

20   PLAINTIFF WANTS A SPECIFIC TIME THAT WE HAVE TO DO IT BY, BUT

21   THAT IS SORT OF DEPENDENT ON WHEN WE GET THE JURY

22   INSTRUCTIONS.

23             **THE COURT:**  LET'S --

24             **MS. ROBERTS:**  SO WE CAN INCORPORATE THEM.

25             **THE COURT:**  LET'S DO IT THIS WAY.  THERE ARE

1    OBVIOUSLY SOME PIECE OF IT THAT YOU KNOW IS GOING TO LOOK, HOW

2    IT IS GOING TO LOOK REGARDLESS OF WHAT THE INSTRUCTIONS ARE.

3    OBVIOUSLY YOU WILL PROBABLY ALSO WANT TO INCORPORATE THE

4    INSTRUCTIONS.  I UNDERSTAND THAT.

5        BUT IT SEEMS TO ME SAY 5:00 O'CLOCK FOR THE EXCHANGE OF

6    THE PARTS THAT ARE -- THE EVIDENTIARY PART YOU CAN EXCHANGE BY

7    5:00 TODAY.  AND THEN, AS I SAID, WE WILL AIM TO GET THE

8    INSTRUCTIONS OUT AS SOON AS YOU CAN -- AS SOON AS WE CAN SO

9    YOU HAVE AN IDEA OF WHAT'S -- WHAT I PROPOSED TO DO.

10       BUT THOSE SHOULDN'T BE CONTROVERSIAL.  ANY SLIDE THAT YOU

11   HAVE ABOUT THE ACTUAL INSTRUCTION WOULD JUST TRACK THE

12   INSTRUCTION.  SO I THINK THERE IS ENOUGH FOR YOU TO DO THE

13   EXCHANGE OF --

14           **MR. PISTORINO:**  UNDERLYING --

15           **THE COURT:**  -- THE MORE ARGUMENTATIVE PARTS AT 5:00.

16           **MS. ROBERTS:**  THAT WORKS FOR US.

17           **MR. PISTORINO:**  I'M SORRY, JUST TO BE CLEAR.  YOU SAY

18   THE MORE ARGUMENTATIVE PARTS --

19           **THE COURT:**  AT SOME LEVEL WHAT YOU WILL DO, IF YOU

20   ARE LIKE EVERY OTHER TRIAL LAWYER, IS YOU WILL HAVE A SLIDE

21   WITH THE INSTRUCTION ON IT OR THE VERDICT FORM.  YOU OBVIOUSLY

22   CAN'T DO THAT YET BECAUSE I DON'T HAVE IT TO YOU.  BUT YOU DO

23   HAVE SLIDES LIKE THE DEFENSE ALREADY PREPARED THAT TALK ABOUT

24   PARTICULAR PIECES OF EVIDENCE, AND THAT'S WHAT I'M SAYING YOU

25   OUGHT TO EXCHANGE BY 5:00 TODAY JUST TO MOVE THE BALL FORWARD.

1          **MR. PISTORINO:**  OKAY.

2          **THE COURT:**  ALL RIGHT.  ANYTHING ELSE?

3          **MS. ROBERTS:**  NOTHING FURTHER, YOUR HONOR.

4          **MR. PISTORINO:**  NOTHING FURTHER AT THIS TIME, YOUR

5     HONOR.

6          **THE COURT:**  WE WILL GET WORKING ON THIS OR CONTINUE

7     WORKING ON IT.  OBVIOUSLY WE HAVE BEEN WORKING ON IT.  AND

8     WE'LL SEE YOU TOMORROW AT 8:30.

9          **MR. PISTORINO:**  I'M SORRY, JUST ONE ITEM.  I KNOW

10    WE'VE GOT THE DEMONSTRATIVE.  FROM THE COURT'S CONVENIENCE, IF

11    THE COURT WOULD PREFER, WE CAN ALSO SUBMIT AN ELECTRONIC

12    VERSION IF THAT ASSISTS THE COURT IN SOME WAY.  I DON'T KNOW.

13         **THE COURT:**  I HAVE NO PREFERENCE.

14         **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

15              (PROCEEDINGS CONCLUDED AT 10:42 A.M.)

16

17                    **CERTIFICATE OF REPORTER**

18         I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

19    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

20    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23                    *Diane E. Skillman*

24         DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

25              THURSDAY, JULY 25, 2019

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**