VOL. 7

PAGES 1037 - 1181

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM, JR., JUDGE**

| | | |
|---|---|---|
| TECHSHOP, INC., | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. C-18-1044 HSG |
| | ) | |
| VS. | ) | TUESDAY, JUNE 11, 2019 |
| | ) | |
| DAN RASURE, ET AL., | ) | OAKLAND, CALIFORNIA |
| | ) | |
| | ) | JURY TRIAL |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**                    PARRISH LAW OFFICE
                                      24 LEXINGTON DRIVE
                                      MENLO PARK, CALIFORNIA 94205
                          BY:   JAMES C. PISTORINO, ESQUIRE

**ALSO PRESENT:**                     DORIS KAELIN, BANKRUPTCY TRUSTEE

**FOR DEFENDANTS:**                   QUINN EMANUEL URQUHART & SULLIVAN
                                      555 TWIN DOLPHIN DRIVE, 5TH FLOOR
                                      REDWOOD SHORES, CALIFORNIA 94065
                          BY:   ANDREA P. ROBERTS, ESQUIRE
                                OLGA SLOBODYANYUK, ESQUIRE

                                      JOHN E. NATHAN, ESQUIRE
                                      1175 PARK AVENUE
                                      NEW YORK, NEW YORK 10128

**REPORTED BY:**                      DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                                      OFFICIAL COURT REPORTER

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1

<u>**I N D E X**</u>

2                                                      <u>PAGE</u>    <u>VOL.</u>

3    CLOSING ARGUMENT BY MR. PISTORINO              1066      7

4    CLOSING ARGUMENT BY MS. ROBERTS               1094      7

5    REBUTTAL CLOSING ARGUMENT BY MR. PISTORINO    1134      7

6    INSTRUCTIONS BY THE COURT                     1145      7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    TUESDAY, JUNE 11, 2019                              8:39 A.M.

 2                        P R O C E E D I N G S

 3                               OOO

 4       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

 5           THE CLERK:  WE ARE CALLING C-18-1044 TECHSHOP, INC.

 6    VERSUS DAN RASURE, ET AL.  PLEASE STEP FORWARD AND STATE YOUR

 7    APPEARANCES FOR THE RECORD.

 8           MR. PISTORINO:  GOOD MORNING, YOUR HONOR.  JAMES

 9    PISTORINO ON BEHALF OF TECHSHOP.

10           THE COURT:  GOOD MORNING.

11           MS. ROBERTS:  GOOD MORNING, ANDREA ROBERTS ON BEHALF

12    OF DEFENDANTS.

13           THE COURT:  GOOD MORNING.

14       I'LL HAVE MADAME CLERK HAND YOU THE VERDICT FORM THAT WE

15    DRAFTED SO YOU CAN START REVIEWING IT.

16               (DOCUMENT HANDED TO COUNSEL.)

17           THE COURT:  OKAY.  LET'S START WITH THE RULE 50

18    MOTION SINCE THAT MAY AFFECT THE INSTRUCTIONS AND THE VERDICT

19    FORM.

20       SO EACH SIDE HAS FILED A MOTION FOR JUDGMENT AS A MATTER

21    OF LAW, AND THE BRIEFLY ON THAT IS COMPLETE.  DEFENDANTS ARE

22    MOVING FOR JUDGMENT AS A MATTER OF LAW CLAIMING THAT THE

23    EVIDENCE FAILED TO PROVE THAT EITHER OF THE MARKS INFRINGE

24    BASED ON GROUNDS OF CONSENT AND THEN FAILURE TO SHOW

25    LIKELIHOOD OF CONFUSION AS WELL AS BASICALLY ARGUING CONSENT,
```

1    PRIMARILY.

2        WITH REGARD TO THOSE ISSUES, I'M GOING TO STAY WITH MY

3    INCLINATION TO SUBMIT THOSE SUBJECT TO THE JURY'S VERDICT AND

4    REVISIT THEM UNDER RULE 50(C), IF NECESSARY, AFTER THE

5    VERDICT.

6        WITH REGARD TO PLAINTIFF'S MOTION, THERE'S A MOTION FOR

7    JUDGMENT AS A MATTER OF LAW ON THREE GROUNDS:  FAILURE TO

8    PRESENT SUFFICIENT EVIDENCE OF ABANDONMENT, FAILURE TO PRESENT

9    EVIDENCE OF LACK OF OWNERSHIP OR INVALIDITY, AND FRAUD.

10       LET'S TALK ABOUT THE THREE.  WITH REGARD TO ABANDONMENT, I

11   TEND TO AGREE THAT THE EVIDENCE IS PRETTY WEAK, BUT NOT SO

12   WEAK AS TO WARRANT JUDGMENT AS A MATTER OF LAW.  SO I WOULD

13   SUBMIT THAT SUBJECT TO A JURY VERDICT UNDER RULE 50.

14       WITH REGARD TO THE OWNERSHIP VALIDITY QUESTION, I THINK

15   THERE'S AMPLE EVIDENCE TO GO TO THE JURY ON THAT POINT.

16       WITH REGARD TO FRAUD, I HAVE SERIOUS QUESTIONS AS TO

17   WHETHER THERE'S BEEN ANY EVIDENCE PRESENTED THAT WOULD SUPPORT

18   A JURY VERDICT FOR FRAUD OR PUNITIVE DAMAGES.

19       SO LET'S TALK ABOUT THAT.

20        **MR. NATHAN:**  YES, YOUR HONOR, JOHN NATHAN FOR THE

21   DEFENDANTS.

22       LET ME START BY TALKING ABOUT THE PROMISE.  THE PROMISE

23   HERE WAS MADE IN THE ORIGINAL MOU, AND THERE WAS AN AGREEMENT

24   TO SELL THE COMPANY, SELL THE ASSETS OF THE COMPANY.  THAT'S

25   WHAT THE FIRST LINE OF THE MOU STATES.

1      AND IT ALSO WENT ON TO SAY THAT THE DEFENDANT WOULD MAKE

2  PAYMENTS, AND THIS IS CRITICAL, THE PAYMENTS WOULD BE CREDITED

3  IF THE DEAL CLOSED.  THERE WAS NO ALLEGATION IN THE

4  COUNTERCLAIM FOR FRAUD.  THE PLAINTIFF AGREED TO REPAY THOSE

5  PAYMENTS.  AND WE HEARD ABOUT THE AGREEMENT TO REPAY BY

6  COUNSEL DURING VARIOUS PHASES OF THE TRIAL.

7      IF YOUR HONOR WILL LOOK AT THE COUNTERCLAIM....

8          **THE COURT:**  LOOK, THE COUNTERCLAIM IS NOT EVIDENCE,

9  COUNSEL.

10         **MR. NATHAN:**  I'M TRYING --

11         **THE COURT:**  THE BOTTOM LINE IS THERE IS A VERY

12  SUBSTANTIAL ARGUMENT THAT I MAY WELL GRANT THAT ALL THAT IS

13  SHOWN HERE IS THE DEAL ULTIMATELY FELL THROUGH.  THERE IS NO

14  EVIDENCE THAT ANYONE SAID ANYTHING THAT THEY DIDN'T MEAN TO

15  FOLLOW THROUGH WITH AT THE TIME.

16      THE CASES THAT YOU CITED IN YOUR BRIEF ARE THE TYPES OF

17  CASES YOU WOULD EXPECT THERE TO BE A FRAUD CLAIM THAT HAS TO

18  GO TO THE JURY.  DEFENDANT LEARNED OF INFORMATION THAT WOULD

19  PREVENT IT FROM CONSUMMATING A DEAL WITH THE PLAINTIFF.

20  MISLED, NEVER INTENDED TO FINALIZE THE AGREEMENT.

21      WHAT'S THE EVIDENCE THAT ANYONE AT ANY TIME WAS DOING

22  ANYTHING OTHER THAN TRYING TO CONSUMMATE THE DEAL AND IT FELL

23  THROUGH, AND THAT'S THAT.

24         **MR. NATHAN:**  THE EVIDENCE, YOUR HONOR, IS THE COURSE

25  OF CONDUCT AFTER THE MOU WAS TERMINATED PREMATURELY, I MIGHT

1    ADD, SO THAT HE DIDN'T HAVE A CHANCE TO FINISH THE WORK THAT

2    HE WAS ALLOWED TO DO.  AND THERE WAS A COURSE OF CONDUCT FROM

3    DECEMBER 12TH, 2017 RIGHT UP TO THE TIME OF THE LAWSUIT WHERE

4    THE PLAINTIFF STRUNG MR. RASURE ALONG --

5         **THE COURT:**  SO "STRUNG ALONG" IS A CHARACTERIZATION.

6    WHAT IS THE EVIDENCE THAT ANYONE DID ANYTHING OTHER THAN ACT

7    WITH THE INTENTION THAT THE DEAL GO THROUGH?  AND IT DIDN'T GO

8    THROUGH.

9       WHERE IS THE EVIDENCE OF DECEIT?  WHERE'S THE EVIDENCE OF

10   FRAUD?  WHERE'S THE EVIDENCE OF A FALSE STATEMENT?  THAT'S THE

11   GRAVAMEN OF THE CLAIM YOU BROUGHT.

12        **MR. NATHAN:**  I TAKE YOUR POINT, YOUR HONOR.  BUT THE

13   EVIDENCE IS THAT THEY KEPT TELLING HIM AND ENCOURAGED HIM THAT

14   A DEAL WAS GOING TO BE MADE.  AS LATE AS FEBRUARY 7TH, THE CEO

15   WROTE MR. RASURE SAYING THAT HE WAS TRYING -- THAT HE WAS

16   STILL OPEN TO A DEAL, AND THEY CONTINUED TO ENCOURAGE HIM, TO

17   ENCOURAGE THE EXPENSES THAT HE WAS FULLY KNOWING THAT THEY

18   WERE NEVER GOING TO CARRY OUT THAT DEAL.

19        **THE COURT:**  THERE YOU GO, FULLY KNOWING THAT THEY

20   WERE NEVER GOING TO CARRY OUT THE DEAL.  WHERE'S THE EVIDENCE

21   OF THAT?

22        **MR. NATHAN:**  THE EVIDENCE IS ON FEBRUARY 18TH, WHEN

23   THEY TOLD FORD THAT THEY WERE GOING TO FILE FOR BANKRUPTCY,

24   AND THEY TRIED TO HIDE THAT FACT FROM MR. RASURE.  YOU

25   REMEMBER THE EMAIL WHERE IT SAID, REMOVING MR. RASURE FROM CC,

```
 1    BUT THEY DIDN'T, AND THEY WERE TRYING TO PLAY BOTH ENDS OF THE
 2    GAME.  AND WITHOUT TELLING HIM THAT THEY WERE GOING TO FILE
 3    FOR BANKRUPTCY, THEY WERE THEN GOING TO CONTINUE TO NEGOTIATE
 4    WITH HIM.
 5        AND THEY CONTINUED TO ALLOW HIM, YOUR HONOR, TO NEGOTIATE.
 6    AND THIS IS ALL IN EVIDENCE.  RIGHT UP ON FEBRUARY 15TH, WHEN
 7    HE WROTE AND SAID THIS HAS BEEN A GREAT DAY, AND THE NEXT
 8    MORNING, ON FEBRUARY 16TH, AND THIS IS IN EVIDENCE, HE WAS --
 9    HE SENT A DRAFT TO AUTODESK.  HE HAD NO IDEA, HE HAD NO IDEA
10    THAT BEHIND THE SCENES THEY WERE GOING TO FILE FOR BANKRUPTCY.
11        SO I WOULD SAY, YOUR HONOR, THAT THE COURSE OF CONDUCT
12    THROUGH THIS ENTIRE TWO MONTHS, EVEN AFTER THE MOU WAS
13    CANCELED, DEMONSTRATED THAT THEY HAD NO INTENTION OF DOING
14    ANYTHING OTHER THAN TO CONTINUE TO LET MR. RASURE RUN UP
15    EXPENSES.  HE WAS WORKING TO TRY TO CLOSE THE DEAL, AND THEY
16    WERE NOT SERIOUS ABOUT IT.  AND THAT EVIDENCE HAS ALL BEEN
17    ADMITTED IN THE COURT.
18            THE COURT:  THIS CLAIM IS EXCEPTIONALLY WEAK.  I MAY
19    LET IT GO AND DEAL WITH IT ON A JUDGMENT NOTWITHSTANDING THE
20    VERDICT, BUT THIS THE WEAKEST POSSIBLE EVIDENCE OF FRAUD YOU
21    COULD EVER HAVE.
22            MR. PISTORINO:  YOUR HONOR, MAY I HEARD BE BRIEFLY?
23            THE COURT:  YES.
24            MR. PISTORINO:  I'M NOT SURE IF WE ARE JUST DEALING
25    WITH LACK OF FAMILIARITY WITH THE EVIDENCE, BUT I KNOW, FOR
```

1    EXAMPLE, EXHIBIT NO. 647 IS THIS FEBRUARY 7TH NOTIFICATION TO

2    MR. RASURE WHERE TECHSHOP FLAT OUT TELLS HIM THEY ARE GOING TO

3    FILE FOR CHAPTER 7.  SO THIS OTHER STUFF THAT HE DIDN'T KNOW,

4    YADA, YADA, I DON'T THINK THAT'S CORRECT.

5        BUT I DO ROLL BACK TO SORT OF MY BASIC THING OF, YOU KNOW,

6    WHAT I SAID IS, FIRST, WHAT'S THE PROMISE?  AND WHAT I HEARD

7    FROM MR. NATHAN WAS, THERE WAS SOMETHING IF THE DEAL CLOSED.

8    AND I KNOW, AS I SAY IN OUR PAPERS, RIGHT, AN AGREEMENT TO

9    AGREE IN THE FUTURE, I THINK JUST, YOU KNOW, FIRST SEMESTER

10   CONTRACTS, IS NOT ENFORCEABLE.  RIGHT?

11       SO, AGAIN, JUST -- I THINK IT'S A PROBLEM THAT EVEN HERE

12   AT THE POINT OF TRYING TO FERRET WITH THE VERDICT FORM AND

13   THAT KIND OF THING IS WE DON'T EVEN KNOW WHAT THE PROMISE IS

14   ALLEGED TO BE.

15       AND, AGAIN, FOLLOWING UP ON IT, THERE IS ABSOLUTELY

16   NOTHING ABOUT, AS YOUR HONOR CORRECTLY POINTS OUT, SORT OF THE

17   DECEIT, YOU KNOW, ANYTHING IN THAT REGARD.

18       SO, AGAIN, YOU KNOW, MY CONCERN, OF COURSE, IS WE ARE

19   THROWING AROUND THE WORD "FRAUD" A LOT.  THAT KIND OF THING.

20   THE JURORS -- AGAIN, I DON'T THINK IT WOULD BE APPROPRIATE,

21   LET ME TRY IT THAT WAY, TO SEND THAT BACK TO THEM, YOU KNOW,

22   ANY MORE THAN ANY OTHER SORT OF REPUTATION DAMAGING CHARGE FOR

23   WHICH THERE'S ABSOLUTELY NOTHING TO SUPPORT IT.

24           **THE COURT:**  ALL RIGHT.  I WILL GIVE THAT

25   CONSIDERATION.

1    AS TO PUNITIVE DAMAGES, AGAIN, EVEN IF I LET THE FRAUD

2  CLAIM GO, THERE JUST IS NO APPARENT EVIDENCE THAT HAS BEEN

3  PRESENTED, IN MY VIEW, THAT WOULD ESTABLISH THE KIND OF HIGHLY

4  REPREHENSIBLE CONDUCT THAT'S REQUIRED FOR THAT.

5    WHAT IS THAT EVIDENCE?

6    **MR. NATHAN:**  MAY I BE HEARD ON A RELATED POINT, YOUR

7  HONOR, ON PUNITIVE DAMAGES?

8    THE MAIN CASE THAT THE PLAINTIFF HAS PRESENTED HERE IS ONE

9  OF TRADEMARK INFRINGEMENT, AS WE ALL KNOW.  AND DURING THAT

10  ENTIRE CASE THERE WAS THIS OVERWHELMING EVIDENCE OF CONSENT.

11  AND IT'S OUR SUBMISSION THAT BRINGING A CASE AGAINST AN

12  INDIVIDUAL UNDER THESE CIRCUMSTANCES AND THE EVIDENCE SHOWED

13  HOW HIS BASICALLY ENTIRE LIFE AND BUSINESS WAS DESTROYED BY

14  THIS CASE SUPPORTS PUNITIVE DAMAGES --

15    **THE COURT:**  SO YOU ARE ALREADY JUST LEGALLY WRONG.

16  PUNITIVE -- THE PUNITIVE DAMAGES CONDUCT THE JURY IS ASSESSING

17  IS THE UNDERLYING FRAUD NOT THE BAD FAITH OF BRINGING THE CASE

18  THAT YOU'RE CLAIMING.

19    **MR. NATHAN:**  WELL, YOUR HONOR, THE PLEADING AND THE

20  AFFIRMATIVE DEFENSE WITH RESPECT TO THE REGISTRATION

21  VIOLATION, WHICH IS WHAT THE PLAINTIFF BROUGHT HERE, SAYS THAT

22  WE ASK FOR SUCH FURTHER RELIEF AS THE COURT FEELS IS

23  APPROPRIATE.

24    IN OUR SUBMISSION, BRINGING THIS BASELESS CASE AGAINST

25  THIS INDIVIDUAL IS MORE THAN SUFFICIENT TO WARRANT THE JURY TO

1    CONSIDER PUNITIVE DAMAGES.

2         SO, IN OTHER WORDS, THE QUESTION OF PUNITIVE DAMAGES

3    DOESN'T JUST RELATE TO THE FRAUD COUNTERCLAIM.  IT RELATES TO

4    THE WHOLE DEFENSE THAT THE PLAINTIFF SUBJECTED THE DEFENDANT

5    TO.  AND I BELIEVE AND I SUBMIT, YOUR HONOR, THAT THE JURY IS

6    ENTITLED TO LOOK AT THAT AND DECIDE WHETHER OR NOT THE COURSE

7    OF CONDUCT IN BRINGING THIS BASELESS CASE WARRANTS AN AWARD OF

8    PUNITIVE DAMAGES.

9         **THE COURT:**  WHAT IS THE LEGAL AUTHORITY FOR THAT?

10   BASED ON WHAT YOU SEEM TO BE SAYING, EVEN IF THEY FOUND

11   AGAINST YOUR CLIENT ON THE FRAUD COUNTERCLAIM, THEY COULD

12   ENTER PUNITIVE DAMAGES.  IT MAKES NO SENSE.

13        **MR. NATHAN:**  THE LEGAL AUTHORITY, YOUR HONOR, IS THE

14   CONSCIENCE OF THE COURT HERE WHICH I AM INVOKING.

15        **THE COURT:**  ALL RIGHT.

16        THE RULE 50 MOTION OF THE PLAINTIFF IS GRANTED AS TO THE

17   PUNITIVE DAMAGES THEORY.  THERE SIMPLY IS NO EVIDENCE THAT HAS

18   BEEN PRESENTED THAT WOULD ESTABLISH, AS REQUIRED BY THE LAW BY

19   CLEAR AND CONVINCING EVIDENCE, THAT TECHSHOP'S AGENTS ENGAGED

20   IN THE ALLEGED FRAUDULENT CONDUCT WITH MALICE, OPPRESSION, OR

21   FRAUD.

22        THE EVIDENCE SIMPLY DOES NOT SUPPORT UNDER ANY

23   CIRCUMSTANCES THE RETURN OF A VERDICT OF PUNITIVE DAMAGES BY A

24   REASONABLE JURY.

25        WITH REGARD TO THE FRAUD CLAIM, I WILL GIVE IT SOME MORE

1  CONSIDERATION AND LET YOU KNOW SHORTLY.

2  **MR. PISTORINO:**  I APPRECIATE THAT.  YOUR HONOR, MAY I

3  BE --

4  **MR. NATHAN:**  CAN I JUST, YOUR HONOR, AND JUST FOR THE

5  RECORD, WE ARE SUBMITTING THAT THE QUESTION OF PUNITIVE

6  DAMAGES SHOULD GO TO THE JURY IN CONNECTION WITH THE

7  INFRINGEMENT CLAIM, WHICH WAS BROUGHT ON A BASELESS CASE, IN

8  MY SUBMISSION, FRANKLY IN BAD FAITH.

9  **THE COURT:**  UNDERSTOOD.  THE RECORD, IN MY VIEW, DOES

10  NOT SUPPORT THAT POINT OF VIEW, BUT YOU ARE ENTITLED TO MAKE

11  YOUR RECORD.

12  WHAT DO YOU HAVE TO SAY?

13  **MR. PISTORINO:**  I JUST WANT -- AGAIN, I APPRECIATE

14  YOUR HONOR'S CONSIDERATION OF THE CONTINUED CONSIDERATION OF

15  THE RULE 50 THING WITH REGARD TO FRAUD.

16  I ACTUALLY DID HAVE ONE QUESTION WITH REGARD TO THE

17  OWNERSHIP AND VALIDITY ISSUES.

18  I GUESS THE PART THAT I'M -- THE TROUBLE I'M HAVING WITH

19  IT -- LET ME TRY IT THAT WAY -- AT LEAST TO MY KNOWLEDGE,

20  THERE'S NO EVIDENCE.  AGAIN, GIVEN THE PRESUMPTION, AND THE

21  PRESUMPTION BECAUSE THE TRADEMARK CERTIFICATES ARE IN

22  EVIDENCE, GIVEN THE PRESUMPTION HAS FLIPPED TO THE DEFENDANTS

23  TO TRY TO SHOW LACK OF OWNERSHIP OR INVALIDITY, AND AT LEAST

24  TO MY KNOWLEDGE JUST FOCUSING ON OWNERSHIP FOR A MOMENT,

25  THERE'S JUST NO EVIDENCE THAT TECHSHOP IS NOT THE OWNER OF THE

```
1    TRADEMARKS, WHICH SHOULD BE YOUR FIRST ISSUE.

2            THE COURT:  WELL, THAT'S RIGHT.  IT WILL BE PUT TO

3    THE JURY, BUT THE WAY THAT THE MODEL -- ESSENTIALLY I HAD TO

4    WORK THROUGH THE MODEL INSTRUCTIONS IN A WAY THAT THE PARTIES

5    DIDN'T.  I THINK THE DEFENDANTS DID A BETTER JOB OF IT.  I

6    THINK YOU TENDED TO ASSUME THAT THEY DIDN'T APPLY, SO IT WAS

7    LEFT TO ME TO WORK THROUGH THEM AND FIGURE THEM OUT.

8        IT'S CLEAR IN THE MODEL INSTRUCTIONS THAT I FILED LAST

9    NIGHT ESTABLISHED THIS, THAT THE IMPORT OF REGISTRATION WHEN

10   THE MARK IS CONTESTABLE IS THAT THE BURDEN ON THESE ISSUES

11   FLIPS TO THE DEFENDANT.

12           MR. PISTORINO:  CORRECT.

13           THE COURT:  AND THEY HAVE, IN MY VIEW, AT LEAST

14   PRESENTED SOMETHING THAT IS SUFFICIENT ON THOSE QUESTIONS TO

15   SEND IT TO THE JURY.

16       AGAIN, I CAN TAKE YOUR MOTION UNDER SUBMISSION AND DEAL

17   WITH IT POST-VERDICT, BUT I AM QUITE COMFORTABLE THAT THAT'S

18   THE APPROPRIATE COURSE.

19           MR. PISTORINO:  OKAY.  AGAIN -- OKAY.

20           THE COURT:  I DON'T NEED TO CONVINCE YOU,

21   MR. PISTORINO.

22           MR. PISTORINO:  I UNDERSTAND.

23           THE COURT:  OKAY?

24           MR. PISTORINO:  OKAY.

25           THE COURT:  ALL RIGHT.  SO IF WE WERE TO -- I'LL NEED
```

1   TO TAKE A MINUTE AFTER WE FINISH HERE AND DECIDE WHAT I'M

2   GOING TO DO WITH THE FRAUD THEORY.

3       ON THE INSTRUCTIONS, OBVIOUSLY YOU SUBMITTED WHAT YOU

4   SUBMITTED, AND I ASSUME THAT EVERYONE IS COMFORTABLE THAT

5   YOU -- YOUR OBJECTION IS PRESERVED TO THE EXTENT THAT I DIDN'T

6   GIVE WHAT YOU WANTED TO GIVE.  ALL I'VE TRIED TO DO IS USE THE

7   MODEL INSTRUCTIONS AND TAILOR THEM TO THIS CASE TO THE EXTENT

8   THAT THEY EXISTED.

9       THE ONE SUBSTANTIVE QUESTION I DO WANT TO ASK THE PARTIES

10  IS ABOUT PROPOSED INSTRUCTION 17, WHICH IS ADOPTED FROM MODEL

11  INSTRUCTION 15.8 WHICH HAS A COMMENT B THAT DISCUSSES THE

12  CIRCUMSTANCES WHEN THERE'S A CONTESTABLE REGISTERED MARK.

13      AND REALLY THE QUESTION IS, THERE ON PAGE 18, IN THE LAST

14  PARAGRAPH IN THE MODEL INSTRUCTION, THE LANGUAGE THERE SAYS,

15  PREPONDERANCE OF THE EVIDENCE.  SO IF THE DEFENDANTS ARE ABLE

16  TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT THE SERVICE

17  MARKS WERE ABANDONED, THE MODEL SAYS, PREPONDERANCE THERE.

18  OBVIOUSLY LATER I HAD TO RESOLVE THE DISPUTE BETWEEN THE

19  PARTIES AND SURPRISINGLY AN ISSUE THAT'S LEFT OPEN IN THE

20  MODEL AS TO WHETHER ABANDONMENT MUST BE PROVEN BY CLEAR AND

21  CONVINCING EVIDENCE OR BY A PREPONDERANCE.

22      I RESOLVED THAT DISPUTE IN FAVOR OF CLEAR AND CONVINCING

23  EVIDENCE BECAUSE IT APPEARED TO ME THAT THE BULK OF

24  AUTHORITIES THAT HAVE CONSIDERED THE QUESTION HAVE APPLIED

25  THAT STANDARD.  SO -- AND THAT'S WHY IN NO. 17 I CHANGED IT TO

1    CLEAR AND CONVINCING, TOO, BECAUSE IT SEEMED TO ME IT WOULD BE

2    ODD FOR THOSE TO BE INCONSISTENT.

3        THE QUESTION IS, DO THE PARTIES THINK THAT THOSE NEED TO

4    BE CONSISTENT IN THOSE TWO PLACES OR IS THERE SOME REASON IT

5    WOULD BE PREPONDERANCE HERE EVEN THOUGH IT'S CLEAR AND

6    CONVINCING LATER?

7            **MR. NATHAN:**  YOUR HONOR, I THINK THEY HAVE TO BE

8    CONSISTENT.  AND SO I TAKE YOUR POINT ABOUT MAKING THEM

9    CONSISTENT.

10       JUST FOR THE RECORD, DEFENDANTS' POSITION IS IT IS THE

11   PREPONDERANCE, AND WE OBJECT TO THE CLEAR AND CONVINCING, JUST

12   FOR THE RECORD.

13           **THE COURT:**  OF COURSE.  FOR TODAY, I MEAN WE COULD GO

14   THROUGH EVERY SINGLE ONE, BUT AT LEAST I'M COMFORTABLE THAT

15   YOUR POSITION ON THAT WAS PRESENTED IN YOUR PROPOSED

16   INSTRUCTION SUCH THAT YOU ARE NOT WAIVING ANYTHING.  WHATEVER

17   WE NEED TO DO TO MAKE SURE YOU ARE NOT WAIVING ANY ARGUMENT,

18   I'M FINE, BUT I TAKE YOUR POINT.

19       WHAT DO YOU THINK?  DO THEY NEED TO BE CONSISTENT?

20           **MR. PISTORINO:**  I HAVEN'T THOUGHT ABOUT IT ACTUALLY.

21   LET ME THINK FOR A SECOND.

22           **THE COURT:**  IT SEEMS HERE IT COULD ONLY BE TO YOUR

23   BENEFIT SINCE I'VE SELECTED YOUR SUBSTANTIVE STANDARD.

24           **MR. PISTORINO:**  TRUE.

25           **THE COURT:**  I'M CURIOUS.  THAT'S ONE THING THAT

```
1    STRUCK ME AS UNCERTAIN.

2            MR. PISTORINO:  CAN I HAVE A MOMENT JUST TO THINK

3    ABOUT IT?  I'M HEARING IT FOR THE FIRST TIME.  BUT I

4    UNDERSTAND THE ISSUE BEING OF COURSE --

5            THE COURT:  SURE.

6            MR. NATHAN:  YOUR HONOR, I DO HAVE SOME MINOR THINGS

7    THAT I WANTED TO POINT OUT.

8       WITH RESPECT TO INSTRUCTION NO. 15, ON PAGE 15, LINE 14,

9    IT SAYS "BY USING A TRADEMARK", AND WE WOULD SUBMIT, AS WE DID

10   EARLIER, THAT THE WORDS "WITHOUT CONSENT" SHOULD BE IN THERE

11   BECAUSE THAT IS EXACTLY WHAT THE STATUTE SAYS.

12           THE COURT:  RIGHT, BUT THIS IS DIRECTLY FROM THE

13   MODEL AND LATER THERE'S AN INSTRUCTION THAT TALKS ABOUT

14   CONSENT.

15           MR. NATHAN:  ALL RIGHT, YOUR HONOR.

16      ON -- WITH RESPECT TO INSTRUCTION 17, LINE 19, WHICH SAYS

17   "OWNER OF THE TRADEMARK", AND WE WOULD SUBMIT "FOR THE WORD

18   TECHSHOP" AND ALSO ON LINE 24, "OWNER OF THE TRADEMARK FOR THE

19   WORD TECHSHOP".

20      THIS IS CONSISTENT WITH THE PROOF IN THE CASE THAT

21   DEFENDANTS' -- PLAINTIFF'S EXHIBIT 351 AND 352 IS FOR A WORD

22   WITH RESPECT TO STYLE AND PRESENTATION AND SO ON.

23           THE COURT:  THE INSTRUCTION SAYS THAT.  THE

24   INSTRUCTION QUOTES THE LANGUAGE OF THE CERTIFICATE, INCLUDING

25   THAT LANGUAGE.  SO YOUR OBJECTION IS MADE FOR THE RECORD AND
```

1    OVERRULED.

2            **MR. NATHAN:**  ALL RIGHT, YOUR HONOR.

3        THEN INSTRUCTION 19 -- SORRY TO BE SO TEDIOUS BUT THESE

4    ARE VERY MINOR, BUT THIS ONE I BELIEVE IS IMPORTANT AS WELL.

5        IN LINE 9 THROUGH -- STARTING ON LINE 9, IT SAYS, "THE

6    PLAINTIFF CONTENDS THAT THE DEFENDANTS' USE OF SIMILAR WORDS

7    IN CONNECTION WITH THE DEFENDANTS' TECHSHOP 2.0."

8        IT'S THE TERM "SIMILAR WORDS".  AND THE SAME POINT CAN BE

9    MADE BY STRIKING OUT "SIMILAR WORDS IN CONNECTION WITH THE

10   DEFENDANTS".  AND SO IT WOULD READ, "THE PLAINTIFF CONTENDS

11   THAT THE DEFENDANTS' USE OF TECHSHOP 2.0 AND THE THESHOP.BUILD

12   IN CONNECTION WITH THEIR BUSINESSES INFRINGES THE SERVICE

13   MARKS."

14       IT'S THE TERM "SIMILAR WORDS" BEING PRESENTED TO THE JURY

15   THROUGH YOUR VOICE I BELIEVE IS UNINTENTIONAL, BUT IN THIS

16   CASE PREJUDICIAL.

17           **THE COURT:**  OKAY.  AGAIN, THIS IS TAKEN DIRECTLY FROM

18   THE LANGUAGE OF THE MODEL INSTRUCTION 15.10.

19           **MR. NATHAN:**  AND THEN EXTENSION -- INSTRUCTION 23.

20   INSTRUCTION 23, IN LINE 19, ARE THE WORDS "IN APPEARANCE,

21   SOUND, OR MEANING."  IT APPEARS AGAIN IN LINES 20 AND 21.

22       AND THE INSTRUCTION MAKES PERFECT SENSE IF WE TAKE OUT THE

23   APPEARANCE, SOUND, OR MEANING BECAUSE THE APPEARANCE IS

24   PRECISELY WHAT HAS BEEN EXCLUDED FROM THE REGISTRATIONS TX351

25   AND 352.

1          **THE COURT:**  ALL RIGHT.  I TAKE YOUR POINT, BUT I'M

2     GOING TO LEAVE THAT LANGUAGE AS IS.

3          **MR. PISTORINO:**  YOUR HONOR, WOULD YOU LIKE TO HEAR ME

4     ON THE ISSUE?

5          **THE COURT:**  NO.

6          **MR. PISTORINO:**  ON THE OTHER ISSUE YOU WERE ASKING ME

7     ABOUT.

8          **THE COURT:**  SURE.

9          **MR. PISTORINO:**  PERHAPS SURPRISINGLY, MAYBE, ACTUALLY

10    I DO THINK THEY CAN BE INCONSISTENT BECAUSE I DO THINK

11    ABANDONMENT, I BELIEVE, IS A HIGHER BURDEN BECAUSE IT SUGGESTS

12    THAT YOU HAD A RIGHT AND YOU SORT OF INTENTIONALLY FOREWENT

13    THAT RIGHT.  WHEREAS I DO THINK OWNERSHIP AND VALIDITY ARE, I

14    THINK, ARE PROPERLY ASSESSED UNDER PREPONDERANCE OF THE

15    EVIDENCE.

16       YOU COULD LOOK AT CONTRACT LAW AND THAT KIND OF THING.  SO

17    I THINK THE STANDARDS, IN FACT, CAN BE INCONSISTENT SORT OF

18    BECAUSE THE DIFFERENT NATURES OF THE INQUIRY, IF THAT MAKES

19    SENSE.

20       SO I BELIEVE ABANDONMENT SHOULD BE CLEAR AND CONVINCING

21    BUT I BELIEVE OWNERSHIP AND VALIDITY SHOULD BE PREPONDERANCE

22    OF THE EVIDENCE.

23          **THE COURT:**  ALL RIGHT.  BUT IT IS INTERESTING.  THE

24    WAY THAT THE INSTRUCTION, AND THIS IS, AGAIN, FROM THE MODEL

25    IS WORDED, IT DOES DIRECT ME TO REFER TO THE BASIS OF THE

1    DEFENSE, WHICH HERE IS ABANDONMENT.  SO THAT'S -- I -- IT IS

2    SORT -- IT'S AN INTERESTING --

3            **MR. PISTORINO:**  RIGHT.

4            **THE COURT:**  -- QUESTION, BUT I THINK ON BALANCE

5    LEAVING IT THE WAY I'VE GOT IT IS ACCURATE, OR AS ACCURATE AS

6    I CAN MAKE IT WITH MY READING OF THE MODEL.

7            **MR. PISTORINO:**  SURE.

8            **MR. NATHAN:**  YOUR HONOR, I HAVE TWO MORE MINOR

9    THINGS, IF I MAY.

10           **THE COURT:**  SURE.

11           **MR. NATHAN:**  INSTRUCTION 28 ON PAGE 36, LINE 3, IT

12   SAYS, "THEN IN ADDITION TO ACTUAL DAMAGES", AND I BELIEVE THIS

13   IS INADVERTENT BECAUSE THE COURT GOES ON TO POINT OUT THAT YOU

14   CAN'T HAVE BOTH ACTUAL DAMAGES AND PROFITS.

15       AND THIS IS SOMETHING THAT WE'VE TALKED ABOUT IN THIS CASE

16   EARLIER.  BUT IT'S THE PHRASE "THEN IN ADDITION TO ACTUAL

17   DAMAGES" THAT MIGHT LEAD THE JURY INADVERTENTLY TO THINK THAT,

18   GEE, WE CAN AWARD NOT ONLY ACTUAL DAMAGES BUT ALSO THE

19   PROFITS.

20       SO I WOULD PROPOSE THAT IN LINE 3 THAT THE PHRASE, "THEN

21   IN ADDITION TO ACTUAL DAMAGES" OR ACTUALLY JUST TAKE OUT --

22   YES, THAT PHRASE, YOUR HONOR.

23           **THE COURT:**  HOW IS THAT NOT CLARIFIED?  AGAIN, THIS

24   IS VERBATIM FROM MODEL INSTRUCTION 15.29.  THE NEXT SENTENCE

25   SAYS, "YOU MAY NOT, HOWEVER, INCLUDE IN ANY AWARD OF PROFITS

1    ANY AMOUNT THAT YOU TOOK INTO ACCOUNT IN DETERMINING ACTUAL

2    DAMAGES."

3            MR. NATHAN:  YES, YOUR HONOR.  THAT'S THE PROBLEM.

4    THE COURT GIVETH AND THEN THE COURT TAKETH AWAY.  I'M

5    SUGGESTING THAT THERE'S NO REASON TO SAY THAT IN ADDITION TO

6    YOU CAN HAVE THIS, BUT THEN YOU CAN'T AWARD IT.

7        SO IT DOESN'T CHANGE ANYTHING TO ELIMINATE THEN "IN

8    ADDITION TO ACTUAL DAMAGES".  IT MAY WELL BE THAT THE MODEL

9    INSTRUCTION IN THIS CASE ALSO HAS AN INADVERTENT ERROR.

10           THE COURT:  I AM COMFORTABLE STICKING WITH THE MODEL

11   INSTRUCTION 15.29, WHICH IS WHAT THIS IS.

12           MR. NATHAN:  FINALLY, AND I THANK THE COURT FOR ITS

13   PATIENCE, INSTRUCTION 30 ON PAGE 38, ON LINE 4, AFTER THE WORD

14   "EXPENSES", WE WOULD SUBMIT IT SHOULD ALSO INCLUDE "OR HIS OWN

15   EXPENSES".

16           THE COURT:  I THINK THIS WAS YOUR PROPOSED

17   INSTRUCTION.

18           MR. NATHAN:  I UNDERSTAND, YOUR HONOR.  UNDERSTAND,

19   YOUR HONOR.

20       IT ALSO APPEARS IN PARAGRAPH 2, "PAID CERTAIN OF

21   TECHSHOP'S EXPENSES", AND WE WOULD SUBMIT "OR HIS OWN

22   EXPENSES".

23           THE COURT:  ALL RIGHT.  I WILL DENY THAT.  YOU HAD A

24   CHANCE TO SUBMIT YOUR INSTRUCTION, YOU DID, AND I ADOPTED IT.

25       ALL RIGHT.  MR. PISTORINO?

1           **MR. PISTORINO:**  I THINK THE ONLY THING I HAVE, BUT I

2    BELIEVE YOUR HONOR HAS RULED ON IT, WAS JUST THE WILLFULNESS

3    INSTRUCTION.  I THINK THE CONCERN I HAVE IS ONLY THAT I DON'T

4    KNOW THAT IT GIVES A LOT OF GUIDANCE TO THE JURORS.

5           AND I PULLED, OBVIOUSLY, AS I SAY IN THE THING, I JUST

6    PULLED IT FROM OTHER COMPARABLE CASES IN IP LAW.  I THINK THE

7    WILLFULNESS INSTRUCTION IS THE SAME.  SO THERE'S CONCERN THAT

8    IT DOESN'T REALLY GIVE THEM GUIDANCE.  I DO KNOW, I THINK,

9    THAT ANY EVERY PLACE I HAVE EVER SEEN IT INCLUDES THE CONCEPTS

10   OF WILLFUL BLINDNESS AND RECKLESS DISREGARD.

11          **THE COURT:**  YEAH.  AND THERE I LOOKED AT THE MOST

12   RECENT NINTH CIRCUIT CASES I COULD FIND.  I THOUGHT THAT THE

13   JUDGE ALSUP CASE THAT YOU CITED WAS FROM 2008, I THINK, BUT

14   THERE WERE MORE RECENT NINTH CIRCUIT CASES ON POINT.

15          LET ME SEE WHAT THEY WERE SO I CAN PUT THE CITES IN THE

16   RECORD.  THAT BASIS INSTRUCTION ON *STONE CREEK VERSUS OMNI*

17   *ITALIAN DESIGN* 875 F. 3D 426, 442, WHICH IS A NINTH CIRCUIT

18   CASE FROM 2017 THAT HELD THAT THE DISTRICT COURT PROPERLY

19   RULED THAT PLAINTIFF MUST SHOW INTENTIONAL OR WILLFUL

20   INFRINGEMENT BEFORE DISGORGEMENT OF PROFITS CAN BE AWARDED.

21          ALSO THE *FIFTY-SIX HOPE ROAD* CASE, WHICH IS A NINTH

22   CIRCUIT CASE, 778 F. 3D 1059, 1074 FROM 2015 IN WHICH THE

23   NINTH CIRCUIT SAID, "WILLFUL INFRINGEMENT CARRIES A

24   CONNOTATION OF DELIBERATE INTENT TO DECEIVE.  GENERALLY

25   DELIBERATE FALSE, MISLEADING, OR FRAUDULENT CONDUCT MEETS THE

```
1    STANDARD.  WILLFULNESS REQUIRES A CONNECTION BETWEEN A

2    DEFENDANT'S AWARENESS OF ITS COMPETITORS AND ITS ACTIONS AT

3    THOSE COMPETITORS' EXPENSE."

4        SO -- AND I DIDN'T SEE ANY REFERENCE IN THOSE QUITE RECENT

5    CASES TO THE WILLFUL BLINDNESS CONCEPT.  I UNDERSTAND YOUR

6    POINT.  AND IF IT GETS THAT FAR ON APPEAL, MAYBE THE NINTH

7    CIRCUIT WILL GIVE US SOME GUIDANCE.

8            MR. PISTORINO:  IF I MAY, IT'S BEEN A WHILE SINCE I

9    LOOKED AT THE STONE CREEK CASE, AT LEAST TO MY MEMORY IT'S

10   BEEN A LITTLE WHILE.

11       I BELIEVE THAT CASE HAS A COPYRIGHT COMPONENT TO IT.  OFF

12   THE STOP OF MY HEAD, I BELIEVE IT'S BOTH A COPYRIGHT AND

13   TRADEMARK CASE.  AND SO I THINK, MY RECOLLECTION IS, IF YOU

14   LOOK AT IT CLOSELY, WITH REGARD TO WILLFULNESS, IT'S ACTUALLY

15   UNCLEAR.

16       I THINK THE PHRASE THAT'S QUOTED THERE BECAUSE I DIDN'T

17   RESPOND TO IT IN MY PAPERS, I THINK -- I BELIEVE THEY ARE

18   REFERENCING THE COPYRIGHT SIDE OF THINGS.

19           THE COURT:  I'LL LOOK AT IT.  AND IF I'M CONVINCED

20   THAT THE WAY I'VE GOT IT NOW IS LEGALLY WRONG, I WILL MAKE A

21   DIFFERENT PROPOSAL.  BUT FOR RIGHT NOW I'M PRETTY CONFIDENT

22   THAT IT'S ACCURATE.

23           MR. PISTORINO:  OKAY.

24           MR. NATHAN:  WE WOULD SUBMIT, YOUR HONOR STONE CREEK

25   IS THE LAW IN THE NINTH CIRCUIT, THAT WILLFULNESS IS THE
```

```
1    TICKET TO SHOWING THAT THEY ARE ENTITLED TO PROVINCE.  IT IS A

2    THRESHOLD DETERMINATION.  THAT IS WHAT *STONE CREEK* STOOD FOR.

3         THE COURT:  ALL RIGHT.  SO, WHAT I WOULD SUGGEST TO

4    YOU RIGHT NOW IS LOOK AT THE VERDICT TIME.  I'LL GIVE YOU SOME

5    TIME TO REVIEW IT.  YOU HAVEN'T HAD TIME TO DO THAT,

6    OBVIOUSLY.  AND THEN I'LL GIVE YOU TEN MINUTES TO DO THAT.

7         WE CAN COME BACK AND SEE IF THAT'S READY TO GO, AND THEN I

8    CAN LET YOU KNOW ABOUT THE FRAUD RULE 50.

9         MR. NATHAN:  THANK YOU, YOUR HONOR.

10        MR. PISTORINO:  THANK YOU, YOUR HONOR.

11        THE COURT:  ONE LAST THING.  WE NEED TO FIGURE OUT A

12   WAY TO GET A COPY OF THE ADMITTED EXHIBITS ONLY TO THE JURY.

13   IT SOUNDS LIKE THE PARTIES ARE WORKING ON IT, BUT IT REALLY

14   WOULD BE BETTER IF IT'S IN ONE DOCUMENT IF THAT'S DOABLE, AND

15   IT SHOULDN'T HAVE REFERENCES TO DOCUMENTS THAT WEREN'T

16   ADMITTED.  SO IF THE LINES CAN BE CUT OUT, THAT WOULD BE

17   BETTER.

18        MR. PISTORINO:  OKAY.

19        WE WILL ATTEMPT TO ADDRESS IT.

20        THE COURT:  ALL RIGHT.

21        THE JURY WILL THANK YOU.  EVERYTHING THAT GETS DONE IN A

22   TRIAL IS FOR THE BENEFIT OF THE JURY.  YOU WANT THEM TO THINK

23   YOU ARE WORKING TO HELP THEM NOT CUTTING CORNERS.

24        MR. PISTORINO:  RIGHT.  I DON'T WANT THERE TO BE ANY

25   UNCERTAINTY.
```

```
1        I KNOW THAT WE ENTERED THE -- I GUESS EXHIBIT 377, AND I

2   INQUIRED ABOUT HOW TO DO IT.  AT LEAST TO MY KNOWLEDGE, RIGHT,

3   BUT IT IS ACTUALLY AN ORIGINAL THING BECAUSE IT'S GOT HIS

4   SIGNATURE ON IT, SO I KNOW THERE WAS A REQUEST, MAYBE THIS

5   MORNING, TO SUBMIT AN ELECTRONIC COPY.  I AM HAPPY TO DO

6   WHATEVER --

7        THE CLERK:  THE JUDGE CLARIFIED THAT IT CAN GO IN.  I

8   TALKED TO THE JUDGE.

9        MR. PISTORINO:  ALL RIGHT.  THANK YOU.

10        THE COURT:  ALL RIGHT.

11        AND JUST WHAT OUGHT TO GO WITHOUT SAYING, AND I'LL JUST

12   SAY THIS AND LEAVE IT, ANY INTERACTION THAT YOU HAVE WITH MY

13   STAFF, YOU SHOULD ASSUME IT IS JUST LIKE INTERACTING WITH ME.

14   ANYTHING YOU WOULD NOT DO IF IT WERE ME, DON'T DO IT.  I'M

15   SERIOUS.

16        MR. PISTORINO:  I BELIEVE YOU.  OF COURSE.

17        THE COURT:  DEAD SERIOUS.  OKAY?  IT'S A BIGGER ISSUE

18   THAN ANY ONE TRIAL.  IT IS A MATTER OF YOUR REPUTATION WITH

19   THE COURT.

20        MR. PISTORINO:  YES.

21        (RECESS TAKEN AT 9:13 A.M.; RESUMED AT 9:29 A.M.)

22        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

23        THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THE

24   HONORABLE HAYWOOD S. GILLIAM, JR., PRESIDING.

25        THE COURT:  ALL RIGHT.  NOW THAT YOU HAVE HAD TIME TO
```

```
 1    REVIEW THE VERDICT FORM, I'LL LET YOU MAKE ANY ARGUMENTS THAT
 2    YOU HAVE ON IT.
 3          MR. NATHAN:  JOHN NATHAN, YOUR HONOR.
 4       NOT AN ARGUMENT, BUT IN QUESTION NO. 2, I BELIEVE THERE'S
 5    SOME NUMBERS WERE TRANSPOSED INADVERTENTLY.  THE SOURCE OF
 6    THIS ERROR IS ME.  BECAUSE IN MY FORM I MISSED IT AS WELL.
 7       YOU SEE WHERE IT SAYS, "IF YOU ANSWER 'YES' TO QUESTION 2,
 8    THEN GO TO 3"?
 9          THE COURT:  UH-HUH.
10          MR. NATHAN:  IT SHOULD BE 12.  THEN, "IF YOU ANSWERED
11    'NO' TO QUESTION 2, GO TO 3".  THE "3" AND THE "12" SHOULD BE
12    TRANSPOSED.
13          THE COURT:  YOU'RE RIGHT.  EXACTLY.  BECAUSE IF IT IS
14    ABANDONED, THEN YOU SKIP TO THE --
15          MR. NATHAN:  I CAN SHOW, YOUR HONOR, BUT I MADE THE
16    MISTAKE WHEN I SUBMITTED IT.
17          THE COURT:  THAT'S ALL RIGHT.  WE DIDN'T CATCH IT
18    EITHER, BUT YOU'RE RIGHT ABOUT THAT.  THANK YOU.  WE'LL MAKE
19    THAT CHANGE.
20       MR. PISTORINO?
21          MR. PISTORINO:  I DIDN'T NOTICE ANYTHING -- ANY
22    DIFFICULTY WITH IT OTHER THAN I APPRECIATE POINTING OUT THE
23    TYPO.
24          THE COURT:  ALL RIGHT.  SO HERE'S WHAT WE WILL DO.
25       I ESPECIALLY THINK IN A CASE WHERE THE LAW IS THIS
```

```
1    INVOLVED, I WILL FOLLOW MY NORMAL PRACTICE OF HAVING EACH

2    JUROR HAVE A COPY OF THE INSTRUCTIONS AS THEY ARE GETTING

3    INSTRUCTED SO THAT THEY CAN FOLLOW IT.  I THINK FOR ANY LAY

4    PERSON TO TRY TO PUT ALL OF THIS STUFF IN THEIR HEAD AND KEEP

5    IT IS A TALL TASK.  AND THEN THEY WILL BE ABLE TO TAKE THOSE

6    COPIES BACK WITH THEM IN THE JURY ROOM.

7         I ASSUME NO OBJECTION TO THAT PROCESS?

8         MR. PISTORINO:  NO, YOUR HONOR.

9         MR. NATHAN:  NO OBJECTION, YOUR HONOR.

10        THE COURT:  ALL RIGHT.

11    SO WE WILL GO AHEAD AND MAKE THOSE COPIES.  THE ONLY --

12   THEN THE ONLY CHANGE TO THE VERDICT FORM BASED ON THE RULING

13   THAT I MADE ON THE PUNITIVE DAMAGES IS THAT QUESTION 14 WILL

14   COME OUT.

15        ON THE FRAUD CLAIM, I DO THINK IT'S A CLOSE CALL BUT IT

16   STRIKES ME AS THE RIGHT APPROACH TO SUBMIT IT TO THE JURY AND

17   THEN HAVE IT BE SUBJECT TO POST-VERDICT RECONSIDERATION BY ME

18   ON THE SAME FOOTING AS THE OTHER ISSUES THAT I HAVE DEFERRED

19   FOR A 50(C) DETERMINATION.

20        MR. NATHAN:  THANK YOU, YOUR HONOR.

21        AND ALSO IN CONNECTION WITH IT, WE WILL HAVE THE BENEFIT

22   OF THE TRANSCRIPT WHEN WE ACTUALLY BRIEF THE POST-VERDICT

23   MOTIONS AS NEEDED.

24        AS YOUR HONOR KNOWS, WE DON'T HAVE A DAILY COPY HERE, SO

25   THERE'S ADDITIONAL EVIDENCE THAT WE WILL POINT TO IN THE
```

1   TRANSCRIPT.

2          **THE COURT:**  ALL RIGHT.  THAT SOUNDS LIKE A FINE

3   APPROACH.

4       ALL RIGHT.  SO ANYTHING FURTHER?  WE WILL GET THE COPIES

5   OF THE INSTRUCTIONS TOGETHER, WE WILL FINALIZE THE VERDICT

6   FORM.

7       THE ONLY CHANGE IN THE INSTRUCTIONS IS THAT THE PUNITIVE

8   DAMAGES INSTRUCTION WILL COME OUT BASED ON THE RULING I JUST

9   MADE AND THEN EVERYTHING WILL GET RENUMBERED.

10      I DID LOOK AT *STONE CREEK* AND IT IS A TRADEMARK CASE.  I

11  THINK IT IS AS GOOD AS I CAN DO IN THE ABSENCE OF A MODEL

12  INSTRUCTION, BUT I TAKE YOUR POINT.  TO THE EXTENT YOU THINK

13  IT FALLS SHORT IN SOME WAY, YOU'VE GOT THAT PRESERVED.

14      ANYTHING ELSE?  SO THE JURY -- WILL START UP WITH THE

15  CLOSINGS AT 10:00.  SO YOU HAVE A LITTLE TIME TO SETTLE IN.

16          **MR. NATHAN:**  YES, YOUR HONOR.

17      THERE WAS THAT ONE CHANGE THAT THE COURT AGREED TO MAKE ON

18  INSTRUCTION 23, TO DELETE IN APPEARANCE OR MEANING.

19          **THE COURT:**  I DIDN'T AGREE TO MAKE THAT CHANGE.  I

20  SAID I DIDN'T THINK THAT CHANGE WAS NECESSARY.

21          **MR. NATHAN:**  DID I -- I MUST --

22          **THE COURT:**  I THINK YOU DID.  I THINK APPEARANCE

23  FAIRLY ENCOMPASSES EVEN THE WORD.  AND SO I THOUGHT I WAS

24  CLEAR ABOUT IT, BUT TO BE CLEAR, I DON'T BELIEVE ANY CHANGE IS

25  NECESSARY IN THE INSTRUCTION THAT'S IS.

1          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

2          **THE COURT:**  YOU'RE WELCOME.

3          **MR. PISTORINO:**  I THINK, YOUR HONOR, THE ONLY OTHER

4    THING THAT I HAVE, OBVIOUSLY HAVE TO DO WHAT YOU HAVE TO DO ON

5    IT, ON THE DEFENDANTS' SLIDES HERE WITH RESPECT TO THE FRAUD

6    CLAIM, AGAIN, THE NUMBER IS CHANGING AGAIN FROM THE NUMBER

7    THAT WAS OUT THERE.

8        IN FAIRNESS, I DID NOT SEE IT WHEN I REVIEWED IT EARLIER

9    LAST EVENING, BUT LOOKING THROUGH IT AGAIN LATE LAST NIGHT, I

10   CAN SEE THAT THE NUMBER'S AGAIN A DIFFERENT NUMBER PLED IN THE

11   COUNTERCLAIMS AND ON THE OTHER STUFF.

12         **THE COURT:**  HOW CAN IT POSSIBLY BE DIFFERENT THAN YOU

13   CLAIMED IN YOUR OPENING?

14         **MS. ROBERTS:**  BECAUSE WHEN WE PRESENTED EVIDENCE OF

15   THE TEXAS TAXES, WE ADDED THAT IN.  AND THAT WAS NOT IN THE

16   OPENING SLIDE.

17         **THE COURT:**  BUT THAT WAS NEVER DISCLOSED IN YOUR

18   COUNTERCLAIM, WAS IT?

19         **MS. ROBERTS:**  WELL, THE COUNTERCLAIM, I SAID -- I

20   BELIEVE SAID AT LEAST THE $33,000 OR ROUGHLY $33,000 THAT WAS

21   LAID OUT SPECIFICALLY IN THE COUNTERCLAIM, AND THEN, OF

22   COURSE, THE DOCUMENTARY EVIDENCE SHOWED THAT THE TEXAS TAXES

23   HAD BEEN PAID.

24         **THE COURT:**  I THOUGHT IT WAS CLEAR, BUT IF IT WASN'T,

25   THE ONLY WAY THAT YOU MADE IT PASSED THE RULE 26 DISCLOSURE

```
1    ISSUE IS THAT IT WAS IN THE COUNTERCLAIM.  SO ANYTHING NOT IN

2    THE COUNTERCLAIM YOU CAN'T ARGUE.

3              MS. ROBERTS:  OKAY.  WE WILL TAKE THAT OUT.

4              MR. PISTORINO:  THANK YOU, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  WE WILL SEE YOU BACK HERE A

6    LITTLE BEFORE 10:00.

7              MR. PISTORINO:  THANK YOU.

8              THE COURT:  MR. PISTORINO, DO YOU WANT TO RESERVE ANY

9    OF YOUR TIME FOR REBUTTAL?

10             MR. PISTORINO:  I WOULD LIKE TO, YES.

11             THE COURT:  HOW MUCH?

12             MR. PISTORINO:  GO WITH FIVE MINUTES.

13             THE COURT:  ALL RIGHT.

14             MR. PISTORINO:  THANK YOU.

15             THE COURT:  YOU'RE WELCOME.

16             MR. NATHAN:  YOUR HONOR, JUST TO BE... JUST TO BE

17   CLEAR ON THE VERDICT, YOU SAID YOU WERE GOING TO TAKE OUT

18   QUESTION 14.  I ASSUME YOU MEANT 15 AS WELL?

19             THE COURT:  THAT'S RIGHT.  ANY OF THE ONES THAT

20   PERTAIN TO PUNITIVE DAMAGES.  YES, THAT'S CORRECT.

21             MR. NATHAN:  ALL RIGHT.  THANK YOU, YOUR HONOR.

22             MR. PISTORINO:  WE'RE GOING TO GET A PAPER COPY

23   BECAUSE I DON'T HAVE PRINTING CAPABILITY?

24             THE COURT:  YES.

25             MR. PISTORINO:  THANK YOU, YOUR HONOR.
```

1        (RECESS TAKEN AT 9:36 A.M.; RESUMED AT 10:08 A.M.)

2        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

3            **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

4   COURT IS BACK IN SESSION.  THE HONORABLE HAYWOOD S. GILLIAM,

5   JR., PRESIDING.

6            **THE COURT:**  SO I WILL ASK MADAME CLERK TO HAND EACH

7   SIDE A COPY OF THE FINAL INSTRUCTIONS AND A COPY OF THE FINAL

8   VERDICT.

9            (DOCUMENTS HANDED TO COUNSEL.)

10           **THE COURT:**  ARE WE PREPARED TO BRING OUT THE JURORS

11  AND PROCEED TO CLOSING ARGUMENTS?

12           **MR. PISTORINO:**  YES, YOUR HONOR.

13           **THE CLERK:**  READY FOR THE JURY?

14           **THE COURT:**  YES.

15       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

16           **THE CLERK:**  YOU MAY BE SEATED.

17           **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.

18  WELCOME BACK.

19       AS I MENTIONED WHEN WE BROKE YESTERDAY, THE NEXT STAGE IN

20  THE TRIAL IS THAT THE COUNSEL FOR THE PARTIES WILL HAVE THE

21  OPPORTUNITY TO GIVE THEIR CLOSING ARGUMENT TO YOU.

22       AND AS I INDICATED EARLIER, THE CLOSING ARGUMENT IS NOT

23  EVIDENCE BUT RATHER IT IS THE PARTIES' COUNSEL'S OPPORTUNITY

24  TO GIVE YOU THEIR VIEW OF WHAT THE EVIDENCE HAS SHOWN IN THE

25  TRIAL.

1   AND SO THE PLAINTIFF HAS THE OPPORTUNITY TO PRESENT ITS

2   CLOSING FIRST, THEN THE DEFENDANT, AND THEN THE PLAINTIFF HAS

3   THE OPPORTUNITY TO BRIEFLY PRESENT A RESPONSE IN WHAT'S CALLED

4   A REBUTTAL.

5   SO THAT IS WHAT WE WILL BE DOING THIS MORNING.  AND THEN

6   AFTER THE CLOSING ARGUMENTS ARE COMPLETE, I WILL GIVE YOU YOUR

7   INSTRUCTIONS ON THE LAW AND THE CASE WILL BE SUBMITTED TO YOU

8   FOR YOUR DELIBERATIONS.

9   SO WITH THAT, MR. PISTORINO, IS THE PLAINTIFF PREPARED TO

10  PRESENT ITS CLOSING ARGUMENT?

11  **MR. PISTORINO:**  YES, YOUR HONOR.

12  **THE COURT:**  WHENEVER YOU ARE READY.

13  **CLOSING ARGUMENT**

14  **MR. PISTORINO:**  GOOD MORNING, LADIES AND GENTLEMEN.

15  I KNOW MS. KAELIN ASKED ME TO EXPRESS TO YOU -- MS. KAELIN

16  WANTED ME TO EXPRESS TO YOU AND I WANTED TO EXPRESS TO YOU

17  MYSELF OUR APPRECIATION FOR YOUR TIME HERE TODAY.

18  I KNOW, IN FACT, LAST WEEK AND EARLY PART OF THIS WEEK, I

19  KNOW EVERYBODY HAS IMPORTANT STUFF TO DO, AND THIS WAS

20  PROBABLY NOT THE JURY LOTTERY YOU WERE HOPING TO WIN.  WE

21  APPRECIATE IT.

22  I KNOW I'M GOING TO TRY MY HARDEST, BUT -- NOT TO TALK

23  QUICKLY, BUT WHAT ARE THE ODDS, RIGHT?  THAT'S JUST WHAT'S

24  GOING TO HAPPEN PROBABLY.

25  I ACTUALLY DON'T THINK I WILL SPEAK TO YOU TOO LONG THIS

1    MORNING BECAUSE I DON'T THINK YOU NEED TO TALK TOO LONG WHEN

2    YOU ARE TELLING THE TRUTH AND YOU DON'T HAVE TO TELL A STORY.

3    IT IS WHAT IT IS.

4        WHEN I THINK ABOUT THIS CASE, I ACTUALLY THINK OF IT VERY

5    MUCH LIKE GOING TO THE CAR DEALERSHIP AND TAKING THE TEST

6    DRIVE WITH A CAR.  RIGHT?  TAKE THE CAR.  YOU'RE GOING TO DO A

7    DEAL.  GO TO THE CAR DEALERSHIP.  THEY LET YOU TAKE A TEST

8    DRIVE WITH THE CAR WITH THE IDEA OF YOU'RE GOING TO DO A DEAL

9    WITH THEM TO BUY THAT CAR.

10       AND I KNOW SOMETIMES I HEAR RECENTLY THEY EVEN LET YOU

11   TAKE THE CAR HOME FOR A DAY OR TWO, RIGHT?  BUT YOU HAVE TO

12   BRING THE CAR BACK AND YOU HAVE TO PAY FOR THE CAR, RIGHT?

13       WHAT WOULD HAPPEN IF INSTEAD OF BRINGING THE CAR BACK YOU

14   JUST DROVE IT HOME?  YOU JUST DROVE IT HOME AND KEPT IT.  WHAT

15   WOULD HAPPEN, RIGHT?  GOOD CHANCE THE COPS ARE GOING TO SHOW,

16   RIGHT?  OR AT A MINIMUM, THE DEALERSHIP IS GOING TO SUE YOU

17   BECAUSE THEY WANT THEIR MONEY BECAUSE YOU TOOK THEIR ASSETS

18   WITHOUT THEIR PERMISSION, RIGHT?  YOU TOOK THE CAR.  TOOK THE

19   LEXUS.  SO WHEN I THINK ABOUT THIS CASE, THAT'S KIND OF THE

20   WAY I THINK ABOUT IT.

21       SO I THOUGHT WHAT I MIGHT DO IS JUST, AS QUICKLY AS I CAN,

22   ROLL YOU GUYS THROUGH BECAUSE I KNOW ALL THE WITNESSES GOT

23   CHOPPED UP.  AND IT MIGHT HELP TO GET A CHRONOLOGICAL STORY OF

24   THINGS.  AFTER WE DO THAT, WE'LL GO THROUGH THE VERDICT FORM

25   AND SHOW YOU WHAT I THINK THE PROPER ANSWERS SHOULD BE TO THE

1    QUESTIONS.  OBVIOUSLY YOU HAVE TO DECIDE.

2         WITH THAT SAID, LET'S GET TO IT.

3         ALL RIGHT.  215, FIRST SLIDE, PLEASE.

4                   (DISPLAYED ON SCREEN.)

5    YOU HEARD FROM -- FROM MR. NEWTON, MR. BUSCH, MR. WOODS

6    AND MR. SPURLOCK ABOUT THE INCREDIBLE SUCCESS OF TECHSHOP.

7    YOU SAW ALL THE ARTICLES, HOW THEY WERE PUBLISHED IN ALL THESE

8    CRAZY MAGAZINES.  I'M SURE YOU HEARD UNTIL YOU WERE TIRED OF

9    HEARING ABOUT IT ABOUT PRESIDENT OBAMA SPEAKING AT THE

10   PITTSBURGH LOCATION.  THEY ARE VERY, VERY PROUD OF THAT.

11        YOU HEARD ABOUT THEIR WORK WITH VETERANS.  YOU HEARD ABOUT

12   THEIR WORK WITH CHILDREN.  NEEDY CHILDREN, WORKFORCE

13   DEVELOPMENT, YOU HEARD ALL OF THAT STUFF.  SO SHORT OF IT IS,

14   TECHSHOP PRETTY DARN WIDELY KNOWN NATIONALLY, INTERNATIONALLY.

15        YOU HEARD FROM -- I THOUGHT ONE THING THAT MIGHT MAKE A

16   LITTLE BIT OF SENSE, YOU HEARD FROM MR. BUSCH ABOUT HIS

17   CONFRONTATION WITH MR. RASURE.  YOU HEARD FROM MR. SPURLOCK

18   ABOUT MR. SPURLOCK'S KIND OF PHYSICAL ASSAULT ON MR. RASURE,

19   WHICH I THOUGHT I HEARD MR. RASURE SAY SOMETHING ABOUT THAT'S

20   BECAUSE MR. SPURLOCK WAS GOING TO CALL THE POLICE.  YOU WERE

21   GOING TO CALL THE POLICE AND THAT'S WHY I PHYSICALLY ASSAULTED

22   YOU?  I HAVE TO ADMIT THAT ONE TOTALLY ALLUDE ME.

23        YOU HEARD MR. RASURE CALL MR. SPURLOCK A LIAR.  YOU HEARD

24   MR. SPURLOCK.  HE'S THE HEAD OF THE NONPROFIT THAT'S WORKING

25   FOR WORKFORCE DEVELOPMENT FOR DISADVANTAGE YOUTH.  YEAH, I

1    THINK YOU GUYS ARE GOING TO HAVE TO MAKE YOUR DECISION ON WHO

2    IS NOT TELLING THE TRUTH IN THAT INSTANCE.

3       SO, OF COURSE, THE MAIN REASON WE ARE HERE IS TECHSHOP'S

4    TRADEMARKS.  PUT UP 351, PLEASE.

5                   (DISPLAYED ON SCREEN.)

6       NEXT PAGE 351 AND 352.  THESE ARE THE TRADEMARKS THAT

7    ARE -- THE REGISTRATIONS THEMSELVES THAT ARE IN EVIDENCE IN

8    THIS CASE.  WE TALKED ABOUT SOME OF THE LITTLE FIELDS THERE

9    ABOUT THE STUFF ABOUT NETWORKING EVENTS FOR PROFESSIONALS AND

10   PROVIDING A MAKERSPACE FOR DO-IT-YOURSELFERS.

11      I DID WANT TO TALK JUST VERY BRIEFLY ABOUT THE WORD ITSELF

12   "TECHSHOP".  ABOUT THE WORD "TECHSHOP".  AND SO WHEN YOU LOOK

13   AT THE REGISTRATIONS, THE FACT WHAT THEY SAY, OF COURSE, IT'S

14   THE WORD ITSELF.  AND WHEN YOU LOOK AT ALL THE INSTANCES THAT

15   WE'RE TALKING ABOUT, YOU SEE THE WORD "TECHSHOP" IN EACH ONE.

16      SO WHILE IT DOES HAVE COLORS AND THAT KIND OF THING, THE

17   WORD, THE ACTUAL TRADEMARK WORD APPEARS IN EACH ONE OF THEM,

18   RIGHT?  EXCEPT FOR, OF COURSE, THE BOTTOM ONE, WHERE AGAIN

19   IT'S KIND OF SIMILAR TO TECHSHOP, RIGHT?

20      SO I JUST WANT TO MAKE SURE WE ARE CLEAR THAT THE WORD

21   APPEARS IN ALL THESE ONES.  AND THE BOTTOM ONE, AGAIN, IT IS

22   VERY, VERY SIMILAR, IN OUR VIEW, LIKELY TO LEAD TO CONFUSION.

23      NEXT, WE KNOW THAT MR. RASURE VERY, VERY MUCH VALUED THE

24   TECHSHOP NAME.

25      EXHIBIT 51, PLEASE.

1          (DISPLAYED ON SCREEN.)

2     WE SAW EVIDENCE INTRODUCED IN THIS CASE WHERE HE INDICATED

3   HE DIDN'T INTEND TO CHANGE THE NAME.  IF WE LOOKED AT WHAT,

4   190 -- I GOT 194.

5          (DISPLAYED ON SCREEN.)

6     HE DID NOT INTEND TO REBRAND.  YOU SAW THE ONE THAT I

7   LIKED PARTICULARLY, 196, WHERE HE RACKED HIS BRAIN FOR A WEEK

8   AND COULDN'T THINK OF A BETTER NAME OTHER THAN THE TRADEMARK

9   TERM "TECHSHOP".

10     IN FACT, I THINK WE KIND OF UNDERSOLD A LITTLE BIT BECAUSE

11   HE SAYS HE RACKED HIS BRAIN FOR A WEEK PLUS.  I DON'T KNOW

12   WHAT THE PLUS PART IS.  I DID THINK -- RESPECTFULLY, I DID

13   THINK IT WAS A LITTLE HUMOROUS YESTERDAY TO HEAR FROM

14   MR. BÜNGER ABOUT, AS I RECALL HIM SAYING, HE DIDN'T THINK

15   MR. RASURE COULD MAKE UP A BETTER ONE IF HE THOUGHT OF FOR A

16   WHOLE YEAR.

17     SO MR. RASURE WAS THE ONE THAT VALUED VERY MUCH -- IF YOU

18   TURN TO TX285.

19          (DISPLAYED ON SCREEN.)

20     WE SAW EVIDENCE INTRODUCED IN THIS CASE OF OTHER PEOPLE

21   TELLING MR. RASURE THAT HE NEEDED THE TECHSHOP NAME TO A DEAL

22   WITH THEM.  YOU SEE, WE NEED THE TECHSHOP NAME.

23     NEXT WE KNOW PART OF THE VALUE HERE IS THAT MR. RASURE

24   FORECAST -- TURN TO 293.

25          (DISPLAYED ON SCREEN.)

1        MR. RASURE FORECAST THAT IF HE WAS ABLE TO USE THE

2    TECHSHOP NAME, AS PART OF HIS TECHSHOP 2.0, HE WOULD GENERATE

3    MORE THAN $10 MILLION IN REVENUE.  THAT'S MR. RASURE SAYING

4    THAT.

5        AND, OF COURSE, IF WE TURN TO TX73, SORT OF THE KEY

6    EXHIBIT IN THIS CASE, THIS IS MR. RASURE VALUING HIS ABILITY

7    TO LICENSE THE TECHSHOP MARK AT MORE THAN TWO AND A HALF

8    MILLION OUTSIDE THE UNITED STATES.

9                   (DISPLAYED ON SCREEN.)

10       AND IT'S ACTUALLY NOT JUST PLAIN TWO AND A HALF MILLION.

11   IF YOU GET INTO THIS ONE, YOU'LL SEE IT'S TWO AND A HALF

12   MILLION PLUS 3 PERCENT ROYALTIES, PLUS $50,000, YADA, YADA,

13   YADA.  MR. RASURE WANTED THE TECHSHOP MARKS.

14       NOW, ONE ASPECT -- IF WE CAN TURN TO THE NEXT ONE, I

15   HEARD -- I WROTE IT DOWN, I'M NOT SURE IF ANY OF YOU GUYS TOOK

16   NOTES -- YOU GUYS HAVE BEEN DOING A TERRIFIC JOB TAKING NOTES,

17   BUT IN MR. RASURE'S TESTIMONY I HEARD HIM MENTION THAT HE

18   ADOPTED THE NAME TECHSHOP 2.0 AT THE INSISTENCE OF THE

19   TECHSHOP BOARD.

20       THAT'S JUST NOT RIGHT.  THAT'S JUST NOT RIGHT.  YOU CAN

21   SEE IN TX15 HERE IT WAS MR. RASURE THAT PROPOSED TECHSHOP 2.0.

22                   (DISPLAYED ON SCREEN.)

23        OF COURSE MR. SPURLOCK SAID, OH, THAT SOUNDS LIKE A GREAT

24   NAME TO ME.

25       YEAH.  IF YOU CAN SEE, TURN TO TX921, IT WAS THE BOARD

1    THAT DIDN'T INSIST.

2                    (DISPLAYED ON SCREEN.)

3        THEY SAID IT WAS HIS CALL.  HIS CALL FOR THE ENTITY TO

4    ACQUIRE ALL THE ASSETS OF TECHSHOP, INCLUDING THE TECHSHOP

5    MARKS.

6        TECHSHOP ONLY AGREED THAT MR. RASURE COULD USE THE NAME

7    TECHSHOP 2.0 AS THE VEHICLE, AS THE ENTITY TO ACQUIRE ALL THE

8    ASSETS OF TECHSHOP, INCLUDING THE MARKS.  NOTHING MORE.

9        SO IF WE TURN TO TX48, THAT'S THE MEMORANDUM OF

10   UNDERSTANDING YOU GUYS HAVE ALL SEEN FIVE TIMES.

11                   (DISPLAYED ON SCREEN.)

12       HERE'S WHAT YOU'VE GOT TO DO TO ACQUIRE THE ASSETS

13   INCLUDING THE TRADEMARKS.  YOU'VE GOT TO PAY THE 200 GRAND AND

14   YOU'VE GOT TAKE ON THE 18 OR $21 MILLION IN LIABILITY AND DO

15   ALL THESE OTHER THINGS, RIGHT?  THAT'S WHAT YOU'VE GOT TO DO

16   TO GET THE RIGHT TO USE THE TECHSHOP TRADEMARKS IN A

17   MAKERSPACE.

18       YOU CAN SEE IF WE TURN TO TX52, THIS IS ANOTHER ONE WE'VE

19   SEEN.

20                   (DISPLAYED ON SCREEN.)

21       IT'S THE PROPOSED FINAL TERMS OF THE TRANSACTION WHERE YOU

22   KNOW AT THE BACK THAT IF YOU DID ALL THAT STUFF, ALL THAT

23   MONEY, ACCEPT ALL THAT LIABILITY, THEN THE THING THAT YOU

24   WOULD GET ARE THE TECHSHOP TRADEMARKS.

25       IF YOU CAN GO TO THE SECOND PAGE OF IT, PLEASE.

1               (DISPLAYED ON SCREEN.)

2          WELL, FARTHER IN THE EXHIBIT.  WE SAW IT BEFORE.  YOU

3    WOULD GET THE ASSETS -- LISTED EXHIBIT A.  YOU GET THE ASSETS

4    OF THE TECHSHOP TRADEMARKS.

5          NOW, YOU KNOW, WE HEARD IT ALL FROM PARTICULARLY

6    MR. BUSCH, ABOUT TECHSHOP'S EFFORTS TO GET MR. RASURE TO DO

7    ANYTHING TO INDICATE THAT HE WAS ANYTHING OTHER THAN JUST A

8    GUY.  JUST A GUY TALKING.  ANYTHING TO SAY THERE'S A TEAM,

9    THAT HE'S GOT THE SERIOUS FINANCIAL RESOURCES THAT WOULD BE

10   NEEDED TO ACQUIRE THE ASSETS OF A COMPANY WITH TEN LOCATIONS

11   IN THE UNITED STATES AND 9,000 MEMBERS.

12         ARE YOU JUST A GUY TALKING OR ARE YOU THE REAL DEAL?  AND

13   HE NEVER PROVIDED THE INFORMATION TO INDICATE THAT HE WAS A

14   REAL DEAL.  YOU HEARD FROM ALL OF THE TECHSHOP'S WITNESSES

15   HERE THAT AFTER ASKING FOR A GOOD LONG TIME IN THIS CONTEXT,

16   RIGHT, WE KNOW TECHSHOP ULTIMATELY DECIDED, HEY, WE'VE GOT TO

17   TERMINATE THAT MOU SO WE CAN TALK TO OTHER FOLKS.

18         SO IF WE TURN TO TX42.

19              (DISPLAYED ON SCREEN.)

20         RIGHT?  THIS IS ANOTHER ONE WE HAVE SEEN MANY, MANY TIMES.

21   SO TECHSHOP TERMINATED -- NOW, DID TECHSHOP SAY -- IN ALL THE

22   EVIDENCE -- DID TECHSHOP SAY, FORGET IT, WE ARE NOT TALKING TO

23   YOU EVER AGAIN.  THAT'S IT.  WE'RE CUTTING -- REMEMBER

24   MR. BUSCH SAID HE INVESTIGATED WHAT MR. RASURE SAID ABOUT HIS

25   CAPABILITIES WITH PIRANHA?

1      MR. RASURE HAD TOLD HIM THAT HE WAS AN EXECUTIVE WITH

2  PIRANHA AND COULD COMMIT THE RESOURCES OF PIRANHA, AND

3  MR. BUSCH INVESTIGATED IT, RIGHT, AND THAT WASN'T TRUE.

4      NEVERTHELESS, TECHSHOP -- HEY, IF YOU'VE GOT A DEAL,

5  TECHSHOP, YOU HEARD FROM ALL THOSE GUYS, THEY WANTED TO DO

6  TAKE DEAL.  THAT WOULD BE GREAT FROM THEIR PERSPECTIVE, RIGHT?

7      THEY COULD PAY THE EMPLOYEES MONEY THAT THEY OWED THEM.

8  THEY COULD PAY CONTRACTORS -- IF THEY COULD DO A DEAL, THEY

9  WOULD LOVE TO.  MR. RASURE NEVER WAS ABLE TO DO THAT DEAL.

10      THEN FINALLY IF WE CAN TURN TO TX47.

11              (DISPLAYED ON SCREEN.)

12      FINALLY, OF COURSE, AFTER ALL THOSE -- LIKE TWO MONTHS

13  ABOUT, RIGHT, OF CONTINUED NEGOTIATE, TECHSHOP JUST, OKAY,

14  THAT'S IT.  TOO MUCH, RIGHT?  TOO MANY DIFFERENT OFFERS.  TOO

15  MUCH STUFF.  WE DON'T HAVE ANYTHING FOR YOU THAT'S REAL.

16  TECHSHOP TERMINATED, SAYS THIS IS OUR FINAL REJECTION OF YOUR

17  OFFER.  WE ARE GOING TO DO THAT BANKRUPTCY THING THAT WE HAVE

18  BEEN TALKING ABOUT.

19      NOW WE GET TO THE MEAT OF WHY WE ARE HERE.

20      SO THIS IS THE PART CHRONOLOGICALLY, IF WE TURN TO TX336,

21  WHERE MR. RASURE, UNBEKNOWNST TO TECHSHOP, HE HAD BEEN TALKING

22  TO THE LANDLORD OVER THERE AT 926 HOWARD STREET, THAT HE WAS

23  GOING TO OPEN TECHSHOP'S FORMER FACILITY USING THE NAME

24  TECHSHOP 2.0 WITHOUT TECHSHOP'S PERMISSION.

25              (DISPLAYED ON SCREEN.)

1  YOU HEARD FROM THE WITNESSES HOW THAT WAS CONCEALED FROM

2  TECHSHOP THE WHOLE TIME.  RIGHT?

3  AND NOW IT COMES OUT HE ANNOUNCES IT.  RIGHT?  WHAT DOES

4  TECHSHOP DO?  ACTUALLY IF WE TURN TO TX324 AS WELL.

5  SAME THING AGAIN.  YOU SEE THE LITTLE MARK AT THE TOP,

6  TECHSHOP 2.0.  TURN TO THE TX324.

7  (DISPLAYED ON SCREEN.)

8  THAT'S MR. RASURE ANNOUNCING IT.  AS YOU HEARD FROM THE

9  WITNESSES, TECHSHOP WAS SHOCKED BECAUSE HE DIDN'T HAVE THE

10  RIGHT TO DO THAT.  HE DIDN'T PAY THE MONEY.  HE DIDN'T DO THE

11  DEAL.  HE DIDN'T ACCEPT ALL THE LIABILITIES.  HE'S JUST TAKING

12  THE ASSETS OF TECHSHOP WITHOUT THEIR PERMISSION.  HE DIDN'T

13  HAVE THE RIGHT TO DO IT.

14  TURN TO TX128, PLEASE.

15  (DISPLAYED ON SCREEN.)

16  AGAIN, HERE'S A LITTLE NOTICE ABOUT TECHSHOP 2.0 OPEN --

17  IF YOU GO TO THE BOTTOM PART A LITTLE BIT RIGHT THERE, YOU

18  WILL SEE -- WE DIDN'T REALLY TALK ABOUT IT THAT MUCH DURING

19  THE TRIAL HERE.

20  ACTUALLY, IF YOU LOOK AT THE TIME OF THAT NOTIFICATION WAS

21  SENT OUT BY MR. RASURE AND HIS ENTITIES, IT WAS FEBRUARY 16TH.

22  RIGHT?  AND WE KNOW THAT WAS DAYS AFTER MR. RASURE WAS TOLD HE

23  DIDN'T HAVE THE RIGHT TO DO IT.

24  IF YOU LOOK IN, IT ALSO SAYS -- TALKS ABOUT JOINING YOUR

25  INTEREST IN THE MEMBER (SIC).  SIGN UP TO BE A MEMBER OF THE

1    TECHSHOP 2.0.  RIGHT?  THIS IS HIS SOLICITATION TO TAKE IN

2    REVENUES USING THE TECHSHOP TRADEMARKS.

3        NOW, ONE THING THAT HAPPENED HERE THAT WE HEARD MR. RASURE

4    CALL MR. SPURLOCK A LIAR WAS THAT DURING THIS TIME MR. RASURE

5    WAS DISCUSSING WITH MR. SPURLOCK AND MR. SPURLOCK SAID, HEY,

6    WHAT -- HOW CAN YOU POSSIBLY BE OPENING A PLACE CALLED

7    TECHSHOP 2.0 BECAUSE YOU DIDN'T DO THE DEAL?  YOU DIDN'T GET

8    THE RIGHTS TO THE NAME.

9        AND WHAT DID MR. RASURE SAY?  WE HEARD FROM MR. SPURLOCK,

10   I'M DOING IT BECAUSE TECHSHOP CAN'T AFFORD TO HIRE A LAWYER TO

11   STOP ME.  THAT'S WHY HE WAS INFRINGING.  IT WAS ALL

12   INTENTIONAL.  HE DIDN'T THINK TECHSHOP COULD GET A LAWYER.

13       TECHSHOP WROTE A LETTER, TX334.

14                    (DISPLAYED ON SCREEN.)

15       TECHSHOP WROTE A LETTER TELLING HIM HEY, OF COURSE, YOU

16   HAVE NO RIGHT TO BE USING OUR NAME WITHOUT OUR PERMISSION.  I

17   GOT TO ADMIT THIS PART, THIS PART IS JUST HARD FOR ME TO

18   UNDERSTAND.  HE'S -- YOU HEARD FROM MR. RASURE.  HE DIDN'T

19   KNOW WHAT IT MEANT.  WHEN TECHSHOP TOLD HIM HE DIDN'T HAVE A

20   RIGHT, HE THOUGHT THAT'S MY SURE SIGN THAT I CAN GO AHEAD AND

21   DO WHAT I'M DOING, USING YOUR NAME WITHOUT YOUR PERMISSION.

22       YOU HEARD ME ASKING IF ENGLISH WAS HIS FIRST LANGUAGE, OR

23   WHATEVER.  I DON'T KNOW.  I DON'T KNOW HOW MUCH CLEARER

24   SOMEBODY COULD WRITE A LETTER TELLING YOU, YOU CAN'T DO IT.

25   BUT HE CONTINUED, RIGHT?

1        NEXT, IF WE TURN TO TX337.

2                   (DISPLAYED ON SCREEN.)

3        NEXT, NEXT DAY THERE'S AN ARTICLE IN THE *CHRONICLE*.

4   TECHSHOP RIGHTS HIM A LETTER TELLING HIM HE DOESN'T HAVE THE

5   RIGHT TO DO IT.  THE NEXT THING, THERE'S A BIG SPREAD IN THE

6   *SAN FRANCISCO CHRONICLE* ABOUT MR. RASURE OPENING A TECHSHOP

7   2.0 THAT IS USING THE TECHSHOP MARKS WITHOUT THEIR PERMISSION.

8        I LIKE THE LITTLE PICTURE HERE OF MR. RASURE RIGHT UNDER

9   THE NAME TECHSHOP.  IT'S TECHSHOP'S FORMER FACILITY.  RIGHT?

10  ALL THE TECHSHOP STUFF IS THERE.  HE JUST HAD TO TURN THE KEY

11  IN THE LOCK WITH THE PERMISSION OF THE LANDLORD.  THAT'S IT.

12  AND HE'S OPERATING TECHSHOP'S FACILITY USING THE NAME TECHSHOP

13  2.0 WITHOUT THEIR PERMISSION.

14       NEXT, TURN TO 652, PLEASE.

15                  (DISPLAYED ON SCREEN.)

16       THIS PART I HAVE TO READ.  EVERY TIME I SEE THIS EMAIL, I

17  WONDER IF IT WAS SARCASM.  WAS IT SARCASM OR WAS HE JUST

18  MOCKING THEM?  THE DAY AFTER TECHSHOP SAYS YOU HAVE NO RIGHT

19  AND THE DAY THE ARTICLE APPEARS IN THE *CHRONICLE*, HE WRITES

20  TECHSHOP, THIS IS A GREAT DAY.

21       THAT'S NOT WHAT YOU HEARD FROM THE TECHSHOP WITNESSES,

22  RIGHT?  WHAT DO THEY ALL SAY?  WE WERE SHOCKED.  STUNNED.

23  COULDN'T BELIEVE IT.  RIGHT?  FELT LIKE WE HAD BEEN DECEIVED.

24       SO, AGAIN, WHEN I SEE THIS THING, I AM WONDERING, WHAT'S

25  THE THINKING THAT GETS YOU TO WRITE A LETTER TO THE GUYS WHO

1    JUST TOLD YOU YOU DON'T HAVE THE RIGHT TO DO WHAT YOU ARE

2    DOING AND YOU KEPT ON DOING IT, AND IT APPEARED IN AN ARTICLE

3    IN THE *SAN FRANCISCO CHRONICLE* FOR THE ENTIRE BAY AREA.

4        TURN TO TX83, PLEASE.

5                    (DISPLAYED ON SCREEN.)

6        BUT, OF COURSE, TECHSHOP WAS ABLE TO GET A LAWYER, RIGHT?

7    TECHSHOP DID GET A LAWYER.  WE HAVE SEEN THIS ONE BEFORE.  I

8    WROTE A LETTER.  STOP, STOP, STOP, STOP, STOP.  STOP USING

9    TECHSHOP'S TRADEMARKS.  YOU DON'T HAVE PERMISSION.  STOP.

10       HE'S BEEN DOING IT FOR A COUPLE OF DAYS AT LEAST, RIGHT?

11   BECAUSE WE KNOW HE STARTED TAKING IN MONEY EARLIER.  WE'VE

12   SEEN IT.

13       STARTED TAKING THE MONEY EARLIER.  SO WE'VE SEEN IT.  BUT

14   HE KEPT ON DOING IT.

15       ATTACHED TO THE LETTER WE KNOW, OF COURSE, WAS A COPY OF

16   THE COMPLAINT IN THIS CASE.  RIGHT?  THE DEFENDANTS IN THIS

17   CASE ARE MR. RASURE, TECHSHOP 2.0 LLC, AND TECHSHOP 2.0 SAN

18   FRANCISCO LLC.  THOSE ARE THE DEFENDANTS IN THIS CASE.

19       AND ONE THING IN THE LETTER THAT WE DEFINITELY SAID IN

20   THE -- ATTACHED A COPY OF THE COMPLAINT WAS PARAGRAPH 31.

21   ANYTHING IN ANY WAY THAT IS CONFUSINGLY SIMILAR TO THE

22   TECHSHOP MARKS, THAT'S WHAT YOU ARE BEING SUED ON.

23       REMEMBER MR. RASURE SAYING, I DIDN'T KNOW I COULDN'T USE

24   THESHOP.BUILD WHEN THE COLORS PRECISELY MATCHED.  I DIDN'T

25   KNOW.  SERIOUSLY?  REALLY?

1    YOU HEARD FROM THE TECHSHOP FOLKS.  THEY THOUGHT IT WAS A

2    JOKE.  THAT -- THAT -- YOU GUYS ARE GOING TO HAVE TO DECIDE

3    WHETHER THAT WAS REMOTELY CLOSE.  THEY THOUGHT IT WAS A JOKE.

4    NO ONE IN THEIR RIGHT MIND COULD THINK YOU COULD DUPLICATE THE

5    LOOK OF THE LOGO, MIMIC IT.  I MEAN, FOCUS ON ONE PART.

6    WHY WOULD YOU DO IT?  WHY WOULD YOU MAKE IT LOOK LIKE THE

7    TECHSHOP MARK AS MUCH AS YOU POSSIBLY COULD?  THAT IS BECAUSE

8    YOU ARE TRYING TO DECEIVE THE PUBLIC.  YOU ARE HOPING THEY

9    WILL BE CONFUSED.  THAT'S WHY YOU DO IT.

10   YOU HEARD MR. NEWTON'S NICE STORY ABOUT THE TEN SPOKES ON

11   THE WHEEL AND HOW HE CAME UP WITH IT BACK IN 2006?  AND THEN

12   WHAT DO WE SEE HERE?  MR. RASURE DID THE EXACT SAME THING,

13   RIGHT?

14   YOU COULDN'T PICK -- YOU COULDN'T GIVE ME A LITTLE BIT.

15   PICK NINE JUST TO BE DIFFERENT.  HOW ABOUT EIGHT?  MAYBE 11?

16   PICKED EXACTLY TEN.  IN THE -- THOSE ARE THE SCIENTIFIC -- IN

17   THE INFINITE POSSIBILITIES OF COLORS IN THE ELECTROMAGNETIC

18   SPECTRUM, YOU COULDN'T PICK ANY OTHER COLORS EXCEPT FOR THE

19   EXACT SAME TWO THAT TECHSHOP USED?  I MEAN, SERIOUSLY.

20   YOU HEARD MR. RASURE SAY THAT THIS WAS HIS EFFORT TO MAKE

21   IT ALL DIFFERENT THAN TECHSHOP.  TRY HARDER.

22   IF WE TURN TO TX6 REAL QUICK.

23                    (DISPLAYED ON SCREEN.)

24   THIS IS THE SPREADSHEET THAT I KEEP ON SHOWING TO YOU

25   GUYS.  I KNOW BECAUSE I ACTUALLY THINK IT IS PARTICULARLY

1    PROBATIVE.  AND WHAT IT SHOWS, IF WE GO TO THE VERY LAST PAGE

2    OF IT, WHAT IT SHOWS IS ALL THE MONEY MR. RASURE WAS TAKING IN

3    USING THE NAME TECHSHOP 2.0, RIGHT?

4        WE KNOW -- THE SPREADSHEET SHOWS HE WAS TAKING IN MONEY

5    BEGINNING, I THINK IT'S ON FEBRUARY 6, ALL THE WAY THROUGH THE

6    16TH UNDER THE NAME TECHSHOP 2.0, RIGHT?  BUT ALSO ACCUSED IN

7    THIS CASE IS MR. RASURE'S USE OF THESHOP.BUILD.  ALL THE MONEY

8    THERE, RIGHT?

9        SO WHATEVER YOU MIGHT HAPPEN TO SAY, HOWEVER IT HAPPENED,

10   WE KNOW FOR SURE THROUGH FEBRUARY 14TH, 15TH, AND 16TH HE WAS

11   TAKING IN MONEY UNDER THE NAME TECHSHOP 2.0 AFTER HE GOT A

12   LETTER FROM TECHSHOP TELLING HIM HE DIDN'T HAVE THE RIGHT TO

13   DO IT.  RIGHT?

14       NOW, IF WE TURN TO, I THINK, TX327, MAYBE ONE -- YES, 327.

15   AGAIN, THIS IS THE ONE WE SAW BEFORE.

16                   (DISPLAYED ON SCREEN.)

17       THIS IS THE CRAZY JOKE, EFFORT TO TRY TO DODGE THE

18   TECHSHOP TRADEMARK WHICH, OF COURSE, IT DOESN'T.

19       NOT ONLY -- JUST ON THE FACE OF IT, RIGHT, YOU JUST

20   LOOK -- ON THE FACE OF IT, COULD IT CAUSE CONFUSION, PEOPLE

21   WOULD BE CONFUSED ABOUT MR. RASURE'S ASSOCIATION, SPONSORSHIP

22   WITH TECHSHOP.  PEOPLE WERE TELLING HIM THAT, RIGHT?

23       IF WE TURN TO TX146.

24                   (DISPLAYED ON SCREEN.)

25       OTHER PEOPLE WERE TELLING HIM.  HEY, IT'S TOO CLOSE.  WHY

1    DON'T YOU JUST PICK ANYTHING DIFFERENT, ANYTHING, EXCEPT

2    TRYING TO TRADE OFF ALL THE GREAT WORK THAT TECHSHOP HAD DID

3    (SIC), WHAT PEOPLE THOUGHT ABOUT TECHSHOP.

4        TURN TO TX288.

5                        (DISPLAYED ON SCREEN.)

6        WE KNOW THAT MR. RASURE WAS USING IT IN COMMERCE, RIGHT?

7    WHERE IS THE MAKERSPACE HE HAS OPENED NOW?  WHERE IS IT

8    OPERATING OUT OF?  926 HOWARD STREET.  IT'S TECHSHOP'S FORMER

9    FACILITY.  THE EXACT SAME PLACE.

10       WHAT DO YOU THINK?  YOU THINK ANYBODY POSSIBLY COULD BE

11   CONFUSED?  OF COURSE.

12       AGAIN, PEOPLE WERE TELLING HIM IT WAS INFRINGING.

13       TX5, PLEASE.

14                        (DISPLAYED ON SCREEN.)

15       THEY TOLD HIM IT WAS INFRINGING AND HE KEPT DOING IT.

16   THEY TOLD HIM.  HE KNEW.

17       NOW I HEAR A LITTLE BIT ABOUT -- OKAY, I GOT THAT

18   LETTER -- I GOT THE LETTER WITH THE COMPLAINT, YOU KNOW, AFTER

19   THE MULTIPLE TIMES TELLING ME NOT TO DO IT, AND THAT'S WHEN I

20   STOPPED FOR SURE.  DIDN'T HAPPEN EVER AGAIN.  I NEVER USED

21   TECHSHOP 2.0.

22       BUT YOU KNOW BECAUSE WE INTRODUCED THE EVIDENCE MANY, MANY

23   TIMES THAT CLAIM IS JUST NOT TRUE.  RIGHT?

24       IF WE TURN TO TX148.

25                        (DISPLAYED ON SCREEN.)

1    REMEMBER, HE WAS TOLD NOT TO USE IT.  HE GOT SUED FOR IT

2    IN FEDERAL COURT AND IT'S THE REASON WE ARE HERE TODAY, THE

3    REASON ALL YOUR TIME HAS BEEN USED UP THIS PAST WEEK, THESE

4    DAYS THIS WEEK, HEY, GUESS WHAT, HE GOT SUED.  WHAT'S HIS

5    FIRST THOUGHT?  I KNOW, I'LL ANNOUNCE PUBLICLY THERE'S A GREAT

6    PIZZA PARTY WITH DAN RASURE OF TECHSHOP 2.0.

7    DID HE HAVE PERMISSION TO DO THAT, USE THE TECHSHOP NAME

8    IN ASSOCIATION WITH MAKERSPACE?  OF COURSE HE DID NOT.

9    DID HE PAY THE MONEY TO GET IT?  NO, HE DID NOT.

10   DID HE ACCEPT ALL THE LIABILITIES?  NO, HE DID NOT.

11   HE'S TAKEN THE CAR FROM THE DEALERSHIP, HE'S GOT IT AND

12   HE'S DRIVING ON A ROAD TRIP TO CANADA.

13   NEXT, IF WE TURN TO TX25.

14                   (DISPLAYED ON SCREEN.)

15   PUTTING ASIDE EVERYTHING ELSE, ALL THE OTHER USES THAT WE

16   TALKED ABOUT HERE, OF COURSE WE KNOW FOR SURE THAT HE DIDN'T

17   EVEN BOTHER TO CHANGE THE NAME UNTIL... WAS THAT APRIL 6?

18   YOU KNOW FOR SURE HE'S OPERATING HIS TECHSHOP 2.0 FOR AT

19   LEAST ANOTHER MONTH AND A HALF OFFICIALLY, LEGALLY.  AND THEN

20   WE SAW A BUNCH OF EVIDENCE OF CONFUSION.  PEOPLE SAYING, HEY,

21   WHO ARE YOU?  WHAT'S YOUR STORY HERE?

22   TURN TO TX94.

23                   (DISPLAYED ON SCREEN.)

24   SAW PEOPLE REACHING OUT.  HELLO, TECHSHOP 2.0.  ARE YOU

25   STILL PLANNING ON BEING OPEN?

1      DOES HE RESPOND?  HOW DOES HE RESPOND?

2      YES, TECHSHOP 2.0 WILL BE OPEN.

3      RIGHT?  THAT'S WHAT HE SAYS.  PEOPLE CONFUSED.

4      TX98.

5                       (DISPLAYED ON SCREEN.)

6      PEOPLE THINK THAT MR. RASURE IS THE NEW MANAGEMENT OF

7  TECHSHOP.  RIGHT?  THAT'S WHAT THEY THINK.

8      OPENED UNDER NEW MANAGEMENT.  THERE'S NO NEW MANAGEMENT

9  HERE.  THERE'S NO ASSOCIATION OR SPONSORSHIP BY TECHSHOP AND

10  MR. RASURE.  BUT BECAUSE OF HIS UNAUTHORIZED CONDUCT, THE

11  PUBLIC IS CONFUSED ABOUT THE ACTUAL ASSOCIATION.  ACTUALLY

12  CONFUSED.

13      TURN TO TX112, PLEASE.

14                       (DISPLAYED ON SCREEN.)

15      SO ANOTHER ONE OF THEM PEOPLE TALKING ABOUT, HEY, I WAS A

16  MEMBER WITH THE PREVIOUS OWNER, RIGHT?

17      THERE'S NO PREVIOUS OWNER OF MR. RASURE'S ENTITIES.

18  RIGHT?  THAT'S ASSUMING THAT TECHSHOP -- THAT HE HAD BOUGHT

19  THE ASSETS OF TECHSHOP, THEN THEY WOULD BE THE PREVIOUS OWNER.

20      THE PUBLIC WAS CONFUSED, RIGHT, ABOUT THEIR ASSOCIATION OR

21  SPONSORSHIP BETWEEN MR. RASURE'S ENTITIES AND TECHSHOP.

22      NOW THIS IS ANOTHER ONE OF THOSE ONES THAT JUST SEEMS

23  CRAZY TO ME.  RIGHT?  WE KNOW BECAUSE WE SAW MANY, MANY

24  INSTANCES OF MR. RASURE TRYING TO SURREPTITIOUSLY GET THAT

25  TECHSHOP EMAIL LIST, RIGHT?

1          TECHSHOP, DOING THEIR JOB, FOLLOWING ALONG, RIGHT?

2     THEY'RE GOING TO PROTECT YOUR PERSONAL INFORMATION, RIGHT?

3     THEY SAID THEY DIDN'T THINK THEY COULD DO IT LEGALLY AND THEY

4     CERTAINLY WOULDN'T DO IT.  RIGHT?

5          AND -- BUT, IF THERE WAS AN ASSET TRANSFER, IT WOULD BE

6     PROPER.  BUT IT WAS ALSO A VERY IMPORTANT ASSET TO TECHSHOP.

7     IT WAS THE FAMILY SILVER, RIGHT?

8          YOU HEARD FROM THOSE WITNESSES THAT AFTER MR. RASURE GOT

9     ACCESS TO THE TECHSHOP FACILITY IN SAN FRANCISCO, ABOUT, I

10    DON'T KNOW, ABOUT A MONTH OR SO LATER, RIGHT, REMEMBER

11    MR. BUSCH'S WIFE STARTED GETTING THOSE EMAILS FROM MR. RASURE?

12         HOW DID IT HAPPEN?  SHE DIDN'T COMMUNICATE WITH HIM.

13    RIGHT?  HOW DID IT HAPPEN?  HUM.  WHAT DO YOU THINK?  YOU

14    THINK HE GOT ACCESS TO THE EMAIL LIST AT TECHSHOP.  RIGHT?

15         WELL, WE KNOW HE DID BECAUSE -- IMPROPERLY, HE GOT THE

16    PASSWORDS.  RIGHT?  THAT'S TX180.

17                    (DISPLAYED ON SCREEN.)

18         TX180.  YOU HEARD ME ASK HIM, YOU DIDN'T DO THAT?

19    WHAT'S -- HOW DO YOU EXPLAIN THE GREAT COINCIDENCE THERE,

20    RIGHT?  THAT MR. BUSCH'S WIFE STARTED GETTING EMAILS, THAT

21    MR. NEWTON STARTED GETTING EMAIL ON EMAIL ADDRESSES THAT HAD

22    NEVER BEEN SHARED WITH MR. RASURE.

23         I DON'T KNOW.  ABSOLUTELY NOT.  WE NEVER DID IT.  YEAH.

24    YOU ARE GOING TO HAVE TO DECIDE WHETHER THAT STATEMENT BY

25    MR. RASURE WAS TRUE OR NOT.

```
 1        TURN TO TX149.

 2                    (DISPLAYED ON SCREEN.)

 3        REMEMBER ME TALKING ABOUT -- REMEMBER HAD THAT BINDER I

 4   BROUGHT UP THERE WITH HIM?  STARTED ASKING HIM QUESTIONS ABOUT

 5   ACTUAL CONFUSION?  REMEMBER WE PICKED SOME, BUT I PICKED THIS

 6   ONE, TX149?

 7        REMEMBER, I COME BACK -- NO, NO, NO, NO ONE WAS CONFUSED.

 8   HERE'S SOMEBODY TRYING TO GET -- I THINK THERE'S CREDIT FOR

 9   THEIR CLASSES FOR TECHSHOP ARLINGTON, RIGHT?  MR. RASURE NEVER

10   HAD ANYTHING AT ARLINGTON.  RIGHT?  HE'S UP THERE, NO, NO,

11   THEY'RE NOT CONFUSED.  NO, NO.

12        THEN HE HAS TO SAY AT THE TOP, WE ARE NOT THE SAME

13   COMPANY.  ACTUAL CONFUSION.

14        NOW... AND, AGAIN, JUST RUN BACK TO TX73 IN TERMS OF WHY,

15   ONE REASON WHY ALL THIS IS HAPPENING IS THAT MR. RASURE'S

16   BELIEF OF THE INCREDIBLE VALUE OF THE TECHSHOP MARKS AND WHAT

17   HE COULD DO IF HE CAN GET A QUICK SCORE ON IT, RIGHT?  THIS IS

18   THE $2.5 MILLION.

19        I WANT TO TURN TO... MAYBE TALK JUST A FRACTION OF A

20   SECOND IF I CAN ABOUT THE WITNESSES OTHER THAN MR. RASURE.

21        I THINK, MR. RASURE, YOU GUYS ARE JUST GOING TO HAVE TO

22   ASSESS HIS PERFORMANCE.  YOU SAW HIM HERE.  YOU'RE GOING TO

23   HAVE TO DECIDE WHETHER HE WAS TELLING THE TRUTH OR NOT.

24        GOING BACKWARDS, I WOULD SAY, MR. BÜNGER, WE TALKED TO

25   YESTERDAY, SEEMS LIKE A VERY NICE GUY TO ME.  BUT I THINK YOU
```

1    COULD SENSE A LITTLE BIT FROM MY QUESTIONING, MAYBE HIS

2    OPINIONS WERE NOT AS GREAT AS THEY COULD HAVE BEEN.  RIGHT?

3    IS 20 OUT OF MORE THAN 1400, IS THAT VERY FREQUENT?  QUITE

4    FREQUENT?  NO.  IT'S LIKE LESS THAN 2 PERCENT.  RIGHT?  SO, IS

5    THAT REALLY THE GREATEST -- THAT'S THE KIND OF RIGOR HE'S

6    APPLYING TO HERE.

7         AND THEN I LIKE THE PART WHERE HE SAID, TECHSHOP HAD --

8    THE TECHSHOP TRADEMARK HAD NOT ZERO VALUE, NEGATIVE VALUE.

9    TECHSHOP WOULD HAVE TO PAY PEOPLE TO USE ITS MARKS.

10        BUT THEN HE REMEMBERED RIGHT AT THE END, DID YOU KNOW

11   ABOUT MR. RASURE'S $2.5 MILLION OFFER?  UH, NO.

12        KIND OF AN IMPORTANT FACT, DON'T YOU THINK?  IF YOU'RE AN

13   EXPERT, YOU'RE HOLDING YOURSELF OUT HERE, SOME GREAT AUTHORITY

14   ON THE WHOLE THING, SHOULDN'T YOU AT LEAST KNOW THE BASIC

15   INFORMATION, LIKE THE GUY YOU ARE WORKING FOR OFFERED SOMEBODY

16   ELSE TO LICENSE IT FOR $2.5 MILLION; THAT HIS BASE DEAL WAS TO

17   GET ACCESS TO THAT FOR LIKE 200 GRAND PLUS ACCEPTING

18   $18 MILLION IN LIABILITIES?  WOULDN'T THAT BE LIKE THE FIRST

19   THING?

20        SO I THINK YOU GUYS ARE GOING TO HAVE TO COMPARE WHAT

21   MR. BÜNGER SAID TO DR. MATOLO'S OPINIONS.  RIGHT?

22        NOW, MR. JOHNSON SEEMED LIKE A VERY NICE GENTLEMAN, VERY

23   NICE GENTLEMAN.  AND WHAT YOU HEARD FROM HIM IS, HE KIND OF

24   WROTE DOWN WHATEVER NUMBERS THE RASURES TOLD HIM.  RIGHT?  YOU

25   HEARD HIM SAY, ANYTHING THAT SAID CALIFORNIA, I JUST WROTE

1    THAT DOWN.  I DON'T THINK I'LL HAVE TIME TO DO IT HERE TODAY,

2    BUT I THINK IF YOU WERE TO LOOK INTO THE FINANCIAL

3    INFORMATION, WHAT YOU WOULD SEE, LIKE NUMBER ONE, THEY

4    FIRST -- NOW THEY COUGHED UP -- YES.  BY THE WAY, WE HAVEN'T

5    PAID THE RENT DOWN THERE FOR THE LAST THREE MONTHS.  SO THAT'S

6    THAT $126,000.

7        YOU MIGHT THINK TO YOURSELF, I WONDER WHAT THE LANDLORD

8    DOWN THERE'S THINKING WHEN THEY HAVEN'T BEEN PAID FOR THREE

9    MONTHS, RIGHT?  KIND OF GETTING GYPPED.  SEEMS TO BE KIND OF A

10   PATTERN GOING ON HERE.

11       I THINK IF YOU DO LOOK INTO ALL THE FINANCIAL THINGS, YOU

12   WILL SEE LIKE $9,000 IN ENTERTAINMENT, TRAVEL EXPENSES FOR

13   VARIOUS MONTHS.  YOU'LL SAY PAYROLL STUFF TO MEGAN AND DREW

14   (SIC) FOR VARIOUS MONTHS.

15       AGAIN, MR. JOHNSON SEEMED LIKE A VERY NICE GUY, BUT HE'S

16   JUST WRITING DOWN WHAT THEY SAID.

17       OKAY.  NOW, THE DEFENDANTS HAVE SOME DEFENSES HERE.  ONE,

18   THEY OFFER TECHSHOP CONSENTED TO MR. RASURE'S USE OF THE NAME

19   TECHSHOP 2.0 TO OPEN A MAKERSPACE.  REALLY?

20       THE FIRST SECOND THEY HEARD ABOUT IT, RIGHT, EMAIL,

21   LETTER, LAWSUIT.  THE MOMENT TECHSHOP HEARD ABOUT IT, THEY

22   REACTED IMMEDIATELY TO ENFORCING THEIR RIGHTS ALL THE WAY

23   THROUGH HERE.  TECHSHOP NEVER CONSENTED TO HIM USING THE MARKS

24   TO OPEN A MAKERSPACE.

25       BUT THEY DID AGREE THAT, YEAH, IF YOU BUY ALL THE ASSETS,

```
1    YOU WILL BE ABLE TO USE THAT NAME FOR THAT AND YOU CAN USE

2    THAT NAME AS PART OF THE SAME TRANSACTION, BUT NOT TO OPEN A

3    MAKERSPACE WITHOUT OUR PERMISSION.  RIGHT?  THAT'S THE PART

4    THAT ACTUALLY INFRINGES THE TRADEMARK WHICH THEY IMMEDIATELY

5    ENFORCED.

6         YOU'RE GOING TO SEE THEY HAVE A DEFENSE THAT TECHSHOP

7    ABANDONED THE TRADEMARKS.  I DON'T EVEN GET THIS ONE.  RIGHT?

8    HOW?  THEY HAVE BEEN SUING ABOUT THEM AND ENFORCING THE RIGHTS

9    THE ENTIRE TIME.  RIGHT?  HOW CAN YOU WALK AWAY FROM IT?

10   THEY'RE ENFORCING IT.  THEY'RE PROTECTING IT.

11        YOU HEARD FROM THE WITNESSES.  THEY ANTICIPATED THAT

12   MS. KAELIN HERE WOULD MAXIMIZE THE VALUE OF THEM BY SELLING

13   THEM OR LICENSING THEM, OR WHATEVER, BUT THEY NEVER ABANDONED

14   THEM.  RIGHT?  THAT'S JUST CRAZY.

15        THEY HAVE TO SHOW THAT BY CLEAR AND CONVINCING EVIDENCE.

16   YOU WILL SEE IN A SECOND.

17        THIS IS ANOTHER ONE.

18                      (DISPLAYED ON SCREEN.)

19        THIS IS ANOTHER ONE YOU HEARD ABOUT WHETHER TECHSHOP

20   INFRINGED OR NOT.  MR. RASURE DIDN'T KNOW THAT THESHOP.BUILD

21   WAS ACCUSED OF INFRINGING.

22        GIVE ME A BREAK.  RIGHT?  GIVE ME A BREAK.  YOU CAN SEE

23   THE WHOLE THING.  IT WAS CONSIDERED TO BE A JOKE.

24        I WANT TO JUST VERY BRIEFLY, IF I CAN, GO THROUGH THE

25   VERDICT FORM WITH YOU GUYS.  MAKE SURE WE CAN SEE.
```

CLOSING ARGUMENT - PISTORINO

1          (DISPLAYED ON SCREEN.)

2     ALL RIGHT.  SO HERE'S THE VERDICT FORM YOU GUYS ARE GOING

3   TO GET TO FILL OUT.  YOU HAVE TO ANSWER THE VARIOUS QUESTIONS

4   ON IT.

5     FIRST ONE:  DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE

6   THAT THE TECHSHOP IS A VALID SERVICE MARK?

7     YEAH.  THEY'RE GOING TO HAVE TO PROVE THAT SO YOU'RE GOING

8   TO SAY YES, TECHSHOP IS A VALID SERVICE MARK.  YOU SAW THE

9   REGISTRATION.  YOU'RE GOING TO HEAR IN THE INSTRUCTIONS HOW IT

10  CREATES A PRESUMPTION.

11    NEXT QUESTION:  DO YOU FIND BY CLEAR AND CONVINCING

12  EVIDENCE THAT THE TECHSHOP SERVICE MARKS WERE ABANDONED?

13    NO.  WE JUST TALKED ABOUT THAT.  THERE'S NO EVIDENCE OF

14  THAT.

15    DO YOU FIND BY PREPONDERANCE OF THE EVIDENCE THAT THE

16  PLAINTIFF OWNS THE TECHSHOP SERVICE MARKS?  DOES -- I MEAN,

17  SIMPLY, DOES TECHSHOP OWN THEM?

18    YES, THEY DO.  RIGHT?  YOU WILL SEE AGAIN, YOU WILL HEAR

19  THOSE NICE LITTLE CERTIFICATES ESTABLISH THAT FACT, CREATE A

20  PRESUMPTION THAT THAT'S TRUE.

21          (DISPLAYED ON SCREEN.)

22    NEXT, WE ARE ON TO 4:  DO YOU FIND BY A PREPONDERANCE OF

23  THE EVIDENCE THAT DEFENDANTS USED THE NAME TECHSHOP 2.0

24  WITHOUT PLAINTIFF'S CONSENT IN A MANNER LIKELY TO INFRINGE --

25  LIKELY TO CAUSE CONFUSION?

1      YOU'RE GOING TO ANSWER YES TO THAT.  YOU'RE GOING TO HEAR

2  SOME OF THE INSTRUCTIONS ABOUT WHAT ARE CALLED *SLEEKCRAFT*

3  FACTORS.  AND YOU WILL SEE SOME OF THEM ARE STUFF LIKE THIS.

4      DEFENDANTS' USE OF THE MARK -- I DON'T KNOW WHAT IT

5  ACTUALLY INCLUDES.  THE NAME TECHSHOP AND IT MIMICS THE LOGO.

6      OF COURSE.

7      YOU'LL SEE THE SIMILARITY.

8      SAME THING.

9      YOU'LL SEE ACTUAL CONFUSION.

10      WE JUST TALKED ABOUT THAT A LITTLE BIT.

11      YOU'LL ALSO SEE DEFENDANTS' INTENT; DID THEY KNOWINGLY

12  INFRINGE?

13      OF COURSE THEY DID, RIGHT?  THAT WAS THE WHOLE IDEA.

14      SO YOU ARE GOING TO ANSWER YES ON THAT ONE.

15      I THINK WE ARE ON 5:  YOU ARE GOING TO ANSWER YES.

16      6:  THAT THEIR USE OF THE TECHSHOP -- TECHSHOP 2.0 CAUSED

17  THEM -- CAUSED TECHSHOP TO SUFFER ACTUAL DAMAGES.

18      YES.  YOU HEARD THIS FROM DR. MATOLO ABOUT THE LICENSE.

19  RIGHT?  YOU'RE GOING TO WRITE ON THAT ONE 1.48 MILLION JUST

20  LIKE DR. MATOLO SAID.  RIGHT?

21      REMEMBER, IF HE GOT IT, HE WAS GOING TO TRY TO MAKE THAT

22  QUICK MILLION DOLLARS BY LICENSING ADEO FOR 2.5.

23      NEXT QUESTION YOU'RE GOING TO HAVE IS:  WAS THE

24  INFRINGEMENT WILLFUL?

25      LIKE WAS IT A MISTAKE OR DID HE REALLY INTEND TO DO IT?

CLOSING ARGUMENT - PISTORINO

```
1    YOU KNOW, RIGHT?  TECHSHOP TOLD HIM AND HE KEPT DOING IT.

2       MAKE SURE I DIDN'T SKIP ONE.

3                     (DISPLAYED ON SCREEN.)

4       OKAY.  7:  YES, WE TALKED ABOUT INTENTIONAL.

5       ACTUAL -- YEAH.  SO ACTUAL IS GOING TO BE AT THE 1.48,

6    RIGHT?  $1.48 MILLION, RIGHT?

7       NEXT WE HAVE THE SAME THING FOR THESHOP.BUILD.  DID THEY

8    USE IT IN A MANNER WITH THE -- LIKELY TO CAUSE CONFUSION?

9    YOU'RE GOING TO SAY YES.

10      DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT HE HAD

11   ACTUAL OR STATUTORY NOTICE?

12      THIS IS THE THING WITH THE "R", RIGHT?  YOU SAW ALL THE

13   STYLE GUIDE AND ALL THAT STUFF TALKING ABOUT HOW HE HAD

14   STATUTORY NOTICE, FOR SURE, AND THEN YOU ALSO SAW THE PART

15   WHERE HE HAD ACTUAL NOTICE.  HE ACTUALLY KNEW OF THE

16   TRADEMARKS AND THEN WAS INFRINGING THEM.

17      SO YOU'RE GOING TO SAY ACTUAL STATUTORY NOTICE?  YOU'RE

18   GOING TO SAY YES.

19      NO. 10:  DID HE CAUSE TECHSHOP TO SUFFER ACTUAL DAMAGES IN

20   THE FORM OF LOST LICENSING REVENUE?

21      YOU'RE GOING TO SAY YES.

22      AND THEN WHAT AMOUNT?  YOU ARE GOING TO SAY WHAT

23   DR. MATOLO SAID, WHICH IS THE 1.48 MILLION.

24                     (DISPLAYED ON SCREEN.)

25      SORRY FOR MY TERRIBLE HANDWRITING.
```

1    NEXT... WE ARE ON 11:  DO YOU FIND THE INFRINGEMENT WAS

2    WILLFUL?  YOU'RE GOING TO SAY YES.  WE JUST TALKED ABOUT IT.

3    HE KNEW.  THEY TOLD HIM TO STOP MANY, MANY TIMES.  GUESS WHAT?

4    HE KEPT ON DOING IT.

5                        (DISPLAYED ON SCREEN.)

6        SO, NEXT -- I'M SORRY.  THERE YOU GO.  MAKE IT EASIER FOR

7    YOU TO SEE.

8        IT WAS INTENTIONAL.  THEY TOLD HIM TO STOP.  HE KEPT DOING

9    IT.  IT WAS NOT A MISTAKE.  RIGHT?  IT WAS ALL INTENTIONAL.

10       NEXT, ON THIS ONE, I AM NOT SURE IF WE MISSED THE OTHER

11   ONE, YOU ARE GOING TO BE ASKED TO TALK ABOUT WHAT AMOUNT OF

12   PROFITS.  THIS IS THE WHOLE THING ABOUT THE REVENUES AND THAT

13   KIND OF THING, RIGHT?  THIS IS THE PART YOU ARE GOING TO WRITE

14   IN THE REVENUES.  RIGHT?  THERE IS NO EVIDENCE IN THIS CASE OF

15   WHAT THE EXPENSES ACTUALLY WERE.  WE TALKED ABOUT HOW THEY

16   WERE KIND OF SCREWED UP.  SO HERE YOU'RE GOING TO WRITE IN THE

17   1.5 -- 1,529,000.

18                       (DISPLAYED ON SCREEN.)

19       NEXT, THIS ONE SEEMS TOTALLY CRAZY TO ME.  YOU GUYS HAVE

20   PROBABLY ALL HEARD, YOU SEE IT IN THE NEWS SOMETIMES -- HERE

21   YOU GO -- YOU SEE IT IN THE NEWS SOMETIMES, RIGHT?  YOU HEAR

22   LIKE A BURGLARY BREAKS INTO SOMEBODY'S HOUSE AND THEY SLIP IN

23   THE KITCHEN WHILE THEY'RE TAKING THEIR STUFF, AND THEN THE

24   BURGLAR SUES THAT GUY, RIGHT?  BURGLAR SUES -- EVERYBODY HAS

25   SEEN THAT NEWSPAPER ARTICLE.

1        THAT'S WHAT'S HAPPENING IN THIS CASE.  HE DID ALL THIS

2    STUFF, NOW HE HAS A CRAZY CLAIM THAT TECHSHOP PERPETRATED A

3    FRAUD ON HIM.  GIVE ME A BREAK.  I MEAN, YOU SAW MR. BUSCH AND

4    THESE GUYS.  WHO'S PERPETRATING A FRAUD ON WHO HERE, RIGHT?  I

5    MEAN, WHO TOOK THE EMAILS WITHOUT THEIR PERMISSION?  WHO USED

6    THE TRADEMARKS WITHOUT THEIR PERMISSION?  MR. RASURE.

7        SO, THE IDEA THAT TECHSHOP PERPETRATED A FRAUD IS CRAZY.

8    THERE'S NOTHING LIKE THAT HERE.  SO THAT ONE IS GOING TO FLAT

9    OUT SAY NO.

10       PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF MADE A FALSE

11   PROMISE TO RASURE?

12       NO.

13       THE AMOUNT OF DAMAGES THAT SHOULD BE FLAT OUT ZERO, RIGHT?

14   FLAT OUT ZERO.

15       I AM SORRY THAT YOUR TIME LAST WEEK AND THIS WEEK UP TO

16   NOW WAS USED ON THIS MATTER.  BUT YOU SAW MR. RASURE UP THERE.

17   AND JUST, AGAIN, THE CRAZY ANSWERS, RIGHT?  THESHOP.BUILD,

18   THAT WAS MY EFFORT TO MAKE IT COMPLETELY DIFFERENT.

19       WHO BELIEVES THAT, RIGHT?  WHY WOULD YOU -- AND THEN,

20   AGAIN, YOU HEARD MR. BÜNGER, THE TECHSHOP NAME WAS SO

21   TERRIBLE.  RIGHT?  YOU HAVE TO ASK YOURSELF, WHY DOES

22   MR. RASURE KEEP TRYING TO USE IT, RIGHT?  WHY DOES HE SAY HE'S

23   GOING TO GET THE $10 MILLION?  WHY, WHEN HE COMES UP WITH A

24   SLIGHTLY DIFFERENT NAME, WHY DOES HE MIMIC THE LOOK, THE

25   COLORS, THE -- EURO THING?

1      WHY?  BECAUSE HE WANTS TO TRADE OFF THE GOODWILL OF

2    TECHSHOP.  RIGHT?  WANTS TO GET THOSE TRADEMARKS AND USE THEM

3    WITHOUT PERMISSION JUST LIKE HE TRIED TO GET THE EMAILS.

4    RIGHT?  THAT'S WHAT WE ARE DEALING WITH HERE.

5      THANK YOU.

6         **THE COURT:**  DEFENDANTS WANT TO PRESENT A CLOSING

7    ARGUMENT?

8         **MS. ROBERTS:**  YES, YOUR HONOR.

9                    **CLOSING ARGUMENT**

10        **MS. ROBERTS:**  GOOD MORNING AGAIN.

11     BEFORE I BEGIN, I WANT TO THANK YOU ALL ON BEHALF OF MY

12   CLIENTS DAN RASURE, THESHOP.BUILD, AND THESHOP.BUILD SAN

13   FRANCISCO FOR YOUR SERVICE.

14     AS YOU HEARD, THIS LITIGATION HAS CAUSED MR. RASURE A

15   GREAT DEAL OF HARM.  HE TRIED TO BE THE WHITE KNIGHT TO COME

16   IN AND TRY TO OPEN MAKERSPACES AFTER TECHSHOP ABRUPTLY CLOSED

17   ITS DOORS.  AND INSTEAD HE GOT A LAWSUIT THAT HAS CLOUDED HIS

18   BUSINESS FOR THE ENTIRE TIME IT HAS BEEN IN BUSINESS.  SO HE

19   TAKES THIS LAWSUIT VERY SERIOUSLY AND HE THANKS YOU FOR ALL

20   THE ATTENTION THAT YOU HAVE PUT INTO THIS CASE.

21     NOW LET'S START WITH THE TIMELINE THAT I SHOWED YOU AT THE

22   OUTSET OF THE CASE.

23                  (DISPLAYED ON SCREEN.)

24     YOU'VE NOW HEARD THAT THE TIMELINE BASICALLY BOILS DOWN TO

25   TWO PERIODS.  ONE, IS WHAT I LIKE TO CALL THE CONSENT PERIOD.

1    THAT'S WHEN TECHSHOP CONSENTED TO THE DEFENDANTS' USE OF THE

2    NAME TECHSHOP 2.0.  THAT WAS FROM MID-NOVEMBER OF 2017 UNTIL

3    FEBRUARY 16TH OF 2018.

4        THE SECOND PERIOD STARTS ON FEBRUARY 16, 2018.  AND THAT'S

5    WHEN THIS LAWSUIT WAS FILED.  AS YOU KNOW, AS SOON AS THIS

6    LAWSUIT WAS FILED, MR. RASURE IMMEDIATELY TOOK STEPS TO CHANGE

7    THE NAME TO THESHOP.BUILD, AND THAT'S THE NAME THAT HE OPENED

8    HIS BUSINESS UNDER ON FEBRUARY 19TH, AND THAT'S THE NAME HE

9    HAS CONTINUED TO OPERATE HIS BUSINESS UNDER, OPENING A SECOND

10   LOCATION IN SAN JOSE IN AUGUST.

11       THIS CASE IS REALLY ONLY ABOUT A FEW DAYS IN THE MONTH OF

12   FEBRUARY OF 2018.  WE'RE ALL HERE FOR JUST THESE FEW DAYS.  IF

13   YOU GIVE TECHSHOP THE BENEFIT OF THE DOUBT, AND WE WILL TALK

14   IN A BIT ABOUT THAT FEBRUARY 14TH LETTER YOU HAVE SEEN A

15   NUMBER OF TIMES, BUT GIVEN THE BENEFIT OF THE DOUBT, IF YOU

16   TREAT THAT AS A CEASE AND DESIST LETTER -- AND WE DON'T THINK

17   IT WAS -- BUT IF YOU GIVE HIM THE BENEFIT OF THE DOUBT, THEN

18   MR. RASURE AND HIS COMPANIES USED THE NAME TECHSHOP 2.0 FOR

19   ALL OF TWO DAYS AFTER RECEIVING THAT LETTER.  TWO DAYS,

20   FEBRUARY 15TH AND 16TH.

21       AND YOU ALSO HEARD THAT THESHOP.BUILD LOGO, THE THIRD ONE

22   ON THE BOARD THAT TECHSHOP'S COUNSEL HAS POINTED TO YOU TO A

23   NUMBER OF TIMES, THAT LOGO WAS ONLY USED FOR THREE DAYS,

24   FEBRUARY 19TH, 20TH, AND 21ST.  THOSE ARE ALL OF THE DAYS THAT

25   ARE AT ISSUE HERE IN THIS CASE.  THERE IS NO EVIDENCE OF USE

1    OF A LOGO THAT LOOKS LIKE ANYTHING ON THIS BOARD AFTER

2    FEBRUARY 21ST OF 2018.

3        NOW, BEFORE WE DIVE INTO ALL OF THE EVIDENCE, I WANT TO

4    REMIND YOU ABOUT WHAT THIS CASE IS ABOUT, WHAT WE ARE HERE FOR

5    AND WHAT WE ARE NOT HERE FOR.

6        WHAT WE ARE NOT HERE FOR IS A LOGO.  BECAUSE AS YOU HEARD,

7    TECHSHOP'S TRADEMARKS DO NOT COVER A LOGO.  MR. NEWTON

8    ADMITTED THAT THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT

9    CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.  IT IS

10   JUST THE WORD "TECHSHOP" THAT WE ARE TALKING ABOUT HERE TODAY.

11       NOW LET'S DIVE INTO THE CLAIMS.  YOU KNOW THAT THERE ARE

12   THREE CLAIMS HERE.  TECHSHOP'S CLAIM THAT TECHSHOP 2.0

13   INFRINGES, TECHSHOP'S CLAIM THAT THESHOP.BUILD INFRINGES, AND

14   MR. RASURE'S CLAIM THAT TECHSHOP COMMITTED FRAUD.  AND, ONCE

15   AGAIN, I'M GOING TO GO THROUGH EACH ONE IN TURN AND THIS TIME

16   I'M GOING TO SHOW YOU ALL OF THE EVIDENCE THAT YOU SAW.

17       WE ARE GOING TO START FIRST WITH THE CLAIM THAT TECHSHOP

18   2.0 INFRINGES.

19       AND THE JUDGE IS GOING TO GIVE YOU INSTRUCTIONS ON THE

20   ELEMENTS THAT NEED TO BE PROVEN TO SHOW INFRINGEMENT BY USE OF

21   TECHSHOP 2.0.  AND THESE ARE TECHSHOP'S BURDEN TO PROVE EACH

22   AND EVERY ONE OF THESE ELEMENTS.

23       IF PLAINTIFF DID NOT PROVE ALL THREE OF THE ELEMENTS, THEN

24   YOU MUST RETURN A VERDICT FOR DEFENDANTS OF NO INFRINGEMENT

25   WITH TECHSHOP 2.0.

1      NOW IN THIS CASE, YOU SHOULD FIND THAT DEFENDANTS DO NOT

2   INFRINGE AS TO THE NAME TECHSHOP 2.0 BECAUSE TECHSHOP FAILED

3   TO PROVE THE THIRD ELEMENT IN MULTIPLE DIFFERENT WAYS.

4      FIRST, TECHSHOP DID NOT PROVE THE DEFENDANTS USED THE NAME

5   TECHSHOP 2.0 WITHOUT THE CONSENT OF TECHSHOP.  SECOND,

6   TECHSHOP DID NOT PROVE THAT DEFENDANTS USED THE NAME TECHSHOP

7   2.0 IN COMMERCE.  AND, THIRD, TECHSHOP DID NOT PROVE THE

8   DEFENDANTS USED THE NAME TECHSHOP 2.0 IN A MANNER THAT IS

9   LIKELY TO CAUSE CONFUSION AMONG ORDINARY CONSUMERS AS TO THE

10  SOURCE, SPONSORSHIP, AFFILIATION, OR APPROVAL OF THE GOODS.

11     WE WILL GO THROUGH EACH OF THOSE POINTS ONE BY ONE.

12     SO, FIRST, CONSENT.  AND I'M GOING TO PAUSE FOR A MINUTE

13  HERE.  IN TECHSHOP'S CLOSING, HE PRESENTED CONSENT AS A

14  DEFENSE.  CONSENT IS NOT A DEFENSE.  AS YOU WILL SEE FROM THE

15  JURY INSTRUCTION, AND I THINK YOU WILL GET THEM IN HARD COPY,

16  TECHSHOP HAS THE BURDEN OF PROVING USE WITHOUT CONSENT.  IT IS

17  TECHSHOP'S BURDEN TO SHOW THAT THERE WAS NO CONSENT.  AND THE

18  EVIDENCE HAS OVERWHELMINGLY SHOWN THAT MR. RASURE AND HIS

19  COMPANIES USED THE NAME TECHSHOP 2.0 WITH THE CONSENT OF

20  TECHSHOP.

21     AGAIN, GOING BACK TO THE TIMELINE.  MR. RASURE AND HIS

22  COMPANIES USED THE NAME TECHSHOP 2.0 FROM LATE NOVEMBER 2017

23  UNTIL FEBRUARY 16TH, 2018.  MR. RASURE TESTIFIED THAT AS SOON

24  AS HE RECEIVED NOTICE OF THIS LAWSUIT, THAT FRIDAY EVENING

25  BEFORE A HOLIDAY WEEKEND, HE AND HIS COMPANIES TOOK STEPS TO

1  CHANGE EVERYTHING OVER TO THESHOP.BUILD AS QUICKLY AS THEY

2  COULD.

3      TECHSHOP CONSENTED TO MR. RASURE AND HIS COMPANIES' USE OF

4  TECHSHOP 2.0 FOR THAT ENTIRE PERIOD, FROM NOVEMBER OF 2017

5  THROUGH FEBRUARY 16TH OF 2018.

6      YOU SAW DOCUMENT AFTER DOCUMENT AFTER DOCUMENT IN WHICH

7  TECHSHOP'S REPRESENTATIVES REFERRED TO MR. RASURE'S COMPANY AS

8  TECHSHOP 2.0.  STARTING IN LATE NOVEMBER 2017 WHEN THE PARTIES

9  BEGAN THEIR NEGOTIATIONS AND THEY'RE EXCHANGING DRAFTS OF THE

10  MEMORANDUM OF UNDERSTANDING, MR. RASURE'S COMPANY IS CALLED

11  TECHSHOP 2.0.

12      YOU'RE FAMILIAR WITH THE FINAL MEMORANDUM OF UNDERSTANDING

13  SIGNED BY DAN WOODS, THE CEO OF TECHSHOP.  IN THE MEMORANDUM

14  OF UNDERSTANDING, MR. RASURE'S COMPANY IS CALLED TECHSHOP 2.0.

15      YOU SAW THE DRAFT ASSET PURCHASE AGREEMENT THAT TECHSHOP

16  DRAFTED AND SHARED WITH MR. RASURE.  IN THE DRAFT ASSET

17  PURCHASE AGREEMENT, HIS COMPANY IS CALLED TECHSHOP 2.0.

18      AND YOU SAW CORRESPONDENCE IN JANUARY OF 2018 REGARDING

19  MR. RASURE'S CONTINUED PROPOSALS.  AND IN THOSE CONTINUED

20  PROPOSALS AND TECHSHOP'S RESPONSES TO THOSE PROPOSALS, HIS

21  COMPANY IS CALLED TECHSHOP 2.0.

22                  (DISPLAYED ON SCREEN.)

23      SO HERE WE HAVE ONE, I THINK, FROM JANUARY 8TH WHERE HIS

24  COMPANY IS CALLED TECHSHOP 2.0.

25      WE GO TO JANUARY 13TH.

1              (DISPLAYED ON SCREEN.)

2        THERE IS A PROPOSAL IN WHICH MR. RASURE USED THE LOGO WITH

3   THE GEAR IN THE UPPER LEFT-HAND CORNER.  THIS ONE IS ON

4   JANUARY 31ST.  MR. WOODS RESPONDED TO THAT PROPOSAL ON

5   FEBRUARY 1ST, WHICH WAS JUST TWO WEEKS BEFORE THIS LAWSUIT WAS

6   FILED.

7        IN HIS RESPONSE, MR. WOODS DID NOT OBJECT TO MR. RASURE'S

8   USE OF THE NAME TECHSHOP 2.0.  HE DID NOT OBJECT TO THE USE OF

9   THE GEAR.  INSTEAD, ON FEBRUARY 1ST, MR. WOODS, HIMSELF,

10  CALLED MR. RASURE'S COMPANY TECHSHOP 2.0.

11       THIS ISN'T DISPUTED.  NONE OF TECHSHOP'S WITNESSES DENIED

12  THAT DURING THE PERIOD BETWEEN THE END OF FEBRUARY 2017

13  THROUGH EARLY FEBRUARY 2018 MR. RASURE'S COMPANY WAS CALLED

14  TECHSHOP 2.0 BY BOTH MR. RASURE AND TECHSHOP.

15       NOW, TECHSHOP'S WITNESSES TRIED TO EXPLAIN THIS AWAY BY

16  SAYING THAT MR. RASURE WAS ONLY ALLOWED TO USE THE NAME

17  TECHSHOP 2.0 IN NEGOTIATIONS WITH TECHSHOP TO ACQUIRE

18  TECHSHOP'S ASSETS.

19       MR. BUSCH TOLD YOU THAT IT WAS ONLY ALLOWED TO BE THE NAME

20  OF THE LEGAL ENTITY.  BUT THIS TESTIMONY IS CONTRADICTED BY

21  THE CONTEMPORANEOUS DOCUMENTS, THE DOCUMENTS THAT THE PARTIES

22  WERE WRITING AT THE TIME.  IN THOSE DOCUMENTS, TECHSHOP'S

23  REPRESENTATIVES REFERRED TO MR. RASURE'S COMPANY AS TECHSHOP

24  2.0 OUTSIDE THE CONTEXT OF THE NEGOTIATIONS WITH MR. RASURE.

25              (DISPLAYED ON SCREEN.)

CLOSING ARGUMENT - ROBERTS

1      FOR EXAMPLE, YOU'VE SEEN THE DRAFT MESSAGE FROM DAN WOODS.

2  THIS WAS A MESSAGE THAT MR. WOODS WAS PREPARING TO SEND OUT TO

3  ANNOUNCE THE MEMORANDUM OF UNDERSTANDING.  IN THE DRAFT

4  MESSAGE FROM MR. WOODS, HE CALLED MR. RASURE'S COMPANY

5  TECHSHOP 2.0.

6      YOU SAW THAT MR. BUSCH RESPONDED TO THAT EMAIL PROVIDING

7  COMMENTS ON THE DRAFT MESSAGE FROM DAN WOODS.  IN HIS

8  COMMENTS, MR. BUSCH ASKED MR. RASURE IF HE WAS SURE HE WANTED

9  TO CALL HIS COMPANY TECHSHOP 2.0.  IN THAT EMAIL, MR. BUSCH

10  DIDN'T TELL MR. RASURE HE COULD ONLY USE TECHSHOP 2.0 IN

11  LIMITED CIRCUMSTANCES.  NO, MR. BUSCH SAID TO MR. RASURE,

12  TOTALLY YOUR CALL.

13                    (DISPLAYED ON SCREEN.)

14      AND YOU SEE THAT THEN MR. WOODS CHIMED IN AND ALSO SAID,

15  YES, THIS IS DAN'S CALL.

16      YOU SAW THAT MR. WOODS REFERRED TO MR. RASURE'S COMPANY AS

17  TECHSHOP 2.0 WHEN HE ANNOUNCED THE DEAL TO EVERYONE ON THE

18  DISTRIBUTION LIST, EVERYONE@TECHSHOP.WS.

19      MR. WOODS REFERRED TO MR. RASURE'S COMPANY AS TECHSHOP 2.0

20  IN EMAIL ANNOUNCEMENTS SENT TO MEMBERS.

21                    (DISPLAYED ON SCREEN.)

22      TECHSHOP ANNOUNCED THE MEMORANDUM OF UNDERSTANDING ON

23  FACEBOOK, TWITTER, AND INSTAGRAM.  TECHSHOP REPEATEDLY

24  REFERRED TO MR. RASURE'S COMPANY AS TECHSHOP 2.0 IN THESE

25  PUBLIC ANNOUNCEMENTS.

1    AGAIN, ANNOUNCEMENTS OUTSIDE OF THE CONTEXT OF THE

2    NEGOTIATIONS.  MR. WOODS DID NOT DENY THAT HIS ANNOUNCEMENT

3    USING THE NAME TECHSHOP 2.0 RAN IN *MAKE:* MAGAZINE, WHICH HE

4    FURTHER TESTIFIED ABOUT THE WIDE CIRCULATION OF *MAKE:* MAGAZINE

5    WITHIN THE MAKER COMMUNITY.

6        MR. WOODS REFERRED TO MR. RASURE'S COMPANY AS TECHSHOP 2.0

7    IN AN EMAIL TO LARA CROUSHORE OF THE ECONOMIC DEVELOPMENT

8    CORPORATION OF NEW YORK.

9              (DISPLAYED ON SCREEN.)

10       YOU SAW THIS OPEN LETTER TO STAKEHOLDERS DRAFTED BY

11   MR. BUSCH.  IN MR. BUSCH'S OPEN LETTER TO STAKEHOLDERS, HE

12   CALLED MR. RASURE'S COMPANY TECHSHOP 2.0.

13       AND IT IS CLEAR THAT MR. BUSCH INTENDED FOR HIS OPEN

14   LETTER TO STAKEHOLDERS TO BE SHARED OUTSIDE OF THE CONTEXT OF

15   THE NEGOTIATIONS BETWEEN TECHSHOP AND MR. RASURE.  WE KNOW

16   THIS BECAUSE WHEN HE SHARED HIS DRAFT OPEN LETTER TO

17   STAKEHOLDERS WITH MR. WOODS, MR. NEWTON, MR. RASURE, AND

18   OTHERS, MR. BUSCH SAID THAT HE WOULD BE POSTING HIS MESSAGE ON

19   VARIOUS SOCIAL MEDIA SITES AND THAT HE EXPECTED FOR IT TO BE

20   WIDELY DISSEMINATED.

21             (DISPLAYED ON SCREEN.)

22       MR. RASURE ALSO SENT OUT A PRESS RELEASE ANNOUNCING THE

23   MEMORANDUM OF UNDERSTANDING.  IN HIS PRESS RELEASE, HE CALLED

24   HIS COMPANY TECHSHOP 2.0.  HE ALSO PROVIDED THE WEBSITE,

25   TECHSHOP2.COM.  MR. WOODS PROVIDED A QUOTE FOR THE PRESS

1    RELEASE.  IN MR. WOODS' QUOTE FOR THE PRESS RELEASE, HE CALLED

2    MR. RASURE'S COMPANY TECHSHOP 2.0.

3        MR. BUSCH SENT MR. RASURE AN EMAIL ABOUT MR. RASURE'S

4    QUOTE "WELCOME TO TECHSHOP 2.0 EMAIL".  MR. BUSCH PROVIDED

5    SOME COMMENTS ON WHAT WAS IN THAT EMAIL.  ALTHOUGH MR. BUSCH

6    WAS PROVIDING COMMENTS, HE DID NOT TELL MR. RASURE THAT HE

7    COULDN'T USE THE NAME TECHSHOP 2.0.

8        YOU SAW THAT MR. NEWTON INTRODUCED MR. RASURE AND HIS

9    COMPANY TO A THIRD PARTY AS TECHSHOP 2.0.  AND YOU SAW THAT ON

10   JANUARY 31ST OF 2018, AGAIN, JUST A FEW WEEKS BEFORE THIS

11   LAWSUIT WAS FILED, MR. WOODS REFERRED TO MR. RASURE'S COMPANY

12   AS TECHSHOP 2.0.

13                    (DISPLAYED ON SCREEN.)

14       IN THIS EMAIL, MR. WOODS INTRODUCED MR. RASURE TO RYAN

15   LLOYD OF WILCOX COUNTY TEXAS FOR THE PURPOSE OF AUTHORIZING

16   MR. RASURE TO PAY TECHSHOP'S BACK TAXES IN THE AMOUNT OF

17   $11,423.19.

18       THUS, TECHSHOP'S ARGUMENT THAT MR. RASURE WAS ONLY ALLOWED

19   TO USE THE NAME TECHSHOP 2.0 IN ITS NEGOTIATIONS WITH TECHSHOP

20   DOES NOT HOLD WATER.

21       ADDITIONALLY, YOU KNOW YOU'VE SEEN A LOT OF DOCUMENTS IN

22   THIS CASE.  BUT DESPITE THE ABUNDANCE OF PAPER, YOU HAVE NOT

23   SEEN A SINGLE DOCUMENT BEFORE FEBRUARY 16TH OF 2018 THAT TELLS

24   MR. RASURE THAT HE WAS ONLY ALLOWED TO USE THE NAME TECHSHOP

25   2.0 FOR PURPOSES OF NEGOTIATING WITH TECHSHOP TO ACQUIRE ITS

1    ASSETS.  YOU DID NOT SEE A SINGLE DOCUMENT BEFORE THAT DATE

2    THAT TOLD MR. RASURE THAT USING TECHSHOP 2.0 WOULD INFRINGE

3    TECHSHOP'S TRADEMARKS.

4        THINK ABOUT ALL THE DOCUMENTS YOU'VE SEEN.  NOT ONE BEFORE

5    FEBRUARY 16TH OF 2018 TELLS MR. RASURE THAT HIS PERMISSION TO

6    USE THE NAME TECHSHOP 2.0 IS LIMITED IN ANY WAY.

7        AND THERE ARE MULTIPLE TIMES THAT YOU WOULD HAVE EXPECTED

8    AN INSTRUCTION LIKE THAT.  YOU KNOW THAT ON FEBRUARY 12TH OF

9    2017, TECHSHOP'S LAWYER, KURT RUTTUM, EMAILED MR. RASURE TO

10   TELL HIM THAT TECHSHOP WAS TERMINATING THE MEMORANDUM OF

11   UNDERSTANDING.

12       SINCE THE MEMORANDUM OF UNDERSTANDING WAS ENDING, IF

13   TECHSHOP DIDN'T WANT MR. RASURE TO USE THE NAME TECHSHOP 2.0

14   UNLESS HE DID A DEAL WITH TECHSHOP 2.0, THEN YOU WOULD EXPECT

15   TECHSHOP TO PUT THAT LIMITATION IN ITS EMAIL.  TECHSHOP

16   DIDN'T.

17       LATER, YOU ARE FAMILIAR WITH THE FEBRUARY 7TH EMAIL THAT

18   MR. WOODS SENT TO MR. RASURE LETTING HIM KNOW THAT TECHSHOP

19   WOULD PURSUE BANKRUPTCY.  IT IS TECHSHOP'S POSITION THAT THIS

20   EMAIL REPRESENTS THE END OF THE NEGOTIATION PERIOD.  OF COURSE

21   THAT POSITION IS CONTRARY TO THE PLAIN LANGUAGE OF THE EMAIL

22   IN WHICH MR. WOODS SAYS THAT THEY WOULD BE SUPPORTIVE OF A

23   DEAL WITH THE SECURED CREDITORS OR SOME OTHER ALTERNATIVE

24   ARRANGEMENT.

25       EVEN IF TECHSHOP IS CORRECT THAT THIS IS THE END OF THE

1    NEGOTIATIONS, AGAIN, YOU WOULD EXPECT TECHSHOP TO TELL

2    MR. RASURE THAT HE WAS NO LONGER ALLOWED TO USE THE NAME

3    TECHSHOP 2.0.  TECHSHOP DIDN'T DO THAT.

4        THEN THERE'S THE FEBRUARY 14TH LETTER THAT WE HAVE TALKED

5    ABOUT BEFORE.  ALTHOUGH THE LETTER SAYS THAT MR. RASURE DOES

6    NOT HAVE THE RIGHTS TO USE TECHSHOP'S TRADEMARKS, THERE'S NO

7    DISPUTE THAT THIS LETTER DOES NOT TELL MR. RASURE TO STOP

8    USING THE NAME TECHSHOP 2.0.

9        THE LETTER DOES NOT SAY THE NAME TECHSHOP 2.0 INFRINGES

10   TECHSHOP'S TRADEMARKS.  THE LETTER DOES NOT SAY THAT

11   MR. RASURE WAS ONLY ALLOWED TO USE THAT NAME IN NEGOTIATIONS

12   OR AS A NAME OF A LEGAL ENTITY.

13       NOW YOU ALSO KNOW THAT TECHSHOP SAYS THAT MR. RASURE WAS

14   ALLOWED TO USE THE NAME WHEN IN NEGOTIATIONS TO ACQUIRE

15   TECHSHOP, BUT THOSE NEGOTIATIONS CONTINUED RIGHT UP UNTIL THE

16   DAY THAT THE LAWSUIT WAS FILED.  AND TECHSHOP KNEW THIS.

17       ON FEBRUARY 13TH, MR. RASURE SENT MR. WOODS, MR. BUSCH,

18   AND MR. NEWTON AN UPDATED -- AN UPDATE EMAIL REGARDING THE

19   STATUS OF NEGOTIATIONS WITH AUTODESK.  REMEMBER, AUTODESK WAS

20   ONE OF THE LARGEST CREDITORS OF TECHSHOP, AND SO AS PART OF

21   THE DEAL, MR. RASURE HAD TO NEGOTIATE DIRECTLY WITH AUTODESK.

22       SO MR. RASURE PROVIDES AN UPDATE ON FEBRUARY 13TH, JUST A

23   FEW DAYS BEFORE THE LAWSUIT WAS FILED TELLING THEM THAT HE WAS

24   HAVING THE PROOF OF FUNDS PREPARED TO BE SENT TO AUTODESK.

25       ON FEBRUARY 15TH MR. RASURE SENT MR. WOODS, MR. BUSCH, AND

1    MR. NEWTON AN EMAIL SAYING THAT IT HAD BEEN A GREAT DAY, BUT

2    WE AREN'T QUITE DONE.  HE THEN TELLS THEM THAT HE IS WORKING

3    ON FINALIZING A DOCUMENT AND AUTODESK WOULD HAVE A DOCUMENT

4    THE NEXT DAY.  MR. RASURE ALSO TELLS THEM THAT HE WAS STILL

5    TRYING TO WORK OUT A SOLUTION FOR THE INSTRUCTORS.

6        NOW, TECHSHOP'S WITNESSES TESTIFIED THAT THEY DID NOT

7    THINK THAT FEBRUARY 15TH WAS A GREAT DAY.  WHETHER THEY DID OR

8    NOT, THERE'S NO DISPUTE THAT MR. RASURE PROVIDED THEM WITH AN

9    UPDATE ON THE STATUS OF HIS NEGOTIATIONS WITH AUTODESK ON

10   FEBRUARY 15TH, THE DAY BEFORE THIS CASE WAS FILED.

11       THEN, ON THE MORNING OF THE 15TH, BEFORE GETTING

12   NOTIFICATION THAT HE HAD BEEN SUED, MR. RASURE SENT A SIGNED

13   AGREEMENT WITH AUTODESK ALONG WITH PROOF OF FUNDS.

14       LATER THAT EVENING, YOU KNOW THAT TECHSHOP'S COUNSEL SENT

15   A CEASE AND DESIST LETTER AND NOTICE THAT THE COMPLAINT IN THE

16   CASE HAD ALREADY BEEN FILED.  GIVEN THE WELL-DOCUMENTED

17   HISTORY, TECHSHOP DID NOT PROVE THAT DEFENDANTS USED THE NAME

18   TECHSHOP 2.0 WITHOUT TECHSHOP'S CONSENT.  DEFENDANTS,

19   THEREFORE, CANNOT INFRINGE.

20       NOW, A SECOND WAY IN WHICH TECHSHOP FAILED TO PROVE

21   INFRINGEMENT BY USE OF TECHSHOP 2.0, IS THAT TECHSHOP DID NOT

22   SHOW USE OF THE MARK.  YOU HEARD MR. RASURE TESTIFY THAT AS

23   SOON AS HE RECEIVED NOTICE OF THIS LAWSUIT, HE BEGAN TO TAKE

24   STEPS TO CHANGE THE NAME OF HIS COMPANIES TO THESHOP.BUILD.

25       HE TOLD YOU THAT, THAT VERY EVENING, HE WENT OUTSIDE AND

1    TOOK DOWN THE TECHSHOP 2.0 SIGN, AND HE TOOK A PICTURE OF THE

2    SIGNLESS BUILDING THAT NIGHT.

3        YOU ALSO SAW THAT HE TOOK STEPS TO CHANGE THE WEBSITE THAT

4    NIGHT.  HE SENT A TEXT TO JERRY GABLE, WHO HE WAS WORKING

5    WITH, TO TELL HIM THAT THEY NEEDED TO SWITCH OVER THE WEBSITE.

6    AND MR. RASURE TESTIFIED THAT THEY ALSO WORKED TO CHANGE THE

7    NAME OF FACEBOOK GROUPS.

8        AS A RESULT, AS I TOLD YOU BEFORE, MR. RASURE AND HIS

9    COMPANIES ONLY USED THE NAME TECHSHOP 2.0 FOR THE -- WITHOUT

10   CONSENT FOR THOSE TWO DAYS.  THAT'S ASSUMING YOU GIVE THE

11   BENEFIT OF THE DOUBT THAT THE FEBRUARY 14TH LETTER IS A CEASE

12   AND DESIST LETTER.  AND HE CHANGED THE NAME WHEN HE GOT NOTICE

13   OF THIS LAWSUIT.

14       THE SAN FRANCISCO LOCATION, AS YOU KNOW, DID NOT OPEN

15   UNTIL FEBRUARY 19TH, AND IT OPENED UNDER THE NAME

16   THESHOP.BUILD.

17       AND IF YOU LOOK AT THE LOGOS THAT TECHSHOP HAS BEEN

18   SHOWING YOU THROUGHOUT THE TRIAL, THERE IS NO EVIDENCE THAT

19   EITHER OF THESE TWO LOGOS WITH THE 2.0 INDICATOR WERE USED

20   AFTER FEBRUARY 16, 2018.

21       DEFENDANTS CHANGED THE NAME AND THE LOGO.  THE NAME WAS

22   CHANGED ON FEBRUARY 16TH, AND BY MARCH OF 2018, DEFENDANTS

23   WERE USING THE CURRENT LOGO WHICH LOOKS COMPLETELY DIFFERENT.

24       YOU ALSO HEARD THAT TECHSHOP WAS AWARE OF THE NAME CHANGE

25   BY FEBRUARY 17TH.  PHILLIP TORRONE FROM ADAFRUIT EMAILED

CLOSING ARGUMENT - ROBERTS

1    MR. WOODS ON THAT DATE REFERRING HIM TO A POST ABOUT THE NAME

2    CHANGE.  I KNOW THIS DOCUMENT IS HARD TO READ.  HOPEFULLY YOU

3    CAN LOOK AT IT IN THE JURY ROOM.  IF YOU LOOK CLOSELY, THE

4    NAME OF THE BLOG POST THAT'S BEING SHARED WITH MR. WOODS HAS

5    THE NAME THESHOP.BUILD IN IT.

6         NOW, MR. RASURE TESTIFIED THAT NOT EVERYTHING WAS ABLE TO

7    GET CHANGED OVER ON THE NIGHT OF FEBRUARY 16TH.  HE DIDN'T GET

8    NOTICE UNTIL THAT EVENING, AND IT WAS A HOLIDAY WEEKEND.  BUT

9    HE TOLD YOU THAT HE FOCUSED ON THE BIG ITEMS AND WORKED AS

10   QUICKLY AS HE COULD TO GET EVERYTHING SWITCHED OVER.

11        SO THERE ARE SOME THINGS THAT DIDN'T GET SWITCHED OVER

12   THAT VERY FIRST DAY, BUT HE TOOK THE STEPS AND WORKED TO GET

13   AS MUCH DONE AS POSSIBLE AS QUICKLY AS POSSIBLE, FOCUSING ON

14   THINGS LIKE THE SIGN AND THE WEBSITE AND FACEBOOK GROUPS, THE

15   THINGS MOST CONSUMER FACING, GET THOSE DONE FIRST.

16        NOW TECHSHOP TRIED TO SHOW YOU EVIDENCE THAT THE NAME

17   TECHSHOP 2.0, THE USE OF THAT NAME, CONTINUED AFTER

18   FEBRUARY 16TH, AND FAILED TO DO SO.  I'M GOING TO SHOW YOU

19   SOME EXAMPLES.

20        SO, FIRST, YOU SAW TX128.

21                    (DISPLAYED ON SCREEN.)

22        THIS IS AN EMAIL RESPONSE TO AN EMAIL ABOUT THE PLANNED

23   OPENING OF TECHSHOP 2.0.  BUT THE DATE ON THE EMAIL WAS

24   FEBRUARY 16TH, 2018.  THIS IS BEFORE MR. RASURE GOT NOTICE OF

25   THE LAWSUIT AND CHANGED THE NAME.

1              (DISPLAYED ON SCREEN.)

2        YOU SAW TX100 WHICH SUGGESTS THAT THERE WAS SOME PROBLEMS

3   WITH THE LOGIN PAGE FOR THESHOP.BUILD AND REFERENCES TO LOGIN

4   WITH TECHSHOP 2.0.  REMEMBER, MR. RASURE ADMITTED THAT HE

5   TRIED TO GET EVERYTHING SWITCHED OVER AS QUICKLY AS POSSIBLE

6   AND APPARENTLY RAN INTO SOME TECHNICAL DIFFICULTIES.

7        BUT THE BOTTOM OF THIS EMAIL SHOWS THAT THE PROBLEM BEING

8   DISCUSSED WAS CORRECTED.  SO BY FEBRUARY 19TH, THE DATE OF

9   THIS EMAIL, THE PROBLEM WAS CORRECTED.

10       YOU SAW ANOTHER EMAIL NOTIFYING MR. RASURE ABOUT A

11  REFERENCE TO TECHSHOP 2.0 ON THE SIGN-UP PAGE.  AGAIN, THIS IS

12  DATED MARCH 6TH, STILL WITHIN JUST A COUPLE OF WEEKS OF THE

13  NAME CHANGE.

14       TECHSHOP SHOWED YOU THIS MESSAGE FROM MR. RASURE

15  REFERENCING THE TECHSHOP 2.0 SAN JOSE PAGE.

16              (DISPLAYED ON SCREEN.)

17       BUT MR. RASURE EXPLAINED TO YOU THAT THIS IS A REFERENCE

18  TO A WEB PAGE THAT IS NOT AFFILIATED WITH OR OPERATED BY HIS

19  COMPANY.  SOMEONE ELSE ADMINISTERS A PAGE CALLED TECHSHOP 2.0

20  SAN JOSE AND HE WAS COMMUNICATING WITH THIS THIRD PARTY.

21       TECHSHOP SHOWED YOU THIS EMAIL THAT MR. RASURE SENT IN

22  AUGUST OF 2018 TO SUGGEST THAT HE WAS STILL USING THE NAME

23  TECHSHOP THAT LATE.  BUT MR. RASURE EXPLAINED TO YOU THAT THIS

24  IS REFERENCING AN EXPENSE REPORT THAT HE SUBMITTED TO HIS

25  PRIOR EMPLOYER PIRANHA FOR EXPENSES THAT HE INCURRED WHEN HE

1   WAS NEGOTIATING WITH TECHSHOP.  SO HIS EXPENSE REPORT IS

2   REFERRING TO TECHSHOP.  HE'S NOT USING IT TO REFER TO HIS OWN

3   COMPANY.

4        TECHSHOP 2.0 ALSO SHOWED YOU SOME DOCUMENTS FROM VENDORS

5   THAT CONTINUES TO USE THE NAME TECHSHOP 2.0, LIKE THIS ONE.

6                    (DISPLAYED ON SCREEN.)

7        MR. RASURE EXPLAINED TO YOU ON DIRECT THAT SOME VENDORS

8   JUST CONTINUED TO USE THE NAME AND WERE SLOW TO SWITCH OVER

9   THEIR SYSTEMS.  HE HAD SET UP ACCOUNTS WHEN HE WAS TECHSHOP

10  2.0, AND THEN SOME OF THE VENDORS WERE SLOW TO SWITCH THEM

11  OVER, AND HE CONTINUED TO GET CORRESPONDENCE FROM THEM.

12       BUT THAT DOES NOT MEAN THAT DEFENDANTS WERE CONTINUING TO

13  USE THE NAME; IT JUST MEANS THE VENDORS WERE SLOW TO CHANGE

14  THEIR SYSTEMS.

15       YOU ALSO SAW SOME EMAILS LIKE THIS ONE IN WHICH CUSTOMERS

16  CONTINUED TO USE THE NAME TECHSHOP 2.0 TO REFER TO

17  MR. RASURE'S COMPANIES AFTER FEBRUARY 16TH OF 2018.

18                    (DISPLAYED ON SCREEN.)

19       THIS ONE IS DATED FEBRUARY 20TH.  THAT'S JUST FOUR DAYS

20  AFTER THE LAWSUIT WAS FILED AND THE NAME CHANGE.  MR. RASURE

21  TESTIFIED THAT SOME CUSTOMERS CONTINUED TO CALL HIS COMPANY

22  TECHSHOP 2.0 BECAUSE THAT'S WHAT THE NAME OF THE COMPANY HAD

23  BEEN SINCE DECEMBER 1ST WHEN THE MEMORANDUM OF UNDERSTANDING

24  WAS ANNOUNCED AND THROUGHOUT THE CONSENT PERIOD.

25       JUST BECAUSE SOME CUSTOMERS CONTINUED TO USE THE OLD NAME

1   DOES NOT MEAN THAT DEFENDANTS WERE CONTINUING TO USE THE NAME.

2       I THINK A GOOD EXAMPLE HERE IS TO THINK ABOUT THE BALLPARK

3   WHERE THE SAN FRANCISCO GIANTS PLAY.  AS OF THIS YEAR IT'S

4   CALLED ORACLE PARK.  LAST YEAR AND FOR SEVERAL YEARS PRIOR, IT

5   WAS CALLED AT&T PARK.  PEOPLE ARE LIKELY TO CONTINUE TO REFER

6   TO THE BALLPARK AS AT&T PARK BEFORE THEY GET USED TO THE NEW

7   NAME.

8       THERE'S NOT GOING TO BE AN AUTOMATIC SWITCH INTO THE MINDS

9   OF EVERYBODY IN THE BAY AREA REFERRING TO THIS BALLPARK, BUT

10  THAT DOESN'T MEAN THAT AT&T OR ORACLE HAS DONE ANYTHING WRONG.

11      SIMILARLY HERE, JUST BECAUSE CUSTOMERS CONTINUED TO CALL

12  MR. RASURE'S COMPANY TECHSHOP 2.0, WHICH HAD BEEN THE NAME FOR

13  TWO AND A HALF MONTHS, DOES NOT MEAN THAT DEFENDANTS WERE

14  CONTINUING TO USE THE NAME OUTSIDE OF THE CONSENT PERIOD.

15      ACCORDINGLY, TECHSHOP DID NOT PROVE THE DEFENDANTS

16  CONTINUED TO USE THE NAME AFTER FEBRUARY 16TH OF 2018.  AND

17  DEFENDANTS, THEREFORE, CANNOT INFRINGE.

18      A THIRD WAY IN WHICH PLAINTIFF FAILED TO PROVE ITS CASE AS

19  TO TECHSHOP 2.0 IS THAT TECHSHOP DID NOT SHOW THE DEFENDANTS

20  USED THE MARK IN A MANNER THAT IS LIKELY TO CAUSE CONFUSION.

21  THE COURT IS GOING TO GIVE YOU INSTRUCTIONS ON THE FACTORS TO

22  CONSIDER IN DETERMINING WHETHER THERE IS A LIKELIHOOD OF

23  CONFUSION BETWEEN TECHSHOP AND DEFENDANTS' USE OF TECHSHOP

24  2.0.

25      YOU WILL LOOK AT THE STRENGTH OF THE MARK.  FIRST,

CLOSING ARGUMENT - ROBERTS

1   TECHSHOP IS NOT A STRONG MARK.  YOU HEARD FROM DEFENDANTS'

2   EXPERT WITNESS, MARK BÜNGER, TESTIFIED THAT HE STUDIED THE

3   FREQUENCY AND USE OF THE WORDS "TECH" AND "SHOP" AND THE NAMES

4   OF 1434 MAKERSPACES.  WHILE THEY ARE NOT THE MOST COMMON AT

5   THE TOP OF THE LIST, MR. BÜNGER TOLD YOU THAT THEY ARE AMONG

6   THE MOST COMMON WORDS USED IN MAKERSPACE NAMES.  HE ALSO

7   TESTIFIED THAT THOSE TERMS ARE USUALLY COMBINED WITH MORE

8   DISTINCTIVE TERMS.

9       YOU WILL ALSO LOOK AT THE SIMILARITY OF MARKS.  IN THIS

10  CASE, THE MARKS ARE NOT THE SAME BECAUSE TECHSHOP 2.0 ADDED

11  THE 2.0.  AND THAT HAS MEANING.  THIS IS CONSISTENT WITH

12  OTHERS' UNDERSTANDING OF THE MEANING OF 2.0.

13                      (DISPLAYED ON SCREEN.)

14      YOU SAW THAT ON NOVEMBER 21ST, MR. RASURE ASKED

15  MR. SPURLOCK WHAT HE THOUGHT OF NAMING THE COMPANY TECHSHOP

16  2.0.  MR. SPURLOCK RESPONDED, IT'S INTERESTING.  HE CONTINUED,

17  TECHSHOP 2.0.  IT TRANSLATES WELL TO THE MOVEMENT FOR SURE.

18  EVERYONE HAS A PROTOTYPE.  THE COMMUNITY HAS TO UNDERSTAND

19  THAT AS MAKERS.

20                      (DISPLAYED ON SCREEN.)

21      TECHSHOP'S FORMER DIRECTOR OF MARKETING HAD A SIMILAR

22  VIEW.  SHE COMMENTED, AS MAKERS, WE'RE ALL FAMILIAR WITH

23  ITERATION.  TECHSHOP 2.0 IS AN EXCITING REVISION OF THIS

24  COMMUNITY MAKERSPACE.

25      THIRD, THERE IS NO EVIDENCE OF ACTUAL CONFUSION.  TECHSHOP

1    SHOWED YOU SEVERAL EMAILS TO TRY TO SHOW CONFUSION, BUT THE

2    VAST MAJORITY OF THE CUSTOMER EMAILS THAT WERE SHOWN DO NOT

3    ACTUALLY SHOW ACTUAL CONFUSION.

4                    (DISPLAYED ON SCREEN.)

5        FOR EXAMPLE, IN THIS EMAIL, TX112, THE CUSTOMER REFERS TO

6    THE PREVIOUS OWNER.  THIS SHOWS THAT THE CUSTOMER UNDERSTOOD

7    THAT THERE WAS A DISTINCTION BETWEEN TECHSHOP AND MR. RASURE'S

8    COMPANIES.

9                    (DISPLAYED ON SCREEN.)

10       IN THIS NEXT EMAIL, THE CUSTOMER PROVIDES IDEAS FOR

11   DIFFERENT NAMES OF THESHOP.BUILD.  THE CUSTOMER'S USE OF THE

12   NAMES TECHSHOP AND THEN SEPARATELY THESHOP SHOWS THAT EVEN IF

13   THE CUSTOMER WAS SUGGESTING A DIFFERENT NAME, THE CUSTOMER

14   UNDERSTOOD THAT THEY WERE TWO DIFFERENT COMPANIES.

15                   (DISPLAYED ON SCREEN.)

16       IN THIS NEXT EMAIL, THE CUSTOMER ASKS FOR CONTACT

17   INFORMATION FOR THE FOLKS AT THE ORIGINAL TECHSHOP.  THIS

18   SHOWS THAT THE CUSTOMER UNDERSTANDS THAT THE PERSON TO WHOM HE

19   SENT THE EMAIL IS NOT TECHSHOP.  HE ALSO REFERS TO THE

20   NEGOTIATIONS BETWEEN YOU AND THEM; AGAIN, SHOWING THAT HE

21   UNDERSTANDS THEY ARE DIFFERENT COMPANIES.

22                   (DISPLAYED ON SCREEN.)

23       IN THIS EMAIL, THE CUSTOMER BEGINS, I UNDERSTAND THAT

24   TECHSHOP 2.0 IS NOT AFFILIATED WITH TECHSHOP 1.0.

25                   (DISPLAYED ON SCREEN.)

1    IN THE NEXT EMAIL, THE CUSTOMER IS ASKING ABOUT CLASS

2    PASSES SHE PURCHASED FROM TECHSHOP.  SHE ASKS IF TECHSHOP 2.0

3    WILL HONOR THE TECHSHOP CLASS PASSES.  THE USE OF THE NAMES

4    TECHSHOP 2.0 AND TECHSHOP SHOWS SHE UNDERSTANDS THAT THEY ARE

5    DIFFERENT.

6              (DISPLAYED ON SCREEN.)

7    SIMILARLY, IN THIS NEXT EMAIL, THIS CUSTOMER IS ASKING

8    THESHOP.BUILD HOW TO PROVE THAT HE TOOK CLASSES AT TECHSHOP.

9    THIS, AGAIN, SHOWS THAT THE CUSTOMER UNDERSTOOD THAT THEY WERE

10   NOT THE SAME BECAUSE HE WAS TRYING TO FIGURE OUT HOW TO PROVE

11   THAT HE HAD ALREADY TAKEN THESE CLASSES.

12             (DISPLAYED ON SCREEN.)

13   THEN YOU SEE IN TX98, THE CUSTOMER STARTS OUT, I

14   UNDERSTAND THAT TECHSHOP IS UNDER NEW MANAGEMENT AND ALL.

15   THE CUSTOMER UNDERSTANDS THAT MR. RASURE'S COMPANY IS

16   DIFFERENT.

17   THERE IS ALSO NO EVIDENCE OF INTENT TO CONFUSE BY

18   DEFENDANTS.  YOU SAW THAT PRESS RELEASE THAT DEFENDANTS SENT

19   OUT ANNOUNCING THE MEMORANDUM OF UNDERSTANDING ON

20   DECEMBER 3RD.  IN THAT RELEASE, DEFENDANTS IDENTIFIED

21   THEMSELVES AS A NEW COMPANY.  DEFENDANTS REFERRED TO TECHSHOP

22   AS THE PREVIOUS COMPANY.  DEFENDANTS MADE IT CLEAR THAT THEY

23   WERE TWO DIFFERENT COMPANIES.

24   YOU ALSO SAW AN INTERVIEW THAT MR. RASURE GAVE TO

25   ADAFRUIT.  PRACTICALLY THE FIRST THING HE SAYS IN RESPONSE TO

1    THESE QUESTIONS IS THAT TECHSHOP 2.0 IS THE NEW ENTITY, FORMED

2    TO ACQUIRE THE ASSETS OF TECHSHOP.  HE CALLS IT THE NEW

3    ENTITY.  IT'S NOT THE SAME ENTITY.

4        AND YOU'VE SEEN FROM THE MOUNTAINS OF CONTEMPORANEOUS

5    DOCUMENTARY EVIDENCE THE DEFENDANTS ONLY USED THE NAME

6    TECHSHOP 2.0 DURING THE PERIOD WHEN TECHSHOP CONSENTED TO THAT

7    USE.

8        MR. RASURE TOLD YOU THAT HE HAD A RIGHT -- HE THOUGHT HE

9    HAD A RIGHT TO USE THE NAME BASED ON HIS HISTORY OF DEALINGS

10   WITH TECHSHOP, TECHSHOP'S OWN ANNOUNCEMENTS TO THE PUBLIC

11   CALLING HIS COMPANY TECHSHOP 2.0.  AND TECHSHOP NEVER OBJECTED

12   TO HIS USE OF THE NAME.  HE DIDN'T KNOW HE HAD A PROBLEM UNTIL

13   TECHSHOP SUED.  AND THEN ONCE TECHSHOP OBJECTED, HE CHANGED

14   THE NAME.

15       YOU ALSO HEARD THAT SINCE NOVEMBER 15TH OF 2017 TECHSHOP

16   HAS NOT OFFERED ANY GOODS OR SERVICES TO CUSTOMERS.

17   THEREFORE, TECHSHOP AND MR. RASURE'S COMPANY WERE NOT OFFERING

18   SIMILAR GOODS AND SERVICES AND WERE NOT USING THE SAME

19   MARKETING CHANNELS.

20       FINALLY, YOU HEARD THAT THE MAKER COMMUNITY IS VERY WELL

21   CONNECTED.  PLAINTIFF'S WITNESSES TESTIFIED THAT MAKERSPACES

22   BUILD COMMUNITY.  THEY ARE LOOKING FOR WAYS TO CONNECT MAKERS.

23   AND MR. RASURE TESTIFIED ABOUT THE VARIOUS FACEBOOK GROUPS

24   WHERE COMMUNITY MEMBERS STAY CONNECTED, AND TOWN HALL MEETINGS

25   THAT HE HAD ATTENDED THAT WERE ATTENDED BY, I THINK HE SAID,

1    75 TO 80 PEOPLE AT ONE PARTICULAR ONE.

2        THE NEGOTIATIONS BETWEEN TECHSHOP AND TECHSHOP 2.0 WERE

3    PUBLISHED -- PUBLICIZED BY TECHSHOP, AND IN THIS COMMUNITY

4    THAT IS WELL CONNECTED AND IS FOLLOWING WHAT'S GOING ON, IT IS

5    NOT LIKELY TO BE CONFUSED.

6        AS A RESULT, TECHSHOP FAILED TO PROVE LIKELIHOOD OF

7    CONFUSION AS TO USE OF TECHSHOP 2.0.

8        WHEN YOU GET YOUR VERDICT SHEET, WHICH COUNSEL SHOWED YOU,

9    AND YOU ARE ASKED THE QUESTION, DO YOU FIND BY A PREPONDERANCE

10   OF THE EVIDENCE THAT DEFENDANTS USED THE NAME TECHSHOP 2.0

11   WITHOUT PLAINTIFF'S CONSENT, ANY MANNER THAT IS LIKELY TO

12   CAUSE CONFUSION AMONG ORDINARY CONSUMERS AS TO THE SOURCE,

13   SPONSORSHIP, AFFILIATION, OR APPROVAL OF THE SERVICES?  YOU

14   SHOULD MARK NO.

15       ALL RIGHT.  MOVING ON TO THE NEXT CLAIM REGARDING

16   THESHOP.BUILD.

17       AGAIN, IT'S PLAINTIFF'S BURDEN TO PROVE EACH OF THE

18   ELEMENTS OF ITS TRADEMARK INFRINGEMENT CLAIM REGARDING

19   THESHOP.BUILD.  TECHSHOP FAILED TO MEET ITS BURDEN BECAUSE IT

20   DID NOT PROVE USE OF THESHOP.BUILD WITHOUT CONSENT OR

21   LIKELIHOOD OF CONFUSION.

22       AGAIN, LET'S LOOK AT CONSENT FIRST.

23                   (DISPLAYED ON SCREEN.)

24       YOU SAW THIS SLIDE IN OPENING.  YOU HEARD FROM MR. RASURE

25   THAT HE CHANGED THE NAME OF HIS COMPANY TO THESHOP.BUILD ON

1    FEBRUARY 16 AFTER GETTING NOTICE OF THIS LAWSUIT.  YOU SAW AN

2    EMAIL INDICATING THAT MR. WOODS, CEO OF TECHSHOP, HAD NOTICE

3    OF THE NAME CHANGE AS OF AT LEAST FEBRUARY 17TH OF 2018.

4         BUT MR. RASURE TOLD YOU THAT TECHSHOP DID NOT OBJECT TO

5    THE NAMED THESHOP.BUILD UNTIL LATE NOVEMBER OF 2018.  BY THAT

6    TIME, DEFENDANTS HAD ALREADY BEEN OPERATING THE SAN FRANCISCO

7    LOCATION FOR NINE MONTHS AND HAD OPENED A SECOND LOCATION IN

8    SAN JOSE IN AUGUST, ALL WITH NO OBJECTION FROM TECHSHOP.

9         NOW, TECHSHOP POINTED YOU TO THE COMPLAINT WHICH REFERS TO

10   CONFUSINGLY SIMILAR VARIATIONS.  AND YOU ARE GOING TO HAVE AN

11   OPPORTUNITY TO LOOK AT THE COMPLAINT.  IT HAS BEEN ADMITTED

12   INTO EVIDENCE AT LEAST TWO DIFFERENT TIMES.

13        GO AHEAD, READ THE COMPLAINT.  NOWHERE IN THE DOCUMENT DO

14   THE WORDS "THESHOP.BUILD" APPEAR, AND MR. NEWTON CONFIRMED

15   THAT WHEN HE WAS ON THE STAND.

16        NOW, IN TERMS OF USE OF THESHOP.BUILD, YOU HEARD FROM

17   MR. RASURE THAT DEFENDANTS STOPPED USING THE LOGO WITH A GEAR

18   FOR THESHOP.BUILD ON FEBRUARY 21ST, 2018.  DEFENDANTS ONLY

19   USED THAT LOGO FROM FEBRUARY 19TH THROUGH FEBRUARY 21ST OF

20   2018, FOR THREE DAYS.  THERE IS NO EVIDENCE THE DEFENDANTS

21   USED ANY LOGO WITH A GEAR AFTER FEBRUARY 21ST OF 2018.  AND

22   MR. RASURE TESTIFIED THAT DEFENDANTS HAVE NOT USED ANY LOGO

23   WITH A GEAR SINCE FEBRUARY 21ST OF 2018.

24        AGAIN, A SECOND REASON WHY TECHSHOP FAILED TO SATISFY ITS

25   BURDEN FOR PROVING INFRINGEMENT AS TO THESHOP.BUILD IS THAT IT

1    FAILED TO SHOW LIKELIHOOD OF CONFUSION.  AGAIN, THE COURT WILL

2    INSTRUCT YOU ON ALL THE FACTORS TO CONSIDER.

3        AS I ALREADY TOLD YOU, THE SHOP -- "TECH" AND "SHOP" ARE

4    COMMON TERMS -- ARE AMONG THE MOST COMMON TERMS USED IN

5    MAKERSPACE NAMES.  AGAIN, THE MARKS AT ISSUE ARE THE WORD

6    "TECHSHOP" NOT THE LOGO.  THE REGISTRATIONS ONLY COVER THE

7    WORD.

8        SO WHEN YOU THINK ABOUT WHETHER THE MARKS ARE SIMILAR,

9    THINK ABOUT THE WAY THEY LOOK.  ON THE TOP, YOU CAN SEE THE

10   WORD, THAT'S WHAT IS ACTUALLY COVERED BY THE REGISTRATIONS.

11   IN THE MIDDLE, WE PUT TECHSHOP'S LOGO THAT THEY USE.  THEN

12   BENEATH THAT IS THE LOGO FOR THESHOP.BUILD, WHICH MR. RASURE

13   TOLD YOU HAS BEEN IN USE SINCE MARCH OF 2018.

14       COMPARING THESE YOU CAN SEE THAT THEY ARE VERY DIFFERENT.

15   WHAT THEY HAVE IN COMMON IS THE WORD "SHOP".  TECHSHOP DOES

16   NOT OWN AND CONTROL THE RIGHT TO USE THE WORD "SHOP".  ITS

17   TRADEMARK REGISTRATIONS DO NOT GIVE IT THAT RIGHT.  BOTH

18   COMPANIES USE THE WORD "SHOP" IN ITS ORDINARY MEANING.

19       THESHOP.BUILD IS A WORKSHOP.  IT IS COMMON TO REFER TO A

20   WORKSHOP AS A SHOP.  THINK ABOUT SHOP CLASS WHICH USED TO BE

21   OFFERED AT HIGH SCHOOLS.  MAYBE SOME STILL DO.

22       DEFENDANTS ARE ENTITLED TO USE THE WORD "SHOP" IN THE NAME

23   OF THE BUSINESS THAT IS LITERARY A SHOP.  THE WORDS ALSO SOUND

24   DIFFERENT.  TECHSHOP, THESHOP.BUILD; THEY HAVE VERY, VERY

25   DIFFERENT SOUNDS.

1     YOU ALSO SAW NO EVIDENCE OF ACTUAL CONFUSION.  PLAINTIFF

2  DID NOT PRESENT ANY EVIDENCE SHOWING CONSUMERS ARE CONFUSED

3  BETWEEN TECHSHOP AND THESHOP.BUILD.

4     YOU SAW NO EVIDENCE OF INTENT TO CONFUSE.  THE EVIDENCE

5  SHOWS THAT WHEN DEFENDANTS MADE ANNOUNCEMENTS TO THEIR

6  MEMBERS, THEY CLEARLY DISTINGUISHED THESHOP.BUILD FROM

7  TECHSHOP.  THIS IS ONE OF THOSE EMAILS TO MEMBERS.

8                    (DISPLAYED ON SCREEN.)

9     IT CLEARLY DIFFERENTIATES BETWEEN THESHOP AND TECHSHOP.

10 ALSO, AS YOU KNOW, DEFENDANTS PROMPTLY CHANGED THEIR NAME TO

11 THESHOP.BUILD IN RESPONSE TO THIS LAWSUIT.  THAT SHOWS THEIR

12 INTENT NOT TO CONFUSE.  AS SOON AS DEFENDANTS KNEW THERE WAS A

13 PROBLEM, THEY CHANGED THE NAME.

14     AGAIN, TECHSHOP IS NOT OFFERING ANY PRODUCTS OR SERVICES,

15 SO THE TWO COMPANIES ARE NOT OFFERING SIMILAR PRODUCTS AND

16 SERVICES AND ARE NOT USING THE SAME MARKETING CHANNELS.

17     AS I PREVIOUSLY SAID, THE EVIDENCE HAS SHOWN THAT THIS IS

18 A SOPHISTICATED, WELL-CONNECTED INDUSTRY, AND SO THE CONSUMERS

19 HAVE A HIGH DEGREE OF CUSTOMER CARE AND ARE NOT LIKELY TO BE

20 CONFUSED BETWEEN TECHSHOP AND THESHOP.BUILD.

21     WHEN YOU GET YOUR VERDICT FORM, YOU ARE GOING TO BE ASKED:

22 DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANTS

23 USED THE NAME THESHOP.BUILD WITHOUT PLAINTIFF'S CONSENT IN A

24 MANNER THAT IS LIKELY TO CAUSE CONFUSION AMONG ORDINARY

25 CONSUMERS AS TO THE SOURCE, SPONSORSHIP, AFFILIATION, OR

1    APPROVAL OF THE SERVICES?  YOU SHOULD MARK NO.

2        NOW YOU HEARD THE DEFENDANTS HAVE A DEFENSE OF

3    ABANDONMENT.  AND, AGAIN, THE COURT IS GOING TO INSTRUCT YOU

4    ON THE LAW FOR THAT DEFENSE.

5        THE EVIDENCE SHOWED THAT TECHSHOP DISCONTINUED USE OF ITS

6    MARKS WHEN IT ABRUPTLY CLOSED ITS DOORS ON NOVEMBER 15TH OF

7    2017.  SINCE THAT DATE, TECHSHOP HAS NOT USED THE MARKS TO

8    SELL GOODS OR SERVICES.  AND THEN TECHSHOP FILED FOR

9    BANKRUPTCY ON FEBRUARY 26TH OF 2018 SHOWING AN INTENT NOT TO

10   RESUME USE OF THE MARKS IN AN ONGOING BUSINESS.

11       YOU ALSO SAW THAT THIRD PARTIES HAVE USED THE WORD

12   "TECHSHOP".  HERE YOU HAVE THE ODYSSEY EXPO WEB PAGE THAT

13   DR. MATOLO WAS QUESTIONED ABOUT.  YOU WILL SEE WHEN YOU TAKE A

14   LOOK AT THIS EXHIBIT, THERE IS REPEATED USE OF THE NAME

15   TECHSHOP IN CONNECTION WITH THIS EXPO.

16       SO WHEN YOU GET YOUR VERDICT FORM AND YOU TURN TO THE

17   QUESTION ABOUT ABANDONMENT, YOU SHOULD MARK THAT TECHSHOP DID

18   ABANDON THE MARKS.

19       NOW BEFORE I MOVE ON TO DAMAGES, I WOULD LIKE TO TALK

20   ABOUT A FEW THINGS THAT YOU'VE HEARD ABOUT AND MAYBE WONDERING

21   HOW THEY ARE RELEVANT TO THE CASE.

22       AND THE FIRST IS, YOU HEARD A LOT ABOUT CUSTOMER LISTS.

23   YOU HEARD THAT MR. RASURE ASKED FOR TECHSHOP'S CUSTOMER LIST.

24   AND YOU MAY BE WONDERING, WELL, HOW DOES THAT FIT IN?

25       THE ANSWER IS IT DOESN'T.  YOU WILL GET TO READ THE

1    COMPLAINT, WHICH IS AN EXHIBIT IN THIS CASE, AND YOU WILL SEE

2    FOR YOURSELF THAT THERE IS NOTHING IN THAT COMPLAINT ABOUT

3    CUSTOMER LISTS.  MR. NEWTON TESTIFIED THAT THERE IS NOTHING IN

4    THE COMPLAINT ABOUT CUSTOMER LISTS.

5        AND WHETHER OR NOT MR. RASURE ASKED FOR OR WANTED THE

6    CUSTOMER LIST, HAS NO BEARING AT ALL ON WHETHER TECHSHOP MET

7    ITS BURDEN OF PROVING ALL OF THE ELEMENTS TO SHOW TRADEMARK

8    INFRINGEMENT.

9        BUT IN ANY EVENT, THE EVIDENCE SHOWS THAT IN EARLY

10   DECEMBER THE PARTIES NEEDED TO SEND OUT AN EMAIL TO MEMBERS

11   ANNOUNCING THE MEMORANDUM OF UNDERSTANDING.  YOU SAW THIS

12   EMAIL FROM MR. NEWTON ON NOVEMBER 30TH ASKING ABOUT THE MEMBER

13   MESSAGE.

14                    (DISPLAYED ON SCREEN.)

15       HE SAID TO HIS TEAM IN THIS EMAIL, I ALSO NEED TO REMIND

16   EVERYONE, ONCE AGAIN, THAT WE HAVE NO EMPLOYEES TO DO THIS

17   EMAIL BLAST TO MEMBERS, SO WE NEED TO GET LOUISE OR TERESA

18   PAID ASAP SO THEY CAN DO IT.  I DO NOT PERSONALLY KNOW HOW TO

19   SEND IT, SO I CANNOT HELP.

20       THEN YOU SAW THAT JUST A COUPLE OF HOURS LATER ON THAT

21   VERY SAME DAY, MR. RASURE TEXTED RYAN SPURLOCK AND ASKED HIM,

22   DO YOU KNOW HOW TO RUN THE CRM?  MR. SPURLOCK ASKED WHAT

23   MR. RASURE NEEDED.  MR. RASURE RESPOND, AN EMAIL SENT OUT.

24   CORPORATE IS TRYING TO FORCE ME TO HIRE THEIR MARKETING

25   PERSON.

1       MR. RASURE TESTIFIED THAT IN EARLY DECEMBER 2017, HE WAS

2    ASKING PEOPLE ABOUT THE CUSTOMER LIST AND HOW TO RUN THE CRM

3    BECAUSE TECHSHOP CORPORATE DIDN'T KNOW HOW TO SEND OUT THE

4    MEMBER EMAIL AS MR. NEWTON ADMITTED IN THE EMAIL WE JUST SAW.

5       IT'S ALSO WORTH REMINDING YOU THAT EARLY ON MR. SPURLOCK

6    WAS WORKING WITH MR. RASURE TO HELP HIM GET THE SHOPS OPEN.

7    MR. RASURE, AS YOU SAW EARLIER IN MY CLOSING, SUGGESTED THE

8    NAME TECHSHOP 2.0 TO MR. SPURLOCK, AND MR. SPURLOCK DID NOT

9    EXPRESS ANY CONCERNS WITH THE NAME.

10      HE ALSO PREVIOUSLY TOLD MR. RASURE THAT HE REFUSED TO

11   TESTIFY AGAINST HIM FOR THE TRUSTEE.  YET, AFTER HE OPENED HIS

12   OWN MAKERSPACE, HE APPARENTLY CHANGED HIS MIND AND CAME AND

13   TESTIFIED TODAY -- OR THIS WEEK.

14      YOU ALSO HEARD SOME REFERENCE TO PASSWORDS.  THERE WAS AN

15   EMAIL THAT HAD PASSWORDS BLACKED OUT.  THERE IS NO EVIDENCE

16   THAT ANY OF THOSE PASSWORDS HAVE ANYTHING TO DO WITH THE

17   CUSTOMER LIST.  THE INDIVIDUALS THAT SENT THAT EMAIL WERE NOT

18   CALLED TO TESTIFY.  MR. RASURE WAS NOT ASKED.  THERE IS NO

19   EVIDENCE THAT THOSE PASSWORDS HAVE ANYTHING TO DO WITH

20   CUSTOMER LISTS.

21      NOW SOMETHING ELSE YOU HEARD A LOT ABOUT WAS WHETHER

22   MR. RASURE HAD THE MEANS AND THE TEAM TO BE ABLE TO ACQUIRE

23   ALL OF TECHSHOP'S ASSETS.  YOU HEARD THAT EVEN THOUGH THE

24   MEMORANDUM WAS -- MEMORANDUM OF UNDERSTANDING WAS SUPPOSED TO

25   LAST UNTIL DECEMBER 21ST, TECHSHOP PREMATURELY CANCELED IT ON

1    DECEMBER 12TH.  AND MR. BUSCH TOLD YOU THAT HE HAD BEEN TRYING

2    TO VERIFY MR. RASURE'S PARTNERS AND BECAME SKEPTICAL THAT

3    MR. RASURE COULD NOT DO THE DEAL.

4        NONE OF THAT MATTERS.  WHY?  BECAUSE TECHSHOP KEPT ON

5    NEGOTIATING WITH MR. RASURE, KEPT ON ALLOWING HIM TO USE THE

6    NAME TECHSHOP 2.0, AND KEPT ON REFERRING TO MR. RASURE'S

7    COMPANY AS TECHSHOP 2.0, BOTH IN THE NEGOTIATIONS WITH

8    MR. RASURE AND IN COMMUNICATIONS WITH THIRD PARTIES.

9        YOU'VE SEEN ALL THOSE DOCUMENTS.  WHETHER OR NOT THE

10   PARTIES ULTIMATELY ENTERED INTO A FINAL ASSET PURCHASE

11   AGREEMENT DOES NOT MATTER TO THE QUESTION OF WHETHER

12   DEFENDANTS USED THE NAME TECHSHOP 2.0 WITHOUT TECHSHOP'S

13   CONSENT.  THEY DID NOT.

14       ANOTHER THING YOU HEARD ABOUT WAS THE LEASE THAT

15   MR. RASURE ENTERED INTO WITH HEARST.  HEARST, YOU WILL

16   REMEMBER, IS THE LANDLORD OF THE 926 HOWARD LOCATION IN SAN

17   FRANCISCO.

18       YOU HEARD MR. WOODS ADMIT THAT HE INTRODUCED MR. RASURE TO

19   ALL OF THE LANDLORDS TO THE VARIOUS TECHSHOP LOCATIONS, AND

20   THAT WAS BECAUSE MR. RASURE WOULD HAVE TO NEGOTIATE WITH THEM

21   DIRECTLY TO BE ABLE TO REOPEN ANY LOCATIONS.

22       THERE WAS NOTHING WRONG WITH MR. RASURE NEGOTIATING

23   DIRECTORY WITH THESE LANDLORDS THAT MR. WOODS HAD INTRODUCED

24   HIM TO.  BUT IT SEEMS LIKE WHAT TECHSHOP'S PROBLEM IS, YOU

25   HAVE THIS LANDLORD, HEARST, IN SAN FRANCISCO, WHO HAS AN EMPTY

1  SPACE, IT'S BEEN ABANDONED BY TECHSHOP, IT IS LOOKING FOR A

2  TENANT, AND THEN YOU HAVE MR. RASURE WHO WANTS TO OPEN A

3  MAKERSPACE AND IS LOOKING FOR A SPACE, THERE IS NOTHING

4  PRECLUDING HEARST AND MR. RASURE FROM ENTERING INTO A RENTAL

5  AGREEMENT FOR OPEN SPACE.

6      NOW LET'S TALK ABOUT DAMAGES.  TECHSHOP IS SEEKING DAMAGES

7  FOR DEFENDANTS' ALLEGED INFRINGEMENT.  AND YOU HEARD THE

8  TECHSHOP IS SEEKING DAMAGES IN THE FORM OF LOST LICENSING

9  REVENUE.

10      AS I SHOWED YOU EARLIER, EVEN IF YOU GIVE TECHSHOP THE

11  BENEFIT OF THE DOUBT AND TREAT THE FEBRUARY 14TH LETTER AS A

12  CEASE AND DESIST LETTER, THEN DEFENDANTS ONLY USED THE NAME

13  TECHSHOP 2.0 AFTER THE CONSENT PERIOD ENDED FOR TWO DAYS.  SO

14  TECHSHOP IS EFFECTIVELY ASKING FOR $750,000 PER DAY.

15      THIS IS A COMPANY THAT WAS IN SUCH DIRE FINANCIAL STRAITS

16  IT COULD NOT EVEN KEEP ITS DOORS OPEN LONG ENOUGH TO GIVE

17  MEMBERS NOTICE BEFORE THEY CLOSED SO THEY COULD COME IN AND

18  GET THEIR STUFF.

19      YOU SAW THE EMAILS WHERE MEMBERS WERE FRUSTRATED BECAUSE

20  THEY HAD TOOLS LOCKED UP AT TECHSHOP.  TECHSHOP DIDN'T EVEN

21  HAVE ENOUGH MONEY TO STAY OPEN FOR THEM.  BUT TECHSHOP

22  BELIEVES THEY ARE ENTITLED TO $750,000 PER DAY FOR USE OF THE

23  NAME TECHSHOP 2.0.

24      YOU ALSO HEARD THAT THE ABRUPT CLOSURE ITSELF SEVERELY

25  DAMAGED THE TECHSHOP BRAND.  AND THAT -- THAT DAMAGE HAS

1    NOTHING TO DO WITH MR. RASURE.  TECHSHOP CLOSED ITS DOORS

2    BEFORE THEY EVEN MET HIM.

3                    (DISPLAYED ON SCREEN.)

4        YOU SAW THAT IN MR. BUSCH'S OPEN LETTER TO STAKEHOLDERS,

5    HE WROTE, I FULLY UNDERSTAND THE FRUSTRATION MEMBERS HAVE

6    EXPERIENCED AS A RESULT OF BEING LOCKED OUT OF STORES, BEING

7    UNABLE TO COMPLETE PROJECTS, AND NOT HAVING ACCESS TO YOUR

8    MATERIALS AND TOOLS IN STORAGE.  HE ALSO SAID THAT THIS HAD

9    PRODUCED A BAD EXPERIENCE FOR OUR MEMBERS.

10                    (DISPLAYED ON SCREEN.)

11       YOU SAW EMAILS FROM FORMER TECHSHOP MEMBERS LIKE THIS ONE.

12   THIS MEMBER IS ASKING FOR CONTACT INFORMATION FOR TECHSHOP

13   SAYING HIS TOOLS HAVE BEEN LOCKED UP FOR TWO MONTHS AND

14   TECHSHOP WAS NOT RESPONDING TO HIS EMAILS ASKING FOR

15   INFORMATION.

16                    (DISPLAYED ON SCREEN.)

17       THIS IS ANOTHER EMAIL FROM A CUSTOMER SAYING THAT NO ONE

18   AT TECHSHOP WAS RESPONDING TO OUR INQUIRIES.

19       THE EVIDENCE SHOWED THAT FORMER TECHSHOP MEMBERS REPORTED

20   TO HAVING INVESTED IN TECHSHOP AND THAT AFTER THE CLOSURE,

21   THEIR INVESTMENTS WERE WORTH NOTHING NOW.

22                    (DISPLAYED ON SCREEN.)

23       AND HERE'S ANOTHER IN WHICH A CUSTOMER TELLS THESHOP.BUILD

24   THAT HE WAS BADLY BURNED BY THE TECHSHOP, GETTING ROUGHLY TEN

25   MONTHS FOR THE PRICE OF A LIFETIME SUBSCRIPTION.

```
1              (DISPLAYED ON SCREEN.)

2         THE FEBRUARY 15TH, 2018 ARTICLE IN THE SAN FRANCISCO

3    CHRONICLE ANNOUNCING THE OPENING OF TECHSHOP 2.0 HAD SIMILAR

4    REPORTS.  IT SAID, THE ABRUPT CLOSURE IN NOVEMBER OF TECHSHOP

5    WORKSHOPS ACROSS THE COUNTRY DISRUPTED THE LIVES OF SMALL

6    BUSINESS OWNERS AND DO-IT-YOURSELF HOBBYISTS.  TECHSHOP CLOSED

7    ITS DOORS QUOTE "WITH LITTLE PRIOR NOTICE".

8         AND THE CHRONICLE REPORTED ON AN ARTISAN RESIDENT WHO WAS

9    STUNNED WHEN THE SHOP CLOSED THE DAY BEFORE THE OPENING

10   RECEPTION FOR AN EXHIBIT OF HIS SCULPTORS.

11        MR. RASURE RECOGNIZED THAT THE TECHSHOP NAME WAS DAMAGED.

12   ON THIS MESSAGE ON JANUARY 3RD OF 2018, HE WROTE, RESTORING

13   THE BRAND VALUE WAS A TOP PRIORITY.  HE RECOGNIZED IT WAS

14   DAMAGED.

15        YOU ALSO HEARD THE TESTIMONY OF MR. BÜNGER, AN EXPERT IN

16   BRANDING AND THE MAKER MOVEMENT.  HE TESTIFIED THAT HE

17   CONDUCTED A SENTIMENT ANALYSIS OF THE TECHSHOP BRAND, AND HE

18   ANALYZED OVER 100 PAGES OF RAW TRADITIONAL AND SOCIAL MEDIA

19   POSTS ABOUT TECHSHOP.

20        HE TESTIFIED THAT THESE ARE MATERIALS THAT EXPERTS IN THE

21   FIELD RELY UPON WHEN DETERMINING THE VALUE OF THE BRAND.  HIS

22   OPINION IS THAT THE TECHSHOP BRAND IN THE UNITED STATES HAD

23   NEGATIVE EQUITY DURING THE PERIOD OF ALLEGED INFRINGEMENT,

24   WHICH IS FROM MID-NOVEMBER OF 2017 THROUGH MID-FEBRUARY OF

25   2018.
```

1      MR. BÜNGER ALSO PROVIDED HIS OPINION THAT THE FOREIGN

2   LICENSE AGREEMENTS THAT DR. MATOLO RELIED UPON IN DETERMINING

3   THE PURPORTED AMOUNT OF LOST LICENSING REVENUE ARE NOT

4   APPROPRIATE TO CONSIDER HERE.

5      AS MR. BÜNGER EXPLAINED, THE DATES OF THE LICENSE

6   AGREEMENTS ON WHICH DR. MATOLO RELIED ARE NOT DISPUTED.

7   DR. MATOLO EXPLAINED THAT THOSE AGREEMENTS ALL PREDATE THE

8   ABRUPT CLOSURE OF TECHSHOP IN THE UNITED STATES, AND THEY ARE

9   NOT APPROPRIATE TO CONSIDER IN DETERMINING THE AMOUNT OF LOST

10  LICENSING REVENUE.  THIS IS BECAUSE THE VALUE OF THE TECHSHOP

11  BRAND HAD CHANGED DRAMATICALLY OVER THAT PERIOD OF TIME.  THE

12  ABRUPT CLOSURE AND ANNOUNCEMENT THAT IT WAS SEEKING BANKRUPTCY

13  DRAMATICALLY CHANGED THE VALUE OF THE TECHSHOP BRAND.

14     MR. BÜNGER ALSO EXPLAINED THAT THOSE LICENSE AGREEMENTS

15  ARE NOT APPROPRIATE TO CONSIDER HERE BECAUSE THEY ARE WITH

16  FOREIGN COMPANIES COVERING FOREIGN COUNTRIES.  MR. BÜNGER

17  EXPLAINED THAT THE VALUE OF A BRAND CAN DIFFER FROM MARKET TO

18  MARKET.  AND, IN THIS CASE, THE VALUE OF THE TECHSHOP BRAND IN

19  THE UNITED STATES WAS NEGATIVE FOLLOWING THE NOVEMBER 2017

20  CLOSER.  SO COMPARISON TO LICENSE AGREEMENTS IN OTHER

21  COUNTRIES THAT ARE MUCH EARLIER IS NOT APPROPRIATE.

22     FOR THE SAME REASON, MR. RASURE'S OFFER TO ADEO IS NOT AN

23  APPROPRIATE INDICATOR ON THE AMOUNT OF LOST LICENSING REVENUE

24  FOR AN U.S. LICENSE.  AS MR. RASURE'S EMAIL SETS OUT, HIS

25  OFFER COVERED 11 COUNTRIES AND THE ENTIRE CONTINENT OF AFRICA.

CLOSING ARGUMENT - ROBERTS

1   IT DOES NOT REFLECT THE VALUE OF THE TECHSHOP BRAND IN THE

2   UNITED STATES.

3       YOU ALSO HEARD DR. MATOLO ADMIT THAT THE LICENSE MATERIALS

4   IN EACH OF THE AGREEMENTS HE RELIED UPON ARE NOT LIMITED TO

5   THE MARKS AT ISSUE.  THEY COVER SEVERAL OTHER PROPERTIES,

6   INCLUDING TRAINING AND COURSE MATERIALS, STORE DESIGN AND

7   LAYOUT, PROPRIETARY CRM SOFTWARE, AND OTHER THINGS.

8       DR. MATOLO DID NOT SPEAK TO ANY OF THE LICENSEES TO

9   DETERMINE HOW MUCH VALUE THEY PLACED ON THE TRADEMARKS AS

10  OPPOSED TO THESE OTHER LICENSE MATERIALS.  AND HE DIDN'T TALK

11  TO THE PEOPLE AT TECHSHOP WHO ACTUALLY SIGNED THOSE

12  AGREEMENTS.

13      WHEN YOU GET TO YOUR VERDICT FORM AND YOU ARE ASKED THE

14  AMOUNT OF LOST LICENSING REVENUE THAT TECHSHOP SUFFERED AS A

15  RESULT OF THE ALLEGED INFRINGEMENT, YOU SHOULD WRITE ZERO.

16  TECHSHOP DID NOT LOSE ANY LICENSING REVENUE BECAUSE OF THE

17  DAMAGE TO THE BRAND THAT WAS DONE WHEN TECHSHOP CLOSED ITS

18  DOORS ON NOVEMBER 15TH OF 2017.

19      NOW, TECHSHOP ALSO HAS A CLAIM THE DEFENDANTS' ALLEGED

20  INFRINGEMENT WAS WILLFUL.  AGAIN, THE COURT'S GOING TO GIVE

21  YOU INSTRUCTIONS ON THE REQUIREMENTS FOR PROVING WILLFULNESS.

22  IT IS TECHSHOP'S BURDEN TO PROVE WILLFUL INFRINGEMENT, AND

23  TECHSHOP DID NOT MEET THAT BURDEN.

24      AS YOU HEARD, MR. RASURE BELIEVED HE HAD THE RIGHT TO USE

25  THE NAME TECHSHOP 2.0.  THAT BELIEF WAS BASED ON USE OF THE

1    NAME THROUGHOUT THE NEGOTIATIONS WITH TECHSHOP.  TECHSHOP

2    NEVER OBJECTED.  AND NOT ONLY DID TECHSHOP NOT OBJECT,

3    TECHSHOP ITSELF USED THE NAME TECHSHOP 2.0 TO REFER TO

4    MR. RASURE'S COMPANIES, BOTH WHEN COMMUNICATING WITH HIM AND

5    WHEN COMMUNICATING WITH THIRD PARTIES AND IN PUBLIC

6    ANNOUNCEMENTS.

7        MR. RASURE HAD EVERY REASON TO BELIEVE THAT THERE WAS NO

8    PROBLEM WITH CALLING HIS COMPANY TECHSHOP 2.0 BASED ON

9    TECHSHOP'S OWN CONDUCT.

10       AND THEN AS SOON AS TECHSHOP OBJECTED, AS SOON AS

11   MR. RASURE LEARNED THERE WAS A PROBLEM WHEN THIS LAWSUIT WAS

12   FILED, HE CHANGED THE NAME OF HIS COMPANY.  TECHSHOP DID NOT

13   PROVE WILLFUL INFRINGEMENT HERE.  AND SO WHEN YOU GET YOUR

14   VERDICT FORM, YOU SHOULD ANSWER NO TO WILLFUL INFRINGEMENT.

15       TECHSHOP IS ALSO SEEKING DEFENDANTS' PROFITS.  AS THE

16   COURT WILL INSTRUCT YOU, PLAINTIFF IS ONLY ENTITLED TO PROFITS

17   IF IT PROVED WILLFUL INFRINGEMENT.  AS I JUST TOLD YOU, IT DID

18   NOT.  BUT IN ANY EVENT, I WILL ADDRESS THEM.

19                    (DISPLAYED ON SCREEN.)

20       THE COURT WILL INSTRUCT YOU THAT PROFITS ARE CALCULATED BY

21   DEDUCTING EXPENSES FROM REVENUE.  AS YOU HEARD, DEFENDANTS DO

22   NOT HAVE ANY PROFITS.  DR. MATOLO SIMPLY TABULATED DEFENDANTS'

23   REVENUES.  BUT WHEN YOU CONSIDER THE EXPENSES, THERE ARE NO

24   PROFITS.  DEFENDANTS HAVE NOT MADE A PENNY FROM THESHOP.BUILD.

25       YOU HEARD FROM DEFENDANTS' CHIEF FINANCIAL OFFICER,

1    JEREMIAH JOHNSON, WHO EXPLAINED HOW HE PREPARED DEFENDANTS'

2    FINANCIAL DOCUMENTS AND THE RESULTING NEGATIVE NET INCOME.  HE

3    TOLD YOU THE STEPS.  HE TOLD YOU WHAT HE LOOKED AT.  HE DIDN'T

4    JUST MAKE UP THESE NUMBERS AND JUST TAKE INFORMATION FROM

5    MR. RASURE.  HE TOLD YOU HE LOOKED AT THE CREDIT CARD

6    STATEMENTS AND THE BANK STATEMENTS.  HE'S A CPA AND EXPLAINED

7    THE DETAIL THAT HE PUT INTO CREATING THESE DOCUMENTS.

8        AND WHEN YOU LOOK AT THE REVENUES AND YOU LOOK AT THE

9    EXPENSES, YOU FIND, AS SHOWN ON THE SLIDE, THERE IS NO PROFITS

10   FOR THESHOP.BUILD.

11       NOW LET'S TURN TO MR. RASURE'S COUNTERCLAIM THAT TECHSHOP

12   COMMITTED FRAUD.

13                  (DISPLAYED ON SCREEN.)

14       AGAIN, THE COURT WILL GIVE YOU AN INSTRUCTION ON THE LAW.

15   MR. RASURE PROVED EACH OF THESE ELEMENTS OF THIS FRAUD CLAIM.

16       TECHSHOP MADE A PROMISE TO MR. RASURE.  THEY MADE THAT

17   PROMISE INITIALLY IN THE MEMORANDUM OF UNDERSTANDING.

18   TECHSHOP SAYS AT THE VERY BEGINNING, TECHSHOP, INC. IS WILLING

19   TO SELL ALL OF ITS ASSET TO A THIRD-PARTY BUYER TECHSHOP 2.0

20   LLC (TECHSHOP 2.0) ON THE FOLLOWING TERMS BY DECEMBER 21ST OF

21   2017, AND THEN INDICATES THE DETAILS WILL BE FINALIZED IN

22   DEFINITIVE DOCUMENTATION.

23       THAT PROMISE IN THE MEMORANDUM OF UNDERSTANDING INCLUDED

24   THAT TECHSHOP 2.0 WOULD ACQUIRE ALL ASSETS OF TECHSHOP, FOR

25   LIST OF CONSIDERATION.  AND THE LIST OF CONSIDERATION INCLUDED

1    IMMEDIATELY PROVIDING FUNDS FOR NOVEMBER HEALTH INSURANCE,

2    GOOGLE SUITE, AND TECHSHOP'S LEGAL COUNSEL.

3        YOU SAW THAT TECHSHOP MADE REPEATED REPRESENTATIONS TO

4    MR. RASURE THAT IT WAS TRYING TO REACH A DEAL WHEN IN THE SAME

5    CORRESPONDENCE IT WAS ASKING MR. RASURE TO PAY ITS EXPENSES.

6        HERE, MR. WOOD IS TELLING MR. RASURE THAT THEY ARE TRYING

7    TO QUOTE "REACH YES TONIGHT".  AND IN THE SAME EMAIL,

8    MR. WOODS GOES ON TO ASK MR. RASURE TO PAY FOR TECHSHOP'S

9    ATTORNEYS.

10                      (DISPLAYED ON SCREEN.)

11       HERE IS ANOTHER EMAIL IN WHICH MR. WOODS TELLS MR. RASURE

12   WE ARE GETTING QUITE CLOSE.  IN THIS EMAIL, MR. WOODS ASKED

13   MR. RASURE FOR $50,000 BY MONDAY JUST TO COVER IMMEDIATE AND

14   VERY PRESSING OBLIGATIONS.

15       AFTER EXECUTION OF THE MEMORANDUM OF UNDERSTANDING,

16   TECHSHOP PROCEEDED AS THOUGH THEY WOULD GO THROUGH WITH THE

17   DEAL.  HERE ON DECEMBER 3RD, MR. WOODS SHARED TRANSITION PLANS

18   WITH MR. RASURE AS THOUGH A DEAL WOULD GO THROUGH.  TECHSHOP

19   THEN TERMINATED THE MEMORANDUM OF UNDERSTANDING NINE DAYS

20   EARLY.

21       REMEMBER, THE PARTIES WERE SUPPOSED TO HAVE UNTIL

22   DECEMBER 21ST TO FINALIZE ALL THE DETAILS BUT TECHSHOP

23   TERMINATED ON DECEMBER 12TH.

24                      (DISPLAYED ON SCREEN.)

25       TECHSHOP CONTINUED TO STRING MR. RASURE ALONG NEGOTIATING

1    WITH HIM THROUGHOUT JANUARY OF 2018.  EVEN ON FEBRUARY 7TH,

2    WHEN TECHSHOP'S -- WHICH TECHSHOP SAYS IS THE END OF THE

3    NEGOTIATIONS, MR. WOODS STILL TELLS HIM, THAT IS NOT TO SAY WE

4    WOULD NOT BE SUPPORTIVE OF A DEAL BETWEEN YOU AND THE SECURED

5    CREDITORS OR SOME OTHER ALTERNATIVE ARRANGEMENT OTHER THAN AN

6    ASSET RENTAL.

7        MR. RASURE TESTIFIED THAT AFTER GETTING THIS EMAIL, HE

8    STILL BELIEVED THERE WAS A CHANCE FOR A DEAL AND CONTINUED

9    NEGOTIATING RIGHT UP TO THE DAY THE SUIT WAS FILED.

10        TECHSHOP THEN ATTEMPTED TO CONCEAL FROM MR. RASURE ITS

11    COMMUNICATION WITH MR. COUGHLIN FROM FORD INDICATING THAT THEY

12    WOULD BE FILING A BANKRUPTCY.

13        REMEMBER, THIS IS AN EMAIL WHERE MR. WOODS INTENDED TO

14    REMOVE MR. RASURE FROM THE DISTRIBUTION LIST BUT FORGOT TO

15    TAKE HIM OFF THE CC LINE.

16        NOW MR. RASURE TESTIFIED THAT HE PAID THE EXPENSES LISTED

17    HERE ON BEHALF OF TECHSHOP FOR A TOTAL OF $31,855.97.  HE PAID

18    FOR TECHSHOP'S COUNSEL, ITS OVERDUE MEDICAL INSURANCE, ITS

19    MARKETING DIRECTOR, AND ITS G SUITE ACCOUNTS.  HE DIDN'T EVEN

20    AUTHORIZE THE LAST OF THE THREE GOOGLE PAYMENTS.

21        THERE IS NO DISPUTE THAT MR. RASURE PAID THESE EXPENSES.

22    TECHSHOP'S WITNESSES DID NOT DISPUTE THIS.  AND THERE IS NO

23    DISPUTE MR. RASURE WAS NEVER PAID BACK FOR THESE EXPENSES THAT

24    HE PAID FOR TECHSHOP.

25        MR. RASURE TESTIFIED THAT HE PAID TECHSHOP'S EXPENSES

1    BECAUSE HE RELIED ON TECHSHOP'S PROMISE THAT THEY WOULD DO A

2    DEAL.  HE SAID HE HAD FAITH IN THE BOARD.  THESE EXPENSES WERE

3    SUPPOSED TO BE PART OF THE CONSIDERATION THAT HE HAD PAID TO

4    ACQUIRE TECHSHOP.  SO HE ENDED UP PAYING A PORTION OF WHAT HE

5    WOULD PAY IF THE DEAL WENT THROUGH BUT DIDN'T GET ANYTHING IN

6    RETURN.

7        TECHSHOP INTENDED FOR MR. RASURE TO RELY ON THESE PROMISES

8    BECAUSE IT NEEDED ITS EXPENSES PAID.  YOU SAW THE EMAILS.  THE

9    MEDICAL INSURANCE WAS OVER DUE.  THEY WERE GOING TO SHUT DOWN

10   THEIR EMAILS.  IN FACT, THEIR EMAILS WERE SHUT DOWN BECAUSE HE

11   DIDN'T PAY THE FULL AMOUNT RIGHT AWAY.  THEY TOLD HIM ALL OF

12   THESE PAYMENTS NEEDED TO BE PAID IMMEDIATELY TO KEEP THE

13   BUSINESS OPEN FOR THE DEAL TO GO THROUGH.

14       SO HE PAID THEM ON RELIANCE -- ON THOSE CLAIMS BY TECHSHOP

15   THAT THEY NEEDED TO GO THROUGH AS PART OF THE STEPS TO GET THE

16   DEAL TO GO THROUGH.

17       MR. RASURE WAS HARMED BY TECHSHOP'S FALSE PROMISE BECAUSE

18   HE LOST THESE OUT-OF-POCKET EXPENSES THAT HE PAID FOR

19   TECHSHOP.  THESE ARE TECHSHOP'S EXPENSES THAT HE PAID.

20       SO, WHEN YOU GET YOUR VERDICT FORM, AND YOU TURN TO THE

21   QUESTION ASKING WHETHER PLAINTIFF MADE A FALSE PROMISE TO

22   MR. RASURE, YOU SHOULD MARK YES.

23       NOW, YOU SPENT OVER A WEEK HERE AND YOU'VE LISTENED

24   INTENTLY TO THE WITNESS TESTIMONY, YOU'VE SEEN COUNTLESS

25   DOCUMENTS, YOU'VE HEARD ME TALK FOR A LONG TIME, WHAT I WANT

1    YOU TO REMEMBER WHEN YOU GO BACK TO THE JURY ROOM IS THAT

2    FIRST TIME LINE I SHOWED YOU.

3        IT SHOWED THAT TECHSHOP CONSENTED TO THE NAME -- TO

4    DEFENDANTS USING THE NAME TECHSHOP 2.0 FOR TWO AND A HALF

5    MONTHS, AND THEN AS SOON AS TECHSHOP OBJECTED, DEFENDANTS

6    CHANGED THEIR NAME TO THESHOP.BUILD AND PLAINTIFF DID NOT

7    OBJECT AGAIN.  NOT UNTIL NOVEMBER OF 2018.  TECHSHOP

8    CONSENTED, AND AS SOON AS THEY COMPLAINED, MR. RASURE CHANGED

9    THE NAME OF HIS COMPANIES.

10       THANK YOU.

11           **THE COURT:**  LADIES AND GENTLEMEN, IT'S 11:45.  SO

12   LET'S GO AHEAD AND TAKE OUR 15-MINUTE BREAK, AND WE WILL COME

13   BACK AND CONCLUDE THE ARGUMENTS, AND THEN I'LL GIVE YOU YOUR

14   INSTRUCTIONS.  JUST REMEMBER ALL OF YOUR DIRECTIONS CONTINUE

15   TO APPLY AT THIS STAGE.  WE WILL SEE YOU AT NOON.

16       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

17           **THE CLERK:**  YOU MAY BE SEATED.

18           **THE COURT:**  SEE YOU IN 15.

19       (RECESS TAKEN AT 11:45 A.M.; RESUMED AT 12:03 P.M.)

20           **THE CLERK:**  REMAIN SEATED COURT IS BACK IN SESSION.

21           **THE COURT:**  READY?

22         **MR. PISTORINO:**  YES.

23       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

24           **THE CLERK:**  YOU MAY BE SEATED.

25           **THE COURT:**  ALL RIGHT.

1          LADIES AND GENTLEMEN, AS I MENTIONED, THE PLAINTIFF HAS

2     THE OPPORTUNITY TO DELIVER A REBUTTAL ARGUMENT IN RESPONSE.

3          AND, MR. PISTORINO, YOU MAY PROCEED WHENEVER YOU ARE

4     READY.

5               **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

6                    **REBUTTAL CLOSING ARGUMENT**

7               **MR. PISTORINO:**  SO HOW DID MY PREDICTION DO ON FAST

8     TALKING?  PRETTY GOOD, HUH?

9          ALL RIGHT.  I THINK THERE'S AN OLD ADAGE, RIGHT, WHEN

10    YOU'RE -- IF YOU'RE EXPLAINING, YOU'RE LOSING, RIGHT?  I THINK

11    WE WROTE DOWN -- I THINK I SPOKE FOR ABOUT 36 MINUTES, WENT

12    THROUGH THE WHOLE THING.  BY OUR COUNT, YOU JUST HEARD ONE

13    HOUR AND TEN MINUTES AND MORE THAN 120 SLIDES, TRYING TO

14    EXPLAIN WHY MR. RASURE WAS USING THE TECHSHOP MARKS WITHOUT

15    TECHSHOP'S PERMISSION.

16         I THINK WHAT I MIGHT DO IS JUST GO BACKWARDS A LITTLE BIT.

17    I'M GOING TO USE SOME OF THE SLIDES YOU JUST SAW FROM THE

18    DEFENDANTS.

19         ONE, THEY SHOWED YOU SOME OF THESE SLIDES ABOUT WHAT THEY

20    SAY IS TECHSHOP'S PROMISE.  I THINK IF YOU GO BACK AND LOOK AT

21    THEM YOU'LL SEE -- I THINK, DOESN'T THAT PREDATE THE MOU,

22    RIGHT?

23         MY UNDERSTANDING WAS -- DECEMBER 1ST.  IT WAS

24    DECEMBER 1ST, RIGHT?  NOT LIKE THE WEEK OR SO BEFORE.  SO I

25    DON'T EVEN KNOW WHAT THIS WAS.  CERTAINLY NOT SOMETHING THAT

1    IS RELEVANT HERE AT THIS TIME.

2                    (DISPLAYED ON SCREEN.)

3        WHAT ABOUT THIS OTHER ONE THEY SHOWED YOU?  WHEN WAS THE

4    MEMORANDUM OF UNDERSTANDING?  IT WAS DECEMBER 1ST, NOT

5    NOVEMBER 20TH.  RIGHT?

6        YOU HEARD FROM MR. WOODS AND YOU'VE HEARD FROM, I THINK,

7    BASICALLY EVERY WITNESS, RIGHT, THAT TECHSHOP TOLD MR. RASURE

8    THAT IF HE EVEN WANTED TO HAVE A NEGOTIATION, TO HAVE A

9    DISCUSSION, HE WAS GOING TO HAVE TO PAY SOME MONEY TO ALLOW

10   EVEN THE DISCUSSION TO GO FORWARD.  RIGHT?

11       NOT THAT THERE WAS NECESSARILY GOING TO BE A DEAL, BUT

12   THAT IF HE WANTED TO TALK AT ALL RATHER THAN TECHSHOP JUST

13   IMMEDIATELY FILING FOR BANKRUPTCY PROTECTION, HE WAS GOING TO

14   PAY FOR SOME OF THE LEGAL FEELS, RIGHT?  PAY TO GET THE EMAIL

15   WORKING, RIGHT?  YOU HEARD ALL OF THAT.

16       SO THIS STUFF THAT TECHSHOP HAD A PROMISE THAT HE PAID

17   MONEY, YADA, YADA, YADA, HE HAD ALREADY AGREED TO THAT TO EVEN

18   HAVE THE DISCUSSIONS.

19       OKAY.  GOING THROUGH THEIR SLIDES REAL QUICK.

20                    (DISPLAYED ON SCREEN.)

21       I HAD ON THEIR SLIDES -- I LIKE THIS ONE.  THIS WAS THEIR

22   SLIDE 102 TALKING ABOUT HOW TECHSHOP'S CLOSURE FRUSTRATED THE

23   CUSTOMERS.  YOU KNOW WHAT I LIKE PARTICULARLY ABOUT THIS ONE?

24   I LIKE THE PART WHERE THEY CUT OFF THE HEADING FROM THE *SAN*

25   *FRANCISCO CHRONICLE* ARTICLE, RIGHT, WHERE THE TOP PART JUST

REBUTTAL CLOSING ARGUMENT - PISTORINO

1    ABOVE THERE SAYS, TECHSHOP 2.0 OPENS IN SAN FRANCISCO, RIGHT,

2    THE INFRINGING USE OF TECHSHOP'S TRADEMARK.  JUST CUT IT OFF

3    THERE A LITTLE BIT ABOVE.  KIND OF A LAWYER THING THERE.

4        NEXT, YOU HEARD ABOUT THEY HAVE TO PROVE BY CLEAR AND

5    CONVINCING EVIDENCE THAT TECHSHOP ABANDONED ITS MARKS.  RIGHT?

6                    (DISPLAYED ON SCREEN.)

7        AND THEY SHOWED YOU THIS ONE.  YOU MIGHT REMEMBER ME

8    TALKING ABOUT THIS ONE.  THIS IS ABOUT THAT CONVENTION OF THE

9    PEOPLE IN THE CORRUGATED PAPER INDUSTRY.  REMEMBER THAT?

10       THIS IS THEIR WHOLE PROOF THAT SOMEONE ELSE WAS GOING

11   SOMETHING WITH THE NAME TECHSHOP.  BUT YOU KNOW FROM THE

12   REGISTRATION CERTIFICATES THAT TECHSHOP'S REGISTRATIONS ARE

13   FOR THE ITEMS LISTED THERE, RIGHT?  DO-IT-YOURSELF CLASSES,

14   PROVIDING DO-IT-YOURSELFER FACILITIES, THAT KIND OF THING.

15       THE IDEA THAT THE CORRUGATED PAPER INDUSTRY HAS ANYTHING

16   TO DO WITH THIS CASE IS JUST CRAZY.  YOU KNOW, OF COURSE, THAT

17   THE SAME NAME CAN BE USED ACROSS MULTIPLE THINGS WITHOUT

18   CAUSING CONFUSION, RIGHT?  SOME OF YOU MIGHT HAVE HEARD OF

19   MCDONALD'S DRY CLEANERS, RIGHT?  NO ONE IS CONFUSED BETWEEN

20   MCDONALD'S DRY CLEANERS AND MCDONALD'S WHERE YOU GET THE

21   FRENCH FRIES, RIGHT?

22       SO -- ACTUALLY, I THINK PEOPLE COULD HAVE TECHSHOP IN THE

23   CORRUGATED PAPER INDUSTRY JUST AS LONG AS THEY DON'T USE IT IN

24   ASSOCIATION WITH A MAKERSPACE BECAUSE THAT'S TECHSHOP'S RIGHT

25   THAT MR. RASURE TOOK WITHOUT PERMISSION.

1              (DISPLAYED ON SCREEN.)

2        I HAVE TO ADMIT THESE ONES PERPLEX ME.  THIS PART HERE

3   ABOUT THE LOGO ONLY USED FOR THREE DAYS.  LET ME GET TO THE

4   RIGHT ONE HERE.

5              (DISPLAYED ON SCREEN.)

6        SO THAT ONE SEEMS LIKE THEY KIND OF ADMIT, RIGHT, DON'T

7   YOU THINK -- I MEAN THEY SAID RIGHT THERE, THAT'S THE THING WE

8   ARE USING.  REMEMBER MR. RASURE UP ON THE STAND, I DON'T KNOW

9   I THINK --

10             **THE REPORTER:**  I CANNOT HEAR YOU WHEN YOUR BACK IS TO

11  ME.

12             **MR. PISTORINO:**  I THINK WE HEARD MR. RASURE SAY,

13  RIGHT, I DON'T KNOW, I THINK WE USED IT FOR FOUR OR FIVE DAYS.

14  NOW FROM THE LAWYER WE HEAR, OH, IT WAS ONLY THREE DAYS OR SO.

15       YOU KNOW, THIS IS NOT LIKE A RENTAL SITUATION, RIGHT,

16  WHERE YOU GET TO RENT THE TRADEMARK.  IT'S ONLY FOR THREE OR

17  FOUR DAYS.  RIGHT?

18       DO YOU THINK IF SOMEONE SAID, HEY, I WANT TO OPEN A

19  HAMBURGER RESTAURANT.  I KNOW, I'M GOING TO USE THE NAME

20  MCDONALD'S FOR MY HAMBURGER RESTAURANT.  BUT I'M ONLY GOING TO

21  USE IT FOR THREE OR FOUR DAYS.  NO PROBLEM.  RIGHT?  IT

22  DOESN'T WORK THAT WAY.

23       SO THESE SLIDES, I'VE GOT TO ADMIT, THEY JUST ACTUALLY

24  FLAT OUT ADMIT, AS FAR AS I CAN TELL, THAT THEY WERE

25  INFRINGING AND USING IT WITHOUT PERMISSION.

1              (DISPLAYED ON SCREEN.)

2         AGAIN, THIS SLIDE (INDICATING), MR. RASURE SAID THAT THEY

3    USED THE BOTTOM ONE.  RIGHT?  THAT IS WHAT MR. RASURE SAID.

4         WHY DOES THIS SHOW A DIFFERENT ONE?  MR. RASURE WAS THE

5    ONE THAT THEY ADMITTED USED THAT.  SO, AGAIN, I KIND OF LIKE

6    THEIR SLIDES.  THEY SEEM LIKE THEY'RE PRETTY GOOD FOR US.

7              (DISPLAYED ON SCREEN.)

8         NEXT THEY HAVE THE SLIDE OF THE... THEY HAD THE SLIDE OF

9    THE MINIMAL USE.  OH, I'M SURE.  IF YOU JUST USE THE

10   MCDONALD'S TRADEMARK WITHOUT THEIR PERMISSION, THEY ARE GOING

11   TO HAVE NO PROBLEM AS LONG AS YOU ONLY DO IT FOR TWO OR THREE

12   DAYS.  NO PROBLEM.  YOU CAN HAVE TERRIBLE HAMBURGERS, TERRIBLE

13   FRENCH FRIES, YOUR MILKSHAKES ARE JUST GROSS.  MCDONALD'S IS

14   NOT GOING TO HAVE ANY PROBLEM WITH THAT AT ALL.  NO PROBLEM,

15   RIGHT?

16        AND IF THEY CATCH YOU THEY'LL SAY, WELL, YOU ONLY USED IT

17   FOR A COUPLE OF DAYS.  MAYBE JUST GIVE US A THOUSAND DOLLARS,

18   OR SOMETHING LIKE THAT.  RIGHT?  IT DOESN'T WORK THAT WAY.

19        IF YOU WANTED TO GET A LICENSE, USE THE MCDONALD'S

20   TRADEMARK, WHAT DO YOU THINK THE NUMBER WOULD BE, RIGHT?  IT'S

21   GOING TO BE A BIG NUMBER, RIGHT?  I DON'T EVEN KNOW WHAT THE

22   FRANCHISING THINGS ARE, BUT I'LL TELL YOU, IT'S NOT A THOUSAND

23   DOLLARS, IT IS GOING TO BE A HUGE NUMBER.

24        SO, AGAIN, IN THIS CASE, WHAT DR. MATOLO HAS OPINED ON IS,

25   IF THEY WANTED TO GET A LICENSE SO THEY DIDN'T INFRINGE, HOW

REBUTTAL CLOSING ARGUMENT - PISTORINO

1    MUCH WOULD YOU HAVE TO PAY, RIGHT?  IT IS NOT A RENTAL

2    SITUATION.

3                    (DISPLAYED ON SCREEN.)

4        THIS ONE, I HAVE TO ADMIT I'M KIND OF AMAZED THEY KEEP

5    SAYING THIS.  IT SEEMS LIKE THE CRAZIEST POINT TO ME.  RIGHT?

6        I MEAN, THE FRAGMENT "SHOP" OR "TECH" ARE USED IN LESS

7    THAN 2 PERCENT OF THE 14 -- MORE THAN 1400, RIGHT?  BUT WE

8    KEEP ON HEARING -- I THINK I HEARD ON THE THING, WELL, THEY

9    ARE KIND OF FREQUENTLY, KIND OF USED, RIGHT?  BUT NOT

10   TECHSHOP.  RIGHT?

11       IT'S NOT THE TECH PART WHICH, ACTUALLY, HAS BEEN USED,

12   AGAIN, LESS THAN 2 PERCENT, AND NOT THE SHOP PART, WHICH

13   AGAIN, LESS THAN 2 PERCENT, BUT NOT TECHSHOP, NOT THE

14   INTERNATIONALLY KNOWN MAKERSPACE, RIGHT, WITH TEN LOCATIONS IN

15   THE UNITED STATES, 9,000 MEMBERS THAT HAVE BEEN IN BUSINESS

16   TEN YEARS WITH BARACK OBAMA THERE, RIGHT?  SO I DON'T EVEN GET

17   HOW THIS HELPS THEM.  IT SEEMS CRAZY TO ME.

18                    (DISPLAYED ON SCREEN.)

19       THEY GOT THIS ONE.  NO EVIDENCE OF ACTUAL CONFUSION.

20   REALLY?  HE TALKS ABOUT THE NEW MANAGEMENT.  THERE'S NO NEW

21   MANAGEMENT AT TECHSHOP.  THERE'S JUST MR. RASURE'S TOTALLY

22   UNRELATED ENTITY, RIGHT, BUT THAT PEOPLE THINK IS RELATED TO

23   TECHSHOP.  RIGHT?  THAT'S WHAT PEOPLE HAVE BEEN LED TO

24   BELIEVE.  THAT'S THE CONFUSION.  THIS IS, ITSELF, IS EVIDENCE

25   OF ACTUAL CONFUSION.

REBUTTAL CLOSING ARGUMENT - PISTORINO

1       WE HEARD SOME DISCUSSION HERE ABOUT... I'M NOT SURE IT'S

2    EVEN DISPUTED ALL THAT MUCH, THAT, YEAH, HE WAS USING THE NAME

3    TECHSHOP 2.0 FOR THE PURPOSES OF CREATING AN ENTITY TO ACQUIRE

4    THE ASSETS OF TECHSHOP.  RIGHT?

5       MAYBE I AM MISREADING IT.  ISN'T THAT EXACTLY WHAT IT

6    SAYS?  I MEAN, IT IS EXACTLY WHAT IT SAYS.  EXACTLY WHAT

7    TECHSHOP SAYS.

8       HE SAYS, THIS IS A NEW ENTITY WE FORMED TO BUY THE ASSETS

9    OF TECHSHOP.  GREAT.  PERFECT.

10      DID YOU BUY THEM?  NO, YOU DID NOT.  YOU DIDN'T PUT UP THE

11   MONEY.  YOU DIDN'T ACCEPT THE $18 MILLION IN LIABILITY.

12      WHAT YOU DID IS YOU TOOK TECHSHOP'S ASSETS WITHOUT

13   TECHSHOP'S PERMISSION, AND USED THEM IN THE MARKETPLACE.

14   RIGHT?  TO CONFUSE CONSUMERS.  RIGHT?  CONSUME THE PUBLIC.

15   AND YOU DUPLICATED THE TECHSHOP THE WAY THE LOGO WORKS.

16   RIGHT?

17      WHAT IS THE MAGIC REASON WHY YOUR NAME HAS GOT, I DON'T

18   KNOW, THE RED GEAR WITH EXACT TEN SPOKES JUST LIKE MR. NEWTON

19   CREATED?

20                  (DISPLAYED ON SCREEN.)

21      AGAIN ANOTHER SLIDE.

22                  (PAUSE IN THE PROCEEDINGS.)

23      AGAIN, JUST ACTUALLY AS A TECHNICAL MATTER, MR. RASURE

24   TESTIFIED DIFFERENTLY AS TO HOW MANY TIMES -- HOW LONG THEY

25   WERE USING THE ONE ON THE BOTTOM.  BUT IN ANY EVENT, IT'S NOT

1    A RENTAL SITUATION.  RIGHT?

2       IF YOU TAKE THE CAR FROM THE DEALER, RIGHT, YOU ARE

3    DRIVING IT ALL AROUND, RIGHT, AND LATER ON THEY GET IT BACK,

4    IT'S NOT, OKAY, WE WILL JUST PRETEND LIKE YOU RENTED IT.

5    ACTUALLY YOU RENTED IT FROM US FOR 49.95 A DAY, RIGHT?

6    INSTEAD OF, NO, NOW IT'S GOT TO A USED CAR SO IT'S TOTALLY

7    DIFFERENT.  IT'S NOT A RENTAL SITUATION.  IT DOESN'T WORK THAT

8    WAY.

9       I HEARD THE CLAIM THAT MR. RASURE HAD EVERY REASON TO

10   BELIEVE HE COULD USE TECHSHOP 2.0 FOR -- TO OPEN A MAKERSPACE.

11   WELL, I GUESS OTHER THAN THE FEBRUARY 14TH LETTER TELLING HIM

12   HE HAD ABSOLUTELY NO RIGHT TO DO SO AND THE FACT THAT HE

13   NEVER -- TECHSHOP NEVER TOLD HIM HE HAD THE RIGHT TO DO THAT,

14   SO THAT OTHER THAN THOSE POINTS, RIGHT, NO ONE COULD HAVE EVER

15   BELIEVED THAT.

16      YEAH, THE ADEO THING, THE OFFER FOR 2.5 MILLION, RIGHT?

17   HOW WOULD YOU GET -- HOW WOULD YOU HAVE THE POWER TO OFFER

18   ADEO A LICENSE AT 2.5 MILLION, RIGHT?  YOU WOULD HAVE TO HAVE

19   THE MARKS THEMSELVES TO GET THERE, RIGHT?  YOU WOULD HAVE TO

20   PAY THE MONEY TO GET THE MARKS TO HAVE THE ABILITY TO MAKE AN

21   OFFER TO ADEO, HOPEFULLY THEY WILL ACCEPT AND YOU'LL MAKE THAT

22   QUICK 1 MILLION, BUT HE NEVER GOT THE RIGHT TO USE THE

23   TECHSHOP MARKS.

24      THE PASSWORD THING, I GUESS, I MEAN -- I GUESS IT'S

25   SUPPOSED TO BE A COINKYDINKY, RIGHT, THAT MS. -- MRS. BUSCH

1    STARTS GETTING EMAILS FROM HIM RIGHT AFTER THE PASSWORDS COME

2    IN?  I DON'T KNOW.  I DON'T GET THAT ONE.

3       WE KNOW HE DIDN'T CHANGE THE NAME UNTIL APRIL, RIGHT?  A

4    MONTH AND A HALF AFTER.  WE KNOW FROM MR. SPURLOCK THAT

5    MR. RASURE TOLD HIM HE WAS USING THE TECHSHOP MARKS WITHOUT

6    TECHSHOP'S PERMISSION BECAUSE HE DIDN'T THINK TECHSHOP COULD

7    GET A LAWYER.  RIGHT?  WE KNOW THAT FROM MR. SPURLOCK.

8                    (DISPLAYED ON SCREEN.)

9       THE MARK, OF COURSE, IS TECHSHOP, RIGHT?  TECHSHOP,

10   TECHSHOP 2.0.  THERE YOU GO.  RIGHT?

11      TECHSHOP, THESHOP, YOU THINK PEOPLE MIGHT KEEP BEING

12   CONFUSED, ESPECIALLY WHEN YOU MIMIC THE COLORS AND THE LOOK?

13   YEAH.  I THINK SO.  MAYBE.  RIGHT?

14      YOU DON'T GET TO USE THE NAME MCDONALD'S AND THE BIG

15   GOLDEN ARCHES IF YOURS ARE JUST SLIGHTLY BROWNER, RIGHT, THAN

16   THE OTHER ONES.  GIVE ME A BREAK.

17      THERE'S THIS ONE... IT GOT MY ATTENTION.  BECAUSE I HEARD,

18   I THOUGHT, IN THEIR ARGUMENT THAT THEY ADMITTED THAT TECHSHOP

19   SAID IT WAS DAN'S CALL AS TO WHETHER OR NOT TO USE THE

20   TECHSHOP 2.0 FOR THE ENTITY.  RIGHT?  THAT'S WHAT I JUST HEARD

21   IN CLOSING.

22      THAT IS THE COMPLETE OPPOSITE OF WHAT MR. RASURE SAID,

23   RIGHT?  MR. RASURE SAID IT WAS AT THE BOARD'S INSISTENCE,

24   RIGHT?  SO IT'S LIKE THE LAWYER -- WHO ARE YOU GOING TO GO

25   WITH?  LET ME TRY IT THIS WAY.

1    ARE YOU GOING TO GO WITH THE LAWYER OR ARE YOU GOING TO GO

2    WITH MR. RASURE?  EITHER ONE IT'S WRONG.  RIGHT?  AT THE END

3    OF THE DAY, HE STILL DIDN'T HAVE THE RIGHT TO USE THE

4    TECHSHOP'S MARKS.  THAT'S ALL THERE IS TO IT.

5    SO I THINK A LITTLE BIT HERE, I KEEP ON COMING BACK TO IT,

6    AS I UNDERSTAND THEIR CLAIM, BETWEEN, FOR EXAMPLE, JUST GOING

7    WITH THE FEBRUARY 14TH THING THROUGH WHATEVER DAY THEY SAY

8    THEY STOPPED USING THESHOP.BUILD IN THIS FORM, BUT OF COURSE

9    IT STILL INFRINGES WHEN IT USES THESHOP, TECHSHOP, RIGHT,

10   THEY'RE JUST GOING ON THESE TWO LOGOS, I BELIEVE AT THIS POINT

11   THEY HAVE ADMITTED THAT FOR AT LEAST FIVE OR SIX DAYS THEY

12   WERE USING ALL THESE MARKS, RIGHT, IN A WAY THAT TECHSHOP HAD

13   TOLD THEM IT WAS COMPLETELY UNAUTHORIZED, YES, THAT'S FOR

14   SURE, AND WHAT I HEARD FROM THEM AGAIN WAS, YEAH, BUT WE JUST

15   WANT TO RENT THEM.  WE JUST WANT TO RENT THEM.  RIGHT?

16   IT DOESN'T WORK THAT WAY.  YOU'VE GOT TO GET A LICENSE TO

17   USE THE MARK; YOU DON'T GET TO RENT THEM.

18   AGAIN, SORT OF THE CAR THING AGAIN.  THE BASIC ARGUMENT IS

19   IF YOU TOOK THE TEST DRIVE, THAT MEANT YOU WERE ABLE TO TAKE

20   THE CAR, YOU KNOW, ON YOUR ROAD TRIP TO CANADA, YOU KNOW,

21   WHATEVER -- I DON'T KNOW IF YOU CAN TAKE A ROAD TRIP TO

22   HAWAII, BUT A LONG ROAD TRIP, RIGHT, WITHOUT PERMISSION AND

23   THEIR POSITION, YEAH, BUT NO ONE TOLD US WE COULDN'T TAKE IT,

24   YOU KNOW, TAKE IT AND THEY SAID NO, WHATEVER.

25   IT DOESN'T WORK THAT WAY.  I CAN'T BELIEVE THAT WE'VE HAD

```
1    TO WASTE A WHOLE WEEK ON THAT BASIC IDEA.  I MEAN, COME ON, WE

2    ALL KNEW, RIGHT?  IT'S AMAZING TO ME THAT YOUR TIME

3    UNFORTUNATELY WAS WASTED WITH A WEEK LIKE THAT.

4         SO, AGAIN, WHAT I HOPE YOU DID, I KNOW I WENT THROUGH THEM

5    VERY QUICKLY ON THE VERDICT FORM, BUT I THINK IF YOU SORT OF

6    WALK YOUR WAY THROUGH IT -- SOMEONE GOT A NOTE TO ME TO

7    EXPLAIN FOR SURE ABOUT -- I THINK IT WAS QUESTION 11, HOW IT

8    GOT THE 1,529,000 RIGHT?  THAT'S THE REVENUES THAT MR. --

9    DR. MATOLO CALCULATED THAT RASURE AND THOSE GUYS HAD TAKEN IN.

10   SO I THINK THAT'S THE RIGHT NUMBER FOR THERE.

11        THAT'S IT.  I THANK YOU FOR YOUR TIME.  THANK YOU.

12             THE COURT:  ALL RIGHT, LADIES AND GENTLEMEN.

13        SO AT THIS TIME IT'S MY DUTY TO INSTRUCT YOU ON THE LAW

14   THAT APPLIES TO THE CASE.  AND TO HELP YOU FOLLOW ALONG,

15   MS. RILEY IS HANDING EACH OF YOU YOUR OWN COPY OF THE

16   INSTRUCTIONS.  YOU WILL BE ABLE TO TAKE THIS BACK INTO THE

17   JURY ROOM, AND YOU CAN USE IT TO FOLLOW ALONG AS I READ THEM

18   TO YOU.

19        THE ONE CAVEAT WITH THIS IS, AS TEMPTING AS IT MIGHT BE TO

20   READ TO THE END OF THE STORY TO SEE HOW IT ENDS, PLEASE JUST

21   FOLLOW ALONG WITH WHAT I AM READING RATHER THAN READING AHEAD

22   ON THIS, ALL RIGHT?

23        MR. HENRIQUEZ?

24             THE JUROR:  CAN WE WRITE ON THESE?

25             THE COURT:  YOU MAY, YES.  THAT'S YOURS -- THAT'S THE
```

1    EQUIVALENT OF YOUR NOTES.  SO TREAT IT LIKE YOU WOULD YOUR

2    NOTES.

3        SO THIS WILL TAKE A LITTLE BIT, BUT LET'S WORK OUR WAY

4    THROUGH.

5        MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL THE

6    EVIDENCE AND THE ARGUMENTS OF THE ATTORNEYS, IT IS MY DUTY TO

7    INSTRUCT YOU ON THE LAW THAT APPLIES TO THIS CASE.  EACH OF

8    YOU HAS RECEIVED A COPY OF THESE INSTRUCTIONS THAT YOU MAY

9    TAKE WITH YOU TO THE JURY ROOM TO CONSULT DURING YOUR

10   DELIBERATIONS.

11       IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN

12   THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT

13   TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER

14   YOU AGREE WITH IT OR NOT, AND YOU MUST NOT BE INFLUENCED BY

15   ANY PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES OR

16   SYMPATHY.  THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON

17   THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN

18   OATH TO DO SO.

19       PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING

20   THAT I MAY SAY OR DO OR HAVE SAID OR DONE THAT I HAVE AN

21   OPINION REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

22       WHEN A PARTY HAS THE BURDEN OF PROVING ANY CLAIM OR

23   AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE, IT

24   MEANS YOU MUST BE PERSUADED BY THE EVIDENCE THAT THE CLAIM OR

25   AFFIRMATIVE DEFENSE IS MORE PROBABLY TRUE THAN NOT TRUE.  YOU

1    SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE, REGARDLESS

2    OF WHICH PARTY PRESENTED IT.

3        WHEN A PARTY HAS THE BURDEN OF PROVING ANY CLAIM OR

4    DEFENSE BY CLEAR AND CONVINCING EVIDENCE, IT MEANS THAT THE

5    PARTY MUST PRESENT EVIDENCE THAT LEAVES YOU WITH A FIRM BELIEF

6    OR CONVICTION THAT IT IS HIGHLY PROBABLE THAT THE FACTUAL

7    CONTENTIONS OF THE CLAIM OR DEFENSE IS TRUE.  THIS IS A HIGHER

8    STANDARD OF PROOF THAN PROOF BY A PREPONDERANCE OF THE

9    EVIDENCE BUT IT DOES NOT REQUIRE PROOF BEYOND A REASONABLE

10   DOUBT.

11       THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

12   FACTS ARE CONSISTS OF THE SWORN TESTIMONY OF ANY WITNESS, THE

13   EXHIBITS THAT ARE ADMITTED INTO EVIDENCE, ANY FACTS TO WHICH

14   THE LAWYERS HAVE AGREED, AND ANY FACTS THAT I MAY INSTRUCT YOU

15   TO ACCEPT AS PROVED.

16       IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

17   TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS

18   ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN DECIDING

19   WHAT THE FACTS EVER.  I WILL LIST THEM FOR YOU.

20       ARGUMENTS AND STATEMENTS BY THE LAWYERS ARE NOT EVIDENCE.

21   THE LAWYERS ARE NOT WITNESSES.  WHAT THEY MAY SAY IN THEIR

22   OPENING STATEMENTS -- OR WHAT THEY DID SAY IN THEIR OPENING

23   STATEMENTS AND IN THEIR CLOSING ARGUMENTS AND AT OTHER TIMES

24   IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT

25   EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE

1  WAY THAT THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM

2  CONTROLS.

3       QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

4  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

5  BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

6  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE

7  COURT'S RULING ON IT.

8       TESTIMONY THAT IS EXCLUDED OR STRICKEN, OR THAT YOU ARE

9  INSTRUCTED TO DISREGARD, IS NOT EVIDENCE AND MUST NOT BE

10  CONSIDERED.  IN ADDITION, SOME EVIDENCE MAY BE RECEIVED ONLY

11  FOR A LIMITED PURPOSE, AND SOME WAS.  WHEN I HAVE INSTRUCTED

12  YOU TO CONSIDER CERTAIN EVIDENCE ONLY FOR A LIMITED PURPOSE,

13  YOU MUST DO SO AND YOU MAY NOT CONSIDER THAT EVIDENCE FOR ANY

14  OTHER PURPOSE.

15       ANYTHING YOU MAY SEE OR HEAR WHEN THE COURT WAS NOT IN

16  SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY ON

17  THE EVIDENCE RECEIVED AT THE TRIAL.

18       AS I NOTED SOME EVIDENCE WAS ADMITTED ONLY FOR A LIMITED

19  PURPOSE.  WHEN I INSTRUCTED YOU THAT AN ITEM OF EVIDENCE WAS

20  ADMITTED ONLY FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY

21  FOR THAT LIMITED PURPOSE AND NOT FOR ANY OTHER PURPOSE.

22       EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

23  IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS

24  ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

25  CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

1    WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH

2    KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE

3    WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

4    EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO

5    ANY EVIDENCE.

6        THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

7    RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

8    OFFERS AN EXHIBIT INTO EVIDENCE, AND THE LAWYER ON THE OTHER

9    SIDE THINKS THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE,

10   THAT LAWYER MAY OBJECT.  IF I OVERRULED THE OBJECTION, THE

11   QUESTION MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I

12   SUSTAINED THE OBJECTION, THE QUESTION CANNOT BE ANSWERED AND

13   THE EXHIBIT CANNOT BE RECEIVED.  WHENEVER I SUSTAINED AN

14   OBJECTION TO A QUESTION, YOU MUST IGNORE THE QUESTION AND MUST

15   NOT GUESS WHAT THE ANSWER MIGHT HAVE BEEN.

16       SOMETIMES I ORDERED THAT EVIDENCE BE STRICKEN FROM THE

17   RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

18   MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

19   CONSIDER THE STRICKEN EVIDENCE FOR ANY PURPOSE.

20       FROM TIME TO TIME DURING THE TRIAL, AS YOU SAW, IT BECAME

21   NECESSARY FOR ME TO TALK TO THE ATTORNEYS OUT OF THE HEARING

22   OF THE JURY EITHER BY HAVING A CONFERENCE AT THE BENCH WHILE

23   YOU WERE PRESENT OR -- HERE IN THE COURTROOM, OR BY CALLING A

24   RECESS.  PLEASE UNDERSTAND THAT WHILE YOU WERE WAITING, WE

25   WERE WORKING.  THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP

1     RELEVANT INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN

2     EVIDENCE IS TO BE TREATED UNDER THE RULES OF EVIDENCE AND TO

3     AVOID CONFUSION AND ERROR.

4         OF COURSE, WE HAVE DONE WHAT WE COULD TO KEEP THE NUMBER

5     AND LENGTH OF THESE CONFERENCES TO A MINIMUM.  DO NOT CONSIDER

6     MY GRANTING OR DENYING A REQUEST FOR A CONFERENCE IS ANY

7     INDICATION OF MY OPINION OF THE CASE OR OF WHAT YOUR VERDICT

8     SHOULD BE.

9         IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

10    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

11    YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

12    NONE OF IT.

13        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

14    INTO ACCOUNT THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE

15    OR HEAR OR KNOW THE THINGS TESTIFIED TO, THE WITNESS'S MEMORY,

16    THE WITNESS'S MANNER WHILE TESTIFYING, THE WITNESS'S INTEREST

17    IN THE OUTCOME OF THE CASE, IF ANY, THE WITNESS'S BIAS OR

18    PREJUDICE, IF ANY, WHETHER OTHER EVIDENCE CONTRADICTED THE

19    WITNESS'S TESTIMONY, THE REASONABLENESS OF THE WITNESS'S

20    TESTIMONY IN LIGHT OF ALL THE EVIDENCE, AND ANY OTHER FACTORS

21    THAT BEAR ON BELIEVABILITY.

22        SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

23    CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

24    DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

25    HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

1150

1    THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT BUT

2    REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES

3    BUT DO NOT DECIDE TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS

4    FROM OTHER TESTIMONY.

5        HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

6    TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

7    CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.  ON THE

8    OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY

9    ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY

10   ACCEPT THE PART YOU THINK IS TRUE AND IGNORE THE REST.

11       THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

12   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

13   WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

14   MUCH WEIGHT YOU THINK THAT THEIR TESTIMONY DESERVES.

15       YOU HAVE HEARD TESTIMONY FROM DR. ERIC MATOLO AND MARK

16   BÜNGER WHO TESTIFIED TO OPINIONS AND THE REASONS FOR THOSE

17   OPINIONS.  THIS OPINION TESTIMONY IS ALLOWED BECAUSE OF THE

18   EDUCATION OR EXPERIENCE OF THESE WITNESSES.

19       SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER

20   TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH

21   WEIGHT AS YOU THINK IT DESERVES CONSIDERING THE WITNESS'S

22   EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

23   AND ALL THE OTHER EVIDENCE IN THE CASE.

24       CERTAIN CHARTS AND SUMMARIES HAVE BEEN ADMITTED INTO

25   EVIDENCE TO ILLUSTRATE INFORMATION BROUGHT OUT IN THE TRIAL.

```
1    CHARTS AND SUMMARIES ARE ONLY AS GOOD AS THE TESTIMONY OR

2    OTHER ADMITTED EVIDENCE THAT SUPPORTS THEM.  YOU SHOULD,

3    THEREFORE, GIVE THEM ONLY SUCH WEIGHT AS YOU THINK THE

4    UNDERLYING EVIDENCE DESERVES.

5        CERTAIN CHARTS AND SUMMARIES NOT ADMITTED INTO EVIDENCE

6    HAVE BEEN SHOWN TO YOU IN ORDER TO HELP EXPLAIN THE CONTENTS

7    OF BOOKS, RECORDS, DOCUMENTS, OR OTHER EVIDENCE IN THE CASE.

8    CHARTS AND SUMMARIES ARE ONLY AS GOOD AS THE UNDERLYING

9    EVIDENCE THAT SUPPORTS THEM.  YOU SHOULD, THEREFORE, GIVE THEM

10   ONLY SUCH WEIGHT AS YOU THINK THE UNDERLYING EVIDENCE

11   DESERVES.

12       SO NOW THERE WILL BE A NUMBER OF INSTRUCTIONS ABOUT THE

13   VARIOUS CAUSES OF ACTION IN THE CASE; FIRST WITH REGARD TO THE

14   TRADEMARK INFRINGEMENT CLAIM.

15       A TRADEMARK IS A WORD, NAME, SYMBOL, DEVICE, OR ANY

16   COMBINATION OF THESE ITEMS THAT INDICATES THE SOURCE OF GOODS

17   OR SERVICES.  A SERVICE MARK IS ONE FORM OF TRADEMARK AND IS

18   ANY WORD, NAME, SYMBOL, OR DEVICE USED BY A PERSON TO IDENTIFY

19   AND DISTINGUISH SUCH PERSON'S SERVICES FROM THOSE OF OTHERS

20   AND TO INDICATE THE SOURCE OF THE SERVICES.

21       THE OWNER OF A SERVICE MARK HAS THE RIGHT TO EXCLUDE

22   OTHERS FROM USING THAT SERVICE MARK OR A SIMILAR MARK THAT IS

23   LIKELY TO CAUSE CONFUSION IN THE MARKETPLACE.  THE MAIN

24   FUNCTION OF A SERVICE MARK IS TO IDENTIFY AND DISTINGUISH

25   SERVICES AS THE SERVICE OF A PARTICULAR MANUFACTURER OR
```

1   MERCHANT AND TO PROTECT ITS GOODWILL.

2       THE TRADEMARK LAWS BALANCE THREE OFTEN-CONFLICTING GOALS.

3   FIRST, PROTECTING THE PUBLIC FROM BEING MISLED ABOUT THE

4   NATURE AND SOURCE OF GOODS AND SERVICES SO THAT THE CONSUMER

5   IS NOT CONFUSED OR MISLED IN THE MARKET, SECOND, PROTECTING

6   THE RIGHTS OF A BUSINESS TO IDENTIFY ITSELF TO THE PUBLIC AND

7   ITS REPUTATION IN OFFERING GOODS AND SERVICES TO THE PUBLIC

8   AND, THIRD, PROTECTING THE PUBLIC INTEREST IN FAIR COMPETITION

9   IN THE MARKET.

10      THE BALANCE OF THESE POLICY OBJECTIVES VARY FROM CASE TO

11  CASE BECAUSE THEY MAY OFTEN CONFLICT.  ACCORDINGLY, EACH CASE

12  MUST BE DECIDED BY EXAMINING ITS SPECIFIC FACTS AND

13  CIRCUMSTANCES, OF WHICH YOU ARE TO JUDGE.

14      IN THESE INSTRUCTIONS, I WILL IDENTIFY TYPES OF FACTS YOU

15  ARE TO CONSIDER IN DECIDING IF THE DEFENDANT IS LIABLE TO THE

16  PLAINTIFF FOR VIOLATING THE TRADEMARK LAW.  THESE FACTS ARE

17  RELEVANT TO WHETHER THE DEFENDANT IS LIABLE FOR INFRINGING

18  PLAINTIFF'S REGISTERED TRADEMARK RIGHTS, BY USING A TRADEMARK

19  IN A MANNER LIKELY TO CAUSE CONFUSION AMONG CONSUMERS.

20      IN THIS CASE, PLAINTIFF CLAIMS THAT DEFENDANTS HAVE

21  INFRINGED ITS FEDERAL SERVICE MARK REGISTRATIONS FOR THE WORD

22  "TECHSHOP".  ON THE PLAINTIFF'S CLAIM FOR INFRINGEMENT, THE

23  PLAINTIFF HAS THE BURDEN OF PROVING EACH OF THE FOLLOWING

24  EVIDENCE -- ELEMENTS BY A PREPONDERANCE OF THE EVIDENCE.

25      FIRST, TECHSHOP IS A VALID PROTECTABLE SERVICE MARK,

1    SECOND, THAT PLAINTIFF OWNS TECHSHOP AS A SERVICE MARK AND,

2    THIRD, THE DEFENDANTS USED TECHSHOP 2.0 AND/OR THESHOP.BUILD

3    WITHOUT THE CONSENT OF THE PLAINTIFF IN A MANNER THAT IS

4    LIKELY TO CAUSE CONFUSION AMONG ORDINARY CONSUMERS AS TO THE

5    SOURCE, SPONSORSHIP, AFFILIATION, OR APPROVAL OF THE SERVICES.

6        IF YOU FIND THAT EACH OF THE ELEMENTS ON WHICH THE

7    PLAINTIFF HAS THE BURDEN OF PROOF HAS BEEN PROVED AS TO

8    TECHSHOP 2.0 OR THESHOP.BUILD, YOUR VERDICT SHOULD BE FOR THE

9    PLAINTIFF AS TO THAT ALLEGEDLY INFRINGING MARK.  IF, ON THE

10   OTHER HAND, THE PLAINTIFF HAS FAILED TO PROVE ANY ONE OF THESE

11   ELEMENTS AS TO TECHSHOP 2.0 OR THESHOP.BUILD, YOUR VERDICT

12   SHOULD BE FOR THE DEFENDANTS AS TO THAT ALLEGEDLY INFRINGING

13   MARK.

14       SO I JUST GAVE YOU INSTRUCTION NO. 16 THAT REQUIRES THE

15   PLAINTIFF TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE

16   SERVICE MARK IS VALID AND PROTECTABLE, AND THAT THE PLAINTIFF

17   OWNS THE SERVICE MARK.  A VALID SERVICE MARK IS A WORD, NAME,

18   SYMBOL, DEVICE, OR ANY COMBINATION OF THESE THAT INDICATES THE

19   SOURCE OF SERVICES AND DISTINGUISHES THOSE SERVICES FROM THE

20   SERVICES OF OTHERS.  A SERVICE MARK BECOMES PROTECTABLE AFTER

21   IT IS USED IN COMMERCE.

22       ONE WAY FOR THE PLAINTIFF TO PROVE SERVICE MARK VALIDITY

23   IS TO SHOW THE SERVICE MARK IS REGISTERED.  AN OWNER OF A

24   SERVICE MARK MAY OBTAIN A CERTIFICATE OF REGISTRATION ISSUED

25   BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND MAY

```
1    SUBMIT THAT CERTIFICATE AS EVIDENCE OF THE VALIDITY AND

2    PROTECTABILITY OF THE SERVICE MARK AND OF THE CERTIFICATE

3    HOLDER'S OWNERSHIP OF THE SERVICE MARK COVERED BY THAT

4    CERTIFICATE.

5        EXHIBITS TX351 AND TX352 ARE CERTIFICATES OF REGISTRATION

6    FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE.  THEY WERE

7    SUBMITTED BY THE PLAINTIFF AS PROOF OF THE VALIDITY OF THE

8    SERVICE MARKS AND THAT THE PLAINTIFF OWNS THE SERVICE MARKS.

9        THE CERTIFICATE ENDING IN THE NUMBERS '529 STATES THAT

10   TECHSHOP, INC. IS THE OWNER OF THE TRADEMARK TECHSHOP IN THE

11   FIELDS OF PROVIDING PROFESSIONAL NETWORKING OPPORTUNITIES AND

12   HOSTING PROFESSIONAL NETWORKING EVENTS FOR INDIVIDUALS WITH

13   SHARED INTEREST IN MANUFACTURING AND FABRICATION AND OTHER

14   FIELDS.  A COMPLETE LISTING OF THE FIELDS COVERED BY THE '529

15   CERTIFICATE IS SHOWN IN EXHIBIT TX351.

16       THE CERTIFICATE ENDING IN THE NUMBERS '110 STATES THAT

17   TECHSHOP, INC. IS THE OWNER OF THE TRADEMARK TECHSHOP IN

18   FIELDS OF PROVIDING WORKSHOP FACILITIES ALLOWING MEMBERS TO

19   UNDERTAKE DO-IT-YOURSELF PROJECTS, PROVIDING WORKSHOP

20   FACILITIES FOR FABRICATION OF PRODUCTS, DEVICES, AND PRODUCT

21   PARTS FROM A WIDE VARIETY OF MATERIALS, CONSULTATION IN THE

22   FIELD OF CUSTOM FABRICATION OF GOODS FROM WOOD, METAL,

23   PLASTIC, CARDBOARD, TEXTILES, FABRIC, LEATHER, AND OTHER

24   MATERIALS.  THIS CERTIFICATE IS EXHIBIT TX352.

25       BOTH CERTIFICATES STATE THAT SERVICE MARKS CONSIST OF
```

1    STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT,

2    STYLE, SIZE OR COLOR.

3       THE LAW PRESUMES THAT THE FACTS NOTED IN THE CERTIFICATES

4    ARE TRUE.  BUT THIS PRESUMPTION CAN BE OVERCOME BY

5    SIGNIFICANT -- SUFFICIENT EVIDENCE TO THE CONTRARY.  HERE, THE

6    DEFENDANT CONTENDS THAT THE SERVICE MARKS WERE ABANDONED.  IF

7    THE DEFENDANTS ARE ABLE TO SHOW BY CLEAR AND CONVINCING

8    EVIDENCE THAT THE SERVICE MARKS WERE ABANDONED, THEN YOU

9    CANNOT RELY ON THE REGISTRATIONS AS STATING THE TRUTH OF THE

10   MATTERS CONTAINED THEREIN.

11      DEFENDANTS CONTEND THAT THE TECHSHOP SERVICE MARKS ARE NOT

12   VALID AND THUS NOT PROTECTABLE.

13      A VALID SERVICE MARK IS A WORD, NAME, SYMBOL, DEVICE, OR

14   ANY COMBINATION OF THESE ITEMS THAT IS EITHER INHERENTLY

15   DISTINCTIVE OR DESCRIPTIVE BUT HAS ACQUIRED A SECONDARY

16   MEANING.

17      ONLY A VALID SERVICE MARK CAN BE INFRINGED.  IF YOU

18   DETERMINE THAT DEFENDANTS PROVED BY A PREPONDERANCE OF THE

19   EVIDENCE THAT PLAINTIFF'S TECHSHOP SERVICE MARKS ARE NOT

20   VALID, THEN THERE CANNOT BE INFRINGEMENT.

21      ONLY IF YOU DETERMINE THAT TECHSHOP IS NOT INHERENTLY

22   DISTINCTIVE SHOULD YOU CONSIDER WHETHER IT IS DESCRIPTIVE BUT

23   BECAME DISTINCTIVE THROUGH THE DEVELOPMENT OF SECONDARY

24   MEANING, AS I WILL DIRECT IN INSTRUCTION 20, WHICH IS COMING

25   UP.

1        SO THE NEXT INSTRUCTION CONCERNS STRENGTH AS A FACTOR FOR

2   DETERMINING VALIDITY.

3        HOW STRONGLY A SERVICE MARK INDICATES THAT A SERVICE COMES

4   FROM A SPECIFIC SOURCE IS AN IMPORTANT FACTOR TO CONSIDER IN

5   ASSESSING ITS VALIDITY.

6        THE PLAINTIFF ASSERTS THAT THE WORD "TECHSHOP" IS A VALID

7   AND PROTECTABLE SERVICE MARK FOR ITS SERVICES PROVIDING

8   PROFESSIONAL NETWORKING AND CONSULTATION IN THE FIELDS OF

9   MANUFACTURING AND FABRICATION, PROVIDING SERVICES FOR

10  EDUCATION AND TRAINING IN FABRICATION OF PRODUCTS, AND

11  PROVIDING WORKSHOP FACILITIES FOR MEMBERS TO UNDERTAKE

12  DO-IT-YOURSELF PROJECTS.

13       THE PLAINTIFF CONTENDS THAT THE DEFENDANTS' USE OF SIMILAR

14  WORD IN CONNECTION WITH THE DEFENDANTS' TECHSHOP 2.0 AND

15  THESHOP.BUILD BUSINESSES INFRINGES PLAINTIFF'S SERVICE MARKS

16  AND IS LIKELY TO CAUSE CONFUSION ABOUT THE BUSINESS ASSOCIATED

17  WITH THAT MARK.

18       A REGISTERED SERVICE MARK IS PRESUMED TO BE DISTINCTIVE.

19  THEREFORE, THE BURDEN IS ON THE DEFENDANTS TO SHOW THAT THE

20  SERVICE MARKS ARE NOT DISTINCTIVE.  IN ORDER TO DETERMINE

21  WHETHER DEFENDANTS HAVE MET THEIR BURDEN OF SHOWING THAT THE

22  WORD "TECHSHOP" IS NOT A VALID SERVICE MARK, YOU SHOULD

23  CLASSIFY IT ON THE SPECTRUM OF SERVICE MARK DISTINCTIVENESS

24  THAT I WILL EXPLAIN IN THIS INSTRUCTION.

25       AN INHERENTLY DISTINCTIVE SERVICE MARK IS A WORD, SYMBOL,

1    OR DEVICE, OR A COMBINATION OF THEM, WHICH INTRINSICALLY

2    IDENTIFIES A PARTICULAR SOURCE OF A SERVICE IN THE MARKET.

3    THE LAW ASSUMES THAT AN INHERENTLY DISTINCTIVE SERVICE MARK IS

4    ONE THAT ALMOST AUTOMATICALLY TELLS A CONSUMER THAT IT REFERS

5    TO A BRAND OR A SOURCE FOR A SERVICE, AND THAT CONSUMERS WILL

6    BE PREDISPOSED TO EQUATE THE SERVICE MARK WITH THE SOURCE OF A

7    SERVICE.

8        THE NEXT SECTION IS TITLED "THE SPECTRUM OF MARKS".

9        SERVICE MARK LAW PROVIDES PROTECTION TO DISTINCTIVE OR

10   STRONG SERVICE MARKS.  CONVERSELY, SERVICE MARKS THAT ARE NOT

11   AS DISTINCTIVE OR STRONG ARE CALLED WEAK SERVICE MARKS AND

12   RECEIVE LESS PROTECTION FROM INFRINGING USES.  SERVICE MARKS

13   THAT ARE NOT DISTINCTIVE ARE NOT ENTITLED TO ANY PROTECTION.

14   FOR DECIDING SERVICE MARK PROTECTABILITY, YOU MUST CONSIDER

15   WHETHER A SERVICE MARK IS INHERENTLY DISTINCTIVE.  SERVICE

16   MARKS ARE GROUPED INTO FOUR CATEGORIES ACCORDING TO THEIR

17   RELATIVE STRENGTH.  THESE FOUR CATEGORIES ARE, IN ORDER OF

18   STRENGTH OR DISTINCTIVENESS, ARBITRARY, WHICH IS INHERENTLY

19   DISTINCTIVE; SUGGESTIVE, WHICH IS ALSO INHERENTLY DISTINCTIVE;

20   DESCRIPTIVE, WHICH IS PROTECTED ONLY IF IT ACQUIRES IN

21   CONSUMERS' MINDS A SECONDARY MEANING, WHICH I EXPLAINED IN

22   INSTRUCTION 20; AND GENERIC NAMES, WHICH ARE ENTITLED TO NO

23   PROTECTION.  SO NOW THERE'S SOME INSTRUCTIONS ON THESE

24   DIFFERENT TYPES OF MARKS.

25        ARBITRARY SERVICE MARKS.  THE FIRST CATEGORY OF INHERENTLY

```
1     DISTINCTIVE SERVICE MARKS IS ARBITRARY SERVICE MARKS.  THEY

2     ARE CONSIDERED STRONG MARKS AND ARE CLEARLY PROTECTABLE.  THEY

3     INVOLVE THE ARBITRARY, FANCIFUL OR FICTITIOUS USE OF A WORD TO

4     DESIGNATE THE SOURCE OF A SERVICE.  SUCH A SERVICE MARK IS A

5     WORD THAT IN NO WAY DESCRIBES OR HAS ANY RELEVANCE TO THE

6     PARTICULAR SERVICE IT IS MEANT TO IDENTIFY.  IT MAY BE A

7     COMMON WORD USED IN AN UNFAMILIAR WAY.  IT MAY BE A NEWLY

8     CREATED OR COINED WORD OR PARTS OF COMMON WORDS WHICH ARE

9     APPLIED IN A FANCIFUL, FICTITIOUS, OR UNFAMILIAR WAY, SOLELY

10    AS A SERVICE MARK.

11         FOR INSTANCE, THE COMMON WORD "APPLE" BECAME A STRONG AND

12    INHERENTLY DISTINCTIVE TRADEMARK WHEN USED BY A COMPANY TO

13    IDENTIFY THE PERSONAL COMPUTERS THAT COMPANY SOLD.  THE

14    COMPANY'S USE OF THE WORD "APPLE" WAS ARBITRARY OR FANCIFUL

15    BECAUSE "APPLE" DID NOT DESCRIBE AND WAS NOT RELATED TO WHAT

16    THE COMPUTER WAS, ITS COMPONENTS, INGREDIENTS, QUALITY, OR

17    CHARACTERISTICS.  "APPLE" WAS BEING USED IN AN ARBITRARY WAY

18    TO DESIGNATE FOR CONSUMERS THAT THE COMPUTER COMES FROM A

19    PARTICULAR MANUFACTURER OR SOURCE.

20         NEXT CATEGORY, SUGGESTIVE SERVICE MARKS.

21         THE NEXT CATEGORY IS SUGGESTIVE SERVICE MARKS.  THESE

22    SERVICE MARKS ARE ALSO INHERENTLY DISTINCTIVE BUT ARE

23    CONSIDERED WEAKER THAN ARBITRARY SERVICE MARKS.  UNLIKE

24    ARBITRARY SERVICE MARKS, WHICH ARE IN NO WAY RELATED TO WHAT

25    THE SERVICE IS OR ITS COMPONENTS, QUALITY, OR CHARACTERISTICS,
```

1   SUGGESTIVE SERVICE MARKS IMPLIES SOME CHARACTERISTIC OR

2   QUALITY OF THE SERVICE TO WHICH THEY ARE ATTACHED.

3       IF THE CONSUMER MUST USE IMAGINATION OR ANY TYPE OF

4   MULTI-STAGE REASONING TO UNDERSTAND THE SERVICE MARK'S

5   SIGNIFICANCE, THEN THE SERVICE MARK DOES NOT DESCRIBE THE

6   SERVICE'S FEATURES, BUT MERELY SUGGESTS THEM.

7       A SUGGESTIVE USE OF A WORD INVOLVES CONSUMERS ASSOCIATING

8   THE QUALITIES THE WORD SUGGESTS TO THE SERVICE TO WHICH THE

9   WORD IS ATTACHED.  FOR EXAMPLE, WHEN "APPLE" IS USED NOT TO

10  INDICATE A CERTAIN COMPANY'S COMPUTERS BUT RATHER

11  "APPLE-A-DAY" VITAMINS, IT IS BEING USED AS A SUGGESTIVE

12  TRADEMARK.  "APPLE" DOES NOT DESCRIBE WHAT THE VITAMINS ARE.

13  HOWEVER, CONSUMERS MAY COME TO ASSOCIATE THE HELPFULNESS OF

14  "AN APPLE A DAY KEEPING THE DOCTOR AWAY" WITH THE SUPPOSED

15  BENEFITS OF "APPLE-A-DAY" VITAMINS.

16      NEXT CATEGORY IS DESCRIPTIVE SERVICE MARKS.

17      THE THIRD CATEGORY IS DESCRIPTIVE SERVICE MARKS.  THESE

18  SERVICE MARKS DIRECTLY IDENTIFY OR DESCRIBE SOME ASPECT,

19  CHARACTERISTIC, OR QUALITY OF THE SERVICE TO WHICH THEY ARE

20  AFFIXED IN A STRAIGHTFORWARD WAY THAT REQUIRES NO EXERCISE OF

21  IMAGINATION TO BE UNDERSTOOD.

22      FOR INSTANCE, THE WORD "APPLE" IS DESCRIPTIVE WHEN USED IN

23  THE TRADEMARK "CRANAPPLE" TO DESIGNATE A CRANBERRY-APPLE

24  JUICE.  IT DIRECTLY DESCRIBES INGREDIENTS OF THE JUICE.  OTHER

25  COMMON TYPES OF DESCRIPTIVE SERVICE MARKS IDENTIFY WHERE A

1     SERVICE COMES FROM OR THE NAME OF THE PERSON WHO PROVIDES THE

2     SERVICE.  THUS, THE WORDS "APPLE VALLEY JUICE" AFFIXED TO

3     CIDER FROM THE CALIFORNIA TOWN OF APPLE VALLEY, IT IS A

4     DESCRIPTIVE TRADEMARK BECAUSE IT GEOGRAPHICALLY DESCRIBES

5     WHERE THE CIDER COMES FROM.

6         SIMILARLY, A DESCRIPTIVE TRADEMARK CAN BE THE PERSONAL

7     NAME OF THE PERSON WHO MAKES OR SELLS THE PRODUCT.  SO IF A

8     FARMER IN APPLE VALLEY, JUDY BROWN, SOLD HER CIDER UNDER THE

9     LABEL "JUDY'S JUICE", RATHER THAN CRANAPPLE, SHE IS MAKING A

10    DESCRIPTIVE USE OF HER PERSONAL NAME TO INDICATE AND DESCRIBE

11    WHO PRODUCED THE APPLE CIDER.

12        THE LAST CATEGORY IS GENERIC NAMES.  THE FOURTH CATEGORY

13    IS ENTITLED TO NO PROTECTION AT ALL.  THEY ARE CALLED GENERIC

14    NAMES, AND THEY REFER TO A GENERAL NAME OF THE SERVICE AS

15    OPPOSED TO THE PLAINTIFF'S BRAND FOR THAT SERVICE.  GENERIC

16    NAMES ARE PART OF OUR COMMON LANGUAGE THAT WE NEED TO IDENTIFY

17    ALL SUCH SIMILAR SERVICES.  A GENERIC NAME IS A NAME FOR THE

18    SERVICE ON WHICH IT APPEARS.

19        IF THE PRIMARY SIGNIFICANCE OF THE ALLEGED MARK IS TO NAME

20    THE TYPE OF SERVICE RATHER THAN THE MANUFACTURER OR PROVIDER,

21    THE TERM IS A GENERIC NAME AND CANNOT BE A VALID SERVICE MARK.

22    IF THE MAJORITY OF RELEVANT CONSUMERS WOULD UNDERSTAND THE

23    TERM TO NAME THE TYPE OF SERVICE RATHER THAN THE MANUFACTURER

24    OR PROVIDER, THE PRIMARY SIGNIFICANCE OF THE TERM IS GENERIC

25    AND NOT ENTITLED TO PROTECTION AS A SERVICE MARK.

THE WORD "APPLE" CAN BE USED AS A GENERIC NAME AND NOT BE
ENTITLED TO ANY SERVICE MARK PROTECTION.  THIS OCCURS WHEN THE
WORD IS USED TO IDENTIFY THE FRUIT FROM AN APPLE TREE.

THE COMPUTER MAKER WHO USES THE WORD "APPLE" AS A
TRADEMARK TO IDENTIFY ITS PERSONAL COMPUTER, OR THE VITAMIN
MAKER WHO USES THAT WORD AS A TRADEMARK ON VITAMINS, HAS NO
CLAIM FOR TRADEMARK OR SERVICE MARK INFRINGEMENT AGAINST THE
GROCER WHO USED THAT SAME WORD TO INDICATE THE FRUIT SOLD IN A
STORE.  AS USED BY THE GROCER, THE WORD IS GENERIC AND DOES
NOT INDICATE ANY PARTICULAR SOURCE OF THE PRODUCT.  AS APPLIED
TO THE FRUIT, "APPLE" IS SIMPLY A COMMONLY USED NAME FOR WHAT
IS BEING SOLD.

THE NEXT SECTION IS REGARDING MARK DISTINCTIVENESS AND
VALIDITY.

IF YOU DECIDE THAT TECHSHOP IS ARBITRARY OR SUGGESTIVE, IT
IS CONSIDERED TO BE INHERENTLY DISTINCTIVE.  AN INHERENTLY
DISTINCTIVE TRADEMARK IS VALID AND PROTECTABLE.

ON THE OTHER HAND, IF YOU DETERMINE THAT TECHSHOP IS
GENERIC, IT CANNOT BE DISTINCTIVE AND THEREFORE IS NOT VALID
NOR PROTECTABLE.  YOU MUST RENDER A VERDICT FOR THE DEFENDANTS
ON THE CHARGE OF INFRINGEMENT IN INSTRUCTION NO. 16 IF YOU
FIND THAT THE MARK IS GENERIC.

IF YOU DECIDE THAT TECHSHOP IS DESCRIPTIVE, YOU WILL NOT
KNOW IF THE SERVICE MARK IS VALID OR INVALID UNTIL YOU
CONSIDER WHETHER IT HAS GAINED DISTINCTIVENESS BY THE

1    ACQUISITION OF SECONDARY MEANING, WHICH I WILL EXPLAIN IN THE

2    NEXT INSTRUCTION NO. 20.

3        IF YOU DETERMINED IN INSTRUCTION NO. 19 THAT TECHSHOP IS

4    DESCRIPTIVE, YOU MUST CONSIDER THE RECOGNITION THAT THE MARK

5    HAS AMONG PROSPECTIVE CONSUMERS IN ORDER TO DETERMINE WHETHER

6    IT IS VALID AND PROTECTABLE EVEN THOUGH IT IS DESCRIPTIVE.

7    THIS MARKET RECOGNITION IS CALLED THE SERVICE MARK'S SECONDARY

8    MEANING.

9        A WORD ACQUIRES A SECONDARY MEANING WHEN IT HAS BEEN USED

10   IN SUCH A WAY THAT ITS PRIMARY SIGNIFICANCE IN THE MINDS OF

11   THE PROSPECTIVE CONSUMERS IS NOT THE SERVICE ITSELF, BUT THE

12   IDENTIFICATION OF THE SERVICE WITH A SINGLE SOURCE, REGARDLESS

13   OF WHETHER CONSUMERS KNOW WHO OR WHAT THAT SOURCE IS.  YOU

14   MUST FIND THAT THE PREPONDERANCE OF THE EVIDENCE SHOWS THAT A

15   SIGNIFICANT NUMBER OF THE CONSUMING PUBLIC ASSOCIATES TECHSHOP

16   WITH A SINGLE SOURCE, IN ORDER TO FIND THAT IT HAS ACQUIRED

17   SECONDARY MEANING.

18       WHEN YOU ARE DETERMINING WHETHER TECHSHOP HAS ACQUIRED A

19   SECONDARY MEANING, CONSIDER THE FOLLOWING FACTORS:

20       FIRST, CONSUMER PERCEPTION.  WHETHER THE PEOPLE WHO

21   PURCHASE THE SERVICE THAT BEARS THE CLAIMED SERVICE MARK

22   ASSOCIATE THE MARK WITH THE OWNER.

23       NEXT, ADVERTISEMENT.  TO WHAT DEGREE AND IN WHAT MANNER

24   THE OWNER MAY HAVE ADVERTISED UNDER THE CLAIMED SERVICE MARK.

25       NEXT, DEMONSTRATED UTILITY.  WHETHER THE OWNER

1    SUCCESSFULLY USED THIS SERVICE MARK TO INCREASE THE SALES OF

2    ITS SERVICE.

3        NEXT, EXTENT OF USE.  THE LENGTH OF TIME AND MANNER IN

4    WHICH THE OWNER USED THE CLAIMED SERVICE MARK.

5        NEXT, EXCLUSIVITY.  WHETHER THE OWNER'S USE OF THE CLAIMED

6    SERVICE MARK WAS EXCLUSIVE.

7        NEXT, COPYING.  WHETHER THE DEFENDANT INTENTIONALLY COPIED

8    THE OWNER'S SERVICE MARK.

9        AND LAST, ACTUAL CONFUSION.  WHETHER THE DEFENDANTS' USE

10   OF THE PLAINTIFF'S SERVICE MARK HAS LED TO ACTUAL CONFUSION

11   AMONG A SIGNIFICANT NUMBER OF CONSUMERS.

12       THE PRESENCE OR ABSENCE OF ANY PARTICULAR FACTOR SHOULD

13   NOT NECESSARILY RESOLVE WHETHER TECHSHOP HAS ACQUIRED

14   SECONDARY MEANING.

15       DESCRIPTIVE MARKS ARE PROTECTABLE ONLY TO THE EXTENT YOU

16   FIND THEY ACQUIRED DISTINCTIVENESS THROUGH SECONDARY MEANING.

17   DESCRIPTIVE MARKS ARE ENTITLED TO PROTECTION ONLY AS BROAD AS

18   THE SECONDARY MEANING THEY HAVE ACQUIRED, IF ANY.  IF THEY

19   HAVE ACQUIRED NO SECONDARY MEANING, THEY ARE ENTITLED TO NO

20   PROTECTION AND CANNOT BE CONSIDERED A VALID MARK.

21       THE DEFENDANTS HAVE THE BURDEN OF PROVING THAT THE WORD

22   MARK TECHSHOP LACKS A SECONDARY MEANING.  THE MERE FACT THAT

23   THE PLAINTIFF IS USING THE WORD MARK TECHSHOP, OR THAT THE

24   PLAINTIFF BEGAN USING IT BEFORE THE DEFENDANTS, DOES NOT MEAN

25   THAT THE SERVICE MARKS HAVE ACQUIRED SECONDARY MEANING.  THERE

1    IS NO PARTICULAR LENGTH OF TIME THAT A SERVICE MARK MUST BE

2    USED BEFORE IT ACQUIRES A SECONDARY MEANING.

3        THEN NEXT THERE'S AN INSTRUCTION ON THE ABANDONMENT

4    DEFENSE.

5        THE OWNER OF A TRADEMARK CANNOT EXCLUDE OTHERS FROM USING

6    THE TRADEMARK IF IT HAS BEEN ABANDONED.  THE DEFENDANTS

7    CONTEND THAT THE SERVICE MARK HAS BECOME UNENFORCEABLE BECAUSE

8    PLAINTIFF ABANDONED IT.  THE DEFENDANTS HAVE THE BURDEN OF

9    PROVING ABANDONMENT BY CLEAR AND CONVINCING EVIDENCE.

10       THE OWNER OF A TRADEMARK ABANDONS THE RIGHT TO EXCLUSIVE

11   USE OF THE TRADEMARK WHEN THE OWNER FIRST, DISCONTINUES ITS

12   GOOD FAITH USE IN THE ORDINARY COURSE OF TRADE INTENDING NOT

13   TO RESUME USING IT OR, TWO, ACTS OR FAILS TO ACT SO THAT THE

14   TRADEMARK'S PRIMARY SIGNIFICANCE TO PROSPECTIVE CONSUMERS HAS

15   BECOME THE SERVICE ITSELF AND NOT THE PROVIDER OF THE SERVICE.

16       THIS IS A DEFINITION OF USE:  A SERVICE MARK IS USED WHEN

17   IT IS USED OR SOLD IN COMMERCE AND THE SERVICE MARK IS

18   ATTACHED TO THE SERVICE, OR PLACED ON DOCUMENTS ASSOCIATED

19   WITH THE SERVICE, THEIR USE, OR THEIR SALE.

20       THEN THERE ARE A NUMBER OF INSTRUCTIONS ABOUT THE STANDARD

21   FOR DETERMINING LIKELIHOOD OF CONFUSION.

22       YOU MUST CONSIDER WHETHER THE DEFENDANTS' USE OF THE

23   SERVICE MARKS IS LIKELY TO CAUSE CONFUSION ABOUT THE SOURCE OF

24   THE PLAINTIFF'S OR THE DEFENDANTS' SERVICES.

25       I WILL SUGGEST SOME FACTORS YOU SHOULD CONSIDER IN

```
 1    DECIDING THIS.  THE PRESENCE OR ABSENCE OF ANY PARTICULAR

 2    FACTOR THAT I SUGGEST SHOULD NOT NECESSARILY RESOLVE WHETHER

 3    THERE WAS A LIKELIHOOD OF CONFUSION, BECAUSE YOU MUST CONSIDER

 4    ALL RELEVANT EVIDENCE IN DETERMINING THIS.  AS YOU CONSIDER

 5    THE LIKELIHOOD OF CONFUSION, YOU SHOULD EXAMINE THE FOLLOWING:

 6        FIRST, THE STRENGTH OR WEAKNESS OF THE PLAINTIFF'S MARKS.

 7    THE MORE THE CONSUMING PUBLIC RECOGNIZES THE PLAINTIFF'S

 8    SERVICE MARKS AS AN INDICATION OF ORIGIN OF THE PLAINTIFF'S

 9    SERVICES, THE MORE LIKELY IT IS THAT CONSUMERS WOULD BE

10    CONFUSED ABOUT THE SOURCE OF THE DEFENDANTS' SERVICES IF THE

11    DEFENDANTS USE SIMILAR MARKS.

12        SECOND, DEFENDANTS' USE OF THE MARKS.  IF THE DEFENDANTS

13    AND PLAINTIFF USE THEIR SERVICE MARKS ON THE SAME, RELATED, OR

14    COMPLEMENTARY KINDS OF SERVICES THERE MAY BE A GREATER

15    LIKELIHOOD OF CONFUSION ABOUT THE SOURCE OF THE SERVICES THAN

16    OTHERWISE.

17        THIRD, SIMILARITY OF PLAINTIFF'S AND DEFENDANTS' MARKS.

18    IF THE OVERALL IMPRESSION CREATED BY THE PLAINTIFF'S SERVICE

19    MARKS IN THE MARKETPLACE IS SIMILAR TO THAT CREATED BY THE

20    DEFENDANTS' SERVICE MARKS IN APPEARANCE, SOUND, OR MEANING,

21    THERE IS A GREATER CHANCE OF LIKELIHOOD OF CONFUSION.

22    SIMILARITIES IN APPEARANCE, SOUND, OR MEANING WEIGH MORE

23    HEAVILY THAN DIFFERENCES IN FINDING THE MARKS ARE SIMILAR.

24        FOURTH, ACTUAL CONFUSION.  IF USE BY THE DEFENDANTS OF THE

25    PLAINTIFF'S SERVICE MARKS HAS LED TO INSTANCES OF ACTUAL
```

1    CONFUSION, THIS STRONGLY SUGGESTS A LIKELIHOOD OF CONFUSION.

2    HOWEVER, ACTUAL CONFUSION IS NOT REQUIRED FOR A FINDING OF

3    LIKELIHOOD OF CONFUSION.  EVEN IF ACTUAL CONFUSION DID NOT

4    OCCUR, THE DEFENDANTS' USE OF THE SERVICE MARKS MAY STILL BE

5    LIKELY TO CAUSE CONFUSION.  AS YOU CONSIDER WHETHER THE

6    TRADEMARK USED BY THE DEFENDANT CREATES FOR CONSUMERS A

7    LIKELIHOOD OF CONFUSION WITH THE PLAINTIFF'S TRADEMARK, YOU

8    SHOULD WEIGH ANY INSTANCES OF ACTUAL CONFUSION AGAINST THE

9    OPPORTUNITIES FOR SUCH CONFUSION.  IF THE INSTANCES OF ACTUAL

10   CONFUSION HAVE BEEN RELATIVELY FREQUENT, YOU MAY FIND THAT

11   THERE HAS BEEN SUBSTANTIAL ACTUAL CONCLUSION.  IF, BY

12   CONTRAST, THERE IS A VERY LARGE VOLUME OF SALES, BUT ONLY A

13   FEW ISOLATED INSTANCES OF ACTUAL CONFUSION, YOU MAY FIND THAT

14   THERE HAS NOT BEEN SUBSTANTIAL ACTUAL CONFUSION.

15        FIFTH, DEFENDANTS' INTENT.  KNOWING USE BY DEFENDANTS OF

16   THE PLAINTIFF'S SERVICE MARKS TO IDENTIFY SIMILAR GOODS MAY

17   STRONGLY SHOW AN INTENT TO DERIVE BENEFIT FROM THE REPUTATION

18   OF THE PLAINTIFF'S MARKS, SUGGESTING AN INTENT TO CAUSE A

19   LIKELIHOOD OF CONFUSION.  ON THE OTHER HAND, EVEN IN THE

20   ABSENCE OF PROOF THAT THE DEFENDANTS ACTED KNOWINGLY, THE USE

21   OF PLAINTIFF'S TRADEMARK TO IDENTIFY SIMILAR GOODS MAY

22   INDICATE A LIKELIHOOD OF CONFUSION.

23        SIX, MARKETING AND ADVERTISING CHANNELS.  IF THE

24   PLAINTIFF'S AND DEFENDANTS' SERVICES ARE LIKELY TO BE SOLD IN

25   THE SAME OR SIMILAR STORES OR OUTLETS, OR ADVERTISED IN

1    SIMILAR MEDIA, THIS MAY INCREASE THE LIKELIHOOD OF CONFUSION.

2        SEVENTH, CONSUMER'S DEGREE OF CARE.  THE MORE

3    SOPHISTICATED THE POTENTIAL BUYERS OF THE SERVICES OR THE MORE

4    COSTLY THE SERVICES, THE MORE CAREFUL AND DISCRIMINATING THE

5    REASONABLY PRUDENT PURCHASER EXERCISING ORDINARY CAUTION MAY

6    BE.  THEY MAY BE LESS LIKELY TO BE CONFUSED BY SIMILARITIES IN

7    THE PLAINTIFF'S AND DEFENDANTS' SERVICE MARKS.

8        NEXT SECTION IS CALLED STRENGTH AS A FACTOR FOR EVALUATING

9    LIKELIHOOD OF CONFUSION.

10        HOW STRONGLY THE PLAINTIFF'S TRADEMARK INDICATES THAT THE

11    GOODS OR SERVICES COME FROM A PARTICULAR SOURCE IS AN

12    IMPORTANT FACTOR TO CONSIDER IN DETERMINING WHETHER THE

13    TRADEMARK USED BY THE DEFENDANT IS LIKELY TO CREATE CONFUSION

14    WITH THE PLAINTIFF'S MARK.

15        THE PLAINTIFF ASSERTS THAT TECHSHOP IS A TRADEMARK FOR ITS

16    SERVICES.  THE PLAINTIFF CONTENDS THAT THE DEFENDANTS' USE OF

17    TECHSHOP 2.0 AND THESHOP.BUILD IN CONNECTION WITH THE

18    DEFENDANTS' SERVICES INFRINGES PLAINTIFF'S TRADEMARK BECAUSE

19    IT IS LIKELY TO CAUSE CONFUSION.

20        THIS NEXT SECTION IS ENTITLED THE STRENGTH OF MARKS.

21        THE MORE DISTINCTIVE AND STRONG A TRADEMARK IS, THE

22    GREATER THE SCOPE OF PROTECTION THE LAW PROVIDES.  THE LAW

23    MEASURES TRADEMARK STRENGTH BY CONSIDERING TWO PRONGS.  FIRST,

24    COMMERCIAL STRENGTH.  THIS IS THE AMOUNT OF MARKETPLACE

25    RECOGNITION OF THE MARK AND, SECOND, CONCEPTUAL STRENGTH.

1    THIS IS THE PLACEMENT OF THE MARK ON THE SPECTRUM OF MARKS.

2        SO, FIRST, WITH REGARD TO COMMERCIAL STRENGTH, WHAT IS

3    COMMERCIAL STRENGTH?  NOT ALL MARKS ARE EQUALLY WELL KNOWN.

4    TRADEMARK STRENGTH IS SOMEWHAT LIKE THE RENOWN OF PEOPLE.

5    ONLY A VERY FEW FAMOUS PEOPLE ARE WIDELY KNOWN AND RECOGNIZED

6    AROUND THE WORLD.  MOST PEOPLE ARE KNOWN AND RECOGNIZED ONLY

7    BY A SMALL CIRCLE OF FAMILY AND FRIENDS.

8        SOME TRADEMARKS ARE RELATIVELY STRONG, IN THE SENSE THAT

9    THEY ARE WIDELY KNOWN AND RECOGNIZED.  A FEW TRADEMARKS ARE IN

10   THE CLEARLY FAMOUS CATEGORY.  THESE FAMOUS MARKS ARE THOSE

11   LIKE "APPLE" FOR COMPUTERS AND MOBILE PHONES, "GOOGLE" FOR A

12   SEARCH ENGINE, "COCA-COLA" FOR BEVERAGES, AND "TOYOTA" FOR

13   VEHICLES.

14       SOME TRADEMARKS MAY BE STRONG AND WELL KNOWN ONLY IN A

15   CERTAIN MARKET NICHE SUCH AS MOUNTAIN CLIMBING GEAR, PLUMBING

16   SUPPLIES, OR COMMERCIAL AIRPLANE ELECTRONICS EQUIPMENT, BUT

17   RELATIVELY WEAK OUTSIDE THAT FIELD.

18       THEN NEXT IS CONCEPTUAL STRENGTH.  WHAT IS CONCEPTUAL

19   STRENGTH?  ALL TRADEMARKS ARE GROUPED INTO TWO CATEGORIES:

20   EITHER INHERENTLY DISTINCTIVE OR NOT INHERENTLY DISTINCTIVE.

21   IF A MARK IS INHERENTLY DISTINCTIVE, IT IS IMMEDIATELY

22   PROTECTED WHEN FIRST USED.  IF IT IS NOT INHERENTLY

23   DISTINCTIVE, TO BECOME A LEGALLY PROTECTIVE MARK, A

24   DESIGNATION MUCH ACQUIRE DISTINCTIVENESS IN PEOPLE'S MINDS BY

25   BECOMING KNOWN AS AN INDICATION OF SOURCE OF GOODS OR

1    SERVICES.  THE LAW CALLS THIS SECONDARY MEANING.

2        FOR DETERMINING THE CONCEPTUAL STRENGTH OF A MARK,

3    TRADEMARKS ARE GROUPED ON A SPECTRUM ACCORDING TO THE NATURE

4    OF THE MARK.  IN THE SPECTRUM, THERE ARE THREE CATEGORIES OF

5    WORD MARKS THAT THE LAW REGARDS AS BEING INHERENTLY

6    DISTINCTIVE.  COINED, ARBITRARY, AND SUGGESTIVE.

7        DESCRIPTIVE WORD MARKS ARE REGARDED AS NOT BEING

8    INHERENTLY DISTINCTIVE AND REQUIRE A SECONDARY MEANING TO

9    BECOME A VALID TRADEMARK.

10       COINED AND ARBITRARY WORDS ARE REGARDED AS BEING

11   RELATIVELY STRONG MARKS.  A COINED WORD MARK IS A WORD CREATED

12   SOLELY TO SERVE AS A TRADEMARK.  FOR EXAMPLE, "CLOROX" FOR

13   CLEANING PRODUCTS AND "EXXON" FOR GASOLINE ARE COINED MARKS.

14       ARBITRARY MARKS ARE WORDS THAT IN NO WAY DESCRIBE OR

15   SUGGEST THE NATURE OF THE GOODS OR SERVICES IT IS USED WITH.

16   AS I MENTIONED A MINUTE AGO, FOR EXAMPLE, "APPLE" IS A COMMON

17   WORD, BUT IT DOES NOT DESCRIBE OR SUGGEST ANYTHING ABOUT THE

18   NATURE OF APPLE BRAND COMPUTERS OR SMART PHONES.  IT IS AN

19   ARBITRARY WORD WHEN USED AS A MARK ON THOSE PRODUCTS AND SAID

20   TO BE CONCEPTUALLY STRONG AS A MARK.

21       SUGGESTIVE WORD MARKS ARE REGARDED AS NOT BEING AS

22   CONCEPTUALLY STRONG AS COINED OR ARBITRARY MARKS.  SUGGESTIVE

23   TRADEMARKS SUGGEST SOME CHARACTERISTIC OR QUALITY OF THE GOODS

24   OR SERVICES WITH WHICH THEY ARE USED.  IF THE CONSUMER MUST

25   USE HER IMAGINATION OR THINK THROUGH A SERIES OF STEPS TO

1    UNDERSTAND WHAT THE TRADEMARK IS TELLING ABOUT THE PRODUCT,

2    THEN THE TRADEMARK DOES NOT DIRECTLY DESCRIBE THE PRODUCT'S

3    FEATURES, BUT MERELY SUGGESTS THEM.

4        FOR EXAMPLE, THE TRADEMARK "TAIL WAGGER" FOR DOG FOOD

5    MERELY SUGGESTS THAT YOUR DOG WILL LIKE THE FOOD.  AS ANOTHER

6    EXAMPLE, WHEN "APPLE" IS USED IN THE MARK "APPLE-A-DAY" FOR

7    VITAMINS, IT IS BEING USED AS A SUGGESTIVE TRADEMARK.  "APPLE"

8    DOES NOT DESCRIBE WHAT THE VITAMINS ARE.  HOWEVER, IT SUGGESTS

9    THE HEALTHFULNESS OF "AN APPLE A DAY KEEPING THE DOCTOR AWAY"

10   WITH THE SUPPOSED BENEFITS OF TAKING "APPLE-A-DAY VITAMINS.

11       DESCRIPTIVE WORD MARKS ARE NOT INHERENTLY DISTINCTIVE.

12   THESE MARKS DIRECTLY DESCRIBE SOME CHARACTERISTIC, OR QUALITY

13   OF THE GOODS OR SERVICES WITH WHICH THEY ARE USED IN A

14   STRAIGHTFORWARD WAY THAT REQUIRES NO EXERCISE OF IMAGINATION.

15       FOR INSTANCE, THE WORD "APPLE" IS DESCRIPTIVE WHEN USED IN

16   THE TRADEMARK CRANAPPLE TO DESIGNATE A CRANBERRY-APPLE JUICE.

17   IT DIRECTLY DESCRIBES ONE OF THE INGREDIENTS OF THE JUICE.

18       THERE ARE A NUMBER OF INSTRUCTIONS REGARDING DAMAGES FOR

19   THE TRADEMARK OR SERVICE MARK INFRINGEMENT CLAIMS.

20       IN ORDER FOR PLAINTIFF TO RECOVER DAMAGES, THE PLAINTIFF

21   HAS THE BURDEN OF PROVING BY A PREPONDERANCE OF THE EVIDENCE

22   THAT DEFENDANTS HAD EITHER STATUTORY OR ACTUAL NOTICE THAT THE

23   PLAINTIFF'S SERVICE MARK WAS REGISTERED.

24       DEFENDANT HAD STATUTORY NOTICE IF; FIRST, THE PLAINTIFF

25   DISPLAYED THE TRADEMARK WITH THE WORDS REGISTERED IN U.S.

1   PATENT AND TRADEMARK OFFICE, OR TWO, PLAINTIFF DISPLAYED THE

2   TRADEMARK WITH THE WORDS REG. U.S. PAT. & TM. OFF, OR THREE,

3   PLAINTIFF DISPLAYED THE TRADEMARK WITH THE LETTER "R" ENCLOSED

4   WITHIN A CIRCLE, THUS THE REGISTERED TRADEMARK SYMBOL.

5        IF YOU FIND FOR THE PLAINTIFF ON THE PLAINTIFF'S

6   INFRINGEMENT CLAIM AND FIND THAT THE DEFENDANTS HAD STATUTORY

7   NOTICE OR ACTUAL NOTICE OF THE PLAINTIFF'S REGISTERED

8   TRADEMARK, YOU MUST DETERMINE THE PLAINTIFF'S ACTUAL DAMAGES.

9        THE PLAINTIFF HAS THE BURDEN OF PROVING ACTUAL DAMAGES BY

10  A PREPONDERANCE OF THE EVIDENCE.  THE PLAINTIFF MUST PROVE

11  BOTH THE FACT AND THE AMOUNT OF DAMAGES.  DAMAGES MEANS THE

12  AMOUNT OF MONEY WHICH WILL REASONABLY AND FAIRLY COMPENSATE

13  THE PLAINTIFF FOR ANY INJURY YOU FIND WAS CAUSED BY THE

14  DEFENDANTS' INFRINGEMENT OF THE PLAINTIFF'S REGISTERED SERVICE

15  MARKS.

16       IN THIS CASE, THE PLAINTIFF CLAIMS DAMAGES IN THE FORM OF

17  LOST LICENSING REVENUE.  YOU SHOULD CONSIDER THE LOST

18  LICENSING REVENUE THAT THE PLAINTIFF WOULD HAVE EARNED FROM

19  LICENSING THE SERVICE MARKS BUT FOR THE DEFENDANTS'

20  INFRINGEMENT.

21       IF YOU FIND THAT THE DEFENDANTS INFRINGED PLAINTIFF'S

22  TRADEMARKS, YOU MUST ALSO DETERMINE WHETHER THE INFRINGEMENT

23  WAS INTENTIONAL OR WILLFUL.

24       IN DETERMINING WHETHER DEFENDANTS ACTED WILLFULLY, YOU

25  SHOULD CONSIDER IF DEFENDANTS ENGAGED IN DELIBERATE, FALSE,

1    MISLEADING, OR FRAUDULENT CONDUCT.

2        IF YOU FIND THAT DEFENDANTS INTENTIONALLY OR WILLFULLY

3    INFRINGED PLAINTIFF'S SERVICE MARKS, THEN IN ADDITION TO

4    ACTUAL DAMAGES, THE PLAINTIFF IS ENTITLED TO ANY PROFITS

5    EARNED BY THE DEFENDANTS THAT ARE ATTRIBUTABLE TO THE

6    INFRINGEMENT WHICH THE PLAINTIFF PROVES BY A PREPONDERANCE OF

7    THE EVIDENCE.  YOU MAY NOT, HOWEVER, INCLUDE IN ANY AWARD OF

8    PROFITS ANY AMOUNT THAT YOU TOOK INTO ACCOUNT IN DETERMINING

9    ACTUAL DAMAGES.

10        PROFIT IS DETERMINED BY DEDUCTING ALL EXPENSES FROM GROSS

11    REVENUE.

12        GROSS REVENUE IS ALL OF DEFENDANTS' RECEIPTS FROM USING

13    THE TRADEMARK IN THE SALE OF ITS SERVICES.  THE PLAINTIFF HAS

14    THE BURDEN OF PROVING A DEFENDANTS' GROSS REVENUE BY A

15    PREPONDERANCE OF THE EVIDENCE.

16        EXPENSES ARE ALL OPERATING AND PRODUCTION COSTS INCURRED

17    IN PRODUCING THE GROSS REVENUE.  THE DEFENDANT HAS THE BURDEN

18    OF PROVING THE EXPENSES AND THE PORTION OF THE PROFIT

19    ATTRIBUTABLE TO FACTORS OTHER THAN USE OF THE INFRINGED

20    TRADEMARK BY A PREPONDERANCE OF THE EVIDENCE.

21        UNLESS YOU FIND THAT A PORTION OF THE PROFIT FROM THE SALE

22    OF THE SERVICES USING THE TRADEMARK IS ATTRIBUTABLE TO FACTORS

23    OTHER THAN USE OF THE TRADEMARK, YOU SHOULD FIND THAT THE

24    TOTAL PROFIT IS ATTRIBUTABLE TO THE INFRINGEMENT.

25        NOW THERE'S SOME INSTRUCTIONS REGARDING THE FALSE PROMISE

CLAIM.

DEFENDANT DAN RASURE CLAIMS HE WAS HARMED BECAUSE TECHSHOP MADE A FALSE PROMISE.  TO ESTABLISH THIS CLAIM, MR. RASURE MUST PROVE ALL OF THE FOLLOWING:

FIRST, THAT TECHSHOP MADE A PROMISE TO MR. RASURE.

SECOND, THAT TECHSHOP DID NOT INTEND TO PERFORM THIS PROMISE WHEN IT MADE IT.

THIRD, THAT TECHSHOP INTENDED THAT MR. RASURE RELY ON THIS PROMISE.

FOUR, THAT MR. RASURE REASONABLY RELIED ON TECHSHOP'S PROMISE.

FIVE, THAT TECHSHOP DID NOT PERFORM THE PROMISED ACT.

SIXTH, THAT MR. RASURE WAS HARMED.

AND, SEVEN, THAT MR. RASURE'S RELIANCE ON TECHSHOP'S PROMISE WAS A SUBSTANTIAL FACTOR IN CAUSING HIS HARM.

MR. RASURE RELIED ON A FALSE PROMISE IF THE FALSE PROMISE SUBSTANTIALLY INFLUENCED HIM TO PAY CERTAIN OF TECHSHOP'S EXPENSES AND, SECOND, HE WOULD PROBABLY NOT HAVE PAID CERTAIN OF TECHSHOP'S EXPENSES WITHOUT THE FALSE PROMISE.

IT IS NOT NECESSARY FOR A FALSE PROMISE TO BE THE ONLY REASON FOR TECHSHOP'S CONDUCT.

IN DETERMINING WHETHER MR. RASURE'S RELIANCE ON THE FALSE PROMISE WAS REASONABLE, HE MUST FIRST PROVE THAT THE MATTER WAS MATERIAL.  A MATTER IS MATERIAL IF A REASONABLE PERSON WOULD FIND IT IMPORTANT IN DETERMINING HIS OR HER CHOICE OF

ACTION.

IF YOU DECIDE THAT THE MATTER IS MATERIAL, YOU MUST THEN DECIDE WHETHER IT WAS REASONABLE FOR MR. RASURE TO RELY ON THE FALSE PROMISE.  IN MAKING THIS DECISION, TAKE INTO CONSIDERATION MR. RASURE'S INTELLIGENCE, KNOWLEDGE, EDUCATION, AND EXPERIENCE.

HOWEVER IT IS NOT REASONABLE FOR ANYONE TO RELY ON A FALSE PROMISE THAT IS PREPOSTEROUS.  IT ALSO IS NOT REASONABLE FOR ANYONE TO RELY ON A FALSE PROMISE IF FACTS THAT ARE WITHIN HIS OBSERVATION SHOW THAT IT IS OBVIOUSLY FALSE.

THESE ARE SOME ADDITIONAL INSTRUCTIONS.

ALL PARTIES ARE EQUAL BEFORE THE LAW AND A CORPORATION IS ENTITLED TO THE SAME FAIR AND CONSCIENTIOUS CONSIDERATION BY YOU AS ANY PARTY.

UNDER THE LAW, A CORPORATION IS CONSIDERED TO BE A PERSON. IT CAN ONLY ACT THROUGH ITS EMPLOYEES, AGENTS, DIRECTORS, OR OFFICERS.  THEREFORE, A CORPORATION IS RESPONSIBLE FOR THE ACTS OF ITS EMPLOYEES, AGENTS, DIRECTORS, AND OFFICERS PERFORMED WITHIN THE SCOPE OF AUTHORITY.

ONE MAY AUTHORIZE ANOTHER TO ACT ON HIS OR HER BEHALF IN TRANSACTIONS WITH THIRD PERSONS.  THIS RELATIONSHIP IS CALLED AGENCY.  THE PERSON GIVING THE AUTHORITY IS CALLED THE PRINCIPAL.  THE PERSON TO WHOM THE AUTHORITY IS GIVEN IS CALLED THE AGENT.

A PRINCIPAL IS RESPONSIBLE FOR HARM CAUSED BY THE WRONGFUL

1    CONDUCT OF ITS AGENTS WHILE ACTING WITHIN THE SCOPE OF THEIR

2    AUTHORITY.

3        MR. RASURE CLAIMS THAT HE WAS HARMED BY FALSE PROMISES

4    MADE BY TECHSHOP'S AGENTS, INCLUDING MR. WOODS AND MR. NEWTON.

5    MR. RASURE ALSO CLAIMS THAT TECHSHOP IS RESPONSIBLE FOR THE

6    HARM BECAUSE MR. WOODS, MR. NEWTON, OR OTHERS WERE ACTING AS

7    ITS AGENT WHEN THE INCIDENT OCCURRED.

8        IF YOU FIND THAT THE FALSE PROMISES OF TECHSHOP'S AGENTS

9    HARMED MR. RASURE, THEN YOU MUST DECIDE WHETHER TECHSHOP IS

10   RESPONSIBLE FOR THE HARM.  TECHSHOP IS RESPONSIBLE IF

11   MR. RASURE PROVES BOTH OF THE FOLLOWING:

12       THAT MR. WOODS, MR. NEWTON, OR ANOTHER INDIVIDUAL WAS

13   TECHSHOP'S AGENT AND THAT INDIVIDUAL WAS ACTING WITHIN THE

14   SCOPE OF HIS AGENCY WHEN HE HARMED MR. RASURE.

15       MR. RASURE CLAIMS MR. WOODS, MR. NEWTON, AND OTHER

16   INDIVIDUALS WERE TECHSHOP'S AGENTS AND THAT TECHSHOP IS

17   THEREFORE RESPONSIBLE FOR THEIR CONDUCT.

18       IF MR. RASURE PROVES THAT TECHSHOP GAVE MR. WOODS,

19   MR. NEWTON, OR OTHER INDIVIDUALS AUTHORITY TO ACT ON ITS

20   BEHALF, THEN THEY WERE TECHSHOP'S AGENT.  THIS AUTHORITY MAY

21   BE SHOWN BY WORDS OR MAY BE IMPLIED BY THE PARTIES' CONDUCT.

22   THIS AUTHORITY CANNOT BE SHOWN BY THE WORDS OF THE AGENT

23   ALONE.

24       LAST SUBSTANTIVE INSTRUCTION REGARDING DAMAGES.

25       IF YOU DECIDE THAT MR. RASURE HAS PROVED HIS CLAIM AGAINST

TECHSHOP, YOU ALSO MUST DECIDE HOW MUCH MONEY WILL REASONABLY COMPENSATE MR. RASURE FOR THE HARM.  THIS COMPENSATION IS CALLED DAMAGES.

THE AMOUNT OF DAMAGES MUST INCLUDE AN AWARD FOR ALL HARM THAT TECHSHOP WAS A SUBSTANTIAL FACTOR IN CAUSING EVEN IF THE PARTICULAR HARM COULD NOT HAVE BEEN ANTICIPATED.

MR. RASURE MUST PROVE THE AMOUNT OF HIS DAMAGES.

HOWEVER, MR. RASURE DOES NOT HAVE TO PROVE THE EXACT AMOUNT OF DAMAGES THAT WILL PROVIDE REASONABLE COMPENSATION FOR THE HARM.  YOU MUST NOT SPECULATE OR GUESS IN AWARDING DAMAGES.

TO DECIDE THE AMOUNT OF DAMAGES YOU MUST DETERMINE THE VALUE OF WHAT MR. RASURE GAVE AND SUBTRACT FROM THAT AMOUNT THE VALUE OF WHAT HE RECEIVED.

MR. RASURE MAY ALSO RECOVER AMOUNTS THAT HE REASONABLY SPENT IN RELIANCE ON TECHSHOP'S FALSE PROMISE IF THOSE AMOUNTS WOULD NOT OTHERWISE HAVE BEEN SPENT.

SO THE REMAINING INSTRUCTIONS ARE CONCERNING YOUR DUTY AS JURORS AND THE PROCESS FOR YOUR DELIBERATIONS.

BEFORE YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE JURY AS YOUR PRESIDING JURY.  THE PRESIDING JUROR WILL PRESIDE OVER THE DELIBERATIONS AND SERVE AS THE SPOKESPERSON HERE IN COURT.

PRESIDING JUROR IS ANOTHER WORD FOR FOREPERSON.

YOU SHALL DILIGENTLY STRIVE TO REACH AGREEMENT WITH ALL OF

```
 1    THE OTHER JURORS, IF YOU CAN DO SO.  YOUR VERDICT MUST BE
 2    UNANIMOUS.  EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT
 3    YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE
 4    EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND
 5    LISTENED TO THEIR VIEWS.  IT IS IMPORTANT THAT YOU ATTEMPT TO
 6    REACH A UNANIMOUS VERDICT BUT, OF COURSE, ONLY IF EACH OF YOU
 7    CAN DO SO AFTER HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.
 8        DO NOT BE UNWILLING TO CHANGE YOUR OPINION IF THE
 9    DISCUSSION PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO
10    A DECISION SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT OR
11    CHANGE AN HONEST BELIEF ABOUT THE WEIGHT OF THE EVIDENCE --
12    THE WEIGHT AND EFFECT OF THE EVIDENCE SIMPLY TO REACH A
13    VERDICT.
14        PARTS OF THIS ONE WILL SOUND FAMILIAR TO YOU.
15        BECAUSE YOU MUST BASE OUR VERDICT ONLY ON THE EVIDENCE
16    RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU
17    THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT
18    THE CASE OR TO THE ISSUES IT INVOLVES.  EXCEPT FOR DISCUSSING
19    THE CASE WITH YOUR FELLOW JURORS DURING YOUR DELIBERATIONS, DO
20    NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET ANYONE
21    ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF THE
22    CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES DISCUSSING THE
23    CASE IN PERSON, IN WRITING, BY PHONE OR ELECTRONIC MEANS, VIA
24    EMAIL, VIA TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG,
25    WEBSITE, OR APPLICATION, INCLUDING BUT NOT LIMITED TO OUR LIST
```

1    OF FAVORITES, FACEBOOK, YOUTUBE, TWITTER, INSTAGRAM, LINKEDIN,

2    SNAPCHAT, OR ANY OTHER FORMS OF SOCIAL MEDIA.  THIS APPLIES TO

3    COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE

4    MEDIA OR PRESS, AND THE PEOPLE INVOLVED IN THE TRIAL.  IF YOU

5    ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE OR

6    ANYTHING TO DO WITH THIS CASE, YOU MUST RESPOND THAT YOU HAVE

7    BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

8    CONTACT TO THE COURT.

9        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

10   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

11   IT, ALTHOUGH I HAVE NO INFORMATION THAT THERE WILL BE NEWS

12   REPORTS ABOUT THIS CASE IN PARTICULAR.  DO NOT DO ANY

13   RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

14   INTERNET, OR USING OTHER REFERENCE MATERIALS, AND DO NOT MAKE

15   ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

16   CASE ON YOUR OWN.  DO NOT VISIT OR VIEW ANY PLACE DISCUSSED IN

17   THIS CASE AND DO NOT USE INTERNET PROGRAMS OR OTHER DEVICES TO

18   SEARCH FOR OR VIEW ANY PLACE DISCUSSED DURING THE TRIAL.

19       ALSO DO NOT DO ANY RESEARCH ABOUT THIS CASE, THE LAW, OR

20   THE PEOPLE INVOLVED, INCLUDING THE PARTIES, THE WITNESSES, OR

21   THE LAWYERS UNTIL YOU'VE BEEN EXCUSED AS JURORS.

22       IF YOU HAPPEN TO READ OR HEAR ANYTHING TOUCHING ON THIS

23   CASE IN THE MEDIA, TURN AWAY AND REPORT IT TO ME AS SOON AS

24   POSSIBLE.

25       THESE RULES PROTECT EACH PARTY'S RIGHT TO HAVE THIS CASE

1    DECIDED ONLY ON EVIDENCE THAT HAS BEEN PRESENTED HERE IN

2    COURT.  WITNESSES HERE IN COURT TAKE AN OATH TO TELL THE TRUTH

3    AND THE ACCURACY OF THEIR TESTIMONY IS TESTED THROUGH THE

4    TRIAL PROCESS.  IF YOU DO ANY RESEARCH OR INVESTIGATION

5    OUTSIDE THE COURTROOM, OR GAIN ANY INFORMATION THROUGH

6    IMPROPER COMMUNICATIONS, THEN YOUR VERDICT MAY BE INFLUENCED

7    BY INACCURATE, INCOMPLETE, OR MISLEADING INFORMATION THAT HAS

8    NOT BEEN TESTED BY THE TRIAL PROCESS.

9        EACH OF THE PARTIES IS ENTITLED TO A FAIR TRIAL BY AN

10   IMPARTIAL JURY.  AND IF YOU DECIDE THE CASE BASED ON

11   INFORMATION NOT PRESENTED IN COURT, YOU WILL HAVE DENIED THE

12   PARTIES A FAIR TRIAL.  REMEMBER, YOU'VE TAKEN AN OATH TO

13   FOLLOW THE RULES AND IT IS VERY IMPORTANT THAT YOU FOLLOW

14   THESE RULES.

15       A JUROR WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES THE

16   FAIRNESS OF THESE PROCEEDINGS AND A MISTRIAL THAT COULD RESULT

17   THAT WOULD REQUIRE THE ENTIRE TRIAL PROCESS TO START OVER.  IF

18   ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE NOTIFY

19   THE COURT IMMEDIATELY.

20       IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

21   COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE COURT

22   SECURITY OFFICER WHO WILL BE OUTSIDE YOUR JURY ROOM, SIGNED BY

23   YOUR PRESIDING JUROR OR BY ONE OR MORE MEMBERS OF THE JURY.

24       NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE

25   WITH ME EXCEPT BY A SIGNED WRITING.  I WILL COMMUNICATE WITH

1    ANY MEMBER OF THE JURY ON ANYTHING CONCERNING THE CASE ONLY IN

2    WRITING OR HERE IN OPEN COURT.

3        IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

4    PARTIES BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU

5    MAY CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER

6    TO ANY QUESTION.  REMEMBER, THAT YOU ARE NOT TO TELL ANYONE,

7    INCLUDING ME, HOW THE JURY STANDS NUMERICALLY OR OTHERWISE

8    UNTIL AFTER YOU'VE REACHED A UNANIMOUS VERDICT OR HAVE BEEN

9    DISCHARGED.  DO NOT IS DISCLOSE ANY VOTE COUNT IN ANY NOTE TO

10   THE COURT.

11       AS YOU SAW, A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AND

12   MS. RILEY WILL SUPPLY YOU WITH THAT.  AFTER YOU HAVE REACHED

13   UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON, OR

14   PRESIDING JUROR, SHOULD COMPLETE THE VERDICT FORM ACCORDING TO

15   YOUR DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE COURT

16   SECURITY OFFICER THAT YOU ARE READY TO RETURN TO THE

17   COURTROOM.

18       ALL RIGHT.  SO AT THIS TIME I WILL RELEASE YOU TO BEGIN

19   YOUR DELIBERATIONS.

20       MADAME CLERK, IS OUR COURT SECURITY PRESENT?

21           **THE CLERK:**  HE IS.  YOU WANT TO STEP FORWARD AND BE

22   SWORN?

23               (SECURITY OFFICER SWORN.)

24       **SECURITY OFFICER:**  I DO.

25       **THE CLERK:**  THANK YOU.

1          **THE COURT:**  THANK YOU.

2      SO I WILL RELEASE YOU AT THIS TIME TO BEGIN YOUR

3   DELIBERATIONS, LADIES AND GENTLEMEN.  AS I MENTIONED

4   YESTERDAY, AT THIS POINT YOU ARE NO LONGER SUBJECT TO MY

5   SCHEDULE.  SO AS A GROUP, YOU MAY DECIDE TO DELIBERATE LATER

6   IN THE DAY, AND JURORS OFTEN DO THAT, BUT IT IS ENTIRELY UP TO

7   YOU AS A GROUP TO SET YOUR SCHEDULE FOR DELIBERATIONS AT THIS

8   POINT.  SO THAT'S SOMETHING THAT GENERALLY THE JURY TAKES UP

9   RELATIVELY EARLY IN THE DELIBERATIONS.

10     THANK YOU VERY MUCH.  I WILL NOW RELEASE YOU FROM YOUR

11  DELIBERATIONS, AND WE WILL ADJOURN ON OUR PART.

12          (JURORS BEGIN DELIBERATING AT 1:07 P.M.)

13     (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

14          **THE CLERK:**  YOU MAY BE SEATED.

15          **THE COURT:**  ALL RIGHT.  SO ONCE MS. RILEY COMES BACK,

16  SHE WILL GENERALLY ASK FOR YOUR CELL NUMBERS.  SO IF SHE NEEDS

17  TO GET IN TOUCH WITH YOU ABOUT A JURY QUESTION OR A VERDICT,

18  WE CAN DO THAT.  IT'S PROBABLY BEST TO STAY RELATIVELY CLOSE

19  BY IF YOU CAN DO THAT IN CASE WE HAVE QUESTIONS.

20     ALL RIGHT.  WE WILL BE BACK TOGETHER WHEN WE ARE BACK

21  TOGETHER.

22     (NO FURTHER PROCEEDINGS WERE HELD IN COURT.  JURORS

23  ADJOURNED DELIBERATIONS AT 5:00 P.M.)

24

25

## CERTIFICATE OF REPORTER

       I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

TUESDAY, JULY 30, 2019