VOL. 4

PAGES 494 - 712

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM, JR., JUDGE**

TECHSHOP, INC.,                    )
                                   )
            PLAINTIFF,             )   NO. C-18-1044 HSG
                                   )
  VS.                              )   THURSDAY, JUNE 6, 2019
                                   )
DAN RASURE, ET AL.,                )   OAKLAND, CALIFORNIA
                                   )
                                   )   JURY TRIAL
            DEFENDANTS.            )
_____)

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**             PARRISH LAW OFFICE
                              24 LEXINGTON DRIVE
                              MENLO PARK, CALIFORNIA 94205
                        BY:   JAMES C. PISTORINO, ESQUIRE

**ALSO PRESENT:**              DORIS KAELIN, BANKRUPTCY TRUSTEE

**FOR DEFENDANTS:**            QUINN EMANUEL URQUHART & SULLIVAN
                              555 TWIN DOLPHIN DRIVE, 5TH FLOOR
                              REDWOOD SHORES, CALIFORNIA 94065
                        BY:   ANDREA P. ROBERTS, ESQUIRE
                              OLGA SLOBODYANYUK, ESQUIRE

                              JOHN E. NATHAN, ESQUIRE
                              1175 PARK AVENUE
                              NEW YORK, NEW YORK 10128

**REPORTED BY:**               DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                              OFFICIAL COURT REPORTER

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

**I N D E X**

| PLAINTIFF'S WITNESSES: | PAGE | VOL. |
|---|---|---|
| **MATOLO, ERIC** | | |
| DIRECT EXAMINATION BY MR. PISTORINO (RESUMED) | 510 | 4 |
| CROSS-EXAMINATION BY MR. NATHAN | 536 | 4 |
| REDIRECT EXAMINATION BY MR. PISTORINO | 577 | 4 |
| RECROSS-EXAMINATION BY MR. NATHAN | 594 | 4 |
| **SPURLOCK, RYAN** | | |
| DIRECT EXAMINATION BY MR. PISTORINO | 599 | 4 |
| CROSS-EXAMINATION BY MR. NATHAN | 642 | 4 |
| **DEFENDANTS' WITNESSES:** | | |
| **NEWTON, JAMES** | | |
| DIRECT EXAMINATION BY MS. ROBERTS | 658 | 4 |
| CROSS-EXAMINATION BY MR. PISTORINO | 660 | 4 |
| **RASURE, DAN** | | |
| DIRECT EXAMINATION BY MS. ROBERTS | 661 | 4 |

| TRIAL EXHIBITS: | WITHDRAWN | I.D. | EVD. | VOL. |
|---|---|---|---|---|
| 2 | | | 614 | 4 |
| 3 | | | 620 | 4 |
| 6 | | | 528 | 4 |
| 17 | | | 618 | 4 |
| 71 | | | 582 | 4 |
| 72 | | | 582 | 4 |
| 73 | | | 523 | 4 |

| TRIAL EXHIBITS: | WITHDRAWN | I.D. | EVD. | VOL. |
|---|---|---|---|---|
| 93 | | | 515 | 4 |
| 195 | | | 624 | 4 |
| 290 | | | 537 | 4 |
| 293 | | | 516 | 4 |
| 306 | | | 518 | 4 |
| 310 | | | 562 | 4 |
| 312 | | | 556 | 4 |
| 317 | | | 557 | 4 |
| 376 | | | 571 | 4 |
| 580 | | | 672 | 4 |
| 585 | | | 675 | 4 |
| 600 | | | 679 | 4 |
| 601 | | | 677 | 4 |
| 626 | | | 689 | 4 |
| 627 | | | 690 | 4 |
| 640 | | | 700 | 4 |
| 746 | | | 540 | 4 |
| 1075 | | | 574 | 4 |

```
 1    WEDNESDAY, JUNE 6, 2019                        8:00 A.M.

 2                      P R O C E E D I N G S

 3                             O0O

 4         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

 5            THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THE COURT

 6    IS IN SESSION.  THE HONORABLE HAYWOOD S. GILLIAM, JR.,

 7    PRESIDING.

 8         CALLING C-18-1044 TECHSHOP, INC. VERSUS RASURE, ET AL.

 9         PLEASE STEP FORWARD AND STATE YOUR APPEARANCES FOR THE

10    RECORD PLEASE.

11            MR. PISTORINO:  GOOD MORNING, YOUR HONOR.  JAMES

12    PISTORINO ON BEHALF OF TECHSHOP.

13            THE COURT:  GOOD MORNING.

14            MS. ROBERTS:  ANDREA ROBERTS ON BEHALF OF DEFENDANTS.

15            THE COURT:  GOOD MORNING.

16         ALL RIGHT.  I GOT THE BRIEFS FROM LAST NIGHT.  LET'S GO

17    THROUGH THE ISSUES.

18         SO THE FIRST CONCERNS MR. NEWTON IF HE'S RECALLED.  IT'S

19    IMMINENTLY REASONABLE NOT TO MAKE HIM MISS HIS CHILD'S HIGH

20    SCHOOL GRADUATION.  HE CAN BE CALLED TODAY.

21         THE CRUX OF THE DISPUTE SEEMS TO BE THAT THE PLAINTIFF IS

22    WORRIED ABOUT WHAT DOCUMENTS MIGHT BE INTRODUCED.  THE

23    ARGUMENT IS THAT NONE WILL BE INTRODUCED EXCEPT FOR

24    IMPEACHMENT.  AND I'M JUST CURIOUS AS TO WHAT THAT MEANS.

25    IMPEACHMENT WITH PRIOR INCONSISTENT STATEMENTS?
```

1    WE HAVE OBVIOUSLY SEEN WHAT SEEMS LIKE MILLIONS OF EMAILS

2    WITH THESE PEOPLE ON THE DOCUMENT YESTERDAY THAT WAS ATTEMPTED

3    TO BE INTRODUCED FOR IMPEACHMENT DIDN'T ACTUALLY IMPEACH

4    ANYTHING, SO I AM CURIOUS AS TO WHAT EXACTLY YOU ANTICIPATE

5    TRYING TO PUT IN QUOTE-UNQUOTE "IMPEACHMENT".

6         **MS. ROBERTS:**  SURE.  WE MAY NOT NEED TO PUT IN THE

7    DOCUMENT.  MR. NEWTON IS THE... I'M FORGETTING THE

8    TERMINOLOGY.

9    HE'S THE PERSON -- RESPONSIBLE PERSON IN THE BANKRUPTCY

10   FOR TECHSHOP.  HE'S NAMED -- HE WAS DESIGNATED THAT IN THE

11   BANKRUPTCY PROCEEDINGS.

12   THE CUSTOMER LIST THAT PLAINTIFF HAS BEEN SPENDING A LOT

13   OF TIME ON AND IT'S NOT AN ISSUE IN THIS CASE WAS ACTUALLY

14   MADE PUBLIC IN THE BANKRUPTCY FILING, WHICH MR. NEWTON SHOULD

15   KNOW AS THE RESPONSIBLE PERSON.

16   SO, FRANKLY, WE DON'T THINK THE CUSTOMER LIST SHOULD BE

17   PART OF THE CASE AT ALL, BUT SINCE PLAINTIFF INTRODUCED THAT,

18   WE WANT TO CALL MR. NEWTON TO CLARIFY THAT THAT LIST HAS BEEN

19   MADE PUBLIC.

20         **THE COURT:**  ALL RIGHT.

21         **MR. PISTORINO:**  MAY I JUST ADDRESS THESE ISSUES

22   BRIEFLY?

23   IN TERMS OF MR. NEWTON AND HIS TESTIMONY, OBVIOUSLY I

24   DON'T WANT ANYBODY TO MISS THEIR CHILD'S GRADUATION.  THE

25   ISSUE JUST COMES DOWN TO THE ORDER OF THE WITNESSES.  WE HAVE

```
1    GOT A DISCLOSURE THAT MR. RASURE IS NEXT --

2            THE COURT:  I UNDERSTAND THE CIRCUMSTANCE.  I'VE

3    RULED.  HE CAN TESTIFY TODAY.

4            MR. PISTORINO:  OKAY.

5            THE COURT:  ALL RIGHT, NEXT.  THERE SEEMS TO BE THIS

6    ONGOING OBJECTION TO FRAUD EVIDENCE.  YOUR RECORD IS MADE.

7    I'VE RULED.  YOUR RECORD IS MADE.

8            MR. PISTORINO:  OKAY.

9            THE COURT:  ALL RIGHT.  THE EXPERT.  HERE'S HOW I'M

10   GOING TO HANDLE THIS.

11       IT'S PLAIN THAT EVERYBODY AGREES THAT THE EXPENSE ANALYSIS

12   IS BEYOND THE SCOPE OF THE OPINION THAT HE OFFERED IN HIS

13   REPORTS.  THAT'S UNDISPUTED.  CORRECT?

14           MR. PISTORINO:  CORRECT.

15           THE COURT:  SO HE'S NOT GOING TO TESTIFY TO THAT

16   TODAY.

17       NOW THE QUESTION BECOMES WHETHER THE MATERIAL THAT THE

18   DEFENDANTS ARE TRYING TO PUT IN THROUGH MR. JOHNSON WAS

19   APPROPRIATELY DISCLOSED.  IT'S NOT CLEAR TO ME THAT IT WAS.

20   IT'S VERY POSSIBLE THAT EVIDENCE IS JUST GOING TO BE EXCLUDED

21   AND THAT ISSUE IS GOING TO BE OUT OF THE CASE.  EVEN IF IT WAS

22   DISCLOSED IN A TIMELY MANNER, I'LL DECIDE, ONCE IT COMES IN,

23   IF MR. MATOLO CAN BE PUT ON IN REBUTTAL FOR THIS.

24       BUT IT'S JUST... AND, AGAIN, COUNSEL, YOU KNOW MY FEELING

25   ABOUT THE WAY THE CASE HAS BEEN LITIGATED.  THE IDEA THAT
```

1   EVERYBODY IS NOW SQUAWKING ABOUT DISCOVERY ISSUES SEVERAL DAYS

2   INTO A TRIAL IS SURPRISING TO ME.  AND IT'S NOT AN ANSWER FOR

3   THE DEFENSE TO SAY THAT WE MAGNANIMOUSLY AGREED TO MAKE HIM

4   AVAILABLE FOR DEPOSITION DURING THE TRIAL.  THAT IS JUST NOT

5   KIND OF IT.

6       SO I THINK THE ISSUE FOR TODAY IS SIMPLE; YOU CAN'T GO

7   BEYOND THE SCOPE OF HIS REPORT.

8           **MR. PISTORINO:**  CORRECT.

9           **THE COURT:**  THEN I THINK BEFORE MR. JOHNSON TRIES TO

10  SAY ANYTHING ABOUT ANY OF THIS, I'LL NEED TO HAVE IT TEED UP

11  SO I CAN DECIDE IF THAT MATERIAL WAS PROPERLY DISCLOSED AND

12  WHETHER IT SHOULD BE ALLOWED TO COME IN.

13      I ASSUME WE DON'T ANTICIPATE MR. JOHNSON COMING ON TODAY.

14          **MR. NATHAN:**  NO, YOUR HONOR.

15      JUST TO FOLLOW UP A POINT.  ONE OF THE TWO EXHIBITS THAT

16  WE BRIEFED WAS 375.  AND I DELIBERATELY DID NOT PUT IN THE

17  BRIEF THAT 375 RECITES ALL OF THE ALLEGATIONS ABOUT THE

18  DISCOVERY MISCONDUCT.

19          **THE COURT:**  YEAH, THAT CLEARLY CAN'T COME IN.  WE ARE

20  NOT PUTTING IN AN EMAIL FROM DEFENSE COUNSEL.  THAT IS NEVER

21  GOING TO HAPPEN.

22          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

23          **THE COURT:**  FRANKLY, FROM A 403 PERSPECTIVE, TRYING

24  TO PUT IN A COMPLAINT FROM SOME OTHER STATE COURT CASE ALSO

25  STRIKES ME AS VERY UNLIKELY TO COME IN.

1           AS I SAID, WE WILL DEAL WITH THAT IF AND WHEN IT'S

2     DETERMINED THAT THIS ISSUE IS EVEN IN THE CASE.

3           **MR. NATHAN:**  YOUR HONOR ALREADY RULED ON MOTION IN

4     LIMINE NO. 4 TO EXCLUDE ANYTHING ABOUT DISCOVERY CONDUCT SO WE

5     WERE SURPRISED TO SEE IT IN THE EXHIBIT LIST.  AND I DIDN'T

6     DELIBERATIVELY DID NOT PUT IT IN THE BRIEF BECAUSE THE

7     ALLEGATIONS ARE SO AGGRAVATED THAT I DIDN'T THINK IT WAS

8     APPROPRIATE TO PUT THEM IN THE BRIEF.

9           **THE COURT:**  RIGHT.  AND AS I SAID, THE -- I THINK

10    PROBABLY FOR TOMORROW WHAT OUGHT TO BE DONE IS THE TEE UP WHY

11    YOU'RE SEEKING TO EXCLUDE THE NEW EVIDENCE FROM JOHNSON,

12    ASSUMING IT'S NEW, AND YOU CAN ADDRESS THAT AND I WILL DECIDE

13    IT.

14          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

15          **THE COURT:**  WE ARE CLEAR FOR TODAY.  AS TO

16    DR. MATOLO, HE'S RESTRICTED TO THE SCOPE OF HIS REPORT.  SO TO

17    THE EXTENT THERE WAS A MOTION TO EXCLUDE THESE MATERIALS, THAT

18    MOTION IS GRANTED.

19          **MR. PISTORINO:**  OKAY.

20          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

21          **THE COURT:**  ALL RIGHT.

22         AND THEN EXHIBIT 1070, I DON'T UNDERSTAND WHAT THE DEFENSE

23    IS TRYING TO DO.  YOU CAN'T PUT IN SOME OMNIBUS

24    UNAUTHENTICATED BUNCH OF EMAILS.  IT'S NOT CLEAR TO ME WHAT

25    THE RELEVANCE IS EVEN IF YOU GET PASSED THE HEARSAY QUESTION.

```
1        I UNDERSTAND YOU ARE SAYING YOU ARE NOT OFFERING IT FOR
2   TRUTH, BUT TO THE EXTENT YOU ARE SAYING IT GOES TO THE
3   WITNESS'S STATE OF MIND IT SEEMS ONLY MARGINALLY RELEVANT ON
4   THAT POINT AND IT SEEMS TO ME TRYING TO JUST BLOB IN A STACK
5   OF A HUNDRED EMAILS RAISES SUBSTANTIAL CONFUSION ISSUES UNDER
6   RULE 403.
7        WHAT IS THE POINT OF THE MATERIAL?
8        MS. ROBERTS:  WELL, YOUR HONOR, THE POINT AND THE
9   RELEVANCE OF THE MATERIAL GOES TO THE VALUE OF THIS BRAND THAT
10  PLAINTIFF HAS TOLD THE JURY WAS TREMENDOUSLY SUCCESSFUL, BUT
11  WE ALL KNOW THEY DECLARED BANKRUPTCY.
12       MR. RASURE AND THESHOP.BUILD'S INFO EMAIL ADDRESS RECEIVED
13  PLENTY OF EMAILS FROM CUSTOMERS COMPLAINING ABOUT TECHSHOP,
14  ASKING IF THERE'S ANY RELIEF THAT THESHOP.BUILD CAN GIVE TO
15  THEM BECAUSE THEY HAVE BEEN LEFT OUT COLD HAVING MADE
16  INVESTMENTS, PURCHASING MEMBERSHIPS IN TECHSHOP, AND WANTING
17  TO KNOW WHAT HE COULD DO ABOUT IT, ASKING IF HE KNEW HOW THEY
18  COULD GET THEIR EQUIPMENT THAT WAS LOCKED UP.
19       SO THE STATEMENTS IN THERE, WE'RE NOT OFFERING TO PROVE
20  YES OR NO WHETHER A PARTICULAR CUSTOMER'S EQUIPMENT WAS, YOU
21  KNOW, LOCKED INSIDE, BUT THIS IS ALL INFORMATION THAT HE
22  RECEIVED AND GOES TO HIS STATE OF MIND OF THE VALUE OF THE
23  BRAND THAT PLAINTIFF IS SAYING IS SO VALUABLE, AND DR. MATOLO
24  IS GOING TO GET ON THE STAND AND SAY THE LOST LICENSING
25  REVENUE WAS 1.5 MILLION BASED ON LICENSING AGREEMENTS THAT
```

1    PREDATE THE BANKRUPTCY.

2        SO THESE COMMUNICATIONS GO TO MR. RASURE'S STATE OF MIND

3    AS TO WHAT ONE WOULD ACTUALLY PAY, AND SHOW THAT THE LICENSE

4    AGREEMENTS THAT PLAINTIFF IS RELYING ON ARE NOT PERTINENT

5    BECAUSE THERE WAS THIS INTERVENING BIG IMPORTANT EVENT OF THE

6    CLOSURE ON NOVEMBER 15TH.

7        **THE COURT:**  SEE, THEY DON'T -- THESE ARE JUST -- I'M

8    JUST LOOKING AT THEM.  ONE IS DECEMBER 2017, AND THEN I SCROLL

9    DOWN AND ONE IS DECEMBER -- THEY SEEM TO SPAN THE PERIOD

10   THROUGH MARCH 2018.  MARCH, MAY 2018.  I DON'T THINK YOU CAN

11   DO THIS IN THIS OMNIBUS WAY.  I DON'T.

12       HOW DOES -- HOW DO EMAILS TO THESHOP.BUILD IN JUNE OF 2018

13   DO WHAT YOU JUST SAID?

14       **MS. ROBERTS:**  BECAUSE THEY SHOW THAT THE VALUE OF THE

15   BRAND AFTER NOVEMBER 15TH DOES NOT MATCH UP TO THE TESTIMONY

16   THAT PLAINTIFF'S WITNESSES HAVE PROVIDED AND THAT DR. MATOLO

17   IS GOING TO TESTIFY ABOUT.

18       I WILL ADD THAT PLAINTIFF, WE HAVEN'T BRIEFED THE EXHIBITS

19   THAT HAVE BEEN DISCLOSED FOR CROSS-EXAMINATION OF MR. RASURE,

20   BUT PLAINTIFF HAS DISCLOSED A WHOLE BUNCH OF CUSTOMER EMAILS.

21       SO BASICALLY IF THEY ARE GOING TO COME IN ON ONE SIDE --

22   WE ARE PREPARED THAT IF WE CAN PRESENT THESE CUSTOMER EMAILS,

23   THEN PLAINTIFF CAN DO THE SAME.  CUSTOMER EMAILS COME IN FOR

24   EVERYBODY.

25       WHAT WE DID IS WE COMPILED THEM INTO ONE.  WHAT PLAINTIFF

1    DID IS GIVE US A LIST OF OVER 200 EXHIBITS YESTERDAY THAT HE

2    INTENDS TO INTRODUCE THROUGH MR. RASURE.

3        BUT WE ARE FINE WITH THE SAME RULES APPLYING TO BOTH

4    SIDES.

5            **MR. PISTORINO:**  I THINK IN TERMS OF MY DISCLOSURE

6    ABOUT MR. RASURE AND HIS CROSS-EXAMINATION, I DON'T THINK

7    WE'RE AT THAT ISSUE TODAY, BUT PRESUMABLY --

8            **THE COURT:**  LOOK, LET'S NOT BE KIDS ABOUT THIS.

9    LET'S BE -- WHAT ARE YOU PLANNING TO DO WITH THEM?

10           **MR. PISTORINO:**  SO MY -- THE ISSUES I HAVE BEEN

11   HAVING HERE IS, AS I SAY, WITH RESPECT TO THEIR ATTEMPTED USES

12   OF THESE MATERIALS, NUMBER ONE, I AGREE, I DON'T THINK YOU CAN

13   HAVE JUST A GENERAL OMNIBUS THING WITH, YOU KNOW, HUGE NUMBERS

14   OF INDIVIDUAL COMMUNICATIONS IN THEM, EACH ONE OF WHICH SPANS,

15   YOU KNOW, CRAZY TIME FRAMES.  YOU'D HAVE TO HAVE THEM

16   INDIVIDUALLY.

17       NUMBER TWO, AS I SAY, THE DOCUMENTS -- YOU CAN NEVER

18   AUTHENTICATE THEM, OF COURSE, BECAUSE THEY REMOVED THE

19   INFORMATION ABOUT IT.  IN MANY INSTANCES IT'S JUST BLANK WHY,

20   BUT IN SOME INSTANCES IT SAYS CUSTOMER IDENTITY.  SO THE FIRST

21   POINT, OF COURSE, IS THAT YOU DON'T KNOW WHO'S SAYING WHAT.

22   YOU DON'T KNOW WHO'S SAYING WHAT.

23       THE DOCUMENTS THEMSELVES ARE NOT THE ORIGINALS AND THEY

24   COULD NEVER BE EVALUATED.  I KNOW WE SAW DOCUMENTS IN THIS

25   CASE, BECAUSE IT HASN'T BEEN REALLY AN ISSUE, BUT WE DO HAVE

```
1    IN THE PRODUCTION OF THIS CASE WE'VE SEEN MANY INSTANCES WHERE

2    MR. RASURE ENCOURAGED OTHERS TO POST THINGS, FOR EXAMPLE, ON

3    FACEBOOK AND OTHER FORA.

4        SO, AGAIN, WHEN I LOOK AT THOSE DOCUMENTS, I KNOW, FIRST,

5    THEY ARE NOT THE ORIGINAL DOCUMENTS.  TWO, THE INFORMATION IN

6    THEM HAS BEEN REMOVED SO I CAN NO LONGER ASSESS THEM.  THEY

7    SPAN A CRAZY TIME FRAME.  YEAH, I DON'T KNOW HOW.  SO I THINK

8    FROM THEIR PERSPECTIVE THEY COULDN'T USE THEM IN THAT WAY.

9        COMING OVER TO MY SIDE NOW WITH USE AGAINST MR. RASURE,

10   YEAH, I THINK THE CASES ARE CLEAR, IN FACT, THAT HEARSAY

11   EVIDENCE CAN BE USED TO ESTABLISH LIKELIHOOD OF CONFUSION.  SO

12   I THINK THERE ARE A BOAT LOADS OF CASES SAYING THAT.

13       IN THIS INSTANCE, WHEN THEY HAVE ALTERED THE DOCUMENTS, I

14   AM WILLING TO ACCEPT THEIR ALTERED DOCUMENTS FOR MY PURPOSES

15   TO SHOW IT, BUT I DON'T THINK THEY CAN ALTER THEM FOR THEIR

16   PURPOSES.

17       THE COURT:  HOW DOES THAT MAKE ANY SENSE?  YOU ARE

18   TRYING TO USE THE EXACT SAME KIND OF REDACTED DOCUMENTS THAT

19   THEY ARE?

20       MR. PISTORINO:  SO I THINK IF THEY HAVE ALTERED THE

21   DOCUMENTS IN A WAY TO ADVANTAGE THEMSELVES, I THINK THEY'VE

22   GOT THESE PROBLEMS.

23       WHEN I'M ATTEMPTING TO USE OTHER DOCUMENTS, I THINK IF I

24   AM WILLING TO ACCEPT THE DOCUMENTS IF THEY HAVE ALTERED THEM,

25   I THINK THEY CAN PROPERLY BE USED.  ON TOP OF IT, I THINK IT
```

1    IS A DISTINCTION THAT THE CASE LAW IS CLEAR.  I THINK HEARSAY

2    EVIDENCE CAN BE USED TO ESTABLISH ACTUAL CONFUSION.  THERE ARE

3    BOAT LOADS OF CASES SAYING THAT.

4         **THE COURT:**  I KNOW, NONE OF WHICH YOU'VE CITED.

5         LOOK, LOOK, LOOK.  GOOD GRIEF PEOPLE.  NONE OF THIS IS

6    COMING IN UNTIL THIS IS BRIEFED.  SO STRUCTURE YOUR CASE SO

7    THAT YOU CAN HAVE A FULLER EXPLANATION WITH SOME CASE LAW.

8    YES, I KNOW THAT.  I'VE DEALT WITH IT IN CASES.  YOU NEVER

9    CITED ONE OF THEM.  SO IT DOESN'T HELP FOR YOU TO COME IN HERE

10   AND ALLUDE TO A BOAT LOAD OF CASES.

11        THE WAY THAT COURT WORKS IS YOU CITE THE CASES.  I LOOK AT

12   THE CASES AND I DECIDE IF THEY SUPPORT WHAT YOU'RE SAYING.

13        **MR. PISTORINO:**  IF I MAY -- AND I AM FULLY PREPARED

14   TO DO THAT, BUT THE RASURE DISCLOSURE WAS, AT LEAST MY

15   UNDERSTANDING, WAS NOT AT ISSUE TODAY.  I DIDN'T BRIEF IT.  I

16   WOULD HAVE BRIEFED IT EXACTLY AS I JUST DID.  IT'S NOT AT

17   ISSUE TODAY.  THAT'S WHY I FOCUSED ON THEIR DISPUTE -- THE

18   DISPUTE HERE ABOUT 1070.

19        **THE COURT:**  ALL RIGHT.  BUT THEY ARE OFFERING IT --

20   WELL, ALL RIGHT.

21        MY INCLINATION IS TO EXCLUDE THIS EXHIBIT 1070 UNDER

22   RULE 403.  THE PROBATIVE VALUE OF IT FOR THE PURPOSE THAT IS

23   ADVANCED IS... APPEARS TO ME TO BE OUTWEIGHED BY THE

24   LIKELIHOOD OF CONFUSION, SUBSTANTIALLY OUTWEIGHED.

25        IF YOU WANT TO BRIEF THIS BETTER, THEN YOU CAN TRY TO

1    DEFER TRYING TO GET IT IN.

2        **MS. ROBERTS:**  YOUR HONOR, WOULD SPLITTING THE EXHIBIT

3    UP BE ACCEPTABLE TO YOUR HONOR?  I MEAN, I THINK BOTH SIDES

4    TOOK A DIFFERENT APPROACH WITH RESPECT TO THE VOLUMINOUS

5    EMAILS FROM CUSTOMERS.  WE COMPILED THEM TOGETHER IN AN EFFORT

6    TO... CONSERVE TIME, TO NOT GO THROUGH THEM ONE BY ONE, BUT WE

7    CAN CERTAINLY SPLIT THEM UP.

8        WE OFFERED TO PULL OUT ALL THE ONES THAT HAVE THE CUSTOMER

9    IDENTITY REDACTED.  MR. PISTORINO KEEPS TALKING ABOUT US

10   ALTERING EXHIBITS.  DEFENDANTS WERE PERMITTED TO REDACT

11   CUSTOMER INFORMATION.  THAT WAS BRIEFED -- THAT WAS ARGUED

12   BEFORE JUDGE SPERO, AND PROVIDED A SAMPLING OF THE CUSTOMER

13   NAMES, BUT WE ARE HAPPY TO REMOVE ALL THE ONES -- WE HAVE

14   ALREADY CREATED THE EXHIBIT AND PROVIDED IT TO MR. PISTORINO

15   THAT REMOVES ALL THE REDACTIONS SO IT'S JUST NAMES OF PEOPLE,

16   NAMES THAT HE'S ALWAYS HAD AND IF HE WANTED TO REACH OUT TO

17   THEM, HE COULD HAVE.

18       **MR. PISTORINO:**  IF I MAY JUST CORRECT A FACTUAL ISSUE

19   THERE.  I'M NOT SURE IT'S PRODUCTIVE BUT AT LEAST THE FACTUAL

20   REPRESENTATION.

21       JUDGE SPERO NEVER, NEVER APPROVED THE REDACTION --

22       **THE COURT:**  I DON'T WANT TO HEAR ANYTHING ABOUT THE

23   DISCOVERY DISPUTE IN FRONT OF JUDGE SPERO.  LIKE I SAID, IT'S

24   PREPOSTEROUS TO ME THAT THIS IS NOW COMING UP.

25       HERE IS WHAT YOU HAVE TO DO.  TAKE OUT THE ONES THAT ARE

1    REDACTED.  WE WILL SEE WHAT'S LEFT.  I HATE THE IDEA OF

2    WASTING A BUNCH OF TIME GOING ONE BY ONE THROUGH THESE.  IF

3    THERE'S SOME GLOBAL BASIS ON WHICH IT CAN BE DONE, BUT I THINK

4    IT WILL RISE OR FALL ON THE SUBSTANTIVE PRINCIPLE.  I HAVE NO

5    DESIRE AND I'M SURE YOU KNOW THE JURY HAS NO DESIRE TO STEP

6    THROUGH HUNDREDS OF THESE ONE BY ONE.

7        SO, BUT AS I SAID, I'VE GOT SOME SERIOUS CONCERNS AS TO

8    WHETHER THEY ARE ADMISSIBLE FOR THAT PURPOSE GIVEN THE NATURE

9    OF THE COMMUNICATIONS AND GIVEN THE DIVERSE TIME FRAME AT

10   ISSUE AND EVERYTHING ELSE.  I DON'T KNOW THAT THEY ARE

11   PARTICULARLY RELEVANT.  AND I DON'T KNOW THAT STATE OF MIND

12   MUCH LATER THAN THE RELEVANT PERIOD HAS ANYTHING TO DO WITH

13   THE CASE.  REALLY, THE FUNNY THING ABOUT THIS CASE IS IT

14   REALLY BOILS DOWN TO A COUPLE OF WEEKS, REALLY.

15        **MS. ROBERTS:**  YOU'RE RIGHT, YOUR HONOR.

16        **THE COURT:**  AND THE JURY IS GETTING BOMBARDED WITH A

17   WHOLE BUNCH OF OTHER STUFF.  WHY IS IT RELEVANT WHAT PEOPLE

18   ARE COMPLAINING ABOUT ONCE IT SWITCHES OVER TO THESHOP.BUILD

19   MANY MONTHS LATER?  IT SEEMS LIKE THE ONLY TIME AT WHICH THIS

20   QUESTION IS REALLY PARTICULARLY RELEVANT IS THE TIME PERIOD

21   BEFORE THE DEAL FELL APART.  RIGHT?

22        **MS. ROBERTS:**  YES.  WE'LL PUT TOGETHER A REVISED

23   EXHIBIT TO SEE IF IT CAN ADDRESS EVERYONE'S CONCERNS.

24        **MR. PISTORINO:**  THAT'S FINE.

25        **THE COURT:**  THEN WE WILL SEE.  THIS CASE IS PRETTY

```
1    SIMPLE.  AND IT'S FUNNY, ALTHOUGH, I SUPPOSE, WHAT REMAINS TO

2    BE SEEN IS WE HAVE HEARD A LOT ABOUT CONTRACT-TYPE ISSUES AND

3    NOT BEING ABLE TO DO THE DEAL AND THAT KIND OF THING.  WHAT WE

4    HAVEN'T HEARD REALLY MUCH ABOUT IS USE OF THE MARKS.  IT

5    HARDLY FEELS LIKE A TRADEMARK CASE REALLY.

6          MR. PISTORINO:  I THINK WE HAVE SHOWN HIS USE OF THE

7    MARKS ON THE WEBSITES AND IN COMMERCE.  SO RESPECTFULLY I

8    THINK WE HAVE.

9          THE COURT:  THAT WILL BE THE ISSUE, I SUPPOSE, FOR

10   THE INEVITABLE DIRECTED VERDICT MOTION OR POST-TRIAL MOTION.

11   BUT IN THE MEANTIME, ALL THIS IS TO SAY, LARDING WE ARE ON THE

12   JURY, I DON'T KNOW, BENEFITS ANYBODY.  THE CASE IS

13   STRAIGHTFORWARD REALLY, AT LEAST, IN THIS REGARD.

14         MR. PISTORINO:  IF I MAY AGAIN TRY TO BE PRODUCTIVE.

15    I MEAN, THERE'S NO TWO WAYS ABOUT IT, WE HAVE A

16   SIGNIFICANT AMOUNT OF EVIDENCE WITH REGARD TO ACTUAL CONFUSION

17   AND I'M FULLY PREPARED TO ENGAGE IN STIPULATIONS ABOUT IT TO

18   STREAMLINE THE MATTERS FOR THE JURY, BUT THERE'S NO TWO WAYS

19   ABOUT IT, THERE IS A SIGNIFICANT AMOUNT.

20         MS. ROBERTS:  I DON'T THINK WE ARE GOING TO STIPULATE

21   TO THAT.  WE DON'T AGREE THOSE DOCUMENTS SHOW THERE IS A

22   SIGNIFICANT AMOUNT OF ACTUAL CONFUSION.

23         THE COURT:  I WOULD EXPECT NOTHING LESS GIVEN THE

24   HISTORY IN THE CASE.

25    ALL RIGHT.  ANYTHING FURTHER?
```

1          **MS. ROBERTS:**  NO, YOUR HONOR.

2          **MR. PISTORINO:**  NO.

3          **THE COURT:**  WE WILL BE BACK AT 8:30.

4          **MR. PISTORINO:**  THANK YOU.

5          (RECESS TAKEN AT 8:18 A.M.; RESUMED AT 8:30 A.M.)

6          **THE CLERK:**  ALL RISE.  THIS COURT IS NOW IN SESSION.

7     THE HONORABLE HAYWOOD S. GILLIAM, JR., PRESIDING.

8          **THE COURT:**  READY TO BRING THE JURY IN?

9          **MR. PISTORINO:**  YES, YOUR HONOR.

10         (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

11         **THE CLERK:**  YOU MAY BE SEATED.

12         **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN.

13    WELCOME BACK.  YOU WILL RECALL THAT YESTERDAY WE WERE IN THE

14    PROCESS OF CROSS-EXAMINATION OF DR. MATOLO, AND THAT WILL

15    CONTINUE THIS MORNING.

16       SO YOU MAY PROCEED, MR. PISTORINO.

17         **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

18       GOOD MORNING.

19                    **DIRECT EXAMINATION RESUMED**

20    **BY MR. PISTORINO:**

21    **Q.**  GOOD MORNING, DR. MATOLO.

22    **A.**  GOOD MORNING.

23    **Q.**  DR. MATOLO, YOU DID PREPARE AN EXPERT REPORT IN THIS CASE,

24    CORRECT?

25    **A.**  THAT'S CORRECT, YES.

1    **Q.**  IF YOU CAN GO AHEAD AND PLACE IT IN FRONT OF YOU, I WOULD

2    LIKE TO ASK YOU A FEW QUESTIONS ABOUT YOUR OPINION.

3           **MR. PISTORINO:**  YOUR HONOR, WE ALSO HAVE SOME

4    DEMONSTRATIVES THAT WE WOULD LIKE TO BE DISPLAYED.

5           **THE COURT:**  HAVE THEY BEEN SHARED WITH OPPOSING

6    COUNSEL?

7           **MR. PISTORINO:**  YES, THEY HAVE, YOUR HONOR.

8           **MR. NATHAN:**  NO OBJECTION TO THE DEMONSTRATIVES, YOUR

9    HONOR, BUT I DO HAVE AN OBJECTION TO THE USE OF THE EXPERT

10   REPORT.  IT'S NOT ON THE EXHIBIT LIST AND THE ONLY THING THAT

11   HAS BEEN DISCLOSED ARE THE DEMONSTRATIVES.

12          **THE COURT:**  IS IT BEING PROPOSED THAT THE WITNESS

13   WOULD READ FROM HIS REPORT?

14          **MR. PISTORINO:**  NO, YOUR HONOR.  NO.  IT IS NOT BEING

15   OFFERED IN EVIDENCE.  HE'S JUST GOING TO TESTIFY.

16          **THE COURT:**  WHY DOES HE NEED A COPY OF IT ON THE

17   STAND?

18          **MR. PISTORINO:**  TO REFER TO IT, TO REFRESH HIMSELF ON

19   EXACTLY WHAT HE SAID, TO LIMIT THE SCOPE OF WHATEVER HE MIGHT

20   HAPPEN TO SAY TO WHAT HE DISCLOSED IN THE REPORT, YOUR HONOR.

21          **MR. NATHAN:**  IT'S NOT IN THE EVIDENCE, YOUR HONOR.

22   IT HASN'T BEEN PROFFERED.

23          **MR. PISTORINO:**  AND HE'S NOT --

24          **MR. NATHAN:**  IT'S NOT ON THE LIST.

25          **THE COURT:**  STOP, COUNSEL.

```
 1        SO IT'S NOT BEING OFFERED IN EVIDENCE.  WHY DON'T WE DO

 2   THIS:  WHY DON'T YOU -- MR. PISTORINO, TAKE THE REPORT.  IF

 3   IT'S NEEDED TO REFRESH THE WITNESS'S RECOLLECTION, YOU CAN USE

 4   IT THAT WAY.

 5        BUT IT DOESN'T NEED TO BE SITTING WITH HIM ON THE STAND.

 6             MR. PISTORINO:  OKAY.

 7        MAY I APPROACH, YOUR HONOR?

 8             THE COURT:  YOU MAY.

 9             MR. PISTORINO:  THANK YOU.

10             THE CLERK:  IT IS OKAY TO SHOW THE DEMONSTRATIVES,

11   YOUR HONOR?

12             THE COURT:  IT IS.

13                  (BINDER RETRIEVED FROM WITNESS.)

14                    (EXHIBIT HANDED TO WITNESS.)

15   BY MR. PISTORINO:

16   Q.  ALL RIGHT.

17        DR. MATOLO, DID YOU ULTIMATELY ARRIVE AT AN OPINION AS TO

18   DAMAGES IN THE FORM OF LOST LICENSING REVENUE?

19   A.  I DID, YES.

20   Q.  CAN YOU TELL US WHAT AMOUNT, IF ANY, WAS YOUR OPINION THAT

21   THE DAMAGES TECHSHOP SUFFERED FOR LOST LICENSING REVENUE?

22   A.  SURE.  I CAME UP WITH A RANGE OF --

23             MR. PISTORINO:  IF WE CAN GO AHEAD AND SHOW THE

24   DEMONSTRATIVE SLIDE, PLEASE?

25             THE WITNESS:  ONE TO 1.48 MILLION.
```

1              (DISPLAYED ON SCREEN.)

2      **BY MR. PISTORINO:**

3      **Q.**  CAN YOU DESCRIBE FOR US A BIT MORE, MAYBE GENERALLY, HOW

4      YOU ARRIVED AT THAT NUMBER?

5      **A.**  SURE.

6          AS WE DISCUSSED YESTERDAY, THERE IS VARIOUS DOCUMENTS I

7      REVIEWED INCLUDING LICENSING MATERIALS.  THIS INCLUDES ACTUAL

8      EXECUTED LICENSES AND ONGOING LICENSING DISCUSSIONS AND

9      OFFERS.

10         AND SO THE GOAL HERE IS TO LOOK AT THE LICENSES AND SEE,

11     BASED ON THOSE MARKET MEASURES, IF WE CAN ISOLATE THE PORTION

12     OF THE LICENSES THAT FOCUSES ON THE TRADEMARKS.

13         AND SO I TOOK THE LICENSES, TOGETHER WITH THE OFFERS, AND

14     BASED ON THOSE TERMS, YOU WILL SEE THAT THERE IS A COMPONENT

15     FOR THE INTELLECTUAL PROPERTY INCLUDING THE TRADEMARKS, AND

16     THEN A SEPARATE COMPONENT THAT COVERS THE SERVICES.

17         FROM REVIEWING THE LICENSES, WE'RE ABLE TO SEE THE DOLLAR

18     AMOUNT FOR THE SERVICES AND SEPARATE THAT FROM THE DOLLAR

19     AMOUNT FROM THE INTELLECTUAL PROPERTY.

20         AND SO I CAN TAKE THE DOLLAR AMOUNT JUST FOR THE

21     INTELLECTUAL PROPERTY, AND THEN WE WANT TO NARROW IT DOWN, IF

22     NEEDED, TO FOCUS JUST ON THE TRADEMARKS.  AND SO FROM THE

23     LICENSES, WE CAN SEE THAT -- AND I REACH THE DETERMINATION

24     THAT THE INTELLECTUAL PROPERTY COMPONENT FOCUSES ON THE

25     TRADEMARKS.

1       THERE ARE SOME ADDITIONAL FEATURES, ITEMS THAT ARE COVERED

2   BY THE INTELLECTUAL PROPERTY, BUT I FURTHER INVESTIGATED AND

3   REACHED THE CONCLUSION THAT THE VALUE IS DOMINATED BY THE

4   TRADEMARKS.

5   **Q.**  OKAY.

6       DID YOU REVIEW -- WERE THERE ANY MATERIALS FROM THE

7   DEFENDANTS THAT YOU CONSIDERED IN YOUR ANALYSIS?

8   **A.**  YES.

9       SO, IN ADDITION TO REVIEWING THE ACTUAL LICENSES TOGETHER

10  WITH LICENSING OFFERS, I LOOKED INTO THE ACTUAL DEFENDANTS IN

11  THIS CASE TO SEE IF THERE'S ANY INFORMATION I CAN LEARN ABOUT

12  THEIR VIEW OF THE INTELLECTUAL PROPERTY.

13      AND THERE IS A COUPLE OF DATA POINTS WE CAN LOOK AT.  AND

14  ONE IS THERE'S DISCUSSIONS ABOUT AN OFFER BY THE DEFENDANTS TO

15  ACQUIRE THE ASSETS OF TECHSHOP, AND THAT INCLUDES THE

16  INTELLECTUAL PROPERTY, AMONG OTHER THINGS, AND THEN THERE'S

17  ALSO AN OFFER BY THE DEFENDANT TO LICENSE THE TECHSHOP NAME TO

18  ANOTHER ENTITY IN EUROPE.

19  **Q.**  I'M SORRY, DR. MATOLO, IF I CAN INTERRUPT YOU FOR ONE

20  SECOND.

21      DID YOU REVIEW ANY -- WERE THERE ANY PROJECTIONS BY THE

22  DEFENDANTS BEFORE THE INFRINGEMENT BEGAN IN THIS CASE, WHAT

23  KIND OF REVENUE THEY ANTICIPATED OF OPENING UP --

24      **MR. NATHAN:**  OBJECTION TO THE FORM OF THE QUESTION,

25  YOUR HONOR.  "BEFORE THE INFRINGEMENT", IT HASN'T BEEN

1   ESTABLISHED.

2          **THE COURT:**  OVERRULED.  ALLEGED INFRINGEMENT.

3          **MR. PISTORINO:**  ALLEGED INFRINGEMENT.

4   **BY MR. PISTORINO:**

5   **Q.**  WERE THERE ANY PROJECTIONS PREPARED BY THE DEFENDANTS OF

6   WHAT KIND OF FINANCIAL RESULTS THEY HAD HOPED TO ACHIEVE IN

7   OPENING A MAKERSPACE USING THE NAME TECHSHOP 2.0?

8   **A.**  YES.  SO THAT'S ANOTHER SET OF DOCUMENTS THAT I REVIEWED

9   FROM THE DEFENDANTS --

10  **Q.**  IF WE CAN -- I'M SORRY.  I WOULD LIKE TO GO AHEAD AND TURN

11  IN YOUR BOOK -- I THINK YOU SHOULD HAVE IN YOUR BOOK AN

12  EXHIBIT MARKED NO. 93.

13         **MR. PISTORINO:**  YOUR HONOR, WE WOULD LIKE TO GO AHEAD

14  AND OFFER EXHIBIT 93.

15         **THE COURT:**  ANY OBJECTION AS TO 93?

16         **MR. NATHAN:**  CAN I HAVE JUST A MOMENT, YOUR HONOR?

17  THE MATERIALS WEREN'T TABBED SO I CAN'T FIND IT IN THE BOOK.

18                  (PAUSE IN THE PROCEEDINGS.)

19         **THE CLERK:**  IF YOU SWITCH IT ON THE SCREEN, HE CAN

20  SEE IT ON THE SCREEN.

21         **MR. NATHAN:**  NO OBJECTION, YOUR HONOR.

22         **THE COURT:**  EXHIBIT 93 IS ADMITTED.

23            (TRIAL EXHIBIT 93 RECEIVED IN EVIDENCE.)

24  **BY MR. PISTORINO:**

25  **Q.**  IS THIS SOME OF THE PROJECTIONS PREPARED BY THE DEFENDANTS

1    IN THIS CASE THAT YOU REVIEWED, DR. MATOLO?

2                    (DISPLAYED ON SCREEN.)

3    **A.**  YES.  THIS IS THE COVER SHEET INCLUDING PROJECTIONS THAT I

4    RECEIVED.

5    **Q.**  AND DID YOU REVIEW THESE MATERIALS OF WHAT THEIR

6    PROJECTIONS WERE?

7    **A.**  I DID.  YES.

8    **Q.**  AND IF WE CAN, I WOULD LIKE YOU TO TURN IN YOUR BOOK TO

9    THE EXHIBIT WE'VE MARKED 293.

10            **MR. PISTORINO:**  YOUR HONOR, WE WOULD OFFER

11   EXHIBIT 293.

12            **MR. NATHAN:**  NO OBJECTION TO 293.

13            **THE COURT:**  293 IS ADMITTED.

14            (TRIAL EXHIBIT 293 RECEIVED IN EVIDENCE.)

15                    (DISPLAYED ON SCREEN.)

16   **BY MR. PISTORINO:**

17   **Q.**  AND, DR. MATOLO, EXHIBIT 293 IS ONE OF THE EXHIBITS TO

18   YOUR REPORT THAT YOU PREPARED, CORRECT?

19   **A.**  THAT'S CORRECT.

20   **Q.**  CAN YOU TELL US WHAT WE ARE SEEING HERE?

21   **A.**  SO I PREPARED THIS EXHIBIT USING THE PROJECTIONS FROM THE

22   DEFENDANTS, THE ONE THAT WAS JUST SHOWN ON THE SCREEN A MOMENT

23   AGO.

24        AND IN THE PROJECTIONS, YOU HAVE A PROJECTION FOR THE YEAR

25   2018 FOR VARIOUS SHOPS, I THINK UP TO ABOUT FIVE OR SIX SHOPS.

MATOLO - DIRECT / PISTORINO

1    AND FOR EACH SHOP THERE'S NUMEROUS PROJECTIONS.

2        AND SO I LOOKED AT THE SAN FRANCISCO AND SAN JOSE STORE

3    PROJECTIONS AND LOOKED AT THE MINIMUM REVENUE PROJECTION, THE

4    MAXIMUM REVENUE PROJECTION, AND THE AVERAGE.  AND SO THAT'S

5    WHAT I HAVE HERE IN THIS EXHIBIT.

6        SO, FOR EXAMPLE, FOR THE SAN JOSE LOCATION, WE HAVE A

7    MINIMUM OF A LITTLE BIT OVER A MILLION, A MAXIMUM PROJECTION

8    OF 1.79 MILLION, AND AN AVERAGE OF 1.468 FOR THE SAN JOSE IN

9    THE SECOND ROW THERE.

10       I'VE ALSO ADDED AT THE BOTTOM, IF YOU LOOK AT ALL OF THE

11   LOCATIONS IN THE PROJECTIONS, SO GOING BEYOND JUST THE SAN

12   FRANCISCO AND SAN JOSE PROJECTIONS.  SO THE PROJECTION

13   DOCUMENT INCLUDE PROJECTIONS FOR MANY MORE STORES AS WELL.

14   AND SO THAT'S WHAT THE BOTTOM ROW COVERS.

15   **Q.**  SO WAS IT YOUR UNDERSTANDING THAT THE DEFENDANTS WERE

16   PROJECTING THAT THEY WOULD BE EARNING THESE MILLIONS OF

17   DOLLARS IN REVENUE FROM USING THE -- OPERATING STORES UNDER

18   THE TECHSHOP NAME?

19   **A.**  SURE, YES.  IF YOU LOOK AT THE PROJECTIONS, THEY WILL

20   REFERENCE TO THE TECHSHOP NAME AND THESE ARE THE REVENUE

21   PROJECTION FIGURES.

22   **Q.**  I SEE AT THE BOTTOM THERE, IT LOOKS LIKE FOR, I GUESS, UP

23   TO FIVE STORES, THE PROJECTIONS FOR 2018 WERE IN THE RANGE OF,

24   WHAT IS THAT, ABOUT TEN AND A HALF MILLION; IS THAT FAIR?

25   **A.**  YES.

1    **Q.**  AND HOW DID THIS FACTOR AT ALL INTO YOUR OPINION THAT --

2    ABOUT THE LOST LICENSING REVENUE TO TECHSHOP?

3    **A.**  SO GOING BACK TO THE ACTUAL LICENSES THAT WE DISCUSSED,

4    THAT HELPS US UNDERSTAND WHAT LICENSE FEES WE'VE SEEN FOR THE

5    TRADEMARKS AT ISSUE IN THE MARKETPLACE.

6        WE ALSO WANT TO FACTOR IN THE DEFENDANTS HERE, WHAT'S THE

7    DEFENDANTS' VIEW.  SO WE CAN LOOK AT THE DEFENDANTS' VIEW ON

8    HOW THEY WOULD PERFORM WITH A TECHSHOP SHOP.  AND THAT'S WHAT

9    THESE PROJECTIONS HELP US UNDERSTAND; THAT THEY ARE

10   THINKING -- THE DEFENDANTS HAVE THESE PROJECTIONS SHOWING THAT

11   THEY WOULD MAKE A PRETTY SUBSTANTIAL AMOUNT OF REVENUE.

12   **Q.**  IN JUST 2018?

13   **A.**  JUST 2018, YES.

14   **Q.**  OKAY.

15       I JUST WANT TO MAKE SURE WE GET OFF ONE TECHNICAL THING

16   MAKE SURE WE HAVE IT IN THE RECORD.  IF YOU WOULD TURN IN YOUR

17   BOOK TO EXHIBIT 306.

18            **MR. PISTORINO:**  AND WE WOULD OFFER 306, YOUR HONOR.

19            **MR. NATHAN:**  NO OBJECTION, YOUR HONOR.

20            **THE COURT:**  IT'S ADMITTED.

21          (TRIAL EXHIBIT 306 RECEIVED IN EVIDENCE.)

22                  (DISPLAYED ON SCREEN.)

23   **BY MR. PISTORINO:**

24   **Q.**  DR. MATOLO, 306, IS THIS A RECORD OF -- ONE OF THESE OTHER

25   LICENSES THAT TECHSHOP DID WITH ADEO FOR A MILLION DOLLARS?

MATOLO - DIRECT / PISTORINO

1    **A.** CORRECT.

2    **Q.** THIS IS JUST ANOTHER ONE. SO ADEO OUTSIDE OF THE UNITED

3    STATES, CORRECT?

4    **A.** CORRECT.

5        AND THIS LICENSE IS A LICENSE THAT ADEO ENTERED INTO ABOUT

6    A YEAR OR SO AFTER THEY ENTERED INTO THE INITIAL LICENSE. AND

7    WHAT WE HAVE HERE IS A MILLION-DOLLAR LICENSE. AND THIS IS

8    JUST FOR THE NAME, JUST FOR THE TRADEMARK.

9        NOW, WHY IS THERE THIS SECOND LICENSE? WELL, THERE IS A

10   LIMIT ON THE NUMBER OF STORES AND THE TIME PERIOD ON THE FIRST

11   LICENSE. THIS IS AN ADDITIONAL LICENSE TO SAY, OKAY, YOU CAN

12   NOW USE THE NAME FOR ADDITIONAL STORES. YOU ARE NOT LIMITED

13   TO A CERTAIN NUMBER OF YEARS.

14   **Q.** AND THE LICENSE YOU'RE REFERRING TO HERE, THIS IS ONLY FOR

15   USE OF THE TECHSHOP NAME IN FRANCE; IS THAT CORRECT?

16   **A.** CORRECT.

17   **Q.** OKAY.

18       DID YOU HAVE ANY VIEW IN ARRIVING AT YOUR OPINION AS TO

19   THE RELATIVE RELATIONSHIP BETWEEN THE LICENSE OUTSIDE THE

20   UNITED STATES AND A LICENSE THAT MIGHT BE TAKEN INSIDE THE

21   UNITED STATES?

22   **A.** SURE.

23       SO WITH REVIEWING THE DOCUMENTS, WHAT WE SEE IS THESE

24   LICENSES OUTSIDE THE U.S. ARE ENTERED INTO AROUND A TIME WHERE

25   THE NAME IS NEWER OUTSIDE THE U.S. IN THE U.S., WE HAVE A

1   LONGER HISTORY OF THE USE OF THE NAME.

2       TECHSHOP HAS HAD ABOUT TEN STORES OPENED, THE NAME IS USED

3   FOR OVER A DECADE, AND SO THERE'S MORE USE AND RECOGNITION FOR

4   THE NAME IN THE U.S. COMPARED TO OUTSIDE THE U.S. JUST BECAUSE

5   YOU HAVE A LONGER HISTORY AND ACTUAL STORES THAT WERE

6   OPERATING IN THE U.S., AND YOU DIDN'T HAVE THAT OUTSIDE THE

7   U.S. BEFORE THESE LICENSES WERE COMPLETED.

8   **Q.**  I THINK I RECALL READING THAT YOU TALK ABOUT SOMETHING IN

9   TERMS OF THINKING ABOUT A LICENSE THAT YOU CALLED SORT OF A

10  HYPOTHETICAL NEGOTIATION DATE.

11      REMEMBER SAYING SOMETHING ABOUT THAT?

12  **A.**  YES.

13  **Q.**  CAN YOU GO AHEAD AND EXPLAIN TO THE JURY SORT OF WHAT THAT

14  IS AND HOW THAT RELATES TO THE TIME YOU WOULD LOOK AT TO

15  CONSIDER WHEN THE PARTIES MIGHT HAVE BEEN NEGOTIATING?

16  **A.**  SO THIS HYPOTHETICAL NEGOTIATION JUST REFERS TO THIS

17  HYPOTHETICAL WORLD.  WE KNOW THE PARTIES DIDN'T ACTUAL ENTER

18  INTO A LICENSE, BUT WE ARE GOING TO GO BACK AND SAY, OKAY,

19  LOOK, THERE'S A CLAIM THAT THE PARTIES SHOULD HAVE ENTERED

20  INTO A LICENSE TO BE ABLE TO USE THE MARK.

21      SO WE ARE THINKING ABOUT A HYPOTHETICAL WORLD IF WE GO

22  BACK TO RIGHT BEFORE THE DEFENDANTS USED THE MARK AND SAY,

23  OKAY, HYPOTHETICALLY, IF THE PARTIES WERE TO ENTER INTO A

24  LICENSE RIGHT BEFORE THEY DECIDE TO USE THE MARK, WHAT WOULD

25  BE THE LICENSE TERMS.  SO AND THAT'S WHERE THIS HYPOTHETICAL

1    LICENSE IDEA COMES FROM.

2        SO YOU THINK ABOUT, WELL, WHEN WOULD THAT HAVE OCCURRED?

3    AND THE IDEA IS IT'S JUST PRIOR TO THE DEFENDANTS' USE OF THE

4    MARK.  SO WE ARE LOOKING AT THE LATE 2017, EARLY 2018 TIME

5    PERIOD.

6    Q.  OKAY.

7        AND IN THAT TIME FRAME WHEN THIS HYPOTHETICAL NEGOTIATION

8    WOULD HAVE BEEN OCCURRING, WOULD THAT HAVE BEEN THE TIME FRAME

9    THAT DEFENDANTS HAD THESE PROJECTIONS OF $10 MILLION IN

10   REVENUE FOR 2018?

11   A.  YES.  I BELIEVE THE DOCUMENT YOU PUT ON THE SCREEN EARLIER

12   WILL SHOW THAT THE PROJECTIONS WERE FROM AROUND THAT TIME

13   PERIOD.

14   Q.  I KNOW YOU KNOW, AND WE HAVE ALL HEARD, THAT IN

15   MID-NOVEMBER 2018, TECHSHOP CLOSED ITS DOORS AND ANNOUNCED ITS

16   INTENTION TO SEEK BANKRUPTCY PROTECTION.

17       THAT'S SOMETHING YOU KNOW ABOUT, RIGHT?

18   A.  CORRECT.

19   Q.  DID YOU FACTOR THAT -- LET ME ASK IT THIS WAY:  DID YOU

20   FACTOR THAT INTO ARRIVING AT YOUR OPINION OF WHAT THE LOST

21   LICENSING REVENUES WOULD BE?

22   A.  I DID.

23       AND SO BECAUSE WE HAVE THIS EVENT THAT OCCURRED IN

24   NOVEMBER OF -- MID-NOVEMBER OF 2017, THIS IS WHERE SOME OF THE

25   DOCUMENTS AND INFORMATION FROM DECEMBER 2018, JANUARY AND

1   FEBRUARY 2018 CAN BE HELPFUL.  AND SO I LOOKED AT DOCUMENTS TO

2   SEE, OKAY, DO WE HAVE ANY STATEMENTS OR EVIDENCE RELATING TO

3   THE VALUE, AND WE DO.

4       WE SEE IN EARLY 2018 THE DEFENDANTS OFFERING A LICENSE TO

5   AN ENTITY IN EUROPE FOR OVER $2.5 MILLION TO USE THE NAME.

6   **Q.**  IF I CAN STOP YOU FOR A SECOND.  I WANT TO MAKE SURE I

7   UNDERSTAND.

8       AFTER TECHSHOP CLOSED THE DOORS AND ANNOUNCED ITS

9   INTENTION TO SEEK BANKRUPTCY PROTECTION, YOUR OPINION IS THAT

10  SOMETIME AFTER THEN AND BEFORE THIS LAWSUIT WAS FILED IN

11  MID-FEBRUARY, YOUR OPINION IS -- YOUR ANALYSIS IS TO CONSIDER

12  HOW THEY WOULD HAVE NEGOTIATED A LICENSE, CORRECT?

13  **A.**  THAT'S CORRECT.

14  **Q.**  AND YOU'RE MENTIONING FACTORING THESE OTHER THINGS.  WHAT

15  I WANT TO GET A BETTER SENSE OF, FOR EXAMPLE, PRIOR TO

16  TECHSHOP'S ANNOUNCEMENT OF THE CLOSURE OF THE STORES AND

17  POTENTIAL TO SEEK BANKRUPTCY PROTECTION, DID YOU HAVE AN

18  OPINION, JUST RELATIVELY, WAS THE VALUE OF THE TRADEMARK

19  HIGHER BEFORE THAT DATE OR WAS THERE ANY CHANGE AS A RESULT OF

20  THE ANNOUNCEMENT?

21  **A.**  WELL, YOU KNOW, YOU MIGHT THINK THAT THERE COULD BE SOME,

22  YOU KNOW, WHEN THERE IS AN ANNOUNCEMENT OF BANKRUPTCY THAT

23  THERE MAY BE A POTENTIAL NEGATIVE IMPACT.  SO THIS IS WHY I

24  THINK LOOKING AT THE INFORMATION AFTER THE ANNOUNCEMENT IS

25  HELPFUL --

1    **Q.**  OKAY.

2    **A.**  -- TO SEE IF THERE IS STILL VALUE ASSOCIATED WITH THE

3    MARK.

4    **Q.**  THAT'S WHEN WE HAVE THESE PROJECTIONS FROM THE DEFENDANTS

5    THAT YOU DESCRIBED TO US; IS THAT RIGHT?

6    **A.**  CORRECT.

7    **Q.**  YOU STARTED MENTIONING IT, BUT MAYBE IT MIGHT HELP US IF

8    WE TURN TO A DOCUMENT.

9        IF YOU COULD TURN IN YOUR BOOK TO THE TAB WE MARKED AS

10   EXHIBIT 73, PLEASE.

11           **MR. PISTORINO:**  YOUR HONOR, WE OFFER EXHIBIT 73.

12           **MR. NATHAN:**  NO OBJECTION.

13           **THE COURT:**  73 IS ADMITTED.

14               (TRIAL EXHIBIT 73 RECEIVED IN EVIDENCE.)

15                   (DISPLAYED ON SCREEN.)

16   **BY MR. PISTORINO:**

17   **Q.**  IT'S AN EMAIL FROM MR. RASURE DATED TUESDAY, JANUARY 30TH

18   TO STEPHANE -- I'LL BUTCHER HER (SIC) FRENCH NAME, CALMES AT

19   ADEO.

20       ARE YOU WITH ME THERE?

21   **A.**  I AM, YES.

22   **Q.**  DO YOU -- WAS ADEO ONE OF THE ENTITIES THAT HAD TAKEN

23   LICENSES EARLIER THAT YOU CONSIDERED?

24   **A.**  YES.

25   **Q.**  OKAY.  AND IT SOUNDS LIKE YOU WERE -- YOUR PRIOR

1    TESTIMONY, YOU ARE REFERRING TO THIS COMMUNICATION.

2        TELL US ABOUT IT.  HOW DID THIS FACTOR IN?

3    **A.**  SO HERE WE ARE LOOKING AT A DOCUMENT IN JANUARY OF 2018,

4    SO THIS IS AFTER THE ANNOUNCEMENT OF THE BANKRUPTCY OF

5    TECHSHOP.

6        AND SO WE ARE SEEING IS THERE STILL -- HOW ARE PARTIES

7    VIEWING THE VALUE OF THE MARK.

8        AND SO WE CAN SEE IN JANUARY 2018, THE DEFENDANT TALKING

9    ABOUT AN OFFER TO LICENSE THE RIGHTS TO THE NAME.  AND WE SEE

10   THAT THE TERMS ARE $2.5 MILLION PLUS ONGOING PAYMENTS,

11   ADDITIONAL ONGOING PAYMENTS.

12       SO IT'S AN INDICATION THAT EVEN AFTER THE NOVEMBER

13   BANKRUPTCY THAT THERE'S STILL THIS VIEW THAT THERE'S VALUE

14   ASSOCIATED WITH THE MARK.

15   **Q.**  OKAY.

16       SO I SEE HERE THAT THIS EMAIL IS DATED JANUARY 30TH.  AND

17   YOU KNOW IN THE ANALYSIS THAT THIS LAWSUIT WAS FILED

18   FEBRUARY 16, CORRECT?

19   **A.**  THAT'S CORRECT.  THAT'S MY UNDERSTANDING, YES.

20   **Q.**  OKAY.  SO THE OFFER FROM THE DEFENDANTS THEN WAS WITHIN

21   LIKE ABOUT TWO WEEKS BEFORE THE LAWSUIT WAS FILED, CORRECT?

22   **A.**  YES.  VERY CLOSE.

23   **Q.**  OKAY.

24       SO DID YOU HAVE A VIEW ABOUT WHETHER OR NOT THIS IS

25   ESSENTIALLY CONTEMPORANEOUS WITH THE HYPOTHETICAL NEGOTIATION

```
1   HERE?

2   A.  OH, YES.  SO EARLIER WE WERE TALKING ABOUT THE

3   HYPOTHETICAL NEGOTIATION THAT WOULD OCCUR IN BETWEEN THIS LATE

4   2018, EARLY -- LATE 2017, EARLY 2018 PERIOD PRIOR TO THE

5   LAWSUIT FILLED IN MID-FEBRUARY.

6       SO, AGAIN, HERE WE HAVE THIS OFFER OCCURRING RIGHT IN THAT

7   TIME PERIOD.  SO THAT'S HELPFUL.  THAT'S A HELPFUL DATA POINT

8   BECAUSE IT IS RIGHT AROUND THE TIME OF THE HYPOTHETICAL

9   NEGOTIATION.

10  Q.  AND SINCE THE ANNOUNCEMENT HAD BEEN EARLIER, THIS WOULD

11  HAVE POST-DATED THE NOVEMBER CLOSURE AND THE ANNOUNCEMENT OF

12  POTENTIAL BANKRUPTCY PROTECTION, CORRECT?

13  A.  CORRECT.

14  Q.  DID YOU HAVE A VIEW THAT IF THE VALUE OF THE TECHSHOP

15  TRADEMARKS HAD BEEN HIGHER BEFORE, HOW THIS WOULD RELATE TO

16  WHAT THEIR CURRENT VALUE WAS AT THE TIME OF THE HYPOTHETICAL

17  NEGOTIATION?

18  A.  WELL, AGAIN, I THINK THIS REINFORCES THE IDEA THAT IF

19  THERE'S ANY IMPACT TO THE VALUE OF THE MARK FROM THE

20  BANKRUPTCY, WE CAN SEE THAT AFTER ANY IMPACT, IF THERE IS ANY,

21  STILL THE REMAINING VALUE IS QUITE HIGH.

22  Q.  SO I JUST WANT TO MAKE SURE I UNDERSTAND.

23      IN YOUR OPINION --

24          MR. PISTORINO:  IF WE CAN GET THE DEMONSTRATIVE SLIDE

25  BACK UP.
```

1          (DISPLAYED ON SCREEN.)

2    **BY MR. PISTORINO:**

3    **Q.**  GOING BACK TO YOUR LOST LICENSING REVENUE OPINION, I WANT

4    TO MAKE SURE WE UNDERSTAND YOUR ANALYSIS HERE.

5         IF MR. RASURE HAD, IN FACT, TAKEN A LICENSE, THE USE OF

6    THE TECHSHOP MARKS FOR ONE TO 1.48 MILLION, HE WOULD HAVE BEEN

7    IN A POSITION TO LICENSE THOSE MARKS TO THIS ADEO FOR, AT

8    LEAST HE WAS OFFERING THEM 2.5 MILLION, RIGHT?

9    **A.**  YES.

10   **Q.**  SO THAT'S A PRETTY QUICK MILLION TO MILLION AND A HALF

11   PROFIT, RIGHT?

12   **A.**  YES.

13   **Q.**  SO OKAY.  SEE WHAT ELSE I GOT HERE.  JUST MAKE SURE I'VE

14   GOT THE FACTORS THAT CONTRIBUTED TO YOUR OPINION HERE.

15        YOU'VE GOT -- YOU HAD FACTORS CONTRIBUTE TO YOUR OPINION

16   WAS THE $10 MILLION REVENUE PROJECTIONS FOR 2018, RIGHT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  AND YOU'VE GOT THESE OTHER LICENSES THAT WE'VE SEEN FOR

19   SEVERAL MILLION DOLLARS, YOU KNOW, ADEO, AND OTHERS, FUJITSU,

20   CORRECT?

21   **A.**  CORRECT.

22   **Q.**  AND THEN YOU ALSO LOOKED FOR CONTEMPORANEOUS INFORMATION,

23   FOR EXAMPLE, THE OFFER FROM MR. RASURE TO LICENSE THE TECHSHOP

24   MARKS IN JUST THESE OTHER AREAS FOR 2.5 MILLION PLUS

25   ADDITIONAL REVENUE AS A PART OF THAT, CORRECT?

1    **A.**  CORRECT.

2    **Q.**  GIVEN THAT AND GIVEN MR. RASURE'S OFFER OF A LICENSE ABOUT

3    TWO WEEKS BEFORE THIS LAWSUIT WAS FILED, HOW DID YOU FEEL

4    ABOUT YOUR NUMBER HERE, ONE TO 1.48 MILLION?  DID YOU THINK IT

5    WAS SORT OF CONSERVATIVE OR AGGRESSIVE, DID YOU HAVE ANY SORT

6    OF VIEW ON THAT?

7    **A.**  SURE.  I LAID IT OUT IN THE REPORT, I THINK THE EVIDENCE

8    SUPPORTS THE CONSERVATIVE NATURE OF THE LOST LICENSING REVENUE

9    CONCLUSION THAT I REACHED.

10   **Q.**  IN YOUR REPORT AS WELL, THE JURY IS ULTIMATELY GOING TO BE

11   ASKED DIFFERENT QUESTIONS, BUT YOU CONDUCTED ANOTHER ANALYSIS,

12   CORRECT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  WERE YOU ASKED TO CONDUCT AN ANALYSIS OF DEFENDANTS'

15   PROFITS?

16   **A.**  YES.

17   **Q.**  CAN YOU GO AHEAD AND TELL US EXACTLY WHAT YOU DID AND HOW

18   YOU WENT ABOUT CONDUCTING THAT ANALYSIS?

19   **A.**  SURE.

20       SO ANOTHER FORM OF DAMAGES FOR A TRADEMARK CASE IS THE

21   DEFENDANTS' PROFITS.  AND AS PART OF THAT ANALYSIS, I REVIEWED

22   FINANCIAL DOCUMENTS FROM THE DEFENDANTS THAT I RECEIVED.  AND

23   FOR THIS TYPE OF ANALYSIS, MY UNDERSTANDING IS THAT --

24   **Q.**  IF I CAN STOP YOU FOR ONE MOMENT.

25       YOU SAID YOU REVIEWED SOME FINANCIAL DOCUMENTS FROM THE

1    DEFENDANTS.

2    **A.**  YES.

3    **Q.**  IF YOU CAN TURN IN YOUR BOOK TO AN EXHIBIT WE HAVE MARKED

4    TX6.

5         **MR. PISTORINO:**  YOUR HONOR, WE WOULD OFFER TX6.

6         **MR. NATHAN:**  NO OBJECTION, YOUR HONOR.

7         **THE COURT:**  EXHIBIT 6 IS ADMITTED.

8              (TRIAL EXHIBIT 6 RECEIVED IN EVIDENCE.)

9                   (DISPLAYED ON SCREEN.)

10   **BY MR. PISTORINO:**

11   **Q.**  AND TX6 IS A LONG SPREADSHEET PRINTOUT?

12   **A.**  YES.

13   **Q.**  IT IS SMALL EVEN ON THE MONITORS.

14      CAN YOU DESCRIBE FOR THE JURY KIND OF WHAT WE ARE SEEING

15   IN ALL THESE ROWS ON TX6?

16   **A.**  SURE.  SO THIS IS AN IMAGE OF THE DOCUMENT THAT I

17   RECEIVED.

18      IT AS MANY, MANY, MANY ROWS.  AND IT IS WHAT I WILL CALL

19   TRANSACTION LEVEL DATA.  SO IT'S A SUMMARY OF INVOICES FOR THE

20   DEFENDANTS.

21      SO YOU WILL SEE AN INVOICE DATE, AN INVOICE AMOUNT, AND A

22   BRIEF DESCRIPTION OF WHAT THE INVOICE IS FOR.  SO, FOR

23   EXAMPLE, A MEMBERSHIP RENEWAL, SO THERE'S AN INVOICE SUBMITTED

24   TO AN INDIVIDUAL AND HOW MUCH THE INDIVIDUAL MAY OWE FOR THE

25   MEMBERSHIP FEE.

MATOLO - DIRECT / PISTORINO

1    **Q.**  SO WHAT WE'RE SEEING HERE, LET'S TAKE LIKE MAYBE ONE OF

2    THESE LINES HERE.  MAYBE WALK US THROUGH A LINE AND TELL US

3    WHAT WE ARE SEEING AND HOW YOU FACTOR IT INTO YOUR OPINION.

4    **A.**  SURE.

5        SO YOU CAN TAKE, FOR EXAMPLE, ROW 3 HERE.  SO THERE'S A

6    USER I.D. AND --

7    **Q.**  I AM SORRY TO INTERRUPT.

8        IT MIGHT HELP IF WE GO TO THE LAST -- SPEED THINGS UP --

9    GO TO THE VERY LAST PAGE OF THE EXHIBIT.

10                      (DISPLAYED ON SCREEN.)

11       IF WE GO TO THE VERY BOTTOM OF THE SPREADSHEET.  MAYBE

12   WALK US THROUGH.  AGAIN, WHEN YOU WALK US THROUGH, TELL US

13   WHAT WE ARE SEEING HERE.

14   **A.**  SURE.

15       SO IF YOU TAKE, FOR EXAMPLE, ROW 3642, THE FIRST COLUMN

16   YOU HAVE A MEMBER I.D. FOLLOWED BY LOCATION.  HERE WE HAVE SAN

17   FRANCISCO.

18       AND THEN WE HAVE, I BELIEVE IT'S AN INVOICE DATE.  SO

19   FEBRUARY 12TH EARLY 2018.  THERE'S A TIME STAMP AFTER THAT.

20       AND I BELIEVE THE NEXT IS JUST AN INVOICE... JUST AN

21   INVOICE NUMBER.

22       THE NEXT COLUMN IS THIS BRIEF DESCRIPTION OF WHAT IS THE

23   INVOICE FOR.  AND IT'S FOR A MEMBER APPLICATION.

24   **Q.**  LET'S WALK IT ALL THE WAY ACROSS.

25   **A.**  OKAY.

1    SO THE FIRST COLUMN HERE ON THE LEFT ON THE SCREEN IS

2    WHERE WE LEFT OFF.  THE ROWS ARE A LITTLE BIT DIFFERENT NOW,

3    BUT BEFORE WE WERE LOOKING AT ONE THAT SAID, I THINK, MEMBER

4    APPLICATION.

5        HERE YOU SEE SOME MEMBERSHIP DESCRIPTIONS.

6        AND THEN THE COLUMN TO THE RIGHT, YOU WILL SEE SOME

7    NUMBERS.  THAT IS THE INVOICE AMOUNT.

8        AND THEN TO THE RIGHT, YOU WILL SEE ANOTHER COLUMN WITH

9    SOME NUMBERS.  AND THAT APPEARS TO BE THE REMAINING OR THE

10   OUTSTANDING AMOUNT OF THE INVOICE.

11       SO IN THE COLUMNS WHERE IT'S ALL ZERO, YOU WILL SEE THEN

12   THE NEXT NOTE WILL SAY IT IS FULLY PAID.

13       YOU WILL SEE TO THE RIGHT WHERE IT SAYS ONLINE.  I BELIEVE

14   THAT'S HOW IT WAS PAID -- YES, IT IS THE PAYMENT TYPE SO IT'S

15   JUST DESCRIBING HOW THE INVOICE WAS PAID.  AND HERE WE ARE

16   SEEING THEY WERE ALL PAID ONLINE, AT LEAST THE EXAMPLES IN

17   FRONT OF YOU.

18   Q.  SO I THINK YOU PICKED 3643 AS YOUR ROW NUMBER, RIGHT?

19       SO THAT WOULD HAVE REFLECTED THAT THE DEFENDANTS -- I'M

20   SORRY, MAYBE YOU PICKED 3642.  I THINK IT SAID SAN FRANCISCO.

21       SO THAT -- DID THAT REFLECT THE DEFENDANTS WERE TAKING IN

22   REVENUE, TYPICALLY HERE $500 OR SO, BACK THERE ON

23   FEBRUARY 12TH USING THE NAME TECHSHOP 2.0?

24   A.  RIGHT.

25       SO YOU HAVE THE INVOICE AMOUNT OF THE 500 WITH THE INVOICE

1    DATE OF MID-FEBRUARY, AND WE HAVE AN INDICATION THAT IT WAS

2    PAID.

3    Q.  IF YOU CAN MAYBE ROLL FORWARD TO THE NEXT TO LAST PAGE IN

4    THE EXHIBIT.  GO TO THE NEXT PAGE, PLEASE.

5                    (DISPLAYED ON SCREEN.)

6        AND ARE WHAT WE ARE SEEING HERE ADDITIONAL TRANSACTIONS

7    ALL THE WAY... WELL, GO TO AT LEAST INTO ROW 3599, TO

8    FEBRUARY 16TH, 2017 -- 2018?

9    A.  DID YOU SAY 3599?

10   Q.  YEAH.  I AM LOOKING AT THE LAST ENTRY FOR FEBRUARY 16TH,

11   2018.

12   A.  I THINK WE NEED TO SCROLL UP.

13       ONE MORE PAGE UP IF YOU WANT TO GO TO 3599.

14   Q.  3599.  RIGHT.

15                    (PAUSE IN THE PROCEEDINGS.)

16                    (DISPLAYED ON SCREEN.)

17       THERE WE GO.  SO THE ENTRIES BELOW THAT, THOSE ARE ALL THE

18   REVENUES THAT DEFENDANTS RECORDED HAVING RECEIVED DURING THE

19   TIME THAT THEY WERE USING THE TECHSHOP 2.0 NAME, CORRECT?

20   A.  CORRECT, BASED ON THE INVOICE DATE, YES.

21   Q.  AND THEN, OF COURSE, THE SPREADSHEET CONTINUES ON UP ABOVE

22   FOR MANY PAGES, CORRECT?

23   A.  THAT'S CORRECT.

24   Q.  THESE ARE ALL RECORDED REVENUES WHEN THE DEFENDANT, AT

25   LEAST IN YOUR ANALYSIS, WHEN YOU UNDERSTOOD THE DEFENDANTS

1    WERE USING THE NAME THESHOP.BUILD, CORRECT?

2    **A.**  THAT IS MY UNDERSTANDING, YES.

3    **Q.**  SO WITH THIS INFORMATION, WHAT DID YOU DO?

4    **A.**  SO I TOOK THESE MANY, MANY ROWS AND EXPORTED THE DATA AND

5    CREATED A TALLY SO I CAN LOOK AT THE MONTHLY AMOUNT.

6    SO I CREATED THE INVOICE TOTALS FOR EACH MONTH AND CREATED

7    A SUMMARY TABLE.

8    **Q.**  SO YOU JUST ADDED UP THE REVENUES, IS THAT FAIR?

9    **A.**  ESSENTIALLY, YES.

10   **MR. PISTORINO:**  IF WE CAN SHOW THE NEXT DEMONSTRATIVE

11   SLIDE, PLEASE.

12   (DISPLAYED ON SCREEN.)

13   **BY MR. PISTORINO:**

14   **Q.**  SO IS THAT WHAT WE ARE SEEING HERE IN THE LITTLE SLIDE

15   THAT YOU PREPARED FOR US?

16   **A.**  YES, THE FIRST ROW THERE.

17   **Q.**  AND IT SAYS THE -- IT SAYS, FEBRUARY 18TH THROUGH

18   SEPTEMBER 18TH TRANSACTION DATA, CORRECT?

19   **A.**  YES.

20   **Q.**  CAN I ASK WHY, WHY IN YOUR LITTLE SUMMARY LINE HERE, IS

21   THE INFORMATION -- WHY DOES IT ONLY GO TO SEPTEMBER 2018 WHEN

22   WE ARE HERE IN JUNE 2019?

23   **A.**  SO THE FIRST ROW IS A SUMMARY OF THE DOCUMENT THAT WE WERE

24   JUST REVIEWING.  AND THAT DOCUMENT HAS DATA FROM MID-FEBRUARY

25   UNTIL ABOUT SEPTEMBER 22ND, I BELIEVE, OF 2018.  SO THAT'S

1    WHERE THE DATA STOPPED FOR THAT DOCUMENT.

2    **Q.** OKAY.

3        AND THEN BELOW I SEE ON THE SLIDE YOU'VE INDICATED

4    FEBRUARY '18 TO APRIL '19 FINANCIAL STATEMENT DATA ONE

5    MILLION -- 1.5 MILLION.

6        WHERE DID THAT NUMBER COME FROM?

7    **A.** SO THE SECOND ROW IS A SUMMARY OF DATA THAT I RECEIVED

8    RECENTLY. IT'S A DIFFERENT SET OF FINANCIALS. AND YOU WILL

9    SEE I HAVE DESCRIBED IT AS FINANCIAL STATEMENT DATA.

10        SO THESE ARE DOCUMENTS THAT INCLUDE REVENUE FIGURES ON

11   THEM. AND SO THIS IS A SECOND SET OF DOCUMENTS THAT I

12   RECEIVED, AND IT COVERS A WIDER DATE RANGE. AND I SUMMARIZE

13   THAT HERE. AND THAT'S WHERE THE 1.5 MILLION COMES FROM.

14   **Q.** THE SECOND SET OF DATA THAT YOU RECEIVED, DID IT HAVE THE

15   SAME LEVEL OF DETAIL AS THE FIRST SPREADSHEET THAT WE SAW?

16   **A.** NO. IT'S A DIFFERENT TYPE OF DOCUMENT. THAT'S WHY YOU

17   WILL SEE THE DESCRIPTION HERE FINANCIAL STATEMENT DATA AS

18   OPPOSED TO THE TRANSACTION DATA. IT DIDN'T HAVE THE

19   TRANSACTION DETAIL.

20   **Q.** OKAY.

21        WERE YOU ABLE TO COMPARE THESE TWO DOCUMENTS IN TERMS OF

22   THE REVENUE FIGURES, AT LEAST THE FIRST PART THAT COVER THE

23   SAME THING, WERE YOU ABLE TO COMPARE THEM AND SEE IF THEY

24   MATCHED UP?

25        DID THE AMOUNTS SHOWN IN THE SPREADSHEET, DID THEY MATCH

1    THE ONES THAT YOU SAW IN THE FINANCIAL STATEMENT DATA?

2    **A.**  SO YOU HAVE DIFFERENT DATES, BUT YOU HAVE A GOOD NUMBER OF

3    MONTHS THAT DO OVERLAP.  AND SO THE SECOND DATA IS MONTHLY.

4    AND THE FIRST DATA, AS WE SAW, HAS A LOT OF TRANSACTION DATES.

5        SO YOU JUST TAKE -- I TOOK THE FIRST FEW MONTHS AND LOOKED

6    AT, FOR EXAMPLE, THE FEBRUARY REVENUE FIGURES AND THEN THE

7    MARCH REVENUE FIGURES AND THEN THE APRIL REVENUE FIGURES FROM

8    THE FIRST FILE AND COMPARED THEM TO THE SECOND FILE, AND YOU

9    SEE DIFFERENT NUMBERS.

10   **Q.**  WHEN YOU SAY "YOU SEE DIFFERENT NUMBERS", THEY DON'T

11   MATCH, ARE THEY CLOSE?

12   **A.**  NO.  THERE'S BIG DIFFERENCES.

13       SO, YOU KNOW, FOR EXAMPLE, LIKE IN THE FINANCIAL STATEMENT

14   DATA, YOU WILL HAVE, I THINK IT WAS AROUND MAYBE 14,000 IN THE

15   SECOND DOCUMENT, BUT IN THE FIRST DOCUMENT IT'S ABOUT 68,

16   69,000.

17       AND SO YOU SEE PRETTY BIG DIFFERENCES IN THE MONTHS THAT I

18   LOOKED AT.

19   **Q.**  SO THE FIRST DOCUMENT, YOU SAY THE FIRST DOCUMENT, YOU

20   MEAN THE ONE THAT HAS THE MORE DETAIL REFLECTED A HIGHER

21   NUMBER; IS THAT RIGHT?

22   **A.**  SORRY.  THE FIRST DOCUMENT WE LOOKED AT AND DISCUSSED, THE

23   ONE WITH ALL THE TRANSACTION DETAIL.

24   **Q.**  AND THE SECOND DOCUMENT WITH THE -- YOU SAY SORT OF

25   SUMMARY OR FINANCIAL STATEMENT DATA, THAT'S THE ONE THAT

1   REFLECTED THE LOWER NUMBERS; IS THAT RIGHT?

2   **A.**  YES.  WHEN I COMPARED THE MONTHS, I SAW FOR THOSE MONTHS

3   THERE WERE LOWER NUMBERS IN THE SECOND DOCUMENTS.

4   **Q.**  MUCH LOWER?

5   **A.**  SURE.  I MEAN, THE ONE EXAMPLE WE LOOKED AT, 14 VERSUS

6   69,000.

7   **Q.**  OKAY.

8   **A.**  I THINK THE NEXT MONTH HAD AN EVEN BIGGER DIFFERENCE.

9   **Q.**  SO THE DOCUMENTS JUST DIDN'T MATCH; IS THAT FAIR?

10  **A.**  CORRECT.

11  **Q.**  OKAY.

12      BUT NEVERTHELESS, YOU -- IT SOUNDS LIKE FOR THE SECOND

13  LINE, YOU JUST ADDED UP ALL THE REVENUES THAT WERE SHOWN

14  THERE, WHATEVER, YOU JUST ADDED IT UP; IS THAT FAIR?

15  **A.**  CORRECT.  THE NUMBER HERE IS A SUMMARY AFTER ADDING UP THE

16  REVENUE FIGURES FROM THE SECOND SET OF DOCUMENTS.

17  **Q.**  SO THESE NUMBERS HERE, THESE REFLECT -- DO THESE REFLECT,

18  AT LEAST, THE INFORMATION YOU GOT FROM WHAT YOU COULD LOOK AT

19  THE DEFENDANTS' SALES/REVENUES?

20  **A.**  CORRECT.

21  **Q.**  AND SO THESE ARE THE NUMBERS HERE, RIGHT?

22  **A.**  THIS IS WHAT I HAVE.

23  **Q.**  AND YOUR TASK, THOUGH, WAS TO FIGURE OUT WHAT THE

24  DEFENDANTS' PROFITS WERE, CORRECT?

25  **A.**  CORRECT.

1  **Q.**  SO WHAT YOU ARE SHOWING US HERE IS SORT OF WHAT THEIR

2  SALES WERE, WHAT THEIR REVENUES WERE, RIGHT?

3  **A.**  THAT'S CORRECT.

4  **Q.**  SO WHAT ABOUT THEIR EXPENSES?  WHY DIDN'T DO YOU ANYTHING

5  ON EXPENSES?

6      **MR. NATHAN:**  OBJECTION, YOUR HONOR, OUTSIDE THE

7  SCOPE.

8      **THE COURT:**  SUSTAINED.

9      **MR. PISTORINO:**  YOUR HONOR, IF I MAY, HE'S

10  DESCRIBING, AS IN THE REPORT, THE PROCEDURE --

11      **THE COURT:**  SUSTAINED.

12      **MR. PISTORINO:**  OKAY.

13    OKAY.  NOTHING FURTHER.  THANK YOU, DR. MATOLO.

14      **THE COURT:**  ANY CROSS-EXAMINATION?

15      **MR. NATHAN:**  YES, YOUR HONOR.

16    MAY I APPROACH?

17      **THE COURT:**  YOU MAY.

18        (BINDER HANDED TO WITNESS.)

19        **CROSS-EXAMINATION**

20  **BY MR. NATHAN:**

21  **Q.**  GOOD MORNING, DR. MATOLO.

22    MY NAME IS JOHN NATHAN.  AND BEFORE WE PROCEED ANY

23  FURTHER, WE HAVE NEVER MET BEFORE?

24  **A.**  CORRECT.

25  **Q.**  AND YOU WORK FOR A COMPANY CALLED NATHAN ASSOCIATES?

```
1    A.  CORRECT.

2    Q.  WE ARE NOT RELATED IN ANY WAY?

3    A.  NO.  NOT THAT I KNOW OF.

4    Q.  DISPLAYED IN THE COURTROOM IS A DEMONSTRATIVE IN FRONT OF

5    THE JURY THAT HAS FOUR LOGOS ON IT.

6         DO YOU SEE THAT?

7    A.  YES.

8    Q.  AND ONE... ONLY IS THE WORD "TECHSHOP" OR "THESHOP".

9         DO YOU SEE THAT?

10   A.  YES.

11   Q.  HAVE YOU BEEN HERE EVERY DAY IN THIS TRIAL?

12   A.  I HAVE NOT BEEN IN THE COURTROOM.

13   Q.  I WILL REPRESENT TO YOU THAT THAT'S BEEN DISPLAYED IN

14   FRONT OF THE JURY EVERY DAY BY THE PLAINTIFF.

15   A.  OKAY.

16   Q.  NOW, COULD YOU TAKE A LOOK IN YOUR NOTEBOOK AT

17   EXHIBIT 290.

18           MR. NATHAN:  WE WOULD OFFER EXHIBIT 290, YOUR HONOR.

19           THE WITNESS:  OKAY.

20           MR. PISTORINO:  NO OBJECTION.

21           THE COURT:  290 IS ADMITTED.

22        (TRIAL EXHIBIT 290 RECEIVED IN EVIDENCE.)

23               (DISPLAYED ON SCREEN.)

24   BY MR. NATHAN:

25   Q.  IT'S A MULTIPAGE EXHIBIT, DR. MATOLO.
```

1    YOU WILL SEE AT THE BOTTOM THERE'S SOME NUMBERS, PAGE

2    NUMBERS.  I WOULD LIKE TO GO TO ONE SPECIFIC PAGE, IF I MAY.

3    MY QUESTION IS, HAVE YOU SEEN THE ACTUAL LOGO THAT THE

4    DEFENDANTS HAVE BEEN USING EVER SINCE THE OBJECTION WAS MADE

5    TO THE ONES THAT ARE ON THE BOARD IN FRONT OF THE JURY?

6    HAVE YOU ACTUALLY SEEN WHAT THE DEFENDANTS ARE ACTUALLY

7    USING?

8    **MR. PISTORINO:**  OBJECTION, HE'S TESTIFYING.

9    **THE COURT:**  OVERRULED.

10   **BY MR. NATHAN:**

11   **Q.**  YOU MAY ANSWER.

12   **A.**  SO ARE YOU ASKING HAVE I SEEN --

13   **Q.**  HAVE YOU SEEN THE ACTUAL LOGO --

14   **A.**  THE LOGO?

15   **Q.**  -- THAT THE DEFENDANTS ARE USING AFTER THE OBJECTION WAS

16   MADE BY THE PLAINTIFF IN ITS COMPLAINT?

17   HAVE YOU SEEN THE ACTUAL LOGO THAT THE DEFENDANTS SWITCHED

18   TO?

19   **A.**  YES.  I'VE LOOKED AT THE WEB PAGE.

20   **Q.**  LET'S TAKE A LOOK.  IF YOU CAN GO TO PAGE DR056070.

21   (DISPLAYED ON SCREEN.)

22   56070.

23   YOU HAVE SEEN THAT LOGO BEFORE?

24   **A.**  YES.  YOU SAID 56070?

25   **Q.**  THE ONE ON THE SCREEN IN FRONT OF YOU.

1    **A.**  YES.

2    **Q.**  AND THIS IS THE ONE THE DEFENDANTS ARE ACTUALLY USING

3    AFTER THE OBJECTION WAS MADE.

4          **MR. PISTORINO:**  OBJECTION, MISSTATES FACTS NOT IN

5    EVIDENCE.

6          **THE COURT:**  IF HE KNOWS.  OVERRULED.

7          **THE WITNESS:**  I KNOW THEY HAVE USED IT SINCE THEN,

8    YES.

9    **BY MR. NATHAN:**

10   **Q.**  I'M SORRY?

11   **A.**  YES.  YEAH, I BELIEVE THIS IS WHAT THEY HAVE USED ON THEIR

12   PAGE.

13   **Q.**  AFTER THE OBJECTION WAS MADE BY THE PLAINTIFF.

14   **A.**  THAT'S MY UNDERSTANDING.

15   **Q.**  NOW, ALL OF YOUR CALCULATIONS, THE REVENUES, THE PROFITS,

16   THE PROJECTIONS, THE FORECASTS, EVERYTHING THAT YOU TESTIFIED

17   A FEW MINUTES AGO DIDN'T TAKE INTO ACCOUNT THAT THE DEFENDANTS

18   HAD SWITCHED TO THE LOGO WHICH IS ON PAGE 56070; ISN'T THAT

19   RIGHT?

20   **A.**  I WOULDN'T SAY THAT IT DOESN'T TAKE IT INTO ACCOUNT.

21   **Q.**  WELL, LET ME REPHRASE IT THIS WAY.

22       ALL OF YOUR PROJECTIONS, REVENUES, PROFITS, AND FINANCIAL

23   INFORMATION THAT YOU JUST TESTIFIED ASSUMED THAT THE

24   DEFENDANTS WERE INFRINGING THROUGHOUT THE PERIOD RIGHT UP

25   UNTIL APRIL 2019; ISN'T THAT RIGHT?

1   **A.** I ASSUME THAT THEY ARE CONTINUING TO USE -- YES, ACCORDING

2   TO THE ALLEGATIONS, I ASSUME THEY ARE CONTINUING TO USE THE

3   TECHSHOP NAME.

4   **Q.** DO YOU SEE THE TECHSHOP NAME IN DEFENDANTS' EXHIBIT 290 AT

5   PAGE DR56070?

6   **A.** NOT ON THIS PARTICULAR PAGE, NO.

7   **Q.** I'M SORRY?

8   **A.** NOT ON THIS PAGE. NOT ON 56070.

9   **Q.** NOW IF YOU WOULD, WOULD YOU TAKE A LOOK IN YOUR NOTEBOOK

10  AT EXHIBIT 746.

11          **MR. NATHAN:** WHICH WE WOULD OFFER INTO EVIDENCE.

12          **MR. PISTORINO:** NO OBJECTION.

13          **THE COURT:** 746 IS ADMITTED.

14          (TRIAL EXHIBIT 746 RECEIVED IN EVIDENCE.)

15                  (DISPLAYED ON SCREEN.)

16  **BY MR. NATHAN:**

17  **Q.** SO, AGAIN, IT IS A MULTIPAGE DOCUMENT. I'M GOING TO TAKE

18  YOU TO ONE PAGE.

19      WOULD YOU TURN TO THE SECOND PAGE, DR53227?

20                  (DISPLAYED ON SCREEN.)

21  **A.** OKAY.

22  **Q.** ARE YOU AWARE THAT IN MARCH OF 2018, AFTER THE OBJECTION

23  WAS MADE, THAT THE DEFENDANTS WENT THROUGH SEVERAL ITERATIONS

24  OF A LOGO SUCH AS THE ONE THAT'S IN EXHIBIT 746 THAT DOESN'T

25  USE THE NAME "TECHSHOP"?

1    **A.**  YES.  MY UNDERSTANDING IS THEY WENT THROUGH MULTIPLE

2    ITERATIONS.

3    **Q.**  AND ARE YOU AWARE THAT THE DEFENDANTS NEVER OPENED A SHOP

4    ANYWHERE USING THE LOGO TECHSHOP 2.0?

5          **MR. PISTORINO:**  OBJECTION, AGAIN, MISSTATES THE

6    EVIDENCE.  ASSUMES FACTS NOT IN EVIDENCE.

7          **THE COURT:**  SUSTAINED.  I SUPPOSE IT OUGHT TO BE

8    FRAMED AS A HYPOTHETICAL AS TO HIS OPINION.

9          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

10   **BY MR. NATHAN:**

11   **Q.**  LET ME REPHRASE IT THIS WAY.

12         IN FORMULATING YOUR OPINION, YOU JUST ASSUMED, DID YOU

13   NOT, THAT THE DEFENDANTS WERE USING THE MARK TECHSHOP 2.0

14   THROUGHOUT THE PERIOD FROM THE TIME THEY OPENED ON

15   FEBRUARY 19TH, 2018 RIGHT UP UNTIL APRIL 2019?  THAT WAS YOUR

16   ASSUMPTION?

17   **A.**  MY ASSUMPTION IS THEY USED THE MARK FOR AT LEAST PART OF

18   THE PERIOD... FOR THE PERIOD YOU JUST MENTIONED, YES.

19   **Q.**  AS YOU ARE SITTING HERE TODAY, YOU ARE NOT AWARE THAT THEY

20   GOT SUED AT 7:00 O'CLOCK ON A FRIDAY NIGHT, FEBRUARY 16TH, BY

21   EMAIL; THEY GOT A COPY OF THE COMPLAINT.

22         ARE YOU AWARE OF THAT?

23   **A.**  I UNDERSTAND THEY WERE SUED.  I DON'T KNOW THE EXACT TIME

24   OF DAY.

25   **Q.**  I'LL REPRESENT TO YOU THAT THE EMAIL CAME IN AT 7:00,

1  AFTER 7:00 O'CLOCK ON FRIDAY NIGHT FEBRUARY 16TH.

2     MY QUESTION IS, ARE YOU AWARE THAT THE DEFENDANTS WENT

3  OUTSIDE AND TOOK DOWN THE SIGN TECHSHOP 2.0, PHYSICALLY TOOK

4  IT DOWN FROM THE FRONT OF THE STORE?

5        **MR. PISTORINO:**  AGAIN, ASSUMES FACTS --

6        **THE COURT:**  SUSTAINED.

7  **BY MR. NATHAN:**

8  **Q.**  LET ME TAKE YOU TO EXHIBIT 6, WHICH IS A TABULATION.

9                (DISPLAYED ON SCREEN.)

10    AND I'M GOING TO ASK YOU A COUPLE OF QUESTIONS ABOUT IT.

11     THIS IS A TABULATION THAT YOU RELIED ON IN COMING UP WITH

12  THE AMOUNT OF PROFIT THAT THE DEFENDANTS DID; IS THAT RIGHT?

13  **A.**  I'M SORRY, I'M ALMOST THERE.

14  **Q.**  IT'S THE MULTICOLORED --

15  **A.**  YES.

16  **Q.**  -- TABULATION.

17     ARE YOU AWARE THAT THAT TABULATION THAT YOU RELIED ON

18  INCLUDED REVENUES FOR STORES THAT THE DEFENDANTS NEVER OPENED?

19        **MR. PISTORINO:**  AGAIN, OBJECTION, ASSUMES FACTS NOT

20  IN EVIDENCE.

21        **THE COURT:**  OVERRULED.

22        **THE WITNESS:**  I UNDERSTAND THERE'S REVENUES AND THEY

23  LIST MULTIPLE LOCATIONS, INCLUDING SAN JOSE AND SAN FRANCISCO

24  AND OTHER LOCATIONS.

25

1  **BY MR. NATHAN:**

2  **Q.** UH-HUH.

3     ARE YOU AWARE THAT EXHIBIT 6 INCLUDES REVENUES FOR THE

4  AUSTIN LOCATION?

5  **A.** I KNOW THERE'S SOME REVENUE FROM SOME OF THE OTHER

6  LOCATIONS, AND AUSTIN MAY BE ONE OF THEM.

7  **Q.** HOW ABOUT ARIZONA, WHICH IS SOMETIMES REFERRED TO AS

8  CHANDLER?

9  **A.** YES.  I'VE SEEN CHANDLER IN HERE.

10 **Q.** AND THAT YOU INCLUDED THAT IN TX6?

11 **A.** I'M SORRY, YOU SAID I INCLUDED IT IN THE EXHIBIT?

12 **Q.** YES, YOU DID, DIDN'T YOU?

13 **A.** IN MY ANALYSIS, YES.

14 **Q.** YOU ALSO INCLUDED REVENUES FROM DETROIT?

15 **A.** CORRECT.

16 **Q.** AND YOU INCLUDED REVENUES FROM DC, ARLINGTON?

17 **A.** CORRECT.

18 **Q.** AND YOU'RE AWARE THAT THE DEFENDANTS NEVER OPENED A STORE

19 IN AUSTIN OR IN CHANDLER, ARIZONA, OR IN DETROIT, OR IN DC.

20          **MR. PISTORINO:**  AGAIN, OBJECTION --

21          **THE COURT:**  SUSTAINED.  COUNSEL, YOU HAVE TO DO IT AS

22 A HYPO, OR NOT DO IT.  YOU CAN'T TESTIFY.

23          **MR. NATHAN:**  LET ME TAKE YOU TO PAGE 82.  THIS IS --

24 I HOPE THIS COULD BE DONE QUICKLY, YOUR HONOR.

25          **THE CLERK:**  IS IT STILL EXHIBIT 6?

MATOLO – CROSS / NATHAN

1      **MR. NATHAN:**  THIS IS STILL EXHIBIT 6.

2              (DISPLAYED ON SCREEN.)

3   **BY MR. NATHAN:**

4   **Q.**  I WILL ASK YOU TO FOCUS ON LINE 3392.

5   **A.**  I'M SORRY, THE PAGE IS?

6   **Q.**  THIS IS PAGE 82, LINE 3392.

7              (DISPLAYED ON SCREEN.)

8   **A.**  OKAY.

9   **Q.**  IS THERE NOT AN ENTRY THERE FOR REVENUES FOR AUSTIN, TEXAS

10  ON LINE 3392?

11  **A.**  YES.  I SEE AUSTIN LISTED THERE.  AND -- YES.

12  **Q.**  AND THEY DIDN'T OPEN A STORE IN AUSTIN.

13  **A.**  THAT'S MY UNDERSTANDING.

14          **MR. PISTORINO:**  AGAIN, OBJECTION.

15          **THE COURT:**  LET'S TAKE A BRIEF SIDEBAR.

16      LADIES AND GENTLEMEN, AS I MENTIONED, SOMETIMES I'LL NEED

17  TO CONSULT WITH THE ATTORNEYS ABOUT EVIDENTIARY ISSUES.  AND

18  WE TRY TO KEEP THAT TO A MINIMUM, BUT PLEASE UNDERSTAND THAT

19  IT'S SIMPLY AN EFFORT TO ADDRESS EVIDENTIARY ISSUES IN AN

20  EFFICIENT WAY.  IT IS NOT INTENDED TO KEEP ANY RELEVANT

21  EVIDENCE FROM YOU.

22      SO WE WILL BE RIGHT BACK.

23          (SIDEBAR DISCUSSION WAS HELD AS FOLLOWS:)

24          **THE COURT:**  IT IS THE SAME OBJECTION.  IF IT WERE THE

25  CASE THAT WHATEVER, WOULD THAT AFFECT YOUR ANALYSIS.

1    SOMETHING LIKE THAT.  BUT YOU CAN'T USE THEM AS FACTS.  THEY

2    ARE NOT IN EVIDENCE.  THAT IS HOW IT SHOULD BE.

3              **MR. NATHAN:**  I APPRECIATE IT, YOUR HONOR.  AND I WILL

4    DO IT THAT WAY.  IT HAS BEEN ESTABLISHED THAT THEY DIDN'T OPEN

5    THE STORES IN THOSE LOCATIONS.

6              **THE COURT:**  I DON'T THINK IT HAS.  THAT IS GOING TO

7    COME IN IN YOUR CASE, SO IT IS OBVIOUSLY FAIR GAME TO SAY, IF

8    THE FACTS ARE THIS, WOULD THAT AFFECT --

9              **MR. NATHAN:**  I TAKE YOUR POINT.

10             **THE COURT:**  ALL RIGHT.

11             **MR. NATHAN:**  I'LL REPHRASE.

12        (SIDEBAR CONCLUDED; PROCEEDINGS HELD IN OPEN COURT.)

13   **BY MR. NATHAN:**

14   **Q.**  IF ON EXHIBIT 6 INCLUDED REVENUES FOR AUSTIN, ARIZONA,

15   CHANDLER, DETROIT, AND DC, ARLINGTON, WOULD THAT HAVE AFFECTED

16   THE NUMBER THAT YOU REPORTED FOR DEFENDANTS' REVENUES?

17   **A.**  NOT NECESSARILY.

18   **Q.**  WHY IS THAT?

19   **A.**  WELL, I THINK THE THING THAT'S IMPORTANT IS THAT THIS IS

20   REVENUES THAT WERE RECEIVED.  SO IT CAN BE REVENUE THAT WAS

21   RECEIVED THROUGH POSSIBLY OPENING UP SHOPS.

22   **Q.**  WELL, LET'S JUST DO ONE -- I'VE TALKED ABOUT FOUR

23   LOCATIONS.  I WILL ASK YOU TO LOOK AT ONE.  ALL RIGHT?

24   **A.**  OKAY.

25   **Q.**  IT'S ON PAGE 82.  THIS IS WHERE YOU WERE.  LINE 3392.

1    **A.**  YES.

2    **Q.**  OKAY?  ARE YOU THERE?

3    **A.**  YES.

4    **Q.**  AND THAT WAS REVENUE RECEIVED FOR THE AUSTIN LOCATION.

5           **MR. PISTORINO:**  AGAIN, OBJECTION, MISCHARACTERIZES

6    THE DOCUMENT.

7           **THE COURT:**  OVERRULED.

8           **THE WITNESS:**  3392, RIGHT?

9    **BY MR. NATHAN:**

10   **Q.**  YES.

11   **A.**  OKAY.  SO WE HAVE AUSTIN LISTED HERE.  AND YOU'RE ASKING

12   IF THAT'S REVENUE FOR THAT STORE?

13      I'M SORRY, DO YOU MIND REPEATING THE QUESTION?

14   **Q.**  LINE 3392 IS REVENUE FOR AUSTIN, TEXAS.

15   **A.**  YEAH.  PRESUMABLY IT'S AUSTIN, TEXAS.

16   **Q.**  YOU INCLUDED THAT IN THE REVENUES THAT YOU USED TO

17   CALCULATE THE DEFENDANTS' PROFITS?

18   **A.**  CORRECT.

19   **Q.**  YOU DID THE SAME THING FOR CHANDLER AND DETROIT AND DC,

20   ARLINGTON?

21   **A.**  CORRECT.

22   **Q.**  SO IS IT FAIR TO SAY THAT YOU -- YOUR REVENUES ARE

23   CHARGING DEFENDANTS FOR ACTIVITY, HYPOTHETICALLY, THAT THEY

24   DIDN'T EVER UNDERTAKE?

25   **A.**  WELL, PRESUMABLY THEY UNDERTOOK SOME ACTIVITY BECAUSE THEY

1  EARNED THE REVENUE.

2  **Q.**  FROM THESE LOCATIONS OUTSIDE OF SAN FRANCISCO AND SAN

3  JOSE?

4  **A.**  IT COULD BE.  I MEAN, YOU HAVE THE CITIES LISTED HERE.  SO

5  WHETHER THAT'S, YOU KNOW, ANOTHER STORE THAT MAY OPEN OR

6  LOCATION OF AN INDIVIDUAL, SURE, THAT'S OUTSIDE SAN FRANCISCO.

7  **Q.**  YOU DON'T HAVE A DOUBT THAT THE LOCATIONS IN AUSTIN,

8  CHANDLER, ARIZONA, DETROIT, AND DC, ARLINGTON WERE OUTSIDE OF

9  CALIFORNIA?

10  **A.**  I AGREE WITH THAT.

11  **Q.**  AND YOU INCLUDED THAT IN THE REVENUES WHERE DEFENDANTS

12  ENGAGED, RIGHT?

13  **A.**  YES.  I INCLUDED THE REVENUES HERE THAT HAVE THE CITIES

14  THAT YOU MENTIONED.

15  **Q.**  ALL RIGHT.

16          **MR. NATHAN:**  CAN WE PUT UP EXHIBIT 292, I BELIEVE.

17  HOLD ON ONE SECOND.

18      WHICH WAS ADMITTED INTO EVIDENCE YESTERDAY.  SORRY, 291,

19  MY APOLOGIES.

20                  (DISPLAYED ON SCREEN.)

21  **BY MR. NATHAN:**

22  **Q.**  THAT WAS YOUR RÉSUMÉ THAT YOU TESTIFIED ABOUT YESTERDAY.

23      YOU WON'T FINED IT -- YOU MAY FIND IT IN THE BOOK, BUT YOU

24  CAN LOOK ON THE SCREEN.

25  **A.**  SURE.

1    **Q.**  CAN YOU -- I'LL TAKE YOU TO PAGE 8.

2                    (DISPLAYED ON SCREEN.)

3        THAT WAS THE -- PAGE 8 IS WHERE YOU LISTED THE CASES THAT

4    YOU'VE TESTIFIED IN IN THE LAST TEN YEARS?

5    **A.**  TESTIFIED OR -- AND/OR SUBMITTED A REPORT.

6    **Q.**  AND IS IT FAIR TO SAY THAT YOU HAVE BEEN A PAID EXPERT IN

7    AT LEAST TEN CASES IN THE LAST TEN YEARS?

8    **A.**  YES, THAT'S FAIR.

9    **Q.**  NOW, I WANT TO BE CLEAR ABOUT WHAT YOU DIDN'T DO.  THIS IS

10   NOT A CRITICISM.  YOU TESTIFIED ABOUT WHAT YOU DID DO, I WANT

11   TO BE CLEAR ABOUT WHAT YOU DIDN'T DO.

12   **A.**  SURE.

13   **Q.**  YOU DIDN'T ANALYZE WHETHER OR NOT THE TECHSHOP MARK WAS

14   VALID, RIGHT?

15   **A.**  NO.  I DON'T -- I DIDN'T LOOK INTO LIABILITY, NO.

16   **Q.**  AND YOU DIDN'T ANALYZE WHETHER OR NOT THE TECHSHOP MARK

17   WAS INFRINGED?

18   **A.**  CORRECT.  I ASSUMED LIABILITY.  I DIDN'T --

19   **Q.**  YOU JUST ASSUMED LIABILITY?

20   **A.**  RIGHT.  RIGHT.

21   **Q.**  AND YOU DIDN'T ANALYZE WHETHER OR NOT THE TECHSHOP MARKS

22   WERE STILL IN FORCE AFTER THE BANKRUPTCY?

23   **A.**  AGAIN, CORRECT.

24   **Q.**  DID YOU ANALYZE WHETHER OR NOT DEFENDANTS' CONDUCT WAS

25   WILLFUL AND DELIBERATE?

1    **A.**  NO.

2    **Q.**  NOW YOU TESTIFIED YESTERDAY, IF MEMORY SERVES, THAT YOU

3    SPOKE TO THE THREE PRINCIPAL WITNESSES THAT HAVE APPEARED HERE

4    IN ORDER, JIM NEWTON AND DAN WOODS AND DOUG BUSCH.

5    **A.**  YES.

6    **Q.**  AND YOU INTERVIEWED THEM FOR -- BY TELEPHONE?

7    **A.**  THAT'S CORRECT.

8    **Q.**  EACH ONE OF THEM FOR A HALF AN HOUR TO AN HOUR?

9    **A.**  YES, THAT SOUNDS RIGHT.

10   **Q.**  AND YOU REMEMBER TESTIFYING ON YOUR DEPOSITION THAT YOU

11   NEVER TALKED TO MR. RASURE?

12   **A.**  CORRECT.

13   **Q.**  YOU NEVER EVEN MET HIM, RIGHT?

14   **A.**  NOT THAT I KNOW OF.

15   **Q.**  DID YOU TALK TO ANY FORMER EMPLOYEES OF PLAINTIFF?

16   **A.**  NO.

17   **Q.**  DID YOU TALK TO ANY OF THE DEFENDANTS' CUSTOMERS?

18   **A.**  NO.

19   **Q.**  DID YOU TALK TO ANY OF PLAINTIFF'S FORMER CUSTOMERS?

20   **A.**  NO.

21   **Q.**  NOW YOU WERE ASKED ABOUT... SOME -- FIRST TALK ABOUT

22   THE -- YOUR OPINION ON LOST LICENSING REVENUE, AND YOU

23   REFERRED TO SOME LICENSE AGREEMENTS?

24   **A.**  YES.

25   **Q.**  YOU RECALL THAT?

1    **A.**  YES, I DO.

2    **Q.**  I DON'T RECALL YOU TELLING US THE DATE OF THE VARIOUS

3    AGREEMENTS.

4         SO WOULD IT BE FAIR TO SAY, WE WILL GO THROUGH THEM ONE BY

5    ONE, BUT THEY WERE EXECUTED FOR FOREIGN TRADEMARKS IN 2014 AND

6    2015?

7    **A.**  YES.  THE 2014, '15 ONE MAY HAVE BEEN '16.

8    **Q.**  AND IN 2014, TECHSHOP WAS DOING WELL, WAS IT NOT?

9    **A.**  THEY WERE OPEN, YES.

10   **Q.**  WELL, THEY WERE DOING WELL ENOUGH FOR PRESIDENT OBAMA TO

11   GO VISIT THEM IN PITTSBURGH, AS COUNSEL HAS BROUGHT OUT DURING

12   EXAMINATION IN THIS CASE.

13   **A.**  RIGHT.  I RECALL THE VISIT.

14   **Q.**  SO ALL OF THESE FOREIGN LICENSES WERE ENTERED INTO DURING

15   A PERIOD OF TIME WHEN TECHSHOP WAS IN BETTER FINANCIAL

16   CONDITION THAN IT WAS IN NOVEMBER 2017 WHEN IT CLOSED ITS

17   DOORS?

18   **A.**  SURE, YEAH.  WHEN THEY ARE OPEN AND OPERATING AS OPPOSED

19   TO AFTER --

20   **Q.**  YOU DON'T THINK FOR A MINUTE THAT PRESIDENT OBAMA WOULD

21   HAVE GONE TO A COMPANY THAT WAS TEETERING ON THE BRINK OF

22   BANKRUPTCY, DO YOU?

23   **A.**  YOU KNOW, I DON'T KNOW WHAT HE WOULD DECIDE TO DO, BUT

24   PRESUMABLY HE WOULDN'T.

25   **Q.**  WHEN YOU TALKED TO DOCTOR -- FORGIVE ME, WHEN YOU TALKED

1   TO MR. BUSCH BY TELEPHONE, DID HE TELL YOU ABOUT THE

2   DECEMBER 3RD OPEN LETTER THAT HE WROTE TO TECHSHOP

3   STAKEHOLDERS?

4   **A.**  I DON'T RECALL AT THE MOMENT.  HE MAY.

5   **Q.**  LET ME TAKE YOU IN YOUR BOOK TO EXHIBIT 612.

6           **THE CLERK:**  I'M SORRY, 612?

7           **MR. NATHAN:**  612, WHICH HAS BEEN ADMITTED INTO

8   EVIDENCE, I BELIEVE.

9           **THE CLERK:**  612 HAS BEEN.

10          **MR. NATHAN:**  IT HAS BEEN?

11          **THE CLERK:**  UH-HUH.

12  **BY MR. NATHAN:**

13  **Q.**  TELL ME WHEN YOU ARE THERE.

14  **A.**  I AM.

15  **Q.**  THIS IS A MULTIPAGE DOCUMENT.  I'M GOING TO TAKE YOU TO

16  ONE PARAGRAPH, ONE PAGE.  IF YOU FOLLOW THE NUMBERS ON THE

17  BOTTOM.  WOULD YOU GO TO PAGE DR7022.

18                  (DISPLAYED ON SCREEN.)

19  **A.**  OKAY.

20  **Q.**  AND DO YOU SEE UNDER THE PARAGRAPH WHERE IT SAYS "NEXT

21  STEPS"?

22  **A.**  OKAY.

23  **Q.**  DO YOU SEE -- WOULD YOU READ TO YOURSELF, BECAUSE THIS HAS

24  ALREADY BEEN PRESENTED, THE FIRST SENTENCE WHICH BEGINS "AS A

25  TECHSHOP, INC. MEMBER" AND SO ON?

1   **A.**  I READ THE FIRST SENTENCE.

2   **Q.**  SO THAT REFRESHES YOU WHETHER OR NOT MR. BUSCH TOLD YOU

3   ABOUT THIS OPEN LETTER WHEN YOU SPOKE TO HIM ON THE TELEPHONE?

4        **MR. PISTORINO:**  OBJECTION, ASSUMES FACTS NOT IN

5   EVIDENCE.

6        **THE COURT:**  OVERRULED.

7        **THE WITNESS:**  NO, I RECALL REFERENCE TO SOMETHING

8   LIKE THIS, I JUST DON'T RECALL IF IT WAS ANY PARTICULAR

9   INDIVIDUAL THAT TOLD ME.  I JUST DON'T RECALL WHICH

10  INDIVIDUAL.

11  **BY MR. NATHAN:**

12  **Q.**  MY QUESTION IS, WHEN YOU SPOKE TO MR. BUSCH, DID HE TELL

13  YOU THAT HE WROTE THIS OPEN LETTER TO THE TECHSHOP COMMUNITY,

14  THE STAKEHOLDERS, THAT HE FULLY UNDERSTOOD THE FRUSTRATION OF

15  ITS MEMBERS AS A RESULT OF BEING LOCKED OUT OF STORES, BEING

16  UNABLE TO COMPLETE PROJECTS, AND NOT HAVING ACCESS TO

17  MATERIALS AND TOOLS OF STORAGE; DID HE TELL YOU THAT?

18  **A.**  I DON'T KNOW -- I DON'T RECALL IF HE SAID THAT HE WROTE A

19  LETTER.  I REMEMBER THERE WAS REFERENCE TO A COMMUNICATION.

20  **Q.**  MY QUESTION IS, THEN, IN FORMULATING YOUR OPINION ABOUT

21  THE VALUE OF THE TECHSHOP MARK, DID YOU TAKE INTO ACCOUNT THE

22  FRUSTRATION THAT THE COMMUNITY FELT ABOUT THE TECHSHOP

23  EXPERIENCE?

24  **A.**  I BELIEVE I DID, YES, TAKE INTO CONSIDERATION WHAT YOU

25  JUST DESCRIBED.

1    **Q.**  AND GIVEN THAT FRUSTRATION, IT'S YOUR OPINION THAT

2    DEFENDANTS SHOULD PAY MILLIONS OF DOLLARS IN THIS COURTROOM

3    FOR A MARK THEY DIDN'T USE?

4         **MR. PISTORINO:**  AGAIN, ASSUMES FACTS NOT IN EVIDENCE.

5         **THE COURT:**  SUSTAINED.

6    YOU DON'T HAVE TO ANSWER.  THE OBJECTION IS SUSTAINED.

7    **BY MR. NATHAN:**

8    **Q.**  YOU DON'T HAVE TO ANSWER.  LET ME REPHRASE.

9    IT'S YOUR OPINION THAT DESPITE THE FRUSTRATION OF THE

10   MEMBERS OF THE TECHSHOP COMMUNITY, THAT DEFENDANTS SHOULD PAY

11   MILLIONS OF DOLLARS IN THIS COURTROOM?

12   **A.**  SO, YEAH, TAKEN THE FRUSTRATION WITH ALL THE OTHER

13   EVIDENCE, THAT'S HOW I REACHED MY CONCLUSION OF THE ONE TO

14   1.48 RANGE.

15        **MR. NATHAN:**  IF YOU COULD PUT UP -- WE HAVE IT AS THE

16   DEMONSTRATIVE AT EXHIBIT 1245.

17        **THE CLERK:**  IT'S A DEMONSTRATIVE?

18        **MR. NATHAN:**  IT'S A DEMONSTRATIVE, BUT WE MARKED IT

19   SEPARATELY SO IT CAN BE PRESENTED IN EVIDENCE.

20        **THE CLERK:**  YOU ARE OKAY WITH THE DEMONSTRATIVE BEING

21   SHOWN, YOUR HONOR?

22        **THE COURT:**  THIS IS JUST BEING USED AS A

23   DEMONSTRATIVE OR ADMITTED?

24        **MR. NATHAN:**  WE HAVE CONSENTED, YOUR HONOR, AND I

25   BELIEVE THERE'S NO OBJECTION TO THE PLACING THE ACTUAL

1    DEMONSTRATIVE IN EVIDENCE.

2            **THE COURT:**  IS THAT CORRECT?

3            **MR. PISTORINO:**  I DON'T THINK I'VE HEARD THIS.

4            **MS. ROBERTS:**  EXHIBIT 1245.  IT'S ON THE LIST.

5                    (COUNSEL CONFER).

6            **MR. PISTORINO:**  I DON'T KNOW THERE'S BEEN A

7    DISCUSSION ABOUT ADMITTING IT --

8            **MR. NATHAN:**  YOUR HONOR, IT WAS ON OUR LIST AND NOT

9    OBJECTED TO.  IT IS SIMPLY A SMALL COPY OF THE DEMONSTRATIVE

10   SO THAT IT CAN BE PLACED INTO EVIDENCE.  THIS IS A MATTER THAT

11   WE WORKED OUT AFTER THE COLLOQUY YESTERDAY.

12           **THE COURT:**  IS THAT INACCURATE?

13           **MR. PISTORINO:**  I THINK -- I THOUGHT YOU WERE

14   REFERRING TO A PARTICULAR EXHIBIT WITHIN IT, NOT THE

15   DEMONSTRATIVES THEMSELVES IS MY UNDERSTANDING.

16           **THE COURT:**  CAN WE PASS THIS FOR THE MOMENT AND MOVE

17   TO ANOTHER ISSUE?  WE CAN TAKE THIS UP WHEN WE BREAK.

18           **MR. NATHAN:**  OF COURSE, YOUR HONOR.  MY ONLY PURPOSE

19   WAS, IF IT GETS INTO EVIDENCE, THE JURY CAN SEE IT ON THEIR

20   SCREENS AS OPPOSED TO ON THE BIG SCREEN.

21           **THE COURT:**  WE NEED TO WORK THAT OUT.  IF THERE'S

22   ANOTHER TOPIC YOU CAN MOVE ON TO, WHY DON'T WE DO THAT.

23           **MR. NATHAN:**  ALL RIGHT.

24   **BY MR. NATHAN:**

25   **Q.**  NOW, THESE -- LET ME GO BACK TO THE LICENSING REVENUES.

```
 1    THEY WERE ALL BACK IN 2014, 2015.

 2    A.   YES.

 3    Q.   THERE WERE THREE OF THEM.

 4    A.   ONE IN 2016.

 5    Q.   THERE WERE THREE OF THEM, RIGHT?

 6    A.   FOUR.  THERE'S THREE IN 2014, '15 AND THEN A SUPPLEMENTAL

 7    ONE IN 2016.

 8    Q.   ALL RIGHT.  LET'S START WITH THE ONE IN 2014.  THE ADEO

 9    LICENSE, EXHIBIT 308.  WOULD YOU TURN TO THAT IN YOUR BOOK?

10                   (DISPLAYED ON SCREEN.)

11       YOU RECALL READING THIS IN CONNECTION WITH PREPARING TO

12    TESTIFY?

13    A.   YES.

14    Q.   I'M NOT GOING TO ASK YOU TO GO THROUGH THE LICENSE, I JUST

15    WANT YOU TO -- CAN YOU AGREE WITH ME THAT THE DATE OF THIS

16    LICENSE WAS DECEMBER 15TH, 2014?

17    A.   YES.

18    Q.   YES?

19       AND IN CALCULATING THE VALUE OF THIS LICENSE, DID YOU USE

20    EXHIBIT 312?

21    A.   CORRECT.

22            MR. NATHAN:  WHICH I WILL OFFER INTO EVIDENCE.

23            THE CLERK:  WHICH NUMBER?

24            MR. PISTORINO:  NO OBJECTION.

25            MR. NATHAN:  312.
```

1      **THE COURT:**  312 IS ADMITTED.

2          (TRIAL EXHIBIT 312 RECEIVED IN EVIDENCE.)

3              (DISPLAYED ON SCREEN.)

4  **BY MR. NATHAN:**

5  **Q.**  DO YOU SEE ON 312, THERE IS A MONETARY FIGURE THERE, FEES

6  AND EXPENSES, PARAGRAPH 3.  DO YOU SEE THAT?

7      IT'S THE FIRST PAGE OF EXHIBIT 312.

8  **A.**  FIRST PAGE.

9      I'M SORRY, THESE ARE STUCK TOGETHER.

10     YES.  YES, I SEE IT.

11 **Q.**  THERE'S A $700,000 NUMBER THERE.  DO YOU SEE THAT?

12 **A.**  YES.

13 **Q.**  OKAY.

14     AND THAT WAS FOR USE OF SOMETHING CALLED LICENSED

15 MATERIALS.  CAPITAL M -- CAPITAL L AND CAPITAL M, LICENSED

16 MATERIALS?

17 **A.**  CORRECT.  THESE ARE THE LICENSED MATERIALS WE DISCUSSED

18 EARLIER.

19 **Q.**  RIGHT.  THAT WAS PLURAL, THERE'S MORE THAN ONE LICENSED

20 MATERIAL, IT'S LICENSED MATERIALS?

21 **A.**  CORRECT.

22 **Q.**  WHERE IS THE DEFINITION OF LICENSED MATERIALS?

23 **A.**  IT IS IN... EITHER IN THE BACK OF THIS DOCUMENT OR IN ONE

24 OF THE -- OR ANOTHER EXHIBIT.

25 **Q.**  LET ME ASSIST YOU BECAUSE THIS IS NOT A MEMORY CONTEST.

1    THIS IS QUITE TEDIOUS, AND I APOLOGIZE.

2         GO TO EXHIBIT 317, WHICH I WOULD OFFER INTO EVIDENCE.

3              **MR. PISTORINO:**  NO OBJECTION.

4              **THE COURT:**  317 IS ADMITTED.

5              (TRIAL EXHIBIT 317 RECEIVED IN EVIDENCE.)

6                   (DISPLAYED ON SCREEN.)

7    **BY MR. NATHAN:**

8    **Q.**  AND DO YOU SEE IN PARAGRAPH 1.4 A DEFINITION OF LICENSED

9    MATERIALS?

10   **A.**  YES.

11   **Q.**  AND IT SAYS -- THAT TAKES YOU TO SECTION 2.1?

12   **A.**  YES.

13   **Q.**  AND SECTION 2.1 TAKES YOU TO EXHIBIT A?

14   **A.**  CORRECT.

15   **Q.**  SO LET'S GO TO EXHIBIT A.  THIS IS ALL THE DEFINITION OF

16   LICENSED MATERIALS.

17        ARE YOU THERE?

18   **A.**  I AM, YES.

19   **Q.**  WOULD YOU READ FOR THE JURY THE DEFINITION OF LICENSED

20   MATERIALS?

21   **A.**  SURE.  SO EXHIBIT A, DESCRIPTION OF LICENSED MATERIALS.

22        LICENSED MATERIALS SHALL INCLUDE THE FOLLOWING:

23   TRADEMARKS, AS DEFINED IN SECTION 1.6.  YOU ALSO HAVE CLASS

24   CURRICULUM, TRAINING, AND COURSE MANUALS, INSTRUCTIONAL

25   MATERIALS, STORE DESIGNS AND LAYOUT, PROPRIETARY BUSINESS

```
 1    METHODS AND PROCESSES, INCLUDING QUALITY CONTROL METHODS,

 2    LOCATION, STANDARDIZATION METHODS, AND EQUIPMENT ACQUISITION,

 3    PROPRIETARY CRM SOFTWARE AND PROPRIETARY TSAP TECHNOLOGIES.

 4    Q.  SO THESE EIGHT ITEMS WERE ALL INCLUDED IN LICENSED

 5    MATERIALS?

 6    A.  CORRECT.

 7    Q.  AND THE $700,000 FIGURE, WHICH WAS IN THE EARLIER

 8    DOCUMENT, WAS FOR THESE EIGHT INDIVIDUAL ITEMS INCLUDED IN

 9    LICENSED MATERIALS?

10    A.  CORRECT.  THESE ARE THE OTHER LICENSE MATERIALS I WAS

11    REFERRING TO EARLIER.

12    Q.  SO THE $700,000 WASN'T JUST FOR TRADEMARKS?

13    A.  IT'S FOR TRADEMARKS AND THE OTHER ITEMS LISTED HERE.

14    Q.  AND IF I COULD BEG YOUR INDULGENCE AND IF YOU COULD GO

15    BACK TO THE FIRST PAGE OF EXHIBIT 317.

16                      (DISPLAYED ON SCREEN.)

17    A.  OKAY.

18    Q.  AND THE LICENSE IN 1.5, THE TERRITORY, WITH THE LICENSE

19    FOR THE TERRITORY MEANS ANY JURISDICTION OUTSIDE THE UNITED

20    STATES OF AMERICA?

21    A.  CORRECT.

22    Q.  SO THERE'S NO DOUBT THAT THIS LICENSE DIDN'T COVER

23    ANYTHING IN THE UNITED STATES?

24    A.  RIGHT.  AS WE DISCUSSED EARLIER, THESE ARE FOREIGN

25    LICENSES.
```

1          MR. NATHAN:  NOW, IF I CAN ASK EXHIBIT A TO BE PUT

2     BACK ON THE SCREEN.  THIS IS AT THE END OF THIS AGREEMENT.

3                    (DISPLAYED ON SCREEN.)

4     BY MR. NATHAN:

5     Q.  ARE YOU THERE?

6     A.  I AM, YES.

7     Q.  DID YOU TALK TO ANYBODY AT ADEO AS TO HOW MUCH OF THE

8     $700,000 A YEAR THEY VALUED FOR THE TRADEMARKS AND HOW MUCH

9     THEY VALUED FOR THE OTHER SEVEN PROPERTIES INCLUDED IN LICENSE

10    MATERIALS?

11    A.  SO I DISCUSSED I HAD MY INTERVIEWS, BUT IT DIDN'T INCLUDE

12    ANYONE AT ADEO.

13    Q.  COULD YOU GO BACK ONE PAGE IN THIS EXHIBIT, AND YOU SEE

14    THE SIGNATURES THERE, MARK HATCH?

15         DO YOU SEE THAT?

16    A.  I DO, YES.

17    Q.  HE WAS THEN THE CEO OF TECHSHOP, INC.?

18    A.  YES.

19    Q.  AND THEN YOU ALSO SEE THE SIGNATURE OF PAUL DUGGAN?

20    A.  YES.

21    Q.  HE WAS THE CEO OF TECHSHOP GLOBAL, LTD.?

22    A.  RIGHT.

23    Q.  DID YOU TALK -- YOU DIDN'T TALK TO EITHER MR. HATCH OR

24    MR. DUGGAN AS TO HOW MUCH OF THE $700,000 A YEAR WAS FOR THE

25    FOREIGN TRADEMARKS AND HOW MUCH WAS FOR THE OTHER SEVEN

1    PROPERTIES INCLUDED IN LICENSED MATERIALS?

2    **A.** CORRECT.  MY INVESTIGATION DIDN'T INCLUDE DISCUSSIONS WITH

3    THESE PARTICULAR INDIVIDUALS.

4    **Q.** LET'S GO TO THE ONE IN JAPAN.

5       AND I'M TRYING TO DO THIS SORT OF MORE GENERALLY SO WE

6    WON'T WASTE EVERYONE'S TIME GOING THROUGH THIS SAME DETAIL.

7       WOULD YOU LOOK AT EXHIBIT 311.

8                **THE CLERK:**  IT IS ADMITTED.

9                **MR. NATHAN:**  IS ADMITTED?

10               **THE CLERK:**  UH-HUH.

11               **MR. NATHAN:**  THANK YOU.

12                        (DISPLAYED ON SCREEN.)

13   **BY MR. NATHAN:**

14   **Q.** ARE YOU THERE?

15   **A.** 311, YES.

16   **Q.** THIS IS THE STATEMENT OF FEES FOR THE... NOW THE JAPANESE

17   LICENSE AGREEMENT, RIGHT?

18   **A.** CORRECT.

19   **Q.** WHAT'S THE DATE OF THIS?

20   **A.** THE DATE SEPTEMBER 7, 2015.

21   **Q.** MORE THAN TWO YEARS BEFORE THE BANKRUPTCY OR THE CLOSING

22   OF THE DOORS IN THE UNITED STATES?

23   **A.** CORRECT.

24   **Q.** AND IF YOU WOULD GO TO PARAGRAPH 3, YOU SEE A DOLLAR

25   FIGURE THERE?

1    **A.**  I DO, YES.

2    **Q.**  $237,000 PER YEAR?

3    **A.**  CORRECT.

4    **Q.**  AND, AGAIN, FOR THE SAME LICENSED MATERIALS?

5    **A.**  YES.  I BELIEVE IT'S THE SAME LICENSED MATERIALS.

6    **Q.**  WOULD YOU AGREE, SO WE DON'T HAVE TO GO THROUGH IT, THAT

7    THE LICENSED MATERIALS IS THE SAME EIGHT PROPERTIES?

8    **A.**  RIGHT, FROM THE EXHIBIT WE WERE LOOKING AT EARLIER.

9    **Q.**  ONLY ONE OF WHICH WAS THE TRADEMARKS?

10   **A.**  THAT'S CORRECT.

11   **Q.**  NOW THE LICENSEE WAS FUJITSU, F-U-J-I-T-S-U, IN JAPAN?

12   **A.**  CORRECT.

13   **Q.**  DID YOU TALK TO ANYBODY AT FUJITSU -- I HAVE TROUBLE WITH

14   THAT WORD, MY APOLOGIES -- AS TO HOW MUCH THEY -- HOW MUCH OF

15   THE $237,000 A YEAR THEY ALLOCATED TO THE TRADEMARKS AND HOW

16   MUCH THEY ALLOCATED TO THE OTHER SEVEN PROPERTIES IN LICENSED

17   MATERIALS?

18   **A.**  I DIDN'T HAVE DISCUSSIONS WITH FUJITSU.

19   **Q.**  AND, AGAIN, THIS DOCUMENT WAS SIGNED BY MARK HATCH AND

20   PAUL DUGGAN?

21   **A.**  CORRECT.

22   **Q.**  AND YOU DIDN'T TALK TO THEM AS TO HOW MUCH THEY VALUED THE

23   $237,000 A YEAR FOR THE TRADEMARKS AND HOW MUCH FOR THE OTHER

24   SEVEN PROPERTIES?

25   **A.**  CORRECT.  I DIDN'T INTERVIEW MR. HATCH OR DUGGAN.

 1    **Q.**  LET ME TAKE YOU TO THE ABU DHABI AGREEMENT, WHICH IS 310,

 2    WHICH I BELIEVE IS IN EVIDENCE.

 3            **THE CLERK:**  310, NO.

 4            **MR. NATHAN:**  IT'S NOT?

 5            **THE CLERK:**  HUH-UH.

 6            **MR. NATHAN:**  WE WOULD OFFER IT INTO EVIDENCE.

 7            **MR. PISTORINO:**  NO OBJECTION.

 8            **THE COURT:**  310 IS ADMITTED.

 9            (TRIAL EXHIBIT 310 RECEIVED IN EVIDENCE.)

10                    (DISPLAYED ON SCREEN.)

11    **BY MR. NATHAN:**

12    **Q.**  WHAT WAS THE DATE -- THIS IS THE SCHEDULE OF FEES THAT THE

13    ABU DHABI ENTITIES WAS GOING TO PAY?

14    **A.**  DECEMBER 15, 2014.

15    **Q.**  AGAIN, THIS IS NOW ALMOST THREE YEARS BEFORE THEY CLOSE

16    THE DOORS IN THE UNITED STATES?

17    **A.**  ROUGHLY, YES.

18    **Q.**  AND WOULD YOU GO TO PARAGRAPH 2?

19    **A.**  OKAY.

20    **Q.**  AND THERE'S A DOLLAR FEE THERE -- A DOLLAR AMOUNT,

21    $200,000 PER YEAR?

22    **A.**  YES.

23    **Q.**  AND I UNDERSTAND YOU INTERPRETED THAT TO MEAN REALLY

24    $250,000 A YEAR BECAUSE IT WAS ONLY 80 PERCENT OF THE FEE?

25    **A.**  CORRECT.

1    **Q.**   OKAY.  NOW FOR THE $250,000 A YEAR, THAT WAS, AGAIN, FOR

2    LICENSED MATERIALS?

3    **A.**   THAT'S CORRECT.

4    **Q.**   DID YOU TALK TO ANYBODY AT ABU DHABI ABOUT HOW MUCH OF THE

5    $250,000 A YEAR PAID IN 2014 WAS FOR THE TRADEMARKS AND HOW

6    MUCH WAS FOR THE OTHER SEVEN PROPERTIES?

7    **A.**   NOT AT ABU DHABI, NO.

8    **Q.**   AND IF YOU WOULD JUST TURN TO THE NEXT PAGE OF THE ABU

9    DHABI AGREEMENT.

10                      (DISPLAYED ON SCREEN.)

11       AGAIN, THE SIGNATORIES WERE MARK HATCH AND PAUL DUGGAN?

12   **A.**   CORRECT.

13   **Q.**   YOU DIDN'T TALK TO THEM ABOUT THE ABU DHABI AGREEMENT?

14   **A.**   CORRECT.

15   **Q.**   SO YOU DON'T KNOW HOW MUCH THEY ALLOCATED TO THE

16   TRADEMARKS AND HOW MUCH TO THE OTHER SEVEN PROPERTIES?

17   **A.**   WELL, I LEARNED ABOUT IT THROUGH OTHER SOURCES, BUT I

18   DIDN'T INTERVIEW THESE INDIVIDUALS.

19   **Q.**   NOW WOULD YOU TURN TO EXHIBIT 306, WHICH I BELIEVE IS IN

20   EVIDENCE.

21             **THE CLERK:**  IT IS.

22             **MR. NATHAN:**  THANK YOU.

23                      (DISPLAYED ON SCREEN.)

24   **BY MR. NATHAN:**

25   **Q.**   ARE YOU THERE?

1    **A.**  I AM.  306.

2    **Q.**  THANK YOU.

3        THIS WAS THE -- ANOTHER ADEO AGREEMENT?

4    **A.**  YES.

5    **Q.**  AND THERE'S ACTUALLY NO AGREEMENT, HERE, THIS IS JUST A

6    BOARD RESOLUTION?

7    **A.**  CORRECT.  IT'S REFERENCED TO AN OFFER AND A RESPONSE TO AN

8    OFFER, YES.

9    **Q.**  AND THE DATE OF IT WAS WHEN?

10   **A.**  DECEMBER 20, 2016.

11   **Q.**  AGAIN, BEFORE THE CLOSURE IN THE UNITED STATES?

12   **A.**  THAT'S CORRECT.

13   **Q.**  AND THIS OFFER WAS FOR THE PURCHASE OF THE TECHSHOP BRAND

14   WHERE?

15   **A.**  IN FRANCE.

16   **Q.**  IS THAT ANYTHING TO DO WITH THE VALUE -- SORRY.

17       ANY OF THAT MONEY WAS REPAYMENT OF ANY TECHSHOP RIGHTS IN

18   THE UNITED STATES?

19   **A.**  NO.  THIS AGREEMENT WAS FOCUSING ON FRANCE.

20   **Q.**  NOW, DO YOU RECALL BEING ASKED ABOUT MR. RASURE'S OFFER TO

21   LICENSE THE TRADEMARKS AFTER TECHSHOP CLOSED ITS DOORS IN

22   2017?

23   **A.**  YES, I RECALL THAT DISCUSSION EARLIER.

24   **Q.**  AND I BELIEVE THAT WAS EXHIBIT 73.

25           **THE CLERK:**  IT'S ADMITTED.

MATOLO - CROSS / NATHAN

1        **THE WITNESS:**  IT LOOKS LIKE 73.

2                    (DISPLAYED ON SCREEN.)

3    **BY MR. NATHAN:**

4    **Q.**  THIS OFFER OF RIGHTS FOR THE TECHSHOP -- FOR A TECHSHOP

5    LICENSE WAS NOT FOR ANYTHING -- FOR THE RIGHTS IN THE UNITED

6    STATES, RIGHT?

7    **A.**  YES, IT'S OUTSIDE THE -- COUNTRIES OUTSIDE THE UNITED

8    STATES.

9    **Q.**  SPAIN, PORTUGAL, I WON'T READ THE WHOLE LIST, ALL THE WAY

10   DOWN TO BRAZIL?

11   **A.**  CORRECT.

12   **Q.**  IT ALSO INCLUDED THE ENTIRE CONTINENT OF AFRICA?

13   **A.**  THAT'S CORRECT.

14   **Q.**  SO HIS OFFER WAS TO COVER ALL OF THOSE COUNTRIES, BUT NOT

15   THE UNITED STATES?

16   **A.**  THAT'S MY UNDERSTANDING, YES.

17   **Q.**  DO YOU HAVE ANY INFORMATION ABOUT WHETHER OR NOT THIS

18   OFFER WAS EVER ACCEPTED BY ADEO?

19   **A.**  NOT ACCEPTED, BUT THERE'S SOME EMAIL RESPONSES WHERE --

20   THIS IS IN SOME OF THE EMAIL DOCUMENTS I REVIEWED WHERE IT

21   SEEMS THAT YOU HAVE ADEO REPRESENTATIVE SAYING, OKAY, WE NEED

22   TO THINK ABOUT IT.  WE UNDERSTAND THERE MAY BE A DISPUTE

23   REGARDING THE MARK.

24       AND SO IT DIDN'T SEEM TO BE THAT ADEO WAS SAYING NO, BUT

25   JUST THAT THEY NEEDED TO THINK ABOUT IT AND WAIT TO SEE WHAT

1   HAPPENS REGARDING OWNERSHIP OF THE MARK.

2   **Q.**  BUT IN THE COURSE OF YOUR STUDY TO PREPARE TO TESTIFY HERE

3   TODAY, DID YOU EVER SEE AN EXECUTED AGREEMENT BETWEEN ANYBODY

4   AND ADEO COVERING ALL THESE COUNTRIES?

5   **A.**  NOT FOR THESE COUNTRIES.  SO THIS GOES BACK TO THE BUCKETS

6   OF DOCUMENTS WE WERE TALKING ABOUT.  THAT WE HAVE LICENSES AND

7   WE ALSO HAVE OFFERS AND NEGOTIATIONS.  SO THIS WOULD FALL INTO

8   THE OFFERS --

9   **Q.**  LET ME ASK IT ANOTHER WAY.

10      WHEN MR. RASURE MADE THIS OFFER ON JANUARY 30TH OF 2018,

11  DID ADEO EXECUTE AN AGREEMENT WITH HIM TO COVER THESE 11

12  COUNTRIES PLUS THE ENTIRE CONTINENT OF AFRICA?

13  **A.**  NOT THAT I AM AWARE OF.  I DON'T BELIEVE SO.

14  **Q.**  AND YOU DIDN'T TALK TO MR. RASURE IN PREPARING TO TESTIFY?

15  **A.**  NO.

16  **Q.**  SO YOU DON'T KNOW HOW HE CAME UP WITH THIS NUMBER WHERE HE

17  WAS PREPARED TO LICENSE IN THESE 11 COUNTRIES AND THE ENTIRE

18  CONTINENT OF AFRICA?

19  **A.**  RIGHT.  I KNOW THE NUMBER IS HERE, BUT I DON'T KNOW, YOU

20  KNOW, ANY BACKGROUND CALCULATIONS, IF HE HAS THEM.

21  **Q.**  CAN I TAKE YOU BACK TO YOUR TESTIMONY ABOUT EXHIBIT 293.

22                  (DISPLAYED ON SCREEN.)

23          **THE CLERK:**  IT'S IN.

24          **MR. NATHAN:**  WHICH HAS BEEN ADMITTED INTO EVIDENCE.

25          **THE WITNESS:**  OKAY.

MATOLO - CROSS / NATHAN

1    **BY MR. NATHAN:**

2    **Q.**  THESE ARE THE PROJECTIONS THAT DEFENDANTS MADE OF

3    FORECASTING REVENUE FOR 2018?

4    **A.**  RIGHT.  IT'S A SUMMARY OF THE FIGURES.

5    **Q.**  I'M NOT GOING TO TAKE YOU THROUGH ALL THE DIFFERENT

6    FIGURES.

7    **A.**  SURE.

8    **Q.**  BUT THIS MAXIMUM OF $10 MILLION, DO YOU SEE THAT?

9    **A.**  I DO, YES.

10   **Q.**  WHEN YOU CALCULATED THIS $10 MILLION, DID YOU TAKE INTO

11   ACCOUNT WHETHER OR NOT THE DEFENDANTS WERE USING THE MARK

12   TECHSHOP 2.0?

13   **A.**  I WAS LOOKING AT THE PROJECTIONS AND SEEING HOW THEY ARE

14   DESCRIBED, AND THEY ARE DESCRIBED AS TECHSHOP 2.0.  SO I'M

15   BASING THE PROJECTIONS JUST ON THOSE DOCUMENTS.

16   **Q.**  SO THE $10 MILLION WAS FOR PROJECTED REVENUES FOR USING

17   TECHSHOP 2.0?

18   **A.**  I BELIEVE IT SAID 2.0.  I REMEMBER IT WAS TECHSHOP, AND

19   THERE MAY HAVE BEEN 2.0 AT THE TOP.

20   **Q.**  2.0?

21   **A.**  I BELIEVE SO.

22   **Q.**  OKAY.

23        YOU ARE AWARE THEY DIDN'T USE THE MARK TECHSHOP 2.0 ALL

24   THE WAY THROUGH 2018?

25              **MR. PISTORINO:**  AGAIN, OBJECTION, ASSUMES FACTS NOT

1    IN EVIDENCE.

2            **THE WITNESS:**  AGAIN, I DON'T HAVE --

3            **THE COURT:**  HOLD ON.

4        SUSTAINED.

5    **BY MR. NATHAN:**

6    **Q.**  COULD YOU GO TO EXHIBIT 376, PLEASE?

7            **THE CLERK:**  376 I DON'T HAVE AS IN.

8            **MR. NATHAN:**  WHICH WE WOULD OFFER INTO EVIDENCE.

9            **THE WITNESS:**  I DON'T BELIEVE I HAVE IT IN THE

10   BINDER.

11           **MR. NATHAN:**  376?

12           **MR. PISTORINO:**  I DON'T HAVE A COPY IN MY BINDER

13   EITHER.

14           **THE COURT:**  I DON'T HAVE IT EITHER.

15           **MR. NATHAN:**  I APOLOGIZE TO ALL CONCERNED.

16           **THE COURT:**  IT'S ALL RIGHT.  WHY DON'T WE DO THIS.

17   MAYBE IT'S A GOOD TIME FOR OUR BREAK SINCE WE ARE A LITTLE

18   BEFORE TEN.  IT IS 9:56.  I WILL GIVE YOU FOUR BONUS MINUTES

19   OF BREAK.

20       LET'S BREAK, AND WE WILL RETURN AT 10:15.  AND JUST AS

21   ALWAYS, CONTINUE TO ADHERE TO ALL OF YOUR INSTRUCTIONS

22   REGARDING YOUR CONDUCT AS JURORS.  SEE YOU IN A LITTLE OVER 15

23   MINUTES.

24           (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

25           **THE CLERK:**  YOU MAY BE SEATED.  YOU CAN STEP DOWN.

1          THE COURT:  LET'S DEAL FIRST WITH THE DEMONSTRATIVE

2     ISSUE.  I KNOW WE HAD A DISCUSSION YESTERDAY.  MY

3     UNDERSTANDING ACTUALLY IS SIMILAR TO MR. PISTORINO'S.

4         I THOUGHT THERE WERE PARTICULAR CHARTS IN THEM THAT YOU

5     WANTED TO USE.  I DIDN'T UNDERSTAND THAT THE PROPOSAL WAS TO

6     PUT THE WHOLE DECK IN.  ON THE ONE HAND, I DON'T KNOW, DO YOU

7     CARE?  BUT IT'S SORT OF UNUSUAL.

8          MR. PISTORINO:  MY REACTION TO IT IS ONLY THAT I

9     HADN'T HEARD OF IT.  SO MY UNDERSTANDING FROM YESTERDAY WAS

10    ONE OF THE PARTICULAR EXHIBITS, WHICH I THINK WE ALREADY, IN

11    FACT, INTRODUCED SO --

12         THE COURT:  I THOUGHT WE HAD, TOO.  IS THERE A REASON

13    TO PUT THE WHOLE SLIDE DECK IN?

14         MR. NATHAN:  NO, YOUR HONOR.  THIS IS A VISUAL AID

15    OFFER.  THE DEMONSTRATIVE IS ONLY ON THE BIG SCREEN.  AND I

16    WANTED TO ASK SOME QUESTIONS, AND I WAS HOPING THE JURY COULD

17    SEE BETTER BY SEEING IT ON THEIR SCREENS.  SO I PUT IT AS AN

18    EXHIBIT.  IT IS THE SAME DOCUMENT.

19        IF THERE'S SOME REASON WHY HE DOESN'T WANT HIS

20    DEMONSTRATIVES IN EVIDENCE, THEN I WILL WITHDRAW THE REQUEST.

21         THE COURT:  HERE'S THE THING.  IT ONLY SEEMS TO WORK

22    OUT TO HIS BENEFIT TO HAVE THE JURY GET TO TAKE HIS EXPERT'S

23    DEMONSTRATIVE SLIDES BACK INTO THE JURY ROOM WHEN THEY

24    WOULDN'T OTHERWISE.

25         DO YOU CARE?

 1          **MR. PISTORINO:**  I DON'T CARE.

 2          **THE COURT:**  THEN FINE, IT'S ADMISSIBLE.  IT'S

 3   ADMISSIBLE.  FINE.

 4          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

 5        (RECESS TAKEN AT 10:00 A.M.; RESUMED AT 10:15 A.M.)

 6          **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

 7   COURT IS BACK IN SESSION.

 8          **THE COURT:**  READY TO RESUME?

 9          **THE CLERK:**  READY, JUDGE?

10          **THE COURT:**  YES.

11        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

12          **THE CLERK:**  YOU MAY BE SEATED.

13          **THE COURT:**  YOU MAY PROCEED, MR. NATHAN.

14          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

15   **BY MR. NATHAN:**

16   **Q.**  WHEN WE TOOK THE RECESS, DR. MATOLO -- MY APOLOGIES TO

17   EVERYBODY IN THE ROOM -- I WAS ASKING ABOUT 276 AND FOR SOME

18   REASON IT IS NOT IN THE BOOK.  THE ONLY COPY I HAVE IS MY

19   COPY.

20        WE HAVE IT ELECTRONICALLY, SO WE WOULD OFFER IT.

21          **MR. PISTORINO:**  NO OBJECTION.

22          **THE COURT:**  IS IT 276 OR 376?

23          **MR. NATHAN:**  376, YOUR HONOR.

24          **THE COURT:**  IF THERE IS NO OBJECTION, IT'S ADMITTED.

25          **MR. PISTORINO:**  NO OBJECTION.

```
 1              (TRIAL EXHIBIT 376 RECEIVED IN EVIDENCE.)

 2                    (DISPLAYED ON SCREEN.)

 3    BY MR. NATHAN:

 4    Q.  WHEN YOU TESTIFIED EARLY ON DIRECT EXAMINATION, YOU

 5    TESTIFIED ABOUT AN OVERALL FIGURE FOR DEFENDANTS' REVENUES

 6    FROM FEBRUARY '18 THROUGH APRIL '19, IT CAME TO $1,529,831.

 7         DO YOU REMEMBER THAT?

 8    A.  YES, I DO.

 9    Q.  IT IS ON THE DEMONSTRATIVE?

10    A.  RIGHT.

11    Q.  NOW WOULD YOU LOOK AT EXHIBIT 376, WHICH IS FROM YOUR

12    REPORT.  AND IN THE RIGHT-HAND COLUMN UNDER "TOTAL", THE VERY

13    LAST NUMBER IS THAT SAME NUMBER, 1,529,831.

14         DO YOU SEE THAT?

15    A.  I DO.

16    Q.  AND THIS PARTICULAR EXHIBIT BREAKS DOWN THE 1,529,831 INTO

17    HOW MUCH FROM SAN FRANCISCO AND HOW MUCH FROM SAN JOSE.

18    A.  RIGHT.  THERE'S A SAN FRANCISCO DOCUMENT AND A SAN JOSE

19    DOCUMENT.

20    Q.  AND YOU'RE AWARE THAT -- STRIKE THAT.

21         CAN YOU -- DO YOU HAVE A CALCULATOR THERE BY ANY CHANCE?

22    PERHAPS ON YOUR PHONE?

23    A.  ON MY PHONE, YES.

24         ONE MOMENT.  I HAVE TO TURN IT ON.

25                    (PAUSE IN THE PROCEEDINGS.)
```

MATOLO – CROSS / NATHAN

1            OKAY.

2   **Q.**   ASK YOU TO MAKE ONE SIMPLE CALCULATION.

3   **A.**   SURE.

4   **Q.**   THE AMOUNT FOR SAN FRANCISCO IS 1,145,598.

5            DO YOU SEE THAT FIGURE?

6   **A.**   YES.

7   **Q.**   WHAT I WOULD LIKE YOU TO DO IS CALCULATE HOW MUCH OF A

8   PERCENTAGE OF THE OVERALL AMOUNT FOR THE TWO LOCATIONS,

9   1,529,831 WAS SAN FRANCISCO.

10                    (PAUSE IN THE PROCEEDINGS.)

11  **A.**   OKAY.  DIVIDING THE SAN FRANCISCO NUMBER BY THE TOTAL, I

12  GET ABOUT 75.

13  **Q.**   75 PERCENT?

14  **A.**   ROUGHLY.

15  **Q.**   YOU ARE AWARE THAT THE DEFENDANTS CLOSED THEIR SAN

16  FRANCISCO LOCATION?

17  **A.**   THAT'S MY UNDERSTANDING, YES.

18  **Q.**   SO WHEN THEY CLOSED THAT, THEY HAVE NOW LOST 75 PERCENT OF

19  THEIR REVENUE STREAM?

20          **MR. PISTORINO:**  OBJECTION, ASSUMES FACTS NOT IN

21  EVIDENCE.

22          **MR. NATHAN:**  ASKING FOR HIS OPINION.

23          **THE COURT:**  SUSTAINED.

24  **BY MR. NATHAN:**

25  **Q.**   JUST TO BE CLEAR THEN, THE REVENUES FOR SAN FRANCISCO WERE

1   75 PERCENT OF THE TOTAL?

2   **A.**   CORRECT, FOR THIS TIME PERIOD.  THAT'S WHAT I COMPUTE.

3        SHOULD I LEAVE MY CALCULATOR OUT?

4   **Q.**   YOU CAN PUT THE CALCULATOR AWAY.

5   **A.**   OKAY.  THANK YOU.

6   **Q.**   NOW, YOUR TESTIMONY -- IN YOUR TESTIMONY YOU SET FORTH

7   YOUR OPINION ABOUT WHAT THE TECHSHOP BRAND WAS WORTH IN THE

8   UNITED STATES.

9        **MR. PISTORINO:**  OBJECTION, MISCHARACTERIZES HIS

10  TESTIMONY.

11       **THE COURT:**  OVERRULED.  IF IT'S MISCHARACTERIZED HE

12  CAN CORRECT IT.

13       **THE WITNESS:**  I'M SORRY.  DO YOU MIND REPEATING THE

14  QUESTION?

15  **BY MR. NATHAN:**

16  **Q.**   YES.

17       IN YOUR DIRECT TESTIMONY FROM COUNSEL, DID YOU TESTIFY

18  ABOUT THE VALUE OF THE TECHSHOP BRAND IN THE UNITED STATES?

19  **A.**   I COMMENTED ON IT AND CAME UP WITH A LOST LICENSING

20  REVENUE DAMAGES FIGURE.

21  **Q.**   WERE YOU AWARE -- WELL, LET ME STRIKE THAT.

22       IN PREPARING TO TESTIFY, YOU SAID YOU LOOKED AT

23  PLAINTIFF'S DOCUMENTS, DEFENDANTS' DOCUMENTS, AND YOU ALSO DID

24  SOME INDUSTRY STUDIES.

25       DO YOU REMEMBER TESTIFYING ABOUT THAT?

1   **A.**  YES.  I LOOKED AT SOME PUBLICLY AVAILABLE INFORMATION.

2   **Q.**  PUBLICLY AVAILABLE INFORMATION.  YOU DID THAT ON A

3   COMPUTER, ONLINE SEARCHES AND SO ON?

4   **A.**  RIGHT.  LOOKED AT COMPANY WEBSITES, FOR EXAMPLE.

5   **Q.**  IN CONNECTION WITH THAT, DID YOU BECOME AWARE THAT THE

6   TECHSHOP NAME IS BEING USED AT A SHOW IN ATLANTA BY A THIRD

7   PARTY BY THE NAME OF ODYSSEY EXPO 2019?

8           **MR. PISTORINO:**  OBJECTION, ASSUMES FACTS NOT IN

9   EVIDENCE.

10          **THE COURT:**  SUSTAINED.

11  **BY MR. NATHAN:**

12  **Q.**  WHEN YOU DID YOUR STUDY, DID YOU BECOME AWARE OF ODYSSEY

13  EXPO 2019?

14  **A.**  I DON'T RECALL COMING ACROSS THAT NAME.

15  **Q.**  WOULD YOU TAKE A LOOK AT EXHIBIT 1075.

16          **THE CLERK:**  1075 IS NOT IN.

17          **MR. NATHAN:**  OFFER IT INTO EVIDENCE.

18          **THE WITNESS:**  YOU SAID 1075?

19          **MR. NATHAN:**  1075.

20          **MR. PISTORINO:**  NO OBJECTION.

21          **THE COURT:**  1075 IS ADMITTED.

22          (TRIAL EXHIBIT 1075 RECEIVED IN EVIDENCE.)

23                  (DISPLAYED ON SCREEN.)

24  **BY MR. NATHAN:**

25  **Q.**  AGAIN, THIS IS A MULTIPAGE DOCUMENT.  I'M GOING TO TAKE

MATOLO – CROSS / NATHAN

1    YOU TO A COUPLE OF PAGES.

2        THE FIRST PAGE, DR60496, IS A HEADING, SEE IT ALL, LEARN

3    IT ALL AT ODYSSEY EXPO 2019.

4        DO YOU SEE THAT?

5    **A.**  YES, I DO.

6    **Q.**  WOULD YOU GO IN A FEW PAGES TO 60499.

7    **A.**  OKAY.

8    **Q.**  AND DO YOU SEE THERE IS A PICTURE OF SOME PEOPLE IN AN

9    AUDIENCE AND A SCREEN, AND IT IS SORT OF A CLASSROOM SETTING.

10       DO YOU SEE THAT?

11   **A.**  I DO, YES.

12   **Q.**  AND WHEN YOU DID YOUR OPINION, WERE YOU AWARE THAT THIS

13   ODYSSEY EXPO 2019 WAS CONDUCTING CLASSROOM EDUCATION FROM

14   INDUSTRY EXPERTS?

15          **MR. PISTORINO:**  OBJECTION, ASSUMES FACTS NOT IN

16   EVIDENCE.

17          **THE COURT:**  OVERRULED.  IT IS NOW.

18          **THE WITNESS:**  WELL, YOU KNOW, I'LL SAY NO, BECAUSE

19   WHEN I SUBMITTED MY REPORT IT WAS NOT IN 2019.

20   **BY MR. NATHAN:**

21   **Q.**  BUT THIS -- YOU ARE SITTING HERE TODAY IN JUNE OF 2019,

22   ARE YOU AWARE BEFORE YOU TESTIFIED ABOUT ODYSSEY EXPO 2019?

23   **A.**  I SEE THE DOCUMENT NOW, YES.

24   **Q.**  THIS IS THE FIRST TIME YOU'VE SEEN THIS?

25   **A.**  I MAY HAVE SEEN THIS JUST IN THE LAST COUPLE OF DAYS AS I

1    WAS GOING THROUGH SOME OF THE TRIAL EXHIBITS.

2    **Q.**  THERE ARE -- IF YOU CAN GO DOWN A LITTLE BIT IN THE SAME

3    PAGE, THERE'S SORT OF FOUR SMALLER PICTURES.

4         DO YOU SEE THAT?

5    **A.**  I DO, YES.

6    **Q.**  THE SECOND ONE, WOULD YOU READ THE HEADING BEFORE THE

7    SECOND PHOTOGRAPH?

8    **A.**  (READING)

9         "EXPERIENCE THE TECHSHOP".

10   **Q.**  WOULD YOU GO TO EXHIBIT -- IN THE SAME EXHIBIT, PAGE

11   60503.

12                       (DISPLAYED ON SCREEN.)

13        TELL ME WHEN YOU ARE THERE.

14   **A.**  I AM.  60503?

15   **Q.**  DO YOU SEE A FLOOR PLAN THERE OF THE EXPOSITION THAT

16   ODYSSEY EXPO CONDUCTED?

17   **A.**  LOOKS LIKE A FLOOR PLAN, YES.

18   **Q.**  AND ABOVE THE FLOOR PLAN, WHAT IS THE WORD ABOVE THE FLOOR

19   PLAN?

20   **A.**  THERE'S MANY WORDS, BUT YOU HAVE "TECHSHOP" IN THE MIDDLE

21   IN REFERENCED TO SQUARE FEET.

22   **Q.**  SO ODYSSEY EXPO 2019 WAS USING THE WORD "TECHSHOP"?

23   **A.**  POTENTIALLY.  I SEE THE TECHSHOP NAME HERE ON THIS

24   ODYSSEY -- I'M NOT SURE IF IT'S AN ODYSSEY WEB PAGE, BUT -- OR

25   FLIER.

1  **Q.**  YOU DON'T HAVE ANY DOUBT ABOUT IT, DO YOU?

2  **A.**  NO.  I SEE THE NAME HERE.  WHEN YOU SAY WHO'S USING IT, I

3  WASN'T SURE WHOSE WEBSITE THIS IS.

4        **MR. NATHAN:**  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

5        **THE COURT:**  ANY REDIRECT?

6        **MR. PISTORINO:**  YES, I DO, YOUR HONOR.

7                **<u>REDIRECT EXAMINATION</u>**

8  **BY MR. PISTORINO:**

9  **Q.**  WE ARE GOING TO GO BACKWARDS.  START WITH THE MOST RECENT

10  ONE.

11      YOU WERE JUST ASKED A LOT OF QUESTIONS ABOUT EXHIBIT 1075

12  AND THE EXPO ODYSSEY, RIGHT?

13  **A.**  YES.

14  **Q.**  AND GO TO THE FIRST PAGE 60 -- GO TO THE PAGE YOU WERE

15  ASKED QUESTIONS ABOUT, 60499.

16  **A.**  499?

17  **Q.**  THE ONE THAT SAID CLASSROOM EDUCATION FROM INDUSTRY

18  EXPERTS.

19      ARE YOU WITH ME THERE?

20  **A.**  I AM.

21  **Q.**  OKAY.  LET'S JUST STARE AT IT FOR A SECOND.

22      LET'S FIGURE OUT WHAT INDUSTRY WERE THEY USING?  IT LOOKS

23  TO ME -- YOU SEE THE PART WHERE IT SAYS, "JOIN US IN ATLANTA

24  FOR ODYSSEY EXPO WHERE LEADERS IN THE FOLDING CARTON

25  CORRUGATED, PRINT FINISHING, PACKAGE DESIGN, AND SPECIALTY

1    CONVERTING INDUSTRIES CONVERGE", CORRECT?

2    **A.**  CORRECT.

3           **THE CLERK:**  ARE YOU AWARE YOUR TECH TEAM DOES NOT

4    HAVE 1075?

5           **MR. PISTORINO:**  I'M SORRY.

6                    (DISPLAYED ON SCREEN.)

7    **BY MR. PISTORINO:**

8    **Q.**  AND RIGHT UNDER THE HEADING, "CLASSROOM EDUCATION FROM

9    INDUSTRY EXPERTS", YOU SEE WHERE IT SAYS -- I'LL READ IT

10   AGAIN, "JOIN US IN ATLANTA FOR ODYSSEY EXPO WHERE LEADERS IN

11   THE FOLDING CARTON, CORRUGATED, PRINT FINISHING, PACKAGE

12   DESIGN, AND SPECIALTY CONVERTING INDUSTRIES CONVERGE", RIGHT?

13   **A.**  I SEE THAT.

14   **Q.**  OKAY.

15       SO THIS ODYSSEY EXPO THING, WAS -- THAT HAVE ANYTHING TO

16   DO WITH PROVIDING DO-IT-YOURSELF FABRICATION -- PROVIDING

17   EQUIPMENT AND STUFF FOR DO-IT-YOURSELFERS?  IT'S THE

18   INDUSTRY -- LOOKS LIKE MAYBE THE PACKAGING INDUSTRY, CORRECT?

19   **A.**  RIGHT.  FROM WHAT I SEE HERE IT LOOKS LIKE A DIFFERENT

20   INDUSTRY.

21   **Q.**  AND I THINK ON PAGE 60501, CORRECT?

22                    (DISPLAYED ON SCREEN.)

23   **A.**  OKAY.

24   **Q.**  THIS IS LIKE THE FLOOR PLAN LAYOUT OF THE TRADE SHOW,

25   RIGHT?

1   **A.**  YES.

2   **Q.**  DO YOU SEE ANYTHING IN THERE USING THE TERM "TECHSHOP"

3   WITH REGARD TO A MAKERSPACE?

4   **A.**  I DON'T -- NO, I DON'T SEE ANY SUCH REFERENCE.

5   **Q.**  SO IT KIND OF LOOKS LIKE THEY WERE USING THE TERM

6   "TECHSHOP" IN A COMPLETELY DIFFERENT INDUSTRY, OR AT LEAST IN

7   YOUR OPINION IT SEEMS LIKE --

8           **MR. NATHAN:**  OBJECTION, LEADING.

9           **THE COURT:**  IT IS.  IT IS.

10          **MR. PISTORINO:**  OKAY.

11  **BY MR. PISTORINO:**

12  **Q.**  WELL, LET ME TRY IT THIS WAY.

13      JUST SITTING HERE TODAY, DO YOU HAVE ANY OPINION ABOUT

14  WHETHER OR NOT THE CORRUGATED INDUSTRY IS THE SAME INDUSTRY AS

15  THAT OF PROVIDING MAKERSPACE AND MAKERSPACE EQUIPMENT?

16  **A.**  THAT SOUNDS LIKE A DIFFERENT INDUSTRY.

17  **Q.**  OKAY.

18      SO IF WE WENT BACK AND -- DID YOU EVER COME UP WITH AN

19  OPINION ABOUT IF WE WENT BACK TO THOSE TRADEMARK REGISTRATIONS

20  AND LOOKED AT THE CLASSES WHERE IT SAYS WHAT THE TERM WAS USED

21  FOR, WHETHER OR NOT IT WOULD MATCH UP WITH THIS AT ALL?

22          **MR. NATHAN:**  OBJECTION, BEYOND THE SCOPE.

23          **THE COURT:**  SUSTAINED.  WE ARE A LONG WAY AWAY FROM

24  THE DAMAGES TESTIMONY.

25          **MR. PISTORINO:**  OKAY.

1          (PAUSE IN THE PROCEEDINGS.)

2     **BY MR. PISTORINO:**

3     **Q.**  AGAIN, I'M GOING TO GO BACKWARDS.  TURN IN YOUR BOOK TO

4     EXHIBIT MARKED TX293.

5                    (DISPLAYED ON SCREEN.)

6          THESE WERE -- THIS IS AN EXHIBIT YOU PREPARED SHOWING THE

7     FORECAST THAT DEFENDANTS MADE ABOUT REVENUES, RIGHT, FOR 2018,

8     RIGHT?

9     **A.**  CORRECT.

10    **Q.**  AND WERE THESE THE FORECAST DEFENDANTS MADE ABOUT THE

11    REVENUES THEY WERE GOING TO EARN IN 2018 USING THE NAME

12    TECHSHOP 2.0?

13    **A.**  THAT'S THE NAME ON THE DOCUMENTS, YES.

14    **Q.**  MAKE SURE I'M CLEAR FROM A TIMING PERSPECTIVE, AFTER ALL

15    THAT STUFF WITH TECHSHOP CLOSING ITS DOORS AND ANNOUNCING IT

16    WAS GOING TO SEEK BANKRUPTCY PROTECTION, THE DEFENDANTS

17    PROJECTED THAT THEY WOULD EARN $10 MILLION OF REVENUE IN 2018

18    USING THE NAME TECHSHOP 2.0, CORRECT?

19    **A.**  THAT IS WHAT I SEE IN THE DOCUMENTS, YES.

20    **Q.**  OKAY.

21         YOU WERE ASKED SOME QUESTIONS ABOUT SOME OF THESE LICENSES

22    THAT WE HAVE SEEN, RIGHT?

23    **A.**  YES.

24    **Q.**  LET ME MAKE SURE I HAVE IT ALL CORRECT HERE.  OH,

25    ACTUALLY, I WILL TRY IT THIS WAY.

1      REMEMBER WE'VE SEEN MR. RASURE'S -- THIS MIGHT HELP THE

2  JURY TO PUT FACTS TOGETHER.

3      IF WE PUT IN FRONT OF YOU TX73.

4                    (DISPLAYED ON SCREEN.)

5  **A.**  OKAY.

6  **Q.**  THIS WAS THE OFFER THAT MR. RASURE MADE LIKE TWO WEEKS

7  BEFORE THIS LAWSUIT WAS FILED TO LICENSE THE TECHSHOP MARKS

8  OUTSIDE THE UNITED STATES FOR $2.5 MILLION, RIGHT?

9  **A.**  RIGHT.

10  **Q.**  AND I BELIEVE ON CROSS-EXAMINATION YOU MENTIONED THAT YOU

11  HAD SEEN -- THE QUESTION WAS HAD ADEO ACCEPTED THE OFFER OR

12  SIGNED A CONTRACT, RIGHT?

13  **A.**  RIGHT.

14  **Q.**  I THINK YOU MENTIONED THAT YOU HAD SEEN SOME

15  COMMUNICATIONS FROM ADEO KIND OF ABOUT IT, RIGHT?

16  **A.**  YES.

17  **Q.**  LIKE AFTER THE OFFER, YOU SAW SORT OF LIKE THE ADEO

18  RESPONSE?

19  **A.**  RIGHT.  RIGHT.

20  **Q.**  DO YOU RECALL -- SEE HOW I PHRASE THIS -- BUT DO YOU

21  RECALL ADEO SAYING NO WAY IN THE WORLD, FORGET IT, THAT'S A

22  CRAZY NUMBER.

23      DO YOU RECALL SEEING ANYTHING WITH THEM SAYING SOMETHING

24  LIKE THAT?

25  **A.**  NO.

1  **Q.**  OKAY.  IF YOU CAN TURN IN YOUR BOOK TO AN EXHIBIT MARKED

2  TX72.

3          **THE CLERK:**  IT IS NOT IN.

4          **MR. PISTORINO:**  WE OFFER TX72, YOUR HONOR.

5          **MR. NATHAN:**  NO OBJECTION.

6          **THE COURT:**  72 IS ADMITTED.

7          (TRIAL EXHIBIT 72 RECEIVED IN EVIDENCE.)

8                  (DISPLAYED ON SCREEN.)

9  **BY MR. PISTORINO:**

10  **Q.**  IS THIS -- LET ME KNOW WHEN YOU ARE READY.

11      ARE YOU WITH ME?

12  **A.**  YES.

13  **Q.**  TX72 IS SORT OF ADEO'S RESPONSE TO MR. RASURE, CORRECT?

14  **A.**  YES.  RESPONDING TO --

15  **Q.**  OKAY.

16  **A.**  -- RASURE REACHING OUT TO THEM.

17  **Q.**  OKAY.  MAKE SURE I HAVE MY TIMING RIGHT.

18      OH, ACTUALLY, THIS PARTICULAR ONE IS EARLIER.  WE WILL

19  DEAL WITH IT LATER.

20      TURN IN YOUR BOOK, IF YOU CAN, TO TX71.

21          **THE CLERK:**  71 IS NOT ADMITTED.

22          **MR. PISTORINO:**  WHICH WE OFFER.

23          **MR. NATHAN:**  NO OBJECTION, YOUR HONOR.

24          **THE COURT:**  71 IS ADMITTED.

25          (TRIAL EXHIBIT 71 RECEIVED IN EVIDENCE.)

1                    (DISPLAYED ON SCREEN.)

2       **BY MR. PISTORINO:**

3       **Q.**  I WANT TO MAKE SURE WE ARE CLEAR ON TIMING.

4            IN TX71, THIS WAS ACTUALLY, IN FACT, EVEN AN EARLIER OFFER

5       MR. RASURE MADE TO ADEO TO LICENSE HIS TECHSHOP MARKS OUTSIDE

6       THE UNITED STATES FOR 2.5 MILLION, RIGHT?  I'M SORRY, 2

7       MILLION, RIGHT?

8       **A.**  CORRECT.

9       **Q.**  SO, NOW WE GET OUR TIMING CORRECT.

10           IF YOU TURN TO TX72, RIGHT?

11                        (DISPLAYED ON SCREEN.)

12           THAT'S THE ADEO RESPONSE, RIGHT?

13      **A.**  CORRECT.

14      **Q.**  IS THAT ONE OF THE ONES YOU WERE REFERRING TO THAT YOU HAD

15      SEEN BEFORE?

16      **A.**  YES, THIS IS THE ONE I WAS REFERRING TO EARLIER.

17      **Q.**  THEY DON'T SAY ANYTHING HERE LIKE 2 MILLION IS JUST WAY

18      OUT OF THE BALLPARK.  THAT'S CRAZY --

19                **MR. NATHAN:**  OBJECTION, LEADING, YOUR HONOR.

20               **THE COURT:**  SUSTAINED.  LET'S JUST MOVE THROUGH IT.

21               **MR. PISTORINO:**  OKAY.

22      **BY MR. PISTORINO:**

23      **Q.**  THEN TO MAKE SURE WE HAVE OUR TIMING RIGHT, IN TX73,

24      THAT'S MR. RASURE SORT OF FOLLOWING UP WITH AN OFFER THAT'S

25      KIND OF BROADER BUT ALSO HAS INCREASED TERMS OF THE 2.5,

MATOLO - REDIRECT / PISTORINO

 1    RIGHT?

 2    **A.**   CORRECT.  IT'S A HIGHER OFFER NOW.

 3    **Q.**   NOW LET'S GO TO WHERE I'M GOING HERE.

 4         TURN IN YOUR BOOK, IF YOU CAN, TO THE DOCUMENT MARKED

 5    TX310.

 6    **A.**   OKAY.

 7                        (DISPLAYED ON SCREEN.)

 8    **Q.**   AND YOU WERE ASKED ON CROSS SOME QUESTIONS ABOUT THIS AND

 9    THE OTHER ONES.  YOU REMEMBER?

10    **A.**   YES.

11    **Q.**   AND WHAT I REALLY WANTED TO FOCUS ON IF I COULD FOR JUST A

12    MOMENT IS FOLLOW UP ON THE MONEY A LITTLE BIT HERE.

13         UNDER, I GUESS, NO. 2, UNDER 2A, UNDER FEES AND EXPENSES,

14    ARE YOU WITH ME THERE?

15    **A.**   I AM, YES.

16    **Q.**   AND YOU SEE IT SAYS -- SEE THE PART WHERE IT SAYS,

17    $200,000.

18         DO YOU SEE THAT?

19    **A.**   I DO.  YES.

20    **Q.**   AND THEN IT SAYS SOMETHING LIKE, LICENSEE SHALL PAY THESE

21    LICENSE FEES EACH YEAR DURING THE TERM OF THE SUBLICENSE.

22         RIGHT?

23    **A.**   CORRECT.

24    **Q.**   SO THE LICENSE HERE, THIS PARTICULAR ONE FOR ABU DHABI, IT

25    WAS FOR LIKE A FIXED PERIOD, RIGHT?

1    **A.**  I BELIEVE SO, YES.

2    **Q.**  SO IT WAS JUST A CERTAIN AMOUNT OF TIME FOR THE TERM?

3    **A.**  RIGHT.

4    **Q.**  NOW I WANT TO GO TO YOUR OPINION.

5         THE ROYALTY RATE THAT WE HAVE SEEN HERE IN YOUR OPINION,

6    YOU'VE GOT A HYPOTHETICAL LICENSE, RIGHT?

7    **A.**  THAT'S CORRECT.

8    **Q.**  IS THE NUMBER THAT YOU ARE OFFERING HERE, IS THAT FOR A

9    FIXED TERM LICENSE?

10   **A.**  IT'S NOT FOR A FIXED TERM.  IT'S FOR ONGOING IN THE FUTURE

11   WITH UNLIMITED NUMBER OF STORES.

12   **Q.**  SO HELP US MAKE SURE WE GOT IT.

13        WHICH WOULD BE MORE VALUABLE, A FIXED TERM LICENSE OR A

14   PERPETUAL LICENSE?

15   **A.**  WELL, THE PERPETUAL LICENSE WILL GIVE YOU MORE FREEDOM AND

16   YOU DON'T HAVE TO WORRY ABOUT RENEWING DOWN THE ROAD.

17   **Q.**  SO WHICH WOULD BE MORE VALUABLE, A FIXED TERM OR A

18   PERPETUAL?

19   **A.**  THE PERPETUAL.  YOU WILL GET MORE FOR YOUR MONEY.

20   **Q.**  OKAY.  AND THE PERPETUAL KIND OF LICENSE, THAT'S THE ONE

21   YOUR OPINION IS BASED ON, THE 1.5 MILLION; IS THAT RIGHT?

22   **A.**  THE -- YES, THAT IS THE PERPETUAL LICENSE.

23   **Q.**  OKAY.  IF YOU TURN TO, I GUESS, IT'S 311 HERE.

24                     (DISPLAYED ON SCREEN.)

25        AND IF YOU GO TO THE PART THAT SAYS, I DON'T KNOW, ITEM 2

1   ABOUT THEIR SUPPORT SERVICES.

2      ARE YOU THERE WITH ME?

3   **A.**  I AM, YES.

4   **Q.**  AGAIN, THIS PARTICULAR FUJITSU LICENSE, WAS THIS LIKE THE

5   MORE VALUABLE PERPETUAL ONE THAT YOU TALKED ABOUT OR WAS THIS

6   ONE OF THOSE TERM ONES?

7   **A.**  THIS IS A TERM.  I BELIEVE IT IS FIVE YEARS.

8   **Q.**  OKAY.  BUT YOUR OPINION IS ABOUT THESE OTHER ONES, THESE

9   MORE VALUABLE ONES, THE PERPETUAL, CORRECT?

10  **A.**  RIGHT.

11  **Q.**  BUT DID YOU STILL USE THESE NUMBERS IN HERE IN SORT OF

12  TRYING TO ARRIVE AT YOUR FIGURE?

13  **A.**  YES.  SO WHEN I COME UP WITH MY RANGE, I USED THE NUMBERS

14  IN HERE TO COME UP WITH THE RANGE.

15  **Q.**  IF YOU CAN, TURN IN YOUR BOOK TO THE ONE THAT'S MARKED

16  317.  YOU WERE ASKED SOME QUESTIONS ABOUT THIS ONE.

17                 (DISPLAYED ON SCREEN.)

18  **A.**  OKAY.

19  **Q.**  AND I THINK MR. NATHAN ASKED YOU SOME QUESTIONS ABOUT --

20  ON THE FIRST PAGE, 1.3, ABOUT INTELLECTUAL PROPERTY RIGHTS,

21  RIGHT?

22      REMEMBER THAT?

23  **A.**  CORRECT.

24  **Q.**  AND THEN HE REFERRED YOU BACK TO THE BACK IN EXHIBIT A OF

25  IT.  SO I DON'T KNOW HOW MANY PAGES IN, BUT EXHIBIT A.  RIGHT?

1   **A.**  RIGHT.

2   **Q.**  AND THEN IN EXHIBIT A?

3   **A.**  I'M THERE, YES.

4                   (DISPLAYED ON SCREEN.)

5   **Q.**  EXHIBIT A YOU TALKED ABOUT HOW THERE'S EIGHT ITEMS LISTED

6   HERE, ONLY ONE OF WHICH IS THE TRADEMARKS, RIGHT?

7   **A.**  CORRECT.

8   **Q.**  OKAY.

9       AND MR. NATHAN HAD SOME QUESTIONS ABOUT WHAT YOU DID KIND

10  OF, IF ANYTHING, HERE TO TALK ABOUT THESE EIGHT POINTS, RIGHT?

11  **A.**  RIGHT.  WE TALKED ABOUT THE EIGHT POINTS.

12  **Q.**  I WILL PICK ONE HERE.  HOW ABOUT IN YOUR ANALYSIS, YOU

13  MENTIONED EARLIER, THAT YOU CONDUCTED AN ANALYSIS TO ISOLATE

14  OUT THESE OTHER POINTS AND FOCUS IN ON THE TRADEMARK ASPECT,

15  RIGHT?

16  **A.**  CORRECT.

17  **Q.**  SO I AM GOING TO PICK ONE.

18      WHAT DID YOU DO IN YOUR INVESTIGATION TO FIGURE OUT WHAT

19  VALUE, IF ANYTHING, WAS ASSOCIATED WITH THE, FOR EXAMPLE, THE

20  PROPRIETARY CRM SOFTWARE?

21  **A.**  SO, FOR PART OF MY INVESTIGATION WAS TO, AGAIN, TRY TO

22  NARROW DOWN THE LICENSE MATERIALS TO JUST THE TRADEMARK VALUE.

23  AND SO I LOOKED AT VARIOUS EVIDENCE.  SOME OF THE EVIDENCE

24  INCLUDES LOOKING AT THE LICENSEES IN THIS CASE AND REALIZING

25  THAT THEY ARE NOT EVEN USING THE CRM SOFTWARE.

MATOLO - REDIRECT / PISTORINO

1        ALSO LOOKING AT --

2    Q.  I'M SORRY CAN I INTERRUPT YOU JUST TO MAKE SURE WE'RE

3    CLEAR.

4        YOU SAID YOU LOOKED INTO THE EVIDENCE ABOUT WHETHER OR NOT

5    SOME OF THE LICENSEES WERE EVEN USING THE CRM SOFTWARE?

6    A.  CORRECT.

7    Q.  WHAT INFORMATION DID YOU HAVE ABOUT THAT?

8    A.  THIS COMES FROM INTERVIEWS OF THE TECHSHOP PRINCIPALS, AND

9    I LEARNED THAT THEY WEREN'T USING THE SOFTWARE.  AND WITHOUT

10   USING THE SOFTWARE, THEY DIDN'T COME BACK AND SAY, HEY, I WANT

11   A LOWER ROYALTY BECAUSE I AM NOT USING THE SOFTWARE.  THERE

12   WAS NO REDUCTION OF THE ROYALTY.

13       IN ADDITION, WE HAVE THE SUBSEQUENT ADEO LICENSE.  YOU

14   DON'T HAVE THE SOFTWARE INCLUDED, IT'S JUST FOR THE TRADEMARK.

15       THEN I WENT FURTHER AND LOOKED AT PUBLIC DOCUMENTS JUST TO

16   SEE, WELL, WHAT DOES THE SOFTWARE COST?  AND SO YOU CAN SEE

17   PRICING ONLINE, AND YOU CAN SEE THAT IT'S MINIMAL.

18       SO, YOU CAN GO OUT AND GET YOUR OWN CRM SOFTWARE FOR, SAY,

19   A FEW THOUSAND DOLLARS.

20   Q.  BUT THE LICENSES, WHAT YOU SEE THERE, FOR HUNDREDS OF

21   THOUSANDS OF DOLLARS, MILLIONS OF DOLLARS, RIGHT?

22   A.  THAT'S CORRECT.

23   Q.  SO DID YOU CONSIDER LIKE THIS $2,000 KIND OF THING FOR THE

24   CRM SOFTWARE KIND OF MATERIAL IN FORMING YOUR OPINION?

25   A.  I INVESTIGATED, AND THE INVESTIGATION I JUST DESCRIBED IS

1    WHAT LED ME TO THE CONCLUSION THAT THE TRADEMARKS ARE THE REAL

2    SOURCE OF THE VALUE HERE.

3    **Q.**  DID YOU DO THAT SAME KIND OF INVESTIGATION, FOR EXAMPLE,

4    ON -- I'M JUST PICKING SOME HERE, ON THE TRAINING AND COURSE

5    MANUALS, INSTRUCTIONAL MATERIALS, THE STORE DESIGNS AND

6    LAYOUT, AND THE PROPRIETARY TSAP TECHNOLOGIES?

7    **A.**  I DID.

8    **Q.**  OKAY.

9    **A.**  YES.

10   **Q.**  AND SORT OF THE SAME CONCLUSION?

11   **A.**  SAME CONCLUSION, CORRECT.

12   **Q.**  ALL RIGHT.

13       IF YOU COULD TURN IN YOUR BOOK TO THE EXHIBIT MARKED TX6.

14                    (DISPLAYED ON SCREEN.)

15       YOU RECALL MR. NATHAN ASKING YOU QUESTIONS ABOUT THIS ONE,

16   THE SPREADSHEETS?

17   **A.**  YES.

18   **Q.**  AGAIN, I WANT US TO GO BACK TO THE VERY BACK PAGE OF IT

19   BECAUSE IT IS EASIER TO DO IT THAT WAY.

20       LAST PAGE, THE PAGE NUMBER IS 1801.

21                    (DISPLAYED ON SCREEN.)

22   **A.**  I HAVE IT ON THE SCREEN.  YES, I'M THERE.

23   **Q.**  THERE WAS SOME QUESTIONS ABOUT THESE VARIOUS LOCATIONS.

24       IF WE LOOK HERE, WE SEE -- AT THE BOTTOM I SEE DETROIT,

25   MID-PENINSULA, THAT KIND OF THING.  REMEMBER THAT --

MATOLO - REDIRECT / PISTORINO

1    QUESTIONS?

2    **A.**  YES.

3    **Q.**  SAN JOSE AS WELL, RIGHT?

4    **A.**  CORRECT.

5    **Q.**  AND THERE WAS QUESTIONS -- YOU WERE QUESTIONED ABOUT

6    WHETHER OR NOT THE DEFENDANTS HAD STORES IN THOSE PLACES,

7    RIGHT?

8        REMEMBER THAT?

9    **A.**  I DO, YES.

10   **Q.**  CAN YOU GO TO THE TOP COLUMN -- THE TOP OF THE COLUMN

11   WHERE THE HEADINGS ARE IN B?

12       WITH ME THERE?

13   **A.**  I AM.

14   **Q.**  AND I KNOW YOU ACTUALLY TESTIFIED ABOUT THIS EARLIER.

15       REMEMBER IT JUST SAYS "HOME", RIGHT?

16   **A.**  THAT'S CORRECT.

17   **Q.**  DID YOU HAVE ANY INFORMATION ABOUT WHAT "HOME" MEANT?

18   **A.**  NO.

19   **Q.**  SO YOU DIDN'T KNOW WHETHER OR NOT THAT MEANT THAT WHOEVER

20   DECIDED TO PAY THAT MONEY HAPPENED TO BE LIVING IN DETROIT?

21   **A.**  WE DON'T KNOW.  CORRECT.  WE DON'T HAVE INFORMATION ON

22   THAT.

23   **Q.**  BUT THE ONLY THING YOU DID KNOW IS THAT THE DEFENDANTS

24   TOOK IN MONEY USING THE TECHSHOP NAME ON THESE PARTICULAR

25   DATES, RIGHT?

1   **A.** CORRECT.

2                    (PAUSE IN THE PROCEEDINGS.)

3   **Q.** YOU WERE -- IF YOU COULD TURN IN YOUR BOOK TO THE NUMBER

4   THAT WAS MARKED 290.

5             **THE CLERK:** I'M SORRY?

6             **MR. PISTORINO:** 290.

7             **THE CLERK:** 290?

8             **MR. PISTORINO:** RIGHT.

9                    (DISPLAYED ON SCREEN.)

10            **MR. PISTORINO:** MAYBE I MISSPOKE. THAT'S CORRECT.

11  **BY MR. PISTORINO:**

12  **Q.** IF YOU CAN TURN TO THE PAGE THAT'S MARKED DR56070.

13                   (DISPLAYED ON SCREEN.)

14  **A.** I'M SORRY, WHAT PAGE?

15  **Q.** 56070.

16  **A.** OKAY.

17  **Q.** DO YOU RECALL MR. NATHAN ASKING YOU SOME QUESTIONS ABOUT

18  THIS ONE?

19  **A.** I DO.

20  **Q.** SO NOW I WANT TO GO BACK TO YOUR OPINION ITSELF AND SOME

21  OF THE ASSUMPTIONS THAT YOU MADE WHEN YOU WERE ARRIVING AT

22  YOUR OPINION.

23      FOR YOUR OPINION, DID YOU ASSUME THAT THE JURORS WOULD

24  DECIDE THAT WHATEVER IT WAS WAS INFRINGING?

25  **A.** CORRECT. I ASSUMED LIABILITY. IT'S TYPICAL FOR A DAMAGES

1    ANALYSIS.

2    **Q.**  YOU'RE NOT -- YOU'RE NOT -- YOU'RE A DAMAGES EXPERT, YOU

3    ARE NOT A TRADEMARK INFRINGEMENT EXPERT?

4    **A.**  THAT'S CORRECT.

5    **Q.**  YOUR AREA OF EXPERTISE IS THE ECONOMICS OF THE WHOLE

6    THING, RIGHT?

7    **A.**  CORRECT.

8    **Q.**  SO JUST MAKE SURE WE ARE CLEAR HERE.

9        YOU ASSUMED FOR THE PURPOSE OF YOUR OPINION, YOU ASSUMED

10   THAT THE JURORS WOULD DECIDE THAT THESHOP.BUILD MIGHT INFRINGE

11   THE TECHSHOP TRADEMARKS, CORRECT?

12   **A.**  CORRECT.

13          **MR. NATHAN:**  OBJECTION, LEADING.

14          **THE COURT:**  OVERRULED.

15          **MR. PISTORINO:**  I'M SORRY?

16          **THE WITNESS:**  AGAIN, CORRECT.  I'VE ASSUMED THE

17   LIABILITY.

18   **BY MR. PISTORINO:**

19   **Q.**  ASSUMING THE JURORS WOULD LOOK AT THESE THINGS AND SAY,

20   HEY, THESHOP.BUILD WITH THE GEAR --

21          **THE COURT:**  OKAY.  SUSTAINED.

22          **MR. PISTORINO:**  OKAY.

23   **BY MR. PISTORINO:**

24   **Q.**  YOUR ASSUMPTION WAS OF INFRINGEMENT, CORRECT?

25   **A.**  CORRECT.  I ASSUMED LIABILITY.

1   **Q.**  COME BACK TO THE MAGNITUDE OF YOUR -- OF THE NUMBER HERE.

2      SOME DISCUSSION ABOUT THE VALUE OF THE TECHSHOP BRANDS

3   OUTSIDE OF THE UNITED STATES VERSUS INSIDE THE UNITED STATES;

4   YOU RECALL THAT?

5   **A.**  I DO.

6   **Q.**  IN YOUR OPINION, DID YOU -- YOU -- YOU -- YOUR OPINION WAS

7   THAT THE VALUE OUTSIDE THE UNITED STATES WAS ACTUALLY LOWER

8   THAN THE VALUE INSIDE THE UNITED STATES, CORRECT?

9   **A.**  CORRECT.

10  **Q.**  OKAY.  AND THEN THERE WAS SOME DISCUSSION ABOUT WHETHER OR

11  NOT... THE CLOSURE OF THE STORES AND HOW THAT MIGHT HAVE

12  AFFECTED THINGS.

13     REMEMBER THAT?  MR. NATHAN ASKED YOU ABOUT THAT?

14  **A.**  CORRECT.

15  **Q.**  IN YOUR OPINION, YOU -- YOU SAID PROBABLY WAS A

16  SIGNIFICANT DROP IN THE VALUE OF THE MARKS WITH THE CLOSURE

17  AND THE ANNOUNCEMENT OF THE IMPENDING BANKRUPTCY, RIGHT?

18  **A.**  CORRECT.

19  **Q.**  OKAY.

20     BUT NEVERTHELESS, DESPITE THAT SIGNIFICANT DROP BECAUSE OF

21  THAT ANNOUNCEMENT, YOU STILL CAME UP WITH THE ONE TO

22  1.5 MILLION NUMBER, RIGHT?

23  **A.**  THAT'S CORRECT.

24  **Q.**  IF YOU TURN IN YOUR BOOK TO EXHIBIT 73.

25                  (DISPLAYED ON SCREEN.)

1          PARTLY THAT WAS BASED ON MR. RASURE'S OFFER OF A LICENSE

2     OF THE TECHSHOP MARKS FOR 2.5 ABOUT TWO WEEKS BEFORE THIS SUIT

3     WAS FILED, RIGHT?

4     **A.**  YEAH.  THIS IS PART OF THE EVIDENCE I CONSIDERED.

5     **Q.**  YOUR NUMBER SEEMS KIND OF LIKE A BARGAIN.  WHAT DO YOU

6     THINK?

7               **MR. NATHAN:**  OBJECTION, YOUR HONOR, HE'S TESTIFYING.

8               **THE COURT:**  IT'S ARGUMENTATIVE.  SUSTAINED.

9               **MR. PISTORINO:**  NOTHING FURTHER.  THANK YOU.

10              **THE COURT:**  ANY RECROSS?

11              **MR. NATHAN:**  YES, YOUR HONOR, JUST BRIEFLY.

12              **THE COURT:**  STRICTLY WITHIN THE SCOPE OF THE

13    REDIRECT, PLEASE.

14                         **RECROSS-EXAMINATION**

15    **BY MR. NATHAN:**

16    **Q.**  GO BACK TO ODYSSEY EXPO 2019.  YOU WON'T NEED TO LOOK AT

17    YOUR BOOK.  YOU ARE FREE TO, BUT I DON'T THINK YOU WILL NEED

18    TO.

19    **A.**  OKAY.

20    **Q.**  COUNSEL'S QUESTIONS ABOUT WHAT WAS GOING ON AT THAT --

21    **A.**  SURE.  CAN YOU REMIND ME WHAT EXHIBIT JUST IN CASE I NEED

22    TO?  I DON'T REMEMBER THE EXHIBIT NUMBER.

23    **Q.**  SURE.  IT'S 1075.

24    **A.**  THANK YOU.

25                         (DISPLAYED ON SCREEN.)

1  **A.**  OKAY.

2  **Q.**  ARE YOU THERE?

3  **A.**  I AM.

4  **Q.**  LET ME ASK YOU SOME QUESTIONS ABOUT THE INDUSTRY AND SO

5  ON.

6      MY QUESTION TO YOU IS, AND I WANT TO BE VERY CLEAR ABOUT

7  THIS, YOU DIDN'T, AS PART OF YOUR STUDY, ANALYZE THE SCOPE AND

8  VALIDITY OF THE TRADEMARKS THAT ARE -- THAT BRING US TO THIS

9  COURTROOM?

10  **A.**  THAT'S CORRECT.

11  **Q.**  COUNSEL ON REDIRECT, AGAIN, PROBED ABOUT THE ADEO

12  CORRESPONDENCE?

13  **A.**  CORRECT.

14  **Q.**  AND I JUST WANT TO BE CLEAR THAT WHEN THE SMOKE CLEARED,

15  THERE WAS NO AGREEMENT EXECUTED BETWEEN ADEO AND MR. RASURE?

16  **A.**  I AM NOT AWARE OF A LICENSE, CORRECT.

17  **Q.**  COUNSEL ASKED YOU ABOUT FIXED TERM LICENSES, PERPETUAL

18  LICENSES, AND SO ON.

19      BUT THE NUMBERS THAT YOU USED WERE ALL FOREIGN, FROM THE

20  FOREIGN LICENSES, RIGHT?

21  **A.**  THAT'S CORRECT.

22  **Q.**  AND THEY WERE ALL EXECUTED TWO TO THREE YEARS BEFORE THE

23  TECHSHOP CLOSURE IN THE UNITED STATES?

24  **A.**  MOSTLY.  I THINK ONE WAS MAYBE A YEAR BEFORE.

25  **Q.**  NOW, I WOULD LIKE TO TAKE YOU TO EXHIBIT A OF EXHIBIT 317.

1       THIS IS THE LIST OF THE EIGHT PROPERTIES THAT WERE

2   INCLUDED IN THE LICENSED MATERIALS.

3                   (DISPLAYED ON SCREEN.)

4   **A.**   OKAY.

5   **Q.**   COUNSEL ASKED YOU ABOUT YOUR OPINION ABOUT NO. 7, THE CRM

6   SOFTWARE?

7   **A.**   CORRECT.

8   **Q.**   HE DIDN'T ASK YOU ABOUT ALL THE OTHERS, BUT IF I HEARD

9   YOUR TESTIMONY CORRECTLY, YOU SAID THAT NO. 1, THE TRADEMARKS,

10  WAS THE VALUE?

11  **A.**   THAT WAS THE VALUE DRIVER, YES.

12  **Q.**   THAT WAS YOUR OPINION BASED ON WHAT YOU HAVE DONE TO

13  PREPARE TO TESTIFY?

14  **A.**   CORRECT.

15  **Q.**   BUT YOU NEVER SPOKE TO THE ACTORS INVOLVED WHO EXECUTED

16  ADEO, FUJITSU, OR ABU DHABI AGREEMENTS BACK IN 2014, 2015?

17  **A.**   I DIDN'T HAVE ACTUAL CONVERSATIONS WITH THEM.

18  **Q.**   SO YOU DON'T KNOW HOW MUCH THEY VALUE, FOR EXAMPLE, NO. 3,

19  THE COURSE AND TRAINING MATERIALS OR MANUALS?

20  **A.**   WELL, I KNOW THAT THE TRAINING AND COURSE MANUALS ARE USED

21  IN CONJUNCTION WITH THE SERVICES.  AND THE PARTIES ARE

22  ACTUALLY PAYING A GOOD AMOUNT FOR THESE SERVICES.  SO WHEN YOU

23  LOOK AT THE LICENSE AGREEMENTS, I AM LIMITING JUST TO THE

24  LICENSED MATERIAL PART.  THE SERVICES --

25  **Q.**   LET'S FOCUS ON NO. 3, THE TRAINING AND COURSE MANUALS.

1    **A.**  RIGHT.

2    **Q.**  YOU'RE AWARE THAT THOSE WERE COPYRIGHTED?

3    **A.**  THAT'S MY --

4           **MR. PISTORINO:**  OBJECTION, ASSUMES FACTS NOT IN

5    EVIDENCE.

6           **MR. NATHAN:**  I'M ASKING IF HE IS AWARE.

7           **THE COURT:**  SUSTAINED.

8    **BY MR. NATHAN:**

9    **Q.**  WOULD YOU GO BACK TO EXHIBIT 6, WHICH IS THE SPREADSHEET.

10                    (DISPLAYED ON SCREEN.)

11        THE FIRST PAGE WILL DO OF EXHIBIT 6.

12   **A.**  OKAY.

13   **Q.**  COUNSEL ASKED YOU, I HOPE I'M STATING THIS ACCURATELY,

14   THAT THIS REFLECTED THE USE OF THE TECHSHOP NAME ON THESE

15   VARIOUS DATES OF THESE TRANSACTIONS.

16        DO YOU REMEMBER THAT?

17   **A.**  YES.

18   **Q.**  LOOK AT THE HEADING OF THIS... OF THE DARK GREEN AT THE

19   TOP OF EVERY ONE OF THESE PAGES, AND ALL THESE DATES.

20        AND DOES IT SAY THESHOP.BUILD?

21   **A.**  YES.

22   **Q.**  IT DOESN'T SAY TECHSHOP.

23   **A.**  NO.  IT SAYS THESHOP.BUILD.

24   **Q.**  AND THEN JUST ONE FINAL QUESTION.

25        TO BE CLEAR, IT'S YOUR OPINION THAT THE VALUE OF THE

1    TECHSHOP MARK IN THE UNITED STATES AFTER THEY CLOSED THEIR

2    DOORS AND AFTER THE FRUSTRATION OF THEIR MEMBERS WAS MORE

3    VALUABLE THAN THE TECHSHOP MARK IN JAPAN AND IN FRANCE AND IN

4    ABU DHABI IN LICENSE AGREEMENTS THAT WERE EXECUTED IN 2014 AND

5    2015?

6    **A.**  RIGHT.  SO WHEN I LOOK AT THE LICENSE VALUES FROM THOSE

7    AGREEMENTS AND COMPARE IT TO THE UNITED STATES, THEN IT'S MY

8    OPINION THAT THOSE WOULD SERVE MORE AS A FLOOR.

9    **Q.**  SERVE AS A?

10   **A.**  AS A FLOOR.

11   **Q.**  AS A FLOOR.

12       IT IS YOUR OPINION THEN, THAT EVEN AFTER THE BANKRUPTCY

13   AND THE FRUSTRATION, THAT THE TECHSHOP MARK IS ACTUALLY WORTH

14   MORE?

15   **A.**  AT LEAST THAN THE NUMBERS THAT I WAS POINTING TO, CORRECT.

16           **MR. NATHAN:**  NOTHING FURTHER, YOUR HONOR.

17           **THE COURT:**  ANYTHING FURTHER FOR DR. MATOLO?

18           **MR. PISTORINO:**  NO, YOUR HONOR.

19           **THE COURT:**  THANK YOU, DR. MATOLO.  YOU ARE EXCUSED.

20       AND THE PLAINTIFFS MAY CALL THEIR NEXT WITNESS.

21           **MR. PISTORINO:**  TECHSHOP CALLS MR. RYAN SPURLOCK.

22               (PAUSE IN THE PROCEEDINGS.)

23           **THE CLERK:**  STAY THERE.  LET HIM COME DOWN.

24       THANK YOU.  NOW YOU CAN RAISE YOUR RIGHT HAND FOR ME,

25   PLEASE.

SPURLOCK - DIRECT / PISTORINO

```
1          (RYAN SPURLOCK, CALLED AS A WITNESS FOR THE PLAINTIFF,

2     HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

3               THE WITNESS:  I DO.

4               THE CLERK:  YOU MAY BE SEATED.  AND ONCE SEATED,

5     WOULD YOU PLEASE STATE AND SPELL BOTH YOUR FIRST AND LAST NAME

6     FOR THE RECORD, PLEASE?

7               THE WITNESS:  MY NAME IS RYAN SPURLOCK.  R-Y-A-N,

8     S-P-U-R-L-O-C-K.

9               THE CLERK:  THANK YOU.

10              THE WITNESS:  THANK YOU.

11              THE CLERK:  THERE STILL SHOULD BE WATER IN THE

12    PITCHER.

13              THE WITNESS:  THANK YOU.

14                        DIRECT EXAMINATION

15    BY MR. PISTORINO:

16    Q.  LET ME KNOW WHEN YOU'RE READY.

17    A.  GOOD AFTERNOON.

18    Q.  GOOD AFTERNOON, MR. SPURLOCK.

19    A.  HELLO.

20    Q.  PLEASE TELL THE JURY A LITTLE BIT ABOUT YOURSELF.

21    A.  MY NAME IS RYAN SPURLOCK.  I AM 40 YEARS OLD.  I AM A

22    GRADUATE OF SAN FRANCISCO STATE UNIVERSITY WITH A DEGREE IN

23    BOTH INDUSTRIAL AND GRAPHIC DESIGN.

24        I HAVE BEEN MARRIED FOR 15 YEARS NEXT MONTH.  MY WIFE IS A

25    RESEARCH SCIENTIST WHO'S DONE WORK FOR DEPARTMENT OF DEFENSE,
```

1    NASA, THE VA.  I HAVE A DAUGHTER WHO'S GRADUATING -- JUST

2    GRADUATED LAST WEEK AND STARTING COLLEGE IN THE FALL.

3    **Q.**  WHERE DID YOUR DAUGHTER GRADUATE FROM?

4    **A.**  OCEANA HIGH SCHOOL.

5    **Q.**  WHERE IS SHE GOING TO COLLEGE?

6    **A.**  SAN FRANCISCO STATE, WHERE I WENT.

7    **Q.**  GREAT.  OKAY.

8        CAN YOU TELL US A LITTLE BIT -- THE JURY A LITTLE BIT

9    ABOUT SORT OF YOUR -- WELL, I'M SORRY, DID YOU TELL US ABOUT

10   YOUR EDUCATIONAL BACKGROUND, IF YOU COULD?

11   **A.**  YES.

12       AS I SAID, I HAVE A DEGREE IN BOTH INDUSTRIAL DESIGN AND

13   GRAPHIC DESIGN FROM SAN FRANCISCO STATE.

14   **Q.**  SAN FRANCISCO.  OKAY.

15       AND THEN, IF YOU COULD, TELL THE JURORS A LITTLE BIT ABOUT

16   YOUR SORT OF WORK HISTORY?

17   **A.**  I'VE KIND OF BEEN ALL OVER THE PLACE.  WHEN I WAS YOUNG, I

18   DID A LOT OF HR.  AND IT WAS FULFILLING AT THE TIME, BUT THEN

19   I KIND OF WANTED TO BE A DESIGNER.  I WANTED TO GET MORE

20   CREATIVE.  WE HAD A DAUGHTER WHILE WE WERE IN COLLEGE, SO I

21   USED THAT OPPORTUNITY TO GO BACK TO SCHOOL AND GET A DEGREE IN

22   SOMETHING I WAS INTERESTED IN.

23       AT THE TIME, MY WIFE WAS WORKING FOR NASA, SO WE FELT IT

24   WAS BEST THAT I WOULD BE THE ONE THAT WAS THE STAY-AT-HOME

25   PARENT.  THAT'S A BIT ABOUT MY EDUCATION.

1   **Q.**  I'M SORRY, YOUR WORK HISTORY.  SO AFTER THE STAY-AT-HOME

2   PERIOD, WHAT DID YOU DO NEXT?

3   **A.**  FEW DIFFERENT THINGS.  I HAD A SMALL BUSINESS DOING DESIGN

4   FABRICATION AND BRANDING AND STUFF WITH MY DEGREE, KIND OF

5   WORKING THROUGH FRIENDS OF FRIENDS DOING LOGOS AND STUFF LIKE

6   THAT.

7        THEN I HAD A COLLEGE FRIEND WHO CALLED ME ONE DAY AND SAID

8   THAT TECHSHOP WAS HIRING.  AND I STARTED THERE IN, I GUESS,

9   2012 AT THE FRONT END JUST TO REALLY GET ACCESS TO THE TOOLS

10  AND BE ABLE TO TAKE PART IN THE COMMUNITY.  YEAH.

11  **Q.**  OKAY.  AND SO YOU STARTED AT TECHSHOP IN -- REMIND US WHAT

12  YEAR?

13  **A.**  I BELIEVE 2012, SUMMER.

14  **Q.**  SUMMER.  WHAT WAS YOUR POSITION AT LEAST WHEN YOU

15  INITIALLY STARTED WITH TECHSHOP?

16  **A.**  IT WAS MORE OF A MEMBER SERVICES ROLE.  FRONT DESK,

17  RECEPTIONIST.  AND REALLY, WHILE IT WAS KIND OF A ROLE THAT

18  WASN'T -- YOU KNOW, MY CAREER WAS FAR BEYOND THAT KIND OF ROLE

19  BUT IT WAS SUCH A GREAT KIND OF COMMUNITY THAT I WANTED ACCESS

20  TO THE TOOLS AND THE MINDS THAT ARE IN THE SPACE, YOU KNOW.

21  **Q.**  OKAY.  SO YOU TOOK THE JOB YOU SAY BECAUSE YOU WANTED

22  ACCESS TO THE TOOLS?

23  **A.**  YEAH.

24  **Q.**  WHAT KIND OF STUFF DO YOU MAKE WITH THOSE TOOLS?

25  **A.**  AT THE TIME I WAS DONE A LOT OF SIGNAGE FOR SIGN

```
1    COMPANIES.  MY FRIEND HAD A SIGN COMPANY THAT WAS KIND OF

2    RAMPING UP AND THEY WERE BUILDING THEIR BUSINESS.  SO I WAS

3    DOING SIGNAGE AND CNC-BASED PRODUCTS, A LOT OF LASER

4    CUTTING --

5              THE REPORTER:  I'M SORRY?

6              THE WITNESS:  CNC, COMPUTER NUMERICAL CONTROL.  IT'S

7    A -- IT'S BASICALLY A COMPUTER CONTROLLED ROUTER.

8    BY MR. PISTORINO:

9    Q.  YOU HAVE NEVER TESTIFIED BEFORE IN A PROCEEDINGS LIKE

10   THIS, HAVE YOU?

11   A.  NAH.  IT'S NOT REALLY SOMETHING I EVER ANTICIPATED.

12   Q.  ALL RIGHT.  I'M SURE THE JURORS ARE HEARING THIS ALL THE

13   TIME, BUT IF WE DO OUR BEST TO GO SLOW BECAUSE SHE'S WRITING

14   DOWN EVERYTHING WE SAY.

15       I'LL DO MY BEST NOT TO INTERRUPT YOU, TALK OVER YOU.

16       SO YOU STARTED AT TECHSHOP KIND OF A CUSTOMER SERVICE

17   THING TO GET ACCESS TO THE TOOLS IN, I THINK, YOU SAID 2011,

18   2012?

19       OKAY.  AND HOW LONG WERE YOU WITH TECHSHOP?

20   A.  I WAS WITH TECHSHOP UNTIL THE CLOSING.  I ACTUALLY WORKED

21   MY WAY UP FAIRLY QUICKLY.  MY SKILL SET WAS A BIT MORE THAN A

22   FRONT END.  SO I WENT STRAIGHT INTO A LEAD POSITION.

23       IT WAS AROUND -- I DON'T RECALL EXACTLY THE TIME FRAME,

24   BUT I THINK IT WAS AROUND SIX TO EIGHT MONTHS, SOMETHING LIKE

25   THAT.
```

1        AND THEN LATE 2014, I WAS GIVEN THE OPPORTUNITY TO RUN THE

2   SPACE AS THE GENERAL MANAGER.  AND I WAS -- I TOOK THAT

3   OPPORTUNITY.

4   **Q.**  AND YOU'RE TALKING ABOUT A PARTICULAR LOCATION OF

5   TECHSHOP.  WHICH OF -- WE HEARD THERE'S TEN.  WHICH ONE WERE

6   YOU WORKING AT?

7   **A.**  I WAS THE STORE LEVEL MANAGER AT TECHSHOP SAN FRANCISCO IN

8   THE SOMA DISTRICT.

9   **Q.**  DO YOU RECALL THE ADDRESS THERE?

10  **A.**  926 HOWARD.

11  **Q.**  OKAY.

12        SO AT THE END -- YOU HAD RISEN FROM THE LOWER LEVEL; AT

13  THE END YOU WERE THE GENERAL MANAGER OF THE STORE, RIGHT?

14  **A.**  ACTUALLY AT THE END THERE I WAS RUNNING TWO SHOPS.

15  OBVIOUSLY CASH WAS GETTING TIGHT, AND I HAD A GOOD -- OUR

16  STORE WAS THE MOST -- ONE OF THE MOST SUCCESSFUL IN THE

17  COMPANY, SO I WENT IN AND KIND OF TRIED TO REBUILD AND BRING

18  THE MID-PENINSULA LOCATION BACK TO PROFITABILITY AND GET IT

19  CLEANED UP.

20  **Q.**  SO YOU WERE THE GENERAL MANAGER OF THE SAN FRANCISCO

21  LOCATION.  AND THEN CLOSER TO THE END --

22  **A.**  I REALLY DID IT BECAUSE I -- YOU KNOW, IT WASN'T LIKE A

23  BIG CAREER -- SORRY, I JUMPED IN.

24        ANYWAY, I JUST WANTED TO HELP IF I COULD.

25  **Q.**  YOU ENDED UP BEING ALSO THE GENERAL MANAGER OF THE MID --

1    SOMETIMES CALLED MENLO PARK, MID-PENINSULA, OR REDWOOD CITY

2    LOCATION, CORRECT?

3    **A.**  THAT'S CORRECT.

4    **Q.**  OKAY.

5        AND IN YOUR SORT OF CAREER THERE WITH TECHSHOP, A

6    SPECIALIZED GENERAL MANAGER, DID YOU HAVE ANY DUTIES IN REGARD

7    TO MARKETING TECHSHOP?

8    **A.**  YEAH.  IT WAS KIND OF OUR JOB TO GET THE WORD OUT, CREATE

9    INTERESTING WORKSHOPS AND TRAINING PROGRAMS THAT WOULD GET

10   PEOPLE IN.

11       I OFTEN TRY TO THINK ABOUT THE SPACE AS KIND OF A FOMO

12   ENVIRONMENT.  AND I HATE TO USE -- KIND OF A CORNY MODERN

13   TERM, BUT FEAR OF MISSING OUT.  AND SO WE WOULD TRY TO CREATE

14   PROGRAMMING THAT WAS KIND OF SO EXCITING THAT PEOPLE FELT LIKE

15   THEY HAD TO BE THERE.  SO, YEAH, OBVIOUSLY --

16   **Q.**  I'M SORRY, YOU SAID FOMO?

17   **A.**  YES.  THAT WAS LIKE OUR TERM.  I WANTED PEOPLE TO BE SO

18   EXCITED.  AND FELT LIKE IF THEY WEREN'T AT THE SPACE, THEY

19   WERE KIND OF MISSING A CLASS OR AN OPPORTUNITY.

20   **Q.**  AND THESE MARKETING EFFORTS, THEY WERE MARKETING

21   EFFORTS -- WERE THEY MARKETING EFFORTS USING THE TECHSHOP

22   BRAND?

23   **A.**  YES, SIR.

24   **Q.**  OKAY.

25       AND CAN YOU RECALL ANY PARTICULAR MARKETING EFFORTS OF THE

1    TECHSHOP BRAND THAT YOU WERE INVOLVED IN DURING YOUR TIME AT

2    TECHSHOP?

3    **A.**  OBVIOUSLY GOING TO MAKER FAIRE AND PROMOTING THE COMPANY

4    AND, YOU KNOW, OBVIOUSLY MEETING PEOPLE ON A DAY-TO-DAY BASIS

5    AND KIND OF PROMOTING THE SERVICES AND THE OFFERINGS WE

6    PROVIDED AT OUR SPACE.

7    **Q.**  CAN YOU GIVE THE JURY A SENSE OF SORT OF THOSE KINDS OF

8    PEOPLE THAT WOULD COME BY THE TECHSHOP SAN FRANCISCO LOCATION

9    THAT HEARD ABOUT TECHSHOP?

10   **A.**  IT WAS ANYONE FROM AN AVERAGE HOBBYIST TO SOMEONE WHO WAS

11   REALLY TRYING TO START A PRODUCT, A COMPANY AND CREATE A

12   BRAND.

13       WE HAD A MULTITUDE OF DIFFERENT KIND OF PEOPLE COME

14   THROUGH.  WE'VE HAD FROM PRESIDENTS TO CELEBRITIES TO LOCAL

15   SPORTS PLAYERS.  I MEAN, IT WAS A WELL-KNOWN FACILITY.

16   **Q.**  WE HAVE ALL HEARD ABOUT AND SEEN THE PICTURE OF PRESIDENT

17   OBAMA.  SO LET ME ASK, OTHER THAN PRESIDENT OBAMA, WERE THERE

18   ANY SORT OF NOTABLE FIGURES THAT THE JURORS MIGHT KNOW OF THAT

19   LEARNED OF TECHSHOP AND CAME BY THE SAN FRANCISCO LOCATION?

20   **A.**  YEAH.  I DON'T RECALL EVERYONE OVER THE YEARS, BUT THE

21   ONES THAT REALLY STAND OUT TO ME, ANDRÉ 3000 OF OUTKAST CAME

22   BY.  AND I GOT TO EXPLAIN --

23   **Q.**  SLOW DOWN.

24   **A.**  -- 3D PRINTING TO HIM, WHICH WAS KIND OF A WILD EXPERIENCE

25   TO TALK TO A CELEBRITY ABOUT 3D PRINTING, ESPECIALLY ONE LIKE

1   THAT.

2   **Q.**  CAN I INTERRUPT YOU?

3       PROBABLY FOR THE OLDER FOLKS LIKE ME, WHO IN THE WORLD IS

4   ANDRÉ 3000?

5   **A.**  HE'S A MUSICIAN, A PRETTY WELL-KNOWN MUSICIAN.  ONE OF

6   THE -- ONE OF OUR GENERATION'S PROBABLY BIGGER --

7   **Q.**  OTHER THAN ANDRÉ 3000, ANY OTHER SORT OF NOTABLE PERSON

8   THAT THE JURORS MIGHT BE FAMILIAR WITH --

9   **A.**  IN SAN FRANCISCO, WE HAD BERNIE SANDERS STOP BY DURING THE

10  2016 ELECTION.  AND I WAS ABLE TO GIVE HIM A FREE MEMBERSHIP.

11  AND WE ACTUALLY PULLED HIS PHOTO FROM THE INTERNET AND PRINTED

12  UP A BADGE REALLY QUICK FOR HIM.

13      HE REALLY, YOU KNOW, OBVIOUSLY HE KNEW BARACK WAS IN, AND

14  HE WAS JUST EXCITED TO BE -- HE WAS CAMPAIGNING AND FELT THAT

15  IT WAS A RELEVANT STOP.

16  **Q.**  WHEN YOU SAY "BARACK", YOU MEAN FORMER PRESIDENT OBAMA?

17  **A.**  FORMER PRESIDENT OBAMA.

18  **Q.**  SO BERNIE SANDERS.  ANYBODY ELSE THAT THE JURORS MIGHT BE

19  FAMILIAR WITH?

20  **A.**  LOCAL SPORTS LIKE RAIDERS AND THE 49ER'S AND PEOPLE OF

21  THAT CALIBER.

22  **Q.**  OKAY.  OKAY.

23      NOW -- I'LL COME BACK TO THAT A LITTLE BIT LATER.

24      DURING YOUR TIME AT TECHSHOP, YOU MENTIONED THAT YOU

25  REALLY JOINED TO GET ACCESS TO SOME OF THOSE TOOLS.  I THINK

SPURLOCK - DIRECT / PISTORINO

1   YOU MENTIONED CNC, COMPUTER NUMERICAL CONTROL, SORT OF THAT

2   KIND OF EQUIPMENT.

3       WERE YOU STILL DOING ANY OF YOUR MAKING ACTIVITIES DURING

4   THAT TIME?

5   **A.**   TOWARDS THE END?  DURING -- AS MY TIME AS GENERAL MANAGER?

6   **Q.**   YEAH.

7   **A.**   I ACTUALLY WAS KIND OF AN INSECURITY OF MINE.  I WAS

8   REALLY BUSY KIND OF RUNNING THE SHOP THAT I STARTED TO FALL

9   OUT OF MAKING, YOU KNOW, AND IT'S THE THING THAT KEPT ME

10  CONNECTED AND ABLE TO DO MY JOB WELL.

11      SO IN MY MIND I REALIZED THAT WE WEREN'T MAKING MAKERS AND

12  THAT WAS MY NEW PROJECT.  SO, YEAH, IN A FORM I WAS.

13  **Q.**   HAD YOU BROUGHT ANY OF YOUR PERSONAL ITEMS THERE, YOU

14  KNOW, TOOLS THAT YOU HAD BEEN WORKING ON ON THE EARLIER

15  PROJECTS?

16  **A.**   YEAH.  BEING -- SO ONE OF THE BENEFITS OF RUNNING A SHOP

17  LIKE THAT IS HAVING ACCESS TO THE TOOLS, BUT ALSO AS GENERAL

18  MANAGER, I HAD A LITTLE REIGN OF THE SPACE.  AND, YOU KNOW, I

19  HAD MY PERSONAL PROPERTY THERE.  MY TOOLS AND, YOU KNOW,

20  OBVIOUSLY THINGS LIKE -- I HAD MY OWN COUCH IN THERE.  MY OWN

21  CHAIR THAT I HAD BROUGHT IN.  YOU KNOW, YOU ARE THERE

22  SOMEWHERE LONG ENOUGH, YOU WANT TO MAKE IT KIND OF YOUR HOME,

23  SO IT WAS MY OFFICE, I BROUGHT A LOT OF MY OWN STUFF IN.  A

24  LOT OF MY OWN TOOLS.  MY WIFE PREFERRED IT RATHER THAN HAVE IT

25  STACKED UP IN THE GARAGE.

1   **Q.**  SO YOU LEFT SOME OF YOUR PERSONAL STUFF THERE -- OR KEPT

2   IT THERE, RIGHT?

3   **A.**  YES.

4   **Q.**  AND I'M GUESSING, JUST GUESSING GIVEN THE NATURE OF WHAT

5   WE ARE DEALING WITH, THAT YOUR NORMAL ATTIRE DURING YOUR

6   WORKDAYS AT TECHSHOP, IT'S NOT REALLY... IT'S NOT REALLY A

7   SUIT KIND OF PLACE, RIGHT?

8   **A.**  YEAH.  I DON'T WEAR THE SPORT COAT WHEN I AM IN THE SHOP.

9   I DO WEAR IT MORE AND MORE AS MY CAREER IS CHANGING.  BUT,

10  YEAH, I AM PRETTY MUCH SHOP ATTIRE.

11  **Q.**  OKAY.  I AM GOING TO ASK YOU, MAYBE I'LL JUST TURN TO ASK

12  YOU THAT NOW.

13      SO YOU WERE WITH TECHSHOP UNTIL IT CLOSED; IS THAT RIGHT?

14  **A.**  YES.

15  **Q.**  AND WHAT HAVE YOU BEEN DOING SINCE THEN BECAUSE IT BEEN

16  WHAT 18 MONTHS, SOMETHING LIKE THAT?

17  **A.**  YEAH.  SO, ACTUALLY, THE DAY THE DOORS CLOSED, WE WERE

18  ALREADY, MYSELF AND A GROUP OF FOLKS, WERE ALREADY WORKING TO

19  REOPEN KIND OF OUR VISION OF WHAT WOULD BE A NEW VERSION OF

20  THE TECHSHOP.

21      SO I'VE BEEN PURSUING OPENING A NONPROFIT SPACE CALLED

22  HUMAN MADE, AND WE ARE A MAKER-BASED MANUFACTURING FACILITY

23  THAT HAS PARTNERED WITH THE CITY OF SAN FRANCISCO AND MAYOR

24  LONDON BREED TO DO WORKFORCE DEVELOPMENT AND BRING IN PEOPLE

25  FROM UNDERSERVED COMMUNITIES, PEOPLE -- IMMIGRANTS, PEOPLE OF

```
 1    COLOR THAT WOULD OTHERWISE NOT HAVE THE MEANS AND NETWORK TO
 2    COME TO A FACILITY LIKE OURS.  AND WE WILL FULLY SUBSIDIZE
 3    THEIR TRAINING.
 4    Q.  SO IT'S A -- JUST SO WE UNDERSTAND, IT'S A NONPROFIT WITH
 5    THE CITY AND THE MAYOR?
 6    A.  THAT IS CORRECT.  YEAH.  WE ARE -- WE HAVE SOME PRETTY
 7    GOOD PARTNERS AS WELL.  SKS PARTNER IS ONE OF THE LARGER REAL
 8    ESTATE DEVELOPERS IN THE CITY.  HAS REALLY HELPED US OUT.  GM
 9    CRUISE IS ONE OF OUR BIG SUPPORTERS AND PARTNERS.
10    Q.  THEY ARE SUPPORTING YOUR EFFORTS TO -- YOU MENTIONED HELP
11    THESE FOLKS WITH WORKFORCE DEVELOPMENT, RIGHT?
12    A.  YEAH.  SO WE ARE BASICALLY RE-OPENING A LARGE SPACE WHERE
13    ONE CAN TRAIN AND HAVE ACCESS TO FACILITY, ENTREPRENEURS, AND
14    PEOPLE LIKE THAT.
15    Q.  OKAY.  AND -- OKAY.
16        AND SO DO THE FOLKS AT THE SPACE YOU ARE WORKING ON,
17    THEY'RE GOING TO GET SCHOLARSHIPS OR HOW DOES IT WORK?
18    A.  SO THEY QUALIFY THROUGH JOBS NOW.  SO IT WAS A REALLY
19    INTERESTING PROJECT CUZ HOW DO YOU -- SORRY, I KNOW YOU GUYS
20    DON'T HAVE A FULL CONTEXT OF EVERYTHING, BUT WHEN YOU ARE
21    DOING WORKFORCE DEVELOPMENT AND YOU ARE DOING AN EIGHT-WEEK
22    TRAINING PROGRAM, WHAT INCENTIVIZES AN EMPLOYER TO HIRE
23    SOMEONE IS WE KIND OF PARTNERED WITH JOBS NOW TO SUBSIDIZE THE
24    FIRST THREE MONTHS OF ON-THE-JOB TRAINING FOR THE EMPLOYEE.
25    SO AN EMPLOYER DOESN'T PAY ANYTHING WHILE THEY CAN GET THAT
```

1   PERSON WHERE THEY NEED TO BE.

2   **Q.**  ALL RIGHT.  I JUST WANTED TO GIVE THE JURY A SENSE OF WHAT

3   YOU'RE DOING NOW.  LET'S GO BACK TO YOUR TIME AT TECHSHOP.

4       NOW, OBVIOUSLY EVERYBODY KNOWS THAT IN NOVEMBER TECHSHOP

5   ANNOUNCED IT WAS GOING TO CLOSE THE DOORS AND POTENTIALLY SEEK

6   BANKRUPTCY PROTECTION, RIGHT?

7   **A.**  YEAH.

8   **Q.**  YOU KNEW THAT.  OKAY.

9       NOT LONG AFTER THAT, YOU -- I AM SORRY, LET ME ASK ONE

10  MORE THING.

11      WHEN YOU WERE WITH TECHSHOP, DID YOU KNOW A GENTLEMAN

12  NAMED COLIN JARAMILLO?

13  **A.**  YES.

14          **MR. NATHAN:**  I'M SORRY.  I COULD NOT HEAR.

15          **MR. PISTORINO:**  COLIN JARAMILLO.

16          **THE WITNESS:**  IT CAN BE PRONOUNCED JARAMILLO AS WELL,

17  I THINK.  J-A-M-I-L-L-O.

18  **BY MR. PISTORINO:**

19  **Q.**  WHAT WAS HIS ROLE AT TECHSHOP WHEN YOU WERE THE --

20  TECHSHOP SAN FRANCISCO WHEN YOU WERE THE GM?

21  **A.**  COLIN WORKED FOR THE IT DEPARTMENT.

22  **Q.**  DOING WHAT KIND OF STUFF?

23  **A.**  PASSWORD ADMINISTRATION, REGULAR SOFTWARE UPDATES, DEEP

24  FREEZE.  KIND OF COMING IN AND MAKING SURE THE SERVERS WERE UP

25  AND RUNNING, MAKING SURE OUR CUSTOMER -- OUR CRM CUSTOMER BASE

```
 1    WAS UP AND RUNNING.  JUST GENERAL IT MAINTENANCE.

 2    Q.   SO ONE OF COLIN'S DUTIES WAS THE CRM SYSTEM AT TECHSHOP?

 3    A.   THAT IS CORRECT.

 4    Q.   DID THE CRM SYSTEM THERE HAVE THAT WHOLE CUSTOMER EMAIL

 5    LIST IN IT FOR TECHSHOP?

 6    A.   YES, IT DID.

 7    Q.   NOW, AFTER THE STORES CLOSED, DID YOU COME TO LEARN OF

 8    MR. RASURE?

 9    A.   YEAH.  AND TIME HAS OBVIOUSLY SLIPPED, BUT I BELIEVE IT

10    WAS THE FRIDAY OR SATURDAY AFTER THE CLOSURE, I GOT A CALL

11    FROM DAN WOODS WHO SAID THERE WAS A GENTLEMAN BY THE NAME OF

12    DAN RASURE WHO WAS INTERESTED IN POTENTIALLY PURCHASING ALL

13    THE SPACES.  AND REALLY WANTED TO TALK -- FELT LIKE HE WANTED

14    TO TALK TO ME ABOUT POTENTIALLY, YOU KNOW, HELPING HIM DO SO.

15         AT THAT TIME I HAD A LOT OF, YOU KNOW, I FELT A LOT OF

16    COMMITMENT TO THE MEMBERS TO TRY AND FIGURE SOMETHING OUT FOR

17    THEM.  THESE ARE PEOPLE WHO RELIED -- THEIR BUSINESSES RELIED

18    ON IT.  I ACTUALLY WOKE UP THE NEXT MORNING AND DAN HAD LEFT

19    ME A VOICE MAIL AND ASKED ME TO CALL HIM.  IT WAS AROUND 4:30

20    IN THE MORNING ACTUALLY.

21         SO WHEN I WORK UP AT LIKE 6:00 TO LET THE DOG OUT,

22    WHATEVER IT WAS, I SAW THE MESSAGE.  I TALKED TO DAN.  I CAN'T

23    QUITE REMEMBER THE EXACT TIMELINE OF EVERYTHING.  BUT HE ASKED

24    ME TO PICK HIM UP IN SAN JOSE FROM THE AIRPORT.

25    Q.   I JUST WANT TO ASK, WHEN THE TECHSHOP STORES CLOSED, WERE
```

 1   YOU ABLE TO GET -- YOU MENTIONED PERSONAL STUFF, JUST

 2   WONDERING IF YOU GOT YOUR STUFF BACK?

 3   **A.**  I GOT PART OF IT, BUT I WAS NOT ABLE TO RETRIEVE ALL OF

 4   IT.

 5   **Q.**  SOME OF YOUR ITEMS WERE LEFT IN THE SAN FRANCISCO LOCATION

 6   AFTER IT CLOSED?

 7   **A.**  YES.

 8   **Q.**  ALL RIGHT.

 9        SO YOU GOT A CALL FROM MR. RASURE.  WHAT WAS YOUR

10   UNDERSTANDING OF WHAT MR. RASURE WAS TRYING TO DO?

11   **A.**  YOU KNOW, HE SEEMED LIKE A NICE GUY AND, OBVIOUSLY, YOU

12   KNOW, I HAD AN INTEREST, AS I SAID, TO KIND OF HELP PEOPLE GET

13   UP AND RUNNING IF I COULD.

14        AFTER YOU KNOW THESE PEOPLE FOR SIX YEARS, IT'S NOT JUST

15   YOUR JOB.  YOU UNDERSTAND THESE PEOPLE'S VALUES, YOU

16   UNDERSTAND THEIR GOALS, AND YOU KNOW THEIR FAMILIES, IN SOME

17   CASES.  SO I THOUGHT IT WOULD BE WORTH MY TIME, EVEN THOUGH WE

18   WERE KIND OF WORKING TO DO OUR -- WE WERE TRYING TO FIGURE OUT

19   HOW WE COULD OPEN OUR OWN SPACE OR REOPEN THE SAN FRANCISCO

20   SPACE, I STILL WANTED TO CHAT WITH DAN AND SEE.  YOU KNOW, IN

21   MY MIND, I WAS THINKING IF WE COULD GET EVERYTHING UP AND

22   RUNNING, THAT WOULD BE THE IDEAL.

23   **Q.**  AND SO DID YOU BEGIN --

24            **THE COURT:**  WE HAVE A COUPLE OF DAN'S.  SO MAYBE

25   LET'S REFER TO THEIR LAST NAMES.

SPURLOCK - DIRECT / PISTORINO

1              **THE WITNESS:**  DAN RASURE.

2              **THE COURT:**  THANKS.

3    **BY MR. PISTORINO:**

4    **Q.**  WHEN YOU SAID "DAN", YOU WERE REFERRING TO MR. RASURE?

5    **A.**  MR. RASURE.

6    **Q.**  ALL RIGHT.

7         AND DID YOU BEGIN WORKING WITH MR. RASURE?

8    **A.**  I NEVER WORKED FOR.  I HELPED HIM TO MY BEST ABILITY.  I

9    ACTUALLY SPENT -- I LOOKED AT MY PHONE RECORDS AT ONE POINT,

10   BUT THERE WERE HUNDREDS OF CALLS OVER THE MONTHS.  I SPENT

11   HUNDREDS OF HOURS TRYING TO HELP HIM REALLY THINK ABOUT HOW TO

12   MOVE FORWARD SUSTAINABLY.

13   **Q.**  SO -- I'M SORRY IF I ASKED THIS ALREADY.

14        WHAT WAS YOUR UNDERSTANDING OF WHAT MR. RASURE WAS TRYING

15   TO DO?

16   **A.**  AT THE TIME?

17   **Q.**  YES.  BACK IN SORT OF THAT --

18   **A.**  WHEN I FIRST MET HIM, HE HAD KIND OF PITCHED TO ME THAT HE

19   WANTED TO REOPEN ALL OF THE -- WHEN I FIRST MET MR. RASURE, HE

20   HAD PITCHED TO ME HE WANTED TO REOPEN ALL OF THE LOCATIONS.

21   **Q.**  SO DID YOU HAVE AN UNDERSTANDING THAT HE WAS -- HIS

22   INTENTION WAS TO PURCHASE THE ASSETS OF TECHSHOP?

23   **A.**  YEAH.  HE KIND OF SAID ALL THE RIGHT THINGS.  LIKE I CAN'T

24   HELP BUT, YOU KNOW, WE ALL KIND OF PLAY INTO FLATTERY.

25        SO WHEN I ASKED HIM WHAT HIS PLAN WAS, HE ASKED ME, WELL,

1    YOU'RE THE EXPERT, WHAT WOULD YOU DO?  AND OBVIOUSLY THAT

2    RESINATED WITH ME, AND I STARTED TO THINK ABOUT WHAT WE COULD

3    DO.  YEAH.

4    **Q.**  OKAY.

5       AND SO SORT OF, I WILL SAY NOVEMBER 18TH TIME FRAME, YOU

6    WERE WORKING -- ASSISTING HIM, I'LL SAY?

7    **A.**  THAT IS CORRECT.

8    **Q.**  IS THAT FAIR?

9    **A.**  WE HAD MET SEVERAL TIMES.  I ACTUALLY EVEN WAS ON VACATION

10   IN CHICAGO, AND HE WAS THERE FOR A TRADE SHOW OR SOMETHING, I

11   DON'T RECALL EXACTLY WHY HE WAS THERE.  AND HE ASKED ME TO

12   MEET WITH HIM SO HE COULD DISCUSS SOME OF THOSE THINGS.

13      IT COULD HAVE BEEN DECEMBER.

14   **Q.**  IN -- YOU SHOULD HAVE IN FRONT OF YOU A BINDER BOOK THERE.

15      IF YOU CAN DO ME A FAVOR AND TURN IN THAT BINDER TO THE

16   TAB ON THE SIDE.  IT SHOULD HAVE A NO. 2.

17   **A.**  NO. 2?

18   **Q.**  NO. 2.

19          **MR. PISTORINO:**  YOUR HONOR, WE OFFER NO. 2.

20          **THE WITNESS:**  I CAN SEE IT.

21          **THE COURT:**  ANY OBJECTION TO THE ADMISSION OF

22   EXHIBIT 2?

23          **MR. NATHAN:**  NO, YOUR HONOR.  NO OBJECTION.

24          **THE COURT:**  2 IS ADMITTED.

25             (TRIAL EXHIBIT 2 RECEIVED IN EVIDENCE.)

1            (DISPLAYED ON SCREEN.)

2    **BY MR. PISTORINO:**

3    **Q.**  AND I'M GOING TO MAKE ANOTHER EFFORT TO HELP THE COURT

4    REPORTER.  IF YOU CAN LET ME FINISH MY QUESTION --

5    **A.**  I APOLOGIZE.

6    **Q.**  LET ME FINISH AND THAT WILL MAKE IT EASIER FOR HER.

7    **A.**  IT'S MY FIRST TIME.  I APOLOGIZE TO THE JURY AND EVERYBODY

8    IF I'M GOING TOO QUICK.

9    **Q.**  YOU'RE DOING FINE.

10       NO. 2, THESE ARE SOME TEXT MESSAGES EXCHANGED BETWEEN YOU

11   AND MR. RASURE; IS THAT RIGHT?

12   **A.**  THAT IS CORRECT.

13   **Q.**  OKAY.

14       AND KIND OF GO ON FOR A LITTLE BIT HERE, BUT THESE ARE

15   AROUND, YOU CAN SEE ON THE SECOND PAGE OR SO, THESE ARE AROUND

16   NOVEMBER 20 SOMETHING, RIGHT?

17   **A.**  I BELIEVE SO.

18   **Q.**  AND YOU'RE THE ONE ON THE LEFT AND MR. RASURE IS THE ONE

19   ON THE RIGHT, RIGHT?

20   **A.**  OKAY.

21   **Q.**  IS THAT RIGHT?

22   **A.**  I BELIEVE SO.

23   **Q.**  OKAY.  AND I'M JUST GOING TO GO TO THE FIRST ONE HERE WE

24   SEE.  SO MR. RASURE ASKED YOU, WHAT ABOUT RENAMING AS TECHSHOP

25   2.0, RIGHT?

SPURLOCK - DIRECT / PISTORINO

1    **A.**   THAT'S WHAT IT SAYS.

2    **Q.**   AND THEN YOU WENT ON TO SAY YOU THINK THAT NAME TRANSLATES

3    WELL TO THE MOVEMENT FOR SURE.

4    **A.**   YES.

5    **Q.**   FOR SURE, RIGHT?

6    **A.**   YES.

7    **Q.**   YOU GO ON, YOU SAY, EVERYONE HAS A PROTOTYPE.  THE

8    COMMUNITY HAS TO UNDERSTAND THAT AS MAKERS, RIGHT?

9    **A.**   YES.

10   **Q.**   WHAT DID YOU -- WHAT DID YOU THINK ABOUT THE TECHSHOP

11   NAME, TECHSHOP BRAND IN THIS NOVEMBER TIME FRAME AFTER

12   TECHSHOP HAD ALREADY ANNOUNCED THE CLOSURE OF ITS DOORS AND IT

13   WAS GOING TO SEEK BANKRUPTCY PROTECTION?

14   **A.**   THERE WERE TWO REASONS I THOUGHT IT RESINATED WELL.

15       OBVIOUSLY IT WAS AN EASY WAY TO PICK UP WHERE TECHSHOP HAD

16   LEFT OFF, AS WELL AS THE 2.0 IS A GREAT -- IT'S REALLY

17   REMINISCENT OF THE MOVEMENT IN ITSELF, MEANING IN MAKERSPACES

18   OR WITH ANY HARDWARE -- OR ANY PRODUCT, THERE IS GENERALLY A

19   VERSION 1, 2 AND 3.  SO THINKING OF THIS AS A PRODUCT THAT

20   WOULD COME OUT OF A MAKERSPACE, I THOUGHT THAT THE COMMUNITY

21   WOULD REALLY THINK THAT IT WAS A COOL NAME.

22       I THOUGHT IT WAS AN INTERESTING CHOICE.

23   **Q.**   I THOUGHT YOU SAID MAYBE A CONTINUATION OF THE TECHSHOP

24   FROM BEFORE?

25   **A.**   YEAH, THAT IS CORRECT.

SPURLOCK - DIRECT / PISTORINO

1    Q.  SO DID YOU HAVE A VIEW ABOUT WHETHER OR NOT THE TECHSHOP

2    2.0 NAME WOULD BE SORT OF A GOOD NAME FOR A MAKERSPACE PLACE?

3    A.  I THOUGHT IF -- YEAH, AT THE TIME I DID.

4    Q.  OKAY.  ALL RIGHT.

5        SO AFTER THESE TEXT MESSAGES WITH MR. RASURE, NOW I'M

6    GOING TO START MOVING INTO THE DECEMBER 2017 TIME FRAME.

7        DID YOU CONTINUE TO TRY TO ASSIST HIM -- TRY TO ASSIST

8    HIM?

9    A.  I DID.  I TRIED TO ANSWER ALL OF HIS CALLS WHEN I COULD.

10   Q.  WHAT WAS -- WHY WERE YOU KEEPING -- YOU WEREN'T GETTING

11   PAID, WERE YOU?

12   A.  NO, SIR.

13   Q.  WHY WERE YOU CONTINUING TO ASSIST HIM SORT OF FOR FREE,

14   PRO BONO?

15   A.  I FELT AN OBLIGATION FOR THE PEOPLE I SERVED.

16   Q.  ALL RIGHT.

17       NOW, AT SOME POINT THERE, I'M NOT GOING TO PUT IT UP

18   BECAUSE WE HAVE SEEN IT SO MANY TIMES, YOU CAME TO UNDERSTAND

19   THAT MR. RASURE AND TECHSHOP HAD COME TO A MEMORANDUM OF

20   UNDERSTANDING, RIGHT?

21   A.  YES.

22   Q.  YOU LEARNED OF THAT?

23   A.  YES.

24   Q.  OKAY.  AND THEN THAT WAS -- THAT WAS AROUND DECEMBER 1ST,

25   DOES THAT SOUND FAMILIAR?

1    **A.**  I BELIEVE SO.

2    **Q.**  THEN AFTER -- AFTER THAT, DID YOU -- I WANT TO TURN YOU

3    TO, I AM SORRY, TURN IN YOUR BOOK TO THE EXHIBIT WE MARKED

4    TX17.

5         **MR. PISTORINO:**  WE OFFER TX17, YOUR HONOR.

6         **THE COURT:**  ANY OBJECTION?

7         **MR. NATHAN:**  NONE, YOUR HONOR.

8         **THE COURT:**  17 IS ADMITTED.

9         (TRIAL EXHIBIT 17 RECEIVED IN EVIDENCE.)

10              (DISPLAYED ON SCREEN.)

11   **BY MR. PISTORINO:**

12   **Q.**  THESE ARE SOME TEXT MESSAGES, AGAIN, BETWEEN YOU AND

13   MR. RASURE.  KIND OF IN A DIFFERENT MORE READABLE FORMAT,

14   RIGHT?

15   **A.**  CORRECT.

16   **Q.**  OKAY.  AND IF WE LOOK ON THE RIGHT-HAND SIDE, WE SEE THE

17   DATES.  AND I WANT TO DROP YOU DOWN TO THAT ONE KIND OF IN THE

18   MIDDLE, DECEMBER 3, 2017, 10:44 P.M.

19        DO YOU SEE THAT?

20   **A.**  YES.

21   **Q.**  AND WAS THE RIGHT-HAND SIDE -- ACTUALLY IT SAYS FROM

22   (785)821-2676, RIGHT?

23   **A.**  MY PERSONAL NUMBER, THAT'S CORRECT.

24   **Q.**  FROM AND THEN TO?

25   **A.**  THAT'S CORRECT.

1    **Q.**  BUT THE FROM, THAT'S MR. RASURE, RIGHT?

2    **A.**  I BELIEVE IT IS MR. RASURE.

3    **Q.**  OKAY.  BACK AT YOUR TIME AT TECHSHOP -- BACK AT YOUR TIME

4    AT TECHSHOP, I WANT TO ASK A LITTLE BIT ABOUT SORT OF WHAT

5    TECHSHOP'S PRACTICES WERE WITH REGARD TO ITS EMAIL CUSTOMER

6    LIST.

7    **A.**  OBVIOUSLY THAT WAS KIND OF THE COMPANY'S BREAD AND BUTTER

8    SO THOSE THINGS WERE KEPT VERY TIGHT FROM ANYONE.

9    **Q.**  SO IN THE TEXT MESSAGE WE ARE SEEING MR. RASURE ASK YOU ON

10   DECEMBER 3RD IF YOU HAVE A MEMBER LIST.

11       DO YOU SEE THAT?

12   **A.**  YES.

13   **Q.**  WHAT DID YOU THINK ABOUT MR. RASURE'S REQUEST -- QUESTION

14   ABOUT WHETHER OR NOT YOU HAD A MEMBER LIST?

15   **A.**  I WAS HOPING HE WASN'T GOING TO ASK ME TO PROVIDE THAT TO

16   HIM.

17   **Q.**  OKAY.  DID YOU HAVE ONE?

18   **A.**  NO.

19   **Q.**  BUT DID YOU HAVE A VIEW ABOUT WHETHER -- OKAY.  THAT'S

20   FINE.  LET ME KEEP ON GOING.

21       SO HE ASKED YOU ABOUT THE LIST THERE.

22              (PAUSE IN THE PROCEEDINGS.)

23   I'M SORRY, I THINK I DID THIS IN THE WRONG ORDER.

24   ACTUALLY, I AM SORRY, I HAVE MY TIMING WRONG.  IF YOU CAN

25   TURN IN YOUR BOOK TO THE EXHIBIT THAT'S MARKED TX3.

```
 1    A.  BEFORE 17?

 2    Q.  I'M SORRY?

 3    A.  THE FIRST ONE WE WERE AT?

 4    Q.  I AM SORRY, NO. 3.  NO. 3 IN YOUR BOOK.

 5         THE CLERK:  WHAT?  I'M SORRY.  WHAT IS THE EXHIBIT

 6    NUMBER?

 7         MR. PISTORINO:  TX3 WHICH WE ARE OFFERING.

 8         THE WITNESS:  I SEE IT.

 9         THE COURT:  THIS IS NO. 3?

10         MR. PISTORINO:  YES.

11         THE COURT:  ANY OBJECTION --

12         MR. NATHAN:  NONE.

13         THE COURT:  -- ITS ADMISSION?

14      ALL RIGHT.  EXHIBIT 3 IS ADMITTED.

15            (TRIAL EXHIBIT 3 RECEIVED IN EVIDENCE.)

16         MR. PISTORINO:  THANK YOU.  I GOT OUR TIMING SCREWED

17    UP.

18                  (DISPLAYED ON SCREEN.)

19    BY MR. PISTORINO:

20    Q.  IN TX3, AGAIN, THESE ARE SOME EMAIL MESSAGES BETWEEN YOU

21    AND MR. RASURE, CORRECT?

22    A.  THAT IS CORRECT.

23    Q.  THESE ARE, IN FACT, DATED NOVEMBER 30TH, RIGHT?

24    A.  YES, SIR.

25    Q.  AND MR. RASURE IS ON THE RIGHT, CORRECT?
```

1    **A.**  YES.

2    **Q.**  THAT'S HIM ASKING, DO YOU KNOW HOW TO RUN THE CRM, RIGHT?

3    **A.**  YES.

4    **Q.**  YOU ARE SAYING YOU DON'T KNOW HOW TO READ ALL OF IT, WHAT

5    DO YOU NEED?  AND HE SAID HE WANTED TO SEND OUT AN EMAIL,

6    RIGHT?

7    **A.**  YES.

8    **Q.**  AND THEN HE SAID... HE HAD SUGGESTED TO TECHSHOP THAT THEY

9    EXPORT THE CUSTOMER LIST TO A CSV, AND THEY VETOED IT, RIGHT?

10   **A.**  I BELIEVE SO.

11   **Q.**  WHAT IS CSV FOR THOSE WHO AREN'T FAMILIAR?

12   **A.**  IT'S A WAY TO MIGRATE THE DATA INTO LIKE A SPREADSHEET

13   FORMAT SO YOU CAN PASS IT FROM ONE SYSTEM TO ANOTHER.

14   **Q.**  AND BELOW AGAIN HE WAS ASKING -- BELOW AGAIN THERE, DO YOU

15   HAVE ACCESS TO A MEMBER LIST, RIGHT?

16   **A.**  YES.

17   **Q.**  AND YOU KIND OF RESPONDED, YEAH, YOU DID, ASSUME YOU HAD

18   THE PASSWORDS AT THAT POINT, RIGHT?

19   **A.**  YEAH, BUT OUR ACCESS WAS, I BELIEVE, AND I AM NOT CERTAIN,

20   I THINK IT WAS ALREADY CUT FROM THE CRM AT THAT TIME.

21   **Q.**  IF YOU HAD BEEN -- IF YOUR ACCESS HADN'T BEEN CUT, FOR

22   EXAMPLE, YOU HAD BEEN PHYSICALLY IN THE SAN FRANCISCO STORE,

23   YOU WOULD HAVE BEEN ABLE TO EXPORT THAT?

24   **A.**  I COULD HAVE, YES.

25   **Q.**  ALL RIGHT.  BUT YOU DIDN'T, RIGHT?

1    **A.**  COMPANY --

2              **THE REPORTER:**  I'M SORRY?

3              **THE WITNESS:**  I WAS SAYING IT'S COMPANY IPA.  I

4    WOULDN'T HAVE THE RIGHT TO GIVE THAT SORT OF --

5    **BY MR. PISTORINO:**

6    **Q.**  OKAY.  AND THEN I'LL GET OUR TIMING RIGHT.

7         SO YOU SAID YOU DIDN'T HAVE IT.  YOU COULDN'T GIVE IT ON

8    THE 30TH.  GO BACK TO 17 -- GO BACK TO EXHIBIT 17, PLEASE.

9                        (DISPLAYED ON SCREEN.)

10   **A.**  I SEE IT.

11   **Q.**  OKAY.

12        AND THAT WAS THE PART WHERE THREE OR FOUR DAYS LATER HE

13   WAS ASKING YOU IF YOU HAVE THE MEMBER LIST, RIGHT?

14   **A.**  YEAH.  IT WAS ON CALLS AS WELL.

15   **Q.**  AND YOU SAID NO, RIGHT?

16   **A.**  CORRECT.

17   **Q.**  DID YOU HAVE ANY DISCUSSIONS WITH ANYBODY AT TECHSHOP

18   ABOUT MR. RASURE'S REQUEST TO YOU FOR A MEMBER LIST?

19   **A.**  ACTUALLY, I HAD SEVERAL NEW MEMBERS OF TECHSHOP --

20             **MR. NATHAN:**  OBJECTION, YOUR HONOR, HEARSAY.

21             **THE COURT:**  OVERRULED SO FAR.  I DON'T THINK IT HAS

22   CALLED FOR HEARSAY YET, BUT IT COULD.  LET'S AVOID THAT.

23             **MR. PISTORINO:**  OKAY.

24   **BY MR. PISTORINO:**

25   **Q.**  SIR, IF YOU CAN CONFINE YOUR ANSWER TO SORT OF WHAT YOU

1    SAID --

2            **THE COURT:**  WHAT HE HEARD FROM MR. RASURE AND WHAT HE

3    SAID.

4    **BY MR. PISTORINO:**

5    **Q.**  DID YOU HAVE ANY DISCUSSIONS WITH ANYBODY AT TECHSHOP

6    ABOUT MR. RASURE'S REQUEST FOR THE TECHSHOP CUSTOMER LIST?

7    **A.**  OH, I UNDERSTAND YOUR QUESTION.  SORRY I DIDN'T QUITE

8    CATCH IT THE FIRST TIME.

9        YES.  AT THE SAME TIME I WAS TALKING WITH MR. RASURE, I

10   WAS ALSO COMMUNICATING BACK AND FORTH WITH DAN WOODS.  AND HE

11   OBVIOUSLY SAID DO NOT PROVIDE HIM ANY SORT OF CUSTOMER LIST OR

12   PASSWORDS.

13   **Q.**  AS THE --

14           **MR. NATHAN:**  YOUR HONOR, CAN I MAKE A CONTINUING

15   OBJECTION TO THIS?

16           **THE COURT:**  YOU MAY.  I ASSUME IT IS NOT OFFERED FOR

17   THE TRUTH BUT RATHER TO EXPLAIN THIS WITNESS'S SUBSEQUENT

18   CONDUCT, CORRECT?

19           **MR. PISTORINO:**  CORRECT.

20           **THE COURT:**  SO, LADIES AND GENTLEMEN, TO THE EXTENT

21   YOU HAVE HEARD ABOUT WHAT MR. WOODS SAID TO MR. SPURLOCK, THAT

22   IS NOT BEING OFFERED FOR ITS TRUTH.  IT IS NOT BEING OFFERED

23   TO SHOW THE UNDERLYING STATEMENT BY MR. WOODS IS TRUE.

24   RATHER, IT IS SIMPLY SO YOU CAN UNDERSTAND SUBSEQUENT ACTIONS

25   THAT MR. SPURLOCK TOOK, AND YOU MAY ONLY CONSIDER IT FOR THAT

1    LIMITED PURPOSE AND FOR NO OTHER PURPOSE.

2    **BY MR. PISTORINO:**

3    **Q.**  OKAY.

4        SO WE'RE INTO, AT LEAST THE EXHIBITS WE HAVE SEEN SO FAR,

5    YOU WERE CONTINUING TO COOPERATE WITH MR. RASURE INTO EARLY

6    DECEMBER, RIGHT?

7    **A.**  CORRECT.

8    **Q.**  AND THEN HOW ABOUT DID YOU KEEP ON ASSISTING HIM

9    THROUGHOUT DECEMBER 2018?

10   **A.**  TO THE BEST OF MY ABILITY.

11   **Q.**  AND THEN HOW ABOUT INTO JANUARY OF 2019?

12   **A.**  THE TIMING IS STARTING TO GET A LITTLE FUZZY, BUT WE WERE

13   IN COMMUNICATIONS ALL THE WAY TO THE OPENING.

14   **Q.**  IT MIGHT HELP YOU IF WE GO TO AN EXHIBIT SO YOU CAN SEE.

15       TURN IN YOUR BOOK TO A DOCUMENT WE MARKED AS TX195.

16           **MR. PISTORINO:**  WHICH WE OFFER.

17           **THE WITNESS:**  I HAVE IT UP.

18           **MR. NATHAN:**  NO OBJECTION.

19           **THE COURT:**  195 IS ADMITTED.

20           (TRIAL EXHIBIT 195 RECEIVED IN EVIDENCE.)

21                   (DISPLAYED ON SCREEN.)

22   **BY MR. PISTORINO:**

23   **Q.**  WHAT WE ARE SEEING IN 195, THESE APPEAR TO BE SORT OF TEXT

24   MEMBERS AT LEAST BETWEEN MR. GABLE AND YOURSELF, CORRECT?

25   **A.**  THAT IS CORRECT, SIR.

1    **Q.**  OKAY.

2        AND ALTHOUGH IT LOOKS LIKE THERE MAY HAVE BEEN A GROUP,

3    BECAUSE THE FIRST PART SAYS YOU WERE REMOVED FROM THE GROUP,

4    RIGHT, I GUESS ON FEBRUARY 28TH, RIGHT?

5    **A.**  YES.

6    **Q.**  AND THEN MR. GABLE SAYS THERE IN THE MIDDLE LIKE JANUARY

7    23RD, HE SAYS TO YOU, I BELIEVE YOU ARE GOING TO BE THE

8    MANAGER IN SAN FRANCISCO.

9        DO YOU SEE THAT?

10   **A.**  YES, SIR.

11   **Q.**  SO WERE THERE ANY DISCUSSIONS -- DID YOU HAVE ANY

12   DISCUSSIONS WITH MR. RASURE ABOUT HIM POSSIBLY HIRING YOU TO

13   BE THE MANAGER OF ANOTHER LOCATION OR MAKERSPACE?

14   **A.**  YEAH.  INITIALLY HE APPROACHED... ME WORKING FOR HIM AS A

15   DIRECTOR.  IT WAS A BIT BASED UPON A REQUEST THAT I BELIEVE

16   SAMSUNG HAD MADE IN THE AUSTIN LOCATION, AT LEAST THAT'S WHAT

17   DAN RASURE HAD TOLD ME.

18       BUT, ESSENTIALLY, I HAD WORKED WITH SAMSUNG TO KIND OF

19   UNDERSTAND THE VALUE OF THE MAKERSPACE MOVEMENT.  THEY HAD

20   COME TO MY FACILITY IN SAN FRANCISCO TO LEARN ABOUT THE AUSTIN

21   LOCATION AND WHAT IT WAS GOING TO BE LIKE.  WE HAD BUILT A

22   GREAT RAPPORT AND WORKED WELL TOGETHER.  IT WAS MY

23   UNDERSTANDING THAT THEY HAD SAID TO DAN THAT THEY WOULD BE

24   WILLING TO HELP HIM IF I WAS THE PERSON THAT WAS GOING TO BE

25   IN CHARGE OF THE STORES.

SPURLOCK - DIRECT / PISTORINO

1    **Q.**  OKAY.  AND WHEN YOU SAY "IN CHARGE OF THE STORES", WAS

2    THIS IN CONTEMPLATION OF MR. RASURE --

3    **A.**  YEAH, THAT WOULD BE POST-DAN TAKING OVER.

4    **Q.**  POST-DAN.

5        WAS THIS IN CONTEMPLATION OF MR. RASURE --

6    **A.**  MR. RASURE.

7    **Q.**  -- COMPLETING A TRANSACTION TO PURCHASE THE ASSETS OF

8    TECHSHOP?

9    **A.**  YES.

10   **Q.**  OKAY.  ALL RIGHT.

11       AND IF YOU CAN, JUST AT THE BOTTOM OF THE FIRST PAGE OF

12   THE EXHIBIT, LOOKS LIKE IT'S A MESSAGE FROM MR. GABLE I GUESS

13   TO YOU.  YOU SEE AT THE BOTTOM HE SAYS, YOU SEE OTHER

14   QUESTIONS?

15   **A.**  I SEE IT.

16   **Q.**  OKAY.  AND THEN IT KIND OF STRINGS OVER TO THE NEXT PAGE.

17   GO TO THE TOP OF THE NEXT PAGE.

18                       (DISPLAYED ON SCREEN.)

19       AND MR. GABLE -- THE QUESTIONS THAT HE HAD, HE HAD ONE,

20   TWO, THREE, ONE HE THEM THAT HE WAS ASKING YOU SEEMS LIKE,

21   WILL YOU HAVE THE RIGHTS TO USE THE TECHSHOP LOGO IN PHOTOS,

22   RIGHT?

23   **A.**  THAT IS CORRECT.

24   **Q.**  AND THEN HE SAYS, THE ONES I AM LOOKING AT ARE OF THE SFO

25   SHOP, RIGHT?

 1   **A.**  THAT'S CORRECT.

 2   **Q.**  SO, AGAIN, WAS THERE SOME DISCUSSION ABOUT -- WITH

 3   MR. RASURE ABOUT, AGAIN, ACQUIRING THE RIGHTS TO THE TECHSHOP

 4   LOGOS?

 5   **A.**  PART OF THE... PART OF THE REASON I DECIDED I WOULDN'T

 6   WORK WITH DAN WAS BECAUSE I FELT THAT IT WOULDN'T BE GREAT FOR

 7   MY CAREER TO HELP HIM WHAT I SAW AS STEALING THE TRADEMARK.

 8   AND I DECIDED TO BACK AWAY FROM THAT FOR THAT REASON.

 9   **Q.**  BUT THROUGH THIS -- I'LL JUST ASK HERE, THROUGH THIS

10   JANUARY 20 SOMETHING TIME FRAME, HAD YOU COMMUNICATED THAT TO

11   HIM AT ALL?

12   **A.**  YES.  AND, ADDITIONALLY, I GUESS IT WAS AROUND JULY OF

13   LAST YEAR --

14   **Q.**  I'M SORRY.

15   **A.**  JUNE OF LAST YEAR.

16   **Q.**  I'M SORRY.  I WANT TO JUST KEEP US FOCUSED, IF I CAN, ON

17   THIS JANUARY, JANUARY 20, 2018 TIME FRAME.  I JUST WANT TO

18   FOCUS ON THAT FOR A MOMENT.  GO CHRONOLOGICALLY.

19        BY THIS JANUARY 20 SOMETHING TIME FRAME, YOU ARE STILL

20   ASSISTING MR. RASURE, CORRECT?

21   **A.**  I BELIEVE -- YES, I WAS HELPING HIM STILL A BIT --

22   **Q.**  AND TO YOUR KNOWLEDGE, DO YOU HAVE AN UNDERSTANDING

23   WHETHER OR NOT MR. GABLE WAS ALSO ASSISTING MR. RASURE IN HIS

24   EFFORTS?

25   **A.**  YES, WE WAS.

1    **Q.**  WHAT KIND OF STUFF DID YOU UNDERSTAND MR. GABLE TO BE

2    DOING FOR MR. RASURE?

3    **A.**  FROM WHAT I UNDERSTAND, HE WAS GOING TO BE ESSENTIALLY THE

4    NO. 2 UNDER DAN.

5    **Q.**  OKAY.  IF A PROPOSED TRANSACTION WITH TECHSHOP COMPLETED,

6    CORRECT?

7    **A.**  THAT IS CORRECT.

8    **Q.**  AT SOME POINT HERE, SO LET ME JUST TRY IT THIS WAY,

9    THROUGH, LOOKS LIKE ALMOST THE END OF FEBRUARY, WOULD YOU

10   DESCRIBE YOUR RELATIONS, YOUR COMMUNICATION WITH HIM STILL

11   RELATIVELY FRIENDLY, CORDIAL?

12   **A.**  YES.

13   **Q.**  YOU WERE STILL ASSISTING HIM, BUT WERE THERE SOME OF THESE

14   ITEMS THAT WERE RAISING CONCERNS WITH YOU?

15   **A.**  OF COURSE.  THE TRADEMARK THING WAS A MAJOR CONCERN FOR

16   ME.

17   **Q.**  AT SOME POINT YOU BECAME AWARE OF MR. RASURE'S INTENTION

18   TO REOPEN TECHSHOP SAN FRANCISCO FACILITY, THE ONE YOU HAD

19   BEEN GENERAL MANAGER OF?

20   **A.**  THAT IS CORRECT.

21   **Q.**  UNDER THE NAME TECHSHOP 2.0, RIGHT?

22   **A.**  (NODS HEAD.)

23   **Q.**  OKAY.  YOU RECALL KIND OF WHEN THAT WAS?

24   **A.**  DO I RECALL WHEN HE WAS GOING TO REOPEN?

25   **Q.**  YOU RECALL WHEN YOU KIND OF LEARNED OF HIS INTENTION TO

```
 1    REOPEN --
 2    A.  HE HAD BEEN KEEPING ME UP TO DATE WITH HIS INTENTION TO
 3    REOPEN SF FROM THE TIME I HAD MET HIM.  I GUESS WHEN IT WAS
 4    OFFICIAL, I THINK IT WAS AROUND TEN DAYS BEFORE.
 5         AS I SAID, THIS IS -- THE TIMELINE IS A LONG TIME AGO,
 6    THAT HE REACHED OUT AND WAS KIND OF... GAVE ME ONE LAST PITCH
 7    TO COME WORK FOR HIM AT THE TECHSHOP 2.0.
 8    Q.  SO WE HAVE SEEN FROM OTHER DOCUMENTS THAT THAT SORT OF
 9    BECAME PUBLICLY KNOWN AROUND FEBRUARY 12TH, 2018.  IS THAT --
10    A.  YES.
11    Q.  OKAY.  ALL RIGHT.
12         AND AFTER IT BECAME PUBLICLY KNOWN THAT MR. RASURE WAS
13    GOING TO REOPEN THE STORE THAT YOU HAD BEEN A MANAGER OF USING
14    THE NAME TECHSHOP -- ACTUALLY, HOLD ON.  LET ME MAKE IT MORE
15    CLEAR.
16         YOU WERE AWARE OF THE MEMORANDUM OF UNDERSTANDING, RIGHT?
17    A.  AT THAT TIME, I BELIEVE IT WAS ALREADY -- I DON'T THINK IT
18    WAS -- I THINK IT WAS ALREADY KIND OF THROWN OUT, RIGHT?
19    Q.  OKAY.  YOU WERE AWARE BECAUSE OF THESE PUBLIC
20    ANNOUNCEMENTS THAT THERE HAD BEEN A MEMORANDUM OF
21    UNDERSTANDING ENTERED INTO; IS THAT RIGHT?
22    A.  YES.
23    Q.  NOW YOU JUST TOLD US THAT YOU ALSO LEARNED THAT IT HAD
24    BEEN TERMINATED, RIGHT?
25    A.  YES.
```

1      AND WHEN WE SAW THE ANNOUNCEMENT FOR TECHSHOP 2.0 OPENING,

2   AT THE SAME TIME I REACHED OUT TO DAN WOODS AND ASKED HIM, DID

3   YOU GUYS MAKE A DEAL?  WERE YOU ABLE TO MAKE A DEAL?  AND HE

4   SAID, THIS IS JUST AS MUCH A SURPRISE TO US AS IT IS TO YOU.

5   **Q.**  AT THIS TIME, THOUGH, EVEN THOUGH YOU HAD A COMMUNICATION

6   WITH MR. WOODS, WERE YOU STILL HAVING COMMUNICATIONS WITH

7   MR. RASURE?

8   **A.**  YES.

9   **Q.**  SO AFTER THE PUBLIC AWARENESS OF MR. RASURE'S PLAN TO OPEN

10  THE TECHSHOP SAN FRANCISCO FACILITY, YOU WERE IN COMMUNICATION

11  WITH HIM?

12  **A.**  YES.

13  **Q.**  AND DID YOU HAVE ANY DISCUSSIONS WITH MR. RASURE ABOUT THE

14  ANNOUNCEMENT AND THE OPENING?

15  **A.**  YEAH.

16      DURING ONE OF THE TIMES WE WERE DISCUSSING ON THE PHONE

17  ABOUT WORKING FOR HIM, I WAS EXPLAINING TO HIM WHY I COULDN'T

18  TAKE PART.  YOU KNOW, I ASKED HIM, HOW DO YOU THINK YOU'RE

19  GOING -- HOW DO YOU THINK YOU'RE GOING TO GET AWAY WITH THIS?

20      AND HE ESSENTIALLY SAID, TECHSHOP DOESN'T HAVE THE MONEY

21  FOR LAWYERS.  I'M PAYING FOR THEIR EMAIL AND I'M PAYING FOR

22  THE INSURANCE.  THEY ARE NOT GOING TO BE ABLE TO DO ANYTHING.

23      AND I KIND OF LAUGHED AND SAID, I DON'T THINK THAT'S THE

24  WAY IT WORKS.  AND IT KIND OF JUST, IN MY MIND, SOLIDIFIED WHY

25  I WAS MAKING THE DECISION NOT TO BE PART OF IT.

1    **Q.**  AND THEN YOU KNOW, YOU LEARNED, DIDN'T YOU, ABOUT TECHSHOP

2    FILING A LAWSUIT TO STOP MR. RASURE FROM USING THE TECHSHOP

3    TRADEMARKS?

4    **A.**  YES.

5    **Q.**  OKAY.  IN YOUR BOOK, IF YOU COULD, TURN ME -- TURN WITH ME

6    TO THE TAB MARKED NO. 330.

7            **THE CLERK:**  330?

8            **MR. PISTORINO:**  330, WHICH WE WOULD OFFER.

9            **THE CLERK:**  IT'S ALREADY ADMITTED.

10           **MR. PISTORINO:**  THERE WE GO.  EVEN BETTER.

11                   (DISPLAYED ON SCREEN.)

12   **BY MR. PISTORINO:**

13   **Q.**  LET ME KNOW WHEN YOU'RE READY.

14           **MR. NATHAN:**  NO OBJECTION.

15           **THE CLERK:**  IT'S ALREADY ADMITTED.

16   **BY MR. PISTORINO:**

17   **Q.**  YOU THERE?

18   **A.**  YES, I'M HERE.

19   **Q.**  AFTER THE LAWSUIT WAS FILED, JUST IN 330, DID YOU COME TO

20   UNDERSTAND THAT MR. RASURE WAS USING THIS THESHOP.BUILD THING?

21   **A.**  YES.

22   **Q.**  DID YOU SEE THESE VERSIONS OF IT WITH THE GEAR AND THE "O"

23   AND THE RED AND THE BLUE?

24   **A.**  YES.  I MEAN, TO ME, IT WAS COMICAL AS SOMEONE WHO HAS A

25   DEGREE IN GRAPHIC DESIGN.  THERE WAS A CLEAR INTENTION IN OUR

1    OPINION ON WHY ONE WOULD REOPEN JUST KIND OF SWITCHING AROUND

2    THE LETTERING, AND IT LOOKS ALMOST EXACTLY LIKE THE ORIGINAL

3    TRADEMARK.  SO WE THOUGHT IT WAS INTERESTING.

4    **Q.**  I'M JUST CURIOUS BECAUSE I DON'T KNOW HOW WIDELY IT WAS

5    KNOWN.

6        DID YOU EVER HAVE A DISCUSSION WITH MR. NEWTON ABOUT HOW

7    HE CAME UP WITH THE TEN SPOKES ON THE GEAR?

8            **MR. NATHAN:**  OBJECTION, YOUR HONOR, HEARSAY AGAIN.

9            **THE COURT:**  SUSTAINED.

10   **BY MR. PISTORINO:**

11   **Q.**  OKAY.  OKAY.

12       AND THEN SUBSEQUENT TO THESE DISCUSSIONS WITH MR. RASURE,

13   DID YOU COME TO A DECISION ABOUT WORKING WITH HIM AT ALL?

14   **A.**  YEAH.  I WAS NOT GOING TO WORK WITH HIM AT ALL AT THAT

15   POINT.

16       ADDITIONALLY, TO KIND OF FOLLOW UP, LIKE, YOU KNOW, I

17   THINK AT ONE POINT HIS WIFE, MEGAN DREW WIESLANDER, WHO IS

18   MAYBE THE OWNER OF THESHOP.BUILD, I BELIEVE, SHE REACHED OUT

19   TO ME AND SAID THAT SHE FELT I SCREWED THEM OVER.  LIKE IT WAS

20   KIND AN ODD -- I JUST GOT HIT UP -- REACHED OUT TO ON

21   MESSENGER.  I NEVER MET THE WOMAN BEFORE AND SHE REACHED OUT

22   AND SAID THAT I HAD SCREWED HER OVER AND I -- THAT --

23            **THE COURT:**  HOLD ON.

24            **MR. NATHAN:**  I AM SORRY.  I CAN'T -- CAN I HAVE AN

25   ONGOING OBJECTION TO THIS HEARSAY, YOUR HONOR?

1          **THE WITNESS:**  I HAVE TEXT MESSAGES.

2          **THE COURT:**  STOP.  STOP.  STOP.  THE HEARSAY

3    OBJECTION IS SUSTAINED.

4          **MR. PISTORINO:**  OKAY.

5    **BY MR. PISTORINO:**

6    **Q.**  IF I MAY, MR. SPURLOCK, DO YOU HAVE AN UNDERSTANDING OF

7    WHAT ROLE MS. RASURE HAS WITH THE ENTITY WHO CHANGED ITS NAME

8    TO THE THESHOP.BUILD?

9    **A.**  I BELIEVE SHE'S THE OWNER OF THE BUSINESS.

10   **Q.**  OKAY.

11         **MR. PISTORINO:**  IF I MAY, YOUR HONOR, I THINK IT

12   WOULD BE A STATEMENT OF A PARTY OPPONENT.

13         **THE COURT:**  WHY DON'T WE BREAK A LITTLE EARLY.  IT'S

14   11:35.  WE WILL TAKE OUR SECOND RECESS A FEW MINUTES EARLY,

15   LADIES AND GENTLEMEN.  LET'S COME BACK AND RESUME AT 11:55.

16      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

17         **THE CLERK:**  THE JURY IS REQUESTING PIZZA.

18      PLEASE STEP DOWN.  YOU MAY BE SEATED.

19         **THE COURT:**  MR. SPURLOCK, WHY DON'T YOU STEP OUTSIDE.

20      (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE WITNESS.)

21         **THE COURT:**  ALL RIGHT.

22      SO I THINK THE PROBLEM IS THERE IS NOT VERY GOOD

23   PREPARATION OF THE WITNESS SO HE IS SORT OF HURDLING FORWARD.

24   IF YOU HAD LAID THE FOUNDATION UP FRONT, THEN IT WOULD BE

25   EASIER TO ASSESS.

1    IT DOES SOUND TO ME THAT THERE'S A BASIS FOR TREATING HER

2    STATEMENTS AS THOSE OF A PARTY OPPONENT.

3         **MR. PISTORINO:**  CANDIDLY IF I MAY, I ACTUALLY HAVE NO

4    IDEA WHAT HE'S GOING TO SAY.  OBVIOUSLY WE KNOW THE

5    DOCUMENTS -- I'M HEARING IT FOR THE FIRST TIME.  THE DOCUMENTS

6    ARE HERE.  WE KNOW SOME OF THEM ARE THE KANSAS -- STATE OF

7    KANSAS LLC INCORPORATION PAPERS, AND MS. WIESLANDER IS LISTED

8    AS THE INCORPORATOR ON THEM.  THOSE DOCUMENTS, I KNOW, WILL BE

9    MOVED INTO EVIDENCE.

10        **MR. NATHAN:**  YOUR HONOR, FORGIVE ME.  THE

11   INCORPORATOR IS NOT NECESSARILY THE OWNER.  AS MR. PISTORINO

12   KNOWS FROM -- HE HAS INCORPORATED SOME ORGANIZATIONS HIMSELF,

13   AND HE'S NOT THE OWNER.

14    MY POINT IS THIS:  THERE'S NO EVIDENCE IN THE CASE THAT

15   MR. RASURE'S WIFE IS THE OWNER.  AND IT'S JUST BEING USED AS A

16   SPRINGBOARD TO GET IN ORAL TESTIMONY.  IF THERE ARE TEXT

17   MESSAGES THAT HE WANTS TO OFFER, WE CAN LOOK AT THEM ON A

18   CASE-BY-CASE BASIS, BUT IT'S JUST LIKE A NARRATIVE.

19    AND I HAVE TRIED NOT TO OBJECT TO COUNSEL TESTIFYING, BUT

20   HE'S LEADING HIM ALL OVER THE PLACE, AND I THINK THE WITNESS

21   IS NOT BEING CONTROLLED BY THE Q AND A PROCESS HERE.  I CAN'T

22   KEEP STANDING UP BECAUSE I KNOW IT WILL ANNOY NOT ONLY THE

23   COURT BUT ALSO THE JURY.

24    THAT'S WHY I ASKED FOR A STANDING OBJECTION ON HEARSAY.

25        **THE COURT:**  WE CAN'T HAVE A STANDING OBJECTION

1    BECAUSE SOME QUESTIONS WILL CALL FOR HEARSAY AND SOME WON'T.

2         I DEFINITELY AGREE WE NEED TO CABIN THE WITNESS.  WHATEVER

3    YOUR PRIOR PREPARATION WAS, THE QUESTIONS NEED TO BE FRAMED SO

4    THAT WHEN THE QUESTION IS POSED, COUNSEL HAS A CHANCE TO

5    OBJECT AND I WILL HAVE A CHANCE TO ASSESS THE ADMISSIBILITY OF

6    WHAT'S BEING OFFERED.

7         HE'S GOING TO NEED TO DO SOMETHING MORE THAN HE'S DONE TO

8    ESTABLISH HIS PERSONAL KNOWLEDGE THAT WOULD MAKE THIS A PARTY

9    ADMISSION.

10             **MR. PISTORINO:**  OKAY.

11             **THE COURT:**  ON THE WIFE'S PART.  AND I THINK YOU

12   OUGHT TO MEET WITH HIM --

13             **MR. PISTORINO:**  I WILL.

14             **THE COURT:**  -- BEFOREHAND AND SEE IF HE'S ABLE TO DO

15   IT.  IF HE ISN'T, IT SHOULDN'T BE OFFERED.

16             **MR. PISTORINO:**  OBVIOUSLY I DID MEET WITH HIM.  WITH

17   ALL DUE RESPECT TO MR. SPURLOCK, OBVIOUSLY, HE'S NEVER BEEN

18   INVOLVED IN PROCEEDINGS LIKE THIS SO HE'S UNDERSTANDABLY

19   NERVOUS.

20             **THE COURT:**  UNDERSTOOD.  I JUST THINK IT'S IMPORTANT

21   TO WALK THAT LINE, RIGHT, THAT IT'S Q AND A BUT NOT LEADING.

22             **MR. PISTORINO:**  I WILL.

23             **THE COURT:**  HE'S GOING TO HAVE TO -- HE'S GOING TO

24   HAVE TO FIGURE OUT HOW TO WALK THAT LINE.

25             **MR. PISTORINO:**  I WILL SPEAK WITH HIM AGAIN.

1      **THE COURT:**  ALL RIGHT.

2          **MR. NATHAN:**  THANK YOU, YOUR HONOR.

3          **MR. PISTORINO:**  THANK YOU.

4      (RECESS TAKEN AT 11:20 A.M.; RESUMED AT 11:57 A.M.)

5          **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THE

6  HONORABLE HAYWOOD S. GILLIAM JR., PRESIDING.

7          **THE COURT:**  ARE WE READY TO RESUME?

8      JUST TO BE CLEAR, I'M GOING TO BE STRICT ON THE HEARSAY

9  ISSUES, SO PROCEED ACCORDINGLY.

10         **MR. PISTORINO:**  I WILL.  I HAVE SPOKEN WITH HIM.

11         **THE CLERK:**  MR. SPURLOCK, YOU WANT TO COME ON BACK UP

12  BEFORE I GRAB THEM?  THANK YOU.

13      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

14         **THE CLERK:**  YOU MAY BE SEATED.

15         **THE COURT:**  YOU MAY PROCEED WHENEVER YOU ARE READY,

16  MR. PISTORINO.

17         **MR. PISTORINO:**  THANK YOU.

18  **BY MR. PISTORINO:**

19  **Q.**  MR. SPURLOCK, YOU ARE A LITTLE NERVOUS; IS THAT FAIR?

20  **A.**  YEAH.  THIS ISN'T REALLY SOMETHING THAT I WANTED TO DO.

21  IT DOESN'T REALLY COME NATURAL TO ME EITHER, YOU KNOW.

22  **Q.**  OKAY.  ALL RIGHT.  AND WE'RE GOING TO, AGAIN, DO OUR BEST

23  TO NOT TALK OVER EACH OTHER.

24      SO, YOU HAD A DISCUSSION WITH MR. RASURE.  YOU -- IT

25  SOUNDS LIKE YOU WERE SAYING YOU TOLD HIM YOU WEREN'T GOING TO

1    WORK WITH HIM, CORRECT?

2    **A.**  YES.

3    **Q.**  AND THEN AFTER -- SO WAS THAT -- WHAT TIME FRAME WAS THAT,

4    SIR?

5    **A.**  I THINK THE FINAL TIME I TOLD HIM WAS JUST A COUPLE OF

6    WEEKS BEFORE THE TECHSHOP 2.0 SHOP REOPENED.

7    **Q.**  OKAY.  OKAY.

8        AND AFTER THAT, DID YOU HAVE ANY FURTHER COMMUNICATION OR

9    CONTACT WITH MR. RASURE?

10   **A.**  YES.

11   **Q.**  CAN YOU TELL US ABOUT THAT?

12   **A.**  YES.  SORRY IF I ANSWER TOO QUICKLY.

13       WE HAD A FEW -- WE SAW EACH OTHER AT A FEW EVENTS IN

14   PERSON.  WE DIDN'T REALLY COMMUNICATE.  WE ALSO -- I ACTUALLY

15   AT ONE POINT WENT TO HIS FACILITY TO PICK UP THE TOOLS THAT I

16   HAD LEFT THERE AND --

17   **Q.**  WHEN YOU SAY YOU WENT TO HIS FACILITY, WHICH PLACE ARE YOU

18   TALKING ABOUT?

19   **A.**  TECHSHOP 2.0.

20   **Q.**  ARE YOU TALKING ABOUT THE LOCATION, IN TECHSHOP'S FORMER

21   LOCATION IN SAN FRANCISCO?

22   **A.**  926 HOWARD STREET.

23   **Q.**  OKAY.  AND THAT'S THE PLACE WHERE YOU HAD BEEN GENERAL

24   MANAGER, CORRECT?

25   **A.**  YES.

1  **Q.**  AND THAT WAS THE PLACE THAT YOUR TOOLS AND STUFF WERE,

2  RIGHT?

3  **A.**  YES.

4  **Q.**  OKAY.

5      AND SO YOU SAID YOU WENT OVER THERE.  CAN YOU DESCRIBE FOR

6  US WHAT HAPPENED?

7  **A.**  WELL, BEFORE I WENT OVER THERE, I HAD BEEN ASKING DAN FOR

8  THE STUFF.  HE HAD GIVEN ME A FEW DIFFERENT REASONS WHY I

9  COULDN'T PICK IT UP.

10     ONE OF THE REASONS WAS THAT THE TRUSTEE WOULDN'T ALLOW HIM

11 TO RELEASE IT.  AT THAT TIME I EMAILED, I BELIEVE, OR CALLED

12 DORIS.

13 **Q.**  OKAY.  I'M SORRY.  IF YOU CAN CONFINE YOUR ANSWER HERE TO

14 YOUR COMMUNICATIONS, IF ANY, WITH MR. RASURE.

15 **A.**  OH, OKAY.  SORRY.

16     I HAD TOLD RASURE THAT I WAS ALLOWED TO COME PICK UP MY

17 STUFF.  THE LANDLORD SAID I COULD PICK IT UP AS WELL AS THERE

18 WAS NO REASON HE SHOULDN'T GIVE IT TO ME.

19     AND, FINALLY, I JUST TOOK IT UPON MYSELF TO GO DOWN AND

20 PICK IT UP.  I WAS KIND OF PREPARED THAT HE WASN'T GOING TO BE

21 THRILLED --

22 **Q.**  CAN I STOP YOU?

23     WHEN YOU SAY YOU WERE KIND OF PREPARED THAT HE WASN'T

24 GOING TO BE THRILLED, WHAT LED YOU TO BELIEVE THAT, SIR?

25 **A.**  JUST THE WAY HE KEPT PUSHING ME OFF AND TELLING ME HE

SPURLOCK - DIRECT / PISTORINO

1    COULDN'T GIVE ME THE STUFF BACK.

2         I ASSUMED THAT BY SHOWING UP IT WASN'T -- HE WASN'T GOING

3    TO BE THRILLED.  SO I ACTUALLY TRIED TO APPROACH IT LIKE

4    PUTTING ON MY BEST CUSTOMER SERVICE VOICE, AND SAY, HEY, DAN,

5    WOULD IT BE POSSIBLE IF I COULD PICK UP MY STUFF TODAY?  AND

6    HE SAID, NO.

7         I ASKED HIM WHY.  AND HE SAID BECAUSE HE DIDN'T HAVE THE

8    AUTHORITY.

9         I SAID, WELL, IT'S MY STUFF.  YOU KNEW THAT WHEN WE HAD

10   MET.  LIKE I POINTED IT OUT TO YOU WHEN YOU FIRST CAME TO THIS

11   FACILITY, WHY, AFTER I HELPED YOU ALL THIS TIME, WOULD YOU

12   KEEP MY STUFF.  LIKE I DON'T UNDERSTAND.

13   Q.  AND THEN WAS THIS A COMMUNICATION YOU HAD WITH HIM BEFORE

14   OR AFTER YOU JUST SORT OF SHOWED UP AT THE --

15   A.  THIS WAS DIRECTLY AFTER WHEN I -- WHEN I SHOWED UP AT HIS

16   SHOP, I ASKED THE RECEPTIONIST IF DAN WAS IN.  THEY SAID HE'S

17   UPSTAIRS IN THE CONFERENCE ROOM.  I OBVIOUSLY KNEW WHERE THAT

18   WAS SINCE I RAN THE FACILITY.

19        I WENT UP.  HE WAS SEATED AT THE CONFERENCE TABLE.  AND --

20   Q.  AND THEN WHAT HAPPENED NEXT?

21   A.  WHEN HE SAID HE WOULDN'T GIVE IT BACK TO ME, MY RESPONSE

22   WAS, DAN, YOU JUST OPENED A MAKERSPACE HERE IN SAN FRANCISCO.

23   YOU ARE OPENING ONE IN SAN JOSE.  DO YOU REALLY NEED THE

24   HASSLE OF ME CALLING THE POLICE TO GET MY STUFF BACK?  I DON'T

25   UNDERSTAND WHY THIS IS THE ROUTE YOU WANT TO TAKE.

1    AND AS SOON AS I SAID "POLICE", HE JUMPED UP OUT OF HIS

2    CHAIR AND CHARGED AT ME, PHYSICALLY THREATENING ME IN A WAY

3    THAT I HAVE NOT EXPERIENCED SINCE I WAS IN LIKE JUNIOR HIGH,

4    HIGH SCHOOL.

5    **Q.**  WHEN YOU SAY HE CHARGED AT YOU, WHAT DO YOU MEAN BY THAT?

6    **A.**  HE JUMPED OUT OF HIS SEAT AND STARTED SCREAMING AT ME

7    THINGS LIKE, YOU -- BASICALLY ASSOCIATING ME WITH TECHSHOP,

8    THAT I ESSENTIALLY MADE ALL THIS HARD FOR HIM AND KIND OF

9    BLAMING ME FOR THEIR TROUBLES.

10    I TRIED TO TELL HIM THAT I DON'T HAVE ANYTHING TO DO WITH

11    TECHSHOP.  I JUST WANT MY STUFF.  THIS IS NOT MY INTEREST.  I

12    DON'T WANT TO TALK ABOUT IT.

13    HE CONTINUED TO KIND OF CORNER ME UNTIL I FELT -- I WAS

14    SCARED TO THE POINT I WAS GOING TO HAVE TO PHYSICALLY DEFEND

15    MYSELF.

16    I AM A BIG GUY.  PEOPLE DON'T GENERALLY DO THAT TO ME.  SO

17    I WAS KIND OF SURPRISED.  AND ADDITIONALLY, I HAVE NEVER HAD

18    ANYTHING, OR REALLY SEEN ANYTHING LIKE THAT IN A PROFESSIONAL

19    SETTING.

20    **Q.**  AND THEN WHAT HAPPENED NEXT?

21    **A.**  IT GOT A BIT, YOU KNOW, OUT OF CONTROL.  HE WAS SCREAMING

22    TO THE POINT LIKE HIS VOICE WAS CRACKING TO WHERE HIS WORDS

23    WEREN'T COMING OUT.

24    HE THEN CALLED THE PROPERTY OWNER, DAVE BYERS AND ASKED

25    HIM IF HE --

1   **Q.**  OKAY.  WHAT DID MR. RASURE SAY?

2   **A.**  MR. RASURE CALLED THE PROPERTY OWNER, MR. DAVE BYERS, AND

3   ASKED IF HE'D GIVE HIM PERMISSION TO PICK IT UP.  HE WAS

4   SCREAMING SO LOUD DAVE COULDN'T UNDERSTAND HIM.  WE KIND OF

5   ARGUED BACK AND FORTH, AND I LEFT.

6   **Q.**  OKAY.  SO YOU LEFT THE FACILITY WITHOUT YOUR MATERIALS?

7   **A.**  YES.  AND THEN I EMAILED -- GO AHEAD.

8   **Q.**  AND THEN WHAT HAPPENED NEXT AFTER YOU DIDN'T GET BACK

9   THOSE TOOLS AND I THINK YOU SAID A COUCH KIND OF THINGS.

10     WHAT HAPPENED?

11  **A.**  ACTUALLY KIND OF TRIED TO NEGOTIATE WITH DAN A LITTLE BIT,

12  JUST SAYING, LET ME GET THIS STUFF AND YOU CAN KEEP THE REST

13  OF THE STUFF.  I WAS JUST TRYING TO GET MY STUFF.  BUT I

14  BASICALLY AT THAT POINT JUST CALLED THE LANDLORD.

15  **Q.**  AND THEN WERE YOU SUBSEQUENTLY ABLE THROUGH OTHER MEANS TO

16  GET AT LEAST SOME OF YOUR MATERIALS BACK?

17  **A.**  I WAS ABLE TO GET SOME OF MY MATERIALS.

18     THE ONE THING THAT I REALLY WANTED TO GET BACK WAS A...

19  IT'S A PICTURE FRAMER THAT WAS -- IT WAS A FRIEND THAT'S

20  GRANDFATHER PASSED AWAY.  AND WHEN THEY GAVE IT TO ME, THEY

21  ASKED ME IF I GET RID OF IT, PLEASE GIVE IT BACK TO THEM.

22     SO IT WAS SOMETHING THAT I KIND OF GAVE MY WORD ON, AND

23  THAT WAS THE ONE THING I FELT RESPONSIBLE TO GET.

24  **Q.**  DID YOU GET THAT BACK?

25  **A.**  I DID.

1    **Q.**  WHAT ABOUT SOME OF OTHER THINGS THAT YOU HAD LEFT THERE?

2    **A.**  THEY WERE A LOST.  THAT'S OKAY.

3          **MR. PISTORINO:**  NO FURTHER QUESTIONS.

4          **THE COURT:**  ANY CROSS-EXAMINATION?

5          **MR. NATHAN:**  YES, YOUR HONOR.

6      MAY I APPROACH?

7          **THE COURT:**  YOU MAY.

8             (BINDER HANDED TO COUNSEL AND WITNESS.)

9                    **CROSS-EXAMINATION**

10   **BY MR. NATHAN:**

11   **Q.**  GOOD AFTERNOON, MR. SPURLOCK.  MY NAME IS JOHN NATHAN.  WE

12   HAVE NEVER MET BEFORE?

13   **A.**  NO, SIR.  PLEASURE TO MEET YOU.

14   **Q.**  YOU, TOO.

15     LET ME START BY TAKING YOU BACK TO WHEN TECHSHOP CLOSED

16   ITS DOORS ON NOVEMBER 15TH, 2017.

17   **A.**  YES, SIR.

18   **Q.**  WERE YOU ON THE CAMPUS THEN IN THE OFFICE WHEN IT

19   HAPPENED?

20   **A.**  YES, I WAS.

21   **Q.**  AND PRIOR TO THAT TIME, WERE YOU AWARE THAT TECHSHOP WAS

22   HAVING FINANCIAL DIFFICULTIES?

23   **A.**  IT WAS KIND OF APPARENT THE LAST FEW MONTHS AS CREDIT

24   CARDS WERE NOT WORKING.

25     YES.

1    **Q.**  NOW PRIOR TO NOVEMBER 15TH, 2017, HAD YOU EVER HEARD OF

2    MR. RASURE?

3    **A.**  NO, SIR.

4    **Q.**  SO YOU NEVER MET HIM?

5    **A.**  NO, SIR.

6    **Q.**  NEVER TELEPHONED WITH HIM, NEVER TEXTED WITH HIM?

7    **A.**  NO.

8    **Q.**  HE WAS A COMPLETE STRANGER?

9    **A.**  YES, SIR.  AS FAR AS I'M AWARE.

10   **Q.**  DID YOU HAVE ANY VIEW -- DID YOU BELIEVE THAT MR. RASURE

11   WAS IN ANY WAY RESPONSIBLE FOR TECHSHOP'S DEMISE?

12   **A.**  BEFORE I MET HIM?

13   **Q.**  YES.

14   **A.**  NO, SIR.

15   **Q.**  HE HAD NOTHING TO DO WITH THAT, RIGHT?

16   **A.**  I DON'T UNDERSTAND THE QUESTION.

17   **Q.**  HE DIDN'T TAKE ANY ACTIONS THAT CAUSED THE PROBLEMS WITH

18   TECHSHOP THAT LED TO THEIR CLOSURE, RIGHT?  HE WASN'T --

19   **A.**  NOT THAT I AM AWARE OF.

20   **Q.**  HE WAS NOT RESPONSIBLE FOR THAT?

21   **A.**  NOT THAT I AM AWARE OF.

22   **Q.**  NOW, COULD YOU GO BACK TO EXHIBIT TX2?

23   **A.**  IN THE BOOK YOU GAVE ME?

24   **Q.**  THIS ONE WOULD BE IN THE BOOK, BUT WE'LL ALSO PUT IT UP ON

25   THE SCREEN SO YOU WILL BE ABLE TO SEE IT TWO WAYS.

```
 1                     (DISPLAYED ON SCREEN.)

 2        YOU HAVE THAT?

 3   A.   YES, SIR.

 4   Q.   AND YOU AGREE THAT THE MESSAGE PART ON THE LEFT, WHICH HAS

 5   THE RED IS YOU, AND THE MESSAGE PART ON THE RIGHT, WHICH IS

 6   BLUE IS MR. RASURE?

 7        IF YOU ARE UNSURE, I HAVE ANOTHER DOCUMENT.

 8   A.   I BELIEVE SO, YES.

 9   Q.   YOU BELIEVE THAT'S THE CASE?

10        I CAN SHOW YOU A LOG WHERE IT DEFINITELY TELLS YOU, BUT --

11   A.   YEAH.

12   Q.   -- YOU ARE COMFORTABLE THAT YOU'RE ON THE LEFT AND HE'S ON

13   THE RIGHT?

14   A.   YES.

15   Q.   LOOKING AT ME, YOU'RE ON THE LEFT AND HE'S ON THE RIGHT?

16   A.   I AM THE ONE HIGHLIGHTED IN RED YOU'RE SAYING?

17   Q.   YES.

18        THIS IS YOU (INDICATING).  CAN I JUST POINT OUT?

19   A.   YES.

20   Q.   THIS IS YOU.

21   A.   THAT IS CORRECT.

22   Q.   AND HE'S ON THE LEFT -- ON THE RIGHT.  EXCUSE ME.

23        AND HE ASKED YOU WHAT ABOUT RENAMING TECHSHOP 2.0.  YOU

24   TESTIFIED ABOUT THAT.  DO YOU REMEMBER THAT?

25   A.   YES.
```

SPURLOCK – CROSS / NATHAN

1    **Q.**  AND YOU RESPONDED, IT'S INTERESTING.

2    **A.**  YES.

3    **Q.**  NOW YOU WERE THE GENERAL MANAGER OF THE TECHSHOP STORES IN

4    NOT ONLY SAN FRANCISCO, BUT ALSO MENLO PARK AT THE TIME?

5    **A.**  YES, SIR.

6    **Q.**  AND THIS EXCHANGE WAS ON NOVEMBER 21ST, 2017.

7         YOU WERE STILL THE GENERAL MANAGER OF THE SAN FRANCISCO

8    AND MENLO PARK STORES?

9    **A.**  NO.  MY JOB ENDED ON THE 15TH WHEN THE DOORS CLOSED.

10   **Q.**  ALL RIGHT.

11        DID YOU IN ANY WAY EXPRESS AN OBJECTION TO THE NAME

12   TECHSHOP 2.0 WHEN MR. RASURE PRESENTED IT TO YOU?

13        AND I'M CONFINING YOU TO THE TIME OF THIS CONVERSATION,

14   THIS TEXT CONVERSATION.

15   **A.**  NOT IN THIS CONVERSATION.  IT WAS MY ASSUMPTION THAT IF HE

16   WAS TO PURCHASE THE TRADEMARK, THAT IT WOULD HAVE BEEN A GOOD

17   CHOICE.

18   **Q.**  WELL, IF I UNDERSTOOD YOUR TESTIMONY CORRECTLY, AFTER THE

19   TECHSHOP CLOSED ITS DOORS ON DECEMBER 15TH, YOU WERE ALREADY

20   IN THE PROCESS OF THINKING ABOUT STARTING A COMPANY CALLED

21   HUMAN MADE.

22   **A.**  IT WAS NOT -- WE DIDN'T KNOW IF IT WAS GOING TO BE HUMAN

23   MADE OR WHAT IT WAS GOING TO BE AT THE TIME.  WE WERE

24   CONSIDERING TRYING TO REOPEN A SPACE FOR THE COMMUNITY.

25   **Q.**  AND WHO IS "WE"?

SPURLOCK - CROSS / NATHAN

1    **A.**  MYSELF AND A GROUP OF INDIVIDUALS THAT WERE EITHER MEMBERS

2    OR PEOPLE THAT I HAD WORKED WITH IN THE PAST.

3    **Q.**  AT THE SAME TIME, DID YOU TELL... THAT YOU WERE INTERESTED

4    IN JOINING MR. RASURE'S COMPANY?

5    **A.**  MR. RASURE KIND OF PITCHED ME THAT INSTEAD OF JUST OPENING

6    SAN FRANCISCO AND THINKING ABOUT OUR COMMUNITY LOCALLY, THAT

7    WE COULD HELP PEOPLE ABROAD.

8         AND I -- FOR ME, THIS ISN'T ABOUT A JOB POSITION.  IT'S

9    ABOUT KIND OF SERVING THE COMMUNITY AND FOLLOWING THROUGH WITH

10   MY COMMITMENTS AND KIND OF MY MISSION ON OUR PROJECTS.

11        SO I THOUGHT IF WE COULD HELP MORE PEOPLE, THAT WOULD BE

12   THE BETTER SOLUTION.  AND I WAS INTERESTED TO HEAR HOW DAN --

13   MR. RASURE HAD ANTICIPATED DOING SO.

14   **Q.**  DID YOU NOT TEXT HIM, I AM HONORED AND EXCITED THAT YOU

15   WOULD LIKE ME TO BE A PART OF YOUR TEAM?

16        DO YOU REMEMBER SAYING THAT TO HIM IN A TEXT?

17   **A.**  I DID AT ONE POINT, YES, SIR.

18   **Q.**  DID YOU ALSO ASK HIM FOR A CONTRACT?

19   **A.**  MANY TIMES.  YES, SIR.

20   **Q.**  DID YOU ALSO SAY TO HIM, AND I'M QUOTING THAT YOU WERE

21   COMMITTED TO TS2 FIRST, AND DON'T WANT TO BE TIED UP IF YOU

22   NEED ME TO OPEN SUDDENLY.

23        DO YOU REMEMBER TEXTING HIM THAT?

24             **MR. PISTORINO:**  OBJECTION TO THE FIRST PART.

25             **THE WITNESS:**  I DO NOT RECALL --

1          **THE COURT:**  STOP.  EVERYBODY STOP TALKING OVER

2     EVERYBODY ELSE.  DON'T DO IT AGAIN.

3          WHAT'S THE OBJECTION?

4          **MR. PISTORINO:**  OBJECTION TO THE FIRST PART.  IT'S

5     TESTIFYING BY COUNSEL I'M QUOTING.

6          **THE COURT:**  OVERRULED.

7     **BY MR. NATHAN:**

8     **Q.**  I CAN SHOW YOU THE TEXT IF YOU WOULD LIKE TO SEE IT.

9     **A.**  THAT WOULD BE GREAT.  THANK YOU.

10          **MR. NATHAN:**  YOUR HONOR, I WOULD LIKE TO SHOW THE

11    WITNESS A TEXT TO REFRESH HIS RECOLLECTION.

12          **THE COURT:**  ALL RIGHT.  YOU MAY.

13               (DOCUMENT HANDED TO WITNESS.)

14          **THE COURT:**  SO YOU WILL HAND IT TO THE WITNESS.  HE

15    WILL READ IT TO HIMSELF.  HE WILL LET YOU KNOW WHEN HE'S DONE

16    DOING THAT.  HE'LL HAND IT BACK TO YOU, AND THEN YOU CAN ASK

17    YOUR QUESTION.

18          **THE WITNESS:**  YEAH.

19               (DOCUMENT RETURNED TO COUNSEL.)

20    **BY MR. NATHAN:**

21    **Q.**  DOES THIS TEXT --

22          **MR. NATHAN:**  YOUR HONOR, WOULD YOU LIKE ME TO

23    IDENTIFY THE DOCUMENT NUMBER?

24          **THE COURT:**  YOU DON'T NEED TO SINCE YOU USED IT TO

25    REFRESH.  YOU SHOULD JUST ASK THE QUESTION.

1    **BY MR. NATHAN:**

2    **Q.**  DOES THE DOCUMENT I JUST HANDED YOU REFRESH YOUR

3    RECOLLECTION AS TO WHETHER YOU TEXTED HIM ON JANUARY 3RD, 2018

4    QUOTE:

5             "BUT I'M COMMITTED TO TS2, FIRST, AND DON'T WANT TO

6             BE TIED UP IF YOU NEED ME TO OPEN SUDDENLY."

7    **A.**  YEAH.  YES.  I BELIEVE AT THAT TIME I WAS STILL TRYING TO

8    GET DAN TO SHOW ME A CONTRACT AND SHOW ME KIND OF WHAT HIS

9    PLANS WERE FOR AN OFFER FOR ME.

10   **Q.**  NOW BY FEBRUARY, EARLY FEBRUARY, HE HAD NOT BEEN ABLE TO

11   OPEN UP HIS NEW COMPANY, EARLY FEBRUARY; IS THAT RIGHT?

12   **A.**  TECHSHOP 2.0?

13   **Q.**  YES.

14   **A.**  I AM NOT SURE ABOUT THE DATES ON THAT.

15      YOU MEAN DID THE DOORS OPEN TO THE 926 HOWARD LOCATION; IS

16   THAT YOUR QUESTION?

17   **Q.**  BY EARLY FEBRUARY, HAD HE OPENED HIS DOORS AT 926 HOWARD?

18   **A.**  I BELIEVE IT WAS MID-FEBRUARY THAT HE OPENED HIS DOORS AT

19   926 HOWARD.

20   **Q.**  DID YOU TEXT HIM ON FEBRUARY 11TH, IT'S OKAY, MAN, I HOLD

21   YOU AT NO FAULT.  I JUST COULDN'T HOLD OUT ANY MORE.

22      DO YOU REMEMBER TEXTING HIM THAT?

23   **A.**  ABOUT ACCEPTING THE JOB?  YEAH, IT'S JUST A COMMON

24   PROFESSIONAL KIND OF COURTESY THING WHERE YOU DON'T WANT TO

25   GET INTO THE CONVERSATION.  IT'S JUST NATURAL BUSINESS TALK.

SPURLOCK – CROSS / NATHAN

1      YES.

2  **Q.**  AND SO YOU MOVED ON AND DID OTHER THINGS?

3  **A.**  YES.

4  **Q.**  AND THAT LED TO HUMAN MADE?

5  **A.**  YES.

6  **Q.**  WHICH IS A COMPETITOR OF MR. RASURE'S THESHOP.BUILD?

7  **A.**  ABSOLUTELY NOT.  WE ARE A NONPROFIT.  IF YOU ARE THINKING

8  ABOUT YOUR BUSINESS AS A COMPETITOR TO A FOR-PROFIT BUSINESS,

9  AS A NONPROFIT, YOU ARE ALREADY LOSING.  OUR GOAL IS TO HELP

10  PEOPLE WHO WOULD OTHERWISE NOT HAVE THE MEANS OR OPPORTUNITY.

11  **Q.**  IT'S A MAKERSPACE, ISN'T IT?

12  **A.**  IT IS -- IT HAS A MAKER ELEMENT TO IT, THAT'S CORRECT.

13  **Q.**  IT'S A MAKERSPACE?

14  **A.**  WE ARE A WORKFORCE

15  DEVELOPMENT-BASED-MAKER-BASED-MANUFACTURING FACILITY.

16  **Q.**  DO YOU REMEMBER TEXTING HIM ON FEBRUARY 12TH, THE NEXT

17  DAY.

18      I THINK YOU'RE A GOOD DUDE AND HAVE ALREADY SPENT ENOUGH

19  MONEY ON THIS MESS.

20  **A.**  I MAY HAVE.  I DO NOT RECALL IT.

21  **Q.**  LET ME SHOW YOU A DOCUMENT THAT MAY HELP REFRESH YOUR

22  RECOLLECTION.

23          (DOCUMENT HANDED TO COUNSEL AND WITNESS.)

24      AGAIN, JUST READ IT TO YOURSELF AND HAND IT BACK TO ME.

25  **A.**  YEAH, I TEXTED IT.

```
 1              (DOCUMENT RETURNED TO COUNSEL.)
 2   Q.  DOES THAT REFRESH YOUR RECOLLECTION THAT YOU CALLED
 3   MR. RASURE A GOOD DUDE ON FEBRUARY 12TH?
 4   A.  YES, IT DOES.
 5       BUT TO ADD TO THAT, I THINK THAT EVERYONE HERE KNOWS THAT
 6   PROFESSIONALLY WE OFTEN, WHETHER WE DISAGREE OR LIKE A PERSON,
 7   WE WILL BE PROFESSIONALLY CORRECT.  SO I ALWAYS TAKE THAT
 8   APPROACH WITH EVERYONE.
 9   Q.  SO YOU SAID HE WAS A GOOD DUDE AND YOU HAD YOUR FINGER
10   BEHIND YOUR BACK CROSSED BECAUSE YOU REALLY DIDN'T MEAN IT?
11   A.  THAT'S NORMAL BUSINESS PROFESSIONALISM.  BEING KIND.
12   PEOPLE SITTING IN AN OFFICE WITH PEOPLE THEY DON'T GET ALONG
13   WITH EVERY DAY AND YOU'RE POLITE, THAT'S PROFESSIONALISM.
14   Q.  YOU WEREN'T GETTING ALONG WITH MR. RASURE ON FEBRUARY 12TH
15   BEFORE HE OPENED ON HOWARD STREET?
16   A.  IT WAS, IN MY OPINION, WHEN I TOLD DAN, NO, HE IMMEDIATELY
17   KIND OF STARTED TO WORK AGAINST ME.  MEANING THAT, YOU KNOW,
18   HE HAD SAID THINGS TO ME LIKE I REALLY WISH I HADN'T TOLD YOU
19   CERTAIN THINGS, AND YOU KIND OF PUT ME IN A POSITION AND
20   SCREWED ME OVER.  SO IT WAS CLEAR THAT WE WERE NOT ON GOOD
21   TERMS.
22   Q.  NOW, AFTER -- YOU'RE AWARE THAT THIS CASE WAS FILED ON
23   FEBRUARY 16TH, 2018?
24   A.  I DON'T KNOW THE EXACT DATE THE CASE WAS FILED ON.
25   Q.  AND ARE YOU AWARE THAT THIS IS A CASE FOR TRADEMARK
```

1    INFRINGEMENT?

2    **A.**  YES, I AM.

3    **Q.**  AND YOU'RE AWARE THAT THERE HAS BEEN A COUNTERCLAIM

4    AGAINST TECHSHOP?

5    **A.**  I FOUND OUT AS PART OF THIS HEARING, YES.

6    **Q.**  IS IT YOUR UNDERSTANDING THAT USE OF AN EMAIL LIST IS PART

7    OF THE CASE OR NOT PART OF THE CASE?

8    **A.**  WE'VE TALKED ABOUT IT TODAY, SO YES, SIR.

9    **Q.**  BECAUSE YOU TALKED ABOUT --

10          **MR. PISTORINO:**  OBJECTION --

11          **THE COURT:**  WHAT'S THE OBJECTION?

12          **MR. PISTORINO:**  BEYOND THE SCOPE.

13          **THE COURT:**  IT'S ALSO JUST -- SUSTAINED.

14   **BY MR. NATHAN:**

15   **Q.**  NOW, DID THERE COME A TIME AFTER THE CASE WAS FILED ON

16   FEBRUARY 16TH, THAT THE TRUSTEE WHO IS SITTING HERE OR SOMEONE

17   ACTING ON HER BEHALF CONTACTED YOU ABOUT TESTIFYING IN THIS

18   CASE?

19   **A.**  I ACTUALLY WILLINGLY CALLED THE TRUSTEES TO DISCUSS A FEW

20   DIFFERENT THINGS.  ONE BEING MY STUFF THAT I WANTED TO PICK UP

21   FROM THE 926 HOWARD.

22       AND I JUST NATURALLY STARTED TALKING ABOUT WHAT I

23   BASICALLY SAID HERE TODAY.  AND I THINK, I DON'T REMEMBER

24   EXACTLY WHAT DORIS SAID -- WHOEVER I SPOKE TO SAID -- I

25   BELIEVE IT WAS DORIS.  OH, THAT'S INTERESTING.  WOULD YOU BE

1    WILLING TO, YOU KNOW, SHARE THAT WITH ME AT A LATER TIME

2    POSSIBLY, AND THAT WAS IT.

3    **Q.**  AND BY "DORIS", YOU MEAN MS. KAELIN WHO IS THE TRUSTEE?

4    **A.**  YES, DORIS.  I NEVER MET HER IN PERSON UNTIL YESTERDAY OR

5    TODAY I THINK.

6    **Q.**  DO YOU -- AND THAT WAS THE EXTENT OF THE CONVERSATION?

7    **A.**  I BELIEVE SO.  I DO NOT RECALL THE FULL CONVERSATION.

8    **Q.**  DO YOU REMEMBER TEXTING MR. RASURE ON JUNE 14TH, 2018, I

9    ALSO REFUSED TO TESTIFY AGAINST YOU FOR THE TRUSTEE.

10   **A.**  BASICALLY WHAT I MEANT WAS THAT I BASICALLY TOLD DORIS

11   THAT I WASN'T INTERESTED IN PROBABLY STATING ANYTHING ON THE

12   RECORD.  I MEAN, IN MY -- LIKE THIS IS NOT SOMETHING THAT I

13   EVER ANTICIPATED TO DO.

14       I GREW UP IN A BLUE COLLAR FAMILY WHERE IT'S LIKE SPEAK

15   WHEN SPOKEN TO, KEEP YOUR MOUTH SHUT, AND MY THOUGHTS ON

16   COMING HERE TODAY ARE THAT I WOULD HOPE THAT IN A CASE WHERE I

17   WOULD NEED SOMEONE TO COME ON MY BEHALF TO TELL THE TRUTH, YOU

18   KNOW, I BELIEVE IN MEASURES AND BALANCES, JUDGE AND JURY, AND

19   THAT'S WHY I'M TALKING TO YOU TODAY.

20   **Q.**  SO -- AND YOU SAID IN THIS TEXT TO MR. RASURE, I ALSO

21   REFUSED TO TESTIFY FOR THE TRUSTEE.  THEN YOU WENT ON, YOU

22   WENT ON TO SAY, I MAY CHANGE MY MIND IF YOU WANT TO GO THERE.

23       DO YOU REMEMBER TEXTING HIM THAT?

24   **A.**  YES, I DO.  VERY CLEARLY, YES.

25   **Q.**  YOU HAVEN'T BEEN SUBPOENAED TO COME HERE?

1    **A.**  NO, SIR.  I CAME HERE TO TELL THE TRUTH BECAUSE, LIKE I

2    SAID, I HOPE SOMEONE WOULD DO THE SAME FOR ME.

3    **Q.**  SO YOU ARE HERE VOLUNTARILY?

4    **A.**  THAT'S CORRECT.

5    **Q.**  EVEN THOUGH BEFORE YOU REFUSED TO TESTIFY?

6    **A.**  I TOLD DAN I REFUSED TO TESTIFY.  I WAS TRYING TO MAKE HIM

7    LEAVE ME ALONE.

8    **Q.**  NOW ON DIRECT EXAMINATION... CAN I TAKE YOU TO EXHIBIT 3,

9    WHICH WILL NOT BE IN YOUR BOOK, BUT THEY WILL PUT IT UP ON THE

10   SCREEN.

11   **A.**  YES, SIR.

12   **Q.**  DO YOU HAVE EXHIBIT 3?

13   **A.**  YES, SIR.

14                      (DISPLAYED ON SCREEN.)

15   **Q.**  DO YOU SEE THIS EXCHANGE ON NOVEMBER 30TH, 2017 BETWEEN

16   YOU ON THE ONE HAND AND MR. RASURE ON THE OTHER HAND?

17   **A.**  YES, SIR.

18   **Q.**  AND YOU ASKED HIM, WHAT DO YOU NEED?

19       THIS HAS TO DO WITH THE CRM?

20   **A.**  YES.

21   **Q.**  WHICH HAD THE EMAIL INFORMATION IN IT -- OR THE CUSTOMER

22   INFORMATION IN IT?

23   **A.**  YES.

24   **Q.**  AND WHAT WAS HIS RESPONSE?

25   **A.**  AN EMAIL SENT OUT.

1  **Q.**  AN EMAIL.

2     DID HE TELL YOU WHAT THE EMAIL HE WANTED TO SEND OUT WAS?

3  **A.**  YES.  I BELIEVE AT THAT TIME IT WAS TO TALK ABOUT THE MOU,

4  IF I'M NOT MISTAKEN.

5  **Q.**  SO HE WANTED --

6  **A.**  I DON'T FULLY -- ACTUALLY I DO NOT RECALL.  I SHOULD SAY I

7  DON'T WANT TO STATE THAT ON THE RECORD.  I DON'T EXACTLY IN

8  THIS CONTEXT -- IT HAS BEEN A LONG TIME.  IF YOU CAN PROVIDE

9  ME MORE.

10  **Q.**  I WANT TO KNOW WHETHER YOU RECALL HERE TODAY WHEN YOU

11  ASKED, WHAT DO YOU NEED, AND HE SAID AN EMAIL SENT OUT, DO YOU

12  RECALL IF HE TOLD YOU WHAT THE EMAIL WAS FOR.

13  **A.**  NOT 100 PERCENT.  I'M -- I THINK IT COULD BE FOR

14  ANNOUNCING THE RE-OPENING.

15  **Q.**  NOW YOU REFER TO THE -- IF I HAVE IT RIGHT, 926 HOWARD

16  STREET LOCATION?

17  **A.**  THAT'S CORRECT, SIR.

18  **Q.**  YOU REFER TO IT AS TECHSHOP 2.0?

19  **A.**  YES.

20  **Q.**  DID YOU EVER SEE A SIGN ON THE FRONT THAT SAID TECHSHOP

21  2.0?

22  **A.**  I HAVE NEVER -- I DIDN'T -- I DON'T KNOW.  I DO NOT

23  RECALL.

24  **Q.**  ARE YOU AWARE ONE WAY OR THE OTHER THAT AFTER MR. RASURE

25  GOT SUED THAT HE PHYSICALLY TOOK DOWN A SIGN 2.0?

1          **MR. PISTORINO:**  OBJECTION.

2          **MR. NATHAN:**  YOU HAVE TO --

3          **THE COURT:**  SUSTAINED.  THE OBJECTION IS SUSTAINED.

4     BY MR. NATHAN:

5     Q.  NOW, I DON'T KNOW HOW MANY EMAILS -- I AM SORRY, TEXTS

6     THAT YOU SHARED BETWEEN YOU AND MR. RASURE.  MANY, MANY, MANY?

7     A.  LOTS.

8     Q.  DURING THIS TWO-MONTH PERIOD?

9     A.  YEAH.

10    Q.  YOU TESTIFIED ON DIRECT EXAMINATION THAT THE THOUGHT OF

11    DEALING WITH TRADEMARK WOULD NOT BE HELPFUL TO YOUR CAREER.

12         DO YOU REMEMBER THAT?

13    A.  YES.

14    Q.  DID YOU EVER TELL HIM THAT?

15    A.  YES.

16    Q.  IN WRITING?

17    A.  I TOLD HIS WIFE IN WRITING THAT.

18    Q.  DID YOU EVER TELL HIM IN WRITING?

19    A.  I TOLD HIM OVER A PHONE CALL IN PERSON -- OVER A PHONE

20    CALL.

21    Q.  SO ORALLY?

22    A.  YES.

23    Q.  WE HAVE NO RECORD OF THAT HERE?

24    A.  I'M NOT AWARE OF IF YOU HAVE IT ON RECORD OR NOT.

25    Q.  NOW THIS STATEMENT THAT YOU ATTRIBUTE TO MR. RASURE WHEN

1      YOU ASKED HIM ABOUT HOW DO YOU EXPECT TO GET AWAY WITH IT, DO

2      YOU REMEMBER TESTIFYING ABOUT THAT EARLIER TODAY?

3      **A.**  YES.

4      **Q.**  YOU ATTRIBUTE IT TO HIM SAYING TECHSHOP DOESN'T HAVE THE

5      MONEY?

6      **A.**  YES.

7      **Q.**  DID YOU EVER MEMORIALIZE THAT IN SOME SORT OF TEXT?

8      **A.**  I DO HAVE A MESSAGE BETWEEN MEGAN DREW WIESLANDER --

9      MESSAGE AND MYSELF.

10     **Q.**  THAT IS NOT ADMISSIBLE.  I'M ASKING YOU --

11            **THE COURT:**  LET'S STOP.  HE'S ANSWERING THE QUESTION

12     YOU ASKED, WHICH IS, DID YOU EVER MEMORIALIZE IT IN SOME SORT

13     OF TEXT?  SO HE SHOULD BE ABLE TO ANSWER THAT QUESTION.

14            **MR. NATHAN:**  ALL RIGHT.

15            **THE WITNESS:**  AND I HAVE A COPY OF THAT IF YOU'D LIKE

16     IT.

17     **BY MR. NATHAN:**

18     **Q.**  I DON'T HAVE IT, SIR.

19            MY QUESTION IS -- LET ME REPHRASE.

20            DID YOU EVER TELL THAT TO MR. RASURE IN A TEXT?

21     **A.**  I ASSUMED WHEN I TOLD HIS -- THE OWNER OF THE BUSINESS,

22     SHE RELAYED THE MESSAGE.

23     **Q.**  AND IT'S YOUR UNDERSTANDING THAT HIS WIFE WAS THE OWNER OF

24     THE BUSINESS?

25     **A.**  AS FAR AS I'M AWARE.

SPURLOCK - CROSS / NATHAN

1   **Q.**  NOW, THERE WAS A DESCRIPTION BY YOU OF TRYING TO GET YOUR

2   TOOLS AND EQUIPMENT OUT OF 926 HOWARD STREET?

3   **A.**  YES, SIR.

4   **Q.**  WHEN YOU WENT THERE --

5   **A.**  YES.

6   **Q.**  -- DID YOU SEE A SIGN THAT SAID TECHSHOP 2.0?

7   **A.**  I DO NOT RECALL.

8           **MR. NATHAN:**  I HAVE NOTHING FURTHER, YOUR HONOR.

9           **THE COURT:**  ANY REDIRECT?

10          **MR. PISTORINO:**  NO, YOUR HONOR.

11          **THE COURT:**  ALL RIGHT.  MR. SPURLOCK, THANK YOU.  YOU

12  ARE EXCUSED.

13          **THE WITNESS:**  THANK YOU, YOUR HONOR.

14          **THE COURT:**  AND THE PLAINTIFF MAY CALL ITS NEXT

15  WITNESS.

16          **MR. PISTORINO:**  YOUR HONOR, WE HAVE NO FURTHER

17  WITNESSES AT THIS TIME IN OUR CASE-IN-CHIEF.

18          **THE COURT:**  SO THE PLAINTIFF RESTS?

19          **MR. PISTORINO:**  YES.

20          **THE COURT:**  SO, LADIES AND GENTLEMEN, THAT IS A

21  MILESTONE IN THE CASE.  WHAT THAT MEANS IS THAT THE PLAINTIFF

22  IS FINISHED PRESENTING ITS CASE-IN-CHIEF.  IT'S OPENING CASE.

23      THE DEFENDANT NOW HAS THE OPPORTUNITY TO PRESENT ITS CASE

24  AND WE WILL BEGIN WITH THAT NOW.

25      SO, MS. ROBERTS, THE DEFENSE MAY CALL ITS FIRST WITNESS.

1        **MS. ROBERTS:**  YOUR HONOR, WE WOULD LIKE TO MAKE A

2    MOTION FOR JUDGMENT AS A MATTER OF LAW.

3        **THE COURT:**  ALL RIGHT.  YOU CAN --

4        **MS. ROBERTS:**  WOULD YOU LIKE ME TO SAY IT ORALLY --

5        **THE COURT:**  WHY DON'T YOU MAKE IT AND I WILL ALLOW

6    YOU TO PUT THE BASES ON THE RECORD AT A BREAK.

7        **MS. ROBERTS:**  OKAY.

8        **THE COURT:**  BUT YOU'VE PRESERVED YOUR MOTION.

9        **MS. ROBERTS:**  YOUR HONOR, WE CALL JAMES NEWTON TO THE

10   STAND.

11       **THE COURT:**  I WILL REMIND YOU, MR. NEWTON, YOU REMAIN

12   UNDER OATH.

13       **THE WITNESS:**  YES.

14                         **DIRECT EXAMINATION**

15   BY MS. ROBERTS:

16   **Q.**  WELCOME BACK, MR. NEWTON.

17   **A.**  THANKS.

18   **Q.**  SO, WHEN YOU WERE HERE BEFORE, I THINK WE ESTABLISHED THAT

19   TECHSHOP FILED FOR BANKRUPTCY ON FEBRUARY 26, 2017, RIGHT?

20   **A.**  NO.

21   **Q.**  WHAT'S THE DATE THAT TECHSHOP --

22   **A.**  IT WAS 2018, I BELIEVE.

23   **Q.**  SORRY.  2018.  THANK YOU.

24      AND YOU WERE DESIGNATED THE RESPONSIBLE INDIVIDUAL FOR

25   TECHSHOP IN THE PENDING BANKRUPTCY PROCEEDINGS?

```
1    A.  YES.

2    Q.  THERE'S AN ORDER FROM THE BANKRUPTCY COURT THAT DESIGNATES

3    YOU RESPONSIBLE FOR THE DUTIES AND OBLIGATIONS OF THE

4    CHAPTER 7 DEBTOR, RIGHT?

5    A.  YES.

6    Q.  AND THE CHAPTER 7 DEBTOR IS TECHSHOP; IS THAT CORRECT?

7    A.  YES.

8    Q.  AND THE FILINGS IN THE BANKRUPTCY ARE PUBLICLY AVAILABLE;

9    ISN'T THAT RIGHT?

10   A.  YES, I BELIEVE SO.

11   Q.  THE INITIAL -- THE INITIAL BANKRUPTCY FILING ON

12   FEBRUARY 26, 2018 INCLUDED A LIST OF TECHSHOP'S CREDITORS,

13   DIDN'T IT?

14   A.  YES.

15   Q.  AND AMONG THE CREDITORS LISTED WERE FORMER TECHSHOP

16   CUSTOMERS?

17   A.  YES.

18   Q.  AND THIS PUBLIC BANKRUPTCY FILING LISTED THE NAMES AND

19   ADDRESSES OF TECHSHOP CUSTOMERS AS PART OF THE FILING?

20   A.  YES.

21   Q.  SO, AS OF FEBRUARY 26, 2018, THE NAMES AND ADDRESSES OF

22   TECHSHOP CUSTOMERS WERE PUBLICLY FILED ON THE BANKRUPTCY

23   DOCKET IN THE TECHSHOP BANKRUPTCY PROCEEDINGS?

24   A.  YES.

25          MS. ROBERTS:  THANK YOU, YOUR HONOR.
```

```
 1              THE COURT:  ANY CROSS-EXAMINATION?

 2              MR. PISTORINO:  SURE, VERY QUICKLY.

 3                         CROSS-EXAMINATION

 4     BY MR. PISTORINO:

 5     Q.  IN THE PUBLIC BANKRUPTCY FILING WERE THE EMAIL CONTACT

 6     ADDRESSES FOR THOSE CUSTOMERS LISTED?

 7     A.  NO, THEY WEREN'T.

 8              MR. PISTORINO:  THANK YOU.

 9              THE COURT:  ANYTHING FURTHER?

10              MS. ROBERTS:  NO, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  THANK YOU, MR. NEWTON.  YOU

12     ARE EXCUSED.

13              THE WITNESS:  THANK YOU.

14              THE COURT:  AND THE DEFENSE MAY CALL ITS NEXT

15     WITNESS.

16              MS. ROBERTS:  DEFENDANTS CALL DAN RASURE.

17              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

18         (DAN RASURE, CALLED AS A WITNESS FOR THE DEFENDANTS,

19     HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

20              THE WITNESS:  I DO.

21              THE CLERK:  YOU MAY BE SEATED.  ONCE SEATED, I'M

22     GOING TO ASK THAT YOU PLEASE -- THAT YOU PLEASE HAVE A SEAT

23     AND PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE

24     RECORD, PLEASE.

25              THE WITNESS:  DAN RASURE, D-A-N R-A-S-U-R-E.
```

1      MAY I MOVE THE BINDERS?

2             **THE COURT:**  YOUR COUNSEL CAN GRAB THEM.

3                      **DIRECT EXAMINATION**

4    **BY MS. ROBERTS:**

5    **Q.**  GOOD AFTERNOON.

6    **A.**  GOOD AFTERNOON.

7    **Q.**  WOULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

8    **A.**  I'M DAN RASURE FROM GOODLAND, KANSAS.

9    **Q.**  I BELIEVE WE HAVE HEARD YOU ARE AFFILIATED WITH THE OTHER

10   DEFENDANTS IN THIS CASE; IS THAT RIGHT?

11   **A.**  YES.  I WAS FOUNDER OF THESHOP.BUILD AND THESHOP.BUILD SAN

12   FRANCISCO.

13   **Q.**  AND YOU SAID YOU WERE FROM GOODLAND, KANSAS.  WHERE DO YOU

14   CURRENTLY RESIDE?

15   **A.**  I CURRENTLY RESIDE IN GOODLAND, KANSAS, BUT I SPEND THE

16   MAJORITY OF MY TIME BETWEEN SAN FRANCISCO AND SAN JOSE,

17   CALIFORNIA.

18   **Q.**  DO YOU HAVE A FAMILY?

19   **A.**  I DO.  I HAVE A WIFE AND THREE KIDS.  A SIX-YEAR-OLD BOY,

20   A TWO-YEAR-OLD GIRL, AND ALMOST A ONE-YEAR-OLD SON.

21   **Q.**  NOW, CAN YOU TELL US WHAT IS THESHOP.BUILD?

22   **A.**  THESHOP.BUILD IS A MAKERSPACE.  WE TRAIN, WE PROVIDE

23   EQUIPMENT, AND BASICALLY IF YOU HAVE AN IDEA, YOU CAN BUILD IT

24   AT THE SHOP.

25   **Q.**  TELL US WHAT KINDS OF EQUIPMENT THESHOP.BUILD HAS?

1    **A.**  WE HAVE WATER JET, WOOD SHOP, METAL FABRICATION EQUIPMENT,

2    LASERS, 3D PRINTERS, ELECTRONICS, AND TEXTILES EQUIPMENT.

3    **Q.**  DID YOU SAY YOU OFFER CLASSES AS WELL?

4    **A.**  YES, WE DO.

5    **Q.**  WHAT TYPES OF CLASSES DOES THESHOP.BUILD OFFER?

6    **A.**  WE OFFER PROJECT-BASED CLASSES AS WELL AS EQUIPMENT-BASED

7    CLASSES ON TEACHING INDIVIDUALS HOW TO USE A PARTICULAR PIECE

8    OF EQUIPMENT.

9    **Q.**  WHEN YOU SAY A "PROJECT-BASED CLASS", CAN YOU GIVE US AN

10   EXAMPLE?

11   **A.**  AN EXAMPLE WOULD BE MAKING A CUTTING BOARD WHERE SOME OF

12   THE COMPONENTS HAVE ALREADY BEEN PRE-KITTED OR READY TO PUT

13   TOGETHER, AND THE INDIVIDUALS BUILT THAT CUTTING BOARD.

14   **Q.**  NOW, CAN YOU DESCRIBE FOR US THE CUSTOMERS OF THE

15   THESHOP.BUILD?

16   **A.**  OUR CUSTOMERS RANGE FROM YOUNG CHILDREN AS YOUNG AS FIVE

17   UP TO ARTISTS, ENTREPRENEURS, CORPORATE CUSTOMERS, THE

18   SCHOOLS.

19   **Q.**  YOU MENTIONED CORPORATE CUSTOMERS.  CAN YOU GIVE US SOME

20   EXAMPLES?

21   **A.**  WE HAVE CORPORATE CUSTOMERS SUCH AS GOOGLE, TESLA, ZOOM,

22   WHICH IS THE PIZZA TRUCK DELIVERY COMPANY.  CREATOR, WHICH IS

23   MAKING THE ROBOTIC HAMBURGER MACHINE.  SO QUITE VARIED IN

24   CORPORATE CUSTOMERS.

25   **Q.**  WHAT TYPES OF SERVICES CAN YOU PROVIDE TO THESE CORPORATE

```
 1    CUSTOMERS?
 2    A.   THE CORPORATE CUSTOMERS, SOME OF THEM COME AND USE IT AS A
 3    TRAINING OR A FUN ACTIVITY FOR THEIR EMPLOYEES.
 4         OTHERS USE IT TO TEACH THEIR EMPLOYEES HOW TO USE A
 5    MACHINE.  AND WE DO THAT TRAINING BOTH ON-SITE AT OUR FACILITY
 6    AS WELL AS AT THE CUSTOMER'S FACILITY.  OR THEY USE THE
 7    FACILITY TO MAKE THEIR OWN PROTOTYPES AND PRODUCTS.
 8    Q.   AND YOU MENTIONED YOU'VE GOT SOME CUSTOMERS WHO ARE
 9    HOBBYISTS.  CAN YOU THINK OF ANY EXAMPLES OF WHAT HOBBYISTS
10    HAVE BUILT IN THE THESHOP.BUILD?
11    A.   WE HAVE ONE PARTICULAR DOCTOR WHO... HE'S A CARDIAC
12    SURGEON AND HE COMES TO THE THESHOP.BUILD TO TURN WOOD BOWLS
13    ON THE LATHE AS A STRESS RELIEVER.
14    Q.   NOW YOU MENTIONED THESHOP.BUILD AND THESHOP.BUILD SAN
15    FRANCISCO.
16         WHAT IS THESHOP.BUILD SAN FRANCISCO?
17    A.   THESHOP.BUILD SAN FRANCISCO IS OUR SAN FRANCISCO LOCATION
18    THAT WAS LOCATED AT 926 HOWARD.
19    Q.   NOW YOU SAY "WAS LOCATED".  WHY DO YOU USE THE PAST TENSE?
20    A.   WE CLOSED THE FACILITY ON MARCH 25TH DUE TO REDEVELOPMENT
21    OF THE PROPERTY.
22    Q.   CAN YOU DESCRIBE FOR THE JURY A BIT MORE WHAT YOU MEAN BY
23    REDEVELOPMENT OF THE PROPERTY?
24    A.   THE BUILDING IS BEING TORN DOWN TO BUILD A HIGHRISE
25    BUILDING.
```

RASURE - DIRECT / ROBERTS

1    **Q.**  AND SO HAVE -- ARE YOU GOING -- HAVE YOU OPENED A NEW

2    LOCATION IN SAN FRANCISCO?

3    **A.**  WE HAVE NOT AT THIS TIME.

4    **Q.**  ARE THERE ANY OTHER LOCATIONS AT THESHOP.BUILD?

5    **A.**  WE ALSO HAVE A FACILITY AT SAN JOSE.

6    **Q.**  OTHER THAN THE FORMER SAN FRANCISCO LOCATION AND THE SAN

7    JOSE LOCATION, HAVE YOU EVER OPERATED ANY OTHER LOCATIONS OF

8    THESHOP.BUILD?

9    **A.**  NO, WE HAVE NOT.

10   **Q.**  WHEN DID THE SAN FRANCISCO LOCATION OPEN?

11   **A.**  FEBRUARY 19TH, 2018.

12   **Q.**  AND WHEN DID THE SAN JOSE LOCATION OPEN?

13   **A.**  APPROXIMATELY AUGUST 22ND, 2019 (SIC).

14   **Q.**  2019 OR '18?

15   **A.**  SORRY, '18.

16   **Q.**  LET'S TALK A LITTLE BIT ABOUT WHAT YOU DID BEFORE FOUNDING

17   THESHOP.BUILD AND THESHOP.BUILD SAN FRANCISCO.

18       CAN YOU TELL US A LITTLE BIT ABOUT YOUR BACKGROUND?

19   **A.**  I WAS WITH PIRANHA FABRICATION LEADING PRODUCT

20   DEVELOPMENT, CUTTING SALES AS WELL AS MARKETING, AND UP UNTIL

21   THE TIME THE DUE DILIGENCE STARTED, I WAS SERVING AS INTERIM

22   GM.

23   **Q.**  AND FOR THOSE OF US NOT FAMILIAR WITH PIRANHA FABRICATION,

24   WHAT IS THAT?

25   **A.**  PIRANHA FABRICATION IS ONE OF THE LEADING MANUFACTURERS OF

1    METAL FABRICATION EQUIPMENT, BOTH IN THE U.S. AND THROUGHOUT

2    THE WORLD.  BUILDING MACHINES THAT CUT, PUNCH, AND SHEAR, ROLL

3    MATERIAL, METAL MATERIAL.

4    **Q.**  AND PRIOR TO FOUNDING THESHOP.BUILD AND THESHOP.BUILD SAN

5    FRANCISCO, DID YOU HAVE ANY EXPERIENCE WITH ACQUISITIONS OF

6    OTHER COMPANIES?

7    **A.**  YES, I DID.

8        MY FIRST ACQUISITION WAS WHEN I WAS 22 COMPLETING AN

9    ACQUISITION FOR A LUMBERYARD THAT WAS ADDED TO -- MY FAMILY

10   HAD BEEN IN THE LUMBERYARD BUSINESS SINCE THE EARLY 1900'S.

11   SO ADDING A LUMBERYARD.

12       AND THEN FROM THERE, AN ACQUISITION START-UP RELATED TO

13   WIND TURBINES WHICH LED TO A START-UP IN THREE ACQUISITIONS

14   RELATED TO GRAIN STORAGE.

15       THEN A SHINGLE REMOVAL TOOL ACQUISITION WHERE I TOOK OVER

16   THE COMPANY DURING THE DUE DILIGENCE PERIOD, AND THEN THAT LED

17   TO AN ACQUISITION OF A PIZZA OVEN DISTRIBUTION COMPANY WHICH

18   THEN ADDED SOME MANUFACTURING ASPECT TO THAT.

19       AND IN BETWEEN ALL THAT COMPLETED DUE DILIGENCE ON OVER A

20   HUNDRED OTHER COMPANIES.

21   **Q.**  SO WHEN YOU SAY "COMPLETED DUE DILIGENCE", DOES THAT MEAN

22   YOU CONDUCTED DUE DILIGENCE ON COMPANIES THAT YOU ULTIMATELY

23   DID NOT ACQUIRE?

24   **A.**  THAT IS CORRECT.

25   **Q.**  AND THESE PRIOR ACQUISITIONS THAT YOU'VE DESCRIBED, DID

```
1    YOU DO THEM ALL BY YOURSELF?

2    A.   THE ACQUISITIONS, SOME WERE WITH FAMILY, SOME WERE WITH

3    PARTNERS, AND SOME WERE BY MYSELF.

4    Q.   PRIOR TO OPENING THESHOP.BUILD, CAN YOU DESCRIBE FOR THE

5    JURY WHAT EXPERIENCE YOU HAD BUILDING OR MAKING?

6    A.   MY -- SOME OF MY EARLIEST MEMORIES IN LIFE ARE FROM MY

7    FAMILY SHOPS BUILDING.  EARLY PROJECTS WERE IN WOODWORKING,

8    WHICH THEN LED TO EQUIPMENT, FIXING O RINGS ON OUR AIR NAIL

9    GUNS IN OUR RENTAL EQUIPMENT BUSINESS.

10       FROM THERE IT LED TO BOTH SMALLER DEVICES AND LARGE

11   DEVICES AS BIG AS A HUNDRED FOOT TALL, AND MY LATEST PROJECT

12   BEFORE THESHOP.BUILD WAS WORKING ON A 12,000 WATT LASER AS

13   PART OF PIRANHA.

14       IN MY SPARE TIME, I LIKE TO WORK IN THE WOOD SHOP BUILDING

15   CUTTING BOARDS AND OTHER PROJECTS.

16   Q.   YOU MENTIONED CUTTING BOARDS.  IS THAT A FAVORITE PROJECT

17   OF YOURS?

18   A.   I USE IT AS A STRESS RELIEVER.  AND I HATE THROWING AWAY

19   GOOD WOOD, SO I TEND TO SAVE ALL MY HARDWOOD AND THEN USE IT

20   FOR CUTTING BOARDS AT A LATER TIME.

21   Q.   NOW HOW DID YOU FIRST LEARN ABOUT TECHSHOP?

22   A.   I FIRST LEARNED ABOUT TECHSHOP IN AN ARTICLE SOMETIME

23   AFTER THEIR FOUNDING.

24   Q.   WERE YOU EVER A MEMBER OF TECHSHOP?

25   A.   NO, I WAS NOT.
```

RASURE - DIRECT / ROBERTS

1    **Q.**   HOW COME?

2    **A.**   THERE WAS NEVER A LOCATION CLOSE TO WHERE I LIVED, WORKED,

3    OR TRAVELED FREQUENTLY.

4    **Q.**   AND HOW DID YOU LEARN THAT TECHSHOP CLOSED ITS DOORS?

5    **A.**   I HAD OPENED UP MY IPAD AND SAW AN ARTICLE ON YAHOO NEWS

6    THE EVENING OF NOVEMBER 16TH.

7    **Q.**   WHAT DID YOU DO WHEN YOU LEARNED THAT TECHSHOP CLOSED ITS

8    DOORS?

9    **A.**   I REACHED OUT TO A PREVIOUS CONTACT THAT I HAD WITH

10   TECHSHOP OF SESAME MISH AND SENT HER A TEXT MESSAGE AS WELL AS

11   EMAIL, AND THEN AT THAT POINT I WAITED.

12   **Q.**   I SHOULD JUST ASK YOU, HOW SOON AFTER FINDING OUT THE

13   TECHSHOP CLOSED ITS DOORS DID YOU REACH OUT?

14   **A.**   AS SOON AS I READ THE ARTICLE, I SEARCHED MY EMAIL FOR THE

15   CONTACT.  WITHIN A DAY, THE EMAIL THAT I HAD SENT BOUNCED

16   BACK.  SO AT THAT POINT I SENT THE EMAIL TO THE GOOGLE TRUSTEE

17   ACCOUNT THAT THEY HAD SET UP AND WAITED.

18       THEN EARLY THAT EVENING CENTRAL TIME, I RECEIVED A TEXT

19   BACK FROM MS. MISH THAT SHE WAS NO LONGER AFFILIATED WITH THE

20   COMPANY.  I ASKED IF SHE KNEW ANYBODY WHO WAS.  AT THAT POINT

21   SOMEHOW I WAS PUT IN CONTACT WITH ROBERT THOMAS.

22   **Q.**   WHO IS ROBERT THOMAS?

23   **A.**   HE WAS A CO-FOUNDER OF TECHSHOP.

24   **Q.**   AFTER BEING PUT IN CONTACT WITH ROBERT THOMAS, WHAT

25   HAPPENED NEXT?

1   **A.**  ROBERT THOMAS AND I HAD A CONVERSATION.  HE TOLD ME I

2   WOULD BE RECEIVING THE CONTACT INFORMATION FOR JOSH EWING, WHO

3   WAS THE PRIMARY CONTACT OF AUTODESK FOR TECHSHOP, AND THAT

4   ALSO DAN WOODS WOULD BE REACHING OUT TO ME.

5   **Q.**  AND THE JURY HAS MET MR. WOODS BEFORE.

6       YOU MENTIONED JOSH EWING AND BEING AFFILIATED WITH

7   AUTODESK.  HOW DOES AUTODESK FIT INTO THESE NEGOTIATIONS?

8   **A.**  AUTODESK WAS THE LARGEST SECURED CREDITOR OF TECHSHOP, AND

9   ANY DEAL THAT WOULD HAPPEN WOULD NEED TO INCLUDE A

10  RENEGOTIATION OF THAT DEBT.

11  **Q.**  MEANING TECHSHOP OWED AUTODESK MONEY, RIGHT?

12  **A.**  YES.  APPROXIMATELY $18 MILLION.

13  **Q.**  SO IS IT CORRECT YOU WOULD NEED TO NEGOTIATE WITH AUTODESK

14  AS PART OF THESE NEGOTIATIONS AS WELL?

15  **A.**  YES, IN ORDER TO CREATE A SUSTAINABLE COMPANY.

16  **Q.**  OKAY.

17      SO YOU'VE GOT -- YOU'VE BEEN CONNECTED TO MR. EWING AND

18  MR. WOODS.  WHAT DATE ARE WE AT NOW IN THE TIMELINE?

19  **A.**  WE ARE AT FRIDAY, NOVEMBER 17TH.

20  **Q.**  WHAT HAPPENED NEXT?

21  **A.**  NEXT I RECEIVED A PHONE CALL FROM DAN WOODS.  WE DISCUSSED

22  THE POSSIBILITY OF A TRANSACTION; THAT DUE DILIGENCE WOULD

23  NEED TO HAPPEN.

24      AND I ASKED IF WE COULD HAVE A MEETING WITH THEIR COUNSEL

25  AS WELL AS THEIR BOARD.  AT THE TIME HE EXPRESSED THAT HE

1    WASN'T SURE ABOUT THE COUNSEL BECAUSE HE WAS UNABLE TO HAVE A

2    MEETING THAT HE NEEDED TO HAVE WITH THEM, BUT HE WOULD DO HIS

3    BEST.  AND A MEETING WAS SET FOR SATURDAY MORNING.

4    **Q.**  THIS IS THE SATURDAY AFTER TECHSHOP CLOSED ITS DOORS?

5    **A.**  CORRECT.

6    **Q.**  ALL RIGHT.  SO WHAT CAME OF THAT MEETING?

7    **A.**  THAT MEETING THE LAWYERS WERE ABLE TO ATTEND AS WELL AS

8    THE BOARD OF TECHSHOP.  WE HAD SOME BRIEF INTRODUCTIONS.

9       AND THEN AFTER THAT MEETING, IT WAS DECIDED THAT DUE

10   DILIGENCE WOULD START.  AT THAT POINT I HAD NOT BOOKED A

11   FLIGHT OR ANYTHING ELSE.  AND THEY WOULD START SENDING ME ALL

12   THE DOCUMENTS THEY HAD READILY AVAILABLE AND MAKE

13   INTRODUCTIONS TO THE LANDLORDS GIVEN THE STATE OF THEIR

14   LEASES.

15   **Q.**  ALL RIGHT.  SO AFTER THIS DECISION HAS BEEN MADE THAT YOU

16   ARE GOING TO GO FORWARD WITH THE DUE DILIGENCE, WHAT HAPPENED

17   NEXT?

18   **A.**  I STARTED RECEIVING EMAILS THAT DAN WOODS HAD SENT

19   INTRODUCING ME TO THE LANDLORDS.  AS I RECEIVED THE EMAILS, I

20   PROCEEDED TO CALL EACH LANDLORD, GET THEIR FEELINGS ABOUT A

21   NEW LEASE, AND ALSO TRYING TO FIND OUT THE COMPLEXITIES OF HOW

22   A DEAL WOULD BE ACCOMPLISHED WITH EACH LANDLORD.

23   **Q.**  BEFORE WE TALK ABOUT THE LANDLORDS, CAN YOU TELL US WHY

24   WERE YOU INTERESTED IN ACQUIRING TECHSHOP?

25   **A.**  ONE OF MY GOALS THAT I HAD WITH TECHSHOP -- SORRY, WITH

1    PIRANHA THAT HAD BEEN GIVEN TO ME YEARS AGO WAS BLOWING UP

2    THE... BLOWING UP THE BRAND OF PIRANHA; THAT PIRANHA HAS A

3    VERY UNIQUE LOGO, ONE THAT IS VERY RECOGNIZED IN THE METAL

4    FABRICATION WORLD AND ALSO VERY DURABLE EQUIPMENT.  BUT EVEN

5    WITH THAT, THE IDEA OF MAKING THAT BRAND RECOGNITION EVEN MORE

6    WAS ALWAYS THERE.

7        AND PART OF -- ALSO PART OF MY RESPONSIBILITIES WAS

8    OPENING UP MARKETS AND MAKING SURE THAT OUR CUSTOMERS HAD

9    ACCESS TO BUY OUR EQUIPMENT.  OUR CHEAPEST PIECE OF EQUIPMENT

10   STARTED AROUND $10,000, BUT OUR MOST COMMON MODEL STARTED AT

11   18,000.  AND WITH SHIPPING AND ACCESSORIES, IT WAS IN THE 19

12   TO $20,000 RANGE.

13       AS I LOOKED AT CUSTOMERS FROM THE '70S, '80'S, AND '90S,

14   TYPICALLY THE PIRANHA IRON WORKER WAS THEIR FIRST -- THE METAL

15   FABRICATOR, IT WAS THEIR FIRST PIECE OF EQUIPMENT THEY BOUGHT

16   OUTSIDE THEIR WELDERS AND VERY BASIC METAL FABRICATION

17   EQUIPMENT.  AND AT THAT TIME, THEY HAD ACCESS TO CAPITAL TO

18   BUY THAT PIECE OF EQUIPMENT.

19       SINCE THE FINANCIAL COLLAPSE, THOSE SAME FABRICATORS

20   DIDN'T HAVE ACCESS TO THE CAPITAL EVEN IF THEY HAD A CONTRACT

21   THAT WOULD HAVE PAID FOR UTILIZING THE PIRANHA IRON WORKER.

22   SO LOOKING AT MY EQUIPMENT RENTAL BACKGROUND, WE'LL JUST RENT

23   THE EQUIPMENT, RENT THE PIRANHA IRON WORKERS TO THE CUSTOMERS.

24       AS I WORKED WITH THE BANKS, THEY WERE GOING TO LOOK

25   NEGATIVELY UPON THAT DUE TO THE UNDERLYING CREDIT RISK OF

1    THOSE INDIVIDUALS AND THE FACT THAT IT WAS NOT A SHORT-TERM

2    LEASE.  THE MINIMUM LEASE TERM WAS AROUND SIX MONTHS.

3        SO I SET IT ASIDE, BUT CONTINUED TO LOOK FOR WAYS TO GET

4    MORE EQUIPMENT OUT IN THE FIELD, BUT ALSO INCREASE MACHINE

5    ACCESS AS IT HAD BEEN PART OF WHAT I HAD BEEN A PART OF SINCE

6    I WAS VERY YOUNG.

7        MY DAD LOOKED AT STARTING A MAKERSPACE AS PART OF AN EMPTY

8    HARDWARE STORE AFTER WE BUILT A NEW ONE IN 1993.

9    **Q.**  IF I CAN ASK YOU, YOU'VE BEEN TALKING ABOUT SOME OF THE

10   PIRANHA MACHINERY.  FOR THOSE OF US WHO MAY NOT BE FAMILIAR

11   WITH IT, IS THAT THE TYPE OF MACHINERY THAT YOU MIGHT FIND IN

12   A MAKERSPACE?

13   **A.**  THE PIRANHA EQUIPMENT TYPICALLY IS LARGER THAN YOU WILL

14   FIND IN MOST MAKERSPACES.  BUT SOME OF OUR ENTRY LEVEL AND THE

15   SMALLER MACHINES YOU WOULD FIND IN A MAKERSPACE SUCH AS A

16   PIRANHA IRON WORKER PLASMA TABLE WHICH IS USED FOR CUTTING,

17   CUTTING METAL.  SOME FIBER LASERS, SOME PRESS BRAKES, AND SOME

18   BENDING ROLLS.

19   **Q.**  AND SO MY UNDERSTANDING THAT YOU WERE INTERESTED IN

20   ACQUIRING TECHSHOP AS PART OF THIS PRIOR INTEREST THAT YOU HAD

21   IN FIGURING OUT HOW TO GET MORE MACHINERY TO MORE PEOPLE?

22   **A.**  CORRECT.

23   **Q.**  NOW, TURNING BACK TO -- YOU SAID TECHSHOP INTRODUCED YOU

24   TO LANDLORDS EARLY ON IN THE NEGOTIATIONS; IS THAT RIGHT?

25   **A.**  YES, THEY DID.

1  **Q.**  WHY WOULD YOU NEED TO BE INTRODUCED TO LANDLORDS FOR THESE

2  NEGOTIATIONS?

3  **A.**  TECHSHOP WAS IN DEFAULT ON ALL OF THEIR LEASES.  AS I

4  LATER FOUND OUT, SOME OF THE LEASES HAD EVEN EXPIRED.

5     SO IF -- FOR ANY SHOP TO REOPEN -- OR FOR ANY SHOP TO

6  OPEN, IT WOULD REQUIRE A NEW LEASE WITH THE LANDLORD, THEIR

7  COOPERATION, THAT THEY STILL WANTED A MAKERSPACE IN THEIR

8  FACILITY.

9     AND ALL THAT WOULD HAVE TO BE COMPLETED ABOUT THE SAME

10  TIME OR BEFORE ANY ADDITIONAL DEALS.

11  **Q.**  SO YOU WOULD NEED TO NEGOTIATE DIRECTLY WITH LANDLORDS

12  SORT OF IN TANDEM WITH NEGOTIATING WITH TECHSHOP?

13  **A.**  THAT IS CORRECT.

14  **Q.**  CAN YOU TURN PLEASE TO TX580.

15       **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT THIS

16  EXHIBIT.

17       **MR. PISTORINO:**  NO OBJECTION.

18       **THE COURT:**  580 IS ADMITTED.

19       (TRIAL EXHIBIT 580 RECEIVED IN EVIDENCE.)

20            (DISPLAYED ON SCREEN.)

21  **BY MS. ROBERTS:**

22  **Q.**  CAN YOU TELL US WHAT THIS EXHIBIT IS?

23  **A.**  THIS IS A RESPONSE EMAIL TO THE INTRODUCTION TO THE

24  LANDLORDS FROM DAN WOODS.

25  **Q.**  SO IF YOU COULD, TURN TO THE SECOND PAGE OF THE EXHIBIT

1    FOR ME.

2         IS THAT THE INTRODUCTORY EMAIL THAT MR. WOODS SENT TO

3    LANDLORDS THAT YOU WERE REFERRING TO?

4    **A.**  YES, IT IS.

5    **Q.**  AND THIS PARTICULAR EMAIL IS TO TODD REIDBORD, RIGHT?

6    **A.**  YES, IT IS.

7    **Q.**  WHO IS MR. REIDBORD?

8    **A.**  THE LANDLORD CONTACT FOR THE PITTSBURGH TECHSHOP FACILITY.

9    **Q.**  AND DID MR. WOODS SEND EMAILS SIMILAR TO THIS ONE THAT

10   WE'RE LOOKING AT IN TX580 TO THE LANDLORD OF TECHSHOP'S OTHER

11   FACILITIES?

12   **A.**  YES, HE DID.

13   **Q.**  OTHER THAN BEING INTRODUCED TO LANDLORDS, DID TECHSHOP

14   INTRODUCE YOU TO ANYBODY ELSE IN CONNECTION WITH THESE EARLY

15   NEGOTIATIONS?

16   **A.**  THEY ALSO INTRODUCED ME TO LOWE'S AND SOME OF THEIR TOP

17   EMPLOYEES AS WELL AS THE GENERAL MANAGERS.  AND AS THE PROCESS

18   WENT ON, SOME BUT NOT ALL OF THEIR EQUIPMENT LEASE COMPANIES.

19   **Q.**  YOU MENTIONED LOWE'S.  WHY WOULD YOU NEED TO BE CONNECTED

20   WITH LOWE'S?

21   **A.**  LOWE'S WAS THE SECURED -- AT THE TIME... IT WAS PERCEIVED

22   THAT THEY WERE THE SECURED CREDITOR FOR THE AUSTIN -- THE

23   FIRST CREDITOR FOR THE AUSTIN LOCATION AS WELL AS THE SECOND

24   UNDERLYING CREDITOR FOR ALL THE OTHER LOCATIONS.

25   **Q.**  HOW WERE YOU PLANNING TO FUND THE ACQUISITION OF TECHSHOP?

1    **A.**  THROUGH EQUIPMENT FINANCE ON THE EXISTING EQUIPMENT OF

2    TECHSHOP.

3    **Q.**  DID YOU HAVE AN EXISTING COMPANY THAT WAS GOING TO ACQUIRE

4    TECHSHOP?

5    **A.**  NO.  THIS WOULD BE A BRAND NEW ENTITY.

6    **Q.**  DID YOU START A NEW ENTITY?

7    **A.**  YES, WE DID.

8    **Q.**  WHAT DID YOU CALL THE NEW ENTITY?

9    **A.**  WE CALLED THE ENTITY TECHSHOP 2.0.

10   **Q.**  HOW DID YOU COME UP WITH THAT NAME?

11   **A.**  THE 2.0 REPRESENTS NEW AND DIFFERENT.

12   **Q.**  DID YOU TELL TECHSHOP THAT WAS THE NAME YOU WERE GOING TO

13   USE?

14   **A.**  YES, I DID.

15   **Q.**  HOW DID TECHSHOP RESPOND WHEN YOU SUGGESTED IT?

16   **A.**  HAD NO OBJECTION TO THE NAME.

17   **Q.**  NOW WE'VE ESTABLISHED THAT YOU HAD TO NEGOTIATE WITH A LOT

18   OF DIFFERENT PEOPLE IN CONNECTION WITH THE NEGOTIATIONS TO

19   ACQUIRE TECHSHOP.  SPECIFICALLY, YOUR NEGOTIATIONS WITH

20   TECHSHOP DIRECTLY, WHO DID YOU NEGOTIATE WITH?

21   **A.**  I NEGOTIATED WITH DAN WOODS, DOUG BUSCH, PERIPHERAL JIM

22   NEWTON, AND ELIZABETH BOBEK SERVED AS THE LIAISON AT TIMES.

23   **Q.**  MR. WOODS, WE HAVE MET HIM.  HE WAS THE CEO OF TECHSHOP?

24   **A.**  YES, HE WAS.

25   **Q.**  MR. NEWTON WAS CHAIRMAN OF THE BOARD?

1   **A.**  YES, HE WAS.

2   **Q.**  MR. BUSCH WAS A BOARD MEMBER?

3   **A.**  CORRECT.

4   **Q.**  AND YOU SAID MS. BOBEK WAS IN-HOUSE COUNSEL?  IS THAT WHAT

5   YOU SAID?

6   **A.**  INSIDE COUNSEL AND INVESTOR RELATIONS FOR TECHSHOP.

7   **Q.**  NOW, DID YOU EVENTUALLY REACH AN AGREEMENT WITH TECHSHOP?

8   **A.**  YES, WE DID REACH A MOU WITH TECHSHOP.

9   **Q.**  HOW SOON AFTER YOU REACHED OUT ON NOVEMBER 16TH DID YOU

10  REACH AN AGREEMENT IN PRINCIPLE?

11  **A.**  WITHIN THE FIRST TEN DAYS.

12  **Q.**  TURN TO TX585.

13          **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT THIS

14  EXHIBIT.

15          **MR. PISTORINO:**  NO OBJECTION.

16          **THE COURT:**  585 IS ADMITTED.

17          (TRIAL EXHIBIT 585 RECEIVED IN EVIDENCE.)

18                  (DISPLAYED ON SCREEN.)

19  **BY MS. ROBERTS:**

20  **Q.**  IS THIS AN EMAIL FROM YOU ON NOVEMBER 24TH, 2017 TO

21  MR. WOODS AND MS. BOBEK?

22  **A.**  YES, IT IS.

23  **Q.**  CAN YOU TELL US WHAT THIS EMAIL IS?

24  **A.**  THIS IS A ROUGH DRAFT MOU SUMMARY.

25  **Q.**  DID YOU PROVIDE A ROUGH DRAFT OF THE MEMORANDUM OF

1    UNDERSTANDING SUMMARY ON NOVEMBER 24TH?

2    **A.**  YES, I DID.

3    **Q.**  TURN TO TX597, WHICH IS ADMITTED.

4                        (DISPLAYED ON SCREEN.)

5        WE HAVE SEEN THIS EMAIL BEFORE.  THIS IS AN EMAIL FROM

6    MR. WOODS TO YOU ON NOVEMBER 29TH, 2017, CORRECT?

7    **A.**  YES, IT IS.

8    **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

9    **A.**  THIS WAS A DRAFT MESSAGE TO BE SENT OUT TO EVERYONE

10   INVOLVED WITH TECHSHOP.

11   **Q.**  AND THE DRAFT MESSAGE WAS GOING TO BE SENT BY WHO?

12   **A.**  BY TECHSHOP.

13   **Q.**  IF YOU TURN TO PAGE 2, CAN YOU READ FOR THE JURY THE FIRST

14   SENTENCE OF THE DRAFT ANNOUNCEMENT?

15   **A.**  (READING)

16              "I AM EXTREMELY PLEASED TO ANNOUNCE THAT TECHSHOP HAS

17              REACHED AN AGREEMENT WITH A THIRD PARTY TO ACQUIRE

18              ALL OF THE COMPANY'S ASSETS AND SECURED DEBT WITH

19              PLANS TO REOPEN AS MANY STORES AS POSSIBLE UNDER THE

20              NAME TECHSHOP 2.0 BEGINNING AS EARLY AS NEXT WEEK."

21   **Q.**  WHAT DID MR. WOODS CALL YOUR COMPANY IN THIS DRAFT

22   ANNOUNCEMENT?

23   **A.**  TECHSHOP 2.0.

24   **Q.**  TURN TO TX601, WHICH IS ADMITTED.

25              **THE CLERK:**  601?

1          **MS. ROBERTS:**  WE WILL MOVE TO ADMIT.

2          **MR. PISTORINO:**  NO OBJECTION.

3          **THE COURT:**  601 IS ADMITTED.

4              (TRIAL EXHIBIT 601 RECEIVED IN EVIDENCE)

5                      (DISPLAYED ON SCREEN.)

6     **BY MS. ROBERTS:**

7     **Q.**  IS THIS AN EMAIL THAT YOU RECEIVED FROM ELIZABETH BOBEK ON

8     NOVEMBER 30TH, 2017?

9     **A.**  YES, IT IS.

10    **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

11    **A.**  A MOCKUP OF THE MOU SUMMARY.

12    **Q.**  CAN YOU TURN, PLEASE, TO PAGE 5.

13                      (DISPLAYED ON SCREEN.)

14       WHAT IS THIS?

15    **A.**  SUMMARY OF THE PRINCIPAL TERMS.

16    **Q.**  I SEE IT IS MARKED UP.  IS THIS A DRAFT?

17    **A.**  YES, IT IS.

18    **Q.**  AND HOW IS YOUR COMPANY REFERENCED IN THIS DRAFT?

19    **A.**  TECHSHOP 2.0.

20    **Q.**  CAN YOU TURN TO TX602?

21         **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

22         **THE CLERK:**  602 IS ADMITTED.

23         **MS. ROBERTS:**  OKAY.

24                      (DISPLAYED ON SCREEN.)

25

1   **BY MS. ROBERTS:**

2   **Q.**  IS THIS AN EMAIL FROM MS. BOBEK TO YOU, DAN WOODS, JIM

3   NEWTON, DOUG BUSCH AND SEAN DOHERTY ON NOVEMBER 30TH?

4   **A.**  YES, IT IS.

5   **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

6   **A.**  TO CONFIRM THAT THIS IS THE FINAL MOU.

7   **Q.**  AND THERE'S AN ATTACHMENT TO THE EMAIL, CORRECT?

8   **A.**  YES, THERE IS.

9   **Q.**  IN THAT ATTACHMENT, HOW IS YOUR COMPANY REFERENCED?

10  **A.**  TECHSHOP 2.0 LLC AND TECHSHOP 2.0.

11  **Q.**  DID MS. BOBEK, MR. WOODS, MR. NEWTON, MR. BUSCH OR

12  MR. DOHERTY OBJECT TO THE NAME TECHSHOP 2.0 AT THAT TIME?

13  **A.**  NO, THEY DID NOT.

14  **Q.**  TURN TO TX598.

15          **MS. ROBERTS:**  WE MOVE TO ADMIT.

16          **THE CLERK:**  IT IS ADMITTED.

17                  (DISPLAYED ON SCREEN.)

18  **BY MS. ROBERTS:**

19  **Q.**  IS THIS AN EMAIL YOU RECEIVED FROM MS. LARSON ON

20  NOVEMBER 30TH, 2017?

21  **A.**  YES, IT IS.

22  **Q.**  AND I BELIEVE WE'VE HEARD THAT MS. LARSON WAS THE

23  DIRECTOR -- FORMER DIRECTOR OF MARKETING FOR TECHSHOP?

24  **A.**  YES, SHE WAS.

25  **Q.**  AND WHO DID SHE ACTUALLY DIRECT THE EMAIL TO?  WHO IS ON

1    THE "TO" LINE?

2    **A.**  DAN WOODS.

3    **Q.**  CAN YOU READ FOR THE JURY THE SECOND PARAGRAPH OF

4    MS. LARSON'S EMAIL?

5    **A.**  (READING)

6           "DAN R, IT'S GREAT TO MEET YOU.  AS MAKERS, WE ARE

7           ALL FAMILIAR WITH ITERATION.  TECHSHOP 2.0 IS AN

8           EXCITING REVISION OF THIS COMMUNITY MAKERSPACE."

9    **Q.**  DID MS. LARSON, THE FORMER MARKETING DIRECTOR OF TECHSHOP,

10   OBJECT TO THE NAME TECHSHOP 2.0 AT THE TIME?

11   **A.**  NO, SHE DID NOT.

12   **Q.**  TURN TO TX600.

13          **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

14          **MR. PISTORINO:**  NO OBJECTION.

15          **THE COURT:**  SUBMITTED.

16          (TRIAL EXHIBIT 600 RECEIVED IN EVIDENCE.)

17   **BY MS. ROBERTS:**

18   **Q.**  IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

19   NOVEMBER 30TH, 2017?

20   **A.**  YES, IT IS.

21   **Q.**  THERE'S ANOTHER NAME ON THE "TO" LINE IN ADDITION TO

22   YOURS, BILL LLOYD.  WHO IS BILL LLOYD?

23   **A.**  BILL LLOYD WAS A POTENTIAL PARTNER OF TECHSHOP 2.0 DUE TO

24   HIS POSITION AS A CREDITOR OF TECHSHOP.

25   **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF MR. WOODS'

```
1    NOVEMBER 30TH EMAIL?

2    A.  IT WAS THE LATEST DRAFT OF THE ANNOUNCEMENT MESSAGING.

3    Q.  THIS WAS THE ANNOUNCEMENT MESSAGE THAT MR. WOODS WAS GOING

4    TO SEND OUT?

5    A.  YES, IT WAS.

6    Q.  TURN TO PAGE 3 OF THIS EXHIBIT.

7                      (DISPLAYED ON SCREEN.)

8        IS THAT THE UPDATED DRAFT OF THE ANNOUNCEMENT THAT

9    MR. WOODS SHARED WITH YOU?

10   A.  YES, IT WAS.

11   Q.  AND IN HIS DRAFT ANNOUNCEMENT, WHAT DID HE CALL YOUR

12   COMPANY?

13   A.  TECHSHOP 2.0.

14   Q.  TURN TO TX610, WHICH IS ADMITTED.

15                     (DISPLAYED ON SCREEN.)

16       THIS IS AN EMAIL FROM YOU ON DECEMBER 1ST, 2017, CORRECT?

17   A.  YES, IT IS.

18   Q.  WHAT WAS THE PURPOSE OF THIS EMAIL?

19   A.  IT WAS A COPY OF THE SIGNED MOU.

20   Q.  IS THE ATTACHMENT TO THIS EMAIL THE FINAL SIGNED

21   MEMORANDUM OF UNDERSTANDING?

22   A.  YES, IT WAS.

23   Q.  WHO SIGNED THE MEMORANDUM OF UNDERSTANDING?

24   A.  DAN WOODS FOR TECHSHOP AND MYSELF FOR TECHSHOP 2.0.

25   Q.  AND WHAT IS THE NAME OF YOUR COMPANY IN THE SUMMARY OF
```

1    PRINCIPAL TERMS?

2    **A.**  TECHSHOP 2.0 LLC AND TECHSHOP 2.0.

3    **Q.**  DID MR. WOODS, AT THE TIME HE SIGNED THIS DOCUMENT, OBJECT

4    TO THE NAME TECHSHOP 2.0?

5    **A.**  NO, HE DID NOT.

6    **Q.**  DID HE GIVE YOU ANY RESTRICTIONS ON HOW OR WHEN YOU COULD

7    USE THE NAME TECHSHOP 2.0?

8    **A.**  NO, HE DID NOT.

9    **Q.**  TURN TO TX611, WHICH IS ADMITTED.

10                     (DISPLAYED ON SCREEN.)

11    IS THIS AN EMAIL YOU RECEIVED FROM MS. BOBEK ON

12   DECEMBER 1ST?

13   **A.**  YES, IT IS.

14   **Q.**  WHAT DO YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

15   **A.**  IT WAS A FORWARD OF AN EMAIL THAT DAN WOODS SENT OUT TO

16   EVERYONE@TECHSHOP.WS.

17   **Q.**  CAN YOU PLEASE READ FOR THE JURY THE SECOND PARAGRAPH OF

18   MR. WOODS' EMAIL TO EVERYONE@TECHSHOP.WS?

19   **A.**  (READING)

20              "TECHSHOP, INC. HAS REACHED AN AGREEMENT WITH A THIRD

21              PARTY TO ACQUIRE ALL COMPANY ASSETS.  THE NEW ENTITY,

22              TECHSHOP 2.0 LLC, PLANS TO REOPEN AS MANY STORES AS

23              POSSIBLE AS SOON AS POSSIBLE."

24   **Q.**  DOES IT IDENTIFY A PARTNERSHIP THERE IN THE NEXT SENTENCE?

25   **A.**  (READING)

1              "THE ACQUIRING PARTNERSHIP IS LED BY DAN RASURE AND

2              BILL LLOYD."

3    **Q.**  THAT'S THE BILL LLOYD WE WERE SPEAKING ABOUT EARLIER?

4    **A.**  YES.

5    **Q.**  TURN TO TX501, WHICH IS ADMITTED.

6                        (DISPLAYED ON SCREEN.)

7         CAN YOU TELL THE JURY WHAT THIS IS?

8    **A.**  THIS IS A SCREENSHOT OF FACEBOOK -- TECHSHOP INCORPORATED

9    FACEBOOK PAGE.

10   **Q.**  WHAT IS THE DATE OF THE POST?

11   **A.**  DECEMBER 1ST, 2017.

12   **Q.**  WHO CREATED THE SCREENSHOT?

13   **A.**  I TOOK THE SCREENSHOT.

14   **Q.**  CAN YOU READ FOR THE JURY THE FIRST TWO SENTENCES OF THIS

15   POST?

16   **A.**  (READING)

17              "THE NEXT ITERATION OF TECHSHOP IS IN THE WORKS.

18              TECHSHOP, INC. HAS REACHED AN AGREEMENT AND PRINCIPAL

19              TO SELL THE ENTIRE COMPANY TO A GROUP CALLED TECHSHOP

20              2.0 LLC."

21   **Q.**  YOU FOUND THIS ON TECHSHOP INCORPORATED'S FACEBOOK PAGE?

22   **A.**  YES, I DID.

23   **Q.**  TURN TO TX505, WHICH IS ADMITTED.

24                        (DISPLAYED ON SCREEN.)

25        WHAT IS THIS DOCUMENT, MR. RASURE?

RASURE - DIRECT / ROBERTS

1    **A.**   A SCREENSHOT I TOOK OF THE TECHSHOP BROOKLYN FACEBOOK

2    PAGE.

3    **Q.**   WHAT IS THE DATE OF THE POST THAT YOU TOOK A SCREENSHOT

4    OF?

5    **A.**   DECEMBER 1ST, 2017.

6    **Q.**   CAN YOU READ FOR THE JURY THE FIRST TWO SENTENCES OF THAT

7    POST?

8    **A.**   (READING)

9          "THE NEXT ITERATION OF TECHSHOP IS IN THE WORKS.

10         TECHSHOP, INC. HAS REACHED AN AGREEMENT AND PRINCIPAL

11         TO SELL THE ENTIRE COMPANY TO A GROUP CALLED TECHSHOP

12         2.0 LLC."

13   **Q.**   TURN TO TX527, WHICH IS ADMITTED.

14                     (DISPLAYED ON SCREEN.)

15        CAN YOU TELL US WHAT DOCUMENT THIS IS?

16   **A.**   A SCREENSHOT I TOOK OF THE TECHSHOP AUSTIN ROUND ROCK

17   TWITTER PAGE.

18   **Q.**   READ FOR THE JURY THE FIRST SENTENCE.

19   **A.**   (READING)

20         "TECHSHOP, INC. HAS REACHED AN AGREEMENT TO SELL THE

21         COMPANY TO TECHSHOP 2.0 LLC."

22   **Q.**   TURN, PLEASE, TO TX530, WHICH IS ADMITTED.

23                     (DISPLAYED ON SCREEN.)

24        CAN YOU TELL US WHAT THIS DOCUMENT IS, MR. RASURE?

25   **A.**   AN INSTAGRAM SCREENSHOT I TOOK OF THE TECHSHOP, INC.

 1  INSTAGRAM PAGE.

 2  **Q.**  WHAT IS THE DATE OF THE POST THAT YOU TOOK A SCREENSHOT OF

 3  HERE?

 4  **A.**  DECEMBER 1ST, 2017.

 5  **Q.**  CAN YOU READ FOR THE JURY THE FIRST TWO SENTENCES OF THIS

 6  POST?

 7  **A.**  (READING)

 8       "THE NEXT ITERATION OF TECHSHOP IS IN THE WORKS.

 9       TECHSHOP, INC. HAS REACHED AN AGREEMENT AND PRINCIPAL

10       TO SELL THE ENTIRE COMPANY TO A GROUP CALLED TECHSHOP

11       2.0 LLC."

12  **Q.**  TURN TO TX612, WHICH IS ADMITTED.

13                 (DISPLAYED ON SCREEN.)

14       IS THIS AN EMAIL YOU RECEIVED FROM DOUG BUSCH ON

15  DECEMBER 3RD, 2017?

16  **A.**  YES, IT IS.

17  **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

18  **A.**  A COURTESY EMAIL FROM DOUG BUSCH TELLING ME THAT HE WAS

19  GOING TO BE POSTING THIS MESSAGE ONTO SEVERAL SOCIAL MEDIA

20  PAGES.

21  **Q.**  DID YOU UNDERSTAND THAT THE MESSAGE BEING SHARED WAS GOING

22  TO BE SHARED PUBLICLY BY MR. BUSCH?

23  **A.**  YES, I DID.

24  **Q.**  NOW TURN TO PAGE 4 OF THIS EXHIBIT.  I'LL DIRECT YOU TO

25  THE SECOND PARAGRAPH OF PAGE 4.

1               (DISPLAYED ON SCREEN.)

2       ARE YOU THERE?

3    **A.**   I AM.

4    **Q.**   WHAT DID MR. BUSCH CALL YOUR COMPANY IN THIS ANNOUNCEMENT

5    THAT HE WAS GOING TO POST ON SOCIAL MEDIA?

6    **A.**   TECHSHOP 2.0.

7    **Q.**   AND HE VOICED NO OBJECTION TO THE NAME TECHSHOP 2.0?

8    **A.**   NO.

9    **Q.**   DID HE GIVE YOU ANY RESTRICTIONS ON HOW YOU COULD USE THE

10   NAME TECHSHOP 2.0?

11   **A.**   NO, HE DID NOT.

12   **Q.**   TURN TO TX613, WHICH IS ADMITTED.

13               (DISPLAYED ON SCREEN.)

14       IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

15   DECEMBER 3RD, 2017?

16   **A.**   YES, IT IS.

17   **Q.**   WHAT WAS THE PURPOSE OF THIS EMAIL?

18       WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

19   **A.**   I UNDERSTOOD IT AS A RE-INTRODUCTION TO ROBERT THOMAS WHO

20   IS THE FIRST PERSON I MET OR TALKED TO AS PART OF THE

21   ACQUISITION -- POTENTIAL ACQUISITION.

22   **Q.**   I THINK YOU SAID EARLIER THAT MR. THOMAS WAS A CO-FOUNDER

23   OF TECHSHOP?

24   **A.**   YES, HE WAS.

25   **Q.**   IN THIS EMAIL RE-INTRODUCING YOU TO MR. THOMAS, THE

1    CO-FOUNDER OF TECHSHOP, WHAT DID MR. WOODS CALL YOUR COMPANY?

2    **A.**   TECHSHOP 2.0.

3    **Q.**   TURN TO TX614, WHICH IS ADMITTED.

4                        (DISPLAYED ON SCREEN.)

5         WHAT IS THIS DOCUMENT?

6    **A.**   A PRESS RELEASE SENT OUT TO *FORBES* BY MYSELF.

7    **Q.**   AND IN THIS PARTICULAR DOCUMENT, IT LOOKS LIKE IT WAS SENT

8    TO *FORBES*.  DID YOU SEND A PRESS RELEASE TO ANYONE OTHER THAN

9    *FORBES*?

10   **A.**   WE SENT OUT A PRESS RELEASE TO EVERYONE WHO HAD PREVIOUSLY

11   REPORTED ON THE CLOSURE OF TECHSHOP.

12   **Q.**   WHAT'S THE DATE OF THE PRESS RELEASE?

13   **A.**   DECEMBER 3RD, 2017.

14   **Q.**   IN THE PRESS RELEASE, WHAT DID YOU CALL YOUR COMPANY?

15   **A.**   TECHSHOP 2.0.

16   **Q.**   IN THE PRESS RELEASE AT THE BOTTOM, THERE IS A QUOTE FROM

17   MR. WOODS, FORMER TECHSHOP AND CEO -- FORMER TECHSHOP CEO.

18        DID YOU OBTAIN THAT QUOTE FROM MR. WOODS TO INCLUDE IN THE

19   PRESS RELEASE?

20   **A.**   YES, WE DID.

21   **Q.**   IN THAT QUOTE THAT YOU OBTAINED FROM MR. WOODS, WHAT DID

22   MR. WOODS CALL YOUR COMPANY?

23   **A.**   TECHSHOP 2.0.

24   **Q.**   IN THIS PRESS RELEASE, DID YOU PROVIDE ANY CONTACT

25   INFORMATION FOR THE PUBLIC FOR YOUR COMPANY?

 1  **A.**  YES, WE DID.  A WEBSITE.

 2  **Q.**  WHAT IS THE WEBSITE?

 3  **A.**  TECHSHOP2.COM.

 4  **Q.**  THAT WAS PROVIDED IN THIS DECEMBER 23RD, 2017 PRESS

 5  RELEASE?

 6  **A.**  YES, IT WAS.

 7  **Q.**  IT WAS PROVIDED TO, I THINK YOU SAID, ANYBODY WHO REPORTED

 8  ON TECHSHOP'S CLOSURE?

 9  **A.**  THAT IS CORRECT.

10  **Q.**  TURN TO TX615, WHICH IS ADMITTED.

11                    (DISPLAYED ON SCREEN.)

12      IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

13  DECEMBER 3RD, 2017?

14  **A.**  YES, IT IS.

15  **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

16  **A.**  PROPOSED WIND DOWN AND TRANSITION PLAN FROM TECHSHOP TO

17  TECHSHOP 2.0.

18  **Q.**  IF YOU CAN TURN TO THE SECOND PAGE, NUMBERED PARAGRAPH 3.

19                    (DISPLAYED ON SCREEN.)

20      WHAT DOES MR. WOODS CALL YOUR COMPANY IN THIS EMAIL?

21  **A.**  TECHSHOP 2.0.

22  **Q.**  TURN TO TX622, WHICH IS ADMITTED.

23                    (DISPLAYED ON SCREEN.)

24      IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

25  DECEMBER 6, 2017?

1    **A.**  YES, IT IS.

2    **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

3    **A.**  THE PROPOSED DRAFTED AGREEMENT BY TECHSHOP TO TECHSHOP

4    2.0.

5    **Q.**  AND WE'VE SEEN THE MEMORANDUM OF UNDERSTANDING ALREADY.

6    THIS WAS THE PROPOSED AGREEMENT THAT HAD MORE OF THE DETAIL?

7    **A.**  IT IS.

8    **Q.**  WHO DRAFTED THE PROPOSED AGREEMENT?

9    **A.**  TECHSHOP.

10   **Q.**  YOU DIDN'T DRAFT THE AGREEMENT?

11   **A.**  NO, WE DID NOT.

12   **Q.**  TURN TO PAGE 3 OF THIS EXHIBIT.

13                          (DISPLAYED ON SCREEN.)

14       THIS IS THE ATTACHMENT THAT CAME WITH THE EMAIL?

15   **A.**  YES, IT IS.

16   **Q.**  IS THIS THE DRAFT ASSET PURCHASE AGREEMENT?

17   **A.**  YES, IT IS.

18   **Q.**  IN THE FIRST PARAGRAPH OF THE DRAFT ASSET PURCHASE

19   AGREEMENT THAT WAS PREPARED BY TECHSHOP, WHO ARE THE PARTIES

20   IDENTIFIED AS THE PARTIES TO THE AGREEMENT?

21   **A.**  TECHSHOP AND TECHSHOP 2.0 LLC.

22   **Q.**  TURN TO TX626.

23           **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT THIS

24   EXHIBIT.

25           **MR. PISTORINO:**  NO OBJECTION.

```
 1              THE COURT:  ADMITTED.

 2              (TRIAL EXHIBIT 626 RECEIVED IN EVIDENCE.)

 3                   (DISPLAYED ON SCREEN.)

 4    BY MS. ROBERTS:

 5    Q.  IS THIS AN EMAIL YOU SENT TO MR. BUSCH AND MR. WOODS ON

 6    DECEMBER 11TH, 2017?

 7    A.  YES, IT IS.

 8    Q.  WHAT WAS THE PURPOSE OF THIS EMAIL?

 9    A.  THEY HAD REQUESTED A PROOF OF FUNDS FOR A MILLION DOLLARS,

10    AND THIS IS THE NOTICE OF THAT.

11    Q.  SO YOU SAID -- SORRY.  YOU SAID THEY REQUESTED PROOF OF

12    FUNDS FOR A MILLION DOLLARS?

13    A.  THAT IS CORRECT.

14    Q.  HOW DID YOU PROVIDE PROOF OF FUNDS?

15    A.  VIA LAWYER/CPA NOTICE.

16    Q.  IF YOU TURN TO THE SECOND PAGE OF THE EXHIBIT, IS THAT THE

17    LAWYER/CPA NOTICE YOU ARE REFERRING TO?

18    A.  YES, IT IS.

19    Q.  HOW DID YOU COME UPON A MILLION DOLLARS FOR THE AMOUNT

20    THAT YOU WERE GOING TO PROVIDE?

21    A.  BASED ON THE EQUIPMENT ASSETS, WE WERE ACTUALLY GOING TO

22    PROVIDE MORE, BUT THE MILLION DOLLARS IS WHAT WAS REQUESTED.

23    SO THIS LETTER WAS DRAFTED AND SENT.

24    Q.  REQUESTED BY TECHSHOP?

25    A.  YES, IT WAS.
```

1   **Q.**  AND HOW WERE YOU GOING TO GET THIS MONEY FOR THE

2   ACQUISITION?

3   **A.**  ONCE WE HAD A CLEAN ASSET PURCHASE AGREEMENT, THE FUNDING

4   WOULD BE PROVIDED FOR... TO COMPLETE THE CLEAN TRANSACTION FOR

5   THE EQUIPMENT OR FOR THE ASSETS.  THE UNDERLYING ASSET THAT WE

6   WOULD BE BORROWING AGAINST WOULD BE THE EQUIPMENT.

7   **Q.**  TURN TO TX627, WHICH IS ADMITTED.

8           **THE CLERK:**  I DON'T HAVE --

9           **MS. ROBERTS:**  WE WILL MOVE TO ADMIT TX627.

10          **MR. PISTORINO:**  NO OBJECTION.

11  **BY MS. ROBERTS:**

12  **Q.**  IS THIS AN EMAIL --

13          **THE COURT:**  I THINK IT'S A DUPLICATE.  BUT, YES, 627

14  IS ADMITTED.

15          (TRIAL EXHIBIT 627 RECEIVED IN EVIDENCE.)

16  **BY MS. ROBERTS:**

17  **Q.**  IS THIS AN EMAIL YOU RECEIVED ON DECEMBER 12TH, 2017 FROM

18  TECHSHOP'S LAWYER?

19  **A.**  YES, IT IS.

20  **Q.**  THE KURT RUTTUM LISTED THERE, THAT'S TECHSHOP'S LAWYER?

21  **A.**  IT IS.

22  **Q.**  WHAT WAS YOUR UNDERSTANDING OF THE PURPOSE OF THIS EMAIL?

23  **A.**  IT WAS A TERMINATION OF THE MEMORANDUM OF UNDERSTANDING.

24  **Q.**  DO YOU RECALL, DID THE MEMORANDUM OF UNDERSTANDING PROVIDE

25  A LENGTH OF TIME BY WHICH THE PARTIES WERE SUPPOSED TO NAIL

1    DOWN THE DETAILED TERMS OF AN AGREEMENT?

2    **A.**  YES, IT DID.

3    **Q.**  HOW LONG WERE YOU SUPPOSED TO HAVE FOR THAT?

4    **A.**  I BELIEVE APPROXIMATELY 21 DAYS.

5    **Q.**  AND WHY WAS THERE A PERIOD OF TIME IN THERE?  HOW DID YOU

6    COME UP WITH THAT PERIOD OF TIME?

7    **A.**  IT WAS INCREDIBLY SHORT PERIOD OF TIME, BUT THIS WAS A

8    VERY COMPLEX DEAL.  ASSETS WERE LOCATED ACROSS THE COUNTRY.

9    NO EQUIPMENT LIST WAS AVAILABLE.  SO EQUIPMENT INVENTORIES

10   NEEDED TO BE TAKEN.  LOCATIONS NEEDED TO BE INSPECTED.  AND AS

11   WE PROCEEDED THROUGH THE PROCESS FOUND AND DISCLOSED DEBTS AND

12   OTHER ISSUES.

13       NORMAL DUE DILIGENCE IS 90 DAYS.  WE AGREED TO A MUCH

14   SHORTER PERIOD GIVEN THE ABRUPT CLOSURE OF TECHSHOP.

15   **Q.**  NOW RETURNING TO TX627, THE EMAIL FROM MR. RUTTUM, JUST TO

16   CONFIRM, THAT WAS SENT BEFORE THE END OF THE PERIOD OF TIME

17   LAID OUT IN THE MEMORANDUM OF UNDERSTANDING?

18   **A.**  IT WAS.

19   **Q.**  IN THE EMAIL FROM TECHSHOP'S LAWYER, WHAT DID HE REFER TO

20   YOUR COMPANY AS?

21   **A.**  TECHSHOP 2.0 LLC.

22   **Q.**  IN THE EMAIL TERMINATING THE MEMORANDUM OF UNDERSTANDING,

23   DID TECHSHOP'S LAWYER TELL YOU YOU NEEDED TO STOP CALLING YOUR

24   COMPANY TECHSHOP 2.0?

25   **A.**  NO, IT DID NOT.

1    **Q.**  NOW WE'VE -- IT'S BEEN ESTABLISHED THAT THE MEMORANDUM OF

2    UNDERSTANDING WAS SIGNED ON DECEMBER 1ST, 2017.  AND WE'VE

3    SEEN NOW THAT THE TERMINATION EMAIL CAME ON DECEMBER 12TH.

4         CAN YOU EXPLAIN TO THE JURY WHAT WERE YOU DOING BETWEEN

5    DECEMBER 1ST AND DECEMBER 12TH TO TRY TO MAKE THE DEAL HAPPEN?

6    **A.**  FROM DECEMBER 1ST TO DECEMBER 12TH I WAS TRAVELING THE

7    COUNTRY MEETING WITH CREDITORS, CREDITORS, GENERAL MANAGERS,

8    VISITING STORES, TALKING TO MEMBERS.

9         MY DECEMBER 1ST STARTED OUT IN ROCKFORD, ILLINOIS.  I MET

10   WITH MY TEAM THERE, AND THEN FLEW TO DENVER, HANDLED SOCIAL

11   MEDIA AND OTHER ISSUES MOSTLY WITH MEMBERS.  MEMBERS WERE VERY

12   EXCITED, BUT THERE WAS ALSO A TREMENDOUS AMOUNT OF ANGER THAT

13   WE WORKED VERY QUICKLY TO POTENTIALLY DIFFUSE.

14        ALSO WORKING WITH BILL LLOYD AND ONE OTHER INDIVIDUAL ON

15   HOW TECHSHOP 2.0 WAS GOING TO BE DIFFERENT FROM THE ORIGINAL

16   TECHSHOP.

17        MONDAY MORNING I GOT UP EARLY, FLEW TO AS AUSTIN, AND MET

18   WITH SAMSUNG WITH BILL LLOYD AND ONE OTHER INDIVIDUAL TO

19   DISCUSS, ONE, THEIR OUTSTANDING CREDIT THAT THEY PREVIOUSLY

20   HAD WITH TECHSHOP, WHAT WAS GOING TO HAPPEN TO THAT.  AND

21   POTENTIALLY SIGNIFICANTLY INCREASING THEIR RELATIONSHIP IF WE

22   WERE WILLING TO DO THINGS THAT THEY HAD CONSTANTLY REQUESTED

23   FROM TECHSHOP AND HAD NOT BEEN ABLE TO GET.

24        FROM THERE WE VISITED THE FACILITY, DID AN INVENTORY OF

25   THE ASSETS.  AND FROM THERE, WE WERE ONLY LOOKING AT WHAT WE

1    COULD SEE, WHAT WAS BROKEN.

2        AT THAT POINT WE DIDN'T KNOW WHO OWNED IT BECAUSE WE HAD

3    NOT BEEN PROVIDED THAT BY TECHSHOP.

4    **Q.**  SORRY TO INTERRUPT.

5        WHEN YOU SAY YOU DON'T KNOW WHO OWNED IT, ARE YOU

6    REFERRING TO THE EQUIPMENT?

7    **A.**  THAT IS CORRECT.

8    **Q.**  SORRY.

9    **A.**  FROM THERE I FLEW TO DETROIT TO MEET WITH THE PRESIDENT OF

10   FORD INNOVATION.  DIRECTLY PRIOR TO THE CLOSURE OF TECHSHOP,

11   THEY HAD SENT A $250,000 CHECK FOR SERVICES.  FORD

12   INNOVATION --

13        **MR. PISTORINO:**  OBJECTION, ASSUMES FACTS NOT IN

14   EVIDENCE.

15        **THE COURT:**  SUSTAINED.  IT IS HEARSAY.

16   **BY MS. ROBERTS:**

17   **Q.**  WHY DID YOU MEET WITH THE PRESIDENT OF FORD INNOVATION?

18   **A.**  THEY HAD REQUESTED THE MEETING RELATED TO THE PAYMENTS

19   THAT THEY HAD MADE TO TECHSHOP AND WHAT WAS GOING TO HAPPEN IF

20   THEY AGREED TO MOVE FORWARD WITH TECHSHOP 2.0.

21   **Q.**  THEN YOU WERE IN THE MIDDLE OF TALKING ABOUT THE WORK THAT

22   YOU WERE DOING BETWEEN DECEMBER 1ST AND DECEMBER 12TH TO MAKE

23   THE DEAL HAPPEN.

24        IS THERE ANYTHING ELSE YOU DID THAT YOU HAVEN'T DESCRIBED

25   YET?

1    **A.**  FROM THE FIRST MEETING WITH FORD, I DID HAVE ONE MEETING I

2    NEEDED TO TAKE AS PART OF MY PIRANHA RESPONSIBILITIES.  SO I

3    FLEW TO NASHVILLE AND DROVE TO JACKSON, TENNESSEE.  AND THEN

4    HAD TO FLY DIRECTLY BACK IN THE SAME DAY TO DETROIT TO MEET

5    WITH THE CEO OF FORD INNOVATION TO FURTHER THE CONVERSATION

6    ABOUT... ABOUT THE MONEY THAT THEY WERE OWED AND HOW WE WOULD

7    PROCEED MOVING FORWARD, AS WELL AS COMPLETE AN INVENTORY OF

8    THAT FACILITY, MEETING WITH THE GENERAL MANAGER OF THE

9    FACILITY.

10        FROM THERE I FLEW TO BROOKLYN.  THAT FACILITY I WAS ONLY

11   ABLE TO SEE FROM THE OUTSIDE OF THE FACILITY THROUGH THE

12   WINDOWS.  AND ALSO THE STORAGE FACILITY THAT HAD PREVIOUSLY

13   BEEN USED FOR MEMBER STORAGE.  AND DURING THAT TIME MET WITH

14   THE GENERAL MANAGER OF THAT FACILITY.  IT HAD ONLY BEEN OPENED

15   TWO WEEKS BEFORE THEY CLOSED.  SO LOOKING AT WHAT COULD BE

16   DONE RELATED TO THAT FACILITY.

17        WHILE THIS WAS GOING ON, I WAS ALSO DISCUSSING WITH LOWE'S

18   AND AUTODESK RELATED TO THEIR SECURED DEBTS.  THE AUTODESK

19   THAT WAS SITTING AT $18 MILLION.  AND ON THE DRIVE, JUST AFTER

20   LEAVING THE TECHSHOP BROOKLYN FACILITY, THEY HAD AGREED TO

21   WRITE IT DOWN TO A MILLION DOLLARS FOR THAT DEBT.

22        SOMETIME AROUND THE SAME TIME, LOWE'S DID AGREE TO WRITE

23   DOWN THEIR DEBT FROM 1.75 MILLION TO $75,000.

24        I WAS SCHEDULED EITHER LATER THAT NIGHT OR EARLY THE NEXT

25   MORNING TO MAKE MY SECOND VISIT TO THEIR ARLINGTON OR DC

RASURE - DIRECT / ROBERTS

```
1    LOCATION.  DUE TO THE SNOW STORM, I HAD TO CANCEL THAT PART

2    AND INSTEAD FIRST THING IN THE MORNING FLEW TO SAN JOSE WHERE

3    I SPENT THE WEEKEND BETWEEN SAN JOSE, REDWOOD CITY, AND SAN

4    FRANCISCO ALONG WITH -- AND THEN THAT MONDAY, DECEMBER 11TH,

5    STARTED THE PROCESS ON MEMORIALIZING THE AGREEMENT BETWEEN --

6    OR RELATING TO THE PURCHASE OF THE DEBT WITH AUTODESK.  THEY

7    EXPECTED IT WAS GOING TO TAKE AROUND A WEEK --

8               MR. PISTORINO:  OBJECTION, YOUR HONOR, HEARSAY.

9               THE COURT:  SUSTAINED.  WHY DON'T WE DO Q AND A.

10   BY MS. ROBERTS:

11   Q.  ALL RIGHT.

12       SO IS IT FAIR TO SAY THAT BETWEEN DECEMBER 1ST AND

13   DECEMBER 12TH YOU WERE DOING A LOT OF WORK TO TRY TO MAKE THE

14   DEAL GO FORWARD?

15   A.  ABSOLUTELY.

16   Q.  I WANT TO CIRCLE BACK ON ONE THING YOU SAID.  YOU SAID YOU

17   VISITED THE BROOKLYN FACILITY OF TECHSHOP?

18   A.  THAT'S CORRECT.

19   Q.  DID YOU SAY THAT IT HAD OPENED TWO WEEKS PRIOR?

20   A.  YES.

21   Q.  SO TECHSHOP OPENED --

22   A.  APPROXIMATELY TWO WEEKS.

23   Q.  OKAY.  SO THEY HAD JUST OPENED A NEW BUSINESS -- A NEW

24   LOCATION BEFORE THEY CLOSED THEIR DOORS?

25   A.  THEY DID.
```

1   **Q.**   NOW AFTER THE MEMORANDUM OF UNDERSTANDING WAS TERMINATED,

2   DID YOU HAVE FURTHER NEGOTIATIONS WITH TECHSHOP?

3   **A.**   YES.  I HAD ONE RESPONSE EMAIL IMMEDIATELY AS WELL AS A

4   PHONE CALL LATER THAT AFTERNOON REQUESTING MY MONEY BACK FROM

5   DOUG BUSCH.  AT THAT POINT IT WAS AGREED TO CONTINUE TALKING,

6   WHICH WE DID OVER THE NEXT COUPLE OF MONTHS.

7   **Q.**   CAN YOU TURN PLEASE TO TX634, WHICH IS ADMITTED.

8                       (DISPLAYED ON SCREEN.)

9       IS THIS AN EMAIL YOU SENT TO DOUG BUSCH AND DANIEL WOODS

10   ON JANUARY 7TH, 2018?

11   **A.**   YES, IT IS.

12   **Q.**   WAS WHAT THE PURPOSE OF YOUR EMAIL?

13   **A.**   IT WAS TO DISCUSS THE FRAMEWORK AND THE STEPS THAT WOULD

14   NEED TO BE TAKEN FOR A TRANSACTION.

15   **Q.**   AND IN THIS DOCUMENT THAT YOU SENT TO MR. BUSCH AND

16   MR. WOODS ON JANUARY 7TH, WHAT DID YOU CALL YOUR COMPANY?

17   **A.**   TECHSHOP 2.0.

18   **Q.**   TURN TO TX635, WHICH IS ADMITTED.

19                       (DISPLAYED ON SCREEN.)

20       IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

21   JANUARY 8TH, 2018?

22   **A.**   YES, IT IS.

23   **Q.**   WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

24   **A.**   A RESPONSE TO THE PROPOSED FRAMEWORK.

25   **Q.**   IS THIS A RESPONSE TO THE DOCUMENT WE LOOKED AT JUST

1   PREVIOUSLY?

2   **A.**  YES, IT IS.

3   **Q.**  IF YOU LOOK AT PARAGRAPH 2 OF MR. WOODS' EMAIL, WHAT DOES

4   HE CALL YOUR COMPANY IN THIS EMAIL?

5   **A.**  TECHSHOP 2.0.

6   **Q.**  SO EVEN AFTER THE MEMORANDUM OF UNDERSTANDING WAS

7   TERMINATED, MR. WOODS WAS CALLING YOUR COMPANY TECHSHOP 2.0?

8   **A.**  THAT IS CORRECT.

9   **Q.**  TURN TO TX636.

10              **MS. ROBERTS:**  YOUR HONOR, WE MOVE TO ADMIT.

11              **THE CLERK:**  636 IS ALREADY ADMITTED.

12                        (DISPLAYED ON SCREEN.)

13  **BY MS. ROBERTS:**

14  **Q.**  IS THIS AN EMAIL FROM MR. WOODS TO YOU ON JANUARY 13TH,

15  2018?

16  **A.**  YES, IT IS.

17  **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

18  **A.**  A SECOND FOLLOW-UP EMAIL TO THE PROPOSED FRAMEWORK.

19  **Q.**  THIS IS THE SAME FRAMEWORK WE JUST LOOKED AT?

20  **A.**  THAT IS CORRECT.

21  **Q.**  IN THIS RESPONSE FROM MR. WOODS, WHAT DID HE CALL YOUR

22  COMPANY?

23  **A.**  TECHSHOP 2.0.

24  **Q.**  TURN TO TX639.

25              **MS. ROBERTS:**  MOVE TO ADMIT.

RASURE – DIRECT / ROBERTS

```
 1              THE CLERK:  IT IS ADMITTED.

 2                       (DISPLAYED ON SCREEN.)

 3    BY MS. ROBERTS:

 4    Q.  IS THIS AN EMAIL THAT YOU SENT TO MR. WOODS, MR. BUSCH,

 5    MR. DOHERTY, AND MR. NEWTON ON JANUARY 31ST, 2018?

 6    A.  YES, IT IS.

 7    Q.  WHAT WAS THE PURPOSE OF THIS EMAIL?

 8    A.  PROPOSED AGREEMENT BETWEEN TECHSHOP AND TECHSHOP 2.0

 9    RELATED TO THE TECHSHOP ROUND ROCK LOCATION.

10    Q.  AND IN YOUR PROPOSAL, WHAT DID YOU CALL YOUR COMPANY?

11    A.  TECHSHOP 2.0 LLC.

12    Q.  JUST TO REMIND THE JURY, THE TECHSHOP ROUND ROCK LOCATION,

13    THAT'S NEAR AUSTIN, TEXAS, RIGHT?

14    A.  YES, IT IS.

15    Q.  TURN TO TX642, WHICH IS ADMITTED.

16              THE CLERK:  IT IS.

17                       (DISPLAYED ON SCREEN.)

18    BY MS. ROBERTS:

19    Q.  IS THIS AN EMAIL THAT YOU RECEIVED FROM DANIEL WOODS ON

20    JANUARY 31ST, 2018?

21    A.  YES, IT IS.

22    Q.  WHO IS THIS EMAIL SENT TO?

23    A.  TO RYAN LLOYD WITH THE WILLIAMSON COUNTY SHERIFF'S

24    DEPARTMENT.

25    Q.  WHERE IS WILLIAMSON COUNTY?
```

1    **A.**   THE COUNTY THAT ROUND ROCK RESIDES IN.

2    **Q.**   IT'S IN TEXAS?

3    **A.**   YES, IT IS.  SORRY.

4    **Q.**   WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF MR. WOODS'

5    EMAIL?

6    **A.**   AUTHORIZING MR. LLOYD TO ACCEPT PAYMENT FOR PAST DUE

7    TAXES, TECHSHOP ROUND ROCK TAXES.

8    **Q.**   ACCEPT PAYMENT FROM WHO?

9    **A.**   FROM TECHSHOP 2.0.

10   **Q.**   JUST TO BE CLEAR, MR. LLOYD, THIS IS SOMEBODY OUTSIDE OF

11   TECHSHOP?

12   **A.**   YES, IT IS.

13   **Q.**   AND HE'S NOT SOMEBODY WHO IS AFFILIATED WITH YOU?

14   **A.**   THAT IS CORRECT.

15   **Q.**   IN THIS EMAIL TO MR. LLOYD, WHAT DOES MR. WOODS CALL YOUR

16   COMPANY?

17   **A.**   TECHSHOP 2.0 LLC.

18   **Q.**   DID YOU ULTIMATELY PAY THOSE TAXES?

19   **A.**   YES, I DID.  PLUS FEES.

20   **Q.**   THERE'S AN AMOUNT LISTED IN THIS DOCUMENT OF $11,423.19.

21       IS THAT THE AMOUNT?

22   **A.**   YES, IT IS.

23   **Q.**   TURN TO TX640.

24       **MS. ROBERTS:**  WE MOVE TO ADMIT THIS EXHIBIT.

25       **MR. PISTORINO:**  NO OBJECTION.

1          **THE COURT:**  ADMITTED.

2              (TRIAL EXHIBIT 640 RECEIVED IN EVIDENCE.)

3                  (DISPLAYED ON SCREEN.)

4    **BY MS. ROBERTS:**

5    **Q.**  IS THIS AN EMAIL FROM MR. WOODS TO YOU ON JANUARY 31ST,

6    2018?

7    **A.**  YES, IT IS.

8    **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

9    **A.**  AN EMAIL ASKING FOR ADDITION LEGAL FUNDING.

10   **Q.**  AND CAN YOU REMIND THE JURY AT THIS POINT IN TIME WHAT

11   PROPOSAL HAD YOU MADE RECENTLY TO TECHSHOP?

12   **A.**  I BELIEVE THIS WAS STILL FOR PURCHASE, BUT I'M NOT SURE AT

13   THIS POINT.

14   **Q.**  THE SUBJECT LINE IS TECHSHOP AUSTIN?

15   **A.**  IT WAS DIRECTLY RELATED TO THE TECHSHOP AUSTIN FACILITY.

16   DUE TO IT BEING ISOLATED, IT RELATED TO THE -- ONLY THE LOWE'S

17   BEING THE SECURED CREDITOR.

18   **Q.**  AND AT THIS POINT IN TIME HAD TECHSHOP OBJECTED TO YOU

19   CONTINUING TO USE THE NAME TECHSHOP 2.0?

20   **A.**  NO, THEY HAD NOT.

21   **Q.**  I THINK WE SAW IN ONE OF YOUR PROPOSALS THERE WAS A

22   TECHSHOP 2.0 LOGO IN THE UPPER LEFT-HAND CORNER.

23       DID TECHSHOP OBJECT TO THAT?

24   **A.**  NO, THEY DID NOT.

25   **Q.**  TECHSHOP DID CONTINUE TO RESPOND TO YOUR PROPOSALS?

RASURE – DIRECT / ROBERTS

1   **A.** YES, THEY DID.

2   **Q.** BUT THOSE RESPONSES SAID NOTHING ABOUT WHETHER YOU COULD

3   USE THE NAME?

4   **A.** THAT IS CORRECT.

5   **Q.** TURN TO TX644.

6          **MS. ROBERTS:** IS IT ADMITTED?

7          **THE CLERK:** IT IS.

8                    (DISPLAYED ON SCREEN.)

9   **BY MS. ROBERTS:**

10  **Q.** IS THIS AN EMAIL THAT YOU SENT TO MR. WOODS, MR. NEWTON,

11  MR. BUSCH, AND MR. DOHERTY ON FEBRUARY 1ST, 2018?

12  **A.** YES, IT IS.

13  **Q.** WHAT WAS THE PURPOSE OF THIS EMAIL?

14  **A.** I WAS DOING EVERYTHING POSSIBLE TO REACH AN AGREEMENT WITH

15  TECHSHOP.  FIRST, TO GET THE SHOPS OPEN; SECOND, TO GET THE

16  PAST DUE EMPLOYEES PAID.  SO THIS WAS A RENTAL AGREEMENT FOR

17  THE EQUIPMENT.

18  **Q.** FOR THE EQUIPMENT IN AUSTIN?

19  **A.** THAT IS CORRECT.

20  **Q.** AND DID YOU INCLUDE A PROPOSED AGREEMENT WITH YOUR

21  FEBRUARY 1ST EMAIL?

22  **A.** YES, I DID.

23  **Q.** IN THAT PROPOSED AGREEMENT, WHAT DID YOU CALL YOUR

24  COMPANY?

25  **A.** TECHSHOP 2.0 AUSTIN.

```
 1    Q.   TURN TO TX645.

 2              MS. ROBERTS:   WHICH IS ADMITTED?

 3              THE CLERK:   UH-HUH.

 4                        (DISPLAYED ON SCREEN.)

 5    BY MS. ROBERTS:

 6    Q.   IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

 7    FEBRUARY 1ST, 2018?

 8    A.   YES, IT IS.

 9    Q.   WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

10    A.   THIS WAS A RESPONSE FROM DAN WOODS TO MYSELF RELATED TO

11    THE ROUND ROCK EQUIPMENT RENTAL PROPOSAL.

12    Q.   THE PROPOSAL WE JUST LOOKED AT?

13    A.   YES, IT IS.

14    Q.   AND IN MR. WOODS' EMAIL RESPONDING TO THE PROPOSAL, HOW

15    DID HE REFER TO YOUR COMPANY ON FEBRUARY 1ST?

16    A.   TECHSHOP 2.0.

17    Q.   WHAT WAS MR. WOODS' RESPONSE TO THE PROPOSAL THAT YOU'D

18    MADE?

19    A.   THAT IT WAS FUNDAMENTALLY DIFFERENT THAN THE PRIOR

20    PROPOSAL.

21    Q.   DID HE INDICATE WHETHER HE WOULD GET BACK TO YOU?

22    A.   YES, THEY WOULD.

23    Q.   TURN TO TX646.

24              THE CLERK:   IT IS ADMITTED.

25                        (DISPLAYED ON SCREEN.)
```

1    **BY MS. ROBERTS:**

2    **Q.**  IS THIS AN EMAIL TO YOU FROM MR. WOODS, MR. BUSCH,

3    MR. DOHERTY, AND MR. NEWTON ON FEBRUARY 2ND, 2018?

4    **A.**  YES, IT IS.

5    **Q.**  WHAT WAS THE PURPOSE OF THIS EMAIL?

6    **A.**  THIS IS AN UPDATE INCLUDING FOUR ADDITIONAL FACILITIES OF

7    REDWOOD CITY, CHANDLER, AUSTIN, DETROIT FOR PREPAID RENT OF

8    $288,000 WHICH WOULD GIVE THEM ENOUGH MONEY TO PAY BACK THEIR

9    PAST DUE WAGES TO EMPLOYEES.

10   **Q.**  IN THIS PROPOSAL THAT YOU MADE ON FEBRUARY 2ND, WHAT DID

11   YOU CALL YOUR COMPANY?

12   **A.**  TECHSHOP 2.0.

13   **Q.**  TURN TO TX647, WHICH IS ADMITTED.

14                      (DISPLAYED ON SCREEN.)

15       IS THIS AN EMAIL YOU RECEIVED FROM MR. WOODS ON

16   FEBRUARY 7TH, 2018?

17   **A.**  YES, IT IS.

18   **Q.**  WHAT DID YOU UNDERSTAND TO BE THE PURPOSE OF THIS EMAIL?

19   **A.**  ADVISED ME THAT THEY WERE -- WERE NOT GOING TO PURSUE THE

20   RENTAL AGREEMENT DUE TO THE RISK OF TOO MANY PARTIES MAKING A

21   CLAIM ON THE FUNDS AND THAT THEY WERE GOING TO BE PROCEEDING

22   TO PREPARE FOR A CHAPTER 7 FILING.

23   **Q.**  AFTER RECEIVING THIS EMAIL ON FEBRUARY 7TH, WHAT WAS YOUR

24   UNDERSTANDING AS TO WHETHER THERE WAS A CHANCE FOR -- A

25   CONTINUED CHANCE TO MAKE A DEAL WITH TECHSHOP?

1    **A.**  THAT THERE WAS A CHANCE.  BASED ON THE LAST SENTENCE --

2    **Q.**  SORRY.  CAN YOU READ FOR THE JURY WHAT THAT UNDERSTANDING

3    IS BASED ON?

4    **A.**  (READING)

5            "I WOULD BE MORE THAN HAPPY TO DISCUSS, BUT WE JUST

6            COMPLETED OUR MEETING AND I WANTED TO GET OUR

7            DECISION TO YOU ASAP."

8    **Q.**  IN THE PARAGRAPH PRIOR TO THAT, WHAT DID MR. WOODS TELL

9    YOU?

10   **A.**  (READING)

11           THAT "THIS IS NOT TO SAY WE WOULD NOT BE SUPPORTIVE

12           OF A DEAL BETWEEN YOU AND THE SECURED CREDITORS OR

13           SOME OTHER ALTERNATIVE ARRANGEMENTS OTHER THAN AN

14           ASSET RENTAL."

15   **Q.**  CAN YOU SLOW DOWN?

16   **A.**  YES.

17   **Q.**  WHY DON'T YOU START THAT PARAGRAPH OVER.

18   **A.**  (READING)

19           "THAT IS NOT TO SAY THAT WE WOULD NOT BE SUPPORTIVE

20           OF A DEAL BETWEEN YOU AND THE SECURED CREDITORS OR

21           SOME OTHER ALTERNATIVE ARRANGEMENT OTHER THAN AN

22           ASSET RENTAL."

23   **Q.**  AND AS A REMINDER, THE SECURED CREDITORS, AUTODESK IS ONE

24   OF THE SECURED CREDITORS, RIGHT?

25   **A.**  AT THIS TIME, YES.

1    **Q.**  AND SO DID YOU UNDERSTAND MR. WOODS SAYING THAT THEY WOULD

2    BE SUPPORTIVE OF A DEAL IF YOU MADE IT DIRECTLY WITH THE

3    SECURED CREDITORS?

4    **A.**  THAT THEY MAY BE.

5    **Q.**  LET'S TURN TO TX273 --

6         **THE COURT:**  WE ARE A LITTLE PASSED 1:25, SO WHY DON'T

7    WE BREAK THERE FOR THE DAY.

8         ALL RIGHT, LADIES AND GENTLEMEN.  SO WE WILL BREAK FOR THE

9    DAY AND PLAN TO RESUME PROMPTLY AT 8:30 TOMORROW.

10        JUST PLEASE CONTINUE TO FOLLOW ALL OF MY ADMONITIONS AND

11   DIRECTIONS REGARDING YOUR CONDUCT AS JURORS IN TERMS OF

12   COMMUNICATIONS ABOUT THE CASE, RESEARCH ABOUT THE CASE, ANY

13   MEDIA REPORTS ABOUT THE CASE.

14        AND, AGAIN, WE'RE AT A DIFFERENT STAGE OF THE CASE NOW,

15   BUT I WANT TO REINFORCE THAT YOU SHOULD KEEP AN OPEN MIND

16   ABOUT ALL OF THE ISSUES UNTIL YOU HAVE HEARD ALL THE EVIDENCE,

17   YOU'VE HEARD THE ARGUMENTS OF COUNSEL, YOU'VE HEARD MY

18   INSTRUCTIONS, AND YOU HAD A CHANCE TO HEAR THE VIEWS OF YOUR

19   FELLOW JURORS.

20        THANKS.  ENJOY THE REST OF YOUR DAY.  WE WILL SEE YOU

21   TOMORROW MORNING.

22        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

23        **THE CLERK:**  YOU MAY BE SEATED.

24        **THE COURT:**  SO AS FAR AS THE RULE 50 MOTION, WHAT I

25   GENERALLY FIND MOST EFFICIENT IS FOR YOU TO PUT IT IN WRITING.

```
 1    IF YOU WANT TO JUST STATE THE BASES GENERALLY ON THE RECORD,

 2    YOU CAN DO THAT, BUT THEN WHY DON'T WE TALK ABOUT A SCHEDULE

 3    FOR BRIEFING IT.

 4        WHEN I SAY "BASES", YOU DON'T NEED DETAILED FACTUAL

 5    RECOUNTING, JUST THE GROUNDS.

 6            MS. ROBERTS:  ALL RIGHT.

 7        DEFENDANTS MOVE FOR JUDGMENT AS A MATTER OF LAW THAT

 8    PLAINTIFF DID NOT PROVE THEIR TRADEMARK INFRINGEMENT CASE

 9    AGAINST DEFENDANTS AS TO THE USE OF TECHSHOP 2.0.

10        PLAINTIFF FAILED TO PROVE IT OWNS THE TECHSHOP SERVICE

11    MARKS BECAUSE PLAINTIFF DISCONTINUED THE USE OF THE MARK IN

12    THE ORDINARY COURSE OF TRADE.

13        PLAINTIFF FAILED TO PROVE THAT DEFENDANTS USED TECHSHOP

14    2.0 WITHOUT THE CONSENT OF THE PLAINTIFF.

15        PLAINTIFF FAILED TO PROVE THAT TECHSHOP USED THE NAME

16    TECHSHOP 2.0 IN COMMERCE.

17        DEFENDANTS ADMITTED THAT -- SORRY.  PLAINTIFF ADMITTED

18    THAT TECHSHOP 2.0 COULD BE USED IN THE NEGOTIATIONS AND

19    THERE'S NO EVIDENCE THAT TECHSHOP 2.0 WAS USED THEREAFTER.

20        THERE'S NO EVIDENCE OF LIKELIHOOD OF CONFUSION BETWEEN

21    TECHSHOP AND TECHSHOP 2.0.

22        ANALYSIS OF THE SLEEKCRAFT FACTORS WOULD WEIGH IN FAVOR OF

23    A FINDING OF NO LIKELIHOOD OF CONFUSION.  IN PARTICULAR, THERE

24    IS NO EVIDENCE OF ACTUAL CONFUSION.  THERE IS NO EVIDENCE OF

25    DEFENDANTS' INTENT TO CAUSE CONFUSION.  THE EVIDENCE SHOWS
```

1   THAT BOTH PARTIES WERE USING THE NAME TECHSHOP 2.0.

2       AND THE EVIDENCE SHOWS THAT THE CONSUMERS HAD A HIGH

3   DEGREE OF CARE.  IT IS WELL-CONNECTED COMMUNITY WITH A LOT OF

4   PUBLICITY REGARDING WHAT'S GOING ON IN IT.

5           **THE COURT:**  SO NOW YOU ARE GOING FURTHER THAN I

6   WANTED.

7           **MS. ROBERTS:**  SORRY.

8           **THE COURT:**  THIS WILL BE IN YOUR BRIEF.

9           **MS. ROBERTS:**  OKAY.

10      AS TO THESHOP.BUILD, PLAINTIFF ALSO FAILED TO PROVE THEIR

11  INFRINGEMENT CASE BECAUSE PLAINTIFF DOES NOT OWN THE TECHSHOP

12  SERVICE MARKS.

13      PLAINTIFF DID NOT PROVE THE DEFENDANTS USED THESHOP.BUILD

14  WITHOUT THE CONSENT OF THE PLAINTIFF.  AND PLAINTIFF HAS NOT

15  SHOWN A LIKELIHOOD OF CONFUSION UNDER THE *SLEEKCRAFT* FACTORS

16  WITH RESPECT TO THESHOP.BUILD.

17      AND, FURTHER, PLAINTIFF, AS TO BOTH TECHSHOP 2.0 AND

18  THESHOP.BUILD, PLAINTIFF FAILED TO PROVE DAMAGES.

19      PLAINTIFF FAILED TO PROVE THE DEFENDANTS' PROFITS ARE A

20  PROXY FOR PLAINTIFF'S DAMAGES BECAUSE PLAINTIFF IS NOT

21  OFFERING ANY SERVICES, SO NO PROFITS HAVE BEEN DIVERTED FROM

22  PLAINTIFF.

23      AND PLAINTIFF ALSO FAILED TO PROVE IT LOST LICENSING

24  REVENUE HAVING RELIED ON FOREIGN LICENSES THAT PREDATE THE

25  RELEVANT TIME PERIOD.

1           THE COURT:  ALL RIGHT.

2       SO DO YOU WANT TO BRIEF THAT MOTION?  I WILL DECIDE IF I

3   DECIDE ANY PART OF IT OR WHETHER I SUBMIT IT TO THE JURY AND

4   THEN DEAL WITH IT AFTER THE VERDICT.

5       BUT WHAT IS YOUR PROPOSED TIMING FOR FILING THAT?

6           MS. ROBERTS:  DO YOU PREFER WE DO IT WITH THE BENEFIT

7   OF A TRANSCRIPT OR... I DON'T THINK EITHER PARTY ORDERED

8   DAILIES.

9           THE COURT:  WELL, I MEAN, LET'S PUT IT THIS WAY.  IF

10  IT'S A STATEMENT OF JUST BASES AND MY TRYING TO REMEMBER WHAT

11  THE EVIDENCE HAS SHOWN, THEN IT IS FAR LESS LIKELY THAT I

12  WOULD BE ABLE TO RULE ON IT IN ANY PART BEFORE THE VERDICT.

13  THAT'S GENERALLY MY TENDENCY.

14      SO IT'S UP TO YOU.  YOU'VE, I THINK YOU STATED THE GROUNDS

15  SUFFICIENTLY TO PRESERVE THE MOTION.

16          MS. ROBERTS:  SO WE COULD SUBMIT BRIEFING AFTER, IS

17  THAT WHAT --

18          THE COURT:  IT SEEMS LIKE THE LIKELY BEST APPROACH.

19          MR. NATHAN:  MAY I HAVE A MOMENT, YOUR HONOR?

20          THE COURT:  YES.

21          MR. PISTORINO:  I WILL GIVE THEM A MOMENT AND IF I

22  MAY BE HEARD.

23          MS. ROBERTS:  WE COULD FILE ON MONDAY MORNING.

24          THE COURT:  ALL RIGHT.  WHY DON'T YOU DO THAT.

25      MR. PISTORINO, YOU CAN SIMPLY SAY THAT YOU OPPOSE.  YOU

1    DON'T NEED TO ARGUE IT.

2         WHAT DO YOU HAVE TO SAY?

3         **MR. PISTORINO:**  I DO NOT INTEND TO ARGUE THE MOTION

4    AT THIS POINT.

5         WHAT I WAS FOCUSED ON FOR A MOMENT THOUGH IS ACTUALLY

6    PROCEDURE.  YOU REMEMBER THE ISSUE ABOUT -- IF -- AT LEAST AS

7    I UNDERSTAND THE RULE, I DID SUBMIT A BRIEF -- IF THE ISSUE

8    ARISES, AND IT DOES APPEAR THAT A RULE 50 MOTION COULD BE --

9    SHOULD BE GRANTED, AS I UNDERSTAND UNDER THE PROCEDURE, THE

10   OPPOSING PARTY HAS TO BE GIVEN A RIGHT TO CURE.

11        SO WHAT I'M FOCUSED ON ACTUALLY IS THE TIMING BECAUSE IF

12   I'M REALLY GOING TO LEARN ABOUT WHAT THOSE THINGS ARE AFTER

13   THE VERDICT, IT SEEMS KIND OF LATE FOR A CURE PROCESS.

14        **THE COURT:**  I'M ACTUALLY NOT -- WHERE IN THE RULE DO

15   YOU SEE AN OPPORTUNITY TO CURE?

16        **MR. PISTORINO:**  I SUBMITTED -- REMEMBER WE -- YOUR

17   HONOR MAY RECALL WE DID, AND I DID PROVIDE A BRIEF ON IT.

18        **THE COURT:**  I DO REMEMBER WE TALKED.  WHY DON'T YOU

19   GIVE ME THE DOCKET NUMBER OF THE FILING.

20        **MR. PISTORINO:**  I DON'T KNOW THE DOCKET NUMBER OFF

21   THE TOP OF MY HEAD.

22        **THE COURT:**  ALL I'M SAYING IS, WHAT WAS THE AUTHORITY

23   THAT YOU CITED ON THIS PRINCIPLE?  AND I WILL LOOK AT IT.

24   I'LL FIND YOUR BRIEF, BUT --

25        **MR. PISTORINO:**  I BELIEVE WE CITED MULTIPLE CASES

1   FROM THIS CIRCUIT.  THEY GO BACK TO RULE 50.  AGAIN, IT HAS

2   BEEN A WHILE.  I THINK IF YOU ACTUALLY LOOK IN THE COMMENTS OF

3   THE RULE ITSELF, IT TALKS ABOUT WHAT I'M SAYING, THAT THERE

4   HAS TO BE A RIGHT TO CURE FOR THE OTHER PARTY.

5       I AM PRETTY SURE I CITED NINTH CIRCUIT -- ACTUALLY, NOW

6   THAT I THINK ABOUT IT, FOR SURE A HUNDRED PERCENT I CITED

7   MULTIPLE NINTH CIRCUIT CASES SAYING IT'S JUST BLACK LETTER LAW

8   THAT YOU HAVE TO HAVE THE OPPORTUNITY TO CURE.

9       **THE COURT:**  ALL RIGHT.  I'LL LOOK AT THOSE CASES AND

10  SEE WHAT THEY HAVE TO SAY.  AND IN THE MEANTIME, WHY DON'T WE

11  PROCEED WITH YOU FILING BY MONDAY AND THEN WE'LL FIGURE OUT

12  WHERE WE GO FROM THERE.

13      **MR. PISTORINO:**  SURE.

14      **THE COURT:**  ANYTHING ELSE?

15      **MR. PISTORINO:**  I ACTUALLY HAVE TWO QUESTIONS.

16      FIRST, THE SLIDES THAT THE PLAINTIFFS SHOWED -- THE

17  DEMONSTRATIVES THAT PLAINTIFF SHOWED DURING OPENING, WHEN THEY

18  SHOWED THEM TO THE JURY, THAT WAS THE FIRST TIME I HAVE EVER

19  SEEN THE SLIDES.  SO ONE THING I HAVE BEEN REQUESTING IS A

20  COPY OF THEM SO I KNOW EXACTLY WHAT THEY WERE.  I HAVE BEEN

21  REQUESTING FOR A FEW DAYS AND I HAVEN'T RECEIVED THAT YET.  SO

22  I WOULD LIKE TO GET A COPY OF THE THING THAT WAS SHOWN TO THE

23  JURY.

24      **MS. ROBERTS:**  WE WILL PROVIDE THEM.  THERE IS NO

25  ISSUE THERE.  I APOLOGIZE IT DIDN'T HAPPEN YESTERDAY.

```
1              THE COURT:  SOUNDS FINE.

2              MR. PISTORINO:  I AM NOT SURE WHERE WE ARE IN TERMS

3    OF THE BRIEFING OR THE ISSUES WITH REGARD TO THESE RASURE

4    DOCUMENTS AND THESE OTHER ITEMS, WHETHER OR NOT THAT'S

5    SOMETHING I'LL BE BRIEFING THIS EVENING OR NOT.  I WOULD LIKE

6    TO KNOW WHAT THE PROCEDURES ARE.

7              THE COURT:  I THINK YOU SHOULD.  WHATEVER YOU ARE

8    PLANNING TO PUT IN, IF THERE IS NOT AN AGREEMENT AS TO IT

9    COMING IN.

10       AND I THINK THE OTHER THING YOU NEED TO MEET AND CONFER ON

11   IS THE SLIM DOWN SET OF....

12             MS. ROBERTS:  THE CUSTOMER EMAILS.

13             THE COURT:  EXACTLY, AND SEE WHAT IS REMAINING IN

14   DISPUTE.

15             MR. PISTORINO:  OKAY.

16             THE COURT:  ALL RIGHT.  AND LET'S TRY TO FILE

17   ANYTHING ON THAT BY 9:00 RATHER THAN 10:00 SO WE ACTUALLY HAVE

18   SOME TIME TO LOOK AT IT.

19             MR. PISTORINO:  I APOLOGIZE TO THE COURT.  LAST

20   EVENING, FOR WHATEVER REASON, I COULD NOT LOG ONTO THE ECF

21   SYSTEM.  SO I KNOW I WAS NOT ABLE TO FILE UNTIL 10:09.  SO I

22   APOLOGIZE.

23             THE COURT:  UNDERSTOOD.  NOT A PROBLEM.  WE'LL SEE

24   YOU TOMORROW.

25             MR. PISTORINO:  THANK YOU.
```

 1          **THE COURT:**  I GUESS THAT IS ANOTHER THING WE SHOULD

 2     NOTE.

 3        SO, AGAIN, EVERYONE SHOULD CHECK THE CURRENT TIME

 4     REMAINING.  AND I WOULD SUGGEST THAT EVERYBODY FIGURE OUT HOW

 5     MUCH TIME YOU ARE PLANNING TO RESERVE FOR YOUR CLOSING AND

 6     MAKE SURE YOU RESERVE IT, AND GUIDE YOUR EXAMINATIONS

 7     ACCORDINGLY.

 8          **MR. PISTORINO:**  I'M SORRY, NOW YOU'RE ASKING, MAY I

 9     ASK ONE FURTHER QUESTION THAT I HAD?

10        I NOTICED -- I WAS REVIEWING THE PRETRIAL FILINGS AND THE

11     PROPOSED VERDICT FORM THAT WAS TURNED IN BY ME, AND I NOTICED

12     IN ONE INSTANCE THERE IS AN ERROR REGARDING THE BURDEN OF

13     PROOF.  SO I WAS TRYING TO FIND OUT THE PROCEDURE AT WHAT

14     POINT WE THINK WE'LL BE ADDRESSING THAT.

15          **THE COURT:**  PROBABLY MONDAY.  THAT'S MY GUESS.

16          **MR. PISTORINO:**  THANK YOU, YOUR HONOR.

17

18          (PROCEEDINGS CONCLUDED AT 1:37 P.M.)

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

      I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

*Diane E. Skillman*

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

SUNDAY, JULY 21, 2019